**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT DELAWARE**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **NEW CENTURY TRS HOLDINGS, INC.,** | § | Case No. 07-10416 (KJC) |
| a Delaware corporation, et al., | § | |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | |
| | § | |

# FINAL REPORT OF
# MICHAEL J. MISSAL
# BANKRUPTCY COURT EXAMINER

KIRKPATRICK & LOCKHART
    PRESTON GATES ELLIS LLP
1601 K Street, N.W.
Washington, D.C. 20006
(202) 778-9000
(202) 778-9100 (fax)

February 29, 2008

*Counsel to Michael J. Missal,
Bankruptcy Court Examiner*

**TABLE OF CONTENTS**

I.   INTRODUCTION AND EXECUTIVE SUMMARY ....................................................1

II.  THE INVESTIGATION ...........................................................................................11

   A.  The Appointment of the Examiner .......................................................................11

   B.  Subsequent Orders ...............................................................................................11

   C.  Process of the Investigation .................................................................................12

      1.  Issues Covered ...............................................................................................12

      2.  Obtaining Information ....................................................................................14

         a.  Obtaining and Reviewing Documents .......................................................14

            i.   Documents Requested from New Century ........................15

            ii.  Documents Requested from KPMG ..................................16

         b.  Witness Interviews ....................................................................................16

      3.  Factors That Influenced the Investigation .....................................................18

         a.  Overview .....................................................................................................18

            i.   Failure by New Century to Provide Accurate Information ..........................................................................18

            ii.  Delays in Transferring E-mail Data Gathered for the SIC Investigation ............................................................19

            iii. Other Document Delays ...................................................21

         b.  Challenges with Respect to Documents Produced by KPMG and Interviews of Former and Current KPMG Personnel ............21

III. OVERVIEW OF THE SUBPRIME MORTGAGE MARKET ....................................23

   A.  Definition of Subprime Mortgages ......................................................................23

   B.  Legal and Regulatory Framework for the Development of the Subprime Mortgage Market ................................................................................................24

   C.  Mortgage-Backed Securities and the Growth of the Subprime Mortgage Market in the Early 1990s ....................................................................................26

   D.  The 1998 Financial Crisis and Its Impact on the Subprime Mortgage Market .....28

   E.  The Subprime Mortgage Market Grows Again in the Early 2000s........................29

   F.  Current Challenges Facing the Subprime Mortgage Industry ...............................32

      1.  Rising Interest Rates ......................................................................................32

      2.  New Regulatory Guidance..............................................................................33

|   |   | 3. | ARM Payment Delinquencies and Foreclosures | 33 |
|---|---|----|--------------------------------------------|-----|
|   |   | 4. | Repurchase Demands from Warehouse Lenders | 36 |
|   |   | 5. | The Sudden Decline in Market Conditions | 36 |

**IV.** **BACKGROUND OF NEW CENTURY** ........................................................ **40**

A.  Overview ........................................................................................ 40

B.  Brief History of New Century from Its Founding through 2004 ........... 41

    1.  Company Founding, Operations and Growth ............................. 41

    2.  New Century's 2004 Conversion to a REIT Structure ............... 43

C.  New Century's Financial Performance and Business Strategies and Operations After 2004 ..................................................................... 44

    1.  Overview of Financial Performance and Growth ....................... 44

    2.  New Century's Corporate Culture ............................................. 49

    3.  New Century's Business Strategies ............................................ 50

    4.  The Company's Information Systems and Automated Processes ........ 54

    5.  Mortgage Loan Originations and Purchases .............................. 55

        a.  Overview ....................................................................... 55

            i.  Wholesale Mortgage Loan Division ................... 55

            ii.  Retail Mortgage Loan Division ......................... 56

        b.  Mortgage Loan Product Mix and Changes in the Mix ........ 56

        c.  Mortgage Loan Origination Process ................................ 58

        d.  Underwriting Standards and Processes ............................ 60

        e.  Appraisal Reviews ......................................................... 60

    6.  Financing New Century's Operations: Warehouse Loans and Liquidity ................................................................................. 62

    7.  Secondary Mortgage Market Activities ..................................... 63

        a.  Overview ....................................................................... 63

        b.  Whole Loan Sale Process: "Kickouts" and "Scratch and Dents" .......................................................................... 66

        c.  Securitization Structures and Processes ........................... 68

    8.  Mortgage Loan Servicing .......................................................... 69

    9.  Mortgage Loan Repurchases ..................................................... 70

D.  Risks to New Century's Business ....................................................... 72

E.  Overview of New Century's Board, Management and Other Key Players .......... 74

|   | 1. | Board of Directors | 74 |
|   | 2. | Board Committees | 75 |
|   | 3. | Board of Directors Activity Level and Issues | 76 |
|   | 4. | Executive Management and Other Key Personnel | 77 |
|   | 5. | Management Committees | 79 |
|   | 6. | New Century's Bonus and Incentive Compensation Plans | 79 |
|   | 7. | New Century's Auditors - KPMG | 83 |
| F. | | Analysts Reports and Comparisons to Other Companies | 84 |
| G. | | Summary of Certain Significant Developments at New Century from 2005 through the Bankruptcy Filing in April 2007 | 88 |
|   | 1. | Internal Audit Review of New Century Loan Processing Centers | 88 |
|   | 2. | Departure of Patrick Flanagan | 89 |
|   | 3. | Resignation Letter Drafts by Richard Zona | 90 |
|   | 4. | Efforts to Sell the Company | 92 |
|   | 5. | Brad Morrice Becomes CEO | 92 |
|   | 6. | David Einhorn Goes on the Board of Directors | 93 |
|   | 7. | Management Concerns About Weaknesses in Accounting and Financial Forecasting | 95 |
|   | 8. | Concerns About Kevin Cloyd's "Dual Role" | 97 |
|   | 9. | Patti Dodge Replaced as CFO | 97 |
|   | 10. | Creation of Repurchase Desk | 98 |
|   | 11. | New Century's Liquidity Crisis | 99 |
|   | 12. | Project Kettlebell | 100 |
|   | 13. | Late January and Early February 2007 Board and Audit Committee Meetings | 101 |
|   | 14. | February 7, 2007 Announcement | 103 |
|   | 15. | March 2, 2007 Announcement | 104 |
|   | 16. | Critical Liquidity Pressures | 105 |
|   | 17. | Retention of AlixPartners | 107 |
|   | 18. | New Century's Bankruptcy Filing | 107 |
|   | 19. | The Internal Investigation by the Company's Audit Committee | 107 |
|   | 20. | The May 24, 2007 Announcement | 108 |
| V. | | **LOAN QUALITY** | **109** |

A.      Introduction and Summary .................................................................................109

B.      The Loan Quality Investigation ........................................................................116

C.      Loan Quality Should Have Been Extremely Important to New Century in
        2004 through 2007 ...........................................................................................118

        1.      New Century's Loans Were Key to New Century's Revenues ..............118

                a.      Loan Sales ..................................................................................119

                b.      Interest Income ...........................................................................122

        2.      Additional Factors Should Have Caused New Century to Focus on
                Loan Quality ........................................................................................123

                a.      Rising Interest Rates and Leveling Property Values ..................123

                b.      The Increasing Risk Profile of New Century Loan Products ......125

D.      Measuring Loan Quality at New Century ...........................................................132

        1.      Delinquency Rates, Including Early Payment Default Rates .................132

        2.      Secondary Marketing Performance ..........................................................134

        3.      Repurchases ...........................................................................................136

        4.      Internal Loan Quality Measurements .......................................................137

                a.      Quality Assurance Department Audits .........................................137

                b.      Internal Audit Reports .................................................................139

E.      Loan Quality in 2004 ........................................................................................140

        1.      Loan Quality Trends in 2004 ..................................................................141

                a.      Early Payment Defaults ..............................................................141

                b.      Kickouts .....................................................................................142

                c.      Quality Assurance Department Findings in 2003 and 2004 ........144

        2.      New Century's Efforts to Improve Loan Quality in 2004 .......................146

F.      Loan Quality in 2005 ........................................................................................148

        1.      2005 Trends Demonstrated Worsening Loan Quality .............................148

                a.      Early Payment Defaults and Other Delinquencies Continued at
                        High Levels .................................................................................148

                b.      Kickout Rates Continued at High Levels .....................................150

                c.      Internal Audit Reported Troubling 2005 Loan Quality Trends ....152

        2.      The Audit Committee and Management Devoted Little Attention to
                Improving Loan Quality in 2005 ............................................................153

G.      Loan Quality in 2006 and Early 2007 ................................................................157

        1.      Loan Quality Trends, January 2006 through March 2007 .......................159

|   |   | a. | Delinquency Data Were Alarming................................................159 |
|   |   | b. | Kickout Rates Continued to Rise in 2006....................................161 |
|   |   | c. | Internal Audit Continued to Identify Problems with the Loan Origination Processes.....................................................................165 |
|   |   | d. | The New Quality Assurance Department Identified Problems with the Loan Origination Processes ...........................................166 |
|   | 2. | | New Century's Response to the Increasingly Negative 2006 Loan Quality Trends ...........................................................................167 |
|   |   | a. | Summary of Loan Quality Improvement Efforts.........................167 |
|   |   | b. | Limitations to the Loan Quality Improvement Efforts ................170 |
| H. |   | | Concluding Loan Quality Observations...............................................175 |

**VI.   ACCOUNTING ISSUES ..........................................................................................177**

| A. |   | | Repurchase Reserves .........................................................................177 |
|   | 1. | | Executive Summary .................................................................177 |
|   | 2. | | The Applicable Accounting Standards ....................................181 |
|   |   | a. | Statements of Financial Accounting Standard ("FAS") 5 and 140....................................................................................181 |
|   |   | b. | The Components of New Century's Repurchase Reserve...........183 |
|   |   |   | i.     Premium Recapture.........................................183 |
|   |   |   | ii.    Interest Recapture ..........................................184 |
|   |   |   | iii.   Future Loss Severity .......................................185 |
|   |   |   | iv.    Inventory Severity...........................................185 |
|   | 3. | | The Calculation of the Repurchase Reserve at New Century.................186 |
|   |   | a. | Development of the Repurchase Reserve Calculation Methodology Prior to 2006........................................................186 |
|   |   |   | i.     Initial development of the repurchase reserve calculation methodology up to 2005.................186 |
|   |   |   | ii.    New Century and KPMG's attention to the repurchase reserve in 2005 ..............................................189 |
|   |   | b. | Repurchase Reserves in the First Quarter of 2006.......................195 |
|   |   | c. | The New Century Repurchase Reserve in the Second Quarter of 2006 ......................................................................................196 |
|   |   | d. | Repurchase Reserves in the Third Quarter of 2006 .....................201 |
|   |   |   | i.     New Century makes additional changes to the calculation of the repurchase reserve................................201 |

|  |  | ii. | KPMG's analysis of the adequacy of the repurchase reserve in the third quarter of 2006....................................204 |
|  |  | iii. | The growing backlog of repurchase claims should have caused New Century to increase the repurchase reserve .205 |
|  | e. |  | Fourth Quarter 2006: Questions About New Century's Repurchase Reserve ......................................................................208 |
|  | f. |  | Discovery of the Repurchase Reserve Accounting Errors...........210 |
| 4. |  |  | Measuring the Amount of Understatement of the Repurchase Reserve..212 |
|  | a. |  | New Century's Failure to Account for the Backlog ....................213 |
|  | b. |  | New Century's Failure to Account for Future Loss Severity ......216 |
|  | c. |  | New Century's Exclusion of Inventory Severity .........................216 |
|  | d. |  | New Century's Failure to Account for Interest Recapture ..........217 |
|  | e. |  | Recalculation of New Century's Repurchase Reserve ................217 |
|  |  | i. | Examiner's assumptions used for recalculation of the repurchase reserves ...........................................................218 |
|  |  |  | (a) Repurchase Percentage .........................................218 |
|  |  |  | (b) Percentage of repurchased loans sold at a loss ....219 |
|  |  |  | (c) Future loss severity ...............................................220 |
|  |  |  | (d) Backlog claims.....................................................221 |
|  |  | ii. | Total repurchase reserve amount ...................................221 |
| 5. |  |  | New Century Failed Properly to Apply LOCOM to Loans Held for Sale.............................................................................................222 |
|  | a. |  | Management's Failure to Apply LOCOM Properly ....................224 |
|  | b. |  | Recalculation of New Century's LOCOM Adjustment...............228 |
| B. |  |  | Residual Interests..................................................................................229 |
| 1. |  |  | Executive Summary...............................................................................229 |
| 2. |  |  | New Century's Residual Interests...........................................................231 |
|  | a. |  | Residual Interests – in General ...................................................231 |
|  | b. |  | Net Interest Margin Securities ("NIMS").....................................233 |
|  | c. |  | New Century's Off-Balance Sheet and On-Balance Sheet Securitizations..............................................................................234 |
|  | d. |  | The Reported Values of New Century's Residual Interests in Off-Balance Sheet Securitizations ...............................................235 |

e.    Accounting Principles That Governed New Century's
      Valuation of Its Residual Interests in Off-Balance Sheet
      Securitizations ................................................................................236

f.    The Use of Models to Value New Century's Residual Interests .238

3.  Development and Operation of New Century's Residual Interest
    Valuation Models ....................................................................................241

a.    In New Century's Early Years ....................................................241

b.    Major Problem with New Century's Residual Interest
      Valuations in 2000 ......................................................................241

c.    Development and Operation of New Century's Residual
      Interest Valuation Models Between 2000 and Early 2006. .........242

d.    The Valuation Models Built and Operated by John Hatch .........247

e.    Supervision of the Residual Interest Valuation Process Within
      Secondary Marketing ..................................................................249

f.    Communication of Information About Residual Interest
      Valuations from Secondary Marketing to the Accounting
      Department and Others ................................................................249

      i.    Secondary Marketing's residual asset valuation binders
            and other reports .............................................................249

      ii.   Accounting's use of information received from
            Secondary Marketing .......................................................251

g.    Review of Residual Interest Valuations by Senior
      Management Outside of Secondary Marketing ...........................252

h.    The Securitization Committee's Review of the Company's
      Residual Interest Valuation Process ............................................253

i.    The Role of the REIT Investment and ALCO Committees, as
      Successors to the Securitization Committee ................................254

j.    Review of Residual Interest Information in Connection with
      Preparation of SEC Filings and SOX Certifications ....................255

k.    Review of Residual Interest Valuations by New Century's
      Board of Directors and the Audit Committee ..............................256

      i.    The Board of Directors ....................................................256

      ii.   The Audit Committee .......................................................257

4.  KPMG's Role with Regard to New Century's Residual Interests ...........258

a.    From the Perspective of New Century's Board and
      Management ..................................................................................258

b.    KPMG's Audit Teams and Their Work on Residual Interest
      Issues ...........................................................................................260

|  |  | i. | John Donovan ................................................................260 |
|  |  | ii. | Mark Kim..........................................................................260 |
|  |  | iii. | Ryan Beckstrom................................................................261 |
|  | c. | KPMG's Procedures for Reviewing New Century's Residual Interest Models..............................................................262 |
|  | d. | Audit Assistance from KPMG's Structured Finance Group........263 |
|  | e. | KPMG's Residual Interest Valuation Conclusion Memos..........265 |
|  | f. | Marc Macaulay's Review of Residual Interest Valuation Issues as the KPMG Concurring Partner ......................................268 |
| 5. |  | New Century's Changes to Its Residual Interest Valuation Models in Late 2006 and Early 2007 ........................................................268 |
|  | a. | The Increased Emphasis on Collateral Values Rather Than Cash Flows................................................................................269 |
|  | b. | KPMG's Increased Concerns About Inadequate Documentation and Inadequate Controls.....................................269 |
|  | c. | The Company's Major Adjustment in Residual Interest Values in Early 2007 ...............................................................................270 |
| 6. |  | The Special Investigation Committee's Investigation of Residual Interest Valuations .....................................................................271 |
| 7. |  | The Examiner's Investigation of Residual Interest Valuation Issues ......272 |
|  | a. | Deficiencies in New Century's Residual Interest Valuation Models and the Company's Decision Not to Use Third-Party Models Instead ..............................................................................273 |
|  |  | i. | General perceptions of New Century's residual interest models by Senior Management personnel and New Century's Finance and Accounting Department..............274 |
|  |  | ii. | Concerns that Mullins and Hatch had about the Company's models...........................................................274 |
|  |  | iii. | Problems with New Century's residual interest models that came to light during the Examiner's investigation ...275 |
|  |  | iv. | KPMG's views regarding New Century's residual interest models ...............................................................277 |
|  |  | v. | The $9 million error produced by one 2005 residual interest model..................................................................278 |
|  |  | vi. | New Century's consideration and rejection of third-party models.....................................................................280 |
|  |  | vii. | The Examiner's conclusions regarding New Century's residual interest models......................................................282 |

b.     New Century's Prolonged Insistence on Using Low Discount
       Rates to Value Its Residual Interests ...........................................283

       i.     New Century's discount rates for residual interest
              valuations prior to the end of 2006 ...................................284

       ii.    The SFG's increasing concerns about New Century's
              discount rates during 2005 and early 2006 and the
              responses of New Century and the KPMG engagement
              team...............................................................................285

       iii.   KPMG's representations to the Audit Committee about
              New Century's residual interest discount rates................290

       iv.    Increasing attention to the discount rate issue in the
              second half of 2006 by New Century and KPMG ...........291

       v.     The Finance Committee's decision not to raise the
              residual discount rates and KPMG's response................296

       vi.    New Century ultimately agrees to raise its residual
              interest discount rates for the fourth quarter of 2006.......299

              (a)    Project Kettlebell .................................................300

              (b)    Taj Bindra ...........................................................300

              (c)    KPMG..................................................................300

              (d)    Movement toward increasing the discount rates
                     to 20% .................................................................301

       vii.   Overview of KPMG's analysis by KPMG's concurring
              partner and the DPP ........................................................302

       viii.  The Examiner's conclusions regarding the discount
              rates used in New Century's residual interest valuation
              models.............................................................................303

c.     The Company's Failure to Reconsider Its Par Value
       Assumption ...................................................................................304

       i.     New Century's "unquestioning" use of a par value
              assumption until late 2006 ...............................................305

       ii.    John Hatch's challenges to the "par value" assumption ..306

       iii.   Project Kettlebell changes the Company's attitude
              toward the par value assumption......................................308

       iv.    New Century's departure from the par value
              assumption in February 2007...........................................309

       v.     The Examiner's conclusions regarding New Century's
              failure to change par value assumption prior to the end
              of 2006 ...........................................................................311

d.     The Company's Repeated Decisions to Postpone the Clean-Up
       of Older Off-Balance Sheet Securitizations by Arbitrarily
       Changing Clean-Up Call Percentages...........................................313

       i.     The clean-up call percentage assumptions in each
              residual interest valuation model .....................................313

       ii.    KPMG's concerns about New Century's changes to the
              clean-up call percentages .................................................313

       iii.   New Century's decisions to exercise clean-up options
              and to postpone trust terminations ...................................316

       iv.    Failure to appreciate the accounting consequences of
              changes in the clean-up percentage assumptions in the
              models.............................................................................317

       v.     The Examiner's conclusions with regard to New
              Century's changes in the clean-up percentages in its
              residual interest valuation models....................................318

e.     New Century's Residual Interest Valuations Were Adversely
       Affected by Problems with the Prepayment and Loss
       Assumptions Upon Which the Company's Models Relied and
       the Failure to Update Those Assumptions in an Appropriate
       Manner. .........................................................................................319

       i.     The prepayment rate assumptions in New Century's
              residual interest valuation models....................................319

       ii.    KPMG's concerns about New Century's prepayment
              rates and the responses of the Secondary Marketing
              Department.......................................................................320

       iii.   New Century's change in its prepayment assumptions
              in early 2007 ...................................................................322

       iv.    The Examiner's conclusions with regard to New
              Century's use of improperly low prepayment rate
              assumptions in its residual interest valuation models......323

       v.     The loss assumptions in New Century's residual
              interest valuation models .................................................325

       vi.    KPMG's concerns about New Century's loss curves
              and the responses of the Secondary Marketing
              Department.......................................................................326

       vii.   New Century's change in its loss assumptions in early
              2007.................................................................................326

       viii.  The Examiner's conclusions with regard to New
              Century's use of improperly low loss assumptions in
              its residual interest valuation models................................327

|     |     |     | ix. | Concerns that New Century stopped updating key assumptions in its residual interest valuation models for pre-2003 securitizations .............................................329 |
|     |     |     | x. | The Examiner's conclusions with regard to New Century's failure to update the prepayment and loss assumptions in certain of its residual interest valuation models in 2006 .................................................................332 |
| C. | | Other Accounting Issues ..................................................................334 |
|     | 1. | | New Century's Allowance for Loan Losses ............................................336 |
|     |     | a. | Executive Summary ..................................................................336 |
|     |     | b. | Background Regarding New Century's ALL ...............................337 |
|     |     |     | i. | Relevant accounting principles and guidance.................337 |
|     |     |     | ii. | The Company's calculation of the ALL ..........................337 |
|     |     |     | iii. | Board oversight of the ALL ..............................................339 |
|     |     | c. | New Century's Methodology Was Not Properly or Sufficiently Documented ..........................................................339 |
|     |     | d. | KPMG Failed to Press New Century to Document Properly Its Methodology ................................................................................340 |
|     |     | e. | New Century's Modeling Varied Substantially from Actual Performance and Models Were Not Updated ..............................341 |
|     |     | f. | New Century Over-Reserved for Loan Losses ............................341 |
|     |     | g. | Examiner's Conclusion Regarding New Century's ALL .............342 |
|     | 2. | | New Century's Accounting for Mortgage Servicing Rights....................342 |
|     |     | a. | Executive Summary ..................................................................342 |
|     |     | b. | Mortgage Servicing Rights – In General ......................................343 |
|     |     | c. | Accounting Treatment for Mortgage Servicing Rights – in General..........................................................................................344 |
|     |     | d. | The Reported Values of New Century's Mortgage Servicing Rights ...........................................................................................344 |
|     |     | e. | Accounting Principles that Governed New Century's Mortgage Servicing Rights ..........................................................345 |
|     |     |     | i. | Determining fair value ......................................................345 |
|     |     |     | ii. | Allocating carrying amount ..............................................346 |
|     |     |     | iii. | Amortizing the amount recognized...................................347 |
|     |     |     | iv. | Assessing impairment .......................................................347 |
|     |     |     | v. | Disclosures .......................................................................348 |

|     | f. | New Century's Accounting for Its Mortgage Servicing Rights...348 |
|     |    | i. | In general ........................................................................348 |
|     | g. | Specific Issues..................................................................349 |
|     |    | i. | Fair value calculations ....................................................349 |
|     |    | ii. | Amortization ..................................................................349 |
|     |    | iii. | Impairment.......................................................................349 |
|     |    | iv. | Disclosures.......................................................................349 |
|     | h. | KPMG's Role with Regard to New Century's Mortgage Servicing Rights.............................................................350 |
|     |    | i. | Amortization ....................................................................351 |
|     | i. | Examiner's Conclusions Regarding New Century's Mortgage Servicing Rights.............................................................352 |
| 3.  |    | New Century's Deferral and Amortization of Loan Fees and Costs .......353 |
|     | a. | Executive Summary ............................................................353 |
|     | b. | New Century's Loan Origination Fees and Costs.........................353 |
|     | c. | Accounting Treatment for Loan Origination Fees and Costs ......354 |
|     | d. | The Reported Values of New Century's Deferred Loan Origination Costs ............................................................354 |
|     | e. | New Century's Amortization of Loan Origination Fees and Costs.............................................................................355 |
|     | f. | KPMG's Role with Regard to New Century's Amortization of Loan Origination Fees and Costs..................................356 |
|     | g. | Examiner's Conclusions Regarding New Century's Loan Origination Fees and Costs ............................................358 |
| 4.  |    | New Century's Hedge Accounting Practices............................................359 |
|     | a. | Summary of Conclusions..............................................................359 |
|     | b. | Hedge Accounting Generally......................................................360 |
|     |    | i. | Relevant types of hedge accounting .................................361 |
|     |    | ii. | Documentation requirements............................................362 |
|     | c. | Derivative Instruments Used by New Century ...........................362 |
|     | d. | Methodology for Assessing and Measuring Hedge Effectiveness.............................................................363 |
|     | e. | New Century's Hedge Accounting Procedures — Generally......364 |
|     | f. | Specific Issues Relating to New Century's Hedge Accounting Treatment.....................................................364 |

|   | i. | New Century had significant deficiencies in its hedge accounting policies and procedures ...................................365 |

|   | ii. | New Century's designation documentation was not prepared "contemporaneously" with inception of hedge relationship........................................................................367 |

|   | iii. | New Century's hedge accounting practices in 2005 resulted in dispute with KPMG and subsequent audit adjustment........................................................................368 |

|   | iv. | New Century's 2005 accounting for irlc was inaccurate .369 |

g. | KPMG's Audit Planning in Connection with Hedge Accounting.................................................................................369

h. | Examiner's Conclusions Regarding Hedge Accounting..............370

5. | New Century's Accounting for Goodwill.................................................370

a. | Executive Summary .........................................................................370

b. | New Century's Acquisition of RBC's Prime Mortgage Platform........................................................................................371

c. | The Prime Mortgage Platform Performed More Poorly than Expected........................................................................................372

d. | Accounting Principles that Governed New Century's Goodwill Valuation and the Impairment Testing of that Goodwill Valuation.......................................................................372

e. | New Century's Testing of Goodwill for Impairment in 2005 .....374

f. | KPMG's Audit of New Century's 2005 Goodwill Impairment Testing........................................................................................375

g. | Examiner's Conclusions Regarding New Century's Accounting for Goodwill .............................................................376

VII. | **MATERIALITY OF THE IDENTIFIED MISSTATEMENTS**....................................**378**

A. | Executive Summary ...................................................................................378

B. | Applicable Standards ................................................................................379

1. | FASCON 2 and GAAS .........................................................................379

2. | SEC Guidance .......................................................................................380

C. | Analysis of the Identified Misstatements: Evaluation of the Quantitative and Qualitative Factors ...............................................................................381

1. | Misstatements Identified by the Examiner ...............................................381

2. | Income Statement Impact ......................................................................382

3. | Balance Sheet Impact............................................................................384

|  | 4. | Impact to Reported Net Earnings and EPS | 385 |
|  | 5. | Discussion of Other Factors | 387 |

**VIII. INTERNAL CONTROLS OVER FINANCIAL REPORTING..................389**

A. Introduction ...................................................................389

B. Summary of Findings ......................................................390

C. Analysis of Management's Annual SOX 404 Assessment of the Effectiveness of Internal Control Over Financial Reporting......391

   1. New Century's Assessment Process in 2004 ...........392

   2. Management's Assessment Process in 2005............395

   3. Management's Assessment Process in 2006............397

D. Management's Commitment to the Assessment Process.....399

E. Analysis of Internal Controls Over Key Financial Reporting Processes.............401

   1. Repurchase Reserve: Change in Methodology.........401

   2. Whole Loan Sales: Backlog in Repurchase Claims Processing .............403

      a. New Century Failed to Establish Effective Controls to Facilitate the Flow of Information Between Departments Critical to Its Process for Handling, Forecasting and Reserving for Repurchase Claims..........403

      b. New Century Failed to Follow Its Repurchase Procedures, Resulting in an Inability to Efficiently Process, Forecast, and Reserve for Repurchase Claims..........405

   3. Valuation of Residual Interests................................406

      a. Importance of Internal Controls in Connection with the Residual Interest Valuation Process..........406

      b. Lack of Written Policies and Procedures for Determining Valuation of Residual Interests..........407

      c. "Key Man" Risk Exposure Resulting From Use of In-House Residual Interest Valuation Models..........408

      d. Ineffective Security Controls for Residual Interest Valuation Models..........408

      e. Lack of Effective Controls for Reviewing and Approving Modifications to Assumptions Used in Valuation Models..........409

      f. Lack of Effective Controls Relating to Clean-Up Calls .............410

   4. Allowance for Loan Losses ....................................411

   5. Mortgage Servicing Rights ....................................412

|   |   |   |   |   |
|---|---|---|---|---|
| | | 6. | Hedging | 413 |
| | | 7. | Information Technology Controls | 414 |
| | | 8. | Company-Level Controls | 414 |

**IX. DISCLOSURE CONTROLS ..... 416**

A. Executive Summary ..... 416

B. New Century's Disclosure Controls and Procedures ..... 417

    1. Background: The Requirement to Maintain Disclosure Controls and Procedures ..... 417

    2. Deficiencies in New Century's Disclosure Controls and Procedures ..... 418

C. The Drafting Process ..... 420

    1. New Century Management ..... 420

    2. Roles of KPMG and Outside Legal Counsel ..... 421

D. Particular Disclosure Issues ..... 421

    1. New Century's Backlog of Repurchase Claims ..... 421

    2. September 8, 2006 Press Release Regarding Loan Production ..... 423

    3. Combination of Allowance for Loan Losses and Valuation Allowance on Real Estate Owned in the 2006 Third Quarter Earnings Release ..... 425

    4. Mortgage Servicing Rights ..... 426

**X. AUDIT COMMITTEE AND THE INTERNAL AUDIT DEPARTMENT ..... 428**

A. Introduction ..... 428

B. The Role of the Audit Committee and Internal Audit ..... 430

    1. The Role of the Audit Committee ..... 430

        a. The Audit Committee and Risk Management ..... 431

        b. The Audit Committee and the Financial Reporting Process ..... 431

        c. The Audit Committee and Control Assessment ..... 432

        d. The Audit Committee and SOX ..... 432

    2. The Role of Internal Audit ..... 433

        a. Internal Audit and Risk Assessment ..... 434

        b. Internal Audit Role in Financial Auditing ..... 436

    3. Audit Committee Oversight of Internal Audit ..... 436

C. The Charters of the New Century Audit Committee and Internal Audit ..... 437

    1. The Audit Committee Charter ..... 437

|  | 2. | The Internal Audit Charter | 438 |
| D. | | Audit Committee Actions | 439 |
|  | 1. | Audit Committee Awareness of New Century Risks | 439 |
|  | 2. | Audit Committee Oversight of the External Auditor | 440 |
|  | 3. | Audit Committee Review of Accounting Results in Areas Calling for Management Judgment | 442 |
|  |  | a. Repurchase Reserves | 442 |
|  |  | b. Residual Interests | 443 |
|  |  | c. Other Accounting Issues | 445 |
|  | 4. | Audit Committee Review of Financial Reports | 445 |
| E. | | Internal Audit Functions | 446 |
|  | 1. | The Audit Process and Risk Assessment | 446 |
|  | 2. | Audit Committee Supervision | 449 |
|  | 3. | SOX | 449 |
| F. | | Deficiencies in Audit Committee/Internal Audit | 450 |
|  | 1. | Failure to Engage in Entity-Wide Risk Assessment | 450 |
|  | 2. | Failure to Address Key Operational Risks | 451 |
|  | 3. | Failure to Assess Financial Risk | 452 |
|  | 4. | The Failure of the Audit Committee to Supervise or Make Effective Use of Internal Audit | 453 |
|  | 5. | Failure to Address Loan Quality Issue | 454 |
| **XI.** | **KPMG** | | **456** |
| A. | | Introduction | 456 |
| B. | | Background | 458 |
|  | 1. | Scope of Work Performed for New Century | 458 |
|  | 2. | Staffing of the New Century Audit Engagements | 458 |
|  | 3. | KPMG's Audit Reports for 2004 and 2005 | 461 |
| C. | | Overview of the Relevant Professional Standards | 461 |
|  | 1. | GAAS and GAAP | 462 |
|  | 2. | Audits of Financial Statements | 464 |
|  |  | a. Due Professional Care and Skepticism | 464 |
|  |  | b. Proper Planning | 465 |
|  |  | c. Obtaining Sufficient Evidence | 465 |

i.      Estimates ........................................................................466

ii.     Fair value measurements.................................................467

3.    Reviews of Interim Financial Statements ..................................467

4.    Audits of Internal Controls Over Financial Reporting ............................468

5.    Audit Documentation..........................................................469

6.    Communications with the Audit Committee ...........................................470

D.   Findings............................................................................................470

1.    Circumstances Surrounding the Overall Management of the
      Engagement Team Created A Higher Risk That KPMG Would Not
      Detect A Material Error. .................................................................470

      a.      KPMG Staffing .....................................................471

      b.      New Century's Accounting Department Personnel....................473

      c.      KPMG's Probationary Status in 2006 Due to the 2005 Form
              10-K for 2005 Filing Issue..........................................474

2.    KPMG Provided Erroneous Advice to New Century Regarding the
      Calculation of its Repurchase Reserve and Failed to Detect A
      Material Misstatement. ....................................................................477

      a.      KPMG Should Have Considered Whether New Century
              Needed to Increase Its Reserve for the Growing Backlog of
              Repurchase Requests. ..............................................479

      b.      KPMG Erroneously Assumed That New Century Was
              Reserving for Lost Interest Recapture As Required by GAAP. ..483

      c.      KPMG's Suggestion That New Century Remove Inventory
              Severity From Its Repurchase Reserve Calculation Was
              Contrary to GAAP. ..................................................484

      d.      KPMG Erroneously Advised New Century To Remove Future
              Loss Severity from Its Repurchase Reserve Calculation
              Contrary to GAAP. ..................................................487

      e.      KPMG Concluded That New Century's Application of
              LOCOM Was Consistent with GAAP Although Repurchased
              Loans Were Improperly Priced and It Operated To Conceal
              Losses...............................................................489

      f.      KPMG Did Not Detect Material Weaknesses in New
              Century's Internal Controls Regarding Repurchase Reserves.....491

3.    KPMG's Reviews and Audits of New Century's Residual Interest
      Valuations Did Not Reflect Due Care. ....................................................493

a.     KPMG Failed to Plan Its Audits and Reviews of New Century's Residual Interest Valuations Effectively in Light of Noted Deficiencies in Internal Controls. .....................................494

b.     KPMG's Acceptance of Management's Assumptions Was Unreasonable..................................................................................495

i.      Discount Rates ...................................................495

ii.     Par Value Assumption ......................................497

iii.    Prepayment Rates...............................................498

iv.    Clean-up Call Percentages .................................498

c.     KPMG Did Not Question Reliability of the Company's Models.................................................................................499

4.     KPMG's Reviews and Audits of Other Financial Accounts Also Reflect a Lack of Due Care.......................................................502

a.     Allowance for Loan Losses ...........................................502

b.     Mortgage Servicing Rights ...........................................505

c.     Deferral and Amortization of Loan Origination Fees and Costs Under FAS 91 ...............................................................507

i.      Risk Assessment ...............................................507

ii.     Errors Detected .................................................508

d.     Hedging.........................................................................509

e.     Goodwill .......................................................................511

5.     KPMG's 2005 SOX 404 Audit Was Not Conducted with Due Care. .....513

a.     KPMG Failed to Identify Control Deficiencies that Existed at the Time of Its 2005 Audit.............................................513

b.     The 2005 SOX 404 Audit Team Did Not Consider Prior Deficiencies Noted When Planning the Review or Evaluating Their Findings..............................................................513

6.     Representations to Audit Committee ........................................515

XII.   POTENTIAL CAUSES OF ACTION.......................................................517

A.     Executive Summary..............................................................517

B.     Legal Considerations Related to Potential Causes Of Action ..............519

1.     Choice of Law.........................................................519

a.     Potential Claims Against KPMG.................................519

b.     Potential Claims Involving Corporate Internal Affairs................520

2.     Statutes of Limitations ..............................................521

a.    California ..................................................................................521

b.    Maryland ..................................................................................522

c.    The Effect of 11 U.S.C. § 108(a) ................................................522

C.    The Estates Have Potential Causes of Action Against KPMG for Professional
Negligence and Negligent Misrepresentation .......................................................522

1.    The Estates May State a Claim for Professional Negligence .................522

a.    KPMG Owed New Century a Duty of Professional Care............523

b.    KPMG Breached Its Duty of Professional Care .........................523

c.    The Breach by KPMG Proximately Caused Injury to the
Estates ......................................................................................525

d.    Damages...................................................................................526

2.    The Estates May State a Claim for Negligent Misrepresentation............528

3.    Possible Defenses That May Be Asserted by KPMG...............................530

a.    Comparative Negligence............................................................530

b.    Unclean Hands .........................................................................530

c.    In Pari Delicto ..........................................................................531

D.    The Estates May Assert Claims to Recover Executive Bonuses Or Other
Compensation Paid to Certain Officers Based On Material Misstatements
Regarding the Company's Financial Performance .............................................531

1.    Certain Officers Were Unjustly Enriched.................................................532

a.    Claims for Unjust Enrichment Under California and Maryland
Law .........................................................................................532

b.    Unjust Enrichment Has Been Used to Require Repayment of
Executive Bonuses .....................................................................532

c.    New Century Officers Received Bonuses They Did Not
Deserve .....................................................................................534

i.     New Century's 2004 Performance Incentive Plan...........534

ii.    Quarterly Performance-Based Bonus Plans.....................537

d.    New Century's Officers Should Return the Bonuses They Did
Not Deserve ..............................................................................538

2.    The Bonuses Improperly Paid to New Century Officers May Also Be
Recoverable Under Section 548 of the Bankruptcy Code .......................539

E.    Potential Causes of Action Against Former New Century Officers or
Directors for Breach of Duty ..............................................................................541

1.    Breach of Fiduciary Duty and Corporate Waste......................................541

a.    Principles Governing Fiduciary Duties of Directors ...................541

i.    Decision-making by Directors .........................................541

    (a)   A director's decisions must be made in "good faith" ...............................................................542

    (b)   A director must "reasonably believe" that his decisions are in the "best interests of the corporation" ........................................................542

    (c)   A director's decisions must be made with the care of an "ordinary prudent person" in similar circumstances....................................................543

ii.   Oversight Duties of Directors ........................................543

b.   Principles governing fiduciary duties of corporate officers..........544

c.   Corporate waste .......................................................................544

2.   Potential Fiduciary Lapses by New Century Officers and Directors.......545

3.   Potential Defenses to Breach of Duty Claims on Behalf of the Estates ..546

a.   The Business Judgment Rule .......................................................546

b.   Unclean Hands ..........................................................................547

c.   In Pari Delicto .........................................................................547

d.   Right to Rely on Information Provided by Others........................548

e.   Indemnification and Limitation of Liability Provisions ..............548

i.    Statutory Framework for Indemnification and Limitations on Liability ...............................................548

ii.   Indemnification or Liability Limitations in New Century's Corporate Documents......................................549

    (a)   Articles of Amendment and Restatement ...........549

    (b)   New Century's Bylaws .........................................550

    (c)   Employment Agreements......................................550

## I.    INTRODUCTION AND EXECUTIVE SUMMARY

On February 7, 2007, New Century Financial Corporation ("New Century," or the "Company") announced the need to restate its financial statements for the first three quarters of 2006. At the time, New Century was the second largest originator of subprime residential mortgage loans, which are loans made to borrowers who represent a high level of credit risk. The Company had grown at an incredible pace since inception, from originating $357 million in mortgage loans in its first year of operation in 1996 to approximately $60 billion in 2006. New Century's equity securities were traded on the New York Stock Exchange ("NYSE"), the Company had a market capitalization of over $1 billion in February 2007, and it had credit facilities of $17.4 billion to finance its activities. New Century reported net earnings of $411 million for 2005 and $276 million for the nine months ended September 30, 2006.

The February 7, 2007 news that New Century needed to restate its 2006 interim financial statements caused a dramatic and swift descent of the Company. Immediately following the announcement, New Century's stock price dropped precipitously, and the Company disclosed on March 2, 2007 that it would not file its 2006 Annual Report on time. This revelation and other developments prompted increased margin calls by the Company's lenders, accompanied by their refusal to provide further financing. As a result of these financial pressures, New Century stopped accepting loan applications on March 8, 2007, and the NYSE delisted the Company's securities on March 13, 2007. On April 2, 2007, New Century and many of its affiliates (collectively the "Debtors") filed for bankruptcy protection. KPMG LLP ("KPMG") resigned as the independent auditor for New Century on April 27, 2007, and the Company announced on May 24, 2007 that its financial statements for the year ended December 31, 2005 also should no longer be relied upon.

On June 1, 2007, this Court issued an order directing the United States Trustee for Region 3 ("U.S. Trustee") to appoint an Examiner to, among other things, "investigate any and all accounting and financial statement irregularities, errors or misstatements" and "to prepare a report within 90 days of the date of appointment, unless such time shall be extended by the Court." On June 5, 2007, the U.S. Trustee appointed Michael J. Missal as Examiner and that appointment was approved by this Court on June 7, 2007. On November 21, 2007, the Examiner filed his First Interim Report related to the possible post-petition unauthorized use of cash

collateral by New Century. The Court subsequently extended the date to file this Final Report until February 29, 2008.

The Examiner has completed his investigation and files this Final Report. The Examiner recognizes that the subprime mortgage market collapsed with great speed and unprecedented severity, resulting in all of the largest subprime lenders either ceasing operations or being absorbed by larger financial institutions. Taking these events into consideration and attempting to avoid inappropriate hindsight, the Examiner concludes that New Century engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes. KPMG contributed to certain of these accounting and financial reporting deficiencies by enabling them to persist and, in some instances, precipitating the Company's departures from applicable accounting standards.

The June 1 Order required the Examiner to identify any potential claims that the Debtors' estates may have arising out of any improper conduct. The Examiner believes that at least several causes of action may be available to the estates. First, the estates may be able to assert causes of action against KPMG for professional negligence and negligent misrepresentation based on KPMG's breach of its professional standard of care in carrying out its audit and reviews of the Company's financial statements and its related systems of internal controls. Second, the estates may be able to assert causes of action against some former Officers of New Century to recover certain of the bonuses paid to them in 2005 and 2006 that were tied, directly or indirectly, to New Century's incorrect financial statements. These causes of action could seek millions of dollars in recoveries.

New Century's Officers and Directors owed the Company fiduciary duties of loyalty, due care, good faith and candid disclosure. The Examiner has assessed the conduct of certain former Officers and current and former Directors to determine whether their actions or inactions may give rise to potential causes of action on behalf of the estates. Breach of fiduciary duty claims against officers and directors have strong defenses to overcome, particularly the business judgment rule and statutory or other limitations. Accordingly, the Examiner has not included a detailed discussion of such potential claims. Nonetheless, because questions may be raised about the conduct and level of care exhibited by the former Officers and current or former Directors, some potential areas of concern are outlined in this Final Report.

All of New Century's revenues, assets and operations were directly affected by the Company's subprime lending policies and practices. It is therefore pertinent to New Century's accounting and financial reporting processes to examine issues related to the Company's loan originations.

• New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named "CloseMore University." Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels.

• The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers. For example, more than 70% of the loans originated by the Company had low initial "teaser rates" that were highly likely to increase significantly over time. A senior New Century officer noted in 2004 that borrowers would experience "sticker shock" after the teaser rates expired. More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as "liars' loans" because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that "we are unable to actually determine the borrowers' ability to afford a loan." Another common loan product offered by New Century that had a high degree of risk was the "80/20" loan, which involved two separate loans for the same transaction: a first lien mortgage loan with an 80% loan to value ratio and a second lien loan with a 20% loan to value ratio, resulting in a combined financing of 100% of the value of the mortgaged property. One Senior Officer of New Century noted in early 2006 that the performance of these 80/20 loans in 2005 was "horrendous."

• New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New

- 3 -

Century warned in 2004 that the "number one issue is exceptions to guidelines." Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies. Of the New Century loans rejected by investors, issues with appraisals were the cause of more than 25% of these "kickouts."

- Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality." Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market. This attitude resulted in an increasing probability that New Century would have to repurchase billions of dollars of the riskier loans because of significant defaults or loan defects, particularly if market conditions changed. Some New Century employees recognized the increased perils of these mortgage products and lending practices starting no later than 2004, and recommended changes to manage and minimize risk. These recommendations, however, were either largely rejected or ignored by Senior Management, until market forces drove changes to the Company's practices in the second half of 2006. By that time, however, billions of dollars of dubious mortgages were either held by New Century on its balance sheet or injected into the markets.

- Senior Management was aware of an alarming and steady increase in early payment defaults ("EPD") on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investors suffered mammoth losses.

- Senior Management similarly gave inadequate attention to the increasing amounts of investor "kickouts." Many loans were rejected for reasons that should have been relatively easy to fix, such as missing documentation from newly funded loan files. Indeed, one former New Century manager recognized that "if we could just cure the no brainer type items I list

below we would serve ourselves well." The problem was not cured and kickout rates increased over time. Between 2004 and the end of 2006, investors rejected approximately $800 million in loans simply due to missing documentation, and billions of dollars of loans for other reasons. Investor kickouts resulted in millions of dollars in additional expenses for New Century to correct and maintain these loans, wasting New Century's assets and further impairing liquidity.

• New Century also did not invest in the necessary technologies, systems or personnel to meet its growing business and expanding challenges. Many of the Company's failures can be traced at least in part to these inadequacies.

• New Century's Senior Management did not set an appropriate "tone at the top." Many former New Century employees rationalized the Company's actions with the belief that the Company was conducting business in the same manner or even better than its competitors. The Examiner did not review the practices of other similarly situated companies, but even if New Century's practices were not outside the norm of its industry, this would not absolve anyone from failing to follow applicable accounting rules, legal standards or prudent business practices.

• New Century engaged in at least seven wide-ranging improper accounting practices in 2005 and 2006, most of which were not in conformance with generally accepted accounting principles ("GAAP"). As a whole, these practices resulted in material misstatements of the Company's consolidated financial statements for at least the fiscal year ended December 31, 2005 and the first three quarters of 2006. The Examiner did not find sufficient evidence to conclude that New Century engaged in earnings management or manipulation, although its accounting irregularities almost always resulted in increased earnings. Ironically, New Century branded itself as a "New Shade of Blue Chip," a marketing campaign which claimed that the Company would outperform its competitors by showing strong results achieved with "integrity." It is now clear that the New Century did not achieve its financial results with "integrity."

• New Century disclosed on February 7, 2007 that it had not been accounting properly for the reserve for losses associated with the repurchase of loans previously sold to investors. The Examiner's investigation determined that New Century calculated the repurchase reserve incorrectly by not accounting for the growing backlog of repurchase claims relating to older loan sales and by excluding interest that needed to be paid to investors ("Interest Recapture") at the time of loan repurchase. Specifically, New Century did not include the back-log of outstanding repurchase claims in any of its repurchase reserve calculations and excluded

Interest Recapture from the repurchase reserve calculation for 2005 and the first two quarters of 2006. The Examiner further determined that New Century reduced its repurchase reserve calculation in 2006, at a time when the Company was being flooded with repurchase claims from investors, by excluding two other critical components. In the second quarter of 2006, New Century removed a loss severity component on the existing inventory of loans already repurchased and included in the Loans Held for Sale ("LHFS") account. The Company then also removed loss severity on estimated future repurchases in the third quarter of 2006. These critical omissions and changes were a violation of GAAP and materially understated the repurchase reserve by at least $104.8 million by the third quarter of 2006. New Century also failed to apply appropriately lower of cost or market ("LOCOM") accounting in valuing LHFS. By the third quarter of 2006, the LHFS account was overstated on New Century's financial statements by at least $85.8 million.

• Several interviewees claimed that KPMG actually recommended the improper changes to the repurchase reserve calculation that were made in the second and third quarters of 2006. Although KPMG denied recommending any changes, it acknowledged discussing the issues with New Century at around the time they were made, and its workpapers document the changes. The workpapers further reflect that KPMG evaluated and approved the third quarter change. New Century is ultimately responsible for the accuracy of its financial statements, but KPMG bears responsibility, at a minimum, for suggesting accounting changes in the second and third quarters of 2006 that were inconsistent with GAAP and for failing to detect the material understatements of the repurchase reserve and the LOCOM valuation account. Further, members of the Accounting Department and KPMG should have advised the Audit Committee of these material changes to its repurchase reserve calculation, particularly since the Audit Committee specifically inquired about the adequacy of the repurchase reserve during these time periods.

• New Century failed to value properly residual interests that the Company held in off-balance sheet securitizations, which represented hundreds of millions of dollars on its balance sheet. Residual interests were New Century's rights to remaining cash flow or other assets from pools of mortgage loans the Company had securitized. New Century used flawed models to value those residual interests. The Board of Directors, Senior Management and KPMG paid close attention to the valuation of residual interests and knew that New Century was

using more aggressive assumptions, including low discount rates, in the valuation models than those of its competitors.

•  If New Century had used a more appropriate discount rate to compute the present value of future cash flows, the residual interest valuations would have been reduced by at least $14.8 million as of December 31, 2005. Other flawed assumptions resulted in the further overstatement of residual interest valuations by at least another $27.5 million as of December 31, 2005. The Examiner finds that KPMG improperly acquiesced in New Century's reliance upon aggressive or stale assumptions in its residual interest valuation models. The Examiner further finds that KPMG failed to insist that New Century cure significant internal control deficiencies with respect to the valuation of residual interests, such as the absence of documentation describing how the residual interest valuation models worked and how the assumptions used in the models were established, revised or approved.

•  The Examiner identified five other problematic accounting issues in 2005 and 2006 related to: (i) its allowance for loan losses ("ALL") with respect to loans it held for investment; (ii) its mortgage servicing rights ("MSR"); (iii) its deferral and amortization of loan origination fees and costs; (iv) its hedge accounting; and (v) the $77.7 million of goodwill that New Century recorded in connection with its acquisition of the loan origination platform of the prime mortgage retail division of RBC Mortgage Company. While problems associated with these accounting issues were not of the same financial magnitude as New Century's errors with regard to its repurchase reserve calculations and its valuation of residual interests, they shared some disturbing characteristics that revealed flaws in New Century's accounting and financial reporting processes.

•  The problematic themes these accounting issues shared included accounting practices and/or methodologies that were inconsistent with GAAP or otherwise subject to criticism by KPMG; not documenting key assumptions underlying New Century's accounting; using discount rates in key areas of accounting that were low when compared to discount rates used by peer firms or the rates used internally by the Company when developing New Century's business plans; and dismissing or minimizing the significance of New Century's accounting errors or departures from prescribed accounting practices on grounds that they were "immaterial," even in the absence of documented support for these conclusions.

• As a consequence of these accounting failures, New Century understated its repurchase reserve by as much as 1000% in the third quarter of 2006, reported a profit of $63.5 million in the third quarter of 2006 when it should have reported a loss, met analysts' earnings expectations for 2005 and the first quarter of 2006 when it should have announced earnings below expectations, and reported an increase in earnings per share ("EPS") of 8% for the second quarter of 2006 as compared to the same quarter of 2005, when it should have reported at least a 40% decline in EPS.  Senior Management benefited from these errors as the three founders (Robert Cole, Edward Gotschall and Brad Morrice) received financial performance bonuses in 2005 that were at least 300% more than they should have been.  Other Officers received financial performance bonuses that were approximately 130% to 270% higher than appropriate.

• KPMG contributed to these failings in critical ways.  Among other inadequacies, KPMG failed to question or test certain important assumptions in a rigorous manner.  The KPMG engagement team acquiesced in New Century's departures from prescribed accounting methodologies and often resisted or ignored valid recommendations from specialists within KPMG.  At times, the engagement team acted more as advocates for New Century, even when its practices were questioned by KPMG specialists who had greater knowledge of relevant accounting guidelines and industry practice.  When one KPMG specialist persisted in objecting to a particular accounting practice on the eve of the Company's 2005 Form 10-K filing -- an objection that was well-founded and later led to a change in the Company's practice -- the lead KPMG engagement partner told him in an e-mail: "I am very disappointed we are still discussing this.  As far as I am concerned we are done.  The client thinks we are done.  All we are going to do is piss everybody off."

• Other conduct by KPMG was equally troubling and puzzling.  KPMG signed off on a New Century repurchase reserve based on the estimate that the Company would need to repurchase approximately $70 million of the loans sold in the fourth quarter of 2005.  At the same time, KPMG's workpapers showed that the number of loans that New Century was going to need to purchase was approximately $140 million, not $70 million.  KPMG had no explanation for this large discrepancy.  Whether careless or intentional, KPMG's error contributed to a significant understatement of the repurchase reserve.

• New Century made a number of false and misleading statements in its public filings, press releases and other communications.  For example, New Century disclosed in its

- 8 -

Form 10-K for 2005 and Forms 10-Q for 2006 that the Company "occasionally" may repurchase loans beyond the 90-day period after the loans were initially sold. These statements were misleading at best, as New Century knew it had a large and growing backlog of repurchase claims more than 90 days old, an important metric for those analyzing the Company's financial statements. The Examiner did not review all of New Century's public statements, but identified certain problematic statements in connection with the analysis of other issues.

• There was an unhealthy friction between the Board of Directors and Senior Management at a time when the business challenges would have greatly benefited from a strong collaborative relationship. An effective working relationship between a company's Board and Senior Management requires mutual respect and a healthy tension. However, this was not the situation at New Century in at least 2005 and 2006. In fact, a number of Board members were openly disdainful of certain members of Senior Management and challenged their integrity and competence. One former Director questioned whether "Management has been providing the board with full disclosure and whether Management judgments have been appropriate." That same Director further "seriously questioned" in 2005 whether "Management has been manipulating earnings." Members of Senior Management believed that some Board members were misguided and involved in issues outside their authority. This tension inhibited an open flow of information between the Board and Senior Management and restricted the ability of New Century to react nimbly and effectively to the rapidly deteriorating subprime market.

• New Century failed to have an effective system of internal controls. An effective system of internal controls is critical for any public company as it is required by law and promotes accurate reporting, effective operations and compliance with applicable laws and regulations. Nonetheless, New Century had a number of deficiencies in its system of internal controls, including not tracking the growing backlog of repurchase requests related to older loans sold to investors, not remediating certain control deficiencies identified in earlier audits and not having proper documentation for key financial processes. These inadequacies contributed to many of the accounting and financial reporting deficiencies identified in this Final Report. KPMG was also to blame as it did not uncover significant internal control deficiencies.

• While New Century had an active Audit Committee, it failed to focus on certain issues of crucial importance to the Company, such as loan quality issues in 2004 and 2005, ensuring a sustained analysis by Management of entity-wide risk, key operational risks and

proper supervision of New Century's Internal Audit Department. Audit Committees are a vital corporate governance gatekeeper and play an important role in assuring the accuracy and integrity of a company's accounting and financial reporting processes. Had the Audit Committee addressed these issues more effectively and with more urgency, some of the accounting and operational failures may have been avoided.

•       New Century's Internal Audit Department was also deficient in a number of ways, including not giving adequate attention to kickouts and repurchase claims, and not thoroughly assessing corporate or operational risks. Because New Century was in an industry with extremely high risks, a strong Internal Audit Department was that much more crucial. Unfortunately, New Century's Internal Audit Department was not as strong a corporate governance mechanism as was needed.

The demise of New Century was an early contributor to the subprime market meltdown. The fallout from this market catastrophe has been massive and unprecedented. Global equity markets were rocked, credit markets tightened, recession fears spread and losses are in the hundreds of billions of dollars and growing. While these consequences are not the result of the activities of just one company, the lessons to be learned from New Century's failures will hopefully strengthen and improve future activities within the mortgage and financial services industries.

## II.   THE INVESTIGATION

### A.   The Appointment of the Examiner

The June 1 Order granted the motion of the U.S. Trustee for the appointment of an Examiner pursuant to 11 U.S.C. § 1104(c)(2). The June 1 Order instructed the Examiner to

(a) investigate any and all accounting and financial statement irregularities, errors or misstatements, including but not limited to such irregularities, errors or misstatements that (i) gave rise to the announced need to restate the Debtors' financial statements for the first three quarters of 2006 and/or (ii) led the Debtors' management and Audit Committee to conclude that it was more likely than not that pre-tax earnings in the 2005 financial statements were materially overstated, and identify and evaluate any claims or rights of action that the estates might have arising from or relating to such irregularities, errors or misstatements, (b) investigate any possible post-petition unauthorized use of cash collateral by the Debtors, and (c) otherwise perform the duties of an examiner set forth in section 1106(a)(3) (as limited by this Order) and 1106(a)(4) of the Bankruptcy Code.

The June 1 Order directed the Examiner to coordinate with governmental agencies investigating matters related to New Century and the Creditors' Committee to avoid duplication of effort. The Court ordered the Examiner to file a report of his examination with the Court within 90 days of his appointment.

The Court signed an Order approving the appointment of Michael J. Missal as Examiner in this matter on June 7, 2007. Mr. Missal, a partner with the Washington, D.C. office of Kirkpatrick & Lockhart Preston Gates Ellis LLP ("K&L Gates"), engaged his firm as counsel and BDO Seidman LLP as his forensic accountants and financial advisors to assist him with respect to the examination of the Company.

### B.   Subsequent Orders

Given the complexity of the issues in the investigation, as well as the limitations imposed upon the Examiner as a result of delays in the production of important documents and information, the Examiner filed a Motion for an Extension of Time to File His Report with the Court on September 5, 2007. This Court granted that motion on October 10, 2007 ("October 10 Order"), and extended the deadline for the Examiner to file his report to January 15, 2008. The October 10 Order provided that, when filed, the Examiner's Report will be kept under seal for 10 days, during which time any interested party may file a motion with the Court seeking to continue to maintain any portion of the Report under seal that may be protected by 11 U.S.C. §107(b), the attorney-client privilege, the work product doctrine or any other applicable privilege or protection. The October 10 Order also provided that the production of documents to the

- 11 -

Examiner by the Debtors would not waive the attorney-client privilege, work product or other privileges or protections.

The October 10 Order required the Examiner to file a report on the "possible post-petition unauthorized use of cash collateral by the Debtors" upon the completion of that portion of his investigation. The Examiner filed his First Interim Report related to the cash collateral issue under seal on November 21, 2007. The Debtors filed a Motion on December 3, 2007 to maintain the seal and subsequently filed a substantive response to the First Interim Report on December 19, 2007. The Examiner filed a Limited Response on January 9, 2007. The Debtors withdrew their motion to maintain the seal with respect to the First Interim Report on January 16, 2008, and all three filings were released publicly on January 17, 2008.

The Examiner filed a Second Motion for an Extension of Time to File His Report on January 8, 2008. That Second Motion described the continued delays with respect to the scheduling of interviews of significant witnesses and production of documents. Most of those details will not be repeated here. On January 23, 2008, the Court granted the Examiner's Motion and entered an Order extending the deadline to file his Final Report to February 29, 2008.

## C.    Process of the Investigation

### 1.    Issues Covered

While the mandate in the June 1 Order was broad, the Examiner did not investigate every potential issue that could have been covered by that Order. The Examiner focused his initial efforts on the two accounting issues (loan repurchase reserves and valuation of residual interests) disclosed by New Century in its Form 8-K filings on February 7 and May 24, 2007. In addition, the Examiner analyzed other significant accounting and financial statement issues that were of most significance, particularly accounting matters that relied upon critical issues, assumptions, estimates or judgments by Management and Senior Management.[1]    Because many of the

---

[1] The Examiner refers in this Final Report to "Senior Management," which means those persons who at various times held the main leadership positions in the Company.    When the Examiner refers in this Report to "Management," he is referring both to Senior Management and other persons who had significant roles in New Century's operations.

During the time that Brad Morrice was CEO (i.e., starting July 2006), the persons in Senior Management generally corresponded to the members of the Executive Management Committee ("EMC"). Prior to that time, the EMC consisted of a smaller group and Senior Management as referred to in this Report includes a group larger than the EMC.

The approximate membership of Senior Management as referred to in this Report during relevant time periods was as follows:

Company's most significant assets and liabilities were directly affected by the quality of the subprime mortgage loans it originated, the Examiner's investigation also included an overview of New Century's loan origination policies and practices and the extent to which information about loan quality problems was shared by and among the relevant areas of the Company. The investigation also included a review of matters directly related to these accounting and financial statement issues, such as the processes and practices by which New Century originated mortgage loans. Moreover, the investigation considered the roles played by various control mechanisms and gatekeepers that should have helped ensure the accuracy of the Company's financial statements, such as the Audit Committee, the Internal Audit Department, the Company's system of internal and disclosure controls and the performance of New Century's outside auditor, KPMG. The Examiner needed to review all of these matters in order to analyze whether the estates may have causes of action against any person or entity. Even though the investigation concentrated on issues related to New Century's 2005 and 2006 financial statements, some of the issues identified in this Final Report may have affected financial statements from earlier time periods.

The June 1 Order did not require a restatement of New Century's financial statements and the Examiner has not sought to undertake such a restatement. On the other hand, the Examiner has quantified the financial statement impacts of certain errors in the Company's accounting for the repurchase reserve, LOCOM valuation account, and residual interests to determine whether those accounting errors were material to the Company's 2005 and 2006 financial statements. That analysis and the underlying methodologies and assumptions are summarized in this Final Report. While the Examiner believes that these methodologies and assumptions are reasonable, he recognizes that other methodologies and assumptions could be appropriate.

The Examiner sought to assess each of the relevant issues in a thorough, objective, fair, efficient and responsible manner, without the use of hindsight. That process took a substantial amount of time and effort because the issues were complex, the process of obtaining information was slow and painstaking, and the analysis of those issues under relevant accounting and legal

----

2004:   Kevin Cloyd; Robert Cole; Patti Dodge; Patrick Flanagan; Edward Gotschall; Brad Morrice and Stergios Theologides.

2005:   Cloyd; Cole; Dodge; Flanagan; Gotschall; Morrice and Theologides.

2006:   Cloyd; Cole (until July 2006); Dodge; Joe Eckroth; Robert Lambert; Anthony Meola (May 2006); Morrice; Tajvinder Bindra (Nov. 2006) and Theologides.

- 13 -

standards was difficult. The Examiner has prepared a Final Report that attempts to present a fair and impartial analysis of the substantial body of information collected during the Examiner's investigation. Given the complexities of the issues this investigation has covered, and some of the obstacles the Examiner has faced, there is more that could be done to confirm relevant facts and analyze further issues that either did not arise or did not become clear until the later stages of his investigation.    Nevertheless, the Examiner believes that he has gathered sufficient information to support the findings and conclusions set forth in this Final Report.

## 2.    Obtaining Information

The examination began, as required by the June 1 Order, with the "meet and confer" held on June 14, 2007 with counsel for New Century, the Creditors' Committee and the U.S. Trustee. Consistent with the June 1 Order, the Examiner was provided information about the scope and results of the investigation that had been conducted previously by the Special Investigation Committee ("SIC") of the Audit Committee of New Century's Board of Directors.[2] At that time, O'Melveny & Myers LLP ("OMM"), counsel for the Company, led the Examiner to believe that the e-mail database created for the SIC investigation was going to be transferred promptly to the Examiner.

Subsequent to the meet and confer, the Examiner was briefed by Heller Ehrman LLP ("Heller"), counsel to the SIC, and its financial consultants, PricewaterhouseCoopers LLP ("PwC"). The Examiner sought not to duplicate the work of the SIC.

Throughout the investigation, the Examiner maintained an active and productive dialogue with counsel for the Creditors' Committee, Hahn & Hessen LLP and Blank Rome LLP. Meetings and conference calls were held regularly to ensure proper coordination and avoid duplication of efforts. The Examiner believes that these interactions were beneficial to the investigation.

### a.    Obtaining and Reviewing Documents

The Examiner received a large volume of documents from numerous sources throughout the course of the investigation, including: (1) New Century; (2) the SIC; (3) KPMG; and (4) several of the Company's independent Directors. As noted below, the Examiner encountered significant delays in receiving documents from both New Century and KPMG. These delays

---

[2] Appendix A lists many of the defined terms and acronyms used in this Final Report. Appendix B identifies many of the New Century and KPMG personnel mentioned in this Final Report.

made the review of the documents less efficient and more costly, as the Examiner's database had to be supplemented and reviewed on multiple occasions. Moreover, the Examiner received a significant number of additional documents in January 2008 from both New Century and KPMG, and the lateness of production greatly limited his review of these documents.

### i.    Documents Requested from New Century

The Examiner was informed initially by New Century that its employees conducted and coordinated most of their activities through the use of e-mail, much of which had already been collected for the SIC investigation. As a result, the Examiner's requests to the Company at the outset of his investigation sought primarily the mere transfer of the e-mail files of employees and officers of New Century that had been gathered for the SIC investigation. As the Examiner's investigation developed, however, the Examiner identified additional time periods and a few other custodians for which e-mail and other documents were needed. During the course of the investigation, the Examiner also learned that important electronic data were stored on several Company shared drives and requested those as well.

The Examiner made clear to New Century at the outset that, to further limit costs and burdens, the Company did not need to perform searches for specific e-mails or documents stored on the requested e-mail backup tapes or shared drives. Rather, the Examiner asked New Century simply to transfer the native electronic data files, much of which was collected prior to the Examiner's appointment. The Examiner then developed his own search terms specific to his investigation and reviewed a subset of the e-mail and documents produced by the Company.

Based on early discussions with counsel for the Debtors, the Examiner believed that there would be a relatively straightforward approach to document production. The process proved to be cumbersome and difficult, however, with inexplicable delays. The Examiner did not receive much of the electronic data he expected from New Century until the fall of 2007 and, in fact, received a substantial amount of important data in December 2007 and January 2008—long after many interviews had been conducted. Moreover, given the late dates of production, the Examiner was unable to conduct a complete review of potentially important data that likely were relevant to his investigation.

The Examiner also sought the production of certain hard copy files. Because the Company had not performed a thorough review of desk and paper files belonging to certain New Century employees, the Examiner and his counsel visited New Century's offices in early-July

- 15 -

2007 to review potential sources of information. After that review, the Examiner requested copies of a limited number of documents, most of which had already been organized in boxes by New Century and that could be easily duplicated. In addition, the Examiner made a small number of specific information and document requests to the Debtors as particular needs were identified. New Century substantially completed the production of the specific paper documents reviewed and requested by the Examiner and his counsel by October 2007.

The Examiner also requested easily accessible data from, or access to, several of the Company's automated accounting systems, including New Century's general ledger. Further, the Examiner asked for copies of documents from the individual computer hard drives for several key former employees.

### ii.   Documents Requested from KPMG

KPMG initially refused to produce voluntarily any documents or information to the Examiner. Consequently, the Examiner was compelled to seek, pursuant to Rule 2004, authority to serve one or more subpoenas on KPMG. On August 1, 2007, the Court granted the Rule 2004 Motion filed by the Examiner, and the Examiner promptly served a subpoena for workpapers and other documents upon KPMG that same day. KPMG objected to the subpoena, and the Court entered a protective order with respect to KPMG's concerns on August 21, 2007.

Counsel for the Examiner and KPMG reached resolution with respect to most of the issues relating to KPMG's production of documents to the Examiner. KPMG's production began on August 23, 2007, and, to date, the Examiner has received almost 150,000 documents (or over 1.9 million pages) from KPMG pursuant to the subpoena. More than 25% of these documents were produced after January 1, 2008, long after most of the KPMG interviews had been completed.

### b.   Witness Interviews

Interviews are typically an important source of information in an investigation. The Examiner and his counsel conducted approximately 110 interviews of 85 different fact witnesses. These interviews included a large number of present or former employees of New Century, as well as members of the Company's Board of Directors. Additionally, the Examiner interviewed several accountants from KPMG. The Examiner did not conduct interviews of every possible witness, but instead selected the persons believed to have the most relevant information.

There were a substantial number of delays in scheduling interviews due to both the failure to produce documents to the Examiner on a more timely basis and because a number of former senior Officers of New Century initially refused to speak with the Examiner despite being subpoenaed. Ultimately, the Examiner interviewed all persons he requested. The delays in producing documents and scheduling interviews did not allow for follow-up interviews with a number of witnesses. The investigation would have greatly benefited from such follow-up interviews.

The vast majority of witnesses appeared voluntarily for interviews by the Examiner. Most of the interviews were done in person, although some were conducted by telephone. Some potential witnesses, however, including a few former senior executives, refused to appear voluntarily, and it became necessary for the Examiner to seek subpoena authorization from the Court to conduct examinations of New Century's current and former Officers, Directors and employees pursuant to Rule 2004. The Court granted the Examiner's motion for subpoena authorization on October 16, 2007. Pursuant to that authorization, the Examiner issued Rule 2004 subpoenas to 17 individuals beginning on October 24, 2007. With one exception, these witnesses requested that the interviews not be transcribed. Notes were taken by the Examiner and his counsel at the interviews and privileged memoranda of the interviews were prepared containing mental impressions of counsel.

Many of the witnesses interviewed by the Examiner were represented by personal counsel at the interviews. To the extent a witness was still an employee of the Company, he or she was also represented by counsel to New Century. Additionally, counsel for New Century asked to attend some of the interviews of former employees of New Century whom they did not represent in order to protect the Company's privilege. The Examiner permitted counsel for the Company to attend each of those interviews.

Most of the witnesses appeared to be forthcoming in the interviews. However, several of them did not seem entirely credible, both in terms of the truthfulness of their answers and their recollections of important events. This Final Report identifies some situations where witnesses did not appear forthright.

### 3.   Factors That Influenced the Investigation

#### a.   Overview

The Examiner's investigation was made much more challenging, lengthy, inefficient and expensive due to some troubling failures of New Century and others to cooperate. Certain actions by New Century's counsel seemed adversarial and did not exemplify the type of cooperation that is contemplated in a bankruptcy examination. For example, the Company unreasonably withheld for many months the production to the Examiner of hundreds of thousands of important documents. Furthermore, requests for information sometimes went unfulfilled for extended periods of time.

In addition, at least one former senior New Century officer, and likely more, met with outside counsel for the Company to prepare him for his upcoming interview with the Examiner, even though New Century's outside counsel did not represent him. The Examiner informed counsel for the Company in October 2007 that he did not consider it appropriate for them to give witnesses they did not represent a preview of the Examiner's interviews as it could harm the integrity of his investigation. Counsel for the Company said that they would not do so in the future. The Examiner was also told that counsel for the Company suggested to a number of counsel for former New Century senior Officers that they could seek to challenge an upcoming production of documents by the Company to the Examiner, which could have further delayed the production of documents to the Examiner. None of the counsel for the former Officers raised any objection to the document productions. These and other actions by counsel were not within the letter or spirit of the June 1 Order directing New Century to cooperate with the Examiner.

Cooperation issues were not limited to the Debtors. KPMG did not voluntarily cooperate with the Examiner's investigation, and a number of KPMG witnesses, typically represented by five or six attorneys at their interviews, did not appear forthcoming. KPMG and its counsel further hindered the investigation by producing relevant documents related to witnesses in a manner that did not allow for the timely review before interviews were conducted.

#### i.   Failure by New Century to Provide Accurate Information

Not only did New Century and its counsel not produce documents in a timely and efficient manner, but outside counsel to the Company provided misinformation to the Examiner about the documents collected by New Century. The Examiner was initially informed by counsel to the Debtors that the electronic documents the Debtors had collected after the

- 18 -

restatement announcement and used by the SIC were from approximately 80 custodians that were restored from backup tapes dating from the first quarter of 2005 to March 2007. In late-July 2007, however, New Century's counsel told the Examiner that its collection was not as comprehensive as they had represented previously. Instead, the documents collected were only from backup tapes for 25 "priority" custodians dating from the first quarter of 2006 to March 2007. For the approximately 55 remaining custodians, e-mails had not been restored from backup tapes, and the documents collected included only e-mails that existed in the custodians' e-mail inboxes when a "snapshot" was taken in either February or March 2007. As a result, the Examiner requested on August 3, 2007 that New Century restore e-mails from backup tapes both for additional custodians and for periods prior to 2006. At the same time, the Examiner also asked for electronic documents for dates subsequent to February and March 2007.

### ii.    Delays in Transferring E-mail Data Gathered for the SIC Investigation

Contrary to their representation at the June 14 "meet and confer" that the e-mails already collected would be produced promptly, counsel to the Company informed the Examiner in late-June 2007 that New Century and the Creditors' Committee had concerns with respect to the production to the Examiner of potentially privileged documents in the existing database without prior review by the Company. The Examiner believed that New Century had agreed to produce privileged documents regarding all issues except for some employment litigation filed after February 7, 2007. Counsel to the Company told the Examiner that New Century would identify and withhold all "potentially privileged" communications by first applying an electronic privilege filter to the data already collected and then reviewing the withheld potentially privileged documents. Given that the proposed privilege filter consisted of a long list of attorneys' names designed to gather communications with attorneys about an extremely broad group of potentially privileged subjects, counsel to New Century agreed that, if the resulting number of withheld documents was great, it would reconsider its approach.

In mid-July 2007, New Century produced approximately 1.2 million documents to the Examiner from the existing database. New Century, however, simultaneously withheld from production to the Examiner as "potentially privileged" approximately 680,000 documents, or about 40% of the then-existing database of e-mails restored from backup tapes. It appeared that the privilege filter was far too expansive, as it was highly unlikely that 40% of the communications of New Century employees were with counsel. The Examiner told counsel to

- 19 -

the Company that he was disappointed with the results of their approach and suggested that New Century revise the list of attorney names used to identify potentially privileged communications. Counsel for New Century agreed and said they would narrow the filter that would be applied to identify the population of potentially privileged documents.

Counsel for New Century subsequently told the Examiner that, with respect to documents dated on or before February 6, 2007 (*i.e.*, prior to the date the Company announced its planned restatement), they would design a revised privilege filter. However, counsel for the Company said that they did not have a plan in place to review any of the documents covered by that filter and would continue to withhold them from the Examiner. For documents dated February 7, 2007 and later (*i.e.*, the date of the Company's restatement announcement and later), counsel for New Century would conduct a manual privilege review with respect to prioritized custodians and would produce any documents not covered by an expanded list of issues. Aside from the documents related to the employment litigation filed after February 7, 2007, New Century also withheld privileged documents related to three other issues: the potential unauthorized use of cash collateral, communications with government investigators and the decision to declare bankruptcy. The revised privilege filter was also applied to the additional e-mail requested by the Examiner from different time periods.

At the "meet and confer" in June 2007, New Century and the Creditors' Committee indicated that they would ask the Court for an order that any information provided to the Examiner by the Company would not be viewed as a waiver of privilege. However, the issue was not pursued at the time and was not raised again until September 2007. This Court ultimately entered an Order on October 10, 2007, which provided that documents produced by New Century to the Examiner would not be deemed to be a waiver of the Company's privilege. As a result, on October 18, 2007, almost four and a half months after the start of the Examiner's investigation, New Century ultimately agreed to provide the Examiner all documents dated prior to the February 7, 2007 restatement announcement that had been withheld previously, regardless of privilege. Approximately one week later, on October 25, 2007, the Debtors began to produce the withheld documents. However, on January 11, 2008, counsel for the Debtors informed the Examiner that New Century's document vendor had failed to produce approximately 750,000 of the previously withheld documents that the Company believed it had produced to the Examiner in October 2007. These e-mails were not produced until the end of January 2008. Consequently,

- 20 -

the Examiner was not able to use these documents in interviews and only was able to conduct a very limited review of them.

### iii.    Other Document Delays

At the beginning of his investigation, New Century informed the Examiner that it did not have a centralized document management system. Instead, New Century employees tended to use e-mail to circulate documents on which they were working. Employees also used certain departmental shared drives to save documents.

Given the Examiner's sensitivity to costs and the fact that the Examiner believed New Century had already gathered the e-mails that would be relevant to the issues under investigation, the Examiner initially determined to forgo an additional request for documents from New Century's shared drives. However, as the investigation progressed, it became apparent that the documents collected by the Company did not include information that would be important to his review, such as the models used by the Company to value its assets.

Accordingly, on September 12, 2007, the Examiner requested a copy of shared drives that contained computer models and data that had been used by the Financial Reporting, Accounting, Secondary Marketing and Internal Audit Departments. The Company first provided downloads from those drives on October 15, 2007. The Examiner determined, however, that almost no models or data from the Secondary Marketing Department were provided in the October production. The Debtors confirmed that the relevant shared drives from the Secondary Marketing Department had not been produced and did not complete production from the shared drives until December 18, 2007.

Additionally, on September 12, 2007, the Examiner requested a copy of or access to Epicor, New Century's general ledger. The Debtors provided the general ledger data on September 20, but it was quickly determined that the data received were in an unusable format. The issues that prevented full access to Epicor by the Examiner were not resolved until December 2007.

### b.    Challenges with Respect to Documents Produced by KPMG and Interviews of Former and Current KPMG Personnel

As described above, KPMG initially refused to produce voluntarily any documents or information to the Examiner, requiring the Examiner to seek Rule 2004 authority to interview former and present KPMG personnel and to compel the production of documents. The Examiner's Rule 2004 Motion was granted on August 1, 2007, and the Examiner served a

subpoena for workpapers and other documents upon KPMG that same day. KPMG objected to the subpoena, and the Court entered a Protective Order with respect to KPMG's concerns on August 21, 2007.

After the entry of the Protective Order, counsel for the Examiner and KPMG negotiated with respect to many of the requests contained in the subpoena. When appropriate, the Examiner limited or deferred some of the requests to KPMG and agreed to accept documents from KPMG on a rolling basis.

KPMG's delays in producing workpapers, e-mails and other documents negatively impacted the Examiner's review of the relevant facts and the scheduling of interviews of current and former KPMG employees. More specifically, despite the issuance of the subpoena to KPMG on August 1, 2007 and discussions among counsel regarding the prioritization of custodians, KPMG did not begin to produce e-mails for any KPMG personnel until mid-October 2007. For several priority employees, all of whom had been identified during early discussions between counsel for the Examiner and KPMG, a large amount of their e-mails and other documents were produced during the week preceding or even after the scheduled interviews. As a result, the Examiner was forced to conduct interviews before all documents relevant to particular custodians and issues were produced or fully analyzed. Additionally, the scheduling of some of the key KPMG witnesses was delayed until December 2007 and January 2008. Further, in January 2008, KPMG produced a large amount of documents, representing approximately 25% of KPMG's total production. Although these documents may contain information relevant to the Examiner's investigation, the Examiner was only able to perform a limited review of these documents. Thus, the Examiner believes that KPMG significantly failed to cooperate in this investigation.

The lack of cooperation that the Examiner received from New Century and KPMG made the Examiner's investigation more time-consuming, expensive and inefficient. This lack of cooperation may have also succeeded in obscuring information or issues that may have confirmed, changed or supplemented the findings and conclusions in this Final Report.

## III. OVERVIEW OF THE SUBPRIME MORTGAGE MARKET

In the past 30 years, the subprime mortgage industry has grown from being a relatively small portion of the overall home mortgage market to originating hundreds of billions of dollars of mortgage loans annually in recent years. The early part of this decade saw remarkable growth in the subprime mortgage industry, but in the past year or so the industry has experienced an historic collapse. A brief review of the conditions that led both to the growth of the subprime mortgage market and its recent difficulties provides context for the sections of this Final Report that follow. This section describes the origins and development of the subprime mortgage market, the factors that led to its rapid growth in the early part of this decade and the current state of the market.

### A. Definition of Subprime Mortgages

The subprime mortgage market generally refers to the market for mortgage loans made to borrowers who represent a higher level of risk to the lender than borrowers who qualify for the best available (or "prime") mortgage loan interest rates. No single, commonly accepted definition exists for the term "subprime mortgage loan." Some observers have identified three categories of home mortgage loans that may broadly be classified as subprime: 1) loans to borrowers with low credit rating scores and/or poor mortgage payment histories; 2) so-called "Alt-A" mortgage loans made to borrowers whose credit scores might qualify them for prime mortgage interest rates, but who cannot or choose not to fully document the necessary asset and/or income information to obtain such rates; and 3) high loan-to-value ("LTV")[3] ratio refinance mortgages, generally originated to borrowers with relatively good credit scores.[4] Others, including federal banking regulators, classify "subprime" solely by reference to the credit characteristics of the individual borrower, and therefore do not necessarily include Alt-A and high LTV mortgage loans in their definitions of "subprime."[5] Regardless how broad or narrow a

---

[3] Loan-to-value ratio refers to the ratio of the amount of the loan to the value of the mortgaged property.

[4] Kenneth Temkin, Jennifer E.H. Johnson, and Diane Levy, *Subprime Markets, The Role of GSEs, and Risk-Based Pricing*, prepared for the U.S. Dept. of Housing and Urban Development (2002), *available at* http://www.huduser.org/Publications/pdf/subprime.pdf.

[5] Interagency Statement on Subprime Mortgage Lending, 72 Fed. Reg. 131 at 37569-70 (July 10, 2007) ("Interagency Statement"); *Expanded Guidance for Subprime Lending Programs*, FIL-9-2001 (Jan. 31, 2001) ("Interagency Expanded Guidance"), *available at* http://www.federalreserve.gov/Boarddocs/SRletters/2001 /sr0104a1.pdf. The Interagency Statement was jointly issued by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift

definition, loans in the first category – to borrowers with lower credit scores – constitute the majority of subprime mortgage lending.[6]

The risk level of potential mortgage borrowers is often assessed by reference to their so-called "FICO" scores, an automated tool used by credit rating companies that assesses a variety of factors in a borrower's credit history in assessing the risk of default.[7] Though no absolute definition exists, a subprime borrower is usually one with a FICO score below the range of 620 to 660 (out of 850).[8] The interest rate charged on a subprime mortgage loan is typically around two percentage points higher than that charged on a prime mortgage loan with similar basic characteristics (e.g., loan term, fixed or variable interest rate).[9]

## B.    Legal and Regulatory Framework for the Development of the Subprime Mortgage Market

Before the early 1980s, the main credit available for mortgage borrowers with impaired credit or other risk factors that made them ineligible for prime mortgage loans was loans insured by either the Federal Housing Administration ("FHA") or the Department of Veterans Affairs ("VA").[10] To support liquidity in the housing finance system, Congress chartered Government Sponsored Entities ("GSE"), Fannie Mae in 1968 and Freddie Mac in 1970. Neither GSE makes

Supervision, and the National Credit Union Administration. The Interagency Expanded Guidance document was jointly issued by all of the same agencies, except the National Credit Union Administration.

[6] *Id.* A subprime borrower has been defined as "one who has a high debt-to-income ratio, an impaired or minimal credit history, or other characteristics that are correlated with a high probability of default relative to borrowers with good credit history." Faten Sabry and Thomas Schopflocher, *The Subprime Meltdown: A Primer*, NERA Economic Consulting (June 21, 2007), *available at* http://www.nera.com/image/SEC_SubprimeSeries_Part1_June2007_FINAL.pdf. Though the common assumption is that subprime mortgage loans generally are made to "higher risk" borrowers, a recent newspaper article described an analysis of "more than $2.5 trillion in subprime loans made since 2000" that showed that "as the number of subprime loans mushroomed, an increasing proportion of them went to people with credit scores high enough to often qualify for conventional loans with far better terms." Rick Brooks and Ruth Simon, *Subprime Debacle Traps Even Very Credit-Worthy*, WALL ST. J., Dec. 3, 2007, *available at* http://online.wsj.com/public/article/SB119662974358911035.html. An analysis of the credit-worthiness of subprime borrowers is beyond the scope of this Final Report.

[7] The factors considered in generating a FICO score typically include the following about the borrower: bill-paying history, the number and type of accounts, whether bills are paid by the due date, collection actions, outstanding debt, and the age of accounts. *Facts for Consumers: Need Credit or Insurance? Your Credit Score Helps Determine What You'll Pay*, Fed. Trade Comm'n publication (July 2007), *available at* http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.

[8] Interagency Expanded Guidance, *supra* note 3.

[9] Souphala Chomsisenghphet and Anthony Pennington-Cross, *The Evolution of the Subprime Mortgage Market*, Fed. Reserve Bank of St. Louis Review at 34 (January/February 2006), *available at* http://research.stlouisfed.org/publications/review/06/01/ChomPennCross.pdf.

[10] Cathy Lesser Mansfield, *The Road to Subprime "HEL" was Paved with Good Congressional Intentions: Usury Deregulation and the Subprime Home Equity Market*, 51 S.C. L. REV. 473, 480-84 (Spring 2000).

mortgage loans directly to homebuyers. Rather, each essentially helps banks, savings and loan associations and mortgage companies by buying their mortgages, packaging the mortgages into securities, which they guarantee, and then selling the securities to investors in the secondary market.[11] The idea behind these entities is to provide lenders with the capital they need to fund new mortgages, in the form of the funds obtained from the sale of loans to the GSE.

The establishment of Fannie Mae and Freddie Mac increased the liquidity available for mortgage lending generally. However, state usury laws (as well as FHA and VA restrictions regarding the mortgages they would insure) often set limits on the maximum interest rates mortgage lenders generally could charge, leading to conditions under which home mortgage credit was rationed almost exclusively to the lowest-risk, or prime, borrowers. Moreover, statutory limits on the original principal amount of loans that Fannie Mae or Freddie Mac could purchase or that FHA could insure meant that loans with higher loan balances needed to find an alternative source of funding.

The modern subprime mortgage market has its roots in the passage of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), Pub. L. No. 96-221, 94 Stat. 132.[12] The DIDMCA preempted state usury laws, eliminating the maximum interest rate that mortgage lenders could charge to borrowers on first lien residential mortgage loans. The DIDMCA usury preemption applied to any mortgage lender making more than $1 million of loans per year, whether the lender was a depository institution or not.[13]

Additional groundwork for the development of the subprime mortgage market was laid by the passage of the Alternative Mortgage Transaction Parity Act ("Parity Act"), Pub. L. No. 97-320, 96 Stat. 1469, in 1982. The Parity Act authorized the use of, and preempted state laws restricting, such non-traditional home mortgage products as variable interest rate loans, balloon payment loans, and negatively amortizing loans.[14] As discussed below, such products have now become common in subprime mortgage lending. Around the time the Parity Act was passed, the

---

[11] This process is known as "securitization," which is discussed more fully below.

[12] Mansfield, 51 S.C. L. REV. at 492.

[13] *Id.* at 502.

[14] *Id.* at 511.

FHA also liberalized its rules for guaranteeing mortgages, thereby increasing competition in the market for certain types of mortgage loans.[15]

The final major piece of the groundwork for the growth of the subprime mortgage market came with the passage of the Tax Reform Act of 1986 ("TRA"), Pub. L. No. 99-514, 100 Stat. 2085. As part of a sweeping change to the federal income tax laws, the TRA eliminated the deduction for interest paid on consumer loans, while continuing to allow a deduction for interest paid on many home mortgages.[16]   This made even relatively higher rate home mortgages, including those securing home equity loans and lines of credit, cheaper than consumer debt for homeowners, thus significantly increasing the market for credit secured by borrowers' homes.

## C.    Mortgage-Backed Securities and the Growth of the Subprime Mortgage Market in the Early 1990s

Even with these legal and regulatory changes, the subprime mortgage market could not have experienced the exponential growth it eventually would without the development of a strong secondary market for home mortgage loans. Loans are most commonly sold into the secondary mortgage market in one of two ways: whole loan sales and securitizations of loan pools. In whole loan sales, mortgage loan originators sell their loans, either individually or in groups or pools, to GSE and other secondary mortgage market purchasers.[17]   In the process known as securitization, large numbers of mortgage loans are pooled – usually in much larger numbers than would be the case with whole loan sales, and interests in the mortgage loan pools are sold to investors. The securitized interests sold to investors are known as mortgage-backed securities ("MBS"). The holders of MBS generally receive all or some portion of the cash flow from the continuing payments on the mortgage loans in the underlying securitized pool of loans.

While MBS were previously available from the GSE, in the 1980s the credit rating agencies began rating privately-issued MBS backed by loans that were ineligible for sale to the GSE or insurance by FHA, making more MBS available for a much broader range of investors to

---

[15] Edward M. Gramlich, Fed. Reserve Governor, Remarks at the Fin. Serv. Roundtable Annual Housing Policy Meeting *Subprime Mortgage Lending: Benefits, Costs, and Challenges* (May 21, 2004), *available at* http://www.federalreserve.gov/boarddocs/Speeches/2004/20040521.

[16] Chomsisenghphet and Pennington-Cross, *supra* note 7, at 38.

[17] On its business-to-business website for use by its customers and partners in the mortgage industry, Fannie Mae describes whole loan sales as "the simplest and most straightforward type of secondary market transaction." *See* https://www.efanniemae.com/sf/exops/wls/wlsoverview/.

purchase.[18]  By 1988, 52% of all outstanding residential mortgage loans were securitized, up from only 23% four years earlier.[19]  The rapid expansion of the secondary mortgage market and the increased securitization of mortgage loans significantly increased mortgage lenders' access to capital, and eliminated the need for a large deposit base as a source of liquidity.  This led to a proliferation of nondepository mortgage lenders.  By 1989, nondepository lenders made up 32% of the market for home mortgage loans.[20]

By 1994, approximately $35 billion in subprime mortgage loans were originated annually in the United States.[21]  That year, rising interest rates decreased the demand for prime mortgage loans, which in turn caused lenders to seek more aggressively to originate subprime mortgage loans.[22]  In addition, technological advances enabled the collection of credit information for a broader base of borrowers, further increasing the potential market for subprime mortgage loans.[23]  These developments helped spur an increase in total subprime mortgage loan originations to approximately $124.5 billion in 1997 and approximately $150 billion in 1998.[24]  The 1997 total represented approximately 14.5% of total home mortgage loan originations for that year.[25]  Of the $124.5 billion of subprime mortgage loans originated in 1997, approximately 53% were securitized and sold via MBS in the secondary market, up from just 28.4% only two years earlier.[26]

The growth in the subprime mortgage loan market in the 1990s was also aided by innovations in the methods of allocating or moderating risk in subprime MBS, which allowed issuers to obtain investment-grade ratings on all or part of their MBS, despite the risk in the

---

[18] Heather M. Tashman, *The Subprime Lending Industry: An Industry in Crisis*, 124 BANKING L. J. 407 (May 2007) *available at* http://www.stradley.com/articles/php?action=view&id=279.

[19] *Id.*

[20] Mansfield, *supra* note 8, at 526.

[21] Tashman, *supra* note 16, at 410.

[22] Chomsisenghphet and Pennington-Cross, *supra* note 7, at 38.

[23] Ben S. Bernanke, Chairman, Fed. Reserve Board, Remarks at the Fed. Reserve Bank of Chi.'s 43rd Annual Conference on Bank Structure and Competition *The Subprime Mortgage Market*, (May 17, 2007) ("Bernanke Remarks"), *available at* http://www.federalreserve.gov/boarddocs/speeches/2007/20070517/default.htm.

[24] Chomsisenghphet and Pennington-Cross, *supra* note 7, at 37.

[25] *Id.*

[26] *Id.*

subprime mortgages underlying the MBS.[27]    This process is called "credit enhancement," and, by the mid-to-late-1990s, issuers began using three main methods of credit enhancement (alone or in combination):

- Senior-subordinate structures. Under this approach, pools of subprime mortgage loans are divided into "tranches," each of which has different cash flow characteristics. Specifically, certain tranches (the "senior" tranches) are paid before other tranches (the "subordinate" tranches), thus ensuring a higher credit rating for at least part of the MBS pool.

- Over-collateralization. This is a process in which the issuer puts more collateral in the pool of mortgage loans than is being sold as MBS. For example, an issuer might put $100 million of loans in a pool, and sell only $98 million of MBS. The surplus is used to ensure that the MBS can withstand losses on the underlying mortgage loans up to the amount of the surplus.

- Bond insurance. This is simply the purchase of insurance against certain losses in the underlying mortgage loan pool. In the event such losses are incurred, the insurance, provided by a third-party insurer, covers some or all of the losses, depending on the level of the coverage.[28]

As these credit enhancement innovations made more subprime MBS acceptable for a wider potential market of investors and purchasers, the total value of subprime MBS sold in the secondary mortgage market grew from $10 billion in 1991 to more than $60 billion in 1997.[29] This growth of the secondary market provided ample liquidity for nondepository and mortgage-only ("monoline") companies, which were responsible for much of the subprime mortgage lending during this period.[30]

### D.    The 1998 Financial Crisis and Its Impact on the Subprime Mortgage Market

By 1997, subprime mortgage lenders, with relatively easy access to liquidity in the secondary market, began originating increasingly riskier home mortgage loans.    Mortgage delinquency and default rates that year were higher than had been expected.[31]    Simultaneously, lower interest rates were leading to high levels of prepayments on subprime mortgage loans.[32]    A

---

[27] Temkin, Johnson and Levy, *supra* note 2, at 10.    An investment-grade rating is important because certain types of investors, especially regulated entities such as pension funds and insurance companies, are restricted in how much they may invest in securities that do not receive such a rating.

[28] Sabry and Schopflocher, *supra* note 4, at 6.

[29] Temkin, Johnson and Levy, *supra* note 2, at 10.

[30] Chomsisenghphet and Pennington-Cross, *supra* note 7, at 38.

[31] Temkin, Johnson and Levy, *supra* note 2, at 10.

[32] *Id.*

series of significant economic shocks, beginning in 1997, led to the first major crisis for the subprime mortgage industry. The combination of the 1997 Asian financial crisis and Russia's debt default in 1998, along with the related collapse of the Long Term Capital Management hedge fund, led to a significant decline in investors' appetite for risky investments, including subprime MBS.[33] Subprime mortgage lenders were increasingly unable to find buyers for the riskiest subprime MBS tranches, which had the dual effects of decreasing the amount of liquidity available to the lenders and saddling them with increasingly worthless assets, the book values of which they were eventually forced to write down.[34] At the same time, the large financial institutions that provided short-term credit to subprime lenders – the so-called "warehouse lenders" or "repo" providers – aware of the subprime lenders' worsening conditions, called or reduced their lines of credit to the subprime lenders, further decreasing available capital for new mortgage loan originations.[35] Reflecting these difficulties, the securitization rate of subprime mortgage loans dropped from 55.1% in 1998 to 37.4% in 1999.[36]

As a result of these issues, significant consolidation took place in the subprime mortgage lending market. Many nondepository and monoline lenders went out of business or were purchased by larger institutions with more ready access to liquidity (whether from a deposit base or through prime mortgage lending activities). By 2000, the top 25 subprime lenders by market share originated 74.1% of all subprime mortgages, up from 39.3% only five years earlier.[37]

### E.     The Subprime Mortgage Market Grows Again in the Early 2000s

In large part because of the difficulties described above, the aggregate total dollar value of subprime mortgage loan originations was actually lower in 2000 than in 1999.[38] However, by 2001, that number started to rise again, and it nearly doubled, from $173.3 billion to $332 billion, from 2001 through 2003.[39] By 2005, over $620 billion in subprime mortgage loans were

---

[33] Sabry and Schopflocher, *supra* note 4, at 8.

[34] *Id.*; Temkin, Johnson and Levy, *supra* note 2, at 10.

[35] *Id.*

[36] Chomsisenghphet and Pennington-Cross, *supra* note 7, at 40.

[37] *Id.* at 37.

[38] *Id.*

[39] *Id.*

originated.[40] This increase came amid a further consolidation of the industry: in 2003, the top 25 lenders originated over 93% of all subprime mortgage loans made that year.[41]

Several factors contributed to this rapid growth in originations. Low interest rates and rapid housing price appreciation provided significant incentives for first-time home purchases, as well as for homeowners to refinance their existing mortgages to access some of the built-up equity in their homes using so-called "cash-out refinancings," in which the amount of the refinancing mortgage loan is higher than the remaining unpaid principal balance of the loan being refinanced. Technological advances also contributed to the expansion of the subprime market, as lenders adopted automated underwriting processes and techniques that simultaneously sped up the mortgage loan approval process and lowered the lenders' costs of originating mortgage loans.[42]

In addition to these factors, another major factor in the subprime mortgage market's growth in the 2000 through 2006 time period was the proliferation of nontraditional mortgage products. In addition to standard fixed-rate mortgages ("FRM"), lenders began to offer an increasing array of alternative mortgage products, including:

- Adjustable-rate mortgages ("ARM"), which have a floating interest rate that adjusts periodically and is generally pegged at a specified premium above the prime interest rate (or some other published interest rate) in effect at the time the mortgage loan rate adjusts;

- Hybrid mortgages, which offer a fixed interest rate for a certain period of time (typically between two and five years), and after that adjust on a periodic basis (e.g., monthly, semi-annually or annually);

- Interest-only mortgages, which are ARM or FRM on which the borrower pays only the interest for a set period of time, after which the borrower must begin to pay down the principal; and

- Negatively amortizing loans, which are ARM or FRM on which the borrower pays less than the full, stated interest amount on the loan for a set period of time, or pays less than the amount of principal on a "normal" amortization schedule,

---

[40] *Mortgage Market Turmoil: Causes and Consequences*, Before the S. Comm. on Banking, Housing, and Urban Affairs, (Mar. 22, 2007) (testimony of Sandra L. Thompson, Director, Div. of Supervision and Consumer Prot. of the FDIC) ("Thompson Testimony") *available at* http://www.fdic.gov/news/news/speeches/archives/2007/chairman /spmar22071.html.

[41] Chomsisenghphet and Pennington-Cross, *supra* note 7, at 40.

[42] Lynnley Browning, *The Subprime Loan Machine*, N.Y. Times, Mar. 23, 2007, *available at* http://www.nytimes.com/2007/03/23/business/23speed.html.

with the unpaid amount of interest and principal during that time being added to the outstanding principal balance of the loan.[43]

For the period from 2004 to 2006, of the more than three million subprime mortgage loans sold in the secondary market, approximately 45% were ARM (including hybrids), 25% were FRM, 20% were interest only loans, and 10% were negatively amortizing loans.[44] Approximately 80% of all subprime mortgage loans originated in 2005 included an adjustable rate (including interest-only and negatively amortizing ARM).[45]

Another important feature of subprime mortgage loans originated during this period was the increasing use of prepayment penalties. Prepayment penalties are used by lenders to discourage borrowers from refinancing and paying down the principal on a mortgage loan early in the loan's term. The use of prepayment penalties can be advantageous for lenders when they securitize loans for MBS, as such penalties decrease the likelihood of early refinancing of the mortgage loans in the underlying pool, thus leading to more predictability and reliability in valuing the pool's cash flow.

An important factor in the growth in the subprime mortgage market in recent years was an increasing investor appetite for subprime MBS and the greater risk inherent in, and greater return expected from, such MBS.[46]   In Congressional testimony given in March 2007, the Chairman of the Federal Deposit Insurance Corporation ("FDIC") described investor demand for subprime MBS as having played a crucial role in the growth of the subprime mortgage loan industry from 2003 to 2005.[47]   It is estimated that subprime MBS made up about $100 billion of the $375 billion aggregate total of all collateralized debt obligations sold in the U.S. in 2006.[48]

---

[43] Sabry and Schopflocher, *supra* note 4, at 3.

[44] Yaliya Demyanyk and Yadav Gopalan, *Subprime ARMs: Popular Loans, Poor Performance*, Fed. Reserve Bank of St. Louis: Bridges, Spring 2007, at 4-5, *available at* http://stlouisfed.org/publications/br/2007/a/pages/2-article.html.

[45] Sabry and Schopflocher, *supra* note 4, at 9.

[46] *Subprime and Predatory Lending: New Regulatory Guidance, Current Market Conditions, and Effects on Regulated Institutions*; Before the Subcomm. on Fin. Inst. and Consumer Credit of the H. Comm. on Fin. Serv. (Mar 27, 2007) (Testimony of Sheila C. Bair, Chairman, FDIC)("Bair Testimony") *available at* http://www.fdic.gov/news/news/speeches/archives/2007/chairman/spmar2707.html.   *See also* Ellen Florian Kratz, *CSI: Subprime*, Fortune Magazine, Mar. 20, 2007, *available at* http://money.cnn.com/2007/03/19/magazines/fortune/clayton.fortune/index.htm (referring to the "voracious investor appetite" for subprime MBS as contributing to the rapid growth of the subprime mortgage loan industry in recent years).

[47] Bair Testimony, *supra* note 44.

[48] *The Subprime Lending Industry: A Look At The Restructuring of a Market in Turmoil*, prepared for ABA Annual Meeting, Bus Law Sec., Aug. 11, 2007, *available at* www.abanet.org/buslaw/newsletter/0063/materials/pp1a.pdf.

### F.    Current Challenges Facing the Subprime Mortgage Industry

In 2006, approximately $600 billion in subprime mortgage loans were originated in the United States, down four percent from 2005 but still nearly double the total from 2003.[49] However, originations of subprime mortgage loans were projected to have shrunk all the way down to $350 billion in 2007, a decline of 47% from 2005.[50] This decline has been caused by a variety of factors.

#### 1.    Rising Interest Rates

The Federal Reserve began raising interest rates in June 2004. The prime interest rate, which remained flat at four percent for more than a year from late-June 2003 through early-July 2004, increased to 4.25% in July 2004 and was at 5.25% by mid-December 2004. The prime rate continued to climb steadily in 2005 and 2006, going up to 8.25% by late-June 2006. The prime rate stayed at 8.25% through September 2007, when it fell, for the first time in more than four years, to 7.75%.[51] At about the same time, after years of rising relatively rapidly in many parts of the country, housing price appreciation began to slow in 2006, with the fourth quarter of 2006 having the slowest rate of annual appreciation since 1999.[52] The rate of housing price quarterly appreciation began to decrease in the third quarter of 2005, falling steadily from a rate of 3.59% in the second quarter of 2005 to 3.31% in the third quarter of 2005, 3.03% in the first quarter of 2005, 2.29% in the first quarter of 2006, 1.32% in the second quarter of 2006 and 1.03% in the third quarter of 2006, before rising slightly to 1.12% in the fourth quarter of 2006.[53] The overall economy began to cool as well during this time. This combination of factors made it difficult for borrowers to refinance mortgage loans at favorable rates, or to pay off existing mortgages by selling the mortgaged property.[54]

---

[49] Thompson Testimony, *supra* note 38.

[50] Bob Ivry, *Subprime Crash Squeezes Out First-Time Home Buyers*, Bloomberg News Service, June 13, 2007, *available at* http://www.bloomberg.com/apps/news?pid=20601087&sid=a9WrgkMoBpyl&refer=patrick.net. Data on the total volume of subprime loans originated in 2007 was not yet available as of the date of this Final Report.

[51] *Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates*, Fed. Reserve System, Nov. 2, 2007, *available at* http://research.stlouisfed.org/fred2/data/PRIME.txt.

[52] *Credit FAQ: Will Subprime Woes Spread to the Wider Mortgage Market?*, S&P Viewpoint, Mar. 13, 2007, *available at* http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/3,1,1,0,1148442756258.html.

[53] *U.S. House Price Appreciation Rate Steadies*, Office of Fed. Housing Enter. Oversight News Release, Mar. 1, 2007, *available at* http://www.ofheo.gov/newsroom.aspx?ID=375&q1=0&q2=6.

[54] Sabry and Schopflocher, *supra* note 4, at 9.

## 2.    New Regulatory Guidance

Regulatory changes that directly impacted only federally regulated depository institutions, and related changes under some state laws, also had a chilling effect on the overall subprime mortgage market during this time period. For example, in the fall of 2006 the federal banking agencies issued guidance for nontraditional mortgage loans, including interest only loans and negative amortization loans.[55]

While the federal banking agencies' guidance described above directly applies only to banks and other financial institutions that are subject to the agencies' jurisdiction (unlike many subprime mortgage lenders), it nonetheless had a broad and chilling effect on the overall subprime mortgage market. In August 2007, the Office of Federal Housing Enterprise Oversight directed Fannie Mae and Freddie Mac, large purchasers of typically prime mortgage loans, to no longer purchase mortgage loans that did not meet the new federal guidelines.[56] In November 2006, the Conference of State Bank Supervisors ("CSBS") and the American Association of Residential Mortgage Regulators ("AARMR") prepared guidance documents mimicking the federal guidance, and state legislatures and regulators have adopted those provisions (or substantively similar provisions) on a broad scale for the mortgage bankers and brokers they regulate. A handful of states adopted the CSBS/AARMR documents on the day they were issued, and, at this point in time, most states have, in one manner or another, adopted stringent "ability to repay" and income documentation requirements for some of the alternative mortgage products that had been a staple of subprime mortgage lender's businesses.

## 3.    ARM Payment Delinquencies and Foreclosures

Also during this time period, a large number of hybrid ARM originated in the preceding years were reaching the point at which their interest rates reset, often to a rate at a premium above the now-higher prevailing interest rates. With the slowing economy and an often

---

[55] In March 2007, the federal banking agencies, out of a concern "with so called '2/28', '3/27', and similar adjustable-rate mortgages ("ARM") that expose borrowers to significant payment shock once introductory interest rates expire," issued for public comment a draft of an "Interagency Statement on Subprime Mortgage Lending" that was issued in final form in July 2007 and "sets forth expectations for sound lending practices and clear communications with borrowers." Interagency Statement on Subprime Mortgage Lending, 72 Fed. Reg. 131 at 37569 (July 10, 2007) (issued by the Department of the Treasury, the Office of the Comptroller of the Currency, the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the National Credit Union Administration).

[56] *OFHEO Director James B. Lockhart commends GSEs on Implementation of Subprime mortgage Lending Guidance*, Office of Fed. Housing Enter. Oversight News Release, Sept. 10, 2007, *available at* http://www.ofheo.gov/newsroom.aspx?Q1=0&Q2=0&FormMode=Detail&ID=382.

relatively large increase in monthly mortgage payments, many borrowers were unable to make their new monthly payments, leading subprime mortgage borrowers with hybrid ARM to experience large increases in payment delinquency and mortgage foreclosure rates in 2006.[57] In the fourth quarter of 2006, the payment delinquency rate was 14.4% for subprime ARM and 13.3% for all subprime mortgage loans, the highest in four years.[58] By way of contrast, only 2.57% of prime mortgages (far fewer of which are ARM) had payment delinquencies in the same period.[59] In the first quarter of 2007, the payment delinquency rate for all subprime mortgage loans rose to 13.77%, compared to only 2.58% for prime mortgage loans.[60] In the second quarter of 2007, the payment delinquency rate for subprime mortgages jumped again, to 14.82%, compared to 2.73% for prime mortgage loans.[61] In the third quarter of 2007, the payment delinquency rate for subprime mortgages increased yet again, to 16.31%, compared to 3.12% for prime mortgage loans.[62] One in every five subprime ARM loans had late payments in the third quarter of 2007, and that number does not include the one in every ten subprime ARM loans in foreclosure.[63]

Mortgage foreclosures have also risen to record highs, with 0.54% of all outstanding mortgages entering the foreclosure process in the fourth quarter of 2006.[64] The percentage of all outstanding mortgages entering the foreclosure process rose to new records of 0.58% in the first

---

[57] *See* S. Comm. on Banking, Housing, and Urban Affairs (Mar. 22, 2007) (Statement of Roger T. Cole, Director, Div. of Banking Superv. and Reg., Board of Governors of the Fed. Reserve System), *available at* http://www.federalreserve.gov/newsevents/testimony/cole20070322a.htm.

[58] Douglas Dyer and Sarah Woo, *Analyzing the Subprime Market Fallout Using EDF Credit Measures*, Moody's K.M.V. Applied Research Note (Apr. 16, 2007), *available at* http://www.moodyskmv.com/research/files/wp/Research_Note_on_NEWC.pdf.

[59] Press Release, Mortgage Bankers Ass'n, *Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey* (Mar. 13, 2007), *available at* http://www.mortgagebankers.org/NewsandMedia/PressCenter/50974.htm.

[60] Press Release: Mortgage Bankers Ass'n, *Delinquencies Decrease in Latest MBA National Delinquency Survey*, (June 14, 2007), *available at* http://www.mortgagebankers.org/NewsandMedia/PressCenter/55132.htm.

[61] Press Release, Mortgage Bankers Ass'n, *Delinquencies Increase in Latest MBA National Delinquency Survey*, (Sept. 6, 2007), *available at* http://www.mortgagebankers.org/NewsandMedia/PressCenter/56555.htm.

[62] Press Release, Mortgage Bankers Ass'n, *Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey*, (Dec. 6, 2007), *available at* http://www.mortgagebankers.org/NewsandMedia/PressCenter/58758.htm.

[63] *Id.*

[64] Press Release, Mortgage Bankers Ass'n, Mar. 13, 2007, *supra* note 57.

quarter of 2007, 0.65% in the second quarter of 2007 and 0.78% in the third quarter of 2007.[65] While subprime ARM represented only 6.8% of all mortgage loans outstanding in the third quarter of 2007, they represented 43% of the foreclosures started during that quarter.[66]

Many of the subprime mortgage loan payment delinquencies and defaults occurred in the first few months after the origination of the loans. The Chairman of the Federal Reserve has pointed to such EPD[67] as likely evidence that lenders loosened their underwriting standards to continue increasing loan volume when mortgage loan originations began to slow.[68] The Federal Reserve Chairman noted that "risk layering," which he defined as "combining weak borrower credit histories with other risk factors, such as incomplete income documentation or very high cumulative loan-to-value ratios," became more common at that time.[69]

The rise in EPD has had numerous adverse consequences for subprime mortgage lenders. In connection with secondary mortgage market sales (both whole loan sales and securitizations) lenders typically commit to repurchase loans under certain circumstances, including EPD. Thus, as EPD rose, many lenders were forced to repurchase loans. At the same time, investors became more reluctant to purchase subprime MBS in light of the increasingly poor performance of the underlying loans, driving total MBS issuance in 2006 down to $1.93 trillion, from a peak of $3 trillion in 2003.[70] To the extent subprime lenders were able to securitize loans, it was on conditions much less favorable to them.[71] This represented a challenge to many subprime lenders that, like New Century, were structured as Real Estate Investment Trusts ("REIT"), which are required under the federal income tax laws to return much of their cash to shareholders

[65] Press Releases, Mortgage Bankers Ass'n, June 14, Sept. 6 and Dec. 6, 2007, *supra* notes 58, 59 and 60.

[66] Press Release, Mortgage Bankers Ass'n, Dec. 6, 2007, *supra* note 60.

[67] There is no standard definition of early payment default. Generally, the agreements between subprime mortgage loan originators and the investors to which they sold loans included a provision requiring the originator to repurchase the loans sold to the investors if the loans went into default within certain period of time after the loan sale.

[68] Bernanke Remarks, *supra* note 21, at 3.

[69] *Id. See also* Sabry and Schopflocher, *supra* note 4, at 9-10 (discussing the widespread use of "low doc" and "no doc" mortgage loans by subprime lenders).

[70] Gretchen Morgenson, *Crisis Looms in Market for Mortgages*, N.Y. Times, Mar. 11, 2007, *available at* http://www.nytimes.com/2007/03/11/business/11mortgage.html.

[71] *Subprime Mortgage Market Turmoil: Examining the Role of Securitization*, Before the Subcomm. on Sec., Ins. and Investment of the S. Banking, Housing, and Urban Affairs Comm., (Apr. 17, 2007) (Testimony of Susan Barnes, Managing Dir., Standard & Poor's Rating Services), *available at* http://banking.senate.gov/_files/ACFE4F.pdf.

every year.  Because of their low level of retained cash, REIT require ready access to the secondary market to obtain the liquidity necessary to originate a high volume of mortgage loans.

### 4.    Repurchase Demands from Warehouse Lenders

Subprime mortgage lenders have also experienced difficulties under their short-term lending arrangements with warehouse lenders.  As market conditions worsened, warehouse lenders began to demand a higher fee, or "haircut," for providing short-term financing to subprime lenders to originate and purchase mortgage loans, before the securitization of those loans in MBS pools.[72]  Eventually, warehouse lenders, concerned with the high level of EPD, also began to exercise their right to compel the subprime mortgage lenders to repurchase loans from the warehouse lenders, further straining the subprime mortgage lenders' available liquidity.[73]

### 5.    The Sudden Decline in Market Conditions

The degradation of market conditions has had a significant negative impact on the viability of many subprime mortgage lenders.  Reports indicate that more than 80 subprime mortgage lenders have exited the business in one way or another, including several that have sought bankruptcy protection, since the end of 2006.[74]  The decline in the subprime mortgage industry has also apparently affected all mortgage lenders generally, with Reports claiming that over 200 mortgage lenders, including both subprime and prime lenders, have exited or substantially curtailed their lending businesses since mid-2006.[75]  In 2007 alone, nearly 150 mortgage lenders, again including both subprime and prime lenders, were reported to have failed and gone out of business.[76]

The sudden and precipitous decline in the subprime mortgage market in the past year, and the impact of the market decline on the largest subprime mortgage lenders, is clear from a

---

[72] Alistair Barr, *Big Banks Control Fate of Subprime Lenders*, MarketWatch.com, Feb. 16, 2007, *available at* http://www.marketwatch.com/news/story/big-banks-deciding-fates-troubled/story.aspx?guid=%7B08BF0083-33AD-47C7-9EDC-3AB1085BBE43%7D.

[73] *Id.*

[74] Worth Civils and Mark Gongloff, *Subprime Shakeout*, WALL ST J., *available at* http://online.wsj.com/public/resources/documents/info-subprimeloans0706-sort.html.

[75] The Mortgage Lender Implode-O-Meter, *available at* http://ml-implode.com.

[76] Press Release, MortgageDaily.com, *Nearly 150 Mortgage Operations Collapse in 2007* (Jan. 22, 2008) *available at* http://www.mortgagedaily.com/PressRelease012208.asp.

comparison of the identities of, and volumes of loans originated by, the top ten subprime mortgage loan originators in the second quarters of 2006 and 2007:[77]

## Top Subprime Mortgage Loan Originators, Q2 2006
### (dollars in millions)

| Rank | Name (bolded and italicized entities were sold or not in business by Q2 '07) | Location | Subprime Volume |
|---|---|---|---|
| 1 | Wells Fargo Home Mortgage | San Francisco, CA | $27,197 |
| 2 | *New Century Financial Corp.* | *Irvine, CA* | *$14,100* |
| 3 | HSBC Finance | Prospect Heights, IL | $14,061 |
| 4 | Countrywide Financial Corp. | Calabasas, CA | $11,206 |
| 5 | *Fremont Investment & Loan* | *Santa Monica, CA* | *$9,539* |
| 6 | *Option One Mortgage Corp.* | *Irvine, CA* | *$8,273* |
| 7 | Washington Mutual | Seattle, WA | $7,280 |
| 8 | *Ameriquest Mortgage* | *Orange, CA* | *$7,200* |
| 9 | WMC Mortgage Corp. | Woodland Hills, CA | $7,100 |
| 10 | *First Franklin Financial* | *San Jose, CA* | *$6,711* |

## Top Subprime Mortgage Loan Originators, Q2 2007
### (dollars in millions)

| Rank | Name | Location | Subprime Volume |
|---|---|---|---|
| 1 | Countrywide Financial Corp. (pending sale to Bank of America) | Calabasas, CA | $5,721 |
| 2 | First Franklin Financial *(sold to Merrill Lynch in early 2007)* | San Jose, CA | $5,304 |
| 3 | HSBC Finance | Prospect Heights, IL | $4,707 |
| 4 | Option One Mortgage Corp. *(planned sale to Cerberus Capital fell through; will now be closed)*[78] | Irvine, CA | $4,500 |
| 5 | Wells Fargo Home Mortgage | San Francisco, CA | $4,106 |
| 6 | Chase Home Finance | Woodcliff Lake, NJ | $3,305 |
| 7 | Washington Mutual | Seattle, WA | $3,280 |
| 8 | CitiFinancial | Baltimore, MD | $3,000 |
| 9 | EMC Mortgage *(wholly owned subsidiary of Bear Stearns)* | Irving, TX | $2,560 |
| 10 | WMC Mortgage Corp. *(a unit of General Electric)* | Burbank, CA | $1,501 |

---

[77] National Mortgage News Online, *available at* http://data.nationalmortgagenews.com/freedata/?what=bcor (last viewed on Dec. 3, 2007).

[78] Press release *H&R Block Announces Mutual Agreement To Terminate Sale Of Option One Mortgage Corporation To Cerberus Capital* (Dec. 4, 2007), *available at* http://www.hrblock.com/press/Article.jsp?articleid=1496.

As this information shows, half of the top ten in subprime mortgage loan originators in the second quarter of 2006 had either gone out of business or been sold by the second quarter of 2007 – just a year later.    It is also noteworthy that each of the top ten subprime lenders in the second quarter of 2007 is either owned by a large bank or financial services company, or in the process of being acquired by a large financial institution.[79]  Another analysis of the fate of top subprime mortgage lenders reported that 15 of the top 25 subprime lenders in 2006 had, by mid-2007, either shut down, been acquired or were seeking buyers.[80]  The collapse of so many mortgage lenders reportedly resulted in the loss of over 86,000 jobs in the mortgage lending industry in 2007 alone, and further mortgage industry job losses are expected in 2008.[81]

Further indication of the scale and scope of the subprime mortgage crisis for subprime and other mortgage lenders comes from data about recent bankruptcy filings:  four of the top five largest bankruptcy filings in the United States in 2007, measured by the amount of the debtors' pre-petition assets, were made by subprime mortgage lenders, and the fifth was a prime mortgage lender.  The aggregate total of pre-petition assets reported by these bankrupt mortgage lenders was in excess of $63 billion, as shown in the following table:[82]

| Mortgage Lender | Bankruptcy Filing Date | Pre-petition Assets |
|---|---|---|
| New Century Financial Corp. (subprime) | 4/2/07 | $26,147,090,000 |
| American Home Mortgage Investment Corp. (subprime) | 8/6/07 | $18,828,985,000 |
| HomeBanc Corp. (prime mortgage lender) | 8/9/07 | $6,822,664,000 |
| Delta Financial Corp. (subprime) | 12/17/07 | $6,589,127,000 |
| NetBank, Inc. (subprime) | 9/28/07 | $4,771,619,000 |
| Total Pre-petition Assets | | $63,159,485,000 |

The difficult conditions in the subprime mortgage industry persist as of the date of this Final Report, and government leaders and others are warning that the subprime mortgage crisis may not yet be over as millions of subprime ARM are scheduled to experience their first interest

---

[79] Press Release *Bank of America Agrees to Purchase Countrywide Financial Corp.* (Jan. 11, 2008), *available at* http://newsroom.bankofamerica.com/index.php?s=press_releases&item=7956.  This acquisition is expected to close in the third quarter of 2008.

[80] *The Subprime Lending Industry:  A Look At The Restructuring of a Market in Turmoil, supra* note 46.

[81] Jonathan Stempel, *Mortgage job losses topped 86,000 in 2007: study*, Reuters, Jan. 7, 2008, *available at* http://www.reuters.com/article/businessNews/idUSN0741649020080107.

[82] Press Release, *Number of Public Bankruptcies Slightly up in 2007, Fifth Lowest Ever, According to BankruptcyData.com* (Jan. 16, 2007), *available at* http://www.businesswire.com/portal/site/home/index.jsp?epi_menuItemID=887566059a3aedb6efaaa9e27a808a0c&ndmViewId=news_view&ndmConfigId=1008918&newsId=20080116006169&newsLang=en.

rate reset by the end of 2008.[83] In an effort to keep the subprime crisis from expanding when those ARM rates reset, the federal government has worked with lenders and others in the mortgage industry to develop a program, announced on December 6, 2007, to freeze interest rates on some subprime ARM for five years and to provide a framework to facilitate the refinancing or modification of subprime ARM.[84] In addition, several pieces of legislation have been introduced in Congress in response to the subprime mortgage crisis, including a bill that would enable the FHA to serve more subprime borrowers[85] and a bill that would give bankruptcy judges the power to change the mortgage terms for the primary residences of bankrupt homeowners.[86]

As the media indicates on a regular basis, the shockwaves of the crisis in the subprime mortgage industry have been felt and continue to ripple throughout the credit, stock, financial, real estate and other markets in the United States and abroad.

---

[83] Hearing Before the Joint Econ. Comm. of the U.S. Congress (Nov. 8, 2007) (Testimony of Ben S. Bernanke, Chairman, Fed. Reserve Board), *available at* http://www.federalreserve.gov/newsevents/testimony/bernanke 20071108a.htm.

[84] For more information on this program, see the *Statement by Secretary Henry M. Paulson, Jr. at Press Conference to Announce Framework to Help Preserve Communities by Preventing Foreclosure*, Dec. 6, 2007, *available at* http://www.treasury.gov/press/releases/hp716.htm, and the American Securitization Forum's *Streamlined Foreclosure and Loss Avoidance Framework for Securitized Subprime Adjustable Rate Mortgage Loans*, Dec. 6, 2007, *available at* http://www.americansecuritization.com/story.aspx?id=2174.

[85] Expanding American Homeownership Act of 2007, H.R. 1852, passed by the House and referred to the Senate on Sept. 19, 2007.

[86] Emergency Home Ownership and Mortgage Equity Protection Act of 2007, H.R. 3609, introduced Sept. 20, 2007.

## IV.   BACKGROUND OF NEW CENTURY

### A.   Overview

New Century Financial Corporation was founded in 1995.[87]   New Century originated, retained, purchased, sold and serviced home mortgage loans, primarily first mortgage loans, on a nationwide basis.[88]  At one time, the Company was the second largest subprime mortgage lender in the United States, measured by loan production volume,[89] and employed over 7,200 people.[90] By the end of 2006, the Company was the third largest subprime mortgage loan originator in the United States, with a loan production volume that year of $51.6 billion.[91]  On February 7, 2007, New Century announced that it would need to restate its financial statements for the first three quarters of 2006 because of errors in accounting for losses related to its mortgage loan repurchase obligations.[92]  On March 2, 2007, New Century reported that it would be unable to file timely its Annual Report on Form 10-K for 2006.[93]  On April 2, 2007, New Century filed its Chapter 11 bankruptcy petition in this Court.  On May 24, 2007, New Century reported that its 2005 pre-tax earnings had been materially overstated and that the Company's 2005 financial statements should no longer be relied upon.[94]

The following subsections provide a brief history of New Century from its founding in 1995 through 2004, and a summary of New Century's business strategies, operations, financial performance, risk exposures, Management and significant developments since 2004.

---

[87] Declaration of Monika L. McCarthy in Support of Ch. 11 Petitions and First Day Relief, signed Apr. 2, 2007 ("McCarthy Declaration") at 2, para. 3.

[88] *Id.*

[89] New Century's Form 10-K for 2004 at 4.  All subsequent references below to Forms 10-K, Forms 10-Q and Forms 8-K and other SEC filings are to New Century's filings.

[90] Form 10-K for 2005 at 21; Annual Report to Shareholders for 2005 at 10, *available at* http://media.corporate-ir.net/media_files/irol/73/73989/reports/NEW2005AR.pdf.

[91] S&P Viewpoint, *Subprime Mortgage Lenders: Transition in a Stressed Mortgage Cycle*, May 8, 2007, *available at* http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/3,1,1,0,1148444105578.html

[92] Form 8-K, Feb. 7, 2007, Item 4.02.

[93] Form 12b-25 (Notice of late filing of Form 10-K for 2006), Mar. 2, 2007.

[94] Form 8-K, May 24, 2007, Item 4.02.

## B.    Brief History of New Century from Its Founding through 2004

### 1.    Company Founding, Operations and Growth

New Century was founded as a Delaware corporation in 1995 by Brad Morrice, Edward Gotschall and Robert Cole.[95]   It ended 1996, its first full year of operation, with over 300 employees and an annual mortgage loan production volume of over $350 million.[96]   The Company became a public company in June 1997, trading on the NASDAQ.[97]   By 2001, New Century had originated over $20 billion in mortgage loans since its inception[98] and had approximately 1,500 employees.[99]   In 2002, New Century originated over $14 billion in mortgage loans.[100]   By 2003, New Century employed over 3,700 people and originated over $27 billion in mortgage loans.[101]   Also in 2003, New Century restructured its business and began retaining 20 to 25% of its mortgage loan production on its balance sheet by structuring loan securitizations as financings rather than as sales.[102]

The following excerpt from the general business description at the beginning of New Century's Annual Report on Form 10-K/A for 2003 summarizes the Company's business model throughout the period from its founding through 2004:[103]

> We offer mortgage products designed for borrowers who generally do not satisfy the credit, documentation or other underwriting standards prescribed by conventional mortgage lenders and loan buyers, such as Fannie Mae and Freddie Mac. We originate and purchase loans on the basis of the borrower's ability to repay the mortgage loan, the borrower's historical pattern of debt repayment and the amount of equity in the borrower's property (as measured by the borrower's loan-to-value ratio, or LTV). We have been originating and purchasing these types of loans since 1996 and believe we have developed a comprehensive and sophisticated process of credit evaluation and risk-based pricing that allows us to

---

[95] Form 10-K for 2005 at F-11.

[96] Form 10-K405 for 1997 at 32, F-6.

[97] Form 10-K405 for 1997 at 24.

[98] Form 10-K for 2001 at 38 (noting the Company originated and purchased $6.2 billion in loans in 2001 and $4.2 billion in 2000); Form 10-K for 1999 at 34 (noting the Company originated and purchased $4.1 billion in loans in 1999 and $3.3 billion in 1998); Form 10-K405 for 1997 at 30 (noting the Company originated $2.0 billion in loans in 1997 and $356.9 million in 1996).

[99] Form 10-K for 2001 at 21.

[100] Form 10-K for 2002 at 2.

[101] Form 10-K for 2003 at 1, 23.

[102] Form 10-K for 2005 at 56; Form 10-K for 2003 at 14.

[103] Form 10-K/A for 2003 at 1.

effectively manage the potentially higher risks associated with this segment of the mortgage industry.

The rapid growth of New Century in the first four years following its founding in 1995, and then especially from 2001 through its conversion to a REIT structure in 2004, is illustrated by the following key data from the Company's Annual Reports on Forms 10-K filed for the years from 1997 through 2004 (dollars in thousands):[104]

| Year | Full-time Employees | Total Revenue | Assets | Loan | | |
|---|---|---|---|---|---|---|
| | | | | Originations and Purchases | Securitizations | Sales (whole loan) |
| 1996 | 300+ | $14,505 | $4,413 | $356,939 | $0 | $298,713 |
| 1997 | 1,140 | $98,633 | $398,128 | $1,964,601 | $1,123,618 | $617,182 |
| 1998 | 1,404 | $176,407 | $624,727 | $3,324,856 | $2,265,700 | $1,477,225 |
| 1999 | 1,740 | $233,942 | $863,709 | $4,080,264 | $3,017,658 | $1,033,006 |
| 2000 | 1,485 | $163,916 | $837,161 | $4,152,357 | $1,029,477 | $3,133,205 |
| 2001 | 1,512 | $293,336 | $1,451,318 | $6,244,971 | $898,244 | $4,723,350 |
| 2002 | 2,468 | $606,246 | $2,402,928 | $14,201,496 | $845,477 | $12,419,687 |
| 2003 | 3,725 | $975,966 | $8,934,880 | $27,382,838 | $4,946,781 | $20,835,105 |
| 2004[105] | 5,200 | $1,732,567 | $19,051,944 | $42,199,640 | $10,111,131 | $30,329,278 |

As described in more detail above, the entire subprime mortgage industry grew rapidly during the period from 2001 to 2005, with the dollar amount of subprime mortgage loans originated nearly quadrupling during that time period, from $173 billion to more than $620 billion. New Century's subprime mortgage loan originations and purchases during the same time period increased more than nine-fold, from $6.2 billion in 2001 to $56.1 billion in 2005.[106]

New Century's asset and liability structure during the period from 2000 through 2004 was as follows (dollars in thousands):[107]

---

[104] Data is from Forms 10-K or Forms 10-K/A filed by New Century for each of the years 1997 through 2004 (data for 1996 is from the Form 10-K for 1997).

[105] The "Total Revenue" amount for this year is the sum of interest income and all other operating income.

[106] Form 10-K for 2001 at 34; Form 10-K for 2005 at 54.

[107] Data is from New Century's Forms 10-K for 2000 through 2004.

- 42 -

| Balance Sheet Item (year-end) | Year | | | | |
|---|---|---|---|---|---|
| **Assets:** | **2004** | **2003** | **2002** | **2001** | **2000** |
| Cash & Cash Equivalents[108] | $842,854 | $278,598 | $176,669 | $100,263 | $10,283 |
| Restricted Cash[109] | $454,035 | $116,883 | $6,255 | $6,416 | -- |
| Mortgage Loans HFS[110] | $3,922,865 | $3,422,211 | $1,920,396 | $1,011,122 | $400,089 |
| Mortgage Loans HFI[111] | $13,195,324 | $4,745,937 | -- | -- | -- |
| Residual Interests[112] | $148,021 | $179,498 | $246,964 | $306,908 | $361,646 |
| **Liabilities:** | | | | | |
| Credit Facilities on LHFS[113] | $3,704,268 | $3,311,837 | $1,885,498 | $987,568 | $404,446 |
| Financing on LHFI[114] | $13,105,973 | $4,686,323 | -- | -- | -- |
| Convertible Senior Notes | $5,392 | $204,858 | -- | -- | -- |
| Subordinated Debt | -- | -- | -- | $40,000 | $40,000 |
| Residual Financing | -- | -- | -- | $79,941 | $176,806 |
| Other Liabilities | $357,746 | $198,909 | $130,880 | $96,048 | $63,760 |

As this information shows, starting in 2003 New Century began holding on its balance sheet a substantial amount of loans for investment, with corresponding financing (which was largely in the form of securitized bonds known as Real Estate Mortgage Investment Conduit, ("REMIC") and Collateralized Mortgage Obligation, ("CMO") issued in the loan securitization process).[115]

## 2.   New Century's 2004 Conversion to a REIT Structure

In 2004, New Century's Board of Directors approved a plan to change the Company's corporate structure to allow it to qualify as a REIT for U.S. federal income tax purposes.[116] This

---

[108] "Cash equivalents" were considered by the Company to include "all highly liquid debt instruments with original maturities of three months or less." Form 10-K for 2004 at F-11.

[109] "Restricted cash" included "cash held in various margin accounts associated with the Company's interest rate risk Management activities," "cash held in custodial accounts associated with [the Company's] mortgage loans held for investment," and "cash held in a cash reserve account in connection with [the Company's] asset-backed commercial paper facility. *Id.*

[110] "HFS" means "Held for Sale."

[111] "HFI" means "Held for Investment."

[112] As discussed in more detail below, "residual interests" refers to amounts recorded as an asset by New Century "as a result of the sale of loans through securitizations that the Company structures as sales rather than financings." *Id.* at F-12.

[113] "LHFS" means "Loans Held for Sale."

[114] "LHFI" means "Loans Held for Investment."

[115] Form 10-K for 2005 at F-33.

[116] *Id.* at 1.

- 43 -

structure results in the REIT entity owing little to no corporate income taxes, though the income of New Century's taxable subsidiaries remained fully taxable.[117]   To maintain its status as a REIT, New Century was required to distribute at least 90% of the REIT's annual, taxable income to its shareholders.[118]   Accordingly, this structure limited the Company's ability to accumulate capital for mortgage lending operations.[119]

To accomplish the Company's restructuring to a REIT, New Century Financial was formed as a Maryland corporation, and the existing Delaware corporation, New Century TRS, merged with and into a wholly-owned subsidiary of New Century Financial.[120]   The merger was completed in October 2004.[121]   The parent corporation, New Century Financial Corporation, was listed on the (NYSE)[122] and succeeded to and continued to operate substantially all of the existing business of New Century TRS and its subsidiaries.

New Century ended 2004 with an annual mortgage loan production volume of over $42 billion.[123]

### C.     New Century's Financial Performance and Business Strategies and Operations After 2004

#### 1.     Overview of Financial Performance and Growth

New Century's reported financial performance and growth from its REIT conversion in 2004 through 2005 and into 2006 were strong.   The Company's growth and financial performance during that time is illustrated by the following key data:[124]

---

[117] *Id.* at 22, 65-66.

[118] Form 10-K for 2005 at 27, 46, F-36.

[119] Form 10-K for 2004 at 58; Form 10-K for 2005 at 46.

[120] *Id.* at F-10.

[121] *Id.*

[122] *Id.* at 2-3, F-11.

[123] *Id.* at 17, 79.

[124] Form 10-K for 2004 at 25; Form 10-K for 2005 at 21, 54, F-6, F-7; Form 10-Q for Q3 2006 at 1, 2, 44.

| Year | Full-time Employees | Gross Income[125] | Net Earnings | Assets | Loan Originations and Purchases | Securitizations[126] | Sales (whole loan) |
|---|---|---|---|---|---|---|---|
| 2004 | 5,200 | $1,732,567 | $375,571 | $19,051,944 | $42,199,640 | $10,111,131 | $30,329,278 |
| 2005 | 7,200 | $2,443,098 | $411,125 | $26,147,090 | $56,108,241 | $17,403,859 | $35,314,781 |
| 2006 Q3[127] | 7,119 | $ 684,240 | $267,613 | $25,059,768 | $45,443,272 | $ 3,393,531 | $41,144,687 |

The principal components of New Century's revenues during this time frame were interest income from mortgage loans held for investment or held pending sale, and gains recognized from whole loan sales and securitizations structured as sales.[128]   In 2005, the Company's net interest income increased to $771.4 million from $531.5 million in 2004, primarily as a result of higher average balances of mortgage loans held for investment and held for sale.  The increase in mortgage loans held for investment in 2005 resulted from higher overall loan production coupled with the strategy, previously noted, of retaining approximately 20% to 25% percent of loan production on the Company's balance sheet.[129]  During 2005, New Century also reported $622.6 million in gain on whole loan sales and securitizations structured as sales (net of associated expenses).[130]

Another source of revenue for New Century came from servicing the mortgage loans it originated and purchased.   Mortgage loan servicing generally involves receiving monthly payments from borrowers and disbursing the payment proceeds to the appropriate parties, notifying borrowers when payments are late, dealing with payment defaults and foreclosures, and working with borrowers to answer questions and resolve issues that arise during the life of a mortgage loan.[131]   Since 2001, New Century had generated revenue either by selling the servicing rights as part of the whole-loan sales or securitizations or by selling servicing rights

---

[125] "Gross Income" as used in this table is the sum of the Company's reported gross interest income and gross other operating income.

[126] "Securitizations" as used in this table includes both securitizations structured as sales and securitizations structured as financings.

[127] The Company's financial data was last disclosed for the third quarter of 2006.  As discussed above, New Century announced previously that it determined it could not file a Form 10-K for 2006 without unreasonable effort and expense.

[128] Form 10-K for 2005 at F-7.

[129] Form 10-K for 2005 at 69, F-7.

[130] Form 10-K for 2005 at F-7, F-25.

[131] Form 10-K for 2005 at 12; *see also* McCarthy Declaration at 5, para. 12.

-45-

that had been retained by New Century to another loan servicer.[132]  In more recent years, and particularly since 2004, the Company increasingly sought to retain the servicing rights to mortgage loans it originated, and New Century generated revenue by collecting fees for servicing the loans.[133]  The Company's servicing income totaled $28.9 million in 2004, $38.5 million in 2005 and $47.4 million by the end of the third quarter of 2006.[134]

By 2005, New Century's reported assets had grown more than tenfold from 2002, from $2.4 billion to $26.1 billion, reflecting the Company's overall growth as well as the strategy shift beginning in 2003 to keeping a substantial loan portfolio on the Company's balance sheet.[135]  Thus, in 2005, out of total assets of $26.1 billion, New Century reported $16.1 billion in mortgage loans held for investment.[136]

When New Century completed a mortgage loan securitization that was structured as a sale rather than a financing, it booked on its balance sheet the residual economic interest retained by the Company.[137]  The residual interest represented the present value of the future cash flows the Company expected to receive from the residual interest.[138]  In 2004, New Century did not complete any securitizations structured as sales.[139]  In 2005, New Century completed four securitizations structured as sales worth $11.0 billion, recognized gain of $141.5 million on these transactions, and retained residual interests that the Company valued at $97.5 million.[140]  In total, in 2005, New Century reported $234.9 million in residual interests in securitizations on its balance sheet.[141]  During the nine months ended September 30, 2006, the Company did not complete any securitizations structured as sales, and it reported $223.7 million in residual interests on its balance sheet at September 30, 2006.[142]  New Century said it valued its residual

---

[132] Form 10-K for 2004 at 16-18.

[133] Form 10-K for 2005, p. 37-38.

[134] *Id.* at 72; Form 10-Q for Q3 2006 at 2.

[135] Form 10-K for 2005 at 53.

[136] *Id.*

[137] Securitizations that are structured as sales rather than financings are referred to as "off-balance sheet" securitizations. Form 10-K for 2005 at 64.

[138] Form 10-Q for Q3 2006 at 9-10.

[139] Form 10-K for 2005 at F-28.

[140] *Id.* at 11.

[141] Form 10-K for 2005 at F-6.

[142] Form 10-Q for Q3 2006 at 14.

- 46 -

interests in its off-balance sheet securitizations by estimating the future rate of prepayment, the prepayment premiums it expected to receive, and the manner in which expected delinquencies, defaults and default loss severity were expected to affect the amount and timing of cash flows.[143]

New Century's reported asset and liability structure during the period from 2004 through 2006 was as follows:[144]

| Balance Sheet Item (at period end) | Year | | |
|---|---|---|---|
| **Assets:** | **2006 Q3** | **2005** | **2004** |
| Cash and Cash Equivalents | $408,860 | $503,723 | $842,854 |
| Restricted Cash | $572,847 | $726,697 | $454,035 |
| Mortgage Loans Held for Sale | $8,945,134 | $7,825,175 | $3,922,865 |
| Mortgage Loans Held for Investment | $14,030,999 | $16,143,865 | $13,195,324 |
| Residual Interests in Securitizations | $223,680 | $234,930 | $148,021 |
| Other Assets[145] | $878,248 | $712,700 | $488,845 |
| **Liabilities:** | | | |
| Credit Facilities on Mortgage LHFS[146] | $8,487,850 | $7,439,685 | $3,704,268 |
| Financing on Mortgage LHFI[147] | $13,858,940 | $16,045,459 | $13,105,973 |
| Convertible Senior Notes | -- | $4,943 | $5,392 |
| Junior Subordinated Notes | $51,545 | -- | -- |
| Other Liabilities[148] | $597,084 | $547,303 | $357,746 |

As described above, as the housing market began to slow in 2006, subprime mortgage loan delinquencies and foreclosures increased as subprime borrowers—who had been able previously to take advantage of housing price appreciation and increased home equity by either refinancing or selling their homes—began defaulting on their loans in increasing numbers.[149]

___

[143] *Id.* at 11.

[144] *Id.* at 1; Form 10-K for 2005 at F-6.

[145] "Other Assets" includes mortgage servicing assets, real estate owned, accrued interest receivable, net income taxes, office property and equipment, goodwill and prepaid expenses.

[146] "LHFS" means "Loans Held for Sale."

[147] "LHFI" means "Loans Held for Investment."

[148] "Other Liabilities" includes accounts payable and accrued liabilities and notes payable.

[149] *See* House Prices and Subprime Mortgage Delinquencies, Fed. Reserve Bank of S.F. Econ. Letter at No. 2 2007-14, at 2 (June 8, 2007), *available at* http://www.frbsf.org/publications/economics/letter/2007/el2007-14.pdf; Bernanke Remarks, *supra* note 21 ("In the fourth quarter of 2006, about 310,000 foreclosure proceedings were initiated, whereas for the preceding two years the quarterly average was roughly 230,000. Subprime mortgages accounted for more than half of the foreclosures started in the fourth quarter. . . . For [adjustable rate subprime] mortgages, the rate of serious delinquencies--corresponding to mortgages in foreclosure or with payments ninety days or more overdue--rose sharply during 2006 and recently stood at about 11 percent, about double the recent low seen in mid-2005."), *see also* McCarthy Declaration at 10-11, paras. 37-39.

Additionally, increases in interest rates negatively impacted consumer demand for mortgage products.[150]

Nonetheless, during 2006 New Century reported positive financial results. On May 4, 2006, New Century reported "strong first quarter 2006 results highlighted by a 21% growth in earnings per share ("EPS"), a 17% increase in REIT taxable income, and 31% growth in mortgage loan production compared with the same period last year."[151] On August 3, 2006, New Century reported second quarter net earnings of $1.81 per share—an 11% increase over the second quarter of 2005—and trumpeted its second quarter results as "evidence of the strength and stability of our franchise."[152]

On November 2, 2006, New Century released its financial results for the nine months ending September 30, 2006. The Company noted the "challenging" market environment, but reported that its "operating results were solid" excluding the impact of certain hedging-related accounting charges.[153] New Century highlighted that loan production volume was comparable to the previous quarter and that the Company had achieved record low loan acquisition costs.[154] Return on assets on the Company's loan portfolio held for investment was reported to have increased over the second quarter before the impact of hedging-related activities.[155] Further, New Century reported that a higher loan delinquency rate in its portfolio was attributable to "normal portfolio seasoning," and that the Company was "adequately reserved for the expected higher level of loan losses."[156] New Century also reported that its gain-on-sale of loans declined in the third quarter in part due to higher levels of loan repurchases and steeper discounts on discounted loan sales.[157] Although New Century's reported EPS of $1.12 reflected a decline compared to both the third quarter of 2005 ($2.04) and the second quarter of 2006 ($1.81), the

---

[150] Form 10-Q for Q3 2006 at 39; *see also* McCarthy Declaration at 10-11, paras. 37-39.

[151] Earnings Release for May 4, 2006.

[152] Earnings Release for Aug. 3, 2006.

[153] Earnings Release for Nov. 2, 2006; Form 10-Q for Q3 2006 at 39-41.

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.*

Company noted that $0.75 of this decline was attributable to the marking-to-market of derivatives that did not qualify for hedge accounting treatment.[158]

## 2.    New Century's Corporate Culture

Like other subprime mortgage lenders, and most if not all other types of businesses, the corporate culture at New Century generally appears to have been one that focused on and encouraged production, sales and growth. Another apparent aspect of New Century's corporate culture was the notion that the Company was "better than" its competitors. This attitude may be reflected somewhat in New Century's disclosure of its "Competitive Advantages" in its Forms 10-K for 2004 and 2005. In those filings, New Century listed the following "competitive strengths":[159]

- One of the largest mortgage REIT portfolios [2004 and 2005].
- One of the largest taxable REIT subsidiaries [2004].
- Lower-cost portfolio accumulation strategy [2004].
- Operational flexibility [2004 and 2005].
- Long-standing institutional relationships [with loan buyers and warehouse lenders]; [2004 and 2005].
- Automated credit grading capability [2004 and 2005].
- Reputation for high quality customer service [2004 and 2005].
- Management experience and depth [2004 and 2005].
- Leading mortgage loan origination franchise [2005].
- Low-cost producer [2005].

New Century's "better than the competition" attitude also seems to be evident in the Company's adoption and use of a branding initiative in 2005: "New Century Financial – A New Shade of Blue Chip." A press release announcing the launch of this branding initiative said:[160]

"Blue chip" is synonymous with companies known as quality investments that deliver long-term value for stockholders and are entrenched leaders in their industries. In addition, "blue chip" connotes strong performance and stability. Like traditional blue chip companies, New Century Financial has outperformed its competitors with consistent and strong financial performance. As a "New Shade

---

[158] *Id.*

[159] Form 10-K for 2005 at 4.

[160] Press Release, *New Century Financial Corporation Announces Launch of First Corporate Branding Initiative* (Feb. 7, 2005) *available at* http://investorrelations.ncen.com/phoenix.zhtml?c=73989&p=irol-newsArticle_Print&ID =671067&highlight=.

of Blue Chip," New Century will update the traditional view of a "blue chip" company by emphasizing not only strong results, but also how those results are achieved.

### 3.    New Century's Business Strategies

New Century reported in its Form 10-K for 2004 that its "business objective is to provide a stable and growing dividend to our stockholders by growing and managing a portfolio of mortgage related assets."[161]    The Company said it intended to "execute this strategy" by doing the following:

- Building our portfolio of mortgage-related assets.
- Actively managing our mortgage loan portfolio.
- Maintaining a strong capital and liquidity base.
- Expanding our servicing platform.
- Strengthening our [loan] production franchise.
- Developing and growing new mortgage products.

In its Form 10-K for the following year, 2005, New Century's stated business objective remained essentially the same—"deliver an attractive return to our stockholders, including a stable dividend"—but there was somewhat less emphasis on growing the Company's mortgage loan portfolio. In its Form 10-K for 2005, New Century said it would achieve its objective by:

- Delivering consistently strong operating performance, including taxable REIT subsidiary ("TRS") and mortgage loan portfolio earnings.
- Broadening the mortgage products and services available through each of our delivery channels.
- Increasing productivity while reducing costs to enhance our competitive position in the industry.
- Actively managing our mortgage loan portfolio.
- Maintaining a strong capital and liquidity base.

It appears that, within a year or so after its conversion to a REIT in October 2004, a divide began to develop within New Century's Board of Directors and between some members of the Board and the Company's Management regarding the appropriate business strategy for the Company. Some felt that the Company should, like other REITs, pursue a "portfolio" strategy in which mortgage loans would be originated and held by the Company, including through loan

---

[161] Form 10-K for 2004.

securitizations that remained on the Company's balance sheet. Others were critical of the portfolio strategy and wanted the Company to originate and sell as many loans as it could, thus generating more short-term income and not holding as many loans on its balance sheet.

Differences of opinion also existed within the Board of Directors and between it and New Century's Senior Management with respect to dividend and liquidity policies and issues, with some favoring large dividends that reduced the Company's liquidity and others favoring lower dividends and higher liquidity. Related to the liquidity issue, the Board also had differences of opinion regarding repurchasing the Company's stock to increase its stock price.

Through the first half of 2006, the debate among New Century's Board of Directors and Senior Management regarding the appropriate financial strategy for the Company appears to have consisted of three general positions: (1) use free capital to repurchase stock and stop securitizing loans; (2) use free capital to grow the REIT portfolio; and (3) use free capital to bolster liquidity. Morrice, the Company's Chief Executive Officer ("CEO"), said in his interview with the Examiner that this debate recurred at every Board of Directors meeting in the first half of 2006. The minutes of the June 28 and 29, 2006 meeting of New Century's Board of Directors indicate that, at that meeting, the Board ended the debate and determined that New Century was a mortgage banking company with a REIT overlay that could use securitizations as a tool, instead of a REIT that focused on securitizations and also happened to originate mortgage loans.[162] According to people interviewed during the Examiner's investigation, this was the point at which the Board and Senior Management reached an agreement as to the fundamental nature of the Company. As a consequence of this decision, New Century stopped securitizing and adding loans to its portfolio in the second half of 2006. The strategy of originating and selling loans had prevailed over the portfolio strategy.

The Company described its shifts in business strategy, first to holding loans on its balance sheet in 2003, and then away from that to selling loans in 2006, as follows:[163]

> During 2003, we shifted our strategy to hold loans on our balance sheet. . . .
> During the third quarter of 2006, we chose to sell loans in the whole loan market

---

[162] The minutes of a June 12, 2006, telephonic meeting of the Finance Committee meeting state: "Mr. Morrice reported that the members of the EMC [Executive Management Committee] had determined that mortgage banking is the Corporation's core business." The minutes of the June 28 and 29, 2006, meeting of the New Century Board of Directors state that "[t]he meeting participants then discussed the belief that the Corporation is fundamentally a mortgage banking company that happens to own a portfolio and utilize a REIT structure."

[163] Form 10-Q for Q3 2006 at 40.

rather than adding assets to our REIT portfolio, resulting in a decline in the portfolio balance.  Going forward, we will continue to evaluate the relative advantages and disadvantages of whole loan sales versus securitizations, taking into account secondary market conditions and our capital allocation strategy.

After the determination was made to pursue the "originate and sell" strategy, the Board and the Finance Committee had discussions regarding potentially "running off" or selling New Century's loan portfolio and effectively "de-REITing," because if New Century no longer had a loan portfolio it could not be a REIT.  The Board ultimately did not make a decision by the end of 2006 regarding "de-REITing," and subsequent events like the restatement announcement obviously overtook that issue.

Regarding the Board's stock repurchase debate, Morrice said in his interview during the Examiner's investigation that there was a concern that the Directors who were pushing for stock repurchases did not understand the liquidity concerns that would accompany that strategy, and that he had to convince those directors that the liquidity concerns were real.  Other Board members apparently did not need convincing that liquidity was the major issue facing New Century.  For example, in connection with a January 2006 Board meeting, independent Director Fred Forster provided the Board of Directors with an "Issues Perspective" document in which the first topic was "Minimum Liquidity.  In that document Forster expressed a concern that New Century's minimum liquidity position may not have been sufficient based on his experience in the mortgage banking business and in light of the uncertainties in that business.

Other members of the New Century Board advocated a different and more aggressive approach.  They thought the Company should sell loans and use excess cash to repurchase stock, as opposed to what they viewed the Company as having done after the REIT conversion, which was to sell stock and buy loans.   Some members of New Century's Senior Management disagreed with Board members regarding a stock repurchase strategy.  They said they believed the Board focused too heavily on stock repurchases to manipulate EPS and that those repurchases would not benefit the Company.

In the fourth quarter of 2005, New Century's Board of Directors approved a share repurchase program for up to five million shares of common stock over a 12-month period. Under this program, New Century reported that, during the nine months ended September 30,

2006, it repurchased an aggregate of over 1.5 million of its shares at an average price of $43.03 per share, for an aggregate of over $64.5 million expended for stock repurchases.[164]

Forster's concerns about the impact of the stock repurchase strategy on the Company's liquidity were expressed in an August 13, 2006 letter to independent Director David Einhorn. In that letter, Forster said, "[W]hatever we do, we need to be very comfortable that less capital/liquidity does not in any material way threaten the very existence or viability of New Century." The Company provided the following summary of its liquidity strategy in its Form 10-Q for the third quarter of 2006: "We establish target levels of liquidity and capital based on a number of factors including our loan production volume, the general economic environment, the condition of the secondary market for our loans, the size and composition of our balance sheet and our utilization of various interest rate hedging techniques."[165] New Century reported the following liquidity positions, including cash and available borrowing capacity, for the following periods (dollars in millions):[166]

| Period End | Reported Liquidity |
|------------|--------------------|
| 12/31/2004 | $987.4 |
| 12/31/2005 | $530.4 |
| 9/30/2006 | $457.1 |

Differences of opinion between New Century's Board and Senior Management also apparently existed regarding the Company's dividend policy. Some in Management reportedly wanted to distribute a strong dividend every quarter, while some Board members were not as interested in doing that. Some members of the Board apparently disagreed with an assertion by Management that the dividend was the best measure of New Century's performance. New Century's quarterly common stock dividend amounts and dates paid from 2005 through early 2007 are as follows:[167]

---

[164] Form 10-Q for Q3 2006 at 74.

[165] Form 10-Q for Q3 2006 at 75.

[166] Form 10-K for 2005 at 83; Form 10-Q for Q3 2006 at 76.

[167] Form 10-K for 2004 at 64; Form 10-K for 2005 at 84; Form 10-Q for Q2 2006 at 73; Form 10-Q for Q3 2006 at 83.

| Dividend Payment Date | Dividend Amount (per share) |
|---|---|
| 1/31/2005 | $1.50 |
| 4/29/2005 | $1.55 |
| 7/29/2005 | $1.60 |
| 10/31/2005 | $1.65 |
| 1/30/2006 | $1.70 |
| 4/28/2006 | $1.75 |
| 7/31/2006 | $1.80 |
| 10/31/2006 | $1.85 |
| 1/31/2007 | $1.90 |

### 4.    The Company's Information Systems and Automated Processes

A detailed review and analysis of New Century's information technology and data processing systems was beyond the scope of the Examiner's investigation. However, during the investigation, several interviewees provided information regarding the Company's information systems and this section provides a brief summary of those views.

Several interviewees told the Examiner that they thought New Century's information technology and data entry and processing systems were not "state of the art" and were not sufficient for a business of the size and nature of New Century's. In particular, New Century's loan production processes were apparently manual and people-intensive through the fall of 2005. Up to that time, New Century apparently used an outdated DOS-based loan underwriting and appraisal operating system, which, according to one Management interviewee, allowed users to "finagle anything."[168]

New Century's lack of automated processes for the receipt and tracking of loan repurchase claims before November 2006 was also cited as a weakness of the Company's information management system. According to several interviewees, before November 2006, there was no specific automated system or protocol for the receipt tracking or resolution of repurchase claims.

---

[168] DOS, or MS-DOS, was a disk operating system developed by Microsoft and widely used from the early 1980s through the mid-1990s, when it became the platform for Microsoft's Windows 95 and Windows 98 systems.

On the other hand, New Century used a web-based loan underwriting tool, known as FastQual, that apparently facilitated the online submission by third-party brokers of loan applications to the Company.  FastQual apparently contributed to the efficiency and "ease of use" of the broker loan submission process at New Century.

### 5.    Mortgage Loan Originations and Purchases

#### a.    Overview

New Century originated and purchased mortgage loans through a wholesale division and a retail division.

#### i.    Wholesale Mortgage Loan Division

New Century's wholesale mortgage loan division operated under the name New Century Mortgage Corporation ("NCMC").[169]    NCMC was responsible for the majority of the Company's mortgage loan production volume.[170]  For example, through the first nine months of 2006, the wholesale division was responsible for approximately 85% of the Company's total mortgage loan originations, with \$38.6 billion in loans originated and purchased by the wholesale division, compared to \$6.8 billion for the retail division.[171]  A year earlier, in 2005, 87.7% (or \$49.2 billion) of New Century's total mortgage loans were originated by the wholesale division.[172]  As of September 30, 2006, the wholesale division operated through 33 regional operating centers in 19 states.[173]

New Century's wholesale division originated and purchased loans through a network of independent mortgage brokers and correspondent lenders identified and solicited by the Company's account executives.[174]  These brokers and lenders entered into agreements with the Company in which they agreed to abide by Company policies and applicable laws.[175]  The independent brokers would identify potential borrowers, assist them in completing loan applications, gather necessary documentation and serve as the liaison between the Company and

---

[169] Form 10-K for 2005 at 4-5.

[170] Form 10-K for 2005 at 5.

[171] McCarthy Declaration at 3, para. 5; Form 10-Q for Q3 2006 at 42.

[172] Form 10-K for 2005 at 5.

[173] Form 10-Q for Q3 2006 at 42.

[174] Form 10-K for 2005 at 5; McCarthy Declaration at 2, para. 5.

[175] Form 10-K for 2004 at 8.

the borrower until the Company closed and funded their mortgage loans.[176]   Correspondent lenders were independent mortgage bankers or financial institutions that sold the Company mortgage loans that had already been originated, closed and funded based on specifications provided by New Century.[177]

## ii.   Retail Mortgage Loan Division

Since May 2004, the Company's retail mortgage loan division operated under the name Home123 Corporation ("Home123").[178]   Mortgage loans made through Home123, or the retail division, involved direct contact between borrowers and employees of the Company or its subsidiaries.[179]   Borrowers came to New Century's retail division through a variety of channels, including the Company's 235 sales offices in 36 states (as of September 30, 2006) and the Company's telemarketing unit and website, and via referrals from builders, realtors or other third-parties.[180]   As indicated above, the retail division originated $6.8 billion in mortgage loans during the first nine months of 2006, representing approximately 15% of the loans originated by New Century during that period.[181]   In 2005 the retail division originated $6.9 billion in mortgage loans, representing 12.3% of the loans originated by New Century that year.[182]

## b.   Mortgage Loan Product Mix and Changes in the Mix

The following table shows the types of mortgage loan products that were originated and purchased by New Century from 2004 through the third quarter of 2006 (dollars in thousands):

---

[176] *Id.*; McCarthy Declaration at 2-3, para. 5.

[177] McCarthy Declaration at 3, para. 5.

[178] Form 10-K for 2005 at 6.

[179] McCarthy Declaration at 3, para. 6.

[180] *Id.*; Form 10-K for 2005 at 4.

[181] Form 10-Q for Q3 2006 at 42.

[182] Form 10-K for 2005 at 5.

|  | Year Ended Dec. 31, 2004 | | Year Ended Dec. 31, 2005 | | 9 Months Ended Sept. 30, 2006 | |
|---|---|---|---|---|---|---|
| **Fixed Rate** | **Total** | **%** | **Total** | **%** | **Total** | **%** |
| 15-30 Year | $11,086,399 | 26.3 | $13,845,595 | 24.6 | $10,453,768 | 23.0 |
| Interest-Only | --- | --- | $671,824 | 1.2 | $1,096,951 | 2.4 |
| 40-Year | --- | --- | $489,697 | 0.9 | $2,403,604 | 5.3 |
| HELOC[183] | --- | --- | --- | --- | $239 | -- |
| Fixed Subtotal | $11,086,399 | 26.3 | $15,007,116 | 26.7 | 13,954,562 | 30.7 |
| **Adjustable Rate** | | | | | | |
| 15-30 Year | $22,969,212 | 54.4 | $21,194,109 | 37.8 | $9,161,140 | 20.2 |
| Interest-Only | $8,144,029 | 19.3 | $16,580,514 | 29.6 | $6,621,009 | 14.6 |
| 40-Year | --- | --- | $3,298,913 | 5.9 | $15,653,449 | 34.4 |
| HELOC | --- | --- | $27,589 | -- | $53,112 | 0.1 |
| ARM Subtotal | $31,113,241 | 73.7 | $41,101,125 | 73.3 | $31,488,710 | 69.3 |
| Total Originations and Purchases | $42,199,640 | 100.0 | $56,108,241 | 100.0 | $45,443,272 | 100.0 |
| | | | | | | |
| Purchase Money Mortgages[184] | $14,880,034 | 35.3 | $23,571,645 | 42.0 | $20,338,741 | 44.1 |
| Refinances[185] | | | | | | |
| Cash-out | $25,121,511 | 59.5 | $27,130,520 | 48.4 | $20,338,741 | 44.8 |
| Rate/Term | $2,198,095 | 5.2 | $5,406,076 | 9.6 | $5,065,173 | 11.1 |
| Total PMM[186] & Refi | $42,199,640 | 100.0 | $56,108,241 | 100.0 | $45,443,272 | 100.0 |
| | | | | | | |
| Documentation | | | | | | |
| Full | $21,530,191 | 51.0 | $30,438,822 | 54.2 | $25,303,436 | 55.7 |
| Limited | $2,014,253 | 4.8 | $1,501,367 | 2.7 | $922,042 | 2.0 |
| Stated | $18,655,196 | 44.2 | $24,168,052 | 43.1 | $19,217,794 | 42.3 |
| Total | $42,199,640 | 100.0 | $56,108,241 | 100.0 | $45,443,272 | 100.0 |
| | | | | | | |
| Weighted Average FICO Score of Loans | 627 | | 634 | | 634 | |
| Weighted Average LTV Ratio of Loans | 81.1% | | 81.0% | | 81.1% | |

As this information shows, non-traditional mortgage loan products, such as interest-only loans and 40-year-amortizing loans, became a larger part of New Century's loan mix from 2004 through the third quarter of 2006. Interest-only ARM loans increased from just over 19% (or $8.1 billion) of all loans originated and purchased in 2004 to nearly 30% (or $16.6 billion) in 2005. In addition, 40-year-amortizing ARM loans grew from only about six percent (or $3.3

---

[183] "HELOC" means Home Equity Line of Credit.

[184] Purchase money mortgages are mortgage loans taken by borrowers to acquire a residence.

[185] Cash-out refinancings involve borrowers "taking money out" of the equity in their homes through the refinancing. Rate and term refinancings are transactions in which borrowers refinance to obtain a better interest rate, lower payment and/or different loan maturity.

[186] "PMM" means Property Market Metric.

billion) of all loans in 2005 to over 34% (or $15.7 billion) by the end of the third quarter of 2006. Also noteworthy from this data are the relatively high proportion of "stated income" mortgage loans that were being originated and purchased by New Century (in the low-to-mid 40% range, or between $18.7 and $24.2 billion dollars in loans per period) and the relatively high (though decreasing) proportion of cash-out refinancings over this time period (from 59.5% in 2004 to 44.8% in 2006, or between $27.1 billion and $20.3 billion in loans originated).

"Stated income" loans involve no documentation regarding a borrower's income; instead, the loan is made based on the borrower's statement as to the amount of his or her income. Secondary sources are often used to verify the borrower's ability to repay the loan. Stated income loans are often referred to in the industry as "liars' loans" because of the tendency of some borrowers to overstate their incomes.[187]

With respect to its level of cash-out refinancings, New Century stated in its Form 10-Q for the third quarter of 2006: "Over the last 12 months, we have made a concerted effort to increase our home purchase business. These efforts, coupled with market and economic conditions and the addition of the RBC Mortgage loan origination platform, have enabled us to decrease the percentage of cash-out refinancings as compared to home purchase finance loans."[188] New Century had acquired certain of the loan origination assets of RBC Mortgage Company in September 2005. The Company said the acquisition "expanded our offerings to include conventional mortgage loans, including Alt-A mortgage loans, loans insured by the . . . FHA, and loans guaranteed by the . . . VA."[189]

### c.   Mortgage Loan Origination Process

New Century's wholesale mortgage loan origination process, and its interaction with independent loan brokers, worked as follows, as described by the Company:[190]

---

[187] Dan Dorfman, *Liars' Loans Could Make Many Moan*, N.Y. Sun, Dec. 20, 2006, *available at* http://www.nysun.com/article/45441. This article reports that "a recent sampling of 100 stated-income loans by an auditing firm in Virginia (based on IRS records) found that 90% of the income statements were exaggerated by 5% or more, while almost 60% of the stated amounts were exaggerated by more than 50%." E. Scott Reckard, *Defaults exposing truth of "liar's loans"*, Los Angeles Times, Jan. 15, 2008, *available at* http://seattletimes.nwsource.com/html/businesstechnology/2004125368_liarloans15.html. This article includes the following quote: " 'This is not a subprime crisis. This is a stated-income crisis,' said Robert Simpson, chief executive of Investors Mortgage Asset Recovery in Irvine, Calif., which works with lenders, insurers and investors to recover losses related to mortgage fraud."

[188] Form 10-Q for Q3 2006 at 43.

[189] Form 10-Q for Q3 2006 at 38.

[190] Form 10-K for 2005 at 5.

> In wholesale loan originations, the broker's role is to identify the applicant, assist in completing the loan application form, gather necessary information and documents and serve as our liaison with the borrower through our lending process. We review and underwrite the application submitted by the broker, approve or deny the application, set the interest rate and other terms of the loan and, upon acceptance by the borrower and satisfaction of all conditions imposed by us, fund the loan. . . . Mortgage brokers can submit loan applications through an account executive or through FastQual, our Web-based loan underwriting engine, at *www.newcentury.com.* In either case, the mortgage broker will forward the original loan package to the closest regional operating center where the loan is logged in for regulatory compliance purposes and approved or denied within 24 hours of receipt in most cases. If approved, we issue a "conditional approval" to the broker with a list of specific conditions that have to be met (for example, credit verifications and independent third-party appraisals) and additional documents to be supplied prior to the funding of the loan. An account manager and account executive work directly with the submitting mortgage broker who originated the loan to collect the requested information and to meet the underwriting conditions and other requirements. In most cases, we fund loans within 30 days from the date of our approval of an application.

In other words, for wholesale loan originations, independent brokers found potential borrowers and filled out the loan applications, which were submitted to New Century account executives. Employees interviewed during the investigation said that account executives did not have lending authority and did not have access to New Century's loan origination or underwriting systems. Account executives submitted loan applications to account managers, who reviewed the applications to ensure that the proper documentation had been gathered by the brokers. Account managers did not have lending authority. After all the proper documentation was in place and on New Century's systems, the account manager forwarded the loan applications to the Company's underwriters.

Underwriters at New Century performed traditional underwriting tasks and determined whether to approve a loan. In other words, they had lending authority. Brokers could not communicate with New Century's underwriters. After an underwriter approved a loan, the loan was sent to a closing agent (an escrow or title agent) for closing and execution of the loan documents. After the loan documents were executed, they were forwarded to a New Century funding officer. The funding officers ensured that all of the documents were properly executed. If everything was in order, the funding officer would contact the Accounting Department and request that a wire be sent to the closing agent.

All New Century employees involved in this loan origination process reported to a regional manager. The regional managers reported to divisional managers. The regional and divisional managers had lending authority and could override the decisions of the underwriters who reported to them.

Loan originations in the retail division operated the same as the wholesale division, with a couple of notable exceptions. First, the underwriters in the retail division did not report to Production Department Management. Second, the regional managers in the retail division did not have lending authority and, thus, could not override the decisions of the underwriters.

### d.   Underwriting Standards and Processes

As indicated above, the loan origination and underwriting process at New Century involved reviewing loan documentation and borrower information to determine compliance with the Company's underwriting standards. In its Form 10-K for 2005, New Century said the following about its underwriting standards:[191]

> Our loan origination standards and procedures are designed to produce high quality loans. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of our employees' work. We help to ensure that our origination standards are met by employing accomplished and seasoned managers, underwriters and processors and through the extensive use of technology. We also have a comprehensive training program for the continuing development of both our existing staff and new hires. In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity. . . . We periodically evaluate and modify our underwriting guidelines. We also adopt new underwriting guidelines appropriate to new loan products we may offer.

### e.   Appraisal Reviews

Appraisals were a key part of the underwriting process at New Century. The Company had two types of appraisers: a corporate appraisal group and a staff of review appraisers. The corporate appraisal group maintained a list of outside appraisers that had been approved (or disapproved) to provide appraisals in connection with loan applications that were submitted to New Century. The corporate appraisal group also participated in the hiring of the review appraisers. The review appraisers were responsible for reviewing and determining the

---

[191] *Id.* at 8.

acceptability of the outside appraisals that were attached to loan applications provided by brokers. When a broker submitted a loan application to New Century, the review appraisers would first check to see if the outside appraiser was on the approved or disapproved list. If the outside appraiser was not on the approved or disapproved list, the review appraiser would submit the outside appraiser for approval by the corporate appraisal group. If the outside appraiser was approved, the review appraiser would then determine the acceptability of the appraisal.

In its Form 10-K for 2005, New Century described its appraisal review process as follows:[192]

> A qualified independent appraiser inspects and appraises each mortgage property and gives an opinion of value and condition. Following each appraisal, the appraiser prepares a Report that includes a market value analysis based on recent sales of comparable homes in the area and, when appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals must conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Foundation's Appraisal Standards Board and are generally on forms acceptable to Fannie Mae and Freddie Mac. Our underwriting guidelines require a review of the appraisal by one of our qualified employees or by a qualified review appraiser that we have retained. Our underwriting guidelines then require our underwriters to be satisfied that the value of the property being financed, as indicated by the appraisal, would support the requested loan amount.

Employees interviewed during the investigation added the following information about New Century's appraisal review process: New Century's automated systems were programmed with certain business rules related to the appropriateness of appraisals. When an appraisal fell outside of those rules, it would be flagged by the system. The responsible underwriter would send the flagged appraisal to an internal New Century appraiser. The internal appraisers would review the appraisal and decide whether to accept or reject it. Because they were licensed appraisers, the New Century internal appraisers also could decrease appraisals. However, they could not increase appraisals. In the wholesale division, the regional managers who had lending authority could override the internal appraisers' decisions. When a regional manager overrode an appraiser's decision, New Century's automated systems reported this information and a report regarding appraisal overrides was sent to the Corporate Credit Officer.

In his interview during the Examiner's Investigation, Morrice said New Century undertook several initiatives to improve the reliability of appraisals, but he also indicated that

---

[192] Form 10-K for 2005 at 8.

bad appraisals were a frustrating source of concern and the main cause of loan "kickouts," which was the rejection of loans by investors in whole loan sale transactions. Morrice also said that improper appraisals were the biggest contributors to losses when loans went bad. However, Morrice also stated that, in his view, New Century was "in the mainstream on appraisal practices."

### 6.    Financing New Century's Operations: Warehouse Loans and Liquidity

To finance and carry the mortgage loans New Century originated and purchased, pending their sale or securitization in the secondary mortgage market, the Company maintained credit facilities, typically in the form of master repurchase agreements, with multiple warehouse lenders, which were large banking and investment institutions.[193]   Typically, the master repurchase agreements between New Century and the warehouse lenders contained covenants that required the Company, among other things, to maintain certain liquidity levels and net worth and debt-to-equity ratios, and to limit the Company's indebtedness.[194]  New Century's breach of any covenant typically triggered a warehouse lender's right to terminate its master repurchase agreement with the Company and to accelerate the Company's repayment obligation,[195] which is often referred to as the obligation to repurchase mortgage loans financed under the master repurchase agreement.[196]  Moreover, New Century's default under any one master repurchase agreement with a warehouse lender generally triggered the right of the Company's other warehouse lenders to accelerate repayment or repurchase under their master repurchase agreements with the Company.[197]

At the end of the third quarter of 2006, the Company reported that it had outstanding approximately $8.5 billion in short-term borrowings under 14 separate master repurchase agreements and an asset-backed commercial paper facility, all of which were secured by mortgage loans held for sale and other assets of the Company.[198]   For year-end 2005, the

---

[193] Form 10-Q for Q3 2006 at 10, 77-79; McCarthy Declaration at 3, para. 8.

[194] Form 10-Q for Q3 2006 at 69.

[195] *Id.* at 70.

[196] McCarthy Declaration at 7, para. 19.

[197] Form 10-Q for Q3 2006 at 70.

[198] *Id.* at 17.  The $8.5 billion outstanding under master repurchase agreements and the commercial paper facility is in addition to the approximately $13.9 billion in securitized bonds the Company reported as its financing on mortgage loans held for investment at September 30, 2006.  *Id.* at 19.

Company reported that it had outstanding approximately $7.4 billion in short-term borrowings under 10 separate master repurchase agreements and an asset-backed note purchase and security agreement.[199]

Some warehouse lenders funded loans placed on their warehouse lines before the receipt by the lender's custodian of the loan documentation packages for the loans being funded. This is referred to in the industry as "wet funding." Other lenders would not fund until the custodian's receipt of the loan packages, which is referred to as "dry funding." If the loan packages for "wet funded" loans were not received by the custodian within seven days of the funding, New Century had an obligation to buy those loans back from the warehouse lender.

Under the master repurchase agreements between New Century and its warehouse lenders, each lender also had the right to initiate a margin call, which required the Company to provide the lender with additional collateral or repay a specified portion of the outstanding borrowing, if the lender determined that the value of the mortgage loan collateral that secured the borrowing had decreased below a set amount.[200] The exercise of these margin call rights by New Century's warehouse lenders in March 2007 had a significantly negative impact on the Company's liquidity position and was a main factor that contributed to the Company's decision to file in bankruptcy.[201]

### 7. Secondary Mortgage Market Activities

#### a. Overview

New Century's secondary mortgage market activities consisted principally of whole loan sales, securitizations structured as sales, and securitizations structured as financings.

New Century sold whole loans pursuant to non-recourse purchase agreements that included representations and warranties regarding loan characteristics and the loan origination process. These generally included New Century's commitment to repurchase or substitute a loan in the event of an EPD—i.e., a default within the first month or two following the sale of the loan—or in the event of a material breach of the representations or warranties made by New Century regarding loan characteristics and the loan origination process.[202] The proceeds of

---

[199] Form 10-K for 2005 at F-31. This amount is in addition to the approximately $16 billion in securitized bonds the Company reported as its financing on mortgage loans held for investment at December 31, 2005. *Id.* at F-33.

[200] Form 10-K for 2005 at 37; McCarthy Declaration at 7, para. 18.

[201] McCarthy Declaration at 14, para. 50.

[202] Form 10-K for 2005 at 10.

whole loan sales were used to pay down warehouse lines and the Company's asset-backed commercial paper note facility.[203]

In a securitization structured as a sale, New Century sold a pool of loans to a trust in exchange for cash and a certificate evidencing an economic interest in the trust—known as a "residual interest."[204]    The trust raised the cash portion of the purchase price by selling certificates representing senior interests in the underlying loans in the trust.[205]  These transactions were accounted for as sales under applicable accounting standards, and New Century recognized gain on the sale.[206]  New Century also received certain cash flows from its residual interests.[207] In 2005, these cash flows totaled $17.5 million (including approximately $17 million categorized as interest income).[208]  As of September 30, 2006, these cash flows were reported to be approximately $2.1 million.[209]

As indicated above, in 2003 New Century began a strategy of keeping loans on its balance sheet through securitizations structured as financings rather than as sales.[210]  During the period from 2003 to 2005, New Century retained approximately 20 to 25% of total loan production on its balance sheet in this manner.[211]  When loans were held on New Century's balance sheet, the Company recognized interest payments on the underlying mortgage loans in the portfolio as payments were received, rather than recognizing gain on the sale of loans.[212]  The proceeds of New Century's securitizations, whether structured as sales or financings, were also used to pay down the warehouse lines and asset-backed commercial paper note facility.[213]

---

[203] *Id.*

[204] *Id.* at 11.

[205] *Id.*

[206] *Id.*

[207] *Id.*

[208] Form 10-K for 2005 at F-14, F-35.

[209] Form 10-Q for Q3 2006 at 5.

[210] Form 10-K for 2005 at 56.

[211] *Id.*

[212] *Id.* at 62.

[213] *Id.* at 10.

New Century's whole loan sales and loan securitizations were conducted by its Secondary Marketing Department, New Century Capital Corporation. [214]   In 2005, whole loan sales comprised approximately 67% of New Century's secondary mortgage market transactions, while securitizations structured as sales and securitizations structured as financings comprised, respectively, approximately 12.2% and 20.8% of the total.[215]   In dollar terms, of $52.7 billion in total secondary market transactions reported in 2005, approximately $35.3 billion were whole loan sales, $6.4 billion were securitizations structured as sales, and $11.0 billion were securitizations structured as financings.[216]   For the nine months ended September 30, 2006, New Century reported that whole loan sales accounted for approximately 93.4% of the Company's secondary market activities, with approximately $41.1 billion in loans being sold.[217]   For that nine-month period, New Century reported no securitizations structured as sales and approximately $3.4 billion, or 7.7% of all secondary market transactions during that period, in securitizations structured as financings.[218]

Generally, New Century sold or securitized loans it originated or purchased within 30 to 90 days after the loans were originated or purchased by the Company.[219]   The analysis and decision-making process regarding whether New Century would sell or securitize loans generally was as follows:  the Secondary Marketing Department would calculate the appropriate prices, discuss liquidity issues with the treasury group, and make a proposal to the CEO, who ultimately made the decision whether to sell or securitize.  The New Century Board would ratify the decision.  The decision was essentially a balancing question, *i.e.*, the sales price for the loans if sold by Secondary Marketing versus liquidity concerns if the loan were placed in the portfolio.  New Century's Board of Directors typically received information regarding the Company's secondary marketing strategy, including information about whole loan sales and loan securitizations.

---

[214] Form 10-K for 2004 at 15, 37.

[215] Form 10-K for 2005 at 61.

[216] *Id.*

[217] Form 10-Q for Q3 2006 at 46-47.

[218] *Id.*

[219] Form 10-K for 2005 at 10.

### b.    Whole Loan Sale Process: "Kickouts" and "Scratch and Dents"

Each month, New Century typically had a few billion dollars in whole mortgage loans to sell in the secondary market.    When New Century put together a pool of loans to sell, it would either send a bid list that included data about the loans in the pool to a group of potential investors or send the data to a targeted investor that New Century believed would be interested in the loans being sold.  When deciding whether to offer to sell whole loans to an investment bank, the Company considered whether the bank was providing New Century with a warehouse line of credit.  The potential investors would review the information and contact New Century regarding loans the investors wanted "kicked out" of the pool because of missing data or data outside the range of what was expected for the loan pool.  Over time, and based on its experience with potential investors, New Century developed a database with a set of queries that looked for "bad" loan data before the data was sent to investors.  If a value about the characteristics of a specific loan in the data warehouse was missing or outside a standard range, the loan was "kicked out" by the database for examination and to address the problematic values.  This amounted to an after-the-fact quality control on the loans that had been recorded in New Century's data warehouse. Before this process was developed in 2006, this control was performed manually on each data tape that went out to potential investors.

Once an agreement on a whole loan sale transaction was reached with an investor, New Century, through its Secondary Marketing Department, would coordinate due diligence with the investor.  At the investor's request, the Secondary Marketing Department would forward a representative sample of the loan files from the loans in the pool to the investor.  The size of the representative sample varied, but it was usually around 25% of the total loans in the pool.  By late-2006, some investors were requiring higher sample rates, including some that required a 100% due diligence review of a pool's loan files.  The investor, or a due diligence firm hired by the investor, would review the files to determine that the loans were underwritten according to the pool's guidelines.  The investor would also look at the appraisals to uncover any potential valuation issues.  The investor would then send a list of problem loans to a loan sale coordinator at New Century, who would review the problems identified and attempt to resolve them.  In the case of loans that met New Century's general underwriting guidelines but did not meet the investor's guidelines, the loan sale coordinator would attempt to persuade the investor that the loan was nonetheless acceptable.  For any loan that was non-performing (i.e., the borrower was

not making payments) or that was discovered not to have met New Century's own underwriting guidelines, no attempt was made to avoid "kicking" the loan out of the pool.

After New Century and the investor agreed upon the "kickouts" from a loan pool, the parties would complete the whole loan sale transaction. This was accomplished by (1) a transfer of the loans being sold from the warehouse lenders to New Century, via the warehouse lenders' custodian, and from New Century to the investor, and (2) payment by the investor to the warehouse lenders on whose warehouse lines the loans had been.

Meanwhile, the loan sale coordinator at New Century would categorize the deficiency of the loan "kickouts" as either egregious or non-egregious. An example of a non-egregious deficiency would be that a particular investor is sensitive to stated income or high debt-to-income ratios, whereas another investor might accept such loans. An example of an egregious deficiency would be non-performing loans and loans that did not comply with New Century's underwriting standards. For non-egregious kickouts, the loan would be moved to another loan pool for potential sale to other investors. For egregious kickouts, the loan would be moved to the so-called "scratch and dent" category in the Company's loan inventory.

New Century sold scratch and dent loan pools from time to time in discounted loan sales. As described by the Company, discounted loans "consisted of repurchased loans, loans with documentation defects or loans that whole loan buyers rejected because of certain characteristics."[220] The Company would assemble a pool of scratch and dent loans and then send out bid documents to investors, which were typically specialized scratch and dent firms or separate scratch and dent "desks" at investment banks. The bid documents described what was wrong with the loans by listing, in a data file, the various deficiencies. The investor due diligence process for scratch and dent loan pools was similar to the due diligence process for the regular loan pools. However, the amount of kickouts was lower because the investors generally knew the problems with the scratch and dent loans. If problems were identified in a scratch and dent loan pool, instead of kickouts, the loans would generally stay in the pool and the value of the pool would drop in proportion to the "loss" related to the problems.

In 2004, New Century sold $148.1 million in loans at a discount to their outstanding principal balance, representing 0.4% of the Company's total secondary market transactions that

---

[220] Form 10-K for 2005 at 63.

- 67 -

year.[221]  In 2005, New Century sold $246.5 million in loans at a discount to their outstanding principal balance, representing 0.5% of the Company's total secondary market transactions for that year.[222]  For the nine-month period ended September 30, 2006, the Company sold $916.3 million of loans in discounted loan sales, representing 2.1% of the Company's total secondary market transactions for that time period.[223]

### c.    Securitization Structures and Processes

As indicated above, New Century engaged in two types of securitizations in which loans were pooled and securities based on the loan pools were sold to investors: (1) securitizations structured as sales, known as off-balance sheet securitizations, and (2) securitizations structured as financings.

In its Form 10-Q for the third quarter of 2006, the Company described its securitizations structured as sales:[224]

> We generally structure off-balance sheet securitizations as follows: first, we sell a portfolio of mortgage loans to a special purpose entity ("SPE") that has been established for the limited purpose of buying and reselling mortgage loans; then the SPE transfers the same mortgage loans to a real estate mortgage investment conduit . . . or owners trust (the "Trust"), which is a qualifying special purpose entity . . . as defined under Statement of Financial Accounting Standards No. 140 . . .; and, finally, the Trust issues (i) interest-bearing asset-backed securities (the "Bonds and Certificates") generally in an amount equal to the aggregate principal balance of the mortgage loans and (ii) a certificate to us representing a residual interest in Cash Flows related to the payments made on the securitized loans.  The Bonds and Certificates are typically sold at face value on a non-recourse basis, except that we provide to the Trust representations and warranties customary in the mortgage banking industry.  One or more investors typically purchase these Bonds and Certificates for cash.  The Trust uses the cash proceeds to pay us the cash portion of the purchase price for the mortgage loans.  In addition, we may provide a credit enhancement in the form of additional collateral (the "OC") held by the Trust.    The servicing agreements typically require that the OC be maintained at certain levels.

New Century's securitizations structured as financings were structured similarly to the Company's securitizations structured as sales, with the following important differences:  (1) the securitization trusts did not meet the qualifying special purpose entity criteria under Statement of

---

[221] Form 10-K for 2005 at 61.

[222] *Id.*

[223] Form 10-Q for Q3 2006 at 46.

[224] Form 10-Q for Q3 2006 at 50.

Financial Accounting Standards ("FAS") 140 and related interpretations because of their ability to enter into derivative contracts, and (2) the Company had the option to purchase loans from the securitization trust at the Company's discretion.[225]   In addition, the Company's accounting treatment of the two types of securitizations was quite different, with the loans in a securitization structured as a financing remaining on the Company's balance sheet as "mortgage loans held for investment."[226]

In a securitization structured as a sale, the securitized loans went off of the Company's balance sheet and the Company recorded on its balance sheet (i) the cash received in the transaction, (ii) the fair value of the residual interests in the securitized loans, and (iii) the estimated fair value of the servicing rights, if the loans were securitized with servicing retained by New Century.[227]   The excess of the cash received and the servicing asset retained, if any, over the carrying value of the loans sold, less transaction costs, equaled the net gain on sale of mortgage loans recorded by New Century in its statement of earnings.[228]

## 8.   Mortgage Loan Servicing

As indicated above, New Century engaged in mortgage loan servicing through one of its taxable REIT subsidiaries.[229]   The Company described its loan servicing activities as follows:[230]

Loan servicing activities are designed and implemented to ensure that each loan in a mortgage servicing portfolio is repaid in accordance with its terms. Such activities are generally performed pursuant to servicing contracts we enter into with investors or their agents in connection with whole loan sales or securitizations. The servicing functions performed typically include: collecting and remitting loan payments; making required advances; accounting for principal and interest; customer service; holding escrow or impound funds for payment of taxes and insurance; and, if applicable, contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of un-remedied defaults. For performing these functions for third parties we generally receive a servicing fee of 0.50% annually of the outstanding principal balance of each loan in the mortgage servicing portfolio. The servicing fees are collected from the monthly payments made by the mortgagors. In addition, we generally receive other remuneration consisting of float benefits derived from collecting and

---

[225] Form 10-K for 2005 at 63.

[226] *Id.*

[227] Form 10-Q for Q3 2006 at 50.

[228] *Id.*

[229] Form 10-K for 2005 at 12.

[230] *Id.*

remitting mortgage payments, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.

As of September 30, 2006, the balance of New Century's mortgage loan servicing portfolio was $43.3 billion, which included $12.9 billion of mortgage loans held for investment, $8.5 billion of mortgage loans held for sale, $9.2 billion of mortgage loans sold on a servicing-retained basis, and $12.7 billion of loans serviced on a temporary basis for purchasers of the loans pending transfer of servicing rights to the purchaser or its designee.[231]   New Century reported servicing income of $28.9 million in 2004, $38.5 million in 2005, and $47.4 million for the nine months ended September 30, 2006.[232]

As discussed above, most of New Century's whole loan sales and securitizations structured as sales were done on a servicing-released basis, meaning New Century did not retain the servicing rights to the loans it sold or securitized. According to Richard Cimino, who was the head of Loan Servicing at New Century, the Company made efforts to increase its servicer rating from third-party rating agencies so that it would be in a position to retain more servicing rights with respect to loans sold and securitized.   New Century described its desire to retain servicing rights, and the improvement in the rating of its servicing platform, as follows:[233]

> We intend to continue to retain servicing rights on certain of the loans we sell in future periods. In the second quarter of 2004, we received a rating of RPS3+, or average with noted strengths, from Fitch Ratings for our subprime servicing platform. In 2005, we received a rating of SQ3+, or average, from Moody's Credit Rating Service and, in January 2006, Standard and Poor's upgraded its rating for our subprime servicing platform to above average from average.

### 9. Mortgage Loan Repurchases

As described above, New Century had an obligation under whole loan sale agreements, and in connection with securitization transactions, to repurchase loans under certain circumstances. New Century described its repurchase obligations as follows in its Form 10-K for 2005:[234]

> When we sell mortgage loans, we are required to make customary representations and warranties about such mortgage loans to the purchaser. Our whole loan sale agreements require us to repurchase or substitute mortgage loans in the event we

---

[231] *Id.*

[232] Form 10-K for 2005 at 67; Form 10-Q for Q3 2006 at 61.

[233] Form 10-K for 2005 at 13.

[234] *Id.* at 40.

- 70 -

breach a representation or warranty given to the mortgage loan purchaser or make a misrepresentation during the mortgage loan origination process. In addition, we may be required to repurchase mortgage loans as a result of borrower fraud or in the event of early payment default on a mortgage loan. Likewise, we are required to repurchase or substitute mortgage loans if we breach a representation or warranty in connection with our securitizations.

Once a loan was repurchased by New Century, the value of the loan was substantially impaired. As the Company stated in its Form 10-K for 2005: "[R]epurchased mortgage loans typically can only be financed at a steep discount to their repurchase price, if at all. They are also typically sold at a significant discount to the unpaid principal balance."[235]

Notices of loan repurchase claims were received by New Century's Secondary Marketing Department, usually by the person with whom the investor making the repurchase claim last dealt with at New Century. When a repurchase claim was based upon a breach of representations and warranties made in a whole loan sale or a securitization transaction, resolution of the issue was assigned to the department within New Century that needed to investigate the issue. For example, fraud and legal issues were sent to the Company's Legal Department and underwriting issues were sent to the Loan Production Department. The department investigating the issue had to approve the repurchase claim request prior to payment being made on the claim. If approved for payment, the Secondary Marketing Department contacted the claimant and facilitated payment for the repurchase of the loan through the Accounting Department. If a repurchase claim was denied, however, the denying department within New Century was responsible for communicating directly with the repurchase claimant. This decentralization reportedly delayed the processing and resolution of repurchase claims, which contributed to a back-log of repurchase claims.

By no later than the end of 2005, a build-up or back-log of unresolved repurchase claims had begun to develop at New Century, and the volume of repurchase claims being received by New Century increased significantly in 2006. By mid-2006, New Century had approximately $224 million of unresolved repurchase claims, of which approximately $170 million were more than two months old and approximately $75 million of those were more than six months old. The build-up of this back-log and concerns about the lack of good tracking and resolution

---

[235] *Id.*

processes for repurchase claims led to the creation of a "repurchase desk" within the Secondary
Marketing Department in the fall of 2006.

A significant change in the funding of repurchases occurred in January 2007. Before that
time, New Century would sometimes repurchase loans with cash before arranging warehouse
line financing. As a result, however, there was sometimes a delay between when cash went out
to repurchase and when cash came back in. That procedure changed early in 2007 when cash
became scarce and the Company's repurchase volume increased. After January 2007, New
Century could only make repurchases when it had the funding to do so.

### D.   Risks to New Century's Business

New Century faced a number of risks in its business, including in the following general
areas:

- Credit risk involving mortgage loan borrowers. This risk was particularly acute
  for New Century (and other subprime lenders) because of the relatively higher
  risk nature of subprime mortgage borrowers.

- Market risk involving changes in interest rates, housing values, warehouse
  lenders' willingness to finance New Century's mortgage lending operations, and
  secondary market investors' appetites for whole loan sales and securitizations
  offered by New Century.

- Operational risks involving the Company's ability to purchase or originate, and to
  sell or securitize, mortgage loans—and to account for those transactions and
  properly reserve against risks relating to those transactions—in an efficient and
  accurate manner that complied with the Company's internal policies and
  guidelines and with applicable accounting principles.

The following paragraph headings from New Century's risk disclosures in its Form 10-K
for 2005 indicate the breadth and nature of the credit, market and operational risks New Century
faced:[236]

- "We are dependent on external sources of financing, and if we are unable to
  maintain adequate financing sources, our earnings and our financial position will
  suffer and jeopardize our ability to continue operations."

- "A prolonged economic slowdown or a lengthy or severe recession could harm
  our operations, particularly if it results in a decline in the real estate market."

- "Our earnings may decrease because of increases or decreases in interest rates."

---

[236] *Id.* at 27-40.

- "Our reliance on cash-out refinancings as a significant source of our origination volume increases the risk that our earnings will be harmed if the demand for this type of refinancing declines."

- "Our accounting policies and methods are fundamental to how we report our financial condition and results of operations, and they may require Management to make estimates about matters that are inherently uncertain."

- "Our hedging strategies may not be successful in mitigating our risks associated with interest rates."

- "An increase in mortgage loan prepayments may negatively affect the yields on our assets."

- "The mortgage loans that we hold are subject to the risks of delinquency and foreclosure loss, which could result in losses to us."

- "The geographic concentration of our mortgage loan originations increases our exposure to economic and natural hazard risks specific to those areas."

- "An interruption or reduction in the securitization and whole loan markets would harm our financial position."

- "Our earnings from holding mortgage-backed securities or government securities may be harmed by changes in the level of interest rates, changes to the difference between short- and longer- term interest rates, changes to the difference between interest rates for these securities compared to other debt instruments, and an absence of or reduction in the availability, at favorable terms, of repurchase financing and other liquidity sources typically utilized by mortgage REITs."

- "A material difference between the assumptions used in the determination of the value of our residual interests and our actual experience could harm our financial position."

- "Our interest-only mortgage loans may have a higher risk of default than our fully-amortizing mortgage loans and, therefore, may be considered less valuable than other types of mortgage loans in the sales and securitization process."

- "We may incur losses on our mortgage loans even if the mortgage loans are insured by the Federal Housing Administration or guaranteed by the Veterans Administration."

- "Our inability to realize cash proceeds from mortgage loan sales and securitizations in excess of the loan acquisition cost could harm our financial position."

- "Our credit facilities are subject to margin calls based on the lender's opinion of the value of our mortgage loan collateral. An unanticipated large margin call could harm our liquidity."

- "Our origination and servicing systems depend significantly on automated controls and any failure of these systems could harm our business."

- "Our efforts to increase our servicing activities may be unsuccessful and a decline in the quality of servicing could lower the value of our residual interests and our ability to sell or securitize mortgage loans and could harm the cash flows from our securitizations structured as financings."

- "We are subject to losses due to fraudulent and negligent acts on the part of mortgage loan applicants, mortgage brokers, other vendors and our employees."

- "Changes in the volume and cost of mortgage loans originated by our Wholesale Division may decrease our mortgage loan production and decrease our earnings."

- "We may be required to repurchase mortgage loans or indemnify investors if we breach representations and warranties, which could harm our earnings."

### E.    Overview of New Century's Board, Management and Other Key Players

This subsection describes New Century's organizational structure and identifies and provides information about its Directors, key Management, and other personnel.

### 1.    Board of Directors

New Century's Board of Directors in early-March 2007 consisted of the following individuals:[237]

| Name | Independent Director (or Officer Position) | Director Since |
|------|--------------------------------------------|----------------|
| Marilyn A. Alexander | Independent Director | 2005 |
| Harold A. Black | Independent Director | 2004 |
| Robert K. Cole | Chairman (through December 2006) and Chief Executive Officer (through June 2006) | 1995 |
| David Einhorn | Independent Director (since March 2006) | 2006 |
| Frederic J. Forster | Independent Director | 1997 |
| Edward F. Gotschall | Vice Chairman-Finance (through June 2006) | 1995 |
| Donald E. Lange | Independent Director | 2002 |
| Brad A. Morrice | Vice Chairman, President and Chief Operating Officer (through June 2006), Chief Executive Officer (from July 2006) | 1995 |
| William J. Popejoy | Independent Director | 2002 |
| Michael M. Sachs | Independent Director | 1995 |
| Richard A. Zona | Independent Director | 2000 |

As this table shows, New Century's founders, Morrice, Gotschall and Cole, all served on the Company's Board of Directors. However, pursuant to the Company's Corporate Governance

---

[237] *See* Proxy Statement, filed Apr. 11, 2005; Proxy Statement, filed Apr., 2006.

Guidelines, independent Directors—that is, directors with no material relationship to the Company other than that of director—constituted the majority of the Board.[238]

New Century's Board included three certified public accountants (Alexander, Sachs and Zona), one member with a PhD (Black), four members with M.B.A. degrees (Alexander, Cole, Forster and Morrice), two members with law degrees (Morrice and Sachs), and several members with considerable years of experience in the banking, mortgage banking and financial services industries (notably Black, Cole, Forster, Gotschall, Lange, Morrice, Popejoy and Zona).[239]

### 2. Board Committees

The New Century Board of Directors had the following committees: Audit; Compensation; Executive; Finance; Governance and Nominating; Public and Community Affairs; and Stock Option.[240] Of these, the most significant for purposes of this Final Report are the Audit and Finance Committees.

The following Independent Directors were members of the Audit Committee from 2005 through the Company's bankruptcy filing: Sachs (Chairman), Alexander, Lange and Zona.[241] The Audit Committee generally met at least monthly, and, occasionally, more than once a month. Among the types of matters the Committee discussed and reports the Committee received in its meetings in 2005, 2006 and 2007 were the following: compliance with Sarbanes-Oxley requirements; quarterly operating and earnings releases; loan quality; reports from the Company's auditors, KPMG; accounting analyses; and internal audit presentations, including regarding audit plan development and a multi-year audit plan. One or more representatives of KPMG appear to have been present at all Audit Committee meetings.

The charter of the New Century Board of Director's Finance Committee provides that the purpose of that Committee "is to help discharge the responsibilities of the Company's Board of Directors . . . relating to the Company's financial performance, financial objectives and

---

[238] New Century Financial Corporation Corporate Governance Guidelines (as amended and restated on July 26, 2006) at 2, *available at* http://www.ncen.com/pdf/corp_gov_guildelines.html; *see also* Form 10-Q for Q3 2006 at p. 54; Proxy Statement, Apr. 4, 2006, p. 32 ("Our governance and nominating committee also seeks to ensure that at least a majority of the directors are independent under any applicable legal and regulatory standards"); Proxy Statement, Apr. 11, 2005; Proxy Statement, Aug. 16, 2004.

[239] *See also* Proxy Statement, filed Apr. 4, 2006.

[240] *Id.* at 26; New Century Financial Corporation Corporate Governance Guidelines (as amended and restated on July 26, 2006) at 6.

[241] Form 10-Q for Q3 2006 at 54; New Century Financial Corporation Corporate Governance Guidelines (as amended and restated on July 26, 2006) at 6.

strategies, capital structure, financing strategies, liquidity, interest rate risk management, loan reserves and performance, acquisitions and divestitures and major financial initiatives." The members of the Finance Committee from its creation in early-2006 through the Company's bankruptcy filing were Alexander (Chair) and Zona, Sachs and Einhorn.

The Finance Committee met slightly more often than monthly. Among the types of issues the Committee discussed and the reports the Committee received were the following: liquidity forecasts; Management's financial models; alternative financial scenarios; and presentations by third-party financial advisory firms.

Finance Committee members said in interviews during the Examiner's investigation that one of the purposes of the Finance Committee was to build a more rigorous financial presentation to the Board as a mechanism to improve its ongoing monitoring of New Century's performance. Committee members also said that the Board wanted to have more time devoted to the analysis of strategic business risks and opportunities than what was feasible at the Board meetings, when there was insufficient time for detailed inquiry on financial presentations. Finance Committee members said that the new format for internal financial reporting developed by the Committee allowed the Board to receive financial information on a more regular basis, and in a format that permitted more time for strategic discussions.

### 3. Board of Directors Activity Level and Issues

New Century's Board of Directors appears to have met, on average, approximately two and a half times per month from early 2005 through early 2007. The Board also appears to have been very actively involved in many aspects of the Company's business and issues. Several interviewees indicated during the investigation that the Board asked very detailed questions about matters presented to it. One member of New Century's Senior Management described the Company's Board of Directors as having been "extraordinarily" active.

By late-2005, the Board had focused on several issues central to New Century's business, including concerns about the strengths and structure of the members of the Company's Senior Management, the strategic direction of the Company, the capabilities of New Century's Finance/Accounting Department, and the need for improvement in the Company's forward - looking financial projections. Ultimately, and as described in more detail below, the Board held an "off-site" meeting in January 2006 to address some of these concerns, and decisions were made to (1) change the Company's CEO structure from the existing "troika" of the Company's

founders, (2) appoint Morrice as the sole CEO, and (3) review the advisability of the "portfolio" strategy that the Company had been pursuing since before its REIT conversion in 2004.

In addition to these very significant matters, New Century's Board was considering many other important issues at various times, and sometimes many or all at the same time, during the late-2005 through early 2007 time period, including:

- replacing Dodge as Chief Financial Officer ("CFO");
- addressing the Company's liquidity position and concerns;
- standardizing and improving the Company's internal financial reporting mechanism;
- loan quality issues;
- imbedded credit risk issues regarding loans in the Company's portfolio;
- secondary marketing issues (including a possible conflict inherent in the "dual role" of Kevin Cloyd, head of New Century's Secondary Marketing Department);
- reviewing accounting issues in areas that required Management's judgment, such as loan loss reserves, loan repurchase reserves and residual interest valuations;
- reviewing the Company's financial reports and information disclosed to the public; and
- dealing with the Company's largest shareholder, David Einhorn, who, in 2006, became a member of the Board.

The Board's ultimate resolutions or actions regarding many of these various issues are discussed elsewhere in this Final Report.

### 4.    Executive Management and Other Key Personnel

New Century's top executive was the President and CEO. One of the Company's founders, Cole, held those positions nominally from the founding of the Company through June 2006. However, as indicated above, Cole, Gotschall and Morrice effectively functioned as a CEO "troika" for New Century from the Company's inception until January 2006. Pursuant to the Board's decision in early 2006, Morrice who apparently, in substance, had been overseeing most of New Century's business already became the Company's President and CEO in June 2006, and he held that position until the Company terminated his employment in June 2007.

The top-level executive officers of the Company who reported to the President and CEO in the 2005 through 2007 time frame were the following:

| Position | Name |
|----------|------|
| EVP, Chief Financial Officer | Patti Dodge (until Nov. 2006) |
| | Taj Bindra (after Nov. 2006) |
| EVP; President, New Century Capital Corp. (the Secondary Marketing Department) | Kevin Cloyd (after Dec. 2005) |
| EVP, Production | Anthony Meola (after May 2006) |
| President, New Century Mortgage Corp. | Patrick Flanagan (until Dec. 2005) (upon Flanagan's departure from the Company in Dec. 2005, this position was split into the positions held by Cloyd and, a few months later, Meola) |
| EVP, Investor Relations | Patti Dodge (after Nov. 2006) |
| EVP, Chief Operating Officer | Brad Morrice (until June 2006) |
| | Joe Eckroth (after June 2006) |
| EVP, Corporate Affairs and General Counsel | Terry Theologides |
| SVP Leadership and Organizational Development | Robert Lambert |

Each of these senior corporate officers, in turn, had a number of direct and indirect reports, including the following that are most relevant for purposes of this Final Report (in last name alphabetical order):

| Name | Position | Reported to |
|------|----------|-------------|
| George Arambula | VP, Internal Audit | Paul Zalle |
| Paul Atkinson | VP, Risk Solutions | Lenice Johnson |
| Eric Bachelor | Capital Markets Department | Evan Mitnick |
| Mark Bernstein | Trading Director | Rick Holguin |
| Ron Brown | Internal Audit | Paul Zalle |
| Ron Brown | Secondary Marketing/Repurchase Desk | Warren Licata, Rick Rhinehart, Karl Weiss |
| Richard Cimino | President, Loan Servicing | Kevin Cloyd |
| Dan Coakley | VP, Credit and Operations | Serene Russell |
| Rick Collins | Investor Reporting Manager | Evan Mitnick |
| Christine Fidler | VP, Corporate Finance | Rod Colombi |
| Amanda Fowler | Asst. VP, Investor Relations | Carrie Marelli |
| Carol Franchi | Asst. VP, Loan Accounting Manager | Tony Sanchez, Dave Kenneally, Donna Walker |
| Jeff Goldberg | VP, Treasurer | Rodney Colombi, Patti Dodge, Taj Bindra |
| John Hatch | Sr. Analyst, Secondary Marketing | Warren Licata |
| John Hedlund | SVP, Corporate Operations | Joe Eckroth |
| Jennifer Jewett | Corporate Counsel | Monika McCarthy |
| Lenice Johnson | SVP, Corporate Credit Officer | Kevin Cloyd |

| Name | Position | Reported to |
|------|----------|-------------|
| Dave Kenneally | SVP, Controller | Patti Dodge, Taj Bindra |
| Tim Lee | Retail Underwriting | Gary Bellmore |
| Steve Lemon | EVP, East Coast Wholesale | Tony Meola |
| Robert Lent | VP, Investor Relations | Karl Weiss |
| Warren Licata | SVP, Secondary Marketing and Capital Markets | Karl Weiss, Kevin Cloyd |
| Mary Malloy | VP, Hedging | Karl Weiss |
| Carrie Marelli | VP, Investor Relations | Patti Dodge |
| Monica McCarthy | SVP Legal Counsel | Terry Theologides |
| Lois McDermott | Risk Manager | Rey Topete |
| William McKay | SVP Mortgage Operations | Dan Sussman, John Hedlund |
| Evan Mitnick | SVP, NCCC | Kevin Cloyd |
| Matthew Mullins | Sr. Analyst, Secondary Marketing (until 4/06); Hedging Dept. (after 4/06) | Warren Licata, Mary Malloy |
| Rick Rhinehart | VP Secondary Marketing | Kevin Cloyd |
| Tony Sanchez | Assistant Controller | Dave Kenneally |
| Music Sprouse | Cash Management Manager | Dave Kenneally |
| Randy Stewart | EVP, Home123 Capital Markets | Kevin Cloyd |
| Jonathan Threadgill | President, Retail Prime | Tony Meola |
| Joe Tortorelli | Legal Dept. | Terry Theologides |
| Donna Walker | VP, Financial Reporting | Patti Dodge, Dave Kenneally |
| Karl Weiss | SVP, Capital Markets | Kevin Cloyd |
| Colleen Wolf | Chief Information Officer | Joe Eckroth |
| Paul Zalle | SVP, Internal Audit | Terry Theologides |

## 5.   Management Committees

New Century's Senior Management participated in several Management-level committees, including the following: Asset and Liability, Cash, Credit, Disclosure, Executive Management, Liquidity, Securitization and Sub-Credit. Several of these committees were formed after the Company converted to a REIT in 2004.

## 6.   New Century's Bonus and Incentive Compensation Plans

New Century's Senior Management received base compensation, bonuses and incentive compensation from the Company based on their employment contracts with the Company and pursuant to the provisions of the Company's "2004 Performance Incentive Plan" (the "2004 Plan").[242] The 2004 Plan was administered by the Compensation Committee of the Company's

---

[242] Proxy Statement, Apr. 4, 2006, at 43-45.

Board of Directors and, to a lesser extent, by the Board's Stock Option Committee.[243] These Committees, as administrators of the 2004 Plan, had broad authority to select the participants in the 2004 Plan and to determine the types of awards they would receive. The types of awards authorized under the 2004 Plan included stock options, stock appreciation rights, restricted stock, stock bonuses and cash bonuses. The administrators of the 2004 Plan could also grant performance-based awards, which depended on the absolute or relative performance of the Company or a subsidiary, segment, division or business unit. As of April 2006, essentially all of New Century's approximately 7,200 employees were considered eligible under the 2004 Plan.[244]

For 2005 and 2006, Cole, Morrice and Gotschall were each granted an award under the 2004 Plan that paid them a bonus based on the ratio of New Century's pre-tax net income to the Company's average stockholder's net equity. That bonus was measured and paid over a six-month and a 12-month period each year.[245] Generally, the higher New Century's pre-tax net income above a certain threshold, the higher the bonuses to Cole, Morrice and Gotschall, up to certain stated maximums based on their base salaries.

Quarterly bonuses were awarded to the Company's officer-level Management under the 2004 Plan. For most officers, these bonuses were based on several factors, including Company performance and, in most cases, attainment of personal performance goals. These different factors were identified in personalized "Bonus Schedules" at the beginning of each quarterly bonus period. Generally, the most significant bonus factors for senior managers were tied to Company or Department performance. Evaluations of individual performance goals comprised a smaller component for the most senior Management.

Many employees also participated in profit-sharing under the 2004 Plan. Each profit-sharing plan participant would receive a "factor" based on his or her annual salary. The plan included a formula for adjusting this factor up or down depending on how New Century's actual pre-tax income compared with targeted pre-tax income. The participant's "bonus benchmark" was the adjusted factor of his or her annual salary. Managers could adjust these benchmarks up or down before authorizing the actual bonus payment. If New Century did not reach a certain percentage of its target, however, no one could receive a bonus under this plan.

---

[243] *Id.* at 12.

[244] *Id.* at 13.

[245] *Id.* at 44.

New Century also offered long-term incentive compensation with time-vested options to executives at the Assistant Vice President level and above. In March 2005, New Century introduced a new long-term incentive approach by awarding executives at or above the Vice President level different combinations of the following under the 2004 Plan.

- "Performance Accelerated Stock Options," which would vest when New Century stock hit a designated price;

- "Performance Accelerated Restricted Stock," which vested when New Century reached consolidated pre-tax earnings targets;

- "Dividend Equivalent Rights" ("DER"), which New Century based on its cash dividends; and

- For division heads in the loan production and servicing areas, "Performance Units," which vested if New Century's taxable REIT subsidiary reaching pre-tax earnings targets.

The total cash compensation, including bonuses, received by New Century's five most senior executive officers in 2005 was as follows:[246]

| 2005 | | | | | |
|---|---|---|---|---|---|
| **Name** | **Salary** | **Bonus** | **DER Payout** | **Other** | **Total** |
| Robert Cole | $569,250 | $1,070,235 | $230,113 | $5,700 | $1,875,298 |
| Brad Morrice | $569,250 | $1,070,235 | $230,113 | $40,627 | $1,910,225 |
| Edward Gotschall | $569,250 | $1,070,235 | $230,113 | $4,740 | $1,874,338 |
| Patrick Flanagan | $577,500 | $1,120,235 | $230,113 | $7,000 | $1,934,848 |
| Kevin Cloyd | $300,000 | $1,546,786 | $104,598 | $67,325 | $2,018,709 |

In addition to these cash amounts, these five men received in 2005 the following restricted stock awards and securities underlying the stock options granted to them, neither of which vested immediately and both of which were subject to certain vesting conditions, including remaining with the Company for a certain number of years after the grant of the award:[247]

---

[246] Proxy Statement, March 16, 2006.

[247] *Id.*

- 81 -

| 2005 | | |
|------|---|---|
| **Name** | **Restricted Stock Award** | **Securities Underlying Options** |
| Robert Cole | 15,628 shares | 39,568 shares |
| Brad Morrice | 15,628 shares | 39,568 shares |
| Edward Gotschall | 15,628 shares | 39,568 shares |
| Patrick Flanagan | 21,566 shares | 39,568 shares |
| Kevin Cloyd | 7,104 shares | 17,986 shares |

Each of these men also realized the following values on New Century stock options they exercised during 2005:[248]

- Robert Cole:        $12,757,558
- Brad Morrice:        $13,304,850
- Edward Gotschall:        $13,942,208
- Patrick Flanagan:        $2,585,274
- Kevin Cloyd        $517,615

New Century did not file a Proxy Statement with the U.S. Securities and Exchange Commission ("SEC") in 2007. As a result, the information that would have been reported regarding compensation and bonuses paid to the Company's most senior executives in 2006 is not as readily available as it was for 2005. However, in anticipation of the preparation of compensation disclosure information for the Proxy Statement the Company was planning to file in 2007, New Century attorneys prepared a memorandum to the Compensation Committee, dated January 31, 2007, that had as an attachment a "Summary Compensation Table" detailing compensation, bonus, stock award and other information for the seven most senior executives of the Company for 2006. With the exception of the bonus figures, the following information is taken from the attachment to that memorandum, which noted "that the attached documents are a work-in-progress and are subject to ongoing review and comment. In addition, some of the data required to update the tables for fiscal year-end is not yet available" (numbers in brackets appear in original and may be some of the information that, according to the memorandum, needed to be updated):

---

[248] *Id.*

- 82 -

| | | | | | 2006 | | | |
|---|---|---|---|---|---|---|---|---|
| **Name** | **Salary** | **Bonus**[249] | **Stock Award** | **Option Award** | **Non-Equity Incentive Plan Compensation** | **Change in Pension Value and Non-Qualified Deferred Comp Earnings** | **All Other Compensation** | **Total** |
| Brad Morrice | $657,647 | $693,016 | $674,988 | $115,654 | [$880,254] | [$1,684,552] | [$75,436] | [$4,088,532] |
| Robert Cole | $663,958 | $693,016 | 0 | 0 | [$871,234] | [$2,844,418] | $11,182 | [$4,390,792] |
| Tajvinder Bindra | $69,231 | 0 | $535,650 | 0 | [$190,217] | 0 | $1,000 | [$796,098] |
| Patti Dodge | $307,692 | $464,232 | $283,514 | $53,174 | [$646,578] | 0 | [$62,577] | [$1,353,535] |
| Kevin Cloyd | $307,692 | $1,034,229 | $330,747 | $62,035 | [$1,366,188] | 0 | [$92,584] | [$2,159,246] |
| Anthony Meola | $323,718 | $453,125 | $2,197,179 | $285,751 | [$640,625] | 0 | [$17,594] | [$3,464,867] |
| Joseph Eckroth | $319,463 | $471,320 | $425,252 | $79,756 | [$652,450] | 0 | [$37,305] | [$1,514,226] |

## 7.    New Century's Auditors - KPMG

New Century retained KPMG as its outside auditors when the Company was formed in 1995. KPMG served as New Century's outside auditors until April 27, 2007, when KPMG resigned as the Company's auditors. At that time, KPMG had not yet completed its audit work in connection with New Century's 2006 Annual Report or the Company's announced restatement of its 2006 quarterly financial Reports.

KPMG's audit reports of New Century's consolidated financial statements for the years ended December 31, 2004 and 2005 did not contain any adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.[250]    Further, the audit reports of KPMG on Management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2004 and 2005 did not contain any adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.[251]

---

[249] The information contained in the Bonus column is taken from Compensation Committee minutes for meetings on October 30, 2006 and January 31, 2007.

[250] Form 8-K, April 27, 2007.

[251] *Id.* The Form 8-K notes that KPMG did not include newly acquired RBC Mortgage in its audit of internal control over financial reporting in 2005.

- 83 -

### F.    Analysts Reports and Comparisons to Other Companies

As indicated above, one aspect of the corporate culture at New Century appears to have been a sense that the Company was better than its competitors. That sense may have come, in part at least, from reports by securities analysts that indicated that New Century was doing certain things better than many of its competitors, at least for a time. The following are excerpts from illustrative analysts reports from mid-2005 into the first half of 2006:

- FBR (Aug. 5, 2005):

"At 1.89%, [New Century's] [loan] origination costs remain one of the lowest in our nonprime coverage universe, and second only to Accredited Home Lenders."

- Fox-Pitt, Kelton (Sept. 26, 2005):

"Based on available data, [New Century] is one of the lowest cost originators in the space, which is a good sign for their longer-term mortgage banking profitability.

Figure 2: Industry Loan Origination Costs

| Originator | Period | Cost (%) |
|------------|--------|----------|
| Ameriquest (retail) | 2004 | 1.25% |
| Accredited | 2Q05 | 1.73% |
| New Century | 2Q05 | 1.89% |
| Argent | 2004 | 1.92% |
| Aames | 2Q05 | 2.33% |
| Fieldstone | 2Q05 | 2.37% |
| Encore | 2Q05 | 2.40% |
| Delta | 2Q05 | 2.50% |
| Novastar | 2Q05 | 2.61% |
| Option One | FY4Q05 | 2.65% |
| Saxon | 2Q05 | 2.84% |

We continue to believe [New Century] is among the best positioned in the industry to weather what we think will be an eventual shakeout in the space. The industry today remains highly fragmented with many players involved, many of whom were born in 2001-2004 era, a period when the Fed was aggressively cutting rates and creating a robust mortgage banking climate for even the most inefficient operators. Most of these originators are smaller, have less liquidity, and limited or not access at all to the capital markets. In addition, they lack an overall presence within the industry to effectively compete with the larger, more solidified originators such as New Century. We expect New Century to emerge from this cycle a stronger, more efficient operator."

- Goldman Sachs (Nov. 29, 2005):

"On the positive side, [New Century] has a leading cost structure as the 2nd largest subprime originator, decent liquidity, some added flexibility because of the size of its loan portfolio (related earnings stream and the ability to monetize some of those assets if need be), and a seasoned Management team (the top tier of executives has been in the subprime mortgage business for over 10 years). We see its relatively low cost structure as key, given the gain on sale margins today – a number of competitors with higher cost bases appear to be under water on recent originations."

- Fox-Pitt, Kelton (Dec. 1, 2005):

"New Century remains a behemoth in the subprime space, a market which is growing and consolidating. The company's origination platform, scale, market depth and overall presence in the asset-backed community is matched by few in the industry. We remain optimistic New Century will emerge from the cycle a stronger, more efficient, and better capitalized financial institution."

- JP Morgan (Dec. 22, 2005):

"With gain-on-sale margins down 100-200 bps, as mentioned above, [New Century's] low cost to produce provides the company with a competitive advantage. . . . Looking forward, we expect to see the company maintain and possibly slightly improve its cost to produce as lower-cost retail origination (via the RBC acquisition) becomes a larger part of [New Century's] business."

- Stifel Nicolaus (Jan. 12, 2006):

"That is not to say, however, that we are bearish on the franchise. On the contrary, we have been surprised that, despite the company's aggressive growth, we have found little evidence of deterioration in underwriting and [New Century's] credit trends remain above industry averages. Based on securitization data, we find consistent evidence that [New Century's] securitizations outperform most competitors in both 2003 and 2004 vintages."

- UBS (Apr. 12, 2006):

"We believe New Century remains well positioned to withstand continued competitive pressures within the subprime mortgage origination sector for several reasons:

Unlike several other players that have had issues with reducing costs, New Century has successfully reduced its loan acquisition costs by over 60 bps [basis points] in 2005. . . .

New Century has one of the best reputations in the secondary market given its leadership position and stronger balance sheet versus some of its peers. In a market where there are increasing concerns that some players may have problems sustaining their franchises, bidders in the secondary market may bid up New Century product to ensure they have a reliable product supply for their securitization business."

- 85 -

- **FBR (May 5, 2006):**

"Cost to originate (CTO) impresses. [New Century's] CTO of 1.66% was significantly below our estimate of 2.00% and essentially flat with 4Q05. Going forward, we expect its CTO to remain lower than industry averages . . . ."

On the other hand, many of these same analysts expressed concerns and caution about, and drew unfavorable comparisons regarding, New Century, beginning in the second half of 2005 and especially into 2006, as indicated below:

- **Fox-Pitt, Kelton (Aug. 9, 2005):**

"[New Century's] [g]ain on sale revenue came in $139 million, well below our estimate of $160 million. The gross gain on sale margin dropped 47 bps to 2.28%, well below our 2.75% estimate. . . . Based on reported 2Q05 results from Accredited Home Lenders . . . and Fremont General . . ., which reported gross GOS margins of 3.15% and 2.75%, respectively, New Century whole loan packages traded at a discount to its peers during the quarter. Although stiff price competition appears to be the main culprit (i.e., coupons have not risen in tandem with short-term rates) other factors contributed to drop in execution including: 1) a higher concentration of IO [interest only] loans (which increased to 37% of production from 33%). IO loans are worth less in the secondary market to due to harsher rating agency stresses, resulting in lower bids from whole loan purchasers. . . ."

- **JP Morgan (Dec. 22, 2005):**

"That said, with limited sources of funding and higher risk premiums being demanded for sub-prime mortgages, liquidity risk exists that could impugn [New Century's] ability to originate and replenish the portfolio, in our view. [New Century] trades at a 20% discount to the overall residential mortgage REIT group."

- **Stifel Nicolaus (Jan. 12, 2006):**

"However, [New Century's] credit quality looks less than stellar in 2005 as recent vintages appear to be seasoning poorly, at least relative to earlier vintages. Specifically, although it is too early to get meaningful data on loss rates, 2005 pool level delinquency rates look to be worse than most recent vintages. While this could be attributed to slowing housing appreciation and/or a weakening consumer, we think it more likely reflects the underwriting deterioration that we noted above, i.e., lower FICO stated income loans. . . . As a result, although we have generally been impressed with what we have found on the credit side, recent vintages don't appear to be as strong. Combined with the fact that these loans will likely season in a weaker housing environment, it serves to undermine our level of comfort with [New Century's] credit quality. . . . Although we believe [New Century's] underwriting has held up over the last couple years, we believe it is more exposed than others in the sector to deteriorating subprime credit quality due to its high concentrations in CA, IO, and stated income loans."

- **JMP Securities (Sept. 29, 2006):**

"[W]e looked at vintage 2003, 2004, 2005 and 2006 [loan] pool data for a number of sub-prime lenders in our coverage universe and found that [New Century's] pools generally showed higher levels of asset quality deterioration as measured by the sum of seriously delinquent and foreclosed loans.... The above-peer deterioration noted in [New Century's] pool suggests that stressed economic conditions could and likely would serve to further weaken the performance of [New Century's] loan assets.... One indication that [New Century] may experience default rates higher than its competitors was its significant increase in 2Q06 loan repurchases. Knowing that EPD (early payment default) repurchases only pertain to whole loan sales of mortgages that have defaulted, or will imminently default . . . the fact that loan repurchases for [New Century] were \$415 million in 2Q06, up 350% from 1Q06, could foreshadow increasing delinquency and loss rates. To compare, for 2Q06, IndyMac Bancorp Inc . . . repurchases were \$101 million (up 55% QoQ), Countrywide Financial Corp . . . repurchases were \$34 million (up 173%) and Accredited Home Lenders Holding Co . . . repurchases were \$39 million (up 164%). While we expect the EPD repurchase cycle to slow over the next 2-3 quarters, we do think the relatively poor performance of [New Century] versus other lenders may indicate that underwriting guidelines at [New Century] may have been more lax than at other lenders."

- **JMP (Oct. 24, 2006):**

"[W]hen we consider our previous finding regarding the weaker credit performance of [New Century's] [loan] pools relative to a select peer group . . ., it seems likely that [New Century's] credit performance will be similarly encumbered.... Moreover, it appears the vintages most susceptible to credit deterioration at this time are the 2005 and 2006 vintages, which we would contend are those that benefited most from increasingly more lax underwriting standards – standards that to our mind were ever more compromised by aggressive competition for market share.... Additionally, given the generally weaker credit performance of [New Century] loan pools versus pools from a select group of peers . . ., we believe certain of [New Century's] loans – specifically, HELOCs – could be predisposed to losses."

- **FBR (Nov. 3, 2006):**

"With one of the most heavily reserved and best performing players in the space recently cautioning that its 3.75%-4.25% cumulative loss rate assumption may prove to be too low, we are concerned with [New Century's] 3.30% and 2.83% projected cumulative loss expectations for 2006 and 2005, respectively. From our industry modeling, if historical roll rates are similar to those in 2001, given current speeds, we can appreciate how [New Century's] models may indicate loss experience in the low-3% range for the 2005 and 2006 vintages. However, given the risks associated with a meaningful slowdown in home price appreciation and risk layering that is by all accounts creating adverse credit performance, we believe historical roll rates may understate this risk. In a quarter where the

- 87 -

allowance for loan losses remained essentially flat at 1.4% (excluding the reserve for REO), we believe there is a risk that [New Century] will have to add meaningfully to the reserve in the future, given our divergence from Management with regards to loss expectations.    We caution investors not to compare the reserve as reported in [New Century's] release across other issuers.    The reserve of $239 million includes $47.8 million of a real estate owned reserve, which is traditionally carried in other assets.    We believe the more appropriate measure is to look at the reserve excluding the REO reserve, as it conforms to reporting standards across the industry.    Probably more immediate than a larger-than-expected reserve build is a residual impairment charge for the off-balance-sheet portfolio.    Based on our analysis, these 2005 off-balance-sheet pools have a worse credit performance than the average managed 2005 vintage.    Given our belief that [New Century's] cumulative loss rate assumptions could prove too low, the most likely credit risk to earnings is a residual write-down on these loans."

- Piper Jaffray (Dec. 12, 2006):

"[W]e are expecting [New Century's] credit stats on its securitized loans to worsen, especially on the '05 and '06 vintages. Historically, [New Century's] credit stats have been worse than the industry average. Although we believe that [New Century] has become a more conservative underwriter, we would like to see some more evidence of this in its credit trends."

## G.    Summary of Certain Significant Developments at New Century from 2005 through the Bankruptcy Filing in April 2007

This Final Report details a number of significant events and issues relating to New Century's accounting, corporate structure management, and business endeavors. The following significant developments will be discussed in greater detail throughout the report, but merit an introduction as background to the Examiner's findings.

### 1.    Internal Audit Review of New Century Loan Processing Centers

During 2005, New Century's Internal Audit Department reviewed nine loan processing centers, including eight of the Company's 38 wholesale processing centers, and one of the three retail processing centers. Seven of the nine centers reviewed, including the retail center, received ratings of "Unsatisfactory." The remaining two received "Needs Improvement." The results of this review were presented to the Audit Committee and were brought to the Board's attention.

Members of the Audit Committee interviewed during the investigation said that, after reviewing Internal Audit's review of the loan processing centers, the Committee instructed Management to fix the problems identified in the review and instructed the Internal Audit Department to follow-up and monitor Management's efforts in this area. The Audit Committee

also requested that Management to provide updates regarding New Century's "loan quality and compliance plan" at future Committee meetings, which Management did.

### 2.    Departure of Patrick Flanagan

On December 27, 2005, New Century announced that Patrick Flanagan, who had been the Head of Loan Production and Secondary Marketing, would take a six-month leave of absence beginning January 1, 2006, after which his employment would terminate.[252]  Beginning July 1, 2006, Flanagan would continue to receive $76,445 per month in compensation for an additional 18 months pursuant to a "Consulting Agreement" with New Century.[253]

Flanagan had joined New Century in 1996 as the Regional Vice President of Midwest Wholesale and Retail Operations.    In 1997, he was promoted to Chief Operating Officer ("COO") of NCMC and relocated from Chicago to California.  As COO, Flanagan supervised New Century's mortgage loan origination processes, including the credit and underwriting functions, secondary marketing activities, the quality control process, and the Company's information technology infrastructure for loan originations.  In February 2002, Flanagan became the President of NCMC and he continued to head New Century's production and secondary marketing activities.  From 2002 through his departure at the end of 2005, Flanagan reported directly to Morrice.

In his interview during the Examiner's investigation, Paul Zalle, head of the Company's Internal Audit function, said that Flanagan emphasized maintaining New Century's loan production even when field audits revealed loan quality problems.  Although Zalle believed that Flanagan considered loan quality concerns, he did not believe that Flanagan gave those quality concerns as much weight as Flanagan gave to loan production volume considerations. Information from interviews conducted during the investigation suggests that the Company's emphasis on volume continued after Flanagan's departure from New Century.

According to interviewees, Flanagan's last day at New Century's offices was December 5, 2005.  Interviewees cited concerns ranging from distractions in Flanagan's personal life to disagreements over the Company's business strategy as factors that may have contributed to Flanagan's departure.  Several interviewees noted that they perceived a rift between Morrice and Flanagan.  For example, Flanagan himself and other interviewees said that Flanagan disagreed

---

[252] Form 8-K, Dec. 27, 2005.

[253] *Id.*

strongly with the stock repurchase plan adopted by the Board, with the agreement or acquiescence of Morrice, in November 2005.

### 3.    Resignation Letter Drafts by Richard Zona

On or around November 1, 2005, Board member Richard Zona drafted a letter to the New Century Board announcing his immediate resignation, but he did not in fact resign. He drafted a similar letter dated December 6, 2005, but, again, he did not resign from the Board. It is not clear with whom Zona shared these drafts, if anyone, however, he never sent either letter in final form to the full Board of Directors. There are significant differences between Zona's two draft resignation letters, but both drafts address the principal concerns Zona had about New Century's (1) Management, (2) financial reporting and (3) strategy to build a portfolio of loans rather than continue whole loan sales.

There are cosmetic and substantive differences between the two draft resignation letters. The November letter, for example, is slightly shorter and does not have a signature line. The November letter also discusses many more details of New Century's interactions with Einhorn and input from Third Point, which owned approximately 3.6% of New Century's shares. Einhorn and Third Point requested that New Century take steps to "maximize shareholder value," including a share repurchase program. Zona's December letter leaves out many of these details.

The December 6, 2005 draft resignation letter refines some of the material from the November draft relating to Zona's three principal concerns, but also includes additional criticisms of Management. The following quotes from Zona's December 2005 resignation letter are illustrative of his concerns (some of these points are also expressed in his November draft):

- "[I]t was wrong for Management to previously lead us to believe that our shareholders were strongly in favor of the balance sheet strategy and conversion to a REIT when they knew that our largest shareholder was opposed to the balance sheet strategy."

- "The Current Management team appears to be dysfunctional. We have gone from Management telling us a short time ago that Pat Flanagan is a star and therefore he was promoted to a "full partner," to a person that is being terminated effective immediately."

- "In my view, Ed [Gotschall] does not respect the outside directors, has displayed unacceptable and highly immature behavior and is a disruptive force within the Company. . . . Further, he has displayed intransigent positions, which are not supported by hard analysis."

- 90 -

- "Bob Cole does not appear to be fully engaged and has to assume responsibility for the dysfunctional Management team."

- "[T]he Board concluded that the Company should let the portfolio run down without replacement . . . and that a buy back of 5,000,000 shares should be pursued, subject to liquidity requirements. This was clearly an initiative pushed by the Board as evidenced by Ed Gotschall's emotional opposition to the buyback, while Bob Cole was largely silent and was thought to have voted for the buyback proposal; while latter [sic] he stated that he had abstained from the vote."

- "For several days subsequent to the Board meeting, Management constructed barriers to implementing the Boards [sic] decisions instead of determining the best way to implement them."

- "Also at the October 25th and 26th Board meeting, Management informed the Board that its current forecast and analyst consensus for third quarter EPS of $2.24 per share could not be achieved unless Management reversed $.26 per share of loan loss reserves. . . . Obviously, Management's desire to reverse reserves in the third quarter smacked of earnings manipulation."

- "Management's use of off balance sheet gain on sale accounting substantially overstates earnings when compared to cash flows, thus generating extremely aggressive income recognition."

- "Our largest shareholder has questioned the appropriateness of our accounting for loan losses."

- "[Regarding questions about New Century's hedging strategies] It's hard to believe that this all this [sic] just happened since the Board began questioning the use of Euro futures instead of [interest rate] SWAPS. It would seem that Management is trying to spin this so as to not appear that they intentionally overstated earnings or simply missed this."

- "As to accounting for loan losses, it is a long standing accounting maxim that accounting should be designed and applied to match revenues and expenses. Management's methodology to provide for loan losses based upon their estimate of charge offs over the next 18 months does not accomplish that objective. . . . Management's methodology does not result in a proper matching of revenues with costs, (loan loss provisions), because charge offs are back ended."

- "From day one, I was skeptical of the proposal by Management to adopt a portfolio strategy and build a balance sheet, which would result in our assuming incremental credit, interest rate and prepayment risks that a whole loan sale strategy would avoid. . . . However, because of Management's strong, forceful recommendation, I did not vote against this strategy. It is much clearer to me now, that the portfolio strategy encompassed in our hybrid REIT is the wrong strategy and that we should either de-REIT or spin off the REIT or TRS."

In his interview during the investigation, Zona said he never submitted his resignation from the New Century Board because other independent Board members persuaded him to wait

to see whether the expected management changes to be discussed during the Board's January 2006 "off-site" meeting would alleviate his concerns.

### 4.     Efforts to Sell the Company

As early as December 2005, representatives of a large securities firm approached Cole to discuss whether New Century would entertain a bid for the Company. On January 25, 2006, New Century Management met with representatives of the securities firm to discuss further a possible acquisition of the Company. New Century engaged a large investment bank to analyze the value of the Company and determine whether other companies would have an interest in purchasing New Century. The potential sale of the Company at this time was referred to within New Century as Project 2000.

In February and March 2006, in connection with Project 2000, Management solicited expressions of interest to acquire New Century from two other large securities firms. Each of the three potential purchasers performed limited due diligence and presented New Century's Management with estimates of New Century's value. By April 10, 2006, New Century received preliminary proposals of less than $50 per share from one of the potential purchasers, $54 per share from another potential purchaser, and $51 to $55 per share from the third. New Century continued discussions with these potential purchasers through May 2006, but did not consummate a sale of the Company under Project 2000.

### 5.     Brad Morrice Becomes CEO

As mentioned above, on January 9 and 10, 2006, New Century's Board of Directors had an "off-site" meeting which the Board agreed, among other things, to restructure the Company's CEO position and formally transition Morrice into the position of CEO. On March 29, 2006, New Century and Morrice executed an Amended and Restated Employment Agreement. Pursuant to this agreement, Morrice served as Vice Chairman and President of New Century and, commencing on July 1, 2006, CEO of the Company. Until July 1, 2006, Morrice continued to serve as Chief Operating Officer.

The January 2006 off-site Board meeting came after what interviewees described as a very difficult year for New Century. Throughout 2005, the Company faced external pressures as interest rates rose, home prices leveled off, competition increased and the market for MBS declined. Internally, a rift had developed between Management and some Board members regarding several significant issues (including New Century's REIT portfolio strategy),

- 92 -

Flanagan's departure forced Management to reorganize his direct reports, and New Century's largest shareholder, Einhorn, was threatening a proxy contest.  The New Century Board invited Dr. Vance Ceasar, Ph.D. to its January 2006 off-site meeting to help the Board and the Company's Senior Management improve their relations and address corporate governance.  With Dr. Ceasar's facilitation, the Board and Management developed five broad initiatives, one of which was the promotion of Morrice to CEO while keeping Cole in place as the Board's Chairman.

Other initiatives the Board adopted during the January 2006 off-site meeting and pursued over subsequent months included the following:

- Morrice was tasked with reviewing existing Management, creating a Senior Management succession plan, and addressing specific leadership requirements and talent acquisition needs.

- The Board and Management determined to agree on common business strategies for the near and long-term.

- The Board agreed to create a Finance Committee to address financial strategy with Management and improve Board-Management communication.

- The Board decided to evaluate adding someone with structured finance expertise to the Board.

According to interviewees, even though he did not formally assume the CEO position until July 1, 2006, Morrice effectively functioned as New Century's CEO from the time of the January 2006 off-site meeting forward.  As noted above, Cole said in his interview during the investigation that the operational side of New Century had reported to Morrice when he was the Company's COO; Cole said that. when he was CEO, Cole was only responsible for investor relations.

### 6.    David Einhorn Goes on the Board of Directors

On March 31, 2006, Einhorn joined New Century's Board of Directors pursuant to an agreement reached among New Century, Einhorn and several entities Einhorn controlled.  At that time, Einhorn and entities he controls were the largest single shareholder in New Century and they held approximately 9.8% of the common stock of the Company as of March 1, 2006.[254] The agreement between Einhorn and New Century followed a year of discussions between

---

[254] 2006 Proxy Statement at 35.

Einhorn and the Company's Board and Management, and the agreement avoided a pending proxy contest.

More specifically, on March 23, 2005, about a year before joining New Century's Board, Einhorn's company, Greenlight Capital, filed a Schedule 13D/A stating that Einhorn held beneficial ownership of 9.1% of New Century's common stock and expressing dissatisfaction with New Century's efforts "to enhance shareholder value."[255] Over the course of the following year, Einhorn apparently had regular contact with members of New Century's Management and independent Board members, such as Zona.

On August 4, 2005, Einhorn presented his views and concerns directly to New Century's Board. In that meeting, Einhorn distributed a PowerPoint presentation that included the following comments, among other points:

- "[Einhorn's] communications with the CEO have not been effective;"
- "We are worried that New Century will destroy further per share value under its current strategy;"
- "[New Century's loan origination business had] all cash gain on sale, [was] not capital intensive, [and had] no retained credit exposure;"
- "We suggested to sell loans and buy back stock . . . the result of an aggressive share repurchase strategy would have been substantial per share value creation for shareholders;"
- "Instead, [New Century] "bought loans and sold stock;"
- "In early 2003, Management elected to pursue a strategy of securitizing loans onto its balance sheet;"
- "Management had difficulty justifying the on-balance sheet election when challenged;"
- "[The portfolio strategy] [h]as left the company as a levered, large holder of credit risk into what many say is a housing bubble;"
- "[The portfolio strategy] [h]as forced New Century to rely on aggressive accounting;"
- "History of Poor Decision making – Management does not seem to understand what drives value, [e.g.,] on balance sheet strategy, Aggressive Accounting;"
- "Significant Management stock sales – Recent sales signal lack of confidence to investors, particularly in light of liquidity from REIT dividends;"

---

[255] Greenlight Capital, L.L.C., Schedule 13D/A, April 28, 2005.

- "Lack of investor confidence in CEO – Many investors and prospective investors have issues with Bob Cole;"

- "Origination franchise is a volatile, low cost, fast growing, not-very-capital-intensive, enormous ROE, cash generating machine;"

- "Loan portfolio is a highly levered, credit risk and duration risk intensive, capital intensive, tax efficient, steady earnings generating machine."

For several months after this presentation, Einhorn apparently continued his discussions with New Century's Board and Management. During this time period, as discussed above, Board member Richard Zona became disillusioned with and critical of some members of Management and considered resigning from the Board.

By February 2006, Einhorn made two requests: (1) that he be given a seat on the Board of Directors; and (2) that Greenlight receive an exemption from the 9.8% stock ownership limit in New Century's charter. On February 14, 2006, New Century offered Einhorn some concessions, but rejected his request to become a director. In response, on February 17, 2006, Einhorn filed another Schedule 13D/A announcing his intention to nominate an alternative slate of directors at New Century's 2006 annual meeting of stockholders.[256]

On March 6, 2006, New Century's Board of Directors authorized a settlement with Einhorn granting him an exception to the 9.8% ownership limit in New Century's charter, and agreeing to give him a seat on the Board of Directors effective March 31, 2006. All of the directors voted in favor of this settlement except Cole, who voted against it. According to Einhorn, he joined the New Century Board earlier than he planned in order to assist the Company in considering the purchase offers that had been received from potential buyers in connection with Project 2000. Einhorn reportedly was less in favor of pursuing the sale of the Company to these potential buyers than were Cole, Gotschall and others.

After serving for slightly less than a year on New Century's Board of Directors, Einhorn resigned from the Board of Directors effective March 7, 2007.[257]

### 7. Management Concerns About Weaknesses in Accounting and Financial Forecasting

In 2006, members of New Century's Senior Management were concerned about weaknesses in the Company's accounting and financial forecasting capabilities. Those concerns

---

[256] Greenlight Capital, L.L.C., Form SC 13D/A filed by February 17, 2006.

[257] Form 8-K, March 2, 2007.

caused the Company to determine that it should hire an accounting "geek in a box" to focus solely on accounting policy issues and GAAP accounting research and literature. Dodge indicated in her interview that she thought the Controller, Dave Kenneally, and the Assistant Controller, Tony Sanchez, had too many responsibilities at that time, including operational roles (e.g., accounts payable) and accounting roles (e.g., GAAP and financial reporting). Dodge also said that she was focused on succession planning and that she was grooming Kenneally to replace her as CFO and she wanted Kenneally to groom Sanchez to replace him as Controller. Dodge said that a "geek in a box" would have freed up Kenneally and Sanchez and make succession planning easier. Morrice said the "geek in a box" would have focused on new accounting issues, such as changes to the hedge accounting rules.

In e-mails, Morrice repeatedly expressed his frustration with New Century's financial information forecasting and dissemination abilities. For example, in a September 7, 2007 e-mail from Cloyd to Morrice and others, Cloyd attached a spreadsheet regarding loan repurchase claims and requests and said, "Clearly the attached suggests that we got our teeth kicked in with regard to repurchase requests in Aug[ust] and thus far in September." Morrice reacted to this information in a reply e-mail to Cloyd and Dodge:

> How can we find out about this just hours after we send a positive press release about this and after sending a positive report to the Board? And I even asked if we were sure we were comfortable! We have to get our act together and get way better coordinated on info sharing and warning lights. I am really tired of being surprised like this! It should be embarrassing to all of us. And that's just the insult, the injury is the economic impact.

In his interview during the investigation, Morrice said this e-mail reflected his frustration with the Accounting Department's financial forecasting capabilities.

Morrice again expressed his concerns about the strength and reliability of the Company's Accounting Department in a January 13, 2007, e-mail exchange with Taj Bindra, who had joined New Century as its CFO in November 2006. In his e-mail Morrice wrote:    "Having just reviewed what Dave [Kenneally] sent out, I am even more dismayed. . . . Worse by far is seeing the stunning magnitude of the forecasting failure on the repurchase reserves and REO reserves. Despite our very public emphasis on these numbers, including the Board's demand that we pay very close attention to these numbers, and a December update that was supposed to reflect a hard look, the forecasts are off by $34 mil relative to base numbers of $18 mil." In an e-mail to Morrice later that day, Bindra wrote: "I continue to be equally dismayed by the lack of financial

discipline and accountability on the part of both finance and operating managers. In my mind not to have any visibility around the impact of the REO mark and the magnitude of the repurchase reserve increase very early in 4q is unacceptable. We should not be getting surprised in January with these rather large swings [in repurchase and REO reserve amounts]."

Morrice indicated in his interview during the investigation that, though there had been some progress with the Company's forecasting capabilities after the arrival of Bindra in November 2006 and the other changes made that year, there were still frustrating problems. Morrice believed that Bindra and Kenneally needed more and better quality staff, and Morrice said that he had hoped Bindra would hire new additional financial staff, something that had not been accomplished by January 2007.

### 8.   Concerns About Kevin Cloyd's "Dual Role"

Certain members of the New Century Board and Senior Management expressed concerns in 2006 about Cloyd's credibility and about his responsibility for both selling mortgage loans in the secondary market and adding loans to the Company's own portfolio. The concern was that Cloyd might be selling the "better" loans in the secondary market and keeping in the Company's portfolio the loans that were not as easy to sell because they were riskier or were otherwise "bad" loans. In an August 18, 2006 e-mail from Einhorn to Morrice after Einhorn's interview of Bindra for the CFO position, Einhorn wrote that Bindra's "strongest comment was his worry about possible adverse selection in the portfolio created by the Kevin [Cloyd] conflict. He identified that issue and shared it without specific prompting from me." By the fall of 2006, Einhorn and others on the Board who believed Cloyd had a conflict in his dual roles pushed to identify this as an issue and address it by separating Cloyd's duties, but, by then, New Century was no longer securitizing mortgage loans. Accordingly, this conflict was not an issue that needed the immediate attention of the Board or the CEO, and it was never resolved.

### 9.   Patti Dodge Replaced as CFO

On October 25, 2006, New Century hired Bindra as an Executive Vice President ("EVP") and the Company's CFO, replacing Dodge in that position.[258]  Dodge, who, as described above, had joined New Century in 1996, became the Company's Executive Vice President for Investor Relations.[259]  According to Board members interviewed during the investigation, New Century's

---

[258] Form 8-K, Oct. 30, 2006.

[259] *Id.*

Board had determined at some time in the spring of 2006 that Dodge should be replaced as CFO. It is apparent from contemporaneous documents made available to the Examiner that Dodge and Senior Management of New Century had been considering this transition by May 26, 2006 at the latest, which is the date of a memorandum from Dodge to Morrice outlining her transition to the investor relations role.

There are various accounts as to why Dodge was transitioned from CFO. Morrice suggested in his interview during the investigation that Dodge's strengths were in accounting and financial reporting rather than financial analysis and forecasting. He suggested that New Century's growth and goals warranted a more experienced CFO. Also, some members of New Century's Board of Directors, including Zona and Einhorn, had expressed doubts about Dodge's capabilities and competence to be the Company's CFO.

Some members of the New Century Board of Directors also apparently had doubts about Dodge's ability to represent the Company to its investors. In an October 2006 e-mail to fellow Board member Zona, Forster wrote, "I would hope you could hold off concluding that Patti [Dodge] is unfit to represent the Company to our investors. You may be correct, but as we agreed this morning, we should hear them out." On the other hand, Morrice said in his interview that he wanted to move Dodge to the investor relations role because of her good relationship with financial analysts and her "great institutional knowledge."

Dodge said in her own interview during the investigation that she had been prepared to leave New Century in May 2006, but that Morrice had persuaded her to take the investor relations position instead. Dodge said her long-term plan was to leave business and teach elementary school. She had indicated in her May 2006 memorandum to Morrice that the transition from the CFO role to the investor relations role was "potentially a step in that direction."

## 10.    Creation of Repurchase Desk

In an effort to create a more centralized and effective tracking system for repurchase claims, New Century created a loan "repurchase desk" in the fall of 2006. Ron Brown in the Secondary Marketing Department ran the repurchase desk, which served as a central point of contact for New Century and its investors for all repurchase requests. It recorded, tracked and reported to Management on the status of repurchase claims. It also facilitated the processing of repurchase claims that were agreed to by New Century.

- 98 -

## 11.    New Century's Liquidity Crisis

New Century experienced a severe liquidity crisis in August 2006. According to its Form 10-Q for the third quarter of 2006, "[t]he minimum level of liquidity currently required under [New Century's] credit facilities is $134.4 million."[260] However, on August 24, 2006, Morrice reported the following in a memorandum and attachment to the Company's Board: "At June 30, 2006, New Century had approximately $380MM in total liquidity. As of August 18th, New Century's total available liquidity was estimated at less than $50MM." Morrice said further: "The decrease in liquidity is attributable to a variety of factors, some of which are seasonal, and some of which are one-time in nature." He went on to list the "categories" of the causes of the decrease in liquidity, which were "typical intra-quarter cash flow patterns as loan originations has [sic] outpaced loan sales quarter-to-date," "continued difficult secondary market conditions leading to warehouse line margin calls, higher 'investor kick-outs,' and loan repurchases," and "mark-to-market on New Century's Euro dollar hedges."

Morrice went on to say, "We view the current liquidity position as short-term in nature," and he estimated that "available liquidity at the end of the 3rd quarter [would] increase back to $300MM-$350MM." However, he also recommended "exercising caution in spending on significant discretionary items such as share repurchases until available liquidity increases back above $300MM." He also said the Company was exploring "other vehicles to improve liquidity, such as an unsecured revolving credit facility," and that they were "also working with our warehouse lenders to expand facilities and/or improve financing rates and we are reviewing our collateral delivery processes to reduce the number of loans we finance with our own cash."

New Century Board members reacted with concern to this information. Forster had the following reaction in an August 25, 2006 e-mail to other Board members:

> The low liquidity event of last week is concerning. It seems that a lot went wrong, including the correlation of risks that we sometimes think of as NOT correlated. With falling rates one might think that the painful hedge margin calls might be offset by somewhat better secondary execution and a friendlier warehouse line advance policy environment—the reverse occurred. The expectation of lower loan volume, credit challenges and a tougher secondary market seems to be growing both outside and inside [New Century]. In any case a lot seems to be working against us now and we must be cautious not to put the company at risk.

---

[260] Form 10-Q for Q3 2006 at 69.

-99-

Of equivalent concern is the lack of warning—this operational/liquidity challenge, from my point of view, seemed to dump upon us with no specific prior indication of a pending problem. We seem to be living in a volatile world without terrific tools to respond constructively.

New Century's Board of Directors and the Finance Committee of the Board monitored the Company's liquidity in the fall of 2006, as market conditions became more aggravated. New Century's efforts to address its liquidity crisis in the late summer and fall of 2006 included two capital raising transactions: (1) the completion of a $50 million private placement of trust preferred securities on September 13, 2006,[261] and (2) the completion of another private placement of trust preferred securities in the amount of $35 million on November 17, 2006.[262] Following the first of these capital raising transactions, in September 2006, New Century spent more than $41 million to repurchase its own stock. The Company's liquidity challenges continued throughout the remainder of 2006 and into early 2007.

### 12.   Project Kettlebell

As indicated above, throughout 2006 New Century's Board and Senior Management re-evaluated the Company's strategy of maintaining a REIT portfolio. In September 2006, New Century Management received notice that a potential purchaser was interested in acquiring all of New Century's REIT portfolio assets. By October and November 2006, New Century appeared to favor selling its REIT portfolio over other potential options. At an October 30 and 31, 2006 Board meeting, Morrice discussed the reasons for selling the REIT portfolio and recommended to the Board that New Century formally explore this option.

During the remainder of 2006, New Century discussed with the potential purchaser the possible sale of the REIT portfolio. These negotiations were internally referred to as "Project Kettlebell." A large investment bank assisted New Century with Project Kettlebell and provided revised financial analyses that the investment bank had prepared earlier in the year in connection with Project 2000.

As had been done in connection with the earlier Project 2000 bids, New Century, the potential purchaser of the REIT portfolio and the investment bank advising New Century

---

[261] Press Release, *New Century Financial Corporation Announces $50 Million Private Placement of Trust Preferred Securities*, (Sept. 13, 2006) *available at* http://investorrelations.ncen.com/phoenix.zhtml?c=73989&p=iral-thewsarticle_Print&ID=905157&highlight.

[262] Press Release, *New Century Financial Corporation Announces $35 Million Private Placement of Trust Preferred Securities*, ( Nov. 17, 2006) *available at* http://investorrelations.ncen.com/phoenix.zhtml?c=73989&p=iral-thewsarticle_Print&ID=932545&highlight.

examined key accounting measures, including discount rates and valuation of residual interests, in connection with Project Kettlebell. The investment bank also discussed challenges that were developing in the subprime mortgage market, such as dramatic industry-wide increases in early payment defaults and lower origination volumes.

On December 12 and 13, 2006, Morrice updated the New Century Board about the status of Project Kettlebell and New Century's discussions with the potential purchaser. Negotiations continued throughout this time, and, in January 2007, the potential purchaser made a bid of $540 million for the Company's REIT portfolio. It appears that there was some support for taking this offer within New Century. Specifically, an executive summary drafted by Senior Management recommended the Company take the offer, and Einhorn said in his interview during the investigation that he would have approved the sale to the potential purchaser no matter what the loss was. However, at an executive session of the independent members of New Century's Board of Directors held on February 1, 2007, "the non-Management directors determined that they would recommend to Management not [to] pursue the potential sale of the REIT portfolio" to the bidder. New Century never accepted the potential purchaser's offer, and it appears no further negotiations took place.

### 13. Late January and Early February 2007 Board and Audit Committee Meetings

At the Audit Committee and Board of Directors meetings held on January 31 and February 1, 2007, New Century Management informed the Company's Audit Committee and Board of Directors that the Company had been calculating incorrectly its repurchase reserves since the second quarter of 2006. The following excerpt is from the minutes of the Audit Committee meeting on January 31, 2007:

The next item of business was consideration of the Corporation's accounting practices with respect to repurchase reserves. Mr. Kenneally reported that Management had conducted an initial review of its repurchase methodology with respect to the carrying value of repurchased loans, which had changed in the second quarter of 2006, and had concluded that the Corporation's methodology applied in the second quarter of 2006 was inappropriate. Mr. Zona noted that the Committee had not been informed of this change in methodology and pointed out that he had questioned the Corporation's accounting for its repurchase reserves at a prior Board meeting, and had been assured by Ms. Patti Dodge, the Corporation's Chief Financial Officer at the time, that the accounting for repurchase reserves was appropriate. Mr. Zona then asked whether KPMG had been informed of this change in methodology and Mr. Kenneally responded that KPMG had been informed of the change. Mr. Kim [from KPMG] agreed that

KPMG and the Corporation had discussed the change in methodology. Next, Mr. Zona asked why the Committee had not been informed of the change in methodology and Mr. Kenneally responded that it was an inadvertent oversight.

The full Board was then informed of and discussed this issue in its meeting on January

31, 2007:

Next, the Board and Management discussed the repurchase reserve adjustment and the change in the Corporation's methodology for estimating its allowance for loan repurchase losses that occurred in the second quarter of 2006.

. . .

Mr. Kenneally then responded to the Board's questions regarding why the Corporation had changed its methodology for estimating its allowance for loan repurchase losses in the second quarter of 2006. Next, the Board expressed its concern that the Audit Committee had not been informed of the change in methodology. Mr. Kenneally then reported that the Corporation was working with KPMG to analyze the impact that the return to the more appropriate accounting methodology and the utilization of the back-log of claims outstanding would have on the Corporation's previous period financial statements. Management informed the Board that if the new information and resulting financial impact resulted in the correction of an error rather than a change in estimate, the Corporation may have to restate its financial statements for one or more periods in 2006.

In interviews, Board and Audit Committee members described Management's revelations at the January 31 meetings as "shocking." They had come to the meeting without any prior understanding that such a disclosure would be made, and they described the discussions at the meeting as being "very emotional" and "ugly." Some stated that they found incredible Kenneally's explanation of Management's failure to inform the Board about the change in repurchase reserve methodology as an "inadvertent oversight."

At a combined telephonic meeting of New Century's Board of Directors and Audit Committee held on February 7, 2007, New Century's Management recommended that the Company delay its fourth quarter and full year 2006 earnings release, and restate its financial results for the first three quarters of 2006, as a result of the previously reported problems with the calculation of repurchase reserves. A presentation prepared for the Board meeting explained that Management had ceased marking repurchased loans to fair market value in the second quarter of 2006, and had ceased including an estimate of the severity of loss on the resale of repurchased loans in the third quarter, in each case because of its interpretation that these factors were already included in the Company's overall LOCOM analysis of loans held for sale.

In response to the Board's questions, Kenneally apparently informed the Board that the use of the inappropriate methodology for calculating repurchase reserves, and the failure to account for the back-log in repurchase claims, had impacted pre-tax net income by approximately $300 million in 2006, including approximately $160 million in the first three quarters and $140 million in the fourth quarter. At that time, members of the Company's Senior Management provided the Board with a draft of a press release to be issued later that day.

Among the related topics discussed at the Board and Audit Committee meeting were whether to disclose in the press release an estimate of the restatement impact and of fourth quarter adjustments to be made to the valuation of residual interests (based on advice from counsel, the Board determined not to disclose such estimates); expectations for shareholder litigation; and the need to work with New Century's warehouse lenders to obtain waivers to various loan covenants. New Century's financing arrangements generally required the Company to deliver timely financial statements to lenders, and many lenders also required that the Company show positive net income for any two consecutive quarters.[263]  Morrice stated at the February 7 meeting that he was "very concerned" about loan covenants that were tied to the Company's profitability and that Management would begin "scrambling" to obtain waivers and amendments.   Morrice said in his interview during the investigation that the restatement announcement undermined the confidence of New Century's warehouse lenders and created credibility issues for the Company.

### 14.    February 7, 2007 Announcement

On February 7, 2007, following its combined telephonic Board and Audit Committee meeting, New Century announced publicly in a Form 8-K and press release that the Company's financial statements for the first three quarters of 2006 "should be restated to correct errors [New Century] discovered in its application of generally accepted accounting principles regarding [New Century's] allowance for loan repurchase losses."[264]    Specifically, New Century announced that, in calculating its allowance for loan repurchase losses, (1) during the second and third quarters of 2006, the Company had failed to account for expected discounts upon the disposition of repurchased loans, and (2), during the first three quarters of 2006, the Company

---

[263] Form NT 10-K, March 2, 2007.

[264] Form 8-K, Feb. 7, 2007, Item 4.02; Press Release, *New Century Financial Corporation to Restate Financial Statements for Quarters Ended March 31, June 30 and September 30, 2006,* (Feb. 7, 2007) *available at* http://investorrelations.ncen.com/phoenix.zhtml?c=73989&p=iral-thewsarticle_Print&ID=960333&highlight.

did not properly consider the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests during 2006, compounded by the increasing length of time between whole loan sales and the receipt and processing of repurchase requests.[265] According to the announcement, New Century was reviewing the full impact its restatements, but expected net earnings for each of the first three quarters of 2006 to be "reduced."[266] The Company thus cautioned that its previous interim financial statements for 2006 "should no longer be relied upon."[267]

New Century's February 7, 2007 Form 8-K and press release also announced that the Company expected to record a net loss for the fourth quarter of 2006 as a result of (1) a fair value adjustment made to the Company's residual interests in loan securitizations to reflect revised prepayment, loss, and discount rate assumptions with regard to loans underlying the residual interests, and (2) the continuing high rate of early payment defaults and loan repurchase requests in the fourth quarter.[268]

On February 8, the day after New Century's announcement, the Company's stock price closed at $19.24, down 36% from the February 7 close of $30.16.

### 15.   March 2, 2007 Announcement

On March 2, 2007, New Century announced that it would be unable to timely file its Annual Report on Form 10-K for the year ended December 31, 2006.[269] New Century reported that it expected the previously announced restatement regarding the Company's allowance for loan repurchase losses to result in net income for the first three quarters of 2006 that was "significantly lower" than previously reported.[270] Further, New Century announced that it expected to report a pre-tax loss both for the fourth quarter of 2006 and for the entire year.[271] These negative results were attributed to: (1) declines in net gain on sale of mortgage loans due to increased loan repurchase demands from whole loan buyers, increases in the percentage of loans rejected by whole loan investors, and increasing severity of losses in discounted loan sales;

---

[265] *Id.*

[266] *Id.*

[267] *Id.*

[268] *Id.*

[269] Form NT 10-K for 2006.

[270] *Id.*

[271] *Id.*

(2) a reduction in the carrying value of residual assets to reflect revised prepayment, loss, and discount rate assumptions for the underlying loans; (3) a reduction in the carrying value of mortgage loans held for sale, reflecting the Company's revised estimate of the value of these loans based on market conditions; (4) an increase in New Century's allowance for losses on its portfolio of loans held for investment, reflecting recent loss experience, changing market conditions, and updated expectations regarding higher credit losses and faster prepayment speeds; and (5) a reevaluation of the realizability of deferred tax assets.[272]

New Century's March 2 announcement also reported that the Company was seeking waivers and/or amendments from warehouse lenders with respect to loan covenants requiring that (1) New Century timely deliver to the lenders financial statements in compliance with GAAP, and (2) the Company show positive net income for any rolling two-quarter period.[273] According to the announcement, KPMG had informed the Audit Committee that it would provide a "going concern" opinion if New Century were not able to obtain waivers or amendments from a sufficient number of its lenders.[274]

Finally, New Century's March 2 announcement disclosed that the SEC staff had requested a meeting to discuss events leading up to the restatement announcement, and that the United States Attorney's Office for the Central District of California had opened a criminal inquiry relating to the Company's accounting and to trading in New Century's securities.[275]

New Century's March 2 announcement led to another precipitous decline in the Company's stock price. On March 5 (Monday), the next trading day after March 2, New Century's stock closed at $4.56 per share, down from a close of $14.65 on March 2.

### 16.    Critical Liquidity Pressures

New Century's previously undisclosed financial and accounting problems created a crisis for the Company with respect to its warehouse lenders, on which New Century depended for financing. On March 8, 2007, New Century reported that it had received an aggregate of approximately $150 million margin calls from its warehouse lenders, approximately $70 million

---

[272] *Id.*

[273] *Id.*

[274] *Id.*

[275] *Id.*

of which the Company had not been able to satisfy.[276]    On March 12, 2007, New Century disclosed that many of its warehouse lenders had informed the Company in the week prior that New Century's failure to satisfy margin calls, make certain cash payments and maintain certain levels of profitability, among other things, amounted to events of default under its master repurchase agreements with the lenders.[277]    New Century reported further that, due to these alleged defaults, and pursuant to the terms of the various master repurchase agreements, many of its warehouse lenders were accelerating the Company's obligation to repurchase the outstanding mortgage loans financed under the respective agreements with the warehouse lenders.[278]    The Company stated that it would not be able to satisfy all of its outstanding repurchase obligations, which totaled $8.4 billion at that time, should all of its warehouse lenders seek to exercise their right to accelerate the Company's repurchase obligations.[279]    On March 13, 2007, the NYSE announced that it had filed an application with the SEC to delist New Century's stock.[280]

By the end of March 2007, New Century had received default and acceleration notices from all of its warehouse lenders, several of which had informed the Company that they intended to take the following actions: (1) sell the outstanding mortgage loans financed under the respective master repurchase agreements; (2) offset the proceeds from such sales against New Century's obligations to the warehouse lenders; and (3) reserve all rights to seek further recovery from the Company.[281]    As of March 31, 2007, the Company's outstanding repurchase obligations under master repurchase agreements with warehouse lenders exceeded $7 billion.[282]

During this same time period, all of New Century's warehouse lenders ceased providing the Company with financing to continue funding new mortgage loan originations and purchases.[283]    Additionally, the Company began receiving cease and desist orders from regulators in various states, pursuant to which New Century was ordered to stop taking mortgage

---

[276] Form 8-K, Mar. 8, 2007, Item 8.01; *see also* McCarthy Declaration at 14, para. 50.

[277] Form 8-K, Mar. 12, 2007, Item 2.04.

[278] *Id.*

[279] *Id.*

[280] Form 8-K, Mar. 14, 2007, Item 3.01.

[281] Form 8-K, Mar. 28, 2007, Item 8.01.

[282] McCarthy Declaration at 7, para. 20.

[283] *Id.* at 7, paras. 14, 21, 51; Form 8-K, Mar. 12, 2007, Item 2.04.

loan applications, among other things.[284]  Subsequently, New Century ceased its mortgage loan origination operations[285] and entered into an agreement to sell its loan servicing rights and business.[286]

### 17.    Retention of AlixPartners

In mid-March 2007, New Century retained AlixPartners LLP, a global restructuring, consulting and financial advisory firm, to assist in the management of the Company.  Personnel from AlixPartners have helped manage New Century's cash flow since March 2007.  As of June 8, 2007, Holly Etlin of AlixPartners served as New Century's CEO and Michael Tinsley of Alix Partners served as the Company's CFO.[287]

### 18.    New Century's Bankruptcy Filing

Following unsuccessful attempts to obtain additional financing,[288] the Company filed for bankruptcy in this Court on April 2, 2007.[289]  As indicated above, New Century's bankruptcy filing was the largest such filing in 2007 measured by pre-petition assets.  As of the date of this Final Report, New Century's bankruptcy filing ranks as the ninth largest of all time, measured by pre-petition assets.[290]

New Century's stock has consistently traded below $1 since mid-April 2007, and below $.20 since early-August 2007.

### 19.    The Internal Investigation by the Company's Audit Committee

As a result of the announced need to restate the Company's interim financial statements for 2006, the Audit Committee of New Century's Board of Directors commenced an internal investigation into the Company's accounting for loan repurchase losses.  The investigation was subsequently overseen by the SIC and was expanded to include New Century's valuation of

---

[284] McCarthy Declaration at 16, paras. 57-58.

[285] Form 8-K, Mar. 8, 2007, Item 8.01; McCarthy Declaration at 14, para. 51.

[286] Form 8-K, July 5, 2007, Item 2.01.

[287] Form 8-K, June 12, 2007.

[288] Form 8-K, Mar. 8, 2007, Item 8.01 (noting that "the Company is in discussions with lenders and other third parties regarding a refinancing and other alternatives to obtain additional liquidity.").

[289] Form 8-K, Apr. 2, 2007, Item 1.03.

[290] Press Release, *Number of Public Bankruptcies Slightly up in 2007, Fifth Lowest Ever, According to BankruptcyData.com*, (Jan. 16, 2007) *available at* http://www.businesswire.com/portal/site/home/index.jsp? epi_menuItemID=887566059a3aedb6efaaa9e27a808a0c&ndmViewId=news_view&ndmConfigId=1008918&newsI d=20080116006169&newsLang=en.

residual interests in 2006 and prior periods. The special investigation was performed by Heller which engaged PwC to assist in the internal investigation.

Based on the information and documents Heller and PwC provided to the Examiner, the SIC did not produce a written report containing its findings or conclusions. However, the Examiner was provided with file memoranda created by Heller that describe interviews conducted with various New Century personnel from March through June 2007, along with a written summary of the process of the SIC's investigation. The undated 21-page written summary describes the process of the internal investigation conducted by Heller and PwC for the SIC, including background information and information about document preservation, collection, searching and review.

Representatives of Heller and PwC met on two occasions with the Examiner and his counsel, in June and July 2007. In those meetings Heller and PwC described generally the work they performed for the SIC and provided a PowerPoint Presentation.

## 20. The May 24, 2007 Announcement

In connection with the internal investigation for the SIC, on May 24, 2007 New Century reported the following:[291]

[T]he Audit Committee has determined that there were errors in the Company's previously filed annual financial statements for its fiscal year ended December 31, 2005 (the "2005 Financial Statements") with respect to both the accounting and reporting of loan repurchase losses and the Company's valuation of certain residual interests in securitizations. . . . [T]he Audit Committee and Management believe that it is more likely than not that these errors in the aggregate resulted in a material overstatement of pretax earnings in the 2005 Financial Statements. Accordingly, on May 23, 2007, the Company's Board of Directors concluded, based upon the recommendation of the Audit Committee, that the 2005 Financial Statements should no longer be relied upon.

The Company also reported, "[A]s the Company is currently in liquidation proceedings under Chapter 11 of the Bankruptcy Code, the Company does not expect to complete a restatement of either the 2005 Financial Statements or the Interim Financial Statements [for the first three quarters of 2006]."[292]

---

[291] Form 8-K, May 24, 2007.

[292] *Id.*

- 108 -

## V.     LOAN QUALITY

### A.     Introduction and Summary

New Century originated ever-increasing quantities of subprime residential mortgage loans. New Century's financial success depended ultimately on the quality of its origination of inherently risky subprime mortgage loans. Poor quality control in the origination of such loans could imperil New Century's financial success in multiple ways: loans might be rejected by purchasers or might bring lower prices; loans sold to investors on which there were early defaults might result in a requirement that New Century repurchase the loan; and loans kept on New Century's balance sheet could result in lost interest income and lower valuations if borrowers had high delinquency rates. In addition, the quality of New Century's loan originations had a significant impact on the various assumptions relied upon in preparing New Century's financial statements. For these and other reasons, it was in New Century's interest to have monitored loan quality carefully and to have prioritized resolving any serious loan quality problems that arose.

The term "loan quality" as used in this Final Report refers to the New Century's loan origination processes, which were supposed to ensure that New Century loans met its own internal underwriting guidelines, as well as the requirements of the investors that purchased New Century loans. Such loan origination processes required that New Century properly qualify individual borrowers for the particular loan products, including the increasingly risky subprime loan products that New Century originated from 2004 through early 2007.

The Examiner's investigation focused on whether New Century's Senior Management and its Board of Directors devoted timely and sufficient attention to loan quality, particularly when certain red flags appeared. Those red flags included:

- An increase in EPD by borrowers, beginning in 2004, which suggested that New Century was making loans to borrowers who had not been properly qualified for the particular loan products;

- An increase in investor rejections of loans that New Century sought to sell (so-called "kickouts" or "fallouts"), beginning in 2003 and 2004. The chief reasons for the investor kickouts included defective appraisals, incorrect credit reports and missing documentation, which suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines. Kickouts were particularly problematic because New Century either attempted to find other purchasers, often at lower prices, for the kicked out loans, or placed them in the Company's own portfolio. All loans that were not sold promptly after funding negatively impacted the Company's liquidity;

- Identification by New Century's Quality Assurance and Internal Audit Departments beginning in 2003 of significant flaws in New Century's loan origination processes, which often mirrored the reasons that investors were refusing to purchase increasing percentages of New Century loans;

- An increase in loan repurchase claims from whole loan purchasers, beginning in the second quarter of 2005;

- A rise in interest rates, beginning in June 2004, which affected the ability of credit-challenged borrowers to meet loan payment requirements, particularly on ARM, and increased default risks;

- A slowing, and even the end, of house price appreciation in certain regions of the country in 2006, which limited the ability of borrowers to refinance loans when they could not meet payment obligations on their existing loans, again increasing default risks;

- New Century's increasing origination, from 2004 onward, of increasingly risky products, such as Stated Income loans (where the borrower did not need to establish via documentation that he/she had sufficient income to be able to repay the loan) and 80/20 loans (where the loan represented 100 percent of the property value, consisting of an 80% first lien and a 20% second lien), with such higher risk features often combined together in a single loan through a so-called layering of risks ("layered risks");

- An increasingly competitive subprime market, beginning in 2004, typified by shrinking margins between the interest rates New Century could charge on loans it was originating and the interest rates New Century was charged by lenders on the funds New Century borrowed to finance its loan originations; and

- A decrease beginning in 2004 in the premium prices that New Century received for the loans it sold.

The Examiner concludes that New Century's Senior Management and Board did not devote sufficient attention to loan quality problems, even after these red flags were identified. Indeed, New Century devoted little attention to improving loan quality until 2006 and did not focus specific attention until the final quarter of 2006, which was too late to prevent the consequences of longstanding loan quality problems in an adversely changing market.

New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004. For example, in April 2004, New Century's Chief Credit Officer reported that "the QA results [pertaining to the loan origination processes] are still at unacceptable levels" and that "Investor Rejects [kickouts] are at an incline as well." Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that "we have so many issues pertaining to quality and process!" Later, in September 2004, it was

reported that investors had rejected 7.17% of loans that New Century had sought to sell in July 2004, which was more than two percentage points higher than the five percent rate that was viewed as the highest acceptable kickout rate. Finally, from approximately June 2004 through the rest of the year, there was a sharp rise in EPD. For all of 2004, the failure of borrowers to make the first, second or third payments on newly originated loans, stood at 7.24% and constituted $1.82 billion of loans, an EPD rate that was 2.86% higher than the 2003 rate.

The Examiner finds that these 2004 developments, taken as a whole, should have prompted Senior Management to develop an action plan to address these troubling loan quality trends. However, despite some discussions, no member of Senior Management was directed to be responsible and accountable for improving loan quality. Rather, New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale. Such lack of attention to quality had a stark result. For example, investors kicked out $1.035 billion of New Century loans in the last six months of 2004 alone.

The situation in 2005 was little different from 2004, although the trend data pointed even more clearly to serious loan quality problems. Some of the 2005 trends were striking. For instance:

- Kickout rates in 2005 exceeded New Century's five percent acceptable limit in 10 of 12 months, with the same sorts of deficiencies being cited month after month; investor kickouts for all of 2005 totaled $2.281 billion;

- EPD increased throughout the year, going from 6.86% of loans originated in the first quarter of 2005 to 9.68% of loans in the fourth quarter, with the overall 2005 average at 8.30% compared to 7.24% in 2004 and 4.38% in 2003;

- New Century's Secondary Marketing Department reported in September 2005 that the Company's 80/20 loans from 2004 had a four-times higher 60+ day default rate than other New Century products, presenting serious risk issues, especially since 80/20 loans amounted to more than 33% of New Century's loan production by September 2005; and

- The Internal Audit Department conducted nine field audits of New Century's loan origination processes in 2005, resulting in seven "Unsatisfactory" and two "Needs Improvement" ratings, as well as identification of numerous problems that suggested serious loan quality deficiencies.

The response of Senior Management and the Board to these 2005 trends was similar to their response in 2004: loan quality was a frequent topic of discussion but no effective remedial

actions were implemented. Indeed, at an October 25, 2005 Audit Committee meeting, there was a relatively full discussion of loan quality issues, including an observation by the Audit Committee Chairman that "the percentage of loans originated by the Corporation that contained defects had traditionally been too high." Despite these discussions, however, loan quality was not a priority. Just as in 2004, no one was directed to be responsible and accountable for any loan quality improvement effort.

The loan quality trends in 2006 continued to be negative, with kickout rates above the five percent acceptable level every month and reaching 14.95% by year-end, and with the same sorts of issues, such as defective appraisals and missing documentation, identified month after month as the primary reasons for kickouts. The value of the kicked out loans in 2006 was $4.622 billion. Similarly, EPD continued to trend upward month after month, exceeding 10% in every month after March 2006 and reaching 16.82% in December 2006. In the face of such trends, and the negative Internal Audit field audit results, the Audit Committee at its January 2006 meeting focused on the need for Senior Management to improve loan quality.  Indeed, the Audit Committee directed Senior Management to report back to the Committee in March 2006 on efforts to improve operations, quality control and quality assurance in the Company's loan origination and processing centers.

Eventually, New Century took certain concrete steps to improve loan quality in 2006, including the following:

- Development of a new Loan Quality Scorecard that permitted Senior Management to identify loan quality problems and who in the loan origination process may have made errors, such as approving a deficient appraisal;

- Development of an improved Quality Assurance ("QA") Department;

- Introduction of a new anti-fraud program that prevented the funding of hundreds of millions of dollars of questionable loans;

- Introduction of an Operational Risk Audit Program that conducted reviews of the loan origination process prior to the funding of loans;

- The strengthening of certain underwriting guidelines, with the objective of curtailing EPD and repurchase claims; and

- Designation of the heads of the Production and Operations Departments as having "ownership" of the Loan Quality Improvement Program.

Loan quality improvement still never became a top priority for New Century in 2006, however, and most of the improvements noted above were not implemented until late in the year.

While diligent efforts appear to have been undertaken on discrete items, there is no apparent sense of urgency to make sure that improvements were implemented as quickly as possible. In one area – loan kickouts – the Examiner concludes that no effective action was taken at all. Month after month, the same sorts of problems, such as defective appraisals and missing documentation, were cited as among the chief reasons that investors increasingly kicked loans out of pools being sold by New Century. New Century's head of Production, Anthony Meola, expressed his frustration in January 2007, commenting that New Century's appraisal processes were "stale, [and that] we need to address them next expeditiously" and in another e-mail stated "we have been asking for 5 months, when can we attack appraisals and how?"

The Examiner sought to determine why Senior Management failed to dedicate resources to improve loan quality during 2004, 2005 and for much of 2006. The Examiner believes that a number of factors contributed to New Century's failure to address such a critical issue. First, New Century's loan originations grew at an enormous rate from 2000 through 2006, becoming the second largest subprime lender by the end of 2004 and remaining one of the largest in 2005. The Production Department was highly motivated and effective in originating such loans and apparently resisted changes that might have limited loan production volume. While both the Quality Assurance and Internal Audit Departments identified loan quality problems, and kickout and EPD rates confirmed many of these problems, the Production Department devoted its resources to generating high volumes of loans, with relatively little attention to loan quality. Indeed, in September 2005, soon after receiving an "Unsatisfactory" Internal Audit report, Patrick Flanagan, the former head of Production, advised Internal Audit and others that Production's success over the years in generating revenues made the Internal Audit results essentially irrelevant:

> If recollection is correct, every singe [sic] audit completed has been unsatisfactory which to me sounds like we need to ammend [sic] policy as much as clean up our act. The financial results that have been ackomplished [sic] over the past few years are inconsistent with the audit results.

In addition, Production resisted suggested changes in the Production compensation system that would have linked improved loan quality to compensation. Compensation within the Production Department, including significant bonuses, historically focused on loan origination volume. Senior Management recognized that Production compensation needed to be tied to loan quality if there was to be meaningful improvement in the quality of the loans originated by New

- 113 -

Century. For example, in a September 2004 memorandum, Brad Morrice, then Chief Operating
Officer, observed:

> Regardless of the inclusion or exclusion of QA's results [as a metric for judging
> loan quality], I believe that whatever measurements we agree upon should be tied
> to production compensation otherwise this has no teeth and continues to be an
> exercise in futility. (emphasis supplied)

The Examiner found little evidence that Production compensation ever was tied to loan quality
results. Indeed, as late as November 2006, Internal Audit reported that commission payments
made to account executives and area sales managers were not affected by EPD, kickouts and
repurchases.

New Century measured loan quality primarily in terms of whether it was successful in
selling loans to investors. So long as investors continued to be willing to purchase New Century
loans, New Century apparently did not believe it needed significantly to improve loan quality,
even as the prices investors paid for loans declined in 2004 and 2005. In 2006, when New
Century finally focused more on loan quality issues, it was partly in response to the demands
being made by investors for better quality loans, particularly prompted by a large increase in
investor repurchase claims. One former senior executive informed the Examiner that he wished
that New Century had addressed the trends earlier so that the Company could have implemented
loan quality enhancements earlier, stating that Senior Management simply did not focus on the
seriousness of the trends before approximately September 2006.

New Century also appears to have paid little attention to improving loan quality prior to
the fall of 2006 because certain comparative data suggested that New Century loans, on average,
were performing better than those of its competitors. Senior Management received a wake up
call in September 2006, when data showed that New Century loans originated in early-2006 had
much worse delinquency rates than comparable loans originated by other subprime lenders.
Further, Senior Management appeared to believe that regardless of day-to-day market conditions
and ever more discerning and discriminating investors, New Century would survive, just as it
had survived the downturn of 1998-2001. In addition, the increasingly alarming trends in 2006
in EPD, repurchase claims and kickouts appear to have received less attention because New
Century viewed these as industry-wide problems and not problems unique to New Century.

The Examiner finds that the foregoing reasons do not satisfactorily explain New
Century's failure to make improving loan quality a priority at a much earlier date. Neither

comparative data nor its prior survival during an earlier market downturn changed the fact that New Century faced increasing numbers of EPD, kickouts and repurchase claims, as well as reduced margins, which should have put the Company on alert that improving loan quality was critical to its long-term financial success. Further, New Century's own internal data showed that many of the loans it originated in 2005 had much higher delinquency rates than loans originated by New Century in 2003 and 2004. New Century Management attributed the higher delinquency rates mostly to New Century's increasing risk profile. For example, Senior Management identified Stated Income loans to single borrowers in an 80/20 product as performing much worse in 2005 compared to 2003 and 2004, stating "[w]e again see the horrendous performance of the Stated Income/Single/80/20 loans." Nonetheless, little was done to curb such risks until late 2006.

The Examiner recognizes, as noted previously, that New Century was engaged in the subprime industry, which necessarily carried with it higher risks than other forms of mortgage lending. New Century, however, not only did not properly address these risks, but continued to be an aggressive originator of ever-increasing volumes of high risk mortgage loans, with relatively little attention to meaningful efforts to improve loan quality. New Century's Board and Senior Management may be criticized for their failures to identify loan quality as an item that needed far earlier and more focused attention and effort.

The Examiner believes that Senior Management in particular deserves criticism for failure to devote efforts to the alarming loan kickout rate. As noted, the same sorts of problems were identified month after month as resulting in kickouts. Some of the problems may have been more difficult to solve, such as some of the appraisal issues that involved subjective judgments. Other issues, however, were termed by New Century personnel as "no brainers" and "black and white" issues – issues that should not have been missed month after month and were viewed even within New Century as relatively easy to fix. The Examiner identified no evidence of any decision to the effect that the costs associated with addressing kickouts were too great to justify the effort. To the contrary, virtually every monthly kickout report from mid-2004 onward stressed the need to get the kickout rates lower, but there was simply no meaningful action. This inaction may have cost New Century millions, if not hundreds of millions of dollars. For example, in 2006, investors rejected an estimated $693 million in loans because the loan files lacked required documents.

The Examiner cannot conclude that, if New Century had focused on loan quality far earlier, it would have avoided bankruptcy. Indeed, many persons interviewed by the Examiner expressed the view that, even without its accounting problems, New Century, like so many others in the subprime market, was doomed to failure unless it found a partner to provide a major cash infusion. The Examiner cannot express an informed view whether such speculation is well-founded. The Examiner can conclude, however, that if New Century had focused on loan quality in a more timely, energetic and effective manner, it would have improved its liquidity (via reduced EPD and repurchase claims and fewer kickouts) and may have been able to continue its operations longer and may have survived long enough and had a sufficient quality of assets and operations to attract an investor before the rest of the subprime market collapsed.

### B.    The Loan Quality Investigation

The Examiner investigated to determine how New Century went about originating loans, the means by which it sought to monitor the quality of the loans it originated, and the steps it took to improve loan quality when it knew that loan quality issues were presented. In carrying out this investigation, the Examiner sought to view data in the context of the 2004 through early-2007 time period and to avoid using hindsight to judge the actions of New Century's Board and Management.

New Century operated a huge and complex loan origination process, funding more than $200 million in loans every business day in most months from April 2005 through December 2006. The Examiner did not attempt to investigate each aspect of that process, such as to judge the appropriateness of the particular underwriting guidelines that might have been in effect at a particular time or whether individual changes to such guidelines were made with appropriate care. Such an undertaking was beyond the scope of the June 1 Order.

The New Century loan origination process can be briefly summarized as follows:

The vast majority of New Century loans were originated through New Century's wholesale processing centers. By late 2005, New Century had established relationships with almost 50,000 mortgage brokers, who would submit loan applications to New Century through New Century's network of almost 1,000 account executives or through New Century's web-based loan underwriting process called FastQual. New Century also purchased funded loans from mortgage bankers and financial institutions that acted as correspondent lenders.

In 2005, New Century's retail platform originated about 12.3% of all loans, compared to 87.3% originated by the wholesale platform. The retail origination process generally was similar to the wholesale process, except that retail

personnel dealt with prospective borrowers directly, instead of dealing through independent brokers and correspondent lenders.

Once a loan application was received, the application would be reviewed by underwriters and sometimes risk managers to determine whether it was complete and met underwriting conditions and other guidelines. Loans from correspondent lenders similarly went through a re-underwriting process. The underwriting process included "an evaluation of credit history and income, the appraisal, preliminary title report, and other loan package documents to determine whether the loan request should be approved, declined or conditionally approved."

In some instances, applications did not meet all underwriting guidelines and other conditions. Some such applications would be rejected. In other instances, the application might be approved through the grant of exceptions. The most common exceptions were maximum loan amount limits, loan to collateral value limits and debt to income limits. Different persons in the Production Department had different levels of exception authority. There does not appear to have been a clear exceptions policy. Indeed, Morrice commented in a September 2004 memorandum that New Century's exceptions policy was "unclear" and Kevin Cloyd in response stated "Our exceptions policy – do we have one?" However, it was acknowledged that exceptions could be granted in a variety of circumstances. For example, the Form 10-K for 2004 provided:

> On a case-by-case basis, we may determine that an applicant warrants an LTV exception, a debt service-to-income ratio exception, or another exception to our underwriting criteria. We may allow such an exception if the application reflects certain compensating factors including low LTV, a maximum of one 30-day late payment on all mortgage loans during the last 12 months, and stable employment or ownership of the current residence. We may also allow an exception if the applicant places in escrow a down payment of at least 20% of the purchase price of the mortgage property or if the new loan reduces the applicant's aggregate mortgage payment. Our automated credit grading system aids in identifying and managing underwriting exceptions. Certain of our loan programs and risk grade classifications limit the approval of exceptions to higher loan approval authority levels.[293]

Once an application was approved, with or without exceptions, the loan would be funded, with most loans funded within 30 days of receipt of the application.

The Examiner cites in this portion of the Final Report data that primarily were generated by New Century, such as data on EPD, kickouts, the grant of underwriting exceptions and the identification by New Century of particular mortgage products that had greater or lesser risks. Based upon witness interviews and other evidence, the Examiner believes such data generally are accurate. However, the Examiner was not able to verify independently the data, and in some

---

[293] Form 10-K for 2004 at 13.

instances, the available data were not reported on a consistent basis and were incomplete. For example, with regard to underwriting exceptions, New Century data revealed the following:

> In its Forms 10-K for 2002 and 2003, New Century reported that underwriting exceptions, as a percentage of the dollar amount of originations, amounted to 18.5% and 14.9% of originations in those years respectively.[294]

> In its Form 10-K for 2004, New Century changed its method of exception reporting, by reporting only the percentage of loans that had exceptions and eliminating the dollar amount analysis: "For the years ended December 31, 2004, 2003 and 2002, our overall underwriting exception rates were 7.4%, 8.4% and 13.5%, respectively."[295]

> In the Form 10-K for 2005, New Century did not report on exception rates at all and available data indicate that between June 2005 and October 2006, New Century did not have accurate exception data.

Such inconsistent data reporting made it difficult for the Examiner to analyze just how frequently exceptions were made to underwriting guidelines. The available data suggest, however, that exceptions were frequent and amounted to at least 10% of loan amounts by dollar value of originations during 2004 through 2007.

### C. Loan Quality Should Have Been Extremely Important to New Century in 2004 through 2007

Loan quality should have been extremely important to New Century for at least two reasons. First, the vast majority of New Century's revenues derived from the inherently riskier subprime loans that it originated. Second, loan quality was all the more important from 2004 onward because certain factors, such as rising interest rates, the leveling of housing prices, compressed margins in the loan origination and sale business, and the increasing riskiness of New Century's loan products, all pointed to a more difficult and higher risk operating environment for New Century. In that environment, New Century should have known that good execution and quality in its origination of subprime mortgage loans were important to ensure New Century's success.

#### 1. New Century's Loans Were Key to New Century's Revenues

New Century's two greatest sources of revenues were subprime mortgage loan sales and interest earned on subprime loans prior to sale and on loans held for investment on New Century's balance sheet.

---

[294] Form 10-K for 2003 at 11.

[295] Form 10-K for 2004 at 13.

### a. Loan Sales

Historically, New Century sought to sell virtually 100% of the loans that it originated, either in whole loan sales or in securitizations accounted for as sales. Beginning in 2003, New Century started to hold some of its loans for investment on its balance sheet. From 2003 through 2005, New Century sold between 75 and 80% of its originations, holding the rest of the loans on its balance sheet through securitizations accounted for as financings. In the first nine months of 2006, New Century loan sales amounted to approximately 92.5% of 2006 originations.

In 2003 and after, most sales were structured as whole loan sales, as opposed to securitizations accounted for as sales.[296] In general, a pool of loans would be created and the investor then would have an opportunity to conduct due diligence on the loans in the pool, typically reviewing approximately 25% of the loans offered for sale, with a further review often conducted on a greater percentage of the appraisals. The investor would advise New Century which loans it did not want to purchase – the kickouts – and would typically tell New Century its reasons for rejecting the loans, such as unacceptable deviations from underwriting guidelines, defective appraisals and missing documentation. New Century personnel then would seek to reduce the proposed kickout rate, either by convincing the investor that it was wrong in rejecting certain loans or by fixing some defect that affected a particular loan. Once the precise pool was finalized, New Century and the investor would agree to a price. As discussed below, kickout rates were tracked by New Century as an important loan quality metric.

New Century typically sold its loans at a premium to par value and kept track of its so-called "net execution," which represented "the premium paid to [New Century] by third-party investors in whole loan sale transactions and the net gain recorded for a securitization accounted for as a sale."[297] New Century's net executions showed a significant decline over the years, which reflected the increasingly competitive subprime market:

| | |
|---|---|
| 2003 | 4.18% |
| 2004 | 3.58% |
| 2005 | 2.06% |
| Q1-Q3 2006 | 1.59% |

---

[296] Between 2003 and the bankruptcy filing in 2007, all loan sales were in the form of sales to whole loan purchasers except for four securitizations accounted for as sales in 2005, totaling $6.4 billion.

[297] Form 10-K for 2005 at 71.

- 119 -

Indeed, in mid-2005, Kevin Cloyd, the head of Secondary Marketing, advised Senior Management that New Century's margin in sale transactions had become "RAZOR thin." (emphasis in original).

New Century recorded gains from the sales of its loans. In 2005, New Century reported $622.2 million in gains on loan sales, a 22.2% decrease from the $800.6 million in gain on sale recorded in 2004. The main identified reason for this reduction was the reduced net execution rate. In its Form 10-K for 2005, New Century stated:

> The decrease in gain on sale of loans was primarily the result of a reduction in net execution from 3.58% for the year ended December 31, 2004 to 2.06% for the same period in 2005. The reduction in our net execution was due mainly to changes in and competitive pressures in the secondary market, as well as the interest rate environment.[298]

In the sale process, New Century faced two initial risks: that investors would refuse to buy certain loans; and that investors would pay less for the loans that they were willing to purchase. As noted, investors primarily kicked out loans due to defects in the loan origination processes, such as defective appraisals, unacceptable exceptions made to underwriting guidelines and missing documentation, each of which was an indication of the quality of the loans that were originated, since most loans rejected by purchasers reflected deviations by New Century from its loan origination processes. Similarly, the higher the quality of the loan being presented for sale, the higher the price that investors were willing to pay.[299]

If an investor kicked out particular loans, New Century had several options. First, it could add the loans to another sale pool and seek to sell them, either before or after trying to correct the problem that caused the initial kickout. Second, if the defects were significant, New Century could attempt to sell the loans in a discounted loan sale, i.e., at a price less than the face amount of the loan. In either event, the process was costly in terms of resources that needed to be devoted and could lead to outright losses when loans had to be disposed of at less than par. The kickout process also increased certain risks faced by New Century. As discussed

---

[298] Form 10-K for 2005 at 71.

[299] Some loans were rejected by investors for reasons unrelated to deviations in New Century's loan origination processes. For example, some investors would reject certain types of loans, such as Stated Income loans to borrowers with relatively low FICO scores, because those investors simply did not have an interest in purchasing such high risk loans. The Examiner cannot quantify the magnitude of such kickouts but believes that the large majority of kickouts involved loans where an investor identified some deviation from New Century's loan origination processes, which processes, in turn, were designed to mirror the requirements of investors.

immediately below, one risk faced by New Century involved required repurchases of loans if borrowers defaulted on early loan payments. New Century sought to sell loans as soon after funding as possible because New Century learned over the years that borrowers' likelihood of defaults increased as more time passed after initial funding. Accordingly, when loans were kicked out, risks were increased because even if they eventually were sold, even at a premium, the risk that the borrower would default would increase because of the passage of time since loan funding.

New Century faced a third risk in the sale process: repurchases. It was typical in a whole loan sale agreement for New Century to agree to repurchase a loan in either of two circumstances. First, if the borrower defaulted on the first one or two loan payments after a loan was sold, New Century could be required to repurchase the loan or to substitute a new loan acceptable to the investor. This repurchase liability was explained as follows by a New Century employee in a February 24, 2005 e-mail:

> Our purchase liability for first payment defaults include[s] loans that fail to make their first payment to the investor so, even though the borrower may be failing to make their second or third payment overall, we would still be on the hook to repurchase the loan if that payment was the first payment due to the investor. (emphasis in original)

This was the primary reason that New Century was required to repurchase loans, with approximately 90% of repurchases caused by first payment defaults ("FPD"). Second, even after that early default period, a purchaser could require New Century to repurchase a loan if it were shown that certain representations and warranties in the loan purchase agreement, such as representations about the value of the underlying property, proved to be false. This category of repurchase requests grew over time, particularly in 2006, as investors became increasingly inclined to demand repurchases. Poor loan quality, whether because the borrower defaulted on early loan payments or because the loan documentation was deficient, was at issue on repurchases. Such repurchases could have a significant impact on New Century's results. When New Century was required to repurchase a loan, it needed to pay the investor the full remaining principal amount of the loan as well as reimburse the investor for interest not received and for the amount of the premium (or some portion of it) initially paid by the investor for the loan. New Century then might be left holding a loan that could only be sold at a discount, further contributing to a loss.

- 121 -

### b.    Interest Income

New Century derived extensive revenues from interest earned on the loans that it originated. Such interest income was derived in two ways. First, between the time a loan was funded and the time that a loan was sold, typically 30 to 50 days, the borrower made regular payments of interest and sometimes of principal, which New Century would collect. Second, when New Century held loans for investment on its balance sheet, New Century would record interest received from such loans as part of its income statement.

The interest received by New Century on loans held for sale and loans held for investment became the biggest single revenue item on New Century's income statement in 2004 through 2006. In the 2004 through 2006 time period, such interest income was reported as follows:

| 2004 | $898,647,000[300] |
| 2005 | $1,759,567,000[301] |
| 9/30/06 | $1,454,733,000[302] |

Interest income was directly impacted by loan quality. If loan quality was poor, meaning underwriting standards and guidelines were not being complied with, then default rates on New Century loans would increase and interest collections would be reduced. This was all the more the case since New Century between 2003 and the end of 2006 greatly increased the quantity of loans that it held for investment on its balance sheet, with the balances at reporting periods as follows:

| 12/31/02 | $0 |
| 12/31/03 | $4.74 billion[303] |
| 12/31/04 | $13.2 billion[304] |
| 12/31/05 | $16.1 billion[305] |
| 9/30/06 | $14.0 billion[306] |

---

[300] Form 10-K for 2004 at 66.

[301] Form 10-K for 2005 at 53.

[302] Form 10-Q for Q3 2006 at 22.

[303] Form 10-K for 2003 at 41.

[304] Form 10-K for 2004 at 70.

[305] At June 30, 2005, the loans held for investment portfolio stood at $18.5 billion. Form 10-Q for Q2 2005 at 35.

[306] Form 10-Q for Q3 2006 at 1.

Such a large increase in loans held for investment, with the inherent embedded credit risk in such loans, was an additional reason that New Century should have had an intense interest in making sure that it originated quality loans.

## 2.   Additional Factors Should Have Caused New Century to Focus on Loan Quality

A variety of additional factors, some outside of New Century's immediate control, should have caused New Century to focus on loan quality.

### a.   Rising Interest Rates and Leveling Property Values

In the several years preceding 2004, the U.S. economy experienced declining interest rates along with rapidly increasing home value appreciation. These developments helped to stimulate substantial increases in subprime mortgage loan origination volumes for New Century and other lenders.

The situation began to change in June 2004, when the Federal Reserve started to raise interest rates regularly. The prime rate, which had remained flat at four percent for more than a year, increased to 4.25% in July 2004, was at 5.25% by mid-December 2004, and climbed steadily in 2005 and 2006, reaching 8.25% in June 2006.[307] As the prime rate and Federal Funds rate rose, other interest rates rose as well, including those for most residential mortgage loans, and borrowers with ARM were all the more likely to face significantly higher payments when their rates reset. New Century was well aware of the fact that interest rates were almost sure to increase. For example, in January 2005, in a presentation to Senior Management entitled "The View of the World," a Secondary Marketing employee commented:

It goes without saying that rates will be going up in the next year. Estimates of the Fed Funds rate are in the 3.25% range -- up from 2.25% now and 1.25% in June 2004.

This individual then stated later in the presentation:

The potential for trouble appears to manifest itself in 2006 (and beyond) with the hybrid loans (especially IO's) [Interest Only] resetting during that year. We can assume that the rising rates we are currently experiencing will continue, resulting in the full initial cap (1.5%) being realized with the associated higher payments.

The rise in interest rates, over time, made it more difficult for borrowers to meet their payment obligations, particularly since most New Century borrowers held adjustable rate

---

[307] *Bank Prime Rate Changes: Historical Dates of Changes and Rates*, Fed. Reserve System, Nov. 2, 2007, *available at* http://research/stloudfed.org/fred2/data/PRIME.txt.

mortgages, whose rates would adjust upward as interest rates increased. Significantly, ARM made up 70.1, 73.7 and 73.3% of New Century originations in years 2003, 2004 and 2005 respectively.[308]

At the same time that interest rates were rising, property value appreciation began to slow and, in some regions, by 2006, values actually began to decline. The slowing of property appreciation had a potentially serious effect on borrowers, something that New Century clearly recognized. In the same View of the World presentation, the author noted that "lower housing price increases could hinder the ability of customers to refinance out of loans that are heading for trouble." In prior years, as property values increased, borrowers often could refinance their loans when ARM adjusted to higher interest rates. However, as property prices leveled, many borrowers discovered that they could no longer refinance and thus were facing higher monthly payments without a refinance option.

New Century publicly acknowledged these trends as they occurred. For example, at an investor and analyst meeting in February 2005, Flanagan highlighted the "expected environmental conditions" as follows:

Rising interest rates – 25 bps [basis points] per quarter
Moderating, but stable home prices
Competitive landscape

The rise in interest rates also directly affected New Century. New Century borrowed money to fund loan originations. New Century tracked the difference between the rates that it needed to pay to borrow money and the rates that it could charge borrowers on the loans that it originated. Over the years, this difference or margin narrowed sharply, as short-term interest rates that New Century needed to pay rose faster than the longer-term rates that it could charge to borrowers:

_____

[308] Form 10-K for 2005 at 54.

| YEAR | MARGIN |
|------|--------|
| 2003 | >5%[309] |
| 2004 | 4.5% |
| 2005 | 2.7%[310] |
| 1Q, 2Q, 3Q 2006 | 2.3%[311] |

In short, it was clear beginning in 2004, that New Century was facing an increasingly difficult operating environment. In June 2004, the head of New Century's Secondary Marketing Department commented that New Century was "entering a point in time where the wind is racing in our face instead of at our backs" and that during this time "it is more vital than ever to maintain our loan quality, loan performance and positive reputation." Similarly, the minutes from the February 2, 2005 meeting of the Board of Directors refer to the "increasingly competitive environment" faced by New Century. This changing and increasingly difficult operating environment should have been an impetus to New Century to focus on loan origination quality controls and assurances.

**b. The Increasing Risk Profile of New Century Loan Products**

New Century also should have focused more carefully on loan quality as New Century began to underwrite more mortgage loan products that had greater inherent risks. New Century, as a leading subprime lender, was by definition engaged in a risky business. However, over time, the risks associated with New Century's subprime mortgage loan products increased substantially.

For example, in 2003, 2004, and 2005, New Century greatly increased its origination of IO loan products, where borrowers would make only interest payments for the first several years of the loan, after which amortization of principal was added to the monthly payments. New Century's IO originations as a percentage of total originations for particular months in the mid-2000s were as follows:

---

[309] Form 10-K for 2004 at 70.

[310] Form 10-K for 2005 at 57.

[311] Form 10-Q for Q3 2006 at 41.

| Month | % IO |
|-------|------|
| 3/03  | 0%   |
| 12/03 | 2.77% |
| 6/04  | 21.39% |
| 12/04 | 21.04% |
| 6/05  | 38.49% |

IO products were understood to have a higher risk than fully-amortizing mortgage loans, as noted by New Century in its Form 10-K for 2005:

> [U]pon expiration of the interest-only payment, the borrower's payment will increase to cover the fully amortizing payment. The adjustment to the higher payment amount increases the risk that the borrower will default or prepay the mortgage loan. Because no principal payments may be made on such loans for an extended period following origination, if the borrower defaults, the unpaid principal balance of the related mortgage will be greater than otherwise would be the case, increasing the risk of loss in that situation. For those reasons, among others, these interest-only mortgage loans may be less valuable in the secondary market and may result in lesser proceeds to us when sold or securitized as compared to fully amortizing mortgage loans.[312]

The risks associated with the IO products were exacerbated by the fact that New Century generally qualified its borrowers only based on their ability to pay the initial interest on the loan and not on their ability to pay interest plus principal amortization. New Century stated in its Form 10-K for 2005: "For our interest-only adjustable rate mortgage, or ARM, loans we generally use the initial interest-only payment for determining the borrower's repayment ability."[313] As discussed hereafter, New Century finally became concerned about the increasing concentration in IO products, due in part to investors' reluctance to purchase IO products at premium prices, and in September 2005, initiated actions to keep IO originations below 25% of originations thereafter. These actions accomplished their intended purposes and IO originations dropped sharply after the peak at June 2005.

A similar trend toward higher risk products took place in so-called Stated Income loans, where the borrower was not required to provide documentation (such as W-2 forms for the prior year's earnings) establishing that his/her income was sufficient to qualify for the loan in question. In such loans, the prospective borrower would "state" his/her income in the application and New Century would accept such a representation, in many instances with little or no

---

[312] Form 10-K for 2005 at 35-36.

[313] Form 10-K for 2005 at 9.

independent verification.[314]  The risks associated with making loans on a "stated" basis were recognized by New Century personnel, one of whom stated to Senior Management in January 2005:

> To restate the obvious, a borrower's true income is not known on Stated Income loans so we are unable to actually determine the borrowers ability to afford a loan.

Despite such risks and despite the fact that New Century knew by January 2005 that Stated Income loans had a "significantly higher delinquency" rate than full documentation loans, Stated Income loans became an increasingly important part of New Century's mix of loan products. This trend caused a New Century employee to comment in an October 20, 2004 e-mail that was copied to Cloyd:

> Stated Income.  This has been increasing dramatically to the point where Stated Income loans are the majority of production, and are teetering on being >50% of production.  We know that Stated Income loans do not perform as well as Full Doc loans. (Emphasis supplied).

Notwithstanding these expressed concerns, Stated Income loans remained a high percentage of overall originations.  Thus, the percentage of New Century loans in the Stated Income category as a percentage of total originations in the months noted below were as follows:

| Month | % Stated Income |
|-------|-----------------|
| 6/02  | 35.71% |
| 12/02 | 34.09% |
| 6/03  | 37.51% |
| 12/03 | 42.46% |
| 6/04  | 43.73% |
| 12/04 | 43.50% |
| 6/05  | 44.89% |
| 12/05 | 45.51% |
| 6/06  | 42.85% |
| 12/06 | 47.24% |

As will be discussed below, analyses in early 2006 established that Stated Income loans had very poor delinquency results.   Despite such analyses, Stated Income loans remained a staple of New Century's loan originations.

---

[314] New Century personnel would sometimes seek to verify that a prospective borrower's statement of his/her stated income was reasonable, such as by checking surveys of average compensation in the region of persons with similar work profiles.  However, the Examiner was told in several interviews that such inquiries were often discouraged.

The same individual who expressed concerns about Stated Income loans, also commented on other risks that he perceived in the products being offered by New Century in fall 2004:

Risk Layering. Adding the risk factors on top of each other such as Stated – IO – 80/20.

80/20. Increasing population of 80/20 is driving up CLTV [combined loan to value ratios]. CLTV's are more important to default risk than straight LTV and while our LTVs are dropping, our CLTV's are increasing – thus increasing Default Risk....

. . .

Stated Wage Earners. While I believe this is being addressed somewhat, I just can't get comfortable with W2'd borrowers who are unwilling or unable to prove their income.

Another senior officer similarly wrote to Morrice on October 24, 2004, commenting that "stated wage earner loans present a very high risk of early payment defaults and are generally a lower credit quality borrower than our self employed stated borrowers."

New Century increased its risks in other ways as well. As noted above, a New Century executive expressed concerns about 80/20 loans. These were 100% LTV loans, with an 80% first lien and a 20% second lien. New Century tracked the percentages of its loans that were "core" or "traditional" loans, generally loans with LTV in the range of 80% or less, and its non-core loans at 100% LTV, which came to be dominated by the 80/20 loans.[315] The shift from core loans to 80/20 loans was dramatic, and starkly depicted the increasing risk profile of New Century's loans:

| Month | % Core | % 80/20 |
|-------|--------|---------|
| 3/03  | 88.13  | 7.9     |
| 12/03 | 83.00  | 9.10    |
| 6/04  | 77.93  | 19.08   |
| 12/04 | 74.98  | 23.54   |
| 6/05  | 65.50  | 33.83   |
| 12/05 | 64.26  | 35.23   |
| 6/06  | 64.81  | 34.77   |
| 12/06 | 68.42  | 29.22   |

---

[315] New Century had a 100% LTV product without the 80/20 structure but this product never had more than approximately a one percent share of New Century originations.

Risks associated with the 80/20 products became apparent as their originations grew. For example, Senior Management became aware in September 2005 that 80/20 loans of the 2004 vintage had four times the 60+ day (loan payments behind by 60 days or more) delinquency rates of non-80/20 products, underscoring the higher risks of this product.

The same trend toward higher risk was reflected in New Century's trend toward ever higher "combined LTV" ratios, meaning the total loans that a borrower had pertaining to the collateral compared to the appraised value of the collateral. As noted in the e-mail quoted above, a New Century executive noted that combined LTV ratios were increasing, therefore "increasing Default Risk . . . ." Those increasing values were as follows in the months listed below:

| Month | WACLTV[316] |
|-------|-------------|
| 11/02 | 79.92% |
| 3/03 | 82.2% |
| 12/03 | 83.69% |
| 6/04 | 83.77% |
| 12/04 | 84.73% |
| 6/05 | 86.92% |
| 12/05 | 87.07% |
| 6/06 | 87.45% |
| 12/06 | 87.47% |

As shown, there was a consistent trend throughout the period to higher combined LTV ratios, with associated greater risks of borrower defaults.

New Century originated some higher risk subprime mortgage loans in response to the appetites of investors who were eager to buy these sorts of products, which tended to have higher interest rates than more conventional products. However, New Century also was a leader in the market on some higher risk mortgage loan products. For example, one product offered by New Century in 2004 was an interest only 80/20 stated wage earner loan, which as of October 2004 made up 3.4% of New Century's originations. Such a loan had multiple layers of risks: it was interest only; it was a 100% combined loan to value loan; and the borrower did not need to verify his/her income. Flanagan observed in 2004 that New Century appeared to be the only lender

---

[316] Weighted average combined loan to value ratio.

originating this layered risk loan.[317]   Cloyd, who headed Secondary Marketing, recommended that such loans be eliminated.  The Examiner found no evidence that this recommendation was accepted.  Stated Income products remained a large component of New Century originations and as noted below, Stated Income products, including those in 80/20 products and in loans to single borrowers, were identified in early-2006 as extremely poor performing, high risk New Century loan products.

A further risk should be noted as well.  New Century originated a large quantity of 2/28 and 3/27 ARM.  Typically, these ARM would have a fixed low interest rate (often called a teaser rate) for the first two or three years and then would adjust at least annually thereafter, with the adjustment tied to an index such as LIBOR.[318]  Even if the index rate did not change over the two or three year fixed rate period, the loan payments would be expected to increase at the first adjustment date.  New Century qualified its borrowers for such loans on the basis of their ability to pay the loan at the initial teaser rate, rather than the ability to pay the loan at the indexed rate after the initial fixed rate period.  This circumstance presented an obvious risk of future default, which was specifically identified by New Century personnel.  Thus, in discussing the 2/28 IO product in fall 2004, New Century's General Counsel identified the potential "sticker shock" risk associated with this product:

> [T]he 2/28 IO product results in significant "sticker shock" at month 25 even with relatively modest increases in LIBOR during that period.  For example, a 57 basis point increase in the interest rate over that period results in a 25 percent jump in the monthly payment amount for that borrower.  In contrast, the traditional 2/28 borrower will only experience a 6% payment increase.
>
> This sticker shock, when combined with lower credit grades (down to 580), higher DTIs [debt to income ratios](as high as 50%), a high concentration of stated wage earners, a high concentration of 80/20 product, higher LTVs and other risk factors led the FLAT [Fair Lending Action Team] members to be concerned that a meaningful percentage of these loans might present serious repayment ability issues.  The sense from my conversations with people in the field is that many of these loans are being sold to borrowers with the expectation that the borrower will be able to refi in a couple years.  While that is certainly a valid choice for a borrower to consider or a broker to suggest, we should not be making loans where the inability to refinance after 2 years leaves the borrower at very high risk of default even under modest interest rate increases.

---

[317] Layered risk refers to the combination of one higher risk product, such as interest only loans, with another higher risk product, such as stated income loans.

[318] London Interbank Offered Rate.

Similarly, in early-2005, New Century personnel again noted the risk of defaults on New

Century's ARM:

> The most common subprime product is a loan that is fixed for 2 or 3 years and
> then becomes adjustable. The initial rate is far below the fully-indexed rate, but
> the loan is underwritten to the start payment. At month 25 the borrower faces a
> major payment shock, even if the underlying index has not changed. This forces
> the borrower into a refinance, likely with another subprime lender or broker. The
> borrower pays another 4 or 5 points (out of their equity), and rolls into another
> 2/28 loan, thereby buying 2 more years of life, but essentially perpetuating a cycle
> of repeated refinance and loss of equity to greedy lenders.
>
> Inevitably, the borrower lacks enough equity to continue this cycle (absent rapidly
> rising property values) and ends up having to sell the house or face foreclosure.

In sum, New Century was aware that it was offering a variety of products that contained

elements of high risk, especially when various risk factors were layered together. At the end of

2005, New Century prepared a Summary of "2005 Loans Characteristics and Delinquency

Performance." The Summary set forth in stark detail the increasingly risky loans made by New

Century in 2005 when compared to earlier years:

> Overall, the 60+ delinquency on the 2005 vintage is higher than the 2003/2004
> vintages, but lower than the combined pre-2003 vintages.
>
> The 60+ delinquency on the 2005 vintage for 650+ FICO bucket is equal to or
> higher than any of the other vintages.
>
> Production characteristics (since 2003):
>
>> Stated Income loans and 80/20 loans are increasing
>>
>> The volume of loans with only one borrower is increasing, especially in
>> the higher FICOs
>>
>> Stated Income loans with one borrower have doubled since 2003, while
>> Full Doc loans with more than one borrower have declined by 1/3
>>
>> CLTVs are highest on Stated Income loans with one borrower
>>
>> FICOs are highest on Stated Income loans
>
> Specific Performance Indicators
>
>> 80/20s perform worse than Core loans
>>
>> Stated Income loans perform worse than Full Doc loans
>>
>> Loans with one borrower perform worse than loans with 2 or more
>> borrowers
>>
>> Stated income\80/20 loans with one borrower have terrible performance
>> relative to other loans in the same FICO band, while Full Doc\Core\Joint
>> loans have superior results

- 131 -

> **Overall, our volume has moved into loan cohorts that have weaker
> performance. As a result of the higher volume coming from those
> poorer performing buckets, our delinquency rates are being
> negatively impacted.**

(emphasis in original) These data evidence the ever-increasing risks incurred by New Century –
a veritable ticking time bomb. Under the circumstances, New Century should have been more
concerned about – and taken greater steps to address – loan quality issues.

### D.    Measuring Loan Quality at New Century

The Examiner investigated to determine how New Century measured loan quality in 2004
through 2007. This was important so that the Examiner could reach a judgment whether New
Century responded appropriately when data relied upon by New Century suggested
deteriorations in loan quality that might have prompted more intense scrutiny and greater action
by New Century's Management and its Board of Directors.

The Examiner determined that New Century never adopted specific criteria for measuring
loan quality. In September 2004, Morrice commented to Senior Management that "we have
historically been . . . unclear about how to measure loan quality and whether it is getting better."
In responding to Morrice, New Century's Chief Credit Officer observed that New Century had
"no standard for 'loan quality'" and observed that New Century needed "to decide what we want
our driver(s) to be."

Even though New Century never appears to have explicitly adopted specific criteria for
measuring loan quality, the Examiner determined that there were two basic types of
measurements by which New Century sought to assess the quality of its loans. The first set of
measurements were factors that affected New Century's profitability in a relatively direct way,
such as:    loan delinquency rates, including EPD; repurchases; and Secondary Marketing
performance, including kickout rates and the prices that New Century received on the sale of
loans. The second set of measurements were derived from internal New Century data, such as
the results of audits by the Quality Assurance and Internal Audit Departments.

### 1.    Delinquency Rates, Including Early Payment Default Rates

New Century would regularly track loan delinquency rates in several different ways.
These data were relied upon by New Century as an important loan quality measurement.

New Century tracked the frequency with which borrowers defaulted on newly funded
loans. New Century would track first, second and third payment defaults, which it collectively

called EPD. FPD appear to have been most important to New Century personnel tracking such data, with one employee commenting to Cloyd in December 2004: "FPDs are a clear indicator of loan performance and the earliest possible objective measure that we have." (emphasis in original). These FPD data were of particular importance because, under its loan purchase agreements with investors, New Century could be required to repurchase loans when there were early defaults by borrowers. Such EPD were also important because New Century securitized on its balance sheet billions of dollars of loans. If loans went into default, especially soon after they were securitized, then New Century's expected interest income would be reduced.

The Examiner could not determine whether New Century ever adopted targets for acceptable EPD rates, although at various times certain targets were mentioned. For example, in October 2005, the Credit Department advised the Audit Committee that its immediate targets for FPD and second payment defaults ("SPD") were two and five percent, respectively, and that its longer-term target for such defaults were 1.5 and five percent, respectively. However, in June 2006, Cloyd stated that FPD should be no more than one percent.

These sorts of defaults were tracked regularly by New Century, and a New Century officer advised the Audit Committee in October 2005 that FPD and SPD default rates were "recognized in the industry as an indicator of quality." The Examiner recognizes that even with the best loan origination processes in terms of qualifying borrowers for loans, some level of EPD were bound to occur. From all the data available to the Examiner, it appears that New Century wanted FPD to be no more than approximately one percent and looked closely at trends among all categories of EPD as a loan quality metric.

New Century also devoted effort to track longer-term delinquency rates among various New Century vintages. New Century did not appear to have established targets for acceptable long-term delinquency rates. However, through use of commercially available data, New Century compared its delinquency rates against the rates reported for competitors in the subprime industry. New Century personnel believed that its loan quality was better than its competitors over most time periods based on such comparative data. While no one informed the Examiner that this was a metric for judging loan quality, the Examiner believes that one factor in New Century's failure for so long to make loan quality a greater priority was its belief that its loan quality in terms of delinquency rates was better than the competition.

- 133 -

## 2.    Secondary Marketing Performance

Secondary Marketing's ability to sell loans at a premium was an important loan quality metric. This metric had two main components.

The first component, and the one most directly connected to loan quality, was the kickout rate. As noted previously, investors would conduct due diligence on loan pools and reject, or "kickout," loans that they did not wish to purchase. Starting no later than late 2002 or early 2003, New Century began to track monthly sales success in terms of kickouts and would circulate to a large group within New Century so-called kickout or fallout reports. Although these reports evolved over time, they generally consisted of a summary report that identified the overall percent of loans that had been kicked out by investors in a particular month and then summarized the principal reasons for the kickouts, such as defective appraisals, income to debt ratios that conflicted with underwriting guidelines, incorrect credit reports, missing documentation and compliance issues. There also were detailed spreadsheets attached to these reports by which persons could identify the precise reasons given by investors for kicking out each particular loan.

Loan files that were missing required documentation were a persistent cause of investor kickouts starting no later than 2004 and continuing through 2007. From April 2004 to January 2007, investors rejected an estimated $1.17 billion worth of loans due to missing documentation.[319]    For example, investors consistently rejected loans that had missing or incomplete documentation, such as current pay stubs, on full document loans; missing 12-month mortgage or rental histories; unresolved title issues, including missing evidence that tax liens or judgments had been released on the subject property; missing legal and compliance documents, such as a copy of the promissory note, Truth-in-Lending forms, Good Faith Estimates or HUD-1 settlement statements; missing or incomplete loan applications (the "Form 1003") used to verify

---

[319] The format of New Century's monthly Fallout Reports varied from 2004 to 2007. As a result, consistent data were not always available to the Examiner. In general, the Fallout Reports reported on missing appraisal documentation and on "all other" missing loan documentation. From July 2004 to December 2006, the Fallout Reports provided data on the "all other" missing documentation category in 29 of the 30 months. Itemized data on missing appraisal documentation were not always provided. For example, in 2004, the statistics on missing appraisal documentation were combined with the "other property issues" category, including unacceptable property types, conditions, or square footage exceptions. Itemized data on missing appraisal documentation were not available for seven months in 2005 and 11 months in 2006; in these months, the Examiner applied an estimate cited by the manager of investor due diligence that approximately 10% of all appraisal kickouts were due to missing appraisal documentation. For the years 2005 and 2006, this estimate totaled $203,263,332.

- 134 -

a borrower's income on a stated document loan; and missing appraisal certificates of completion.[320]

New Century did not adopt a target for a maximum acceptable rate of kickouts before the summer of 2006, when a five percent target was identified in the so-called scorecard reports. Flanagan in an e-mail from April 2005 suggested that kickouts should not exceed 2.5% of the loans in any pool. The Examiner believes that such a rate was probably more aspirational than real, and a senior executive wrote in 2006 that "[i]nvestor rejects run about 3 to 4% in best markets . . . ." Information made available to the Examiner suggests that a kickout rate under five percent was what was viewed as generally acceptable and that anything above five percent was viewed as too high.

The Examiner makes three observations pertaining to kickout data. First, the Examiner was told consistently during his investigation, and the review of many documents confirmed, that the amount of due diligence conducted by investors varied depending on whether the investors were whole loan purchasers or securitization trusts. Whole loan purchasers conducted significantly greater due diligence than securitization trusts, with the reason being that in securitizations, New Century bore the residual credit risk. In any event, in months in which fallout rates were reported to be low, those months tended to have a larger percent of securitizations than other months. For example, the reported kickout rate in April 2005 was 1.31%, with the rates in March and May 2005 being 4.98% and 6.03%, respectively. It turns out that 82% of the premium loan sales in April 2005 were to the 2005 NC-2 securitization trust, which explains the very low fallout rate for that month. The kickout rate in April 2005 for whole loan sales alone was 5.59%.

Second, kickout data may not be a true indication of loan quality trends because New Century was able, particularly when the subprime market was strong and housing prices were rising, to negotiate understandings with certain loan purchasers to limit kickouts to a maximum rate, such as 2.5%. Flanagan was explicit in stating to the Examiner that such understandings were reached. The Examiner was unable to establish corroboration for this statement. Nevertheless, such understandings may have limited kickouts, masking loan quality problems that existed but were not reported.

---

[320] The certificate of completion, or "Form 442", was required when a property's appraisal value was subject to a condition, such as the completion of a home remodeling project or the completion of a new home construction.

Third, the Examiner was told by many interviewees that investors became more discerning and discriminating over time in the due diligence process as the downturn in the subprime mortgage market grew more apparent. Accordingly, although kickout rates increased steadily in 2005 and 2006, that does not necessarily mean that the quality of New Century loans was getting worse. Rather, at least part of the reason for the increased kickout rates may have been the greater degree of due diligence carried out by investors, as well as investors' reluctance to purchase certain sorts of loans, irrespective of loan origination process issues, because of a decreasing appetite for the purchase of higher risk loans.

The other metric of Secondary Marketing performance was the price that New Century received on loan sales. It was a regular practice in the monthly Capital Markets Reports that were widely circulated to Senior Management for Secondary Marketing to report to a large number of persons on the total average premium received on loan sales in any month. It is not clear that this metric was explicitly tied to loan quality, as there could be non-loan quality reasons why lower premium prices were achieved in a particular month, such as investors having less of an appetite to purchase large quantities of certain types of subprime loans.

### 3.   **Repurchases**

Repurchase claims and actual payments made to repurchase loans were identified by Senior Management in 2004 as another possible metric by which to measure loan quality. Indeed, Morrice in a September 24, 2004 memorandum to senior colleagues, specifically identified repurchases as one of the metrics that he favored tracking in assessing the quality of New Century loans. Cloyd concurred.

Notwithstanding these views, repurchase claims and actual repurchase payments apparently did not receive much attention and were not used as a metric to measure loan quality until some time in 2006. This is surprising for two reasons: (1) repurchases resulted most often from early borrower defaults; and (2) available data show that there was a spike in repurchase payments starting in the second quarter of 2005, from approximately $25 million per quarter to approximately $100 million per quarter in the second quarter of 2005 and the remainder of that year.

There are several possible reasons why repurchases were not tracked before mid-2006 as a loan quality metric. First, as reported elsewhere in this Final Report, New Century did not have reliable data on the quantity of repurchase claims it received. Second, in 2004 and 2005, by

historic averages (assuming the averages are accurate), the levels of actual repurchases were relatively low, although they doubled in 2005. New Century's historic repurchase data were as follows:

| Year | Repurchases as a % of total loans sold |
|------|----------------------------------------|
| 2002 | 1.47% |
| 2003 | 0.37% |
| 2004 | 0.34% |
| 2005 | 0.63% |
| 2006 | 1.35% |

Indeed, Dodge commented in September 2006, by which time repurchases were clearly on New Century's radar screen, that repurchases in "2005 represented a very low level by historic standards."[321]

### 4.    Internal Loan Quality Measurements

New Century had internal means to track loan quality. The most important means are summarized below.

#### a.    Quality Assurance Department Audits

The New Century Quality Assurance Department regularly audited the New Century loan origination processes. These were monthly post-funding audits whereby the Quality Assurance Department would audit between 7.5 and nine percent of funded loans to determine if the loan files evidenced compliance with applicable New Century requirements. The audit results would then be reported to the Production Department and there were periodic reports provided to the Audit Committee. The Quality Assurance audit results tended to identify the same sorts of problems as identified in the kickout reports, such as faulty appraisals, undocumented exceptions to underwriting guidelines and missing documentation from loan files.

Given that the Quality Assurance audit results appeared closely to track the types of data documented in kickout reports, the Examiner expected that Quality Assurance audit results would have been a significant metric of loan quality. However, the audits by the Quality Assurance Department were not an important metric used by Senior Management in assessing New Century loan quality. First, since such post-funding audits did not directly affect profitability, some in Management discounted their importance. For example, in a September

---

[321] The Examiner has found that a significant back-log of claims submitted existed as of 2005 year-end.

24, 2004 memorandum to others in Senior Management, Morrice addressed the then-existing loan quality scorecard, which was a device used to attempt to track the quality of New Century loans. He stated:

> I believe it is consistent to focus our [loan quality] measurement process on objective outcomes (secondary results and loan performance), rather than subjective opinions (like re-underwriting and exception rates that are not correlated to loan sale/performance results).
>
> Accordingly, I would suggest that our Loan Quality Scorecard (LQS) be simplified by eliminating (i) QA report results, (ii) exception rates, (iii) percentage of appraisals in different Hansen risk categories, and (iv) zero defects. This information is probably worth tracking and working on for other reasons and we may want QA reports relative to compliance issues, but I would no longer report this information on the LQS. (emphasis added)

Second, some at New Century questioned the quality of the New Century Quality Assurance Department in 2004 and 2005.    The Internal Audit Department audited the performance of the Quality Assurance Department in 2004 and found that its operations were inefficient and that its results were not always reliable. Thereafter, in March 2005, an individual from the General Counsel's office who had been tasked to assess the Quality Assurance Department, summarized his views as follows:

In my view the current QA function is weak because there is a:

> lack of QA knowledge and experience on part of current QA management
>
> lack of quality QA system-Brain is a poor QA system at best
>
> lack of QA knowledge and experience on part of current auditing staff
>
> lack of clear-cut QA Plan
>
> lack of fraud detection capability
>
> lack of appropriate sampling size and stratification by
>
>> product type
>>
>> origination channel
>>
>> fulfillment channel
>>
>> geographic
>
> lack of meaningful resolution of audit findings (QC Committee)

Pursuant to this individual's recommendations, and after making a report to the Audit Committee on May 17, 2005, the Quality Assurance Department was dissolved in September 2005, most of its personnel were laid off and the Quality Assurance function was then outsourced while a new

Quality Assurance Department was developed under new leadership.[322]    This new Quality Assurance Department began to function in mid-2006.

### b.    Internal Audit Reports[323]

In terms of loan quality, beginning in late 2004 and continuing in 2005, Internal Audit conducted so-called field audits to assess whether the loan origination processes in New Century's wholesale fulfillment centers and retail offices were being conducted in accordance with existing policies and procedures.  The Internal Audit Department's results consistently reported that the loan origination processes had significant flaws.  For example, in an audit dated September 19, 2005, the Internal Audit Department identified countless deficiencies in loan files it reviewed at a retail production center, including that 29 of 100 files had missing or improper RESPA[324] disclosures and that 18 of the 100 files were missing or had incomplete documents required by state law.

The Internal Audit Department's results, however, did not figure heavily in measuring loan quality prior to 2006.  First, just like the Quality Assurance Department's results, the Internal Audit Department's findings did not directly affect New Century profitability in the way that kickouts and EPD could affect profitability.  Accordingly, such subjective measurements of loan quality apparently carried relatively little weight within New Century.

Second, the Production Department was focused on originating ever larger volumes of loans at ever lower costs.  The Production Department viewed Internal Audit as an entity that increased the average cost to originate new loans.  As of June 30, 2005, New Century estimated that its total cost per funded loan was $505.  Flanagan in August 2005 set a cost goal of $400 per funded loan by the end of 2005 and, among other things, sought to cut the Internal Audit contribution to such costs, estimated at $26/loan, to no more than $15/loan, remarking:

---

[322] The Examiner sought to determine whether there was an effective Quality Assurance Department/function in effect between September 2005 and June 2006 when the new Quality Assurance Department commenced audits. The results were inconclusive, but suggested that the Quality Assurance function in the interim was limited at best and the results of the outsourced Quality Assurance audits were not viewed as reliable.

[323] The Internal Audit function is addressed elsewhere in this Final Report and that discussion will not be repeated here.

[324] RESPA, or the Real Estate Settlement Procedures Act, is a consumer protection statute which requires that borrowers receive certain disclosures regarding closing costs and settlement procedures at specified times during the real estate transaction.

**Internal Audit**

- Cost is too high
- Accuracy of the results is questionable
- Don't know what we are getting for our $ spent
- Group is out of control and tries to dictate business practices instead of audit against policy[325]

In a later e-mail from Flanagan in September 2005, Flanagan's disdain for Internal Audit was unmistakable. Writing soon after a loan processing center had received an "Unsatisfactory" rating in an Internal Audit Department field audit, Flanagan stated:

> I think the group who are receiving this e-mail needs to get together and discuss the operating center audits. If recollection is correct, ever singe [sic] audit completed has been unsatisfactory which to me sounds like we need to ammend [sic] policy as much as clean up our act. The financial results that have been ackomplished [sic] over the past few years are inconsistent with the audit results.

Flanagan's message was clear. The Production Department's results in generating revenue made the Internal Audit Department's results unimportant.

### E.    Loan Quality in 2004

In 2004, New Century increased its loan originations by 54% compared to 2003, originating $42.2 billion in loans compared to $27.4 billion a year earlier. In the context of such strong growth in originations, loan quality trends were mixed but decidedly negative. EPD increased from mid-2004 until the end of the year, as did investor kickouts. Similarly, the New Century Quality Assurance Department reported loan origination process deficiencies, which mirrored the problems identified by investors in kicking out or rejecting New Century loans.

In response to these trends, loan quality became a frequent topic of discussion among members of Senior Management and the Audit Committee, particularly after rising interest rates in June 2004 signaled that tougher operating conditions appeared likely. However, improving loan quality did not become a priority in 2004. No one was directed to address the disturbing trends and there was no concerted effort to address certain arguably fixable problem areas, particularly on process issues, such as documenting reasons for exceptions and making sure there

---

[325] Production sought to reduce costs associated with other departments as well at the same time. But, the percentage cuts for Internal Audit were far larger than any other proposed cuts. The Examiner was unable to determine whether these proposed cost cuts were carried out.

were no documents missing from a loan file at the time of loan funding, which were frequent reasons investors were rejecting loans in whole loan sales.

### 1.    Loan Quality Trends in 2004

#### a.    Early Payment Defaults

The trends in 2004 for EPD, including FPD, were negative, particularly from the middle of the year onward.  The data for 2004 were as follows:

|  | **FPD** | **EPD** |
|---|---|---|
| January | 1.02% | 6.40% |
| February | 0.71% | 6.32% |
| March | 0.53% | 4.23% |
| April | 0.62% | 4.53% |
| May | 0.86% | 8.20% |
| June | 0.92% | 7.62% |
| July | 1.13% | 7.91% |
| August | 0.94% | 7.06% |
| September | 1.20% | 8.76% |
| October | 1.39% | 9.70% |
| November | 1.35% | 10.02% |
| December | 1.31% | 8.72% |

The upward trend of EPD did not go unnoticed.  In an October 2004 e-mail copied to Cloyd, a New Century employee, in addressing various risks facing New Century in the types of products it was offering and citing the factors that the employee considered to be "troublesome," stated:  "Early Defaults:  This key indicator is increasing."  (emphasis added).  And the same employee commented in December 2004:

> We have seen FPDs increasing rapidly and steadily since the low of .53% in March, reaching 1.39% in October, before falling slightly to 1.35% in November.

Shortly thereafter, the Secondary Marketing Department circulated the following summary of EPD in 2004 compared to 2003, showing the marked increase and financial consequences in all categories of EPD:

## Early Payment Default Summary

|            | 2003        |       | 2004          |       |            |            |
|            | Dollar      | %     | Dollar        | %     | Difference | % Increase |
|------------|-------------|-------|---------------|-------|------------|------------|
| FPD        | 103,873,250 | 0.60% | 338,789,455   | 0.93% | 0.33%      | 54%        |
| SPD        | 140,216,425 | 1.95% | 778,319,627   | 2.92% | 0.97%      | 50%        |
| TPD[326]   | 68,718,595  | 1.83% | 704,586,688   | 3.39% | 1.57%      | 86%        |
| Total EPD  | 312,808,270 | 4.38% | 1,821,695,770 | 7.24% | 2.86%      | 65%        |

This summary documented the significant deterioration of New Century loan quality, as measured by EPD, in the first, FPD, SPD and TPD categories in 2004 when compared to 2003, and the large financial impact of such defaults.

### b.    Kickouts

As discussed here and elsewhere in this Final Report, kickouts represent, for the most part, loan origination process issues caused by New Century loan production and operations personnel not doing their jobs as expected or in accordance with the Company's underwriting policies and procedures. These policy issues were perpetuated by Management, who, month after month, tolerated this inattention to those policies and procedures.

The kickout problems began no later than 2003. For example, between April and December 2003, kickout rates on whole loan sales ranged from a low of 4.41% to a high of 7.24% in September 2003 and the monthly average was 5.83%. The August results of 6.70% were sufficiently severe that the Senior Vice President in the Company's Secondary Marketing Department prepared a report on the investor due diligence process and the number of loans that investors kicked out from the August 2003 loan pools. The author planned a more comprehensive report in due course but stated that she "did not want to wait until the 10th [of the month] to share this information with you as each day we continue to allow these types of exceptions and mistakes we not only erode the profitability of our loans but the confidence of our investors. Weakening credit quality is the number one concern for our investors." The author reported that the primary reasons for loan kickouts included unsupportable underwriting exceptions for maximum loan amount, LTV ratios, FICO scores and debt-to-income ("DTI") ratios, missing documentation, and income miscalculation. The majority of the loan kickouts in

---

[326] Third payment default.

August 2003 resulted from missing documentation; the report also noted that LTV exceptions "exceeded [the] maximum allowed by 10% to as high as 65% in some cases."

Concerns over investor kickouts escalated in 2004. Kickout rates on whole loan sales for the months of 2004 for which the Examiner has data were as follows:

**2004 Kickouts**

|           |        | Value of Kicked Loans |
|-----------|--------|-----------------------|
| January   | 6.35%  | $172,646,148          |
| February  | 5.45%  | $164,250,580          |
| March     | 6.92%  | $132,783,341          |
| April     |        |                       |
| May       | 5.22%  |                       |
| June      |        |                       |
| July      | 7.17%  | $250,586,173          |
| August    | 5.56%  | $211,388,971          |
| September | 5.65%  | $ 94,917,107          |
| October   | 5.55%  | $185,796,482          |
| November  | 5.15%  | $120,608,953          |
| December  | 5.35%  | $172,592,474          |
| **TOTAL** |        | **$1,505,570,229**    |

The average monthly rate in 2004 was the same as the last nine months of 2003, namely 5.83%.

The same sorts of problems that had been identified in 2003 as causing kickouts were again reported in 2004. For example, in July 2004, investors rejected 7.17% of the loans that New Century sought to sell.[327] There were various reasons listed for the July kickouts, including:

Property value and appraisal documentation issues. $67,868,537 of loans were rejected in July 2004 due to unsupported property values and another $11,672,387 were rejected due to missing appraisal documentation.

Problems with income and debt ratios accounted for $19,871,113 of July rejections.

Other problems that led to investor rejections included:

---

[327] The Examiner was unable to locate quantified kickout data in 2004 for months prior to July 2004, except for a reference to a 5.22% kickout rate in May 2004.

Unacceptable exceptions related to borrowers' mortgage or rental payment
histories and credit grades

LTV ratios that exceeded guidelines

Non-arm's length transactions

Missing documentation

Compliance issues.

From July through December 2004, investors rejected approximately $126 million in
loans due to missing documentation alone. These kickouts accounted for over 12% of the
investor kickouts for this time period.

In a September 7, 2004 e-mail to many persons in the New Century Production,
Operations and Secondary Marketing Departments, the officer responsible for the kickout reports
stated as follows concerning the July 2004 kickout rate:

We are unfortunately seeing a very concerning trend in both Appraisal and Credit
quality . . . .

This could be an anomaly in that June [2004] production (our largest month)
made up a substantial portion of the population, but I ask that we not assume that
to be the case. This severe of a drop in execution clearly warrants a legitimate
concern on everyone's part and we are asking that each of you review carefully
the information contained and take action within your area of responsibility to
insure future months are greatly improved.

Following up on these kickout rates, a senior New Century employee commented about loan sale
issues, stating as follows:

The number one issue is <u>exceptions to guidelines</u>; for DTI, Mortgage/Rental
rating, Credit Grade, loan amounts (in August those exceptions were in excess of
$20mm). Part of this can be attributed to the fact that generally in these instances
the underwriting staff did not do a very good job, if any attempt at all, at
documenting the reasons for making the exception. As well, due to the absences
of clear and comprehensive exception policy and underwriting policy/guidelines,
we exacerbate the issue. Ambiguity (in guidelines) may have been common and
even acceptable in the past, but in today's environment it is not by the investment
community and it is becoming evident that it may very well be the root cause in
many of our issues surrounding credit quality. (emphasis in original)

This demonstrates recognition within New Century that there was substantial room for
improvement in the quality of the Company's loan origination processes in 2004.

### c.    Quality Assurance Department Findings in 2003 and 2004

New Century's Quality Assurance Department repeatedly identified problems in the loan
origination processes beginning in 2003, which mirrored the reasons that investors were kicking

out loans in whole loan sales. For example, in June 2004, the Quality Assurance Department provided the Audit Committee a summary report of its 2003 Quality Assurance findings pertaining to the New Century loan origination processes. The Quality Assurance Department reported that it had identified a high percentage of errors in New Century's underwriting related to loan credit grading and a high percentage of compliance errors, such as the failure of persons to have signed legal documentation. Quality Assurance reported that severe underwriting errors, defined as errors that could impact loan salability due to credit issues, predatory lending, legal, state violations and other compliance issues, were found in almost 25% of the loans audited in November and December 2003, and in approximately 12 to 17% of the loans from June to October 2003. The number of loans with severe compliance defects ranged from approximately eight percent of the June 2003 loans to 16% of the December 2003 loans. After reviewing the report and discussing its content with Senior Management, "[t]he [Audit] Committee expressed concerns with respect to many of the issues listed on the QA Report . . . ."

Prior to the release of the 2003 Quality Assurance results to the Audit Committee, New Century Senior Management discussed the early- 2004 Quality Assurance results, stating that while Quality Assurance results were somewhat improved in early-2004 as compared to 2003, they were "still at unacceptable levels" as of March 2004, and that the same sorts of problems identified in the kickout reports were being reported by Quality Assurance. Thus, from January 2004 through March 2004, approximately 16 to 21% of the audited loans were determined to have had moderate to high risk underwriting defects. Further, approximately 14 to 15% of loans in April and May 2004 had high risk compliance defects.

The negative Quality Assurance findings continued in the second half of 2004. In March 2005, the Quality Assurance Department issued a 2004 Year-End Quality Assurance Trends and Update Report. Quality Assurance audited approximately seven percent of the wholesale production volume and 11% of the retail production volume during its 2004 audits. The Quality Assurance Department reported: "[t]here has been a significant spike in the high-risk defect rates in our underwriting audit[s] in the last several months of the year." From April 2004 to October 2004, the percentage of loans with high risk underwriting errors increased from approximately 12.5% to 15%. By December, the number of errors had significantly increased, and underwriting errors were identified in approximately 24% of the loans. The most prevalent underwriting

- 145 -

defects included credit misgrading, missing mortgage or rental verification, errors in the DTI ratio calculation and missing documentation.

## 2. New Century's Efforts to Improve Loan Quality in 2004

In view of the troubling loan quality trends evident in 2004, the Examiner investigated whether New Century gave sufficient attention to improving loan quality. The Examiner determined that loan quality was a frequent topic of discussion, both among Senior Management and at Audit Committee meetings. However, those discussions led to no meaningful action plan to address issues. No person or persons were assigned responsibility for addressing loan quality issues, including process issues, such as documents missing from loan files, a problem that could have been fixed fairly easily according to persons interviewed by the Examiner. Such issues were not fixed and the problems that were reported to have caused the kickouts and adverse Quality Assurance Department findings persisted. The Examiner makes a number of observations about New Century's reaction to loan quality issues in 2004.

First, in response to the negative Quality Assurance findings, QA set up monthly meetings with the Production Department. In a May 25, 2004 Memorandum to the Audit Committee, the meetings were described as follows:

> In January 2004, the QA Department implemented monthly "Quality Meetings" to discuss detailed QA results with each operation for underwriting and funding the loans. The focus of the meetings is to discuss "root causes" and corrective actions required by specific operations groups on deficiencies reported. Senior operating management and the Chief Credit Officer participate in each meeting. In addition, targeted audits to monitor and follow-up on serious exceptions are now in place. Future reporting on these follow-up reviews will address exceptions not corrected and will identify the responsible operating groups.

The Examiner learned in his investigation that these "Quality Meetings" and other efforts by the Quality Assurance Department to address loan quality were not well received and were largely ineffective.

Second, the Audit Committee and the Board addressed loan quality on several occasions in 2004 appear to have been similarly ineffective. For instance, on June 2, 2004, the Audit Committee heard the report on the Quality Assurance Department audit results in 2003 and also received a report about the continuing Quality Assurance Department efforts in 2004, including a description of the Quality Meetings discussed above. The Committee is reported in the Minutes to have asked questions about "credit grades, the underwriting process and training issues" and to have "expressed concerns with respect to many of the issues listed on the QA Report,

- 146 -

including the process for implementing mortgage history updates prior to funding and to have asked that Senior Management periodically update the Committee on QA matters." Loan quality issues then appear to have been discussed at the Board meeting that took place on June 2-3, 2004, with the minutes noting that Senior Management answered questions regarding how loan quality might impact volume.

The Audit Committee continued to monitor loan quality issues during the remainder of 2004, consistent with its request at the June 2 meeting to get periodic updates. For example, at the August 17, 2004 Audit Committee meeting, the Committee received an update on Quality Assurance Department findings for January through May 2004, with the Committee being informed that "credit grading errors had decreased since the last quality assurance summary report provided to the Committee, which contained audit results for the year ended December 2003." The minutes then go on to state:

> Management and the Committee then discussed ways to incentivize or penalize employees to ensure increased focus on loan quality rather than just production volume.  Mr. Flanagan reported that the bonuses of region managers in 2005 would be based in part on loan quality.

The Examiner found no evidence, however, that regional managers' compensation was directly tied to loan quality in 2005. Indeed, even in 2006, the bonus compensation system for regional managers made no reference to loan quality. Rather, the 2006 bonus for regional managers was 30% based on volume, 30% based on deviations from rate sheets, 30% based on the number of funding brokers utilized and 10% based on Senior Management's discretion.

Third, the Audit Committee and the Board appear to have addressed only a limited number of the loan quality issues that were apparent in 2004. As noted, there were increases in EPD and kickout rates in mid-2004, with those higher rates continuing for the remainder of 2004. If loan quality had been a significant priority for New Century's Board, the Examiner believes that such troubling trends would have been mentioned in Board and Audit Committee minutes. There is no such mention in the minutes reviewed by the Examiner.

Fourth, Senior Management, like the Audit Committee, did not make loan quality improvement a priority in 2004. Despite the negative trends in EPD and kickouts, apparently no significant efforts were undertaken by Senior Management to address the issues. Kickout reports were circulated monthly to a wide group, but no concerted effort was undertaken to fix the problems that resulted in kickouts above five percent month after month.

- 147 -

Fifth, Senior Management personnel in October 2004 exchanged views on the increasing risks inherent in the types of mortgage loan products New Century was originating in increasing quantities. The upshot of those discussions was no action. New Century continued in 2004 and 2005 to concentrate originations in the layered risk products that presented the greatest risks, particularly the Stated Income and 80/20 products. Senior Management appears to have been mindful that such products exposed New Century to risks beyond those presented in earlier years, but the Examiner could discern no efforts made to address such risks in any concerted manner.

### F.    Loan Quality in 2005

New Century's failure to focus on loan quality in 2005 was virtually identical to 2004. However, the problems and issues grew more severe in 2005, making the inaction all the more difficult to understand. The trends that became apparent in 2004, particularly higher EPD and kickouts, continued in 2005. In response, Senior Management and the Audit Committee devoted some time to discussions of loan quality, although such attention appears to have been no greater in 2005 than it had been in 2004. Improvement of loan quality in 2005 was not made a priority and no one in Senior Management was directed to be responsible and accountable for improving loan quality or correcting known problems with loan quality. As a result, loan quality worsened in 2005, with delinquency rates for many categories of 2005 loans much worse than similar products originated in 2003 and 2004.

### 1.    2005 Trends Demonstrated Worsening Loan Quality

#### a.    Early Payment Defaults and Other Delinquencies Continued at High Levels

As noted previously, EPD were on the rise in the second half of 2004, finishing the year at 8.72%. FPD, the type tracked most closely by New Century, stood at 1.31% at year-end 2004. 2005 began much the same as 2004 ended, with EPD in January 2005 at 8.05% and FPD at 1.07%. The trend then improved for a couple of months, dropping to a low of 4.47% for EPD (and 0.64% for FPD) in March 2005. After March 2005, however, the trend in EPD and FPD grew worse again, and continued to deteriorate through the rest of the year:

| Month | FPD Rate | EPD Rate |
|-------|----------|----------|
| April | 0.97% | 6.58% |
| May | 0.80% | 6.66% |
| June | 1.06% | 7.00% |

| Month | FPD Rate | EPD Rate |
|-------|----------|----------|
| July | 1.20% | 7.76% |
| August | 1.02% | 7.28% |
| September | 1.37% | 8.70% |
| October | 1.15% | 8.81% |
| November | 0.95% | 8.72% |
| December | 1.42% | 9.24% |

The negative trends were promptly noticed.  For example, in the April 2005 Capital Markets Report to Senior Management, one of the "Key Items Highlights" was as follows:

First Payments Defaults increased by 31 bps to 0.97%.  Total Early Defaults rose by 2.26 pctpts to 6.96%; this is the first month since November [2004] that Early Payment Defaults have increased.  In total, 40,364 loans with first, second or third payments occurring in April were included.

The negative EPD rates continued to be reported regularly to Senior Management.  For example, the July 2005 Capital Markets Report included the following comment:

The percent of units with an Early Payment Default rose by 67 bps to 8.65%.  The percent of units with a First Payment Default increased by 24 bps to 1.35%.

Indeed, the trend was of sufficient concern that it was reported to the Audit Committee at the October 25, 2005 meeting:  "First Payment Defaults appear to be on the rise" and "Second Payment Defaults continue to rise as well.  Going forward, it will be very important to monitor performance and see if this upward trend continues."

In addition, data available to New Century Senior Management in September 2005 indicated that the 80/20 loan product was, in the words of one employee, "performing worse than the other [New Century] products."  New Century's Senior Management learned that the 80/20 loan product of the 2004 vintage had four times the 60+ day delinquency rates of non-80/20 products.  In response to these data, the head of the Secondary Marketing Department queried, "thoughts on what to do with this information...pretty compelling."  The Corporate Credit Officer concurred that the information was "very compelling," but the volume growth of the 80/20 product continued.  Indeed, it was reported in the December 2005 Capital Markets Executive Summary Report that the volume of 80/20 loans had increased to 35.24% of overall loan production, compared to 23.54% at December 31, 2004 and 9.10% at December 31, 2003.

The negative delinquency trends became even more pronounced when Secondary Marketing Department personnel examined certain products originated in 2005 and compared them to similar products originated in 2004.  Thus, in a 2005 Delinquency report prepared early

- 149 -

in 2006, the Secondary Marketing Department identified troubling delinquency trends in 2005 originations. For example, in comparing 2005 originations to those in 2003 and 2004, the Secondary Marketing Department reported as follows:

> 60+ Delinquency performance has deteriorated in 2005 versus the 2003-2004 vintages. Overall, the 2005 60+ delinquency at month 11 is twice as high as it was in 2003. 80/20 loans show similar trends and although they have higher FICOs, the delinquency is generally higher than the core products, across all vintages.

### b. Kickout Rates Continued at High Levels

Just as EPD continued at high levels in 2005, so did investor kickouts. Investors rejected over $147 million worth of loans funded by New Century in January 2005 for an overall kickout rate of 5.64% in January. As in 2004, the top reasons for the investor kickouts reported in January 2005 were property value and appraisal documentation issues, which accounted for 44% of the kickouts, and compliance and excessive DTI ratios, which accounted for almost 10% and 7.5% of the kickouts, respectively. It should be noted that these figures may be artificially low as the Examiner was told by Flanagan that New Century negotiated limits on the amount of loans that some investors could kickout.

Overall, kickout rates for all of 2005 on whole loan sales stayed high, as shown by the following data:

2005 Kickouts (Whole Loan Sales)

| Month | Kickout Rate |
|-------|--------------|
| January | 5.64% |
| February | 5.92% |
| March | 4.98% |
| April | 5.59% |
| May | 6.03% |
| June | 5.59% |
| July | 5.92% |
| August | 4.57% |
| September | 5.62% |
| October | 8.11% |
| November | 6.59% |
| December | 8.77% |

Just as troubling as the kickout rates was the huge dollar value of sales that were delayed or discounted, or never occurred, and the fact that the reasons for the kickouts tended to be the same sorts of problems, month after month, indicating that no effective attention had been devoted to correcting the recurring problems.  These trends for 2005 can be summarized as follows:

| Month | Value of Kickouts | Top 3 Reasons for Kickouts |
|---|---|---|
| January | $147,260,020 | Property Values/appraisals (44.21%)<br>Other[328] (21.49%)<br>Compliance (9.76%) |
| February | $40,768,831 | Other (47.79%)<br>Compliance (18.63%)<br>Property Value/Appraisal docs (15.96%) |
| March | $180,631,805 | Other (33.72%)<br>Property Value/Appraisal docs (23.72%)<br>Compliance (15.88%) |
| April | $47,969,820 | Other (41.91%)<br>Property Value/Appraisal docs (18.13%)<br>Other Credit[329] (10.38%) |
| May | $202,453,903 | Property Value/Appraisal docs (30.97%)<br>Other (23.79%)<br>Compliance (12.71%) |
| June | $136,124,852[330] | |
| July | $169,164,290 | Property Value/Appraisal docs (33.96%)<br>Compliance (19.34%)<br>Other (17.76%) |
| August | $129,850,097 | Property Value/Appraisal docs (36.85%)<br>Other (21.75%)<br>Compliance (13.32%) |
| September | $283,044,874 | Property Value/Appraisal docs (31.67%)<br>Other (24.85%)<br>Other Credit (15.72%) |

---

[328] Other includes a category that included missing credit files and collateral packages and FPD.

[329] Other credit reasons include loans rejected due to loan amount exceptions, cash-out exceptions exceeding guidelines and non-arm's length transactions.

[330] The Examiner was unable to establish the top kickout reasons in June 2005.

| Month | Value of Kickouts | Top 3 Reasons for Kickouts |
|-------|-------------------|----------------------------|
| October | $285,729,177 | Property Value/Appraisal docs (32.38%)<br>Other (18.11%)<br>Compliance (15.58%) |
| November | $171,834,488 | Other (25.47%)<br>Property Value/Appraisal docs (22.67%)<br>Missing Documentation (20.62%) |
| December | $486,915,048 | Property Value/Appraisal docs (36.03%)<br>Other (30.69%)<br>Missing Documentation (9.21%) |
| **Total:** | **$2,281,747,205** | |

As in 2004, over 12% of the investor kickouts in 2005, totaling approximately $280 million, were due to loan files that were missing required documentation – loans that never should have been funded until the files were complete.

    c.  **Internal Audit Reported Troubling 2005 Loan Quality Trends**

   New Century's Internal Audit Department did not historically conduct audits of the Company's loan origination and production processes. That changed in 2005, resulting in findings that revealed serious deficiencies in those processes.

   For example, in a June 17, 2005 audit of the Sacramento wholesale fulfillment center covering 77 loans originated in October through December 2004, the Internal Audit Department found many "High Risk" problems that could affect the salability of the loans. The findings from the Sacramento audit included:

   35 (45%) of the loans had improper RESPA disclosures

   32 (42%) of the loans did not have approval stipulations fully satisfied.[331]

   26 (39%) of the loans had exceptions noted with income calculations and/or verification.

   18 (23%) of the loans had exceptions with either the appraisal conducted or the review appraisal submitted with broker-provided loans or the review appraisal conducted by New Century's Appraisal Department.

---

[331] Approval stipulations are items or documents on which the lender needs further clarification or validation prior to closing a loan. An underwriter may conditionally approve a loan file subject to the specified approval stipulations being met. Once the additional data are gathered, the underwriter may remove the stipulations and approve the loan file.

Before the end of 2005, the Internal Audit Department completed nine such field audits, with seven receiving "Unsatisfactory" ratings and two receiving "Needs Improvement" ratings. The Examiner sought to determine precisely when each audit was conducted and reported to the Production Department. The Examiner could not make a precise determination, but it is clear that Production knew of at least a number of such "Unsatisfactory" findings well before the end of 2005. For example, the Sacramento Wholesale Fulfillment Center report discussed above was delivered to Production Department Management no later than June 17, 2005. The memorandum accompanying the audit included the following comments:

> The overall audit opinion based on this review is **Unsatisfactory**. Areas requiring immediate improvement include State and Federal Regulatory compliance, income calculations, satisfaction of approval stipulations, compliance to policies governing non-arms length transactions, adherence to down payment requirements on purchase money loans, assignment of proper credit grades and proper completion of the 1003 applications. (emphasis in original)

Similarly, the field audit results for the Itasca Retail Fulfillment Center were delivered to Production Management on September 19, 2005, along with a cover memorandum that summarized the findings:

> The Scope of the audit included loan origination processes for the period of February through April 2005. Other areas reviewed included associate expenses, State Licensing, and posters required by the Company and regulatory agencies.

> The overall audit opinion based on this review is **Unsatisfactory.** Areas requiring immediate improvement include Initial disclosure documentation, redisclosure requirements, satisfaction of underwriter approval stipulations, income calculations, adherence to hazard insurance requirements, and proper assignment of credit grades. (emphasis in original)

These Internal Audit Department field audit reports should have merited prompt Management attention from a loan quality improvement and assurance perspective. The sorts of problems that were identified repeatedly by the Internal Audit Department were the same sorts of problems that had been reported repeatedly to Management in the monthly loan kickout reports, documenting the reasons that investors were rejecting ever-increasing quantities of loans New Century sought to sell.

### 2.    The Audit Committee and Management Devoted Little Attention to Improving Loan Quality in 2005

Trends reported above, such as high EPD and kickout rates and the field audit findings of the Internal Audit Department, all pointed to the fact that New Century had significant loan

quality problems. The Examiner believes that such loan quality problems should have prompted the Audit Committee and Senior Management to commence a serious effort to improve loan quality. That did not happen.

The Audit Committee held seven meetings in 2005 prior to October 25, 2005. Witnesses did not recall any discussion of loan quality and the minutes from those meetings do not reflect a single discussion of loan quality or of the need to improve loan quality. Similarly, a review of the minutes of the meetings of New Century's Board of Directors did not reflect any discussions of loan quality in all of 2005. The Audit Committee and Senior Management did address loan quality at the October 25, 2005 meeting, which is discussed below. Thereafter, however, loan quality was not addressed further at Audit Committee meetings in 2005. The negative field reports from the Internal Audit Department were on the Audit Committee agenda for the December 15, 2005 Audit Committee meeting and appear to have been briefly discussed, but the minutes report that "the Committee then decided to defer further discussion of Mr. Zalle's report regarding the Internal Audit Department's 2005 branch audit results until the next Committee meeting."

The October 25, 2005 Audit Committee meeting deserves more discussion because the Examiner determined from interviews, the minutes and various documents that there was a reasonably robust discussion of loan quality and acknowledgement by Senior Management and certain Directors that New Century had loan quality problems. The agenda for the meeting identified "Loan Quality Plan" as a specific discussion topic. The materials distributed in advance of the meeting included two documents relevant to loan quality. First, the Audit Committee received a document entitled "Credit Operations, Risk & Administration," disclosing that the Credit Operations, Risk and Administration Department ("Credit Department") had been reorganized in July 2005. Based upon the minutes, the Department's reorganization does not seem to have been discussed in detail. However, the referenced document made the point that "The Chief Credit Officer is independent of Production influences" and would be expected to monitor the performance of loans originated by New Century. The document also advised the Audit Committee that the Credit Department had developed an "Underwriter Performance Report" by which the performance of individual underwriters could be monitored and those responsible for approving defective loans, such as loans that were kicked out by investors or suffered EPD, could be identified. The intent was either to get better performance through

- 154 -

training or to restrict such underwriters' authority or even possibly to end their employment. The document stated: "Performance Improvement Training – improvement required to maintain authority levels and potentially employment at NC."

This Credit Department document, taken at face value, appears to be a start at addressing the types of loan quality issues reported in the monthly kickout reports and suggested by high EPD rates. However, this plan was not accepted by New Century Senior Management. The former Chief Credit Officer informed the Examiner that she presented this means of monitoring underwriter performance to Senior Management, and to Morrice specifically, but was not successful in persuading Senior Management to implement the system. This former employee was not certain why Senior Management resisted, but believed that they may have been influenced by the Production Department, which resisted changes that might impede rapid and high volume loan origination.

The second document provided to the Audit Committee at the October 25, 2005 meeting was an inaugural "Credit Quality Summary Report." In the report, the Chief Credit Officer advised the Committee and Senior Management that it would begin reporting regularly about loan quality using three basic metrics: Secondary Marketing Performance, meaning the percentage of loans in any month that were kicked out; significant Quality Assurance findings; and FPD and SPD. All of these data would be broken down by the separate New Century loan origination divisions and groups so that Senior Management would be able to identify quickly where loan quality problems were most serious.

The inaugural Credit Quality Summary Report summarized the results in the foregoing categories for July 2005, noting that kickouts had averaged 5.79%, Quality Assurance had found 24.9% of loan files to have serious defects, and FPD and SPD had been 1.34% and 4.22%, respectively. Similar to the Underwriter Performance Report, the Credit Quality Summary Report, at face value, looked as if it were the kind of report that could assist Senior Management to monitor loan quality and to take action as required. However, the report was discontinued immediately - the inaugural Report was the last report. No member of the Audit Committee or Senior Management appears ever to have inquired why the report was discontinued.

There was an extended discussion of the Loan Quality Plan at the October 25 meeting, led by Flanagan. The minutes indicate the following:

- Mr. Flanagan described Management's new methods for monitoring New Century's credit quality.

- The Credit Quality Summary Report was discussed and members of the Committee made suggestions about how it might be improved and made more timely and Management appeared to accept the suggestions.

- Mr. Flanagan stated that Management had developed an incentive plan for production managers to improve the credit quality of New Century's loans. The details of that plan were not described in the minutes.

- A member of the Audit Committee commented that "the percentage of loans originated by the Corporation that contained defects had traditionally been too high" and Mr. Flanagan is reported to have responded "that management was looking at methods to reduce the percentage of loans with defects."

- Mr. Flanagan reported that the QA Department had been laid off and that the QA function was being outsourced until "a more effective quality assurance team" could be assembled.

The seemingly frank discussion of loan quality issues at the October 25 meeting demonstrated an awareness that New Century's loan quality left much to be desired. However, the loan quality discussion at the October 25 meeting apparently led to no meaningful action. No person was charged with responsibility for addressing loan quality issues and reporting back to the Audit Committee. Indeed, it does not appear that any action came out of the meeting and there was no concerted effort to address New Century's problematic and recurring loan quality issues.

The Examiner sought to understand why no effective action was taken to address loan quality as a result of the matters discussed on October 25 or even earlier. The Examiner received no satisfactory answer from persons interviewed. The Examiner offers a number of observations about loan quality issues in 2005.

First, Internal Audit, which by October 25, 2005 had delivered to Senior Management several "Unsatisfactory" field audit reports, does not appear to have brought those reports to the attention of the Audit Committee until December 15, 2005.[332] This is perplexing. Zalle, the head of the Internal Audit Department, was present at the October 25 meeting, and it would have seemed natural for him to have mentioned the unsatisfactory Internal Audit field results on October 25, since they were directly relevant to the matters being discussed.

---

[332] Zalle informed the Examiner that he would meet informally with the Audit Committee chair and that he informed the chair often and in detail of his serious concerns about loan quality. The Audit Committee chair did not recall being so informed.

- 156 -

Second, the lack of priority accorded to loan quality improvement may in part be due to the fact that Flanagan was an extremely powerful force within New Century Senior Management until his departure in December 2005. During Flanagan's tenure, it would have been difficult for persons in Senior Management, even the Company's founders, to make material changes in the operations of the Production Department without Flanagan's agreement. Flanagan apparently resisted significant loan quality improvement efforts that might have affected loan origination volume.

Third, despite the fact that improving loan quality did not get priority attention in 2005, a matter related to loan quality did get attention. By September 2005, New Century Senior Management focused on the fact that its quantity of IO loans had grown to more than 30% of originations. Given continuing deterioration of execution rates in the secondary market, Senior Management reported to the Board in September 2005 that it had established a goal to decrease the quantity of IO products by raising the coupon rates on the product, by adding a 40-year fixed-rate product and by making changes to underwriting guidelines and compensation structures. Senior Management reported that this action was prompted in part by the fact that investors had expressed concerns about IO products in general. This effort proved to be successful, with IO originations dropping to 22.4% of production in the fourth quarter of 2005.

This attention to the risk characteristics of New Century products seems to have been productive. However, as described below, the Examiner believes that New Century should have given greater attention in 2005 and the first half of 2006 to the identification of other particular mortgage loan products that were contributing disproportionately to New Century problems, including rising delinquency rates for Stated Income and 80/20 products. This did not occur prior to the fall of 2006, when New Century's Chief Credit Officer made suggestions to eliminate or cut back on products that contributed disproportionately to risk.

## G.    Loan Quality in 2006 and Early 2007

New Century's loan quality trends worsened dramatically in 2006 and early 2007. The most important metrics by which New Century tracked loan quality, EPD and kickouts, showed large increases throughout the year. Further, in March and September 2006, it became clear that loans originated by New Century in 2005 and early-2006 had significantly greater delinquency rates than similar loans originated by New Century in 2003 and 2004 and by other subprime lenders in 2006. These trends, coupled with increased investor due diligence, a large increase in

- 157 -

repurchase claims and a focus on the problems identified in the 2005 field audits by the Internal Audit Department, led New Century to concentrate to a much greater degree on improving loan quality.

The increased focus on loan quality began at an Audit Committee meeting in January 2006 and continuing through the rest of 2006 and into early-2007. A loan quality improvement program was initiated in the spring of 2006 and loan quality became a much greater priority than in previous years, particularly after the hiring of a new leader of the Production Department in May 2006 and a new Chief Credit Officer in June 2006.

However, despite these efforts, actual progress in terms of improving loan quality was slow. It was not until summer of 2006 that the new Quality Assurance Department was functioning and that new data became available by which to track by region and personnel the sources of the main loan quality deficiencies. Similarly, it was not until fall of 2006 that significant enhancements to underwriting standards were implemented to cut back on certain loan products that contributed disproportionately to EPD and repurchase claims. Despite greater attention to loan quality matters, the available data showed that even as late as December 2006, the same sorts of problems, including defective appraisals and missing documentation, continued to be the main reasons for investors kicking out increasing quantities of New Century loans.

In short, despite some efforts, New Century failed through most of 2006 to make substantial improvements in loan quality. New Century seems to have finally moved toward making loan quality improvement a priority in the fourth quarter of 2006 and announced at that time that it expected its efforts to result in better quality loans and fewer EPD and repurchase claims in 2007. This was "too little too late." EPD rates did fall in early 2007, dropping from an historic high of 16.82% in December 2006 to approximately 13% in January and February 2007. It appears likely that if New Century had begun determined efforts to address loan quality earlier, the negative trends could have been slowed or reversed earlier, giving New Century a greater chance to survive the crisis that resulted after the February 2007 announcement regarding accounting irregularities.

### 1.    Loan Quality Trends, January 2006 through March 2007

#### a.    Delinquency Data Were Alarming

Three sets of delinquency data, rising EPD, delinquency rates in 2005 originations, and delinquency rates in 2006 originations, all pointed toward New Century's worsening loan quality problems.

First, FPD and EPD rates showed alarming increases over the rates experienced in 2004 and 2005. The following chart illustrates those trends.

| Date | FPD | EPD |
|---|---|---|
| January 2006 | 1.18% | 8.37% |
| February 2006 | 1.67% | 8.83% |
| March 2006 | 1.57% | 7.76% |
| April 2006 | 2.00% | 12.30% |
| May 2006 | 1.67% | 10.58% |
| June 2006 | 1.98% | 11.19% |
| July 2006 | 1.94% | 12.85% |
| August 2006 | 2.08% | 13.42% |
| September 2006 | 2.05% | 14.88% |
| October 2006 | 2.29% | 12.94% |
| November 2006 | 2.26% | 14.16% |
| December 2006 | 2.58% | 16.82% |
| January 2007 | 2.20% | 13.09% |
| February 2007 | 1.99% | 13.14% |

Second, New Century identified in February 2006 alarming delinquency trends among many of its higher risk 2005 loan originations, demonstrating significantly higher delinquency rates among certain 2005 originations compared to similar originations in 2003 and 2004. Among the trends identified were the following:

"60+ Delinquency performance has deteriorated in 2005 versus the 2003-2004 vintages. Overall, the 2005 60+ delinquency at month 11 is twice as high as it was in 2003. 80/20 loans show similar trends and although they have higher FICOs, the delinquency is generally higher than the core products, across all vintages.

Each FICO band was further segregated by Documentation type – either Full Doc or Stated Income. It should come as no surprise the performance of the Stated Income loans is inferior to Full Doc loans. In fact in most instances, the 60+ on the Stated Income loans is 50%-100% higher than the Full Doc across all vintages.

Again we see the very negative performance of the Stated Income/80/20 loans, particularly in the 2005 Vintage. This cohort is at least three times worse than any of the other 2005 Vintage cohorts in the 650+FICO bucket, including the Full Doc/80/20 and Stated Income/Core populations.

We again see terrible performance of the Stated Income\Single\80/20 loans in the 650+ FICO band. The Single Stated Wage Earner loans have by far the highest 60+ while the Single Stated – not Wage earners are at least as high as the Joint Loans."

Therefore, at the beginning of 2006, New Century's Senior Management knew that many of its loan products were performing extremely poorly from a delinquency perspective.

Third, another troubling delinquency trend was identified in September 2006. New Century historically tracked 90+ day delinquency rates of its loans against similar products offered by its competitors. New Century personnel took comfort from the fact that New Century loans from 2003 through 2005 generally had better delinquency rates than the competition. Comparative delinquency rates for loans originated in 2006 did not become available until September 2006 and showed that New Century's 2006 loans had a much higher 90+ day delinquency rate than the competition, with 3.40% of New Century's 2006 loans as of September 2006 showing 90+ day delinquencies compared to 1.08% for the competition. As more comparative data became available in later months of 2006, the quality of New Century loans was shown to continue to trend worse than competitors. The data for October through December for 90+ day delinquencies were as follows:

**Competitors' 90+ Delinquencies    New Century 90+ Delinquencies**

| | Competitors' 90+ Delinquencies | New Century 90+ Delinquencies |
|---|---|---|
| October | 1.70% | 4.75% |
| November | 3.39% | 5.75% |
| December | 3.39% | 5.75% |

Cloyd informed the Examiner that these negative trends in New Century's 2006 loans were a significant factor in causing the greater priority on loan quality improvement efforts in the last quarter of 2006.

### b.    Kickout Rates Continued to Rise in 2006

Kickout rates rose alarmingly in 2006, following the same trend as EPD, far exceeding the five percent acceptable target, even in March 2006 when securitizations were undertaken. The kickout rates were as follows:

| Date | Kickout Percentage |
|------|-------------------|
| January 2006 | 6.92% |
| February 2006 | 6.38% |
| March 2006[333] | 5.67% |
| April 2006 | 8.27% |
| May 2006 | 7.54% |
| June 2006 | 6.61% |
| July 2006 | 9.90% |
| August 2006 | 9.62% |
| September 2006 | 11.48% |
| October 2006 | 11.89% |
| November 2006 | 12.12% |
| December 2006 | 14.95% |
| January 2007 | 11.75% |

The high kickout rates in 2006 should have been of significant concern to New Century for the same reasons that the 2004 and 2005 rates should have been of concern: the kicked out loans represented more than $5 billion in lost or delayed sales. The same sorts of problems were identified as the chief causes of the kickouts, again indicating that loan quality was inadequate and that the recurring problems in the loan origination processes had not yet been fixed. The trends can be summarized as follows:

| Month | Value of Kickouts | Top Reasons for Kickouts |
|-------|-------------------|--------------------------|
| January | $239,236,818 | Property value/appraisals (35.7%)<br>Other (19.01%)<br>Compliance (14.59%) |
| February | $246,019,179 | Appraisals (33.8%)<br>Underwriting (19.52%) |

---

[333] March 2006 had both whole loan sales and a securitization. Overall kickouts were 5.56%; kickouts on whole loan sales alone were 6.80%.

| Month | Value of Kickouts | Top Reasons for Kickouts |
|-------|-------------------|--------------------------|
| | | Missing Documentation (12.80%) |
| March | $330,521,451 | Appraisals (24.45%)<br>Underwriting (33.94%)<br>Missing Documentation (10.94%) |
| April | $131,020,752 | Appraisals (41.61%)<br>Underwriting (19.40%)<br>Compliance (17.25%) |
| May | $319,647,911 | Appraisals (38.38%)<br>Underwriting (14.53%)<br>Compliance (19.15%) |
| June | $477,095,992 | Appraisals (36.74%)<br>Underwriting (23.72%)<br>Compliance (13.00%) |
| July | $340,299,202 | Appraisals (40.23%)<br>Underwriting (22.33%)<br>Missing Documentation (8.80%) |
| August | $316,802,423 | Appraisals (29.51%)<br>Underwriting (21.79%)<br>Investor Guidelines (10.64%) |
| September | $978,959,226 | Appraisals (38.15%)<br>Underwriting (18.09%)<br>Missing Documentation (10.79%) |
| October | $612,328,354 | Appraisals (25.74%)<br>Underwriting (26.52%)<br>Investor Guidelines (12.53%) |
| November | $312,949,423 | Appraisals (39.63%)<br>Underwriting (19.87%)<br>Missing Documentation (12.52%) |
| December | $804,631,119 | Appraisals (32.14%)<br>Underwriting (25.88%)<br>Investor Guidelines (10.86%) |
| **Total:** | **$5,109,511,850** | |

In 2006, approximately 13.5%, or $693 million, of the investor rejects were a direct result of missing documentation.

New Century appeared to recognize in January 2006 the importance of reducing the kickout rates. It convened a group of senior managers from the Production, Operations and Secondary Marketing Departments to discuss the so-called "post closing process" to develop means to stem the high and increasing rates of kickouts. However, this was a limited effort and focused only on attempting to make certain that a loan file contained all required documents at the time of funding. It was pointed out that by failing to make sure that loan files were complete, New Century was losing over \$20 million annually.[334] Unfortunately, this group was not tasked to address all the other reasons for kickouts. And, as discussed below, the group was not successful in seeking to cure the missing documentation kickouts.

Accordingly, the high kickout rates continued throughout 2006 and into 2007. During this time, New Century managers who communicated the kickout reports to others would point out the types of errors that were repeatedly being found and their frustrations that corrective action had not taken place. For example, in communicating January 2006 kickout data on February 14, 2006, a manager highlighted the following problems with appraisals and compliance issues:

> Appraisal: Month after month a significant amount (over 30%) of our sales fallout is for appraisal issues. For the purposes of focus if we could just cure **the no brainer type items** I list below we would serve ourselves well.
>
> 2nd appraisal on loan amounts over 650K. Per our guidelines we have a second appraisal. If we don't have it we don't sell it.
>
> Appraisal reports need to be complete and signed. If not they are kicked.
>
> Missing 442's. These cannot be waived.
>
> Health and safety issues. Railings on decks and stairwells and evidence of emergency releases on safety bars is an absolute must.
>
> Compliance: We have to do better in MA and TX. Cindy (Nichols that is) what can we do to make this better? I know we are revising the tangible net benefit form which should help in MA.
>
> We just don't seem to do Texas right. Missing disclosures, exceeding 3% fee tolerance, can't reflect benefit to the borrower for discount points charged, etc.
>
> If everyone who produces in these two states can focus a little bit more to make sure we are doing the loans correctly we can increase pull through and profitability.

---

[334] Based on data available to the Examiner in New Century's monthly Fallout Reports, this number appears grossly underestimated.

- 163 -

> I choose these two areas because **they are black and white**. We are either in
> compliance or we are not and if we state something in our guidelines we have to
> do it or we are on the hook for the consequences. Only about 25% or our loans
> are sampled at the time of sale. That means there are a lot of loans out there with
> issues that we don't know about. We are in an environment of decreasing if not
> stagnant value appreciation which means borrowers will be less able to refi for
> lifestyle finance or to get out of bad situations. When a loan goes bad an investor
> is going to review that file to see if we did anything incorrectly and if we did they
> are going to look to use for loss reimbursement. In instances of the items I
> mention above we are not going to have an argument and there is real potential
> for this to get expensive. (emphasis added)

The following month, the same manager wrote about the need to improve missing
documentation, estimating that fixing the missing documentation problem would reduce 10% of
the monthly kickout. The manager stated the following:

> Last month I addressed a couple areas of concern as it relates to appraisal and
> compliance issues. For this month I would like to focus on missing
> documentation.
>
> By simply being more thorough in regards to making sure we have all of the
> necessary documentation in our files we could eliminate 10% of our monthly
> fallout. This 10% is just the amount we are not able to cure in my world during
> the due diligence process. I don't have a number as to the amount of missing
> documentation we do cure but I can tell you that is substantial.
>
> ...
>
> I ask that you please focus on the missing and incomplete documentation going
> forward. In my mind this is an area ripe for picking in that by taking the time to
> be thorough we can increase sale execution resulting in more cash in our pocket's
> [sic] via a more profitable enterprise.

Similarly, in June 2006, a manager wrote the following about May 2006 kickouts:

> Now that I've had a chance to pick myself up off the floor after reviewing the
> latest investor sale pool results, it is obvious that we have a tremendous amount of
> work to do. As we have discussed on many occasions, there is no excuse for an
> investor kick out for missing documentation such as 442s, appraiser explanations,
> Collateral Analyst supportive commentary, etc. Looking at the condensed report I
> have furnished for you, it is clear that collateral related kick outs are at an
> unacceptable level and needs to be fixed. Of course there are some questionable
> and arguable kick outs for value, distant and/or dissimilar sales, however there are
> a plethora of rejects that are valid. What is even more disturbing is that the
> majority of kick outs for collateral had reviews completed by Collateral Analyst
> and were in markets we have had success with over the past several pool sales.
>
> In yet another communication regarding investor kickouts due to missing documentation,

in an e-mail sent to the Chief Credit Officer regarding the August 2006 fallout report, it was

stated that "[m]any of these [loan file documentation] omissions are simply due to sloppy work, trying to get loans closed quickly without being thorough... ."

The Examiner heard through interviews that investors sometimes used kickouts, particularly kickouts based on appraisals which involved a degree of subjectivity, as a means to restructure loan pools in order to purchase only the best-performing loans in the pool. According to a former employee in the Secondary Marketing Department, investors historically would sample of 20 to 30% of the loans in a particular pool as part of their due diligence review. This process changed in 2006 when most investors began to look at the appraisal documents in all loan files of a particular loan pool. Additionally, investors began to examine 30 to 35% of loan files and, in late-2006, one investor conducted due diligence of all of the loan files in a pool. This made it more likely that they would find errors that would give them an excuse to reject loans from a particular pool. Such heightened investor due diligence, especially on appraisal matters, should have provided additional reason for New Century to make it a priority to improve its loan origination processes and loan quality.

### c.    Internal Audit Continued to Identify Problems with the Loan Origination Processes

The Internal Audit Department in 2006 continued to conduct field audits of New Century's loan origination processes. In the first seven months of 2006, the Internal Audit Department conducted 10 such audits, with nine resulting in "Needs Improvement" ratings and one an "Unsatisfactory" rating. These results, while not as negative as the results from the 2005 field audits, nevertheless documented repeatedly that the same sorts of problems were recurring. For example, in the nine audits where Internal Audit checked to determine if underwriters' approval stipulations had been fully satisfied, it found delinquencies more than 50% of the time in seven of those audits and 27% and 35% of the time in the other two. Similarly, almost every audit determined that name affidavits had been completed incorrectly a high percentage of the time. Such findings were consistent with the types of problems identified by investors when they kicked out loans. Such findings were also consistent with the Internal Audit report to the Audit Committee on January 18, 2006, which indicated that errors related to approval stipulations and name affidavits were the most numerous problems found in the 2005 field audits.

#### d.     The New Quality Assurance Department Identified Problems with the Loan Origination Processes

The reconstituted New Century Quality Assurance Department became active in conducting audits in June 2006. Accordingly, in terms of identifying loan quality trends that perhaps should have prompted earlier steps to make loan quality improvement a priority, the Quality Assurance Department did not play a significant role in 2006. However, once active, the Quality Assurance Department's audit findings confirmed the loan quality concerns that had been identified by others.

For example, in August 2006, the Quality Assurance Department audited 745 loans that had been funded in July 2006. The Department divided its findings into three categories:

Audit function – borrower & property information and program guidelines

Compliance function – legal documents and federal and state regulatory issues

Re-verification – reconfirming the documentation used to determine income and when applicable sufficient funds to close.

With respect to the audit function, any loan that lacked documentation or contained errors in the evaluation of the documentation was rated as high risk if it had a severe impact on loan salability and moderate risk if it had some impact on salability. The results for the August audit showed that 8.05% of the loans were high risk and another 4.03% were moderate risk. The results for the compliance and re-verification functions were similar. The audit function Quality Assurance results for 2006 may be summarized as follows:

| Production | High Risk | Moderate Risk | Total High/Moderate Risk |
|---|---|---|---|
| Month | QA Audit Findings | QA Audit Findings | |
| June | 1.00% | 11.40% | 12.40% |
| July | 8.05% | 4.03% | 12.08% |
| August | 6.62% | 3.38% | 10.00% |
| September | 7.99% | 2.94% | 10.93% |
| October | 5.38% | 2.22% | 7.60% |
| November | 6.29% | 3.74% | 10.03% |
| December | 5.83% | 1.95% | 7.78% |

### 2.    New Century's Response to the Increasingly Negative 2006 Loan Quality Trends

#### a.    Summary of Loan Quality Improvement Efforts

New Century began to focus on loan quality improvement at the January 18, 2006 Audit Committee meeting.  Zalle presented the Committee with a summary of the results of the nine field audits completed by Internal Audit in 2005.  The audits for field processing centers found that seven were "Unsatisfactory" and the other two "Need[ed] Improvement."  This summary generated considerable discussion within the Committee and between the Committee and Management.  The Audit Committee Minutes for January 18 in relevant part read as follows:

> Next, Mr. Zalle responded to specific questions of the Committee regarding the internal audit department's 2005 branch audit results.  Mr. Morrice then responded to the Committee's questions about why such a high percentage of the processing centers audited received an unsatisfactory rating and management's response to rectify the problems highlighted by the internal audit department's findings.  Mr. Morrice noted that the senior management was focused on improving the Corporation's quality control and quality assurance processes and that the improvement of these processes would, in turn, improve the operations of the processing centers.  In response to the Committee's request, Mr. Morrice agreed to provide the committee with reports on the progress of the Corporation's revisions to its quality control and quality assurance programs at the next in-person meeting on March 2.
>
> In response to questions of the Committee, Mr. Zalle noted that the branch audit results had been discussed with senior management and that the internal audit department and senior management had determined that the exceptions noted in the internal audit report were significant.  Members of the Committee expressed concern over the number of exceptions noted in the internal audit report and discussed with management ways to improve operations of the processing centers.  Mr. Morrice agreed that management would provide an action plan to improve operations of the processing centers at the next in-person Committee meeting on March 2.

This is the first instance found by the Examiner where the Audit Committee appears to have directed New Century Senior Management to develop a loan quality improvement plan.  The Examiner sought to determine what factor(s) may have led to this seemingly decisive directive from the Audit Committee.  Unfortunately, persons interviewed by the Examiner had poor recollections regarding what led to this change in approach.

Regardless of the precise cause or causes for this changed approach, the January 18 Audit Committee meeting led to sustained, albeit slow, efforts to improve New Century's loan quality.  The first steps occurred in February and March 2006:

On February 21, 2006, Zalle distributed a memorandum to Morrice and to Joe Eckroth, recently designated as Chief Operating Officer, outlining a proposed loan quality improvement program.

At the March 17, 2006 Audit Committee meeting, Morrice presented an outline of a "Mortgage Operations – Loan Quality/Compliance Program." Morrice summarized the elements of a loan quality improvement program and identified specific individuals who would be responsible to make sure that the program was implemented.[335] One of the anticipated elements of the improvement plan was to use the compensation system to incentivize loan quality efforts. A PowerPoint presented to the Audit Committee stated "Results and improvements tied to compensation and employment."

Work on the loan improvement program got under way in earnest in mid-April 2006.

Significant progress on loan quality improvement efforts was made from May to October 2006.

The milestones may be summarized as follows:

On May 1, 2006, Anthony Meola joined New Century as head of Production. Meola was a seasoned mortgage banking professional with big company experience who appears to have had a genuine commitment to improved loan quality. The Audit Committee was advised at its May 12, 2006 meeting that Meola, along with COO Eckroth, would have "ownership" of the loan quality improvement program.

On or about June 1, 2006, Lenice Johnson joined New Century as Chief Credit Officer. Like Meola, Johnson was a seasoned mortgage banking veteran with big company experience and would be responsible, along with others, for a significant revamping of certain underwriting guidelines, starting in October 2006 and continuing into February 2007, which were expected, once fully implemented, to improve loan quality and reduce EPD and repurchase claims.

Relations between Internal Audit and the Production Department were much improved from 2005. In April 2006, Production and Internal Audit personnel agreed to focus on high risk areas to be reviewed by Internal Audit in its field audit program. The Examiner believes that the Internal Audit audit results in 2006 were taken much more seriously by Production than in prior years.

The Quality Assurance function was significantly revamped under new leadership and was operating productively by approximately June 2006.

A new operational risk review program was introduced and in operation by summer 2006. Unlike the Internal Audit and Quality Assurance functions, the operational risk review efforts had personnel reviewing loan files before loans

---

[335] Joseph Eckroth and various individuals from the Production Department, were identified as having "ownership" of the loan quality improvement effort. As of this time, Senior Management was seeking a replacement for Flanagan. As noted hereafter, once Tony Meola was hired to replace Flanagan as head of Production, Eckroth and Meola were identified as the "owners" of this project.

were funded and thus had the ability real time to make a difference in the quality of loans.[336]

The Company expanded its anti-fraud software (FraudMark), which it had been using as a predictive analytic tool, to allow the software to conduct a "real-time" fraud analysis of in-process loan files. FraudMark then automatically referred certain loans to risk managers if the loans appeared to be problematic. The Company reported that from March until September 2006, FraudMark helped identify and prevent funding of over $630 million in risky loans.

By August 2006, New Century had developed enhanced data, known as the Scorecard and Dashboard reports, which allowed New Century personnel to identify particular New Century employees and brokers with whom New Century was doing business that were contributing disproportionately to loan quality problems. Mr. Meola and others made a practice of meeting regularly with Production managers at monthly Loan Quality Scorecard Steering Committee meetings to review these reports and to encourage managers to take action in light of the data that were developed. The first such meeting was August 28, 2006.[337]

In October 2006, New Century announced changes designed to tighten underwriting standards, with the expectation that over time, such changes would bring down the EPD rates and repurchase claims. In an October 12 press release, New Century stated, among other things:

> "Tightening underwriting guidelines for its adjustable-rate mortgage programs for at-risk borrowers. This includes using the fully-indexed rate minus 1 percent as the qualifying rate for these borrowers.
>
> Offering existing adjustable-rate mortgage (ARM) and interest only customers who qualify for the option of refinancing into a low fee 30-year or 40-year fixed-rate mortgage. . . .
>
> . . .

---

[336] An operational risk group had been under consideration for more than a year. Thus, on March 3, 2005, Zalle had advised the Audit Committee as follows:

Internal Audit is currently consulting with the EVP/COO of Production Operations in establishing an "Operations Audit" organization within Wholesale and Retail to conduct compliance and control "self-assessments." Assuming this new organization is approved, significant reliance can be placed on day-to-day audit monitoring by Operations nationwide.

This program to improve loan quality was not implemented, however, until Summer 2006, when New Century adopted a program that had been started initially at RBC Mortgage, the loan origination platform that was acquired by New Century in September 2005. This is an example of a loan quality improvement effort that presumably could have been initiated far earlier than it was.

[337] This is another instance of Senior Management taking an action in 2006 that could have been taken much earlier. As noted, the Audit Committee was told on October 25, 2005 that the Credit Department had developed a means to identify underwriters whose actions led to a high number of defective loans. Senior Management did not implement that effort.

- 169 -

Enhancing its processes for confirming the income information provided on stated income loans."

In sum, between January 2006 and the fall of 2006, considerable loan quality improvement projects were identified and steps to implement the efforts were carried out.

### b.    Limitations to the Loan Quality Improvement Efforts

New Century's 2006 loan quality improvement program, however, did not have a high priority through virtually all of that year. Loan quality improvement was discussed frequently and certain concrete steps were taken in support of the efforts. However, the progress was slow and there was internal resistance.

First, while the Audit Committee insisted in January 2006 that the loan quality improvement effort be undertaken, the Committee failed to follow up to ensure that the effort was a top priority. As noted, the effort did not get under way in a meaningful fashion until April 2006. The Audit Committee received briefings on the efforts at the May 12 and July 26, 2006 meetings, but there was no detailed follow up and no timetable was set for getting improvements in place. For example, the minutes of the July 26 meeting reflect that one director requested that Senior Management "provide the Committee with a specific report on precisely what impact compliance with the [loan quality improvement] plan would have on an employee's compensation and Morrice agreed to provide such a report." The Examiner found no evidence that any such report ever was provided. Similarly, at the same meeting, the Audit Committee was told that Johnson, the new Chief Credit Officer, would have a role "in revising the Corporation's underwriting policies as a result of the implementation of the plan" and would be introduced to the Committee at its next meeting. Johnson never attended an Audit Committee meeting.

After the July 2006 meeting, the Audit Committee devoted little attention to loan quality until the end of the year. There was brief discussion of the loan quality improvement efforts at the October 30, 2006 Audit Committee meeting, but the minutes indicate that Senior Management advised the Committee that a more detailed report would be provided at the December meeting. There appears to have been no objection to deferral of the issue until December.

Accordingly, at least in terms of the Audit Committee, the full implementation of the loan quality improvement plan does not seem to have been a priority. No timetable was set and no results were demanded. It is thus not surprising that progress was not reported in 2006. When

the Audit Committee met in December 2006, the New Century loan quality trends were mostly unchanged from the beginning of the year. The minutes from the December 12, 2006 Audit Committee meeting reflect that there was "[a] lengthy discussion . . . about the Corporation's increase in first payment defaults, early payment defaults and investor kickout rates and the actions Management was taking to reduce these trends."

Second, the Examiner learned in his investigation that notwithstanding efforts to get the loan quality improvement plan implemented, it was not an easy task to get persons to support the need for serious changes. For example, for a long period of time, New Century's Production Department had been extraordinarily successful in originating loans. Accordingly, there was resistance to efforts by some persons to change the culture of New Century in fundamental ways. Meola said that he needed to speak repeatedly with Production Department personnel to get them to buy into the need for Production personnel to focus on loan quality. Meola also reported to the Examiner that some Production veterans sought Morrice's help to reduce his emphasis on improving loan quality. Meola explained, therefore, that this was something that simply took more time than anticipated, but he also stressed that by late 2006 and early 2007, he believed that progress was taking place. For example, the Examiner reviewed an e-mail chain from December 2006 in which one of Meola's direct reports, a long-time Production Department veteran, contacted a large number of his subordinates about the importance of preventing fraud in the loan origination process. Meola forwarded the e-mail to persons who had been working on the loan quality improvement effort, commenting: "We are slowly changing the mind set. [____'s] note below is an excellent example."

A related, difficult task was the effort to tie loan quality to compensation within the Production Department. Meola described his efforts over many months to persuade senior members of the Production Department to make loan quality a high priority and then to agree to tie loan quality improvement to compensation in a meaningful way.

It appears that progress in this regard did take place, but it again took significant time. At the start of 2007, New Century put in place controls designed to incentivize account executives in the Production Department to focus on loan quality. New Century introduced the "broker scorecard" system whereby brokers who had an excessive quantity of loans that had FPD would be separated from their account executive and the account executive would not be able to earn income from loans submitted by that broker. In addition, the broker might be suspended from

- 171 -

providing loans to New Century. Meola explained that he felt this system, when fully implemented, would provide a significant financial incentive to account executives since they depended on broker relationships for their compensation. If they were faced with losing such broker relationships, they would have a greater incentive to develop relations only with brokers who tended to present high quality loans.

Third, the Examiner found evidence that there was some internal resistance to some of the efforts to improve New Century's underwriting guidelines, even in the face of mounting EPD and repurchase claims. New Century's new Chief Credit Officer and her staff analyzed EPD and repurchase claims to identify products that disproportionately were responsible for such claims. She then proposed in October 2006 to New Century's Business Unit Review Department certain changes, such as to tighten standards for loans to first time home buyers. She developed data that demonstrated that first time home buyers with stated wage earner loans (i.e., loans where the borrower did not need to demonstrate past income sufficient to afford the loan) represented three percent of originations but 7.1% of EPD. She proposed to eliminate such loans, especially since most of New Century's competitors had already eliminated this product. She recalled that Morrice was initially quite reluctant to agree to the changes. Johnson believed the reluctance reflected a desire to keep New Century's origination volumes as high as possible. Eventually, virtually all of the changes that were proposed were implemented, but the initial resistance meant that many of the changes did not take effect until December 2006 and February 2007, too late to have any meaningful impact.

By late 2006, New Century's Senior Management appeared to believe that enhanced underwriting standards would lead to better loan quality and reduced repurchase claims. For example, in the PowerPoint that accompanied New Century's third quarter earnings release in November 2006, New Century stated:

> We anticipate FPD and loan repurchases will stabilize, then decline, as underwriting changes take full effect.
>
> . . .
>
> Improved underwriting guidelines expected to enhance future loan performance.

New Century also implemented credit changes that effectively tightened underwriting guidelines in December 2006, stating that these changes "will reduce the occurrences of credit losses and exposure to delinquency performance."

- 172 -

Fourth, it is troubling that New Century did little in 2006 to address the high rates of kickouts, particularly on the process issues such as loan files that lacked required documentation. As previously noted, the fallout reports month after month and year after year reported the same sorts of problems resulting in kicked out loans. Indeed, it is ironic, as reported above, that 2006 began with a Post Closing Group being convened to address the high rate of kickouts, and the year closed in the same way. In a December 20, 2006 presentation entitled "Post Closing Process Review," Management identified yet again the need to improve its processes, stating the mission as follows:

> Review current Post-Closing operational process to identify causes for missing files and documents. Recommend policy, process, technology, organization and other applicable enhancement opportunities to minimize the cost of exceptions and improve the efficiency and quality of service.

These process issues fundamental to the quality origination of subprime mortgage loans should have been addressed earlier and with greater priority by New Century's Senior Management and Board.

In 2006, missing documents remained a significant reason for kickouts, with the estimated dollar amounts of loans not purchased due to missing documentation being as follows:

| January | $ 38,417,079 |
|---|---|
| February | $ 40,022,174 |
| March | $ 44,148,263 |
| April | $ 13,657,097 |
| May | $ 38,153,243 |
| June | $ 62,533,882 |
| July | $ 43,619,723 |
| August | $ 38,934,857 |
| September | $ 142,980,831 |
| October | $ 74,767,085 |
| November | $ 51,599,504 |
| December | $ 103,684,840 |
| | $ 692,518,578 |

Interviewees advised the Examiner that kickouts due to missing documentation should have been relatively easy to fix. New Century apparently devoted little or no effort to fixing this problem and instead allowed high kickout rates for missing documentation to continue throughout 2006.

It is also noteworthy that problems with appraisals remained a significant concern throughout 2006, just as they were a significant problem throughout 2004 and 2005. Even though appraisals emerged as the number one reason for kickouts throughout most of 2006, New

Century did not act on this information in any meaningful way. For example, a September 7, 2006 e-mail from the head of the Operational Risk Department suggested that New Century needed to create a working group to "drill down on the high kick out appraisal value issues, with the goal to identify root causes." Further, even as late as December 2006, the Audit Committee minutes reflected that Senior Management advised the Committee that "deficiencies in the appraisal process were a significant contributing factor to the unfavorable trends" in EPD and kickouts. Indeed, even in January 2007, New Century still had not squarely addressed the appraisal issue. For example, Meola noted in an e-mail that "our appraisal policies are stale, [and] we need to address them next and expeditiously" and in another e-mail stated "we have been asking for 5 months, when can we attack appraisals and how?" Cloyd responded to this e-mail, stating "we'll put it on the pile with everything else..."

During 2006, New Century also experienced kickouts related to underwriting deficiencies. A reason for some of those kickouts is that New Century made exceptions to underwriting guidelines in many of the loans it originated, with maximum loan amount, LTV and DTI exceptions being the most common. Notwithstanding the frequency of exceptions, New Century had no formal exceptions policy. A former New Century Chief Credit Officer stated that she fought to have a formal exceptions policy but that it was hard to get anything implemented because of the inefficiencies of Senior Management. She added that the Credit Committee eventually created a standard exceptions policy, but she understood that the policy was rescinded after she left the Company in early-2006. The Examiner found no evidence of such a policy.

Another former New Century Chief Credit Officer said she was surprised when she joined New Century in 2006 that decisions to make exceptions were managed by persons in the Production Department and not the Credit Department. She found this unusual as, in her experience, companies made exceptions either through the Chief Credit Officer or through a formal exceptions matrix.

In short, 2006 was a mixed year in terms of loan quality improvement efforts. Undeniably, New Century made progress on loan quality improvement in 2006, instituting new programs and tightening underwriting standards. However, with regard to basic loan origination processes, New Century made little effort and the Examiner could discern no tangible progress or improvement in that area. Rather, as noted above, kickouts trended upwards throughout the

- 174 -

year and even relatively easy to fix defects, such as documentation missing from files, remained a significant problem.

### H.    Concluding Loan Quality Observations

The Examiner concludes that New Century's Board of Directors and Senior Management failed for many years to give loan quality the attention that it deserved.  Loans originated by New Century were critical to New Century's financial success.  Loans that were carefully processed, with all underwriting requirements satisfied, were more likely to be purchased at premium prices in the secondary market, and the borrowers on such loans were generally more likely to meet payment obligations, thus avoiding EPD and ensuring a constant stream of interest income to the owners of such loans.

New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004.  Yet, as documented in this portion of the Final Report, the Board of Directors and Senior Management before 2006 took few steps to address the troubling loan quality trends.  Such inaction cost New Century millions of dollars in lost revenues, including from loans that it could not sell at a premium in a timely manner, from loans that needed to be repurchased after borrowers defaulted, and from the numerous loan kickouts that were experienced month after month.

The Examiner believes that the Board could have paid closer attention to loan quality issues during much of 2004 through 2007.  However, the Examiner recognizes that the Board is entitled to rely on Senior Management to run the day-to-day affairs of the Company.  Further, the Board, through the Audit Committee, periodically did give some attention to loan quality issues, such as at Audit Committee meetings in 2004 (June and August) and 2005 (October and December, albeit briefly).  In 2006, the Audit Committee gave rather extensive attention to loan quality issues, with the issue discussed at meetings in January, March, May, July, October and December.  In such instances, particularly in 2006, Senior Management repeatedly assured the Board that New Century's loan quality problems were being addressed.    The Examiner concludes that the Board were likely entitled to rely upon such assurances.

The Examiner is much more critical of Senior Management, particularly with respect to its failure to address kickouts, including problems that reportedly would have been relatively simple to correct, such as missing documentation from loan files. This was a fundamental error: no loan should have been funded if the paperwork was incomplete or missing.  The Examiner

was told repeatedly in his investigation and confirmed through the review of many documents that kickouts were an important metric of loan quality. The fact that New Century meticulously analyzed the reasons for kickouts on a monthly basis serves to underscore the importance of this metric.

The Examiner received no satisfactory reasons to explain why the loan quality issues that caused so many kickouts were not addressed proactively. No interviewee suggested that it would have been too hard or too expensive to correct the problems leading to kickouts. To the contrary, the Examiner heard over and over again that while some number of kickouts was inevitable, the kickout rates incurred by New Century were far too high and should have been reduced. In short, the Examiner believes that Senior Management may have abdicated its responsibility to manage the Company's day-to-day affairs by failing for so long to make reduction of kickouts a priority. As a result, New Century lost millions, possibly hundreds of millions, of dollars in revenues.

The Examiner is also critical of Senior Management for failing to address sooner the increased riskiness of some of the loan products New Century was originating. With few exceptions, such as the cutback on the IO product in September 2005, Senior Management was informed about the increasing risks associated with some its products but took few timely actions to seek to address or mitigate those risks. New Century finally began to address the products that contributed disproportionately to EPD and repurchase claims, but by then, billions of dollars of unsound mortgages were either held by New Century or sold in the market.

-176-

## VI.    ACCOUNTING ISSUES

### A.    Repurchase Reserves

#### 1.    Executive Summary

On February 7, 2007, New Century announced that it needed to restate its earnings for the first nine months of 2006 due to its failure to account properly for the loan repurchase loss reserve required to be established under GAAP for probable expenses and losses to be incurred on loans that New Century had sold but then potentially was obligated to repurchase ("repurchase reserve"). New Century subsequently announced on May 24, 2007 that it was more likely than not that similar accounting errors made New Century's 2005 financial statements unreliable.

The magnitude of such accounting errors was significant. The Examiner estimates that at year-end 2005, the repurchase reserve should have been approximately $17.0 million, rather than the $5.5 million reported by New Century in its 2005 Form 10-K.[338]  Similarly, at September 30, 2006, the repurchase reserve should have been approximately $115.2 million, rather than the $10.3 million reported by New Century in its Form 10-Q for that quarter.[339]  In addition, as part of its reserve calculation, New Century failed to account properly for losses on loans that it had already repurchased, so-called Inventory Severity.  These errors in the reserve calculation amounted to approximately $9.8 million at year-end 2005 and $85.8 million at September 30, 2006, with these incorrect amounts ultimately affecting New Century's LOCOM valuation adjustment to loans held for sale, rather than the repurchase reserve itself.

New Century entered into sales agreements with loan purchasers ("Investors"), selling most loans at a premium to par value.  In 2005, on average, New Century appears to have sold loans at a 2.06% premium to par, meaning that a $100,000 loan, on average, was sold for $102,060.  In such sales agreements, New Century typically was obligated to repurchase a loan from Investors if the borrower defaulted on the loan soon after the sale or if New Century failed to comply with representations and warranties contained in the loan purchase agreements.

---

[338] The actual amount of repurchase reserve reported in the 2005 Form 10-K was $6.955 million, of which $5.5 million related to New Century Mortgage Corporation and the remainder related to Home 123.  The data in this section of the Report pertain only to New Century Mortgage Corporation.

[339] The actual amount of the repurchase reserves reported in the third quarter of 2006 Form 10-Q was $13.885 million, of which $10.3 million related to New Century Mortgage Corporation.

When New Century repurchased loans, it incurred expenses and potential losses. First, New Century not only needed to pay the Investors then-existing full principal amount of the loan, but also was required to repay the Investors the premium (or some portion of it) that had been paid at the time of the original sale ("Premium Recapture"). Second, New Century had to pay Investors for any interest due on the loan that had not been paid by the borrower ("Interest Recapture"). Third, New Century needed to account for any losses on the loan that it repurchased. Repurchased loans frequently were not performing as required, such as due to a continuing borrower payment default, and the loan might be worth substantially less than the full principal amount at which it was repurchased by New Century.

Under GAAP, New Century was obligated to establish a loss reserve for potential expenses and losses related to repurchases that could be expected. In its Form 10-K for 2005, and for earlier periods as well, New Century stated that its repurchase reserve was "the Company's estimate of the total losses expected to occur" in connection with the potential loan repurchase exposure related to loan sales.[340]

There is no dispute that New Century failed to account properly for repurchase reserves. New Century admitted on February 7, 2007 and May 24, 2007, and the Examiner's investigation has confirmed, that New Century violated GAAP in multiple respects. KPMG, New Century's independent auditor, similarly has acknowledged that New Century did not satisfy GAAP requirements pertaining to repurchase reserves and repurchased loan valuation.

First, for all accounting periods up to the third quarter of 2006, New Century failed to include amounts in the repurchase reserve for Interest Recapture. Second, starting in the second quarter of 2006, New Century failed in its repurchase reserve calculation to compute the LOCOM adjustment ("Inventory Severity") for loans that it had already repurchased but had not sold. Third, starting in the third quarter of 2006, New Century failed to reserve for anticipated losses on loans that would need to be repurchased in the future ("Future Loss Severity"). Fourth, New Century in 2005 and 2006 greatly underestimated the quantity of loans that would need to be repurchased because it assumed that only loans sold within 90 days of the close of a quarterly accounting period would be subject to possible repurchase, thus failing to reserve for a large and growing backlog of repurchase claims relating to loans sold before that 90-day period ("Backlog Claims").

---

[340] Form 10-K for 2005 at F-16.

The Examiner investigated to determine how these material errors came about over such a long period of time and whether there was any purposeful failure to calculate the repurchase reserve and LOCOM correctly, such as to increase earnings. The Examiner found no persuasive evidence of such a motivation, even though New Century's second and third quarter 2006 changes to its repurchase reserve calculations had the effect of increasing earnings. For example, the second quarter of 2006 elimination of Inventory Severity in the LOCOM valuation account increased earnings by approximately $23.4 million in that quarter and the elimination of Future Loss Severity in the third quarter of 2006 increased earnings that quarter by approximately $28.1 million.

At a minimum, these errors were due to New Century's and KPMG's failure over an extended period to devote the necessary professional attention to making certain that the repurchase reserve and LOCOM were calculated correctly. There is little evidence that either New Century or KPMG personnel ever looked critically at the reserve calculation methodology, including the LOCOM portion, to assess whether it was being done correctly. This continued in 2005 and 2006, even when a large increase in repurchase claims underscored that the repurchase reserve and its associated method of calculation were extremely important. Accordingly, when KPMG suggested possible changes to the repurchase reserve calculation in 2006, the changes were implemented by New Century with little careful attention to GAAP requirements by either New Century or KPMG personnel.

Neither New Century nor KPMG took responsibility for initiating changes to the accounting pertaining to the repurchase reserve calculation. For example, there is no dispute that the elimination of Inventory Severity in the second quarter of 2006 was an error. Personnel from the Accounting Department, however, point to KPMG as having recommended this change. KPMG personnel on the other hand, acknowledge raising the issue but not recommending the change.

The Examiner concludes that there is joint responsibility for the repurchase reserve calculation errors. KPMG was at the center of the repurchase reserve calculation changes and the LOCOM calculation, and almost certainly first suggested the second quarter of 2006 accounting change and advised that the changes made in the third quarter of 2006 were appropriate. At the same time, New Century's Accounting Department personnel had a responsibility independently to review professional standards and to make determinations as to

- 179 -

the propriety of accounting changes. The data suggest that New Century personnel spent little time in serious professional consideration of the changes, opting instead to implement changes that served to reduce the repurchase reserve (or the rate of increase in that reserve) and the LOCOM valuation account at a time when New Century's repurchase claims were reaching historic levels.

Similarly, New Century and KPMG each share responsibility for failing to correct the repurchase reserve calculation methodology that permitted the Backlog Claims to be excluded from the repurchase reserve through all accounting periods. The data are clear that New Century personnel knew that many repurchase claims pending as of the time of a quarterly financial statement pertained to loans that had been sold in earlier quarters. KPMG likely knew of this information in early 2005, and data specifically communicated to KPMG in early 2006 that pending repurchase claims were $188 million at December 31, 2005 should have made KPMG investigate the issue. Both New Century and KPMG, however, proceeded quarter after quarter to assume with no in-depth investigation that the only loans needing to be considered in the repurchase reserve calculation were loans sold during that quarter. This was a significant error, accounting for more than 50% of the dollar value of the repurchase reserve accounting errors.

The conduct of New Century and KPMG personnel is all the more surprising because members of the Audit Committee regularly questioned Accounting personnel and KPMG auditors, particularly in 2006, to seek assurance that New Century had adequate repurchase reserves. For example, at the July 26, 2006 Audit Committee meeting, KPMG reported to the Committee on its review of New Century's financials for the second quarter of 2006, which is precisely when the Inventory Severity change in repurchase reserve calculation methodology was discussed between KPMG and New Century. The minutes of that meeting make clear that the repurchase reserve was an important topic:

> Mr. Kim reported that KPMG was in the process of reviewing the Corporation's second quarter financial information and that its review was primarily focused on the accounting for the Corporation's derivatives, allowance for loan losses, repurchase reserves and residual interests. Mr. Sachs then asked a question about the adequacy of the Corporation's repurchase reserves and Mr. Donovan [KPMG] and Ms. Dodge responded. (emphasis supplied)

Neither New Century Accounting personnel nor KPMG at that meeting, or any time thereafter, disclosed to the Committee that the repurchase reserve calculation methodology had been changed in a manner that would increase earnings in the second quarter of 2006 by $23.4

million. Rather, the consistent answer at this and other Audit Committee meetings was that the reserve was more than adequate and that New Century might even be over-reserved.

Moreover, despite its identification in 2005 of New Century's lack of a formal policy with respect to its repurchase reserve as a control deficiency, KPMG never detected that New Century failed to take into account the backlog of repurchase claims in its reserve calculation. KPMG further failed to detect that New Century had not taken interest recapture into account until the third quarter of 2006, and failed to determine that its repurchase reserve process was not compliant with FAS 140.

Finally, the failure to take a more critical look at the repurchase reserve calculation methodology is all the more inexplicable because the New Century repurchase reserve presented a red flag, as New Century reserved significantly less than smaller mortgage banking companies. Within a month the Taj Bindra started as New Century's CFO in November 2006, he asked New Century's Accounting personnel, and later KPMG, to justify the amounts and calculation methods for New Century's repurchase reserve. Such inquiries by Bindra led in relatively short order to the discovery of material accounting errors in January 2007 and the restatement announcement on February 7, 2007. This is further evidence that both New Century personnel and KPMG may have engaged in conduct that failed to meet applicable standards.

### 2. The Applicable Accounting Standards

#### a. Statements of Financial Accounting Standard ("FAS") 5 and 140

FAS 140 requires a transferor of loan assets, such as New Century, to recognize all assets obtained and liabilities incurred upon completion of a transfer of financial assets, such as mortgage loans, that qualifies as a sale. One such liability consists of the expenses and losses estimated to be incurred in connection with the repurchase of loans previously sold. The repurchase reserve is the quantification of that estimated liability.

Paragraph 55 of FAS 140 states: "The transferor initially measures those assets and liabilities at fair value on the date of the change, as if the transferor purchased the assets and assumed the liabilities on that date."[341]  This means that the transferor must record, as part of the

---

[341] The "change" referenced in FAS 140 relates to the circumstances under which a transferor, in this case New Century, would be required to regain control of loans previously sold.

loss estimate, any amounts that are expected to be paid to the purchaser over the fair value of the repurchased loan at the repurchase date.

Under FAS 140, a repurchase reserve is calculated at the time of sale at fair value as part of the computation of gain or loss on the transfer of assets. Subsequent calculation of the repurchase reserve is based on FAS 5, *Accounting for Contingencies* ("FAS 5"). Under FAS 5, a liability for a loss contingency, such as an early payment default, is recorded on the transferor's balance sheet if it is deemed to be probable and can be reasonably estimated. The "probable" condition for recording a liability is provided in FAS 5 as follows:

Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

For New Century, there was no question at the time a pool of loans was sold that a certain number of such loans would need to be repurchased. Based on historical experience, New Century knew that some borrowers would default shortly after the loans were sold and that Investors would require New Century to repurchase some of those loans. New Century also knew from experience that even aside from early payment defaults, it would doubtless receive some repurchase claims arising out of allegations that loans sold failed to comply with typical representations and warranties contained in loan sale agreements. Similarly, the requirement that the loss contingency be reasonably estimable was never in dispute because the sorts of expected expenses and losses, such as Premium Recapture, could be reasonably estimated. Thus, under FAS 5, the "probable" and "estimable" conditions were satisfied and New Century at every quarter calculated a repurchase reserve.

For repurchase reserves on sold loans, two categories of loss contingencies subject to FAS 5 should have been identified. The first category was known claims existing as of the date of the New Century quarterly financial statements. In other words, when a transferor like New Century received notification of repurchase claims but had not yet repurchased the loans associated with those claims, it had to estimate and reserve for the potential losses that might be incurred on those claims. In this Final Report, the Examiner has divided this first category of repurchase claims into two groups. The first group is repurchase claims reported to New Century pertaining to loans that were sold in the same quarter as the financial period for which a repurchase reserve needed to be calculated ("Reported Current Claims"). Thus, if New Century

- 182 -

was seeking to calculate its repurchase reserve for the first quarter of 2006, the Reported Current Claims would be repurchase claims reported to New Century pertaining to loans sold to investors in the period January 1 through March 31, 2006. The second group is reported repurchase claims pertaining to loans sold to investors prior to the quarter the report is being filed. In the above example, reported repurchase claims pertaining to loans sold prior to January 1, 2006, such as loans sold in the fourth quarter of 2005 and before, fall into this second group and are referred to as "Backlog Claims."

The second category of loss contingencies is potential claims that had not yet been reported as of the quarterly financial statement closing date. For example, New Century knew, as of the date that it filed a Form 10-K or Form 10-Q, based on historical data, that some repurchase claims would arise for loans sold that quarter, but New Century had not yet received notification of these claims as of the date of the financial statements. Because it was known that some of these as-yet-unreported claims would result in repurchase obligations, an estimate and reserve for the related potential expenses and losses were required. These are referred to as "Future Current Claims," as they were assumed to be claims relating to loans sold in the same current financial reporting period but would be received in the future.

The data set forth later in this section of this Final Report establish that New Century did not include in the repurchase reserve calculation any estimate of expenses and losses associated with Backlog Claims. Rather, New Century developed a repurchase reserve calculation methodology that was intended to cover the Reported Current Claims and Future Current Claims (collectively, "Current Claims"), but the methodology omitted during all reporting periods Backlog Claims. This was a significant error, leading to a material underestimation of the quantity of repurchases for which the repurchase reserve needed to account.

### b.    The Components of New Century's Repurchase Reserve

There are three GAAP-required components of a repurchase reserve: Premium Recapture; Interest Recapture; and Future Loss Severity. Additionally, loans repurchased from investors are required to be valued at LOCOM and reported in a valuation allowance account related to loans held for sale. Each of these four components is described below.

### i.    Premium Recapture

As noted, New Century generally sold its mortgage loans to investors at a premium, i.e., at a price exceeding their par value. Under the loan purchase agreements, when a repurchase

was made, New Century was required to repay the investors the premium (or some portion of it) paid in the original loan sale transaction. New Century estimated the premium that it would have to repay as the average premium paid by investors on loans sold, multiplied by the estimated volume of loans that would need to be repurchased from loan sales in the prior three months. The Premium Recapture calculation may be illustrated as follows:

| | |
|---|---|
| Prior three months loan sales: | $1,000,000 |
| Estimated repurchase percentage rate: | 1% |
| Average premium: | 2% |
| Premium recapture: | $1 million times 1% times 2% = $200 |

New Century consistently included Premium Recapture in its repurchase reserve calculation for all time periods reviewed by the Examiner.

### ii. Interest Recapture

New Century also agreed in its loan purchase agreements to pay investors any lost interest on loans that New Century repurchased. Accordingly, if a borrower defaulted on loan payments and one or more interest payments had not been paid to the investors, New Century was required as part of the repurchase to pay the investors the lost interest. Interest Recapture was calculated by determining the weighted average coupon (*i.e.*, interest rate) of the loans originated during that three-month period, multiplied by the assumed missing interest payments (generally three payments) and the repurchase rate. The Interest Recapture calculation may be illustrated as follows:

| | |
|---|---|
| Prior three-month loan sales: | $1,000,000 |
| Estimated repurchase percentage rate: | 1% |
| Average coupon interest rate: | 10% |
| Assumed annualized missing interest | $1,000 |
| Estimated Interest Recapture: | ($1,000 divided by 12 times 3) = $250 |

Historically, New Century did not include Interest Recapture in its repurchase reserve calculation. New Century included Interest Recapture for the first time in the third quarter of 2006, based at least in part on the erroneous opinion of KPMG that the repurchase reserve should be based solely on Interest and Premium Recapture. The Examiner did not undertake a detailed review to quantify the dollar amounts of Interest Recapture that should have been included in the repurchase reserve for reporting periods before year end 2005. However, the Examiner estimates

- 184 -

that the unreported Interest Recapture component of the repurchase reserve for 2004 should have been approximately $790,000, compared to the reported repurchase reserve in the 2004 Form 10-K of $7.9 million, an understatement of about nine percent.

### iii. Future Loss Severity

Under GAAP, New Century was required to estimate the losses on loans that would need to be repurchased in the future. This amount, referred to in this Final Report as Future Loss Severity, was to be calculated on the basis of an estimate of the difference between the actual repurchase price that was estimated to be paid and the estimated fair value of the future repurchased loan on the date of repurchase. A repurchased loan often had an impaired market value. Apart from the repurchase obligation expenses outlined above, an additional loss could be expected when the repurchased loan, with whatever defects that triggered the repurchase, was eventually repurchased. Future Loss Severity was calculated by New Century based on the prior three months whole loan sales, the historical repurchase percentage rate and the historical percentage of repurchased loans actually sold at a loss, the result of which was multiplied by the average historical loss incurred on sales of repurchased loans. The calculation of Future Loss Severity may be illustrated as follows:

| Prior three months loan sales: | $1,000,000 |
|---|---|
| Estimated repurchase percentage rate: | 1% |
| Historical % of repurchased loans repurchased at a loss: | 50% |
| Historical loss rate on repurchased loans: | 20% |
| Estimated Loss: | $1 million times 1% times 50% times 20% = $1,000 |

As set forth later in this Final Report, New Century removed Future Loss Severity from the repurchase reserve calculation in the third quarter of 2006.

### iv. Inventory Severity

Inventory Severity represented the LOCOM adjustment related to repurchased loans held on the Company's balance sheet pending resale. This LOCOM adjustment was calculated by New Century as part of its repurchase reserve calculation, which is why the Examiner is reporting on Inventory Severity (LOCOM) in this portion of the Final Report. In fact, however,

Inventory Severity or LOCOM is not a part of the repurchase reserve but instead is a valuation allowance account related to loans held for sale ("LHFS").

Loans repurchased by New Century frequently had severe defects, meaning that they likely would be resold at a loss, *i.e.*, at a price well under par value. New Century was required to recognize losses on such LHFS, which was the difference between the carrying value of such loans and their fair value. As discussed hereafter, New Century stopped accounting for Inventory Severity on repurchased loans in the second quarter of 2006, which resulted in a material overstatement of the value of LHFS in the second and third quarters of 2006. In addition, New Century misapplied LOCOM on loans for which a valuation allowance had been established, which resulted in an overstatement of the value of LHFS in the fourth quarter of 2005 and the first quarter of 2006.

### 3. The Calculation of the Repurchase Reserve at New Century

The Examiner sets forth in the discussion that follows in roughly chronological order the development of the New Century repurchase reserve calculation methodology, the changes to it over time, and the role of KPMG auditors related to that calculation methodology.

#### a. Development of the Repurchase Reserve Calculation Methodology Prior to 2006

##### i. Initial development of the repurchase reserve calculation methodology up to 2005

New Century initially developed its methodology for calculating the repurchase reserve in the 1990s. Dodge was New Century's Controller at the time and informed the Examiner that she developed the initial methodology. According to Dodge, the first step in calculating the reserve was to determine an estimated loan repurchase rate for the financial statement reporting period in question. She did this by comparing the historical number of loans repurchased with the number of historical loans sold. Initially, the repurchase rate was calculated using industry-wide repurchase data. New Century later began to use its own historical repurchase data for the calculation when New Century's loan sale volume grew to be significant.

Once the repurchase rate was estimated, Dodge estimated the number of whole loan sales at risk of repurchase by reviewing data provided by New Century's Secondary Marketing Department. Dodge explained that repurchase claims were typically made within approximately 90 days of the loan sale. Accordingly, Dodge believed that a 90-day look-back period for loans at risk of repurchase provided a reasonable estimate of that exposure. Accordingly, it was the

- 186 -

practice of New Century in determining the volume of loans that might be subject to repurchase claims to look only at the volume of loans sold in the 90 days prior to the close of the reporting period. For example, if the reporting date was as of the end of the first quarter, *i.e.*, March 31, the 90-day look-back would mean that loans sold from January 1 through March 31 would be the universe of loans to which to apply the estimated repurchase rate.

Dodge informed the Examiner that she also would consider loans sold outside the 90-day look-back period if she had reason to believe that they might give rise to a repurchase claim. Dodge informed the Examiner that she was unsure whether the persons who subsequently took over calculation of the repurchase reserve, Walker and then Kenneally, continued to look at loans outside the 90-day look-back period.[342] The Examiner concludes that they did not. Indeed, the New Century Form 10-K for 2005, when addressing the repurchase reserve, makes clear that New Century used only the 90-day look-back window to estimate the volume of loans that might be at risk for repurchase. Thus, that Form 10-K stated:

> Approximately $10.7 billion and $8.3 billion of loans were subject to repurchase, representing loans sold during the fourth quarter of 2005 and the fourth quarter of 2004, respectively.[343]

Indeed, Sanchez recalled raising with Kenneally the issue of looking at loans sold more than 90 days earlier for purposes of the repurchase reserve calculation and was informed that New Century was contractually obligated to repurchase loans only within 90 days of the sales.

Dodge explained that once she had determined the volume of loans that might be subject to repurchase claims and the estimated repurchase rate, she then applied the repurchase rate to the number of whole loan sales at risk to come up with the amount of loans likely to be repurchased by the Company. The next step was to determine the average dollar amount of Premium Recapture that would need to be returned to the investors on the repurchased loans.

---

[342] In or around 1999, Dodge delegated the calculation of the quarterly repurchase reserve to Walker and trained her on the procedure. Walker continued to take the lead on calculating the repurchase reserve until 2003, when Kenneally was hired as New Century's Controller and Dodge assigned the repurchase reserve calculation role to him. Kenneally calculated the repurchase reserve using the methodology and formula he inherited from Dodge and Walker. Kenneally regarded this as essentially a mathematical formula that was not even necessary for him to perform personally. After 2003, Kenneally delegated the calculation of the reserve to Trevor Drummond, and it later became Theresa Lam's responsibility. At one point, Tony Sanchez also got this assignment. All of these individuals reported to Kenneally, who informed the Examiner that the method of calculating the repurchase reserve remained unchanged from 2003 until the second quarter of 2006.

[343] Form 10-K for 2005 at 65.

She determined the average premium and then multiplied this rate by the amount of loans likely to be repurchased to determine the Premium Recapture component of the repurchase reserve.

The next estimate involved calculation of Future Loss Severity and Inventory Severity. Dodge again used historical data to determine both the percentage of repurchased loans likely to be sold at a loss and the average loss rate. The result of this calculation yielded the severity components for losses on repurchased loans and on loans likely to be repurchased. Finally, Dodge added the Premium Recapture component to the Future Loss Severity component to arrive at the repurchase reserve amount. The Inventory Severity component of the reserve calculation would then be transferred to the LHFS valuation allowance account as part of the LOCOM adjustment.

The failure to include Interest Recapture in the repurchase reserve calculation from the outset is perplexing because the Examiner understands that it was a long time requirement under loan purchase agreements for New Century to pay to Investors the amount of interest that the borrower had failed to pay. Accordingly, this was a standard part of a repurchase arrangement, no different in substance than the Premium Recapture that was included at all times in the calculation of the repurchase reserve.

The Examiner also sought to determine how KPMG failed to question why New Century did not include Interest Recapture in the repurchase reserve calculation in 2005 and in earlier years. The loss severity factor that New Century used in its repurchase reserve calculation was based on historic loss rates on repurchased loans that were subsequently resold. This calculation did not take into consideration any Interest Recapture because it was based solely on the difference between the principal balance of the repurchased loan and the ultimate loss incurred upon resale of that loan. Therefore, New Century was not factoring into the loss severity factor any Interest Recapture it would have to pay to Investors upon repurchasing a loan.

The KPMG repurchase reserve conclusion memorandum for the year end December 31, 2005 stated with no supporting documentation that Future Loss Severity included Interest Recapture. However, the Examiner has reviewed the elements used by New Century to compute the loss severity factors and has determined the loss severity factors did not include Interest Recapture.

The Examiner was informed that KPMG was told during the 2005 audit by Kenneally that Interest Recapture was included in the New Century repurchase reserve calculation. Further,

a KPMG workpaper from January 2006 notes that estimated losses on future repurchases "include[s] accrued interest the investor would have collected from the borrower, if the loan had performed, that New Century must pay to the investor at the time of repurchase." If KPMG had performed adequate tests and calculations, it would have determined that Interest Recapture was omitted from the repurchase reserve calculation.

### ii.    New Century and KPMG's attention to the repurchase reserve in 2005

The failure of New Century to include Backlog Claims in the repurchase reserve constituted by far the greatest reason that the repurchase reserve was understated at December 31, 2005. The Examiner investigated to determine if there were any particular developments in 2005 that might have suggested an awareness on the part of New Century or KPMG that the repurchase reserve calculation had flaws and/or needed to be reexamined. The Examiner identified data that make clear that the proper calculation of the repurchase reserve, including the Backlog Claims issue, should have been an issue for both New Century and KPMG in 2005.

First, on January 26, 2005, as part of its 2004 audit of New Century's financial statements, KPMG specifically asked New Century's Accounting Department via e-mail (Walker with a copy to Kenneally) why there had been a "big jump" in repurchases in November 2004. This provoked an e-mail exchange within New Century, culminating with the following explanation from Cloyd to Walker: "many of the loans repurchased were from prior quarters and months leading to the increased volume and discount." This is a clear indication that New Century Accounting Department personnel knew that many loans that were ultimately repurchased in 2004 were Backlog Claims, *i.e.*, or loans sold outside the 90-day window that New Century used to calculate the volume of loans that might need to be repurchased. Notwithstanding this information, New Century did nothing to adjust its methodology for estimating the quantity of loans that might need to be repurchased as of the end of a financial reporting period. Rather, in its 2004 Form 10-K filed March 1, 2005, New Century reported that only loans sold in the fourth quarter of 2004 were at risk of repurchase.[344] New Century did nothing to determine how many Backlog Claims it had pertaining to loans sold prior to the fourth quarter of 2004.

_____

[344] Form 10-K for 2004 at 76.

- 189 -

KPMG probably also knew of this information since KPMG had initiated the request for such data. The Examiner determined that Walker planned to forward Cloyd's e-mail to her KPMG counterpart but appears never to have done so. However, the Examiner believes that KPMG was likely apprised of this information. KPMG, like New Century, did nothing to investigate. Thus, a KPMG memorandum as part of its 2004 year-end audit states:

> At 12/31/04, KPMG notes that the Company assumed that only the most recent 3 months of sales are at risk of repurchase.
>
> . . . .
>
> Based on the review of the Company's repurchase log and discussions with management, it appears reasonable that the most recent 3 months sales are at risk for repurchase.

The Examiner cannot accept the explanation that KPMG got comfort from having reviewed the New Century repurchase log. The repurchase log identified loans that New Century repurchased from 2001 onward. The log identified the date that New Century originally sold the loan and the date that New Century had repurchased the loan but did not set forth when the repurchase claim was received by New Century. If KPMG had indeed undertaken a careful review of that log, it would have recognized, consistent with the Cloyd communication mentioned above, that many loans that had been repurchased by New Century in the fourth quarter of 2004 were Backlog Claims relating to loans sold more than 90 days prior to being repurchased.

Second, a KPMG auditor, Christina Chinn, recalled being present at a meeting in the second half of 2005 with Kim and Kenneally where Kim raised issues related to the components of the repurchase reserve calculation and questioned whether it was appropriate to account for Future Loss Severity in the calculation. The issue was not resolved at this meeting, and Chinn did not recall either Kim or Kenneally taking a strong position either way. The Examiner believes that the fact that KPMG was questioning whether New Century was correctly calculating the repurchase reserve should have triggered action by KPMG and/or New Century to take a hard look at the calculation methodology, particularly since, as reported below, the level of repurchase claims increased in 2005, with the reported 2005 repurchase rate being almost double that of 2004.

However, through 2005, repurchases were not the focus of special interest at New Century, at least for most persons. Karl Weiss, Senior Vice President, Capital Markets, informed the Examiner that neither New Century's Investors, nor anyone in Management, paid special attention to repurchases until the middle of 2006 or later that year. Flanagan, head of New Century's Production Department, similarly told the Examiner that he believed New Century received few repurchase claims through 2005.

Robert Lent, the Vice President of Secondary Marketing who had responsibility for managing repurchase claims, had a different view. He detected signs of a trend toward increased repurchase claims in 2005. According to Lent, the level of repurchases started to increase in mid-2005 as a result of an increase in early payment defaults. Indeed, as reported in the Loan Quality portion of this Final Report (particularly Section V.), EPDs increased steadily from mid-2004 onward and the dollar amount of repurchases increased sharply in the second quarter of 2005 from under $25 million in the first quarter of 2005 to around $100 million per quarter for the remainder of 2005.

Third, new data became available in early 2006 that should have prompted New Century and KPMG to be concerned about potential Backlog Claims. On February 9, 2006, Christina Chinn, who was working on testing the adequacy of the New Century repurchase reserve, asked New Century for data about pending repurchase claims as of December 31, 2005. Lent responded via e-mail on February 10:

We had outstanding repurchase requests of $188mm at year end. The majority of which, $157mm, were for early payment defaults.

This communication should have been a significant red flag for New Century (and KPMG) that the 90-day look-back assumption might lead to a serious underestimation of likely repurchases for which a reserve was required. Assuming that Lent's data were correct (and KPMG so assumed), this meant that New Century as of December 31, 2005 had repurchase claims that represented approximately 1.8% of fourth quarter of 2005 loan sales (those sales were approximately $10.7 billion). Assuming a 20-25% success rate in refuting repurchase claims (roughly New Century's historical rate), this still meant that New Century could anticipate repurchases of around 1.4% of fourth quarter of 2005 loan sales, a rate much higher than the repurchase rate experienced for several years.

These data should have put New Century and KPMG on the alert for the possibility that the $188 million in repurchase claims reflected a certain amount of Backlog Claims. At a minimum, it should have prompted some detailed analysis by KPMG whether this suggested a new trend of significantly higher repurchase claims that could affect assumptions in the methodology for calculating the repurchase reserve. This did not happen. Indeed, a KPMG auditor advised the Examiner that KPMG did not take the $188 million in claims into account in calculating New Century's repurchase reserve for the fourth quarter of 2005.

KPMG's substantive procedures for its 2005 audit involved consideration of the Risk of Significant Misstatement ("RoSM") at the significant account and disclosure level "because such consideration directly assists in determining the nature, timing and extent of further audit procedures at the assertion level." RoSM requires consideration of both the inherent risk and the control risk associated with the repurchase reserve calculation. KPMG reported that it regarded the RoSM with respect to New Century's repurchase reserve calculation as "moderate" in 2005 and determined that the controls in place at the time were "effective." The level of RoSM assessed by KPMG dictated the nature, timing, and extent of substantive audit procedures to be performed (e.g., tests of details, third-party confirmations, substantive analytical procedures, etc.). "The higher [our] assessment of the risk of significant misstatement the more persuasive the audit evidence we obtain from substantive procedures."

KPMG was aware that New Century had experienced significantly higher repurchases in 2005 than 2004 and that its pending claims were high as well at year end 2005. Thus, as noted previously, KPMG was informed that New Century had $188 million in pending repurchase claims as of December 31, 2005. Further KPMG's workpapers from January 2006 demonstrate KPMG's knowledge that New Century had spent $332.1 million in 2005 on repurchases, compared to $135.4 million in 2004. Such data clearly should have alerted KPMG to an ominous trend in repurchases and should have triggered inquiry into whether New Century was adequately reserved for repurchase claims. However, no such inquiry took place. Rather, KPMG's audit procedures[345] in connection with the 2005 audit of the repurchase reserve were limited to re-performing and validating underlying data pertaining to the calculation of the repurchase reserve and analytically reviewing those data.

---

[345] Audit procedures included KPMG's tests of controls as well as their analytical and substantive testing. The Examiner has focused on the analytical and substantive testing for the repurchase reserve since these procedures were also employed during the quarterly reviews.

The KPMG conclusion memorandum pertaining to the New Century repurchase reserve for the 2005 audit summarized its procedures to roll forward the repurchase reserve account balance for the fourth quarter of 2005 and to test the mathematical accuracy of the Company's worksheet for calculation of the repurchase reserve. In this connection, KPMG reviewed and annotated the various components used to calculate the repurchase reserve and documented its understanding of factors used to calculate the repurchase reserve. The memorandum was prepared by Chinn and initialed by Debbie Biddle and Mark Kim. It sets forth, among other things, the following:

- YTD 2005 loan repurchases had more than doubled, from the 2004 figure of $135.4 million to $332.1 million

- As of the time of the audit, there were $188 million in outstanding repurchase requests, of which $157 million were first payment defaults.

KPMG concluded that the "methodology estimates and data used in determining the Company's reserve for future repurchases and expected losses [and] the amount reserved...appear reasonable."

The Examiner concludes that KPMG must be faulted for its handling of this information. For the fourth quarter of 2005, New Century calculated based on historic averages from 2001 onward that the repurchase percentage would be 0.659%. Then, using whole loan sales from the fourth quarter of 2005 ($10.715 billion), New Century determined that $70.648 million of those sales would likely need to be repurchased. KPMG accepted these figures. In the process, however, New Century and KPMG ignored the documented fact that there were $188 million in actual pending repurchase claims at December 31, 2005. Assuming that New Century could refute about 25% of those claims, this meant that approximately $141 million in loan sales pending as of December 31, 2005 would need to be repurchased — more than double the $70.648 million calculated by New Century and accepted by KPMG. The large difference between these numbers should have prompted both New Century and KPMG, at a minimum, to inquire whether the repurchase reserve calculation methodology needed to be reexamined. This did not happen.

KPMG did not document in any detail its bases for its conclusion that New Century's 2005 repurchase reserves were reasonable. For example, a note in the KPMG workpapers relating to "Historic Loss Rate on Discounted Loan Sales" states:

- 193 -

> Historic loss rate on discounted loan sales (since January 1, 2003) as calculated by
> the Company, [was] 13.38% at 12/31/05 appears reasonable as it is fairly
> consistent with [the prior quarter]. In addition, losses experienced on discounted
> sales during Q4 is 13.42%, the loss rate utilized in the reserve appears consistent
> with actual losses experienced.

The Examiner's investigation did not reveal any information suggesting that KMPG questioned New Century about the adequacy of this historic loss rate to cover future period liabilities. Similarly, there is no evidence that KPMG questioned New Century with regard to the repurchase percentage of 0.659% despite being informed of the $188 million of pending repurchase claims at December 31, 2005. The Examiner received no explanation as to how KPMG could have satisfied its professional responsibilities without probing such data.

In addition, in its SOX review for 2005, KPMG identified New Century's failure to adopt a formal policy for estimating the repurchase reserve as a control deficiency. KPMG's 2004 SOX review had similarly determined that New Century lacked formal documentation setting forth its repurchase reserve estimation process. KPMG observed in its 2005 SOX audit that New Century had failed to take steps to remedy the 2004 problem in 2005.

In November 2005, Trevor Drummond of New Century prepared a memorandum to the Accounting File regarding the Allowance for Repurchase Losses, which set forth a description of New Century's repurchase accounting processes. In December 2005, KPMG reviewed the memorandum and initially took the position that the memorandum did not remediate the deficiency of a lack of formal policies and procedures, noting that the memorandum was in draft form and not finalized. However, one day later, and without further explanation, KPMG decided that the draft memorandum satisfied the required remediation and the issue was "cleared" without exception. The Examiner cannot understand how KPMG could so conclude since the memorandum is most noteworthy for its generalities and its failure to set forth any of the required elements of the repurchase reserve calculation. The memorandum, in full, is as follows:

> Generally Accepted Accounting Principles ("GAAP") for recognition of loan
> losses is provided by Statement of Financial Accounting Standards No. 5,
> "Accounting for Contingencies ("SFAS No. 5')". An estimated loss from a loss
> contingency, such as the potential repurchase of loans, should be accrued when,
> based on information available prior to the issuance of the financial statements, it
> is probable that an asset has been impaired or a liability has been incurred at the
> date of the financial statements and the amount of the loss can be reasonably
> estimated. Additional guidance on the recognition, measurement, and disclosure
> of loan losses is provided by Emerging Issues Task Force ("EITF') Topic No. D-

80, Application of SFAS No. 5 and No. 114 to a Loan Portfolio (EITF Topic D-80), Financial Accounting Standards Board Interpretation No. 14, "Reasonable Estimation of the Amount of a Loss ("FIN 14")"and the American Institute of Certified Public Accountants (AICPA) "Audit and Accounting Guide, Banks and Savings Institutions".

**General**

The allowance for repurchase losses on loans sold relates to expenses incurred due to the potential repurchase of loans or indemnification of losses based on alleged violations of representations and warranties which are customary to the mortgage banking industry. Generally, repurchases are required within 90 days from the date the loans are sold. Occasionally, New Century Financial Corporation ("the Company") may repurchase loans after 90 days have elapsed. In connection with its allowance for repurchase losses on loans sold, the Company establishes an allowance for loan losses based on its estimate of losses inherent and probable as of the balance sheet date. The Company evaluates the adequacy of this allowance each quarter, giving consideration to factors such as the current performance of the loans, credit characteristics of the portfolio, the underlying value of the collateral and the general economic environment. Using historic experience and taking into consideration the factors, above, the Company estimates an allowance for repurchase losses, which it believes is adequate for known and inherent losses. Provisions for losses are charged to gain on sale of loans and credited to the allowance while actual losses are charged to the allowance.

**Accounting**

The accounting for the repurchase reserve, if necessary, is recorded upon the completion of analysis with current quarter's repurchase reserve balance. To aide with the analysis, historical data is used as a guide to assist in evaluating a recommended balance, per FIN 14. Also, documented analysis from Secondary is used as a reference when reviewing the repurchase reserve balance per quarter. If an adjustment is required, the appropriate management review will be obtained and the transaction will be recorded onto the financial statements.

####    b.    Repurchase Reserves in the First Quarter of 2006

In the first quarter of 2006, New Century continued to use its existing methodology to calculate the repurchase reserve. A historical repurchase rate was calculated by dividing New Century's total repurchases from the beginning of 2001 through the end of 2005 by New Century's total whole loan sales over the same period. This calculation resulted in an estimated repurchase rate of 0.689% for the first quarter of 2006. New Century then applied this percentage to the first quarter of 2006 whole loan sales to estimate the dollar amount of loans New Century was likely to repurchase. The Examiner found no evidence that New Century or

KPMG in preparing or evaluating the first quarter of 2006 repurchase reserve focused on the reported $188 million in outstanding repurchase claims that existed at year-end 2005 or the number of pending claims as of March 31, 2006 as part of determining the quantity of loans that might be repurchased. New Century then determined the Future Loss Severity and Premium Recapture components of the reserve calculation by applying these rates to the volume of loans estimated to be repurchased, resulting in New Century's total repurchase reserve for the first quarter of 2006 in the amount of $6.916 million.

For the period ended March 31, 2006, New Century prepared a standard worksheet entitled "Analysis of Adequacy of Repurchase Reserve," which KPMG reviewed as it did in all reporting periods. The workpaper documented KPMG's review, bearing the initials of several KPMG auditors, including Donovan, Kim and Chinn. The worksheet includes, among other things, the following entries:

- Estimated Potential Future Repurchases $80.5 million

- Estimated Potential Repurchases with Losses $44.4 million

A comparison of these figures with those from the first quarter of 2005 reveals that the estimated potential future repurchases had more than doubled, from $29.7 million to $80.5 million. Estimated potential repurchases with losses more than doubled, from $18.9 million to $44.4 million. The Examiner found no evidence that this substantial increase resulted in more than a routine inquiry into whether the repurchase reserve was correctly calculated.

### c. The New Century Repurchase Reserve in the Second Quarter of 2006

In the second quarter of 2006, New Century repurchase claims continued to rise. According to a New Century "Repurchase Activity" slide presentation dated September 2006, which was circulated widely, including to senior members of the Accounting Department, repurchase claims as a percentage of production volume nearly tripled in the first half of 2006 compared to 2005 levels.[346] This same presentation estimated that as of July 2006, $150 million in repurchase claims were outstanding and that 30% of the $150 million ($45 million) were from 2005, thus putting the New Century Accounting group directly on notice that New Century had significant Backlog Claims and that the 90-day look-back resulted in New Century ignoring such

---

[346] From 0.57% of 2005 production volume to 1.62% year-to-date July 2006 production volume.

- 196 -

Backlog Claims. This is the quarter in which the repurchase reserve calculation methodology began to be modified.

First, New Century's practice was to calculate its estimated repurchase percentage rates based on historical rates going back to 2001. However, in the second quarter of 2006, as repurchase claims continued to rise and the market was shifting in a negative direction, New Century decided that the estimated repurchase percentage rate should reflect more current trends. As a consequence, the Accounting Department modified the historical time period for calculating the estimated repurchase percentage to the beginning of 2004 (instead of 2001) through the second quarter of 2006. Kenneally advised the Examiner that he believed that this change would make the repurchase reserve calculation more sensitive to then-current economic conditions. This change resulted in a new estimated repurchase rate of 1.0% for the second quarter of 2006, compared to the 0.689% rate used in the first quarter of 2006.

Second, the Accounting Department eliminated Inventory Severity from the repurchase reserve calculation. As noted, Inventory Severity was an amount intended to estimate the future losses to be incurred on loans that had already been repurchased. Inventory Severity had been consistently a component of the repurchase reserve calculations in prior financial reporting periods and then would be reclassified on the balance sheet into a LOCOM valuation allowance account and reported as a contra-asset to LHFS. However, according to New Century's repurchase reserve analysis worksheet for the second quarter of 2006, the Inventory Severity component was removed in the second quarter of 2006 from the calculation because the amount was believed "appropriately [to be] considered in [the Company's] LOCOM [lower of cost or market] analysis." This turned out to be an error, as discussed in the LOCOM discussion.

The Examiner investigated to determine how Inventory Severity came to be eliminated from the repurchase reserve calculation in the second quarter of 2006, with no notice thereof to the Audit Committee or most members of Senior Management, aside from Dodge who likely knew of the change. The precise sequence of events is not clear. However, from all the data, the Examiner concludes that this accounting change reflects a combination of a suggestion from Kim of KPMG that such a change was consistent with GAAP and a subsequent decision by the Accounting Department, after a review of accounting literature, to effectuate the change. There was no notification made by the Accounting Department or KPMG to the Audit Committee,

which was at this very time seeking assurance that New Century's reserves were adequate. The approximate sequence of events is as follows.

Kenneally recalled that this change occurred as a result of a suggestion from Kim. Kenneally said the proposed change in the methodology was first mentioned in mid-July 2006, when Kenneally was foeused on closing the second quarter books. Kim initially proposed the change at a meeting with Sanchez, who reported on the meeting to Kenneally. According to Kenneally, Kim informed Sanchez that New Century might be double-counting and over-reserving this category of loss. When New Century repurchased loans, it held those loans on its balance sheet at their par value pending sale. When New Century performed its LOCOM analysis, it would offset the mark-to-market losses from these repurchased loans by other loans held for sale that had market values in excess of cost, thus not realizing any loss for repurchased loans. However, until the second quarter of 2006, a separate mark-to-market calculation was made for the repurchased loans as part of the repurchase reserve calculation and the amount was reclassified to a contra-asset account against LHFS. Since the loans had been marked to market as part of the LOCOM analysis, Kim informed Sanchez that New Century did not need to record the loss related to these loans. Kenneally and KPMG now recognize that this view was incorrect under relevant accounting principles and the Company's application of GAAP with respect to LOCOM, which still required a mark to market calculation for Inventory Severity for the loans repurchased.

Kenneally recalled that after he had heard this KPMG suggestion, he and Sanchez reviewed accounting literature and concluded it made sense. Kenneally acknowledged that an added benefit of this change to the calculation was a credit to the income statement in an amount he later estimated to be approximately $21 million.

Sanchez's recollection of events was similar to Kenneally's. He recalled discussing issues related to the repurchase reserve calculation with Kim in connection with quarter-ending work related to the second quarter of 2006. According to Sanchez, Kim explained how New Century needed to include Interest Recapture in its repurchase reserve calculation but should not include Future Loss Severity or Inventory Severity in the calculation. Sanchez mentioned this conversation in an e-mail to Kenneally and Walker dated July 28, 2006: "[r]epurchase reserve [was] called into question by Mark Kim, BUT I was somewhat successful after a root canal meeting...He agrees that our new way is better...." (emphasis in original). According to

- 198 -

Sanchez, this conversation with Kim in July 2006 was when Sanchez was first introduced to the possibility of changes to the methodology for calculating the repurchase reserve.[347] However, at his interview with the Examiner, Sanchez did not recall Kim discussing the issue of double-counting the loss as a result of the LOCOM calculation. Also, while Sanchez recalled that Kim had suggested in or around July 2006 that Interest Recapture needed to be added to the repurchase reserve calculation, that was not done in the second quarter of 2006 and no other interviewee recalled the mention of Interest Recapture at that time. The Examiner cannot reach a final determination whether Interest Recapture was discussed in the second quarter of 2006 timeframe.

Walker became aware of the change to the reserve calculation in the second quarter of 2006 because it affected the work she performed to prepare the Form 10-Q. Walker said she recalled speaking to Kenneally about this while he was simultaneously speaking to Dodge on the phone. According to Walker, Kenneally told her and Dodge that it was no longer necessary to include repurchased loans in the reserve because this amounted to "double-counting" or "double-dipping." Walker recalled Kenneally saying he "had a conversation with KPMG" or "ran it by KPMG," and that KPMG agreed with the change to the calculation. She remembered that Kenneally said he discussed this with Kim.

The Examiner investigated these communications in several interviews with Kim, who had inconsistent recollections of what he did and knew at various times. Kim told the Examiner that he was not aware that New Century removed Inventory Severity from the repurchase reserve calculation in the second quarter of 2006 and did not recommend it. However, these statements must be viewed together with the fact that Kim did recall having a conversation with Kenneally in the second quarter of 2006 about whether the severity adjustments to the repurchase reserve calculation would result in a potential double-counting given the Company's LOCOM analysis.

Kim initially told the Examiner that he did not know about the second quarter Inventory Severity change until the year-end 2006 audit. However, Kim acknowledged that he discussed the removal of Inventory Severity from the reserve calculation with Kenneally, but he was not sure that the discussions took place in the second quarter. He said he believed Kenneally was going to do his own research on the issue and the Company would formulate its own position.

---

[347] Sanchez's recollection is not precise as to the time of this and other conversations with Kim, which he says may have occurred at earlier dates and involved the issues of the three-month look-back period and the inclusion of interest in the reserve calculation.

Moreover, a number of KPMG workpapers contradict Kim's recollection that he had no contemporaneous knowledge of the second quarter of 2006 change to the repurchase reserve calculation methodology. For example, Kim's initials appear on an analysis of the repurchase reserve calculation, which specifically notes that the "Mark To Market on Repurchases Not Yet Sold" (*i.e.*, Inventory Severity) was not applicable because it was "appropriately considered in the LOCOM analysis." Kim stated that he did not remember whether he noticed the change had been made when he initialed the papers on August 7, 2006.

Additionally, Chinn prepared a "Balance Sheet Analytics" workpaper, also approved by Kim, for the period ending June 30, 2006, which directly addressed the discontinued use of Inventory Severity, using the following language:

> The decrease in this account from both March 31, 2006 and June 30, 2005 is due to discontinued use. This account was used by the Company as a valuation allowance to mark certain loans repurchased not yet sold. However, in the current quarter the Company has discontinued use of this account as these repurchased loans are properly included in the LOCOM analysis of loans held for sale.

Kim's handwritten revisions to this paragraph in a prior version of this Balance Sheet Analytics workpaper appear verbatim in this final version. Kim acknowledged that the comments were his, but nonetheless insisted that that he did not recall making them or having discussed the change in calculation methodology with anyone.

The Examiner concludes that KPMG knew of the elimination of Inventory Severity and that Kim almost certainly provided advice in connection with the second quarter of 2006 financial statements concerning the elimination of Inventory Severity from the repurchase reserve calculation. The Examiner also concludes that New Century personnel did not simply rely on this KPMG suggestion but also sought to review accounting literature to some extent to confirm that the change was appropriate. The Examiner is aware of no effort by KPMG to assess through a review of accounting literature whether such a change would be appropriate.

In connection with the second quarter of 2006 financial statements, KPMG did not prepare a specific repurchase reserve conclusion memorandum to accompany its workpapers.[348] KPMG workpapers indicate that KPMG tested the mathematical accuracy of the New Century second quarter of 2006 reserve computation. There is no indication that KPMG questioned the

---

[348] It was KPMG's practice to prepare conclusion memoranda on some significant accounting issues in its year-end audits and on some Forms 10-Q.

applicability of the use of historic repurchase rates, the exclusion of potential Backlog Claims from the repurchase reserve calculation, the elimination of Inventory Severity, or the lack of accounting for Interest Recapture.

The Examiner is further troubled by the handling of the second quarter of 2006 change to the calculation methodology because this matter was not disclosed to the Audit Committee. The Audit Committee met on July 26, 2006 and repurchase reserves were a specific topic of discussion. The minutes indicate that "Mr. Sachs then asked a question about the adequacy of the Corporation's repurchase reserves and Mr. Donovan [KPMG] and Ms. Dodge [New Century] responded." Neither Donovan nor Dodge disclosed the changes, although Kenneally advised the Examiner that he assumed that the changes had been discussed since repurchase reserves were on the agenda for that meeting. [349]

### d.    Repurchase Reserves in the Third Quarter of 2006

#### i.    New Century makes additional changes to the calculation of the repurchase reserve

New Century made further changes in the third quarter of 2006 to its methodology for calculating the repurchase reserve, raising the repurchase rate percentage, eliminating Future Loss Severity and adding Interest Recapture to the calculation. The Examiner describes these changes below.

First, New Century raised the estimated repurchase percentage rate from the one percent in the second quarter of 2006 to 1.75% in the third quarter of 2006. The increased repurchase percentage was the product of discussions among the Secondary Marketing, Accounting and Finance Departments, and grew out of a recognition that the historical calculation no longer reflected the current market environment.[350] Kenneally later believed that the estimate of 1.75% used in the third quarter of 2006 may have been low and observed that a rate of 2.75% was intended to be used in the fourth quarter of 2006 forecast.

Second, Kenneally informed the Examiner that he excluded Future Loss Severity from the repurchase reserve calculation in the third quarter of 2006 because KPMG recommended that the reserve should only consist of an estimate of Interest and Premium Recaptures. Kenneally

---

[349] Kenneally was not present at this Audit Committee meeting because he was attending a conference out of town.

[350] The 1.75% figure was based on an expected repurchase claims rate of 2-2.25% and the assumption that 20-25% of such claims would be successfully refuted. Kenneally stated that the increase from one percent to 1.75% in the third quarter of 2006 was in direct response to a larger number of repurchase claims in June 2006, and was done in consultation with Dodge and Cloyd.

told the Examiner that Kim initially proposed this change to the methodology to Sanchez. Kenneally told the Examiner that the purpose of the removal of Future Loss Severity in the third quarter was to implement fully what he and Sanchez had started, at Kim's suggestion, in the second quarter of 2006. Sanchez told the Examiner that Kim told him that the Company should not include the loss on future repurchases, but that Kim did not explain this. According to Sanchez, Kim and Kenneally had a separate meeting, following his own meeting with Kim, that he did not attend. Sanchez told the Examiner that Kenneally said to him, in late September or early October, that he had spoken to Kim and would consider whether to change the reserve calculation.

Kim acknowledged that Future Loss Severity had been removed from the repurchase reserve calculation in the third quarter of 2006. He told the Examiner that his recollection of what occurred in the third quarter of 2006 was limited to knowledge that: (i) interest to be refunded to investors had been added to the reserve calculation; (ii) that New Century had changed the historical experience methodology; and (iii) that losses on future repurchases were not being included in the calculation.

There is also contemporaneous documentary evidence of KPMG's and Kim's knowledge of the removal of Future Loss Severity in KPMG's quarterly review of documents produced by the Company each quarter entitled, "New Century Mortgage Corporation Analysis of Adequacy of Repurchase Reserves," dated March 31, June 30 and September 30, 2006. In these quarterly documents, there are itemized dollar amounts for Future Loss Severity for the first two quarters of 2006, referred to as Estimated Potential Repurchases with Losses. That entry was removed in the third quarter, however, and the entry for Estimated Losses on Future Repurchases was comprised solely of the estimated Interest and Premium Recapture. KPMG is linked to contemporaneous knowledge of this change not only by virtue of the fact that Kim reviewed and initialed these documents, but also because Kim advised New Century that the change documented in these workpapers, *i.e.*, the substitution of interest and premium costs for Future Loss Severity, was appropriate.

Specifically, Kim admitted to the Examiner that he had advised Sanchez only that Premium and Interest Recapture should be reserved and not Future Loss Severity. He told the Examiner this conclusion was justified by equating the sum of estimated Premium Recapture and estimated Interest Recapture to Future Loss Severity – as set forth in the third quarter analysis

- 202 -

document Kim initialed. Kim also conceded that even if he once held this belief, he did not do so any longer. He explained that he abandoned this belief when he learned of paragraph 55 of FAS 140 in the early part of 2007.

Kim told the Examiner that he advised Sanchez in September 2006 that there was no accounting literature applicable to the issue of calculating the repurchase reserve. Kim admitted that when he so advised Sanchez, he did not know that paragraph 55 of FAS 140 applied to repurchase reserve calculations. Indeed, according to Kim, he was not even aware of paragraph 55 of FAS 140 until January 2007, when he was copied on an e-mail from Donovan to Kenneally discussing it. In that e-mail, Donovan sought to explain in simple terms the concept of severity with respect to repurchases. Citing paragraph 55 of FAS 140, the e-mail stated:

> When you repurchase the loan it needs to come back at fair value. In the example yesterday, if you repurchase the loan for 104, and you determine for whatever reason the loan is only worth 90 then you have to record the loan at 90. 14 would be debited to the reserve and 90 is the new cost basis for the loan when you put in loans held for sale.

Walker recalled that when the issue of the potential accounting errors came to her attention in January 2007, Kenneally forwarded her this e-mail with the reference to paragraph 55 of FAS 140. Walker experienced a "mouth-dropping" moment when she read the e-mail and realized severity had been eliminated from the reserve calculation. In Walker's opinion, paragraph 55 of FAS 140 required, among other things, that potential repurchase liability be reserved for — and because severity is the loss contingency on repurchases that has to be reserved for — the removal of the severity components from the reserve calculation did "not make sense to [her] at all."

Dodge did not remember specifically when she first learned about the repurchase reserve calculation methodology changes, although she believes she would have known about the changes by November 2006 when Kenneally made a presentation to the Audit Committee on the LOCOM analysis. Morrice told the Examiner, however, that Dodge said that Kenneally told her about the changes when they occurred and that KPMG had approved them. Kenneally also told the Examiner that he briefly discussed the methodology change with Dodge, explained that the suggestion was made by KPMG, and that Kenneally and Sanchez had reviewed the literature and that KPMG's position made sense.

These third quarter of 2006 changes to the repurchase reserve calculation methodology were not revealed to the Audit Committee despite many opportunities for KPMG and Management to do so. In the fourth quarter of 2006, there were four meetings of the Audit Committee attended by Kenneally, Kim and Donovan. According to the minutes of these meetings, a report to the Committee from KPMG was always the first item on the agenda. At the October 25 meeting, Donovan advised the Committee that "management's estimates with respect to its repurchase reserves were considered adequate when compared to historical experience." At other meetings, Donovan and Kim reported to the Committee on the adequacy of internal controls over financial reporting and the lack of material concerns with respect to Management's preparation of financial information. Despite these repeated and ample opportunities for Accounting and KPMG to apprise the Audit Committee of the significant modifications to the repurchase reserve calculation which had occurred in the prior two quarters, neither disclosed this information to the Committee

### ii.     KPMG's analysis of the adequacy of the repurchase reserve in the third quarter of 2006

For the quarter ended September 30, 2006, KPMG analyzed the adequacy of New Century's repurchase reserve. A New Century worksheet was prepared by Theresa Lam and approved by Sanchez. Kim initialed the analysis.

The New Century worksheet estimated potential future repurchases in the amount of $242 million (more than double the prior quarter's $101 million). Because New Century did not include any severity component in the third quarter of 2006 repurchase reserve calculation, the component estimating potential repurchases with losses was eliminated. The estimated losses on future repurchases included only Interest and Premium Recapture. The actual repurchase reserve amount in the third quarter of 2006 as reported in the New Century Form 10-Q was $10.373 million, which was $1.681 million less than the reserve of $12.054 million for the second quarter of 2006, despite a tremendous increase in repurchase claims in 2006. If Future Loss Severity had remained in the repurchase reserve in the third quarter of 2006, and if it had been calculated consistent with the method employed in the second quarter of 2006, the reserve calculation would have been approximately $28.1 million greater than reported.

Unlike the first and second quarters of 2006, KPMG completed a repurchase reserve conclusion memorandum for the third quarter of 2006. The procedures identified in this memorandum were: (i) "Analyze [New Century's] accounting change given current accounting

literature to decide the proper accounting and disclosure requirements"; and (ii) "Analyze the method of calculating the repurchase reserve for reasonableness."

The memorandum included an analysis of two changes made in the third quarter repurchase reserve calculation. First, it documented that New Century increased the rate at which loans were expected to be repurchased to 1.75%, to account for changes in the operating environment, but did not document any testing on whether such an increase was adequate.

Second, the memorandum documented the addition of Interest Recapture as part of the reserve. It indicated that the component known as Estimated Losses on Future Repurchases previously included Future Loss Severity, but was now comprised solely of Premium and Interest Recapture. The memo stated that the reason for the change was that the "former method was essentially an adjustment that is accounted for in the Company's LOCOM adjustment."

KPMG concluded that the changes constituted a change in accounting estimate, and not a change in accounting principle in accordance with FAS 154, *Accounting for Changes and Error Corrections*. Finally, the KPMG memorandum concluded that "[t]he calculation appears appropriate as a method of estimating the Company's repurchase reserve liability." The KPMG memorandum reflected no evidence that KPMG undertook any careful review of these changes in calculation methodology by New Century. Similarly, the Examiner's interviews with KPMG personnel established that KPMG merely discussed such changes but undertook no rigorous review to assess whether the changes complied with GAAP or relevant accounting literature, such as FAS 140.

### iii.    The growing backlog of repurchase claims should have caused New Century to increase the repurchase reserve

The calculation of the New Century repurchase reserve was further flawed because New Century in the third quarter of 2006 continued to fail to take into account the growing Backlog Claims.

New Century experienced an increase in repurchase claims beginning in the fourth quarter of 2004 and continuing at a much greater rate in 2006. As such claims continued to grow, the Accounting Department continued to compute the quantity of loans that might need to be repurchased as of the close of a reporting period based on the assumption that only the loans that were sold in the prior 90 days before the financial statement reporting date would be susceptible to repurchase. This was a significant error, resulting in a material underestimate of the required repurchase reserve.

- 205 -

New Century failed to keep careful records of its unresolved repurchase claims. Had it kept careful records, it would have learned at an early date of the growing amount of Backlog Claims relating to loans sold before the 90-day look-back period. This is an internal controls deficiency, which is discussed in Section VIII. of this Final Report.

Even though New Century did not maintain accurate data regarding the growing Backlog Claims, their existence was no secret. For example, New Century's Treasurer, Jeffrey Goldberg, performed a liquidity analysis in June 2006. In doing so, he became worried about the level of repurchases, which had reached $200 million in the second quarter of 2006. This was the largest volume of repurchases in at least three years. In a June 13, 2006 e-mail transmitting his liquidity analysis to Dodge and Kenneally of the Accounting Department, Goldberg predicted that liquidity would drop to $310 million by the end of the year, which he characterized as being "at the low end of the range." He explained that the pressure on liquidity was coming from, among other sources, "a whole bunch of outstanding repurchase requests." According to Goldberg, the problem of the growing backlog of repurchase claims was a matter of "general knowledge" within the Accounting, Finance and Secondary Marketing groups. At a minimum, Goldberg's June 13, 2006 e-mail to the two senior members in the Accounting Department put them on notice that Backlog Claims existed and that someone needed to investigate to determine if they should be taken into account in the calculation of the repurchase reserve. The Examiner found no evidence that anyone in the Accounting Department undertook such an effort.

Other data also put the Accounting Department on notice that Backlog Claims were significant. For example, in September 2006, a Repurchase Activity document was created and was presented at the September 2006 Business Unit Review meeting, which was attended by many members of the Accounting Department. Indeed, the Examiner determined that Cloyd e-mailed the document to Dodge on September 6, 2006. The document noted that the author had estimated that $52.9 million of the $153.9 million in then-pending repurchase claims were from 2005 and that another $19 million in claims were more than three months old.

Similarly, between August and October 2006, New Century was seeking to better organize its tracking of repurchase claims. As part of that effort, Secondary Marketing concluded that, as of October 31, 2006, there were $421 million in outstanding repurchase claims. The data that were widely distributed within New Century in Key Indicator Reports and other documents, including to Dodge and Kenneally, showed the following:

| Date | Pending Claims |
|------|----------------|
| December 31, 2005 | $143,008,639 |
| March 31, 2006 | $281,625,528 |
| June 30, 2006 | $199,120,740 |
| September 30, 2006 | $399,757,399 |

The foregoing analysis, whether precisely accurate or not,[351] demonstrated that New Century had a large and growing amount of repurchase claims, a substantial portion of which likely were Backlog Claims, and that senior members of New Century's Accounting Department were aware of these data. However, they took no action to analyze whether such data required reexamination of the method of calculating the quantity of loans that were estimated to be subject to repurchase claims as of September 30, 2006. The Examiner discovered no satisfactory explanation for this failure.

The Examiner dismisses as not credible one such explanation. Certain Accounting Department personnel suggested that it was not until approximately January 2007 that they understood the magnitude of the potential backlog and its likely significance, blaming Secondary Marketing for failing to make the Accounting Department aware of Backlog Claims. Indeed, Kenneally told the Examiner that on January 10 or 11, 2007, while he and Sanchez were meeting with Weiss and Licata to discuss repurchase data, a "light went on" when Kenneally realized that there was a backlog. He told the Examiner that he had always believed that claims in the "pipeline" (*i.e.*, being evaluated and processed) were not material to the reserve calculation as long as the number of such claims remained stable over time. Sanchez similarly told the Examiner that he learned in January or February 2007 about the significant backlog of repurchase requests. He recalled learning this from Walker while she was working with Kim to correct the repurchase reserve. This explanation does not fit the facts.

As noted above, Kenneally and others in the Accounting Department were provided documents in at least June, September and October 2006 indicating that Backlog Claims existed. Despite this information, the Accounting Department failed to investigate. While the Secondary

---

[351] The Examiner sought to determine whether the data in the foregoing table were accurate. The Examiner could make no precise determination, especially with regard to the older data, given New Century's poor recordkeeping with regard to repurchase data. Nonetheless, the Examiner believes that this chart presents reasonable estimates of the repurchase claims pending at the indicated times.

Marketing Department could have done a much better job of regularly informing the Accounting Department of the quantity and vintage of repurchase claims, Accounting Department personnel were certainly on sufficient notice that their professional obligation was to conduct a careful analysis.

### e.    Fourth Quarter 2006:    Questions About New Century's Repurchase Reserve

In November 2006, Bindra became New Century's CFO. Within two months, events unfolded that demonstrated that New Century's repurchase reserve calculation methodology was in error. The main milestones in this sequence of events may be summarized briefly.

On November 27, 2006, Bindra received an e-mail from Morrice, suggesting that it might be advisable to review the repurchase reserve, including its calculation, with a view toward increasing the reserve amount. Morrice's e-mail, which was copied to Dodge, Kenneally and Cloyd, stated:

> I saw in the most recent 4Q forecast a reference to increasing the repurchase reserve. Probably a good idea, but I would still like to review how we calculate the reserve. I am especially curious about this given that, as far as I know, we still do not have a good methodology for forecasting repurchases. Please advise on current approach.

Dodge responded to Morrice's e-mail in a way which gave no indication of the recent changes to the repurchase reserve calculation methodology:

> Actually we have always looked at a combination of historical experience and recent trends, the question is how much weight to put in the recent trends. In the third quarter we recognized the upward trend and increased the frequency factor to 1.75%. You can make an argument that we didn't go high enough, given the October requests, but November requests have been pretty light. To be safe, Dave and I felt that an additional reserve was warranted, at least for the forecast.

Bindra was confused by Dodge's e-mail. He asked:

> I am confused by patti response did we change from looking at historical information to trying to estimate the upcoming quarters repurchase level to estimate the level of reserve or not in 3q?

Kenneally responded to Bindra in an e-mail message that appears inconsistent with the changes to the method of calculating the repurchase reserve that Kenneally had implemented in the second and third quarters of 2006:

> *We really haven't changed the process or methodology.* We have always considered both the historical mathematical answer and then existing conditions

and market trends, i.e., judgment. What ended up happening is that the market was fairly stable until we got into 2006, so history served as a good indicator/predictor until then, and was weighted fairly heavily as the primary driver.

In 2006, particularly at the end of Q3, we acknowledged that history wasn't the best predictor/indicator of activity and weighted the trends and market conditions more heavily, and thus came up with an expected percentage that had more judgment involved that relying on the historical math as the primary driver. (Emphasis supplied.)

The highly selective description of the repurchase reserve calculation in Kenneally's e-mail suggests a lack of candor, particularly given that he began the e-mail by stating that New Century had not changed "the process or methodology" for the repurchase reserve calculation. That assertion is not accurate given that Inventory Severity and Future Loss Severity had been eliminated from the computation and Interest Recapture had been added to the computation. The Examiner acknowledges that Kenneally's e-mail focused on the use by New Century of historic versus current repurchase data as the best means for estimating the likely repurchase rate, which was the focus of Bindra's e-mail. However, Kenneally knew that a series of changes had been made to the repurchase reserve calculation methodology over the previous two quarters but did not mention them.

Shortly after this e-mail exchange, Kenneally prepared a draft memorandum on November 27, 2006 addressing the methodology for calculating the repurchase reserve. Kenneally's memorandum acknowledged that FAS 5, *Accounting for Contingencies*, applied to the recognition of loan losses, and that one of these contingencies was the allowance for loan repurchase losses - expenses and losses incurred due to the potential repurchase of loans. The memorandum identified the "return of premiums received from the investor, as well as a make whole of interest due to the investor," as the primary elements of expenses and losses related to loan repurchases.

Kenneally's memo did not mention that, prior to the third quarter of 2006, New Century excluded Interest Recapture from the reserve calculation. The memorandum also did not mention that New Century's calculation methodology included Inventory Severity through the first quarter of 2006 and Future Loss Severity through the second quarter of 2006.

Bindra remained unsatisfied with New Century's repurchase reserve after receipt of Kenneally's November 27 memorandum. He told the Examiner that his concern was prompted,

in large measure, by what he perceived as an apparent discrepancy between New Century's extremely high loan origination volume and relatively low repurchase reserve, which was $10.3 million when he arrived at New Century in November 2006. Because he believed New Century's repurchase reserve was far less than the comparable reserve for other mortgage banking companies and that its potential exposure to repurchase obligations was greater given larger origination volumes, Bindra continued to question how the New Century repurchase reserve was calculated and whether it was consistent with New Century's exposure to repurchase claims. Indeed, Bindra remained concerned, especially when he learned that New Century did not include severity components in the reserve, while the other companies did, based on an informal survey he conducted through personal and professional contacts in the mortgage banking industry.[352]

At or around this time, outside sources were noting the apparent differences between New Century's reserves and those of others in the industry. For example, in December 2006, the Center for Financial Research and Analysis ("CFRA") published a study comparing a number of mortgage companies, including New Century, across several important common measures. The study stated that New Century's loss rate on repurchases exceeded 26%, and that other lenders had a higher repurchase reserve than New Century to recognize these potential losses.

Kenneally wrote on January 15, 2007 what amounted to a rebuttal of the report's criticisms of New Century, disputing the conclusions of the report. Addressing the issue of the repurchase reserve, Kenneally stated that the Company's repurchase reserve made provision for the return of premium and interest, and that this was a concept "we have vetted in detail with KPMG." This rebuttal was circulated on January 15, 2007 to Morrice, Bindra, Cloyd and Dodge.

### f.     Discovery of the Repurchase Reserve Accounting Errors

In January 2007, New Century finally determined that it had materially and in multiple respects failed to calculate its repurchase reserve correctly for the first three quarters of 2006. A brief chronology of the discovery of those errors follows.

---

[352] Bindra told the Examiner that in December 2006, after seeing Kenneally's November memo on the repurchase reserve, he inquired as to why the reserve did not contain a "severity" factor. Kenneally told Bindra that severity was already included in the company's LOCOM analysis and was thus unnecessary. In January 2007, Bindra continued to ask questions and was informed by Kenneally that severity had in fact been removed from the calculation during 2006. At this point, Bindra reviewed peer disclosures and discovered that the lack of severity was out of step with the methodology employed by comparable companies to estimate the appropriate reserve.

On January 18, 2007, only three days after his rebuttal to the CFRA report, Kenneally and Sanchez met with Kim, Donovan and KPMG's SOX manager for an initial meeting to "kick-off" the 2006 audit process. Kenneally led a discussion of the repurchase reserve. He reviewed the methodology changes that had been implemented in the second and third quarters, and distributed copies of FAS 65, 114 and 5. Kenneally told the Examiner that everyone at the meeting agreed they were comfortable with the methodology, including Donovan and Kim.

The next day, January 19, 2007, Kenneally recalled that he received an e-mail from Donovan in which Donovan advised Kenneally that he had done more research on the reserve calculation, which suggested that New Century's calculation of the reserve was wrong. Kenneally recalled that Donovan identified paragraph 55 of FAS 140 as the basis for his belief that the New Century calculation methodology was wrong. Donovan told the Examiner that he first learned of the changes to the reserve methodology around the time of the January 18, 2007 meeting. He maintained this position despite being shown documentary evidence that he had initialed and commented on the balance sheet analytic workpapers in the second and third quarters and year-end 2006, which identified these changes.

After he got Donovan's e-mail, Kenneally asked Sanchez to look at paragraph 55 of FAS 140 and Donovan's e-mail, which had been based on input from Macaulay, the KPMG concurring partner. Sanchez told Kenneally that he thought KPMG was right. Kenneally acknowledged to the Examiner that he was shocked. Kenneally then reviewed the accounting literature over the weekend and decided that Donovan was correct. On Sunday, January 21, 2007, Kenneally called Bindra to notify him of the issues. He told Bindra he would work with Secondary Marketing to quantify the impact of the accounting errors.

Kenneally told the Examiner that both Kim and Donovan separately acknowledged to him prior to the restatement announcement that the changes to the repurchase reserve methodology were Kim's idea.

Donovan told the Examiner that he initially regarded the error as limited to the misinterpretation of FAS 140 with respect to the second and third quarter of 2006 changes, but that Kenneally came to him and said the numbers were a lot bigger because of the Backlog Claims. Kenneally told the Examiner that he knew the impact of the accounting errors would be material.

- 211 -

On January 31, 2007, the Audit Committee met. At the meeting, Kenneally reported that the Company had used an inappropriate methodology for calculating the repurchase reserve starting in the second quarter of 2006. Zona asked if KPMG knew about the changes, and Kim acknowledged that the changes had been the subject of discussions between KPMG and New Century. Kenneally also reported on the backlog issue and Morrice advised the Audit Committee that the Company's controls with respect to the backlog issue had been inadequate. Donovan also took the position that these matters signified a deficiency in internal controls over financial reporting. Bindra advised the Audit Committee that KPMG and New Century would need to review the Company's financial statements to determine the effect that these accounting errors would have on prior period financial results.

On February 6, 2007, Kenneally prepared a memorandum for Terry Theologides, New Century's General Counsel, on the accounting issues related to the repurchase reserves, which estimated that the incorrect accounting resulted in an overstatement by $21.69 million, or 16.1%, of second quarter 2006 pre-tax earnings, and $13.01 million, or 12.3% of second quarter 2006 net earnings. This memorandum concluded that the accounting issue had no material impact on the second quarter of 2006, and that the Company could correct the errors by restating the third quarter financial statements and by changing its estimates reported in the year-end financial statements. These events led to the February 7, 2007 announcement by New Century that its financial statements for the first three quarters of 2006 needed to be restated.

      **4.**     **Measuring the Amount of Understatement of the Repurchase Reserve**

The chart below summarizes the various components of the repurchase reserve calculation for the first quarter of 2005 through the third quarter of 2006 and displays the changes made to the reserve methodology in the second and third quarters of 2006.[353] As the chart shows, the modifications and exclusions are directly related to the erroneous accounting which led to the February 2007 restatement announcement.

---

[353] Since the calculations of the repurchase reserve were consistent for each quarter of 2004 and 2005, analysis of data was only performed for 2005 and 2006.

| Description | Q1 – 2006 & prior | Q2 – 2006 | Q3 – 2006 |
|---|---|---|---|
| Interest Recapture | Excluded | Excluded | Included |
| Premium Recapture | Included | Included | Included |
| Future Loss Severity | Included | Included | Excluded |
| Inventory Severity (LOCOM) | Included | Excluded | Excluded |
| Backlog Claims | Excluded | Excluded | Excluded |

The Examiner sets forth below a summary of each of the material errors that contributed to the material miscalculation of the repurchase reserve.

### a.    New Century's Failure to Account for the Backlog

New Century's repurchase reserve calculation failed to include potential losses associated with the Backlog Claims. During 2005 and through September 30, 2006, Backlog Claims never were considered in New Century's calculation of its repurchase reserve. Estimated expenses and losses on an assumed percentage of Backlog Claims expected to be valid should have been taken into account along with estimated expenses and losses on projected future repurchase claims. The failure to consider Backlog Claims is particularly troubling because of the explosive growth of Backlog Claims between year-end 2005 and September 30, 2006.

The Examiner concludes that both New Century and KPMG bear responsibility for ignoring the Backlog Claims. New Century knew of a large number of reported but unresolved claims at year-end 2005 ($188 million) and a further mounting volume of repurchase claims by no later than June 2006. Similarly, KPMG's workpapers for the 2005 audit reflect knowledge of the $188 million in outstanding repurchase claims, but KPMG took no steps to test whether the New Century repurchase reserve calculation took any or all of these claims into account.

The Company and KPMG assumed that only loans that it had sold during the 90 days prior to the reporting date were at risk of repurchase and that it would not repurchase any loans from any prior period. In reality, beginning no later than 2004, New Century was receiving repurchase requests related to loans sold outside of the previous 90-day period and it was taking much longer than 90 days to evaluate and process repurchase requests and repurchase loans. New Century was not reserving, however, for these loans that it might be required to repurchase, and on which it might incur losses and expenses, but for which no reserve was provided. An example will put this error in perspective.

If New Century sold $10 billion in loans in one quarter (the fourth quarter of 2005) and assumed that the repurchase rate was 1%, then New Century would assume for its December 31,

2005 financial statement that 1% of the loans sold in the fourth quarter of 2005 would be repurchased. The loans assumed to be repurchased would be calculated as being $100 million and the various reserve components, *i.e.*, Premium Recapture, etc., would be computed upon the $100 million in loans. This methodology, however, left out the growing backlog of loans sold prior to the fourth quarter of 2005 as to which repurchase claims were pending as of December 31, 2005.

In connection with both its annual audits and quarterly reviews, KPMG examined the 90-day look-back assumption and concluded that it was reasonable. Several KPMG witnesses told the Examiner that New Century Management represented to KPMG that repurchase requests were usually received and processed within 90 days of the date the loans were sold. The witnesses told the Examiner that KPMG's engagement team tested this representation by Management in two ways: (1) it reviewed the loan sales agreements to confirm that they contained provisions requiring New Century to repurchase loans under certain conditions only within 90 days of sale; and (2) it reviewed New Century's repurchase log to confirm that repurchases were actually being processed within 90 days of the sale.

The Examiner does not accept KPMG's position. First, at year-end 2005, KPMG, as shown in its workpapers, was told that New Century had a $188 million backlog of repurchase claims. The Examiner determined that KPMG did not test whether any of these $188 million in claims related to loans sold before September 30, 2005. If KPMG had investigated, it would have concluded either that the $188 million in pending repurchases identified must have included claims relating to sales outside the most recent 90-day period or else the repurchase rate, assumed to be 0.659% based on historic averages, would be far too low. Either way, the significant reported number of Backlog Claims at the end of 2005 should have alerted KPMG to assess carefully whether the Company's approach to quantifying its true repurchase liability was appropriate. Instead, KPMG ignored the issue.

Second, the Examiner's review of the whole loan sales agreements revealed varying and inconsistent repurchase provisions among agreements. Similarly, an internal review conducted by New Century in the summer of 2006 revealed the same thing. A Repurchase Research presentation from August 2006 specifically noted as a factor contributing to the backlog, "high variability in sale terms deal to deal, with some creating greater exposure for NC." The presentation explained further, "no time limit on investor to request repurchase" and "greater

- 214 -

variability leads to longer validation time."    The presentation recommended that loan sale agreements contain a "fixed time for notification of payment default" and a "standardized definition of payment default."

Third, if a repurchase request was based on a breach of representations or warranties contained in the loan documents, there was no time limit within which an investor was required to request that New Century repurchase the loan. It could request repurchase at any time during the life of the loan. Given the 90-day look-back assumption, losses incurred on the repurchase of loans based on breaches of representations and warranties that occurred after 90 days from the date of the loan sale were not accounted for in New Century's repurchase reserve. According to Lent, repurchase requests relating to breaches of representations and warranties increased significantly in mid-to-late 2006. Indeed, one Investor informed Lent that it had retained an outside firm to review the Investor's losses and that this might result in an increase of the number of repurchase requests based on breaches of representations and warranties.

Fourth, the loan sale agreement repurchase provisions relate only to the time within which an investor must "request" that New Century repurchase a loan and not the time within which New Century must actually "repurchase" the loan. Because New Century's repurchase reserve only took into consideration actual repurchases and did not account for repurchase requests received but not acted upon by the Company, the loan sale agreements could not have provided support for the 90-day look-back assumption in any event.

The Examiner also reviewed the repurchase log. The repurchase log identified loans New Century repurchased from 2001 forward.[354]    The log identified the date New Century originally sold the loan and the date New Century repurchased the loan. It did not identify the date New Century received an investor's repurchase request. Accordingly, while the repurchase log contained sufficient information to confirm whether loans were actually repurchased within 90 days of sale, it could not confirm whether repurchase requests were received by New Century within 90 days of sale. Based on the Examiner's review of the repurchase log, New Century rarely repurchased loans within 90 days of the date the loans were sold. In most cases, the log reflected more than 90 days between the date the loans were sold and the date the loans were

---

[354] Given the lack of centralization of the repurchase process, it is not clear that the repurchase log was entirely accurate.

repurchased. The repurchase log, therefore, also does not provide support for the 90-day look-back assumption.

### b.    New Century's Failure to Account for Future Loss Severity

The Future Loss Severity component was included in the calculation of the repurchase reserve through the quarter ended June 30, 2006 but was eliminated for the quarter ended September 30, 2006. There is no justification for eliminating Future Loss Severity from the calculation, particularly in light of the significant increase in repurchase claims New Century was experiencing in 2006.

Kenneally said the removal of Future Loss Severity from the repurchase reserve calculation was based on discussions with KPMG and the belief that this severity component was already included in the Company's overall LOCOM analysis of repurchased loans in inventory. Kim maintained that although there were discussions about changes to the repurchase reserve calculation between KPMG and the Company, he did not advise New Century to make the changes. Indeed, he took the position that he was not informed of the changes when they were made.

The LOCOM rationale offered to support the elimination of Future Loss Severity from the calculation of the repurchase reserve for the quarter ended September 30, 2006 has since been abandoned. Kim told the Examiner that he informed Sanchez that New Century should only reserve for Premium and Interest Recapture, but that he no longer believed that was correct as a matter of accounting under FAS 140. In his February 2007 memorandum to Theologides, Kenneally acknowledged that LOCOM valuations of repurchased loans held for sale cannot substitute for Future Loss and Inventory Severity.

### c.    New Century's Exclusion of Inventory Severity

In the second quarter of 2006, New Century removed Inventory Severity from the repurchase reserve calculation because it was believed that this severity component was also already included in the overall LOCOM valuation adjustment. For the same reasons discussed above pertaining to Future Loss Severity, this accounting position is untenable and has been abandoned by New Century and KPMG. Kenneally stated in his February 6, 2007 memorandum evaluating the accounting issues related to repurchases that using the LOCOM analysis as a substitute for Inventory Severity "was not appropriate." Kim told the Examiner that even though

he once believed that there could be potential double-counting of the repurchase reserve if LOCOM adjustments were made on an aggregate basis, he no longer holds that view.

### d.    New Century's Failure to Account for Interest Recapture

Until the third quarter of 2006, New Century also failed to account for Interest Recapture in its repurchase reserve calculation. Chinn recalled to the Examiner that Kenneally believed as of the third or fourth quarter of 2005 that interest should be and was included in New Century's repurchase reserve calculation in the component known as estimated losses on future repurchases. However, an examination of the estimated losses on future repurchases used by New Century demonstrated that Interest Recapture was not included in its calculation until the third quarter of 2006. While the inclusion of Interest Recapture in the third quarter of 2006 was a correction which had the effect of making the reserve more appropriate, Interest Recapture should have been included in all calculations of the repurchase reserve in all periods.

### e.    Recalculation of New Century's Repurchase Reserve

The Examiner has sought to recalculate New Century's repurchase reserve, as well as its LOCOM adjustment. In undertaking this effort, the Examiner investigated not only the accounting errors already discussed but whether New Century used appropriate assumptions that were representative of then-current market conditions in 2005 and 2006. The Examiner determined that the historical data used by New Century to estimate its repurchase reserve spanned a number of years, with the number varying depending on whether New Century was estimating the repurchase percentage, the loss rate on sales of repurchased loans or some other number. During the bulk of this time period, the mortgage industry was experiencing low repurchase claims and low subsequent losses on loans repurchased. As described below, the Examiner recalculated various elements of the repurchase reserve using data that were more representative of market conditions existing at the time the reserve was estimated in 2005 and 2006.

The repurchase reserve is an estimate of the future expenses and losses to be incurred on loans to be repurchased and therefore should consider current trends. The Examiner believes that a 12-month look-back period, *i.e.*, data from the most recent 12 months, is appropriate for determining certain inputs used to estimate the repurchase reserve since this period more accurately depicts the market conditions facing the Company during 2005 and 2006. In his analysis, the Examiner also recalculated the Percentage of Repurchased Loans Sold at a Loss and

the Loss Severity Percentage using six-month and 18-month look–back periods, which did not result in materially different percentages than those determined using a 12-month look-back period. The Examiner believes that a 12-month look-back period does not give too much weight to short-term volatility and takes into account then-existing market conditions and trends.

While the concept of accounting estimates is fairly straightforward, judgment is required in developing estimates because estimates are based on subjective as well as objective factors. The Examiner recalculated revised approximations of the repurchase percentage, the repurchases sold at a loss, and Future Loss Severity using the most recent 12 months of history to better approximate the market conditions to which New Century was subject at the time. Because developing estimates requires the application of judgment based on information available at the time, other parties may arrive at somewhat different assumptions using the same information. However, the Examiner believes that the estimates used to recalculate the repurchase reserve are appropriate and reasonable in that they represent information that was available to New Century Management contemporaneous to estimating the reserve.

The Examiner summarizes below the assumptions used in the recalculation and then presents the recalculated numbers.

### i.    Examiner's assumptions used for recalculation of the repurchase reserves

#### (a)    Repurchase Percentage

New Century estimated the volume of loans to be repurchased ("Repurchase Percentage") based on the percentage of loans repurchased in prior periods. The Repurchase Percentage was applied to whole loan sales that the Company assumed were still at risk, namely the whole loans sold in the most recent three months. The table below shows the Repurchase Percentage used by New Century for the periods reviewed by the Examiner and the percentages recalculated by the Examiner.

Repurchase Percentage

| Period | NC % | Examiner |
|--------|------|----------|
| YE 2005 | 0.659% | 1.000% |
| Q1-2006 | 0.689% | 1.000% |
| Q2-2006 | 1.000% | 1.000% |
| Q3-2006 | 1.750% | 1.750% |

In the fourth quarter of 2005 and the first quarter of 2006, New Century calculated the Repurchase Percentage by dividing all repurchased loans since January 2001 by the total whole loan sales for the same period, effectively creating a five-year historic average look-back period. The Examiner concluded that use of a long look-back period was inappropriate for the reasons cited above. Therefore, the Examiner recalculated the Company's Repurchase Percentage for the fourth quarter of 2005 and first quarter of 2006 using a one-year look-back period, arriving at a Repurchase Percentage for both periods of one percent.

For the second quarter of 2006, New Century reduced the look-back period because it wanted to weigh recent years more heavily to take account of a trend toward higher repurchase claims. Accordingly, New Century used a weighted average Repurchase Percentage for repurchases and whole loan sales since 2004, which resulted in a shorter look-back period.[355] In the third quarter of 2006, New Century determined that a forward looking Repurchase Percentage expectation of 1.75%[356] was appropriate to arrive at a more detailed and accurate analysis of the potential repurchase activity. The Repurchase Percentage for the third quarter of 2006 would have been 0.89% if New Century had applied the same methodology as the second quarter of 2006. The Examiner concludes that the Repurchase Percentages New Century used for the second quarter of 2006 and third quarter of 2006 were reasonable, since New Century updated the percentage in the second and third quarters of 2006 contemporaneously to account for changing market conditions.

### (b)    Percentage of repurchased loans sold at a loss

New Century developed the percentage of repurchased loans that would be sold at a loss by dividing the cumulative repurchases sold at loss by the cumulative repurchases per the repurchase log. The Examiner believes that a more current time frame should again have been used to reflect better changes in market conditions. Because the repurchase reserve represents a reserve for estimated losses to be incurred on loans to be repurchased in the future, the inputs used to estimate the repurchase reserve should take into consideration current market trends and assumptions about conditions expected to exist. Utilizing information obtained from New Century, the Examiner calculated the percentage of repurchased loans sold at a loss based on a

---

[355] If New Century had used the same methodology in the second quarter of 2006 as previous quarters, the Repurchase Percentage would have been 0.841%.

[356] Kenneally and Secondary Marketing determined that the repurchase requests would be between 2 - 2.25% but that 20 – 25% of these claims would be refuted.

12-month historic look–back period. The following table shows the percentage of repurchased loans sold at a loss as estimated by New Century and the Examiner for the periods reviewed.

Percentage of Repurchases Sold at a Loss

| Period | NC | Examiner |
|--------|------|----------|
| YE 2005 | 52.84% | 39.66% |
| Q1-2006 | 55.16% | 48.11% |
| Q2-2006 | 53.89% | 50.21% |
| Q3-2006 | N/A$_{357}$ | 68.57% |

The Examiner's calculation resulted in a percentage that is more consistent with then-recent market conditions and is not impacted by the inclusion of sales from older periods, such as in 2002, 2003 and 2004.

### (c)   Future loss severity

Starting in the fourth quarter of 2005, New Century calculated Future Loss Severity for future loan repurchases as the actual losses incurred on discounted sales of repurchased loans between January 2003 and the current quarter. New Century determined the Future Loss Severity percentage by dividing the actual losses incurred on repurchased loans that were sold at a loss by the total face value (or principal) of repurchased loans sold at a loss. The Examiner believes that a more current time frame should have been used to better reflect changes in the market. The repurchase reserve represents a reserve for estimated losses to be incurred on loans to be repurchased in the future. Therefore, the information used to estimate the repurchase reserve should take into consideration current market trends and assumptions about conditions expected to exist, Utilizing information obtained from New Century, the Examiner calculated the Future Loss Severity percentage using a 12-month historic look-back period as compared to the longer timeframe used by New Century. The following table shows the Future Loss Severity percentage as estimated by New Century and the Examiner for the periods reviewed.

---

[357] New Century did not use a percentage in the third quarter of 2006 because it eliminated severity from its repurchase reserve calculation.

Future Loss Severity Percentages

| Period | NC | Examiner |
|--------|-----|----------|
| YE 2005 | 13.38% | 11.79% |
| Q1-2006 | 13.78% | 12.43% |
| Q2-2006 | 15.68 | 18.45% |
| Q3-2006 | N/A[358] | 25.28% |

#### (d)    Backlog claims

As stated previously, the best estimate of Backlog Claims at various time periods were as follows.

| Date | Backlog |
|------|---------|
| December 31, 2005 | $143,008,639 |
| March 31, 2006 | $281,625,528 |
| June 30, 2006 | $199,120,740 |
| September 30, 2006 | $399,757,399 |

The Examiner's calculation of the repurchase reserve amount attributable to the Backlog Claims applied the same interest rate, premium percentage and severity components that were used by the Examiner for future loan repurchases. The Examiner applied a refutation rate of 28% against the loan repurchase backlog amount based on various sources of data from New Century. Kenneally stated in documents and at his interview that a 20-25% refutation rate was appropriate. The Examiner also discovered in KPMG's workpapers for the fourth quarter of 2006 a refutation rate against the backlog at that time of 28%. This was a weighted average calculation based on which time period the repurchase claims were originally sold. The Examiner elected to use the 28% identified in the KPMG workpapers rather than the range cited by Kenneally because the KPMG percentage was based on actual analysis of repurchase claims.

#### ii.    Total repurchase reserve amount

The Examiner recalculated the repurchase reserve based on the changes in assumptions discussed above and the addition of the Backlog Claims. The following table breaks down the Examiner's estimates of an appropriate repurchase reserve by future sales and backlog:

---

[358] New Century did not use a percentage in the third quarter of 2006 because it eliminated severity from its repurchase reserve calculation.

## Repurchase Reserve

| ($ in 000's) | | YE 2005 | Q1 2006 | | Q2 2006 | | Q3 2006 | |
|---|---|---|---|---|---|---|---|---|
| New Century's Repurchase Reserve & LOCOM | | | | | | | | |
| New Century's Premium Recapture | a. | $    1,137 | $    1,349 | e. | $    2,606 | e. | $    5,335 | e. |
| New Century's Interest Recapture | a. | - | - | | - | | 5,039 | e. |
| New Century's Future Loss Severity | a. | 4,392 | 5,566 | e. | 9,448 | e. | - | |
| New Century's Repurchase Reserve | | 5,529 | 6,915 | | 12,054 | | 10,373 | |
| | | | | | | | | |
| New Century's Inventory Severity (LOCOM) | b. | 8,272 | 8,394 | | - | | - | |
| New Century's Reserve and LOCOM | | $  13,801 | $  15,309 | | $  12,054 | | $  10,373 | |
| | | | | | | | | |
| Examiner Recalculation of Repurchase Reserve and LOCOM | | | | | | | | |
| Premium Recapture | | $    1,725 | $    1,964 | | $    2,355 | | $    5,464 | |
| Interest Recapture | | 1,956 | 2,484 | | 2,122 | | 5,161 | |
| Future Loss Severity | | 5,009 | 6,993 | | 9,363 | | 42,095 | |
| Backlog | | 8,351 | 19,846 | | 19,633 | | 62,481 | |
| Examiner's Repurchase Reserve | | 17,041 | 31,287 | | 33,473 | | 115,201 | |
| | | | | | | | | |
| Inventory Severity (LOCOM) | c. | 18,080 | 26,797 | | 81,871 | | 85,788 | |
| Total Examiner's Calculated Reserve and LOCOM | | $  35,121 | $  58,084 | | $  115,344 | | $  200,989 | |
| Difference between New Century's and the | | | | | | | | |
| Examiners total reserve | | 21,320 | 42,775 | | 103,290 | | 190,615 | |
| Quarterly Income Statement Impact | d. | 21,320 | 21,455 | | 60,515 | | 87,325 | |

**Notes:**
a. Excludes Home123 repurchase reserve amounts.
b. Relates to the MTM on repurchased loans booked by the Company.
c. Includes only the Inventory Severity (LOCOM) on Repurchased Loans due to mispricing of loans in Q4 2005 and Q1 2006 and the exclusion of Inventory Severity in Q2 and Q3 2006. Does not include Industry Practice LOCOM, discussed in E, *infra*.
d. Does not constitute the total financial statement impact of the Examiner, as this excludes Industry Practice LOCOM, discussed in E, *infra*.
e. Includes certain immaterial reconciling items to financial statements.

### 5.    New Century Failed Properly to Apply LOCOM to Loans Held for Sale

New Century reported repurchased loans pending resale on its balance sheet as part of LHFS. In accordance with GAAP, New Century was required to report its LHFS at LOCOM. The Examiner has determined that New Century not only failed to apply LOCOM consistent with industry practice, but also failed to account for its repurchased loans consistent with its own LOCOM policy.

Under GAAP, LHFS are reported at LOCOM, *i.e.*, they are reported at the lower of cost or market value. FAS 65, *Accounting for Certain Mortgage Banking Activities*, provides, in pertinent part:

> Mortgage loans held for sale shall be reported at the lower of cost or market value ("LOCOM"), determined as of the balance sheet date....The amount by which cost exceeds market value shall be accounted for as a valuation allowance. Changes in the valuation allowances shall be included in the determination of net income of the period in which the change occurs... (FAS 65, paragraph 4)

The market value of mortgage loans and mortgage-backed securities held for sale shall be determined by type of loan. At a minimum, separate determinations of market value for residential (one- to four-family dwellings) and commercial mortgage loans shall be made. Either the aggregate or individual loan basis may be used in determining the lower of cost or market value for each type of loan... (FAS 65, paragraph 9)

Under FAS 65, the proper application of LOCOM requires that a company, such as New Century, determine if the market value of LHFS is lower than the carrying amount of those loans. If it is, then a valuation adjustment is required with an offsetting charge to current earnings, generally as a component of gain on sale on loans.

Industry practice for conducting a LOCOM analysis is to first group the loans into generally like-kind (by type) loan categories to facilitate their pricing. For example, it is customary for a mortgage banking company like New Century to categorize mortgage loans into performing and non-performing categories since the market prices of such loans are very different.[359] Pursuant to the broad guidance in FAS 65, mortgage banking companies also customarily aggregate loans by product type and further separate "scratch and dent"[360] and non-performing loans for LOCOM testing purposes.[361]

Once the pricing categories are established, a company should then determine the market value for each category of LHFS. This market value represents the average selling price for each category of loans at the reporting date and would generally be determined by a mortgage banking company's secondary marketing department because of their direct access to, and knowledge of, market conditions. Categories of loans for which the market value exceeds cost are carried at historical cost. Categories of loans for which the market value is below cost are written down to market value by way of a valuation allowance.

---

[359] FAS 65 does not specify how a company's loan categories should be aggregated (other than requiring commercial and residential loans to be aggregated separately), nor does it specify the level of aggregation.

[360] "Scratch and dent" loans are loans that are impaired in some manner and would therefore trade in the secondary market at a price less than a similar, but unimpaired, loan. The impairment could be caused by a number of factors, such as early payment default, missing documentation, or underwriting errors.

[361] This practice is derived from federal regulations applicable to banks, thrifts, and credit unions, which require that "scratch and dent," non-performing, and repurchased loans be categorized separately for purposes of the LOCOM analysis. The Office of Thrift Supervision has provided guidance on the classification and segregation of repurchased loans in Section 573 of the Mortgage Banking Examiners Handbook. While New Century was not specifically subject to these regulations, it is customary for mortgage banking companies to follow these practices as they relate to LOCOM analysis.

### a.   Management's Failure to Apply LOCOM Properly

The Examiner identified two issues with respect to New Century's application of FAS 65. First, prior to the second quarter of 2006, New Century calculated a LOCOM adjustment for repurchased loans included in LHFS as part of the repurchase reserve calculation, but reported this amount on its balance sheet as part of LHFS in the LOCOM valuation account. New Century's reclassification of this amount from the repurchase reserve calculation to a LOCOM valuation account when viewed in isolation may be unobjectionable. However, the Examiner determined that this process enabled the Company to apply the provisions of paragraph 55 of FAS 140, in that repurchased loans were effectively recorded at their fair value.[362]    The Examiner further determined that the prices (or marks) that New Century used to value repurchase loans in the fourth quarter of 2005 and first quarter of 2006 were not consistent with the marks used in its LOCOM analysis for its LHFS portfolio. In addition, starting in the second quarter of 2006, New Century eliminated entirely this LOCOM adjustment for repurchased loans.

Second, the Examiner found that New Century did not apply LOCOM in a manner consistent with industry practice, thereby enabling the Company effectively to hide losses in its LHFS portfolio by offsetting losses in certain loan categories with gains in other loan categories.

The Examiner determined that New Century's loan trial balance ("LTB") included the following categories of loans:

- Performing
- Current Month
- Commercial
- Woodland Hills

- Repurchase Performing
- Repurchase Not Yet Boarded – NP
- Non-Performing
- Repurchases Non-Performing

In its application of LOCOM, New Century first determined the market value of these repurchased loans by loan category at the reporting date. Secondary Marketing provided the loan pricing used by the Accounting Department for this purpose. However, once New Century priced the loans by category, it collapsed those individual categories and re-aggregated the entire

---

[362] Under paragraph 55 of FAS 140, loans that are repurchased should be measured at fair value on the date of repurchase as if the transferor purchased the loans on that date.

LHFS portfolio for LOCOM analysis purposes.[363]   As a consequence, loan losses in some categories, such as non-performing loans, were offset by gains in other categories. By utilizing this practice, New Century consistently determined that a LOCOM adjustment was not required. The result was that New Century did not mark down the value of the "scratch and dent" and other non-performing loans.

The following illustrates the manner in which the Company offset gains and losses among its various loan categories, resulting in no overall LOCOM adjustment.

| ($000's) | Market Value | LTB (Cost) | Variance |
|---|---|---|---|
| Commercial Loans | $2,650 | $2,790 | $(140) |
| Woodland Hills Repurchase Loans | 445 | 583 | (137) |
| Non-Performing | 211,823 | 298,743 | (86,920) |
| Repurchases Performing | 76,114 | 91,275 | (15,161) |
| Performing | 7,671,976 | 7,497,289 | 174,686 |
| | $7,963,011 | $7,890,681 | $72,329 |

The LTB amount, in the aggregate, was then added to the net Premiums, FAS 91, *Adjustments and Discounts* ($29,497 at June 30, 2006), to arrive at total cost of $7,920,179. Because the total cost was lower than the market value ($7,963,011), no LOCOM adjustments were recorded.

This practice of re-aggregating loans into a single category after the loans were priced, and using gains to offset losses, is inconsistent with industry practice and the interpretation of FAS 65 as applied by financial institutions and various other mortgage banking companies. In practice, mortgage banking companies typically recognize a LOCOM valuation allowance for categories of loans where the market value is below cost, especially for non-performing loans and repurchased loans.

By virtue of this practice, the Examiner determined that New Century's LHFS portfolio was overstated for at least the year ended December 31, 2005 and for the first three quarters of 2006. In other words, if New Century had performed its LOCOM analysis consistent with industry practice, changes in the LOCOM valuation allowance would have been recorded against earnings. So, for example, by not applying LOCOM consistent with industry practice, New Century overvalued its LHFS portfolio at March 31, 2006 and June 30, 2006 by $22.3 million and $102.4 million, respectively, overstating pre-tax earnings by $80.1 million for the second quarter of 2006.

---

[363] New Century would value the loans based on different "buckets" and then "price out" each bucket to determine a blended price for all of the buckets together.

Further impacts of this practice are quantified below, which show that New Century would have incurred charges to pre-tax earnings had it properly accounted for its LOCOM adjustments consistent with industry practice. Instead, by off setting the LOCOM effects of lower value loans with the LOCOM effects of higher value loans, New Century was able to avoid adjusting the value of its "scratch and dent" and other impaired loans, thereby avoiding charges to pre-tax earnings.

In the CFRA study done in December 2006, New Century was criticized for recognizing the losses on repurchased loans only at the time of the resale of the loan, which not only affected the timing of the losses, "but likely signifies that material 'unrealized' losses remain embedded in New Century's loan portfolio. . . ."

Kenneally's "rebuttal" to this criticism consisted of resisting the terms used. He wrote, in a memorandum dated January 15, 2007, to Morrice, Bindra, Cloyd and Dodge that New Century is not recognizing "'repurchase' expense at the time of sale," referring to the terms used in the CFRA report. Instead, according to Kenneally, New Century was "disposing of inventory at a loss." He acknowledged that no LOCOM valuation was done, but justified this by asserting that KPMG approved the aggregation of loan categories, had told him this is what "most" people do, and that "the entire portfolio of loans held for sale is greater than its cost."

Carol Franchi, the person who performed the LOCOM analysis for Kenneally, described how in early 2007 she was asked by Kenneally, for the first time, to perform the LOCOM analysis on an individual loan basis. Kenneally also asked her to compare the actual marks, *i.e.*, what the repurchased loans actually sold for, for several prior quarters, and to compare them to the marks used for the LOCOM analysis of the same in those quarters. This analysis led her to conclude that the LOCOM calculation, at least for the second quarter of 2006, had been inaccurate.

To be fair, Kenneally's defense of the LOCOM process is more plausible once the specific accounting is considered. As described previously, prior to the second quarter of 2006, New Century effectively calculated a LOCOM adjustment, albeit using incorrect pricing, for repurchased loans that were included in LHFS as part of the repurchase reserve calculation. This LOCOM adjustment was designated on the relevant repurchase reserve worksheets as "*MTM on Repurchases not yet Sold.*" At the end of each reporting period, New Century reclassified the LOCOM adjustments related to repurchased loans (*i.e.*, the "*MTM on Repurchases not yet*

- 226 -

*Sold"*) to the LOCOM valuation account for LHFS.[364]  New Century's reclassification of the *"MTM on Repurchases not yet Sold"* to the LHFS valuation account had the effect of creating a LOCOM adjustment for repurchased loans not yet sold included in the Company's LHFS portfolio.

Consequently, until the second quarter of 2006, it was New Century's accounting policy to provide a LOCOM adjustment for repurchased loans.  When the Company decided to remove the *"MTM on Repurchases not yet Sold"* component from its period end analysis of the repurchase reserve, it effectively eliminated the LOCOM valuation account for repurchased loans reported with LHFS, thereby recognizing amounts in the valuation account into income and no longer providing a LOCOM adjustment for repurchased loans.

The *"MTM on Repurchases not yet Sold"* reclassification at period-end essentially approximated the proper accounting for repurchased loans pursuant to paragraph 55 of FAS 140,[365] in that most of the amount reclassified to the LOCOM valuation account appears to represent the difference between the estimated fair value of the loans repurchased on the date of repurchase and their par value, although it is possible that some portion of this reclassified amount may have represented a further reduction in the fair value of the repurchased loans from the date of repurchase to the end of the reporting period.

Because repurchased loans were included in LHFS,[366] Kenneally and others in the Accounting Department, as well as Kim, incorrectly believed that a mark-to-market adjustment for the same loans was being performed -- the purported risk of double-counting.  However, because New Century netted gains and losses among the various loan categories when performing its LOCOM analysis, *i.e.*, it used gains in certain loan categories to entirely offset losses in the other loan categories, it did not recognize a LOCOM adjustment or expense during any of the reporting periods for 2005 or 2006, except for repurchased loans that, prior to the

---

[364] Account 1135-0000 "Loan Loss Reserve" is a contra-asset that offsets, or reduces, the LHFS.

[365] When the Company repurchased loans, they were added to the LHFS portfolio at par value and the excess of the repurchase price paid over the par value was charged to the gain on sale account (or in some instances to the repurchase reserve).  Paragraph 55 of FAS 140 requires a Company to initially measure repurchased loans (assets) "at fair value on the date of [repurchase], as if the [Company] purchased the assets... on that date."  Therefore, to the extent that the *"MTM on Repurchases not yet Sold"* was nearly equivalent to the difference between the repurchase price and the fair value of the loans on the date of repurchase, the Company appears, in this respect, to have complied with the requirements of FAS 140, but perhaps may have done so inadvertently.

[366] The LTB detailed loan by loan all the loans that comprised the LHFS on the Company's financial statements.

- 227 -

second quarter of 2006, were reflected in the Company's repurchase reserve worksheets as *"MTM on Repurchases not yet Sold."*

### b.    Recalculation of New Century's LOCOM Adjustment

To better understand the impact of New Century's improper accounting related to LOCOM, the chart below compares New Century's actual LOCOM valuation with a recalculation of what the proper LOCOM valuation should have been, and the impact of the difference for year-end 2005 and the first three quarters of 2006.

| ($000s) | New Century's LOCOM | Examiner's LOCOM | Difference in LOCOM | Difference Related to Repurchased Loans[367] | Difference in LOCOM Amount[368] |
|---|---|---|---|---|---|
| YE 2005 | 8,272 | 21,170 | 12,898 | 9,808 | 3,090 |
| Q1 – 2006 | 8,394 | 30,678 | 22,284 | 18,403 | 3,881 |
| Q2 – 2006 | 0 | 102,358 | 102,358 | 81,871 | 20,487 |
| Q3 – 2006 | 0 | 116,362 | 116,362 | 85,788 | 30,574 |

---

[367] These amounts relate to New Century's use of incorrect loan prices for the fourth quarter of 2005 and first quarter of 2006 and the elimination of a LOCOM adjustment for repurchased loans beginning in the second quarter of 2006.

[368] These amounts relate to New Century's application of LOCOM in a manner inconsistent with industry practice. The Examiner determined that these amounts cannot be considered misstatements because the application of the LOCOM requirements pursuant to FAS 65 is subject to varying interpretation.

## B.    Residual Interests

### 1.    Executive Summary

The Examiner focused significant attention on the manner in which New Century valued the dozens of residual interests that New Century held in off-balance sheet securitizations. The Examiner did so because serious questions about those valuations had been raised by the Company itself, when it announced the likely need to restate its 2005 and 2006 financial statements, and by the Special Investigation Committee that reviewed New Century's accounting practices in the spring of 2007.

In general, the Examiner found that New Century relied for far too long on antiquated and flawed internally-developed Excel-based models to value residual interests that represented hundreds of millions of dollars of assets on New Century's books. As of December 31, 2005, residual interests in off-balance sheet securitizations were valued at \$234.9 million on New Century's balance sheet.    The Examiner found that the people at New Century most knowledgeable about these models were well aware of the models' flaws and had suggested that New Century use professionally developed third-party models instead. KPMG's engagement team also repeatedly found evidence of those flaws. Nevertheless, for cost reasons or because of institutional inertia, New Century continued to use models that, in at least one instance, produced a valuation error in 2005 of \$9 million as to just one particular residual interest – an error that was not discovered until months after KPMG's audit of New Century's 2005 financial statements. The Examiner's review of New Century's residual interest models also revealed mathematical routines that were inconsistent, the "hard-coding" of certain data cells in order to override certain mathematical routines, and an inability of the models to process all of the data relevant to New Century's residual interest calculations.

Everyone at New Century who was familiar with the Company's models for valuing its residual interests – including members of the Board, the highest levels of New Century's Senior Management, the Company's chief financial and accounting officers, and the people within New Century's Secondary Marketing Department who built and operated the residual interest valuation models – understood that the accuracy of the results produced by those models depended heavily upon key assumptions. Yet many of those assumptions were flawed in ways that tended to result in inflated valuations of New Century's residual interests. New Century's own internal analyses in February 2007 concluded that, when proper assumptions were applied,

- 229 -

New Century's residual interests would need to be written down by approximately $90 million from the amounts at which they were valued as of September 30, 2006.

For instance, a critical assumption in each residual interest model was the discount rate that was used to compute the present value of the future cash flows to which New Century was entitled. The Examiner has determined that New Century insisted on using unduly low discount rates (of 12% for some residual interests and 14% for others) in both 2005 and 2006 that led to an overvaluation of New Century's residual interests of no less than $14.8 million (6.3%) as of December 31, 2005 and of comparable amounts in the quarters that followed. Not only New Century's Management, but ultimately its independent Directors as well, repeatedly resisted warnings from specialists at KPMG, who warned that the discount rates New Century was using were below those used by most of its peers. The Examiner's review has determined that during 2005 New Century's peer firms were using discount rates that ranged from 15% to 21%. The Examiner has concluded that the logic of New Century's own residual interest valuation analyses in late-2006 and early 2007 suggest that New Century should have been using discount rates that were at least 3 percentage points higher than those it did use during 2005 and 2006, *i.e.*, that it should have used discount rates of at least 15% and 17% during those accounting periods.

New Century's residual interest models also relied upon improper assumptions about the likely values of the remaining loans in the off-balance sheet securitization trusts at the times when those trusts were "cleaned up" or terminated because the unpaid principal balances of those trusts made them uneconomic to service. New Century uniformly – and without much thought or any reexamination – assumed that all of those loans could be sold at par, regardless of their delinquency status or market conditions. Only in early 2007, after serious doubts had arisen about the valuation of New Century's residual interests, did its Senior Management acknowledge that their unthinking reliance upon the "par value" assumption had been a mistake. The Examiner has determined that by improperly relying upon the par value assumption, New Century's residual interest valuations as of December 31, 2005 were overstated by no less than $27.5 million (11.7%). The valuations reported in subsequent quarters were similarly overstated.

The Examiner found that there were flaws in other key assumptions used in New Century's residual interest models, including the assumptions regarding how quickly loans in the off-balance sheet securitization trusts would be prepaid, the losses they would incur, and the dates upon which the trusts would be terminated. Although the Examiner has not tried to

quantify the specific financial statement impacts of these other flawed assumptions, the Examiner has observed that these flaws frequently resulted in inflated residual interest valuations and often persisted in the face of internal criticism and questions from New Century's independent auditors.

Finally, the Examiner has found that New Century's residual interest valuation process was infected by a dangerous lack of internal controls. The Examiner could not find any significant documentation that explained the operation of New Century's residual interest valuation models or the manner in which the assumptions used in those models were established, revised or approved by Senior Management. This lack of documentation not only interfered with the Examiner's investigation, but complicated previous efforts by auditors and others to understand and verify the accuracy of the models and their results. The lack of useful documentation about the models also created significant "key man" risks, because in many cases only one or a few people at New Century understood how the residual interest valuation models worked. In addition, it appears that the models themselves were not adequately safeguarded from access by people outside the Secondary Marketing Department who were responsible for operating the models and testing their results.

### 2. New Century's Residual Interests

#### a. Residual Interests – in General

New Century sold many of the mortgage loans it originated by packaging pools of such loans into trusts that issued securities for sale to investors. These investors received certificates representing senior interests in the cash flows generated by the loans in the trust. New Century, as the sponsor of the securitizations, was paid a cash price for the pool of mortgage loans it sold to the trust, and also retained a small ownership interest in each securitization trust known as a "residual interest."[369] In general, New Century's "residual interest" represented its right to cash flow or assets remaining in the trust after all investors in the securitization had been paid the principal and interest to which they were contractually due under the applicable trust documents and after the trust's expenses (including servicing fees, guarantor fees and other trust expenses)

---

[369] New Century's December 31, 2005 Form 10-K, pages F-14 and F-15.

had been paid.[370] New Century's residual interests were documented by certificates evidencing its residual interest ownership in the trusts.[371]

In general, New Century's residual interest in a securitization trust was related to the additional assets, above the aggregate principal value of the securitization, that New Century put into the trust's over-collateralization ("OC") account when the trust was created. The OC account represented a form of credit enhancement for investors in the trust, which gave them "a margin for error" in case the loans in the trust did not produce adequate cash flows to meet their expectations. As such, a trust's OC requirements could increase "investor confidence" in a securitization. Because of the "credit enhancement" features of these securitization trusts, they were often referred to as Credit Enhancement "CE" securities.

As New Century explained in its Form 10-K disclosures, each trust's "[o]ver-collateralization requirements [were] generally based on a percentage of the original or current unpaid principal balance of the loans [in the trust] and [could] be increased during the life of the transaction depending upon actual delinquency or loss experience." In general, New Century would not receive cash flow from its residual interest in a securitization trust unless the trust's over-collateralization requirements had been met. If investors received the payments they were expecting from the trust, New Century might not only receive cash flow associated with its residual interest in the trust, but might also be entitled to a return of the cash from that trust's OC account after the trust had been in existence for a certain time period.[372] On the other hand, if a trust drew down on its OC account to pay investors, New Century's residual interest in the cash flows generated by the loans in the trust would be reduced by a transfer of assets into the OC account, to restore it to agreed upon levels.

---

[370] In general, the investors received the principal collected, including prepayments, from the cash flows generated by the loans in the trust. In addition, they received a portion of the interest on the loans in the trust equal to the specified "investor pass-through interest rate" on the principal balance of those loans.

[371] New Century's residual interests were subordinate to the interests of other holders of certificates in the securitization trusts until they were fully paid, but those certificate holders and the securitization trusts had no recourse against New Century in the event that the loans in the various trusts did not perform as expected.

[372] New Century, as the trust sponsor, typically would be entitled to a lump sum payment from the trust's OC account thirty-seven months after the trust was created. *See* Prospectus Supplement dated February 22, 2002 for Securitization 2002-1 ("On and after the Stepdown Date and provided that a Trigger Event is not in effect, the required Overcollateralized Amount may be permitted to decrease or step down . . ."). The Prospectus defined the "Stepdown Date" as March 2005, which was 37 months after the prospectus date of February 2002.

Thus, during the useful life of a securitization trust, New Century, as the holder of a residual interest in a CE securitization trust, would receive cash flows from its residual interest in the trust if the cash flows generated by the mortgage loans in the trust exceeded the trust's current obligations to pay bondholders and to pay expenses and if the trust's over-collateralization requirements had been met. In addition, New Century also would receive returns of amounts New Century had deposited in a trust's OC account when the trust met certain benchmarks.[373] This meant that the cash flow from a particular securitization trust could be substantial, but irregular and difficult to predict.

When a securitization trust moved toward the end of its useful life, New Century, as the sponsor of the securitization, generally had a contractual option to end or "collapse" the trust. When a trust was "collapsed," the trust's sponsor would pay off any remaining obligations to bondholders and, by exercising its option, take possession of any remaining assets in the trust. Most trust sponsors would collapse a trust when the balance of loans held in the trust fell below a certain level because the servicers of the loans in the trust – who typically receive fees of 2.5% to 5% of the value of the loans they are servicing – would experience diminishing returns on servicing loans as the trust's loan balance declined.

### b.    Net Interest Margin Securities ("NIMS")

Rather than receive cash flows from a residual interest in a CE securitization trust on a current basis over the life of the trust, the holder of a residual interest could securitize those expected cash flows as well by creating Net Interest Margin Securities ("NIMS"), which would be supported by most of the residual interest holder's right to receive, for a period of years, the trust's residual asset cash flow (the trust's current residual interest cash flows plus the right to the trust's over-collateralization balance and any penalties paid when loans in the trust were paid off prematurely minus any losses incurred on loans that defaulted or were delinquent). A NIMS transaction might occur concurrently with or shortly after a CE securitization.

For example, in 1999 New Century sponsored a NIMS securitization (NIMS 99-1) that securitized most of the residual asset cash flows that New Century held in CE securitizations New Century had sponsored in 1997 and 1998, respectively. As the sponsor of a NIMS, New Century received a portion of the discounted net present value of the residual interests' cash

---

[373] If certain requirements were met, New Century would also receive a portion (from 5-10%) of the principal balance of the trust if bondholders had received all scheduled payments as of a certain anniversary date.

flows in the form of an up-front payment at the closing of the NIMS transaction, rather than a receipt of cash flows over the life of the loan pool. In return, the investors in the NIMS received the right to receive, as a pass-through, a portion of the residual interests' cash flows collected by the NIMS trust with the sponsor of the NIMS entitled to receive any excess cash flows.

As the sponsor of a NIMS, New Century retained a residual interest in the NIMS trust as well, which would remain an asset on its balance sheet. A NIMS trust did not, however, offer the credit enhancement feature (in terms of over-collateralization) associated with other securitization trusts nor would New Century, as the sponsor of a NIMS, be obliged to pay the NIMS investors if the residual interest cash flows received by the NIMS trust from the underlying CE securitizations fell short of expectations. As a result, the interest rates paid to NIMS investors were higher than the interest rates on CE securitization trusts – to compensate those investors for their greater risk.

### c.    New Century's Off-Balance Sheet and On-Balance Sheet Securitizations

New Century's residual interests were large assets of the Company (worth hundreds of millions of dollars), but how they were valued and disclosed on New Century's financial statements depended on whether the securitizations associated with those residual interests were structured as "sales" or "financings" for accounting purposes.

If a securitization was structured as a "sale," New Century would record a gain on the sale of a portfolio of loans to the securitization trust, remove those loans as assets from its balance sheet, and, as required by applicable accounting rules, record and disclose its residual interest in the off-balance sheet securitization as a separate asset for accounting purposes. If a securitization was structured as a "financing," New Century would not record a gain on the transfer of its loan portfolio to the securitization trust because those loans would remain on New Century's balance sheet (referred to as on-balance sheet or "OBS" securitizations), and New Century's residual interest in that securitization would not be separately recognized.

New Century's first off-balance sheet securitization occurred in 1997. Between 1997 and 2002, the Company closed 30 off-balance sheet securitizations (referred to as the "pre-2003 securitization deals"), each of which resulted in the recognition of residual interests on New Century's balance sheet. As discussed previously, these off-balance sheet securitizations consisted of CE securitizations and NIMS securitizations. Prior to January 2003, New Century disposed of mortgage loans only through whole loan sales and off-balance sheet securitizations.

- 234 -

Off-balance sheet securitizations were less common after New Century became a REIT and decided to build up its OBS REIT portfolio.

Beginning in 2003, New Century began to do OBS securitizations.    These OBS securitizations were done at the REIT (or "QRS") level or at the non-REIT (or "TRS") level. The decisions about whether to do securitizations as OBS or off-balance sheet securitizations, and whether to do OBS securitizations at the QRS or TRS levels were influenced by financial and economic considerations, and by REIT requirements, that are beyond the scope of this discussion of residual interest valuation.

New Century closed four OBS securitizations at the non-REIT level in 2003, because these deals were originated before New Century became a REIT in late-2004, and five OBS securitizations at the REIT level in 2004.    New Century did not close any securitization transactions accounted for as sales in 2003 or 2004.    In 2005, New Century closed eight securitizations, including four OBS securitizations at the REIT level and four off-balance sheet transactions treated as sales (the residual interests of which were all included in NIMS trusts). All four of New Century's securitizations in 2006 were OBS transactions at the REIT level.

The four securitizations structured as sales during 2005 totaled $6.4 billion in assets.  The gain on sale that New Century recorded when these four securitizations closed was $141.5 million, and the value of the Company's residual interests in those securitizations was $97.5 million.   As of December 31, 2005, the off-balance sheet trusts in which the Company held residual interests owned $6.9 billion in loans.

### d.    The Reported Values of New Century's Residual Interests in Off-Balance Sheet Securitizations

New Century's residual interests in off-balance sheet securitizations have always been a significant asset of the Company, because the Annual Percentage Rate, or APR, paid on the mortgage loans in each securitization trust was relatively high in comparison to the "pass-through" interest rate paid to investors who held senior certificates in the trusts. As indicated by the table below, New Century's residual interests in off-balance sheet securitizations represented a much larger percentage of the Company's total assets prior to 2003:

| Period | Residual Interests | Total Assets | Residuals as a % of Total Assets |
|---|---|---|---|
| Q4 2000* | $361,646 | $837,161 | 43.20% |

| Period | Value of Residual + | Total Assets + | Residual Interests as a % of Total Assets |
|---|---|---|---|
| Q4 2001* | $306,908 | $1,451,318 | 21.15% |
| Q4 2002* | $246,964 | $2,402,928 | 10.28% |
| Q4 2003* | $179,498 | $8,943,938 | 2.01% |
| Q4 2004* | $148,021 | $19,051,944 | 0.78% |
| Q1 2005 | $143,928 | $21,727,408 | 0.66% |
| Q2 2005 | $145,563 | $26,431,980 | 0.55% |
| Q3 2005 | $172,111 | $29,087,243 | 0.59% |
| Q4 2005 | $234,930 | $26,147,090 | 0.90% |
| Q1 2006 | $208,791 | $24,821,182 | 0.84% |
| Q2 2006 | $209,335 | $27,325,399 | 0.77% |
| Q3 2006 | $223,680 | $25,059,768 | 0.89% |

+ Dollars in thousands.

* Data from New Century's 2004 Form 10-K. Remaining data from New Century's other Forms 10-K and 10-Q.

At some points between 1996 and 2000, the value of New Century's residual interests represented a major portion of the Company's total assets. In 2002 or 2003, New Century decided to reduce the size of its residual interests, in part because of the difficulty of valuing those assets.

New Century's residual interests in off-balance sheet securitizations were also a source of annual cash flow. During 2005, the Company's residual interests provided $17.5 million in cash flow to the Company.

> e.  **Accounting Principles That Governed New Century's Valuation of Its Residual Interests in Off-Balance Sheet Securitizations**

The remainder of this section of the Report will deal with the valuation of New Century's residual interests in off-balance sheet securitizations, because, for the reasons set forth above, these were the only residual interests that were reported as separate assets on New Century's financial statements.

The accounting standard that applied to the valuation of New Century's residual interests in securitizations structured as sales was Financial Accounting Standards Board ("FASB") Statement No. 140, Accounting for Transfers and Servicing of Financial Assets and

Extinguishments of Liabilities – A Replacement of FASB Statement No. 125 ("FAS 140"). FAS 140 specifies that, upon completion of a transfer of financial assets (for example, the sale of mortgage loans to a securitization trust) that satisfies the conditions to be accounted for as a sale, the transferor (seller) should initially measure at "fair value," among other things, the residual interests obtained as a result of the transfer. Subsequent to the sale, FAS 140 requires that residual interests continue to be measured at "fair value."

Paragraphs 68–70 of FAS 140 provide some general guidelines for "fair value" measurements. FAS 140 defines the fair value of an asset as the amount at which that asset could be bought or sold in a current transaction between willing parties – that is, other than in a forced or liquidation sale. If quoted market prices are not available, the estimate of fair value is to be based on the best information available in the circumstances. Estimates of fair value should consider prices for similar assets and the results of valuation techniques to the extent they are available. One example of a valuation technique described in FAS 140 is computation of the present value of estimated future cash flows.

Because residual interests were not traded on an exchange during the relevant time period, many mortgage companies, including New Century, valued their residual interests in off-balance sheet securitizations based on the present value of the estimated future cash flows associated with those residual interests. FAS 140 recognized this valuation methodology and provided the following broad valuation guidelines for using it:

- Assumptions used for interest rates, default rates, prepayment rates, and volatility should incorporate what market participants would use in similar circumstances.
- Estimates of expected future cash flows should be based on reasonable and supportable assumptions and projections.
- All available evidence should be considered in determining the assumptions. The weight given to the evidence should be commensurate with the extent to which the evidence can be verified objectively.

If a range is estimated for either the amount or timing of possible cash flows, the likelihood of possible outcomes should be considered either directly, if applying an expected cash flow approach, or indirectly through a risk-adjusted discount rate, if determining the best estimate of future cash flows.

Another accounting standard that applied to New Century's valuation of residual interests in off-balance sheet securitizations was EITF Issue No. 99-20, Recognition of Interest Income

and Impairment on Purchased Beneficial Interests and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets ("EITF 99-20"). EITF 99-20 provides accounting guidance for how a transferor that continues to hold an interest (for example, a residual interest) in securitized financial assets should account for interest income from those assets and for any impairment in the value of those assets. Among other things, EITF 99-20 specifies that the holder of a residual interest should recognize the excess of all cash flows attributable to the interest estimated at the transaction date over the initial investment as interest income over the life of the interest using the effective yield method. EITF 99-20 also specifies that if the holder's best estimate of cash flows indicates there has been an adverse change in estimated cash flows, then: (1) an other-than-temporary impairment should be considered to have occurred; and (2) the beneficial interest should be written down to fair value with the resulting change being included in income.[374]

### f.    The Use of Models to Value New Century's Residual Interests

On the basis that residual interests in off-balance sheet securitizations were not bought and sold in well developed markets, New Century attempted, pursuant to FAS 140, to determine the "fair value" of its residual interests in CE securitizations and NIMS as balance sheet assets by using models to calculate the discounted net present value of the expected cash flows associated with those assets. New Century used these models to record the fair value of its residual interests when they first became assets and then to update and revise those values as New Century received new information and/or updated the assumptions the models relied upon.

In general, the residual interest valuations computed by these models depended on several key factors, including: (1) the nature of the residual interest held in each trust;[375] (2) the extent to which the trust was over-collateralized; (3) the prepayment fee income the trusts could expect to receive as certain loans in the trust were prepaid; and (4) losses the trust could be expected to suffer as borrowers defaulted or became delinquent in making their payments.

Each model would compute a net present value of the cash flow that New Century expected to receive over the life of the securitization from its residual interest in the mortgage loans held as collateral by each securitization trust, based on a combination of assumptions

---

[374] EITF 99-20, paragraphs 4, 11, and 12.

[375] The nature of New Century's residual interest would be defined by the securitization documents and would depend, in part, on the "pass-through" rates paid to the holders of senior certificates in the securitization trusts and the interest rates associated with the mortgage loans held as collateral in the securitization trust.

regarding that cash flow. As the trusts matured, some of the assumptions in those models would be replaced or updated by actual performance data. The assumptions in the models included expected prepayment speeds,[376] expected losses on the loans held in the securitization trust,[377] anticipated prepayment penalty income,[378] prevailing interest rate estimates,[379] whether the loans were expected to be held to maturity or sold when the trust was terminated pursuant to a clean-up call, the clean-up call percentage,[380] and the expected value of the loans remaining in the trust when it was terminated.[381]    NIMS models essentially inherited the cash flows and related assumptions from the underlying CE securitization models. In addition, the models relied upon discount rates to convert the anticipated net cash flows from the residual interest in the trusts into net present values.

Because each securitization had its own unique set of loans with its own special deal terms, each securitization had its own valuation model, although most of the models shared the same mathematical functions and had similar types of assumptions. Although there were many different assumptions in the models, the conditional prepayment rate ("CPR") and loss assumptions may have had the greatest impacts on the cash flows estimated by the models. Discount rates, which were used to compute the present value of those cash flows, could also have a significant impact on a model's residual interest valuation.

As discussed below, New Century made various changes to the CPR and loss assumptions, as well as to other assumptions that were important to the models' operation. The

---

[376] Prepayment speeds were expressed in a CPR, which was based on historical experience with regard to both voluntary prepayments of loans and loans removed from the trust's collateral pool as a result of foreclosure.

[377] Loan loss "severity," expressed as an annualized percentage of the outstanding loan balance, was based on historical losses for loans of the relevant type. As will be described below, actual loan losses were populated into the models each quarter.

[378] Prepayment penalties were calculated based on the ratio of loans in the collateral pool with prepayment penalties, and that ratio was applied against the original loan balance.

[379] Interest rates were based on a daily feed of projected LIBOR interest rates from Citigroup. These interest rates were used to forecast the rates for one-month, three-month, six-month and one-year LIBOR-based interest rates.

[380] The clean-up call percentage was the pre-determined percentage of the original loan balance at which New Century could exercise its clean-up call option and collapse the trust or securitization. The clean-up call percentage, which was set in the applicable securitization documentation, was usually no higher than 10% of the original loan balance.

[381] The terminal values of these loans were represented as the percentages of par value at which, according to the model, the underlying loan collateral could be sold upon collapsing the trust. As we will discuss below, until early 2007, New Century's residual interest models always assumed that this percentage was 100%, *i.e.*, that all remaining loans in the trust could be sold at par if and when the trust was terminated.

frequency of these assumption changes varied over time, and it is unclear who bore ultimate responsibility for making many of those changes. On the other hand, as also discussed below, New Century rarely changed the discount rates used in its residual interest valuation models. In 2005 and 2006, those discount rates were lower than market conditions justified.

In its 2005 Form 10-K, New Century described its methodology for valuing residual interests as follows:[382]

- First, New Century recognized that the performance of the mortgage loans in the securitization trusts would impact its ability to realize the current estimated fair value of these residual assets.

- As a result, New Century performed an evaluation of its residual interests quarterly, taking into consideration trends in actual cash flow performance, industry and economic developments, as well as other relevant factors.

- In determining the value of its residual interests, New Century estimated the future rate of loan prepayments, prepayment penalties that would be received as loans were prepaid, loan delinquencies, loan defaults and default loss severity as they affected the amount and timing of the estimated cash flows from the off-balance sheet securitization trusts.

- New Century estimated prepayments by evaluating historic prepayment performance of its loans and the impact of current trends. New Century used a prepayment curve to estimate the prepayment characteristics of the mortgage loans in the securitization's portfolio. According to New Century's Form 10-K disclosures, the rate of increase, duration, severity, and decrease of the curve depended on the age and nature of the mortgage loans in the securitization trust, primarily whether the mortgage loans were fixed or adjustable and the interest rate adjustment characteristics of the mortgage loans (six-month, one-year, two-year, three-year, or five-year adjustment periods). New Century reported that these prepayment curve and default estimates resulted in weighted average lives of the loans in the securitization trusts of between 2.29 to 2.60 years for New Century's adjustable-rate securities and 2.33 to 3.54 years for its fixed-rate securities as of December 31, 2005.

- As of December 31, 2005, New Century estimated that average cumulative losses, as a percentage of the original principal balance of the mortgage loans in the off-balance sheet securitization trusts, were between 1.75% and 4.86% for adjustable-

---

[382] Another, more detailed description of New Century's procedures for valuing its residual interests appeared in documentation prepared by Ernst & Young in connection with the work it performed for the Company to meet its obligations under Sarbanes-Oxley. As discussed below, the fact that New Century had not previously and independently created its own manuals and descriptions to explain these policies or procedures raises serious internal control issues. The Company did not maintain a manual or internal document that described how the models worked. Warren Licata, who had primary responsibility within New Century for the residual interest valuation models, vaguely recalled that there was a discussion at some point that the Company should have policies and procedures in place explaining the models, but they "never got to it."

rate securities and between 1.45% and 5.30% for fixed-rate securities. According to the Company, these estimates were based on historical loss data for the loans, the specific characteristics of the loans, and the general economic environment. New Century explained that, while the range of estimated cumulative pool losses was fairly broad, the weighted average cumulative pool loss estimate for the entire portfolio of residual assets was 3.72% at December 31, 2005 and 3.87% at December 31, 2004.

- During 2005, the Company modified certain assumptions based upon actual performance and made minor adjustments to certain other assumptions, resulting in a $10 million downward adjustment in the fair value of its residual interests, including a hurricane loss provision of $2.6 million, for the year.[383]

### 3.    Development and Operation of New Century's Residual Interest Valuation Models

#### a.    In New Century's Early Years

Several people played key roles in creating and developing New Century's models for valuing residuals. The initial models were developed on Microsoft Excel spreadsheets by John Kontoulis, who was the Company's original head of the Secondary Marketing Department, in 1997 or 1998.

Ed Gotschall and Patrick Flanagan both played roles in the development of New Century's early residual interest models. Flanagan relied in part on expertise he had acquired dealing with securitizations at Bank One. Gotschall remained involved with the residual interest valuation models through the year 2000. According to Flanagan, as securitizations became more sophisticated, the models needed to be revised and others in the Secondary Marketing Department did the actual work in creating new models, but Flanagan told us that he remained very involved in the details of the models until he left New Century in 2005.

#### b.    Major Problem with New Century's Residual Interest Valuations in 2000

As discussed previously, in the early years of New Century, its residual interests in off-balance sheet securitizations represented a large portion of its balance sheet assets. In 2000, New Century had to write down the value of its residual interests by nearly $70 million, which caused the Company to record its first loss. Patti Dodge attributed the write-down to the fact that

---

[383] New Century 2005 Form 10-K, Note (j), *Residual Interests in Securitizations.*

the Company's residual interest valuation models had used a CPR assumption that proved to be lower than actual prepayment experience.[384]

The Company's 2000 Form 10-K specified that the large write-down in New Century's residual interest values was due to a wider range of factors, including:

- Increases in interest rates that reduced the excess spread cash flow in the adjustable-rate securities;

- An increase of 1% in the discount rate assumption;

- A clean-up call being exercised for one securitization; and

- Increases in CPR and loss assumptions due to differences in actual versus projected results.[385]

According to documents reviewed by the Examiner, KPMG identified an inaccurate calculation in New Century's models used to value its residual interests. Apparently, until this time, New Century had not been evaluating actual results of its residual interests against the Company's projections and, therefore, had not been adjusting the models' assumptions properly.

The large write-down in residual interest valuation in 2000 may have had more than a short-term effect. According to Dodge, one reason why New Century decided, in or about 2002 or 2003, to reduce the relative size of the residual interests on its balance sheet was because of the difficulty of valuing those assets. Terry Theologides agreed that there was frequent discussion about the valuation of residual interests when they constituted a relatively big part of New Century's balance sheet, but that there were fewer such discussions when the Company stopped doing as many off-balance sheet securitizations, after New Century converted to REIT status, and residual interests receded in terms of their relative share of New Century's assets.

### c. Development and Operation of New Century's Residual Interest Valuation Models Between 2000 and Early 2006.

In or about 2000 or 2001, after being hired by New Century as an analyst in August 1998, Warren Licata was asked by Gotschall to work on the Company's residual interest valuation models. Although Licata may have reported to Gotschall at the time, once he was transferred to the Secondary Marketing Department, the Secondary Marketing Department took full responsibility for fine-tuning and operating the residual interest valuation models.

---

[384] Scott Carnahan was the KPMG audit partner on the New Century engagement for the 1996 to 1999 audits. Pat Kinsella assumed this role for the 2000 to 2004 audits. It is not clear whether this change in audit partners had any role in the discovery of the problems with New Century's residual interest valuations in 2000.

[385] 2000 Form 10-K at pp. 16-17.

- 242 -

Licata, who became a Senior Vice President of Secondary Marketing, had an MBA from California State University at Fullerton and seemed to have a good understanding of the issues related to residual interest valuation. Licata said that, when he first began working on residual interests, he ran the residual interest valuation models, determined and changed their assumptions, and assisted Gotschall in the process of deciding when residual interest valuations should be written down.

Over time, Licata and a "model" team within the Secondary Marketing Department rewrote and "changed the mathematics" in New Century's residual interest valuation models so that they would more closely track prospectus language for the relevant off-balance sheet securitization trusts, would be easier to update, and would rely upon "more practical" techniques. Although Licata's models continued to rely upon Excel spreadsheets, they were considered to be an improvement over previous models used by New Century (which were too "high-level" and inaccurate). Licata also thought it was difficult to track changes made to the models he had inherited. Licata's models principally relied upon estimates of prepayment rates and loan defaults, because either event would reduce future cash flows and thereby affect a residual interest's valuation.

Licata and his team developed new models for all of the Company's early securitizations deals (*i.e.*, from those done as early as 1997) and, until John Hatch took over the modeling process in 2004, created new models as new off-balance sheet securitizations were closed. New Century's securitization model for each transaction was in a Microsoft Excel file that had multiple spreadsheets. To create a new model, a senior analyst in the Secondary Marketing Department entered the structure of the deal into a model template, based on "waterfall" payment rules and other factors specified in the Prospectus Supplement for that deal and/or the relevant Pooling and Servicing Agreement. Because loan-level detail was too cumbersome to be modeled individually within the Excel spreadsheet, the senior analyst took the loan-level data from the mortgage loan collateral file and segregated those data into "Rep Lines."[386] The residual interest valuation models often had "collateral side" calculations (for cash flow payments to the securitization trustee) and "investor side" calculations (for amounts owed to investors). Each model had the same functionality and types of assumptions. Model structures changed and

---

[386] *Id.*

became more complex over time. According to Flanagan, the models became more accurate as New Century learned more about how the securitization structures worked.

The prepayment and loss assumptions in the models were determined internally by Licata and others in the Secondary Marketing Department based on their analysis of historical data collected by New Century and, to a lesser extent, market trends. New Century applied the same sets of prepayment and loss curve assumptions in all valuation models by vintage and collateral type. Prepayment and loss assumptions were based on fairly stable baseline assumptions, but could vary by deal based on collateral specific criteria. All changes to underlying assumptions from the previous securitization and the reasons for such changes were supposed to be documented in the final closing memorandum for each new securitization, but we have never seen such documentation.

Each residual interest valuation model relied upon forward LIBOR interest rates, both to determine the "pass-through" payments to which senior investors in the trusts were entitled but also to estimate the payments due from mortgage loan borrowers whose rates fluctuated with prevailing interest rates. These LIBOR rates and changes in the underlying loan collateral pool (*e.g.*, information about unpaid principal balances and actual delinquencies) were updated by the senior analyst within the Secondary Marketing Department based upon information received from Citigroup and the securitization trustee. A senior analyst within the Secondary Marketing Department was supposed to conduct a "back test" to compare the cash flows previously projected by New Century's models for each securitization to the actual cash flows received from the trustee. Licata was supposed to review the results of each back test quarterly to determine whether changes should be made to the models' cash flow assumptions.

These quarterly back tests were supposed to help New Century decide whether to update the models' assumptions regarding prepayment rates and loss experience. It appears that changes to model assumptions were not even considered unless Licata decided, based on his own knowledge and experience, that such changes were necessary. Licata acknowledged that he played a role in revising, reevaluating or modifying the assumptions every quarter. After receiving a set of data, Licata (and later other employees) would "roll" the models to the current point in time and true up the models so that the bond balances were accurate and tied out to the securitization trustee's statements. Licata then would modify the models for prepayment speeds and determine whether the deals were tracking as the Company had assumed. If the deals were

tracking properly, Licata would leave the models as is. If the deals were not tracking properly, Licata would determine what changes needed to be made to the models and would make them. According to Licata, there are times the models would be "hard-coded," *i.e.*, the mathematical routines in the models would be overridden, in order to force the models to produce results that matched the cash flows reported by the securitization trustees.

According to Licata, he wanted to observe at least six to nine months of data in order to determine if there was a "trend" suggesting that actual prepayment rates and loss curves were varying significantly from what had previously been forecast and, as a result, that one or more model assumptions should be changed. He considered three months of data too short a period of time to determine a "trend," but insisted that after six or nine months he would acknowledge and respond to a trend in the data.

When Licata (or later Hatch) determined that a change to a model's assumptions was necessary or appropriate, one of them would notify New Century's Accounting Department, Karl Weiss (to whom Licata reported in the Secondary Marketing Department) and New Century's Executive Management. According to Licata, after he had discussed a model assumption change with Kevin Cloyd and obtained his approval, the change would also be presented to a Management-level committee, *e.g.*, the Securitization Committee, the REIT Committee or the Asset and Liability Committee ("ALCO") Committee. Licata said that either he or Cloyd would present the proposed changes in assumptions to the relevant committee along with memoranda, charts and analyses explaining the change.[387]  According to the SOX narrative of the residual interest valuation process prepared by Ernst & Young, model assumptions were not updated unless and until they were discussed and approved by Senior Management. It is not clear how often these approvals were sought or given.

Matt Mullins was hired by Licata in May 2002 to help run the securitization models that Licata had developed. As a senior analyst in the Secondary Marketing Department, Mullins was responsible, through the fourth quarter of 2005, for updating the data fed into the models.[388]

---

[387] Licata also recalled that he, Cloyd and others provided information regarding residual interest valuations to New Century's Board of Directors or one of its committees, although no one has suggested that the Board or its committee played any role in deciding whether prepayment or loss assumptions in the residual interest valuation models should be changed.

[388] Mullins has a bachelor's degree in finance and a self-taught "technical background" in working with databases. Prior to joining New Century, Mullins had worked for several other mortgage companies on the production side. He did not have any experience in secondary marketing, securitizations, or hedging prior to joining New Century.

Mullins shadowed Licata for approximately one year to learn how to perform his initial responsibilities. Mullins later assumed responsibility for performing these tasks himself and then transitioned several of these tasks, over time, to Ron Brown, Henry Opinion and John Hatch.

Mullins' responsibilities included loading data from the trustee statements into the securitization models, rolling the models forward (*i.e.*, updating the models on a monthly basis with actual data), reconciling any discrepancies between the models and the trustee statements, reviewing and updating (if necessary) the assumptions set forth in the models, and generating various reports on the value of the Company's residual interests and other outputs from the models. Since each securitization had its own model, Mullins had to repeat these tasks for each of many residual interest models. When Mullins began at New Century in 2002, there were approximately 12 such models. When he left the Secondary Marketing Department in 2006, there were more than 30.[389]

Brown joined Licata's group in 2003 to load the data transmitted by the securitization trustees into the Secondary Marketing Department's database. Colleagues complained that Brown's poor performance of this task caused problems for senior analysts who had to roll forward the models in short periods of time after Brown loaded the data.

Opinion joined Licata's group from the production side of New Century some time in late-2005 or early 2006.[390] At that point, he reported directly to Licata. His first three months involved shadowing Mullins, trying to understand how things worked in the Secondary Marketing Department and learning how to roll the residual interest models forward. Eventually Opinion took over that role. Opinion initially reported to Licata, but as Licata started bringing on more people, and because there were too many people for Licata to supervise directly, Opinion started reporting directly to Mullins. Opinion helped Mullins with the residual valuations for the fourth quarter of 2005 and the first quarter of 2006, then worked under Hatch beginning in the second quarter of 2006 when Mullins left and Hatch took over from Mullins the primary responsibility for the residual interest valuation models. Opinion's primary

---

[389] Mullins left Licata's group to work for Mary Malloy in the newly-formed hedging group within the Secondary Marketing Department in approximately March or April of 2006, and eventually left New Century on May 31, 2007.

[390] Opinion started with New Century in August 2004, working on the wholesale side of the Company, where he reported to Karen Hernandez. Before that Opinion had been an advisor for UBS for a year and at Ditech for a year. He was two years out of school when he started at New Century.

responsibility was to roll forward the residual interest valuation models on a quarterly basis and to reconcile differences between New Century's data and the data from the securitization trustee.

According to Opinion, no one even looked at the assumptions in the residual interest valuation models until actual performance data from the securitization trustee were loaded into the models and the models were rolled forward.    Opinion did not analyze the baseline assumptions in the models in the fourth quarter of 2005 or the first quarter of 2006, but only provided information to superiors, such as Licata, who, from his perspective, made decisions about how those assumptions should be changed, if at all.

**d.    The Valuation Models Built and Operated by John Hatch**

After Hatch joined New Century in November 2003, he built valuation models for all new securitization deals originated in and after 2004.    Hatch was highly regarded for his analytic and technical skills.    Hatch's models were more sophisticated than Licata's models because he had a better understanding about how models should be used to value residual interests.    He was also willing to question how New Century's models were performing those valuations and was not shy about suggesting changes to those models.    According to Licata, New Century needed Hatch to rewrite New Century's models because the securitizations in which New Century was engaging had become more complex.

Like Licata, Hatch built Excel-based models that were designed to determine the net present value of projected cash flows over the life of each deal.    Hatch created his Excel model template by looking at the previous models developed by Licata and adding features to expedite the valuation process and to capture additional loan-level fields that were not available in Licata's model by, for example, adding rep lines, breaking out collateral groups, modeling all bonds in a deal (not just different tranches), and updating the mathematics of the models.    Hatch said that he did not create any models to value off-balance sheet CE securitizations and that the only off-balance sheet securitizations that he "modeled" (2005-A, 2005-B, 2005-C and 2005-D) were NIMS transactions.    Hatch said that NIMS deals were "easy" to model because they required just one-page spreadsheets.    He also said there was no difference between the models for off-balance sheet "residual" deals and OBS deals.

Hatch did not model the residual interests in the pre-2003 off-balance sheet securitizations and did not change the models for those deals that had been developed by Licata. Hatch said that he discussed "re-modeling" those deals with Licata after Hatch joined New

- 247 -

Century, but Licata determined it was not worth the time and effort because of the "seasoning" of those deals. According to Licata, it would have been "cost-prohibitive" to re-model the older securitizations and he did not believe better models would "dramatically" change the valuations of those older residual interests.

Hatch's initial responsibility was to create models for new securitizations. He was not responsible for rolling those models forward or for otherwise updating those models to determine the value of residuals after inception of the securitization. The other members of Licata's team (Mullins, Brown and Opinion) were responsible for those tasks. In late 2005 or early 2006, Hatch became responsible for portfolio reporting within the Secondary Marketing Department, taking over that responsibility from Mullins when Mullins left to join Mary Malloy's hedging team. In this capacity, Hatch had to report to Licata on the value of all securitizations. But even then Hatch did not undertake a detailed evaluation of the pre-2003 models or roll any of these models forward, because that was the responsibility of Opinion, and later Matt Walder, who had become responsible for data loading.

Hatch had discussions with Mullins prior to the time that Mullins transferred the responsibility for portfolio reporting to Hatch. According to Hatch, he did not intend to perform those responsibilities differently than Mullins had nor did anyone at the time perceive a change in the way Hatch performed those responsibilities. Hatch has acknowledged that he may have scrutinized the post-2003 residual interest models more thoroughly because he created them and that he was not familiar with all the assumptions in Licata's models for the pre-2003 securitizations. Neither Hatch nor Mullins recalls any discussion, when Hatch assumed Mullins' responsibilities, of the way that assumptions in the pre-2003 residual interest models had been updated by Licata and Mullins. It was not until early 2007 (when Hatch was asked to go back and review the assumption changes to the pre-2003 models that occurred when Mullins was in charge of portfolio reporting) that Hatch learned that Licata and Mullins had changed assumptions for the pre-2003 models more frequently before Mullins left and Hatch became responsible for portfolio reporting. Despite overwhelming evidence that this is so, Licata has denied that the Secondary Marketing Department changed the frequency with which it updated assumptions in the pre-2003 models during 2006 or its practices in that regard.

### e.    Supervision of the Residual Interest Valuation Process Within Secondary Marketing

When Licata moved to the Secondary Marketing Department, he originally reported to Cloyd, who reported to Flanagan. After Flanagan left New Century in 2005 and Cloyd became the Executive Vice President for Secondary Marketing, Weiss was hired as a Senior Vice President of Secondary Marketing to manage Licata and other vice presidents in the Secondary Marketing Department.

Weiss never played much of a role in overseeing Licata's work on residual interest valuation. Licata and Hatch worked directly with Cloyd on residual valuation issues, and Weiss never inserted himself into the process for valuing residual interests, except, perhaps, to edit for style purposes some PowerPoint presentations dealing with residual interest valuations. Weiss said he did not ask more questions of Licata about residual interest valuations because he believed in "horizontal management" and did not care if Licata went straight to Cloyd when necessary because the residual interest valuation process existed before Weiss arrived at New Century, it was not something with which he was familiar, he had no plans to change it, and Cloyd knew the subprime mortgage market and the residual interest valuations better than Weiss.

When the residual interest valuation models were "rolled forward" each quarter, Licata and Cloyd would engage in dialogues about whether changes should be made in the models' assumptions relating to cumulative losses and prepayment speeds. Because of Cloyd's expanding range of responsibilities after Flanagan left New Century at the end of 2005, Cloyd began to focus more on corporate management issues and Licata's portfolio was expanded to include whole loan sales. These factors may have led to greater autonomy in the securitization modeling and valuation group, although the personnel in the group continued to report to Licata.

### f.    Communication of Information About Residual Interest Valuations from Secondary Marketing to the Accounting Department and Others

#### i.    Secondary Marketing's residual asset valuation binders and other reports

The Secondary Marketing Department provided KPMG and New Century's Senior Management with Residual Asset Valuation binders on a quarterly basis. These binders contained the documentation that supported the Secondary Marketing Department's present

- 249 -

value calculations of the residual interests that the Accounting Department would book in New Century's general ledger.[391]

These Residual Asset Valuation binders included eight sets of documents:

a.    A narrative summary of each quarter's CE off-balance sheet securitizations and NIMS securitizations;

b.    A numerical summary of the net present value, cumulative losses, and other values associated with those securitizations;

c.    Projected LIBOR curves, since the one-month LIBOR was used in calculating bond payments to investors in the securitizations and the six-month LIBOR was used for calculating interest payments on adjustable-rate mortgages ("ARMs") that may have been part of the underlying collateral for the securitizations;

d.    An analysis of hedging performance against the interest rate of one-month LIBOR;

e.    A CPR chart that included one-month data annualized, a loss curve chart that showed the loss curve over the life of the loans, and a CPR chart that included data from the start of the loans;

f.    A loss analysis, which was used primarily by KPMG and the Accounting Department;

g.    An analysis of triggers, which described the different types of triggers and evaluated how close New Century was to the trigger threshold (*i.e.*, to "popping" a trigger) that would require action by New Century; and

h.    The amounts New Century was making or losing on the securitizations based on modeled versus. actual cash flows. At times, New Century may have had to transfer additional assets into an OC account trust to maintain sufficient credit enhancement for investors. Mullins stated that "lots of eyes were looking" at this section of the residual asset valuation report.

Secondary Marketing also provided ad hoc reports on residual interest valuations upon request. Some reports were a comparison of actual data to projected data based on certain assumptions.[392] Other reports were analyses of various "what if" scenarios requested by the Securitization Committee or other Management officials, *e.g.*, an analysis of the impact on the securitizations if interest rates rose and New Century slowed down the CPR. The Secondary

---

[391] The sheer volume of each binder and certain reports in the binder were designed in part to convince KPMG and New Century's Accounting Department that the residual interest calculation was supported by sufficient documentation. According to Mullins, the running joke within Secondary Marketing was that "the binder felt like an A."

[392] The Secondary Marketing Department also reported on the cash flows received by New Century from the securitizations.

Marketing Department's modeling team frequently ran up to 12 different assumption scenarios through the models at the end of an annual period, which often put time pressure on the team to meet deadlines.

According to Licata, these alternative residual interest calculations at the end of particular quarters were for "sensitivity analyses" that helped the Accounting Department determine the "matrix value" of the residual interest assets and breakpoints for footnote disclosures in New Century's Forms 10-K.[393]  Particularly in late-2006, the Secondary Marketing Department was asked to measure changes in value that would occur under different scenarios for purposes of the Project Kettlebell negotiations and to understand the impact on fourth-quarter 2006 financials of various changes in residual interest valuation methodology.

Mullins said he was not involved in any of the decisions to run alternative scenarios through New Century's residual interest valuation models and does not know why he was asked to do so.  The various scenarios were not kept secret, and Mullins did not believe they were requested to help New Century hit earnings targets.  Licata also denied that these alternative calculations were intended to help New Century reach earnings targets, although he conceded that changes in residual interest valuations could have an impact on quarterly earnings and that it would be "simple" to determine the impact on earnings per share of changes in different assumptions in the residual interest valuation models.  Licata does not recall ever being asked to make such a calculation.

### ii.    Accounting's use of information received from Secondary Marketing

Residual interest valuations were among the critical accounting issues that were reviewed on a quarterly basis for financial statement purposes.  The Finance and Accounting Department relied on Secondary Marketing Department personnel to supply those valuations.  Each quarter, about a week in advance of KPMG's review, Dave Kenneally would receive a standard reporting package from the Secondary Marketing Department that contained the fair values computed by the residual interest models and summary sheets that described the assumptions used by models (*e.g.*, regarding prepayment rates, cumulative loss rates and discount rates).   Kenneally characterized this as a "mechanical" process of transmitting data that allowed the Finance and

---

[393] An example of one such footnote disclosure can be found in New Century's Form 10-K for 2005 at page F-29.

Accounting Department to record various journal entries. Kennelly did not check the inputs into the residual interest valuation models.

Kennelly acknowledged having regular discussions with the Secondary Marketing Department regarding the fair value of residual interests, primarily so the Secondary Marketing Department could explain the reason for any material variances between their residual valuation calculations and certain hedges. During 2006, the Finance and Accounting Department received e-mails and documents from the Secondary Marketing Department on a regular basis. Sometimes that information was prepared at the request of other individuals and copied to the Finance and Accounting Department. Other times the Secondary Marketing Department would supply the Finance and Accounting Department with more information or analyses than they requested.

According to Kennelly, at least as of 2005, the Secondary Marketing Department shared its residual interest valuations with ALCO and the Finance Committee, and the Accounting Department would book those valuations only after they had been approved by the ALCO Committee and the Finance Committee.[394] Although Donna Walker could not recall a specific instance in which she was asked to make an adjustment to residual interest numbers she received from the Secondary Marketing Department , she stated that she might have been asked to make such an adjustment by Kennelly, noting that a residual interest is a "very intricate model to run" and that it generally goes through a few revisions. Walker prepared an internal CFO report on a monthly basis, which contained a residual interest page supplied by the Secondary Marketing Department. The internal CFO reports were posted on Encompass, a program that was available on the desktops of certain New Century employees.

### g. Review of Residual Interest Valuations by Senior Management Outside of Secondary Marketing

The investigation revealed a general lack of understanding and confusion within Senior Management about who was responsible for the residual interest valuation process in general and certain aspects of that process in particular. For the most part, New Century's Senior Management and executives in parts of the Company outside of the Secondary Marketing Department and the Finance and Accounting Department became aware of residual interest

---

[394] *See* Section VI.B.3.i. below for a discussion of ALCO and its role in reviewing residual interest valuations.

valuation issues, if at all, through their participation in various Management-level committees described below.

### h. The Securitization Committee's Review of the Company's Residual Interest Valuation Process

The Securitization Committee was a Management-level committee that was created to review the structure, pricing, valuation and performance of previous loan securitizations and to discuss how to improve the securitization of new loans. It is not clear when the Securitization Committee was first created, but minutes for the Securitization Committee go back as far as 2002. It appears that a decision to securitize loans was not taken to New Century's Board of Directors until after consideration by the Securitization Committee.

At various point in time, the members of the Securitization Committee consisted of key members of Senior Management, people within the Secondary Marketing Department who were involved in modeling and execution of securitizations, and representatives from the Finance and Accounting Department, including Robert Cole, Brad Morrice, Gotschall, Flanagan, Dodge, Cloyd, Kenneally, Jeff Goldberg, Licata, Rod Colombi,[395] Yury Pyatigorsky,[396] Paul Tuan, and Ralph Flick. Representatives of KPMG regularly attended meetings of the Securitization Committee.

When interviewed, members of the Securitization Committee had, at best, only vague recollections of the procedures and policies it used to review the Secondary Marketing Department's residual interest valuation models and to check their results, although Gotschall and Flanagan confirmed that the committee performed such reviews on a quarterly basis. Morrice, who said he was an ex-officio member of the Securitization Committee, vaguely recalled that the committee may have reviewed some analytics related to the assumptions used in the residual interest valuation models. Although minutes were kept, many were not located and it is not clear how consistently they were prepared.

Flanagan said the Securitization Committee would decide what information to present to the Company's auditors, based on presentations by the Secondary Marketing Department and Accounting Department. According to Flanagan, there were many "moving parts" when it came

---

[395] Executive Vice President of Corporate Finance.

[396] Pyatigorsky was an analyst who reported to Colombi. He may not have been an official member of the Securitization Committee, but the Committee probably relied on his expertise during the meetings because he modeled the cash flows for the entire Company.

to valuing residual interests, such as forecasting borrower behavior and the interest rate environment, and the valuation of residuals was not an exact science. According to Gotschall and Flanagan, there was a wide range of opinions from everyone (accountants, Board members and Management) on these issues, and members of the Securitization Committee often asked questions and requested changes before approving the models or their results.

### i. The Role of the REIT Investment and ALCO Committees, as Successors to the Securitization Committee

The REIT Investment Committee replaced the Securitization Committee in or about 2004. The members of the committee appear to have remained largely the same, and it appears that its review of residual interest valuations was similar to the review previously conducted by the Securitization Committee.

Shortly after Lou Garday was hired as New Century's tax director in December 2004,[397] the REIT Committee was renamed ALCO, which became responsible for reviewing all investments and all risk management. Garday was made the chair of ALCO in or about mid-2005. According to Kenneally, the Secondary Marketing Department shared its residual interest valuations with ALCO and the Finance Committee, and the Accounting Department would not book those valuations until they were approved by ALCO and the Finance Committee.

The REIT Committee and ALCO were subcommittees of the Finance Committee, which was chaired by the Company's CFO. The Finance Committee involved all senior leadership in Company, who also sat on ALCO. According to Garday, any decision by ALCO was "kicked up" to the Finance Committee, which in turn could kick the issue up to the Executive Management Committee ("EMC").[398]

The three founders of New Century (Gotschall, Cole and Morrice) were honorary ex-officio members of ALCO.[399] The voting members of ALCO included one person from each relevant area of the Company: Licata (Secondary Marketing), Cloyd (Capital Markets), Garday (tax), Taj Bindra (CFO), Lenice Johnson (Credit), and Weiss. Garday said that the heads of these areas met to focus on investments and assets and liabilities. The committee had a standing

---

[397] The Company hired Garday to be the Company's tax director and REIT expert.

[398] The EMC was also known internally as the "G-7," and senior vice presidents of the Company were called the "One-Down Level."

[399] Garday said he did not recall seeing Gotschall at an ALCO meeting, but that he did not think that Morrice missed an ALCO meeting. Garday said that Cole was very active in ALCO meetings until maybe the October 2006 meeting. He did not remember Cole missing a meeting.

meeting once each month.  ALCO meetings covered a number of different issues, including the tax consequences of various transactions.  One set of discussions – apparently among Dodge, Kenneally, and Goldberg – had to do with what discount rate should be used to value residual interests.[400]

Garday said that, except for the discount rate assumption, the assumptions the Secondary Marketing Department used and changes in those assumptions did not go through ALCO, *i.e.*, that Licata and his modeling team did not bring proposed changes to the prepayment and loss assumptions in their models to ALCO.  According to Garday, ALCO's agenda was largely set by SOX and tax requirements, which demanded an orderly and well documented review of certain key decisions.  The assumptions used in the residual interest valuation models did not fall into that category, and the "section heads" and "generalists" on ALCO did not "drill down" to a level of detail that would have included residual interest assumptions, which, Garday believed, were decided by Licata and the Controller's office.

Licata, who often attended ALCO meetings and made presentations on residual interest valuations, agreed that the members of ALCO did not focus on the details of the residual interest valuations.  Licata put together residual interest valuation summaries for ALCO, which would vote to "approve the numbers."  According to Licata, ALCO would also have been the proper committee to approach for permission to collapse the pre-2003 off-balance sheet securitization trusts, but Licata never did so in or before 2006.[401]

### j.    Review of Residual Interest Information in Connection with Preparation of SEC Filings and SOX Certifications

The Legal Department usually created "Time & Responsibility" ("T & R") schedules each quarter in connection with the preparation of public filings.  Reviewing and updating assumptions about residual interests were specifically referenced in each T & R schedule (the only accounting function expressly set forth there).[402]  The Legal Department did not know what steps members of the Secondary Marketing Department took to meet their responsibilities as to

---

[400] *See* Section VI.B.7.b. for a more detailed discussion of the debate that occurred over discount rate assumptions.

[401] *See* Section VI.B.7.d. below for a discussion of the significance of "collapsing" off-balance sheet securitization trusts.

[402] Dodge speculated that this was because of the relative significance of residual interests on the Company's balance sheet in its early years.  *See* Section VI.B.3.b. above.

residual interests on the T & R schedules or how KPMG performed the testing that was also described in those schedules.

To satisfy requirements of Sarbanes-Oxley, the Legal Department prepared and circulated SOX certifications and mini-certifications every quarter and tracked their execution. One of those mini-certifications, executed by Cloyd, included specific certifications regarding residual interest valuation, along with other subjects.    Cloyd was asked to sign these representations on behalf of Secondary Marketing.  The Legal Department did not know what steps Cloyd or his staff took in verifying the information he was certifying.

### k.    Review of Residual Interest Valuations by New Century's Board of Directors and the Audit Committee

#### i.    The Board of Directors

Residual interest valuations were a topic of discussion at every Board meeting.  From the perspective of Board members, residual values were determined by using complex calculations that depended upon a number of variables.  According to Fred Forster, New Century's lead Director (and current Chairman), residuals were considered to be volatile assets because of the wide range of uncertainties related to these variables, which often relied upon estimates and assumptions.

Forster said that the Board relied on KPMG to provide assurances that the Company's financial information was adequately stated, which KPMG did in presentations to the Audit Committee.  According to Forster, the Board, through the Audit Committee, hired KPMG to review the Company's residual interest calculations and to confirm that the calculations were appropriate.    Forster expected that KPMG would review the residual interest calculations assumption by assumption and discuss those assumptions with Company representatives until both sides were comfortable with the result.  Forster recalled that New Century had been required to "write down" its residual interests several years before (causing New Century to record a loss for the year in question) because KPMG had said that the number needed to be lower.[403]  According to Forster, this insistence by KPMG had given the Board confidence in KPMG's review of the Company's residual interests.

According to Forster, by undertaking a detailed review of New Century's residual interest calculations and presenting a "consensus valuation" to the Board, KPMG "put their stamp" on

---

[403] *See* the discussion of this write-down in 2000 in Section VI.B.3.b. bove.

the Company's assumptions. Forster said that, although there were extensive discussions at Board or Audit Committee meetings about how the Company's residual interests were calculated, he and other Board members relied on KPMG to get a comfort level with the Company's residual interest valuations.

Forster said that New Century's residual interest values were important for a number of reasons, including their impact on earnings and how the marketplace perceived the Company. Forster explained that if the Company adjusted its residual interest balance, the market would likely question the Company's future product, thus driving down its share price.

### ii.   The Audit Committee

As part of its "very active" review of accounting and KPMG activities, members of the Audit Committee (particularly Rick Zona) would regularly ask pointed questions of the CFO, the Controller, Secondary Marketing and KPMG regarding residual interests and the assumptions underlying the residual interest calculations.

According to Zona, the Audit Committee focused on risk areas and related accounting areas that required a great deal of judgment by New Century's Accounting Department. These focus areas were probably the same in the beginning and at the end of 2005, as well as during 2006, and included the valuation of residuals and related hedging. Zona said that, because their valuation was "highly judgmental," residual interests were discussed in depth by the Audit Committee, the Accounting Department and KPMG. Zona stated that the main issues of concern regarding residual interest valuation were the Company's choice of discount rate, its loss assumptions, and its prepayment assumptions, because these issues drive the valuation process.

Michael Sachs, the chair of the Audit Committee, explained that at least 50% of the Audit Committee meetings included an executive session with KPMG at which the topics included, among others, how KPMG had reviewed the Company's residuals and whether they were valued correctly. Sachs was unable to recall any specific concerns raised by KPMG at the executive sessions and was sure that KPMG never raised any items that required Audit Committee action.

The Audit Committee's minutes confirm that residual interest valuation issues were frequently discussed during 2006 and that Mark Kim or John Donovan repeatedly represented to the Audit Committee that KPMG had reviewed "Management's judgments and estimates relating to the corporation's . . . valuation of residual interests in securitizations," that KPMG had found

-257-

those estimates were "reasonably stated," that "KPMG had not discovered any material differences in these estimates," and that KPMG had evaluated "key factors and assumptions."

### 4.    KPMG's Role with Regard to New Century's Residual Interests

#### a.    From the Perspective of New Century's Board and Management

As indicated above, the New Century Board of Directors and Audit Committee looked to KPMG to give it comfort with regard to the Company's residual interest valuations.  Until 2007, KPMG never suggested to the Board or the Audit Committee that New Century's residual interest valuations may have been materially misstated on New Century's financial statements.

Until at least 2002, residual interests represented a significant portion of the Company's total assets.[404]  Because of the historic importance of the Company's residual interests, KPMG focused more on this issue than on other accounting issues during much of the Company's early history.  According to Dodge and Cloyd, after New Century decided to reduce the relative size of its residual interests, KPMG focused more attention on the allowance for loan losses and hedge accounting than on residual interests.

Dodge and Kenneally would meet with KPMG every quarter for at least an hour prior to Audit Committee meetings to discuss the valuation of the Company's residual interests and other relevant accounting issues.  During those discussions they would review with the KPMG audit partner the large Residual Interest Valuation binders prepared by the Secondary Marketing Department, which contained historical experience for each securitization and vintage data.[405]

Kenneally dealt more frequently than Dodge with KPMG during 2005 and 2006.  In addition to discussing residual interest issues with KPMG in connection with KPMG's period-end "fair value" reviews, Kenneally typically reviewed and provided comments on drafts of any presentation that KPMG would make to the Audit Committee or Board a day or two in advance of the meeting.  Kenneally and Donovan would also talk about how to respond to questions raised about New Century's residual interest valuations by KPMG's Structured Finance Group ("SFG").[406]

---

[404] *See* Sections VI.B.3.b. and VI.B.3.d. above.

[405] *See* Section VI.B.3.f.i. for a discussion of the Residual Asset Valuation binders that the Secondary Marketing Department prepared for the Accounting Department and KPMG.

[406] *See* Section VI.B.4.d. for a discussion of the audit assistance provided by the SFG.

The independent Directors whom we interviewed repeatedly told us that they received what they regarded as comfort from KPMG that there were no significant problems with New Century's residual interest valuations. Members of Senior Management, including Morrice, Dodge and Cloyd, generally repeated this view. Senior Management and the independent Directors took comfort from the fact that KPMG tested New Century's models on a regular basis, even though they seemed not to know very much about the nature or results of those tests or held what appeared to be incorrect understandings of what KPMG had done.[407]

More junior members of the Secondary Marketing Department and of the Finance and Accounting Department, however, recalled earlier signals from KPMG that they had concerns about New Century's residual interest valuation models, above and beyond the discount rate assumptions that received the most discussion. For instance, Hatch recalled hearing from KPMG engagement team members during 2006 that New Century's models had shortcomings that were in increasing need of an overhaul. Tony Sanchez recalled that, during the second quarter of 2006, Kim made an "offhand comment" to him suggesting that KPMG was becoming more concerned about New Century's residual interest valuations and that residual interests were becoming a "hot button" topic. Sanchez also learned that Kenneally had become aware that Scott Carnahan "did not think [the residual interest calculation] was right." As discussed below, KPMG's expressions of concern became more pointed in early 2007.

While some New Century employees were concerned about KPMG's increasing criticisms of New Century's residual interest valuation models, Licata was not. Licata became aware of some of KPMG's concerns because he participated in the KPMG's period-end meetings or was otherwise made aware of KPMG's concerns. But according to one subordinate, Licata typically dismissed KPMG's concerns as "immaterial" and resisted changes to New Century's residual interest valuation methodology on the basis that his work had always "passed audit."

---

[407] Flanagan recalled that around 2002 or 2003, KPMG was hired to do a complete audit of New Century's residual interest valuation models and that only minor errors were discovered during that process. But Flanagan incorrectly believed that this "audit" of New Century's models was during a time when Carnahan was the KPMG audit partner for New Century. In fact, Carnahan was the KPMG audit partner for New Century for the 1996 to 1999 audits and Kinsella was the audit partner for the 2000 to 2004 audits. Furthermore, Flanagan recalled that, prior to KPMG, the Berkshire Group did some work on New Century's models. No one else recalls any such work nor have we been able to find any documents regarding work by the Berkshire Group on New Century's residual interest valuation models.

b.    **KPMG's Audit Teams and Their Work on Residual Interest Issues**

In 2005 and 2006, the relevant KPMG engagement team consisted of Donovan, Kim, Ryan Beckstrom and other associates of KPMG. Marc Macaulay was the concurring partner for the New Century audit. The following paragraphs describe the key KPMG personnel for purposes of their review and audit of residual interest valuations.

i.    **John Donovan**

Donovan became the KPMG audit partner for New Century after New Century's 2004 Form 10-K was filed in early 2005. Donovan appeared to have, at best, a general understanding of New Century's residual interest valuation models. He understood that New Century accounted for its residual interests by "estimating cash flows and then discounting them at a rate they believed was market-commensurate." Donovan knew that New Century used its own internally-developed models to value its residual interests, but did not know who at New Century had created those models. Donovan was aware that each securitization by New Century required the development of a new model, but he could not recall how many models New Century had developed during the relevant time period.

Donovan acknowledged that, with respect to its 2006 quarterly reviews and 2005 annual audit, KPMG had concluded that New Century's residual interests were "fairly stated, when looking at the financial statements as a whole."[408] Donovan said he never had any concerns regarding New Century's models, though "there were some concerns raised during our audit of 2006, in the 2007 timeframe, regarding the models, how to audit them, and what was the appropriate discount rate." Donovan said KPMG never determined how accurate New Century's models were because "we never finished our work" with regard to the 2006 audit. According to Donovan, year-end 2006 was different from year-end 2005 simply because "the market had changed - things were different." Donovan also stated that, even now, based on the information he has, he still views New Century's residual interests for 2005 as "fairly stated."

ii.    **Mark Kim**

Kim considers himself to be someone who knows how to value residual interests. He said that he had experience with residual interests at Encore and with other mortgage clients of

---

[408] Donovan explained that the phrase – "in the context of the financial statements as a whole" – reflects KPMG's policy of not opining on "individual balances and line items." Donovan confirmed that this determination involved questions of materiality.

KPMG. During his interviews with us, Kim provided a more sophisticated discussion than Donovan of what residuals are and how they are valued.

Kim told us that residual interests arise as a result of an off-balance sheet securitization and that they represent a stream of cash flows discounted to present value and retained as assets on the Company's books. Kim said there are several components to the valuation of residual interests, including prepayment speeds, projected losses from the collateral assets and interest rates that the collateral pools have as compared with what the bondholders were receiving. Kim said that each residual interest model relied upon a set of assumptions (including prepayment speeds, interest rates, and loss assumptions) and that there would be changes in those assumptions from time to time.

Kim could not recall which assumptions in New Century's residual interest models changed. Kim understood that when assumptions needed to be changed there would be a review by the Secondary Marketing Department, which would recommend changes in assumptions to New Century's Finance Committee for approval.[409]  Kim's understanding was that if certain trends were clearly noticeable, *i.e.*, if they occurred over a long period of time, and were not just a "blip" in one quarter, the Secondary Marketing Department would recommend a change in assumptions.

Kim stated that, despite certain deficiencies identified during the audit and review processes, New Century's residual interest valuation models were reasonable in that the models yielded reasonable values, *i.e.*, that the output of the models was reasonable. According to Kim, KPMG would suggest changes to the models. The engagement team, including SFG, would meet with the Secondary Marketing Department and Kenneally and make a presentation regarding KPMG's suggested changes. According to Kim, residual interests were not that much of an issue during 2005, but became a more important issue in 2006 because of changes in the housing and mortgage markets.

### iii.    Ryan Beckstrom

Beckstrom first worked on New Century's audit in connection with the audit of the Company's 2004 year-end financials. He thereafter worked on the 2005 quarterly reviews for

---

[409] Kim said that, as part of the audit process, KPMG reviewed the minutes of the Finance Committee to see what was decided. Kim did not recall how often changes in assumptions were made, when they were made, or whether the Committee ever rejected suggested changes. The Examiner has not found any discussion of assumption changes in Finance Committee minutes.

New Century. As part of the 2005 quarterly review process, Beckstrom began working on residual interest issues, among others.

Beckstrom had, at most, a rudimentary understanding of residual interests.[410] Beckstrom had not worked on residual interests for any other company and did not have any experience evaluating other models for valuing residual interests. He understood that the purpose of New Century's models was to provide a value for the residual interests that the Company held. Beckstrom, however, did not completely understand the Company's residual interest models, he could not judge the level of sophistication of the models, and the procedures he performed in testing the models did not give him a basis for forming an opinion regarding the sufficiency or effectiveness of the models. Beckstrom did not have an impression regarding the models used to value 2005 securitizations as compared to the models used to value pre-2003 securitizations. Beckstrom said that the models were more complex than he was comfortable evaluating.

### c.   KPMG's Procedures for Reviewing New Century's Residual Interest Models

In general, KPMG engaged in the following procedures to evaluate New Century's residual interest models:

1.    The engagement team performed data integrity testwork, by which it compared the data entered in the models with the trustee statements for the specific deal.

2.    The engagement team performed a reasonableness test on the accretion income associated with the residual interest. Essentially, this was a test to compare estimates, which had been based on past performance, with actual results. In general, if those tests revealed actual results that differed by more than 5% from predicted results, further testwork was considered necessary.

3.    The engagement team also reviewed information regarding prepayments and the losses associated with the residual interests.

4.    The engagement team asked KPMG's SFG to test a sample of New Century's residual interest models.

More details about KPMG's audit procedures were set forth in the Residual Interest Valuation Conclusion Memoranda that KPMG would prepare in connection with each review and audit. As set forth in one such Memorandum:

---

[410] Beckstrom's understanding was that a residual interest was the right to future benefit (in terms of future cash flows) to the Company as a result of a securitization transaction.

- 262 -

1.      The engagement team reviewed any new securitization transaction that occurred to ensure that it was properly accounted for as a sale or a secured borrowing.

2.      The engagement team also performed analytical reviews of fluctuations in models to compare estimates to actual results.

3.      The engagement team looked at losses and loss percentages for each securitization.

4.      The engagement team assessed the reasonableness of the discount rates the Company used in each model. The determination of a discount rate's reasonableness was based on whether the information available supported the Company's choice of discount rates.

5.      Because, in certain key respects, the Company's residual interest models rested upon judgments, assumptions and/or expectations by Management concerning matters such as discount rates, expected losses, and prepayment rates, the KPMG engagement team tested Management judgments in those areas by reviewing and comparing actual performance to Management's past estimates. For example, KPMG would compare the amount that was estimated in the prior quarter to actual performance. (SFG was part of this review.)

6.      When estimates of a key variable (*e.g.*, of prepayment rates) were incorrect over several quarters, the engagement team would review the estimates to determine whether there was a recurring problem with Management's estimates or whether the divergence between the estimates and actual results could be attributable to the fact that modeling is not an exact science.

Even when KPMG raised the "inherent risk" assessment for its audits of residual interest valuations from "moderate" for its 2004 and 2005 audits to "high" for its 2006 incomplete audit, the range of audit procedures planned by KPMG for those audits hardly changed.

One of KPMG's audit procedures was to review the assumptions used in New Century's models. The engagement team understood that each residual interest model had a set of assumptions and that there would be changes in those assumptions from time to time. Some of these assumptions concerned prepayment speeds, interest rates and loss assumptions.

### d.      Audit Assistance from KPMG's Structured Finance Group

In auditing New Century's residual interest valuations, KPMG's engagement team sought and received the assistance of its SFG. Donovan explained that the practice of involving the SFG in the process of reviewing New Century's residual interest valuations had been in place when he took over the New Century engagement, and he elected to retain it. Donovan said that

the engagement team had an "ongoing dialogue" with SFG.  Both Donovan and Kim considered SFG to be part of the engagement team.

Kim indicated that SFG was involved every quarter in KPMG's work at New Century. Kim stated that, although memoranda from SFG stated that their assistance was requested by the engagement team on specific dates, it was understood that SFG would be an integral part of the team.  Kim stated that SFG is regularly involved with most financial services audit engagements in the same fashion as it was with New Century, although Kim admitted that he had limited previous experience working with SFG at KPMG.  Before his assignment to New Century, Beckstrom had not previously worked with SFG, although he has since worked with SFG.

Carnahan, the SFG partner who provided audit assistance for the New Century engagement in 2005 and 2006 had been the audit engagement partner for the 1996 to 1999 New Century audits and, as a result, should have had a good understanding of the Company and the risks associated with its valuation of residual interests.  Carnahan told us that he had regular oral discussions with the audit partners regarding issues that SFG identified with respect to the residual interest valuations.

SFG provided different forms of assistance to the New Century engagement team:

First, SFG reviewed pool and servicing agreements to see if a securitization was a true sale.

Second, SFG would look at the specific numbers of each transaction to ensure that amounts were being recorded properly on New Century's books.  As part of the proper recording, they would test the proceeds coming in.

Third, SFG would run the data New Century received from the securitization trustee through KPMG's own model to check the results produced by one or more New Century models.

According to Kim, SFG tested New Century's models for their mathematical accuracy and to determine whether the models were performing as intended, and it reviewed their inputs and outputs.  Based on its industry knowledge and experience, SFG also provided advice regarding the reasonableness of assumptions in the models.

Kim understood that each securitization transaction had its own model and that there were about 15 or 20 different such models.  Each quarter SFG would test a sample of models. Donovan stated that it was his practice to have SFG review one or two residual interest models each quarter and at year-end.  KPMG selected the models to evaluate.  In the first quarter of

2006, Donovan requested that certain of the 2005 models be reviewed. Beckstrom was asked to select the models at some point in 2006. He asked SFG to review models that had not been reviewed in the prior year. Kim suggested that they not review the same models each quarter and that the models be rotated for testing, so that over the course of a year, KPMG would have reviewed a number of the models from an audit standpoint. Kim could not recall the same model being selected for testing in successive periods. Debbie Biddle said that it was part of KPMG's audit strategy to test at least two models per quarter. Biddle told us that KPMG selected the models at random and attempted to choose new models as well as a cross section of older models.

Each quarter the engagement team would provide electronic copies of the selected models to SFG to review. Beckstrom did not know if SFG created its own models to test New Century's models, despite the clear indication in its audit-assist memos that KPMG "independently modeled" certain residual interest transactions. Carnahan told us that SFG used its own internally-developed models to test the results of the models used by the Company but that SFG's models used the data and assumptions from the Company's models as inputs into SFG's own models. Carnahan explained that SFG looked at the prospectus for a securitization and tried to model the transaction the way the prospectus described it. Carnahan said that SFG would then compare the results of its model with the results of the Company's model. Carnahan told us that SFG did what it felt was appropriate but did not compare "every cell in every formula" of the models. Carnahan insisted that SFG used the Company's assumptions and was not asked to review those assumptions, although he admitted that SFG commented on the models, methodologies and assumptions when it felt it was appropriate or relevant. Nevertheless, Carnahan stated that SFG's review was not a "stamp of approval" of New Century's residual interest valuations because it only looked at certain aspect of deals and not all the assumptions in New Century's models.

### e.   KPMG's Residual Interest Valuation Conclusion Memos

Beckstrom stated that each quarter during 2005 and 2006 he prepared a Residual Interest Valuation Conclusion Memorandum that described the specific procedures used by the engagement team to test New Century's residual interest valuations and the results of those procedures. Among other issues, incorrect estimates would be considered and discussed in

determining the reasonableness of the Company's estimates and whether Management's current estimate required adjustment.

Beckstrom and Kim stated that SFG input was necessary for Beckstrom to complete the Residual Interest Valuation Conclusion Memoranda he prepared each quarter. Each quarter, SFG would prepare an audit assistance memorandum for the engagement team documenting its review of the models selected for testing and its observations related to those models and the assumptions it used. The results of SFG's review of New Century's residual interest models and its comments about those models would ultimately be incorporated into the Residual Interest Valuation Conclusion Memoranda prepared by Beckstrom. The engagement team would review the SFG memorandum and ultimately determine whether, based on the conclusions stated in the memorandum, it would be reasonable to conclude that New Century's residual interests were not materially misstated. Kim stated that he would review the conclusion memoranda that Beckstrom prepared, which would state that SFG had tested a certain number of residual interest models and that the engagement team was comfortable with SFG's conclusions.

Beckstrom could not explain why the SFG memorandum for the third quarter of 2005 was dated November 30, 2005, a month later than the Residual Interest Valuation Conclusion Memorandum for the third quarter of 2005, which is dated October 26, 2005. Despite the discrepancy in dates, Beckstrom asserted that he used the SFG memo to prepare his Conclusion Memorandum.

There is a similar inconsistency in dates between the SFG memorandum for the first quarter of 2006, which is dated May 9, 2006, and the Residual Interest Valuation Conclusion Memorandum for that quarter, which is dated April 26, 2006. Beckstrom could not explain why the Conclusion Memorandum is dated a couple of weeks before the SFG memorandum, but claimed that, regardless of the dates on the memoranda, there was regular interaction between the engagement team and SFG regarding particular findings. Beckstrom said it is possible that he had received the information he needed from SFG to draft the Conclusion Memoranda before he received the formal SFG memoranda.

Kim claimed that, although the dates of the engagement team's conclusion memoranda might be dated prior to the dates of the SFG memoranda, there were ongoing discussions regarding the models being reviewed and residual interests generally, so that the engagement team was continually updated on SFG's progress. Kim explained that, by the time the

engagement team had finalized their conclusion memoranda, they would have had enough discussions with SFG to reach its conclusions regarding the audit or the review. According to Kim, he would receive draft memoranda from SFG that would substantially represent the final product. In his view, SFG's final memoranda was a formality.

Donovan stated that the commentary provided in SFG memoranda was "cleared" through discussions with the SFG partner, though he did not recall how this "clearing" process was documented, and the Examiner did not find any documented evidence that this "clearing" process occurred. Carnahan said that he had regular discussions with the audit partners regarding issues identified by the SFG. Carnahan characterized these discussions as "negotiations" wherein they would "try to convince each other and reach resolution." According to Kim, there were many suggestions and recommendations in the audit assistance memoranda that SFG prepared. In his interview, Carnahan claimed that SFG made "suggestions" and not "recommendations" to the engagement team. In general, Kim said, the suggestions were to make sure that the assumptions used in New Century's models were adjusted in a manner that was consistent with then-current market conditions.

In fact, the SFG memoranda indicate that SFG consistently recommended that the engagement team should:

- Compare the data in the models to the source documents provided by the Company

- Test the assumptions against supporting documentation, such as historical data

- Review the Company's results when testing its models against actual cash flows (back-testing), and

- Review the Company's support for its discount rate assumptions.

Kim claimed that all suggestions set forth in SFG's memoranda were presented to New Century and that these suggestions were "well-taken" by New Century. Kim claimed that, more often than not, New Century would implement the changes that SFG recommended, although this claim does not seem to withstand scrutiny with regard to SFG's recommendations concerning New Century's discount rates.[411]

---

[411] *See* Section VI.B.7.b. for a more detailed discussion of the discount rate issue.

**f.     Marc Macaulay's Review of Residual Interest Valuation Issues
        as the KPMG Concurring Partner**

Macaulay stated that he did not review the quarterly SFG memoranda regarding New Century's residual interest models. Macaulay understood that SFG was doing the reviews of those models and summaries of the results were included in the engagement team's completion memoranda for each audit, which he did review. Macaulay also does not recall reviewing the quarterly residual interest conclusion memoranda.

**5.     New Century's Changes to Its Residual Interest Valuation Models in
        Late 2006 and Early 2007**

During the second half of 2006, KPMG appeared to become more insistent that New Century consider changes to its residual interest valuation models, particularly with regard to the discount rates they used. The audit assistance memoranda from SFG repeatedly suggested that those discount rates might be too low and, as a result, New Century might be overstating the values of its residual interests.

New Century's discount rates, however, were not the only issues being raised about New Century's residual interest models as 2006 drew to a close. Hatch became more aggressive in questioning the Company's apparent reluctance to collapse pre-2003 securitizations and questioned the Company's continued assumption that the loans left in the securitization trusts could be sold at par when those trusts were collapsed.[412] Furthermore, the Project Kettlebell transaction that New Century considered in the late fall of 2006 raised questions about the Company's previous residual interest valuations.[413]

As a result of a detailed reexamination and analysis of New Century's residual interest valuation methodology in late 2006 and early 2007, it appears that New Century was prepared to make a downward fair market value adjustment of nearly $90 million (39%) to the residual interest valuations that it had reported as of September 30, 2006. When the engagement team that was conducting the incomplete 2006 audit asked why such a large write-down was being made, Hatch explained that additional analysis of residual interest valuations had been performed in association with Project Kettlebell.

---

[412] *See* Sections VI.B.7.c. and VI.B.7.d. below.

[413] *See* Section VI.B.7.c.iii. below.

### a.    The Increased Emphasis on Collateral Values Rather Than Cash Flows

During the fall of 2006, Carnahan reemphasized his view that New Century should consider changing its residual interest valuation methodology by obtaining market bids for those residual interests.  At a minimum, Carnahan argued, those bids would help determine the reasonableness of the valuations New Century had been obtaining from models that computed discounted present values of future expected cash flows.  New Century, however, resisted this suggestion as impractical and futile, on the ground that New Century could not obtain realistic bids for its residual interests.

That point of view began to change during the fourth quarter of 2006, as the Company began to learn, in the course of the Project Kettlebell negotiations, how others might value its residual interests.  As a result of those discussions, the Company's methodology for valuing residual interests began to shift from a focus on cash flows to a focus on collateral value. According to Licata, that change in focus required the Company to consider a number of market factors, including trends in home values, how similar loans were trading in the market, the coupon rate on the loans in which New Century had an interest compared to the coupon rate on other loans trading in the market, and the relative state of delinquency of the loans in the relevant trust portfolio.

As part of its new valuation methodology, New Century began to assign market values to the remaining loans in the securitization trusts by allocating them to "buckets" based on current delinquencies, each of which would be assigned a distinct market price.  Licata and Hatch tried to determine these market prices by actively asking people in the market about the appropriate contours and pricing for different types of buckets in terms of discounts from par.  This process continued into the early months of 2007, motivated in part by the growing realization that KPMG was beginning to change the standards it applied to the shortcomings in New Century's models.

### b.    KPMG's    Increased    Concerns    About    Inadequate Documentation and Inadequate Controls

In connection with its incomplete 2006 audit, KPMG expressed increasing concern about the lack of documentation supporting key assumptions in New Century's residual interest models and the inadequacy of control procedures relevant to the Company's residual interest valuations.

During their incomplete 2006 SOX review of New Century's residual interests, KPMG identified significant deficiencies regarding residual interest valuations.  As a result of their 2006

"walkthrough," KPMG learned that Management did not have documentation indicating the need to adjust assumptions to the 1999 – 2002 models or how that need would be evaluated. In addition, KPMG criticized the inadequacy of New Century documentation supporting New Century's continued use of discount rates that had been in place the prior year. Similarly, KPMG criticized New Century because it did not have controls in place to revise the fair value, had no controls designed to adjust model assumptions to current market data, failed to update assumptions for 1999-2002 vintage residual models, and did not have controls for ensuring that "inputs into the models are accurate." The internal control deficiencies memorandum also expressed concerns about New Century's changes in call dates during 2006.

It is not clear why these deficiencies in documentation and controls, which applied to matters that had been in existence at New Century for a number of years, had become worthy of mention by KPMG in connection with the incomplete 2006 audit. Kim could not say whether the same deficiencies in terms of documentation and controls existed at the end of 2005 or whether different internal control tests were performed in 2005 than in 2006, such that the same deficiency noted in 2006 could not have been detected in 2005. Instead, Kim noted that the internal control deficiency workpapers for the incomplete 2006 audit were a work in progress and the language could have changed up until the year-end audit was complete.

### c. The Company's Major Adjustment in Residual Interest Values in Early 2007

In February 2007, in connection with the preparation of its December 31, 2006 financial statements, New Century revised certain assumptions (discount rates, loss severity, prepayment speeds, terminal collateral values) used to value its residual interests to take into consideration then-current market conditions and the likelihood that the terminal values of the mortgage loans would be less than par value at the clean-up call date. At the same time, the Company also planned to increase the discount rate used in its residual interest valuation models. Hatch summarized these changes in a February 27, 2007 memorandum to Cloyd, Weiss, Licata, Kenneally and Sanchez ("the 2007 Hatch Memorandum").

Although New Century never issued its December 31, 2006 financial statements, documentation developed in connection with these assumption changes and the preparation of New Century's 2006 financial statements show that, because of the proposed assumption changes described in the 2007 Hatch Memorandum, the Company had revised the value of its residual interests to $136.6 million, representing a 39% write-down of nearly $90 million (from

$223.7 million to $136.6 million) of the Company's residual interests, as compared to the amount reported at September 30, 2006. The specific impacts of each of the proposed assumptions changes will be discussed in more detail below.

> **6.     The Special Investigation Committee's Investigation of Residual Interest Valuations**

According to Heller, counsel for the Special Investigation Committee of New Century's Audit Committee (the "SIC"), KPMG alerted the SIC to an issue with respect to potentially inflated valuations of residual interests in February 2007 by suggesting that the Company had, at some point in 2005, stopped making adjustments to certain assumptions (specifically, prepayment speeds and loss assumptions) in the models used by the Company to value its residual interests in pre-2003 off-balance sheet securitizations, resulting in possible overvaluations of the Company's residual interests in those securitizations.

According to Macaulay, when New Century revealed a material weakness associated with its repurchase reserves, he asked the engagement team to start thinking about whether there were any other areas that could rise to the level of a material weakness. Macaulay also asked for a "desk review" of New Century's accounting for residual interests by a partner in KPMG's Department of Professional Practice ("DPP"). Macaulay does not recall if any conclusions were reached regarding whether material weaknesses existed with respect to the residual interest valuations. But because certain assumptions in the residual interest valuation models appeared not to have been changed and because the people who controlled the residual interest models were the same people who controlled the repurchase reserve that had been materially misstated, KPMG recommended to the Audit Committee that its investigation be expanded to include residual interests.

In response to this recommendation, in March 2007 the SIC directed that its investigation be expanded to include an analysis of certain assumptions used by the Company to value its residual interests in the pre-2003 securitized loans and directed Heller, with the assistance of PwC, to conduct an internal investigation of those issues and of New Century's methodology and assumptions for valuing and accounting for the residual interests it held in off-balance sheet securitizations that occurred prior to 2003 and the financial reporting of those values. Heller and PwC subsequently determined that certain New Century financial statements might be incorrect because some of New Century's residual interests were overvalued.

- 271 -

On April 27, 2007, Heller and PwC met with the SIC and provided an oral report detailing the results of their investigation as of that date. On May 23, 2007, the Audit Committee brought to the attention of the Board the findings of the SIC relating to the Company's repurchase reserves and its valuation of residual interests in pre-2003 securitizations, with a recommendation that the Board authorize the filing of a Form 8-K stating that, in the opinion of the Audit Committee, it was more likely than not that the Company's 2005 financial statements were materially misstated and, therefore, that those 2005 financials should not be relied upon. This determination by the Audit Committee resulted in the filing of such a Form 8-K on May 24, 2007, in which New Century disclosed that:

> Based on recent communications with members of the Investigative Team [Heller Ehrman and PwC], the Audit Committee has determined that there were errors in the Company's previously filed annual financial statements for its fiscal year ended December 31, 2005 (the "2005 Financial Statements") with respect to both the accounting and reporting of loan repurchase losses and the Company's valuation of certain residual interests in securitizations. The Company's ability to further investigate these matters is constrained as the Company is currently in liquidation proceedings under chapter 11 of the Bankruptcy Code. However, based upon the work performed by the Investigative Team, the Audit Committee and management believe that it is more likely than not that these errors in the aggregate result in a material overstatement of pretax earnings in the 2005 Financial Statements. Accordingly, on May 23, 2007, the Company's Board of Directors concluded, based upon the recommendation of the Audit Committee, that the 2005 Financial Statements should no longer be relied upon.

The SIC's investigation suggested there might be long-term problems with residual interest valuation that were known by at least certain New Century personnel, some of whom refused to speak to the SIC's investigators and some of whom gave information that conflicted with the information provided by other individuals. Thus, in addition to recommending that the Company file the Form 8-K that the Company did file in May 2007, the SIC and its counsel recommended that the residual interest issue be investigated in more detail by persons with subpoena authority and more resources.

### 7. The Examiner's Investigation of Residual Interest Valuation Issues

Although the Examiner's review and analysis covered a wide range of issues related to New Century's residual interest valuations, the investigation focused most of its attention on the following six issues:

A.     New Century's continued reliance on internally-developed Excel-based models to value its residual interests, even as third-party alternatives became available and flaws in the Company's models continued to come to light.

B.     The Company's insistence on using relatively low discount rates for determining the net present value of its residual interest cash flows and its resistance to repeated suggestions by KPMG's SFG that it increase those discount rates.

C.     New Century's failure to consider the continued viability of its assumption that all remaining loans in each securitization trust could be sold at par if and when that trust was terminated.

D.     The Company's change in the clean-up call percentages for some of its older securitizations, which had the effect of increasing the value of the Company's residual interests in those securitizations.

E.     The use of improper prepayment and loss assumptions in the Company's residual interest models and the failure to update those assumptions as necessary during 2006.

F.     The absence of critical internal control measures for the Company's residual interest valuation models.

The remainder of this section of the report will discuss each of these issues in turn, except for the internal control issue, which is discussed in detail in Section VIII.E.3. of the Final Report.

### a.     Deficiencies in New Century's Residual Interest Valuation Models and the Company's Decision Not to Use Third-Party Models Instead

The investigation revealed strikingly different perceptions within New Century about the technical capabilities and accuracy of New Century's residual interest valuation models. For the reasons set forth below, the Examiner's view is that those models should have been replaced by better third-party tools by no later than 2006, if not before. Whether because of inattention, cost concerns, inertia or other reasons, the Company continued to use models that those most knowledgeable about them regarded as "antiquated" or "flawed."[414]   The Examiner concludes that KPMG should not have acquiesced in the continued use of those models, particularly after a "flaw" in one such model resulted in a $9 million overvaluation of one specific residual interest at December 31, 2005.

---

[414] *See* Sections VI.B.7.a.ii. and VI.B.7.a.vi. of this Section below.