i.      **General perceptions of New Century's residual interest models by Senior Management personnel and New Century's Finance and Accounting Department**

In general, many members of New Century's Senior Management seemed to know relatively little about the details of the Company's residual interest valuation models, but assumed they were producing accurate results, in part because they were being reviewed by KPMG. Even the people in the Accounting Department had no concerns about the models New Century was using to value residual interests. Although Patti Dodge recalled one time when KPMG found an error in a particular residual interest valuation model,[415] she was not aware of any additional structural problems with the models, and was surprised by the suggestion that the models were not sophisticated enough to capture all of the data from the trustee statements. Dodge acknowledged that she could not rule out the possibility that there were other errors in the models, because the models were Excel spreadsheets and there could have been problems copying cells, but she was not aware of any such problems.

ii.     **Concerns that Mullins and Hatch had about the Company's models**

The people in the Secondary Marketing Department who operated the residual interest valuation models had a broader and deeper range of concerns about their technical deficiencies.

For instance, although Licata's residual interest valuation models were an improvement over previous models used by New Century, they were not very precise because they did not accommodate all of the information set forth on the securitization trustee statements. This created situations in which the models would not "tie out" to the trustee statements because the Licata models contained lump sum amounts for the bond tranches whereas the Deutsche Bank trustee statements broke out the amount of each tranche. The Secondary Marketing Department analysts also had difficulty reconciling information in the models to the trustee statements because some of the tranches had different "waterfall" payments and over-collateralization requirements. Furthermore, the Licata models did not manage over-collateralization account numbers well. Because the OC numbers often did not "tie out," the models often generated false "trigger" pops.[416]   In addition, the databases used to perform trustee reporting and servicing

---

[415] Dodge was probably referring to the problem with the 2005-B model, which is discussed in part v of this Section below.

[416] A "trigger pop" was a violation of a specific covenant in the securitization agreement relating to delinquencies or other occurrences.

reporting could not hold certain details, such as income from liquidating loans or the separation of prepayments from repurchases. Since the information was not captured, it was omitted from the models.

It appears that everyone in the Secondary Marketing Department, except Licata, recognized that the models he had built for the pre-2003 securitizations were inadequate, flawed, even "antiquated," in the words of Cloyd. Although Hatch brought greater modeling expertise to the Secondary Marketing Department, even the models he created in and after 2004 contended with the limitations of an Excel spreadsheet format and were not immune from errors.[417]

Licata may not have been aware of the limitations in the residual interest valuation models because he did not have much modeling experience. Although the senior analysts who worked on the models claim that they brought these limitations to Licata's attention and discussed with him their concerns about the models' accuracy, Licata claims not to recall anyone ever suggesting that the models were inadequate or unsophisticated. He did acknowledge learning, in the period between 2005 and 2007, that the models were not capturing all relevant data and that the models' calculations were not operating properly in all instances. Licata, however, seemed quick to dismiss problems with the models as "immaterial," and he rejected as "unnecessary" suggestions that older securitizations be re-modeled to correct their deficiencies. Although Hatch grew increasingly uncomfortable with the accuracy of the models for the pre-2003 securitizations during 2006, the Secondary Marketing Department was always pressed for time, and Hatch was too busy to press the issue with Licata after bringing it to his attention.

### iii.   Problems with New Century's residual interest models that came to light during the Examiner's investigation

During the Examiner's review of New Century's residual interest models, we identified several problems with the models New Century had been using to value its residual interests in pre-2003 off-balance sheet securitizations:

- The mathematical routines and formulas in the models were inconsistent. For example, the calculation taking into consideration the par value assumption appeared to differ from model to model. The formulas in certain models (*e.g.*, the model for securitization 00NCB) appeared to be inaccurate since a reduction in the terminal par value percentage in those models had the effect of increasing the value of the residual interest.

---

[417] *See* Section VI.B.7.a.v. below.

- The routine in some models that purported to compare projected results to actual results was ineffective, in that the formulas compared actual results to actual results.

- Some models contained certain cells where data had been hard-coded into the cells instead of being formula-driven. For instance, the required over-collateralization balance in the model for securitization 99NCB was hard-coded and when that hard-coding was removed, the value of the residual interests decreased by $1.2 million at December 31, 2005. The modeled cash flow/over-collateralization step-down trigger test for model 00NCA was hard-coded and when that hard-coding was removed, the value of the residual interests decreased by $3.8 million at December 31, 2005.[418]

The Examiner could not conduct a detailed analysis of the models New Century used to value its 2005 residual interests because those models were provided to the Examiner on a hard drive containing date-organized folders and files from the Secondary Marketing Department's shared drive at New Century. When the macros contained in these models were initiated, they appeared to search for data in other files that were not provided on this hard drive. Accordingly, the macros were unable to recalculate the results when certain assumptions and other inputs were changed. This situation precluded the Examiner from conducting a complete evaluation of these models. Subject to this constraint and our limited analysis of the 2005 residual interest models, the Examiner identified the following problems with those models:

- These models were heavily reliant on macros and Visual Basic ("VBA") logic. This created a "key person" risk as it is likely that only Hatch truly understood the complexities involved in these models. The macros make it difficult to review the calculations behind the cash flow forecasts and, therefore, to locate or fix any errors in the models. Furthermore, the complexity of these models precluded an independent review of the models by New Century, as the employee designated to conduct the independent review of these models (Pyatigorsky) did not have enough experience with such complex macros or with VBA.

- An error was identified relating to how the 2005 residual interest models use the terminal collateral value assumption. Evidently, the terminal value assumption contained in these models for periods prior to December 31, 2006 was not used to compute the residual interest values.[419] This modeling flaw was corrected in the

---

[418] Licata claimed that cells in certain models were "hard-coded" when the models would "break" or were unable to "deal with the calculations." According to Licata, "hard-coding" would allow a model to "true up for a given calculation that the model had difficulties with." Because this process was apparently not documented, there is no reasonable way to verify Licata's explanation for the "hard-coding." But even Licata's explanation for "hard-coding" confirms the existence of deficiencies in the mathematical routines of the models.

[419] In periods prior to December 31, 2006, New Century assumed a terminal value for the collateral in the 2005 NIMS of 100%. Therefore, this error did not impact the value of the residual interests reported in those periods.

2005 models that were used to value the residual interests at December 31, 2006. Apparently, this flaw was identified in connection with the Company's decision to change the terminal values for all the securitization deals at December 31, 2006.[420]

The Examiner also reviewed an analysis done by PwC in early 2007 of models for two 2005 securitizations.    Among other things, PwC determined that the models for these 2005 securitizations were deficient in that:

- The loss calculations were inconsistent with industry practice.

- The delinquency triggers were not modeled appropriately.

- The discount rates used for valuation were not product-specific, while New Century's pricing model had product-specific discount rate adjustments.

- The models were limited to 20 rep lines – limiting the models' granularity

- The processes for regular review and updates to model assumption were not defined.

- There was no model documentation.

- A significant key person risk existed, which was exacerbated by the limited documentation and use of a propriety model.

- No controls existed for model changes.

PwC also advised New Century that most of its peers were using third-party structuring tools, such as Intex, IMAKE or Wall Street Analytics, rather than internally-developed models to value their residual interests.

### iv.    KPMG's views regarding New Century's residual interest models

The investigation revealed conflicting information about KPMG's views regarding the sufficiency of New Century's residual interest valuation models.

According to Hatch, KPMG shared his views about the inadequacies and poor quality of the valuation models being used by New Century, particularly for pre-2003 securitizations, and agreed that New Century would need to change those models.

KPMG's workpapers reveal that KPMG's engagement team was repeatedly made aware of flaws in the Company's models. As part of KPMG's testing for data integrity for the year-end 2005 audit, KPMG discovered variances between the data inputs in the models and the

However, this error demonstrates that there are risks associated with the use of internally-developed models, particularly when they are not subject to third-party review.

[420] *See* Section VI.B.7.c. below.

comparable data from the corresponding trustee statements, which, they were told, were due to minor flaws in the models. Beckstrom did not recall what, if anything, KPMG did to verify that the variances were a result of minor flaws in the models nor did he recall whether anyone tried to determine whether there was a need to make an adjustment to the models as a result. The workpapers for the 2004 year-end audit also discussed discrepancies that had been identified in the models.

KPMG's workpapers for the second quarter of 2006 indicate that the same or similar flaws in the models were responsible for variances between the data inputs in the models and the corresponding trustee statements. Beckstrom could not recall whether these were the same flaws that were discovered in 2005 or whether there were variances in all the models KPMG tested.

Despite knowledge of these flaws, Kim said that the engagement team had no reason to believe that New Century's models were "unreasonable." According to Kim, although there were minor flaws in the models tested and it could be assumed that there were minor flaws in untested models, that even when you extrapolated them the flaws amounted to insignificant amounts and only led to immaterial differences. How Kim could be confident of this conclusion is not clear, given that KPMG only tested two or three models each quarter.

According to Kim, if the variances had been material, the engagement team would have addressed them, but they were not concerned. Kim explained that as long as the variances, in aggregate within the specific model, were reasonable the engagement team was comfortable with the minor flaws. His concern was "reasonableness," not dollar accuracy. Kim acknowledged that there were off-setting differences within the models, and only the net difference was assessed when determining the reasonableness of the valuation. Kim discussed the minor flaws in the models with people in the Secondary Marketing Department, but because he considered the flaws to be immaterial, they were not raised as a significant issue.

Apparently, KPMG's confidence in New Century's models was not shaken even when SFG discovered an error in the quarterly valuation by one model for a 2005 securitization that resulted in a $9 million overvaluation of one specific residual interest.

### v. The $9 million error produced by one 2005 residual interest model

As KPMG learned in early 2006, even the models created by Hatch for the 2005 securitizations were subject to error. The most significant such error occurred in the fourth quarter of 2005, when the failure of a model to properly account for private mortgage insurance

("PMI") payments resulted in a $9 million error in the residual interest valuation for securitization 2005-B. KPMG, not New Century, discovered this error.

There were four off-balance sheet securitizations that occurred in 2005.[421] The general residual interest model layout New Century used could not handle PMI information, so Hatch created an input for that information in a side table for securitization 2005-B. It was the only New Century deal he modeled that had a PMI strip.[422] Hatch claimed that a subordinate neglected to update the side table that included the PMI information, which led to a significant overstatement in the value of New Century's residual interest in the 2005-B securitization in the fourth quarter of 2005 when the PMI was excluded and a write-down in the first quarter of 2006 when KPMG caught the error and the information was subsequently updated in the side table.

Although the error in this model clearly occurred within the Secondary Marketing Department, it is not clear why the Finance and Accounting Department did not catch the error given the multi-million dollar difference between the amount of cash New Century would have received for this residual interest from the securitization trustee and the amount of cash it would have recorded on the basis of the model's improper calculation. Hatch claimed that the Accounting Department should have noticed a 20% write-up in a quarter of a residual interest valuation that is usually decreasing. Hatch, as the person within the Secondary Marketing Department who was responsible for portfolio reporting, should also have noticed that write-up, particularly since it related to a model he had built.

The error was discovered by KPMG's SFG during the first quarter of 2006. Donovan had asked that SFG review three residual interest models for 2005 securitizations and that SFG had identified the error in the model for the 2005-B securitization. Information about the error was relayed from SFG to Beckstrom through Kim. Despite this $9 million error resulting from only one model, Beckstrom does not recall whether anyone expressed concern regarding the accuracy of New Century's other models. Donovan told us the $9 million error did not raise any concerns on his part about the Company's remaining models. It does not appear that KPMG sought to review any additional models after discovering the error in the model for the 2005-B

---

[421] PwC did not review the models for those transactions as part of its work for the SIC.

[422] Hatch said that he does not know whether the pre-2003 deals had PMI strips because he did not roll or build those models.

securitization. Beckstrom acknowledged that finding an error would normally increase an auditor's skepticism regarding the accuracy of the models.

The $9 million error in the valuation of New Century's residual interest in the 2005-B securitization triggered an analysis of the materiality of that error and a discussion of whether it was material enough to require a restatement of New Century's 2005 financial statements. There was a conference call to discuss the materiality of the error in the 2005-B residual interest model. As a result of that conference call, Kenneally, on behalf of New Century's Management, prepared a memorandum (to Sanchez) dated May 8, 2006 with a description of the write-down in the first quarter of 2006 that was required to correct the error in the fourth quarter's valuation of New Century's residual interest in the 2005-B securitization.[423]   Kenneally's memorandum described the failure to load a component (PMI) into the model, provided a rationale for why the error was not "material," and concluded that, because the error was "immaterial," New Century did not need to restate its 2005 financial statements - a conclusion with which Donovan agreed.[424]

Kim said that people within the Secondary Marketing Department made the adjustment to New Century's residual interest valuations for the first quarter of 2006 that KPMG recommended in light of their discovery of the $9 million error.  Kim indicated that the issue of internal controls was raised with New Century in connection with that error and that New Century Management indicated that they would take KPMG's comments into consideration and implement control processes to mitigate this deficiency.  According to Kim, Management took "proactive" measures to implement new controls in 2006 to prevent future errors, although he could not recall what those controls were without reviewing the year-end SOX documentation. No such changes in controls were discovered by the Examiner.

### vi.   New Century's consideration and rejection of third-party models

According to Hatch, New Century could have used professional third-party valuation models that would have: (a) allowed more valuation work with fewer people; (b) limited analysis

---

[423] *See* the memorandum from Kenneally to Sanchez dated May 8, 2006 Re: Evaluation of Residual Model 2005-B Correction.

[424] Although, this $9 million error may have been immaterial when considered in isolation, it is only one of several errors in New Century's 2005 financial statements that this investigation uncovered, which, in the aggregate, did result in a material misstatement of those financial statements. *See* Section VII.

to model specific elements without concern about the underlying calculations; (c) allowed flexibility in the types of assumptions (*i.e.*, would have allowed the use of CPR and loss severity functions not available in the Excel models New Century used); (d) run multiple models simultaneously; (e) maintained loan-level detail rather than aggregates in rep lines; and (f) permitted scalability.

According to Mullins and Hatch, New Century had talked to vendors like Intex, Wall Street Analytics and IMAKE about using commercial software to value its residual interests, but New Century did not want to spend the money necessary to use third-party models. Hatch also said that Licata thought the weakness was in the modeler and not in the models so that professional models were an unnecessary expense.

Others did not support the view that New Century did not purchase third-party software because of its cost. Flanagan said New Century had considered purchasing Intex, a third-party vendor software, to help value New Century's residual interests and that this purchase was in the budget for 2006.[425] Flanagan said that New Century was considering Intex because Wall Street had begun to use it (it was industry standard by the end of 2005), so its use would make it easier for New Century to share information with broker-dealers (rather than converting information from Excel to Intex). Flanagan personally tested the Intex software in 2001 or 2002, but it was not well developed then, and was not in common use. Cloyd confirmed that there had been discussions about the willingness and desire to upgrade the Company's "antiquated" tools for valuing residual interests by purchasing tools like Intex and Levels. According to Cloyd, investments in this software were actually included as part of the 2006 and 2007 budgets.

The evidence is mixed as to whether KPMG felt strongly that New Century should use third-party models to value its residual interests. KPMG understood that New Century was using in-house models developed by people at New Century to value its residual interests. Neither Donovan nor Kim knew who developed the models, which used Excel software, but understood that Licata, Hatch, and Mullins reviewed and worked with the models. To Kim's knowledge KPMG did not have any involvement in the creation of New Century's models.

According to Hatch, KPMG thought New Century should use professional models, at least by 2006. But Kim disagreed with Hatch's recollection. According to Kim, KPMG generally thought that New Century had sufficient in-house people with appropriate knowledge

---

[425] Flanagan did not know if Intex was ever purchased because he left New Century before 2006.

to develop the models it used to value its residual interests. Donovan and Kim also told us that they believed their other clients in the subprime mortgage industry used their own, internally-designed models to value residual interests. Beckstrom did not know whether other companies used third-party models to value residual interests.

Kim claimed that, although there are products you can buy that are designed by third parties, these products require a great deal of customization and thus would likely require the use of a consultant. In this respect, Kim would not consider them to be third-party software or products, but rather, the work of an outside consultant. Kim said that an alternative to internally-developed valuation models such as those used by New Century was to hire a consultant to go through the same modeling process and develop a value. Kim did not know whether New Century ever contacted a consultant regarding residual interest valuation models. He also does not recall recommending that they do so.

### vii.    The Examiner's conclusions regarding New Century's residual interest models

By 2006, if not before, New Century should not have been using its internally-developed Excel-based models to value its residual interests. The Secondary Marketing Department was aware that these internally-developed models had a range of flaws and that there were third-party alternatives that would have been an improvement over the Excel-based models upon which New Century was relying. Licata's resistance to a change in modeling technology was understandable, given his personal faith in the residual interest models he had developed, but other people at New Century – above and below Licata – who had less of a personal investment in those models should have pushed harder to replace them with better tools.

The Examiner's understanding is that mortgage companies with similarly sized assets often used independent third-party models rather than internally-developed in-house models because of the risks associated with the use of internally-developed models, particularly when they are not subject to third-party review. This understanding is supported by PwC's advice to New Century, in February 2007, that most industry peers with similarly sized assets used a third-party structuring tool to value their residual interests.

The Examiner understands that, even when internally-developed models are used, there is typically some form of documented testing of the models by an independent third-party to ensure the models are performing their calculations correctly. When a mortgage company uses its own models (for example, Microsoft Excel-based models) to value its residual interests, it is "best

practice" and not uncommon for a third-party to be retained to value the mortgage company's residual interests at year-end using the third-party's own models.[426]  The mortgage company can then calibrate its models to achieve results consistent with the results attained by the third-party so the internally-developed models could continue to be used on an interim basis with some level of confidence.  New Century did not follow these "best" practices.[427]  In the Examiner's view, the limited testing by the SFG at KPMG of only two or three models per quarter was not an adequate substitute for the kind of testing that should have taken place, particularly given the "flaws" and errors that KPMG found in the course of its testing.

The Examiner cannot quantify the potential impact on New Century's financial statements of its continued use of flawed, internally-developed models for valuing its residual interests.  As we have described above, KPMG found at least one instance in which one of the models it tested had overstated a single residual interest by $9 million in one particular quarter.  It would be difficult and time consuming to determine if there were similar million-dollar errors in the dozens of other residual interest models that were not tested each quarter.  But one lesson to be drawn from New Century's experience is that a publicly-listed financial services company, like New Century, should be using better technology to value the financial assets it reports to investors and the public, particularly when those values rely on complex assumptions and judgments.  Repeatedly dismissing "flaws" in antiquated valuation models is a recipe for disaster.

### b.    New Century's Prolonged Insistence on Using Low Discount Rates to Value Its Residual Interests

As previously discussed, the results produced by New Century's residual interest valuation models depended heavily upon the assumptions they used.  A key assumption for these purposes was the discount rate used in each model to compute the present value of the net cash flows associated with the residual interest in the securitization to which that model related.  The valuation of New Century's residual interests bore a direct but inverse relation to the discount

---

[426] Although Flanagan and Dodge suggested that a third-party had been asked to review New Century's models, their recollections on this subject were vague and unsupported by any documentation.  Furthermore, if there was a third-party review of New Century's residual interest valuation models at some point in the past, that review did not cure those models of deficiencies that were readily detected by Mullins, Hatch and KPMG in 2005 and 2006.

[427] In addition, a third-party would likely create or insist that New Century create documentation that described the various mathematical routines and formulas in the models.  As discussed in Section VIII.E.3. of the Final Report, New Century never created such documentation.

rates used in the residual interest models. If the discount rates increased, the residual interest valuations would necessarily decline.

New Century's choice of discount rates – 12% for residual interests in CE securitizations and 14% for NIMS residuals – was a subject of continuous discussion by New Century and certain people within KPMG during 2005 and 2006. By late 2006 or early 2007, New Century's Board of Directors and Senior Management had come to the conclusion that these discount rates were too low and would result in an overvaluation of the Company's residual interests. The Examiner has concluded that those discount rates should have been increased much earlier than the end of 2006, and that, by failing to do so, New Century overstated the valuations of its residual interests by no less than $14.8 million at the end of 2005 and by comparable amounts in 2006.

### i. New Century's discount rates for residual interest valuations prior to the end of 2006

Over a six-year period of considerable turbulence in general interest rates and significant changes in the subprime mortgage market, the discount rates that New Century used to value its residual interests remained remarkably stable. As the following table demonstrates, throughout most of that time period, including every quarter from the second quarter of 2002 until the third quarter of 2006, the discount rate that New Century used for its residual interests in standard CE securitizations was 12% and the discount rate that it used for NIMS residuals was 14%.[428]

|  | Q2 2000 – Q3 2000 | Q4 2000 – Q3 2001 | Q4 2001 – Q1 2002 | Q2 2002 – Q3 2006 |
|---|---|---|---|---|
| CE Securities | 12% | 13% | 13% | 12% |
| Pre-2001 NIMS | 14% | 15% | 15% | 14% |
| 2001 NIMS | - | - | 20% | 14% |
| 2005 NIMS | - | - | - | 14% |

With one exception, during the six quarters from the fourth quarter of 2000 through the first quarter of 2002, when New Century increased its discount rates, it did so by only 1%.

The Company provided various reasons for returning its discount rates in the second quarter of 2002 to 12% and 14%, including: (1) current market rates, which were at a 40-year low; (2) the fact that the residual portfolio was hedged against interest-rate risk; (3) additional CPR had been added to all fixed-rate products; (4) losses were increased by approximately 26 basis points; and (5) year-to-date, the Company had repurchased over $70 million in seriously delinquent loans from the residual portfolio.

---

[428] We have been told that the higher 14% discount rate for NIMS residuals was intended to reflect their greater risk.

It is not clear who within New Century determined the discount rates that were used in New Century's residual interest valuation models prior to 2003 and who had the responsibility for reconsidering those discount rates in the years thereafter.[429]  What is clear is that, until 2006, New Century did not go through an analysis similar to the analysis described in June 2002 to consider whether its discount rates for residual interest valuation should be adjusted, even though some of the factors that supported the Company's previous adjustment of discount rates in 2002 had substantially changed.  This was so even though, in about 2005, New Century increased the discount rate on securitizations done at the REIT level to 18%, purportedly to reflect the higher risks associated with such securitizations[430] and even though KPMG's SFG frequently questioned New Century's discount rates during 2005 and 2006, observing that they were low when compared to the discount rates used by other similar companies.

Even apart from the concerns expressed by KPMG (which will be discussed below), there is evidence that Senior Management within New Century had reason to believe as early as 2005 that its residual interest discount rates might be too low.  Certain officers, including Cloyd, were aware, by at least July 2005, of the downward turn in the subprime mortgage market and the concomitant increase in risk associated with its residual interest portfolio.  Internal e-mails in December 2005 suggest that senior executives were aware that any secured financing relating to residual interests would carry interest rates close to 25% and that an increase in New Century's residual interest discount rates to that level would result in a substantial reduction in the valuations of those residual interests.

> ii.     **The SFG's increasing concerns about New Century's discount rates during 2005 and early 2006 and the responses of New Century and the KPMG engagement team**

At least as far back as May 2005, SFG, led by Carnahan, consistently produced memoranda that suggested New Century's discount rates might be too low and that urged

---

[429] Cloyd, Licata and Hatch consistently suggested that, unlike other assumptions in the residual interest valuation models, the Finance and Accounting Department had responsibility for setting the discount rate assumptions in those models.  But Walker suggested that the Finance and Accounting Department looked to the Secondary Marketing Department for guidance about what discount rates it should use for valuing residual interests.

[430] Licata said that the Company used an 18% discount rate for securitizations at the REIT level in order for those deals "to make sense."  He also claimed that, although the assets in REIT securitizations and in off-balance sheet securitizations were similar, a higher discount rate was justified by certain REIT requirements, the tax implications of REIT deals, and higher costs of capital for REIT deals.  Licata claimed that the discount rate for the REIT securitizations was dictated by the Finance Department.

KPMG's engagement team to require New Century to supply information that would support those low rates. During his interview, Carnahan insisted that he never "recommended" that New Century increase its residual interest discount rates and did not tell anyone that the discount rates were "too low," but merely observed that New Century's discount rate was at the low end of the acceptable range. In this respect and others set forth below, Carnahan's statements seem inconsistent with the language and tone of the memoranda he signed during 2005 and 2006.

In an audit assistance memorandum prepared for the quarterly review for the first quarter of 2005, SFG noted that New Century's 12% discount rate:

> [I]s at the low end of the range compared to similar issuers. SFG notes that other issues have been typically using residual asset discount rates principally ranging from 12% to 35% per annum. The client should provide supporting information for their discount rate assumption. Examples of supporting information are a letter from an Investment Bank or market information based on comparable assets with similar ratings (the Company should estimate the implied rating for their security), risk and duration profiles (*i.e.*, High Yield Corporate Bonds or ABS bonds rated B).

The same recommendation for the same reason appeared in the audit assistance memoranda SFG provided for the second and third quarters of 2005. SFG never saw such documentation in 2005, although Carnahan told us he believed the engagement team had seen it. But Kim could not recall whether New Century provided the supporting information that SFG suggested during the reviews for the first three quarters of 2005 or whether the engagement team pressed New Century to provide such information. Donovan did not recall seeing any documentation of New Century's discount rates until some point in late-2006.

In connection with the 2005 year-end audit, New Century did provide KPMG with a memorandum that tried to support its discount rate assumptions. While this memorandum discusses some of the issues that would need to be considered to arrive at an appropriate discount rate, its basic approach was to: (a) consider the yield curves of low-rated debt issues; (b) add a premium; and (c) then compare the results to the discount rates used by New Century to value its residual interests. New Century claimed that, by basing its analysis on yields associated with Composite USD B-rated bonds, it was comparing its discount rates to "third-party financial instruments and their relative spread to Treasuries as assets that have similar cash flow characteristics."

The Company's memorandum did not explain why the yield of low B-rated debt issues was an appropriate benchmark for its analysis nor did it provide any evidence to support the spread (or premium) between the yield of those debt issues and the discount rates used to value the Company's residual interests.[431]   In fact, KPMG's SFG stated, at a later time, that "junk bonds are not comparable nor an average of all 'B' rated bonds since most are junk corporate bonds and few are asset-backed."

Despite these deficiencies, the KPMG engagement team reviewed and relied upon the Company's analysis in determining that the Company's residual interest discount rates were reasonable.  According to Kim, at the time of the review, the engagement team and SFG, after analysis of the Company's position, agreed that the use of a four-year B-rated bond was an appropriate way to evaluate whether the discount rates being used were reasonable.  He said they also agreed that New Century's justification for the 12% and 14% discount rates the Company was using was reasonable.  Kim stated that he also accepted the Company's position that the discount rates being used by New Century's competitors were not indicative of the rates it should be using because every portfolio or loan pool is different in nature, not only because it is composed of different loans, but because the loans are underwritten by different companies and different companies have different underwriting guidelines.    As a result, Kim said, a generalization cannot be made regarding a single industry-wide discount rate.

The Company's justification of its discount rates did not indicate that the Company had considered the market values or recent sales of residual interests, as recommended by SFG.  For example, in its memorandum for the December 31, 2005 year-end audit, SFG observed that "we are aware of numerous residual interest sales in the last year and [sic] with the average discount rate in the range of 18% to 25% depending on the other assumptions."  Similarly, in an e-mail dated February 14, 2006, Carnahan advised the engagement team that numerous clients had sold residuals in the 2005 financial year and that the average discount rate was 18% to 23%, depending on other variables.    In relation to New Century's residual interests in 2005 securitizations, Carnahan observed that for similar NIMS products, Washington Mutual had used a discount rate of 35%, and Countrywide Financial had used a 40% discount rate.

---

[431] Morrice told us that he believed the decision to base New Century's residual interest discount rates on the lowest B-rated bonds was made by Colombi, working with Goldberg.  But Goldberg told us he had no involvement in the discount rate issue until September 2006 and that he did not believe the yield on B-rated bonds was a proper basis for determining the discount rate for residual interest valuation.

Thus, SFG's own documents are inconsistent with Kim's characterization of the consensus he claimed to exist between the engagement team and SFG on discount rate issues when work was being completed on the 2005 audit.

SFG's concerns about New Century's discount rates appeared to become increasingly urgent during 2006. SFG's audit assistance memorandum for the first quarter of 2006 stated that the 14% discount rate New Century was using for its 2005 NIMS residual interests:

> [I]s the lowest discount rate we have seen used by others recently for similar assets. Based on discussions with market participants, residual asset sales in recent months were priced to yield 23% - 30% return on the asset. While these sales do not necessarily define an active market they are hard to ignore. NC should provide supporting information for its discount rate assumption as compared to other market information. Applying higher discount rates to the retained assets would reduce the value of the assets . . .

As part of the quarterly reviews for the first, and second and third quarters of 2006, SFG continued to urge the engagement team to ask New Century for more documentation to support its discount rate assumptions. Carnahan increasingly emphasized the importance of looking for possible market valuations of residual interests because, in his view, the market for those interests had grown so substantially that market bids might be a preferable alternative to continued reliance on calculations of discounted present cash flow. For example, in June 2006, Carnahan suggested that New Century look to:

> 7. Comparable securities that trade (the ones most commonly referred to as 'B' rated CMBS bonds (8% (15 years) to 12% (30 years)) over comparable durations and treasuries.
>
> 8. Benchmark other SEC reporting entities with similar assets.
>
> 9. Since so many residuals have been traded in the last year, obtain sufficient information from the investment bankers to use in reversing the discount rate (or get a bid/valuation on a NC residual).

The repeatedly expressed and increasingly strong expressions of concern by SFG seemed to have little impact on KPMG's engagement team. Neither Donovan nor Kim was troubled that the engagement team may not have insisted upon the supporting documentation that SFG had recommended during each quarterly review in 2005 and 2006. Donovan argued that quarterly reviews are just that—"reviews" as opposed to audits—and that KPMG's responsibility on quarterly reviews was to advise the Company whether any changes are necessary in order to comply with GAAP. According to Kim, SFG's comments were discussed with people at New

Century as part of the quarterly reviews, but the engagement team's primary objective was to determine the reasonableness of New Century's discount rates. Kim stated that, although SFG continued to suggest that New Century document the bases for its relatively low discount rates, the engagement team continued to conclude that the Company's discount rates were reasonable without documentation. From Kim's perspective, documentation would only have been required as part of the year-end audit.

Kim ultimately had no explanation for why SFG recommended additional information from New Century supporting its discount rate assumptions quarter over quarter, yet the engagement team concluded that New Century's residual interest valuations were reasonable without such documentation. Despite evidence to the contrary, Kim insisted that SFG had a similar opinion to that of the engagement team regarding New Century's discount rates, and that SFG's concerns were addressed with the Company each quarter during 2005 and 2006. According to Kim, New Century's Management was repeatedly told, throughout 2006, that the Company's discount rates were at the aggressive end of the range of discount rates used by companies in its industry, and that the engagement team would continue to monitor their discount rates and analyze them in light of changes in the market. They also asked the Company to do the same. Kim insisted that, even though New Century's discount rates were considered to be "aggressive" and "at the low end of the range," the engagement team, including SFG, concluded that they were reasonable. Kim stated that in his personal opinion the 12% and 14% discount rates that New Century used in 2005 and 2006 were reasonable, although this statement appears to be inconsistent with concerns Kim expressed to at least one person in New Century's Secondary Marketing Department, who recalled that Kim frequently raised questions about New Century's discount rates.

Donovan, like Kim, took the position that SFG, despite the issues raised in their audit assistance memoranda, ultimately agreed that New Century's valuations were reasonable quarter after quarter through the third quarter of 2006. According to Donovan, he deferred to SFG and, in particular, to Carnahan, on such matters. Donovan said that he had discussions with Carnahan regarding the adequacy of the discount rate used in New Century's residual interest models as early as the first quarter of 2006. He also recalled the discount rate issue being addressed in SFG's audit assistance memoranda, that they placed New Century's rate "at the low end of the

range," and that they repeatedly suggested that New Century provide documentation in support of its discount rate.

Donovan acknowledged that the discount rate concerns expressed in SFG memoranda could properly be viewed as "Scott Carnahan's opinions," as Carnahan was the most senior SFG individual noted on the memos. Donovan insisted, however, that, upon discussing the discount rate issue, Carnahan "ultimately agreed with the Company's rate in all instances through the third quarter of 2006," although Carnahan maintained that the discount rate issue would need to be revisited in the fourth quarter of 2006. Donovan said that he relied on Carnahan to make these determinations, and that he "never" disagreed with him. Donovan also claimed that Carnahan agreed with the engagement team's conclusion memoranda, which expressed no disagreement with the Company's residual interest discount rates.

### iii.   KPMG's representations to the Audit Committee about New Century's residual interest discount rates

KPMG, through Donovan and Kim, repeatedly told the Audit Committee that New Century's residual interest discount rates were acceptable, although at the low end of the range of discount rates being used in the industry.[432] Management gave the Audit Committee the same assurances, *i.e.*, that New Century's discount rates were within the range of acceptable comparables. Zona told us that the fact that New Century's discount rates were lower than others in its peer group raised issues in his mind, but that KPMG informed the Audit Committee that New Century's discount rates complied with GAAP. Morrice recalled that the discount rate issue was discussed frequently at Audit Committee meetings.

Dodge's recollections were slightly different. Dodge recalled that the Company's residual interest discount rates were frequently discussed at the 2006 Audit Committee meetings and that KPMG "pushed back" with regard to those rates during 2006. Dodge also said that the discount rate was discussed in her hour-long meetings with KPMG prior to each Audit Committee meeting. Dodge said that KPMG never argued that New Century's discount rates

---

[432] According to Forster, by informing Board members that New Century's discount rates were "acceptable," KPMG put their "stamp on it." Donald Lange recalled that the Company's discount rate was lower than its peer group, but he did not think it was "aggressive accounting." Lange said that Zona "was leading the charge" regarding residual interests and the appropriate discount rate.

were inconsistent with GAAP. Rather, Dodge stated, KPMG argued that the Company's
discount rate was low when compared to the Company's peer group.[433]

> #### iv.    Increasing attention to the discount rate issue in the
> #### second half of 2006 by New Century and KPMG

Even if Kim claims he was comfortable with the discount rates New Century was using
to value residual interests during 2005 and 2006, the concerns expressed by SFG received more
attention during the second half of 2006.

Hatch became aware in early to mid-2006 that KPMG thought the Company's discount
rates were too low because the industry standard was higher for New Century's asset type.
Walker recalled a dialogue with KPMG related to documentation of the discount rates used to
value residual interests, including a conference call with Carnahan in July 2006 during which
Carnahan stated that the Company was not valuing residual interests appropriately. According to
Walker, other participants in this dialogue included Kenneally, Donovan, Kim, and Justin Ayre
from KPMG. Walker recalled that KPMG representatives repeatedly questioned why New
Century was using a 12 – 14% discount rate when other companies were using a higher one.
Walker's recollection is that Kenneally gave KPMG some backup to support the Company's use
of the 12 – 14 % discount rates, but she believes Kenneally would have asked the Secondary
Marketing Department about any issues relating to those discount rates.

Discussions regarding the possibility of increasing the discount rates the Company used
to value residual interests became more serious later in the third quarter of 2006. On September
5, 2006, Carnahan, Donovan and Kim of KPMG met with Kenneally, Licata and Goldberg of
New Century to discuss Carnahan's concerns. Donovan did not recall where the September 5
meeting occurred, or whether he or Carnahan specifically requested it, but he remembered that
Carnahan used the meeting to communicate to New Century Management his concerns about the
Company's discount rate, which Donovan believes were prompted by changing market
conditions. According to Goldberg's memo summarizing the meeting, Carnahan "noted than
when compared to other companies in the space he works with or follows, while [New
Century's] loss assumptions are essentially in-line with the rest of the industry, [its] CPRs are

---

[433] Cloyd also recalled that KPMG questioned the discount rate because it was below the rate used by the
Company's peer group. Cloyd did not recall ever being concerned about the discount rate or ever having
discussions with anyone about the impact that a higher discount rate could have on the Company's financial
statements.

slower and [it has] the lowest discount rate." Goldberg's memo stated that KPMG's comments were directed to the 2005 securitization transactions because KPMG viewed "the older residuals as both immaterial, and a lower discount rate [was] justified due to age." Carnahan and others discussed several alternative methodologies, including bids from third parties, which the Company might use to determine the value of its residual interests.

New Century representatives responded that, while what others were doing was interesting, it might or might not be an appropriate basis of comparison given the distinctive characteristics of the collateral in the securitizations in which the Company had residual interests, the Company's views of credit quality, and other factors. In addition, New Century's representatives observed that the SEC staff had recently reviewed New Century's Form 10-K, and in particular the notes related to residual interests, and had made no comments regarding the Company's discount rate, although it is not clear why the failure to provide such comments should have been a source of comfort to the Company.

Although Kim said the September 5 meeting was one of the "ongoing" discussions between KPMG and New Century regarding residual interest discount rates, Donovan did not recall such meetings taking place in previous quarters.[434] Donovan stated that there was "not much of a reaction" on the part of Management to Carnahan's observation that the Company was using the lowest discount rate in the industry because New Century's Management had their own justification for the rates they were using. Furthermore, Donovan shared the view that "no two securitizations are alike" and that the "underlying collateral is different," and thus that the use of other companies' valuations was merely one "data point" to consider.

In his interview with the Examiner, Carnahan characterized the September 5 meeting with New Century in ways that were different from Donovan's recollection and Goldberg's contemporaneous memo describing the meeting. Carnahan insisted that he did not suggest to New Century that it might need to raise its residual interest discount rates during the meeting and that the focus of the discussion had been less on valuation issues than on residual interest transactions taking place in the marketplace, internal controls and the need for better documentation of New Century's discount rates.

---

[434] Kim did not recall the details of the discussion at the September 5 meeting, other than that it probably concerned discount rates used in the industry.

Kim told us that KPMG got comfortable with New Century's discount rates in part, he recalled, because there were comparables in the market that supported the Company's discount rates. It is not clear what "comparables" would have supported this conclusion.

Potential concerns about New Century's residual interest discount rates were brought to the attention of the full Board of Directors shortly after the September 5 meeting with KPMG. It appears that a focus of the Board discussion on September 8, 2006 was how a change in the residual interest discount rates would affect the Company's earnings. The minutes state that Dodge "reported that a change in the discount rate for the Corporation's residual assets could cause a write-down but that Management was actively working with KPMG with respect to that matter. . . . Ms. Dodge then responded to the Board's questions regarding the impact that a change in the discount rate for the Corporation's residual asset could have on EPS."

Morrice recalled learning about Carnahan's concerns, but regarded them as less of an attack on the discount rates that New Century was using than a desire by Carnahan not to have to explain New Century's discount rates to other KPMG clients. According to Morrice, Carnahan acknowledged that New Century was able to support its discount rate, but that Carnahan's other clients used a higher discount rate than New Century and Carnahan wanted New Century to increase its discount rate to "make things easier." According to Morrice, New Century did not want to base the discount rates it used on what peer firms were using because: (1) looking only at the discount rates used by peer firms can be inaccurate because a discount rate reflects cost of capital, which varies by firm; and (2) New Century wanted a formulaic process to determine its discount rates and did not want to wait for its competitors to reach a decision about discount rates before New Century would know what discount rate it should use.

In an internal New Century e-mail chain on October 5, 2006, Kenneally also suggested that KPMG was pressuring New Century to raise its residual interest discount rate because of "pressure from other clients." Donovan could not recall any such discussions with New Century, and stated that he did not receive any "pressure" from other clients regarding New Century's discount rate. When asked whether he felt the "true sensitivity" of the discount rate issue had been adequately conveyed by KPMG to New Century during the September 5, 2006 meeting, Donovan stated, "I don't know."

Sanchez remembered that KPMG (and in particular Carnahan) was encouraging New Century to increase its discount rate to 18% because they "felt other people in the market were at

that level" and that New Century was using only 12 – 14%. Sanchez recalls Kenneally saying that the Company felt it was justified in using 12 – 14% because some residuals were sold at that value and KPMG was basing their analysis on a "fire sale" of some residuals.

In the weeks following the September 5 meeting with KPMG, Goldberg undertook a fresh analysis of New Century's discount rates. Goldberg said Dodge and Kenneally asked him to perform an analysis of New Century's residual interest discount rates by starting "with a blank piece of paper" and figuring out how he would calculate the appropriate discount rate. To conduct his analysis, Goldberg looked at the methodology that the Company had used to calculate the discount rate. Goldberg did not think that the Company's residual interests could be compared to low B-grade corporate bonds, which was the premise for the Company's previous discount rate analyses. Goldberg said that he looked at implied rates of return on other financial instruments and at the Company's cost of capital. He also looked at publicly available data about the discount rates being used by New Century's competitors, but said that he did not consider those discount rates to be dispositive or even highly important in conducting his empirical analysis.     Among other comparables, Goldberg considered the yield on Ba2 Residential Mortgage-Backed Security ("RMBS") instruments, which Goldberg adjusted by a risk premium of 200-300 basis points (to account for the additional risks associated with residual interests).[435]

The results of Goldberg's analysis were set forth in a presentation dated October 2006 and entitled "Residual Discount Rate Analysis." Goldberg's analysis concluded that although New Century's rates – 12% for residual interests in CE securitizations and 14% for NIMS residuals – were at the low end of the ranges established by his alternative methodologies, they were within those ranges. Nevertheless, on the basis of his discount rate analysis, Goldberg, Dodge and Kenneally jointly concluded that it was appropriate to raise the Company's residual interest discount rate to 15%. Goldberg said this was a "joint" recommendation. Apparently before reaching that recommendation, Kenneally ran sensitivity analyses of the impact of possible changes in the discount rate on New Century's earnings per share.

Kenneally sent Goldberg's analysis to KPMG in "draft form." Donovan conceded that New Century was probably seeking KPMG's input in preparing the document, even though the purpose of the presentation was to provide KPMG with documentation in support of New

---

[435] This premium reflected the difference in yield between Ba1 and Ba2 rated bonds.

Century's discount rates. Donovan claimed that sending such a document in draft form to KPMG was appropriate and "not uncommon at all—numerous clients would do that." Kim, on the other hand, claimed that there would be no reason for the Company to send KPMG a "draft" of an analysis because KPMG would only provide comments on a "final version" of a document, not a "draft," given that the Company had to formulate its own conclusions and analyses. According to Kim, although the document from New Century says "draft," it was probably because the Company forgot to remove the "draft" language prior to circulating the document.

The Goldberg analysis provoked a number of reactions within KPMG. For instance, Kim observed that Goldberg's analysis did not necessarily support New Century's current discount rates because "if you strictly use the Company's analysis, we could conclude that a 13% discount rate should be used for all deals prior to 2003 and 16% should be used for all 2005 deals as these are the lower ranges." Indeed, the Examiner has noted that the high range of the discount rates in Goldberg's analysis is 16.3% to 20.0% — which is above both New Century's then-current rates and the 15% discount rate Goldberg, Dodge and Kenneally ultimately recommended.

Donovan also sent the "draft" of Goldberg's presentation to Carnahan to obtain his comments. Carnahan had several responses. Among other things, he noted that Goldberg's analysis had not considered the prices paid by buyers of residual interests or possible bids for New Century's residual interests, ostensibly because the Company felt there was not a listed market for these residual interests and a firm that systematically did not want to hold residual interests might be willing to accept a lower price than a firm that is comfortable retaining such interests. Carnahan disagreed, asserting that "[New Century] could get a bid on a deal at any time [as t]here are active buyers of this right now." As a result, he asked "why is this method being ignored."

Donovan did not disagree with any of Carnahan's comments on Goldberg's analysis, and forwarded them to New Century with a message stating: "see Carnahan's comments - the one I agree with is that we should get a bid." Even though the possibility of obtaining bids had been discussed at the September 5 meeting, and both Carnahan and Donovan agreed the Company should do so, Donovan claimed that Carnahan ultimately "agreed" with the Company's decision not to seek a bid during the third quarter of 2006. According to Donovan, one reason Carnahan backed off his insistence upon bids in the third quarter was because of the distinction, from KPMG's perspective, between a quarterly "review" and a year-end "audit" and because KPMG

- 295 -

was urging New Century to obtain bids in the fourth quarter. Donovan stated that Carnahan would have liked New Century to obtain bids for the third-quarter review, but agreed it was not required because it was only a review and because a bid would only be one data point to consider in determining the fair value of New Century's residual interests.

Goldberg recalled Carnahan had wanted the Company to call Wall Street firms and get bids on their residual interests. Goldberg said that he thought it might be possible to get bids on New Century's residual interests, so he talked to Licata about the possibility of contacting Wall Street firms to obtain such bids. Goldberg said that Licata told him he would not bother to do so because he did not think the bids New Century would receive would be accurate. Goldberg said that, although he had worked at Morgan Stanley, he did not have contacts with the fixed income desks that would have been the sources of bids on the Company's residual interests.

During October 2006, at or about the same time that Goldberg was undertaking his analysis of New Century's residual interest discount rates, Kenneally undertook a survey of accounting policies of New Century's peer firms, as set forth in their most recent public filings, which indicated, among other things, that the residual interest discount rates used by New Century's peer firms ranged from 18% to 22%.

The concerns expressed by KPMG regarding New Century's residual interest discount rates became a subject of discussion at ALCO meetings. According to Garday, the primary participants in those discussions were Dodge, Kenneally, and Goldberg. In general, the theme of those discussions appeared to be that New Century was at the low end of the discount rate range for KPMG's clients and that it needed to continue to justify those low discount rates if it did not want to propose or accept a higher one. From Garday's perspective as the chair of ALCO, the discount rate issue appeared to be a matter of "arm-wrestling" between New Century and KPMG. Although ALCO minutes state that Kenneally approached ALCO to ask whether New Century should maintain its existing discount rates, ALCO never made a decision about what discount rate New Century should use. Garday considered ALCO a "forum" for getting input from everyone on a significant issue, but not necessarily the group to decide such issues. Instead, it appears, the discount rate issue was taken to New Century's Finance Committee.

### v.    The Finance Committee's decision not to raise the residual discount rates and KPMG's response

Although New Century's Management had been reluctant to change the Company's residual interest discount rates, because it believed it had some "good comparables of sales that

could justify" the rates it was using, in light of Goldberg's analyses and Carnahan's concerns, Dodge, Kenneally and Goldberg and others in Management agreed to recommend an increase in the residual interest discount rates to 15%, even though it would have caused a "hit to earnings." This recommendation was presented to the Finance Committee of the Board on October 16, 2006.

According to the Finance Committee's minutes, "[a]fter a lengthy discussion, the Committee and Management decided not to change the residual discount rate at the time." Despite extensive questioning on this subject, we have not identified a clear and consistent explanation for this surprising decision, particularly in light of concerns expressed by some independent directors in other contexts about not wanting New Century to engage in aggressive accounting.

Sachs, who chaired the Audit Committee and was a member of the Finance Committee, recalled that both Management and KPMG had concluded that New Century's discount rate was within an acceptable range.   Sachs recalled that the Finance Committee supported a less conservative discount rate in mid-October 2006 because discount rate analysis was not a science and the Committee had no basis to say that a 15% or 17% discount rate was correct.  Even though Sachs acknowledged that everyone knew a lower discount rate resulted in higher residual interest valuations, he emphasized that New Century had a duty not to overstate or understate its residual interests.

Zona, who was normally aggressive in challenging what might be aggressive accounting treatment, offered a more curious explanation for the Finance Committee's decision.  According to Zona, he thought the Company's residual interest discount rates should be even higher than the 15% that Management was recommending and was concerned that approving a small increase from 12% and 14% to 15% would subject the Company to outside criticism and might also make it more difficult to increase residual interest discount rates to a more appropriate level in the near future.

According to Dodge, the Finance Committee reached a consensus that there was no reason to use a higher discount rate to value the Company's residual interests because Project Kettlebell was expected to conclude around the end of 2006 and the 12-14% discount rates used by the Company were within the range of discount rates determined to be reasonable by

Goldberg's analysis. Dodge stated that other factors probably also contributed to the Finance Committee's decision not to raise the discount rate.

Although Gotschall and Donald Lange recalled discussion about increasing the discount rate a small amount at the October 16 Finance Committee, they claimed (it appears incorrectly) there was nothing to vote on because no specific recommendation to increase the residual interest discount rate was made. Gotschall recalled that the Finance Committee told Management to work with KPMG and make a proposal.

The Finance Committee's decision not to increase the residual interest discount rates was a surprise to many people at New Century, including Goldberg and Kenneally, because the Company had already booked its residual interest assets for the third quarter of 2006 using a 15% discount rate prior to the Committee's meeting and had to "un-book" the higher discount rate after the Finance Committee meeting. Goldberg said that he was surprised that the Finance Committee decided not to increase its discount rates to 15% because KPMG had questioned the Company's discount rate and management had recommended a change in that discount rate. Goldberg, who did not attend the Finance Committee's meeting, was not aware of any connection between the Committee's decision and Project Kettlebell.

Donovan recalled having a conversation with Kenneally in which he learned that either the Audit Committee or the Finance Committee had decided to stay with the 12-14% discount rates rather than increasing them to 15%. According to Donovan, Carnahan was comfortable with New Century's decision not to adjust its discount rates in the third quarter of 2006, although he continued to suggest that the Company seek bids for its residual interests during the fourth quarter. Donovan indicated that Carnahan wanted the Company to develop additional data points that could be considered by KPMG in its evaluation of Management's estimates as part of the annual 2006 audit. Donovan could not recall many specifics, other than that KPMG "signed off" on the Company's third quarter of 2006 discount rate and stated that the Company would need to revisit the issue in the fourth quarter of 2006.

The draft version of KPMG's Interim Completion Document for the third quarter of 2006, which apparently was written before the Finance Committee's decision, reflected a change in the discount rate to 15% that would have required a $7 million audit adjustment, whereas the final version of the same KPMG document contained neither of these elements. In the draft

document, the note regarding "discount rate" states: "KPMG determined that in an appropriate range of discount rates, 15% would be the low end of the range."

According to Kim, the notation in the draft version of the KPMG workpaper indicated that KPMG was proposing an adjustment of $7,028,823 to New Century's residual interest valuations, which reflected the difference resulting from a change in the discount rates previously used by New Century and the new 15% discount rate. In the final version of the same KPMG document, the passage in the draft document regarding the change in discount rates has been deleted. Kim did not recall why the change appeared in the draft document and not the final, but explained that, ultimately, KPMG reached the conclusion, when it signed off on the third quarter review, that it was comfortable with the 12-14% discount rates. Kim explained that there is a paragraph in the final version of KPMG's workpaper supporting that conclusion. Kim did not recall discussing the change in language, but indicated that based on the final document, the engagement team had had enough discussions internally to conclude that 12-14% discount rates were reasonable at that time.

An e-mail from Kenneally on October 17, 2006, on which Donovan was copied, stated: "John [Donovan] and I just spoke regarding the Discount Rate. The current rates are acceptable, although KPMG will once again point out in the Audit Committee Meeting that there is some risk to such a rate as they did previously." Donovan contended that he did not come to the conclusion that New Century's current discount rates were acceptable until later, after reaching agreement with Carnahan on this matter, and thus that any such statements by Kenneally as of October 17 would have been merely "preliminary."

### vi. New Century ultimately agrees to raise its residual interest discount rates for the fourth quarter of 2006

Later in 2006 or early in 2007, New Century's Management and Board determined that the Company had to increase the discount rates being used to value its residual interests. The only issue was by how much. One impetus for this change in attitude was the information New Century learned, through its negotiations concerning Project Kettlebell, about how others valued New Century's residual interests. A second reason for this change in attitude was the arrival of Bindra, who questioned a number of the Company's long-held assumptions. A third influence was the increasing pressure from KPMG.

### (a)    Project Kettlebell

According to Licata, during the course of the Project Kettlebell negotiations, the Company learned that neither Carrington Capital, with which New Century was negotiating, nor New Century's financial advisor, which solicited bids for New Century's residual interests, agreed with the Company's residual interest valuations.  The analyses and discussions that accompanied Project Kettlebell persuaded Licata and New Century's Management that, even if the Project Kettlebell transaction did not close, the Company would need to move toward a "mark-to-market" methodology that was becoming more common in the industry.  As a result, the Secondary Marketing Department began to analyze how the assumptions in their residual interest valuation models would need to be changed.

### (b)    Taj Bindra

Bindra's understanding was that the Company had been using a 14% discount rate for a long time, and that this had been known to the Audit Committee, to Management and to KPMG.  After Bindra joined the Company, a few Directors asked if New Century's accounting had been too aggressive in various respects.  Those inquiries were one of the reasons Bindra started looking into certain accounting issues.  Bindra understood that the discount rate issue had been raised with Dodge in the past and that she had reassured the Audit Committee.  Bindra wanted to determine if the discount rates had been changing in the wrong direction as the markets got worse.  As a result, he asked PwC to review the Company's most recent residual interest models.  The results of that analysis are set forth above.[436]

### (c)    KPMG

As part of its 2006 review of New Century's internal controls, KMPG had preliminarily identified as a deficiency the fact that New Century did not have supporting evidence to continue to use discount rates that had been in place the prior year.  More specifically, the KPMG engagement team reiterated that Management did not have adequate documentation to support the reasonableness of the 12-14% discount rates used to value its residual interests.  In addition, on December 3, 2006, Beckstrom sent Kim an e-mail with an attachment showing a $7 million impact from adjusting New Century's discount rate from 12-14% to 15%.  Kim does not recall whether he requested the quantification or the request came from someone in SFG.

---

[436] *See* Section VI.B.7.a.iii..

It is not clear whether KPMG ever analyzed how much New Century's residual interest valuations in quarters prior to the fourth quarter of 2006 would have changed had New Century used higher discount rates in those quarters. Donovan acknowledged that a change in the Company's discount rate could result in a "material dollar amount." But when asked if it would be necessary to reexamine previous quarters if, at year-end, the Company had decided to adjust its discount rates, Donovan responded that quarterly reviews only produce "estimated values" and that he would consider such a change a "change in estimate," not a change in accounting policy.

### (d)    Movement toward increasing the discount rates to 20%

By January 2007, pressure was increasing to raise the Company's discount rate to more than 15%. Concerns about the Company's residual interest discount rate were discussed at the same Board meeting at which the Company learned of the accounting errors that had occurred with respect to New Century's repurchase reserve. The minutes of the January 31, 2007 Board meeting state that, in connection with Bindra's report on matters impacting fourth quarter financial results, he reported that the other impacts included "a revised mark on the off-balance sheet residual portfolio due to updated performance assumptions and an increase in the discount rate . . . ." [437] Gotschall recalled that the residual interests were discussed at this meeting, but he could not recall any details about the discussion. He recalled, however, that there was a discussion about increasing the discount rate during the year-end audit.

It appears that, although the Company never issued its final 2006 financial statements, the Finance and Accounting Department had reached the conclusion that the Company's residual interest discount rates should be raised to 18% for the pre-2003 securitizations and 20% for the 2005 securitizations. The 2007 Hatch Memorandum, which discussed how the Company planned to revise various assumptions related to the valuation of its residual interests, shows that the new proposed discount rates for the 2005 residuals and pre-2003 residuals were expected to be 20% and 18%, respectively. [438]

---

[437] Cole did not recall this discussion. Cole said that he probably did not attend the executive session of non-management directors at the January 31, 2007 Board meeting (at which there was an additional discussion of residual interest valuation) because he was not considered an independent director.

[438] *See* Section VI.B.5.c. for a discussion of the 2007 Hatch Memorandum.

Bindra wanted the 20% discount rate for these residual interest valuations to be supported by a careful weighted cost of capital analysis. Goldberg subsequently performed such an analysis at Kenneally's request. Goldberg said that, at some point in early 2007, Kenneally asked him to document the Company's decision to increase the residual interest discount rate to 20%. Goldberg has asserted that there were enough changes in the market between October 2006 and February 2007 to justify an increase from 15% to 20% in the Company's residual interest discount rates, although he could not recall specifically when some of those changes had taken place.

### vii. Overview of KPMG's analysis by KPMG's concurring partner and the DPP

KPMG's analysis of the Company's residual interest discount rates was within the scope of the concurring partner review conducted by Macaulay and was included within the scope of the DPP's review in February 2007.

Macaulay's recollection is that he became aware of the discount rate issue during 2006 although he cannot recall exactly when. According to Macaulay, at some point in 2006, probably in the third quarter, he was part of a dialogue regarding the discount rates New Century was using to value its residual interests. Macaulay stated that he was not aware of recommendations to the Company from KPMG to provide documentation to support its discount rates. He indicated that, because the recommendations set forth in SFG's memoranda tend to be "rudimentary" and are merely recommendations, they would not "make it to his level." Macaulay said that, to his knowledge, at no time did SFG notify the engagement team that they were "not comfortable with" (then Macaulay corrected himself to say) "believed the residual interest account was materially misstated."

Macaulay's understanding of SFG's view was that New Century's discount rates were at the lower end of the range but that, ultimately, the engagement team concluded that the discount rate issue did not impact its ability to conclude in the quarterly reports that there was no material misstatement. Macaulay was not concerned about the residual interest valuations because the only time he would express a concern was when an error could result in a material misstatement and he did not have any concern that there was a material misstatement associated with residual interest valuations. According to Macaulay, the discount rate assumption did not have a relatively large impact on the residual interest valuations, such that concerns about those rates were not necessarily that critical to the analysis as a whole.

These statements by Macaulay seem to have no basis in fact or theory. As explained below, even small changes in a discount rate can materially affect a residual interest valuation.

Kurt Kurimsky acknowledged that, as part of his "desk review," he had read the audit assistance memoranda from SFG to the engagement team dated May 9, 2006, July 27, 2006 and November 9, 2006, each of which noted New Century's low discount rate. Kurimsky observed that SFG's data and analysis suggested that a higher discount rate might be appropriate in the absence of "additional support" by the Company for its use of a lower rate, particularly by the third quarter of 2006. Kurimsky also reviewed the Residual Interest Valuation Conclusion memoranda Beckstrom prepared for the first, second and third quarters of 2006, each of which endorsed the Company's valuation of residual interests without change to the models' assumptions.

Kurimsky acknowledged that New Century did not raise its residual interest discount rates as SFG's memoranda may have suggested, but that the engagement team's testwork was nonetheless "reasonable." In support of this conclusion, Kurimsky made two essential points: (1) the quarterly work performed by the engagement team consisted of limited "reviews," not "audits"; and (2) New Century had provided some sort of analysis in support of the discount rates they were using.

### viii. The Examiner's conclusions regarding the discount rates used in New Century's residual interest valuation models

The Examiner has concluded that the 12-14% discount rates New Century used to value its residual interests during 2005 and most of 2006 should have been increased well before the fourth quarter of 2006. In fact, the Examiner concludes that New Century should have increased its residual interest discount rates before the end of 2005 to no less than 15% for its residual interests in CE securitizations and no less than 17% for its residual interests in NIMS and that, had it done so, the aggregate value of its residual interests as of year-end 2005 would have been almost $14.8 million less than New Century reported on its financial statements.

The Examiner reaches this conclusion based upon the following considerations:

- SFG consistently found that most other firms in the mortgage industry were using higher residual interest discount rates in 2005 and 2006.

- Carnahan, as the responsible SFG partner and a former audit partner of New Century, had the greatest qualifications to assess New Century's residual interest

- 303 -

discount rates, and he consistently expressed concerns throughout 2005 and 2006 that those rates might be too low.

- A survey of discount rates by the Examiner found that the residual interest discount rates used by other subprime mortgage lenders ranged from 15% to 21% during 2005 and from 16% to 22% during 2006.

- Kenneally's own October 2006 survey of accounting policies used by peer firms suggested that those firms used residual interest discount rates that ranged from 18% to 22%.

- We have seen no credible evidence to support the repeated assertions by some New Century officers that the Company's residual interests were subject to less risk and, therefore, merited a lower discount rate.

- The yield, as of December 31, 2005, on Ba2 RMBS pools (which Goldberg identified as a benchmark during his October 2006 analysis), plus the same risk premium that Goldberg recommended be added to that yield (200-300 basis points) would result in a discount rate of 18% as of December 31, 2005.

- New Century decided to use an 18% discount rate for its on-balance sheet securitizations in 2005.

- New Century recognized, by early 2007 that New Century's residual interest discount rates as of year-end 2006 should have been at least 18-20%.

Based on recalculations using New Century's own residual interest models, the Examiner has determined that, had New Century used discount rates of 15% (for its residual interests in CE securitizations) and 17% (for its residual interests in NIMS) as of December 31, 2005, the aggregate value of its residual interests as of year-end 2005 would have been at least $3.8 million less for New Century's residual interests in pre-2003 securitizations and $11 million less for its residual interests in the 2005 off-balance sheet securitizations. Thus, the Examiner concludes that, because New Century used unreasonably low discount rates to value its residual interests in 2005, those residual interests were over-valued on New Century's balance sheet as of December 31, 2005 by no less than $14.8 million.

The valuations of New Century's residual interests in its quarterly financial statements during 2006 were similarly inflated by New Century's continued reliance upon unduly low residual interest discount rates.

### c. The Company's Failure to Reconsider Its Par Value Assumption

As previously stated, New Century's residual interest valuation models heavily depended upon various assumptions, some of which were reexamined and updated from time to time. One

-304-

assumption that New Century did not reexamine until late in 2006 was that all remaining loans in each securitization trust could be sold at par if and when that trust was terminated.

The Examiner has concluded that this par value assumption should have been reexamined and revised before the end of 2005 and that, by failing to do so New Century significantly overstated the valuations of its residual interests by at least $27.5 million at the end of 2005 and by comparable amounts during 2006.

### i.    New Century's "unquestioning" use of a par value assumption until late 2006

Until late in 2006, New Century consistently assumed that the mortgage loans in the off-balance sheet securitization trusts in which it held residual interests could be sold at par value when those trusts were terminated.  As a result, the terminal value assumption, which related to the percentage of par value at which the mortgage loans held as collateral in the securitization trusts could be sold at termination of the trust, was set at 100% for all deals.

Although the par value assumption had important consequences for New Century's residual interest valuations, New Century did not consider changing the par value assumption in its models from 1997 or 1998 until the end of 2006, when the par value assumption was challenged as a result of information learned during the consideration of Project Kettlebell. According to Licata, the par value assumption was a "standard," "unquestioned," "inherited" assumption, which he and others in management had "overlooked" and not questioned or reexamined until late in 2006 or early in 2007.  Licata could not recall any specific conversations with anyone in the Secondary Marketing Department or with anyone in the Finance and Accounting Department about the par value assumption or anyone ever questioning the par value assumption until late in 2006, nor did he recall anyone from the Board of Directors, the Audit Committee or KPMG questioning the par value assumption until late in 2006.  Even in the first quarter of 2006, when 95% or more of the pre-2003 securitizations were at their termination point, no one considered that the termination values of the loans in the pre-2003 securitization trusts could be anything other than par.  Licata said the Company never created a sensitivity matrix or undertook sensitivity analyses of the par value assumption, even though data showed that the assumption was likely to be invalid for loans with delinquencies ranging from 8.3% to 23%.

Licata said that in the fourth quarter of 2005 non-performing assets were still selling at a premium, which may have "subconsciously" gone into his thinking about the par value

- 305 -

assumption during early 2006. Licata admitted, however, that New Century may have been "lucky" in 2005 with regard to the par value assumption. His view was that, at some point in 2005, from the middle to late in the year, par was a conservative assumption, but that over the course of 2006, as home loan values deteriorated and collateral performance suffered, the par value assumption may no longer have been valid. The first time Licata thought the par value assumption may not have been "fine" would have been the middle or end of the second quarter of 2006, when New Century started to see more kickouts and scratch-and-dent pricing started to fade as well. Licata was glad that the Company decided to change the par value assumption in December 2006.

### ii.    John Hatch's challenges to the "par value" assumption

By the third quarter of 2006, Hatch believed that New Century was very unlikely to receive par value for the loans left in the pre-2003 securitizations when they were terminated, and he tried to make Company Management aware of this view in the course of recommending that "old" pre-2003 securitizations be terminated. Mullins agreed with Hatch's view, because he also believed the loan collateral in those trusts would have to be sold at a discount.

In October 2006, Hatch prepared an analysis of the pre-2003 residuals entitled "Pre-2003 Residuals Valuation," which he sent to Licata on October 16, 2006. In that analysis, Hatch asserted that the pre-2003 residuals were over-valued and that the par value assumption used in the residual interest models was not correct.

Hatch's October 2006 analysis was prompted by an analysis that Hatch performed during or soon after the third quarter of 2006, at the request of Garday and the tax team, which valued New Century's residual interests at maturity and not at termination. As a result of this earlier analysis, Hatch did not believe the Company's pre-2003 residuals were valued properly. According to Hatch, the analysis he did for Garday was regularly requested by the New Century tax team and had previously been provided by Licata.

Hatch said that his October 2006 residual value analysis separated the residual loans into different loan delinquency buckets and then applied market-driven "marks" to each delinquency bucket, which was far different from the method used in the residual interest valuation models, which used the par value assumption for all remaining loans. The difference in value between the two methodologies of approximately 20-30% surprised Hatch. The tax team and Licata were informed of Hatch's results and received a copy of his analysis.

Hatch transmitted his analysis of the pre-2003 residuals to Licata on October 16, 2006 with what has become known as the "Chicken Little" e-mail. Hatch used that phrase in his e-mail because, he said, it was not the first time he had raised concerns about the pre-2003 residuals with Licata. Mullins had never questioned or heard anyone question the adequacy of the par value assumption until Hatch raised those concerns with Licata. But Mullins agreed with Hatch's view that the residual loans should not have been valued at par because they would likely sell only at a discount.

Opinion said that he also questioned the par value assumption, but that "Licata truly believed it." Opinion asked Licata if he really thought New Century could sell the remaining loans in the trusts at that price, and Licata gave Opinion several reasons why he thought that was possible. According to Opinion, Licata thought he could go into the market and get par for those loans and actually called someone to see what price he could get for those loans. Although Opinion conceded that Licata had more "market color" than he ever would, Opinion did not believe the residual interests valuation models when they invariably "spit out 100" with regard to the termination values of the loans in the collateral.

According to Hatch, Licata was not concerned about Hatch's findings because Licata believed that the "all-in value" of the residual portfolio was approximately equal to the OC value and thus reflected the economic value of the securitizations.[439] Hatch was disappointed that his views were not well received and that Licata, in particular, did not want to address the issues he had raised. Although Licata seemed to be annoyed by Hatch's persistence in arguing for the collapse of the pre-2003 deals, he told Hatch that all of the pre-2003 deals would probably be collapsed or terminated in 2007.

When interviewed during the SIC investigation, Licata did not recall ever having received or seen Hatch's October 2006 analysis or the "Chicken Little" e-mail that transmitted it. Licata claimed that he had never spoken to Hatch or anyone else about problems with the par value assumption until late in 2006, when the Project Kettlebell transaction began to raise questions about that assumption. According to Licata, there was no discussion of the par value assumption when New Century was going through the close for the third quarter of 2006.

Licata said if he had received the Hatch presentation on October 16, 2006, he probably would have said it was too soon to tell if the Company was likely to receive par or not as a

---

[439] Hatch disagreed with Licata's view that the residual values were correct because they equaled the OC.

termination value, but that statement absolutely would have caught his eye. Although he would have disagreed with Hatch's analysis at the time, he agreed with it in March 2007 when he was interviewed by the SIC investigators.

Licata was not the only person who did not recall seeing Hatch's presentation in October 2006. Morrice, Dodge, Bindra and Kenneally also did not recall ever having seen it or having discussed it. Kenneally said he did not recall ever seeing a presentation by Hatch that questioned the par assumption and claimed there was never a time before early 2007 that he had reason to question the par value assumption, when the subject arose during the discussion of Project Kettlebell. Kenneally acknowledged that, with the benefit of hindsight, it appears that the par value assumption was an "aggressive" assumption that should have been changed, but he did not have that belief until early in 2007.

Morrice did not speak to Hatch about collapsing the pre-2003 securitizations, although he recalled speaking with Cloyd and Licata about this topic in or about September 2006. There was some discussion of older deals that had reached their clean-up call dates and what would happen if the Company did a clean-up call. Cloyd said that it would be a bad idea to voluntarily collapse those securitizations because doing so would result in the loans coming back to New Century. Cloyd believed that the loan market was not good and that it would be better to wait for the market to improve before collapsing the securitizations. Morrice said it was implicit in his discussion with Cloyd in the fall of 2006 that collapsing securitizations would result in the Company having to sell loans released from the old securitizations for less than par value.

However, Morrice recalled that Cloyd had Credit Based Asset Servicing and Securitization ("C-BASS") analyze the potential effects of collapsing certain securitizations, and that C-BASS concluded that some loans would sell above par, some would sell below par, and some would sell at par. Morrice recalled that C-BASS found that, on average, the loans would sell for about par.

### iii.    Project Kettlebell changes the Company's attitude toward the par value assumption

According to Morrice, valuations of the Company's REIT portfolio by its financial advisor (a global investment banking firm) during the discussions surrounding Project Kettlebell caused New Century to realize that the par value assumption upon which it based its residual interest valuations might be incorrect, because there was a "disconnect" between the par value assumption and its financial advisor's valuations. Morrice recalled that New Century discovered

- 308 -

this disconnect around January 2007. According to Sanchez, one of the reasons that Project Kettlebell fell apart was because Carrington Capital's valuation team changed the value of New Century's residuals from par to 95.

Licata said the par value assumption only started being questioned in connection with Project Kettlebell because the Company had become more interested in determining what its assets were worth and about alternative ways to value those assets. They learned that delinquent loans held in inventory were becoming worth less and less. What the Company was learning about the values of the loans it held in inventory led to a rethinking about how it should value its residual interests as well. The Company began to recognize that the market value of these residual interests was largely a function of what the collateral was worth. Consequently, the Company decided that the way it should value these deals was that as soon as a deal approached or hit its termination point or clean-up call, the Company would try to assess the market value of that collateral, rather than assume it could be sold at par.

### iv.    New Century's departure from the par value assumption in February 2007

As explained in the 2007 Hatch Memorandum, in connection with the preparation of its December 31, 2006 financial statements, New Century revised and adjusted certain assumptions used to value its residual interests to take into consideration current market conditions and the likelihood that the terminal values of the mortgage loans in the securitization trusts would be less than par value at the clean-up call date.[440] New Century changed the terminal values for its residual interests, acknowledging that the new values were intended to take into consideration the delinquency status of the underlying loans, and to "better reflect a more reasonable expectation of collateral value at the point of termination, accounting for delinquent and non-performing loans in the pool at the time of settlement."

The February 2007 Hatch Memorandum explained that the proposed change to the par value assumption for the pre-2003 residual interests was to determine terminal value as the greater of the whole loan prices of the remaining loans (in light of their delinquency statuses) less the value of any remaining outstanding bonds and zero. According to the memorandum, the Company changed its methodology with respect to the terminal value for 2006 based on the following:

---

[440] *See* the discussion of the 2007 Hatch Memorandum in Section VI.B.5.c.

Prior to the current quarter, it was assumed that all deals would be terminated at their optional termination point, which usually occurs when the collateral pool falls below 10% of its original balance at the time the deal is settled. Furthermore, it was assumed that the collateral purchased out of the security at the point of termination would be sold at par. Recent experience relative to the recently terminated 2003-NC1 security, recent downward trends in whole loan prices, as well as current delinquency levels in some of our more seasoned securities indicated that selling terminated collateral at par might be an unsupportable expectation.

The new calculation was intended to take into consideration the delinquency statuses of the underlying loans, which provided a "weighted average whole loan price for the entire pre-2003 portfolio of assets of only 91.84 at December 31, 2006."

The underlying methodology employed by Hatch in February 2007 to determine the appropriate terminal collateral values as of December 31, 2006, was to segregate the remaining loans in each pre-2003 securitization trust into the following categories based on their delinquency statuses:

- Current
- 30 days delinquent
- 60 days delinquent
- 90 days delinquent
- Foreclosure
- Real estate owned ("REO")

Hatch then applied an expected terminal value to each loan delinquency category based on loan prices used by the Company in its LOCOM analysis. Those loan prices were, respectively: 101, 95, 80, 75, 60, and 60. Through this approach, Hatch determined a terminal value for the loans in each trust. For the 2005 NIMS, Hatch used a terminal par value of 98.[441]

According to the 2007 Hatch Memorandum, through the use of the foregoing methodology, the Company reduced the terminal values of the loans in the pre-2003

---

[441] The Examiner observes that Hatch's approach considered the delinquency statuses of the loans in the securitization trusts as of December 31, 2006, rather than the projected delinquency statuses of those loans at the date the trusts were expected to be collapsed. While this approach may not have had a significant effect on the calculated terminal values Hatch used for the pre-2003 residual interests (given that New Century was planning to collapse these trusts within the next six to eight months), using the projected delinquency statuses as of the date the trusts were expected to be collapsed would likely have led him to estimate lower terminal values for the 2005 NIMS because those deals were not expected to be collapsed for a number of years, and the terminal values of those loans as of the collapse date would probably have been significantly less than 98.

securitizations to less than an average of 92% of par as of December 31, 2006. According to Cloyd, this change in the terminal value assumption in the first quarter of 2007 was the most significant change the Company had made to the residual interest valuation models in years.

It does not appear that anyone at KPMG ever raised a question about New Century's reliance upon the par value assumption until early 2007. Neither Kenneally nor Licata could recall any discussion of the par value assumption with KPMG in or before 2006. Indeed, during his interview, Carnahan appeared to mistakenly assume that New Century had no choice but to assume that the terminal values in their off-balance sheet securitizations would be equal to par because, Carnahan assumed, no one would collapse a securitization if they could not sell the loans for par.

### v. The Examiner's conclusions regarding New Century's failure to change par value assumption prior to the end of 2006

The Examiner has concluded that assuming that the terminal values in its residual interest valuation models would always be equal to par was fundamentally wrong and that, at a minimum, New Century should have used a valuation methodology, similar to the "delinquency bucket" method used by Hatch in 2007 to determine terminal values of the loans in its off-balance sheet securitizations before 2006.[442] In fact, the Examiner concludes that, had New Century used that terminal valuation methodology as of December 31, 2005, the aggregate value of its residual interests as of year-end 2005 would have been no less than $27.5 million less than New Century reported on its financial statements.

The Examiner reaches this conclusion based upon the following considerations:

- The fact that neither the appropriate people within the Secondary Marketing Department nor anyone within New Century's Accounting and Finance Department even questioned, much less reviewed, the propriety of the par value assumption for a period of eight or nine years, even though Warren Licata and others working in the Secondary Marketing Department understood the importance of that assumption.

---

[442] As noted previously in the discussion of New Century's models, there were modeling errors that related to the par value assumption. For example, the calculation taking into consideration the par value assumption appeared to differ from model to model. In this regard, the calculation for model 00NCB appears to be inaccurate since a reduction in the terminal par value percentage has the effect of increasing the value of the residual interest. *See* Section VI.B.7.a.iii. In addition, the Examiner's limited review of New Century's residual interest valuation models for the 2005 off-balance sheet securitizations identified an error relating to how these models used the terminal par value assumption. *Id.*

- Evidence that Company Management was aware of changing market conditions as early as 2005 that should have encouraged them to adjust the terminal value of the loans in its off-balance sheet securitizations. By contrast, there is no support for Licata's position that New Century was "lucky" that the par value assumption remained viable at the end of 2005.

- The Company's recognition, in February 2007, that it needed to reduce the terminal value of the loans in its residual interest valuation models to less than an average of 92% of par as of December 31, 2006.

- New Century could have and should have applied the same "delinquency bucket" methodology prior to 2006.

Based on recalculations using New Century's own residual interest models, the Examiner has determined that, had New Century used the same "delinquency bucket" methodology for assessing terminal values of the loans in its off-balance sheet securitizations as of December 31, 2005 as the Company planned to use for its 2006 financial statements,[443] the aggregate value of its residual interests as of year-end 2005 would have been at least $24.3 million less for New Century's residual interests in pre-2003 securitizations and at least $3.2 million less for its residual interests in 2005 off-balance sheet securitizations.[444]  Thus, the Examiner concludes that, because New Century unreasonably relied upon the par value assumption to value its residual interests in 2005, those residual interests were over-valued on New Century's balance sheet as of December 31, 2005 by no less than $27.5 million.

The valuations of New Century's residual interests in its quarterly financial statements during 2006 were similarly inflated by New Century's continued reliance upon the par value assumption.

---

[443] *See* Section VI.B.7.c.iv.

[444] The Examiner segregated loans based on the delinquency methodology that Hatch used in February 2007, although using the buckets as at December 31, 2005, as well as the same whole loan prices for those delinquency categories.  The Examiner determined that those loan prices had not changed significantly between December 31, 2005, and December 31, 2006, by considering the loan prices reflected on the Company's loan trial balance as of December 31, 2005.  The blend of all individualized securitization terminal values as of December 31, 2005 was 92.86, as compared to the 91.84 blended terminal value Hatch computed as of December 31, 2006.  For New Century's 2005 securitizations, the Examiner used a terminal collateral value of 98, even though, for the reasons set forth above, it is likely that, as a terminal value, a price of 98 is probably too high.  Had the Examiner used a lower terminal value for the 2005 NIMS, the calculated valuations of those residual interests would have been reduced and the minimum overstatement of those valuations by New Century would have been larger.

- 312 -

### d. The Company's Repeated Decisions to Postpone the Clean-Up of Older Off-Balance Sheet Securitizations by Arbitrarily Changing Clean-Up Call Percentages

New Century routinely (and without explanation or support) reduced the clean-up call percentages in its older residual interest models, thereby pushing out the termination (or collapse) dates of the corresponding securitizations. This practice had the effect of changing the values of certain residual interests. In addition, if the Company had elected to collapse the trusts on their originally scheduled call dates, it may have learned whether the loans remaining in those trusts could in fact be sold for par value.

### i. The clean-up call percentage assumptions in each residual interest valuation model

Off-balance sheet securitizations generally have a short average life but have a "long tail," which means that the majority of the loans in a securitization are paid off quickly but a certain percentage takes longer to pay off. As a general matter, when the unpaid principal balance ("UPB") of loans in a securitization trust fell to 10% or less of the value of the original collateral pool, the Company had the option to collapse the securitization by calling the trust's remaining notes, paying all bondholders, disposing of the trust, taking back any remaining balance in the OC account, and purchasing the remaining loan collateral in the securitization trust.[445] This option or call feature was often referred to as the clean-up call percentage.

Collapse of a securitization normally was mandatory when it held 5% or less of the securitization's original collateral and, as a result, discussions about collapsing a securitization often occurred when the collateral left in the securitization was in the range of 5-10% of the original collateral pool. But each residual interest valuation model contained an assumption that the corresponding securitization trust would be collapsed (*i.e.*, the clean-up call would be exercised) when the UPB in the trust reached the optional clean-up call percentage – typically 10%.

### ii. KPMG's concerns about New Century's changes to the clean-up call percentages

KPMG's SFG was concerned about the Company's practice of routinely changing (reducing) the clean-up call percentages in its residual interest models, which effectively pushed

---

[445] According to Weiss, when the volume of loans in a trust fell below a certain level (usually 10% of the original pool balance) it became uneconomic to service the loans and the Company should have been willing to clean-up the securitization and call in the trust's notes, even if New Century had to sell the remaining loans at a discount.

out the clean-up call dates. As a result, SFG recommended that the engagement team test the Company's assertion that it would terminate the securitizations at the points specified in the models and obtain support for that determination when call percentages differed from quarter to quarter.

By 2006, the UPBs in most of the pre-2003 securitizations were under 10% of the original pool balances for those securitizations and were eligible for clean up. But New Century had been pushing out the termination dates for these securitizations and was not collapsing them. Only one OBS deal (2003-1) was collapsed, and it was collapsed when the balance was well below 10%. Since the end of 2002, no pre-2003 securitization trusts were collapsed, although most of the pre-2003 trusts had UPBs that were below 10%.

SFG noted that changing the clean-up call for a securitization to a lower percentage effectively pushed out the terminal cash flows of the residual interests and changed the valuation of the residual interest associated with that securitization. Accordingly, if the Company did not intend to call securitizations when the remaining loan value reached 10% of the original loan balance, New Century should have assumed a lower call percentage in its early models.[446]

During KPMG's review work for the first quarter of 2006, KPMG learned that projected cash flows in the residual interest valuation models were higher than actual cash flows because the projected cash flows had assumed that Management would perform a clean-up call for the 2000-A residual interest, which did not actually occur.[447] This resulted in a $3 million difference in cash flow (roughly 10%). According to Beckstrom, because this difference was discovered as part of a quarterly procedure, KPMG did not evaluate the significance of that difference.

In the second quarter of 2006, Yuval Ron of SFG asked Beckstrom to look at the clean-up call percentages from the first and second quarters of 2006, which, Beckstrom noticed, had been reduced for certain residual interests. He reported this information to Ron. Beckstrom also understood that this subject would be raised on a going forward basis.

During the third quarter 2006 review, SFG observed that "[New Century] has repeatedly revised the call assumptions for the 1999-B transaction resulting in higher valuations in earlier calculations than if [it] had used the current estimate. NC's intent and ability to retire

---

[446] Kenneally acknowledged that KPMG had expressed the view that some of the older securitizations had not been modeled correctly from an accounting perspective, but nobody within New Century appeared to share that view.

[447] *See* the Residual Interest Valuation Conclusion Memorandum for the first quarter 2006.

outstanding seasoned issues that are below the 10% optional termination threshold should be considered when evaluating the model assumptions and the resulting residual values."

During the 2006 year-end SOX walkthrough in November 2006, Ron asked Hatch about the clean-up call percentages in the residual interest models and Hatch mentioned that he had recommended to Licata that certain older securitizations be "cleaned up," but that Management had determined not to do so. According to Hatch, KPMG was concerned that the Company's residual interest valuation models assumed that the securitizations would be collapsed at the eligible termination date (when the relevant UPB was equal to or less than 10% of the original pool balance) but, during his time at the Company, New Century had only collapsed one securitization prior to maturity. Hatch eventually agreed with KPMG, for the reasons described in his "Chicken Little" e-mail and October 2006 presentation, except he believed that securitizations with only six months left to maturity were immaterial to the overall valuation of New Century's residual interests. According to Licata, KPMG was pressuring New Century to "cleanup" older securitizations and was "giving Hatch more of a headache" because of difficulties that other KPMG clients were having.

KPMG's Summary of Internal Control Deficiencies for year-end 2006[448] included a discussion of the Company's changes in the call dates for their residual interest valuation models and identified those changes as an internal control deficiency. At his interview, Carnahan seemed to minimize this deficiency by claiming there could be legitimate business reasons for pushing out call dates, and that a lack of documentation explaining those reasons might lead to a deficiency from an internal control perspective. Carnahan also suggested that New Century may have changed its clean-up call dates more frequently than other mortgage companies because New Century had many more old deals.

Despite Carnahan's explanation, in February 2007, KPMG observed that the operating "assumption" that New Century would exercise clean-up calls within 5-6 months for certain securitizations that were past their clean-up date had been "in effect for the last several quarters and hence not valid unless new evidence is presented."

Donovan acknowledged that "the effect would be to push out the cash flows longer" and that "without seeing the calculation, I would presume that" this change would increase the values

---

[448] Donovan generally declined to answer questions about this document because, he said, "this is an incomplete document—we didn't finish our work," noting the handwritten "SS" across the first page, which, he stated, meant that the document had been "superseded." But this also appears to be the most recent draft KPMG prepared.

of the residual interests. Donovan stated that he never formed any suspicions about the Company's motive in this regard, nor had any discussions with anyone on the subject. Kim seemed to have little interest in or concern about New Century's habit of reducing clean-up call percentages and postponing clean-up calls. Kim did not recall whether New Century had changed clean-up call dates prior to 2006, and did not have any suspicions regarding why New Century was not collapsing its older securitizations in 2006. He said this was a subject KPMG was still addressing during the 2006 audit. Also, unlike his colleagues at KPMG, Kim asserted that a change in a clean-up call percentage could affect a residual interest valuation in either direction.[449]

### iii. New Century's decisions to exercise clean-up options and to postpone trust terminations

Decisions to exercise clean-up options or to change clean-up call percentages and postpone securitization trust terminations were made by the Secondary Marketing Department, not by the Finance and Accounting Department. Although Kenneally was aware that the Secondary Marketing Department was pushing out the termination dates for certain securitization trusts in 2005 and 2006, he never had reason to question the reasonableness of the assumptions upon which they relied in making those decisions. Sanchez was aware that the Secondary Marketing Department wanted to defer certain clean-up dates, but did not seem to know why. Gotschall did not know why the Company did not collapse the pre-2003 deals that were eligible for collapse.

Although people within the Secondary Marketing Department may have discussed their decisions with others, it appears that even Senior Management relied upon the Secondary Marketing Department to decide when to "clean up" a securitization trust. Morrice recalled discussions with Cloyd and Licata in the fall of 2006 about collapsing some of the pre-2003 securitizations, and that Cloyd had expressed the view that it would be a bad idea to voluntarily collapse those securitizations because doing so would result in the loans coming back to New Century at a time when the loan market was not good.

---

[449] Kim said that, at the call date, the value of the residual interest could be higher or lower than what the Company had on its books, and that by stretching out the payments, the value could be higher or lower. Generally speaking, Kim said, extending a securitization trust for a longer period could lower the value of the residual interests because there could be more loss assumptions built in and there is no prepayment income after a long period of time because prepayment penalties are paid during the earlier periods of a loan.

Practical considerations may have played a role in the decisions about when to make clean-up calls of older securitizations, along with a misunderstanding on Licata's part about the effects of postponing a clean-up call. Because he believed they had modeled the securitizations properly, he did not think that pushing out the clean-up calls would have an impact on anything. Because clean-up calls required a lot of time and effort, Licata "figure[d] they would push them out until they had time to do them." While Licata claimed that the practice of reducing the clean-up call percentages did not impact the value of the residual interests,[450] the KPMG staff we interviewed and commentary in the KPMG working papers contradicted Licata's assertion.

According to Licata, in November or December 2006, "the Company" decided to collapse the pre-2003 securitizations in 2007 because, Licata said, it was "time to do so." Although Licata acknowledged that ALCO was the proper committee to approach for permission to collapse the pre-2003 residuals, he never approached ALCO in 2006 to request such permission. Licata did not recall whether anyone on ALCO approached him to discuss collapsing the pre-2003 residuals. In the fourth quarter of 2006 or the first quarter of 2007, Licata put a summary together that contained scenarios for collapsing the deals and the pros and cons of selling notes or calling back collateral.

Although in his interview Carnahan suggested that an inability to obtain par might be a reason not to collapse an older securitization, Licata claimed that he had never heard anyone suggest, until after New Century went into bankruptcy, that clean-up calls might have been pushed out because otherwise the par value assumption would be revealed to be inappropriate or the Company would have taken a "big hit" because it could not sell the residual loans at par. Nobody ever indicated to Kenneally that New Century tried to defer clean-up dates to mask the inappropriateness of the par value assumption.

### iv.   Failure to appreciate the accounting consequences of changes in the clean-up percentage assumptions in the models

Decisions about when to exercise clean-up calls and to terminate securitization trusts may have been influenced by business, tax or economic considerations. But how those decisions affected the clean-up call percentages in the residual interest valuation models created

---

[450] *See* Section VI.B.7.d.iv.

accounting issues. Licata's explanation for how the relevant model assumptions were changed suggests that he did not fully appreciate those accounting consequences.

For instance, during his interviews by the SIC's investigators, Licata said that when each off-balance sheet securitization was created, the relevant residual interest valuation model would assume, at the outset, that the clean-up call would be exercised when the UPB was 10% of the original loan collateral. According to Licata, this was "a mathematical determination." When a trust came close to the 10% UPB trigger, if the Company was not ready to collapse the trust, Licata or his team would just change the percentage required to terminate the trust and push the deal out further.

Licata's rather cavalier attitude toward changing a basic assumption in the residual interest valuation model appeared to rest upon his mistaken view that changing the clean-up percentage or the termination date was "not really going to matter" because the assets remaining in the trust upon termination would continue to be valued at par. If Licata truly believed this, then he failed to appreciate that, by pushing out the trusts' termination dates, he was also changing the cash flows being valued by the residual interest valuation models and, thereby, changing the valuations of the residual interests on New Century's financial statements.

> v.    **The Examiner's conclusions with regard to New Century's changes in the clean-up percentages in its residual interest valuation models**

The Examiner has concluded that the responsible people within the Secondary Marketing Department at New Century did not appreciate the accounting implications of their frequent and unsupported changes in the clean-up call percentages upon which their residual interest valuation models relied. Licata, who appeared to control changes to this assumption, was fundamentally mistaken in thinking that changes in that percentage would not affect the valuations of New Century's residual interests.    As a result, changes that he regarded as ministerial or "mathematical" were producing unappreciated consequences in terms of the accounting for New Century's residual interests.

Unfortunately, the Examiner is not in a position to assess the quantitative impact of the changes being made in the models' clean-up call percentages. The Examiner did not find any evidence, however, that these changes were intended to achieve significant increases in New Century valuations.

> **e.  New Century's Residual Interest Valuations Were Adversely Affected by Problems with the Prepayment and Loss Assumptions Upon Which the Company's Models Relied and the Failure to Update Those Assumptions in an Appropriate Manner.**

As previously described, each of the New Century residual interest valuation models was based on a large number of assumptions (potentially up to 100). Each deal had different assumption curves.

The original assumptions used in New Century's models came from Kontoulis, New Century's original head of the Secondary Marketing Department, based upon his past industry experience. Everyone agreed that New Century's residual interest valuation models were only as good as the assumptions upon which they relied, that these assumptions required exercises of judgment, that the assumptions in the models needed to be updated from time to time to keep the models accurate and consistent with market trends, and that there were frequent discussions within New Century and with KPMG about those assumptions. But the Examiner's investigation revealed misunderstandings and disagreements about the sources of certain key assumptions, the processes by which they were determined, and the frequency with which they were updated. These misunderstandings and disagreements were particularly acute for the models' assumptions regarding prepayments and expected losses, which were the two assumptions most likely to have the greatest impact on the cash flows into the residual interest models.

> **i.  The prepayment rate assumptions in New Century's residual interest valuation models**

The residual interest valuation models attempted to predict the rate at which borrowers would repay the mortgage loans held in the securitization trust collateral. To do this, the models relied upon a prepayment rate assumption, known as the CPR, as a predictor of how fast all loans in the trust pool would be repaid. The CPR was a key assumption in the residual interest valuation models, because prepayments of loans not only removed those loans — and their cash flows — from the relevant trust's collateral, but also could result in the trust's receipt of prepayment penalty income.[451] The CPR attempted to estimate both voluntary prepayments (*e.g.*, in connection with sales and refinancings) and prepayments associated with foreclosures and defaults.

---

[451] Prepayment penalty income generally is applicable only within the first two years of a loan.

Prior to December 2006, the Company generally based its CPR assumptions on the average historical performance of its collateral from 1997 to 2002. According to Hatch, the Company used the 1997-2002 time period in an attempt to be "conservative" in predicting prepayment speeds because this was before the "spike" in mortgage volume that led to higher prepayment speeds and lower losses.

A number of people have criticized the CPR assumptions used in New Century's residual interest valuation models, often in inconsistent ways. For example, Mullins said that New Century sometimes understated and sometimes overstated the CPR. According to Morrice, however, the biggest error in the assumptions used in the residual interest valuation models was the underestimation of prepayment speeds.

Hatch said it was "problematic" that the CPR combined voluntary and forced prepayments. He also considered it a problem that the prepayment penalty projection was calculated on a static unpaid principal balance that did not reflect prepayments, so that if the prepayment percentage increased, New Century's values would not accurately reflect the impact of those prepayments. According to Hatch, to refresh static data with actual dynamic data was too difficult using New Century's Excel-based models.[452]

### ii. KPMG's concerns about New Century's prepayment rates and the responses of the Secondary Marketing Department

KPMG believed the CPR assumptions should have been changed by New Century more often as a result of the divergence between actual and projected results. Based on their analysis of the models tested each quarter, KPMG's SFG consistently recommended to the KPMG engagement team that they analyze New Century's CPR assumptions because the CPR assumptions were considered "low compared to those of similar issuers, the prepayment performance in the industry, and the Pool's historical performance." A low CPR assumption would mean that the corresponding residual interest would be overvalued.

Kim acknowledged that New Century's CPR assumptions were a topic of discussion with New Century. A chart in the KPMG workpapers documented the variances between projected and actual conditional prepayment rates. The fact that all the variances, except one, are negative indicates that the actual prepayment speeds were faster than what New Century had originally

---

[452] On the other hand, Hatch said the CPR limitations in the models were not significant because he could check the numbers with the trustee statements and come close to "tying" them out.

forecasted. Although the KPMG workpaper discusses the fair value adjustment that New Century needed to make in the second quarter of 2006 to bring New Century's recorded values in line with the actual fair values of the residual interest, Kim stated that faster prepayment speeds do not necessarily result in a write-down of a residual interest because there may be other assumptions in the model going in the opposite direction so the net effect could be different. Given the other factors that might influence residual interest valuation, Kim said that it would be inappropriate to say the fair value adjustment recommended in the KPMG workpaper was primarily the result of the change in prepayment rate, but he admitted that the change in the CPR could certainly be part of the reason for that adjustment.

New Century declined to change the CPR assumptions as frequently as suggested by KPMG. At least in part, this may have been because KPMG did not support its view with market information and the Secondary Marketing Department apparently believed that Kim did not understand secondary marketing. Furthermore, according to Hatch, KPMG was not as concerned with the Company's assumptions about prepayment rates or loss curves as it was about the Company's residual interest discount rates and its repeated decisions to postpone the collapse of older securitizations and, therefore, may not have pressed the Company as hard on the CPR issue.[453]  Walker did not recall any discussions with KPMG regarding the CPR curve or loss assumptions used to value residual interests.

New Century's CPR assumptions were discussed at the September 5, 2006 meeting between KPMG and New Century representatives that we have discussed previously. According to Goldberg's memo describing that meeting, Carnahan told New Century that its CPRs were slower than those of other companies with which he worked. At his interview, Carnahan tried to minimize this statement by saying that New Century had always been "pretty good" at estimating prepayment speeds and that, although New Century's CPRs were slower "on the tails" of older securitizations, that weakness was "offset" by the fact that the Company was historically "very accurate" in predicting prepayment speeds and cash flows at the "front part" of the curve. According to Carnahan, his purpose at the September 5 meeting was to stress New Century's need to document its CPRs better to avoid "risks." Carnahan also claimed that Goldberg's memorandum of the September 5 meeting did not accord with his recollection to the extent it

---

[453] According to Hatch, KPMG was more concerned about the Company's discount rate assumptions and the assumption that the deals would be collapsed at the eligible termination level rather than maturity (since history had shown that NCF only collapsed one deal prior to maturity).

suggested that he had described New Century's CPRs as generally "slow" or inappropriate and, therefore, in need of adjustment. He also disagreed with any suggestion that there had been a disagreement between him and KPMG on matters related to CPRs.

Despite what Carnahan said at his recent interview, KPMG's workpapers indicate that New Century continued to use prepayment rates throughout 2006 that were lower than the SFG considered to be appropriate. As part of their work on the incomplete 2006 audit, KPMG learned that, once again, actual prepayment speeds were faster than had been anticipated by the estimates used in the residual interest models.

Apparently, the key people in the Secondary Marketing Department who largely controlled the assumptions in the residual interest valuation models believed the increase in prepayment speeds and decline in delinquencies and losses experienced in 2003 and 2004 were unique to the market conditions at the time (for example, low interest rates, abnormal housing price appreciation). This reluctance to make changes in reaction to current events was summed up in the following description, by Mullins, of Licata's view that a change in "one quarter was an anomaly, [a change that lasted] two quarters we pay attention [to], and [if a change lasted] three quarters we [would] make a change" in the models' assumptions. Because of this reluctance to adjust its prepayment assumptions, when the mortgage market trended downward in 2005, New Century failed to adjust its prepayment assumptions to reflect then-current market conditions.

### iii.    New Century's change in its prepayment assumptions in early 2007

New Century did not change its prepayment assumptions until early 2007 when New Century changed, as of December 31, 2006, the prepayment rate assumptions that applied to the residual interest valuation models for its 2005 off-balance sheet securitizations. The February 2007 Hatch Memorandum explains that this change came about as a result of the following:

> Prior to the current quarter, baseline prepayment speeds applied to the securitization models were based on [a] combination of historic prepayment experience and management's judgment relative to current market conditions at the time the securitization settled (*please refer to the quarterly Residual Asset Valuation Report and the Securitization Valuation Methodology Memo for a comparison of historic prepayment speeds relative to the baseline CPR assumptions*). These prepayment speeds, being based on market averages were not adjusted for changing market conditions and required periodic management review to determine if and when changes in modeled speeds were appropriate. Furthermore, they were not reflective of loan specific collateral characteristic in

- 322 -

each individual securitization either at the point of security settlement or over time.

*          *          *          *

For future valuation purposes it was determined that the baseline prepay speeds in the Pricing Model would provide a more logical basis for determining projected prepayment speeds via conditional prepayment rates (CPR).    The rationale for this change is based on the fact that the pricing model is consistently updated to reflect values in the current whole loan market and more recent market views on speeds."

In other words, it took until February 2007 for New Century to recognize that its previous approach for determining prepayment speeds — based on historic experience from several years before (1997-2002) — should be jettisoned in favor of using CPR data in a pricing model that New Century consistently updated on a current basis.

iv.    **The Examiner's conclusions with regard to New Century's use of improperly low prepayment rate assumptions in its residual interest valuation models**

The Examiner has concluded that the Company should have been calibrating the prepayment assumptions in its residual interest valuation models to reflect changing market conditions much earlier than 2007.

Based on an analysis of the variances between the CPR assumptions in New Century's residual interest models and actual prepayment results, the Examiner has determined that, despite evidence of changing market conditions during 2005, New Century did not materially adjust its modeled CPR assumptions to reflect the then-current market conditions and, as a result, consistently under-forecasted its projected prepayments. *See* Table A on the following page.  In fact, while projected prepayments were generally lower than actual results, the Examiner observed that New Century made changes to its CPR assumptions — up until the first quarter of 2006 — that tended to *reduce* the modeled prepayment rates, *i.e.*, made changes that moved the models in the *wrong* direction. If New Century's residual interest valuation models consistently relied upon unduly low CPR assumptions, then the residual interest valuations they produced were consistently overstated.

- 323 -

## TABLE A
## New Century Financial Corporation
## Quarterly Prepayment Variance ($)

| | 03/31/2004 | 06/30/2004 | 09/30/2004 | 12/31/2004 | 03/31/2005 | 06/30/2005 | 09/30/2005 | 12/31/2005 | 03/31/2006 | 06/30/2006 | 09/30/2006 | 12/31/2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 99NC1 | (9,073) | 816,044 | 696,992 | 1,220,435 | 1,850,076 | 1,644,240 | 1,313,624 | 864,945 | 1,086,765 | 770,263 | 366,069 | 673,658 |
| | 0% | 13% | 14% | 43% | 70% | 69% | 62% | 45% | 61% | 48% | 25% | 50% |
| 99NC2 | 203,931 | 1,194,844 | 230,478 | 736,321 | 660,035 | 1,037,536 | (11,831,975) | 352,588 | 505,277 | 943,462 | (137,137) | 282,590 |
| | 7% | 45% | 15% | 73% | 72% | 125% | -88% | 55% | 86% | 180% | -31% | 66% |
| 99NC3 | 390,341 | 187,917 | 2,636,008 | 1,553,829 | 604,187 | 1,408,770 | (14,343,869) | 109,037 | 802,065 | (10,217,094) | (9,519,963) | 908,590 |
| | 10% | 6% | 131% | 125% | 55% | 142% | -90% | 14% | 110% | -86% | -93% | 176% |
| 99NC4 | (173,918) | 2,417,189 | 1,601,907 | 2,982,088 | 2,420,104 | 1,550,340 | 2,842,750 | 2,004,131 | (23,957,693) | (21,519,288) | 1,629,511 | 591,770 |
| | -3% | 40% | 35% | 101% | 73% | 148% | 121% | -89% | -90% | 140% | 58% | |
| 99NC5 | 204,990 | (88,411) | 217,889 | 184,529 | 318,144 | 193,951 | 332,515 | 325,952 | 207,013 | 226,704 | 179,914 | 27,033 |
| | 31% | -16% | 68% | 64% | 127% | 100% | 197% | 401% | 391% | 196% | 174% | 30% |
| 99NCA | (904,734) | 1,136,260 | 1,273,994 | 4,153,237 | 539,679 | 1,399,422 | 2,405,326 | 900,521 | 656,500 | 589,468 | 742,679 | 333,982 |
| | -13% | 18% | 23% | 114% | 22% | 61% | 146% | 62% | 49% | 47% | 64% | 32% |
| 99NCB | (1,141,841) | 3,367,559 | 1,390,421 | 4,520,813 | 2,807,990 | 3,125,057 | 2,085,371 | (40,597,248) | 362,386 | 352,600 | 249,981 | 212,391 |
| | -12% | 38% | 19% | 98% | 81% | 101% | 76% | -93% | 16% | 17% | 13% | 12% |
| 99NCD | (1,596,060) | 622,709 | (388,898) | 1,877,953 | 1,384,887 | 1,636,735 | 1,469,656 | 810,766 | 1,088,982 | 95,363 | 16,369 | (502,183) |
| | -29% | 12% | -10% | 79% | 65% | 85% | 115% | 53% | 79% | 8% | 1% | -46% |
| 00NC1 | (1,208,456) | 1,522,648 | 3,355,968 | 187,821 | 3,316,889 | 4,035,026 | 2,646,165 | 2,394,729 | 929,135 | 1,710,505 | 608,290 | 1,117,833 |
| | -13% | 18% | 103% | 3% | 128% | 242% | 184% | 188% | 83% | 164% | 66% | 129% |
| 00NCA | (1,157,907) | 1,056,077 | 1,932,406 | 889,409 | 1,661,773 | 746,886 | 1,447,405 | 2,740,476 | (18,142,872) | 196,384 | 648,551 | 457,879 |
| | -24% | 30% | 76% | 46% | 96% | 48% | 136% | 286% | -92% | 27% | 94% | 72% |
| 00NCB | 891,481 | 2,233,920 | 2,925,205 | 3,012,494 | 2,669,203 | 2,102,557 | 1,735,680 | 751,370 | 1,097,187 | 1,564,298 | 365,395 | 1,000,948 |
| | 12% | 39% | 77% | 111% | 110% | 106% | 54% | 88% | 140% | 38% | | 112% |
| 01NC1 | 1,477,486 | 4,029,337 | 3,502,509 | 1,968,927 | 4,321,296 | 1,224,466 | 3,612,984 | 1,570,492 | 3,130,922 | 2,057,705 | 1,180,792 | 265,659 |
| | 12% | 36% | 37% | 33% | 94% | 37% | 121% | 92% | 204% | 158% | 104% | 26% |
| 01NC2 | 12,617,011 | 6,496,638 | (118,185) | 4,608,252 | 2,914,010 | 4,076,268 | 4,844,119 | 4,703,099 | 3,538,717 | 1,389,735 | 2,227,666 | 3,484,991 |
| | 60% | 38% | 0% | 43% | 38% | 70% | 145% | 196% | 170% | 76% | 134% | 235% |
| 02NC1 | 10,114,565 | 10,304,048 | (2,078,703) | 2,398,655 | 1,874,566 | 951,717 | 3,198,657 | 1,182,668 | 2,561,573 | 340,809 | 861,557 | 575,117 |
| | 49% | 85% | -16% | 41% | 58% | 42% | 335% | 163% | 396% | 71% | 201% | 167% |
| 02NCA | (768,165) | 11,016,173 | 3,494,090 | 1,265,842 | 2,764,439 | 6,037,342 | 6,002,630 | 5,692,113 | 5,832,673 | 6,473,150 | 3,752,511 | 2,925,530 |
| | -1% | 24% | 10% | 6% | 20% | 56% | 78% | 107% | 141% | 179% | 120% | 106% |
| 05NCA | | | | | | | | (3,702,770) | (5,892,952) | (4,126,887) | (5,713,714) | (13,283,234) |
| | | | | | | | | -11% | -12% | -7% | -9% | -23% |
| 05NCB | | | | | | | | 6,588,343 | 36,454,210 | 45,115,890 | (2,611,571) | (9,072,071) |
| | | | | | | | | 21% | 63% | 56% | -2% | -6% |
| 05NCC | | | | | | | | | 25,586,073 | 51,596,082 | 13,583,956 | (5,958,806) |
| | | | | | | | | | 65% | 82% | 11% | -4% |
| 05NCD | | | | | | | | | 22,241,784 | 36,539,135 | 4,415,612 | (7,026,661) |
| | | | | | | | | | 73% | 76% | 5% | -6% |

*Positive numbers mean that actual results were higher than projected results.

For the reasons set forth above, it does not appear that the Company's use of improper prepayment assumptions could be characterized as inadvertent. To the contrary, New Century's failure to adjust its prepayment rates to reflect changing market conditions was contrary to the advice it consistently received as far back as the first quarter of 2005 from KPMG's SFG, which repeatedly expressed concern about the Company's use of low prepayment speed assumptions. In fact, the changes made to prepayment assumptions that are described in the 2007 Hatch Memorandum seem consistent with what KPMG's SFG had been recommending for years before that time.

Not only did New Century wait too long to make appropriate changes to its prepayment assumptions in the models for its residual interests in the 2005 off-balance sheet securitizations; it does not appear that New Century made comparable adjustments in 2007 to the prepayment assumptions in the models for its pre-2003 securitizations, even though the value of those pre-2003 residual interests was approximately $133.4 million at December 31, 2005, representing roughly 56% of the total residual interests recorded by New Century.

### v.   The loss assumptions in New Century's residual interest valuation models

The residual interest valuation models also attempted to predict the rate at which the securitization trusts would suffer losses on the mortgage loans held as collateral. To do this, the models relied upon loss curves that attempted to predict the extent to which the trusts would suffer losses over the life of the trust. Actual losses were populated into the models each quarter, and projected losses were expressed as an annualized percentage of the outstanding balance.

According to Morrice, New Century determined the appropriate loss curves by calling various Wall Street firms to gather data. Morrice said there was some concern about the way in which New Century determined its loss curves and some people (not clear who) wanted a better procedure for determining this assumption, but no one could think of anything better.

Hatch said that New Century's loss curves were not up to industry standards because they did not include the conditional default rate ("CDR") and "loss severity" (the probability of loss) functions that were available in most third-party valuation tools. This was a problem with both Licata's models and Hatch's models.

- 325 -

Just like New Century's CPR assumptions, and for similar reasons,[454] the loss curves New Century used in its residual interests valuation models prior to December 2006 were based on historical averages of loss experience associated with its loan collateral as of the 1997-2002 time period.

### vi.    KPMG's concerns about New Century's loss curves and the responses of the Secondary Marketing Department

KPMG argued that New Century should have changed its loss curve assumptions more frequently, because of the divergence between actual losses suffered by the trusts and the losses that New Century's models were projecting. As was true with prepayment rates, however, KPMG seemed not to give as much emphasis to its concerns about New Century's loss curves as it gave to other residual interest matters, like discount rates and collapse dates. As a result, the Secondary Marketing Department appeared to follow Licata's view that the Company should not change its loss assumptions unless there had been an actual trend suggesting a change that lasted for at least three quarters.

### vii.    New Century's change in its loss assumptions in early 2007

New Century did not change its loss assumptions until early 2007 when New Century changed, as of December 31, 2006, the loss rate assumptions that applied to the residual interest valuation models for its 2005 off-balance sheet securitizations. The February 2007 Hatch Memorandum explains that this change came about as a result of the following:

> Prior to the current quarter, baseline loss assumptions applied to the securitization models were based on [a] combination of historic loss experience and Secondary Marketing management's professional judgment relative to current market conditions at the time the securitization settled (please refer to he quarterly Residual Asset Valuation Report for a comparison of historic losses relative to the baseline loss vectors).

> The methodology for determining losses in the company's Pricing Model is significantly different from our existing securitization models. The Pricing Model bases losses on a loan level loss allocation based on credit grade and then updated for the loan level characteristics and distributed by a defined schedule over the life of the loan as of inception.... To measure the adequacy of our current historically based loss assumptions, and consistent with the Kettle Bell [sic] analysis, each deal's modeled loss expectations was evaluated against current delinquencies and actual loss performance to date to determine if an adjustment to

---

[454] *See* Section VI.B.7.e.i. above.

- 326 -

the existing loss assumptions was required. In addition, recent loss trends were evaluated to determine if the calculated historical and delinquency based factor adjustments made sense relative to recent and expected experience.

As in the case of its CPR assumptions, it took until February 2007 for New Century to recognize that its previous approach for determining loss curves — based on historic experience from several years before (1997-2002) — should be jettisoned in favor of using much more recent data.

### viii. The Examiner's conclusions with regard to New Century's use of improperly low loss assumptions in its residual interest valuation models

The Examiner has concluded that the Company should have been calibrating the loss assumptions in its residual interest valuation models to reflect changing market conditions much earlier than 2007.

Based on an analysis of the variances between the losses that New Century projected and the losses actually incurred by its pre-2003 securitizations, the Examiner has determined that actual losses generally were consistently higher than projected losses. *See* Table B on the following page. This suggests that the Company may not have been adjusting its loss rate assumptions to reflect market conditions and, as a result, was consistently under-forecasting its losses. If New Century's residual interest valuation models consistently relied upon unduly low loss projections, then the residual interest valuations they produced were consistently overstated.

Not only did New Century wait too long to make appropriate changes to its loss assumptions in the models for its residual interests in the 2005 off-balance sheet securitizations, it does not appear that New Century made comparable adjustments in 2007 to the loss assumptions in the models for its pre-2003 securitizations.

## TABLE B
## New Century Financial Corporation
## Quarterly Loss Variance ($)

| | 03/31/2004 | 06/30/2004 | 09/30/2004 | 12/31/2004 | 03/31/2005 | 06/30/2005 | 09/30/2005 | 12/31/2005 | 03/31/2006 | 06/30/2006 | 09/30/2006 | 12/31/2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 99NC1 | (53,004) | 411,581 | 371,420 | 279,412 | 750 | 300,325 | 402,673 | 241,363 | 229,111 | 143,018 | 37,779 | 505,044 |
| | -13% | 98% | 196% | 211% | 1% | 809% | 1225% | 1469% | 1566% | 155% | 45% | 670% |
| 99NC2 | (178,041) | 45,751 | 32,525 | (17,052) | (40,605) | (24,475) | 136,437 | 136,913 | 131,336 | 48,890 | 21,990 | (19,632) |
| | -77% | 21% | 21% | -18% | -69% | -79% | 510% | 1325% | 1376% | 141% | 73% | -72% |
| 99NC3 | 14,212 | 89,990 | 263,881 | 232,401 | 30,939 | 133,735 | 74,706 | 140,393 | 214,989 | 139,836 | 171,773 | 248,669 |
| | 5% | 38% | 233% | 299% | 59% | 625% | 714% | 2523% | 4222% | 4634% | 12250% | 6873% |
| 99NC4 | (131,580) | 89,042 | 216,091 | (9,496) | 2,609 | 745,769 | 376,764 | 209,121 | 296,032 | 308,826 | 346,605 | 125,633 |
| | -32% | 23% | 60% | -3% | 1% | 951% | 1113% | 738% | 3373% | 1410% | 1809% | 782% |
| 99NC5 | 204,990 | (88,411) | 217,889 | 184,529 | 318,144 | 193,951 | 332,515 | 325,952 | 207,013 | 226,704 | 179,914 | 27,033 |
| | 31% | -16% | 68% | 64% | 127% | 100% | 197% | 401% | 391% | 196% | 174% | 30% |
| 99NCA | (20,211) | 439,826 | 203,347 | 282,878 | 177,210 | 85,520 | 315,046 | 249,918 | 140,461 | 100,680 | 20,065 | 171,622 |
| | -5% | 115% | 83% | 159% | 133% | 138% | 697% | 646% | 402% | 319% | 71% | 683% |
| 99NCB | (9,005) | 557,956 | 86,522 | 59,956 | 305,888 | 424,572 | 304,325 | 188,390 | 386,956 | 309,467 | 173,214 | 151,990 |
| | -2% | 106% | 25% | 21% | 124% | 255% | 225% | 586% | 925% | 833% | 519% | 496% |
| 99NCD | 304,655 | 186,050 | 184,756 | 200,473 | 23,551 | 251,726 | 162,661 | 221,369 | 382,165 | 77,974 | 249,598 | 75,162 |
| | 219% | 158% | 215% | 261% | 47% | 899% | 942% | 1647% | 3148% | 721% | 2560% | 836% |
| 00NC1 | 414,750 | 878,370 | 338,977 | 670,476 | 999,485 | 1,176,550 | 384,340 | 652,930 | 363,830 | 342,698 | 336,782 | 525,796 |
| | 66% | 161% | 76% | 632% | 1359% | 3100% | 1275% | 3949% | 2516% | 2932% | 3296% | 5829% |
| 00NCA | 23,723 | 185,244 | 378,123 | 309,517 | 95,333 | 288,010 | 236,556 | 231,159 | 513,416 | 273,794 | 165,642 | 91,465 |
| | 14% | 122% | 287% | 669% | 306% | 1140% | 1120% | 1805% | 6560% | 2608% | 1764% | 1129% |
| 00NCB | 114,500 | (20,677) | 496,893 | 8,988 | 282,784 | 317,204 | 128,353 | 196,705 | 235,200 | 211,975 | 61,073 | 180,014 |
| | 38% | -8% | 249% | 7% | 278% | 467% | 246% | 447% | 613% | 635% | 206% | 680% |
| 01NC1 | 274,850 | 460,708 | 101,158 | (468,162) | 334,946 | (104,346) | 164,993 | 64,654 | 198,746 | 221,339 | 114,505 | 346,447 |
| | 80% | 102% | 23% | -123% | 107% | -43% | 77% | 55% | 228% | 322% | 225% | 965% |
| 01NC2 | 132,003 | (241,209) | (38,588) | 205,462 | 587,736 | 811,736 | 349,153 | 328,149 | 407,446 | 165,029 | 612,664 | 478,833 |
| | 30% | -41% | -9% | 64% | 226% | 399% | 209% | 671% | 1323% | 618% | 2608% | 2278% |
| 02NC1 | (187,617) | 167,964 | (492,504) | 148,312 | (141,913) | (23,602) | (59,881) | (16,796) | (92,541) | (30,343) | (24,070) | (24,344) |
| | -65% | 53% | -97% | 106% | -93% | -18% | -53% | -16% | -102% | -88% | -86% | -95% |
| 02NCA | (163,628) | 84,786 | 364,109 | 363,632 | (82,087) | 166,520 | 364,888 | 143,061 | 599,554 | 492,567 | 1,245,918 | 538,173 |
| | -14% | 7% | 32% | 33% | -8% | 20% | 54% | 28% | 150% | 229% | 680% | 343% |
| 05NCA | | | | | | | | | 56,175 | 65,511 | (548,420) | (796,846) |
| | | | | | | | | | | | -75% | -75% |
| 05NCB | | | | | | | | | 6,890 | 57,358 | 133,159 | 84,489 |
| | | | | | | | | | | | | 6% |
| 05NCC | | | | | | | | | - | 33,410 | 1,284,471 | 2,448,501 |
| 05NCD | | | | | | | | | - | 164,529 | 475,599 | 1,570,098 |

*Positive numbers mean that actual results were higher than projected results.

ix.     **Concerns that New Century stopped updating key assumptions in its residual interest valuation models for pre-2003 securitizations**

The primary reason the SIC looked more closely at New Century's accounting for residual interests was that KPMG informed the SIC in February 2007 that the Company had stopped making adjustments to its prepayment speed and loss assumptions in the models for its pre-2003 securitizations. The Examiner's investigation confirmed that this was true, *i.e.*, that New Century substantially reduced the number of adjustments to its prepayment rate and loss assumptions by the fourth quarter of 2005, and stopped making those adjustments after the first quarter of 2006, even though the value of its pre-2003 residual interests was approximately $133.4 million at December 31, 2005, representing roughly 56% of the total residual interests recorded by New Century.

According to Mullins, when he had operational responsibility for the residual interest valuation models, changes in assumptions would be made on a quarterly basis, depending on market conditions. Mullins said that he discussed possible changes in assumptions with Warren Licata before receiving authorization from Licata to make those changes. Mullins did not know whether the CPR, loss and other assumptions in the models were changed after he stopped being involved in the residual interest valuation process.

When Hatch took over responsibility from Mullins for portfolio reporting in late 2005 or early 2006,[455] the Secondary Marketing Department did not continue to update the CPR and loss assumptions in the residual interest valuation models for the pre-2003 securitizations as frequently as had been the case before,[456] even though Hatch said he did not intend to perform his portfolio reporting responsibilities differently than had Mullins. Neither Hatch nor Mullins recalls any discussion, when Hatch assumed Mullins' responsibilities, of the way that assumptions in the pre-2003 residual interest models had been updated by Licata and Mullins. It was not until early 2007 (when Hatch was asked to go back and review the assumption changes to the pre-2003 models that occurred when Mullins was in charge of portfolio reporting) that Hatch learned that Licata and Mullins had changed assumptions for the pre-2003 models more frequently before Mullins left and Hatch became responsible for portfolio reporting.

---

[455] *See* Section VI.B.3.d. above.

[456] *See* the table in Section VI.B.7.e.x. below.

Hatch disclaimed any responsibility for making any unilateral decisions about assumption changes, claiming that everything he did was at the direction of Licata. Hatch said he merely rolled forward prior assumptions without questioning the assumptions themselves. Although Hatch stated that he made recommendations to Licata from time to time about changes in assumptions, he would not implement any such change without Licata's approval. According to Hatch, Licata provided him with the assumptions to use in his models and would direct Hatch to make changes in assumptions. Hatch did not change assumptions unless Licata specifically told him to do so. Hatch did not know whether Licata developed the assumptions himself or whether others had input in setting the assumptions.

According to Hatch, the only instance in which Licata directed Hatch to change an assumption occurred in late 2005 or early 2006 when Hatch changed the prepayment speeds on the 2005 models because the prepayment speeds were significantly lower than reality and the values, therefore, were inaccurate. The change involved the use of prepayment speeds based on the New Century pricing model, which frequently updated assumptions in order to tie to whole loan sales. Hatch did not consider using the pricing model's assumptions in the residual interest valuation models prior to that change in prepayment speeds.

Hatch said that he did not make monthly recommendations to change the prepayment and loss assumptions in the residual interest valuation models because the numbers were derived from historical averages and changing assumption curves every month based on actual data would skew the results more than not changing the assumptions. Further, Hatch said that Licata directed Hatch to not change assumptions because dips and spikes were temporary and the curves would return to the long-term modeled trends. Hatch agreed with this theory in the short-term (three to six months out), but also believed that changes to assumptions would be warranted if market forces changed considerably after more than six months. According to Hatch, both he and Licata believed that assumptions should not change without well-reasoned documentation. Our investigation never discovered any such documentation.

Licata was adamant that New Century did not stop updating the assumptions in the residual interest valuation models at any time, asserting that that the Company continued to update the assumptions in the models for the pre-2003 securitizations during 2006. When asked whether the Company updated the assumptions less frequently in 2006 than in the past, Licata claimed that his group followed their same procedures as they had every quarter. Licata

disagreed with KPMG's assertion that the models were not adjusted as frequently in or after 2005, claiming that KPMG's incorrect impression was based upon a miscommunication between a KPMG junior analyst and that person's contact on Licata's staff.

Licata did not recall discussing with anyone in 2005 or later that it was no longer cost-effective for the Company to update the assumptions in the models for the pre-2003 securitizations. He also did not remember discussing with anyone that, because the pre-2003 deals were getting older and the pools were seasoned, it did not make sense to revisit and update the assumptions as frequently. Licata claimed that his group was always looking at the assumptions in the models in the process of rolling them forward in an effort to determine whether they were working correctly. Licata's superiors (Cloyd and Flanagan) said they were not aware of any change in the Secondary Marketing Department's practice of updating assumptions in the residual interest valuation models for pre-2003 securitizations in 2005 and 2006, and claimed they would have disagreed with any suggestion that those assumptions not be updated as frequently as before in order to conserve resources or for other reasons.

Kenneally claimed that, although he participated in "conceptual discussions" with the Secondary Marketing Department about the assumptions in the residual interest valuation models, the Secondary Marketing Department would tell Finance and Accounting Department what assumptions were being used in the residual interest valuation models and that he did not provide the Secondary Marketing Department with any of those assumptions. According to Kenneally, the assumptions in the models were not changed each quarter. The Secondary Marketing Department would identify the changes they had made in informal discussions or e-mails (not in formal memoranda). Kenneally suspected that there may have been some discussion in ALCO meetings about the model assumptions, in which Licata, Cloyd, Hatch and Mullins participated. Kenneally said no one ever "pushed back" against the Secondary Marketing Department on these issues. Kenneally said he did not recall any change in the Secondary Marketing Department's methodology for adjusting assumptions in the residual interest valuation models, although he was aware of "hearsay" from Kim and Beckstrom in the fourth quarter of 2006 or the first quarter of 2007 that the Secondary Marketing Department had stopped changing the assumptions. Kenneally also recalled being told by KPMG that Licata or Hatch had confirmed that the Company had stopped revising the assumptions in the models for older securitizations.

It is not clear when KPMG first learned that New Century had changed its practice with regard to updating the assumptions in the residual interest valuation models for the pre-2003 securitizations. Kim does not recall when New Century stopped changing the assumptions, but that it is indicated in the KPMG workpapers. Kim was not sure whether it was year-end 2006 when he first learned that they were not changing assumptions. Kim does not recall whether the SFG specifically weighed in on the reasonableness of New Century's actions, but he stated that they would have discussed the issue with the whole engagement team, of which SFG was a part. KPMG prepared a document for the incomplete 2006 year-end audit that criticized management for not updating some of the assumptions for the older transactions. It was Kim's impression that "someone" determined that adjusting the assumptions for the older securitizations would not make a significant difference. In order to determine whether this was reasonable, either New Century or KPMG would have done some calculations. Kim could not recall who performed those calculations.

> x.    **The Examiner's conclusions with regard to New Century's failure to update the prepayment and loss assumptions in certain of its residual interest valuation models in 2006**

The Examiner has determined that adjustments to the prepayment speed and loss assumptions in those models were not made with the same frequency after residual interest valuations were calculated for the third quarter of 2005:

| Quarter | Number of Adjustments | Net Impact on Residual Interests |
|---------|----------------------|----------------------------------|
| Q2 2004 | 65 | $2,695,777 |
| Q3 2004 | 57 | $4,978,679 |
| Q4 2004 | 47 | $2,663,239 |
| Q1 2005 | 48 | $2,487,804 |
| Q2 2005 | 39 | $2,020,927 |
| Q3 2005 | 43 | $2,658,385 |
| Q4 2005 | 6 | $747,161 |
| Q1 2006 | 14 | $101,230 |

The Examiner has concluded that New Century should have continued to update the CPR and loan loss assumptions in the valuation models for its residual interests in pre-2003 securitization in 2006 as it had before and that the failure to update those assumptions as frequently in 2006 as had been the case in earlier years was a mistake.

However, the Examiner did not find any evidence that this change in practice was intentional or designed to affect the overall value of New Century's residual interests. To the contrary, it appears that this change in practice was a mistake, perhaps as a result of poor communications or misunderstanding when overall responsibility for the residual interest valuation models shifted from Mullins to Hatch.[457]

The failure to continue to update those assumptions did not appear to have a significant impact on New Century's residual interest valuations. Furthermore, the documents that troubled the SIC investigators may be important to an understanding of other issues related to New Century's valuation of its residual interests (*e.g.*, New Century's insistence upon using unduly low discount rates, its undue reliance upon the par value assumption, and its decisions to postpone the collapse of older securitizations), but they seem to have little relevance to whether New Century updated the CPR and loan loss assumptions in the models for its pre-2003 securitizations.

---

[457] No one from New Century seems to have supported KPMG's claim that cost considerations influenced the decision to stop updating these assumptions. To the contrary, Cloyd claims never to have heard cost raised as an issue. Furthermore, the Examiner is not aware of any significant direct costs associated with the process of updating these assumptions, other than an incremental amount of additional time spent by employees who were "rolling forward" the relevant models on a quarterly basis throughout 2006.

## C. Other Accounting Issues

The Examiner's investigation analyzed several accounting issues in addition to the repurchase reserve and residual interest valuation issues identified by the Company and discussed above. These issues were reviewed for a number of reasons, including concerns expressed by the SIC, Taj Bindra and others during the spring of 2007 that there might be other areas of New Century's accounting where improper judgments and assumptions may have distorted New Century's financial statements.    In addition, workpapers from KPMG's incomplete 2006 audit revealed angst about areas of New Century's accounting that KPMG had not previously questioned, at least not with the same level of detail or intensity.

As a result, the Examiner focused attention on several accounting issues that required important judgments by New Century's Management or were identified as areas of concern in KPMG's workpapers. They included:

1. New Century's deferral and amortization of loan origination fees and costs;
2. The manner in which New Century accounted for mortgage servicing rights;
3. The $77 million in goodwill that New Century recorded in connection with its acquisition of the loan origination platform of the prime mortgage retail division of RBC Mortgage;
4. New Century's allowance for loan losses with respect to loans it held in inventory; and
5. New Century's hedge accounting.

The following sections of this Final Report will analyze each of these accounting issues.

In general, the investigation of these accounting issues did not reveal problems of the magnitude of the repurchase reserve and residual interest issues discussed previously. Nevertheless, these accounting issues did share some disturbing themes with each other and with New Century's accounting for repurchase reserves and residual interests.

First, New Century's Accounting Department repeatedly engaged in accounting practices or methodologies that were inconsistent with GAAP or were otherwise subject to criticism by KPMG. For example, the Accounting Department often resorted to "straight-line" amortization (*e.g.*, with regard to deferred loan original costs and mortgage servicing rights) when accounting standards required more sophisticated methodologies.  In addition, the Accounting Department frequently relied upon cash flow models to develop "fair values" of assets rather than make reasonable efforts to obtain market quotations, as KPMG specialists often recommended.

Second, key assumptions underlying New Century's accounting (*e.g.*, with regard to residual interest valuation, mortgage servicing rights and goodwill impairment) were often undocumented or documented in a cursory manner and KPMG's engagement team frequently failed to question or test those assumptions in a rigorous manner.

Third, New Century used discount rates in certain key areas of accounting (*e.g.*, with regard to residual interest valuation and goodwill impairment testing) that seemed unreasonably low when compared to discount rates used by New Century's peer firms or the discount rate that New Century's financial management used internally when developing business plans. This resulted in higher "fair value" estimates than appropriate.

Fourth, KPMG's engagement team seemed unduly willing to acquiesce in New Century's departures from prescribed accounting methodologies and often seemed to resist or ignore suggestions from specialists within KPMG that New Century improve its accounting practices or do a better job of explaining its departures from prescribed accounting practices. At times, it appeared that senior people on the KPMG engagement team became advocates for or defenders of New Century's accounting practices when those practices were questioned by KPMG specialists who had greater knowledge of relevant accounting guidelines and industry practice.

Finally, both New Century's Accounting Department and the KPMG engagement team frequently dismissed or minimized the significance of New Century's accounting errors or New Century's departures from prescribed accounting practices on grounds that they were "immaterial," although the documentation for these conclusions of "immateriality" were often thin or non-existent. Of at least equal concern is that on more than one occasion, when KPMG discovered a problem with a New Century accounting practice and determined that it had resulted in an "immaterial" impact during a particular accounting period, neither New Century nor KPMG appeared to expand its analysis to determine whether that same practice had resulted in material impacts during some prior accounting period. As a result, as to many of these accounting issues, the Examiner was not in a position to conclude whether or not some of New Century's accounting errors materially impacted its financial statements during 2005 and 2006.

### 1. New Century's Allowance for Loan Losses

#### a. Executive Summary

The Examiner investigated matters related to the Company's ALL, which was one of New Century's critical accounting areas. The ALL represented a reserve by which New Century sought to provide for probable and reasonably estimimable losses on loans held for investment by the Company. Because the potential magnitude of such losses was very large, particularly as New Century grew its portfolio of loans held on its balance sheet, the ALL was a regular focus of New Century's Audit Committee and KPMG. Notwithstanding the significance of the ALL, and the attention paid to it by certain Directors and KPMG, the Examiner identified several inadequacies related to New Century's calculation of ALL.

First, New Century failed to document properly the methodology used to calculate its ALL, as required by GAAP. KPMG was aware that this was an issue, having concluded that it was a significant deficiency in 2004. Furthermore, KPMG discussed proper documentation with New Century and evidently concluded that the deficiency had been remediated in 2005, despite no apparent change in New Century's methodology or documentation policies. The issue persisted and, as part of its audit work for 2006, KPMG utilized a credit specialist who observed continued deficiencies in the Company's documentation of its methodology for calculating the ALL.

Second, the Examiner obtained information that the New Century models used to calculate its ALL were not regularly updated to reflect trends associated with the actual performance of the Company's loan portfolio. Moreover, the Company did not update or modify its models to reflect its then-current assumptions regarding future loan losses. As a result, the models produced ALL figures that deviated substantially from New Century's actual loan loss experience. Neither New Century accounting personnel nor KPMG took steps to cause these models to be updated consistent with the Company's actual loan loss performance or anticipated future losses. This was true even as market conditions began to change dramatically during 2006.

Third, the Examiner determined that New Century overreserved for loan losses throughout the relevant period. Such over-reserving, under circumstances where the Company's methodology is insufficiently documented and its calculations cannot be adequately verified, reflects a significant deficiency in relevant controls. Furthermore, this over-reserving of the

- 336 -

ALL led at least one independent Director to question whether New Century's Management planned to utilize the excess reserves to manipulate earnings.

### b.    Background Regarding New Century's ALL

#### i.    Relevant accounting principles and guidance

New Century's ALL was governed by the following accounting principles and guidance.

- FAS 5 states that an estimated loss from a loss contingency, such as an uncollected receivable, should be accrued when, based on information available prior to the issuance of the financial statements, it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated.

- SEC Staff Accounting Bulletin No. 102 *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102") requires that a company document the development and consistent application of a systematic methodology for determining allowances for loan losses in accordance with GAAP. SAB 102 describes the following documentation the SEC normally expects to be prepared and maintained in support of the allowance for loan losses: (1) written policies and procedures to document the systems and controls by which a company maintains an appropriate loan loss allowance, including the loan loss allowance calculation methodology; (2) a loan grading system or process; (3) a summary or consolidation of the loan loss allowance balance; (4) validation of the loan loss allowance methodology; and (5) periodic adjustment to the loan loss allowance process.[458]

- Financial Reporting Release No. 28 ("FRR 28") provides that the books and records of a company engaged in lending activities should include documentation of: (a) a systematic methodology to be employed each period in determining the amount of loan losses to be reported; and (b) the rationale supporting each period's determination that the amounts reported are adequate.

#### ii.    The Company's calculation of the ALL

New Century established its ALL based on its estimate of losses with respect to on-balance sheet loans held for investment and related assets. The Company determined its ALL on a monthly basis, as it believed that such a methodology more closely mirrored portfolio activity

---

[458] The SEC has also stated that a company's policies and procedures should identify the roles and responsibilities of company personnel and should include the methodology for estimating loan losses and for charge-offs and recoveries. Further, the SEC has directed that in modeling estimated future losses, companies should document their evaluation and their conclusions regarding the appropriateness of estimating loan losses with model or other loss estimation tools, as well as the objective support for adjustments to the models or their results. When a company identifies particular segments of its loan portfolio for which it is probable that there will be loan losses, the company must document its analysis for an adjustment and include supporting documentation, such as economic reports, economic data and information from individual borrowers. Finally, the SEC has stated that a company should have documented adequate internal controls for ensuring the reliability and integrity of the loan loss estimation methodology.

versus a "life of loan" methodology. The Company's ALL calculation was a rolling 18-month projection based on certain loss rates, prepayment rates and interest rate assumptions applied to the unpaid principal balance of the loans held for investment.[459] Once these factors were applied, the Company used the projected losses for the next 18-month period as its ALL.[460]

The Company evaluated the adequacy of the ALL quarterly, giving consideration to factors such as the current performance of the securitized loan portfolio, credit characteristics of the portfolio, the underlying value of the collateral and the general economic environment. With respect to loans held for investment, the Company estimated losses using "static pooling," which stratified the subject loans into separately identified pools. Such "pooling" and related estimates were performed by Secondary Marketing Department personnel, including Yun Pyatigorsky, John Hatch and Warren Licata, in coordination with Kenneally in Accounting. Using historical experience and taking into consideration the factors noted above, the Company estimated an allowance for losses inherent and probable in the loans held for investment ("LHFI") portfolio. Provisions for losses were charged to the consolidated statement of operations. Actual losses incurred on securitized loans held for investment were charged to the allowance account.

For 2004 through 2006, the Company's ALL balance, provision for losses and loss charge-offs, and the loans held for investment balances, are summarized as follows:

| Period | Per SEC Filings | HFR ALL | Financing LHFI | NET | ALL Begin | Provision | Actual Charge-off | Other Adjustments | ALL End | ALL as % of LHFI ALL |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/31/2004 | 5,999.3 | 6,045.1 | (5,991.7) | 53.4 | 26.3 | 19.9 | (0.4) | - | 45.8 | 0.8% |
| 6/30/2004 | 9,146.5 | 9,209.1 | (9,086.9) | 122.2 | 45.8 | 17.1 | (0.3) | - | 62.6 | 0.7% |
| 9/30/2004 | 10,890.5 | 10,975.2 | (10,788.2) | 187.0 | 82.6 | 25.8 | (1.1) | (2.6) | 84.7 | 0.8% |
| 12/31/2004 | 13,195.3 | 13,285.5 | (13,106.0) | 179.5 | 84.7 | 7.4 | (2.3) | 0.4 | 90.2 | 0.7% |
| 3/31/2005 | 15,836.2 | 15,953.7 | (15,692.3) | 261.4 | 90.2 | 30.3 | (3.7) | 0.7 | 117.5 | 0.7% |
| 6/30/2005 | 18,483.0 | 18,828.6 | (18,343.5) | 265.1 | 117.5 | 36.9 | (8.9) | 0.1 | 145.6 | 0.8% |
| 9/30/2005 | 18,330.3 | 18,508.1 | (18,226.8) | 261.3 | 145.8 | 38.6 | (10.0) | 3.6 | 177.8 | 1.0% |
| 12/31/2005 | 16,143.9 | 16,342.0 | (18,045.5) | 296.5 | 177.8 | 28.9 | (13.6) | 5.0 | 198.1 | 1.2% |
| 3/31/2006 | 18,102.9 | 16,312.7 | (15,948.9) | 383.8 | 198.1 | 27.8 | (18.2) | 2.1 | 209.8 | 1.3% |
| 6/30/2006 | 15,905.6 | 16,115.5 | (15,794.3) | 321.2 | 209.8 | 32.3 | (27.2) | (5.0) | 209.9 | 1.3% |
| 9/30/2006 | 14,031.0 | 14,222.8 | (13,858.9) | 363.7 | 209.9 | 20.7 | (25.4) | (13.6) | 191.6 | 1.3% |
| 12/31/2006 | 12,218.7 | 12,413.4 | (12,152.0) | 261.4 | 191.6 | 20.7 | (30.2) | 12.6 | 194.7 | 1.6% |

---

[459] Other factors apply but are not material to the ultimate calculation of the loss reserve.

[460] The Company phased up to an 18-month assumption over the first six months of the securitization's life (i.e., the loss assumption for the first month equaled the projected losses for the next 12 months; the second month loss assumption equaled the projected losses for the next 13 months, and so forth until month six when an 18-month loss projection was reached)

### iii.    Board oversight of the ALL

New Century's Audit Committee regularly discussed the ALL because it was a critical accounting policy and because it involved a high degree of judgment and subjectivity. According to Zona, the Committee reviewed whether changes had been made to the methodology for calculating the allowance and whether KPMG believed the allowance was reasonably stated. The Audit Committee routinely asked the KPMG auditors to address whether the ALL was adequate. On each such occasion, KPMG personnel expressed the view that the Company's ALL was "reasonably stated" and that "KPMG had not discovered any material differences" related to the Company's estimates.

As discussed more fully below, in late 2005, Zona raised questions with respect to whether the Company contemplated an improper reduction in the ALL – *i.e.*, a "bleeding down" of the reserve – to enable New Century to meet its quarterly earnings target. Zona told the Examiner that he caused the Audit Committee to resist Management's recommendation for a reduction in the allowance at that time.

Later, in 2006, Zona and Einhorn focused on the adequacy of the ALL reserve and questioned whether the 18-month evaluation window used by New Century was adequate. Zona and Einhorn believed the Company may have been under-estimating future losses that would be incurred by New Century as the subject loans aged. With respect to the 2006 audit, the Audit Committee asked KPMG to focus on the ALL. KPMG responded by adding a member of its Consumer Credit Financial Risk Management practice ("FRM") to assist the engagement team on this subject.

### c.    New Century's Methodology Was Not Properly or Sufficiently Documented

As noted above, the relevant SEC guidance and accounting literature directed New Century to document properly its methodology for calculating the ALL. Notwithstanding this regulatory guidance and related internal controls requirements, the Examiner has determined that New Century failed to document adequately its methodology for calculating the ALL.

KPMG noted that New Century failed to document its ALL methodology and related rationale in connection with its 2004 audit. In particular, KPMG found that there was inadequate documentation evidencing methodology and rationale and no supporting data for the loss curves used by New Century in calculating the ALL. According to a KPMG report to the Audit

Committee, the issue was remediated by New Century as of the end of 2004. The Examiner, however, has been unable to confirm the type and nature of any such remediation.

Later, in connection with its audit work for 2006, KPMG again observed that New Century lacked formal policies and procedures respecting the ALL, that there was insufficient documentation of the ALL base curve, and that there was no evidence the Company timely reviewed related gain/loss worksheets. KPMG concluded preliminarily that the lack of documentation was a material weakness. KPMG also determined that review by a specialist was necessary because KPMG could not rely upon the Company's figures. Accordingly, KPMG enlisted the assistance of a FRM specialist to assist the engagement team. He determined that New Century did not document properly its methodology for calculating the allowance[461] and that the Company failed to use industry best practices in its development and modification of loan loss curves.[462]

### d.    KPMG Failed to Press New Century to Document Properly Its Methodology

Although KPMG did not identify documentation deficiencies during its 2005 audit, New Century's methodology and documentation for the ALL did not change from 2004 to 2005. Accordingly, the Examiner concludes that the deficiencies KPMG identified in 2004 and 2006 also existed in 2005, but were not identified by KPMG at that time. It also appears that the same documentation deficiency that was allegedly remediated by New Century in 2004 was in fact not remediated in 2004, 2005 or 2006.

KPMG did not press New Century to improve its ALL documentation until the 2006 audit. Given that the substantive guidance provided by SAB 102 focuses predominantly on the documentation of the Company's calculation methodology, the Examiner concludes that additional efforts should have been made by KPMG in a much more timely manner to ensure

---

[461] Although New Century's methodology and documentation did not change from period to period, the record of KPMG's reviews did not indicate consistent deficiencies identified for the same processes. The documentation issue appeared in 2004 and 2006, but not in 2005. In addition, the inherent risk for ALL was determined by KPMG to be significant in 2006 but only moderate in 2005. The only apparent change from 2005 to 2006 was the involvement of the credit specialist. This is further indication that KPMG did not devote sufficient resources on a consistent basis to the New Century engagement.

[462] The specialist's KPMG colleagues may not have agreed with his observations. Kim told the Examiner that the specialist was incorrect about the documentation issue, although he could not identify the relevant documentation prepared or maintained by New Century. Further, Donovan told the Examiner that Kenneally rejected the factual basis for specialist's memorandum. However, the Examiner found no evidence that New Century complied with the documentation requirements of SAB 102.

that New Century's calculation methodology was appropriately documented. When asked about these matters, Kim and Donovan told the Examiner that they thought New Century had complied with the requirements of SAB 102, although Donovan said that KPMG did not receive the documentation. Under the circumstances, the Examiner questions the basis for KPMG's regular assurances to the Audit Committee regarding the allowance for loan losses.

### e.    New Century's Modeling Varied Substantially from Actual Performance and Models Were Not Updated

KPMG's audit workpapers indicate that the Company's actual losses on loans held for investment were significantly different than the Company's modeled losses. New Century's explanation, as documented in KPMG's workpapers, was that it expected its future losses to exceed those reflected by the models used for the 18-month rolling forecast. Stated differently, New Century apparently maintained a "cushion" in its ALL that was designed to address future losses that were expected but were not yet "probable and estimable" under its methodology.

The disconnect between New Century's ALL and both its actual and its anticipated loan losses was well-known within New Century. Nonetheless, the Company's Management balked at suggestions to change the base curves. According to Matthew Mullins, a former senior analyst in the Secondary Marketing Department, Management did not want to lower constant prepayment rates ("CPR") because it would affect the loss reserves. The Examiner found no evidence that Dodge, Kenneally or other internal accountants ever asked for a change in the models, even though it was apparent that the models were poor predictors of actual loan losses.

### f.    New Century Over-Reserved for Loan Losses

KPMG documented New Century's belief that its ALL was larger than required. KPMG's workpapers state the following with respect to the Company's allowance for loan losses from 2004 through 2006: "The Company believes that the model reasonably supports the above balance as expected losses for some of its earlier models have been lower than initially modeled and thus the allowance has not been reduced by expected charge-offs. The Company believes that the actual losses may exceed modeled in future periods and does not believe it appropriate to reduce the allowance in the current quarter due to what could possibly be timing differences or a period of unusual actual losses." The Examiner found no evidence that KPMG or the Company ever quantified the over-reserve or challenged the appropriateness of the models' assumptions.

- 341 -

New Century's large loss reserve raised potential issues.    In late 2005, Zona contemplated resigning from the Board, because, among other reasons, according to him, Management suggested using a portion of the loss reserve to boost quarterly earnings.    In October 2005, Zona said that Management tried to adjust its loan loss reserves in order to achieve a certain level of earnings. As Zona reported to the Examiner, New Century experienced a tax problem that reduced earnings by $0.26/per share.  Dodge presented a report to the Board of Directors showing that earnings would not be reduced because, as Management argued, New Century was overreserved in its ALL by that exact same $0.26 per share.  Zona told the Examiner he was particularly frustrated by what he viewed as Management's lack of integrity, the quality of its financial reporting and New Century's business strategy.  Zona added that he made clear he would not approve the financial reports if the adjustment to the loan loss reserve was made.[463]    Management did not make the adjustment.  As stated in his draft resignation letters, dated November 1, 2005 and December 6, 2005, Zona thought Management's suggestion that the reserve should be reduced to permit New Century to meet its earnings target "smacked of earnings manipulation."

### g.    Examiner's Conclusion Regarding New Century's ALL

The ALL involved large dollar amounts and substantial risk.  GAAP required New Century to document appropriately its methodology for calculating the allowance and to adopt models that it reasonably believed would generate good faith estimates.  The Examiner has determined that New Century failed to document properly its methodology for calculating the ALL and that the Company failed to employ appropriate models.  The Examiner has also determined that KPMG allowed New Century to utilize poor documentation policies and improper modeling methodology without testing the significance of the variances.

### 2.    New Century's Accounting for Mortgage Servicing Rights

### a.    Executive Summary

New Century made at least two errors when accounting for its interests in MSRs and made misleading disclosures about how it accounted for MSRs.   In addition, KPMG's

---

[463] Zona described Management's argument for reducing the loan loss reserves and his opposing argument in his November 1, 2005 draft resignation letter as follows: "Management attempted to justify the reversal of loan loss reserves by stating that the delinquency and charge off experience for the portfolio was much better than expected. However, Management also knew that there would be losses from hurricanes Katrina, Rita and Wilma, but had not quantified the amount of the losses. (Wells Fargo and B of A have provided $100 million and $50 million, respectively, for hurricane losses)."

engagement team failed to pursue issues raised by specialists within KPMG who had concerns about New Century's accounting for MSRs.

New Century did not initially record MSRs based on their relative fair values at the time of sale as required by GAAP. Instead, the Company relied on internal estimates of market value that were based on "recent whole loan sale activity and market color." Although KPMG's SFG recommended that New Century obtain at least one independent third-party valuation to validate its internal estimates, it does not appear that the KPMG engagement team ever pushed New Century to do so. In addition, New Century amortized its MSRs on an essentially straight-line basis and failed to apply proportionate method of amortization as required under FAS 140. The Examiner is not in a position to conclude whether these errors in New Century's accounting for its MSRs may have materially affected any of New Century's financial statements.

New Century also made inaccurate disclosures in its financial statements about its initial computation of the fair value of its MSRs, its amortization methodology and its impairment review. These disclosures were inconsistent with the Company's accounting policies and suggest that the Company was in compliance with GAAP, when in fact the Company and the KPMG engagement team knew that it was not.

Finally, it appears that the KPMG engagement team did not actively pursue issues that were raised by specialists within KPMG about the Company's accounting for MSRs. KPMG was quick to excuse the Company's failure to comply with GAAP on grounds that the Company's improper accounting for MSRs was probably immaterial.

### b.     Mortgage Servicing Rights – In General

The contractual rights to service mortgages after loan origination are called "mortgage servicing rights." Essentially, mortgage servicing includes collecting principal, interest and escrow payments from borrowers; paying taxes and insurance from escrowed funds; monitoring delinquencies; executing foreclosure if necessary; temporarily investing funds pending distribution; remitting fees to guarantors, trustees and others providing services; and accounting for and remitting principal and interest payments to the holders of beneficial interests in the financial assets.[464] MSRs become distinct assets or liabilities only when an event occurs that would require the rights to be bifurcated from the underlying loans, such as a sale or

---

[464] FAS 140 ¶ 61.

- 343 -

securitization.[465]    Lenders may service the loan themselves or engage another company to perform the servicing for a fee.

### c.    Accounting Treatment for Mortgage Servicing Rights – in General

MSRs may be classified as servicing assets or servicing liabilities.  If the benefits of servicing are expected to be more than adequate compensation to a servicer for performing the servicing, the contract results in a servicing asset.[466]  If the benefits of servicing are not expected to be adequate compensation to a servicer for performing the servicing, the contract results in a servicing liability.[467]  Typically, a contract results in a servicing asset.  The benefits of servicing include revenues from contractually specified servicing fees, late charges and other ancillary sources.  The servicer incurs the costs of servicing the asset.

The value of the servicing asset changes over time based on market factors and estimates of future servicing revenue.  A seller of loans that retains service rights must allocate value to the servicing asset at the date of sale or securitization.  Subsequently, the servicer must adjust the value downward if, based on a change in market factors and estimates of future servicing revenue, the value of the servicing asset falls below the value at which the company carries the asset.

### d.    The Reported Values of New Century's Mortgage Servicing Rights

New Century retained MSRs on whole loan sales, primarily to Carrington Capital Management, and on loan securitizations accounted for as sales in accordance with FAS 140.  The Company generally received fees for servicing these loans.[468]   For the year ended December 31, 2005, the Company valued the right to service loans in the range of 65 to 71 basis points of the principal balance sold at the time of sale or securitization, which value represented the Company's best estimate of the fair value for new MSRs.[469]

---

[465] FAS 140 ¶ 61.

[466] FAS 140 ¶ 62.  Adequate compensation is defined as the "amount of benefits of servicing that would fairly compensate a substitute servicer should one be required, which includes the profit that would be demanded in the marketplace." FAS 140 ¶ 364 (Glossary).

[467] FAS 140 ¶ 62.

[468] Forms 10-K for 2004 and 2005.  By contract, the Company received fees of approximately 0.50% of the outstanding principal balance of each loan in the mortgage service portfolio.

[469] The fair market value of MSRs is ordinarily the present value of estimated future cash flows, taking into consideration, among other things, expected prepayment assumptions and discount rates.

New Century reported the following mortgage servicing assets for 2004, 2005 and the first three quarters of 2006:[470]

| ($in 000's) | 2004 | 2005 | Q1 2006 | Q2 2006 | Q3 2006 |
|---|---|---|---|---|---|
| Beginning balance | $1,900 | $8,249 | $69,315 | $40,559 | $42,096 |
| Additions | 7,923 | 95,120 | 0 | 6,796 | 23,230 |
| Sales of servicing rights | 0 | (24,877) | (24,516) | 0 | 0 |
| Amortization | (1,574) | (9,177) | (4,240) | (5,259) | (5,448) |
| Ending balance | $8,249 | $69,315 | $40,559 | $42,096 | $59,878 |

The Company reported the following net servicing income for 2004, 2005 and the first three quarters of 2006:[471]

| ($in 000's) | 2004 | 2005 | Q1 2006 | Q2 2006 | Q3 2006 |
|---|---|---|---|---|---|
| Net Servicing Income | $28,896 | $38,514 | $15,642 | $14,012 | $17,770 |

### e.  Accounting Principles that Governed New Century's Mortgage Servicing Rights

The accounting standard that applies to MSRs is FAS 140.[472]  FAS 140 states that, upon the completion of any transfer of financial assets (including securitized loans), the transferor should continue to carry on its balance sheet any retained interests in the transferred assets, including, if applicable, servicing assets or liabilities.  FAS 140 requires that the retained interests be measured by allocating the previous carrying amount of the loans transferred between the assets sold and the retained interests based on their relative fair values at the date of the transfer.  This means that the company must determine the fair value of the loans (with servicing attached and other retained interests) and must allocate a portion of the cost to the servicing rights retained and other retained interests based on the percentage of total fair value for each component.

### i.  Determining fair value

The fair value of an asset or liability is the amount at which the asset or liability could be bought or sold in a current transaction between willing parties.[473]  According to FAS 140, the best, and preferred, way to measure the fair value of the asset or liability is through quoted

---

[470] Forms 10-K for 2004 and 2005 and Forms 10-Q for the first three quarters of 2006.

[471] Id.

[472] FAS 140 was amended by FAS 156, *Accounting for Servicing of Financial Assets*, in March 2006; however, FAS 156 did not go into effect until the first fiscal year after September 15, 2006 and therefore did not alter New Century's accounting obligations under FAS 140.

[473] FAS 140, ¶ 68.  This assumes that the seller is not selling in a forced or liquidation sale.

market prices in active markets.[474]  If quoted market prices are not available, the company must estimate fair value by considering prices for similar assets and liabilities and the results of valuation techniques to the extent available.[475]  Valuation techniques include the present value of estimated future cash flows, option-pricing models, matrix pricing, option-adjusted spread models and fundamental analysis.[476]  In utilizing valuation techniques, the company should incorporate proper assumptions about interest rates, default rates, prepayment rates and volatility.[477]  The estimates must be based on reasonable and supportable assumptions and projections.[478]  If it is not practicable to estimate the fair value of assets, the company must list the assets as having zero value.[479]

## ii.    Allocating carrying amount

Under FAS 140, a company must allocate the amount received in the sale between the loans sold and the retained interests, including MSR, to arrive at the relative fair value basis of each component.  For example,[480] a company originates $1,000 of loans that yield 10% interest income for their estimated lives of nine years.[481]  The company sells the $1,000 principal plus the right to receive interest income of 8 percent for a total sale price of $1,000.  The selling company will continue to service the loans and will receive the right to the portion of the interest income not sold as compensation.  The remaining half of the interest income not sold is called an interest-only strip receivable.[482]  At the date of the transfer, the fair value of the loans, including servicing, was $1,100.  The fair value of the servicing assets was $40.  Therefore, the fair value of the interest-only strip receivable was $60.  Taking the fair value of the loan with servicing as $1,100, the $1,000 received in the sale for the loans represents 91% of the total fair value.  The

---

[474] FAS 140, ¶ 68.

[475] FAS 140, ¶ 69.

[476] FAS 140, ¶ 69.

[477] FAS 140, ¶ 69.  Applying the present value approach depends heavily on assumptions about default and prepayment of all the assets securitized. FAS 140, Footnote 21.

[478] FAS 140, ¶ 70.

[479] New Century recorded its MSRs as assets.  Liabilities are not recorded as having zero value and must be recorded according to the instructions in FAS 140, ¶ 71.

[480] For purposes of this example, the MSRs are servicing assets.

[481] FAS 140, ¶ 65.

[482] The right to future interest income that exceeds contractually specified servicing fees is not a servicing asset and must therefore be accounted for as a separate financial asset. FAS 140, ¶ 63(e).

$40-value for the servicing assets represents 3.6% of the total fair value. When the company allocates the cost between the loans and the retained interests, the loans sold have a carrying amount of $910, the servicing assets have a carrying amount of $36, and the interest-only strip is carried at $54.[483] If the company acquires the servicing rights in a separate transaction, the fair value of the servicing asset is presumably the price paid.[484]

### iii. Amortizing the amount recognized

After initially allocating the carrying amount based on relative fair values, the company must monitor the fair value of the servicing assets or liabilities. FAS 140 requires that servicing assets and liabilities be amortized to income or expense in proportion to and over the estimated period of time in which the company earns net servicing income (if servicing revenues exceed servicing costs) or incurs net servicing losses (if servicing costs exceed servicing revenues).[485] In the example given above, the company would amortize $36 over the nine-year period in which it expected to service the loans. The amortization of the cost basis of MSRs should reflect actual prepayment experience. Amortization speeds should correspond, and be adjusted to reflect changes in the estimated remaining net servicing income period.

### iv. Assessing impairment

FAS 140 also requires that a company assess servicing assets and liabilities for impairment (or increased obligation) based on their current fair values.[486] This is a multi-step process. First, the company must stratify servicing assets based on one or more of the predominant risk characteristics of the underlying financial assets. These characteristics include financial asset type (conventional or government guaranteed or insured mortgage loans and adjustable-rate or fixed-rate mortgage loans), size, interest rate, date of origination, term and geographic location.[487] Second, the company must recognize impairment equal to the amount by which the carrying amount of servicing assets for a stratum exceeds their fair value. For example, if the quoted market price is below the amount at which the company currently measures the servicing asset's value, the company must decrease the servicing asset's value to

---

[483] The calculations are as follows: $1,000 X 91% = $910; $1,000 X 3.6% = $36; and $1,000 X 5.4% = $54.

[484] FAS 140, ¶ 13

[485] FAS 140, ¶ 13.

[486] FAS 140, ¶ 13.

[487] FAS 140, ¶ 63(g). *See also* FAS 140, Footnote 19.

- 347 -

the quoted market price and recognize the difference as impairment in its financial statements. Third, the company must adjust the valuation allowance to reflect changes in the measurement of impairment subsequent to the initial measurement.[488]

### v.    Disclosures

A company must disclose certain information about its accounting for MSRs. In each accounting period, the company must disclose the amounts of servicing assets or liabilities recognized and amortized; the fair value of recognized servicing assets and liabilities for which it is practicable to estimate that value and the method and significant assumptions used to estimate that fair value; the risk characteristics of the underlying financial assets used to stratify recognized servicing assets for purposes of measuring impairment; and the activity in any valuation allowance for impairment of recognized servicing assets.[489]  The company must also disclose its accounting policies for initially measuring retained interests, including the methodology it used in determining fair value.  The disclosures should include a list of the key assumptions used in measuring fair value of retained interests at the time of securitization.[490]  In addition, the company must disclose its accounting policies for subsequently measuring those retained interests, including the methodology and key assumptions used in determining their fair value, as discussed above.[491]

### f.    New Century's Accounting for Its Mortgage Servicing Rights
### i.    In general

New Century did not have formal accounting policies and procedures regarding its accounting and disclosure of MSRs.  However, information regarding the Company's approach to these issues is contained in a memorandum that Kenneally wrote dated February 2007 (the "Kenneally Memorandum"), as well as in KPMG's year-end 2005 workpapers.  New Century's methodology appears to have been consistent from 2005 to 2006.

---

[488] FAS 140, ¶ 63(g)(3).

[489] FAS 140 ¶ 17(e).

[490] FAS 140 ¶ 17(f).  FASB requires, at a minimum, that the company include quantitative information about discount rates, expected prepayments including the expected weighted-average life of prepayable financial assets, and anticipated credit losses.

[491] FAS 140 ¶ 17(g).

### g.    Specific Issues
#### i.    Fair value calculations

New Century initially valued its MSRs using internal values rather than an allocation of the loans' carrying amounts. According to the Kenneally Memorandum, New Century chose not to use the fair value measurement method.[492]  Instead, Management derived fair value based on "recent whole loan sale activity and market color."  New Century stratified the MSRs by deal because "the Company's core collateral pools consist of homogeneous non-prime originations, which generally evolve with the market environment."  New Century did not obtain third-party valuations for its MSRs because it believed that its approach was reasonable based on the overall materiality of its mortgage servicing assets.

#### ii.    Amortization

New Century amortized its servicing portfolio using a constant amortization rate rather than a proportionate method.  The Kenneally Memorandum stated that New Century used cash flow models in its amortization computations.  The Secondary Marketing Department updated the models to reflect the unpaid balance and assumptions for prepayments, credit losses and interest rates.  The Company then computed a constant amortization rate so that the remaining cost basis was amortized over the remaining life of the deal by the Accounting Department. New Century chose this methodology because it "appears to closely approximate the expected cash flows of the transactions underlying" the MSRs.

#### iii.    Impairment

New Century did not believe that it needed to establish an impairment allowance for its MSRs because Kenneally thought that the outstanding cost basis for these rights was a reasonable estimate of their fair value.

#### iv.    Disclosures

New Century stated in its public disclosures that it valued MSRs using relative fair values at the time of sale.  The Company stated that it amortized by a proportionate method, as required by FAS 140.  In addition, New Century stated that it reviewed and assessed potential impairment of its MSRs.  In its Form 10-K for 2005, New Century stated:

> Mortgage servicing rights ("MSRs") retained in the sale of mortgage loans are based on relative fair values at the time of sale.  The MSRs are carried at the

---

[492] Kenneally referred to FAS 156 as if it were in effect for 2006.  FAS 156 did not apply until the following fiscal year.

lower of cost or fair value. Fair values of MSRs are determined based on the present value of estimated future cash flows related to serviced loans. Assumptions used in estimating the value of MSRs include market discount rates and anticipated prepayment speeds including defaults, estimated ancillary fee income and other economic factors. The prepayment speeds are estimated using the Company's historical experience and third-party sources. The MSRs are amortized to earnings in proportion to, and over the period of, estimated net future servicing revenue. The Company used an estimated market discount rate of approximately 18% which it believes is representative of the rate equal to the return that would adequately compensate a substitute servicer for performing the servicing.

MSRs are reviewed quarterly for potential impairment. Impairment is assessed based on fair value. MSRs are stratified by: the fiscal year of the loan sale date and loan type. When MSRs are reviewed, management makes an estimate of the future prepayment rates and other key variables of the underlying mortgage loans. If actual prepayment rates prove to be higher than the estimate, impairment of the MSRs could occur.[493]

This disclosure was inaccurate in several respects. First, it did not accurately describe the manner in which New Century valued servicing assets at the time of sale. Second, it claimed that New Century used a proportionate method as required by FAS 140 to amortize those rights, when in fact the Company used a constant amortization method. Third, it stated that New Century reviewed its servicing portfolio for potential impairment when, in fact, it did not.

The inaccuracies in this disclosure are particularly surprising because both the Audit Committee and the Disclosure Committee reviewed the Company's disclosures with regard to mortgage servicing and purportedly received reports from KPMG about its review and audit of New Century's accounting for MSRs.

### b.    KPMG's Role with Regard to New Century's Mortgage Servicing Rights

Kim could not recall whether New Century had a formal accounting policy for MSRs. According to Kim, New Century's MSRs represented a small portion of its entire balance sheet so that valuation of MSRs was not significant to him, although KPMG reviewed the valuation of MSRs on a quarterly basis and audited the valuation of MSRs at December 31, 2005.

KPMG's workpapers acknowledged that New Century recognized MSRs based on fair value, as determined by the Secondary Marketing Department, rather than on the basis of an allocation of carrying amount as required by FAS 140. The workpapers noted that this

---

[493] Form 10-K for 2005, Notes to Consolidated Financial Statements, 1(r), pp. F-17 to F-18.

methodology did not comply with GAAP. Kim could not recall how the Secondary Marketing Department determined the fair value of New Century's MSRs, but acknowledged that the proper determination of carrying value under FAS 140 was not laborious. A handwritten note on KPMG's substantive testwork memorandum states that New Century performed that calculation to determine the difference between the company's method and the FAS 140 method. For 2005, KPMG determined that the difference was $698,217, which was below the income statement posting threshold of $923,000.

KPMG reviewed New Century's valuations by comparing the servicing values for New Century's MSRs to those of New Century's competitors. KPMG determined that the basis points and multiples used in the valuation methodology were reasonable and within the range of values reported by comparable companies, but noted that New Century should perform a formal valuation because there could be an audit difference.

KPMG was aware that New Century's valuation methodology carried an inherent risk of inaccuracy. SFG recommended in February 2006 that New Century obtain at least one independent third-party valuation to validate its internal valuation. Kim thought that third-party valuations were not necessary, but he admitted that Macaulay and one of the specialists recommended them. Macaulay stated an SFG credit specialist who undertook a supplemental review in 2007 identified the valuation of MSRs as an area with a risk of fraud and material misstatement.

### i.    Amortization

Kim understood that New Century amortized its servicing rights portfolio using a constant amortization rate rather than the required amortization method. According to KPMG's workpapers, New Century amortized MSRs based on electronic amortization tables, which calculate amortization based on the estimated remaining life of the relevant loan pools. New Century used residual models, which updated the amortization schedule with the current unpaid balances and expected remaining life. KPMG noted that this was the same amortization schedule that the Company used for its FAS 91 calculations.[494]

In a February 26, 2006 memorandum, three members of KPMG's SFG stated that New Century utilized a modified form of straight-line amortization methodology to amortize its servicing rights portfolio, which was not the same method as the net proportionate method

---

[494] FAS 91 governs the amortization of loan origination fees and costs.

outlined in FAS 140 and did not accurately reflect the market value and economics of the servicing assets. KPMG also recommended that New Century perform a formal valuation of the servicing assets at least quarterly.

### i.    Examiner's Conclusions Regarding New Century's Mortgage Servicing Rights

The Examiner has concluded that New Century improperly recorded the initial carrying amounts of its mortgage servicing assets. Under GAAP, the Company was required to record their initial amounts by allocating the carrying amount of the relevant loans (with servicing) between the loans sold and the interests retained, including servicing rights. KPMG identified this variance as an issue, but only quantified the difference for 2005, when, KPMG determined, the difference was below its posting threshold. The Examiner is unable to determine whether there would be an audit difference for 2006 but notes that New Century did not change its methodology after KPMG's SFG recommended a change in February 2006. There is no indication that KPMG's engagement team urged New Century to change in its methodology in the first three quarters of 2006.

The Examiner has also concluded that New Century did not apply a proportionate method of amortization as required under FAS 140, but instead used a constant amortization rate (similar to a straight-line method) to amortize the servicing portfolio. Using a proportionate method would have yielded higher amortization during periods when the estimated income or loss was expected to be greater and lower amortization during periods when the estimated income or loss was expected to be less. Although the amortization resulting from each method would be the same over the total life of the MSRs, the difference between the two methods could be material from period to period. The Examiner did not have sufficient information to measure the potential impact of New Century's use of an improper amortization method.

The Examiner has further concluded that New Century inaccurately disclosed its initial carrying amount computation and amortization methodology for MSRs in its public filings. Information learned during the investigation suggests that these inaccuracies were not inadvertent, because New Century's Accounting Department and KPMG were aware that New Century's accounting practices for MSRs were different than those described in its public disclosures.

- 352 -

### 3.    New Century's Deferral and Amortization of Loan Fees and Costs
#### a.    Executive Summary

New Century made at least two errors over a period of years when accounting for the fees it received and the costs it incurred in originating mortgage loans. Although KPMG dismissed one of these errors as immaterial in 2006, neither the Company nor KPMG adequately addressed the materiality of these errors with respect to prior financial statements that may have been affected.

First, New Century used an improper methodology to amortize deferred loan origination fees and costs that, according to KPMG, was inconsistent with FAS No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* ("FAS 91"). Although KPMG preliminarily concluded that this violation of GAAP was not material for purposes of New Century's 2006 financial statements, neither New Century nor KPMG ever addressed the likely impact of this error on New Century's earlier financial statements.

Second, beginning in 2004, New Century improperly excluded certain costs from its deferral and amortization methodology on the basis that those costs were associated with correspondent loans. Although KPMG discovered in the second quarter of 2006 that the loans at issue were not correspondent loans, neither New Century nor KPMG made any effort to determine the likely impact of this error on New Century's earlier financial statements.

Because New Century and KPMG did not properly test the significance of the errors in New Century's accounting for loan origination fees and costs, the Examiner cannot determine whether those errors may have had a material impact on New Century's financial statements.

#### b.    New Century's Loan Origination Fees and Costs

New Century funded over $10 billion of loans each quarter between the fourth quarter of 2004 and the fourth quarter of 2006. New Century earned fees and incurred certain costs as part of its business of originating mortgage loans, whether New Century made the loans directly (through its retail division) or purchased them from its network of brokers (through its wholesale division). Net loan origination fees and costs amounted to approximately one percent of the total value of the loans originated. In general, New Century received loan origination fees that were collected from borrowers at closing in the form of points, commitment fees and application fees. New Century incurred direct loan origination costs in the form of payments for credit reports,

appraisals, flood certifications, and document preparation and in the form of compensation for employees directly involved in the loan origination process.

        **c.**    **Accounting Treatment for Loan Origination Fees and Costs**

FAS 91 requires that all non-refundable loan origination fees and the direct costs associated with lending, committing to lend or purchasing a loan or group of loans be deferred and amortized over the life of the underlying loans. FAS 91 requires the holder of a loan, or group of loans, to recognize loan origination fees (net of origination costs) as an adjustment to yield(s) over the life of the loan(s) using an interest rate method that results in a constant effective yield (sometimes known as a "level-yield" calculation).[495] This amortization method accounts for the difference between a loan's stated interest and the actual interest earned by the company in any given accounting period when net origination fees and costs are considered. For example, if a lender collects a $1,000 fee from a borrower and incurs $400 in direct costs, the net $600 fee ($1,000 - $400) must be amortized over the term of the loan by adjusting that loan's effective interest rate.

Only qualified direct loan origination costs may be deferred to another accounting period. Lending-related costs other than qualified direct loan origination costs must be charged to expense in the period they are incurred. FAS 91 requires that management exercise judgment in developing and implementing a methodology for properly identifying and segregating only qualified direct loan origination costs for deferral. Methodologies for identifying qualified direct loan origination costs are subject to various assumptions about the types of costs incurred and their relation to successful loan origination efforts. These assumptions affect the amount of costs that are deferred.

        **d.**    **The Reported Values of New Century's Deferred Loan Origination Costs**

New Century maintained two pools of loans. One pool, loans held for sale, consisted of loans which the Company intended to sell in either whole loan sale transactions or securitizations structured as sales. The other pool, loans held for investment, consisted of loans that were securitized or that the Company intended to securitize in on-balance sheet securitizations. Fees and costs associated with loans held for sale were deferred until the loans were sold. At that

---

[495] The level-yield method of amortization seeks to create a constant yield over the life of the underlying loan. This means that a different amount of amortization is recorded each period to achieve the constant (or level) yield. The yield is the interest earned on the loan divided by the principal balance of the loan (net of deferred costs).

time, New Century recognized the deferred fees and costs in determining its gain on the sale of the loans. Fees and costs associated with loans held for investment were deferred and amortized over the expected lives of the loans. This means that the Company recognized the fees earned and the costs incurred over a period of time, based on the length of time the Company expected the loans to remain outstanding. On a monthly basis, New Century's Accounting Department recalculated the life expectancy of these loans, based on the actual and estimated rates at which borrowers prepaid the loans.

The chart below reflects the amount of loans New Century held for sale, the amount of loans it held for investment and the associated net deferred loan origination costs for five quarters between 2004 and 2006.

**Deferred Costs as a Percentage of Loans Held for Sale and Loans Held for Investment (1)**

| Quarter | LHFS | Deferred | Percentage | LHFI | Deferred | Percentage |
|---|---|---|---|---|---|---|
| Q4 2004 | $3,898,998 | $38,673 | 0.99% | $13,169,596 | $122,285 | 0.93% |
| Q4 2005 | 7,815,201 | 19,960 | 0.26% | 16,184,233 | 140,996 | 0.87% |
| Q1 2006 | 6,341,566 | 21,212 | 0.33% | 16,194,665 | 128,533 | 0.79% |
| Q2 2006 | 9,267,890 | 35,263 | 0.38% | 16,005,457 | 119,934 | 0.75% |
| Q3 2006 | 8,907,251 | 38,011 | 0.43% | 14,131,294 | 78,273 | 0.55% |

(1) All figures derived from New Century's records

### e.    New Century's Amortization of Loan Origination Fees and Costs

New Century initially recorded all fees earned and costs incurred in the loan origination process as income and expense items. At the end of each month, New Century performed a calculation, utilizing assumptions based on past experience, to determine what percentage of the loan origination costs it had incurred related to successfully funded loans. This percentage was then applied to the total costs incurred for the period to arrive at the amount to be deferred. New Century further categorized deferred loan fees and costs depending on whether the loans at issue were loans held for sale or loans held for investment.

Walker was responsible for the initial calculation each quarter of the percentage of net origination fees and costs to defer for a specific period of time. Walker did not have the ability to capture direct origination costs on each individual loan. Instead, she pooled the costs, allocated them on a pro rata basis, and multiplied the net costs by the percentage of loan originations that were held for sale at the end of the period to determine the FAS 91 deferral. After Walker determined the initial deferral amount that was to be used in the amortization

calculation for loans held for investment, she gave her computations to Kenneally and his staff, who performed the actual amortization calculations.

It appears that New Century followed the same methodology for calculating amortized fees and costs from the fourth quarter of 2004 through the third quarter of 2006. The Accounting Department calculated a proposed journal entry to record the deferral. The source of the deferral calculation was a monthly trend report. The Examiner was unable to match these monthly trend reports to New Century's general ledger accounts. The Examiner also could not determine whether the trend reports were prepared on a consistent basis from period to period. Although Walker claimed that New Century's methodology for the deferral and amortization of loan origination fees and costs was reviewed for compliance with GAAP, New Century did not properly apply the interest rate method of amortization as prescribed by FAS 91, which results in a level yield, but instead amortized these fees and costs using a formula that resulted in a constant amount of amortization in each period.

Beginning in the third quarter of 2004, New Century began excluding direct loan origination costs that purportedly were incurred in connection with correspondent loans. Correspondent loans are loans that are underwritten, approved and funded by an independent mortgage company. New Century, as the correspondent's sponsor, purchased or funded those loans, generally at a premium. The Company continued to exclude costs purportedly associated with correspondent loans until the second quarter of 2006, when New Century determined that the loans at issue were not correspondent loans, and the fees and costs should have been included in New Century's deferral calculations. There is no evidence that New Century or KPMG assessed the potential impact of this error in 2005 or 2006, and neither New Century nor KPMG offered the Examiner any explanation for this error.[496]

### f.    KPMG's Role with Regard to New Century's Amortization of Loan Origination Fees and Costs

KPMG determined that New Century was accounting for loan origination fees and costs in accordance with FAS 91 from at least the first quarter of 2004 through the third quarter of 2006. KPMG workpapers related to the Company's accounting for loan origination costs and

---

[496] According to KPMG workpapers for the third quarter of 2004, Kenneally indicated that the maximum financial impact of excluding commissions paid for correspondent loans that quarter was approximately $1.5 million less accumulated amortization. There is no evidence to suggest that KPMG independently confirmed this potential financial impact.

fees suggest that KPMG performed substantially the same procedures for each of its quarterly reviews and annual audits during this period. The quarterly memoranda remained virtually unchanged from Q4 2004 through Q3 2006. Until then, KPMG considered the inherent risk associated with New Century's accounting of loan origination fees and costs to be "low."

Although New Century's methods of accounting for loan origination fees and costs do not appear to have changed before the end of 2006, KPMG's procedures for auditing those accounting methods did change. For instance, KPMG changed its inherent risk assessment for this area of New Century's accounting from "low" to "moderate" and, for the first time in years, the KPMG memorandum that discussed New Century's accounting for loan origination fees and costs was substantially rewritten. Also, apparently for the first time, KPMG assigned a credit specialist from the SFG to conduct a supplemental review of these issues under the supervision of KPMG's concurring partner. Macaulay, the concurring partner, did not explain why this supplemental review was conducted in connection with the 2006 audit, but assumed it was based on KPMG's increased assessment of risk.

Although he was the senior audit manager, Kim could not explain the reason for the change in risk assessment. KPMG's workpapers suggest it was because New Century was not amortizing deferred origination costs on a loan-level basis "which brings into question the accuracy and adequacy of amortization based on the Company's current portfolio performance." A planning document for the 2006 incomplete audit also raised questions about New Century's practice of amortizing loan origination costs on a portfolio basis rather than on a loan-by-loan basis, suggesting that this methodology was prone to error, even though New Century had been using that same methodology for a number of years. Kim dismissed this criticism in the KPMG planning document on the grounds that it had not received the "appropriate" level of review. Macaulay did not agree with Kim's view.

Whether or not the KPMG engagement team reached any conclusion about the propriety of New Century's practice of amortizing loan origination costs on a portfolio basis, the engagement team apparently reached a consensus about another problem. Although KPMG did not complete its 2006 audit, its workpapers indicate that it had concluded, at least preliminarily, that New Century's accounting for loan origination fees and costs was not in compliance with GAAP. According to KPMG, New Century was not properly applying the interest rate method of amortization required by FAS 91 because New Century was not properly calculating a level-

yield.[497]    According to Kim, this error originated in models designed by New Century's Secondary Marketing Department.

KPMG preliminarily determined that an adjustment of $261,060 was needed because of New Century's improper amortization methodology. Although this adjustment was below KPMG's posting threshold, KPMG apparently did not address the impact that New Century's improper amortization methodology may have had on prior accounting periods.

### g.    Examiner's Conclusions Regarding New Century's Loan Origination Fees and Costs

The Examiner agrees with KPMG's preliminary conclusion that New Century improperly amortized its deferred loan origination fees and costs during 2006 because it did not use the level-yield method required by FAS 91.

Although KPMG concluded that this violation of GAAP did not result in a material error in 2006, neither KPMG nor New Century ever addressed the likely impacts of this error on New Century's financial statements for prior periods in which the error also occurred. The Company and its independent auditors should have considered those impacts, given that both knew that this improper amortization methodology had existed prior to 2006.[498]  Because they failed to do so, the Examiner cannot conclude whether New Century's improper amortization methodology had a materially adverse impact on New Century's earlier financial statements.[499]

The Examiner also finds as problematic the way the Company and KPMG dealt with New Century's improper exclusion of certain costs that were purportedly related to correspondent loans from its deferral of loan origination costs. It appears that, in the second quarter of 2004, KPMG did not test Kenneally's representation that the excluded costs were immaterial. Then, during the second quarter of 2006, when KPMG discovered that New Century had improperly classified certain loans as correspondent loans, there is no evidence that New Century or KPMG made any effort to determine the financial impact of that improper classification in prior accounting periods. As a result, the Examiner cannot determine what, if any, impact that improper classification had on New Century's financial statements.

---

[497] Kim could not recall whether New Century amortized its loan origination fees and costs on a level-yield basis, but suggested that level-yield amortization is only one of several acceptable amortization methodologies.

[498] KPMG did not test the amortization methodology prior to the 2006 year end audit.

[499] In addition, the Examiner could not determine whether the trend reports New Century used to accumulate costs for the loan origination fee and cost deferral calculation were prepared in an accurate and consistent manner. Irregularities or errors in those trend reports could have led to additional problems that the Examiner cannot assess.

4. **New Century's Hedge Accounting Practices**

   a. **Summary of Conclusions**

The Examiner identified several deficiencies related to New Century's hedge accounting practices. First, the Company failed to adopt a comprehensive and effective set of policies, procedures and practices relating to hedging until 2006. Its previous hedging policy documentation did not describe all the hedging strategies used by the Company, did not describe the methods used to test for hedging effectiveness, and failed to address other important aspects of its hedge accounting practices. In addition, KPMG identified two significant deficiencies relating to New Century's hedging practices during the 2004 and 2005 SOX audits.

Second, New Century did not document adequately its hedge accounting practices "contemporaneously" with the inception of certain hedge relationships, as required under the relevant financial accounting standards. New Century only provided "draft" documentation to KPMG in the first quarter of 2005 to support the designation of its hedging relationships at inception.

Third, New Century's hedge accounting documentation in 2005 was insufficient because it did not explain how the ineffectiveness portions of changes in the fair value of the derivatives accumulated in other comprehensive income ("OCI") would be reclassified into current earnings. In addition, the Company's hedge documentation did not adequately support its projection of future cash flows from on-balance sheet securitizations because of volatile prepayment speeds. These problems resulted in internal disagreements at KPMG and almost prevented the timely filing of New Century's Form 10-K for 2005.

Fourth, the Company inaccurately disclosed that it accounted for interest rate lock commitments ("IRLC") as derivatives at fair value for all of its loans. In fact, it did so only for prime mortgage loans (and not subprime loans, which accounted for the vast majority of its originations). As a result, New Century failed to recognize the effect of IRLC associated with subprime mortgage loans in its financial statements.

All of the foregoing deficiencies in New Century's hedging practices were identified by KPMG during the course of its SOX and substantive audit work. The deficiencies include poor documentation and other accounting practices by New Century, and the lack of strict compliance with applicable accounting standards in the hedging area. In addition, several of these deficiencies were not resolved when KPMG signed off on New Century's Form 10-K for 2005.

The Examiner has not conducted an analysis of whether any of these deficiencies were material, although the evidence strongly suggests that most of the deficiencies were not material to New Century's financial statements from a purely quantitative standpoint (and, to the extent there were errors requiring adjustment, the impact would have been the release of additional income to New Century). However, New Century did make one audit adjustment in 2006 based on the concerns raised by KPMG about its hedging practices prior to the filing of the Company's Form 10-K for 2005. The implications of this adjustment and the other deficiencies are described more fully below.

### b.    Hedge Accounting Generally

Many companies use derivative financial instruments to limit their exposure to different risks (*e.g.*, interest rate risks, foreign exchange risks and commodity risks) that could have a negative impact on earnings or cash flows. When these derivative instruments qualify for hedge accounting treatment and this treatment is elected by the Company, their cash flows and changes in value can be used to offset changes in the value of assets and liabilities that are hedged during the periods when those changes occur. When these derivative instruments do not qualify for hedge accounting treatment, such offset is not permitted, and any change in the value of the derivatives goes straight to the company's bottom line (which often leads to earnings volatility). Thus, the goal of hedge accounting is to match periodic changes in the value of the hedging instruments with the underlying hedged risk, thus removing volatility from earnings. As a result, an entity can mitigate the impact of economic risks (such as interest rate movements) on its performance and the attendant profit and loss ("P&L") effect arising from derivatives used for hedging.

Hedge accounting is a complicated accounting concept that involves highly technical and complex rules as well as extensive documentation requirements. FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activity* ("FAS 133"), establishes accounting and reporting standards for derivative instruments and hedging activities (including the implementation and continued use of hedge accounting). [500]  All derivatives within the scope of FAS 133 must be recorded at "fair value" as an asset or a liability on the company's balance

---

[500] FAS 133 and related guidance define derivative instruments as not only those instruments that are traditionally considered derivatives (such as swaps, options, and forwards), but also certain other instruments that may be embedded in cash instruments and any other non-derivative contracts.

sheet. The accounting for changes in the fair value of a derivative instrument (*i.e.*, gains and losses) depends on the intended use of the derivative and any resulting hedge designation.

To qualify for FAS 133 hedge accounting, a derivative instrument must be shown to be "highly effective" in correlating to changes in the hedged risk on a retrospective and prospective basis, and the reporting enterprise must have the appropriate hedge documentation in place at the inception of the hedge that establishes such effectiveness. If the derivative instrument does not meet the effectiveness criteria, it would be considered ineffective and all changes in the fair value of the derivative instrument would flow through earnings in the period of the change. Such ineffectiveness can produce significant volatility in corporate earnings.

### i.    Relevant types of hedge accounting

There are two types of hedge accounting relevant to New Century's activities: (1) cash flow hedging; and (2) fair value hedging. Cash flow hedging is intended to address exposure to the variability in the cash flow of a recognized asset or liability, or of a forecasted transaction. Cash flow hedge accounting requires that the effective portion of the gain or loss from a derivative instrument designated as a cash flow hedge be reported in OCI in the current period. It is subsequently reclassified into earnings when the hedged asset, liability or forecasted transaction affects earnings. The ineffective portion of a cash flow hedge must be reported in current period earnings.

Fair value hedging involves a hedge of the exposure to changes in the fair value of a recognized asset or liability, or of an unrecognized firm commitment, which are attributable to a particular risk. For fair value hedges, this is achieved by marking-to-market an asset or liability which offsets the P&L movement of the derivative. Fair value hedge accounting requires that changes in the fair value of the derivative instrument and changes in the fair value of the hedged asset or liability attributable to the hedged risk be reported in current earnings. The effect of such accounting treatment is to reflect in current earnings the extent to which the hedge is not effective in achieving offsetting changes in fair value.

For a derivative not designated as a hedging instrument, the gain or loss on the change in fair value is recognized in earnings in the period of change. Where a hedge relationship is effective, most of the mark-to-market derivative volatility will be offset in the P&L account.

### ii.    Documentation requirements

Proper hedge accounting treatment requires significant attention to compliance requirements. Hedge accounting is an exception to the usual rules for financial instruments. Strict criteria must be met before it can be used. Management must identify, document and test the effectiveness of those transactions for which it wishes to use hedge accounting. For derivative hedging activities to qualify for hedge accounting, the following documentation is required at the inception of *each* hedge:

(1)    A description and the specific terms of the hedging relationship and the risk management objective and strategy for undertaking the hedge;[501]
(2)    A description of the hedging instrument (the derivative);
(3)    A description of the hedged item;
(4)    A description of the nature of the risk being hedged;
(5)    For fair value hedges, a description of how the hedging instrument's effectiveness in offsetting the exposure to changes in the hedged item's fair value will be assessed;
(6)    For a fair value hedge of a firm commitment, a description of a reasonable method for recognizing in earnings the asset or liability representing the gain or loss on the hedged firm commitment;
(7)    For cash flow hedges, a description of how the hedging instrument's effectiveness in hedging the exposure to the hedged transaction's variability in cash flows will be assessed;[502] and
(8)    A description of the methodology to be used to measure hedge ineffectiveness.[503]

In addition, retrospective and prospective effectiveness must be tested periodically to demonstrate the hedging relationship continues to be effective.

### c.    Derivative Instruments Used by New Century

New Century used various derivative instruments as part of its strategy to mitigate interest rate risk associated with its financing on mortgage loans held for sale, mortgage loans held for investment, and residual interests. Such derivative instruments included: Euro Dollar futures; [504] interest rate cap contracts;[505] interest rate swap contracts; non-designated hedge

---

[501] The company must prove, both prospectively and retrospectively, that the hedge relationship is effective.

[502] Whether fair value or cash flow hedging is used, FAS 133 guidance requires a reasonable basis for how the company plans to assess the hedging instrument's effectiveness.

[503] The methodology used to test hedge ineffectiveness is subject to guidance issued in EITF Topic No. D-102 and DIG Issue G7. There are three primary methods of testing the hedging ineffectiveness of forwards, futures, and swaps: the dollar-offset method, the variability-reduction method, and the regression method. New Century elected to use the regression method.

[504] Euro Dollar futures may be both cash flow and fair value hedge instruments. New Century had open Euro Dollar futures contracts that were designated as hedging the variability in expected cash flows from the variable-rate debt related to its financing on mortgage loans held for investment. The fair value of these contracts at December 31,

instruments; [506] and free-standing derivatives (interest rate lock and forward sale commitments).[507] These instruments were intended to provide income and cash flow to offset potential reduced interest income and cash flow under certain interest rate environments. Pursuant to FAS 133, these derivatives and any related margin accounts were required to be reported on New Century's balance sheet at fair value.

### d.   Methodology for Assessing and Measuring Hedge Effectiveness

Under FAS 133, a company that elects to apply hedge accounting is required to establish, at the inception of the hedge, the method it will use for assessing the effectiveness of the hedging derivative and the measurement approach for determining the ineffective portion of the hedge. These testing methods must be consistent with the purpose of the hedge.

A hedge is regarded as effective only if, at inception and during the life of the hedging relationship, the hedge is expected to be highly effective in offsetting changes in the hedged item's fair value or the variability in cash flows attributable to the hedged risk. While there are differing interpretations of "highly effective," FAS 133 requires only that some reasonable measure of effectiveness is used. For example, if the company uses the regression method, as New Century did, paragraph 75 of FAS 133 states that if the price of the hedged item and the price of the hedging derivative are highly correlated, it is reasonable to expect the hedge to be

---

2005 and 2004 was $80.9 million and $26.1 million, respectively, and was included in prepaid expenses and other assets. As of December 31, 2005, the Company also had open Euro Dollar futures contracts that were designated as fair value hedges. The fair value of these contracts at December 31, 2005 was $0.9 million and was included in accounts payable and accrued liabilities. The fair value of these contracts was substantially offset by changes in the fair value of the hedged assets.

[505] The fair value of these interest rate cap contracts at December 31, 2005 and 2004 was $0.5 million and $7.4 million, respectively, and was included in prepaid expenses and other assets.

[506] The fair value of these contracts at December 31, 2005 was $0.6 million and was included in prepaid expenses and other assets.

[507] A mortgage company is exposed to interest rate risk from the time the IRLC is made to a residential mortgage applicant until the time that mortgage loan is sold. During this period, the value of the IRLC or mortgage loan may decline as a result of interest rate increases. IRLCs are recorded at fair value with the changes in fair value recognized in current period earnings as part of gain on sale of mortgage loans. To manage this interest rate risk, the Company used primarily forward sales commitments that were recorded at fair value with the changes in fair value recognized in current period earnings as a part of gain on sales of mortgage loans. The aggregate fair value of these free-standing derivatives on the consolidated balance sheet was a net liability of $1.1 million at December 31, 2005, and was included in accounts payable and accrued liabilities.

"highly effective" in offsetting price changes.  That is, in order to be highly effective, the gains or losses of derivatives should offset changes in fair values or cash flows of the hedged item.[508]

When a hedge fails the effectiveness test, hedge accounting is discontinued prospectively. Hedges are seldom, if ever, perfectly effective.  Any hedge ineffectiveness, even if the hedge continues to be considered effective overall, must be recognized in earnings in the current period. An assessment of effectiveness is required at least every three months.

### e.    New Century's Hedge Accounting Procedures — Generally

As mentioned above, New Century utilized both cash flow and fair value hedge accounting.  New Century accounted for certain Euro Dollar futures contracts and interest rate cap contracts as hedges.  In accordance with FAS 133, these contracts were designated from inception as hedging the exposure to variability of cash flows from the Company's financing on mortgage loans held for investment attributable to changes in interest rates.  New Century also used Euro Dollar futures contracts and interest rate swaps to hedge the interest rate risk associated with debt issued in conjunction with its on-balance sheet securitizations.  In addition, to a lesser extent, certain Euro Dollar futures contracts were designated as hedges of the fair values of certain mortgage loans held for investment and certain mortgage loans held for sale. These fair value hedging activities were not all accounted for using hedge accounting and were generally immaterial to the Company's earnings.  In addition, the Company used Euro Dollar futures contracts not designated and documented as hedges to hedge the fair value of its residual interests in securitizations.  The Company asserts that it did not use derivative instruments for the purpose of speculating on changes in interest rates.

### f.    Specific Issues Relating to New Century's Hedge Accounting Treatment

As set forth below, the Examiner has determined there were several instances in which New Century departed from strict compliance with FAS 133 or otherwise lacked inadequate documentation or engaged in and other important hedge accounting practices.[509]

---

[508] While the meaning of the term "highly effective" is subject to interpretation under applicable accounting principles, a generally accepted measure of correlation is that the regression of changes in the hedged item to changes in the derivative should have an adjusted R-squared value of at least 80%.

[509] FAS 133 is a very complex, technical accounting standard and there can be legitimate differences of opinion on whether certain practices violate FAS 133.  At a minimum, unless otherwise stated, the deficiencies described in this Section of the Final Report were not consistent with best practices and raised serious questions about the adequacy of New Century's internal controls in the hedging area.

- 364 -

### i. New Century had significant deficiencies in its hedge accounting policies and procedures

Prior to late-2006, New Century failed to adopt a comprehensive and effective set of polices and procedures relating to its hedge accounting activities. The Company's previous hedging policy document, which was last updated in 2003, failed to describe all of the different hedging strategies used by the Company to manage interest rate risk. In addition, the policy document did not describe with specificity the methods used by New Century to test for hedge effectiveness and ineffectiveness. These and other documentation and control deficiencies with New Century's hedging policies and procedures were identified during the SOX process in 2004 and 2005.[510]

In fact, one of the five significant deficiencies reported by KPMG to New Century's Audit Committee as part of the 2004 audit related to its hedging practices. Specifically, KPMG noted that New had failed to reconcile certain liability accounts related to derivatives and did not have a full understanding of the margin account activity with its investment broker. This resulted in a $30.9 million audit adjustment to reflect the OCI existing upon the termination of a Euro Dollar futures contract in the fourth quarter of 2004.

The only significant deficiency reported to the Audit Committee by KPMG as part of its 2005 SOX audit also related to the hedging area. Specifically, KPMG noted that the Company should not be applying the "change in variable cash flows method" per FAS 133 Implementation Issue No. G7 issued by the Derivatives Implementation Group ("DIG Issue G7").[511] Cash flow hedge accounting requires that the effective portion of the gain or loss in the fair value of a derivative instrument designated as a cash flow hedge be reported in OCI and the ineffective portion be reported in current earnings. The Company stated in its documentation that cash flow hedge ineffectiveness for certain Euro Dollar futures contracts would be measured using the

---

[510] After Mary Malloy was hired as the Vice President for Hedging in late 2005, New Century's hedging policies, procedures and practices began to improve. In December 2006, the Asset and Liability Committee approved a comprehensive hedging policy document that addressed all of the areas missing from the Company's 2003 version of the policy.

[511] KPMG also reported that New Century's hedge documentation inadequately explained the specific methods and valuation approaches used by the Company to measure ineffectiveness.

change in variable cash flows method as specified in DIG Issue G7. [512] However, the guidance in DIG Issue G7 is applicable to interest rate swaps – not Euro Dollar futures contracts. [513]

Even assuming DIG Issue G7 is applicable to Euro Dollar futures contracts, the use of the change in variable cash flows method would be questionable because these financial instruments are entirely different. A Euro Dollar futures contract fixes LIBOR for only a three-month period while a swap generally fixes LIBOR for the entire life of the contract. Accordingly, in addition to the change in the variable cash flows, there would be a change in fixed cash flows that would need to be considered. This issue of incorrectly referring to the DIG Issue G7 method in its documentation was identified by KPMG during the year-end December 31, 2005 SOX audit and was noted as a significant deficiency in KPMG's management letter to New Century.

KPMG also noted additional deficiencies with New Century's hedging documentation practices in 2004 and 2005. For example, KPMG concluded that the Company's hedge accounting policy documents did not specifically address the manner in which ineffective portions of the changes in the fair values of derivatives accumulated in OCI would be reclassified into current earnings. In certain circumstances, this level of detail is required by FAS 133.

KPMG also raised an issue with New Century's effectiveness testing methodology. As noted above, cash flow hedge accounting requires that, at the inception of the hedge (and on an ongoing basis), the hedging relationship be highly effective in achieving an offset of the cash flows attributable to the hedged risk during the term of the hedge. New Century tested prospective effectiveness at inception using statistical regression analysis and, on an ongoing basis, using sensitivity analysis. [514] The Company concluded these were acceptable statistical methods. However, in the summer of 2006, KPMG questioned the propriety of the use of sensitivity analysis to perform the ongoing prospective testing because FAS 133 requires "regression or other statistical analysis."

---

[512] Although New Century's hedge documentation states that the change in variable cash flows method was used, it appears that the hypothetical derivative method actually was used to measure hedge ineffectiveness. The hypothetical derivative method is an acceptable method to measure ineffectiveness.

[513] The Company maintained that using a series of Euro Dollar futures contracts was akin to an interest rate swap because, from an economic standpoint, both instruments are construed in a similar fashion. However, DIG Issue G7 only refers to interest rate swaps.

[514] The Company's retrospective effectiveness testing was performed using statistical regression analysis.

### ii.    New Century's designation documentation was not prepared "contemporaneously" with inception of hedge relationship

New Century's policy was to designate selected derivatives as hedges of specified risks at the inception of the hedge relationship, which was generally when the Company assumed risk (*e.g.*, at the origination of a loan held for sale or the completion of an on-balance sheet securitization). The Company's policy also stated that the hedge relationship must be shown to be effective both at the inception of the hedge relationship and on an ongoing basis. The methods used to test effectiveness at the inception of the hedge relationship and on an ongoing basis, and to measure hedge ineffectiveness, were specified in the Company's hedge designation memoranda.[515]

FAS 133 requires that hedge documentation be prepared "contemporaneously" with the inception of the hedging relationship. Data provided to the Examiner reflect that in certain transactions the required documentation was not prepared within an acceptable timeframe. A June 2005 internal KPMG e-mail states that the first quarter of 2005 hedging documents provided by the Company for the quarterly review were all "DRAFT documents."

The term "contemporaneous" is not defined within FAS 133. The SEC has not established a precise definition of contemporaneous in this context, but generally has held companies to a strict interpretation of the rule and required sufficient documentation at inception or within days thereafter in order to maintain eligibility for hedge accounting treatment. "DRAFT" documents containing no indication of management review and/or approval could not reasonably be considered to be contemporaneous within the meaning of FAS 133 and applicable SEC guidance, particularly because the Examiner has not seen evidence that finalized documentation ever was prepared or provided to KPMG. The failure to prepare adequate hedge designation documentation "contemporaneously" with inception is a violation of FAS 133 and results in the loss of hedge accounting treatment for the hedge transaction at issue.[516]

---

[515] Under FAS 133, hedge documentation must be prepared for each hedging relationship.

[516] As noted above, many of the FAS 133 requirements are open to reasonable interpretation. However, if the SEC concluded that adequate designation documentation was not prepared contemporaneously with the inception of the hedging transaction, the SEC would not allow hedge accounting treatment for that particular transaction.

### iii.    New Century's hedge accounting practices in 2005 resulted in dispute with KPMG and subsequent audit adjustment

Prior to the filing of New Century's Form 10-K for 2005, KPMG's hedging specialist raised a number of issues with respect to the sufficient of the Company's hedge accounting practices. In his interview with the Examiner, John Klinge, a member of KPMG's Financial Derivatives Resources ("FDR") group, stated that, as of March 16, 2006, the date the Company filed its Form 10-K for 2005, he had not seen sufficient evidence to (1) understand how the Company was reclassifying amounts from OCI and to determine that the method employed was appropriate; and (2) support the probability of future outstanding debt balances in light of volatile prepayment speeds. Klinge told the Examiner that he subsequently received sufficient information to make that determination. However, Klinge could not recall what specific information was provided to him.

Interviews with other KPMG professionals and a review of the relevant documents revealed that Klinge appears to have been under significant pressure from his colleagues (in particular, Donovan) to permit the Form 10-K for 2005 filing to proceed as scheduled and to ignore his concerns regarding the Company's policy documentation and other deficiencies. Based on a review of the information obtained during the investigation, the Examiner has concluded that Klinge's assessment of the Company's documentation in early March 2006 appears to have been accurate and that there was a basis for his two primary concerns about New Century's hedging practices. Specifically, the Company appears to have failed to describe properly and in accordance with the accounting documentation how it would reclassify the ineffectiveness portion of the hedges. In addition, New Century did not support how it had projected cash flows in light of the volatile prepayment speeds that it experienced on its outstanding debt balances.

In the first quarter of 2006, New Century booked an audit adjustment of $3.7 million to account for the first issue raised by Klinge about OCI effectiveness and an audit adjustment of $7.6 million to account for the second issue raised by Klinge based on the Company's inability to accurately estimate future debt balance beyond 24 months. In effect, New Century conceded that it had made errors in the hedge accounting reflected in its 2005 Form 10-K. In addition to these audit adjustments, New Century changed its hedge accounting in the second quarter of 2006 to adopt the approaches recommended by Klinge.

- 368 -

### iv.   New Century's 2005 accounting for irlc was inaccurate

New Century disclosed in the notes to its December 31, 2005 financial statements that IRLC were recorded at fair value with changes in fair value recognized in current period earnings.[517]  However, the Company was not accounting for IRLC on their subprime loans (the overall majority of their originations) as derivatives under FAS 133.  In effect, New Century was not considering the value of the IRLC in its financial statements.  Thus, the footnote disclosure was inaccurate and New Century did not comply with the FAS 133 requirement to account for the fair value of IRLC.

Upon discovering the non-GAAP accounting approach in its audit, the KPMG engagement team concluded that the potential financial statement impact of the departure from GAAP was immaterial.  The engagement team's view was based on their understanding that two-year swap rates (which is one of the components generally used by a company valuing IRLC) "DID NOT move considerably between 11/1/05 and 12/31/05."  The KPMG engagement team prepared a memo in April 2006 which estimated the potential financial statement impact of this accounting error at between $300,000 and $875,000.  The brief memo focuses on the swap rate change over time (not its volatility) and fails to explain why only the 2-year swap rate, as opposed to 5 or 10 year rates, was considered.  In his interview with the Examiner, Klinge said that the swap rate was the most significant factor in the valuation of the IRLC.  However, he also acknowledged that other factors (including the pull-through rate and credit risk) impact the valuation of IRLC, and that it was the responsibility of the engagement team to assess and document its conclusion on materiality in light of all these factors.

### g.   KPMG's Audit Planning in Connection with Hedge Accounting

KPMG's substantive audit procedures were determined by its assessment of risk.  KPMG assessed the inherent risk and control risk for the audit objectives and provided a rationale for the related assessments.  Based on these assessments, KPMG assessed the risk of significant misstatement ("RoSM") arising from an error for each audit objective.  The level of RoSM determines the nature, timing and extent of the audit procedures to be applied, which are documented in the audit program for each area.

---

[517] Form 10-K for 2005 at 88, F-24, and F-50.

KPMG's audit risk assessment for the derivatives instruments and derivatives gains and losses for the December 31, 2004 was "moderate." The "moderate" assessment was based on the positive results of the tests of design and tests of operating effectiveness performed on the controls related to the derivative accounts. The December 31, 2005 audit program for the hedging area also ranked the level of RoSM as "moderate." Inherent risk was assessed at "moderate" because of the potential impact on the income statement due to interest rate fluctuations and control risk was assessed as "effective."

According to the hedging audit program for the December 31, 2006 incomplete audit, the RoSM was identified as "high" for that year because the audit engagement team determined that:

- Control risk was "non effective;" and
- Inherent risk was "significant" because KPMG deemed the accounting rules pertaining to hedge effectiveness and measurement of ineffectiveness as complex.

While KPMG's assessment of controls as "non effective" in 2006 supported the RoSM of "High," it is unclear why KPMG did not identify the significant risks sooner, particularly given the number of control deficiencies in the hedging area identified in prior years. The Company's hedging practices do not appear to have deteriorated from 2005 to 2006.

### h.   Examiner's Conclusions Regarding Hedge Accounting

Hedge accounting is complex, requires extensive documentation and often involves a high degree of subjectivity in determining whether there has been compliance with FAS 133. The Examiner's investigation revealed a number of deficiencies with respect to the Company's hedge accounting policies and practices. Most, if not all, of these issues were identified and documented by KPMG at some point during the course of their audits and reviews, but the reaction by KPMG to these deficiencies was not effective. Many of these deficiencies are reflective generally of the Company's weak documentation and other internal controls. In addition, the hedging dispute arising from the filing of the Form 10-K for 2005 raises a number of concerns about KPMG's conduct that are discussed in other sections of this Final Report.

### 5.   New Century's Accounting for Goodwill

#### a.   Executive Summary

In the fall of 2005, New Century recorded more than $75 million in goodwill on its balance sheet as a result of its acquisition of the prime mortgage platform of RBC Mortgage ("RBC"). The former RBC business unit performed more poorly in the last four months of 2005 than had been expected. When New Century closed its books at the end of 2005, it undertook a

- 370 -

limited review of the valuation of the goodwill recorded in connection with its acquisition from RBC. The Company concluded, on the basis of limited testing, that the goodwill it had recorded was not "impaired," and, therefore, that no reduction in goodwill and no corresponding charge against current earnings were necessary. KPMG, on the basis of its own limited testing as part of the 2005 audit, reached the same conclusion.

The Examiner has concluded that the limited testing of goodwill that the Company and KPMG performed at year-end 2005 rested upon assumptions that were not adequately documented by New Century and not adequately questioned by KPMG. A change in those assumptions might have led to a substantial reduction in the goodwill reflected on New Century's 2005 balance sheet as well as a corresponding reduction in the earnings that New Century reported for 2005. Although substantial impairment of goodwill so soon after an acquisition might be considered unlikely, the Company's failure to document adequately the assumptions upon which its assessment of impairment of goodwill relied—violated applicable accounting principles and make it impossible for the Examiner to determine whether an impairment might have been required at year-end 2005.

### b.   New Century's Acquisition of RBC's Prime Mortgage Platform

As part of an effort to diversify and expand its product line, New Century acquired the loan origination platform of the prime mortgage retail division of RBC in September 2005 for $80.6 million.[518] Because this purchase price substantially exceeded the value of the net tangible assets that New Century acquired from RBC, New Century allocated $77.7 million of the purchase price to goodwill in recognition of the fact that one of the Company's primary business purposes in undertaking this transaction was to acquire RBC's established name and position in the prime mortgage loan market, its work force and other intangible assets.

According to Dodge, New Century conducted several forecasts to determine the amount of goodwill associated with its acquisition from RBC because New Century knew it would book significant goodwill as a result of that transaction.   She said that the Company's most

---

[518] New Century purchased the assets of RBC through its Home123 subsidiary, which it had previously acquired for $4.0 million in May 2004. New Century booked $2.8 million of goodwill in connection with its acquisition of Home123, but the Examiner's investigation only focused on the goodwill booked in connection with the RBC transaction because this was the only acquired asset that the Company tested for impairment, and the only acquisition for which an undetected impairment could have resulted in a material misstatement of the Company's financial statements.

conservative forecast supported a goodwill allocation of approximately $75 million. At least one knowledgeable person, however, believed that New Century may have overpaid RBC for the tangible and intangible assets it acquired. Jonathan Threadgill, who had been a senior executive at RBC at the time of the acquisition and who subsequently joined New Century to help run the prime mortgage platform, thought that New Century's management did not understand the prime mortgage business and failed to appreciate the differences between the prime and subprime mortgage markets.

### c.    The Prime Mortgage Platform Performed More Poorly than Expected

During the four months after New Century acquired the prime mortgage platform, it sustained losses of $17.2 million, which was worse than New Century had forecasted. The "Originations and Sales" part of the MD&A section of New Century's 2005 Form 10-K, which was filed on March 16, 2006, disclosed these greater losses with the following description:

> [D]uring the fourth quarter of 2005, we closed $2.5 billion in loans through the origination platform recently acquired from RBC Mortgage and acted as a broker for an additional $382.8 million to third parties. As we previously expected, these operations negatively impacted our net income in 2005, including certain integration costs. While the loss was modestly greater than anticipated, we expect that the origination platform will be profitable in 2006.[519]

Even after New Century filed its 2005 Form 10-K, New Century's senior financial officers understood that the former RBC unit might not perform as New Century had hoped. In late-April 2006, Dodge warned that the prime mortgage division would need to have a profitable quarter soon or New Century would come under pressure to consider impairment of the goodwill that New Century had booked the previous fall. By the fourth quarter of 2006, Sanchez was suggesting that the Company consider a goodwill impairment because the prime mortgage platform was performing so poorly. This suggestion was rejected, at least initially, by Bindra and others.

### d.    Accounting Principles that Governed New Century's Goodwill Valuation and the Impairment Testing of that Goodwill Valuation

One of the accounting standards that applies to goodwill and to goodwill impairment is FAS 142, Goodwill and Other Intangible Assets, which requires a company to book any

---

[519] Form 10-K for 2005, p. 57-58.

difference between the price paid and the value of the assets acquired (minus liabilities) in an acquisition as goodwill on its financial statements.[520] FAS 142 also requires a company to assess its valuation of goodwill at least annually to ensure that the company is not carrying its goodwill at an amount that exceeds its implied fair value.[521] When the carrying amount of goodwill on a company's books exceeds the implied fair value of that goodwill, an impairment results.[522] If goodwill is determined to be impaired, the company must take an impairment charge against current earnings equal to the difference between the implied fair value of its goodwill and the amount at which it is carrying goodwill on its financial statements.

A company must use a two-step test to identify potential goodwill impairment and to measure the amount of goodwill impairment loss to be recognized (if any).[523] First, a company must compare the fair value of the business unit that was acquired with its carrying amount.[524] Ideally, the fair value of that business unit would be based on quoted market prices.[525] FAS 142 outlines alternative methods for the valuation of a business unit if quoted market prices are not available.[526] Those alternative methods include valuations based on estimated cash flows. If the

---

[520] A company initially must book goodwill under FAS 141, Business Combinations. FAS 141 ¶ 34.

[521] FAS 142 ¶ 26. The company may carry forward a detailed determination of fair value from one year to the next if all of the following are true: (1) the assets and liabilities have not changed significantly since the most recent fair value determination; (2) the most recent fair value determination resulted in an amount that exceeded the carrying amount by a substantial margin; and (3) based on an analysis of events that have occurred and circumstances that have changed since the most recent fair value determination, the likelihood that a current fair value determination would be less than the current carrying amount of the reporting unit is remote. FAS 142 ¶ 27.

[522] FAS 142 ¶ 18. FAS 142 states that the fair value of goodwill can only be measured as a residual and cannot be measured directly. FAS 142 provides directions for determining a reasonable estimate of the value of goodwill for purposes of measuring impairment loss. That estimate is called the implied fair value of goodwill. FAS 142 Footnote 13.

[523] FAS 142 ¶ 18.

[524] FAS 142 ¶¶ 19 and 30.

[525] The fair value of an asset (or liability) is the amount at which the asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, i.e. not in a forced or liquidation sale. The fair value of a reporting unit refers to the amount at which the unit as a whole could be bought or sold in a current transaction. Quoted market prices in active markets are the best evidence of fair value and must be used as the basis for measurement, if available. FAS 142 ¶ 23.

[526] If quoted market prices are not available, the estimate of fair value must be based on the best information available, including prices for similar assets and liabilities and the results of using other valuation techniques. A present value technique is often the best available technique with which to estimate the fair value of a group of net assets (such as a reporting unit). If a present value technique is used to measure fair value, estimates of future cash flows used in that technique should be consistent with the objective of measuring fair value. Those cash flow estimates should incorporate assumptions that marketplace participants would use in their estimates of fair value. If that information is not available without undue cost and effort, an entity may use its own assumptions. Those cash

fair value of the applicable business unit exceeds its carrying amount, the company need not engage in a more detailed goodwill impairment analysis. If, however, the carrying amount of the business unit exceeds its fair value, the company must undertake a second, more detailed analysis to determine whether a goodwill impairment charge is necessary and, if so, the amount of that charge.[527]

This second step in the impairment analysis requires a company to engage in a complex allocation process in which the fair value of the reporting unit is allocated to all of the assets and liabilities of the unit. The remaining unallocated fair value is the new implied value of goodwill. This revised implied fair value of the goodwill associated with the relevant business unit is then compared with the carrying amount of that goodwill.[528]  If the carrying amount of the business unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss must be recognized in an amount equal to that excess. If a company cannot complete the second step of the impairment test before its financial statements are issued, but can reasonably estimate the probable goodwill impairment loss, it must recognize the best estimate of that loss in its financial statements.[529]

### e.    New Century's Testing of Goodwill for Impairment in 2005

As part of the process of preparing its 2005 financial statements, New Century was required under FAS 142 to consider whether the $77.7 million[530] in goodwill it recognized in connection with its acquisition of the prime mortgage platform from RBC in September 2005 might be impaired.

Kenneally and Walker shared the view that the acquisition from RBC could not be analyzed properly until after an appropriate "start-up period" and that it was unnecessary to consider goodwill impairment so soon after the acquisition had closed. Nevertheless, to comply with FAS 142, New Century's Accounting staff undertook the first step in determining whether a goodwill impairment was necessary by estimating the current fair value of the former RBC unit. Given that there were no market prices for determining that business unit's fair value, the

---

flow estimates should be based on reasonable and supportable assumptions and should consider all available evidence. FAS 142 ¶ 24.

[527] FAS 142 ¶ 19.

[528] FAS 142 ¶ 20.

[529] FAS 142 ¶ 22.

[530] Due to a purchase price allocation in Q4 2005, the Company's goodwill balance at 12/31/05 was $77.4 million.

Accounting staff modeled its future expected cash flows and discounted those cash flows to a present value figure. Although this methodology was consistent with FAS 142,[531] its accuracy heavily depended upon two key sets of assumptions: (1) the future revenues and profit margins the prime mortgage platform was projected to generate; and (2) the discount rate used in the model.

The revenue projections upon which New Century relied in connection with its 2005 goodwill impairment testing were not well documented, and the discount rate the Company's cash flow model used is subject to question. For instance, it is not clear if or how those revenue projections were adjusted in light of the substantial losses that the prime mortgage platform suffered in the last four months of 2005. Furthermore, although New Century used a 15% discount rate to calculate the net present value of the prime mortgage platform's projected cash flows for purposes of its impairment analysis, at approximately the same time, New Century's senior financial officers were using a more conservative 20% discount rate when internally analyzing the prime mortgage platform's future business plans.

Based on the revenue projections and discount rate that New Century's Accounting staff used in conducting the initial goodwill impairment test required under FAS 142, the Company determined that the fair value of the former RBC business unit exceeded the amount at which that business unit was being carried on the Company's books as of the end of 2005. As a result, the Company concluded that no further goodwill impairment analysis was necessary. As discussed below, it does not appear that the Company could have reached this conclusion had it used a 20% discount rate in the first stage of its impairment testing.

### f. KPMG's Audit of New Century's 2005 Goodwill Impairment Testing

Donovan and Kim shared the view of New Century's senior accounting officers that the 2005 audit was too soon to assess the goodwill that New Century had booked in connection with its acquisition from RBC in September 2005. Even though they understood that the prime mortgage business unit had suffered significant losses in 2005, Donovan and Kim thought that less than four months was too short a period of time to gather data from which to draw conclusions about the prime business unit's future prospects.

---

[531] FAS 142 ¶ 24.

As a result, although KPMG conducted some goodwill impairment testing in connection with the 2005 audit, it does not appear that senior people on the KPMG engagement team gave this goodwill impairment testing much consideration. According to KPMG's workpapers, the engagement team analyzed certain calculations in the Company's goodwill valuation by checking the mathematical accuracy of the computations in the fair value cash flow model and by inquiring about the nature of certain assumptions the model used. It does not appear that KPMG tested or questioned, with any degree of skepticism, the Company's underlying revenue and gross profit projections for the prime mortgage platform. KPMG did not document its understanding of the source of those revenue projections or its understanding of the business unit's ability to achieve those projections. Indeed, because the acquisition from RBC had occurred so recently, Donovan was not even concerned about the prime mortgage platform's cash flow projections.

Kim acknowledged that KPMG should have tested the revenue projections New Century used in its goodwill impairment test, but he could not identify any workpapers documenting that KPMG had conducted such testing. He could not recall whether or how KPMG's engagement team assessed the propriety of the assumptions used in New Century's cash flow model for the prime mortgage business unit. He assumed that KPMG reviewed those assumptions for reasonableness because there was a description of those assumptions in KPMG's workpapers, and because he assumed the engagement team performed sufficient analysis to justify its conclusions. Kim's assumptions are not supported by any documentation or by notes in the workpapers themselves.

Thus, on the basis of a discounted cash flow analysis that relied upon revenue projections that KPMG did not question seriously, the engagement team determined that the fair value of the prime mortgage business unit exceeded its carrying value on New Century's books, and, as a result, no further goodwill impairment testing was required under FAS 142 at year-end 2005.

### g.   Examiner's Conclusions Regarding New Century's Accounting for Goodwill

The Examiner concludes that the Company's year-end 2005 assessment of the goodwill associated with its acquisition of RBC relied upon unsupported cash flow projections and a questionable discount rate. The Examiner's investigation did not discover adequate evidence to support the revenue projections and other assumptions upon which New Century's 2005

- 376 -

goodwill impairment testing was based.  At a minimum, however, the absence of such evidence raises documentation and internal control issues.

More importantly, the 15% discount rate used in the Company's goodwill testing is questionable given that senior financial executives were simultaneously using a 20% discount rate when internally analyzing the prime mortgage platform's business prospects.  The Examiner has determined that, had New Century used a 20% discount rate in its initial goodwill impairment test for year-end 2005, the fair value of the former RBC business unit would have been less than the amount at which the business unit was carried on New Century's books and that additional goodwill impairment testing would have been required in accordance with FAS 142.  By using a 15% discount rate, it appears that New Century avoided the full two-step goodwill impairment testing that FAS 142 requires.  The Examiner did not have access to enough information to determine whether more complete goodwill impairment testing would have resulted ultimately in an impairment charge as of year-end 2005, but the Examiner concludes that New Century was not in compliance with the requirements of FAS 142 by not conducting that testing.

## VII.   MATERIALITY OF THE IDENTIFIED MISSTATEMENTS

### A.   Executive Summary

As discussed above, the Examiner has estimated that New Century's financial statements were misstated for at least the year ended December 31, 2005 and the quarters ended March 31, 2006, June 30, 2006, and September 30, 2006 (collectively referred throughout as the "four periods"). In order to fulfill his responsibilities under the Court's June 1 Order, however, the Examiner not only needed to identify accounting and financial statement irregularities, errors or misstatements, but he also had to determine whether those misstatements were material, such that the Company's 2005 and 2006 financial statements could not be relied upon and needed to be restated.

The Examiner has considered whether the identified misstatements were material according to the relevant accounting standards and professional guidance. The Examiner also has considered KPMG's internal benchmarks of materiality for audits and reviews of New Century's financial statements. The Examiner concludes that at least the allowance for loan repurchase losses, the LOCOM valuation allowance for LHFS, and the valuation of residual interests were materially misstated based on an evaluation of quantitative and qualitative factors. As a result of these material misstatements New Century:

- overstated its reported pre-tax earnings for each of the four periods by at least $63.6 million, $7.4 million, $75.6 million and $116.4 million, respectively;

- met analysts' earnings expectations for 2005 and the first quarter of 2006 when it should have announced earnings below expectations;

- paid bonuses for 2005 financial performance to the three founders of New Century, Cole, Gotschall and Morrice that were at least 300% higher than they should have been;[532]

- paid bonuses to other officers of New Century for 2005 financial performance that were approximately 130% to 270% higher than they should have been;

- reported an increase in EPS of eight percent for the second quarter of 2006 as compared to the second quarter of 2005 when it should have reported a minimum of a 40% decline in EPS;

- reported a profit in the third quarter of 2006 of $63.5 million when New Century should have reported a loss in that quarter;

---

[532] The Examiner assumes that the bonuses referenced in this section were actually paid because they were approved by New Century's Compensation Committee, as reflected in the minutes of the meetings of the Committee.

- understated its repurchase reserve by as much as 1000% in the third quarter of 2006;

- overstated its earnings by at least 129% in the third quarter of 2006; and

- paid mid-year bonuses to Cole, Gotschall and Morrice in 2006 when none should have been paid; and paying quarterly bonuses in 2006 to other officers that likely should not have been paid.

**B.   Applicable Standards**

In evaluating the materiality of the errors in New Century's financial statements, the Examiner considered the definition of materiality in the professional literature, the guidance provided by the SEC staff, the guidance in GAAS and the materiality thresholds used by KPMG in its audit of New Century's December 31, 2005 financial statements.[533]  As discussed in further detail below, these guidelines require companies and independent auditors to consider qualitative and quantitative factors when assessing the materiality of a misstatement and to evaluate that misstatement in light of the relevant facts and circumstances.

**1.   FASCON 2 and GAAS**

The Financial Accounting Standards Board ("FASB") issued a conceptual statement in 1980, FASB Statement of Financial Accounting Concepts No. 2, *Qualitative Characteristics of Accounting Information*, ("FASCON 2"), which focuses in part on materiality.  FASCON 2 defines materiality as "the magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement."[534]  While recognizing that materiality has a central quantitative component,[535] FASCON 2 cautions that the "magnitude of a misstatement, without considering the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment."[536]

---

[533] In September 2006, the SEC issued Staff Accounting Bulletin ("SAB") No. 108, which was codified as SAB Topic 1.N, Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements.

[534] FASCON 2, Glossary of Terms – Materiality, at p. 10.  *See also id.* at ¶¶ 123-132 (discussing materiality in greater depth).

[535] *Id.* at ¶ 156 ("Though the definition of materiality is not substantially changed, *its quantitative character is now given a more central position*, enabling the distinction between materiality and relevance to be stated more clearly . . . "[M]ateriality depends primarily on the *size* of the judgment item in particular circumstances").

[536] *Id.* at p. 7.

The definition of materiality in GAAS, which relies in part on FASCON 2, also is instructive. Among other things, GAAS specifies that "[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with generally accepted accounting principles."[537]    GAAS acknowledges that materiality judgments are made in light of surrounding circumstances and involve consideration of both quantitative and qualitative factors and that "misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements."[538]

### 2.    SEC Guidance

SAB was issued in August 1999 in response to increasing concerns among SEC staff that management and auditors were relying too heavily, if not exclusively, on quantitative benchmarks to evaluate materiality.    Among other things, SAB 99 attempts to dispel any misconception that there is a set numerical threshold for materiality or that small intentional accounting errors can be excused as immaterial. SAB 99 was not intended to change professional standards, and it does not provide an exhaustive list of all the factors that need to be considered in evaluating materiality.  Nonetheless, SAB 99 does provide clarity in this highly judgmental area.

SAB 99 specifies that exclusive reliance on a percentage or numerical threshold is not appropriate.  Nevertheless, the use of a percentage as a numerical threshold (for example, five percent of net income) may provide a basis for a preliminary quantitative assessment that misstatements less than such threshold are unlikely to be material.  Such a threshold, however, should not be used as a substitute for a full analysis of all relevant considerations.

Consistent with the principles contained in FASCON 2, however, SAB 99 specifies that an assessment of materiality requires an evaluation of the facts in the context of the surrounding circumstances because qualitative factors may cause quantitatively small misstatements to be material.    In the context of a misstatement of a financial statement item, this includes consideration of both the size in numerical or percentage terms of the misstatement, as well as the factual context in which the user of financial statements would view the financial statement

---

[537] *AICPA Professional Standards*, Audit Risk and Materiality in Conducting an Audit ("AU § 312"), AU § 312.04.
[538] AU § 312.11.

item. SAB 99 provides examples of some of the qualitative factors to consider. In relevant part, these factors include whether the misstatement:

- hides a failure to meet analysts' consensus expectations for the company;

- arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate;

- masks a change in earnings or other trends;

- changes a loss into income or vice versa;

- concerns a segment or other portion of the company's business that has been identified as playing a significant role in its operations or profitability; and/or

- has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or incentive compensation.

SAB 99 also instructs that management and auditors need to first consider the quantitative and qualitative aspects of each individual misstatement in relation to relevant financial statement line item amounts, subtotals or totals. Second, they should consider the aggregate of the misstatements to those financial statement captions.

## C.     Analysis of the Identified Misstatements: Evaluation of the Quantitative and Qualitative Factors

The Examiner first considered whether the estimated misstatements were quantitatively material. As recognized in SAB 99, management and auditors commonly apply a five percent rule of thumb when reviewing the impact of an estimated misstatement on the financial statements. Using this five percent benchmark, the Examiner concluded that, for each of the four periods, the misstatements were quantitatively material with respect to the income statement as a whole, as well as with respect to the gain on sale of mortgage loans. Moreover, KPMG would have deemed the misstatements material for year-end 2005 and for each quarter of 2006, according to its own internal guidelines. In addition to assessing quantitative materiality, the Examiner considered the factors outlined in SAB 99 and concluded that the impact of the misstatements are qualitatively material.

### 1.     Misstatements Identified by the Examiner

As discussed in Section VI.B., the Examiner has determined that New Century overvalued its residual interests in securitizations by no less than $42.3 million, $28.2 million, $43.4 million and $72.5 million for year-end 2005 and the first through third quarters of 2006, respectively. With respect to New Century's repurchase reserve, as discussed in Section VI.A., the Examiner has determined that New Century was under-reserved by $11.5 million, $24.4

million, $21.4 million and $104.8 million for each of those same reporting periods, respectively. In addition, New Century's LOCOM account was understated by $9.8 million, $18.4 million, $81.9 million and $85.8 million, respectively.

## 2.      Income Statement Impact

The Examiner evaluated the quantitative materiality of the misstatements in the aggregate compared to the income statement as a whole, as well as to individual line items, *e.g.*, gain on sale. The Examiner evaluated the impact to gain on sale because it is a significant line item and all of the misstatements at issue would have impacted the reported gain on sale. The Examiner's analysis is detailed in Tables 1 and 2, below.

## Table 1: Impact on Earnings[539]

| | Year Ended 12/31/05[540] | Quarter Ended 3/31/06[541] | Quarter Ended 6/30/06 | Quarter Ended 9/30/06 |
|---|---|---|---|---|
| Reported earnings before income taxes[542] | $443.4[543] | $115.7 | $134.8 | $90.2 |
| Increases (decreases) to earnings for the following identified misstatements[544]: | | | | |
| Allowance for repurchase losses[545] | (11.5) | (12.9) | 3.0 | (83.4) |
| LOCOM valuation allowance[546] | (9.8) | (8.6) | (63.4) | (3.9) |
| Valuation of residual interests[547] | (42.3)[548] | 14.1 | (15.2) | (29.1) |
| Total identified misstatements | (63.6) | (7.4) | (75.6) | (116.4) |
| *Revised earnings before income taxes* | *$379.8* | *$108.3* | *$59.2* | *($26.2)* |
| % Change | (14.3%) | (6.4%) | (56.1%) | (129.1%) |

[539] Estimated balance sheet impact may differ slightly from amounts reflected on "Table 1: Impact on Earnings" due to rounding discrepancies.

[540] During its 2005 year-end audit, KPMG identified misstatements of about $9.6 million related to hedging and other income statement accounts that were not corrected by New Century Management.  If corrected, these misstatements would have resulted in additional pre-tax earnings for that year of $9.6 million.  During its March 31, 2006 quarterly review, KPMG's SFG identified an error in the model that was used to value the 2005-B NIMs at December 31, 2005.  The impact of this misstatement on the residual interests balance at December 31, 2005 was an overstatement of approximately $9 million.  New Century corrected this misstatement during the first quarter 2006.  The Examiner did not consider these two misstatements in the materiality analysis at December 31, 2005 because their impact to earnings essentially offset each other.  While not all of the uncorrected hedging misstatements identified by KPMG at December 31, 2005 would reverse and entirely offset the effects of the $9 million error for the 2005-B securitization, the Examiner considered that during the first quarter of 2006, New Century decided to remediate the hedging deficiencies and, as a result, recorded one-time adjustments (increases to pre-tax earnings) aggregating $11.3 million.  These one-time adjustments more than offset the effects of the $9 million error for the 2005-B securitization corrected during the first quarter of 2006.

[541] *Id.*

[542] These figures were taken from New Century's Form 10-K for 2005 and Form 10-Qs for the first three quarters of 2006.

[543] All figures are in millions.

[544] The effects of the misstatements on New Century's pre-tax earnings were computed as the difference between the asset or liability amounts determined by the Examiner and amounts reported by the Company in its financial statements.  Differences for the year ended December 31, 2005 were reflected in annual pre-tax earnings in their entirety.  In determining the effects on pre-tax earnings in subsequent periods, the Examiner took into consideration any misstatements reflected in previous periods.  As a result, the amounts that were added or subtracted from the income statement per quarter are not equal to the amount of the minimum misstatement that the Examiner found to exist as of that period end.

[545] *See* Section [Repurchase Reserves].

[546] *See id.*

[547] *See* Section [Residual Interests].

[548] The 12/31/05 financial statements report a value for residuals that is $2.7 million less than the amount reported in the Company's year-end internal Quarterly Residual Asset Valuation Report.

Table 1 shows that for the four periods, New Century's pre-tax earnings were overstated by at least 6.4% to 129.1%. Significantly, in the third quarter of 2006, New Century's reported financial statements reflect positive pre-tax earnings of $90.2 million. Had the financial statements been reported accurately, this number would not have been a positive number but would have reflected negative earnings of $26.2 million.

### Table 2: Impact on Reported Gain on Sale

| | Year Ended 12/31/05[549] | Quarter Ended 3/31/06[550] | Quarter Ended 6/30/06 | Quarter Ended 9/30/06 |
|---|---|---|---|---|
| Reported gain on sale of mortgage loans[551] | $622.6[552] | 129.5 | 195.2 | 173.0 |
| Increases (decreases) to gain on sale for the following identified misstatements[553]: | | | | |
| Allowance for repurchase losses[554] | (11.5) | (12.9) | 3.0 | (83.4) |
| LOCOM valuation allowance[555] | (9.8) | (8.6) | (63.4) | (3.9) |
| Valuation of residual interests[556] | (42.3)[557] | 14.1 | (15.2) | (29.1) |
| Total identified misstatements | (63.6) | (7.4) | (75.6) | (116.4) |
| *Revised gain on sale of mortgage loans* | *$559.0* | *$122.1* | *$119.6* | *$56.6* |
| % Change | (10.2%) | (5.7%) | (38.7%) | (67.3%) |

As illustrated in Table 2, above, the Examiner also finds that the material misstatements caused New Century to overstate by a material amount its reported gain on sale during each of the four periods.

### 3. Balance Sheet Impact

In assessing quantitative materiality, the Examiner also considered the impact of the misstatements on New Century's balance sheet and determined the following:

- New Century's repurchase reserve was understated by at least 208%, 350%, 178%, and 1000% for the four periods, respectively.

---

[549] *See* n. 540.

[550] *See* n. 541.

[551] *See* n. 542.

[552] *See* n. 543.

[553] *See* n. 544.

[554] *See* n. 545.

[555] *Id.*

[556] *See* n. 547.

[557] *See* n. 548.

- 384 -

- New Century's LOCOM valuation account was understated by at least 105% and 215% at December 31, 2005 and March 31, 2006. There was no LOCOM valuation amount for June 30, 2006 or September 30, 2006, when such amounts should have been $81.9 million and $85.8 million, respectively.

- Residual interests were overvalued by at least 17%, 13%, 20%, and 32% for the four periods, respectively.

### 4.    Impact to Reported Net Earnings and EPS

Finally, the Examiner also calculated the impact of the misstatements on New Century's net earnings and EPS. As reflected in Table 3 below, the Examiner has determined the following:

- The misstatements resulted in New Century meeting analysts' earnings expectations for year-end 2005 and the first quarter of 2006, when it otherwise would have had to announce earnings that were at least three to four percent below the bottom range of analysts' estimates.

- For the second quarter of 2006, New Century reported an increase in EPS of eight percent.  The Examiner finds that, instead, the Company's earnings actually dropped by at least 40% in that period over the prior comparable period.

- If the financial statement had been accurate, the Company would no longer have been reporting a profit as of the quarter ended September 30, 2006.  Instead of posting a profit of $63.5 million, New Century would have reported a loss of at least $6.3 million.

## Table 3: Estimated Impact on Earnings per Share[558]

| | Year Ended 12/31/05[559] | Quarter Ended 3/31/06[560] | Quarter Ended 6/30/06 | Quarter Ended 9/30/06 |
|---|---|---|---|---|
| **Reported net earnings available to common shareholder ("CSH")[561]** | $411.1[562] | $101.2 | $103.0 | $63.5 |
| Identified misstatements – tax effected at 40%[563] | (38.2) | (4.4) | (45.4) | (69.8) |
| *Revised net earnings available to CSH* | *372.9* | *96.8* | *57.6* | *(6.3)* |
| | | | | |
| Reported basic earnings per share | 7.42 | 1.82 | 1.85 | 1.14 |
| *Revised basic earnings per share* | *6.73* | *1.74* | *1.03* | *(0.11)* |
| % overstated | 9% | 4% | 44% | 110% |
| | | | | |
| Reported diluted earnings per share | 7.17 | 1.79 | 1.81 | 1.12 |
| *Revised diluted earnings per share* | *6.51* | *1.71* | *1.01* | *(0.11)* |
| % overstated | 9% | 4% | 44% | 110% |
| | | | | |
| Reported basic EPS for the comparable prior period: | 10.20 | 1.55 | 1.71 | 2.10 |
| Trend - % change as reported | (27%) | 17% | 8% | (46%) |
| *Trend - % change as revised* | *(34%)* | *12%* | *(40%)* | *(105%)* |
| Reported diluted EPS for the comparable prior period: | 8.29 | 1.48 | 1.65 | 2.04 |
| Trend - % change as reported | (14%) | 21% | 10% | (45%) |
| *Trend - % change as revised* | *(22%)* | *15%* | *(39%)* | *(105%)* |
| | | | | |
| Analysts' estimates[564] | $6.73 – $8.88 | $1.78 – $1.79 | $1.85 – $1.89 | $1.65 – $1.98 |
| *% revised diluted EPS below analysts' estimates* | *3% - 27%* | *4% - 5%* | *45% - 46%* | *106% - 107%* |

---

[558] *See* footnotes for Table 1.

[559] *See* n. 540.

[560] *See* n. 541.

[561] *See* n. 542.

[562] *See* n. 543.

[563] The Examiner reviewed the tax rates in the financial statements filed by New Century and believes that 40% is approximately the rate that had been applied by the Company previously to New Century TRS Holdings, Inc, which is where these corrections would have been reported. The Examiner has insufficient information to calculate accurately the appropriate tax rates since such a calculation needs to be performed considering the taxable status of the entity, the various tax jurisdictions, and whether any of the tax benefits considered can be realized.

[564] The December 31, 2005 analysts' estimates were derived from various equity research firms. The quarterly 2006 estimates were derived from research from Goldman Sacbs, Morgan Stanley, and Merrill Lynch.

### 5. Discussion of Other Factors

As demonstrated in Tables 1, 2 and 3 above, the misstatements had a significant impact on New Century's financial statements. The Examiner has also evaluated two other relevant factors outlined in SAB 99. First, the estimated misstatements are related to three areas—valuation of residual interests, allowance for repurchase reserves, and allowance for LOCOM—that New Century identified in its public filings as critical accounting policies. In other words, the estimated misstatements were in areas that were both important to the portrayal of a company's financial condition and results and required subjective or complex judgments.

Second, the Examiner evaluated the impact of the misstatements on Management's incentive compensation. Specifically, to the extent that the Examiner was able to determine the formulas on which the bonuses were based, the Examiner recalculated the bonuses based on the revised earnings figures set forth above. The Examiner has determined that the bonuses paid to several executives were significantly affected by the material misstatements in 2005 and 2006.

Specifically, for 2005 performance, Cole, Gotschall and Morrice each received bonuses that were at least approximately 300% higher than they would have been if the year-end financial statements had not been misstated. They each received a bonus of $1,070,236. If the Company's financial statements had been more accurate, the bonus each received should have been, at most, $354,736. Similarly, Flanagan's bonus was at least approximately 270% higher than it should have been and Cloyd's was inflated by at least approximately 130%. In total, at least $3.2 million of the bonuses paid by New Century in 2005 should not have been paid based on the estimated revised quarterly earnings figures.

During 2006, Cole, Gotschall and Morrice received mid-year bonuses of $693,016 each based on the Company's 2006 performance to date. If the interim financial statements had not been materially misstated, they would not have received any bonuses for that time period. While the Examiner did not recalculate the bonuses for other New Century executives in 2005 and 2006 because the Examiner was not provided a description of the formulas on which their compensation was based, it is likely that those bonuses also would have been impacted significantly by the misstatements at issue, as they also had a component that was tied to earnings.

Based on the foregoing analysis, the Examiner concludes that the misstatements were material to New Century's financial statements for each of the four periods. The misstatements

were not only material, but they served to mask significantly the financial difficulties that the Company was facing for many months before the Debtors filed for bankruptcy.

## VIII.  INTERNAL CONTROLS OVER FINANCIAL REPORTING

### A.  Introduction

As a reporting company subject to the Securities Exchange Act of 1934, New Century was required to establish and maintain a system of internal controls over financial reporting sufficient to provide reasonable assurances that, among other things, transactions were recorded as necessary to permit the preparation of financial statements in conformance with GAAP.[565] Under SOX Section 404 ("SOX 404"), New Century's Management was responsible for assessing the effectiveness of its internal controls over financial reporting as of each year-end financial reporting period between 2004 and 2006.[566] In addition, New Century's independent auditor, KPMG, was retained to audit and express an opinion on Management's assessment of internal financial controls and on the effectiveness of those internal financial controls as of each year-end financial reporting period between 2004 and 2006.[567]

This Section of the Report provides an overview of the SOX 404 review process undertaken by New Century for the fiscal years ending 2004 through 2006, the relevant findings of Management over that time period, and the conclusions the Examiner has drawn with respect to the sufficiency of New Century's internal controls over financial reporting.  The Examiner concludes that deeply-rooted and long-standing failures to establish and monitor adequate internal controls over financial reporting substantially contributed to New Century's accounting errors.  Many of these control failures relate to the lack of written and effective policies and procedures for calculating accounting estimates.  The Examiner is unable to determine with any certainty the impact that more rigorous controls would have had at specific points in time on the accuracy of New Century's financial statements, but believes that weak internals controls in all likelihood contributed to the occurrence of the repurchase reserve, residual interest and other accounting errors and allowed those errors, to remain undetected.

The Examiner was mindful of the need to seek to assess New Century's internal controls as they existed during the relevant time periods, without the benefit of hindsight.  Toward this end, the Examiner engaged in a year-over-year comparison of control deficiencies identified by

---

[565] *See* 15 U. S. C. § 78m(b)(2)(B).

[566] Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 404, 116 Stat. at 789 (codified at 15 U.S.C. § 7262).

[567] *Id.*  KPMG resigned prior to completing its SOX 404 audit work for the 2006 year-end period, but it completed substantial testwork and reached some interim conclusions with respect to deficiencies in internal controls that are discussed further herein.

Management and KPMG for several of New Century's significant accounts (such as the repurchase reserve, residual interest valuation, and certain other accounting matters discussed in this Final Report). The Examiner did not, however, review every single control deficiency identified during the SOX review process, but instead focused on the more significant control deficiencies.

### B.    Summary of Findings

The Examiner has identified a number of deficiencies concerning New Century's internal controls over financial reporting during the period covered by the 2004 through 2006 audits and the adequacy of the SOX assessment conducted by New Century. The most significant deficiencies are as follows:

- New Century failed to develop effective policies and procedures for performing accounting estimates requiring the exercise of considerable judgment. This created an environment devoid of safeguards that enabled the Accounting and Secondary Marketing Departments to revise certain accounting practices and related assumptions without adequate review and oversight. This led to material errors with various accounting matters, including the repurchase reserve and residual interest valuation. For example, in early 2006, the Secondary Marketing Department stopped updating the prepayment and loss rate assumptions used in its pre-2003 valuation models without any process controls in place to make certain that such inaction was warranted. Similarly, in the second and third quarters of 2006, Kennealy made several changes in the way that New Century calculated the repurchase reserve without notifying the Audit Committee.

- New Century did not remediate internal control deficiencies that existed at year-end 2004 and year-end 2005, despite representing to KPMG that it would. Many of these recurring deficiencies can be characterized as documentation issues. When viewed in isolation, they may seem insignificant. However, in the aggregate, these deficiencies demonstrate that New Century had poor documentation practices and weak internal controls in areas critical to its financial reporting, including the repurchase reserve, residual interest valuation and hedging process. The recurrence of such internal control deficiencies during the 2004 through 2006 SOX reviews also indicates that New Century's Senior Management was not effective in promoting a strong compliance culture.

- New Century lacked adequate internal controls to log, process and track all repurchase requests presented to the Company, thereby creating a significant risk that the number of repurchase claims pending would not be identified accurately or processed efficiently. This contributed to the development of a significant backlog of outstanding repurchase requests. New Century also lacked adequate controls to ensure that the existence and magnitude of this backlog was factored into the repurchase reserve estimate. Neither Management's nor KPMG's SOX review identified these control deficiencies in the repurchase reserve processes.

- New Century did not devote sufficient internal resources to the SOX assessment process. New Century budgeted for at least three full-time SOX auditors, but never filled any of these positions. New Century outsourced substantially all of Management's assessment effort, and the evidence strongly suggests that Management did not perform a detailed analysis of the severity of the deficiencies identified by its consultant Ernst & Young ("E&Y"). In addition, New Century's Management failed to cooperate with some reasonable information requests made by KPMG as part of its SOX audits.[568]

### C. Analysis of Management's Annual SOX 404 Assessment of the Effectiveness of Internal Control Over Financial Reporting

SOX 404 requires management to produce an "internal control report" as part of each annual Form 10-K filing with the SEC.[569]  This report must affirm "the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting."[570]  In addition, the report must contain "an assessment, as of the end of the most recent fiscal year of the company, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting."[571]  SOX also requires management to evaluate any changes in internal controls that occurred during a fiscal quarter and that have materially affected, or are reasonably likely to materially affect, the entity's internal controls over financial reporting.[572]

To ensure that management is accountable for its assessment of the adequacy of internal financial controls, Section 302 of SOX requires principal executive officers and principal financial officers to certify in Form 10-K and 10-Q filings that they are "responsible for establishing and maintaining internal controls" and "have designed such internal controls to ensure that material information relating to the company…is made known to such officers or to others within [the entity], particularly during the period in which the periodic reports are being prepared."[573]  The certifications must provide that all significant deficiencies and material

---

[568] New Century refused KPMG's repeated requests during the 2006 audit to provide any written explanation of its rationale for determining the likelihood or potential magnitude of any misstatement that could result from the failure of identified control deficiencies.  Also, in late 2006, Kenneally prevented the release to KPMG of Asset and Liability Committee ("ALCO") Committee meeting minutes because the minutes did not evidence required discussion and approval of the assumptions used in the residual interest valuation models.

[569] Pub. L. No. 107-204, § 404, 116 Stat. at 789 (codified at 15 U.S.C. § 7262).

[570] Id.

[571] Id.

[572] 17 CFR § 240.13a-15 (2003).

[573] See 15 U.S.C. § 7241(a)(4).

weaknesses in the design or operation of internal controls over financial reporting which could adversely affect the issuer's ability to record, process, summarize and report financial data have been disclosed.

During the relevant time period at New Century, Section 302 certifications were filed by Robert Cole, Brad Morrice, Edward Gotschall (for periods prior to 2006) and Dodge. To support their certifications, New Century established a mini-certification process whereby various senior managers, including Kenneally and Licata, provided internal certifications with respect to controls within their areas of responsibility to support the executive certifications. New Century also established a Disclosure Committee, comprised of various members of Senior Management, which met every quarter to consider (among other things) internal controls and the mini-certification process.

As discussed in Section VIII. of this Final Report, the 2004 through 2006 KPMG audits of New Century's internal controls over financial reporting were governed by Auditing Standard No. 2. ("AS 2") of the Public Company Accounting Oversight Board ("PCAOB"). AS 2 requires the independent auditor to inform the audit client of all significant deficiencies and material weaknesses existing at the end of the client's annual financial reporting period. AS 2 defines a significant deficiency as "an internal control deficiency or combination of control deficiencies that adversely affects the company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with GAAP such that there is a more-than-remote likelihood that a misstatement of the company's annual or interim financial statements that is more than inconsequential will not be prevented or detected." AS 2 defines a material weakness as "a significant deficiency or combination of significant deficiencies that result in a more-than-remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."

### 1.    New Century's Assessment Process in 2004

The first year of SOX 404 review at New Century covered the year ending December 31, 2004. New Century's 2004 SOX compliance effort was the primary responsibility of the Company's Controller, Kenneally, and Accounting Manager, Trevor Drummond, who were responsible for identifying key financial accounts and for ensuring that adequate documentation, testing and evaluation of the relevant internal controls over those accounts was performed by New Century's SOX contractors. New Century formed a committee to oversee Management's

SOX 404 compliance effort (the "SOX 404 Committee").[574]  The SOX 404 Committee members included Patti Dodge, Kenneally, Terry Theologides, Jennifer Jewett, Joseph Tortorelli, Paul Zalle and George Arambula.[575]  The members of the SOX 404 Committee from the Internal Audit Department, Zalle and Arambula, played significant roles in coordinating New Century's SOX work and regularly apprised the Audit Committee of progress.  However, neither of them engaged in any substantive review work.

During the 2004 SOX implementation process, New Century retained E&Y to assist with documentation, testing, and remediation of the various internal control processes associated with key financial reporting accounts.  New Century relied heavily on E&Y to prepare the necessary documentation, evaluate process controls and conduct the testwork required for Management's initial assessment of the sufficiency of its internal controls.  E&Y did not express any professional opinion on the adequacy of New Century's internal controls.  In addition, New Century retained Grant Thornton to remediate deficiencies in the information technology ("IT") general controls and to assist with Management's SOX review of the income tax and REIT processes.

KPMG's 2004 audit of New Century's internal controls over financial reporting ("SOX 404 audit") was integrated with KPMG's audit of New Century's financial statements ("substantive audit").  Kinsella served as the partner in charge of KPMG's integrated audit engagement in 2004.  Significant roles were played by Tara Hatanaka (manager) and Athena Chan (junior manager).  A separate consulting team from KPMG also had a limited role in preparing some of New Century's SOX documentation in 2004.  The objective of the KPMG consulting engagement was to "assist [New Century] in documenting its internal control over financial reporting for in-scope process/locations [as determined by Management], and provide observations and recommendations."  The Examiner could find no indication that KPMG provided New Century with any observations or recommendations in connection with this work. KPMG's assistance to New Century in this regard does not appear to raise any significant auditor independence problems because of the limited scope of KPMG's work, its use of a separate

---

[574] The Examiner's inquiry observed that the following names were used interchangeably to refer to this committee: "Compliance Committee," "SOX Compliance Steering Committee," "SOX Oversight Committee," and "SOX 404 Committee."

[575] Although the SOX 404 Committee prepared frequent status reports to the Audit Committee, the Examiner was only able to locate an agenda and meeting minutes for a July 7, 2005 meeting of the SOX 404 Committee.

internal audit group (rather than the audit engagement team) to perform this work, and the approval of this work by New Century's Audit Committee.

Upon completing its SOX review for 2004, New Century identified 104 process control deficiencies and an additional 66 IT general control deficiencies. KPMG identified 10 additional process control deficiencies and 31 additional IT general control deficiencies after reviewing Management's results, evaluating any remediation performed by Management and completing its own independent testwork.

KPMG determined that New Century remediated most of these deficiencies by the end of 2004. On March 15, 2005, in accordance with its responsibility under AS 2, KPMG issued a letter to New Century's Management describing five significant deficiencies in internal control over financial reporting. These deficiencies were as follows:

Management neglected to create adequate documentation evidencing the appropriate application of GAAP in certain areas. These areas included the allowance for loan loss methodology and rationale, the accounting treatment for securitization transactions (sale vs. financing), the accounting for forward loan sale commitments and the accounting for investments in affiliates. This deficiency was evidenced by the Carrington securitization transaction, which should have been recognized as a financing rather than a sale in the second quarter. Though underlying information existed and several of these areas were remediated at year end, financial management needs to instill the discipline to effectively document the accounting rationale for all significant accounting matters.

Management neglected to create adequate documentation supporting data inputs for Secondary Marketing's calculation of residual values and the loss curves used in determining the allowance for loan losses. This includes collateral data reconciliation and certification of expected cash flows. This information is necessary to support the review process of such calculations to help ensure data integrity underlying the calculations. This was remediated at year end.

Management neglected to have an appropriate reconciliation of certain liability accounts related to derivatives and a full understanding of the margin account activity with the investment broker, resulting in a $30.9 million adjustment from Other Comprehensive Income (OCI) to Other Liabilities. This adjustment was necessary to reflect the OCI existing upon the termination of a Euro Dollar futures contract in the fourth quarter.

The Company's reconciliation and review process was not complete when we were provided with tax balance sheet account documentation. A roll forward of deferred taxes was prepared arriving at the ending inventory. However, in order to help ensure that the resulting inventory is accurate, the Company should validate each deferred tax item at period end with supporting documentation.

> Additionally, the Company should reconcile the period end current tax receivable and other tax accounts on a timely basis.

> With respect to the period-end financial reporting process, management neglected to create adequate documentation to evidence the review of information provided by other departments prior to being sent to Financial Reporting. This was remediated at year end.[576]

In its Management letter, KPMG did not identify any material weaknesses in internal controls over financial reporting. Therefore, KPMG issued an "unqualified" SOX 404 audit opinion for 2004. However, in addition to the significant deficiencies listed above, KPMG attached an appendix to its Management letter setting forth additional, unremediated control deficiencies identified during the course of the SOX 404 audit that it categorized as either inconsequential or documentation deficiencies.

Quite reasonably, New Century appears to have taken great comfort from obtaining a "clean" opinion from KPMG on its internal controls in 2004. In a March 2005 e-mail to various members of Senior Management, Zalle lauded the Company's receipt of "an unqualified, clean opinion…[on its] financial reporting processes and controls." His message contrasted New Century's "very successful result" with that of contemporaneous adverse SOX reports identifying material weaknesses at two other public companies. The minutes from a May 2005 Audit Committee meeting reflect Zalle representing that "the Corporation's SOX 404 compliance effort in 2004 confirmed the Corporation's internal control over financial reporting was working effectively." Other members of Senior Management, including Dodge, informed the Examiner that New Century took considerable comfort in the fact that it had "passed" its SOX audit.

### 2.    Management's Assessment Process in 2005

To coordinate Management's SOX 404 compliance review in 2005, New Century hired an outside consultant, Bruce Polk. His role was to interface among Management (including its contractor, E&Y), the Internal Audit Department and the independent auditors from KPMG. Tony Sanchez, who joined the Company in 2005, became a member of the SOX 404 Committee and played an important role in the 2005 SOX review. New Century continued to rely upon the consulting services of E&Y to perform substantially all of Management's documentation, review

---

[576] These KPMG findings were reported to the Audit Committee on March 10, 2005. On May 16 2005, KPMG reported to the Audit Committee that Management had remediated most of these significant deficiencies by year-end.

and testing of internal controls over financial reporting. KPMG continued in its role as New Century's independent auditor.[577]

At the beginning of 2005, in accordance with the engagement partner rotation requirements of SOX, KPMG assigned Donovan to replace Kinsella as the engagement partner on the New Century audit team. The audit team also experienced additional turnover from the prior year as a result of other personnel changes. Debbie Biddle, a new in-charge senior associate, replaced Chan in March 2005. In June 2005, KPMG hired Mark Kim to fill the senior manager position on the New Century engagement vacated by Tara Hatanaka in February 2005.

KPMG managed and staffed the 2005 SOX work using various members of the engagement team. Biddle simultaneously managed the SOX process and also served as the in-charge senior associate for the substantive audit. Until December 2004, Biddle served as an assistant manager in KPMG's Birmingham, UK office. She joined the New Century engagement shortly after beginning a rotation in KPMG's Los Angeles office. Biddle had extremely limited experience with SOX and U.S. GAAP issues prior to beginning her work on the New Century audit.

In 2005, New Century identified 84 control deficiencies after completing its SOX review. KPMG identified an additional 10 control deficiencies in 2005. KPMG also identified 18 IT general control deficiencies. However, as of year-end 2005, KPMG only identified one significant deficiency relating to hedge documentation. KPMG concluded that all other deficiencies were either remediated by year-end or did not rise to the level of a "significant deficiency" that required a report to New Century's Audit Committee.

Specifically, KPMG's 2005 SOX letter to the Audit Committee described the significant deficiency as follows:

- Management's hedge documentation for On Balance Sheet securitizations is inconsistent with their current accounting method used to calculate ineffectiveness and reverse effective amounts out of Other Comprehensive Income (OCI) into earnings, resulting in an audit difference of $9.7 million. Based on the nature of the Company's dynamic hedging relationship, the Company should not be applying the "change in variable cash flows method" per Statement 133 Implementation Issue No. G7 issued by the Derivatives Implementation Group (DIG G7). Additionally, Management's hedge documentation does not include details related to the specific methods and

---

[577] In contrast to 2004, KPMG did not provide documentation assistance or otherwise assist Management in its assessment of internal controls in the 2005 or 2006 reviews.

valuation approaches used to measure ineffectiveness. This specific level of detail is critical given Management's application of DIG G7 to the Company's dynamic hedging relationship."

In the above-referenced 2005 letter to the Audit Committee, KPMG did not identify a significant deficiency relating to accounting documentation problems at New Century, as it had done in the prior year. In its 2004 Management letter, KPMG reported that "Management neglected to create adequate documentation evidencing the appropriate application of GAAP in certain areas." KPMG also specifically noted in that 2004 letter that New Century "financial management need[ed] to instill the discipline to effectively document the accounting rationale for all significant accounting matters." The same findings were not made in 2005, even though KPMG found in the 2005 SOX audit that New Century continued to lack written policies and procedures in several key accounting areas including allowance for loan losses, repurchase reserve, valuation of residual interests and hedging. There is no sufficient explanation for why a different conclusion was reached by KPMG in 2005.

### 3. Management's Assessment Process in 2006

In 2006, New Century conducted its SOX review with the same degree of reliance on E&Y. Polk continued in his role as SOX coordinator. The key members of Management's effort continued to include Kenneally and Sanchez. Conversely, KPMG's management of the SOX audit changed considerably. Rather than rely on the same senior associate to manage both the substantive and the internal controls aspects of the audit, KPMG assigned a dedicated SOX manager to the New Century engagement. This shift in staffing strategy occurred at the request of the engagement team's SEC concurring partner, Marc Macaulay. In April 2006, as part of KPMG's engagement risk assessment and approval process, Macaulay expressed concerns within KPMG about manager staffing on the engagement team. These concerns led to his temporary refusal to approve KPMG's undertaking of New Century's 2006 audit engagement. His concern was resolved (at least in part) by the addition of a manager whose focus was specific to the SOX component of the engagement.

Accordingly, the work performed by Biddle in 2005 was divided between two junior managers in 2006: Fiona Liang (substantive audit) and Veronica Wong (SOX audit). Wong had two full years of SOX experience and considerably more U.S. GAAP experience than Biddle. During her planning for the SOX audit, Wong engaged in a limited review of prior year

workpapers, relying extensively on Beckstrom and Kim (who continued in their roles from 2005 to 2006) to provide assistance with the identification of the client's key processes and controls.[578]

The 2006 SOX review was not completed because of KPMG's April 2007 resignation as New Century's independent auditor. Nonetheless, Management had substantially completed its assessment of internal controls, and KPMG was in the final stages of its review prior to resigning. By December 2006, Management submitted its preliminary control deficiency listing containing 100 deficiencies in various process areas (exceeding the 86 final deficiencies identified in the prior year). KPMG's Beckstrom (who had worked on both the 2004 and 2005 audits) exclaimed "Wow" in an e-mail to other members of the audit team in reaction to the extent of Management's initial deficiency list. Wong informed the Examiner that this level of deficiencies in the abstract was not necessarily unusual. In a November 2006 e-mail, however, Licata noted the following: "I'm surprised that there are issues as nothing has changed in our process year over year."

The Examiner has concluded, based on a review of the deficiency listings and related workpapers, that both KPMG and New Century exhibited increased diligence in their 2006 review of internal controls as compared to the prior year. New Century's control processes did not change significantly from 2005, yet the number of deficiencies grew substantially in 2006. Bruce Polk suggested that E&Y took a "deeper dive" on the SOX review in 2006, which probably accounted for the greater number of deficiencies identified by Management.

KPMG's more robust identification and review of controls may have been attributable in part to Wong's experience and resolve. Aided by her SOX expertise, Wong appears to have taken a closer review of New Century's deficiencies than Biddle did in 2005. For example, Wong insisted that Management provide written evidence of its assessment of control deficiencies as inconsequential, documentation issues, significant deficiencies or material weaknesses. Polk objected to Wong's request and indicated that New Century previously had not been asked to provide such information to KPMG. Indeed, KPMG's 2004 SOX workpapers confirm that although New Century performed a version of this severity analysis for 2004, it did not document this assessment. In 2005, Biddle did not raise the issue at all. In 2006, Wong felt that it was important enough that she continued to pursue the supporting documentation again in

---

[578] However, the Examiner was unable to locate any evidence in the 2006 KPMG workpapers of formal review by Beckstrom or Kim of prior year deficiencies.

December 2006 and January 2007 after her initial request was rebuffed in November.[579]  She forwarded guidance to Polk explaining why she needed this information, and she ultimately indicated that she was flexible with respect to the format of the written documentation so long as Management provided an adequate rationale for its severity assessments.  The issue was never resolved because of the February 2007 announcement about the accounting irregularities and KPMG's eventual resignation.

The initial list of deficiencies identified by Management and KPMG for 2006 is similar to prior years (although more deficiencies are identified and the IT control deficiencies appear to be more severe).  After accounting problems with the repurchase reserve and residual interests valuation were discovered, KPMG prepared a conclusion memorandum in March 2007 that identified material weaknesses in four accounts (repurchase reserve, residual interests, allowance for loan losses and hedging) and significant deficiencies in two accounts (mortgage servicing rights and payroll).  The memorandum, which reflected deficiencies that KPMG had not identified as material or significant until the restatement announcement was made in February 2007, was not finalized because of the subsequent resignation by KPMG.

### D.    Management's Commitment to the Assessment Process

New Century retained the professional services of E&Y to perform its documentation, evaluation and testing of internal controls.  New Century also engaged the services of a professional SOX project manager in 2005 and retained other consultants to assist in the SOX review process.  Nonetheless, the Examiner has concluded that New Century did not devote sufficient internal resources to the SOX compliance effort.

At the May 16, 2005 Audit Committee meeting, the SOX 404 Committee reported that it had been unsuccessful in filling three open SOX positions (SOX Project Director for the Finance Department, SOX Senior Auditor for the Internal Audit Department and a dedicated SOX Auditor for the Servicing Department) that had been authorized and budgeted for by New Century.  The SOX 404 Committee attributed the hiring difficulty to the "tight job market for qualified SOX experienced personnel."  However, in a May 11, 2005 e-mail, Kenneally admitted to Dodge that "we have had a couple of candidates submitted, but have not been 'actively' searching."  In a handwritten note dated June 8, 2005 to Dodge, Zalle questioned Kenneally's

---

[579] In his interview with the Examiner, Donovan stated that he thought Wong's information request was a "good idea."  However, contemporaneous correspondence indicates that Donovan did not actively support Wong's efforts to obtain this information from New Century.

commitment to the SOX review process, and expressed disappointment in his apparent passivity toward the recruitment effort for the SOX Finance Director. These three SOX positions were never filled.

As discussed throughout Section E below, New Century's lack of formal policies and procedures governing many of the accounting estimates requiring substantial judgment was frequently noted as an internal control deficiency by KPMG. Management failed to develop written and effective polices and procedures for these processes after these deficiencies were brought to its attention on a recurring basis. This epitomizes the lack of attention that Management gave to remediating internal control deficiencies.

In addition, the Examiner is troubled by at least two instances in which Management failed to respond appropriately to KPMG's reasonable requests for information during the SOX 404 audit process. As discussed in Section E.3.b, Kenneally obstructed an important portion of the SOX 404 audit by blocking the release of ALCO meeting minutes to KPMG. At best, Kenneally's action is inconsistent with that of a Controller who takes seriously his responsibility over ensuring the effectiveness of internal controls over New Century's financial reporting. The second instance, discussed in Section C.3 above, pertains to Wong's request for Management to provide written support for its assessment of the severity of deficiencies. Among the factors an auditor must consider in evaluating management's assessment process is whether management "evaluat[ed] the likelihood that failure of [a deficient] control could result in a misstatement, the magnitude of such a misstatement, and the degree to which other controls, if effective, achieve the same control objectives."[580] Management repeatedly resisted Wong's reasonable request for documentation evidencing this evaluation, engaged in a finger-pointing exercise with E&Y over who was responsible for preparing such documentation, and ultimately provided nothing to KPMG. This refusal is an indication that, as late as January 2007, Management lacked the necessary commitment to the SOX review of its internal controls.

Also relevant to New Century's commitment to the effectiveness of its internal control over financial reporting is the likely overextension, of and over reliance upon, its Controller. As discussed above, New Century never managed to fill its vacant SOX positions. During KPMG's 2006 audit, Kim noted that "Dave [Kenneally] seems to know the answers for everything and anything and the rest of the accounting department is on almost the same boat as the audit team

---

[580] AS 2, ¶ 40.

is – little knowledge of what's going on." Similar comments were made by New Century employees. At various times, Dodge lamented that "Dave does too much," and Zalle questioned whether Kenneally had sufficient time to properly prioritize the SOX review. Indeed, even Kenneally remarked in a non-SOX related response to an inquiry from Donovan that "my time, your money...neither of us have enough." The SOX audit oversight responsibilities added to the mix of Kenneally's responsibilities and substantially increased the burden on an already busy individual.

### E.    Analysis of Internal Controls Over Key Financial Reporting Processes

#### 1.    Repurchase Reserve: Change in Methodology

A year-over-year analysis of the key controls surrounding the repurchase reserve estimation process reveals that New Century's Management permitted certain recurring deficiencies to remain unaddressed. Most importantly, Management never adopted detailed written policies and procedures for the repurchase reserve calculation process. As part of its 2004 SOX audit, KPMG agreed with Management's observation that New Century lacked formal documentation memorializing its methodology for estimating the repurchase reserve. In response to this finding, Management represented to KPMG that it was taking steps to formalize its "informal" and "undocumented" policies and procedures and would include timelines, checklists and retention policies in that documentation. This was never done.

During its 2005 SOX walk-through of the repurchase reserve estimation process, KPMG again noted that Management failed to adopt "formal policies and procedures" for calculating the repurchase reserve. During KPMG's 2006 SOX walk-through of the repurchase reserve estimation process, KPMG again noted that New Century lacked "formal policies and procedures" for calculating the repurchase reserve. According to KPMG's narrative from the walk-through, Kenneally represented to KPMG that "the memo on Repurchase Reserve policies will be updated near the end of the year."

In November 2005, Trevor Drummond of the Accounting Department submitted to KPMG a draft memorandum entitled "Allowance for Repurchase Losses." This brief memorandum provided a high-level summary of the purpose of the repurchase reserve and listed applicable accounting standards. However, the memorandum provided absolutely no explanation of how New Century calculated the repurchase reserve. In KPMG's view, this memorandum failed to remediate the control deficiency because its draft form indicated that

New Century never adopted it as Company policy. According to Biddle, "formal adoption" would have necessitated a more thorough consideration of the policy by New Century's Management. The memorandum also failed to explain New Century's repurchase reserve estimation process in any detail. It does not discuss any of the specific procedures followed by the Accounting Department to calculate the reserve, much less the rationale for using such procedures and any related assumptions in light of applicable accounting standards. It is evident that the memorandum was prepared in an unsuccessful attempt to satisfy KPMG's documentation request and not to establish clear and thorough procedures for calculating the reserve.

Despite the Company's failure to adopt adequate repurchase reserve policies and procedures for the second year in a row, KPMG concluded as part of its 2005 SOX audit that this deficiency was "inconsequential" and therefore did not report the deficiency to the Audit Committee. In support of its assessment, KPMG noted in its workpapers (without further explanation) that the Audit Committee's review of New Century's financial statements as a whole satisfactorily compensated for this documentation deficiency. In addition, Biddle told the Examiner that through KPMG's quarterly review of the repurchase reserve calculation, the audit team could observe and test other control points in New Century's process for calculating the repurchase reserve irrespective of whether policies and procedures were formally adopted. However, as discussed elsewhere in this Final Report, KPMG's engagement team failed to appreciate the impact of material, improper changes in the methodology for calculating the repurchase reserve that took place in the second and third quarters of 2006, despite KPMG's quarterly reviews. Thus, the observation and testing of other control points in the repurchase reserve estimation process did not enable the KPMG engagement team to identify the material error in the calculation methodology.

The Examiner believes that the lack of a detailed, written repurchase reserve policy with specific calculation and review procedures enabled Kenneally to have largely unrestrained discretion over changes to the reserve methodology in 2006. During his interview with the Examiner, Kenneally stated that he now believes that the 2006 changes to the repurchase reserve methodology probably should have been disclosed to the Audit Committee. An effective, detailed written policy governing the reserve estimation process would have required Kenneally to follow certain steps before making any changes to the methodology (such as obtaining the

review and approval of the Audit Committee or other members of Management). As a result, the proposed changes very likely would have been brought to the attention of the KPMG audit engagement partner (who denies he knew about the methodology changes at the time they were implemented). This likely would have prompted a review of such changes from a GAAP standpoint and may have prevented the material errors which were not discovered until early 2007.

The failure to develop effective policies and procedures for calculating the repurchase reserve is more than a technical documentation issue. It reflects the lack of adequate internal controls that New Century had in place to ensure that the repurchase reserve was being calculated on a consistent basis in accordance with GAAP. The Examiner has concluded that the existence of written and effective repurchase reserve estimation policies and procedures would have decreased the risk of an improper accounting error (which is one of the principal objectives for having such documentation controls) by imposing a review and approval framework that would have required Management and/or the Audit Committee to consider the rationale supporting the proposed changes and their consistency with GAAP. New Century's failure to develop and comply with such policies and procedures for calculating the repurchase reserve was at least a significant deficiency (if not a material weakness) in New Century's internal control environment that contributed to a material misstatement in its financial reports.

### 2. Whole Loan Sales: Backlog in Repurchase Claims Processing

#### a. New Century Failed to Establish Effective Controls to Facilitate the Flow of Information Between Departments Critical to Its Process for Handling, Forecasting and Reserving for Repurchase Claims.

In January 2007, New Century disclosed to KPMG that delayed processing of repurchase requests had allowed a substantial backlog of unresolved repurchase claims to build up throughout 2006. Kenneally informed both the Examiner and the SIC that he was unaware of the backlog and therefore did not consider it in the estimation of the repurchase reserve. However, documents from as early as June 2006 indicate that Kenneally was put on notice about the existence of a growing backlog of request requests. Licata told the Examiner that he "assumed" the Accounting Department knew about the backlog. Licata never took any steps, however, to ensure that Kenneally knew about the backlog or considered it as part of the repurchase reserve. Even if Kenneally may have known about the backlog of outstanding repurchase claims as early

- 403 -

as June 2006, the Secondary Marketing and Accounting Departments still failed to establish an effective process for tracking and sharing information about the backlog and for evaluating how it might be relevant to the repurchase reserve calculation.

In early 2007, KPMG characterized the failure of the Accounting and Secondary Marketing Departments to share information about the backlog as a material weakness in New Century's internal controls. According to Beckstrom, KPMG had not previously evaluated the adequacy of this specific control in its SOX review of the whole loan sales process because New Century had not identified a specific control point relating to the flow of repurchase claim information between the Secondary Marketing and Accounting Departments. As a result, KPMG asserts that it failed to identify the risk of misstatement in the repurchase reserve balance due to the lack of effective communication between those Departments. As discussed further in Section XI. below, KPMG actually requested and received information from New Century about the claims backlog as early as 2005.

During all relevant periods, the Secondary Marketing Department's policy manual included specific procedures for handing repurchase requests. For each repurchase claim, the procedure required that a repurchase specialist "log in the receipt of the request in a tracking spreadsheet on the [Company] network, obtain additional repurchase information from the investor if required, and complete a Repurchase Summary Form." Subsequently, the repurchase specialist was required to forward the request to "Loan Sales Management," which would determine whether an investigation was warranted.

Depending on the nature of the claim, repurchase requests requiring investigation were either forwarded to the Legal Department or to another member of the Secondary Marketing Department. Once the investigation was complete, a recommendation would be made to the Loan Sales Management Department. If the loan was designated for repurchase, a wire request was sent to the Accounting Department. Throughout the entire repurchase claims process, this transmittal of the wire request was the only point at which New Century's repurchase handling policy designated any role for the Accounting Department. Therefore, it does not appear that the Accounting Department received regular reports from the Secondary Marketing Department on the extent of repurchase claims made against the Company and the potential impact on the repurchase reserve.

**b.     New Century Failed to Follow Its Repurchase Procedures, Resulting in an Inability to Efficiently Process, Forecast, and Reserve for Repurchase Claims.**

Despite this detailed policy, New Century's repurchase claims review process operated in a highly decentralized and informal manner. Repurchase requests often were received by the investor's most recent point of contact at the Company. Incoming requests would flow into the Secondary Marketing Department from various departments and then would be assigned to Legal, Secondary Marketing and other departments, as necessary, for review and approval or refutation. Secondary Marketing had primary responsibility for tracking repurchase claims, but other departments (including Legal) kept their own records and the lists did not always reconcile in terms of volume and/or status. Ron Brown of Secondary Marketing told the Examiner that the main problem with New Century's repurchase claim system prior to the fall of 2006 was that there was no centralized process to collect, track, and manage claims as they were received. In addition, Cloyd acknowledged that there was no one responsible for monitoring the operations of each repurchase agreement "because it was never a problem until March 2007."

Prior to 2005, Secondary Marketing's tracking mechanism consisted of a handwritten log of repurchase requests. A handwritten log failed to satisfy the requirements of New Century's policy, although it may have been sufficient for tracking a low volume of claims. As volume increased in 2005, Secondary Marketing attempted to streamline this process by tracking all requests in an Excel spreadsheet. This spreadsheet was created and maintained by the Transaction Management group (headed by Lent) within the Secondary Marketing Department. However, the process remained decentralized, with claims logged by various transaction managers within the Secondary Marketing Department and by other departments (including Legal), maintaining their own spreadsheets and not coordinating their findings.

By October 2006, the substantial volume of repurchase claims prompted New Century to establish a centralized repurchase desk ("Repurchase Desk") to more efficiently track and handle all repurchase claims.[581] The Repurchase Desk was staffed by representatives from the Legal, Secondary Marketing and other departments and had sole responsibility for reviewing and

---

[581] KPMG engagement team members (including Kim and Donovan) claim they were never informed about the establishment of the Repurchase Desk until early 2007 when New Century advised KPMG of the backlog issue. If true, the fact that KPMG did not learn about the creation of the Repurchase Desk (and the resulting changes to the repurchase claims tracking and handling process) as part of its SOX walkthrough in November 2006 strongly suggests that KPMG did not ask appropriate questions or otherwise conduct a sufficient examination of the Company's controls surrounding the repurchase claim process.

tracking the status of repurchase requests. New Century's failure to establish the Repurchase Desk until late 2006, after the trend of increasing repurchase claims was evident, reflects another internal control weakness in the repurchase process.

New Century's failure to establish an effective mechanism for tracking, processing and handling repurchase claims contributed to its inability to promptly detect the increasing volume and (staleness) of repurchase claims. This weak control environment led to the development of a substantial backlog of claims. In addition, the Secondary Marketing Department's failure to track and disclose the increased volume of unresolved repurchase claims precluded the Accounting Department from making adjustments to the reserve that could have taken into account the increased repurchase volume. New Century's failure to establish effective controls for handling repurchase claims prior to late 2006 prevented the Company from detecting early warnings about the development of the backlog. The Examiner has concluded that this was a material weakness in the control environment as early as 2005, when repurchase claims began to increase.[582]

### 3.    Valuation of Residual Interests

New Century also failed to establish sufficient internal controls with respect to its residual interest valuation process. As with the repurchase reserve calculation, New Century did not begin to develop written policies and procedures for the residual interest valuation process until early 2007, after KPMG applied increasing pressure on New Century to substantiate various aspects of its valuation approach. In addition, New Century had weak controls surrounding the process used to determine and update various assumptions used in its valuation models. These internal control deficiencies are discussed in further detail below.

### a.    Importance of Internal Controls in Connection with the Residual Interest Valuation Process

New Century relied on Excel-based spreadsheet models to determine its residual interest in a particular securitization. Each securitization had a separate model. The models for different vintages of New Century securitizations were built by different people - the early models were built by John Kontoulis, the models between approximately 1998 and 2003 were built by Licata,

---

[582] The same control weaknesses existed in 2004, although it is less clear such weaknesses could have been characterized as "material" at that point given the size of the backlog that may have existed.

and the post-2003 models were built by Hatch. The models became more complex and sophisticated over time.

Each month, the Secondary Marketing Department would populate each securitization model with actual data. The model then would be rolled forward from the prior month to calculate the current residual interest based on various assumptions (including, most importantly, the prepayment rate, the loss rate, and the discount rate) that were built into the model at the outset. From time to time, these assumptions (particularly the prepayment rate and the loss rate) were updated by the Secondary Marketing Department. Such changes to the assumptions could have a material impact on the value of the residual interest. For example, Mullins told the Examiner that changes to the prepayment and loss assumptions would have the greatest impact on the valuation results and that, from time to time, he was asked by Licata to run the models with different assumptions.

As noted above, the design of the models gave the Secondary Marketing Department the ability to change the inputs and assumptions to achieve particular results. Therefore, to prevent and detect fraud and other errors in the calculation of the residual interest, it was imperative for New Century to have robust and effective controls in the residual interest valuation process. The residual interest value was an important component of New Century's balance sheet, and therefore rigorous controls were necessary to prevent improper assumptions or other procedures from being used intentionally or inadvertently.

### b.   Lack of Written Policies and Procedures for Determining Valuation of Residual Interests

As noted above, New Century failed to develop detailed, written policies and procedures for how it built, operated and updated the models it used to develop the residual interest valuation. New Century did not develop a manual which explained the design of the functions or routines within the valuation models. This was problematic because different vintages of the models were built by different people and therefore had different limitations and capabilities. In addition, New Century did not have written policies and procedures which set forth a methodology for establishing and changing assumptions within the models. This was an important control deficiency because the accuracy of the models depended on the reasonableness of the assumptions, which in turn depended on the exercise of judgment. Thus, these assumptions needed to be updated from time to time based on actual securitization performance and market trends. The lack of detailed policies and procedures for establishing and updating

those assumptions left New Century vulnerable to a high risk of misstatement from unreasonable assumptions because the models could be very sensitive to assumption changes..

### c.    "Key Man" Risk Exposure Resulting From Use of In-House Residual Interest Valuation Models

The post-2003 securitization models developed by John Hatch were more sophisticated than prior models built by Licata and Kontoulis, but nobody at New Century except Hatch understood fully how to design the post-2003 models or how they operated. New Century therefore exposed itself to considerable risk in the event that Hatch was not available to help operate, understand and interpret the models. This "key man" control weakness manifested itself in at least two important respects which are described below.

First, KPMG discovered an error in the first quarter of 2006 with respect to the PMI component of one of the 2005 securitization models. This error led to a $9 million write-down in the first quarter of 2006. According to Hatch, a "side table" that he had to build into the model to calculate the PMI (because the Excel spreadsheet did not have the capability to account for the PMI without the side table) was not working effectively. Had the Secondary Marketing analyst rolling the model forward understood as well as Hatch how the model at issue was built, it is likely that the error would have been discovered earlier or avoided altogether. Second, one of the residual interest controls put into place by New Century was a process for "third-party" valuation of the residual models on a quarterly basis by someone outside of the Secondary Marketing Department. Yuri Pyatigorsky from the Finance Department was tasked to perform this "third-party" validation role. The problem, however, was that Pyatigorsky could not understand the Microsoft Visual Basic for Applications ("VBA") logic that Hatch built into the post-2003 models.[583] Therefore, he was unable to review these models and the third-party validation process was an ineffective control.

### d.    Ineffective Security Controls for Residual Interest Valuation Models

New Century also had weak controls with respect to the security of its residual interest valuation models. The SOX reviews performed in 2004 and 2005 revealed that "inappropriate users have access to the structured finance folder" in which the valuation models were kept by

---

[583] The Examiner was informed that only Hatch and maybe Licata could understand the VBA routines in these models. Despite this limitation, no effort was made by New Century to have Licata review the models or to identify someone outside the Secondary Marketing Department who could provide adequate "third-party" validation of the relevant securitization models.

the Secondary Marketing Department. This meant that unauthorized personnel could access the models and change the inputs and assumptions. The Examiner did not perform a forensic analysis of whether unauthorized changes to the inputs or assumptions were made over the relevant period. In addition, the Examiner is not aware of any evidence suggesting that such unauthorized changes were made. Nonetheless, the Examiner notes that the absence of strong security controls in this area could have had a significant adverse impact on the accuracy of New Century's financial statements given the sensitivity of the models to input and assumption changes.

### e.    Lack of Effective Controls for Reviewing and Approving Modifications to Assumptions Used in Valuation Models

According to the written narratives developed by New Century as part of the SOX review process, and the documentation created by KPMG following its SOX walkthroughs, the ALCO was responsible for reviewing and approving any changes to the prepayment and loss assumptions in the valuation models. In practice, however, with the exception of the discount rate assumption, Licata decided if and when to make such assumption changes and there was no documented review or sign-off by ALCO on all assumption changes. The Examiner learned that during the 2006 SOX audit, KPMG repeatedly requested copies of the ALCO meeting minutes to verify that review and approval of the assumptions occurred (as stated in the narratives). However, KPMG never received these minutes. In an e-mail exchange initiated by Polk on November 16, 2006, Kenneally, Hatch, Sanchez, and Licata (among others) recognized that the ALCO meeting minutes did not reference any discussion of approving the assumptions for New Century's residual interest valuations. On December 11, 2006, KPMG attempted to obtain copies of the minutes from Kenneally's office. Kenneally told his assistant that he "would rather delay KPMG a little bit, because the minutes need some work." Upon learning that KPMG already had copied some of the minutes, Kenneally wrote "Actually, we will be fine. We lost the right minutes.... Please don't give them October either." KPMG repeated its requests throughout January, February and March 2007. Kenneally instructed his staff to invent excuses explaining the delay. Ultimately the minutes were never provided to KPMG because Kenneally specifically prevented their release.

Every month, Secondary Marketing analysts responsible for operating the models would roll the models forward with actual data, determine if prepayment and loss assumption changes were necessary based on any divergence between actual and projected performance, and then

discuss any proposed assumption changes with Licata, who exercised final decision-making authority. According to both Hatch and Mullins, Licata did not believe in making such assumption changes every month in response to deviations between actual and projected performance, but only would make changes after a clear trend had been established over several months.

The lack of any written policies and procedures for when to make changes in the prepayment and loss assumptions, and the lack of any review outside of the Secondary Marketing Department for decisions about the propriety of such assumption changes, facilitated Secondary Marketing's unilateral decision to stop making such assumption changes to the pre-2003 securitization models in early 2006. At a minimum, written policies and procedures providing thresholds for assumption changes and mandating a formal review process would have ensured additional vetting of the decision to stop updating the assumptions. Thus, the lack of formal policies and procedures gave the Secondary Marketing Department personnel the latitude to decide unilaterally not to update the pre-payment and loss assumptions as frequently as was necessary in 2005 and 2006. Therefore, the lack of effective controls in connection with the assumptions used in the models most likely prevented New Century from detecting residual valuation errors that had a material impact on its financial statements.

### f.    Lack of Effective Controls Relating to Clean-Up Calls

New Century also had no written policies and procedures in place to determine whether and when to exercise its optional termination rights when the collateral in a securitization fell below the "clean-up call" threshold (typically 10%). All of the residual interest valuation models used by New Century assumed that each securitization would be collapsed when the collateral reached the 10% clean-up call threshold. However, in practice, New Century routinely pushed out the collapse date in its models after reaching the threshold. New Century did not develop any written documentation explaining the rationale for such changes in the clean-up call assumption, and Secondary Marketing personnel in charge of the models had unfettered discretion to determine when to push out the call dates without review by the Securitization Committee or any other group within New Century. Licata explained to the Examiner that there was "no thought process" involved and that New Century would just push out the termination date if it was not ready to collapse a security that had fallen below the 10% or other applicable threshold. This lack of controls enabled New Century to engage in a practice which New

Century ultimately concluded (as part of the 2005 restatement) was unsupported and therefore was inconsistent with GAAP.

### 4.   Allowance for Loan Losses

A year-over-year review of the SOX deficiency listing reveals that New Century never adopted adequate written documentation of its methodology and assumptions for determining the ALL provision.   The ALL is not a transactional balance, but rather a judgmental estimate. Therefore, it is important to have strong internal controls in this area.   In addition to the documentation deficiencies, the ALL provision was not consistently reviewed and approved by the appropriate individuals within the organization.   In 2004, KPMG noted the following significant deficiencies relative to ALL and communicated them to New Century through a formal letter:

- "Management neglected to create adequate documentation evidencing the appropriate application of GAAP in certain areas.   These areas included the allowance for loan loss methodology and rationale…"
- "Management neglected to create adequate documentation supporting data inputs for Secondary Marketing's calculation of residual values and the loss curves used in determining the allowance for loan losses…."

During the 2005 SOX audit, KPMG's workpapers indicate that the ALL methodology deficiency persisted.   However, this deficiency was viewed as inconsequential by KPMG.   There is no explanation for why the ALL documentation deficiency was reported as a significant deficiency in 2004 and was deemed inconsequential in 2005.   In its December 2006 deficiency listing, KPMG observed that New Century still lacked a "documented/written policy detailing the Allowance for Loan Loss methodology."

In its March 2007 draft SOX memorandum, prepared after the February restatement announcement, KPMG concluded that, when aggregated, the ALL deficiencies likely constituted a material weakness. KPMG specifically noted the following:

> At the end of 2006 the Company had a loss provision of approximately $204.5 million.  Given the materiality of the provision and the high degree of subjectivity in estimating an adequate ALL, and the above deficiencies identified by Management – i.e. [lack of] proper documentation describing its methodology and assumptions, lack of evidence of review of the gain/loss calculation for a sample securitized deal, we determined that we would not rely upon the Company's [internal controls] in contemplation of the extent of our substantive audit procedures.  We also determined that specialist involvement would be necessary.

Earlier in the 2006 audit, KPMG's engagement team requested assistance from KPMG's FRM practice. A draft memorandum from a FRM specialist dated December 2006 for the period ending May 31, 2006 listed the above deficiencies, and stated that "[c]ompared to other industry participants in mortgage lending that both develop securitization net loss assumptions and ALL balances, [New Century] does not use or apply industry best practice modeling methods. [New Century's] net loss estimates are based upon static vectors that are unresponsive to changes in delinquency and environmental factors."

The Examiner finds it difficult to believe that the substantial control deficiencies with the ALL noted in 2006, which are similar to deficiencies noted in 2004, were remediated, documented and tested in 2005, and then subsequently became deficient again in 2006. The Examiner therefore concludes that Management did not sufficiently test and evaluate the severity of, and KPMG did not sufficiently review, the ALL controls during the 2005 SOX audit.

### 5.    Mortgage Servicing Rights

Neither Management nor KPMG identified any internal control deficiencies in the process for valuation of MSR assets for year-end 2004 and 2005. However, in its 2006 draft deficiency memorandum, KPMG identified a significant deficiency relating to the MSR valuation. Specifically, KPMG noted the following:

> The Company does not have a valuation model to support its MSR valuation assessment for lower of cost or market determination for servicing assets. The Company calculates its MSR valuation by taking a fixed [basis point] multiple of total unpaid collateral balance. During 2006, the Company used 70 [basis points] as its valuation multiple based on the amount recorded by the Company for loan sales made to Carrington. The Company does not have documentation to support the valuation used.

The Examiner is unaware of any material changes that occurred in the MSR valuation process between 2004 and 2006. In 2005, KPMG's SFG specialists raised issues with the engagement team relating to the MSR valuation process during the substantive audit. However, the engagement team declined to raise these issues with Management. These same concerns surfaced during the 2006 SOX 404 audit, in the form of the significant deficiency noted above. New Century's failure to develop an MSR valuation model appears to be a potentially significant deficiency that was not remedied despite concerns expressed by KPMG.

### 6.    Hedging

Over a three year period, beginning in 2004 and ending in 2006, KPMG noted a number of deficiencies related to the Company's internal controls for the hedging and derivatives process. Many of the deficiencies related to the Company's inadequate documentation of its hedging policies and procedures, including the lack of a comprehensive policy, inadequate designation documentation at inception and inadequate documentation in support of effectiveness testing of its hedging relationships. In addition to the documentation issues, KPMG noted a number of other deficiencies related to the Company's reconciliation procedures, spreadsheet controls, valuation procedures and approval procedures. The non-documentation deficiencies reflected ineffective controls in procedures used to calculate the financial impact of hedging and derivative transactions. In addition, the documentation deficiencies raised concerns about the adequacy of New Century's control environmental in the hedging area particularly since FAS 133 requires considerable documentation to substantiate the use of hedge accounting treatment.

For the year ended December 31, 2004, four non-documentation deficiencies (out of a total of six deficiencies) were identified by KPMG in the hedging area. For the year ended December 31, 2005, six of the 12 deficiencies identified related to non-documentation issues. For the year ended December 31, 2006, eight of 11 deficiencies identified by KPMG during the incomplete SOX review related to non-documentation issues. For example, KPMG noted in 2006 that New Century lacked proper segregation of duties with respect to derivative trading (one individual could enter, verify, and confirm a trade).[584]

Based on the Examiner's review of the available data, it does not appear that New Century placed much emphasis on improving its controls related to the hedging and derivatives process. To the contrary, the control deficiencies appear to have worsened over time, both in volume and significance. As noted above, KPMG identified a significant deficiency with New Century's controls in the hedging area in 2004 and 2005. Both of these significant deficiencies resulted in audit adjustments. During its incomplete 2006 SOX audit, KPMG reached the preliminary conclusion that there was a material weakness in new Century's hedging control

---

[584] The higher number of deficiencies noted by KPMG in 2005 and 2006 may be explained by KPMG's use of SFG specialists to review internal controls in the hedging and derivatives area in 2005 and 2006 (but not 2004). The 2006 findings also reflect a SOX review of RBC mortgages activities for the first time.

environment as a result of the aggregation of deficiencies (many of which were recurring from prior years).

### 7. Information Technology Controls

A typical SOX 404 review includes a detailed internal control evaluation of all information systems that impact financial reporting. The information technology controls are categorized as either Information Technology General Controls ("ITGC") or application controls. ITGC describe the general overall IT controls for key systems such as backup and disaster recovery, whereas application controls concern specific IT applications or processes (*e.g.*, evaluating whether a particular calculation is functioning as it should).

KPMG engaged its Information Resources Management ("IRM") specialists to conduct the SOX review of New Century's information systems. The impression obtained by the Examiner from IRM's findings is consistent with the results of the other SOX process areas. New Century failed to establish specific policies and procedures to prevent unauthorized access to systems, models and sensitive documents. These control deficiencies suggest a permissive environment that was not sufficiently designed to prevent or detect the possibility of fraud or other accounting errors. For instance, New Century neglected to adequately secure sensitive information within the shared Accounting Department folder. Accordingly, unauthorized individuals could access, and potentially manipulate or misuse, such data. This deficiency existed in 2004, 2005, and 2006.

The Examiner is not aware of any evidence establishing that unauthorized access to New Century's information systems enabled the perpetration of fraud or other intentional misconduct. However, the recurrence of such basic security deficiencies is illustrative of New Century's general disregard for ensuring the adequacy of internal controls over financial reporting.

### 8. Company-Level Controls

Company-level controls include those "controls that exist at the company-level often hav[ing] a pervasive impact on controls at the process, transaction, or application level."[585] Examples of company-level controls include items that apply to all locations and business units within the company, such as codes of conduct, company policies and procedures and the assignment of authority within the company. Professional standards encourage auditors to evaluate the effectiveness of these company-level controls at the outset of an audit so that the

---

[585] AS 2, paragraph 52.

results may inform the auditors in planning for the review of process-level and transaction-level controls.

In 2004, neither Management nor KPMG identified any company-level control deficiencies at New Century. In 2005, Management noted five company-level control deficiencies which were all reported to have been remediated by year-end. These control deficiencies were: (i) lack of evidence of acknowledgement by certain employees of the Company's Code of Conduct; (ii) lack of an Internal Audit charter; (iii) lack of evidence of the date Senior Management signed the quarterly financial certifications; (iv) lack of updated policies and procedures in the Company's online policy library; and (v) lack of a consistent policy regarding documenting Executive Management Committee meeting minutes.

The SOX review for 2006 was not completed. However, the deficiency list provided by Management following all of its testing included two control deficiencies relating to company-level controls: (i) lack of evidence of acknowledgement by certain employees of the Company's Code of Conduct; and (ii) lack of updated policies and procedures on the Company's intranet. Both of these control deficiencies existed in 2005 and were reported by New Century to have been remediated by year-end 2005. Although KPMG did not identify any company-level control weaknesses in its draft internal control deficiency letter relating to its incomplete 2006 SOX review, Management's detection of these same two deficiencies in 2006 reinforces the Examiner's conclusion that New Century did not take its remediation obligations as seriously as it should have done.

## IX. DISCLOSURE CONTROLS

### A. Executive Summary

SOX and SEC rules mandate that SEC reporting companies maintain "disclosure controls and procedures" to ensure that information required to be disclosed in SEC filings is processed and reported in a timely and accurate manner. As a result of the accounting issues that led New Century to determine that a financial restatement was necessary, New Century concluded in February 2007 that its disclosure controls and procedures had probably been ineffective.

In its February 7, 2007 Form 8-K filed with the SEC, New Century stated after revealing the repurchase reserve accounting errors:

The registrant is evaluating the impact of this matter on its internal control over financial reporting and disclosure controls and procedures for the applicable periods. The registrant expects to conclude that the errors leading to these restatements constitute material weaknesses in its internal control over financial reporting for the year ended December 31, 2006.

Because of this statement by the Company, the Examiner believed it appropriate to perform at least a cursory review of New Century's disclosure controls and procedures, and the implementation of those controls and procedures. This section of the Final Report discusses the Examiner's findings and conclusions with regard to New Century's disclosure controls and procedures. It also describes New Century's processes for drafting earning releases and discusses particular problematic disclosures that were identified.

New Century did not have formal structures or processes that were designed to elicit potential disclosure issues from various parts of the organization for consideration by the Disclosure Committee. Rather, New Century relied on members of the Disclosure Committee to identify issues within their areas of responsibility. Without such formalized processes, there was an increased risk that important questions would not be brought up for discussion. This may have contributed to the fact that in July 2006, only days before the Disclosure Committee met on July 31, Accounting Department personnel determined to change the Company's longstanding practice of marking repurchased loans to their estimated fair market value, and the issue does not appear to have been discussed by the Disclosure Committee. As discussed in this Final Report, this change in accounting methodology resulted in an overstatement of New Century's assets at June 30, 2006 by $81.8 million.

- 416 -

In addition, while the Examiner did not review and analyze all of New Century's statements in public filings and press releases, he identified several problematic statements in connection with his analysis of other accounting and financial reporting issues. Certain of those mistakes are identified in the discussion that follows. Given these errors, there may very well be other misstatements, omissions or inaccuracies in New Century's public filings and press releases.

## B.    New Century's Disclosure Controls and Procedures

### 1.    Background: The Requirement to Maintain Disclosure Controls and Procedures

Rules 13a-15 and 15d-15 under the Securities Exchange Act of 1934 (promulgated pursuant to Section 302 of SOX) generally require SEC reporting companies to maintain "disclosure controls and procedures," defined as "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files ... is recorded, processed, summarized, and reported, within the time periods specified in the Commission's rules and forms." Disclosure controls and procedures include controls and procedures "designed to ensure that information required to be disclosed ... is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers ... as appropriate to allow timely decisions regarding required disclosure."[586]

Exchange Act Rules 13a-14 and 15d-14 require principal executive officers and principal financial officers of reporting companies to certify in Form 10-K and Form 10-Q filings, among other things, (1) that they have designed, or caused to be designed, disclosure controls and procedures to ensure that material information is made known to them by others within the issuer, and (2) that they have evaluated the effectiveness of the issuer's disclosure controls and procedures and presented their conclusions regarding such effectiveness as of the end of the reporting period.

---

[586] There is substantial overlap between disclosure controls and procedures and internal controls over financial reporting. In particular, disclosure controls and procedures include those components of internal controls over financial reporting that provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP. *Final Rule: Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports,* Securities Act Release No. 33-8238 (June 5, 2003). This section of the Examiner's Final Report discusses New Century's disclosure controls and procedures other than internal controls over financial reporting. Internal controls are discussed in Section ___ of in this Final Report..

The SEC does not require that issuers adopt any particular types of disclosure controls and procedures. The only guidance the SEC has issued is the recommendation that issuers form a disclosure committee.[587] Further, secondary sources generally agree that there is no "one size fits all" standard for disclosure controls and procedures. The nature of the issuer's business, operations, and management structure are all factors that will determine what types of disclosure controls and procedures are appropriate for any particular company.

### 2.    Deficiencies in New Century's Disclosure Controls and Procedures

Beginning with the third quarter of 2004, New Century's Form 10-Q and Form 10-K filings included the required officer certifications regarding disclosure controls and procedures, as well as a representation that the responsible officers had evaluated New Century's disclosure controls and procedures and found them to be "effective." These representations were premised on a quarterly review of the Company's disclosure controls and procedures undertaken by New Century's Disclosure Committee.[588]

However, at a meeting held on February 22, 2007, the Disclosure Committee concluded for the first time that New Century's disclosure controls and procedures were not effective for the period ending December 31, 2006. The reason for this determination was the material weaknesses in internal control over financial reporting that prompted the need for the February 7, 2007 restatement announcement. The material weaknesses identified were: (1) the failure to maintain effective controls over the interpretation and application of the accounting literature relating to the Company's critical accounting policies (specifically as to the calculation of repurchase reserves); and (2) the failure to maintain effective controls to provide reasonable assurances that the Company collected, analyzed, and used information relating to outstanding repurchase claims when establishing the allowance for repurchase losses.

New Century maintained some of the types of disclosure controls and procedures that have become common for issuers in response to SOX and SEC rules. These included (1) a

---

[587] "[W]e are not requiring any particular procedures for conducting the required review and evaluation. Instead, we expect each issuer to develop a process that is consistent with its business and internal management and supervisory practices. We do recommend, however, that, if it has not already done so, an issuer create a committee with responsibility for considering the materiality of information and determining disclosure obligations on a timely basis. ... [S]uch a committee would report to senior management, including the principal executive and financial officers, who bear express responsibility for designing, establishing, maintaining, reviewing and evaluating the issuer's Disclosure controls and procedures." *Certification of Disclosure in Companies' Quarterly and Annual Reports,* Securities Act Release No. 33-8124 (Aug. 28, 2002).

[588] The members of the Disclosure Committee included many members of Senior Management.

Disclosure Committee, (2) a requirement that certain senior officers execute "mini-certifications" to support the required certifications of the principal executive and principal financial officers, and (3) the use of written Time and Responsibility Schedules ("T&R Schedules") in connection with the preparation of quarterly SEC filings and earnings releases.

The Disclosure Committee had a broad mandate to gather information that could potentially require disclosure, including financial, business, and legal information; to examine the information collected to determine what disclosures were required; to prepare the disclosure reports in draft form; to cause the draft disclosure reports to be reviewed by outside auditors and attorneys, when appropriate; to make certain that the information was accurate; and to formally report the state of the Company's disclosures controls and procedures during the reporting period to the Chairman, President and CEO and CFO. The Disclosure Committee met quarterly in connection with the filing of the Company's Forms 10-Q and the 10-K.

Mini-certifications were signed each quarter by more than a dozen officers at the Vice President level and above to support the certifications of the principal executive and principal financial officers required under Section 302 of SOX. Mini-certifications were tailored to each individual's areas of substantive responsibility, but generally included language stating that the certifier was not aware of any material misstatements or omissions in the filing and had disclosed to the CEO and CFO any deficiencies or material weaknesses in the Company's internal control over financial reporting. T&R Schedules set forth the deadlines for preparing various drafts of filings and earnings releases, and the persons responsible for drafting and review. These included KPMG and the Company's outside counsel, OMM. A "First Working Group" prepared several drafts of the Form 10-Q and Form 10-K filings, the quarterly earnings releases, and the investor conference call slide presentations before elevating them to the "Second Working Group" (comprised of Disclosure Committee members plus the First Working Group), which also went through a number of drafts.

Notwithstanding the presence of the Disclosure Committee, mini-certifications, and T&R Schedules, the Examiner finds that there were deficiencies in New Century's disclosure controls and procedures. For example, New Century did not maintain a comprehensive written set of disclosure controls and procedures that documented the entire process and the responsibilities at each step by various groups and individuals. A comprehensive set of written procedures is one

of the tools that some commentators have recommended to help ensure a consistent and reliable disclosure process.

Further, New Century did not have any formal or structured processes for identifying and raising to the Disclosure Committee potential disclosure issues from throughout the Company. Theologides informed the Examiner that mini-certifications were provided by a broad group of personnel who could be expected to have extensive knowledge of their various subject areas. Nonetheless, New Century did not have additional mechanisms such as disclosure questionnaires, meetings with employees at various levels or written reports to the Disclosure Committee by persons with subject matter responsibilities. Without such structured processes, New Century appears principally to have relied on members of the Disclosure Committee themselves to bring potential issues that they were aware of to the attention of the Committee as a whole.

### C.  The Drafting Process

#### 1.  New Century Management

Witnesses and document review confirmed that Forms 10-K and 10-Q and earnings releases underwent multiple drafts and review by a wide range of Management, substantially as reflected on the T&R schedules. Earnings releases were discussed at group working sessions, with the Investor Relations Department responsible for preparing and revising the drafts.

"Messaging" appears to have been a principal focus of Senior Management in crafting earnings releases. Witnesses described the practice of holding an initial meeting to begin discussing the earnings release, shortly after the end of the quarter, at which the financial data were discussed and the message or themes around the numbers developed.

By mid 2006, executives seemed to be concerned with how to offer the market a positive Company message in the wake of negative financial information. For example, in a memorandum to the Board of Directors dated July 19, 2006, Dodge addressed New Century's second quarter earnings, and outlined "Second Quarter Messaging Considerations:"

> Recognizing the irony of strong results but a sizable earnings miss, we should consider ways to make the negative news of an earnings miss as innocuous as possible. A favorable outcome would be analyst notes with neutral to upbeat tones, recognizing that the timing of loan sales is the key driver of the miss and everything else is good news. … We have asked the Legal Department to consider our ability to:

> \* Have a pre-conference call, or some other form of communication, with the analysts, drawing their attention to the sales timing as the key difference between consensus and our results
>
> \* Do the call earlier to minimize the time that trading occurs without our additional color
>
> \* Do the release and call after market closes in the afternoon, eliminating trading before we can provide color.

Similarly, on October 12, 2006, in connection with the anticipated third quarter of 2006 earnings release, Cole wrote to Gotschall:

> As we focus on our investor message for the 3Q call, I have this grave concern we will not give investors encouragement to hold our stock, let alone go out and buy more. Over the years, especially during the tough times, it was usually Ed and Bob that crafted and polished the investor message and marketed our story.

### 2.    Roles of KPMG and Outside Legal Counsel

T&R Schedules and other documents reviewed reflect that KPMG and OMM reviewed multiple drafts of New Century's periodic reports and earnings releases. KPMG and OMM did not attend New Century's drafting sessions for earnings releases, but provided comments on drafts, respectively, to in-house accounting and legal personnel. OMM was heavily involved in discussions concerning what risk factors to include in the Company's filings and in drafting risk factor disclosures.

### D.    Particular Disclosure Issues

### 1.    New Century's Backlog of Repurchase Claims

As discussed in more detail in Section VI. of this Final Report, by the end of 2005 New Century appears to have had a backlog of approximately $143 million in repurchase claims that had not been taken into account in the Company's repurchase reserve calculation.    That repurchase claim backlog grew significantly through the first three quarters of 2006. An internal New Century report dated August 30, 2006 showed a backlog of approximately $170 million in unresolved repurchase claims that were more than two months old at that time, and of those, approximately $75 million were more than six months old. Other internal New Century reports prepared in the fall of 2006 showed the following repurchase backlog amounts at the end of each month from January through September 2006:

| 2006 | Internally Reported Month-end Backlog |
|------|---------------------------------------|
| January | $209.1 |
| February | $278.3 |
| March | $281.6 |
| April | $243.1 |
| May | $225.8 |
| June | $199.1 |
| July | $212.8 |
| August | $335.2 |
| September | $399.8[589] |

The Company's Form 10-K for 2005 and each of its Forms 10-Q for the first three quarters of 2006 reports the following under the heading "Allowance for Repurchase Losses," after describing generally what the allowance for repurchase losses was: "Generally, repurchases are required within 90 days from the date the loans are sold. Occasionally, we may repurchase loans after 90 days have elapsed." (Emphasis added.) There is no mention in these filings of the repurchase backlog. In light of the large, and growing, size of the repurchase backlog during this time period, it was misleading for New Century to report that it "occasionally" repurchased loans "after 90 days [had] elapsed" from the time of the loan sale – without at least also disclosing the existence and amount of the repurchase claims in the backlog that were more than 90 days old.

New Century's disclosure regarding the allowance for repurchase losses in the Form 10-K for 2005 also reports: "As of December 31, 2005 and December 31, 2004, the repurchase allowance totaled $7.0 million and $6.3 million, respectively. Approximately $10.7 billion and $8.3 billion of loans were subject to repurchase, representing loans sold during the fourth quarter of 2005 and the fourth quarter of 2004, respectively." (Emphasis added.) The Form 10-Q filings for the first three quarters of 2006 have similar language that discloses the amount of the repurchase reserve for each period, but the Form 10-Q filings do not include the language about "representing loans sold" during the just-ended quarter.

In light of the repurchase backlog that existed at the end of 2005, it was misleading for New Century to report, as it did in the highlighted language in the paragraph above, that the

---

[589] The Examiner notes that three internal New Century reports that are dated before the Company's November 9, 2006 filing of its Form 10-Q for the third quarter of 2006 showed that the amount of the repurchase backlog continued to grow extremely rapidly, rising to $545.1 million as of October 26, 2006.

amount of loans subject to repurchase "represent[ed] loans sold" during the just-ended quarter. In fact, New Century's August 2006 internal report regarding the repurchase backlog shows that there were more than $38 million of loans in the backlog that, as of August 2006, were more than 12 months old, meaning that those loans had been sold sometime before August 2005, which was obviously before the start of the fourth quarter of 2005. Thus, the statement in the Form 10-K for 2005 that the loans subject to repurchase atyear-end2005 "represent[ed] loans sold during the fourth quarter of 2005" was neither complete nor accurate.

   This inaccurate Form 10-K disclosure is all the more difficult to comprehend in light of the fact that New Century's Form 10-Q for the third quarter of 2005, filed just four months before the Form 10-K for 2005 was filed, contained the following language regarding the amount of the repurchase allowance and what it represented: "As of September 30, 2005 and December 31, 2004, the repurchase allowance totaled $5.9 million and $6.3 million, respectively, and approximately $10.0 billion and $8.3 billion of loans, respectively, were subject to repurchase, generally representing loans sold during the prior quarter." The use of "generally" in this disclosure, a word that was not used in this part of the Form 10-K for 2005, arguably makes this a more accurate disclosure in light of the repurchase backlog, even though it cannot be said to enhance the disclosure of information about the backlog. It is not clear why New Century did not continue with the use of "generally" in this part of the repurchase allowance disclosure in its Form 10-K for 2005.[590]

   In summary, New Century's failure to disclose the existence and amount of the repurchase backlog through the third quarter of 2006 is troubling. The Examiner believes that the existence and amount of the backlog during this time period was information that was necessary to make the information that was disclosed about the allowance for repurchase losses not misleading.

## 2.    September 8, 2006 Press Release Regarding Loan Production

   On September 8, 2006, New Century issued a press release announcing August loan production volume. The release included the following quote attributed to Morrice:

   We believe our strict underwriting guidelines, skilled risk management and servicing teams and enhanced fraud detection tools have resulted in lower early payment default and repurchase rates than many of our peers. While we have seen

---

[590] The use of "generally" in the Form 10-Q for the third quarter of 2005 may also indicate that New Century was aware at that time of the existence of a repurchase claim backlog.

an increase in early payment defaults from 2005 levels as a result of the macro-economic environment, the *increase has been modest.* (emphasis added)

Prior to the date of this release, at 8:50 p.m. on September 7, Cloyd reported in an e-mail to Morrice and Dodge that "we got our teeth kicked in with regard to repurchase requests in Aug. and thus far in September."[591] Morrice responded at 9:56 p.m.: "How can we find out about this just hours after we send a positive press release about this and after sending a positive report to the Board?" Cloyd's e-mail attached a Repurchase Claims Summary spreadsheet that showed 656 repurchase claims resulting from early payment defaults filed in August and the first week of September 2006 on loans totaling $130.8 million, compared with just 285 claims filed during all of 2005 on loans totaling $22.2 million. Although the September 8 press release was likely transmitted outside New Century for purposes of distribution to the public prior to the time that Cloyd sent his e-mail to Morrice and Dodge, the announcement could have been retrieved before it was released. However, no one at New Century took any steps to do so.

In any event, the increase in EPD was hardly "modest." In all of 2005, EPD had ranged from a low of 4.47% in March to a high of 9.24% in December. By contrast, in January through August 2006, EPD ranged from a low of 7.76% in March to a high of 13.42% in August, with July EPD rates being 12.85%. Accordingly, the statement in the press release that the rise in EPD had been modest was utterly without basis.

The Examiner observes that this faulty disclosure relating to the quality of New Century's loans is similar to other questionable loan quality disclosures in New Century's periodic SEC filings. For example, New Century represented in its Forms 10-K for 2004 and 2005 that regardless of document type, New Century designed its underwriting standards and quality assurance standards to make sure that loan quality was consistent and met its guidelines, even when New Century originated stated document loans as opposed to full document loans. This statement is not supportable. First, as noted previously, New Century's Quality Assurance program was not held in high esteem until it was reconstituted and the program was outsourced in September 2005 for nine months. Any suggestion of reliance on the New Century Quality Assurance program is questionable. More important, in October 2004, a New Century employee who regularly compiled statistics on the performance of New Century products stated: "We know that Stated Income loans do not perform as well as Full Doc loans." Then, in early 2006,

---

[591] All times are Pacific time.

this same employee prepared for Management a document entitled 2005 Delinquencies, which set forth in detail the many ways in which stated document loans performed far worse than full document loans. In the summary of the document, he stated:

> Stated Income loans perform worse than Full Doc loans
>
> . . .
>
> Stated Income\80/20 loans with one borrower have terrible
>
> performance relative to other loans in the same FICO band.

There appears, therefore, to be no justifiable basis for the statement in the Form 10-K for 2004.

Similarly, in the Form 10-K for 2005, the following statements appear:

> "Our loan origination standards and procedures are designed to
>
> produce high quality loans."[592]
>
> "We adhere to high origination standards in order to sell our loan
>
> products in the secondary mortgage market."[593]

The Examiner questions these assertions, which together suggest that New Century in 2005 originated high quality loans. In fact, as previously set forth in Section V. of this Final Report, New Century did not produce "high quality" loans or have "high origination standards."

### 3. Combination of Allowance for Loan Losses and Valuation Allowance on Real Estate Owned in the 2006 Third Quarter Earnings Release

New Century's earnings release for the third quarter of 2006 reported that at September 30, "the allowance for losses on mortgage loans held for investment and real estate owned was $239.4 million," representing 1.68% of the unpaid principal balance of the loan portfolio. This was the first time the Company had combined the loan loss allowance and the real estate valuation allowance in its earnings presentation. Previous earnings releases had described only the loan loss allowance. Thus, for example, the second quarter 2006 earnings release reported that the allowance for losses on loans held for investment was $209.9 million (1.31% of the portfolio). In the third quarter, the loan loss allowance by itself declined to $1.96 million (1.36% of the portfolio), but combining that figure with the valuation allowance for real estate owned had the effect of showing a larger number -- $239.4 million. Notwithstanding the presentation in

---

[592] Form 10-K for 2005 at 8.

[593] *Id.* at 21.

- 425 -

the earnings release, the loan loss allowance and the real estate valuation allowance were broken out and reported separately in the Form 10-Q for the third quarter of 2006.

Dodge determined to combine the two figures in the third quarter earnings release. Dodge told the Examiner that her intent was to provide the investment community with a more complete picture of the company's reserves. She explained that when mortgages defaulted and property was foreclosed upon, the loan loss reserve was charged, and the asset was reclassified as real estate owned, with a separate real estate valuation allowance established.[594] Thus, although the Company's loan loss reserve by itself declined when there was a default, the allowance for real estate owned increased. Dodge related that she believed it was more accurate to report the two reserves together so that investors could see the cumulative change. However, on the third quarter conference call, in response to a question from an analyst about New Century's "margin of safety" on loss expectations, Dodge specifically referenced the $240 million figure as the "allowance for loan losses."

Both Kenneally and KPMG told Dodge that combining the two numbers violated GAAP. This explains why the Company's Form 10-Q for the third quarter of 2006, unlike the earnings release, reported the loan loss allowance and the real estate valuation allowance separately. However, Dodge advised the Examiner that the earnings release was vetted with KPMG, and that KPMG understood the Company's reasons for combining the loan loss reserve and the real estate valuation allowance in the release. The documents produced to the Examiner reflect that KPMG was closely involved in reviewing drafts of the third quarter earnings release. Multiple drafts were sent to KPMG, and on some drafts handwritten notes indicate that KPMG specifically reviewed the portions of the drafts (text and/or table and footnote) that relate to this issue.

### 4.    Mortgage Servicing Rights

As noted in Section VI., New Century made at least two mistakes in its accounting for MSRs. In addition to the accounting deficiencies, the Company also inaccurately disclosed in its financial statements its initial computation of fair value of its MSRs, its amortization methodology and its impairment review. The MSRs disclosures suggested that the accounting was in compliance with GAAP when that was not true. Both New Century and the KPMG

---

[594] Real estate acquired through foreclosure was recorded at the lower of cost or estimated fair value, net of an allowance for estimated selling costs.

engagement team knew that the Company's accounting practices for MSRs were different than those disclosed in public filings.

## X.    AUDIT COMMITTEE AND THE INTERNAL AUDIT DEPARTMENT

### A.    Introduction

The Audit Committee of the Board of Directors plays a critical role in the governance of any public company.  The Audit Committee should be comprised of independent Board members (some of whom have financial expertise), should retain independent auditors and should work with both the independent auditors and the Internal Audit Department to monitor a company's financial statements, accounting systems, financial projections, financial disclosures, risks and systems of internal controls.  In other words, the Audit Committee should act as an independent bulwark on behalf of shareholders.

From May 2005 through February 2007, the New Century Audit Committee ("Audit Committee") was comprised of four independent Directors:  Michael Sachs, Richard Zona, Marilyn Alexander and Donald Lange, with Sachs serving as chair of the Audit Committee.  In addition, two other independent Directors played a key role in the activities of the New Century Board of Directors ("Board"):  Fredric Forster served as the lead independent Director and David Einhorn was an independent Director who was active on the Board of Directors and the Finance Committee once he joined the Board in spring 2006.

The Examiner acknowledges that the independent Directors of the Audit Committee were capable individuals who approached their role with a sense of responsibility.  The Audit Committee also turned to others for assistance, including KMPG for financial issues and the Internal Audit Department for operational issues.  The Examiner also acknowledges that the Audit Committee worked within the context of decisions made by New Century's Board. Moreover, beginning in 2006, the efforts of the Audit Committee were augmented by the activities of the Finance Committee, a committee of the Board which was established to focus on the Company's financial forecasting and the format of internal financial reporting.  Sachs, Zona, Einhorn and Alexander were members of the Finance Committee.

Fundamental to effective action by any Audit Committee is a monitoring process whereby operational and financial issues are discovered, analyzed and addressed, and remedial policies or procedures are implemented to ensure that financial and operational failures are prevented, or do not reoccur.  The Internal Audit Department of New Century ("Internal Audit") was relied upon by the Audit Committee as a key component in gathering information about New Century operations, as well as identifying and analyzing certain areas of operational risk

within the Company. In particular, Internal Audit was to operate pursuant to internal audit "best practices," as set forth in New Century's Charter for Internal Audit, dated September 20, 2005.[595]

The Audit Committee was active from May 2005 to the close of 2006. During this time, the Audit Committee met 21 times, either in person or by telephone. Moreover, the Audit Committee undertook significant activities in analyzing the ramifications of strategic decisions, the structure of management, reviewing financial reports, loan quality issues, and addressing other operational concerns. Nevertheless, the Examiner finds that the Audit Committee was deficient in at least the following areas:

1.       The Audit Committee did not ensure that Management conducted an adequate analysis of entity-wide risk;

2.       The Audit Committee did not ensure that key operational risks were addressed;

3.       The Audit Committee did not give sustained attention to loan quality until 2006; and

4.       The Audit Committee did not adequately supervise or make effective use of Internal Audit.

Internal Audit was led by Zalle, a well-qualified Internal Audit professional. Zalle hired qualified staff, and the personnel of Internal Audit seemed to pursue their responsibilities diligently and professionally. Moreover, consistent with sound practices, Internal Audit reported to the Audit Committee, developed a risk-based ranking of issues, typically provided written audit reports to the Audit Committee and developed a procedure to monitor recommendations for improvements. Internal Audit made valuable contributions to the governance and operations of New Century by preparing a significant number of audit reports, and in the process, identified issues concerning loan quality, regulatory compliance, loan servicing and loan appraisals. Nevertheless, the Examiner also finds at least the following significant deficiencies with Internal Audit:

- Internal Audit did not perform a thorough assessment of entity-wide risk;
- Internal Audit did not identify and examine certain areas of operational risk; and
- Internal Audit did not address internal control over financial reporting risk.

---

[595] The September 2005 Charter specifically states that the Director of Internal Audit is to "apply 'best practice' audit techniques required to accomplish audit objectives."

### B.    The Role of the Audit Committee and Internal Audit

#### 1.    The Role of the Audit Committee

Under best practices for corporate governance, all public companies must have an audit committee, or the entire Board will be deemed to function as the committee.[596]  In addition, the NYSE requires every listed company to establish and maintain "an audit committee that satisfies" the statutory standards relating to audit committees, as outlined in 15 U.S.C. § 78j-1(m).[597]  In terms of structure, each audit committee member must be independent, which means that the member may not receive fees from the company for any consulting, advisory or other services, and may not be affiliated with either the company or its subsidiaries in any capacity other than as a director.[598]    As a matter of best practices, an audit committee should be responsible for:

- The appointment, compensation and oversight of auditors, including resolution of any disagreements between management and the auditors;

- The establishment of procedures for receiving and addressing complaints, including anonymous submissions, concerning accounting, internal control, or auditing matters;

- Developing and supervising an internal audit function; and

- Engaging independent counsel or other advisors. [599]

These undertakings provide the structure for the substantive duties within the purview of the audit committee.

The audit committee has a broad range of duties, including financial analysis, review of financial reports, and ensuring that a company's risks are adequately addressed by company management.  Indeed, under the broad topic of risk assessment and risk management, the audit

---

[596] *See* 17 C.F.R. § 229.304(a)(1)(iii) (2005); *see also Principles of Corporate Governance: Analysis and Recommendations*, Part III, § 3.05 (A.L.I. 2005); Business Roundtable, *Principles of Corporate Governance* at 17-20 (Nov. 2005).

[597] N.Y.S.E. Listed Company Manual § 303A.06.

[598] *See* 15 U.S.C. § 78j-1(m)(3) (2006); *see also* N.Y.S.E. Listed Company Manual § 303A.07; *Principles of Corporate Governance: Analysis and Recommendations*, Part III, § 3.05 (A.L.I. 2005).

[599] *See* 15 U.S.C. § 78j-l(m). *See also* 17 C.F.R. § 240.10A-3(b)(2)-(5) (2006); N.Y.S.E. Listed Company Manual § 303A.07(c)(iii) & (d); *Corporate Governance: Law and Practice* § 9.04 (MB 2007); Business Roundtable, *Principles of Corporate Governance* at 17-20 (Nov. 2005).

committee should address internal control assessment, external auditor oversight, the effective use of internal auditing, and financial accuracy.[600]

### a.    The Audit Committee and Risk Management

Risk to an enterprise can exist in many circumstances and is not just inherent in financial reports, operational activities and regulatory compliance.  Risk lies in each of these areas, but risk can lie outside such traditional categories, such as where operational components intersect.  For New Century, such risks were most noteworthy in the increasingly high risk loan products that New Century originated, as reported on in Section V. of this Final Report.  As a result, best practices for corporate governance dictate that the audit committee guide an entity-wide risk management process.

Senior management should assess and manage a company's exposure to risk, but as a best practice, the audit committee should develop guidelines and policies to govern and monitor the process by which risk is addressed and managed.  For example, the audit committee should discuss a company's major risk exposures and the steps management has taken to monitor and control such exposures. [601]   Moreover, under the supervision of the audit committee, internal audit should provide assurance to the audit committee as to the effectiveness of a company's entity-wide risk management program.

### b.    The Audit Committee and the Financial Reporting Process

One of the audit committee's primary responsibilities is to monitor and oversee a company's financial reporting process.  As part of this oversight, the audit committee must review and discuss with management and the external auditor the company's annual and quarterly financial statements, including the company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."[602]  In addition, the audit committee is required to review, prior to issuance, the company's earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies.[603]

---

[600] *See* N.Y.S.E. Listed Company Manual § 303A.07(c)(iii) & (d); *see also* Business Roundtable, *Principles of Corporate Governance* 17-20 (Nov. 2005).

[601] *See* N.Y.S.E. Listed Company Manual § 303A.07(c)(iii)(D); Business Roundtable, *Principles of Corporate Governance* 17-20 (Nov. 2005; *Corporate Governance: Law And Practice* § 9.04 (2)(i)(iii)(MB 2007).

[602] N.Y.S.E. Listed Company Manual § 303A.07(c)(iii)(B).

[603] N.Y.S.E. Listed Company Manual § 303A.07(c)(iii)(C) and N.Y.S.E. commentary thereon.

As part of its review of the company's financial statements and earnings releases, the audit committee is required to review and assess the company's critical accounting policies, the quality of accounting judgments and estimates made by management, and any material communications between the external auditor and management.[604]  In other words, the audit committee is required to go beyond a simple cursory review of the financial information and actually delve into the background documentation and decisions that led to the financial amounts being reported.[605]  The external auditor should provide the audit committee with a report about the accounting principles used and the effects of any alternative accounting treatments discussed with management.

### c.    The Audit Committee and Control Assessment

The audit committee must have an understanding of management's process for assessing internal controls, applicable regulatory controls, and the risks faced by the organization.  A process should be in place for assessing and reporting on financial controls, and the controls in place throughout the enterprise.  As part of this process, there should be discussions on control impacts, oversight monitoring, review of the external auditor's audit assessment plan and its opinions, and review of the controls in place for fraud identification.[606]

### d.    The Audit Committee and SOX

Pursuant to Section 404 of SOX ("SOX 404") and the related SEC regulations, a company must include in its annual report filed with the SEC an internal control report that (1) states management is responsible for "establishing and maintaining an adequate internal control structure and procedures for financial reporting" and (2) contains an assessment of the effectiveness of the internal control structure and procedures for financial reporting.[607]  In

---

[604] See 17 C.F.R. § 210.2-07 (2006); *see also* Statement on Auditing Standards No. 61, *Communications with Audit Committees*, ("SAS 61"), as amended.  SAS 61 requires external auditors to communicate certain matters to the audit committee, including: (1) methods used to account for significant unusual transactions and the effect of significant accounting policies in controversial or emerging areas for which there is no authoritative guidance or consensus; (2) judgments and estimates that affect the financial statements, including the process used by management in formulating its accounting estimates and the basis for the auditor's conclusions regarding the reasonableness of those estimates; (3) disagreements with management over the application of accounting principles, the basis for management's accounting estimates, and the disclosures in the financial statements; and (4) serious difficulties encountered by the auditors in dealing with management related to the performance of the audit.

[605] See 17 C.F.R. § 210.2-07(a) (2006); *see also* N.Y.S.E. Listed Manual § 303A.07(c)(iii)(H) and the N.Y.S.E. commentary thereon.

[606] *See* Business Roundtable, *Principles of Corporate Governance* 17-20 (Nov. 2005).

[607] 15 U.S.C. § 7262(a) (2006).

addition, an external auditing firm that prepares or issues the audit report for the company must "attest to, and report on, the assessment made by the management" for the company.[608]

Neither the statute nor the regulations specifically assign any role to the audit committee in connection with the SOX 404 annual internal control assessment and attestation. However, the SEC, in adopting its regulations, stated that "[t]he preparation of the management report on internal control over financial reporting will likely involve multiple parties, including senior management, internal auditors, in-house counsel, outside counsel, and audit committee members."[609] Accordingly, given the audit committee's oversight responsibilities regarding a company's internal control structure, the audit committee should take "a significant interest in reviewing the annual Section 404 management internal control assessment, the auditor's attestation, and the process by which both were arrived at."[610] This review should include presentations by management and the external auditor at audit committee meetings regarding the SOX 404 internal control report and attestation.[611]

## 2.    The Role of Internal Audit

Although federal statutes do not specifically require companies to maintain an internal audit function, the NYSE requires each listed company to maintain an internal audit function to provide management and the audit committee ongoing assessments of the company's risk management process and system of internal control.[612] Moreover, recognized best practices for corporate governance provide that the establishment of an internal audit function is a key element to an effective internal control system.[613] In particular, the internal audit function

---

[608] 15 U.S.C. § 7262(b) (2006).

[609] SEC Release Nos. 33-8238, 34-47986, "Management Reports on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports" § V(B) (June 5, 2003).

[610] *Corporate Governance: Law and Practice* § 9.04 (2)(v) (MB 2007).

[611] *Id.*

[612] N.Y.S.E. Listed Company Manual § 303A.07(d) and N.Y.S.E. commentary thereon.

[613] In 1987, the widely circulated "Treadway Report" addressed responsibility with respect to a company's operational activity and financial statements. *See Report of the National Commission on Fraudulent Financial Reporting* (Oct. 1, 1987) ("Treadway Report"). As noted in the Treadway Report, internal audit has a critical role with respect to the financial and operating environment:

> One key practice [to reduce the incidence of fraudulent financial reporting] is the board of director's establishment of an informed, vigilant and effective audit committee to oversee the company's financial reporting process. Another is establishing and maintaining an internal audit function.

*Id.* (emphasis supplied).

provides assurance to the audit committee that the internal controls in place are sufficient to mitigate the risks, the governance processes are adequate and organizational objectives are met.[614] The audit committee and internal audit are interdependent, with internal audit providing objective opinions, information, support and education to the audit committee, and the audit committee providing validation and oversight to internal audit.

Internal audit's primary role is to evaluate and report on the effectiveness of the company's risk management, control, and governance processes.[615] To accomplish this primary role, the internal audit department should identify and evaluate the company's "significant exposures to risk and contribut[e] to the improvement of risk management and control systems."[616] This means that internal audit should "evaluate risk exposures relating to the organization's governance, operations, and information systems regarding the:

- Reliability and integrity of financial and operational information;
- Effectiveness and efficiency of operations;
- Safeguarding of assets; [and]
- Compliance with laws, regulations, and contracts."[617]

Furthermore, internal audit should continually evaluate "the adequacy and effectiveness of controls encompassing the organization's governance, operations, and information systems."[618]

### a.    Internal Audit and Risk Assessment

Best internal audit practices require that internal audit evaluate the risk exposures relating to an organization's governance, operations and information systems, specifically addressing the reliability and integrity of financial and operational information and the effectiveness and efficiency of operations.[619]    In 2004, the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") published the *Enterprise Risk Management – Integrated Framework* ("ERM Framework") to assist companies to effectively identify, assess, and manage

---

[614] *See generally*, N.Y.S.E. Listed Company Manual § 303A.07(d) and N.Y.S.E. commentary thereon.

[615] *See* N.Y.S.E. Listed Company Manual § 303A.07(d) and N.Y.S.E. commentary thereon; *see also* The Institute of Internal Auditors, *Standards for the Professional Practice of Internal Auditing* 2100 (hereinafter "IIA Professional Standards").

[616] IIA Professional Standards 2110.

[617] IIA Professional Standards 2110.A2.

[618] IIA Professional Standards 2120.A1.

[619] IIA Professional Standards 2110.A1-A2.

a company's risk.[620]   COSO defines the ERM Framework as "a process, effected by an entity's board of directors, management and other personnel, applied in a strategy setting and across the enterprise, designed to identify potential events that may affect the entity, and [designed to] manage risks to be within its risk appetite, [and]... provide reasonable assurance regarding the achievement of entity objectives."[621]

In conjunction with COSO's ERM Framework, IIA has published guidance for internal auditors regarding the role of internal auditing under the ERM Framework.[622]   IIA provides that internal audit's "core role with regard to ERM is to provide objective assurance to the board on the effectiveness of an organization's ERM activities to help ensure key business risks are being managed appropriately and that the system of internal control is operating effectively."[623] According to IIA, the core internal auditing roles in regard to ERM are:

- Giving assurance on risk management processes;
- Giving assurance that risks are correctly evaluated;
- Evaluating risk management processes;
- Evaluating the reporting of key risks; and
- Reviewing the management of key risks.[624]

In fulfilling its ERM role, the internal audit analysis of risk must be rigorous and thorough, including risk analysis, risk ranking, and risk investigation. The IIA Professional Standards provide mandatory guidance related to internal audit's role with regard to the risk assessment, requiring that "the internal audit activity's plan ... should be based on a risk assessment, undertaken at least annually."[625]   Furthermore, the development of the plan must be followed by independent audits that are presented to the audit committee, with provisions for monitoring and remediation of deficiencies, if necessary.[626]

---

[620] See COSO, *Enterprise Risk Management – Integrated Framework, Executive Summary* (September 2004).

[621] *Id.* at p. 2.

[622] IIA, *The Role of Internal Auditing in Enterprise-Wide Risk Management,* (September 29, 2004).

[623] *Id.*

[624] *Id.*

[625] IIA Professional Standards 2010.A1.

[626] IIA Professional Standards 2010-2110 *Corporate Gtovernance: Law And Practice* § 14.03 (MB 2007).

### b.    Internal Audit Role in Financial Auditing

The internal audit role in assessing risk is not just limited to operational or regulatory risk. The internal audit function also has a specific role in auditing financial processes and financial reporting. For example, the IIA Professional Standards specifically provide that the internal audit department should evaluate the risk exposures related to the "reliability and integrity of financial and operational information."[627] Moreover, the IIA Professional Standards provide that the internal audit department also should evaluate the "adequacy and effectiveness of controls," including an appropriate review related to the "reliability and integrity of financial and operational information."[628] The review of the financial information by internal audit often includes "reviewing the financial statements for errors, misstatements, and potential fraud."[629]

### 3.    Audit Committee Oversight of Internal Audit

Because internal audit reports to the audit committee, and because internal audit is critical to the ability of the audit committee to fulfill its responsibilities, the audit committee must closely supervise internal audit. Recognizing this need, the IIA has offered the following guidance on the reporting relationship between internal audit and the audit committee:

1.    Role and responsibility [of internal audit] should be defined in a charter approved by the audit committee;

2.    The Chief Audit Executive ("CAE") is selected by the audit committee;

3.    The CAE should meet regularly with the audit committee and obtain approval for audit plans and budget from the committee or other governing body;

4.    The CAE should report functionally to the audit committee and administratively to the CEO; and

5.    The CAE should communicate with external audit regularly.[630]

This means that the audit committee must evaluate internal audit and ensure that internal audit is fully identifying risk, fully investigating risk and clearly communicating its findings.[631]

---

[627] IIA Professional Standards 2110.A2.

[628] IIA Professional Standards 2120.A1.

[629] *Corporate Governance: Law and Practice* § 14.03 (MB 2007).

[630] IIA Practice Advisory 1110-2: Chief Audit Executive Reporting Lines, and Practice Advisory 2060-2: Relationship with the Audit Committee.

[631] *See generally*, N.Y.S.E. Listed Company Manual § 303A.07.

### C.    The Charters of the New Century Audit Committee and Internal Audit

Both the Audit Committee and the Internal Audit Department of New Century had charters that generally reflected best practices.

#### 1.    The Audit Committee Charter

The Audit Committee Charter ("Committee Charter") for New Century instructed the Audit Committee to assist the Board in:

- oversight of: (i) the accounting and financial reporting processes of the Company and audits of its financial statements, including the integrity of the Company's financial statements, financial reporting process and systems of internal controls; (ii) compliance with the Company's policies and procedures and with legal and regulatory requirements applicable to the Company; (iii) the outside auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and outside auditors;

- providing an avenue of communications among the outside auditor, Management, the Internal Auditing Department and the Board;

- reviewing areas of potential significant financial risk to the Company; and

- preparing a report as required by the proxy rules of the SEC to be included in the Company's annual proxy statement.

Pursuant to the Committee Charter, the Audit Committee was also directed to discuss and review the Company's Annual Reports on Form 10-K, the Company's Quarterly Reports on Form 10-Q, the information on earnings press releases and financial information provided to analysts and rating agencies.

The Committee Charter also identified the following specific items that "the Committee shall review":

- (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

- (ii) analyses prepared by management and/or the outside auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and

- (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

Moreover, it was recognized that the Audit Committee "shall discuss guidelines and policies of the Company with respect to risk assessment and risk management."

- 437 -

The Audit Committee also had clear responsibilities in connection with Internal Audit reports:

The Audit Committee is to <u>review significant reports</u> prepared by the <u>internal audit department</u>, together with management's response thereto and <u>follow-up to those reports</u>. In the event that such reports concern any significant exposures, fraud or regulatory noncompliance, this review should include reconsideration of the internal controls that should be strengthened to reduce the risk of a similar event in the future.

Further, the Committee Charter also provided that the Audit Committee shall:

Instruct the <u>outside auditor</u> to report to the Committee on all <u>critical accounting policies</u> and practices of the Company, all <u>alternative treatments of financial</u> information within generally accepted accounting principles that have been discussed with management, <u>ramifications of the use of such alternative disclosures</u> and treatments and the treatment preferred by the outside auditor, and other materials written communications between the outside auditor and management, such as any management letter or schedule of unadjusted differences, and shall discuss the same with the outside auditors and management....

### 2.    The Internal Audit Charter

Until September 2005, Internal Audit was governed by the tacit adoption of a charter that Zalle had used with a company where he was previously employed. The broad role of Internal Audit in addressing risk eventually was memorialized in New Century's Internal Audit Charter ("Internal Audit Charter"), which was developed and approved by the Audit Committee in September 2005. The Internal Audit Charter stated:

The mission of Corporate Internal Audit is to provide independent, objective assurance and consulting services designed to add value and improve the company's operations.    It helps the company accomplish its objectives by bringing a <u>systematic, disciplined approach to evaluate and improve the effectiveness of risk management, control and governance processes</u>.

To accomplish this mission, Internal Audit's scope of work was "to determine whether the company's risk management, control and governance processes, as designed and represented by management, [were]... adequate and functioning."    Moreover, as part of that determination, Internal Audit was to ensure:

- Risks are appropriately identified and managed;
- Interaction with internal governance groups as well as the Governance and Audit Committees of the Board, occurs as needed;
- Significant financial, managerial, and operating information is accurate, reliable and timely;

- 438 -

- Quality and continuous improvements are fostered in the Company's control processes.

Thus, company risk and financial information are specifically placed within the ambit of Internal Audit and its functions, and the Internal Audit Charter stated that "the Internal Auditing Division will meet or exceed the *International Standards for the Professional Practice of Internal Auditing* of the Institute of Internal Auditors."

## D.    Audit Committee Actions

The Audit Committee clearly appreciated the fact that New Century was in a risky business.    The Audit Committee's activities between May 2005 and February 2007 must therefore be reviewed against that backdrop.

### 1.    Audit Committee Awareness of New Century Risks

Members of the Audit Committee were aware of the high risks associated with New Century's business plan as well as the subprime industry as a whole.    Based on fluctuations in the financial and housing markets from the Russian credit crisis of 1998 and interest rate increases in 2001, members of the Audit Committee told the Examiner that they knew that external events and interest rate changes could significantly impact New Century's business. New Century's external auditor, KPMG, informed the Audit Committee that KPMG viewed the subprime business as risky and charged New Century higher fees because of this view.

The Audit Committee understood there were many significant risks in the subprime industry, including: (1) credit risk – a risk of loan defaults, foreclosures, etc.; (2) funding risk – a risk that warehouse lenders would not provide funds to New Century to originate new loans; (3) liquidity risk – a risk that New Century would not have sufficient available cash to operate; (4) regulatory risk – the risk that government action could make New Century's business plan moot; (5) predatory lending risk – the risk of government actions or attacks by community action groups against certain lending practices; (6) interest rate risk – the risk that fluctuations in interest rates could compress margins; (7) concentration risk – the risk associated with relying on investment banks for everything, *i.e.* providing funding to originate loans and finding investors to buy loans; and (8) competition risk – the risk of increased competition, which could lower the rates and fees received by New Century, because of the relative ease to enter the subprime business.

The Audit Committee specifically recognized credit risk as a significant risk facing New Century.    Moreover, the Audit Committee understood that credit risk impacted many facets of

- 439 -

the Company, for if investment banks perceive that the Company has credit risk that was too high, then warehouse lenders would reduce funding, which would affect the Company's ability to originate new loans. Moreover, the Audit Committee recognized that if credit risk was perceived as too high, investment banks would be hesitant to buy the Company's loans, which could cause the price for whole loans to be reduced and the inventory held for sale to age. Further risks included higher kickouts of loans sought to be sold, repurchase claims of loans sold, and more frequent margin calls on warehouse credit lines. For New Century, credit risk also was imbedded in the portfolio of loans it maintained on its balance sheet, which could result in an increase in loan defaults and foreclosures.

The Audit Committee also recognized that low liquidity was a significant risk, as the Company needed to preserve adequate liquidity and have sound inventory management. Low liquidity put the Company at risk on several fronts, including the risk that the Company would not be able to meet margin calls on warehouse lines, and that the Company would have limited flexibility to buy back stock, hold loans, or take other actions.

Finally, the Audit Committee realized that there was risk to under-reserving as to repurchase reserves and loan loss reserves, and constantly reviewed at Audit Committee meetings all reserves requiring judgment. Audit Committee minutes in 2005-2006 are replete with Audit Committee inquiries as to reserve matters.

### 2.    Audit Committee Oversight of the External Auditor

To fulfill its responsibilities, the Audit Committee monitored the performance of KPMG in several different respects. The Audit Committee invited KPMG to attend and participate in each Audit Committee meeting, and to be present for the entire length of each meeting. Moreover, the Audit Committee received an engagement letter from KPMG that defined the scope of its work. In addition, KPMG would report to the Audit Committee on its annual audit and quarterly reviews of New Century's financials, as well as provide SAS 61 reports.

During the Audit Committee meetings, KPMG routinely would discuss its review of the significant accounting "judgment areas" as part of its report regarding New Century's financials. KPMG's discussion usually focused upon the accounting results in the valuation of residuals and related hedging, allowance for loan losses, repurchase reserves and taxes. KPMG would typically report that it reviewed these areas and that KPMG believed that the accounts were reasonably stated. KPMG would then respond to questions from the Audit Committee, such as

- 440 -

the degree of conservatism in the calculations. The Audit Committee was active in asking KPMG questions and discussing issues that KPMG might raise.

In exercising its oversight responsibilities, the Audit Committee questioned the decision by KPMG to replace Kinsella with Donovan as the partner in charge of the New Century account in early 2005. Kinsella was well respected by the Audit Committee and was viewed as a valued resource. Donovan, on the other hand, was new to KPMG, and concerns arose within the Audit Committee whether Donovan had a sufficient understanding of the issues facing the subprime industry, and whether he had sufficient stature within KPMG.

Although requested by the Audit Committee, KPMG refused to provide another engagement partner and the Audit Committee briefly considered replacing KPMG in early 2005. Ultimately, the Audit Committee determined that a switch to a new accounting firm would be tremendously disruptive and would send a bad signal to its lenders. Accordingly, KPMG continued to be retained by the Audit Committee.

Another action by KPMG that caused concern within the Audit Committee involved a hedge accounting issue identified by KPMG in March 2006. During its presentation relating to the 2005 audit at the March 2, 2006 Audit Committee meeting, KPMG indicated that concerns had arisen relating to New Century's documentation for its hedge accounting. KPMG stated that if the concerns were not satisfied, New Century would be required to make a large adjustment. Two days after the March 2, 2006 Audit Committee meeting, Management informed the Audit Committee that KPMG had signed off on the hedge accounting issue. Nevertheless, the very day that New Century's Form 10-K was to be filed, the Audit Committee members learned that KPMG thought the hedge accounting documentation was inadequate and would not sign off on New Century's financials. In particular, Management informed the Audit Committee that "an internal disagreement appeared to have arisen within KPMG between one of the review partners and its Department of Professional Practice and the audit review team the evening before [New Century] was required to file its Form 10-K." Later in the day, KPMG finally decided that the documentation was sufficient and New Century's Form 10-K was filed timely.

The hedge accounting issue of March 2006 shook the Audit Committee's confidence in KPMG. As a result, the Audit Committee decided to defer its decision on retaining its 2006 external auditor until a determination was reached that KPMG could properly serve in this role. Eventually, the Audit Committee decided to retain KPMG. The Audit Committee's decision was

made after KPMG conducted an internal review and outlined steps to avoid a similar situation in the future. Moreover, the Audit Committee felt that any change in the external auditor would be extremely disruptive, especially considering the recent move to make Morrice the new CEO and the then on-going search for a new CFO.

### 3. Audit Committee Review of Accounting Results in Areas Calling for Management Judgment

Consistent with best practices and the requirements of the NYSE Listed Company Manual, the Audit Committee reviewed and assessed New Century's accounting results in areas calling for Management judgment, including: (1) the valuation of residuals and related hedging; (2) allowance for loan losses; (3) repurchase reserves; and (4) taxes. On a regular basis, the Audit Committee would question both Management and KPMG regarding these areas, which are based, in large part, on the judgment of Management and the New Century Accounting staff. These discussions with Management and KPMG took place in 2005 and 2006 at regular Audit Committee meetings and separate executive sessions.

The Audit Committee reliance on KPMG to assist in these accounting areas requiring management judgment is reflected in the KPMG quarterly reviews of New Century's financials and the KPMG SAS 61 reports. KPMG would report that it reviewed these accounting areas and that KPMG believed that the accounts were reasonably stated. Indeed, KPMG never reported any disagreements with the Company's Management as part of its SAS 61 Reports.

The Audit Committee held executive sessions with KPMG that included the following inquiries: (1) did KPMG review the residuals and are they valued correctly; (2) were the reserves, particularly the loan loss and repurchase reserves, reviewed and are they reasonable; (3) did KPMG observe anything that the Audit Committee should be concerned about; and (4) did New Century's personnel cooperate during KPMG's review. The reason for this procedure was because the Audit Committee wanted KPMG's opinion about reserves without Company personnel present; *i.e.*, to be open with the Audit Committee without the Company's influence. To the recollection of the members of the Audit Committee, KPMG never raised any items that required Audit Committee action.

### a. Repurchase Reserves

The repurchase reserve was a major issue to the Audit Committee because the level of the repurchase reserve could have a significant impact on earnings. Furthermore, if repurchase reserves were increased, loan buyers might interpret this increase as an indication that the quality

- 442 -

of New Century's loans was poor. Repurchase reserves could also impact lender perceptions as to the Company, and increasing reserves could be a sign of potential underwriting problems to lenders.

The Audit Committee asked KPMG on a quarterly basis whether the Company's repurchase reserves were adequate, and the Audit Committee always received confirmation from KPMG that the reserves were adequate and reasonably stated. The Audit Committee also inquired of Senior Management as to repurchase reserves, but received no indication from either Dodge or Kenneally that there had been a change in the methodology used to calculate the repurchase reserves. Furthermore, all members of the Audit Committee expected KPMG to inform the Audit Committee of any change in the methodology of calculating the reserve. KPMG never disclosed the change in accounting methods related to the calculation of the repurchase reserve to the Audit Committee.

According to the Audit Committee minutes, Kenneally informed the Audit Committee at its January 31, 2007 meeting that Management had reviewed its repurchase reserve methodology, "which had changed in the second quarter of 2006, and had concluded that the Corporation's methodology applied in the second quarter was inappropriate." Members of the Audit Committee informed the Examiner that their reaction was one of shock and dismay. The Audit Committee asked Kenneally why the methodology change was not previously disclosed to the Audit Committee. Kenneally responded that it was an "inadvertent oversight." In response to a question, Kenneally further said that KPMG was aware of the methodology change. According to one Audit Committee member, Kenneally looked directly at Kim, who nodded yes. That same Audit Committee member stated that Donovan also confirmed that KPMG was aware of the change in methodology.

### b.    Residual Interests

Similar to repurchase reserves, the Company's residual interests also were a consistent topic of discussion at Audit Committee meetings. Residual interests were considered a highly sensitive area because their valuations were subject to judgments by accounting, and the Audit Committee believed KPMG had the responsibility to review and monitor the assumptions underlying the valuation calculations. The Audit Committee would discuss residual interests in depth with the Company's Accounting and Secondary Marketing Departments and KPMG. The

focus of these discussions generally was on the discount rate, the loss assumption and the prepayment assumption.

The Finance Committee, which included three of the four Audit Committee members, also reviewed and assessed the adequacy of the discount rate used in the residual interests valuations. During the October 16, 2006 Finance Committee meeting, there was a discussion regarding a Residual Discount Rate Analysis prepared by Management and reviewed by KPMG. This rate analysis recommended an increase of the discount rate to 15% from 12% (non-NIMS rate) and 14% (NIMS rate). Zona recalled that the Finance Committee discussed the discount rate at length, and the discussion included a reiteration of New Century's residual interest valuation methodology, as well as assurances that the then current discount rates were within GAAP. Contrary to the recommendation of Management, the discount rate was not raised "at that time," and that "for the short-term the corporation would continue to apply" the 12% and 14% discount rates.

Zona stated that there were several reasons for this decision. First, the current rate being used by New Century had been disclosed in New Century's filings with the SEC, including New Century's most recent Form 10-Q. In addition, because the significant majority of the residuals were NIMS, the weighted average rate was very close to 14%. This meant that it would only be an increase in the discount rate of one percent. Zona told the Examiner that if the discount rate was in accordance with GAAP but on the low side of the industry range, changing from 14% to 15% was "a change without substance." Zona further explained that many on the Finance Committee thought that a change from 14% to 15% could be misconstrued by investment banks as "too clever by half," and would be viewed by investors as "sleight of hand" to appear conservative. In addition, some members of the Finance Committee, including Zona, wanted to increase the residual discount rate to 20%, or more, and if New Century was going to change, *i.e.* be more conservative, then New Century should make a meaningful change, and that based on the current analysis as of October 2006, Management was not comfortable changing to 20%. Finally, New Century was hiring a new CFO who might, after analyzing New Century's residual interests, decide a different methodology was appropriate or that the residual discount rate should be changed differently. Accordingly, the Finance Committee decided that the Company should not change the discount rate to 15% or any other number at that time.

Einhorn told the Examiner that in connection with this Finance Committee meeting, he understood the 12% and 14% discount rates to be within GAAP. He also recalls that he did not believe the analysis supporting the change to be adequate, and that he perceived the recommendation was proposed by Management to accommodate KPMG. Einhorn recalls that rather than take this small step, which might be followed by other increases, the Finance Committee wanted a more complete analysis, and based on that analysis, the Finance Committee would raise the discount rate to 20%, or to whatever number that was justified by the analysis.

<blockquote>c.    <strong>Other Accounting Issues</strong></blockquote>

In October 2005, Management tried to adjust its loan loss reserves. Specifically, the Company experienced a tax problem that resulted in a reduction in earnings of $0.26/share. Dodge presented a report to the Board of Directors showing that earnings would not be reduced because, as Management argued, the Company was over-reserved in its allowance for loan losses by exactly the same $0.26/share. Zona described Management's argument for reducing the loan loss reserves and his opposing argument in his November 1, 2005 draft resignation letter as follows:

> Management attempted to justify the reversal of loan loss reserves by stating that the delinquency and charge off experience for the portfolio was much better than expected. However, management also knew that there will be losses from hurricanes Katrina, Rita and Wilma, but had not quantified the amount of the losses. (Wells Fargo and B of A have provided $100 million and $50 million, respectively, for hurricane losses).

Zona wrote in his November 1, 2005 draft resignation letter that this "smacks of earnings manipulation." Zona made it clear that he would not approve the financial reports if the adjustment to the loan loss reserve was made, and Management ultimately did not make the adjustment.

<blockquote>4.    <strong>Audit Committee Review of Financial Reports</strong></blockquote>

The Audit Committee reviewed and approved all of the Company's Forms 10-K prior to filing with the SEC. The Audit Committee's approval was in the form of a resolution adopted by the Committee recommending to the Board the inclusion of the audited financial statements in the Company's Form 10-K. The Audit Committee also would approve the Company's Forms 10-Q prior to filing with the SEC. In addition, the Audit Committee reviewed drafts of the Company's earnings releases.

## E. Internal Audit Functions

Zalle joined New Century in November 1999 to develop the Internal Audit function at the Company, and remained the head of Internal Audit until he left the Company in July 2007. He reported to the Audit Committee and his performance reviews were conducted by the Chairman of the Audit Committee. At his hiring, Zalle was told that New Century had decided to develop an internal audit group to add "credibility" in order to be traded on the NYSE. He was further told that New Century needed professional risk assessment to identify the highest areas of risk because of the high risks in the subprime business. Zalle was the only member of the Internal Audit Department in late-1999 and early-2000, so he outsourced much of the internal audit functions to KPMG and E&Y for approximately two years. In 2002, Zalle hired George Arambula, first as a consultant from E&Y, and then as a New Century employee. Arambula was knowledgeable in information technology ("IT"), and was responsible for auditing IT and general corporate office audits. Ron Brown was hired to perform field operations audits and a field audit staff was developed to assist Brown.

All three of the Internal Audit leaders were qualified for their positions. Zalle had held various high-level internal audit positions with financial services companies. Arambula had a Bachelor's degree in Accounting and an IT, and prior to joining New Century, had worked for various financial services companies and E&Y's IT consulting practice. Brown had an extensive background in the financial services industry, as well as many years in mortgage banking, including specific experience in underwriting analysis.

### 1. The Audit Process and Risk Assessment

Zalle started to prepare an audit plan by consulting with Sachs and solicited input from Senior Management as to risk. The discussions with Management as to risk were done at meetings. Zalle did not keep notes or memoranda of the meetings. Once Zalle identified risk-rated areas for audit, he developed audit plans based upon risk level and available resources. Audit plans usually covered a three-year period, and the areas with the highest risk levels were selected for audit in a given year.

After Internal Audit conducted an audit, an audit report was issued explaining the review process, what was found and Internal Audit's opinion as to the adequacy of process controls. The opinion would contain one of the following "bottom-line" conclusions: "satisfactory;" "satisfactory with improvements needed;" "needs improvement;" or "unsatisfactory." Any area

designated "unsatisfactory" or "needs improvement" was identified as high risk for the following year.

When an audit report was issued, copies were typically sent to Management, including the applicable department head responsible for the area being audited, and often to the Audit Committee.    Copies also were available to KPMG.    If any problems were identified, Management in the audited area would be required to respond within three weeks, and the Management responses would go to Senior Management and the Audit Committee.    In the response, Management would have to explain how the problems would be corrected (typically termed "remediation" within the Company), and when the remediation would be completed. Management was responsible for the design and implementation of the remediation and Internal Audit would conduct a follow-up audit to verify that the corrective actions were implemented in a timely and complete manner.

Both Zalle and the Audit Committee viewed financial audits as being outside of the scope of Internal Audit's responsibility.    The Audit Committee delegated to KPMG the responsibility for addressing financial risks and conducting financial audits.    This contradicted the Internal Audit Charter, which identified examination of "financial" risk as a role of Internal Audit.    Zalle stated that although the limitation of Internal Audit to operational areas was not a written policy, there was a broad understanding with the Audit Committee that Internal Audit would not conduct any financial audits.

The areas of risk for Internal Audit review were typically identified by Zalle and reviewed by Sachs, with input from Management and Internal Audit personnel, and approved by the Audit Committee.    One example of input from Internal Audit personnel was a January 16, 2004 e-mail from Brown to Zalle in which Brown urged that the level of field audits increase. This request was made because Brown and his team of field auditors were conducting their own file reviews and "walk-throughs" of loans to make sure the Quality Assessment/Quality Control ("QA/QC") controls were satisfactory.    During this time, Internal Audit found many exceptions to underwriting standard, and concluded that something was "falling apart" in the QA/QC function.    Internal Audit found that loans would get through the QA/QC process, even though the loans had problems with the LTV ratio or the stated income did not look accurate.

In response to the problems discovered by Internal Audit in the QA/QC function, Zalle expanded the scope of the underwriting/loan quality audits in 2005 to include both a compliance

- 447 -

audit and a system of internal control walk-throughs. Zalle designed the 2005 audit program to include the audit of a cross-section sample of eight wholesale processing centers and one retail center. Internal Audit next identified a sample number of loan files per operating center, and then conducted a "walk-through" that involved reviewing the loan origination process from the time the loan first entered the system through loan funding. Internal Audit then conducted testing to ensure that internal controls related to loan applications, such as verifications and exceptions, were handled properly. Internal Audit also looked at underwriting procedures, account manager review/approval, appraisals and funding. The results of the loan quality field audits were dismal. Of the nine branches audited, none were rated satisfactory, seven were rated unsatisfactory and two were rated as needs improvement. This should have been a strong signal to the Audit Committee and Senior Management that significant improvements in loan quality were needed.

Other operational areas of significance did not receive similar attention. For example, Brown also advocated in his January 16, 2004 e-mail that Internal Audit review the Secondary Marketing Department, including "reviewing investor rejects." Investor rejects were called "kickouts" by the due diligence teams, and Zalle acknowledged that a great amount of reliance was placed on investor rejects in addressing loan quality. Zalle also expressed the view that New Century personnel believed that New Century loan quality was good because its kickout rates were reported to be lower than those of competitors. However, Zalle cautioned that these kickout rates did not give a complete picture of loan quality because investors often did not perform extensive due diligence. Although Zalle acknowledged that kickouts provided some sense of loan quality, the area was not the subject of Internal Audit scrutiny. Similarly, the processes of Secondary Marketing with respect to reviewing and processing kickouts and repurchase claims were never audited by Internal Audit.

As part of the risk management effort, E&Y developed an ERM proposed approach for New Century in December 2005 ("ERM Proposed Approach"). The ERM Proposed Approach noted that New Century Senior Management perceived that there were "common gaps in our risk management practices." The ERM Proposed Approach further identified "Liquidity," "Operations/Processes," and "Accounting Policies and Financial Reporting" as risks. E&Y also identified the "Risk of inappropriate processes and controls in the origination (underwriting, funding), secondary, servicing and other operations such as failure to identify, capture, and/or

communicate data in a timely period which does not enable employees to carry out their responsibilities." Zalle conceded to the Examiner that all the areas identified by E&Y were high-risk but Internal Audit never addressed any of them.

## 2.   Audit Committee Supervision

Zalle stated that a quality assurance review of the Internal Audit Department was not conducted during his tenure. In addition, although Zalle received performance reviews from the Chairman of the Audit Committee, the feedback was verbal and vague. Zalle asserted that during his performance evaluations, he was simply told to "keep up the good work" or "you are auditing the right stuff." When asked if written key performance indicators or benchmarks were established to measure his performance, as well as the performance of the Internal Audit Department, Zalle indicated that such benchmarks had not been established. Indeed, both Sachs and Zona conceded to the Examiner that the Audit Committee made no effort to assess whether IIA Professional Standards were met by Internal Audit.

## 3.   SOX

Zalle told the Examiner that Internal Audit had no substantive role in the SOX 404 review because SOX 404 was the responsibility of Management. Zalle stated that Kenneally was the key SOX person and that he brought in E&Y to assist in the SOX 404 review.

Internal Audit's limited role in SOX 404 review was to oversee the timing and implementation of the SOX 404 review and report to the Audit Committee on whether New Century would meet its SOX requirements. Specifically, Internal Audit reviewed the timing and scope of the SOX 404 review to make sure critical control areas were captured within the scope of the review. Internal Audit also monitored whether work was scheduled so that the SOX review could be completed on time.

On a quarterly basis, Zalle signed a certification letter addressed to Cole, Morrice and Dodge listing facts upon which those individuals could rely and determine whether to execute and deliver their SOX 302 certifications. In the certification letter signed by Zalle for the quarter ending September 30, 2006, Zalle certified to the following:

*We have disclosed,*

> All significant deficiencies and material weaknesses in the design or operation of New Century's internal controls over financial reporting which could adversely affect New Century's ability to record, process, summarize and report financial data; and....

a.  During the quarter ended September 30, 2006, there were no changes in New Century's internal control over financial reporting or in other factors that have materially affected, or are reasonably likely to materially affect, New Century's internal control over financial reports, including any corrective actions with regard to significant deficiencies and material weaknesses.

Zalle stated that in order to certify to these statements, he relied on KPMG and the financial management team to be doing their jobs.

## F.    Deficiencies in Audit Committee/Internal Audit

Although the Audit Committee addressed issues concerning inventory, liquidity and management structure, the Audit Committee was deficient in not addressing other issues, including entity-wide risk assessment, operational risk, Internal Audit performance and loan quality.

### 1.    Failure to Engage in Entity-Wide Risk Assessment

The Audit Committee and the other independent Directors were active in identifying certain risks, such as credit risk in New Century's loan portfolio and areas of accounting judgment. Nevertheless, the Audit Committee undertook no effort to ensure that Management undertook comprehensive examination of risks to the Company. The Audit Committee admittedly recognized several areas of risk to the Company, including the concentration risk of relying on a limited number of lenders for all financing, operational issues in secondary marketing, and issues concerning underwriting. The Audit Committee also realized the ramifications that these risks posed the Company. For example, if the lenders did not provide funds through warehouse lines of credit, then the Company could not do business. Similarly, if there was no market to sell loans on the secondary market at appropriate prices, then the Company could face serious issues.

The Audit Committee was aware of the need for entity-wide risk assessment and was provided an Enterprise Risk Management Program Description ("ERM Description"). This ERM Program Description identified risks as including "liquidity," "strategic planning and decision making," "capital management," "operations/process," and "accounting policies and financial reporting." Despite this information and the best practices for an audit committee to ensure an entity-wide risk assessment, the Audit Committee did not ensure that any entity-wide risk assessment program was in place. As a consequence, certain significant risks were not analyzed. For example, neither the Audit Committee nor anyone else addressed funding risk,

and as a result, options were not analyzed and contingency plans were not put in place. In addition, operational issues in Secondary Marketing, such as keeping track of the backlog of pending repurchase claims, were never identified.

Internal Audit also had no consistent and documented examination to identify the risks of the Company, and the risks identified in the E&Y ERM Proposed Approach were never analyzed or monitored by Internal Audit. This failure of Internal Audit and the Audit Committee to ensure that there was a program to analyze risk on an entity-wide basis was contradictory to best practices.

### 2.    Failure to Address Key Operational Risks

One of the consequences of the failure to address entity-wide risks was the failure to analyze certain operational risks. Internal Audit analyzed the Company's operations, and based on that review, developed a three-year audit plan. To develop its plan, Internal Audit obtained input from Management and rated several characteristics (e.g. critical programs, vital systems and significant operations) to derive an overall risk ranking per audit area. The highest ranked areas were presented to the Audit Committee in the three-year audit plan and it generally was approved without any changes.

As a result of this approach, Internal Audit focused on several key operational areas, including underwriting, appraisal, servicing and regulatory compliance. Nevertheless, some critical areas of operational risk were neither identified nor addressed. Notably absent from this list of audit projects was any audit of the Secondary Marketing Department, including Secondary Marketing organization and operations, the processing of reviewing and addressing repurchase claims, the process for deciding what loans to hold in the portfolio, how inventory was handled and the loan quality in inventory. Other operational areas, such as the process of reviewing and addressing kickouts, were identified, but never addressed.

Secondary Marketing was critical to the Company because it both executed loan sales and selected loans to be kept on New Century's balance sheet. Brown had focused on the need to audit Secondary Marketing and kickouts as early as 2004. Zalle acknowledged to the Examiner that Internal Audit should have addressed the repurchase claim process, as well as other areas of Secondary Marketing, including the amount of investor kickouts. The Examiner never received a satisfactory explanation why this did not occur.

The reason these areas were not identified or analyzed is rooted in process flaws inherent in the Internal Audit function and not addressed by the Audit Committee. Based on the number of audit areas that were given similar risk scores between 90 – 100 and the lack of supporting documentation for the development of risk assessment, the Examiner determined that a robust risk assessment framework was not utilized to develop the Company's internal audit plan. In the 2005 audit plan, 77 auditable areas were identified and 45, or 58%, had a risk score of 90 or more. Zalle said that an annual risk plan was provided to the Audit Committee based on his understanding of the business, interviews with Senior Management and KPMG, results of prior audit reports, and determinations whether specific risks were previously audited.

Internal Audit was not making true distinctions as to risk and was not going beyond operational issues that carried over from prior years. This reflects a flaw in the process, and the fact that this flaw was not addressed by the Audit Committee is a significant deficiency. If the Audit Committee had required an entity-wide risk management approach and had Internal Audit followed such an approach, it is possible that critical operational risks would have been identified and addressed.

### 3.    Failure to Assess Financial Risk

In general, Internal Audit did not conduct any financial risk assessment, or develop an annual financial audit plan. The complete reliance by Internal Audit and the Audit Committee on KPMG to address significant deficiencies and material weaknesses in the design and operation of internal controls over financial reporting did not follow industry best practices and guidelines established by the IIA. This also contradicted the express language of the Internal Audit Charter, which specifically stated that the scope of Internal Audit included determining:

> whether the Company's risk management, control, and governance processes, as designed and represented by management, is adequate and functioning to ensure...significant **financial**, managerial, and operating information is accurate, reliable, and timely.

Zalle stated that although he considered some review of financial processes to be part of the scope of Internal Audit, he placed reliance on KPMG's work to address the accuracy of the financial information. This singular focus of Internal Audit on operational issues conflicted with internal audit best practices and the Audit Charter itself. It also may have prevented tracing the control deficiencies back to the financial statements and/or reduced the urgency of timely remediation. Moreover, it reflected a lack of adequate supervision by the Audit Committee.

Indeed, the fact that Internal Audit was not required to be more proactive in financial auditing is especially surprising in light of the fact that the Audit Committee had concerns about KPMG once Donovan became the engagement partner. There is no guarantee that Internal Audit review of financial processes would have identified the accounting deficiencies identified by the Examiner, but the opportunity never existed under the approach adopted by the Audit Committee of limiting Internal Audit to operational issues.

## 4. The Failure of the Audit Committee to Supervise or Make Effective Use of Internal Audit

The Examiner found evidence of lax oversight by the Audit Committee of Internal Audit. The Internal Audit Charter specifically stated that Internal Audit must use best practices and will be held to IIA standards. Nevertheless, the Audit Committee did not require accountability. The first indication of lax oversight was the development of the Internal Audit Charter. Prior to September 2005, the Internal Audit Department operated under the guidelines of an internal audit charter from Zalle's previous employer, i.e., a charter from a different company from the 1990s. Once drafted, the New Century Internal Audit Charter was well crafted and encompassed best practices. However, because the Department operated for so long with no clear guidance, poor practices developed, such as limiting Internal Audit to operational areas and total reliance on KPMG for financial audits.

In addition, the Audit Committee did not monitor whether Internal Audit adhered to the Internal Audit Charter. Internal Audit was "to meet or exceed the International Standards for the Professional Practice of Internal Auditing of the Institute of Internal Auditors," but the Audit Committee admittedly did not examine whether there was adherence to IIA standards. Further, the Audit Committee did not document its evaluation of the performance of the Internal Audit Department or Zalle. In fact, the Audit Committee did not identify specific benchmarks to measure the Internal Audit performance, and Sachs admitted that he did not benchmark Internal Audit against IIA Standards or any other internally-established performance goals.

Another indication of lax oversight was that Internal Audit never undertook an internal quality assurance review. As a result, the Internal Audit Department was in non-compliance with the Internal Audit Charter and the IIA standards. Furthermore, Internal Audit did not establish internal benchmarks and did not communicate with the Audit Committee about these shortcomings. The Audit Committee should have ensured that such performance and quality reviews occurred.

Finally, although the Audit Committee meeting minutes indicate that Internal Audit plans were approved by the Audit Committee, the meeting minutes do not indicate that any detailed discussions took place regarding how the audit plans were developed or how risk areas were identified. Further, no consistent standards or benchmarks were used to:

a.    Identify audit areas included in the risk assessment;

b.    Assign risk ratings of one through 10 within each of the 10 risk categories; and

c.    Identify the audit areas that then would be included in the annual audit plan.

The Audit Committee's failure to systematically supervise Internal Audit meant that there was a gap in identifying the appropriate risks of the Company.

### 5.    Failure to Address Loan Quality Issue

The Audit Committee also contributed to the inattention to loan quality and did not closely oversee the remediation of New Century's poor loan quality. Under best practices for corporate governance, as well as the requirements outlined in the NYSE Listed Company Manual, the Audit Committee was required to discuss the Company's risk assessment guidelines and policies with Management and oversee the process by which risk assessment and remediation were undertaken.[632] With loan quality, however, the Audit Committee downplayed the significance of this risk and did not require Management to implement remediation procedures until 2006. By that time, billions of dollars of suspect loans were on the balance sheet of New Century and sold to investors.

The Audit Committee should have identified and analyzed, along with Management, the material risks facing the Company related to loan quality. In other words, Management, with Audit Committee oversight, should have documented New Century's business objectives and identified the risks that could undermine those objectives, such as the risks related to poor loan quality discussed in Section V. of this Final Report. Internal control processes should have been developed, such as specific policies, procedures and practices, for achieving the business objectives and mitigating risk.

Finally, the Audit Committee should have understood the significant deficiencies and material weaknesses in Management's internal control structure related to loan quality, and held Management accountable for resolving these significant deficiencies and material weaknesses. The Audit Committee identified and recognized the risks to New Century arising from poor loan

---

[632] N.Y.S.E. Listed Company Manual § 303A.07(c)(i)(ii)(D).

quality. Each of the Audit Committee members interviewed by the Examiner acknowledged that poor loan quality would result in an increase, at a minimum, in repurchase requests and kickouts. Moreover, the Audit Committee understood that an increase in repurchase requests and kickouts would place a strain on New Century's liquidity, resulting in an aging inventory and lower profits.

Although the Audit Committee recognized and appreciated the risks caused by poor loan quality, the Audit Committee did not require Management to establish and maintain an adequate internal control structure to minimize these risks. According to Zona, while loan quality had been an issue for the Company for a long time, there were other items of higher priority for the Board and Audit Committee. The Audit Committee felt that, ultimately, the investors who purchased the loans would provide the appropriate feedback as to whether the performance in loan quality was satisfactory. This was not the proper standard.

In 2005, New Century's loan quality problems became clearly evident as Internal Audit conducted loan quality audits in nine branches. Of the nine branches audited, none were satisfactory: seven were rated "unsatisfactory" and two were rated "needs improvement." The branch audits were presented to the Audit Committee, but the Audit Committee did not seem overly concerned about the problems highlighted by the branch audits. Audit Committee members told the Examiner that the problems were basically "paperwork" errors as opposed to an indication of the severity of loan quality problems.

Even when Management established a remediation plan for loan quality in 2006 at the Audit Committee's direction, the Audit Committee failed to (1) require an expedited time frame to remediate the significant deficiencies identified, (2) ensure that Management prioritized the remediation efforts, and (3) adequately verify that the remediation plans were implemented and operating effectively. The Audit Committee's response was simply to instruct Management that loan quality needed to improve and it should "go fix it," without proper verification or follow-up. These matters are reported on in Section V. of this Final Report and will not be repeated here.

## XI.    KPMG

### A.    Introduction

KPMG was the independent auditor for New Century from the Company's founding in 1995 until KPMG resigned in April 2007 soon after the Company filed its Chapter 11 petition. During those 12 years, the engagement was overseen by several different partners with varying degrees of experience in the mortgage banking industry.

In the spring of 2005, a new engagement partner took over the New Century account, and a predominantly new team of auditors was brought on to assist him. The next two years proved to be turbulent.    In March 2006, an eleventh hour disagreement among members of the engagement team threatened New Century's ability to timely file its Form 10-K for 2005, caused significant tension between New Century's Audit Committee and KPMG's engagement team, and nearly cost KPMG the engagement for future audit years.    In February 2007, New Century announced that it needed to restate its financial statements for the first three quarters of 2006.    In April 2007, following New Century's filing of its Chapter 11 petition, KPMG resigned. In May 2007, New Century announced that the Company's audited 2005 financial statements for the year ended December 31, 2005 (hereinafter "2005 year-end financial statements") should no longer be relied upon.

As discussed in Section VII., the Examiner has concluded that the earnings reported in New Century's 2005 year-end financial statements were materially overstated by at least $63.6 million.    In addition, New Century's earnings were materially overstated in its interim financial statements for the first three quarters of 2006 by at least $7.4 million, $75.6 million and $116.4 million, respectively.

The Examiner has compiled an extensive record over the course of the investigation (including interviews, workpapers, e-mails, and other documents) relating to KPMG's annual audits and quarterly reviews of New Century's financial statements in an effort to determine the extent, if any, of KPMG's knowledge of, involvement with, and/or responsibility for these material misstatements in New Century's financial statements.    In addition, the Examiner has sought to determine whether KPMG, in conducting its audits and reviews of New Century's financial statements, performed its work in accordance with applicable professional standards.

As discussed in greater detail below, the Examiner finds that KPMG did not perform its reviews and audits in accordance with professional standards in at least the following respects:

- Certain factors, including KPMG's staffing of the New Century engagement team and its relationship with the client during the applicable periods, increased the risk that KPMG would not detect a material misstatement in the financial statements.

- KPMG failed to exercise due care by providing erroneous advice to New Century that was inconsistent with GAAP regarding the Company's methodology for calculating repurchase reserves and its methodology for calculating lower of cost or market ("LOCOM") adjustments for repurchased loans, and New Century relied on this advice. In addition, KPMG failed to exhibit the appropriate amount of professional skepticism in reviewing the methodology employed by New Century to calculate its repurchase reserve and ignored critical evidence that indicated the methodology was flawed, which resulted in a material understatement of the reserve and overstatement of the Loans Held For Sale ("LHFS") portfolio.

- KPMG failed to criticize New Century's reliance, through 2006, upon outdated and inadequate internally developed models to value residual interests worth hundreds of millions of dollars, even though KPMG's reviews and audits repeatedly detected flaws in those models. In addition, although KPMG specialists frequently questioned the low discount rates that New Century used in those models (which tended to result in inflated valuations of the Company's residual interests), KPMG's engagement team repeatedly acquiesced in the use of those discount rates (which had not been adjusted since mid-2002). Furthermore, the engagement team acquiesced in New Century's continued use of other key assumptions that had been questioned by KPMG specialists and neither the engagement team nor those specialists discovered a critical flaw in another key assumption in the Company's residual interest valuation models.

- KPMG failed to plan its audits and reviews appropriately in light of the inherent and control risks of the engagement, including, among other things, known defects in the control environment and certain aggressive assumptions used as part of New Century's accounting practices.

- KPMG's audits and reviews of other financial accounts at New Century, including the allowance for loan losses, mortgage servicing rights, amortization of loan fees and costs, hedging and goodwill, exhibited a general lack of due care in that the engagement team frequently failed to consider seriously repeated concerns expressed by KPMG specialists, failed to adequately question assumptions, and failed to determine if identified errors occurred in prior periods.

- KPMG's SOX 404 audit failed to uncover material weaknesses and significant internal control deficiencies relating to the repurchase reserve process and did not recognize certain recurring deficiencies that epitomized the weak control environment at New Century.

- The engagement team ignored the weaknesses and deficiencies that the SOX 404 audit revealed with respect to residual interests and did not insist upon adequate remediation of those deficiencies.

- 457 -

The Examiner further concludes that, had KPMG conducted its audits and reviews prudently and in accordance with professional standards, the misstatements included in New Century's financial statements would have been detected long before February 2007.

**B.      Background**

New Century retained KPMG as its independent auditor when the Company was formed in 1995. KPMG served as New Century's independent auditor until April 27, 2007, when KPMG resigned soon after New Century filed for bankruptcy protection. At that time, KPMG had performed a substantial amount of the necessary work in connection with its audit of New Century's financial statements for the year ended December 31, 2006, but KPMG resigned before completing that work and never issued a formal audit opinion relating to those financial statements.

**1.      Scope of Work Performed for New Century**

For each year from 1995 through 2006, KPMG was retained by New Century's Audit Committee to perform the annual audits and quarterly reviews of the financial statements of the Company and its related entities. Specifically, as part of the audit services for 2004 and 2005, KPMG audited and issued reports on New Century's consolidated balance sheets and the related consolidated statements of income, comprehensive income, changes in stockholders' equity and cash flows. In each of those years, KPMG also performed audits of the effectiveness of New Century's internal controls over financial reporting (the SOX 404 audits). In addition, KPMG conducted quarterly reviews of New Century's interim financial statements for each fiscal quarter for 2004 through 2006. During the applicable period, KPMG performed certain other services for New Century relating to, among other things, tax matters for 2004 and 2005, due diligence for the acquisition of RBC in 2005 and Regulation AB.

**2.      Staffing of the New Century Audit Engagements**

Over time, dozens of KPMG personnel were staffed on the New Century account. Each engagement team was led by an audit engagement partner, whose role included overseeing the audit process, serving as the principal client contact and generally making decisions regarding the staffing of the engagement, including the use of KPMG's internal specialists for certain accounting issues. Operating under the audit engagement partner were generally one or more managers who oversaw the engagement team staff and the day-to-day work performed. Additionally, because New Century is a public company, KPMG assigned a "SEC concurring

partner" to every engagement team to review the audit report and certain work performed by the team and to provide a "negative assurance," which is a statement to the effect that nothing has come to KPMG's attention of an adverse nature or character regarding the financial data reviewed. The KPMG audit engagement partner and concurring partner were required to sign-off on KPMG's audit of New Century's financial statements.

Scott Carnahan was the first audit engagement partner. Carnahan knew New Century's founders Brad Morrice, Robert Cole, and Edward Gotschall, as well as Patti Dodge, from their prior employment with Plaza Home Mortgage Corp. Throughout his tenure as audit engagement partner, Carnahan's primary contact at New Century was Gotschall. After a few years, Carnahan transitioned to the SFG, KPMG's internal specialist group that provided consulting services to clients and assistance to KPMG engagement teams relating to certain financial issues, including the proper accounting treatment for securitizations. Until he left KPMG in late 2006, Carnahan continued to provide advice to New Century's engagement team regarding its residual interest valuations.[633]

Beginning in or around 2000, the New Century audit engagement was led by another KPMG partner, Patrick Kinsella. Kinsella was an experienced auditor and had been at KPMG for over 20 years. He was knowledgeable about the mortgage banking industry and was considered an expert on FAS 133, which deals with accounting for derivative instruments and hedging activities. Initially, Kinsella's primary contact at New Century was Gotschall. When Dodge became CFO of New Century, however, she took a more active role in interfacing with KPMG. In 2003, when Dave Kenneally, a former KPMG manager, became New Century's Controller, he became KPMG's primary contact at the Company and he continued in that role until KPMG's resignation in April 2007.

Kinsella remained the KPMG audit engagement partner through the filing of New Century's Form 10-K for 2004 in the first quarter of 2005. Beginning with the first quarter 2005 review, the entire KPMG engagement team changed with the exception of two first-year associates who had participated in the 2004 audit. The senior level members of the new engagement team included John Donovan, the audit engagement partner, Marc Macaulay, the SEC concurring partner, and Mark Kim, the senior manager assigned to the engagement

---

[633] In his interview, Carnahan stated that his "official" end-date was March 31, 2007, but he effectively ceased his work for KPMG in December 2006.

beginning with the second quarter 2005 review. Debbie Biddle, the senior associate on the engagement, primarily focused on the 2005 SOX 404 audit. Over the course of the 2005 interim reviews and year-end audit, as many as ten different junior level associates were utilized.

In addition to being new to the New Century matter, both Donovan and Kim were new to KPMG. Macaulay was new to his position as concurring partner, having been promoted to this position in early 2005. Biddle had just transferred to the Los Angeles office from KPMG in the United Kingdom. The senior members of the core engagement team had varying levels of experience with the mortgage banking industry.

Prior to joining KPMG, Donovan had been a partner at Ernst & Young ("E&Y") since 2002. Before E&Y, Donovan worked at Arthur Andersen for 17 years and was a partner when that firm ceased operations. Although Donovan had many years of experience in public accounting, he did not have substantial experience auditing companies in the mortgage banking industry.

Macaulay became the concurring partner on the New Century engagement in the summer of 2005, only a few months after he was named a concurring partner by KPMG. At the time, he had been a partner for less than three years. Macaulay worked primarily with financial institutions, depository or finance-oriented companies, and leasing companies.

Kim joined KPMG for the second time in May 2005, as a senior manager. Kim had numerous jobs after college, few lasting more than two or three years. During his first tenure with KPMG, as a junior staff accountant, Kim mostly counseled Korean clients doing business in the United States. His subsequent experience elsewhere included working as an accountant in-house at Nissan Motors, working at the accounting firm PricewaterhouseCoopers ("PwC") on engagements involving private companies and companies in the automotive sector, and working at a boutique accounting firm that dealt primarily with private companies in the manufacturing, retail and distribution sectors. Before the New Century engagement, Kim's only experience in the mortgage banking industry was at Encore Credit, a small mortgage lending company, where he worked for three years as assistant controller. Kim left KPMG in April 2007.

Biddle played a major role in coordinating the SOX audit despite having virtually no experience auditing U.S. clients and no prior SOX experience. She did not work on the New Century engagement after the 2005 audit was completed in April 2006. Biddle returned to the U.K. in December 2007.

- 460 -

In addition to the core New Century engagement team, several KPMG specialists were involved in conducting tests for annual audits and quarterly reviews for fiscal years 2004 through 2006. The primary KPMG groups involved were SFG, which reviewed New Century's residual interest valuations, the FDR group, which reviewed New Century's accounting for derivatives and hedging, and the FRM group, which performed testing of models, assumptions, calculations and regression analyses related to the Company's accounting for derivatives and hedging.

Specifically, Carnahan and others in KPMG's SFG consulted with the New Century audit engagement team for the annual audits and quarterly reviews from at least 2004 through 2006. Each quarter, SFG reviewed a small sampling of New Century's residual interest valuation models and advised the engagement team of their conclusions and observations.

KPMG's FDR first became involved in reviewing New Century's derivative and hedging activities in connection with the 2005 audit. John Klinge, an audit partner, and Ray Munoz, an audit manager, were the FDR specialists. Their work for New Century continued through the quarterly reviews in 2006 and the incomplete 2006 audit. Klinge and Munoz were responsible for reviewing the Company's accounting for hedges and derivatives and KPMG's audit testing of those transactions, as opposed to the mathematics of the transactions, which was primarily the responsibility of FRM.

### 3.    KPMG's Audit Reports for 2004 and 2005

KPMG's audit reports of New Century's consolidated financial statements for the years ended December 31, 2004 and December 31, 2005 did not contain any adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.[634] Further, KPMG's audit reports on Management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2004 and 2005 did not contain any adverse opinion or disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.[635]

### C.    Overview of the Relevant Professional Standards

In order to determine whether – or to what extent – KPMG performed adequately its duties as New Century's independent auditor, it is necessary to assess KPMG's audit work in the

---

[634] Form 8-K, Apr. 27, 2007.

[635] *Id.* The Form 8-K notes that KPMG did not include newly acquired RBC Mortgage in its audit of internal control over financial reporting in 2005.

context of applicable professional auditing standards. For audits of public companies, independent auditors such as KPMG are required to comply with the rules of the PCAOB. In addition, PCAOB rules required KPMG to comply with "all applicable auditing and related professional practice standards," including GAAS,[636] in planning, conducting and reporting the results of its audits of New Century's financial statements.[637] KPMG also was required to conduct its reviews of New Century's interim financial statements in accordance with relevant professional standards. Set forth below is a brief overview of the primary standards relevant to the Examiner's assessment of KPMG's audits and reviews of New Century's year-end and interim financial statements.

### 1. GAAS and GAAP

GAAS consist of ten standards as follows:

*General Standards*
1. The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.
2. In all matters relating to the assignment, independence in mental attitude is to be maintained by the auditor or auditors.
3. Due professional care is to be exercised in the performance of the audit and preparation of the report.

*Standards of Field Work*
1. The work is to be adequately planned and assistants, if any, are to be properly supervised.
2. A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.
3. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*
1. The report shall state whether the financial statements are presented in accordance with GAAP.
2. The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.
3. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.
4. The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be

---

[636] Certification of Statements on Auditing Standards, AU § 150.

[637] PCAOB Rule 3100. *See* also PCAOB Rule 3200T (interim rule requiring firms to comply with GAAS unless superseded by the PCAOB). This Section refers both to GAAS and PCAOB rules, as applicable.

> expressed.   When an overall opinion cannot be expressed, the reasons therefore
> should be stated.  In all cases where an auditor's name is associated with financial
> statements, the report should contain a clear-cut indication of the character of the
> auditor's work, if any, and the degree of responsibility the auditor is taking.

GAAS include Statements on Auditing Standards ("SAS") issued by the Auditing Standards Board of the AICPA, which are codified in *AICPA Professional Standards* under the prefix "AU." [638] Pursuant to GAAS, an independent auditor's report must state whether financial statements are presented "in conformity with" GAAP. [639] GAAP is "a technical accounting term that encompasses the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time." [640] Practically speaking, GAAP is a set of accounting rules used to prepare, present and report financial statements.

For financial statements to be presented "in conformity with" GAAP, they must follow "established accounting guidance." [641]   There is a hierarchy of guidance, and statements and interpretations issued by the Financial Accounting Standards Board ("FASB") are one of the most authoritative sources of guidance.    Statements of Financial Accounting Standards ("FAS") issued by the FASB are in the most authoritative category of GAAP, and auditors routinely look to FAS when determining how items should be reported and disclosed in a company's financial statements. [642]

Accountants also may look to other sources of guidance if specific guidance is not contained in FAS. In addition, GAAS instruct that an auditor may follow accounting practices that are "widely recognized as being generally accepted because they represent prevalent practice in a particular industry, or the knowledgeable application to specific circumstances of pronouncements that are generally accepted." [643]   In an industry such as mortgage banking that involves complex technical accounting issues, it is thus important for an independent auditor to be familiar with industry practice.  For example, FAS 65 discusses the aggregation of certain types of loans when evaluating whether they should be reported at the lower of cost or market

---

[638] AU § 150.01.

[639] *Id.*

[640] AU § 411.02.

[641] AU § 411.

[642] Other authorities included in the most authoritative category of GAAP are opinions issued by the Accounting Principles Board, which was dissolved in 1973, and Accounting Research Bulletins issued by the AICPA.

[643] AU § 411.

and provides limited guidance for such aggregation. In the mortgage banking industry, however, aggregation is far more complex than FAS 65 contemplates, and independent auditors often consider industry practices and the interpretation of FAS 65 as applied by financial institutions and other mortgage banking companies when conducting audits and reviews.

## 2.    Audits of Financial Statements

Independent auditors are retained to render an opinion regarding a company's financial statements. Specifically, auditors opine as to the fairness with which financial statements present "in all material respects, [the company's] financial position, results of operations, and its cash flows in conformity with [GAAP]."[644] In the case of a public company, this opinion – or report – is included in the Form 10-K that the company is required to file annually with the SEC.

Management is ultimately responsible for the content of a company's financial statements,[645] and "an auditor is not an insurer and his or her report does not constitute a guarantee."[646] Nonetheless, it is the independent auditor's responsibility to plan and perform the audit such that the auditor obtains reasonable assurance that the financial statements are free of material misstatement whether caused by error or fraud.[647] If a material misstatement is detected in the course of an audit, and management does not correct the misstatement, the independent auditor cannot issue an unqualified ("clean") audit opinion as to the company's financial statements.[648]

### a.    Due Professional Care and Skepticism

Among other things, GAAS requires that the independent auditor exercise "due professional care . . . in the planning and performance of an audit . . . ."[649] In order to exercise due care, an independent auditor must exercise *professional skepticism* – "an attitude that includes a questioning mind and a critical assessment of the audit evidence."[650] The independent

---

[644] AU § 110.01.

[645] AU §§ 110.02 and 110.03.

[646] AU § 230.13.

[647] AU §§ 110.02 and 110.03.

[648] AU § 312.38.

[649] AU § 230.01.

[650] AU § 230.07.

auditor cannot merely rely on a belief that management is honest but instead must obtain "persuasive evidence" to support his or her opinion.[651]

### b.    Proper Planning

GAAS specifically require independent auditors to develop a plan for the audit that is appropriate in light of relevant facts and circumstances such as the complexity of the business and the company's accounting policies and procedures.[652]    The plan must be documented and should be modified as necessary if conditions change.[653]    An independent auditor's planning also depends on the auditor's assessment of audit risk, which is the risk that the financial statements may be materially misstated.[654]    If an independent auditor assesses the risk as high – or higher than assessed in previous audits of a company – the plan must be adjusted accordingly, for example, by assigning more experienced personnel to the audit or conducting more extensive and rigorous testing.[655]    Where the accounting at issue involves estimates, "the risk of material misstatement is generally greater . . . due to the inherent subjectivity in estimating future events and the possibility of using inappropriate data or misapplying appropriate data."[656]

### c.    Obtaining Sufficient Evidence

In order to satisfy the standard of due care, an independent auditor needs to obtain competent and sufficient evidence[657] such that it provides a *reasonable basis* for forming an opinion on the financial statements.[658]    Under the standards governing audit evidence, the "evidence must be both valid and relevant" in order to be "competent."[659]    These concepts embody the notion that certain evidence is more reliable and, thus, ought to be accorded more weight by an auditor. GAAS provide the following specific examples:

---

[651] AU § 230.09.

[652] AU § 311.03.

[653] AU § 311.05.

[654] The concept of materiality is discussed in Section __ of this Final Report.

[655] AU § 312.17.

[656] AU § 312.36.

[657] Evidence can take many forms, such as written confirmation, a contract or information obtained by observation. AU § 326.17.  It also includes the testing of data by "(a) analysis and review, (b) retracing the procedural steps followed in the accounting process, (c) recalculation, and (d) reconciling related types and applications of the same information." AU § 326.19.

[658] AU § 230.11.

[659] AU § 326.21.

- When evidence can be obtained from independent sources outside a company, it provides greater assurance of reliability for an independent audit than evidence secured solely within the company.

- The more effective the internal control, the more assurance it provides about the reliability of the accounting data and financial statements.

The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation and inspection, is more persuasive than information obtained indirectly.[660]

A number of the accounting issues reviewed by the Examiner in this matter – particularly New Century's repurchase reserves and residual interest valuations – present specific evidentiary challenges that are acknowledged by GAAS, as discussed below.

### i.   Estimates

New Century's repurchase reserve and residual interest valuations involved estimates. GAAS recognize that "there is potential for bias in the subjective factors considered [by management] in determining estimates."[661]  By definition, any reserve – such as the repurchase reserve – requires a company to estimate a potential outcome.  Accordingly, independent auditors are required to exercise appropriate professional skepticism.[662]  In other words, an independent auditor cannot merely rely on an assertion by management that an estimate is reasonable but must conduct appropriate testing and analysis of the factors underlying the estimate.  GAAS state that the "auditor's objective when evaluating estimates is to obtain sufficient competent evidence to provide reasonable assurance that:

- All accounting estimates that could be material to the financial statements have been developed.

- Those accounting estimates are reasonable in the circumstances.

- The accounting estimates are presented in conformity with the applicable accounting principles and are properly disclosed."[663]

---

[660] AU § 326.21.

[661] AU § 342.04.

[662] AU § 342.0 ("When planning and performing audit procedures to evaluate accounting estimates, the independent auditor considers, with an attitude of professional skepticism, both the subjective and the objective factors considered by management.").

[663] AU § 342.07.

### ii.    Fair value measurements

Similarly, GAAS acknowledge difficulties in assessing a company's accounting with respect to items that are measured at fair value,[664] as these "measurements are inherently imprecise (that is, they are ordinarily based on assumptions about future conditions, transactions, or events whose outcome is uncertain)." [665] Independent auditors are required to "obtain sufficient competent audit evidence to provide reasonable assurance that fair value measurements and disclosures are in conformity with GAAP."[666]   GAAS state that the "auditor should test a company's fair value measurements and disclosures."  The level of testing that is appropriate depends on (1) the "complexity of the fair value measurements;" (2) the "auditor's understanding of the reliability of management's process for determining fair value measurements;" and (3) the "auditor's assessment of the level of risk of material misstatement associated with the company's process for determining fair values."[667]  GAAS also require auditors to test the reasonableness of the assumptions underlying the fair value measurement.[668]

### 3.    Reviews of Interim Financial Statements

The purpose of a review of interim financial statements is "to provide the independent accountant with a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information for it to be in conformity with GAAP."[669]  A "review consists principally of performing analytical procedures and making inquires of persons responsible for financial and accounting matters."[670]   More extensive inquiries and procedures are required if, in the process of conducting a review, the auditor "becomes aware of information that leads him or her to believe the interim financial information may not be in conformity with GAAP" but needs additional information to conclude whether the

---

[664] FASB Statement of Financial Accounting Concepts No. 7, *Using Cash Flow Information and Present Value in Accounting Measurements*, defines the fair value of an asset (liability) as the amount at which that asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, that is, other than in a forced liquidation sale.

[665] AU § 328.05.

[666] AU § 328.03.

[667] AU § 328.23.

[668] AU § 328.26.

[669] AU § 722.

[670] AU § 722.07.

financial statements should be modified.[671] While reviews of interim financial statements are not audits and do not contemplate procedures consistent with an *audit* performed under GAAS,[672] independent auditors are required to follow relevant GAAS as they conduct their review procedures.

### 4.    Audits of Internal Controls Over Financial Reporting

In March 2004, the PCAOB adopted PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of Financial Statements* ("AS 2"). This standard governed KPMG's SOX work during the relevant period.[673] The objective of an internal control audit is to form an opinion "as to whether management's assessment of the effectiveness of the registrant's internal control over financial reporting is fairly stated in all material respects."[674] Further, SOX requires the independent auditor's report to present an evaluation of whether the internal control structure provides reasonable assurance that transactions are recorded as necessary and that other internal control requirements are met.

AS 2 provides that an internal control deficiency exists when the design or operation of a control does not allow the company's management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. AS 2 defines the following two levels of internal control deficiencies:

- Significant Deficiency - A significant deficiency is defined as an internal control deficiency or combination of control deficiencies that adversely affects the company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with GAAP such that there is a more-than-remote likelihood that a misstatement of the company's annual or interim financial statements that is more than inconsequential will not be prevented or detected.[675]

- Material Weakness – A material weakness is defined as a significant deficiency or combination of significant deficiencies that result in a more-than-remote

---

[671] AU §§ 722.07, 722.22.

[672] AU § 722.07.

[673] AS 2 recently was superseded and replaced by AS 5. However, during the periods covered by this investigation, AS 2 was the relevant guidance.

[674] SEC Regulation S-X-2-02 (f), 17 C.F.R. § 210.2-02(f) (2006).

[675] The standard specifies that a misstatement is inconsequential if a reasonable person would conclude, after considering the possibility of further undetected misstatements, that the misstatement, either individually or when combined with other misstatements, would clearly be immaterial to the financial statements. If a reasonable person could not reach such a conclusion regarding a particular misstatement, that misstatement would be more than inconsequential.

- 468 -

likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

The key steps in performing a SOX audit pursuant to AS 2 include (1) identifying significant financial accounts; (2) understanding the internal controls associated with such accounts through the review of process narratives developed by the audit client and walkthroughs with relevant audit client personnel; (3) testing the design and operating effectiveness of those controls; (4) identifying any significant deficiencies or material weaknesses; and (5) reporting those deficiencies or weaknesses to the audit client.

AS 2 requires the independent auditor to evaluate the severity of all control deficiencies identified during the review and to inform the audit client of all significant deficiencies and material weaknesses existing at the close of the client's annual reporting period.    The independent auditor also is required to issue an adverse opinion on the adequacy of internal controls if any material weakness exists as of the end of the reporting period.

### 5.    Audit Documentation

The documentation requirements for audits of financial statements, audits of internal control over financial reporting, and reviews of interim financial information of public companies are prescribed in PCAOB Auditing Standard No. 3 ("AS 3"). This standard provides guidelines to independent auditors with respect to the contents of their workpapers. Specifically, AS 3 requires workpapers to "clearly demonstrate the work was in fact performed" with sufficient detail to allow "an experienced auditor, having no previous connection with the engagement," to:

- Understand the nature, timing, extent, and results of the procedures performed, evidence obtained, and conclusions reached, and

- Determine who performed the work and the date such work was completed as well as the person who reviewed the work and the date of such review.[676]

The documentation required depends on a number of factors enumerated in AS 3. As in this matter, where the accounting involves estimates, which are considered presumptively "significant," AS 3 requires "more extensive documentation."[677]   Indeed, with respect to New Century's repurchase reserves and residual interest valuations, for example, findings are

---

[676] AS 3.06.

[677] AS 3.07-3.08.

presumptively "significant" for purposes of AS 3, and therefore should have been documented more extensively by KPMG in its workpapers.

### 6.    Communications with the Audit Committee

The professional standards also require independent auditors to communicate certain matters to the client's audit committee.[678]  In relevant part, independent auditors must report the following:

- **The Independent Auditor's Responsibility Under GAAS** –The independent auditor must communicate the level of responsibility assumed for certain matters under GAAS and that an audit is designed to obtain reasonable, rather than absolute, assurance about the financial statements.

- **Significant Accounting Policies** – The independent auditor is required to discuss the initial selection of, and changes in, significant accounting policies or their application, the methods used to account for significant unusual transactions, and the effect of significant accounting policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus.

- **Management Judgments and Accounting Estimates** – The independent auditor is required to communicate the process used by management to formulate particularly sensitive accounting estimates and the basis for the independent auditor's conclusions regarding the reasonableness of those estimates.

- **Independent Auditor's Judgments About the Quality of the Company's Accounting Principles** – The independent auditor is required to communicate certain information relating to his or her judgments about the quality, not just the acceptability, of the company's accounting principles.

### D.    Findings

   1.    **Circumstances Surrounding the Overall Management of the Engagement Team Created A Higher Risk That KPMG Would Not Detect A Material Error.**

During the relevant period, KPMG faced a number of challenges with respect to the New Century engagement, including staffing, a difficult client, and a poorly handled internal disagreement that almost delayed the filing of New Century's Form 10-K for 2005 and resulted in the consideration by the Audit Committee of replacing KPMG.  These factors contributed to KPMG's failure to detect the accounting errors and material misstatements at issue in that they increased the attendant risks of the engagement.  Thus, the Examiner believes that a consideration of these factors is essential to a proper assessment of KPMG's conduct and underlying responsibility.

---

[678] AU § 380.02.

Although weaknesses in the engagement's staffing alone may not have created unacceptable levels of risk, the engagement would have benefited from stronger and more experienced auditors in the industry, particularly where, as in this matter, the team had to deal with difficult and strong personalities at the Company and an inadequately staffed Accounting Department. This could have led to an earlier change in the residual interest discount rate, an earlier detection of certain weak internal controls and more candid communications with the Audit Committee.

### a.    KPMG Staffing

The 2005 engagement team, in particular, was not staffed with auditors with sufficient experience in the client's industry and/or relating to the particular tasks to which they were assigned. As discussed previously, the entire 2005 engagement team, with the exception of two junior auditors, was new to the New Century engagement. The team also consisted of auditors who were relatively inexperienced in the mortgage banking industry. The new engagement partner, Donovan, had many years of experience in public accounting but did not have significant experience in the mortgage banking industry, as he acknowledged in his self-evaluations. Kim's experience in the industry was limited to his brief tenure at Encore before joining KPMG.

In addition to new supervisors, a substantial amount of the team's 2005 work with respect to two critical accounting policies—the repurchase reserve and residual interest valuation—was performed by first-year auditors with no substantive experience in these areas. The auditor who reviewed the accounting related to residual interest valuation admitted to the Examiner that the models were more complex than he was comfortable evaluating and that he did not understand the complete models. Although the team sought the input of KPMG's internal valuation specialists, the specialists had little or no control over the conclusions reached by the engagement team and their concerns were often dismissed by the engagement team leaders, as discussed above.

Moreover, as noted above, Biddle, the in-charge senior associate for the 2005 SOX 404 audit, had virtually no experience with auditing internal controls under SOX or even U.S. GAAP issues prior to beginning her work on the New Century audit. In April 2006, as part of KPMG's engagement risk assessment and approval process, Macaulay indicated he had concerns about

manager staffing, and a manager with relevant experience, Veronica Wong, was added to the team to focus specifically on the SOX component of the audit.[679]

Finally, not only was the engagement team weak in experience, but Donovan and, to some extent, Kim, appeared unwilling to challenge the client, and in some instances may have acted as advocates for the Company. For example, a dispute arose between a KPMG FDR specialist and the engagement team in March 2006 that threatened the timely filing of New Century's Form 10-K for 2005, as discussed below. Donovan was frustrated with the specialist's concerns – which were later determined to be legitimate– and was able to get KPMG's "clean" opinion issued despite those concerns. A senior KPMG partner, in a telephone conversation with Dodge, commended Donovan and Kim for acting as "advocates" of New Century "without crossing the line of independence."

Another example is how, despite repeated concerns from KPMG's own internal specialists (SFG) regarding the discount rate used to value New Century's residual interests, as discussed above in Section VI.B. and below, Donovan supported the Company's discount rates in the face of opposition first from New Century Management and later from a Board committee to increasing those rates.

A third example relates to an email request from a junior auditor to Tony Sanchez seeking what appeared to be legitimate information on a number of audit issues, which Sanchez forwarded to Kenneally. Kenneally then forwarded the e-mail to Kim, complaining about the junior auditor and stating that he is not the "KPMG Training Center." In response, instead of recognizing the validity of the auditor's questions, Donovan adopted Kenneally's view that the questions required obvious answers and that the questions should have been filtered first, while Kim pointed out that "some of the answers were not straight forward [sic] (*e.g.*, Look for residuals to see if they are still on the books").

In addition, on two occasions, Kim proactively suggested in mid 2006 to the Accounting Department, and in particular to Sanchez and Kenneally, changes to the Company's estimation process for repurchase reserve and LOCOM that had the effect of decreasing the reserve and increasing earnings, as discussed in Section VI.A. and below.

---

[679] Macaulay has denied that the concerns resulted from any perceived inadequacies in the performance of the 2005 engagement team.

Donovan's focus on preserving the client relationship is reflected in his performance evaluations for the applicable period. In particular, with respect to New Century, Donovan stated in three different appraisals in 2005—a "goal setting" review, an interim review and a year-end review—that there had been "no loss of client service" and that he had developed "good relationships" with the client's team. In another review in 2006, Donovan stated that he had to deal with "significant client service and technical issues that I was able to overcome and find a good middle ground for the client."

### b.    New Century's Accounting Department Personnel

The engagement team's lack of experience was compounded by the fact that New Century's accounting function was weak and was led by a domineering and difficult Controller. The Controller, KPMG alumnus Dave Kenneally, was the engagement team's primary contact at New Century. By many accounts, Kenneally was a difficult, condescending and quick-tempered Controller who intimidated junior staff accountants when they were requesting information from the Company. KPMG provided the following descriptions of Kenneally to the Examiner:

- One KPMG professional described Kenneally as "condescending" and said that he "liked to push his weight around." She also stated that Kenneally often made fun of Donovan and Kim in their presence.

- Another KPMG engagement team member stated that Kenneally had a tendency to raise his voice and left a bad impression personally because of his way of dealing and interacting with both employees of New Century and the auditors.

- Donovan recognized that Kenneally was "difficult with the junior members" of the engagement team.

- Kim observed that Kenneally was difficult and conceited, that he would balk when new issues arose and that junior auditors would encounter difficulty when attempting to obtain information from Kenneally. He also noted that the junior members of the team were intimidated by Kenneally.

Kenneally also was one of only a few CPAs in the entire Accounting Department at New Century, and the Examiner observed that Kenneally was the keeper of a large amount of critical accounting information and often the only source of knowledge about the Company's accounting policies and procedures. This fact was noted in an e-mail from Kim to Donovan in September 2006 in which Kim stated that "Dave seems to know the answers for everything and anything and the rest of the accounting department is on almost the same boat as the audit team is – little knowledge of what's going on. This intimidates everyone in the engagement team."

These factors appear to have contributed to the bad reputation of the New Century engagement at KPMG and the high turnover in the engagement team. Kim complained to Donovan in the same e-mail noted above that "we will never get a good team out there because of the reputation the engagement has." In an e-mail to Kenneally, Sanchez observed, with respect to the KPMG's engagement team's experience, that New Century was not getting the "A team." When asked about the engagement's bad reputation, one KPMG engagement team member informed the Examiner that it was based on a number of factors, including that it required long hours and involved difficult people, such as Kenneally and Kim.

Despite these circumstances, Kim and Donovan both stated that they believed they ultimately obtained all of the information they needed from Kenneally and that they were not intimidated by him.

### c.    KPMG's Probationary Status in 2006 Due to the 2005 Form 10-K for 2005 Filing Issue

As noted above, an issue came to a head on the eve of filing New Century's Form 10-K for 2005. Specifically, there was a disagreement related to a review of the Company's hedge accounting practices and documentation by John Klinge and Ray Munoz, KPMG's FDR specialists, which held up KPMG's issuance of its audit opinion. Although KPMG ultimately issued its opinion and the Company was able to file its Form 10-K on time, the event damaged the relationship and put KPMG personnel under tremendous pressure to convince the Company that it should continue to retain KPMG.

In the fall of 2005, Klinge and Munoz were assigned to assist in the audit of the Company's 2005 financial statements in order to provide specialized expertise and "quality control" with respect to derivatives and hedging issues that arose in the context of the audit. Among Klinge's primary tasks was determining whether the Company's hedge accounting conformed to FAS 133 (*Accounting for Derivative Instruments and Hedging Activities*). Many weeks later, however, Klinge and Munoz had not received any of the documentation they had requested in order to begin their review. Klinge alerted Donovan to this fact in an e-mail dated January 17, 2006. Klinge cautioned Donovan that the delay might complicate the timely resolution of any accounting issues discovered in connection with their analysis.

Despite the fact that Klinge had indicated on January 17 that he had received no documents to begin his analysis, two weeks later, on February 1, 2006, Donovan represented to New Century's Audit Committee that an "outside expert" had been engaged to review the

- 474 -

Company's derivatives documentation, and that the Company's hedge accounting satisfied FAS 133. Donovan did not consult Klinge prior to making this representation of FAS 133 compliance to the Audit Committee because Donovan "didn't think there was going to be an issue." Klinge was unaware that Donovan had made this representation to the Audit Committee.

Over the course of February 2006, a disagreement arose between Donovan and Klinge stemming from Klinge's unwillingness to "sign-off" on the Company's hedge accounting because he had not seen sufficient documentation to support the Company's cash-flow hedging practices. Per KPMG policy, until the disagreement was resolved, KPMG could not release its opinion. Ultimately, in mid to late February, Donovan brought in KPMG's Department of Professional Practice ("DPP") to attempt to resolve the disagreement.[680]

On March 2, 2006, Donovan participated in another Audit Committee meeting, and informed the Committee of an "open audit issue" regarding New Century's hedge accounting and a potential deficiency relating to the Company's hedging documentation. Donovan indicated that the issue "should be resolved in the next day or two after KPMG's [DPP] had finished reviewing all of the documentation." Soon thereafter, the DPP gave Donovan a "verbal approval" of the Company's hedge accounting, which he then passed along to Kenneally. On March 3, 2006, Kenneally sent an e-mail to the Board of Directors in which he stated: "KPMG's Department of Professional Practice has accepted our hedge accounting treatment . . . the result is a PASS, and as we discussed, there will be no adjustment to the financial statements." Kenneally forwarded this e-mail to Donovan and Kim. Klinge informed the Examiner that he had never seen Kenneally's e-mail and did not know that any such representation had been made to the Board of Directors.

The issue, however, had not yet been resolved to Klinge's satisfaction and it was still holding up KPMG's audit opinion, a fact that, according to then-CFO Dodge, was not communicated to New Century until just hours before the Company's Form 10-K filing deadline on March 16. In an e-mail exchange in the late evening of March 15, 2006, Kim learned that Klinge was not prepared to sign off on the FDR review and Kim informed Donovan. In an e-mail exchange with Klinge on the morning of March 16, Donovan stated: "I am very

---

[680] The DPP is the national office of KPMG that is responsible for policy, quality control and standards. The partners and managers in DPP are available to consult with engagement teams as needed. In certain instances, such as disagreements among members of an engagement team, KPMG's internal procedures require DPP involvement.

disappointed we are still discussing this. As far as I am concerned we are done. The client thinks we are done. All we are going to do is piss everybody off."

Ultimately, KPMG issued its audit opinion minutes before the Form 10-K was due and New Century timely completed its filing deadline. A high-ranking member of DPP, Terri Iannaconi, authorized Donovan to issue KPMG's audit report following a lengthy emergency conference call among Donovan, Macaulay, Kim and Klinge and various members of DPP. Iannaconi also instructed Klinge to prepare and forward to the engagement team a sign-off memorandum and directed Kim to prepare a "disagreement memorandum" to document the dispute.[681]

The members of New Century's Audit Committee expressed great annoyance with KPMG over this sequence of events. According to the Chair of the Audit Committee, Michael Sachs, the Committee spent much of its March 17, 2006 meeting "yelling and screaming" at Donovan and Kim about this issue. The minutes reflect that Richard Zona "expressed his displeasure that Donovan had given the Committee the impression that this matter was near resolution at the March 2nd meeting and there was no indication to the contrary until just before the filing deadline." Several Audit Committee members felt that Donovan, personally, was to blame for the crisis, and that the problem would not have arisen under Donovan's predecessor engagement partner, Kinsella.

Indeed, the Audit Committee decided that it would defer its decision to retain KPMG for the 2006 audit until an explanation was provided regarding the events surrounding the FDR dispute. The Company's full Board of Directors also considered the possibility of replacing KPMG. For the time being, however, the Audit Committee agreed to retain KPMG to perform a review of the Company's financial statements for the first quarter of 2006.

During this probationary period, Donovan and Scott London, a KPMG partner responsible for the firm's audit practice in the Los Angeles region, made a presentation to the Audit Committee during its May 9, 2006 meeting. Donovan and London gave the Committee a chronology of the events leading up to the last-minute filing crisis and discussed in greater detail

---

[681] Iannaconi realized the following day when she reviewed Klinge's memorandum that open issues remained, which presented a potentially significant problem in that KPMG had issued its clean opinion already. The disagreement was not resolved completely, in fact, until the following month. Klinge eventually received sufficient documentation to form a conclusion, which was that the accounting treatment was improper and had resulted in a misstatement of several million dollars. The misstatement ultimately was deemed immaterial.

the hedging issue that had led to the disagreement. They also "commit[ed] to the Company that a situation like this will never happen again" and promised to involve the FDR at an earlier stage during quarterly reviews and annual audits "such that any problems will be identified early and no surprises will occur." Following this May 9 meeting, the Audit Committee agreed to retain KPMG for the entire 2006 audit cycle.

This issue also cost KPMG goodwill with Kenneally. He told the Examiner that he had been furious over the "near-disaster" with the 2005 Form 10-K filing. He said that he met privately with Donovan during this period, who assured him that such problems would not occur in the future. Kenneally noted that he and New Century were provided exceptional client service by KPMG over the next few months as a result.

Donovan acknowledged to the Examiner that he was concerned that KPMG would lose the New Century account as a result of this sequence of events. While the Examiner has not found definitive evidence that Donovan failed to remain independent, as required by AU § 220, the Examiner notes that this concern may have influenced the review and audit planning process in 2006. In particular, it is possible that Donovan and Kim were not as skeptical as they might otherwise have been with regard to critical assumptions, such as with respect to the residual interest discount rate, as discussed in Section VI.B. Donovan and Kim also may have looked for ways to add unique value in order to salvage KPMG's reputation, such as by providing proactive (though erroneous) advice in connection with the repurchase reserve calculation methodology, as discussed in Section VI.A. and below.

### 2.    KPMG Provided Erroneous Advice to New Century Regarding the Calculation of its Repurchase Reserve and Failed to Detect A Material Misstatement.

New Century's Allowance for Loan Repurchase Losses was identified as a critical accounting policy in both the Company's public filings and in KPMG's audit planning documents.[682] As a critical accounting policy, the repurchase reserve was considered to have a high subjective element and a possible material impact on the Company's financial statements. It also was an area of concern to New Century's Audit Committee and was generally discussed by KPMG at Audit Committee meetings throughout 2005 and 2006.

---

[682] *See, e.g.*, Form 10-K for 2005 at pp. 65.

Despite its status as a critical accounting policy, New Century's repurchase reserve estimation process was not well organized and documented. KPMG noted in its audit of New Century's internal controls in 2004, 2005, and 2006 that New Century had an internal control weakness because it had not adopted formal policies and procedures for the repurchase reserve estimation process. KPMG considered the deficiency inconsequential, however, and did not change any of the substantive audit procedures or tests of details from 2004 through 2006. The Examiner finds, as discussed above, that it was unreasonable for KPMG to conclude that this deficiency was inconsequential without performing additional substantive procedures and testing, the results of which should have been documented in its audit workpapers.

KPMG also observed a considerable increase in loan repurchases in the fourth quarter of 2004, and then a more than doubling of repurchases in 2005 compared to 2004, from $135.4 million to $332.1 million. Nevertheless, KPMG failed to perform any increased procedures or testing of New Century's repurchase reserves. Even in 2006, when KPMG changed the Risk of Significant Misstatement (RoSM), which reflects KPMG's assessment of the risk arising from error for each audit area and determines the quantity and quality of the audit steps for that area, from Low to High, it failed to increase any of the substantive audit procedures or tests of details in response to the change of the RoSM.

KPMG performed detailed quarterly reviews of New Century's repurchase reserve estimation process and sometimes, but not always, prepared workpaper memoranda discussing the reasonableness of New Century's reserve calculation. KPMG's workpapers for the first and second quarterly reviews for the 2005 audit all concluded: "Based on the discussion above, methodology, estimates and data used in determining the Company's reserve for potential future repurchases and expected losses, the amount reserved for based on the Company's analysis . . . appears reasonable."

As discussed in Section VI.A., however, New Century's repurchase reserve was underestimated by at least $21.3 million at December 31, 2005. In 2006, the reserve was underestimated by $42.8 million, $103.3 million and $190.6 million, respectively, in each of the first three quarters. KPMG failed to detect these material misstatements in its audits and reviews due, in part, to an unreasonable reliance on management's representations, estimations and assumptions. KPMG also suggested changes to New Century's repurchase reserve calculation

methodology that were contrary to GAAP, which contributed to the misstatement as described further below.

### a. KPMG Should Have Considered Whether New Century Needed to Increase Its Reserve for the Growing Backlog of Repurchase Requests.

As described more fully in Section VI.A., to calculate its repurchase reserve, New Century multiplied whole loan sales in the current period by a fixed percentage. This percentage was derived from the ratio of actual repurchases made by the Company during a specified historical time period to all whole loan sales made over that same time period. The percentage was changed by the Company over time. In 2005 and 2006, the Company tweaked the duration of the historical period used, and the result was an increase in the percentage. By the end of 2006, however, New Century was simply increasing the percentage without regard to the actual ratio in order to account for worsening market conditions.

However, New Century never factored repurchase requests or claims already received by the Company into its calculation. In combination with the faulty assumption that claims were received, evaluated, processed and repurchased within 90 days of the date the whole loans were sold (the 90-day look-back assumption), this failure to take into consideration repurchase claims proved to be a critical error. The Company failed to reserve at all for these Backlog Claims – the large and growing amount of repurchase claims relating to loans sold before that 90-day period. KPMG was aware that New Century failed to consider the Backlog Claims in its estimation process but never insisted that New Century do so. Indeed, KPMG approved of New Century's calculation and continued to defend it in interviews with the Examiner.

New Century's repurchase reserve calculation assumed that all repurchases were made within 90 days of the date New Century sold the loans. For this reason, New Century assumed that any potential repurchases outstanding at the end of any particular quarter (*e.g.*, first quarter) were either repurchased or no longer susceptible to repurchase as of the end of the next quarter (*e.g.*, second quarter). Using this example, the calculation for the second quarter, therefore, only took into consideration potential repurchases related to whole loan sales for the second quarter (the previous 90 days) and assumed that no potential repurchases still existed from the first quarter or prior periods; that is, the calculation was based on an assumption that no Backlog Claims existed.

- 479 -

The Examiner interviewed KPMG about the basis for this 90-day look-back assumption. KPMG reported that New Century represented that the majority of its repurchases were completed within 90 days of the date New Century sold the loans. KPMG told the Examiner that it tested this assumption in two ways. First, it reviewed the loan sale agreements to confirm that they contained provisions requiring repurchase in the event of early payment defaults only within 90 days of purchase. The agreements provided that New Century could also be required to repurchase loans, with no time constraints, in the event of a breach of certain representations and warranties. KPMG claims that such repurchases, however, were minimal and did not warrant expanding the period of the look-back. Second, KPMG reviewed New Century's repurchase log, which contained historical information about repurchases (including the date the loans were sold and the date the loans were repurchased) to confirm that repurchases generally were actually being made within 90 days of the date of sale.

Even a cursory review of these documents, however, should have revealed that reserving only for potential repurchases of whole loan sales for the last 90 days was unreasonable. First, the loan sale agreements were not uniform in any respect. The repurchase provisions varied from agreement to agreement. Accordingly, KPMG could not have determined that all the agreements required repurchases within 90 days, and it should have been clear that additional testing was required. Second, the Examiner reviewed the repurchase log, and it reflects that the dates loans were repurchased were more—and sometimes much more—than 90 days from the date the loans were sold. Thus, KPMG's review of the repurchase log could not have confirmed that the majority of repurchases were made within 90 days of sale. KPMG failed to adequately test this critical assumption.

The flawed 90-day look-back assumption enabled the backlog of repurchase claims to exist and grow from period to period. By starting over each quarter and only reserving for potential repurchases of loans sold within the most recent quarter, New Century was failing to reserve for the Backlog Claims – any potential repurchases of loans sold in any prior periods. As market conditions worsened, and repurchases increased, the number of Backlog Claims outstanding from prior periods grew substantially and rolled over from period to period. New Century was aware as of the end of 2004 that repurchases were increasing as a result, at least in part, of repurchases rolling over from prior periods. KPMG's SOX 404 audit process and audit apparently failed to detect this critical piece of information, or at least to realize its significance.

In connection with its 2005 audit, however, KPMG did, in fact, obtain this critical information but then did nothing with it.

On February 10, 2006, Christina Chinn, the KPMG junior auditor responsible for reviewing New Century's repurchase reserve calculation specifically solicited and obtained from Robert Lent in New Century's Secondary Marketing Group the amount of repurchase requests outstanding as of December 31, 2005. Chinn told the Examiner that Mark Kim asked her to obtain this information. Lent responded that New Century had $188 million in outstanding repurchase requests as of December 31, 2005.[683] A substantial portion of these $188 million in outstanding repurchase requests likely were Backlog Claims relating to loans sold prior to the fourth quarter of 2005 that were not being accounted for in the repurchase reserve calculation.

While in possession of this critical information, KPMG approved New Century's repurchase reserve calculation which ignored the claims received by the Company. Instead, as with all prior periods, the calculation estimated the amount of repurchases based only on historical actual repurchases as a percentage of whole loan sales applied to the whole loan sales made in the fourth quarter of 2005. At year-end 2005, using New Century's traditional method of simply calculating the historical percentage of whole loan sales that the Company repurchased (0.659%) and applying that percentage to the whole loans sales from the fourth quarter of 2005 (approximately $10.7 billion), New Century estimated only approximately $70 million in potential future repurchases, although New Century was already in possession of repurchase claims totaling $188 million.

KPMG was aware of these $188 million in outstanding claims and even referenced them in the repurchase reserve workpaper for the period, but did not take them into consideration whatsoever in evaluating the sufficiency of New Century's repurchase reserve calculation. The audit workpapers contain no evidence of additional testing or any other substantive procedures performed on these outstanding repurchase claims as of December 31, 2005 to determine if any or all were Backlog Claims relating to loans sold prior to the fourth quarter of 2005 that were not being accounted for in the repurchase reserve calculation. Chinn could not even explain why

---

[683] Lent's e-mail also noted that $157 million of the $188 million were for EPD. The other $31 million (16%) were thus presumably related to breaches of representations and warranties, for which there was no time limitation on an investor's ability to submit a repurchase request. This high percentage of requests for such breaches is additional evidence that that the 90-day look-back period was insufficient to adequately account for New Century's loan repurchase liability.

KPMG requested this information or if KPMG had ever requested it from New Century in any prior or subsequent periods.

Applying even the simplest of calculations to this information – for example, the percentage of repurchase claims that New Century ultimately repurchased historically – would have revealed that New Century was substantially underreserved. A review of the loan sales that were the subject of the repurchase claims would have revealed that the claims related to sales made in prior periods such that reserving only for sales made in the last 90 days was a critical error. Comparing the number to prior periods and to subsequent periods would have revealed that the number of outstanding repurchase claims was growing period to period, which would have been a clear sign of a mounting problem, especially given that New Century itself had done nothing to adjust its methodology to account for the increasing amount of Backlog Claims. KPMG, however, appears to have done nothing with this critical information as well, and instead, merely made a passing reference to it in a workpaper. KPMG failed to consider the financial statement impact of these repurchase claims or further investigate the treatment of these claims whatsoever. Such an oversight constitutes a lack of due professional care, as required by GAAS, and a failure to obtain sufficient competent evidence to provide reasonable assurance that the accounting estimate was reasonable and presented in conformity with applicable accounting principles.[684]

Kim told the Examiner that disregarding actual repurchase claims received by the Company, and instead only estimating repurchases based on the historical actual repurchase percentage applied to the most recent period's whole loan sales, was a reasonable method of estimating New Century's repurchase liability. Kim also told the Examiner that he holds this belief even today with knowledge that the growing amount of Backlog Claims rolling over period to period was substantially more than the Company's estimate and a significant factor in the Company's need to restate its 2006 quarterly financial statements. The Examiner concludes that Kim's alleged continued belief in this regard is utterly without factual basis and lacks basis in accounting standards as well.

The same KPMG 2005 repurchase reserve analysis workpaper noted that repurchases had more than doubled during 2005 compared to 2004 from $135.4 million to $332.1 million. Notwithstanding this substantial increase in repurchases, and direct knowledge of an additional

---

[684] AU § 342.

$188 million in outstanding repurchase claims, New Century's repurchase reserve actually *decreased* slightly from the end of 2004 to the end of 2005. KPMG made note of this in its workpaper but Chinn could not recall any related discussions or concerns by anyone within KPMG. Instead, KPMG concluded that the amount reserved was reasonable without any additional inquiry. This also demonstrates a lack of due professional care as required by GAAS.[685]

### b.   KPMG Erroneously Assumed That New Century Was Reserving for Lost Interest Recapture As Required by GAAP.

Under FAS 5, New Century was required to reserve for the interest to which an investor was entitled but did not receive, while it held a loan, due to a default by the underlying borrower. New Century was required to pay this lost interest (referred to in this Report as "Interest Recapture") to the investor at the time it repurchased the loan. New Century did not begin to reserve for this lost interest until the third quarter of 2006.

KPMG was aware that New Century was required to reserve for lost interest but incorrectly assumed that the reserve included such an interest component. Kim admitted to the Examiner that he specifically told Tony Sanchez in September 2006 that *only* premium and interest to be repaid to the investor needed to be included in the reserve. Although, as discussed below, this was patently erroneous advice, it confirms that KPMG knew that GAAP required that interest be included in the reserve. Much earlier than September 2006, however, it appears that Kim inquired about whether New Century's reserve included interest. Specifically, Chinn recalled a meeting she attended with Kenneally and Kim where Kim specifically asked Kenneally whether New Century's repurchase reserve included an interest component. Chinn recalled that Kenneally responded that interest was included in the component of the reserve known as "Estimated Losses on Future Repurchases."

KPMG did nothing, however, to test this representation. Chinn confirmed that KPMG took Kenneally's representation at face-value and then repeated it in its repurchase reserve workpaper for the 2005 audit. In fact, the "Estimated Losses on Future Repurchases" did not include an interest component. It consisted solely of the estimated loss on the sale of repurchased loans based on the historical losses incurred over the prior three years. Had KPMG

---

[685] AU § 342.

performed even minimal testing of Management's representations, it would have determined that, in violation of GAAP, the reserve did not account for the Interest Recapture component.

Interest Recapture was not included in the reserve calculation until the third quarter of 2006. KPMG prepared a workpaper memorandum the third quarter of 2006 discussing the change to the calculation to include Interest Recapture. Chinn, who had prepared the 2005 year-end workpaper and had left the New Century engagement at the end of the second quarter 2006 review, was shown the third quarter 2006 memorandum discussing the change to include interest. She stated that the new interest component discussed in the memorandum was the same component she thought was already included back in the 2005 audit and which her workpaper noted, incorrectly, was included.

KPMG's failure to test whether interest was, in fact, included in the repurchase reserve calculation for all applicable periods (as required by GAAP) violated GAAS. KPMG's 2005 audit procedures and 2006 first and second quarter reviews failed to identify this departure from GAAP. KPMG failed to obtain sufficient competent evidence to provide reasonable assurance that the accounting estimate was reasonable and presented in conformity with applicable accounting principles and in doing so, breached the standard of due care.[686]

### c. KPMG's Suggestion That New Century Remove Inventory Severity From Its Repurchase Reserve Calculation Was Contrary to GAAP.

When New Century repurchased loans from investors, it was required under FAS 140 to book the repurchased loans at fair value at the time of repurchase. The difference between the price it paid to repurchase the loans and the fair value of the loans was then to be debited to the repurchase reserve account. For example, if New Century was required to repurchase a loan for $100,000, but that loan was only worth $95,000 at the time New Century repurchased it, the loan should have been booked at $95,000 and the repurchase reserve account debited the difference of $5,000.

Through the first quarter of 2006, New Century did not technically comply with all the requirements of FAS 140, but instead performed a calculation as part of its repurchase reserve that amounted to an approximation of the FAS 140 requirements. At the time of repurchasing a loan, New Century booked the repurchased loans at par value in LHFS and then, at the end of the

---

[686] AU §§ 230, 326, and 342.

quarter, performed a LOCOM analysis of these loans and booked a LOCOM valuation amount that was reported as a contra-asset as part of LHFS. This LOCOM valuation amount was reflected in New Century's repurchase reserve calculation as MTM on Repurchases Not Yet Sold and is referred to in this Report as "Inventory Severity." Although technically not in strict compliance with GAAP, the method employed by New Century approximated the requirements of FAS 140.

In the second and third quarters of 2006, however, New Century removed the Inventory Severity component of the repurchase reserve calculation after Mark Kim told Tony Sanchez that this loss was already accounted for in the Company's general LOCOM analysis. In or around July 2006, in connection with the second quarter review, Kim told Sanchez that because the LHFS was subject to the Company's general LOCOM analysis, performing the MTM on Repurchases Not Yet Sold was, in effect, double counting and resulted in New Century being over-reserved. Sanchez and Kenneally then followed up on this suggestion, conducted a minimal amount of their own research and removed the LOCOM valuation component from the calculation of the repurchase reserve. By removing this component, however, New Century eliminated the "approximation" to the requirements of FAS 140 for the second and third quarters of 2006, which left the Company's calculation in violation of GAAP.

Kim acknowledged to the Examiner bringing the issue to Kenneally's attention and having a discussion concerning it at some point in time, but claimed to not have specifically recommended a change. In fact, Kim claimed to have not even known a change was ultimately made in the second quarter until he reviewed the repurchase reserve in connection with the 2006 audit. Based on a number of factors, including interviews of Sanchez, Kenneally and members of the Audit Committee who were present at a 2007 Audit Committee meeting in which Kim did not deny having known about and/or suggested the change (Kim also admits this occurred), and also based on KPMG's Balance Sheet Analytics workpapers for the second quarter 2006 in which Kim specifically revised a paragraph describing the change and which references a discussion between Kim and Sanchez about the change, the Examiner does not find credible Kim's denial that he suggested the change or that he did not know a change was then made. The Examiner finds that Kim's suggestion was, at minimum, the catalyst for the change, *i.e.*, but for his suggestion, it is unlikely that Sanchez or Kenneally would have independently decided to remove Inventory Severity from the repurchase reserve calculation.

Christina Chinn reviewed the repurchase reserve in connection with KPMG's second quarter 2006 review. When she noticed that this component of the reserve had been removed from the calculation, she sought a memorandum from New Century discussing the basis for the removal but was told by Kim in an e-mail, "Please do not ask the client regarding this anymore." Accordingly, no further analysis was performed on the second quarter 2006 change, which was repeated in the third quarter of 2006.

The evidence reviewed by the Examiner indicates that Donovan also was aware of the second quarter 2006 change removing Inventory Severity from the repurchase reserve calculation. When interviewed, Donovan claimed that he knew nothing about the change until a discussion with Kenneally in January 2007, which ultimately led to the realization of the need for a restatement. Kim, however, told the Examiner that he had discussed the issue with Donovan before ever discussing it with Kenneally. The Examiner does not find Donovan's claimed ignorance of the second quarter 2006 change credible. Donovan confirmed that he reviewed KPMG's Balance Sheet Analytics workpapers for the second quarter of 2006. He even confirmed that his handwriting appears on the very section of the workpaper discussing the second quarter change, and that he wrote "let's discuss" on the workpaper. It is clear to the Examiner that Donovan was aware of the change at least as of the time of KPMG's second quarter review.

Donovan and Kim attended the July 26, 2006 Audit Committee meeting for the second quarter at which they made a presentation regarding KPMG's second quarter review, addressing specifically New Century's repurchase reserves. Notwithstanding their knowledge of and participation in the change, neither Donovan nor Kim informed the Audit Committee that a change had been made in the calculation methodology or that there would be a resulting change in the LOCOM valuation account.

At a time when KPMG was aware, as evidenced in its own workpapers, that market conditions were worsening and repurchases were increasing, KPMG made a recommendation to New Century to remove a component of the repurchase reserve that had the effect of *decreasing* the reserve – actually overvaluing LHFS due to the way New Century accounted for Inventory Severity – and then failed to inform the Audit Committee of the change to this critical accounting policy. Kim's suggestion to New Century to remove Inventory Severity from the repurchase reserve calculation resulted in New Century's failure to comply with GAAP. KPMG's

- 486 -

subsequent second quarter 2006 review then failed to identify the material departure from GAAP, in that it failed to recognize that Management's calculation of the repurchase reserve did not consider Inventory Severity.

These findings indicate that KPMG's second quarter 2006 review of the repurchase reserve failed to meet professional standards in several respects. KPMG failed to conduct adequate analytical procedures, inquiries, and other procedures to address whether the accounting estimate was reasonable and presented in conformity with applicable accounting principles. KPMG also failed to inform the Audit Committee of its recommended change to the repurchase reserve calculation, and in doing so, breached the standard of due care.[687]

### d. KPMG Erroneously Advised New Century To Remove Future Loss Severity from Its Repurchase Reserve Calculation Contrary to GAAP.

Under FAS 140 and FAS 5, New Century was required to reserve for potential losses on the future repurchase of loans referred to in this Final Report as "Future Loss Severity." Future Loss Severity is the estimated excess of the repurchase price over the expected fair value of the repurchased loan on the date of repurchase. Through the second quarter of 2006, New Century's repurchase reserve calculation properly included an estimate of Future Loss Severity, but, as discussed above, only for potential repurchases related to whole loan sales for that quarter (previous 90 days) and not for any Backlog Claims. In the third quarter of 2006, however, New Century removed Future Loss Severity from its calculation based again on advice it received from Kim.

In September 2006, Kim advised Sanchez that the repurchase reserve only needed to include the premium and lost interest to be refunded to the investor upon repurchase of the loan (Premium and Interest Recapture). Accordingly, consistent with his second quarter 2006 suggestion to remove the loss for loans that had been *already repurchased*, Kim further recommended removing the potential loss for *future repurchases*.[688] Kim had a conversation with Sanchez in September 2006 in which he incorrectly advised Sanchez that there was no

---

[687] AU §§ 230 and 722.

[688] Chinn stated that as early as the third or fourth quarter of 2005, in a meeting with Kenneally, Kim questioned the appropriateness of including in the reserve the potential loss on the sale of repurchased loans that had not yet been repurchased. At the time of her interview, Chinn was vaguely familiar with the term "loss severity" but was not familiar with it at the time of the referenced meeting. She did not recognize Kim's inquiry to be questioning the inclusion of loss severity.

- 487 -

accounting literature applicable to the repurchase reserve and that only premium and interest to be refunded to the investor needed to be included in the reserve. When interviewed by the Examiner, Kim acknowledged that at the time of his conversation with Sanchez, he was not aware that paragraph 55 of FAS 140 applied to the repurchase reserve and acknowledged that his advice had been contrary to GAAP. Sanchez confirmed the substance of his conversation with Kim in an e-mail to Kenneally.

In connection with its third quarter 2006 review, Chinn prepared a workpaper, entitled "Repurchase Reserve Memo," with the stated purpose "to obtain sufficient and appropriate evidence regarding the appropriateness of the client's Repurchase Reserve calculation," which Kim reviewed and initialed. New Century's repurchase reserve calculation for the third quarter 2006 is presented in a box on the front page of that memorandum. The calculation presented includes only "Estimated Premium to be Refunded to Investor" and "Estimated Lost Interest to be Refunded" and contains no severity component, either for losses on repurchased loans in LHFS (Inventory Severity) or for losses on future repurchases (Future Loss Severity). This is consistent with the advice Kim gave Sanchez. The KPMG memorandum concludes, contrary to GAAP, that New Century's "calculation appears appropriate as a method of estimating the Company's repurchase reserve liability."

The memorandum discusses two changes New Century made to its repurchase reserve calculation in the third quarter. First, the Company used more recent history to determine its percentage of whole loan sales historically repurchased, and second, as discussed above, the Company added Interest Recapture. The memorandum made only a passing reference, however, to the removal of the critical component, Future Loss Severity, from the Company's calculation. The KPMG memorandum noted that, although the Estimated Losses on Future Repurchases component had previously included Future Loss Severity, it was now comprised solely of Premium and Interest Recapture. The memorandum noted that the reason for the change was that the "former method was essentially an adjustment that is accounted for in the Company's LOCOM adjustment."

Most KPMG witnesses interviewed by the Examiner attempted to distance themselves from this memorandum. Kim's initials appear on the memorandum, and he conceded reviewing it and participating in its preparation. Kim said that Donovan also participated in discussions with him and the junior auditor who wrote the memorandum regarding the third quarter changes,

as well as discussions related to the need for a memorandum and the substance of the memorandum.  Donovan, however, claimed that he did not see the memorandum and was unaware of the third quarter 2006 changes.  As a result of the possible restatement in early 2007, KPMG assigned Kurtis Kurimsky, a partner with KPMG's DPP, to conduct a "desk review" of KPMG's workpapers to determine if any additional issues required attention.  In addition, Marc Macaulay, KPMG's SEC concurring partner on the New Century engagement, conducted an "in-depth review" of KPMG's workpapers to determine whether any of KPMG's conclusions were inappropriate.  Despite conducting their respective reviews specifically as a result of a possible restatement relating to New Century's repurchase reserve, neither Kurimsky nor Macaulay could recall whether they had ever seen the third quarter Repurchase Reserve Memo.  The Examiner does not find Donovan, Kurimsky or Macaulay credible in this regard.

Kim's recommendation to New Century to remove Future Loss Severity directly contravened GAAP, as stated in paragraph 55 of FAS 140.  KPMG's subsequent third quarter 2006 review then failed to identify the material departure from GAAP in that it failed to recognize that Management's calculation of the repurchase reserve did not consider any loss severity.  With respect to its third quarter review, KPMG failed to conduct adequate analytical procedures, inquiries, and other procedures to address whether the accounting estimate was reasonable and presented in conformity with applicable accounting principles.  KPMG actually took an active role in providing erroneous advice to Management relating to the proper GAAP treatment for a key account, and, in doing so, breached the standard of due care.[689]  For the second consecutive quarter, at a time when market conditions and New Century's own experience indicated a need for greater reserves, KPMG departed from taking a conservative approach and in fact recommended that New Century make a change to its repurchase reserve calculation that had the effect of *decreasing* the reserve.

### e.    KPMG Concluded That New Century's Application of LOCOM Was Consistent with GAAP Although Repurchased Loans Were Improperly Priced and It Operated To Conceal Losses.

The Examiner identified two issues with respect to New Century's application of the LOCOM requirements of FAS 65.  First, as described previously, prior to the second quarter of 2006, New Century calculated a LOCOM adjustment for repurchased loans included in LHFS as

---

[689] AU §§ 230 and 722.

part of the repurchase reserve calculation, but reported this amount on its balance sheet as part of LHFS in the LOCOM valuation account. The Examiner determined that the prices (or marks) that New Century used to value repurchased loans in the fourth quarter of 2005 and first quarter of 2006 were not consistent with the marks used in its LOCOM analysis for its LHFS portfolio. In addition, starting in the second quarter of 2006, New Century eliminated entirely this LOCOM adjustment for repurchased loans. As a result of this misapplication of LOCOM for repurchased loans included in LHFS, the LHFS portfolio was overstated in the Company's financial statements by at least $9.8 million for the year-ended December 31, 2005 and by at least $18.4 million, $81.9 million and $85.8 million in the first three quarters of 2006.

Second, the Examiner found that New Century did not apply LOCOM in a manner consistent with industry practice, thereby enabling the Company to conceal losses in its LHFS portfolio by offsetting losses in certain loan categories with gains in other loan categories. In applying LOCOM, New Century first determined the market value of LHFS separated by loan categories related to risk and loss. However, it then collapsed those separate categories and re-aggregated the entire pool of LHFS for LOCOM purposes. As a consequence, loan losses in some categories, such as non-performing loans, were offset by gains in other categories. By utilizing this practice, New Century Management consistently determined that a LOCOM adjustment was not required and that it did not have to mark down the value of the "scratch and dent" and other non-performing loans. The Examiner believes the practice of re-aggregating loans into a single category after the loans were priced, and using gains to offset losses, is inconsistent with industry practice in applying and interpreting FAS 65. As a result of this misapplication of LOCOM, the LHFS portfolio was overstated in the Company's financial statements by at least $3.1 million for the year ended December 31, 2005, and by at least $3.9 million, $20.5 million and $30.6 million, respectively, in the first three quarters of 2006.[690]

In its 2005 audit and 2006 quarterly reviews, KPMG examined New Century's LOCOM analysis and determined that it was reasonable. When questioned about this practice by the Examiner, Kim and Donovan both stated that the practice was acceptable because it was technically permitted under FAS 65. This conclusion does not evidence proper consideration of

---

[690] These amounts relate to New Century's application of LOCOM in a manner inconsistent with industry practice. The Examiner does not consider these amounts misstatements because the application of the LOCOM requirements pursuant to FAS 65 is subject to varying interpretations.

industry practice or the overall impact of the accounting treatment on the financial statements presented.[691]

Minimal research and analysis by the KPMG engagement team would have revealed that New Century's LOCOM analysis was not only contrary to industry practice, but that it operated to conceal losses and prevent the mark-down of the value of non-performing repurchased loans. KPMG's failure to recognize this valuation issue evidences a lack of due care in performing the audit and reviews. Moreover, as a result of this failure, KPMG did not properly advise Management or the Audit Committee that: (1) New Century's LOCOM analysis was not consistent with industry practice; (2) the practice had the potential to conceal losses; and (3) the practice actually did cause New Century to conceal losses and overstate the LHFS balance.

### f.   KPMG Did Not Detect Material Weaknesses in New Century's Internal Controls Regarding Repurchase Reserves.

During the 2004 SOX audit, KPMG concluded that New Century lacked written policies and procedures for estimating the repurchase reserve. In 2005, despite the Company's failure to develop and implement a formal policy for the second year in a row, KPMG concluded that this deficiency was not significant. In support of its assessment, KPMG cited in its workpapers to its materiality thresholds. When interviewed by the Examiner, the KPMG auditor responsible for most of the 2005 internal control audit work stated that KPMG's detailed quarterly reviews of the repurchase reserve allowed it to observe and test the control points of New Century's process for calculating the repurchase reserve irrespective of whether the policy was formally adopted. However, as discussed above, KPMG failed to appreciate the effect of changes in the methodology for calculating the reserve, and it failed to detect a material weakness relating to the backlog of repurchase claims. A formal corporate policy setting forth the required procedures for calculating the repurchase reserve in sufficient detail likely would have alerted KPMG to both of these issues.

Despite its status as a significant financial account, KPMG's SOX walkthrough of New Century's repurchase reserve estimation process in 2004 and 2005 failed to detect the lack of effective controls relating to the communication of repurchase requests from New Century's Secondary Marketing Department to the Accounting Department. The Accounting Department was responsible for calculating the reserve, yet no procedures existed in either the Accounting

---

[691] AU §§ 230, 342 and 722.

Department or Secondary Marketing for communication between the two departments of anything other than actual repurchases made. KPMG's SOX walkthrough should have revealed this lack of communication. Indeed, as a result, New Century's repurchase reserve methodology only took into consideration repurchases actually made, and not repurchase requests received. KPMG's internal control review was equally deficient because it started its review with repurchases actually made instead of beginning at the time when repurchase requests were first received. As a result, KPMG missed the growing backlog of repurchase claims that should have been properly included as part of the repurchase reserve calculation methodology. KPMG should not have issued an unqualified opinion on the adequacy of New Century's internal controls in light of this glaring disconnect between the two departments primarily responsible for this significant financial account.

During the 2004 year-end audit, KPMG noted that the principal balance of loans repurchased in the fourth quarter of 2004 soared to $58.7 million as compared with $22.8 million in the prior quarter. KPMG workpapers note that "the bulk of Q4 2004 repurchases took place in November 2004." Some of the increase was attributed by KPMG to the repurchase of "a bulk of loans from Morgan Stanley due to first payment default." KPMG's workpapers do not indicate that any other follow-up or substantive testing was performed to confirm this response or calculate the impact on the applicable accounts. An internal New Century communication from Cloyd to Walker noted that the increase was due, in part, to the fact that "many of the loans repurchased were from prior quarters and months leading to the increased volume and discount." It is not clear whether this information was conveyed to KPMG, but it likely was conveyed because KPMG had specifically inquired regarding the November 2004 repurchase spike. In any event, KPMG's lack of diligence during the SOX 404 audit process failed to detect the fact that as early as 2004, repurchase claims were rolling over from one quarter to the next. As a result, KPMG and New Century missed an important opportunity to identify this material weakness in the repurchase claims process at a time when KPMG was on notice of the issue.

As a result of the material weakness with respect to New Century's repurchase reserve calculation process, KPMG's unqualified opinion in 2005 on the adequacy of New Century's internal controls over financial reporting violated AS 2. In addition, KPMG violated AS 2 by not informing the Audit Committee of the material weakness.

Moreover, although no opinion was issued by KPMG with respect to the 2006 SOX 404 audit, the Examiner believes that the SOX 404 audit was substantially completed by KPMG by the time the firm resigned in April 2007. Based on the Examiner's review of the workpapers in connection with the repurchase reserve process walk-through for the 2006 SOX 404 audit, it appears that the second and third quarter changes to the repurchase reserve calculation methodology escaped engagement team scrutiny. These changes, as discussed above, not only violated GAAP, but also had the effect of decreasing the reserve at a time when all market conditions suggested the reserve should be increased substantially. Because there was no formal accounting policy regarding the repurchase reserve calculation—which had been deemed to be an insignificant control weakness by KPMG in prior audits—Management had unfettered discretion over changes to the reserve calculation, and the Audit Committee was never informed of these changes.

### 3. KPMG's Reviews and Audits of New Century's Residual Interest Valuations Did Not Reflect Due Care.

In its annual audit planning documents for 2005 and 2006, KPMG identified New Century's residual interest valuations, like the repurchase reserve, as a critical accounting policy, which reflected KPMG's judgment that it was "both most important to the portrayal of the company's financial condition . . . and require[d] management's most difficult, subjective or complex judgments . . . ." Nonetheless, KPMG failed to detect the material overstatement of the value of the Company's residual interests in the 2005 year-end financial statements and in its 2006 interim financial statements. Indeed, KPMG consistently concluded—and represented to the Company's Audit Committee—that the Company's residual interest valuations were reasonable and KPMG issued an unqualified audit opinion on the 2005 year-end financial statements.

GAAS, as described above, requires independent auditors to exercise due care in the planning and performance of an audit. The Examiner finds that KPMG failed in its duties. An extensive chronology of KPMG's conduct is contained in Section VI.B., and will not be repeated here. A discussion of the pertinent factual findings in light of the relevant standards is set forth below.

a.    **KPMG Failed to Plan Its Audits and Reviews of New Century's Residual Interest Valuations Effectively in Light of Noted Deficiencies in Internal Controls.**

In 2004, 2005 and 2006, KPMG identified a number of internal controls deficiencies with respect to the residual interest valuation process. As discussed in greater detail in Section VIII., during its 2004 internal control review, KPMG documented a significant deficiency in internal controls surrounding residual interests, noting that New Century did not have adequate documentation supporting its valuation of residual interests. Specifically, KPMG concluded:

> Management neglected to create adequate documentation supporting data inputs for Secondary Marketing's calculation of residual values and the loss curves used in determining the allowance for loan losses. This includes collateral data reconciliation and certification of expected cash flows. This information is necessary to support the review process of such calculations to help ensure data integrity underlying the calculations.

KPMG reported this as a *significant deficiency* to New Century in its year-end management letter. KPMG's 2004 workpapers indicate that the Company remediated this deficiency as of year-end based on KPMG's review of the minutes of a REIT Committee meeting in late January 2005 at which the topic of residual interest valuations was discussed. Not only did the REIT Committee meeting occur after year end, but the documentation provided does not appear to have addressed the specific concerns underlying the deficiency finding.

In 2005, KPMG also identified thirteen control deficiencies relating to the residual interest valuation process. Notably, the identified deficiencies included concerns relating to missing policies, support for assumptions and documentation. Similarly, KPMG's draft workpapers for its 2006 SOX 404 audit noted a number of deficiencies related to residual interest valuation, including the recurring theme that "[m]anagement does not have a regular, documented process in place to determine a threshold at which to adjust assumptions in the residual asset models."

Despite the identification of significant internal control deficiencies with respect to residual interests in the 2004 SOX 404 audit, this area of the engagement was assessed a risk of misstatement of "moderate" for 2005. Moreover, while the audit risk in this area was changed to "high" in 2006, the Examiner has not been able to discern any significant difference in the planned tests for 2006.

GAAS requires independent auditors to develop a plan for their audit that is appropriate in light of relevant facts and circumstances. KPMG's planned audit procedures in 2005 and 2006 with regard to residual interest valuation issues, and its documentation in underlying workpapers, were insufficient to address the increased risk related to internal control deficiencies in key process areas that either were or should have been identified by KPMG. Moreover, as discussed further below, KPMG should have considered the known deficiencies in internal controls when testing (or relying on) Management's assumptions and representations.

### b.   KPMG's Acceptance of Management's Assumptions Was Unreasonable.

The assumptions underlying Management's residual interest valuations were accepted as reasonable by KPMG in the absence of sufficient evidence to support those assumptions. In light of the lack of internal controls surrounding residual interest valuation, and, in particular, a lack of documentation to support the assumptions, KPMG did not exercise appropriate professional skepticism in conducting its audits and reviews. Applicable professional auditing standards required KPMG to adopt "an attitude that includes a questioning mind and a critical assessment of the audit evidence," or to obtain sufficient evidence to support Management's assumptions. KPMG's acceptance of Management's assumptions without supporting evidence represents a clear departure from GAAS and a lack of professional care.[692]

### i.   Discount Rates

First, as discussed in Section VI.B., the Examiner has concluded that the discount rates used by New Century in calculating the value of its residual interests were too low as of year-end 2005 and through the first three quarters of 2006. Specifically, the Examiner has concluded that the discount rates should have been no less than 15% and 17%, respectively, for the CE securitizations and NIMS as of year-end 2005 and that New Century's financial statements overstated the value of the Company's residual interests for that period by at least $14.8 million because it relied upon unduly low discount rates of 12% and 14%. KPMG effectively approved New Century's discount rates despite clear indications that they were not appropriate from, among others, KPMG's own internal SFG specialists.

---

[692] The use of marketplace information, where appropriate, is required by GAAS. AU § 326, ¶ 6 ("However, if observable market prices are not available, GAAP requires that valuation methods incorporate assumptions that marketplace participants would use in their estimates of fair value whenever that information is available without undue cost or effort.").

- 495 -

As early as the first quarter of 2005, KPMG knew that the Company's discount rates were aggressive. Indeed, each SFG review revealed this fact, quarter after quarter. Specifically, the audit assist memoranda Carnahan prepared in the first three quarters of 2005 stated that New Century's discount rate "is at the low end of the range compared to similar issuers" with "other issuers . . . typically using residual asset discount rates principally ranging from 12% to 35%." SFG recommended that the engagement team obtain from New Century information supporting the use of its relatively low discount rates, such as a letter from an investment bank or market information for a comparable asset. Despite SFG's findings, the engagement team repeatedly concluded that the residual interest valuations were reasonable and proper, without insisting, during its quarterly reviews, on the documentation that the SFG had recommended.

New Century ultimately provided supporting documentation to KPMG in January 2006 in connection with the 2005 audit. Although the engagement team determined that the discount rates were reasonable based on this documentation, the SFG considered the Company's documentation to be insufficient because New Century provided comparative market data for various bonds and had concluded that a corporate junk bond supported its low discount rates. SFG did not view this as an appropriate comparison. Moreover, SFG expressed increasing concern that the Company's discount rates were inconsistent with rates used in comparable sales of residual interests by New Century's peers. For example, in an e-mail dated February 14, 2006, Carnahan noted that "[w]e have numerous clients that have sold Residuals in the last year and the average discount rate . . . has been 18% to 23%" for non-NIMS and two other clients use rates of 35% and 40% for NIMS . . . . *[T]his client [New Century] has the lowest sub-prime Residual discount rates of any client that I am aware of, which we have consistently communicated.*" (emphasis added) Nonetheless, less than two months later, the KPMG engagement team's conclusion memorandum states, as it had stated for the previous quarters: "Given the Company is in sub-prime lending, the assumed discount rates appear reasonable . . . ." Whether due to a lack of understanding, unreasonable reliance on Management or a lack of willingness to challenge Management in the wake of the 2005 10-K filing crisis, the engagement team merely reiterated its client's rationale instead of properly considering the contrary data presented by SFG.

In the fall of 2006, the SFG eventually pushed even harder for stronger documentation of the Company's discount rates, at which time Dodge and Kenneally asked Goldberg to prepare an

analysis of these discount rates. Goldberg's analysis concluded, and Kenneally and Dodge agreed, that the Company should recommend an increase of the residual interest discount rates to 15%. Although Carnahan wanted to press for at least market bids to support the valuations, KPMG did not press the Company for such bids nor did KPMG press Management or the Board to increase the discount rate. The Finance Committee of the Board ultimately rejected that recommendation on October 16, 2006. Details regarding this series of events are set forth in Section VI.B.

When questioned by the Examiner, both Donovan and Kim reiterated their belief that the Company's residual interest discount rates were appropriate during this time period, despite SFG's concerns, and maintained that SFG ultimately agreed that the Company's residual interest valuations were reasonable. Carnahan supported that view, but the Examiner finds that the plain language of the SFG memoranda—and the increasing alarm noted in the memoranda—are inconsistent with his representations to the Examiner. This is yet another area in which the KPMG witnesses did not appear credible.

### ii.    Par Value Assumption

The Examiner also is critical of New Century's unquestioning reliance upon its assumption that remaining loans would be sold at par upon collapse of a securitization. The Examiner has not found any evidence, however, that KPMG challenged New Century's reliance upon this "par value" assumption throughout 2004, 2005 and 2006. In determining that the par value assumption was reasonable, KPMG appears to have relied only on information obtained from the Company that the remaining loans in a small number of older deals had been sold "at about par" when those deals collapsed, claiming that "the Company has enough internal historical data of its own in order to evaluate the reasonableness of assumptions." New Century departed from the par value assumption on its own initiative in February 2007.

The par value assumption was embedded in all of the Company's many residual interest valuation models, including the models that the SFG reviewed each quarter. At a minimum, KPMG's engagement team should have challenged this assumption as early as 2005 by requesting that New Century provide documentation that would explain and support its reliance upon the par value assumption. Such a challenge might have triggered the kind of analysis that John Hatch ultimately conducted in the fall of 2006 and the kind of discussion New Century

engaged in during consideration of Project Kettlebell, which ultimately led the Company to realize the problems with the par value assumption.

### iii.  Prepayment Rates

Management's prepayment rate assumptions were based on historical information—the average performance of New Century's loan collateral from 1997 to 2002—that did not yield accurate estimates. The Examiner has concluded that the Company should have been calibrating the prepayment assumptions in its residual interest valuation models to reflect changing market conditions much earlier than 2007.

KPMG's SFG consistently recommended that the KPMG engagement team analyze New Century's prepayment assumptions because the Company's prepayment assumptions were considered "low compared to those of similar issuers, the prepayment performance in the industry, and the Pool's historical performance." As discussed above, SFG also recommended that New Century update these assumptions because New Century's actual prepayment results repeatedly differed from its projected results, but the engagement team did not press this point and New Century did not adjust its assumptions until February 2007. The engagement team's conduct with regard to this critical assumption in New Century's residual interest valuation models is further evidence of a lack of due professional care.[693]

### iv.  Clean-up Call Percentages

KPMG's SFG was concerned about the Company's practice of routinely changing the clean-up call percentages in its residual interest models, which effectively pushed out the clean-up call dates. As a result, the SFG recommended that the engagement team test the Company's assertion that it would terminate securitizations when they reached the clean-up call percentages specified in its residual interest valuation models and obtain explanations when the clean-up call percentages differed from quarter to quarter. The SFG noted that changing a clean-up call to a lower percentage effectively pushed out the terminal cash flows associated with the Company's residual interests and tended to increase their fair value.

During its first quarter 2006 review, KPMG learned that projected cash flows in the residual interest valuation models were higher than actual cash flows by $3 million (which amounted to roughly 10% of the value). In its workpapers, however, KPMG concluded that this

---

[693] Since the first quarter of 2005, SFG had recommended that the engagement team analyze the prepayment assumptions and had repeatedly raised the issue that New Century's prepayment rate was low compared to the rates of similar companies, industry prepayment performance, and historical prepayments.

"slight" 10% variance "indicates that the residual interests appear reasonable." KPMG apparently did not evaluate the significance of that difference and its impact on the Company's financial statements, however. The Examiner was told by Ryan Beckstrom that no such analysis was conducted because this difference was discovered as part of a quarterly procedure. The Examiner finds that KPMG should have explored further the cause of the variation and its impact before concluding that the valuation was reasonable..

In addition, although members of the engagement team and SFG recognized potential problems with New Century's changes in its clean-up call percentages, the engagement team was not aggressive enough in determining the causes of those changes and in communicating their significance to Licata and other appropriate people at New Century.

In sum, the Examiner finds that, particularly with respect to the discount rate and par value assumptions, KPMG's engagement team should have questioned Management and, in general, exhibited a far greater degree of professional skepticism with respect to the Company's assumptions by, for example, including demanding more evidence to support those assumptions. In addition, KPMG's workpapers and the Examiner's interviews indicate that members of the engagement team believed that Management was not reviewing the validity of its own assumptions for pre-2003 securitizations as of at least late 2005.[694] Such a belief should have triggered further inquiry of Management, at minimum, to determine why they were no longer updating the assumptions and follow-up testing to determine whether the assumptions were adequate. Moreover, while Kim told the Examiner that he reviewed Finance Committee minutes as a matter of course to determine Management's changes to its assumptions, the Examiner has not found, with the exception of the October 2006 discussion of the discount rate, anything more than passing references in the Finance Committee minutes to the assumptions, and the minutes certainly do not provide comfort that a system was in place for reviewing the assumptions or that sufficient documentation existed to support the assumptions.

### c.    KPMG Did Not Question Reliability of the Company's Models.

The Examiner believes KPMG should have been more critical of estimates generated by models developed in-house.    Indeed, auditing standards recognize that externally derived evidence (*e.g.*, reliance on a model developed by a third party to support a company's estimates)

---

[694] While the Examiner found that changes actually were made through the first quarter of 2006, New Century began to drastically reduce the number of assumption changes made to the pre-2003 models in late 2005.

is generally more reliable than that obtained solely from sources inside the company (*e.g.*, in-house models).[695] Although Kim and Donovan claim that many clients in the industry developed their own models, the Examiner finds that, by 2005, that was not the case. As set forth in Section VI.B., the Examiner has concluded that the models used by New Century to calculate the value of its residual interests should have been abandoned by 2006, at the latest, in favor of third-party models, which were widely used in the industry at that time.

Moreover, as discussed in Section VI.B. and as summarized below, KPMG personnel knew that the models used by Management to calculate residual interest valuations were flawed and had generated errors. The reliability of the models was repeatedly called into question. In its audits and reviews of New Century's residual interest valuations, KPMG determined on a number of occasions that the models contained errors. In early 2006, an error caused by the failure to include private mortgage insurance in one of the 2005 securitization models was deemed to be significant and required a $9 million write-down. The error, which existed at December 31, 2005 and which overstated the value of the Company's reported residual interest assets, was detected by SFG in its testing of a sample of models in the first quarter of 2006.

The engagement team also discovered variances between the data inputs in several models and comparable data from the corresponding trustee statements, which, it was told by Mullins, were due to minor flaws in the models. Beckstrom, the junior auditor responsible for reviewing residual interest valuations, did not recall what, if anything, was done to verify that the variances were a result of minor flaws in the models nor did he recall whether anyone tried to quantify what the variances might have been or whether there was a need to make an adjustment to the models as a result. When Beckstrom reviewed the workpapers for the 2004 year-end audit (as part of his work on the review for the first quarter of 2005), he found that discrepancies had been identified in models as part of the 2004 year-end audit work as well. These variances were documented in the workpapers, which should have been reviewed by the engagement manager and audit partner.

Other KPMG engagement team members also acknowledged the existence of modeling errors during their interviews with the Examiner. Donovan and Kim said they knew of the flaws, but claimed that they were immaterial, even in the aggregate, even though they reached their conclusions without any documentation as required by AS 3. Moreover, KPMG's approach –

[695] AU § 326.21.

and the views of its engagement team – apparently did not change despite the discovery of the $9 million overstatement by one model in the fourth quarter of 2005. Even when interviewed, Kim and Donovan claimed that the models were sufficient.

An analysis conducted by PwC in early 2007 of models for two 2005 securitizations confirms that the models were deficient in numerous respects, including that:

- The loss calculations were inconsistent with industry practice.
- The delinquency triggers were not modeled appropriately.
- The discount rates used for valuation were not product-specific, while New Century's pricing model had product-specific discount rate adjustments.
- The models were limited to 20 rep lines – limiting the models' granularity.
- The processes for regular review and updates to model assumptions were not defined.
- There was no model documentation.
- A significant key person risk existed, which was exacerbated by the limited documentation and use of a propriety model.
- No controls existed for model changes.[696]

The Examiner finds that, had KPMG exercised appropriate professional skepticism with respect to the reliability of the models and conducted more rigorous testing (instead of relying solely on Management's representations that variances were caused by "minor flaws"), these deficiencies would have been discovered much earlier. That KPMG never challenged the continued use of the internally developed models is yet another example of a lack of professional skepticism exhibited by the engagement team[697] and a failure of the team to obtain sufficient and competent evidence to support a valuation estimate.[698]   This failure is particularly notable given that, several years before, with respect to New Century's financial statements for the year ended December 31, 2000, KPMG discovered a calculation error in the residual interest models that led to a $70 million write-down that resulted in the first loss in New Century's history.

---

[696] This analysis was pursuant to an engagement of PwC by Taj Bindra that was separate and independent of the work later down by PwC in connection with the SIC's investigation.

[697] AU § 230

[698] AU § 326

### 4.    KPMG's Reviews and Audits of Other Financial Accounts Also Reflect a Lack of Due Care.

The Examiner's investigation also revealed other errors in New Century's financial statements, as discussed above, and corresponding audit and quarterly review failures by KPMG. While the Examiner is not in a position to conclude whether these errors caused a material misstatement, they nonetheless reflect, at best, a lack of professional skepticism and due care in KPMG's audits and reviews and, at worst, an acquiescence by KPMG in New Century's aggressive accounting policies and practices.

### a.    Allowance for Loan Losses

New Century established an ALL to reserve for losses related to its on-balance sheet loans held for investment ("LHFI") and related assets.    LHFI included securitized loans structured as financings and those loans pending securitization as financings.  Loans securitized as financings do not qualify for sales treatment under FAS 140 and therefore were retained on the Company's balance sheet.

KPMG's workpapers indicate that New Century's ALL estimation models were reviewed during the quarterly reviews and year-end audits during 2004 through 2006.  KPMG identified the ALL calculations as a risk in their planning documents for 2004, 2005 and 2006.  In all three years, the ALL was identified as a critical accounting policy. [699]  Beckstrom was the primary engagement team member performing the work on the ALL in 2005 and 2006.  KPMG applied analytical procedures, inquired of Management, and tied out actual data from the ALL models prepared by New Century to the underlying trustee statements for the securitizations in performing its audit and review of ALL.

Based on the Examiner's review, and the fact that KPMG assigned some risk to ALL calculations year over year, the Examiner has concluded that KPMG's review and audit of ALL did not comport with applicable professional standards.  KPMG commented at various times in 2004 through 2006, in both the general audit workpapers and those related to internal controls over financial reporting, that the Company did not adequately document its methodology for its ALL, and yet KPMG allowed the same deficiencies to remain unremediated each year. Additionally, the assumptions used to estimate the ALL were not updated for the trends in actual performance or Management's revised expectations.  KPMG failed to insist that New Century

---

[699] Form 10-K for 2005 at pp. 63-64.

update the models that KPMG knew were incorrect and which resulted in inaccurate amounts for the ALL. KPMG's failures likely violated its obligation to use due care and exercise professional skepticism in accordance with AU § 230. Additionally, KPMG failed to obtain sufficient evidence and improperly relied on assertions of Management regarding ALL estimates in violation of AU §§ 326 and 342. Finally, KPMG also did not modify its audit plan appropriately in light of the circumstances identified by KPMG as affecting ALL calculations for 2004 and 2005.

Lack of documentation for the ALL estimation was identified as an issue for New Century as early as 2004. On March 15, 2005, KPMG sent a letter to Dodge regarding the 2004 audit of internal controls over financial reporting. The letter identified the following significant deficiencies with the ALL: (i) Management's failure to create adequate documentation evidencing the appropriate application of GAAP to ALL; and (ii) Management's lack of adequate documentation to support the loss curves used in determining ALL.

Despite its identification by KPMG during the 2004 audit, New Century's lack of documentation to support the loss curves was not listed in the substantive audit procedures until 2006 when it was listed as a control risk. It also was included as a deficiency in KPMG's workpapers for the incomplete 2006 audit along with a statement that, "[p]olicies and procedures to describe the Allowance for Loan Loss (ALL) methodology are not formally documented." When interviewed by the Examiner, Kim could not explain why the significant deficiencies documented in the letter to Dodge in March 2005 had not been remedied as of year-end 2006 or why they were not viewed as a significant deficiency during the 2005 SOX 404 audit.

In 2006, based on the heightened risk of the ALL noted in the planning documents and the Audit Committee's increased interest in the adequacy of the ALL, a specialist in FRM conducted an audit assist at the request of the engagement team and performed a detailed review of the modeling approach and forecasting outputs generated by the Company in preparing its ALL. The specialist drafted a memorandum dated December 2006 wherein he concluded that, with respect to ALL: "[t]here is no model development documentation;" "[t]here have apparently been no formal model validations performed over the net loss forecasting methodology;" "[t]here is no documentation describing Allowance for Loan Loss procedures;" and the Company lacked documentation to support the "development and modification of the allowance for loan losses base curve." Both Kim and Donovan were interviewed regarding the specialist's comments.

Kim reported that the Company was looking into the matters brought to light by the specialists. Donovan stated that the Company actually had the necessary documentation and that during the spring of 2007, it was in the process of gathering the data to give to KPMG.

The Examiner found no evidence that New Century provided KPMG with the missing ALL documentation identified by the specialist from 2004 through 2006. Substantially similar deficiencies were noted at several points over the three-year period and there is no evidence that these deficiencies were remediated. The substantive guidance in the area of ALL contained in SAB 102 and FRR 28 focuses predominantly on the necessity for documenting the Company's support for the amount and methodology of estimating the ALL. There is no evidence for the years 2004 through 2006 that New Century had such documentation or that KPMG tested for remediation and documented the results in its workpapers.

New Century's modeled ALL estimates produced different results than the actual loan losses in virtually every quarter. In quarterly and year-end workpapers from 2005 to 2006, KPMG documented that the ALL was overreserved based on the rolling 18-month projection used to estimate the ALL. The 2005 through second quarter 2006 workpapers for the ALL state that:

> The Company believes that the model reasonably supports the above balance as expected losses for some of its earlier models have been lower than initially modeled and thus the allowance has not been reduced by expected charge-offs. The Company believes that the actual losses may exceed the modeled losses in future periods and does not believe it appropriate to reduce the allowance in the [current quarter] due to what could possibly be timing differences or a period of unusual actual losses.

In the third quarter of 2006, the language changed slightly:

> KPMG obtained the eighteen models for the pools above and noted that the expected losses are set on a base curve that has historically projected greater losses than have been experienced, and these base curves continue to project greater losses than the historical curve would indicate. Per discussion with Management, this difference is the result of changes in the economic environment, such that historical losses may not accurately predict future losses given the slowing housing market and decreasing appreciation on home prices in many markets.

The 2006 year-end workpapers reflect that New Century's ALL "had been overaccrued in the past and now the seasoning of the portfolio [caused] actual losses to approach the level of expected losses."

For each of these quarters, although the workpapers indicate that Management knew the performance of the loan portfolios differed significantly from the ALL methodology, KPMG never sought to revise the calculation or quantify the potential misstatement. The Company's estimate in June 2006 was that the ALL was overreserved by $21 million.

The provision for loan losses is primarily governed by FAS 5, which allows a reserve for an estimated loss to be recorded (1) when it is probable that an asset has been impaired (or a liability has been incurred) *and* (2) the amount of the loss can be reasonably estimated. The fact that Management's estimation of the ALL was inconsistent with actual losses indicates that Management may have maintained an overstated ALL through 2004 and 2005 to cover future losses that were not "probable and estimable," as required by FAS 5. As noted, KPMG declined to challenge Management's assumptions regarding the ALL or quantify the potential overstatement of this reserve account.

### b.    Mortgage Servicing Rights

Although New Century sold (through either whole loan sales or securitizations) a large number of the loans it originated, it continued to hold the right to service many of these loans, i.e., mortgage servicing rights ("MSRs"). FAS 140 provides the relevant guidance regarding the accounting for MSRs, and requires that the retained interests in the transferred assets be measured by allocating the previous carrying amount of the loans transferred between the assets sold, if any, and retained interests, if any, based on their relative fair values at the date of the transfer. It also requires that servicing assets and liabilities be (a) amortized to income or expense in proportion to and over the period of estimated net servicing income or loss and (b) assessed for impairment (or increased obligation) based on their fair values. Under FAS 140, a company is required to disclose its accounting policies for initially measuring the MSRs, including the methodology used in determining their fair value and the key assumptions used in measuring the fair value of the MSRs at the time of securitization.

New Century improperly recorded the initial values of its MSRs by using estimates of market value, as opposed to allocating the carrying amount of the loans transferred between the assets sold and the interests retained, as required by FAS 140.[700] As a result, although the

---

[700] For the 2005 audit, KPMG quantified the impact of this deviation from GAAP, and determined that the resulting figure ($698,217) fell below the posting threshold from the Company's income statement. KPMG's engagement team does not, however, appear to have recommended that the Company alter its method of recording initial MSR

Company claimed in its public disclosures that it conducted a quarterly impairment assessment of its MSRs, New Century *could not* have meaningfully undertaken that analysis in light of its failure to book the initial values of these assets appropriately.

In connection with the 2005 audit, KPMG observed that New Century did not perform a formal valuation of its MSRs portfolio (relying instead upon quoted market prices on historical transactions to estimate the fair value of its MSRs). KPMG's SFG recommended in February of 2006 that the Company obtain at least one independent, third-party valuation to support its internal valuation, but there is no indication that the KPMG engagement team pressed this recommendation with New Century. Further, New Century did not conduct a formal valuation of its ongoing servicing operations, which created the possibility of a GAAP violation, as FAS 140 requires all institutions conducting loan sales and securitizations to perform ongoing valuations of their servicing portfolios, including amortization and impairment analysis.

To the extent that the Company attempted to amortize the net gains or losses from its MSRs, it did so using a simple, linear approach. This violates the requirement of FAS 140 that a net proportional amortization method be used for this purpose.[701]  KPMG was aware of this departure from FAS 140, which was mentioned in a draft audit assistance memorandum from SFG relating to the 2005 audit.[702]  In addition, that same draft contained a comment inquiring about the quantitative impact of this improper amortization method and raising the possibility of an audit difference. It does not appear that KPMG or the Company ever calculated that impact.

Nonetheless, the Company represented (inaccurately) in its 2005 financial statements that its accounting for MSRs complied with GAAP. KPMG's awareness of potential GAAP shortfalls outlined above, and its failure to quantify their impact, reflect a lack of due professional care. At a minimum, consistent with its obligations under applicable professional standards, KPMG should have conducted additional inquiry and testing to determine the impact of the GAAP violations. Its failure to do so was inconsistent with GAAS.[703]

---

values to comply with FAS 140, nor did KPMG quantify the impact of this non-GAAP practice in other accounting periods.

[701] Under the net proportional method, a higher degree of amortization occurs during more pronounced periods of expected income or loss, while less amortization occurs in periods of lower projected gain/loss.

[702] Mention of this issue was removed from the final version of the memorandum.

[703] *See, e.g.*, AU § 230 (due care).

### c.    Deferral and Amortization of Loan Origination Fees and Costs Under FAS 91

New Century was required to defer its costs and fees associated with the origination of mortgage loans in accordance with FAS 91. KPMG performed year-end audits and quarterly review of the FAS 91 calculations from 2004 through 2006. Generally, a staff accountant performed the work, a senior associate supervised it and the manager and partner reviewed the work. In each quarterly review and year-end audit from 2004 through 2006, KPMG determined that New Century was accounting for loan origination fees and costs in accordance with FAS 91. Additionally, KPMG workpapers reflect that the procedures performed by KPMG essentially did not change over this entire period.

In order to calculate the amortization under FAS 91 for New Century, certain net costs were pooled and allocated pro rata because New Century was unable to capture loan level information and direct origination costs on each individual loan. The net costs were then divided by the number of loans for the given period to derive the costs per loan that should be allocated under FAS 91 and the costs were applied to unsold inventory. The computations were passed to the Accounting Department at New Century to perform the amortization calculations.

### i.    Risk Assessment

KPMG assessed the RoSM of net deferred origination costs as "low" in 2004 and 2005 and "moderate" in 2006. In addition to altering the risk assessment, KPMG changed its 2006 audit procedures to review New Century's amortization methodology. The 2006 planning document states that KPMG should take steps to ensure that current expenses are not being deferred in FAS 91 type activities. The 2006 planning document also identified amortization of origination costs as a fraud risk.

Kim told the Examiner that the RoSM was assessed as low in 2004 and 2005 because the amortization of deferred origination costs was routine, in spite of the fact that variable assumptions such as prepayment speeds could affect the calculation. Neither Donovan, Macaulay nor Kim were able to provide any explanation regarding the change in assessment from 2004 and 2005 to 2006. In addition, they were unable to explain the fraud risk.

According to the workpapers, moderate risk was assigned by KPMG in 2006 because the Company did not amortize deferred origination costs on a loan level basis and there was a risk of inaccurate amortization when applying the pool method. Macaulay opined that errors, rather than fraud, could arise because of the amortization on a pool basis. However, New Century

amortized these fees and costs on a pooled basis for the entire time period from 2004 through 2006, so it is unclear why the inherent risks associated with pool-based amortization affected KPMG's risk assessment of the FAS 91 calculation only in 2006. To the extent that this was not understood to be a risk in the prior years suggests that KPMG did not exercise reasonable care and diligence in its assessment of the risks involved in the FAS 91 calculation in 2004 and 2005 and that the audits and reviews were not planned appropriately as a result.[704]

## ii.    Errors Detected

In the third quarter of 2004, the Company changed its practices with respect to correspondent loans and began to exclude commissions paid to New Century employees in obtaining correspondent loans in the calculation of the deferred cost balance. New Century continued this practice until the second quarter of 2006, when it was discovered that the loans were not, in fact, correspondent loans and therefore the commission amount should have been included.

At the time of the change in 2004, KPMG asked New Century to quantify the overstatement in deferred costs for the quarters prior to the third quarter 2004 in which the Company had included commissions paid to New Century employees in obtaining correspondent loans. KPMG relied on Kennealy's representation that the maximum overstatement in the deferred costs balance for correspondent loans was $1.5 million. Because the amount was less than the KPMG audit difference posting threshold, KPMG elected not to propose an adjustment. It does not appear from the workpapers that KPMG ever verified Kennealy's representation regarding the dollar amount. KPMG's acceptance of Management's explanation of the maximum overstatement in the deferred costs balance for correspondent loans made prior to third quarter 2004 reflects a failure to obtain reliable evidence[705] and failure to exercise appropriate professional skepticism.[706]

KPMG failed to identify that New Century was misclassifying correspondent loans and, therefore, not deferring specific costs for the period from third quarter 2004 through second quarter 2006. While it was determined in second quarter 2006 that the method utilized prior to third quarter 2004 was actually the correct method because the loans were not correspondent

---

[704] AU § 230

[705] AU § 326

[706] AU § 230

loans, it is not clear what measures were taken by KPMG to investigate and/or quantify the accounting variance based on the exclusion of the amounts from the third quarter 2004 to the second quarter 2006. The failure to identify the mislabeling of the correspondent loans, and the apparent lack of documentation regarding KPMG's investigation thereof, reflects a failure to obtain reliable evidence[707] and failure to exercise appropriate professional skepticism.[708] Additionally, there is no indication that KPMG attempted to determine the effect of the misclassification on the deferred cost balance in the previous quarters. The Examiner is unable to determine whether the impact of the error was material and therefore required adjustment.

In the fourth quarter of 2006, KPMG determined that New Century misapplied the level-yield method and identified an adjustment of $261,060 as a result of a failure by New Century to factor interest income into its computations under FAS 91. According to KPMG, the error originated in the models designed by Secondary Marketing. KPMG's workpapers do not reflect any intention to address the impact of the failure to account for interest income on New Century's statement of earnings in prior quarters. KPMG failed to act with reasonable care and diligence in its failure to look-back to other quarters to determine the origin and financial impact of the mistake.[709]

### d.    Hedging

New Century used derivative instruments in an attempt to insulate itself against the possibility of interest-rate shifts detrimentally impacting the Company's cash flow from loans held for investment (and, to a lesser extent, against potential adverse changes in the value of its loans held for sale). Specifically, the Company used certain Euro Dollar futures contracts, interest rate swap contracts and interest rate cap contracts for this purpose.

In connection with the 2005 audit, as discussed above, KPMG appointed FDR specialist John Klinge to the New Century engagement.[710] In connection with his review of New

---

[707] AU § 326.

[708] AU § 326.

[709] AU §§ 312, 329

[710] No such specialist assisted with the 2004 audit, however. Moreover, KPMG's 2004 hedging workpapers do not appear to have been reviewed even by senior members of the engagement team: Neither the audit nor the concurring review partner signed off on any of the KPMG hedging memoranda, which left Athena Chan, (a manager) solely responsible for reviewing the hedging work of Beckstrom and Chinn (both of whom were first-year staff accountants). This relative lack of supervision and expertise in auditing a complex area of accounting during the 2004 audit marks a potential deviation from AU § 210 (training and proficiency of the independent auditor) and AU § 311 (planning and supervision).

Century's hedging for the 2005 audit, Klinge informed the engagement team that New Century had failed to account for at least some of its IRLC as derivatives, which represented a departure from GAAP. In New Century's 2005 financial statements, however, the Company stated that its "interest rate lock commitments are considered to be derivatives and are recorded on our balance sheet at fair value."[711] The KPMG engagement team determined that the impact of the GAAP departure on the financial statements was immaterial, but does not appear to have identified the disclosure discrepancy.

Citing FAS 133, paragraph 29(b) (which deals with forecasting the probability of a given transaction's occurrence), Klinge also raised questions during the 2005 audit regarding New Century's use of a 48-month assumption for interest cash flows, in light of the possibility for borrower prepayment. In particular, Klinge maintained that he had not seen adequate documentation to support this assumption. As discussed above, the matter was ultimately escalated to KPMG's DPP, which considered and effectively set aside Klinge's concerns on March 16, 2006, the deadline for filing the Company's Form 10-K (thereby allowing KPMG to issue its audit opinion and the Company to file the Form 10-K). Nonetheless, Klinge's documentation concerns do not appear to have been addressed at the time the Form 10-K was filed, and indeed, KPMG worked to document all matters to Klinge's satisfaction over the next 45 days and get appropriate sign-off memoranda from Klinge. Ultimately, KPMG required New Century to change its hedge accounting treatment going forward to conform to Klinge's concerns.

In addition, FAS 133 requires that a company's hedge documentation must be prepared *contemporaneously* with the inception of the hedging relationship. Internal KPMG communications reveal that KPMG was aware, as of June 2005, that much of the Company's hedge documentation for the first quarter of 2005 was in draft form. Although "contemporaneous" is not defined in FAS 133, the SEC generally has held public companies to a strict interpretation of the rule, and thus, draft documentation that is not finalized until some time after the inception of the hedging relationship likely does not satisfy FAS 133. KPMG should have required New Century to furnish final documentation under GAAP and its failure to do so reflects a lack of due care.

---

[711] Form 10-K for 2005, p. 80.

### e.    Goodwill

Of the $80.6 million purchase price for its Home123 subsidiary's acquisition of RBC Mortgage's prime mortgage origination platform in September 2005, New Century recorded $77.7 million in goodwill.  The RBC Mortgage business unit sustained losses of approximately $17 million between the date of acquisition in September 2005 and the end of 2005, which was worse than New Century had forecasted.[712]  KPMG conducted goodwill impairment testing in connection with its 2005 audit, but concluded that no impairment was warranted despite the $17 million in losses.

Goodwill impairment testing involves two steps under FAS 142.  First, the business unit's fair value is compared with its carrying amount.  If the fair value exceeds its carrying amount, no additional testing is required and no impairment charge is required.  If, however, the carrying amount of the business unit exceeds its fair value, a second more detailed analysis must be conducted to determine whether a goodwill impairment charge is necessary, and if so, the amount of that charge.  Accordingly, KPMG's goodwill impairment testing consisted of comparing the RBC Mortgage business unit's fair value, based on the Company's discounted cash flow analysis, with its carrying value.  Determining that the fair value exceeded the carrying value, KPMG concluded that no impairment was warranted.  However, the revenue projections on which KPMG relied were not well documented, and the discount rate the Company's cash flow model used was questionable.

Although KPMG's 2005 audit workpapers contain New Century's discounted cash flow analysis for the RBC Mortgage business unit, the workpapers do not appear to contain any evidence that KPMG ever tested or questioned, with any degree of professional skepticism, the Company's underlying revenue assumptions that were used to generate the cash flows.  In addition, KPMG did not document its understanding of the source of the revenue projections or RBC's ability to achieve the forecasted revenues.  KPMG merely analyzed certain calculations of the Company's goodwill valuation and inquired of Management about the nature of certain assumptions.  When interviewed by the Examiner, Kim acknowledged that testing the revenue projections would be a necessary step in the goodwill valuation but could not identify any workpapers documenting that KPMG conducted any such testing.  Because the determination of RBC's fair value begins with the present value of cash flows (which is primarily driven by

---

[712] Form 10-K for 2005, at pp. 57-58.

revenue projections), without support for the revenue projections, the fair value cannot meaningfully be compared to the carrying value.

Moreover, even when RBC incurred losses of $17 million in the first four months following the acquisition, neither Kim nor Donovan were concerned with the possible impairment of goodwill nor were they skeptical of the $18 million in projected net income for 2006. In interviews with the Examiner, both maintained that the Company expected early losses following the acquisition and four months was too short of a period to be concerned with goodwill impairment. In fact, Donovan said he did not expect the audit engagement team to make any attempt to ascertain whether RBC had been experiencing losses, or anything else regarding its profitability, despite FAS 142's requirements that goodwill be tested for impairment on at least an annual basis.

KPMG's 2005 audit workpapers also do not appear to contain any evidence that KPMG questioned or tested New Century's discount rate assumption of 15%. The Company used 20% when internally analyzing the prime mortgage platform's future business plans. Had a 20% discount rate been used rather than 15%, New Century would have been required to at least conduct the second step of impairment testing, the more detailed analysis, in order to determine if goodwill should have been impaired.

Similarly, the Examiner concludes that KPMG failed adequately to audit New Century's goodwill impairment testing in connection with its 2005 audit. KPMG's 2005 workpapers do not appear to contain any documentation that evidences testing of the revenue and gross profit projections upon which New Century relied or even the source of those projections. The KPMG audit team apparently did not question or rigorously test those revenue or gross profit projections, but instead focused on the mathematical accuracy of the calculations used by the Company's cash flow model. It also does not appear that the audit team raised questions during the 2005 audit concerning the 15% discount rate that the Company used in that model. KPMG's apparent failure to obtain sufficient competent audit evidence to support the reasonableness of the critical assumptions underlying the Company's fair value measurement, which were at the core of KPMG's impairment testing at year-end 2005, was inconsistent with KPMG's obligations under GAAS.[713]

---

[713] AU § 328

### 5.    KPMG's 2005 SOX 404 Audit Was Not Conducted with Due Care.

The Examiner finds that KPMG's 2005 review of the adequacy of New Century's internal controls over financial reporting was not conducted in accordance with AS 2 in certain significant respects, as discussed below.  On a preliminary note, the Examiner observes that, in general, the 2005 review appears to have been less rigorous than either the 2004 review or the subsequent 2006 review.  The Examiner believes that this likely is attributable to the limited relevant experience of the senior associate primarily responsible for the review, Biddle, as discussed above.

### a.    KPMG Failed to Identify Control Deficiencies that Existed at the Time of Its 2005 Audit.

As discussed above, KPMG failed to identify certain deficiencies in its 2005 audit of New Century's internal controls with respect to repurchase reserves and residual interest valuations.  Many of these deficiencies were noted in the draft workpapers for the 2006 audit of internal controls as both material weaknesses and significant deficiencies, but they existed at the time of the 2005 audit and should have been identified at that time.

### b.    The 2005 SOX 404 Audit Team Did Not Consider Prior Deficiencies Noted When Planning the Review or Evaluating Their Findings.

The Examiner found no evidence that the KPMG engagement team engaged in a formal process to compare year over year deficiency findings in connection with the 2005 SOX 404 audit.  Conducting this analysis would have been prudent given the wholesale turnover in the KPMG engagement team.  This failure is significant, as it impacted the planning for the SOX 404 audit in 2005, the evaluation of findings in 2005 and the planning for the year-end audits.

Specifically, the Examiner found no evidence of any significant communication between the 2004 and 2005 engagement teams regarding the SOX issues in workpapers, e-mails or interviews.  Highlighting this point, Biddle told the Examiner that she never discussed the New Century audit engagement with the 2004 audit engagement partner, Kinsella, even though she knew Kinsella and was working with him on another engagement in 2005.  Biddle also stated that she did not perform a formal review of the internal control deficiencies identified in the prior year or Management's remediation of those deficiencies.

Under AS 2, an auditor is required to consider the following when planning a SOX 404 audit:

- Knowledge of the company's internal control over financial reporting obtained during other engagements.
- Control deficiencies previously communicated to the audit committee or management.
- The extent of recent changes, if any, in the company, its operations, or its internal control over financial reporting.

By not considering the prior year's deficiencies, the planning for the 2005 SOX 404 audit did not comply with AS 2.

In addition, because they were not aware of certain recurring deficiencies, the KPMG SOX 404 audit team did not consider all of the information available to them when assessing the significance of the deficiencies noted in 2005. For example, as discussed above, KPMG concluded in connection with its 2004 SOX 404 audit that New Century lacked adequate documentation supporting its valuation of residual interests. Although KPMG reported this deficiency to Management, KPMG's workpapers do not adequately explain how the documentation deficiency was remediated by the Company, and the Examiner does not believe, based on his review of the support provided, that the Company did remediate the deficiencies.

In 2005, KPMG identified 13 control deficiencies relating to the residual interest process. However it raised *none* of them as significant deficiencies, which would have necessitated a report to New Century's Audit Committee. Notably, the identified deficiencies included several of the same concerns that were raised as significant deficiencies in 2004 and again later in 2006. Moreover, the KPMG team failed to document its methodology for determining the severity of various control deficiencies identified during the 2005 SOX 404 audit as required by AS 2. The absence of this documentation corroborates the Examiner's conclusion that many of KPMG's severity determinations were based on minimal analysis.

Had the 2005 engagement team considered the 2004 findings, KPMG should have concluded that, at a minimum, significant control deficiencies had persisted with respect to residual interests. These findings would have been reported to New Century's Audit Committee, as required by AS 2. As a result of these inadequacies in KPMG's review, however, the Audit Committee was never provided with the opportunity to address the recurring deficiencies.

In connection with the 2006 SOX 404 review, KPMG documented multiple internal control deficiencies with respect to the residual interest valuation in its draft audit workpapers and assessed internal controls as not operating effectively. These deficiencies, which are as

follows, also would have existed at the time of the 2005 audit but were not identified then by KPMG:

- Management does not have a regular, documented process in place to determine a threshold at which to adjust assumptions in the residual asset models.

- Management does not have adequate documentation to support the reasonableness of the 12-14% discount rates used in the valuation of the residual interests for the following reasons.

- No external bid for residuals has been obtained.

- Management analysis supports 13-18% discount rates for CMO securities.

- Management benchmarking indicates the discount rates used by the Company are lower than competitors' rates for comparable transactions.

- Company should independently validate the models to ensure mathematical accuracy of the models and accurate valuation based on market conditions.

A number of these deficiencies also were found by PwC in February 2007 when it was retained by Bindra at New Century to review certain models and the valuation process. PwC noted, in particular, a lack of documentation to support certain assumptions and a lack of controls for changes in assumptions used in the models. The fact that KPMG did not identify in 2005 these same control issues, but instead assessed internal controls as effective, is evidence of a lack of professional care in the performance of the 2005 SOX 404 review.

### 6.    Representations to Audit Committee

GAAS requires independent auditors to communicate with their audit committee clients regarding, among other things, the Company's critical accounting policies and changes to those policies, their opinions regarding the soundness of those policies, and the foundation for and reasonableness of management's judgments regarding estimates.[714] In accordance with this rule, Donovan and Kim gave regular reports to the Audit Committee. These reports, however, were not accurate. In particular, KPMG, through Donovan and Kim, gave assurances to the Audit Committee throughout the relevant time period that the repurchase reserve estimate and residual interest valuations were reasonable, that there were no changes to the Company's critical accounting policies and that the accounting policies complied with GAAP.

---

[714] AU § 380.02.

The following is typical of the representations made by KPMG, as reported in the Company's minutes for an Audit Committee meeting on May 9, 2006, at which KPMG discussed its review of New Century's interim financial statements for the first quarter of 2006:

> In response to a question of the Committee, Mr. Donovan noted that none of the review matters required changes to the Corporation's critical accounting policies . . . .
>
> Mr. Kim reported that the Corporation had not adopted any new significant accounting policies and that its accounting policies were all in accordance with [GAAP]. . . .
>
> Mr. Kim reported that the basis for management's judgments and estimates relating to the valuation of mortgage servicing rights, the valuation of residual interests, the allowance for loan losses and the Corporation s repurchase reserve were reasonably stated and that KPMG had not discovered any material differences in these estimates.

Zona confirmed to the Examiner that these minutes described a "routine report from KPMG where they discussed their review of the main judgment areas. Typically, KPMG would report that they reviewed these areas, no changes in methodology were made and that KPMG believed that the accounts were reasonably stated."   Donovan made substantially similar remarks regarding KPMG's reviews of the second and third quarter 2006 interim financial statements, as reflected in the minutes for the Audit Committee meetings on August 2, 2006 and November 7, 2006.  KPMG's audit opinion for year-end 2005 also stated that New Century's financial statements were presented fairly and in conformity with GAAP.  Further, its SOX 404 opinion concluded that there were no material weaknesses in the Company's internal controls over financial reporting.

As discussed above, the Examiner has found that KPMG's conclusions were not sound. In particular, the residual interest valuations were *not* reasonable, the repurchase reserve was *not* sufficient, and the financial statements were materially misstated as a result.  In addition, certain changes were made to the methodology for calculating the repurchase reserve—a critical accounting policy—and the Audit Committee was not informed of these changes.  Accordingly, KPMG's representations to the Audit Committee were not accurate, and the Audit Committee was not properly informed as was required under GAAS, of the serious flaws in New Century's financial reporting.

## XII.    POTENTIAL CAUSES OF ACTION

In the June 1 Order, the Court directed the Examiner to "identify and evaluate any claims or rights of action that the estates might have" related to New Century's accounting and financial statement "irregularities, errors or misstatements."[715] The June 1 Order also prohibited the public disclosure of any evaluation by the Examiner with respect to "the strengths or weakness of any potential claim or right of action the estates may have or suggested litigation strategy in connection therewith," absent further order from the Court.[716]

The following summarizes the Examiner's analysis of potential causes of action in a manner that recognizes the sensitivity ascribed to public disclosure of these matters by the Court.

### A.    Executive Summary

The Examiner has determined that a number of potential causes of action may be available to the estates.  First, the estates may be able to assert causes of action against KPMG for professional negligence and negligent misrepresentation.  The Examiner has determined that the estates may assert that KPMG breached its professional standard of care in its audit and quarterly reviews of the Company's financial statements and its related systems of internal controls.  Among other things, the Examiner found that KPMG failed to exercise due care in planning and carrying out its audits and reviews, failed to demonstrate appropriate professional skepticism with respect to Management's judgments and representations, and failed to obtain sufficient competent evidence to support its opinions and representations to the Company's Officers, Directors and shareholders.  These failings by KPMG led to material misstatements in the financial statements of New Century.  The Examiner believes the estates may seek to recover a broad range of damages proximately caused by KPMG's negligence, including, but not limited to:  (a) the fees paid to KPMG in connection with its 2005 audit and its quarterly reviews of the Company's financial statements during 2006;  (b) the legal, accounting and other costs incurred by the estates in connection with investigations of matters related to KPMG's negligence, including, but not limited to, costs associated with the Examiner's investigation;  (c) losses suffered or expenses incurred in connection with payments that New Century might never have made (*e.g.*, incentive bonus payments to Senior Management) or transactions in which New

---

[715] June 1, 2007 Order Denying in Part and Granting in Part Motion of the United States Trustee for an Order Directing the Appointment of a Chapter 11 Trustee, or in the Alternative, an Examiner ("June 1 Order") ¶ 3.

[716] *Id.* ¶ 6.

Century might never have engaged (*e.g.*, stock share repurchases) had New Century's financial statements not been materially misstated; and (d) damages New Century suffered when, in early 2007, it was suddenly forced to announce that it needed to restate its 2006 financial statements on account of errors that had occurred, at least in part, because of KPMG's negligence. In addition, because KPMG's negligence may have been a proximate cause of New Century falling deeper into insolvency, the Examiner believes the estates may be able to recover additional damages from KPMG under the "deepening insolvency" theory of damages.

Second, the estates may be able to assert causes of action to recover bonuses and other forms of compensation paid to certain officers by New Century that were tied, directly or indirectly, to the Company's net income. The Examiner has determined that the Company's reported net income was materially overstated for 2005 and 2006. When adjustments are made to correct for these material inaccuracies, it becomes clear that the bonuses paid to certain New Century officers were inflated or undeserved. For example, the bonuses paid to Cole, Gotschall, Morrice, Cloyd and Flanagan with respect to 2005 were approximately \$2.9 million greater than they should have been. Performance and mid-year bonuses paid to Cole, Gotschall and Morrice with respect to 2006 (totaling approximately \$2 million) were undeserved altogether when accurate financial statements are taken into account. The Examiner believes these bonus amounts, and all or portions of certain quarterly bonuses paid to other senior executives in 2005 and 2006, may be recovered by the estates under unjust enrichment and bankruptcy law theories.

Third, the Examiner has reviewed various issues related to the conduct of former Officers and current and former Directors of New Century with respect to whether actions or inaction on the part of individual Officers or Directors may give rise to potential causes of action on behalf of the estates. The issues surrounding these possible claims are fact-specific and the Examiner observes that the legal standards applicable to potential causes of action against New Century's Officers or Directors present significant obstacles to recovery of money damages from the subject individuals. In particular, the business judgment rule and statutory or other limitations on liability applicable to New Century Officers and Directors require a substantial showing of misconduct, self-dealing and/or gross negligence to support a claim for liability. Accordingly, the Examiner has not undertaken to include in this Final Report a detailed discussion of such potential claims and related factual or legal considerations. Nonetheless, because questions and allegations may be raised with respect to the conduct and level of care observed by certain of the

Company's Officers and Directors, the Examiner is outlining some potential areas of concern below.

The potential causes of action the Examiner has considered may give rise to possible defenses, some of which may operate to defeat or reduce significantly the liability of the defendants. For example, KPMG and New Century Officers may assert defenses based upon the *in pari delicto* doctrine, or otherwise contest liability because of alleged unclean hands on the part of the Company, reasonable reliance on representations made by others, and/or deceptions or failures to disclose by persons at New Century. Further, as noted, current or former Directors or Officers of New Century may seek to reduce or avoid liability based upon the protections of the business judgment rule or indemnification provisions contained in the Company's organizational documents or language contained in individual employment agreements. The strengths or weaknesses of such defenses in individual cases may vary considerably, and in deference to the prohibition in the June 1 Order, the Examiner is not providing any evaluation of those strengths and weaknesses in this Final Report.

## B.    Legal Considerations Related to Potential Causes Of Action

### 1.    Choice of Law

Claims on behalf of the estates may be brought in this Court under 28 U.S.C. § 1334(b) (2007).[717] In the Third Circuit, a bankruptcy court must apply the choice of law rules of the state in which the bankruptcy court sits. *See, e.g., PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 F. App'x 839, 843 (3d Cir. 2005); *Burtch v. Dent (In re Circle Y of Yoakum)*, 354 B.R. 349, 359 (Bankr. D. Del. 2006); *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006). Accordingly, the Court is to apply Delaware choice of law rules to determine which state's law applies to such claims.

#### a.    Potential Claims Against KPMG

Both Delaware and federal common law choice-of-law rules provide that a bankruptcy court must follow the "most significant relationship" test of the Restatement (Second) of Conflict of Laws with respect to tort claims. *T. Frederick Jackson, Inc. v. Pepper, Hamilton & Scheetz, LLP (In re Olson Industries)*, No. 98-140, 2000 U.S. Dist. LEXIS 4897, at *35 (D. Del. 2000) (*citing Pig Improvement Co. v. Middle States Holding Co.*, 943 F. Supp. 392, 396 (D. Del.

---

[717] "Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

1996)). In applying this test, courts consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145(2) (1971). [718]

The Examiner believes that, under the "most significant relationship" test, California law is likely to apply to claims that may be brought by the estates against KPMG. Most courts that have applied this test in the context of accounting malpractice claims have determined that the state with the most significant relationship is the state where the audit or accounting services were performed. *See, e.g., Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1536-37 (10th Cir. 1996) (applying Colorado law to a Colorado law firm and accounting firm that performed work, including an audit of a Nevada corporation, in Colorado); *Nordica USA, Inc. v. Deloitte & Touche*, 839 F. Supp. 1082, 1085-86 (D. Vt. 1993) (applying Utah law under the Restatement test where alleged misconduct involved Deloitte audits in Utah). KPMG performed most work related to its audits and quarterly reviews of New Century in California at the Company's headquarters, which strongly suggests that California law governs potential claims against KPMG.[719]

### b.   Potential Claims Involving Corporate Internal Affairs

New Century Financial Corporation was incorporated as a real estate investment trust ("REIT") in Maryland in 2004. Delaware's choice-of-law rules require application of the law of the state of incorporation for all claims involving corporate internal affairs. *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1115 (Del. 2005). This "corporate internal affairs" doctrine applies to the regulation of the relationships among a corporation and

---

[718] The court must also consider the following factors: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectation, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2) (1971).

[719] The KPMG engagement letters contain arbitration provisions that designate New York, New York as the applicable forum. However, even if New York choice of law rules were applied, the Examiner believes that it is more likely than not that any claims brought by the estates against KPMG would be evaluated based on California law.

its officers, directors and shareholders.[720]  Although principally related to shareholders' rights, the doctrine also governs the rights and liabilities of officers and directors.  In particular, the doctrine applies to claims for breach of fiduciary duty, *see Coleman v. Taub*, 638 F.2d 628, 629 n.1 (3d Cir. 1981), and corporate waste.  *See Official Comm. of Unsecured Creditors of Teu Holdings, Inc. v. Kemeny (In re Teu Holdings, Inc.)*, 287 B.R. 26, 32 (Bankr. D. Del. 2002). Therefore, the Examiner believes Maryland law would apply to claims against former officers of New Century for breach of fiduciary duty, including claims for corporate waste, brought on behalf of the estates.[721]

### 2.    Statutes of Limitations

#### a.    California

California has a two-year statute of limitations for claims of professional negligence or negligent misrepresentation against accountants.[722]  Any such claim accrues when the plaintiff discovers (or through reasonable diligence should have discovered) the negligent act and suffers actual injury. *See Int'l Engine Parts, Inc. v. Feddersen & Co.*, 888 P.2d 1279, 1283-84 (Cal. 1995); *see also Moonie v. Lynch*, 256 Cal. App. 2d 361, 365-66 (Ct. App. 1967) (holding that, in a malpractice action against an accountant, "the statute of limitations does not run until the negligent act is discovered or with reasonable diligence could have been discovered"). Accordingly, claims arising from KPMG's alleged negligence in connection with its 2005 quarterly reviews, its 2005 audit, or its 2006 quarterly reviews had not expired when New

---

[720] See Deborah A. DeMott, *Perspectives on Choice of Law for Corporate Internal Affairs*, 48 Law & Contemp. Probs. 161, 161 (1985).

[721] The Examiner has not concluded whether California or Maryland law would apply to the unjust enrichment claims described below.  Under both Delaware and federal common law choice-of-law rules, the bankruptcy court must follow the "most significant relationship" test discussed above.  *In re Olson Industries*, 2000 U.S. Dist. LEXIS 4897, at *35.  Several facts might be relevant to the Court in its determination of the applicable law for claims other than those impacted by the internal affairs doctrine.  The Company conducted a large portion of its business in California.  Most of New Century's Officers and Directors resided in California, executed their employment agreements under the laws of California, and conducted most of their employment obligations in California. However, as noted, New Century Financial Corporation was incorporated as a REIT in Maryland.  Considering those facts, it is difficult to predict with certainty how a court would rule with respect to the choice of law applicable to potential unjust enrichment claims against former New Century Officers, but, as described later in this Section of the Final Report, that choice may not be important because the legal standards for unjust enrichment claims in California and Maryland are similar.  To the extent causes of action are brought under Company Officers' employment agreements, an agreement-by-agreement analysis would be necessary.  A review of a sample of employment agreements indicates that California law usually applies.

[722] To the extent California law may be deemed to apply to claims against corporate officers, a three-year statute of limitations applies. Cal. Civ. Proc. Code § 338(d) (Deering 2007).  California law could be implicated, for example, with respect to potential claims arising under the employment agreements for New Century executives.

Century filed its Chapter 11 voluntary petitions on April 2, 2007. *Int'l Engine*, 888 P.2d at 1280; *Apple Valley Unified Sch. Dist. v. Vavrinek, Trine, Day & Co. LLP*, 120 Cal. Rptr. 629, 635 (Ct. App. 2002); Cal. Civ. Proc. Code § 339(1) (Deering 2007).

### b.     Maryland

Under Maryland law, a three-year statute of limitations applies to civil actions. Md. Code Ann., Cts. & Jud. Proc. § 5-101 (LexisNexis 2008). Although § 5-101 provides that the statute of limitations begins to run when a cause of action "accrues," the term "accrue" is undefined in the statute.    Therefore, the question of accrual has been left to judicial determination.   To that end, courts have created exceptions to protect plaintiffs, the most important of which is the discovery rule. The discovery rule delays accrual of a claim where the cause of action is "inherently unknowable" and the plaintiff could not have reasonably known of the wrong within the limitations period. The Maryland Court of Appeals has declared that the rule applies generally in all civil actions. *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981).

### c.     The Effect of 11 U.S.C. § 108(a)

If the statute of limitations has not run on a claim as of the bankruptcy petition date, 11 U.S.C. § 108(a) extends the time period for filing the claim by "two years after the order for relief." *Fruehauf Trailer Corp. v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168, 185 (D. Del. 2000).  For purposes of 11 U.S.C. § 108(a), filing a voluntary petition for bankruptcy protection operates as an order for relief.  *Id.*  Consequently, claims for which the statute of limitations had not run by April 2, 2007, the date New Century filed its petitions, will not be timed-barred until April 2, 2009.

### C.     The Estates Have Potential Causes of Action Against KPMG for Professional Negligence and Negligent Misrepresentation

The Examiner has evaluated his factual findings in the context of the relevant professional and legal standards applicable to KPMG.  Based upon this review, the Examiner has determined that the estates possess potential causes of action against KPMG for professional negligence and negligent misrepresentation.

### 1.     The Estates May State a Claim for Professional Negligence

Under California law, accountants constitute "a skilled professional class . . . subject generally to the same rules of liability for negligence in the practice of their profession as are members of other skilled professions." *Lindner v. Barlow, Davis & Wood*, 27 Cal. Rptr. 101, 104 (Ct. App. 1962) (citation omitted).  As such, accountants "have a duty to exercise the

ordinary skill and competence of members of their profession, and a failure to discharge that duty will subject them to liability for negligence." *Id.* (citation omitted).

A plaintiff must demonstrate the following elements to prevail on a claim for professional negligence against an accountant: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Mattco Forge v. Arthur Young & Co.*, 60 Cal. Rptr. 2d 780, 788 (Ct. App. 1997) (citation omitted). The Examiner believes the facts uncovered during his investigation are sufficient to support each of these elements with respect to potential claims by the estates against KPMG.

### a.    KPMG Owed New Century a Duty of Professional Care

As its independent auditor, KPMG owed New Century a professional duty to perform its audits and quarterly reviews with the degree of skill, prudence, and diligence commonly exercised by members of the audit profession. Specifically, KPMG was required to "use the skill and due professional care and to exercise good faith and to observe generally accepted auditing standards [GAAS] and professional guidelines, with the appropriate reasonable, honest judgment that a reasonably skillful and prudent auditor would use under the same or similar circumstances." *Mishkin v. Peat, Marwick, Mitchell & Co.*, 744 F. Supp. 531, 538 (S.D.N.Y. 1990); *see also Flowers v. Torrance Mem'l Hosp. Ctr.*, 884 P.2d 142, 145 (Cal. 1994) (holding that "[w]ith respect to professionals, their specialized education and training . . . are considered additional circumstances relevant to an overall assessment of what constitutes 'ordinary prudence' in a situation. Thus, the standard for professionals is articulated in terms of exercising 'the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing'") (citations omitted). KPMG recognized this standard of care. For example, in its engagement letters, KPMG agreed to conduct the audits of the Company's financial statements and its internal controls over financial reporting in accordance with the rules and standards established by the PCAOB, which include GAAS.

### b.    KPMG Breached Its Duty of Professional Care

To determine whether KPMG breached its professional standard of care, a trier of fact should look to GAAS. *See Bily v. Arthur Young & Co.*, 834 P.2d 745, 749-52 (Cal. 1992) (observing that "[t]he planning and execution of an audit . . .   require[s] a high degree of

professional skill and judgment" and describing the application of GAAS and GAAP to a financial statement audit). *See also Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.)*, 278 B.R. 28, 33-34 (Bankr. E.D.N.Y. 2002) (holding that trustee sufficiently alleged that KPMG had "failed to gather sufficient competent evidential matter to support the financial statements," and "failed to exercise requisite skepticism in its audits"). Although a deviation from GAAS does not constitute negligence *per se*, courts have held that such violations impose a trial burden of explanation on the auditor. *Mishkin*, 744 F. Supp. at 537-38 (noting that plaintiff retains the burden of proof on the whole case to establish the auditor's negligence); *see also Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994) (stating that "compliance with GAAP and GAAS do not immunize an accountant who consciously chooses not to disclose in a registration statement a known material fact").

The Examiner believes that sufficient evidence exists to permit the estates to allege that KPMG breached its duty of professional care in performing its 2005 audit and quarterly reviews of the interim financial statements of New Century during 2006.[723] The estates may contend that KPMG's multiple departures from GAAS, as described elsewhere in this Final Report, resulted in its failure to detect that New Century's financial statements were not fairly presented in conformity with GAAP.

More specifically, the Examiner found evidence that may permit the estates to assert that KPMG violated fundamental tenets of GAAS by, among other things:

- not planning and preparing its audits and reviews appropriately in light of the risks of the engagement, including known defects in the control environment and certain aggressive assumptions used as part of New Century's accounting practices;

- not providing advice to New Century that was consistent with GAAP regarding the Company's methodology for calculating the loan repurchase reserve and its methodology for calculating lower of cost of market ("LOCOM") adjustments for repurchased loans;

- not exhibiting the appropriate amount of professional skepticism in reviewing the methodology employed by New Century to calculate its repurchase reserve and by ignoring critical evidence that indicated the methodology was flawed, which resulted in a material understatement of the reserve and overstatement of the Loans Held For Sale ("LHFS") portfolio;

---

[723] *See Murphy v. BDO Seidman, LLP*, 6 Cal. Rptr. 3d 770, 783 (Ct. App. 2003) (holding that "even if reviews are less rigorous than audits, the relaxed standards were not a license to misrepresent"); *Anderson v. Deloitte & Touche LLP*, 66 Cal. Rptr. 512, 516-17 (Ct. App. 1997).

- not criticizing New Century's reliance, through 2006, upon outdated and inadequate internally-developed models to value residual interests worth hundreds of millions of dollars, even though KPMG's reviews and audits detected multiple flaws in those models;

- not pressing New Century to correct its use of low discount rates in its residual interest valuation models (which tended to result in inflated valuations of the Company's residual interests), notwithstanding concerns expressed repeatedly by KPMG specialists;

- not addressing effectively New Century's continued use of other key assumptions that had been questioned by KPMG specialists regarding the residual interest valuation models;

- not considering seriously concerns expressed by KPMG specialists about errors identified during prior periods with respect to the Company's allowance for loan losses and its accounting for, mortgage servicing rights, amortization of loan fees and costs, and hedging;

- not obtaining sufficient competent evidentiary matter through inspection, observation, inquiries, and confirmation to afford a reasonable basis for opinions regarding the audited financial statements;

- not obtaining an understanding of the Company's internal controls sufficient to plan the audit and determine the proper nature, timing, and extent of substantive testing;

- as part of its SOX 404 audit, not uncovering material weaknesses and significant internal control deficiencies relating to the repurchase reserve process and not recognizing certain recurring deficiencies that reflected the overall weak control environment at New Century; and

- not acting to address weaknesses and deficiencies revealed by the SOX 404 audit with respect to residual interests and by failing to insist upon adequate remediation of those deficiencies.

### c.    The Breach by KPMG Proximately Caused Injury to the Estates

The Examiner has found that material misstatements regarding New Century's repurchase reserve, LOCOM valuation account and residual interests rendered New Century's financial statements unreliable. The Examiner also has determined that other elements of New Century's accounting policies and related procedures were inadequate. In light of these findings and the above-described failings by KPMG, the Examiner believes the estates may allege that KPMG proximately caused them injury because KPMG did not (1) detect or recommend that New Century correct the Company's material misstatements, (2) propose audit differences related to the repurchase reserve, LOCOM valuation account or residual interest valuations, or

(3) issue an adverse audit opinion.  The estates also may allege that, as a result of KPMG's professional negligence, New Century proceeded without correcting its financial statements or even recognizing the possibility of restatement that was presented by its improper accounting methods.  By the time New Century discovered the extent of the accounting irregularities and material misstatements, the subprime market was in a precipitous decline.  The material misstatements resulted in New Century not being able to file its 2006 Annual Report on Form 10-K.  Shortly after New Century announced on March 2, 2007 that it would not be filing its Annual Report on time, there were increased margin calls by the Company's warehouse lenders and further financings for the Company were denied.  New Century could not survive without the financings, and the Company filed for bankruptcy protection on April 2, 2007.

### d.   Damages

The measure of damages the estates would be entitled to seek against KPMG for professional negligence is governed by statute and is equal to the amount that "will compensate for all the detriment proximately caused" by KPMG's breach of duty, whether or not that detriment was foreseeable.[724]  As the statute suggests and case law holds, the range of potential damages the estates might seek is quite broad.

First, a number of courts have awarded clients the accounting and auditing fees they paid to accountants who committed professional malpractice.[725]  Thus, the estates potentially may

---

[724] The California Code states: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."  Cal. Civ. Code § 3333 (Deering 2007).

[725] *See, e.g., Stanley L. Bloch, Inc. v. Klein*, 258 N.Y.S.2d 501, 508 (N.Y. Sup. Ct. 1965) (holding the plaintiff was entitled to recover from defendants: (1) "the accounting and auditing fees paid to defendants for the one year of services rendered by them immediately prior to the issuance of the erroneous balance sheet;" and (2) "the accounting and auditing fees necessitated by the review of this erroneous statement"); *see also Gordon v. Basroon (In re Plaza Mortgage & Fin. Corp.)*, 187 B.R. 37, 44 (Bankr. N.D. Ga. 1995) (holding that in action against debtor's former accountants for malpractice and fraud arising out of the operation of debtor as a "Ponzi" or pyramid scheme, damages could include accounting fees paid and "other accepted methods of measuring damages suffered by debtors"); *World Radio Labs., Inc. v. Coopers & Lybrand*, 557 N.W.2d 1, 15 (Neb. 1996) (holding that plaintiff was entitled to recover both fees it paid to its accounting firm and fees paid to another firm as a result of the original accountant's negligence because "an accountant is not entitled to fees for preparing false financial statements") (citing 1 Am. Jur. 2d *Accountants* § 13, at 537 (1994); *Ryan v. Kanne*, 170 N.W.2d 395 (Iowa 1969); and *Bd. of County Comm'rs v. Baker*, 102 P.2d 1006 (Kan. 1940)).  Although the Examiner is not aware of a California case directly on point, he believes that California would permit the recovery of both accounting and auditing fees paid to KPMG, as well as accounting and auditing fees necessitated by KPMG's errors.  *See, e.g., FDIC v. O'Melveny & Myers*, 969 F.2d 744, 752 (9th Cir. 1992), *rev'd on other grounds, O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), *reaff'd on remand, FDIC v. O'Melveny & Myers*, 61 F.3d 17 (9th Cir. 1995) (holding that if the client was successful in proving professional negligence, negligent misrepresentation or breach of fiduciary duty against its former attorney, the "out of pocket costs to the client properly attributable to the fraudulent transaction," including any fees paid to the law firm, would be the appropriate measure of damages); *see also Sahadi v. Scheaffer*, 66 Cal.

recover the fees paid by New Century to KPMG with respect to KPMG's audit work and quarterly reviews concerning 2005 and 2006. The Examiner has determined that the aggregate amount of such fees exceeds $5 million.

Second, courts have held that the kind of "detriment" for which a victim of professional malpractice may recover includes, among other things, investigation costs. *Apple Valley*, 120 Cal. Rptr. at 640; *see also Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison*, 958 P.2d 1062, 1070 (Cal. 1998). Accordingly, the estates potentially may recover from KPMG the legal, accounting and other costs the Company has incurred with respect to reviews and investigations related to the Company's interactions with KPMG, including costs associated with the investigations that have been and are being conducted by the Examiner, the SIC, the SEC, and the U.S. Department of Justice. To the extent that New Century has incurred costs or may incur costs in connection with shareholder litigation that challenges the accuracy of the Company's financial statements and related disclosures, those costs may also be recoverable.

Third, the estates potentially may be able to recover other losses that New Century suffered or expenses that New Century incurred in connection with payments that New Century might never have made (*e.g.*, incentive bonus payments to Senior Management) or transactions in which New Century might never have engaged (*e.g.*, stock share repurchases) had New Century's financial statements not been materially misstated as a consequence of KPMG's negligence. For example, as discussed below, New Century paid millions of dollars in undeserved incentive bonuses to New Century Officers based upon the mistaken belief that New Century had earned certain amounts of net income which, in fact, New Century had not earned. Had New Century's financial statements not been materially misstated in 2005 and 2006 as a result of KPMG's negligence, payments like those would not have been made. Similarly, New Century spent tens of millions of dollars on stock repurchases that the Company might not have made had it realized that its financial statements were weaker than they appeared.

Fourth, New Century suffered a wide range of damages when, in early 2007, it was suddenly forced to announce that it needed to restate its 2006 financial statements on account of errors that had occurred, at least in part, because of KPMG's negligence. As a direct

---

Rptr. 3d 517 (Ct. App. 2007) (holding that an accountant's alleged failure to adequately or properly prepare the clients' tax returns resulted in significant "consequential losses," including audit fees paid to another accountant and attorney's fees).

consequence of that announcement, New Century's stock price and market capitalization dropped precipitously, the Company's lenders initiated margin calls, the Company's liquidity disappeared, it no longer could accept new loan applications, the Company was delisted by the New York Stock Exchange, and, ultimately, the Company filed for bankruptcy protection. KPMG's professional malpractice was a trigger for this disastrous series of events. The estates potentially may recover some or all of those damages from KPMG, to the extent that the estates can prove they were proximately caused by KPMG's professional malpractice.

Finally, the estates potentially may recover additional damages from KPMG under the "deepening insolvency" theory of damages. *See Smith v. Arthur Andersen LLP*, 421 F.3d 989, 1004 (9th Cir. 2005) (holding trustee's complaint alleged a cognizable harm to the bankrupt corporation by alleging defendants, including the audit firm, "'prolonged' the firm's existence, causing it to expend corporate assets that would not have been spent 'if the corporation [had been] dissolved in a timely manner") (citation omitted).[726] This theory of damages is appropriate where there has been negligent conduct by auditors and the negligence was a proximate cause of the audited entity falling further into insolvency. In calculating damages stemming from accounting malpractice that may apply in a deepening insolvency context, at least one court has allowed a model that determined the amount as the difference between the enterprise value at the time the audit report was issued and the enterprise value at the time of bankruptcy to factor in the delay in filing.[727] California law permits a plaintiff to seek such damages. *See Arthur Andersen LLP v. Superior Court*, 79 Cal. Rptr. 2d 879, 890-91 (Ct. App. 1998) (rejecting Andersen's contention that it could have no liability for causing "deepen[ing] insolvency").

## 2.    The Estates May State a Claim for Negligent Misrepresentation

Accountants may also be held liable for negligent misrepresentation. "Negligent misrepresentation is the assertion of a false statement, honestly made in the belief it is true, but

---

[726] *See also Allard v. Arthur Andersen & Co.*, 924 F. Supp. 488, 494 (S.D.N.Y. 1996) (recognizing the "deepening insolvency" theory of damages and rejecting Arthur Andersen's claim that the trustee could not recover damages based on further indebtedness to trade creditors); *Alberts v. Tuft (In re Greater Cmty. Hosp. Corp. I)*, 353 B.R. 324, 337-38 (Bankr. D.D.C. 2006). *But see Seitz v. Detweiler, Hershey & Assoc. (In re Citx. Corp., Inc.)*, 448 F.3d 672, 678 (3d Cir. 2006) (questioning application of the deepening insolvency theory of damages); *Trenwick Am. Litig. Trust v. Ernst & Young LLP*, 906 A.2d 168, 174 (Del. Ch. 2006), *aff'd, Trenwick Am. Litig. Trust v. Billet*, No. 495, 2007 Del. LEXIS 357 (2007) (same).

[727] *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 186 (Tex. App. 1987) (finding that a jury could have reasonably concluded from the evidence that the negligent failure of the accounting firm to perform audits in accordance GAAS was a "substantial factor" in bringing about the company's bankruptcy, and that the damage "would not have occurred but for such negligence").

without reasonable ground for such belief." *Anderson v. Deloitte & Touche LLP*, 66 Cal. Rptr. 2d 512, 516 (Ct. App. 1997). Under California law, "[i]f the acts or conduct of a professional accountant . . . fall below the applicable standard of care for the profession, in that the accountant failed to examine or acquire the necessary information required to support the accountant's professional opinion . . . the opinion is made without a reasonable ground for believing it to be true." *Id.* at 517 (recognizing that an accountant's professional opinion may be regarded as a "positive assertion of fact"). Such claims have been alleged successfully in the context of accounting malpractice cases.[728]

In light of the evidence collected in his investigation, the Examiner has determined that the estates may be able to assert a claim against KPMG for negligent misrepresentation based on at least the following statements:

- the statement in KPMG's unqualified 2005 audit report that New Century's consolidated financial statements "present fairly, in all material respects" the financial position of New Century;

- KPMG's representations that the audits were performed in accordance with GAAS;

- KPMG's representations relating to the lack of internal control weaknesses when, in fact, they were present;

- KPMG's erroneous advice related to the GAAP requirements for calculating the repurchase reserve and the LOCOM valuation allowance; and

- KPMG's repeated assurances to the Audit Committee regarding critical accounting areas that reflect deficiencies, including the Company's calculation of the repurchase reserve.[729]

---

[728] *See, e.g., R.D. Kushnir & Co. v. Adler Drobny Fischer LLC (In re Sec. Investor Prot. Corp.)*, 274 B.R. 768, 779 (Bankr. N.D. Ill. 2002) (holding that the trustee for the debtor corporation had successfully pleaded negligent misrepresentation against its auditors based on misrepresentations by the auditors in their opinion letters that: (1) the audits were performed in accordance with GAAS; (2) the financial statements were fairly presented in accordance with GAAP; (3) no material weaknesses in internal controls had been observed; and (4) the client's net capital was in compliance with regulatory requirements); *see also Metro. Mortg. & Sec. Co., Inc. v. PriceWaterhouseCoopers, LLP*, No. CV-05-290, 2005 U.S. Dist. LEXIS 39851 (E.D. Wash. Dec. 21, 2005) (denying former independent auditor's motion to dismiss complaint for professional negligence, negligent misrepresentation, and breach of contract premised on the fact that the bankrupt company's financial statements audited by PWC violated GAAP, standards of professionalism, and standards of field work); *Cumis Ins. Soc'y Inc. v. Tooke*, 739 N.Y.S.2d 489, 493 (App. Div. 2002) (citations omitted) ("Accounting malpractice or professional negligence contemplates a failure to exercise due care and proof of a material deviation from the recognized and accepted professional standards for accountants and auditors, generally measured by GAAP and GAAS . . . which proximately causes damage to plaintiff").

[729] *Anderson*, 66 Cal. Rptr. 2d at 516 (holding that "[w]hen a statement, although in the form of an opinion, is 'is not a casual expression of a belief' but 'a deliberate affirmation of the matters stated,' it may be regarded as a positive assertion of fact and [others] . . . may reasonably rely . . . on [that] knowledge, information, or expertise").

With respect to a potential claim for negligent misrepresentation, the estates may recover the same categories or types of damages as they would seek to recover in asserting a claim for professional negligence, as discussed above.

### 3.    Possible Defenses That May Be Asserted by KPMG

The categories of defenses KPMG might assert with respect to claims brought on behalf of the estates include:

#### a.    Comparative Negligence

KPMG might assert the defense that New Century's Accounting personnel were negligent in the performance of their duties and that such negligence limits KPMG's liability for professional negligence. The relevant California Code section states: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." Cal. Civ. Code § 1417 (Deering 2007).

California adheres to a "system of 'pure' comparative negligence, the fundamental purpose of which [is] to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties." *Li. v. Yellow Cab Co.*, 532 P.2d 1226, 1243 (Cal. 1975). Accordingly, to the extent that KPMG can show negligence on the part of the Debtors, damages may be apportioned between the parties. The California Supreme Court has granted broad discretion to trial courts to ensure that the comparative negligence rule is applied "in the interest of justice." *Id.; see also Daly v. General Motors Corp.*, 575 P.2d 1162, 1173 (Cal. 1978) (*quoting Hoffman v. Jones*, 280 So.2d 431, 439-40 (Fla. 1973)) ("we scrupulously abstained from issuing a detailed guidebook to the new area of comparative negligence, preferring to adopt the view of a Florida court that '. . . the trial judges of this State are capable of applying [a] comparative negligence rule without our setting guidelines in anticipation of expected problems'").

#### b.    Unclean Hands

The equitable defense of unclean hands may bar recovery if misconduct on the part of a defendant: (1) is imputable to the corporation; (2) can be imputed to any bankruptcy trustee; and (3) is sufficiently related to the causes of action asserted in the case. *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 35 Cal. Rptr. 3d 31, 46 (Ct. App. 2005). The doctrine

is qualified by the requirement that the party against whom it is invoked has directly "infected" the actual cause of action before the court, and is not merely guilty of some unrelated improper past conduct. *Pond v. Ins. Co. of N. Am.*, 198 Cal. Rptr. 517, 521-22 (Ct. App.1984).

### c.   In Pari Delicto[730]

Under the doctrine of *in pari delicto*, "when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed *in pari delicto*, and the law will aid neither, but rather, will leave them where it finds them." *Casey v. U.S. Bank Nat. Assoc.*, 26 Cal. Rptr. 3d 401, 404 n.1 (Ct. App. 2005) (citation omitted). Generally, if the wrongdoing of officers or directors is imputed to the corporation, the doctrine of *in pari delicto* bars suit by the bankruptcy trustee. *Id.* at 404-05.

Courts have applied a multi-part test to assess the *in pari delicto* defense. First, agents of the corporation must have participated in the wrongdoing for which the corporation seeks to recover. *In re Crown Vantage, Inc.*, No. 02-3836, 2003 WL 25257821, at *7 (N.D. Cal. Sept. 25, 2003), *aff'd, Crown Paper Liquidating Trust v. PriceWaterhouseCoopers LLP*, 198 F. App'x 597 (9th Cir. 2006). Second, the agents must have acted in the interest of the corporation. Third, if they did not, then the "adverse interest exception" applies, under which agents' actions are not imputed to the corporation. *Id.*

### D.   The Estates May Assert Claims to Recover Executive Bonuses Or Other Compensation Paid to Certain Officers Based On Material Misstatements Regarding the Company's Financial Performance

The Examiner believes the estates may be able to recover incentive compensation paid by New Century to some Officers, including large bonuses paid to the Company's founders, which were tied, directly or indirectly, to the Company's net income in 2005 and 2006. Such bonuses sprang from material misstatements in the Company's financial statements and were improperly large or underserved altogether. The Examiner believes the estates may assert claims to cause these former officers to return these bonuses on grounds that they were unjustly enriched by such

---

[730] The rule of *in pari delicto* has been used by defendants to bar not only claims by a bankruptcy trustee, on the theory that the actions of an agent acting within the scope of his employment are imputed to the principal, but also to bar standing by a bankruptcy trustee. The *Wagoner Rule* is an influential expression of the doctrine that, depending on choice of law determinations, may be applicable. The *Wagoner Rule* has been applied to bar bankruptcy trustees, as successors to corporations, from bringing an action against the wrongdoing third party. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991).

payments and that the estates are entitled to recover them under Section 548 of the Bankruptcy Code.

### 1.    Certain Officers Were Unjustly Enriched

#### a.    Claims for Unjust Enrichment Under California and Maryland Law

Both California and Maryland recognize the doctrine of unjust enrichment. Under California law, a plaintiff must prove receipt of a benefit and unjust retention of the benefit at the expense of another. *Lectrodryer v. Seoulbank*, 91 Cal. Rptr. 2d 881, 883 (Ct. App. 2000). *See also* Restatement (Second) of Restitution § 1 (1937). The recipient of the enrichment may raise equitable defenses, including reliance. *City of Hope Nat'l Med. Ctr. v. Super. Ct.*, 10 Cal. Rptr. 2d 465, 467 (Ct. App. 1992). *See also* Restatement (Second) of Restitution § 69 (change of circumstances).

Under Maryland law, a plaintiff may recover moneys paid to a defendant if three elements are shown: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows of or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return. *Mona v. Mona Elec. Group, Inc.*, 934 A.2d 450, 473 (Md. Ct. Spec. App. 2007); *Comm'rs of Caroline County v. Dashiell & Sons, Inc.*, 747 A.2d 600, 607 n.7 (Md. 2000). *See also* Restatement (Second) of Restitution § 1 cmt. c. Recovery under unjust enrichment principles may be permitted even if the defendant has no knowledge that the funds rightfully belong to the plaintiff. *Plitt v. Greenberg*, 219 A.2d 237, 242 (Md. 1966).

#### b.    Unjust Enrichment Has Been Used to Require Repayment of Executive Bonuses

Relying upon unjust enrichment principles, the Alabama Supreme Court recently affirmed a lower court's order that the former CEO of HealthSouth Corporation, Richard M. Scrushy, repay $47.8 million in bonuses he did not deserve once it became clear that HealthSouth had not reached the profit thresholds upon which those bonuses were contingent. *Scrushy v. Tucker*, 955 So. 2d 988 (Ala. 2006) (relying on Delaware and Alabama law). Scrushy's bonuses had been based on HealthSouth earnings, which the company later discovered were massively overstated due to accounting errors. The Alabama Supreme Court ordered repayment even under the assumption that Scrushy had no actual knowledge of, and no active

participation in, any of the activities that resulted in the falsification and fabrication of HealthSouth's financials. *Id.* at 999. Following Delaware law, the Alabama courts held that Scrushy had been unjustly enriched and that it would be "unconscionable" to allow him to retain the bonuses he did not deserve, regardless of whether he had participated in any wrongdoing. *Id.* at 1011 (*citing Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

Although the court in *Scrushy* did not make explicit reference to it, the logic of its opinion is consistent with the contractual principle of mutual mistake. California and Maryland courts provide for the restitution of money paid under contract due to a mutual mistake of fact. *See Admiral Ins. Co. v. Am. Nat'l Savs. Bank*, 918 F. Supp 150, 153 (D. Md. 1996) (*citing Young v. Cities Serv. Oil Co.*, 364 A.2d 603 (1976)); *see also Debelius Realty Co. v. Chassagne*, 271 A.2d 527, 530 (Md. 1970); *Bridges v. Cal-Pac. Leasing Co.*, 93 Cal. Rptr. 796, 798 (Ct. App. 1971); *Finnegan v. Spiegl Farms, Inc.*, 44 Cal. Rptr. 645, 648 (Ct. App. 1965).    There also is relevant authority for the position that a mistake of fact may be actionable if the mistake is material whether it is mutual or unilateral. *Bridges*, 93 Cal. Rptr. at 798.    California and Maryland follow the Restatement (Second) of Restitution, which states: "A person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum paid was necessary for the discharge of a duty, for the performance of a condition, or for the acceptance of an offer, is entitled to restitution of the excess." Restatement (Second) of Restitution § 20 (1937). *See, e.g., Bridges*, 93 Cal. Rptr. at 798; *Debelius*, 271 A.2d at 530. It is irrelevant whether the plaintiff was negligent. *Bridges*, 93 Cal. Rptr. at 800 (holding that repayment is required even if the payor could have discovered the mistake, unless the payee changed his position to such an extent that repayment would be unjust).

In *Scrushy*, the Alabama Supreme Court observed that the bonus provisions applicable to Scrushy's employment agreement and in the company's proxy statement required HealthSouth to meet annual performance standards before bonuses would be paid. *Scrushy*, 955 So. 2d at 1007-08. In addition, the proxy statement specified that "[n]o bonuses are payable unless annual net income exceeds budgeted net income." *Id.* at 1008. When HealthSouth paid Scrushy his bonuses, it mistakenly believed – based on incorrectly stated financials – that those standards had been met. According to the Alabama Supreme Court, when the company recalculated its annual earnings and determined that those standards had not been met, it was entitled to recover the compensation that it had mistakenly paid to Scrushy.

The *Scrushy* decision is the most prominent of a number of recent efforts to recover bonuses that were mistakenly paid to senior executives based upon what later were determined to be incorrect financial statements. For example, in February 2005, Nortel Networks brought suit against its former chief executive and two other officers to recover more than $10 million in bonuses that had been paid based on manipulated financial statements. A dozen other Nortel executives voluntarily returned $8.6 million in bonuses after the company's financials were restated.[731] When Congress enacted Sarbanes-Oxley in 2002, it specifically provided, in Section 304, for the forfeiture of bonuses by senior executives of a company whose financial statements, as a result of misconduct, were materially misstated. 15 U.S.C. § 7243 (2007). Although Section 304 of Sarbanes-Oxley did not create a private right of action that would enable corporations to recover bonus payments, it embodied an important statement of public policy by the United States Congress that senior executives should not be allowed to retain bonuses and other compensation they did not deserve. Similarly, the SEC staff has reportedly brought several actions to force the return of bonuses from senior executives who may have been unjustly enriched.[732]

### c.   New Century Officers Received Bonuses They Did Not Deserve
### i.   New Century's 2004 Performance Incentive Plan

Certain members of the Company's Senior Management received performance-based bonuses with respect to a six-month and 12-month performance period each year. The Officers' eligibility was determined under New Century's 2004 Performance Incentive Plan ("Plan"), which provided for various forms of compensation, including dividend equivalent rights, stock options, stock appreciation rights, restricted stock, stock bonuses and cash bonuses. Under the Plan, which was incorporated by reference into executive employment agreements, New Century

---

[731] Ian Austin, *Nortel Sues 3 Ex-Officers Over Big Bonuses*, N.Y. Times, Feb. 4, 2005, at C11.   One legal commentator said the Nortel suit was "on the cutting edge of developments in corporate governance." *Id*.

[732] The former chief executive of Raytheon Corporation reportedly agreed to return part of a $1.75 million bonus to settle SEC accusations over improper accounting practices. Leslie Wayne, *Ex-Raytheon Chief Agrees to Fine and Forfeit of Part of Bonus*, N.Y. Times, Mar. 28, 2006, at C11.  The former chief executive of Waste Management similarly is reported to have agreed to pay $19.5 million, which included his bonus, to settle SEC claims. *Id*.  In 2006, the SEC recovered $5 million from William W. McGuire, the former CEO of United Health Group, who received bonuses based on erroneous earnings figures. *SEC v. William W. McGuire*, Litig. Release No. 2754 (Dec. 6, 2007).   In addition, the Office of Federal Housing Enterprise Oversight is seeking restitution of bonuses from former Fannie Mae executives under 12 U.S.C. § 4613(d)(1)(A), which specifically states that restitution should be made when an individual is unjustly enriched by certain conduct. *In re Raines, Howard and Spencer*, Notice of Charges, Office of Fed. Hous. Enter. Oversight (Dec. 18, 2006).

could grant stock or cash awards equaling a percentage of the Company's pre-tax net income (as defined and adjusted pursuant to the Plan) based upon the ratio of New Century's pre-tax net income to the Company's average stockholder's equity, as measured over a six-month and 12-month period.   Generally, the higher the Company's pre-tax net income above a certain threshold, the higher the bonuses to certain officers.

New Century used the following formulas to determine bonus amounts under the Plan. For the six months ended June 30, if the pre-tax net income to stockholder equity ratio was less than nine percent, the officer was not eligible for any bonus. If the ratio was between nine percent and 14%, the officer received 1.125% (the "bonus factor") of pre-tax net income for the amount between nine percent and 14%. If the ratio was between 14% and 19%, then the officer received the bonus factor of pre-tax net income plus .75% of pre-tax net income between 14% and 19%. For a ratio above 19%, the executive got the bonus factor of pre-tax net income plus .75% of pre-tax net income and .60% of pre-tax net income in excess of 19% of total stockholder equity.

As part of a year-end review, incentive bonuses were re-calculated utilizing the same ratio of pre-tax net income to stockholder equity, but with higher thresholds. If the ratio was less than 18%, the officer received no bonus. If the ratio was between 18% and 28%, the officer was entitled to the bonus factor of pre-tax net income between 18% and 28%. If the ratio was 28% to 38%, the officer received the bonus factor of pre-tax net income plus .75% of pre-tax net income between 28% and 38%. If the pre-tax net income to stockholder equity ratio exceeded 38%, the officer received .60% of pre-tax net income, in addition to the bonus factor of pre-tax net income plus .75% of pre-tax net income.

These formulas can be depicted as follows:

|  | If the ratio of A to B is: | The amount of bonus is: |
|---|---|---|
| 6 month performance period (Jan 1 - June 30) | < 9% | No bonus |
|  | between 9% and 14% | 1.125% of A in excess of 9% but not in excess of 14% of B |
|  | between 14% and 19% | 1.125% of A in excess of 9% but not in excess of 14% of B plus 0.75% of A in excess of 14% but not in excess of 19% of B |
|  | > 19% | 1.125% of A in excess of 9% but not in excess of 14% of B plus 0.75% of A in excess of 14% but not in excess of 19% of B plus 0.60% of A in excess of 19% of B |
| 12 month performance period (Jan 1 – Dec 31) | < 18% | Nil |
|  | between 18% and 28% | 1.125% of A in excess of 18% but not in excess of 28% of B |
|  | between 28% and 38% | 1.125% of A in excess of 18% but not in excess of 28% of B plus 0.75% of A in excess of 28% but not in excess of 38% of B |
|  | > 38% | 1.125% of A in excess of 18% but not in excess of 28% of B plus 0.75% of A in excess of 28% but not in excess of 38% of B plus 0.60% of A in excess of 38% of B |
|  |  |  |
| Where A equals | Pre-tax net income (as defined and adjusted) | |
| Where B equals | Total stockholders' equity (average as defined) | |

Pursuant to this formula, New Century paid out millions of dollars in inflated or unearned bonuses to members of Senior Management under the Plan. For example, in 2005, each of Cole, Morrice, Gotschall and Flanagan received performance-based bonus payments of $1,070,235 under the Plan.[733] In 2006, Cole, Morrice and Gotschall received bonuses of $693,016 each under the Plan for the six months ended June 30, 2006. These bonuses were higher than they should have been because the Company materially overstated its pre-tax net income. When the amounts of the Company's material misstatements in 2005 and 2006 are taken into account, pre-tax net income would have been reduced significantly. Consequently, 2005 bonuses paid to these members of senior Management would have been reduced considerably and bonuses paid for the six months ended June 30, 2006 would have been eliminated altogether.

Specifically, for 2005, the performance-based bonuses paid to Cole, Gotschall, Morrice and Flanagan should have been no more than $354,736 each, a total reduction of almost $2.9

---

[733] Flanagan also received an additional $50,000 cash payout in 2005.

million.[734]  Cole, Gotschall and Morrice should have been paid no bonuses in 2006, a total reduction of almost $2 million.[735]

### ii.    Quarterly Performance-Based Bonus Plans

New Century also paid quarterly bonuses to certain members of Senior Management and others, including Cloyd, Dodge, Meola, Eckroth and Theologides. Net income was a factor in determining these bonuses. For example, Kevin Cloyd, the head of Secondary Marketing, received quarterly bonuses totaling over $1.5 million in 2005. Cloyd's bonuses apparently were based principally upon New Century's loan production volume, net income and operating margin results relative to pre-established targets.

After taking into account the impact of New Century's material misstatements of its net income, the Examiner has determined that the quarterly bonuses paid to Cloyd were $351,098 greater than they should have been in 2005. Expressed as a percentage, the bonuses paid to Cloyd for 2005 were 130% larger than they should have been.

---

[734] For 2005, the ratio would have decreased from 23% to 20% when the material misstatement is considered. Although, according to the chart above, the bonus factor (1.125%) for these officers would have remained the same (because the ratio of pre-tax net income to the average stockholders' equity was still between 18% and 28% percent at year end), it would have produced significantly smaller bonuses because the factor would have been applied to significantly lower pre-tax income.

[735] In 2006, the ratio of pre-tax net income to the average stockholders' equity would have decreased from 12% to eight percent when the material misstatement is considered. According to the chart above, if the ratio is less than nine percent for a six month performance period, the officer is not eligible to receive a bonus.

The effect of the Company's misstatement of net income with respect to this example can be illustrated as follows:

| At December 31, 2005 | | Budget | Actual | Revised Actual | % (revised) | Bonus payout |
|---|---|---|---|---|---|---|
| | | | | | | |
| Q1 | Production | 9,563,453,000 | 10,251,567,000 | 10,251,567,000 | 107% | 159,293 |
| | Net Income | 61,834,000 | 84,760,000 | 75,220,000 | 122% | 272,250 |
| Q2 | Production | 11,323,526,000 | 13,444,171,000 | 13,444,171,000 | 119% | 178,091 |
| | Net Income | 81,468,000 | 95,079,000 | 85,539,000 | 105% | 236,250 |
| Q3 | Production | 12,679,116,000 | 15,856,978,000 | 15,856,978,000 | 125% | 187,595 |
| | Net Income | 172,266,000 | 124,217,000 | 114,677,000 | 67% | - |
| Q4 | Production | 14,249,691,000 | 13,170,734,000 | 13,170,734,000 | 92% | 138,642 |
| | Net Income | 215,401,000 | 120,950,000 | 111,410,000 | 52% | - |
| | **Bonus – Cloyd** | | | | | 1,172,121 |
| | Bonus paid per Board Minutes | | | | | 1,523,219 |
| | **Difference** | | | | | **(351,098)** |
| | *Reported bonus % compared to revised* | | | | | **130%** |
| | | | | | | |
| Revised actual uses tax-effected misstatement divided into 4 to determine quarterly adjustment | | | | | | |
| | [ $63.6 million less tax at 40% = $38.16 m / 4 = $9.54 m adjustment each quarter][736] | | | | | |

As this example illustrates, the dollar amount disparity between the quarterly bonuses New Century paid to executives during 2005-2006 and the maximum quarterly bonuses the Company should have paid is substantial.

### d.     New Century's Officers Should Return the Bonuses They Did Not Deserve

The Examiner has determined that the estates possess potential causes of action against the Officers who received the bonuses described above – as well as against any other Officers who received bonuses or other compensation that were paid based upon net income figures that were misstated – to require the return of those bonuses under principles of unjust enrichment. Just as the Alabama courts required Richard Scrushy to return bonuses he did not deserve, the

---

[736] To determine the effect of the material misstatement at year end 2005 on Cloyd's quarterly bonuses paid in 2005, the Examiner divided the misstatement into four equal parts.

Examiner believes it would be "unconscionable" for former New Century officers to retain bonuses or any other compensation they did not deserve, regardless of whether they participated in any wrongdoing.

### 2.    The Bonuses Improperly Paid to New Century Officers May Also Be Recoverable Under Section 548 of the Bankruptcy Code

The bonuses that were improperly paid to New Century Officers may also be recoverable as fraudulent conveyances under Section 548 of the Bankruptcy Code.[737] Section 548 (B)(ii)(IV) of the Bankruptcy Code and changes made to Section 548(a)(1) of the Bankruptcy Code, were added in 2005 "to enhance the recovery of avoidable transfers and excessive prepetition compensation, such as bonuses, paid to insiders of a debtor." H.R. Rep. No. 109-31, pt. 1, at 154 (2005), *as reprinted in* E-2 *Collier on Bankruptcy*, Pt. 10(b) (Alan N. Resnik & Henry J. Sommer eds. 15th ed. revised 2007). To satisfy the requirements of Section 548(B)(ii)(IV), a debtor must have received less than reasonably equivalent value and the transfer must have been

---

[737] Section 548(a) of the Bankruptcy Code provides:

(a)

    (1)    The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily -- . . .

(B)

    (i)    received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (ii)

    (I)    was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

    (II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

    (III)    intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

    (IV)    made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a) (2007).

made (i) to an insider, (ii) under an employment agreement and (iii) not in the ordinary course of business. No showing concerning a debtor's financial condition is required under Section 548(B)(ii)(IV).

Because New Century's actual net income during 2005 and 2006 was less than the reported net income that purportedly justified the incentive bonuses paid, the Debtors did not receive reasonably equivalent value in return for bonuses paid to former Officers of New Century who were statutory insiders, as defined in 11 U.S.C. § 101(31)(B)(ii) (2007). Although Section 548(B)(ii)(IV) does not define the term "not in the ordinary course of business," it is appropriate to look for guidance to interpretations of this phrase in other sections of the Bankruptcy Code.

In *In re Roth American Inc.*, 975 F.2d 949 (3d Cir. 1992), a case involving the interpretation of the phrase "ordinary course of business" as used in Section 363 of the Bankruptcy Code, the Third Circuit explained that

> [T]he courts have engaged in a two-step inquiry for determining whether a transaction is in "the ordinary course of business": a "horizontal dimension" test and a "vertical dimension" test . . . .
> The inquiry deemed horizontal is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry . . . . For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." . . .
> The inquiry deemed vertical (more appropriately characterized as the creditor's expectation test) analyzes the transactions "'from the vantage point of a hypothetical creditor and [the inquiry is] whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit.'" . . . Under this test, "the touchstone of 'ordinariness' is . . . the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." . . . The primary focus thus is on the debtor's pre-petition business practices and conduct, although a court must also "consider the changing circumstances inherent in the hypothetical creditor's expectations."

*In re Roth American Inc.*, 975 F.2d at 952-53 (citations omitted).

Although there is no case law directly on point, the estates potentially could assert that New Century's payment of bonuses to Officers in 2005 and 2006 based upon misstated net income figures is not within the reasonable expectations of creditors and, therefore, was not in

the ordinary course of New Century's business. As a result, the Examiner believes the estates may have a cause of action to recover those bonuses under Section 548(B)(ii)(IV) of the Bankruptcy Code.

### E.    Potential Causes of Action Against Former New Century Officers or Directors for Breach of Duty

The Examiner has considered other potential causes of action that possibly could be asserted by the estates against former Officers and current or former Directors of New Century. These potential claims, each of which requires satisfaction of a substantial legal standard to support liability, are summarized as follows.

#### 1.    Breach of Fiduciary Duty and Corporate Waste

As discussed above, Maryland law would apply to claims by the estates against Officers and Directors of New Century for breach of fiduciary duty. Maryland has codified the duties of directors of Maryland corporations. *See* Md. Code Ann., Corps. & Ass'ns § 2-405.1(a) (LexisNexis 2008) ("A director shall perform his duties . . . [i]n good faith[,] [i]n a manner he reasonably believes to be in the best interests of the corporation[,] and [w]ith the care that an ordinary prudent person in a like position would use under similar circumstances.").

No statute and only a few reported judicial decisions have contemplated directly the fiduciary duties of officers. Maryland has long held, however, that directors and officers of a corporation stand in a fiduciary relationship to their corporation. *See Merchs. Mortg. Co. v. Lubow*, 339 A.2d 664, 669 (Md. 1975); *see also In re Walt Disney Co. Derivative Litig.*, No. 15452, 2004 Del. Ch. LEXIS 132, at *14 (Del. Ch. Sept. 10, 2004) ("To date, the fiduciary duties of officers have been assumed to be identical to those of directors.").

#### a.    Principles Governing Fiduciary Duties of Directors
#### i.    Decision-making by Directors

Since its enactment in 1976, there have been no authoritative Maryland cases interpreting the Maryland statute governing conduct by corporate directors. *See* James J. Hanks, Jr., *Maryland Corporation Law* §164. Nonetheless, Section 2-405.1(a) specifies certain elements which serve to define and circumscribe the liability of corporate directors. For purposes of this Final Report, those elements may be summarized as follows:

### (a)    A director's decisions must be made in "good faith"

"Good faith", as used in § 2-405.1(a)(1), is the absence of any desire to obtain a personal benefit or a benefit for some person other than the corporation. Good faith is generally synonymous with what is referred to in other jurisdictions as the duty of loyalty or the duty of fair dealing. *See United Wire, Metal & Mach. Health & Welfare Fund v. Board of Sav. & Loan Ass'n Comm'rs*, 558 A.2d 379, 383 (Md. 1989) (noting that § 2-405.1(a)'s good faith and reasonable belief requirements cover many requirements that would be called the duty of loyalty in the absence of the statute). In addition, the duty of good faith includes a duty of candor with the stockholders. *See Parish v. Maryland & Va. Milk Producers Ass'n*, 242 A.2d 512, 539 (Md.)) 1968) (stating that the duty of candor means revealing to the stockholders all material facts about a major transaction or any other important matter involving the corporation).

### (b)    A director must "reasonably believe" that his decisions are in the "best interests of the corporation"

"Reasonable belief," as used in § 2-405.1(a)(2), means that there must be some rational basis for the director's action, that the director must have knowledge of that basis, and that his performance must be based on that knowledge. *See Martin Marietta Corp. v. Bendix Corp.*, 549 F. Supp. 623, 633-34 (D. Md. 1982).[738] The reasonable belief requirement does not authorize judicial review of the *wisdom* of the director's action or failure to act, but rather the process of coming to her decision.[739] In order for a decision to be reasonable, it must be based on adequate information. *See NCR Corp. v American Tel. & Tel. Co.*, 761 F. Supp. 475, 491 (S.D. Ohio 1991) (applying Maryland law) (stating that [a]ny decision undertaken on the basis of insufficient knowledge is inherently unreasonable). Additionally, a court will determine whether a director satisfies the standard of conduct at the time of his act or omission rather than in hindsight. *Cf. Gay v. Md. Deposit Ins. Fund*, 521 A.2d 1205, 1213 (Md. 1987).

---

[738] Where a director is confronted with two possible courses of action, both rational, the fact that his or her choice of one of them later turns out to have been less advantageous to the corporation than the other will not mean, especially in the absence of any showing of bad faith, that he or she did not reasonably believe she was acting in the corporation's best interests at the time. *See Cummings v. United Artists Theatre Circuit, Inc.*, 204 A.2d 795, 802 (Md. 1964).

[739] Courts generally may not interfere with or second-guess the business decisions made by directors of a corporation in their management of the corporation. *See, e.g., Mountain Manor Realty, Inc. v. Buccheri*, 461 A.2d 45, 50 (Md. Ct. Spec. App. 1983).

"Best interests of the corporation," as used in § 2-405.1(a)(2), means that a director is required to act in a manner he reasonably believes to be in the best interests of the corporation, rather than the best interests of any stockholder or group of stockholders. *See Werbowsky v. Collomb,* 766 A.2d 123, 133 (Md. 2001).

> **(c)    A director's decisions must be made with the care of an "ordinary prudent person" in similar circumstances**

A board of directors should have available to it information material to the decision and should have some opportunity to ask questions of management and to meet and discuss the matter among themselves. The "ordinary prudent person standard," as used in § 2-405.1(a)(3), is applied in the context of a like position under similar circumstances. The standard of care that is expected is the same standard of care that an ordinary prudent director would give as he engages in the process of making decisions. In addition, the requirements of § 2-405.1(a)(3) codify the pre-existing gross negligence standard. *See Parish,* 242 A.2d at 540; *see also Billman v. Md. Deposit Ins. Fund Corp.,* 593 A.2d 684, 697 (Md. Ct. Spec. App. 1991) (noting that Maryland courts have continued to require proof of gross or culpable negligence as the basis for recovery of money damages). Former officers and current or former Directors of New Century may be liable for breach of fiduciary duty only if their conduct involved "gross or culpable negligence," bad faith or fraud. *See Froelich v. Senior Campus Living LLC,* 355 F.3d 802, 810-11 (4th Cir. 2004) (applying Maryland law); *See also Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 239 (3d Cir. 2005) (applying Delaware law, the court observed that irrational decision-making may constitute gross negligence).

### ii.    Oversight Duties of Directors

In addition to liability for lack of care in authorizing or making decisions, directors or officers may violate the duty of care through lack of attention or failure adequately to supervise officers or employees or other neglect of duty. While a decision to delegate generally will be protected by the business judgment rule, *see Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 943 (Del. 1985), the business judgment rule does not apply to a failure to take action where "directors have either abdicated their functions or absent a conscious decision, failed to act." *Aronson v. Lewis,* 473 A2d 805, 813 (Del. 1984), *overruled on other grounds, Brehm v. Eiser, 746 A.2d 244 (Del. 2000).*

### b.     Principles governing fiduciary duties of corporate officers

In Maryland, corporate officers are judged under general agency principles. *See* James J. Hanks, Jr., *Maryland Corporation Law* § 198.6 (Aspen 2006). The principal to whom officers owe their duties is the corporation. *See id.*; *Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1987) (stating that the court has "read into every contract of employment an implied duty that an employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self-interest"). General agency principles include the exercise of reasonable care and skill in the performance of the officer's responsibilities as well as the duties of loyalty, good faith and candid disclosure. *See Hale Trucks of Md., LLC v. Volvo Trucks N. Am., Inc.*, 224 F. Supp. 2d 1010, 1023 (D. Md. 2002).[740]

A plaintiff must demonstrate the following elements to hold an officer personally liable for a breach of fiduciary duty: (1) a breach of the officer's duty of care (or of his duty to inform the Board of material matters); [741] (2) that "contributed to, or helped bring about;" (3) an injury to the corporation. *Tedrow v. Deskin*, 290 A.2d 799, 803 (Md. 1972). Officers of a corporation are personally liable for the torts in which they actively participated, even if the tort was committed in the name or on behalf of the corporation. *See, e.g., Steigerwald v. Bradley*, 229 F. Supp. 2d 445, 451 (D. Md. 2002).

### c.     Corporate waste

Maryland law also recognizes that corporate officers and directors may be held individually liable for permitting corporate assets to be wasted.     Such a claim sometimes is treated as an extension of a claim for breach of fiduciary duty. *See, e.g., Kann v. Kann*, 690 A.2d 509, 521 (Md. 1997) ("[o]ur holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion"). The legal standard with respect to liability for corporate waste is high.     Absent self-dealing or self-enrichment, corporate officers or directors may be liable for corporate waste only as a consequence of "gross or culpable

---

[740] An agent has a duty to inform its principal of material matters relevant to the agency.  Restatement (Second) of Agency § 381 (1958).  An officer's duty to inform the board of directors can be inferred from the Maryland statutory requirement that the corporation be managed by or under the direction of the board of directors, Md. Code Ann., Corps. & Ass'ns § 2-401(a), and that, in performing his or her duties, a director may rely on information, opinions, reports, or statements (including any financial statement or other financial data), prepared or presented by: (1) an officer or employee of the corporation; (2) legal counsel, a certified public accountant or other professional or expert; and (3) a committee of the board on which the director does not serve.

[741] *See, e.g.*, Restatement (Second) of Agency § 381.

- 544 -

negligence." *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 340 A.2d 225, 236 (Md. 1975) ("While we have held that the directors of a corporation may be held individually liable for permitting corporate assets to be wasted, this rule applies only where this occurs in consequence of 'gross or culpable negligence.'") (citations omitted); *Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 442 (D. Md. 1996) (court sustained cause of action for gross negligence and waste of corporate assets, ruling "Plaintiff has alleged sufficient facts to state a cause of action for gross negligence and waste of corporate assets").

## 2. Potential Fiduciary Lapses by New Century Officers and Directors

The Examiner investigated potential fiduciary lapses by New Century Officers and Directors, including instances where action or inaction by New Century Officers and Directors might constitute corporate waste. Given the operation of the business judgment rule, statutory limitations on liability for Directors under Maryland law, and provisions contained in the Company's organizational documents and certain employment agreements, the Examiner understands that the estates would have to demonstrate gross negligence and possibly self-dealing or affirmative misconduct on the part of the Officers or Directors to recover for these apparent lapses. In light of these rigorous legal standards, the Examiner has not included a detailed discussion of such potential causes of action in this Final Report. Nonetheless, because these matters raise some significant questions, and because representatives of the estates may wish to consider more thoroughly possible allegations or claims regarding these matters, the Examiner believes it is important to summarize certain of the potential claims he had considered.

As described in this Final Report, the Examiner found certain circumstances in which members of New Century's Management, including Senior Management and possibly members of its Board of Directors, acted in a manner that appears to reflect departures from a standard of reasonable care. These circumstances include, but are not limited to, the following conduct or activities by former Officers or Directors of New Century:

- altering the methodology for the calculation of the repurchase reserve with respect to the second and third quarters of 2006 in a manner that was inconsistent with GAAP and that caused the reserve to be understated by 178% and 1000% for those periods, respectively ;

- failing to track properly and account for the backlog of loan repurchase demands received by the Company, resulting in an underreporting of repurchase exposure and a materially inadequate reserve;

- failing to update assumptions and to increase the discount rates used by New Century to value residual interests, which resulted in an overvaluation of residual interests throughout the relevant period and a material overstatement of pre-tax earnings;

- overstating the LOCOM valuation account by more than 100% with respect to 2005 and more than 200% for the period ended March 31, 2006;

- failing to ensure the adequacy of systems and controls respecting repurchase reserves, the LOCOM valuation account, residual interest valuations and the other accounting areas where the Examiner identified errors;

- guiding New Century toward the origination of higher risk loan products without taking prudent steps to address those risks in a meaningful manner, especially after New Century identified the poor delinquency rates of many of the higher risk products;

- failing to act, for at least several years, to curb the kickouts, including "no brainer" loan rejections based upon incomplete loan files, which cost New Century millions of dollars;[742] and

- causing New Century to repurchase millions of dollars worth of its own stock amidst growing liquidity concerns, aggravated market conditions, rising EPDs and a dramatic increase in loan repurchase exposure.

### 3. Potential Defenses to Breach of Duty Claims on Behalf of the Estates

The following categories of defenses might be asserted with respect to claims brought on behalf of the estates for breach of fiduciary duty or corporate waste. As noted above, these defenses impose substantial limitations on the ability of the estates to assert possible breach of duty claims against Officers or Directors of New Century.

#### a. The Business Judgment Rule

Maryland courts apply the business judgment rule when determining whether directors have complied with their fiduciary duties. The business judgment rule creates a presumption that directors acted in good faith. *See Zimmerman*, 800 F.2d at 392 (interpreting Maryland law). In Maryland, § 2-405.1(e) of the Corporation Code codifies the business judgment rule by creating a presumption in favor of a director's acts. Md. Code Ann., Corps. & Ass'ns § 2-405.1(e) (LexisNexis 2008); *see Werbowsky*, 766 A.2d at 138 n.7.[743] The business judgment rule prohibits judicial review of business decisions made by directors that turn out to be mistakes of

---

[742] The failure to take action to reduce meaningfully this drain on resources might constitute "irrational decisionmaking" sufficient to support a claim. *Tower*, 416 F.3d at 241.

[743] "Presumption of satisfaction. – An act of a director of a corporation is presumed to satisfy the standards of subsection (a) of this section." Md. Code Ann., Corps. & Ass'ns § 2-405.1(e).

judgment. *See Parish* 242 A.2d at 540. However, the business judgment rule does not protect business decisions of directors that are the result of gross or culpable negligence. *Id.* If a director did not comply with each of the three requirements embodied within the standard of care required of directors (acting in good faith, in the best interests of the corporation, and with due care) of § 2-405.1(a), then the director may be liable without regard to the merits of the decision. *See, e.g., Black v. Fox Hills N. Cmty Ass'n*, 599 A.2d 1228, 1231 (Md. Ct. Spec. App. 1992).

The business judgment rule has been applied primarily in the context of director conduct. While few cases show the extent of the rule's applicability to decisions of non-director officers, some cases suggest that decisions of officers should be governed by the rule. *See, e.g., Kaplan v. Centex Corp.*, 284 A.2d 119, 124 (Del. Ch. 1971) ("the decision of executive officers may also come within the [business judgment rule]").

### b.   Unclean Hands

There appears to be some disagreement under Maryland law whether the defense of unclean hands may be applied only to bar recovery in actions at equity or at both equity and at law. *Compare Adams v. Manown*, 615 A.2d 611, 623-24 (Md. 1992) and *Hicks v. Gilbert*, 762 A.2d 986, 989-90 (Md. Ct. Spec. App. 2000). "The doctrine is not for the protection of the parties to a lawsuit, but rather, for the protection of the courts -- the idea being that judicial integrity is endangered when judicial powers are interposed to aid persons whose very presence before a court is the result of some fraud or inequity." *Manown v. Adams*, 598 A.2d 821, 824 (Md. Ct. Spec. App. 1991) (citation omitted), *vacated on other grounds, Adams*, 615 A.2d 611. Where there is evidence of "willful wrongdoing in relation to the controversy before it," the doctrine of unclean hands permits the court (at its discretion) to deny relief to parties who have participated in the wrongdoing. *Manown*, 598 A.2d at 825.

### c.   In Pari Delicto

Under Maryland law, when the parties have participated in fraudulent or illegal conduct, they are considered to be *in pari delicto*, and one party may not maintain suit against another party "directly arising out of the misconduct." *See Adams*, 615 A.2d at 623 (Chasanow, J., dissenting) (citation omitted). If the wrongdoing of a director or officer is imputed to the corporation, the doctrine of *in pari delicto* may bar suit on behalf of a bankruptcy estate, unless claims are asserted on behalf of the estate as an innocent victim of the wrongdoing. *See id.* at

624 (holding that the defense of *in pari delicto* did not apply because the trustee was pursuing the rights of mortgage lenders that were assigned to the estate).

### d.     Right to Rely on Information Provided by Others

Pursuant to § 2-405.1, in performing his or her duties, a director may rely on information, opinions, reports, or statements (including any financial statement or other financial data), prepared or presented by: (1) an officer or employee of the corporation; (2) legal counsel, a certified public accountant or other professional or expert; and (3) a committee of the board on which the director does not serve. Md. Code Ann., Corps. & Ass'ns § 2-405.1. The director reasonably must believe in the presenter's reliability, competence and expertise on the relevant subject. With respect to information from a committee, it must be "as to a matter within [the committee's] designated authority [and] the director [must] reasonably [believe] the committee to merit confidence." *See* § 2-405.1(b).

A director's reliance upon the competent information and advice of others, as set forth in subsection (b), is a defense to allegations that his or her performance did not meet the requirements of § 2-405.1. *See, e.g., Yost v. Early,* 589 A.2d 1291, 1299 (Md. Ct. Spec. App. 1991); *see also* Md. Code Ann., Corps. & Ass'ns § 2-405.1(c). The burden of proof is upon the defendant director to demonstrate that he or she met the requirements of § 2-405.1(b). *Yost,* 589 A.2d at 1299.

### e.     Indemnification and Limitation of Liability Provisions

New Century Officers and Directors may also seek to assert defenses to causes of action asserted by the estates based upon rights to indemnification and limitations on liability contained in the Company's charter, bylaws and employment agreements.

### i.     Statutory   Framework   for   Indemnification   and Limitations on Liability

In Maryland, indemnification of a corporation's directors and officers is governed by Section 2-418 of the Corporation Code. *See* Md. Code Ann., Corps. & Ass'ns § 2-418(a)(3) & (j)(1) (LexisNexis 2008). Unless limited by charter, indemnification of expenses incurred by a director or officer in connection with a proceeding is mandatory if (1) a director or officer has been successful on the merits or otherwise in the defense of any proceeding covered by the indemnification statute or (2) a court orders indemnification under specific circumstances set forth in the statute. *See id.* § 2-418(d). In the absence of a successful defense of the proceeding by a director or officer or an applicable court order, indemnification is permissive unless it is

established that an act or omission by a director or officer: (1) was material to the matter giving rise to the proceeding, and (a) was committed in bad faith or (b) was the result of deliberate dishonesty; or (2) resulted in improper personal benefit to the director; or (3) in the case of a criminal proceeding, the director had reasonable cause to believe the act or omission was unlawful. *See id.* § 2-418(b). A corporation may not indemnify a director, officer, employee or agent in "any proceeding charging improper personal benefit to the director [or officer, employee or agent], whether or not involving action in the [individual's] official capacity, in which the [individual] was adjudged to be liable on the basis that personal benefit was improperly received." *See id.* § 2-418(c).

Since 1988, Maryland corporations have been permitted to adopt a charter that further limits the liability of directors and officers of the corporation or its stockholders for money damages, so long as any such limitation does not limit the director's or officer's liability if the director or officer has actually received an improper benefit or engaged in active and deliberate dishonesty. *See* Md. Code Ann., Corps. & Ass'ns § 2-405.2 (LexisNexis 2008) and Md. Code Ann., Cts. & Jud. Proc. § 5-418 (LexisNexis 2008). To the extent a corporation's charter includes a provision limiting director and officer liability and there is no allegation that the director's or officer's conduct falls within one of the two exceptions, a court may dismiss any claim against the director or officer by the corporation or its stockholders for money damages arising out of such conduct. *Grill v. Hoblitzell*, 771 F. Supp. 709, 712 (D. Md. 1991) (dismissing a stockholder derivative action against the directors of a Maryland corporation with a director exculpation provision in its charter, in part because the stockholders' boilerplate allegations of waste and mismanagement did not constitute "situations involving 'active and deliberate dishonesty' or the actual receipt of an improper benefit").

### ii. Indemnification or Liability Limitations in New Century's Corporate Documents

#### (a) Articles of Amendment and Restatement

Article VIII of New Century's Articles of Amendment and Restatement, dated September 30, 2004, provides that Directors and Officers (including former Directors and Officers) are entitled to indemnification "in the manner and to the fullest extent permitted by law" when that individual "is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceedings, whether or not by or in the right of the Corporation, and whether civil, criminal, administrative, investigative or otherwise."

Article IX states broadly that Directors and Officers shall not "be personally liable to the Corporation or its stockholders, or any of them, for money damages," to the fullest extent permitted under Maryland law.

### (b)    New Century's Bylaws

New Century's Amended and Restated Bylaws ("Amended Bylaws"), dated September 30, 2004, provide broad rights of indemnification, akin to those contained in the Articles of Incorporation and the Articles of Amendment and Restatement. The Amended Bylaws state that the Company will indemnify, to the maximum extent permitted by applicable law, without requiring a preliminary determination of the ultimate entitlement to indemnification, reasonable expenses in advance of final disposition of a proceeding to a current or former director or officer who is made a party to or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding (including civil, criminal, administrative or investigative matters).

### (c)    Employment Agreements

Some employment agreements for New Century Officers and employees also contain provisions with respect to indemnification. The standard formulation incorporated by New Century in employment agreements for Senior Management provides for indemnification to the extent permitted by law, applicable statutes, the Articles of Incorporation, Bylaws or Company Resolutions, and obligates New Century to indemnify the Officer against "liability or loss arising

out of [his or her] actual or asserted misfeasance or nonfeasance in the performance of [his or her] duties or out of any actual or asserted wrongful act against, or by, the Company including but not limited to judgments, fines, settlements and expenses incurred in the defense of actions, proceedings and appeals."

Respectfully submitted,

Michael J. Missal
Examiner

February 29, 2008

By Examiner's Counsel:

Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, D.C. 20006
(202) 778-9000
(202) 778-9100 (fax)

Saul Ewing LLP
222 Delaware Avenue
Suite 1200
Wilmington, Delaware 19899
(302) 421-6800
(302) 421-6813 (fax)

Appendix A
Often Used Acronyms or Abbreviations

| Acronym or Abbreviation | Definition |
| --- | --- |
| AARMR | America Association of Residential Mortgage Regulatory |
| ABS | Asset Based Securities |
| AICPA | American Institute of Certified Public Accountants |
| ALCO | Asset and Liability Committee |
| ALL | Allowance for Loan Losses |
| AOCI | Accumulated Other Comprehensive Income |
| ARM | Adjustable Rate Mortgage |
| AU | AICPA Professional Standards, Audit Risk and Materiality in Conducting an Audit |
| CAAT | Computer Assisted Audit Technique |
| CAE | Chief Audit Executive |
| C-BASS | Credit-Based Asset Servicing and Securitization |
| CDR | Conditional Default Rate |
| CE | Credit Enhancement |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CFRA | Center for Financial Research and Analysis |
| CLTV | Combined Loan-To-Value |
| CMBS | Commercial Mortgage-Based Securities |

| Acronym or Abbreviation | Definition |
|---|---|
| CMO | Collateralized Mortgage Obligation |
| COO | Chief Operational Officer |
| COSO | Committee of Sponsoring Organizations of the Treasury Commission |
| CPR | Constant Prepayment Rate |
| CSBS | Conference of State Bank Supervisors |
| CSH | Common Shareholder |
| DER | Dividend Equivalent Rights |
| DIG | Derivatives Implementation Group |
| DIDMCA | Depository Institutions Deregulation and Monetary Control Act of 1980 |
| DPP | Department of Professional Practice |
| DTI | Debt-To-Income |
| EDF | Euro Dollar Futures |
| EITF | Emerging Issues Task Force |
| EMC | Executive Management Committee |
| EPD | Early Payment Default (default on any of the first three borrower loan payments) |
| EPS | Earnings Per Share |
| EVP | Executive Vice President |
| E&Y | Ernst & Young |
| FASB | Financial Accounting Standards Board |
| FASCON | FASB Statement on Financial Accounting Concepts No. |

| Acronym or Abbreviation | Definition |
| --- | --- |
| FDR | Financial Derivatives Resource Group |
| FHA | Federal Housing Authority |
| FICO | A credit score developed by Fair Isaac Corporation. |
| FIN | Financial Accounting Standards baord Interpretation No. |
| FPD | First payment default |
| FRM | Financial Risk Management |
| FRM | Fixed Rate Mortgage |
| FRR | Financial Reporting Release |
| GAAP | Generally Accepted Accounting Principles |
| GAAS | Generally Accepted Auditing Standards |
| GOS | Gain On Sale |
| GSE | Government Sponsored Entities |
| Heller | Heller Ehrman LLP |
| HELOC | Home Equity Line of Credit |
| HFI | Held for Investment |
| HFS | Held For Sale |
| IIA | Institute of Internal Auditors |
| IO | Interest Only |
| IRLC | Interest Rate Lock Commitments |
| IRM | Information Resources Management |
| IT | Information Technology |

| Acronym or Abbreviation | Definition |
|---|---|
| ITGC | Information Technology General Controls |
| K&L Gates | Kirkpatrick & Lockhart Preston Gates Ellis LLP |
| KPMG | KPMG LLP |
| LHFI | Loans Held For Investment |
| LHFS | Loans Held For Sale |
| LIBOR | London Interbank Offered Rate |
| LOCOM | Lower of Cost or Market |
| LTB | Loan Trial Balance |
| LTV | Loan To Value |
| MBS | Mortgage-Backed Securities |
| MSR | Mortgage Servicing Rights |
| MTM | Mark To Market |
| NCCC | New Century Capital Corp. |
| NCMC | New Century Mortgage Corporation |
| NIMS | Net Interest Margin Securities |
| NYSE | New York Stock Exchange |
| OBS | On Balance Sheet |
| OC | Over Collateralization |
| OCI | Other Comprehensive Income |
| OMM | O'Melveny & Myers LLP |
| PCAOB | U.S. Public Accounting Oversight Board |

| Acronym or Abbreviation | Definition |
|---|---|
| P&L | Profit and Loss |
| PMI | Private Mortgage Insurance |
| PwC | Pricewaterhouse Coopers LLP |
| QA | Quality Assurance |
| QRS | Qualified REIT Subsidiary |
| RBC | Royal Bank of Canada |
| REIT | Real Estate Investment Trust |
| REMIC | Real Estate Mortgage Investment Conduit |
| REO | Real Estate Owned |
| RESPA | Real Estate Settlement Procedures Act |
| RMBS | Residential Mortgage Backed Security |
| ROE | Return on Equity |
| RoSM | Risk of Significant Misstatement |
| SAB | SEC Staff Accounting Bulletin |
| SAS | Statement on Auditing Standards |
| SEC | U.S. Securities and Exchange Commission |
| SFG | Structured Finance Group |
| SIC | Special Investigation Committee of the New Century Audit Committee |
| SOX | Sarbanes-Oxley Act of 2002 |
| SPD | Second Payment Default |
| SPE | Special purpose entity |

| Acronym or Abbreviation | Definition |
|---|---|
| SVP | Senior Vice President |
| TDP | Third Payment Default |
| T&R | Time and Responsibility |
| TRA | Tax Reform Act of 1980 |
| TRS | Taxable REIT Subsidiary |
| UPB | Unpaid Principal Balance |
| VA | Department of Veterans Affairs |
| VBA | Microsoft Visual Basic for Applications |
| VP | Vice President |
| WACLTV | Weighted Average Combined Loan to Value Ratio |

### Appendix B
### Important New Century and KPMG Personnel

## New Century

| Name | Position |
|---|---|
| Marilyn Alexander | Independent Director (mid-April 2005) |
| George Arambula | Vice President, Internal Audit |
| Paul Atkinson | Vice President, Risk Solutions |
| Eric Bachelor | Senior Trading Analyst |
| Mark Bernstein | Program Type Manager |
| Tajvinder Bindra | Executive Vice President (after November 2006) |
| Harold Black | Independent Director |
| Ron Brown | AVP, Internal Audit |
| Ron Brown | Secondary Marketing, Repurchase Desk |
| Richard Cimino | President, Loan Servicing |
| Kevin Cloyd | Executive Vice President and President of New Century Capital Corp. |
| Dan Coakley | Vice President, Credit and Operations |
| Robert Cole | Chairman of the Board and Chief Executive Officer |
| Rick Collins | Investor Reporting Manager |
| Rodney Colombi | Executive Vice President, Corporate Finance |
| Patti Dodge | Executive Vice President, Chief Financial Officer (until November 2006) |
| Trevor Drummond | Accounting Manager |
| Joseph Eckroth, Jr. | Executive Vice President, Chief Operating Officer (2006) |
| David Einhorn | Independent Director (since March 2006) |
| Holly Etlin | Chief Restructuring Officer (Alix Partners) |
| Christine Fidler | Vice President, Corporate Finance |
| Patrick Flanagan | President, New Century Mortgage Corp. (until December 2005) |
| Frederic Forster | Independent Director |
| Amanda Fowler | Assistant Vice President, Investor Relations |
| Carol Franchi | Assistant Vice President, Loan Accounting Manager |
| Lou Garday | Tax Director |
| Jeffrey Goldberg | Vice President, Treasurer |
| Edward Gotschall | Vice Chairman-Finance (through June 2006) |
| John Hatch | Senior Analyst, Secondary Marketing |
| John Hedlund | Senior Vice President, Corporate Operations |
| Jennifer Jewett | Vice President, Corporate Counsel, Corporate Secretary |
| Lenice Johnson | Senior Vice President, Corporate Operations (beginning June 2006) |
| David Kenneally | Senior Vice President, Controller |
| Robert Lambert | Senior Vice President, Leadership and Organizational |

| Name | Position |
| --- | --- |
| | Development |
| Donald Lange | Independent Director |
| Tim Lee | Underwriter |
| Steve Lemon | Executive Vice President, East Coast Wholesale |
| Robert Lent | Vice President, Investor Relations |
| Warren Licata | Senior Vice President, Secondary Marketing and Capital Markets |
| Mary Malloy | Vice President, Hedging |
| Carrie Marrelli | Vice President, Investor Relations |
| Monica McCarthy | Senior Vice President, Assistant General Counsel |
| Lois McDermott | Risk Manager |
| William McKay | Senior Vice President, Mortgage Operations |
| Anthony Meola | Executive Vice President, Loan Production (beginning May 2006) |
| Evan Mitnick | Senior Vice President, New Century Capital Corporation |
| Brad Morrice | Vice Chairman, President and Chief Operating Officer (through June 2006), Chief Executive Officer (from July 2006) |
| Matthew Mullins | Associate Trader |
| Yury Pyatigorsky | Vice President, Corporate Development |
| William Popejoy | Independent Director |
| Rick Rhinehart | Vice President, Secondary Marketing |
| Michael Sachs | Independent Director |
| Tony Sanchez | Vice President, Controller |
| Music Sprouse | Cash Management Manager |
| Randy Stewart | Executive Vice President, Home123 Capital Markets |
| Stergios ("Terry") Theologides | Executive Vice President, Corporate Affairs and General Counsel |
| Jonathan Threadgill | President, Retail Prime |
| Joseph Tortorelli | Assistant Vice President, Corporate Counsel |
| Donna Walker | Vice President, Financial Reporting |
| Karl Weiss | Senior Vice President, Capital Markets |
| Colleen Wolf | Senior Vice President, Chief Information Officer |
| Paul Zalle | Senior Vice President, Internal Audit |
| Richard Zona | Independent Director |

## KPMG

| Name | Position |
|------|----------|
| Athena Chan | KPMG Manager, New Century Engagement |
| Christina Chinn | KPMG Associate, New Century Engagement |
| Debbie Biddle | KPMG Senior Associate, New Century Engagement |
| Fiona Liang | KPMG Senior Manager, New Century Engagement |
| John Donovan | KPMG Partner, New Century Engagement |
| John Klinge | KPMG Partner, FRM/FDR |
| Justin Ayre | KPMG Senior Manager, FRM/FDR |
| Kurt Kurimsky | KPMG Partner |
| Marc Macaulay | KMPG SEC concurring partner, New Century Engagement |
| Mark Kim | KPMG Senior Manager, New Century Engagement |
| Patrick Kinsella | KPMG Partner, New Century Engagement |
| Ray Munoz | KPMG Manager, FRM/FDR |
| Ryan Beckstrom | KPMG Senor Associate, New Century Engagement |
| Scott Carnahan | KPMG SFG Partner, SFG |
| Scott London | KPMG Partner, In-charge Audit Los Angeles |
| Tara Hatanaka | KPMG Senior Manager, New Century Engagement |
| Terri Iannaconi | KPMG Partner, DPP |
| Veronica Wong | KPMG Manager, New Century Engagement |
| Ron Yuval | KPMG Senior Manager, SFG |