UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW CENTURY HOLDINGS, INC., a Delaware | ) | Case No. 07-10416 (KJC) |
| corporation, et al. | ) | Jointly Administered |
| Debtor. | ) | |
| | ) | |

**OBJECTION AND MEMORANDUM OF LAW OF AD HOC COMMITTEE OF
BENEFICIARIES OF THE NEW CENTURY FINANCIAL CORPORATION
DEFERRED COMPENSATION PLAN AND/OR SUPPLEMENTAL EXECUTIVE
RETIREMENT/SAVINGS PLAN TO CONFIRMATION OF
FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION**

Gregory J. Schroeder ("Schroeder"), Michelle Parker ("Parker"), Martin Warren

("Warren"), Steve Holland ("Holland"), and Nabil Bawa ("Bawa") and the Ad Hoc

Committee of Beneficiaries of the New Century Financial Corporation Deferred

Compensation Plan and/or Supplemental Executive Retirement/Savings Plan (the

"Plans"), for themselves and all other similarly situated, as beneficiaries of the New

Century Financial Corporation Deferred Compensation Plan and/or The New Century

Financial Corporation Supplemental Executive Retirement/Savings Plan (collectively, the

"Beneficiaries"), hereby object to confirmation of the First Amended Joint Chapter 11

Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors

Dated as of March 18, 2008 (the "Chapter 11 Plan").

As detailed below, should the Beneficiaries prevail in any aspect of the pending

adversary proceeding, the proponents of the Chapter 11 Plan admit that the Plan will not

affect that litigation result. Since that result will not be known at the time of the

confirmation hearing, the Beneficiaries – given the possibility (however remote) that they

will be treated as unsecured creditors of New Century Financial Corporation – object to

confirmation of the Chapter 11 Plan on the ground that the Chapter 11 Plan does not, and cannot, meet the requirements of 11 U.S.C. §1129(a) and (b).

## I.    JURISDICTION, VENUE AND BASIS FOR RELIEF SOUGHT

1.    This Court has jurisdiction over this Objection under 28 U.S.C. §§ 157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2). The statutory bases for relief include 11 U.S.C. §§ 1129(a)(1)(3) & (7) and 1129(b).

## II.    FACTUAL AND PROCEDURAL HISTORY

2.    On or about January 1, 1999, New Century Financial Corporation ("New Century") executed and made available to eligible employees the New Century Deferred Compensation Plan. New Century subsequently replaced the original Deferred Compensation Plan with the New Century Financial Corporation Deferred Compensation Plan Amended and Restated July 1, 2004 (the "Deferred Compensation Plan"). Amounts contributed to and/or withheld under the Deferred Compensation Plan from the participants' salaries, bonuses and commissions were placed in a trust ("Plan Assets"). As of December 31, 2006 the trust contained in excess of $43 million (and perhaps as much as $49 million) of Plan Assets.[1]

3.    Debtors filed petitions for chapter 11 relief on April 2, 2007 (the "Petition Date") and the cases have been jointly administered by this Court. Following a May 7, 2007 hearing on the Beneficiaries' Motion for Appointment of an Additional Committee,

---

[1] By agreement of the parties, and this Court's order implementing the same, the Plan Assets have been allocated to safer investment vehicles and used to pay off a Deferred Compensation Plan loan used to fund benefits. Accordingly, the current amount of the Plan Assets may be somewhat lower, but reportedly exceeds the amount required to pay all vested benefits even after the adjustments.

this Court ruled that the Plan Assets remain held in a segregated account (the "Segregated Account") pending further court order.

4.    On June 20, 2007, the members of the Ad Hoc Beneficiaries Committee, as Beneficiaries, initiated an adversary proceeding against the Debtors, Wells Fargo Bank N.A. as Trustee, the Compensation Committee of Board of Directors of the New Century Financial Corporation as the Plan Administrator, and the Official Committee of Unsecured Creditors by filing a Complaint seeking, *inter alia*, declaratory and equitable relief to redress violations of ERISA with regard to the funds held in the Segregated Account (the "Adversary Proceeding"). The Beneficiaries, among other relief, seek a ruling that the Plan Assets in the Segregated Account are being held in trust for the exclusive benefit of the Beneficiaries because the Plans are not "top hat" plans and are therefore subject to all of ERISA's substantive provisions.[2]

5.    In addition, the Beneficiaries have alleged that – in the event that the Court finds that the Plan Assets are not held for their exclusive benefit – under the terms of the Deferred Compensation Plan and related trust agreement (the "Trust"), the Plan Assets may only be paid to the Beneficiaries and "general creditors" of NCFC, one of the so-called Holding Company Debtors as defined in the Deferred Compensation Plan. The Beneficiaries allege in the Adversary Proceeding that to the extent the Court finds that the Deferred Compensation Plan is, in fact, a "top hat" plan exempt from ERISA's substantive provisions, the assets of the Deferred Compensation Plan are subject to claims of creditors only to the extent provided by the terms of the Trust. E.g., Bank of

---

[2] Courts continue to shoot down alleged "top hat" plans upon employee challenges, finding that plans do not meet the "select group" test and applying ERISA's substantive provisions. *See, e.g.,* Deal v. Kegler Brown Hill & Ritter Co. L.P.A., 2008 WL 269617 (S.D. Ohio)(court grants summary judgment to employees, finding defendant employer failed to establish "top hat" status of plan).

3

America v. Moglia, 330 F.2d 942 (7th Cir. 2003) (rabbi trust assets not subject to claims of secured party and security interest did not attach to such assets).  Under the terms of the Trust, if the Deferred Compensation Plan is a "top hat" plan, the Plan Assets are subject to the claims only of "general creditors,"  and only those of NCFC, who share pro rata with the Beneficiaries.  Id.

The term "general creditors" of NCFC necessarily encompasses only general unsecured creditors of NCFC, not creditors of any other Debtor or Debtor's estate, and excludes all secured creditors, including to the extent asserting deficiency claims.  Id. The Debtors themselves have conceded before the Court at various times that the Plan Assets are to be shared only with NCFC's general unsecured creditors according to the terms of the Deferred Compensation Plan and Trust.  For example, at the January 9, 2008 hearing, Debtor's counsel stated that the Plan Assets were "reserved by NCFC . . . to be available to the unsecured creditors of NCFC . . ." and that the "trust assets . . . are for the benefit of creditors of NCFC . . ."  (Transcript at 68) (D.E. 4433). The term "general creditors" under applicable federal and state  law, that of California, includes only unsecured creditors who have not obtained a judgment or lien and do not enjoy any special priority. [3]

---

[3] The term "general creditors" under applicable federal and state (California) law is defined to include only general unsecured creditors that have not obtained a judgment or lien and that do not enjoy any special statutory or other priority. *See generally*, BLACK'S LAW DICTIONARY 442 (Rev. 4th ed. 1968). *See also* Howard Delivery Service, Inc. v. Zurich American Ins. Co., 547 U.S. 651, 667, 165 L.Ed.2d 110, __, 126 S. Ct. 2105, 2116 (2006)(distinguishing priority from general unsecured creditors); Joint Industry Board at the Electrical Industry v. U.S., 391 U.S. 224, 20 L.Ed.2d 546, 88 S. Ct. 1491(1968)(same); In re Midway Airlines, Inc., 383 F.3d 663, 669 (7th Cir. 2004)(same); Menner v. Slater, 148 Cal. 284, 286, 83 P. 35 (1905)(general creditor defined as creditor with no judgment, no lien and "in no position to claim any priority of right to . . . property"); Quackenbush v. Armato, Gaims, Weil, West & Epstein, 36 Cal. App. 4th 363, 375, 42 Cal. Rptr. 2d 498, 505 (Cal. App. 1995)("general creditors" paid only after priority creditors in state liquidation proceeding); Estate of Black, 65 Cal.App.3d 112, 117, 135 Cal.Rptr. 115, 118 (Cal. App. 1976)(California law regarding disposition of estate assets distinguished among administrative expenses, priority and wage claims and "general creditors' claims" (which have the lowest priority));

4

6.    The Debtors, Official Committee of Unsecured Creditors (the "Committee") and Wells Fargo Bank, as trustee of the Trust, filed motions to dismiss the Adversary Proceeding and the Beneficiaries filed appropriate and timely responses to the motions to dismiss.  The motions to dismiss have been briefed and oral argument has been held, and are under consideration by the Court.

7.    On February 2, 2008, the Debtors filed the Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008 [D.E. 4804] and the Chapter 11 Plan of Reorganization of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008 [D.E. 4805].

8.    On February 27, 2008, the Beneficiaries timely objected to the Debtors' motion seeking approval of the disclosure statement on the grounds that the disclosure statement did not contain adequate information and, moreover, that the Chapter 11 Plan that it described was facially unconformable. Among other contentions, the Beneficiaries argued that the Chapter 11 Plan contained fatal flaws to the extent that it proposed to substantively consolidate the Debtors' estates and improperly classified the Beneficiaries' claims [D.E. 5068].  The same day, the Debtors filed an Amended Disclosure Statement which failed to cure the deficiencies raised in the Beneficiaries' objections [D.E. 5103]. Following negotiations between the Debtors and the Beneficiaries, the Debtors further amended the Amended  Disclosure Statement to include additional disclosures, including additional schedules to the Amended Disclosure Statement, that the Beneficiaries

---

Trinity Tractor Co. v. Allis-Chalmers Mtg. Co., 3 Cal. App. 3d 428, 442, 83 Cal. Rptr. 783, 791 (Cal. App. 1970)(distinguishing priority claims from "general creditor"claims).

believed were essential to complete disclosure and needed to be included. The Court agreed.

On March 18, 2008, this Court approved the Debtors' further-amended disclosure statement [D.E. 5396] (the "Disclosure Statement") and the Debtors filed the Joint Amended Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March 18, 2008 (the "Chapter 11 Plan") [D.E. 5405]. This version of the Chapter 11 Plan is the one that is currently before this Court. While the disclosure-related objections of the Beneficiaries were resolved, all of the remaining objections of the Beneficiaries relating to confirmation of the Chapter 11 Plan were preserved for the hearing on confirmation.

9.     The Disclosure Statement's section on "Risks" says this about the Adversary Proceeding and its possible effect on funding of the Chapter 11 Plan:

> The projected recoveries set forth in this Disclosure Statement make certain assumptions about the realization of the Debtors' remaining assets. With respect to the Holding Company Debtors, the distributions estimated herein assume a range of favorable outcomes with respect to the litigation regarding the Deferred Compensation Trust – both with respect to the ERISA-based liabilities and remedies thereunder and the theories advanced by the Deferred Compensation Beneficiaries that attempt to restrict the use of the funds of the Deferred Compensation Trust (see Sections III.C.10.c and V.A.4.e hereof). If the Deferred Compensation Beneficiaries prevail in the Schroeder Adversary Proceeding as to their liability and remedy contentions, the amounts contained in the Deferred Compensation Trust will be excluded from the Debtors' estates, will not be included in the Assets of the Holding Company Debtors, and thus will not be available as Holding Company Debtor Net Distributable Assets. If the Deferred Compensation Beneficiaries prevail with respect to their alternative contentions, the distribution of such assets will be limited to certain Unsecured Claims against NCFC.

10.     Thus, if the Adversary Proceeding were to be resolved favorably to the Beneficiaries, that outcome would moot the Beneficiaries' concerns. (In the secondary argument in the Adversary Proceeding, the Beneficiaries contend that deficiency, priority

6

and administrative claims could not share in the Plan Assets, since such claimants are not "general creditors.") (See the cases cited at footnote 3, supra*)*.

11.      However, pending final adjudication or settlement of the Adversary Proceeding, the Beneficiaries press their objections to confirmation of the Chapter 11 Plan. The Chapter 11 Plan, now amended, continues to consolidate all of the assets held by NCFC, NC Credit, NC Residual IV, and TRS Holdings into a single debtor group called the "Holding Company Debtors". Plan at 10. These consolidated assets include the Plan Assets which, as conceded by the Debtors, are, at *worst* only available to NCFC's general creditors, regardless of how one defines "general creditor." The Plan provides for a pro rata distribution from the consolidated estate of the Holding Company Debtors to the Beneficiaries (and other alleged unsecured creditors of the Holding Company Debtors) based on the consolidated claims of such creditors against the consolidated assets of the Holding Company Debtors. All intercompany claims, if any, among the Holding Company Debtors are eliminated under the Chapter 11 Plan. This is, of course, the definition of substantive consolidation.

### III.    OBJECTIONS TO CONFIRMATION

12.      Under the terms of the Plan and Trust, the Beneficiaries only share with "general unsecured creditors" of NCFC and no other Debtor. To the extent that the Chapter 11 Plan contravenes the language of the Plan and Trust, it also must fail under sections 1129(a)(1) and (a)(3) of the Code, including, *inter alia*, because the Chapter 11 Plan is proposed by a means forbidden by law.

13.      Because confirmation of the Chapter 11 Plan requires invocation of "deemed" substantive consolidation, the Chapter 11 Plan violates sections 1129(a)(1) and

7

1129(a)(3).  The creation of the "Debtor Groups" and the consolidation of the assets of

and claims against each Debtor Group for purposes of voting and distribution is nothing

more than "deemed substantive consolidation" of the type recently outlawed by the Third

Circuit.  In re Owens Corning, 419 F.3d 195, 216 (3d. Cir. 2005), *cert denied*

McMonagle v. Credit Suisse First Boston, 547 U.S. 1123 (2006) *and cert denied* Official

Committee Representing Bondholders and Trade Creditors of Debtors Owens Corning v.

Credit Suisse First Boston, 547 U.S. 1123 (2006).[4]  The formation of the group consisting

of the "Holding Company Debtors" suffices only to strip from the Beneficiaries the rights

granted to them under the language of the Plan and Trust in order to pay other creditors in

contravention of those vested rights, but with no benefit to the Beneficiaries.  Id.

14.    To the extent that the Chapter 11 Plan attempts to achieve actual

substantive consolidation of the Holding Company Debtors, its proponents cannot begin

to meet the test set forth in Owens Corning.  None of the purported excuses for the

consolidation of the Holding Company Debtors under the Chapter 11 Plan, either alone or

in combination, suffices to overcome that precedent.  Id. at 210-12.  The Debtors have

not, and cannot, allege that, as to the Debtors, "(i) prepetition they disregarded

separateness so significantly their creditors relied on the breakdown of entity borders and

treated them as one legal entity or (ii) post petition their assets are so scrambled that

separating them is prohibitive and hurts all creditors. Id. at 211(emphasis supplied).  As

the Third Circuit notes, "[m]ere benefit to the administration of the case (for example,

---

[4] As the Third Circuit has held, substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased).  The result is that claims of separate debtors morph to claims against the consolidated survivor." Genesis Health Ventures. Inc. v. Stapleton (In re Genesis Health Ventures, Inc.), 402 F. 3d 416, 427 (3d Cir. 2005); *see also*, Owens Corning, 419 F. 3d at 205.  This is the precise effect of the use of the Debtor Groups, including the Holding Company Debtors Group, under the Chapter 11 Plan.

allowing a court to simplify a case by avoiding other issues or to make post petition accounting more convenient) is hardly a harm calling substantive consolidation into play." Id. As to the Plan Assets in particular, there is no issue as to their intended use either in the event that ERISA's substantive provisions apply or if they do not and the language of the Plan and Trust govern. Accordingly, the Chapter 11 Plan fails under sections 1129(a)(1) and 1129(a)(3) of the Code.

15.     The Chapter 11 Plan also improperly classifies the claims of the Beneficiaries with the claims of unsecured creditors of all Holding Company Debtors, despite the rights conferred by the Plan and Trust, in violation of section 1122 of the Code; accordingly the Chapter 11 Plan fails under section 1129(a)(1) of the Code.

16.     Moreover, to the extent the Beneficiaries are placed in a class with such other creditors, the Chapter 11 Plan provides for disparate treatment of the Beneficiaries, who would be forced to relinquish valuable rights under the Plan and Trust. In re AOV Indus., Inc. 792 F. 2d 1140, 1152 (D.C. Cir. 1986).

17.     The Chapter 11 Plan also necessarily fails under section 1129(a)(7) of the Code as to the Beneficiaries because under chapter 7, the Beneficiaries would not share the Plan Assets with creditors of Debtors other than NCFC and would still share in all litigation and other proceeds rightfully owned by NCFC.

18.     To the extent that the Debtors can overcome the above objections, and are permitted to resort to section 1129(b), the Chapter 11 Plan cannot be confirmed because it is not fair and equitable and the Chapter 11 Plan unfairly discriminates against the Beneficiaries.

## IV.  MEMORANDUM OF LAW

**A.**     *Because it violates the terms of the Deferred Compensation Plans and Trust, and ignores the state law and contractual rights of the Beneficiaries and other NCFC creditors, the Chapter 11 Plan is proposed by a means forbidden by law and cannot be confirmed.*

19.     Under Section 1129 of the Code, the Court may confirm a plan only if the plan "has been proposed in good faith and *not by any means forbidden by law*." 11 U.S.C. § 1129(a)(3) (emphasis supplied).  Subsection 1129(a)(3) incorporates state law. In re Zenith Electronics Corp., 241 B.R. 92, 108 (Bankr. D. Del. 1999) (". . . the Plan must not only comply with the provisions of the Code, but must meet the standards for approval of such a transaction under Delaware corporate law.  We agree that section 1129(a)(3) does incorporate Delaware law (as well any other applicable nonbankruptcy law)."); In re Chandler Air Park Joint Venture I, 163 B.R. 566, 570 (Bankr. D. Ariz. 1992) (in competing plan scenario, court refused confirmation under section 1129(a)(3) where plan required capital contributions in contravention of terms of joint venture agreement); In re Sovereign Group, 1984-21 Ltd., 88 B.R. 325, 329 (Bankr. D. Colo. 1988) (partnership plan must comply with partnership agreement).

20.     The proponent of a plan of reorganization or liquidation may not use property  to fund or implement the plan in contravention of the state law property rights of third parties in such property.  In re Criimi Mae, Inc., 251 B.R. 796, 807-808 (Bankr. D. Md. 2000).  Use of property in this fashion would violate section 1129(a)(3), and "[t]he debtor will be required to prove at the confirmation hearing that such use of the [disputed property] is legally permissible.' Id. at 808.

04/18/08/SL1 810929v1/102440.00001

21.     While federal law may determine what property becomes property of the estate, the extent of the debtor's and creditors' interest in property is defined by state law. Butner v. United States, 440 U.S. 48, 54-55, 99 S. Ct. 914, 917-18, 59 L.Ed.2d. 136 (1979). The bankruptcy estate's rights in property are limited to only those rights that the debtor possessed prepetition.  Integrated Solutions, Inc. v. Service Support Specialties, Inc., 124 F.3d 487, 492 (3d Cir. 1997).  See also In re Roach, 824 F.2d 1370, 1374 (3d Cir. 1987)(Under *Butner*, state law governs questions of property rights); In the Matter of Celeste Court Apts. Inc., 47 B.R. 470, 473 (D. Del. 1985)("...state, not federal, law determines a creditor's property rights in bankruptcy").    Property interests are not enlarged, enhanced or altered by virtue of a bankruptcy filing.  In re Shoen, 193 B.R. 302, 317 (Bankr. D. Ariz. 1996)(citing *Butner).*    Neither the bankruptcy laws nor the bankruptcy court, as an equity court, can create or expand property rights not otherwise available under applicable state law.  Southern Rwy. Co. v. Johnson Bronze Co., 758 F.2d 137, 141 (3d Cir. 1985).

22.     In the case of the Plan Assets in this case, on the assumption that the "rabbi trust" provisions do not run afoul of ERISA (and therefore must be reformed or ignored), "all indicia of ownership in the Trust corpus are defined in all respects by the Trust Agreement" and the applicable state law of trusts.  Bank of America v. Moglia (In re Outboard Marine Corp.), 278 B.R. 776, 787-791 (N.D. Ill. 2002), *affirmed* Bank of America v. Moglia, 330 F.2d 942 (7th Cir. 2003).  Restrictions on the use of the trust corpus set forth in the trust agreement forming the "rabbi trust" must be enforced in bankruptcy.  Id.  The trustee and beneficiaries cannot grant rights that they do not possess. Id. at 789.

11

23.    The bankruptcy courts have consistently held that restrictions on the use of a trust corpus must be enforced, even where the debtor is the settlor of the trust. Tort Claimants Committee v. Roman Catholic Archbishop of Portland in Oregon (In re Roman Catholic Archbishop of Portland in Oregon), 345 B.R. 686 (Bankr. D. Or. 2006); Salisbury v. Ameritrust Texas, N.A. (In re Bishop College), 151 B.R. 394 (Bankr. N.D. Tex. 1993)("The bankruptcy estate, insofar as it includes the Trust's assets, takes them subject to all limitations and conditions that existed on the property, pre-petition"). As the court held in Roman Catholic Archbishop of Portland, even though the debtor-trustee's right to exercise powers over the trust and the debtor's beneficial interest therein became property of the estate, the funds in the trust were subject to all restrictions on use contained in the trust instrument to the extent enforceable under nonbankruptcy law. 345 B.R. at 706-707. Funds designated for a particular use were limited to that use despite the fact that enforcing the use limits would reduce distributions to estate creditors. Id.

24.    Moreover, use restrictions with respect to a trust res define and limit the nature of the trustee's and the beneficiaries' property interests. Such use restrictions are not mere restraints on the alienation of otherwise unrestricted assets and are not "preempted" by the Bankruptcy Code. Roman Catholic Archbishop of Portland, supra. Compare In re Combustion Engineering, 391 F.3d 190 (3d Cir. 2004)(1123(a)(5) allows preemption of simple restriction on alienation in insurance policy) with Pacific Gas and Electric Company v. People of the State of California, 350 F.3d 932 (9th Cir. 2003)(section 1123(a)(5) limited to preempting statutory or contractual transfer restrictions tied to financial condition).

12

25.     In the case of the Plan Assets, the trustee of the Plans was permitted to disburse the Plan Assets for only two uses: to pay the benefits due the Beneficiaries or, in the event of insolvency (assuming this provision is enforceable), to pay general unsecured creditors of *NCFC*. *See* Trust Agreement at §§ 1.2, 4.2 and 4.7. Section 4.7 of the Trust Agreement provides that: "Except as provided in this Section 4.7 [inapplicable] and in Sections 4.2 [payment to creditors *of NCFC* in event of insolvency], 13.2 [payment to NCFC after all participants' benefits paid in full and trust terminated], and 16.2 [change in control], the Company shall have *no right or power to direct the Trustee to pay the Company or to divert to others any of the Trust assets* before all payments of benefits have been made to the Participants and their beneficiaries pursuant to the terms of the Plans." (emphasis supplied). Whether inside or outside of bankruptcy, the trustee was powerless to use the funds for any other purpose without violating the express terms of the trust and state law; the state law property interests of the trustee and all of the named beneficiaries—including any creditors-- simply did not extend any further. To the extent that the Plan Assets (the trust corpus) are property of the estate, the estate's property interest is similarly limited. In the Adversary Proceeding, the Beneficiaries contend that the Plan Assets are wholly excluded from the Debtors' estates under both ERISA and 11 U.S.C. § 541(b)(7). These use restrictions—unless they run afoul of ERISA—must be enforced under applicable law.

26.     Accordingly, to use the Plan Assets to pay any creditors other than the Beneficiaries or (if the rabbi trust terms are enforceable) the general unsecured creditors of NCFC violates applicable state law and is an unlawful attempt to expand the estate's interest in property beyond that which the Debtor enjoyed at state law. This would clearly

constitute "divert[ing] to others…the Trust assets." Butner and section 1129(a)(3) do not permit such an action, by plan of reorganization or otherwise. Yet this is the precise effect of the consolidation of the Holding Company Debtors under the Chapter 11 Plan—the use restriction is violated and creditors other than NCFC creditors share in the Plan Assets. The Plan is proposed by a means forbidden by law and cannot be confirmed under 11 U.S.C. § 1129(a)(3).

> **B.** *The substantive consolidation proposed in the Chapter 11 Plan does not satisfy the test set out by the Third Circuit in* **Owens Corning.**

27. The Chapter 11 Plan seeks to combine all of the assets of the Debtor Holding Companies, including the Plan Assets, and distribute those assets on a pro rata basis to all of the claimholders asserting a claim against any one of those entities. In a case bearing strong factual resemblance to the circumstances currently before this Court, the Third Circuit Court of Appeals held that "what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) post-petition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." In re Owens Corning, 419 F.3d 195 (3rd Cir. 2005).

28. The Owens Corning case involved bankruptcy cases filed by a parent company and its numerous subsidiaries which, like the New Century cases, had been jointly administered. The various corporations and limited liability companies operated on a multinational level and had different purposes, such as limiting liability, capitalizing on tax benefits and addressing various regulatory concerns. Owens Corning, 419 F.3d at 200. Aside from "some 'sloppy' bookkeeping":

14

> Each subsidiary was a separate legal entity that observed governance
> formalities. Each had a specific reason to exist separately, each
> maintained its own business records, and intercompany transactions were
> regularly documented.

Id. As a result, creditors of the Owens Corning subsidiaries were aware at all times

which particular entity they were dealing with at any particular time.

29.    The Owens Corning debtors and certain unsecured creditors proposed a

plan which called for all of the assets and liabilities of each subsidiary to be treated as

though it had been merged into and with the assets and liabilities of the parent company.

Owens Corning, 419 F.3d at n. 7. In other words, "the Plan Proponents sought a form of

what is known as a 'deemed consolidation,' under which a consolidation is deemed to

exist for purposes of valuing and satisfying creditor claims, voting for or against the Plan,

and making distributions for allowed claims under it." Id. at 202. Although a number of

unsecured creditors approved and, in fact, were proponents of the proposed plan, several

banks objected to the consolidation of the entities.

30.    The banks had entered into a prepetition credit agreement with the parent

company. The terms of that loan were carefully "designed to protect the separateness of

[the parent company] and its subsidiaries." Owens Corning, 419 F.3d at 201.

Accordingly, the plan's proposed consolidation directly violated the terms of the credit

agreement executed by the parent company and its subsidiaries.

31.    The Owens Corning court carefully laid out the history of substantive

consolidation and noted that, "No court has held that substantive consolidation is not

authorized, though there appears nearly unanimous consensus that it is a remedy to be

used 'sparingly.'" Owens Corning, 419 F.3d at 208-209 citing Union Sav. Bank v.

Augie/Restivo Banking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.), 860 F.2d 515,

15

518 (2d Cir. 1988); <u>Alexander v. Compton (In re Bonham)</u>, 229 F.3d 750, 767 (9th Cir.

2000). The court agreed that substantive consolidation is a remedy that should be applied

only in limited circumstances, and then went further to state that, when it comes to a

creditor that relied upon the separateness of corporate entities, it is a remedy that should

not be applied *at all*. "If an objecting creditor relied on the separateness of the entities,

consolidation cannot be justified *vis-à-vis* the claims of that creditor." <u>Owens Corning</u>,

419 F.3d at 210.

      32.    Based on its review of historical case law and its own consideration of

substantive consolidation as an equitable remedy, the court identified five guiding

principles behind the application of substantive consolidation. Among these principles

were the ideas that:

> (3) Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make post-petition accounting more convenient) is hardly a harm calling substantive consolidation into play . . .
>
> (5) While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

419 F.3d at 211. Based on these principles, the Court developed the test stated above

which requires the proponents of substantive consolidation to establish either such a lack

of corporate formality among the entities that creditors treated them prepetition as if they

were one entity or that those entities' assets and liabilities are so scrambled post-petition

that separating them would be prohibitively harmful to all creditors. <u>Id</u>. Under either

scenario, the obvious aim is to protect creditors from any negative impact caused by

debtor subsidiaries' and affiliates' lack of corporate formalities.

33.    The application of the test to the facts before the <u>Owens Corning</u> court

mandated its rejection of a plan calling for substantive consolidation.  The court held that

there was no evidence of a prepetition disregard for corporate separateness and rejected

the Debtors' argument that the banks' failure to request separate financial statements for

each entity subjected them to the application of such an equitable remedy.  419 F.3d at

213-14.  The court further held that the plan's proponents equally failed to satisfy the

second part of the test because, post-petition, there was no question as to which entity

owned which principal assets and was subject to which material liabilities.  <u>Id</u>. at 214.

Importantly, the court held that the district court:

> . . . erred in concluding that the commingling of assets will justify
> consolidation when 'the affairs of the two companies are so entangled that
> consolidation *will be beneficial*.' [citations omitted] As we have
> explained, commingling justifies consolidation only when separately
> accounting for the assets and liabilities of the distinct entities will reduce
> the recovery of *every* creditor – that is, when every creditor will benefit
> from the consolidation. *Moreover, the benefit to creditors should be from
> cost savings that make assets available rather than from the shifting of
> assets to benefit one group of creditors at the expense of another.*  Mere
> benefit to some creditors, or administrative benefit to the Court, falls far
> short.

<u>Id</u>. (emphasis supplied).  Finally, "[n]either the impossibility of perfection in untangling

the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is

sufficient to justify consolidation." <u>Id</u>.

34.    Since <u>Owens Corning</u>, courts in the Third Circuit have permitted

substantive consolidation only where the <u>Owens Corning</u> test has been satisfied or there

is no objection by a creditor that would be impaired as a result of the consolidation. *See*

<u>In re Lisanti Foods, Inc.</u>, 241 Fed.Appx. 1, 2 (3d Cir. 2007)(affirming under <u>Owens</u>

<u>Corning</u> a district court ruling that substantive consolidation is applicable where the three

debtors shared the same officers, directors and shareholders, conducted business

17

operations under very similar names, and intercompany dealings were done without the usual corporate formalities); <u>Steiert v. Guiliano, Miller & Co., LLC. (In re Macrophage, Inc.)</u>, 2007 WL 708926 *6 (D.N.J. March 2, 2007)(upholding bankruptcy court judge's ruling under the <u>Owens Corning</u> test that substantive consolidation was inappropriate because only one creditor was seeking to "pierce the veil" indicating that others recognized the separateness of the entities and creditors' "claims against these separate entities were discernible from the separate books and bank accounts they kept and . . . there was no indication money was transferred between them without documentation, thus establishing that post-petition assets of the entities were not so scrambled as to prohibit accountants from separating them"); <u>In re Kaiser Aluminum Corp.</u>, 2006 WL 616243 *10, 22 (Bankr. D. Del. February 6, 2006) (permitting substantive consolidation where all of the classes entitled to vote "overwhelming voted to accept the Plan" and there were no objections to the substantive consolidation of any of the estates).

35.    <u>Owens Corning</u> and its progeny clearly preclude the Debtors in the case at bar from substantively consolidating their estates, in whole or in part.  The only reasons that the Debtors could possibly have to justify the consolidation their estates are: (1) convenience and/or (2) benefit to certain unsecured creditors holding claims against Debtors with no material assets.  As <u>Owens Corning</u> stated, however, neither of these reasons are sufficient to warrant substantive consolidation.

36.    Much like the debtors in <u>Owens Corning</u>, the Debtors in this case are separate entities with separate corporate structures.  Despite the Debtors' burden of proof under <u>Owens Corning</u>, not a single piece of evidence can be offered to show that the Debtors' prepetition disregard for corporate formality lead their creditors to think of them

18

as a single entity. In fact, much like the banks in <u>Owens Corning</u>, the Beneficiaries' reliance upon NCFC's corporate separateness is clearly evidenced by the Deferred Compensation Plan and Trust which state that the Plan Assets are available only to NCFC's general unsecured creditors in the event of insolvency. "If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified *vis-à-vis* the claims of that creditor." <u>Owens Corning</u>, 419 F.3d at 210. If the Beneficiaries had been told that all creditors of all Debtors might someday invade the trust assets, they likely would have chosen not to contribute to the Deferred Compensation Plan at all. Therefore, the first prong of the <u>Owens Corning</u> test cannot possibly be satisfied.

37.     Most importantly, the Trust's assets have always been maintained in a separate, segregated account with Wells Fargo as trustee, and since very shortly after the commencement of this case have been virtually *in custodia legis* as a result of the Court's order forbidding any use or transfer of them without further order.

38.     The Debtors also cannot show that their assets and liabilities are so scrambled post-petition that untangling them would be prohibitively harmful to any of their creditors. The Debtors have not suggested that their books and records do not accurately denote or otherwise reflect intercompany transfers. (Available evidence indicates that the Debtors easily sorted out such transactions.) Moreover, none of the creditors have, for their part, raised any issues regarding the separateness of the various entities. Indeed, tellingly, the Debtors and the Committee, in the motion to set a bar date, *required* all creditors to file claims against a particular Debtor, under penalty of waiving the claim if they chose incorrectly. The Debtors and the Committee obviously thought it easy enough to sort out the Debtors and the claims against them as to require claimants to

19

file claims against a particular Debtor. They should not now be heard to offer a contrary view; indeed, they should be affirmatively estopped from doing so. In any event, there is no credible evidence of any mystifying and intractable post-petition entanglement of assets or claims as to the Holding Company Debtors. Accordingly, substantive consolidation is not appropriate under the second prong of the Owens Corning test.

39.    The Chapter 11 Plan seeks to enrich certain creditors by consolidating, among other property, the Plan Assets which are currently the subject of the Adversary Proceeding. At best, the entirety of the Plan Assets belongs to the Beneficiaries. At worst, the Beneficiaries are forced to share those assets *only* with NCFC's general unsecured creditors. By consolidating these particular assets with all of the assets held by the Holding Company Debtors, and then distributing them pro rata to every creditor holding a claim against those consolidated entities, the Chapter 11 Plan forces the Beneficiaries to share with other creditors property that would otherwise be subject solely to the Beneficiaries' interests or shared only on a limited basis. In other words, the benefit gained by other creditors of other Holding Company Debtors is not as a result of cost savings, but rather, as a result of taking Plan Assets which rightfully belong to the Beneficiaries or only NCFC creditors and distributing them to a larger number of creditors. This is precisely the sort of favoritism the Third Circuit has explicitly prohibited. Owens Corning, 419 F.3d at 214.

40.    There is simply no evidence or legal authority to support the substantive consolidation proposed in the Debtors' Plan.

20

**C.** **To the extent that the Debtors argue that the Chapter 11 Plan is not substantive consolidation but merely a "series of compromises" under Rule 9019, those "compromises" are also precluded by _Owens Corning_.**

41.     Since the Debtors and the Committee cannot meet the standard for substantive consolidation, their Chapter 11 Plan must fail.  To the extent that the Chapter 11 Plan proponents attempt to justify substantive consolidation by claiming that the Chapter 11 Plan merely represents a "series of compromises" with various creditors to be tested only under the standards applicable to stand-alone settlements of actual disputes under Rule 9019, that argument also fails under the reasoning and holding of Owens Corning.

42.     The Chapter 11 Plan at issue before this Court is nearly identical to the Owens Corning plan.  The Owens Corning debtors settled with every group of creditors but the banks, which objected to the Plan.  The Third Circuit refused to let the Owens Corning debtors do by "compromise" what they were prohibited from doing under the doctrine of substantive consolidation.

43.     Characterizing either the Owens Corning plan or the Chapter 11 Plan before this Court as a series of "compromises" is a semantic exercise which attempts to place form over substance. The plain fact is that if this Plan is a series of compromises – and in some sense every plan of reorganization or liquidation is a series of "compromises," otherwise known as negotiating the plan – its effect is substantive consolidation and, therefore, it must be – and can only be – approved  under the two-part standard for substantive consolidation established by the Third Circuit in Owens Corning. That case involved precisely what is attempted here – an attempt to "settle" on substantive consolidation by partial agreement of the parties over the objection of a

dissenting group of creditors. The Third Circuit squarely rejected the attempt. Consolidation can only be achieved by <u>unanimous</u> consent or by meeting the <u>Owens Corning</u> test.

44. Accordingly, <u>Owens Corning</u> precludes the Debtors in this case from "compromising" around a standard they cannot otherwise meet.

**D.    *The Chapter 11 Plan does not represent a compromise of issues surrounding substantive consolidation.***

45. Since there is no legal justification to support substantive consolidation in this case, either outright or as a series of "compromises" designed to get around the <u>Owens Corning</u> test, the only argument Debtors can advance in support of their Chapter 11 Plan is that it constitutes a compromise of a dispute regarding substantive consolidation and, therefore, those Chapter 11 Plan provisions are subject to the much lower standards applicable under Rule 9019 rather than the <u>Owens Corning</u> test.

46. For there to be a compromise, however, there must first be a dispute. Indeed, the factors courts apply in their analysis under Rule 9019 all revolve around the basic concept that a compromise is designed to avoid costly and protracted litigation. In this case, however, there simply was no issue as to whether the Debtors' estates should be substantively consolidated until the Debtors, themselves, raised it for the first time in their Chapter 11 Plan. No creditor or creditor group has raised, in any pleading, the threat of substantive consolidation. Moreover, despite the absence of any claim and the utter absence of any evidence compelling consolidation, the Chapter 11 Plan would represent complete surrender by the Debtors to the non-existent threat of a wholly unsupported claim.

04/18/08/SL1 810929v1/102440.00001

47.     Therefore, any claim by the Debtors that the Plan represents a compromise designed to avoid costly and protracted litigation on substantive consolidation is an illusory attempt to circumvent the strict test established by the Third Circuit in <u>Owens Corning</u>.

      **E.**      ***Even if this Court finds that the substantive consolidation provisions in the Chapter 11 Plan are a compromise subject to the standards of Rule 9019, the Chapter 11 Plan fails because even those standards have not been met.***

48.     Even if this Court were to somehow find that the substantive consolidation provisions found in the Chapter 11 Plan constitute a compromise which is subject to Rule 9019 standards rather than the <u>Owens Corning</u> test, the Chapter 11 Plan must still fail.

49.     The Debtors will likely contend that the Chapter 11 Plan's substantive consolidation provisions are subject to the <u>Martin</u> test. There are four factors that a bankruptcy court should consider under this test: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." <u>In re RNI Wind Down Corp.</u>, 348 B.R 286, 297 (Bankr. D. Del. 2006) *quoting* <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 393 (3d Cir. 1996); <u>In re Key3Media Group</u>, 336 B.R. 87, 93 (Bankr. D. Del. 2005); <u>In re Marvel Entertainment Group, Inc.</u>, 222 B.R. 243 (D. Del. 1998). "The Debtors carry a burden of persuasion to provide the court with sufficient information to conclude that the compromise falls within the reasonable range of litigation possibilities." <u>Key3Media Group</u>, 336 B.R. at 93.

50.     Admittedly, this standard is not high. However, it is also not the standard which this Court must apply to the Chapter 11 Plan. "[I]t is the 'duty of the Bankruptcy

Court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." In re Exide Technologies, 303 B.R. 48, 67 (Bankr. D. Del. 2003). Accordingly, in this jurisdiction, when a Rule 9019 compromise is considered within the context of a plan of reorganization, additional factors are considered, among which is "The extent to which the settlement is truly the product of 'arms-length bargaining, and not of fraud or collusion." Id. at 68. Indeed, this same principle has been recognized in other jurisdictions as well. See Whispering Pines Estates, Inc. v. Flash Island, Inc. (In re Whispering Pines, Estates, Inc.), 370 B.R. 452, 461 (1st Cir. BAP 2007) ("where, as here, the 'settlement' is not put forth by a fiduciary having authority and responsibility to act for the estate and who negotiated it in an arm's length transaction, but unilaterally by the very party who would be receiving the benefit of the release, there is no cause for deference in the matter").

51.     Courts within the Third Circuit have consistently rejected compromises proposed by self-interested parties. See In re National Health & Safety Corp., 2000 WL 968778 *4 (Bankr. E.D.Pa. July 5, 2000) (rejecting a compromise which, "[i]n the most simplistic terms . . . buys off the only creditor with sufficient information and resources to scrutinize the fairness of the Debtor's plan"); Eddy v. National Union Fire Ins. Co. of Pittsburgh, PA (In re Medical Asset Management, Inc.), 249 B.R. 659 (Bankr. W.D. Pa. 2000) (finding that compromise which enjoined debtor from suing insurer in exchange for insurer's lump sum payment which was to be distributed to settling creditor violated principles of fairness and equity because it virtually guaranteed that certain other creditors would receive nothing).

52.     The Chapter 11 Plan before this Court was proposed by both the Debtors and the Committee.  Both of these groups, however, have interests which are directly adverse to the Beneficiaries as to the Plan Assets.  The Debtors seek to simplify the administration of their estates as much as possible.  The Committee, on the other hand, greatly benefits if the more than $43 million in Plan Assets to which the Beneficiaries have claimed a right are shared among general unsecured creditors for several estates.  The Beneficiaries, in contrast, assert that all of the Plan Assets are held in trust for their sole benefit, or at the very worst are available to be shared only by the general unsecured creditors of NCFC.

53.     The Chapter 11 Plan's proposed pro rata distribution of the Plan Assets is fundamentally unfair to the Beneficiaries.  Accordingly, this compromise cannot possibly meet the standard for approval of a compromise within a plan context.  It simply was not negotiated at arms' length; indeed, it was not negotiated at all with the group of creditors most affected, the Beneficiaries.

54.     Even if the Court limits its analysis to the Martin test, the substantive consolidation of the Debtors' estates cannot be approved.  The Debtors and the Committee carry the burden of proving the four Martin factors, yet they can offer no evidence to show that any party would likely succeed on the merits in any proceeding seeking substantive consolidation of the various estates.  In fact, as demonstrated above, such a proceeding would necessarily fail since the Debtors' cannot satisfy the Owens Corning test.  Since the likelihood of any party prevailing under Owens Corning is strikingly low, and thus the Debtors' total surrender to substantive consolidation in the name of "compromise" falls well below the lowest level of reasonableness.  The Chapter

11 Plan represents the worst possible outcome that would be achieved by the Debtors if they defended substantive consolidation. Approval of the compromise, on a stand-alone basis, would be withheld. Exide, supra.

55.     Moreover, as has also been demonstrated here, the "compromise" is not in the paramount interest of the creditors. To the contrary, it significantly harms the interests of at least one large group of unsecured creditors – the Beneficiaries. The compromise likewise harms any other unsecured creditors holding claims against any propertied estate which is being consolidated with "empty" estates.

56.     In short, no matter what test this "compromise" is analyzed under, it simply does not meet the requirements of either Owens Corning or Rule 9019. The Debtors and the Committee have used the Chapter 11 Plan to further their interests in concluding the case and in achieving administrative convenience and efficiency at the expense of unsecured creditors holding valid claims, especially the Beneficiaries. Accordingly, the Chapter 11 Plan cannot be confirmed as long as it includes there are provisions calling for the consolidation of some or all of the Debtors' estates.

04/18/08/SL1 810929v1/102440.00001

### Conclusion

Whether termed substantive consolidation or a Rule 9019 compromise, the effect is the same – the Chapter 11 Plan cannot be confirmed in its current form. The Chapter 11 Plan is proposed by a means forbidden by law to the extent it violates the express terms of the Plans and Trust. The Chapter 11 Plan satisfies neither the <u>Owens Corning</u> test nor the <u>Martin</u> test, enhanced or not. Accordingly, the Beneficiaries respectfully request that the Court deny confirmation of the Chapter 11 Plan.

Dated: April 18, 2008

**STEVENS & LEE, P.C.**

/s/ Joseph H. Huston, Jr.
JOSEPH H. HUSTON, JR. (NO. 4035)
1105 NORTH MARKET STREET
SUITE 700
WILMINGTON, DELAWARE 19801
TEL: (302)425-3310
FAX: (610-371-7972
EMAIL: JHH@STEVENSLEE.COM

- and -

**BERNSTEIN, SHUR, SAWYER & NELSON**

ROBERT J. KEACH
100 MIDDLE STREET
P.O. BOX 9729
PORTLAND, ME 04104-5029
TELEPHONE: (207) 774-1200
TELECOPIER: (207) 774-1127
EMAIL: RKEACH@BERNSTEINSHUR.COM

SL1 810929v1/102440.00001

## CERTIFICATE OF SERVICE

Joseph H. Huston, Jr., hereby certifies that on April 18, 2008, he caused a true and correct copy of the foregoing Objection And Memorandum Of Law Of Ad Hoc Committee Of Beneficiaries Of The New Century Financial Corporation Deferred Compensation Plan And/Or Supplemental Executive Retirement/Savings Plan To Confirmation Of First Amended Joint Chapter 11 Plan Of Liquidation to be served electronically through the Court's CM/ECF system and by email, and also by regular mail upon the parties listed below.

Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square, 920 King Street
Wilmington, DE 19899

Monika L. McCarthy, Esq.
New Century Mortgage Corporation
3337 Michelson Drive, Suite CN-350
Irvine, California 92612

Mark S. Indelicato, Esq.
Mark T. Power, Esq.
Hahn & Hessen. LLP
488 Madison Avenue
New York, NY 10022

Joseph J. McMahon, Jr.
*Office of the United States Trustee*
J. Caleb Boggs Federal Building
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

Suzzanne S. Uhland, Esq.
Andrew M. Parlen, Esq.
O'Melveny & Myers LLP
275 Battery Street
San Francisco, California 94111

AP Services, LLC
Attn: Holly Felder Etlin
9 West 57th Street, Suite 3420
New York, New York 10019

Bonnie Glantz Fatell, Esq.
Regina Stango Kelbon, Esq.
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801-4226

/s/ Joseph H. Huston, Jr.
Joseph H. Huston, Jr.

28

04/18/08/SL1 810929v1/102440.00001