## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416(KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Hearing Date: April 24, 2008 at 10:00 a.m.** |
| | : | **Objection Deadline: At the hearing** |

## MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER DETERMINING THAT PROPOSED PLAN MODIFICATIONS DO NOT ADVERSELY CHANGE TREATMENT OF CREDITORS AND DO NOT REQUIRE RESOLICITATION OF ANY CLASS OF CREDITORS

The above captioned debtors and debtors in possession (the "Debtors") and the

Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the

"Plan Proponents") hereby move this Court (the "Motion") for entry of an order pursuant to

sections 105 and 1127(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule

3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) determining that

the proposed modifications (the "Modifications") to the *First Amended Joint Chapter 11 Plan of*

*Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March*

*18, 2008* (the "Plan") set forth in the draft of the *Second Amended Joint Chapter 11 Plan of*

*Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April*

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company, NCoral, L.P., a Delaware limited partnership and New Century Warehouse Corporation, a California corporation.

*[ ], 2008* (the "Draft Second Amended Plan"), which is attached hereto in blacklined form as

Exhibit A,[2] do not adversely change the treatment of Creditors[3] and do not require resolicitation of

any Class of Creditors and (ii) authorizing the Plan Proponents to make the Modifications to the

Plan and deeming the Modifications to be accepted by all Creditors that vote to accept the Plan.  In

support of their Motion, the Plan Proponents respectfully represent as follows:

## INTRODUCTION

In the month-long period since the Plan Proponents filed the Plan, they have worked to

address comments, questions, and concerns raised by Creditors and other parties in interest about

the Plan.  These discussions have yielded the proposed Modifications that are incorporated into the

Draft Second Amended Plan.  Many of the Modifications are ministerial or editorial in nature,

while others are substantive.  Most of these changes, and essentially all the substantive provisions,

pertain solely to the Plan's treatment of New Century Warehouse Corporation ("Access Lending"),

a small, stand-alone Debtor with two main Creditors and a third small Creditor.  The Modifications

to the Access Lending provisions of the Plan reflect a settlement of disputes between Access

Lending's two principal creditors - Goldman Sachs Mortgage Company ("GSMC" and, together

with its affiliate Goldman, Sachs & Co., "Goldman") and the Debtor New Century Mortgage

Corporation ("NCMC") - in a manner beneficial to all creditors of the Access Lending Estate other

than Goldman, which has consented to these modifications.  These Modifications are also

beneficial to NCMC (and , therefore, beneficial to the Creditors of NCMC and the other Operating

Debtors), although the improved recoveries to NCMC from the Access Lending Estate are not

material when considered in the context of the Estate of NCMC or the anticipated recoveries for

Creditors of NCMC or the other Operating Company Debtors.  The Modifications have essentially

no perceptible impact on the Estates of the Holding Company Debtors.

Because the significant Modifications set forth in the Draft Second Amended Plan relate to

---

[2] The Plan Proponents intend to file an amended chapter 11 plan prior to the Confirmation Hearing substantially in the form of the Draft Second Amended Plan (the "Second Amended Plan")  The Second Amended Plan may contain further non-material modifications, which modifications will be disclosed to the Court and parties in interest

[3] Capitalized terms not otherwise defined herein have the meaning given to them in the Amended Plan.

Access Lending, this Motion focuses primarily on the Access Lending-related Modifications (the "Access Lending Modifications"), the reasons for them, and their effects before then setting forth the few other inconsequential substantive modifications.  In no case do any of the Modifications adversely affect any Creditor in a material matter (other than possibly the effect of the Access Lending Modifications on Goldman, whose Claims against Access Lending are being settled in connection with the Access Lending Modifications and which has consented to the Access Lending Modifications subject to their inclusion in the Debtors' confirmed chapter 11 plan).  Rather, the Modifications either benefit or have no discernable effect on Creditors and, therefore, the Plan Proponents do not believe that resolicitation of any Class of Creditors is necessary or appropriate.[4]

## FACTUAL BACKGROUND

I.    THE CHAPTER FILINGS

1.    On April 2, 2007 (the "Petition Date"), the Debtors, other than New Century Warehouse Corporation d/b/a Access Lending ("Access Lending") filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code.  No trustee has been appointed in these cases (the "Chapter 11 Cases"), and the Debtors continue to manage their affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.    On April 4, 2007, the Court entered an order authorizing the joint administration of the Debtors' cases for procedural purposes only (the "Joint Administration Order").

3.    On April 9, 2007, the United States Trustee for the District of Delaware appointed the Committee.

---

[4] Goldman's vote on the Plan with respect to its Claim against Access Lending is conditioned on confirmation of the Plan as modified in Exhibit A hereto  In the event that the Bankruptcy Court does not approve the Access Lending Modifications or the Draft Second Amended Plan is materially modified without Goldman's consent, Goldman has the right to withdraw or change its vote or to object to confirmation on any and all grounds (not limited to the Access Lending Modifications)

4.      On August 3, 2007, Access Lending, a wholly owned subsidiary of Debtor New Century TRS Holdings, Inc. ("TRS Holdings"), filed a voluntary chapter 11 petition, and, subsequently, the Joint Administration Order was amended to include Access Lending.

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

II.      ACCESS LENDING[5]

6.      Access Lending financed residential mortgage loans originated by a network of mortgage originators and other smaller financial institutions. Access Lending provided financing to these loan originators that was, in turn, used to fund the loans provided to individual borrowers who were customers of the loan originators. Access Lending obtained its financing from three entities through various receivable purchase agreements, credit agreements, and repurchase agreements.

7.      Access Lending operated largely independently of the other Debtors and, as noted, did not file a chapter 11 petition along with those entities. Those Debtors' financial difficulties, however, triggered cross-defaults under certain of Access Lending's financing facilities. Goldman had a repurchase agreement with Access Lending that Goldman contends qualified for the "safe harbor" protections of the Bankruptcy Code. In March 2007, Goldman declared an event of default under the Master Repurchase Agreement dated February 15, 2006 (as amended by Amendment No. 1 dated as of October 25, 2006, Amendment No. 2. dated November 30, 2006, and Amendment No. 3 dated as of February 7, 2007) entered into by Access Lending and GSMC, with New Century Financial Corporation ("NCFC") as guarantor (the "Goldman MRA"). Goldman proceeded to exercise remedies against Access Lending. Access Lending

---

[5] All factual description herein relating to Access Lending or claims against Access Lending is for settlement purposes only, and is not an acknowledgment of admission of the Debtors, the Committee, or Goldman as to the validity of such factual description.

entered into forbearance agreements with the other two entities that had provided it financing, which allowed Access Lending to operate while it liquidated substantially all of its assets.

      8.      Pursuant to the *Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 Authorizing the Access Sale and Granting Related Relief*, Access Lending sold substantially all of its assets as a going concern to Access Holdings Corporation ("Access Holdings") pursuant to that certain Amended and Restated Asset Purchase Agreement by and between Access Holdings Corporation and New Century Warehouse Corporation dated as of April 26, 2007 (the "APA"). The sale closed on April 27, 2007. Under the APA, Access Holdings agreed to pay Access Lending 60% of the net proceeds realized on the sale of loans that were subject to Access Lending's financing facilities, with a minimum guaranteed amount of $4.5 million, plus approximately $76,000. As of the filing of this Motion, Access Lending has received $2.4 million from Access Holdings, holds approximately $3.28 million in its bank account, and is owed the remaining $2.1 million of the amount guaranteed to it under the APA. Access Lending, in consultation with the Committee, extended the due date for the payment of the minimum guaranteed amount, but that extended date passed without Access Holding satisfying its obligations under the Access Purchase Agreement. Thus, on February 28, 2008, Access Lending notified Access Holdings of this default and made demand on Access Holdings to pay immediately the remaining balance due -- approximately $2.1 million. Access Lending, the other Debtors, and the Committee are making active efforts to recover the remaining balance, either through a revised agreement that will result in Access Holdings paying $1 million to Access Lending in the next few weeks and Access Holdings agreeing to a revised methodology for paying additional sums to Access Lending or, if necessary, pursuing other legal remedies. Thus, if the Plan, as amended to include the Modifications, is confirmed, as of the Effective Date, the Debtors expect that there will be approximately $4.28 million in the Access Lending Estate, with the prospect of receiving additional recoveries from Access Holdings, probably in the range

of an additional $1.1 million, or perhaps slightly more.[6] As a result, the Debtors estimate that the amounts available to satisfy Allowed A/P/S Claims against Access Lending and Allowed Unsecured Claims against Access Lending will equal approximately $5.38 million, or perhaps slightly more. While Access Lending intends to proceed aggressively in attempting to collect the amounts due from Access Holdings, whether Access Lending will recover any amount in excess of the $3.28 million held presently by Access Lending is presently uncertain. In sum, Access Lending presently has $3.28 million of cash, expects to have approximately $4.28 million on the Effective Date, and expects ultimately to have around $5.4 million to distribute to its Creditors, subject to the uncertainties noted above.

III.    CLAIMS AGAINST ACCESS LENDING

9.    As of the filing of this Motion, the Debtors estimate that, based on an assumed Effective Date of April 30, 2008, Secured Claims, Priority Claims, and Administrative Claims (defined in the Plan as "A/P/S Claims") against Access Lending will total approximately $950,000.00. Professional fees and the estimated costs of administering Access Lending's Estate from April 2, 2007 through April 27, 2007 (the date of the closing of the sale of Access Lending's assets) comprise nearly all A/P/S Claims against Access Lending. No Priority Claims or Secured Claims were filed against Access Lending as of its claims bar date. Thus, the Debtors estimate that as of the Effective Date they will have approximately $3.5 million available to distribute to Holders of Allowed Unsecured Claims against Access Lending and ultimately the total available for distribution to Holders of Allowed Unsecured Claims against Access Lending will equal around $4.5 million (subject to the uncertainties mentioned above).

10.    There are five Unsecured Claims against Access Lending entitled to vote to accept or reject the Plan. Those Claims are held by Goldman, NCMC, Sheppard, Mullin, Richter & Hampton LLP ("Sheppard"), Street Resources Group ("SRG"), and Deutsche Bank National Trust Company ("DBNTC"). The five Claims held by these entities have been balloted in an

---

[6] No Priority Claims or Secured Claims were filed against Access Lending prior to its claims bar date.

aggregate amount of $19,150,459.70 -- $15.1 million (or 78.9%) of which is on account of

Goldman's Claim and $3.974 million (or 20.7%) of which is on account of NCMC's Claim, with

the remaining 0.4% on account of the Claims of Sheppard, SRG, and DBNTC.

a.   <u>Goldman Claim</u>

11.    Goldman filed Proof of Claim number 3847 (the "Goldman Claim") against

Access Lending on October 17, 2007. The Goldman Claim asserts a Claim against Access

Lending based on conversion, constructive trust, losses under the Goldman MRA, and other

tortious acts, as well as related contract claims including attorneys' fees (as more fully described in

the Goldman Claim), allowed for voting purposes in the amount of $15,109,754, which Claim

Goldman asserts is guaranteed by NCFC. The Goldman Claim arises out of the Goldman MRA.

On March 8, 2007, Goldman notified Access Lending that it was terminating the Goldman MRA

based on some asserted events of default and on March 12, 2007 notified Access Lending that it

was purporting to exercise a remedy under the Goldman MRA by crediting what Goldman asserted

was the market value of the mortgage loans subject to the Goldman MRA against Access

Lending's repurchase obligations.

12.    Goldman asserts that its Claim against Access Lending results from

deficiencies and other contractual rights under its MRA, as well as the fact that, according to

Goldman, former management of Access Lending allegedly collected proceeds from the sale of

some mortgage loans subject to the Goldman MRA or otherwise owned by Goldman. The Debtors

believe that they have various defenses to Goldman's Claim, but obviously Goldman disagrees.

13.    Shortly prior to April 2, 2007 (the Petition Date for all Debtors other than

Access Lending), NCMC directed Access Lending to transfer approximately $10.1 million to

NCMC's general corporate operating account. This transfer was the subject of the Adequate

Protection Dispute discussed in section III.D.3 of the Disclosure Statement. The Court has

approved the motion to approve the settlement of the Adequate Protection Dispute, and pursuant

thereto, Goldman Sachs has received a payment of $5,603,511.34. As part of the settlement

contained in the Access Lending Modifications, the Debtors and Goldman agree that Goldman's

7

remaining Claim against Access Lending is fixed at $9,506,242.66 to account for its payment

under the settlement of the Adequate Protection Dispute, and Goldman's guaranty Claim against

NCFC is allowed at $5,000,000.

b.    NCMC Claim

14.    Access Lending is a direct subsidiary of TRS Holdings. Prior to the Petition

Date, NCMC, which like Access Lending is a direct subsidiary of TRS Holdings, advanced Access

Lending substantial sums. As a result, NCMC asserts a claim against Access Lending (the

"NCMC Claim"), in the amount of $3,973,199.86. Most of these advances by NCMC were made

in the months immediately prior to NCMC's Petition Date and were used to fund margin calls

made by Access Lending's three MRA counterparties, including Goldman. These advances were

made by NCMC as loans to its sister company and are documented on the books of both Access

Lending and NCMC as intercompany loans. The $10.1 million transfer from Access Lending

shortly prior to NCMC's Petition Date were accounted for as partial payments on such

intercompany debt and the $3,973,199.86 million balance is the amount outstanding after

application of these payments. Goldman contests whether this intercompany debt is debt or should

be recharacterized as an equity contribution.

c.    Sheppard Claim

15.    Sheppard filed Proof of Claim number 2328 (the "Sheppard Claim") against

Access Lending on August 28, 2007. Pursuant to the Sheppard Claim, Sheppard asserts a general

unsecured claim against Access Lending in the amount of $68,801.70 for legal services rendered

prior to April, 2 2007. Sheppard filed identical Proofs of Claim against Debtors NCFC, NCMC,

and Home123 Corporation ("Home123"). The Debtors reserve their rights with respect to the

Sheppard Claim.

d.    SRG Claim

16.    Access Lending scheduled SRG as holding a general unsecured claim for

$1,657.00 on account of prepetition services rendered by SRG to Access Lending.

e.    DBNTC Claim

17.    DBNTC filed Proof of Claim number 3756 (the "DBNTC Claim") against

Access Lending on December 14, 2007.  Pursuant to the DBNTC Claim, DBNTC asserts an

unliquidated general unsecured claim against Access Lending relating to certain custody

agreements under which DBNTC serves as custodian.

f.    Natixis Claim

18.    Natixis Real Estate Capital Inc. ("Natixis") filed a $7.6 million contingent

Claim against Access Lending seeking indemnification in case it is held liable to Goldman in a

litigation Goldman commenced against Natixis relating to certain loans owned by Goldman

pursuant to its MRA, which loans Natixis asserts it purchased by paying Access Lending.  Natixis'

Claim against Access Lending is contingent on Natixis being held liable to Goldman and actually

paying Goldman, but Natixis denies liability to Goldman in this litigation, and the Debtors

understand that Natixis has not paid Goldman anything related to this litigation.  Thus, the Debtors

show no liability to Natixis on their books and records and believe that Natixis' Claim against

Access Lending should be disallowed under Bankruptcy Code Section 502(e)(1)(B).  The Debtors

therefore objected to Natixis' Claim against Access Lending.  Natixis responded, and the dispute

with respect to Natixis' Claim against Access Lending will ultimately be determined by the

Bankruptcy Court (or by agreement of the parties).  While the Debtors believe that Natixis' Claim

against Access Lending should be disallowed, nothing in the Plan modifications prejudice Natixis'

rights on this issue.  To the contrary, if Natixis has a valid claim against Access Lending, the Plan

modifications will benefit Natixis -- to the extent that Goldman receives distributions in the Access

Lending portion of the Draft Second Amended Plan, this may arguably reduce the damages

Goldman seeks against Natixis, and to the extent that NCMC agrees to partially subordinate its

recoveries from the first $3.5 million of Access Lending Net Distributable Assets, that will benefit

all other Creditors of Access Lending, including Natixis (if it has a valid Claim against Access

Lending) and Goldman (thereby arguably reducing Goldman's damages sought against Natixis).

IV.    THE PLAN

19.    On March 18, 2008, the Plan Proponents filed the Plan, and the Debtors filed the related Disclosure Statement with the Court under certification of counsel. The Court then entered an order dated March 18, 2008 [Docket No. 5396] approving the Disclosure Statement and establishing solicitation procedures, among other things. "Solicitation Packages" were mailed to Creditors on March 21, 2008. The deadline to vote to accept or reject the Plan is April 21, 2008 and the confirmation hearing is scheduled for April 24, 2008.

A.    Access Lending Modifications

20.    As detailed in the Disclosure Statement, the Plan contains a series of complex interrelated compromises that together form a global settlement of the Estates' primary intercreditor and intercompany disputes. Among the compromises, the Debtors other than Access Lending are divided into two "Debtor Groups" (the Holding Company Debtors and the Operating Debtors), while Access Lending is in its own "Debtor Group." In almost every respect, the Plan provides for a plan within a plan for Access Lending. Unlike the other Debtors, Access Lending's assets are not transferred to the Liquidating Trust on the Effective Date and are not then subject to the terms of the Liquidating Trust Agreement; rather, Access Lending's stock is transferred from TRS Holdings to the Liquidating Trust and Access Lending remains an independent corporate entity ("Reorganized Access Lending").

21.    Because settlement discussions between Goldman and NCMC, Access Lending's two largest general unsecured creditors, were ongoing as of the filing of the Plan, the Plan Proponents kept the Plan's treatment of Access Lending as simple as possible. The Plan provides for three Access Lending Classes: Class AL1 (Priority Claims Against Access Lending), Class AL2 (Secured Claims Against Access Lending), and Class AL3 (Other Unsecured Claims Against Access Lending). Upon the Effective Date, the Plan Administrator for Reorganized Access Lending is responsible for paying all A/P/S Claims against Access Lending, resolving all Disputed Claims against Access Lending, prosecuting Access Lending Causes of Action (if any), and paying taxes as appropriate. Upon completion of these tasks, the Plan presently provides that

the Plan Administrator is to calculate and distribute the Access Lending Net Distributable Assets to Holders of Allowed Unsecured Claims against Access Lending and then dissolve Reorganized Access Lending. The only way in which the Plan's settlements presently involve Access Lending is with respect to the "Joint Administrative Expense Share" compromise by which the Plan proposes to allocate administrative expenses for which (a) liability cannot be allocated to a particular Debtor or Debtors and (b) Debtors in more than one Debtor Group are liable. Specifically, the Plan provides that 0.7% of such expenses for the period from April 2, 2007 through April 27, 2007 shall be allocated to Access Lending. Notably, if the Access Lending portion of the Plan is not confirmed along with the portions of the Plan relating to the other Debtors, Access Lending's Joint Administrative Expense Share would be reduced to zero under the Plan. (See Exhibit C to the Plan).

22.     Goldman and the Plan Proponents now have reached a settlement of their disputes, consisting of a series of interrelated compromises, regarding the Goldman Claim and the NCMC Claim that is embodied in the Draft Second Amended Plan. The elements of the settlement, which are incorporated into the Draft Second Amended Plan (and, as noted above, are referred t herein as the "Access Lending Modifications") are as follows:[7]

    a.    Distributions to Holders of Allowed Access Lending Unsecured Claims

23.     Under the Plan, Access Lending Net Distributable Assets (i.e., the Assets of Access Lending net of A/P/S Claims and post-Effective Date expenses of Reorganized Access Lending) are distributed Pro Rata to Holders of Allowed Class AL3 Claims (i.e., all general unsecured creditors of Access Lending). In the Draft Second Amended Plan (see Draft Second Amended Plan, Article 4.L), this treatment has been modified so as to provide that (i) until Holders of Class AL3 Claims other than NCMC receive distributions equal to 30% of the allowed amounts of their Class AL3 Claims, the NCMC Claim will be allowed at 60% of its scheduled amount (or

---

[7] The description of the proposed Plan modifications is a general summary of the proposed modifications and is provided for explanatory purposes only.

$2,383,919.92), and (ii) after Holders of Class AL3 Claims other than NCMC receive distributions equal to 30% of the allowed amounts of their Class AL3 Claims, the NCMC Claim will be allowed in the amount of $3,973,199.86 and no further distribution will be made on account of the Goldman Claim. Thus, the most that Goldman can recover from the Estate of Access Lending on account of the Goldman Claim is $2,851,872.80 and, after Goldman recovers such amount from Access Lending, all further recoveries will be distributed Pro Rata to the remaining Holders of Allowed Class AL3 Claims, including NCMC. If the 30% threshold is reached, NCMC will have recovered $715,175.98, subject to possible adjustments discussed in paragraph (b) below. All other Creditors of Access Lending (other than NCMC) benefit from this compromise because, until they receive cash equal to 30% of the amount of their Allowed Class AL3 Claims, the NCMC Claim will be allowed at only 60% of its scheduled amount (a difference of $1,121,327.06), and, thereafter, the Goldman Claim will not share in any recoveries (a net reduction of $8,384,915.60). For example, Sheppard, SRG, DBNTC and Natixis (if Natixis has a valid Claim against Access Lending) will benefit since their Pro Rata distributions will be increased -- when Access Lending Net Distributable Assets are in the range of the expected cash on hand on the Effective Date, they will share with NCMC based on NCMC discounting the NCMC Claim by 40%. And to the extent that Access Lending recovers additional amounts from Access Holding after the Effective Date, other Creditors against Access Lending will benefit since the dominate Access Lending Creditor -- Goldman -- will not participate.[8]

24.    The compromises embodied in these modifications are also beneficial to NCMC, although minor when assessed in the context of the Draft Second Amended Plan as a whole -- the modifications will have a positive, but de minimis, impact on the recoveries available for Creditors of NCMC. Goldman asserted that the intercompany Claim of NCMC against Access Lending should be disallowed, arguing that it should be recharacterized as an equity contribution.

---

[8] Goldman will share in distributions until it receives a 30% recovery on the Goldman Claim. The Debtors expect that this threshold will be met on the Effective Date or shortly thereafter. The examples in the text are based on the simplifying assumptions that Goldman's maximum distribution will be reached on the Effective Date.

Obviously, NCMC disagrees. The compromises embodied in the modifications resolve this issue by Allowing NCMC 's Claim against Access Lending at approximately $2.4 million until other Unsecured Creditors receive a 30% recovery, and thereafter Allowing NCMC's Claim against Access Lending at the full asserted amount of approximately $3.9 million and providing that Goldman will not participate in any such distributions. As a result, NCMC is estimated to share in approximately 20% of the distributions expected to be available on the Effective Date and close to 100% of any future distributions available thereafter. This compromise reflects that collections received from Access Holdings after the Effective Date are likely to be the product of NCMC's efforts to pursue Access Holdings. Thus, Goldman was willing to give up its share of any such future recoveries in return for a discounted sharing by NCMC in the cash expected on the Effective Date. From NCMC's perspective, it will do far better under the modifications than if Goldman prevailed in recharacterizing the NCMC Claim as equity even with respect to the cash expected to be available on the Effective Date, and thereafter will get the benefit of almost all recoveries realized against Access Holdings.

        b.      Interim Distributions.

      25.      To accommodate the modified treatment of Class AL3 Claims, the Plan Proponents and Goldman agree that it is necessary for the Plan, as amended, to provide for the Plan Administrator to have the ability to make interim distributions. Accordingly, the Draft Second Amended Plan duplicates, nearly identically, the interim distribution provisions employed for the Holding Company Debtors and Operating Debtors. (See Draft Second Amended Plan, Article 10.E.2). If and when the Plan Administrator determines that interim distributions are warranted and economical, the Plan Administrator may make interim distributions to Holders of Allowed Class A3 Claims provided that the Access Lending Administrative Fund, the Access Lending A/P/S Reserve, and the Access Lending Claims Reserve are fully funded. While they have no impact on any other Creditors of the Estates, these modifications benefit Creditors of Access Lending because they will not be forced to wait until all Claims against and Causes of Action of Access Lending are resolved before receiving distributions.

c.    NCFC Guarantee Claim

26.    As noted above, NCFC guaranteed Access Lending's obligations under the Goldman MRA. Goldman asserts that it has a Claim against NCFC in the same amount of its Claim against Access Lending. The Debtors assert the same defenses to Goldman's Claim against NCFC as they do to Goldman's Claim against Access Lending. In recognition of the counterarguments to their positions and in order to avoid potentially costly claim litigation, the parties have agreed that Goldman shall have a Class HC3b Claim (Other Unsecured Claim Against NCFC) in the amount of $5,000,000.00. (See Draft Second Amended Plan, definition of "Goldman HC3b Claim"). This is substantially less than the amount that Goldman asserts -- $15.1 million based on Goldman's Claim against Access Lending, as allowed for voting purposes, before receipt of its Adequate Protection payment or approximately $9 million after netting these payments. Other NCFC Creditors will benefit from this aspect of the settlement with Goldman.

d.    Cap on Administrative and Post-Effective Date Expenses

The Access Lending Net Distributable Assets are the assets that will be distributed to Holders of Allowed Unsecured Claims against Access Lending. The Plan provides that Access Lending Net Distributable Assets are calculated by deducting Access Lending's administrative expenses, A/P/S Claims against or allocated to Access Lending, the expenses of Reorganized Access Lending, and the costs of prosecuting the Access Lending Causes of Action from the gross proceeds of the liquidation of Access Lending's Assets and the gross recoveries from the Access Lending Causes of Action. Pursuant to the settlement between the Debtors and Goldman, the Draft Second Amended Plan slightly modifies this calculation: if the amount to be deducted from the gross proceeds of the liquidation of Assets and prosecution of Access Lending Causes of Action exceeds $1,000,000, the excess amount will be paid out of amounts that would otherwise be distributed to NCMC on account of the NCMC Claim. (See Draft Second Amended Plan, Article 10.F.4). This element of the settlement avoids litigation with Goldman about the appropriate allocation of administrative expenses, such as professional fees and corporate payroll expenses, while still ensuring that a significant and, in the Debtors' view, accurate amount of such

expenses are borne by Access Lending's Creditors. Further, to the extent that the $1,000,000.00 threshold is exceeded, deducting the excess amount from the distribution to NCMC (and, thus, the Operating Debtors) is an equitable result, as the Operating Debtors are prime beneficiaries of the Access Lending Estate. As with all but one aspect of the settlement, this element has no impact on Creditors of the Holding Company Debtors.

        e.      Objections to Claims Against Access Lending

27.     Under the Draft Second Amended Plan, all Creditors of Access Lending, as opposed to just the Plan Administrator, will have standing to object to Claims against Access Lending (See Draft Second Amended Plan, Article 10.C). This modification expands the rights of Access Lending Creditors, while not affecting any other Creditor of the Estates.

        f.      Release of Goldman

28.     The Draft Second Amended Plan contains a provision releasing any claims of the Debtors against Goldman related to Access Lending. (See Draft Second Amended Plan, Article 13.D). The Debtors are not aware of any claims that they hold against Goldman related to Access Lending. Indeed, Goldman asserts that since its obligations arise under a repurchase agreement (as defined in Bankruptcy Code section 101(47), no transfer to it may be avoided under the Bankruptcy Code avoiding powers, including preferences, strong-arm avoidance or constructive fraudulent conveyances, as set forth in Bankruptcy Code section 546(f).

B.     SEC Modifications

29.     In consultation with the Securities and Exchange Commission (the "SEC"), the Plan Proponents have modified (i) the definition of "Protected Party" and (ii) the Plan's provisions relating to the extension of the automatic stay and exculpation (the "SEC Modifications"). (See Draft Second Amended Plan, Articles 13.B and 13.C). The SEC had expressed concerns to the Plan Proponents about including the Debtors within the definition of Protected Party, which term is used in Article 13.A, the Draft Second Amended Plan's injunction section. The Plan Proponents' primary concern in including the Debtors within the Protected Party definition was to ensure that any stays or injunctions imposed during the Chapter 11 Cases

(including the automatic stay of section 362 of the Bankruptcy Code) are recognized by parties and courts after the Effective Date. Accordingly, the definition of "Protected Party" has been modified to remove the Debtors, while the Plan Proponents have added explanatory detail to Article 13.B (formerly Article 12.B), the provision of the Draft Second Amended Plan that provides for the extension of injunctions or stays (including the automatic stay) until the later of the entry of the Final Decree or the dissolution of the Liquidating Trust. The additional language of Article 13.B is not a substantive modification. Rather, the additional language simply excerpts certain language from section 362 of the Bankruptcy Code so as to clarify the preceding sentence's reference to section 362.

30.    The third SEC Modification is found in Article 13.C. of the Draft Second Amended Plan, where the Plan Proponents have acknowledged that no provision of the Draft Second Amended Plan releases prepetition claims held by the SEC other than for claims pertaining to the filing of the Chapter 11 Cases.

C.    Liquidating Trust Modifications

31.    The Draft Second Amended Plan contains three modifications to provisions regarding the Liquidating Trust (the "Liquidating Trust Modifications"), each of which is administrative or mechanical in nature. First, Article 8.E.4 has been amended to more accurately describe the application of Treasury Regulation section 301.7701-4(d) and applicable guidance published by the Internal Revenue Service to the transfer of Assets from the Debtors to the Liquidating Trust for federal income tax purposes. The Plan Proponents believe that this modification benefits beneficiaries of the Liquidating Trust because, by providing a more complete and precise description of the transfer of the Assets to the Liquidating Trust, it enables each beneficiary to determine the specific Asset or Assets, and the portion of each such Asset, that the beneficiary is deemed to receive from the Debtors in satisfaction of its Claims and contribute to the Liquidating Trust as grantor for federal income tax purposes.

32.    Article 8.F.5.c.xii of the Plan has been deleted. This provision required that upon determining that the beneficiaries or the Liquidating Trust could become subject to adverse

tax consequences, the Liquidating Trustee would be obligated take such actions that would alleviate such adverse tax consequences. Upon further consideration of this provision, the Plan Proponents became concerned that the provision could create conflicts of interest for the Liquidating Trustee, as beneficiaries of the Liquidating Trust will likely have varying tax situations. In addition, this provision placed an obligation on the Liquidating Trustee that the Plan Proponents believe is not properly within the scope of his employment. The omission of this provision in the Draft Second Amended Plan has no material consequence to Creditors.

33.     Finally, Article 8.F.6, which provides that the Liquidating Trustee must make a good faith determination of the value of the Liquidating Trust Assets as soon as practicable after the Effective Date, has been modified to exclude ambiguous language and lessen the administrative burden on the Liquidating Trustee. This modification will assist the Liquidating Trustee in properly carrying out his duties and will reduce the Liquidating Trust's administrative costs, thereby benefiting beneficiaries of the Liquidating Trust.

D.     Indenture Trustee Modifications

34.     The Modifications in Article 4.C to the Senior Claims Procedure were included to establish a reserve (the "Future Expense Reserve") in the amount of $100,000 to be held by the Indenture Trustee for payment of future Indenture Trustee Expenses, all of which Indenture Trustee Expenses are subject to the Indenture Trustee's charging lien. The Future Expense Reserve shall only be funded from any distributions that would otherwise be made on account of Allowed Capital Trust Claims and not from any other Assets. Therefore, these revisions only impact Holders of Senior Class HC3b Claims, if any, and Holders of Capital Trust Claims. Because the Indenture Trustee has a charging lien against the assets in the Capital Trust and would be entitled to payment of its Indenture Trustee Fees prior to any distribution of such assets to the Holders of Senior Class HC3b Claims and the Holders of Capital Trust Claims, such Holders are not prejudiced by the establishment of the Future Expense Reserve and the proposed revisions are not materially adverse to any Creditors. Moreover, the only known Holder of a Capital Trust Claim has reviewed and approved these revisions.

E.     Technical Modifications

35.     The Draft Second Amended Plan also contains certain technical clarifications and grammatical corrections (the "Technical Modifications") that must be rectified before confirmation.  These modifications are ministerial in nature, and the Plan Proponents believe that they do not amount to the type of modification requiring resolicitation of acceptances of the Plan.  The Technical Modifications are perfunctory and do not violate sections 1122 or 1123 of the Bankruptcy Code and do not adversely affect the treatment of any Creditor's Claim.

## RELIEF REQUESTED AND AUTHORITY THEREFOR

36.     By this Motion, the Plan Proponents are seeking the entry of an order, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, authorizing them to make modifications to the Plan as set forth in the Draft Second Amended Plan.

37.     Section 1127(a) of the Bankruptcy Code provides as follows:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

38.     Under this provision, a plan proponent may modify its plan prior to confirmation so long as the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Bankruptcy Rule 3019 provides as follows:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

The Modifications comply with these requirements.

39.     Courts addressing this issue have concluded uniformly that resolicitation is unnecessary unless a modification has an adverse impact on the treatment of the claims of a

creditor accepting the prior version of the plan. In In re American Solar King Corp., 90 B.R. 808 (Bankr. W.D. Tex. 1988), the modification at issue added an allowed claim to a class the distribution for which was in the form of stock. The additional shares necessary to pay the "new" claimant raised the possibility that the value of the distribution (i.e., stock) received by the other class members would be diluted. The bankruptcy court nevertheless concluded that the proposed modification did not cause a sufficiently "material" negative change in the treatment of this class's claims to warrant a resolicitation to such claimants. Id. at 823-25.

40.     Likewise, in In re Mt. Vernon Plaza Community Urban Redevelopment Corp. I, 79 B.R. 305 (Bankr. S.D. Ohio 1987), the court found that modifications that added a co-proponent, included another party to the plan, increased administrative expenses, set a time limit for filing proofs of claim, and added various technical modifications did not, taken as a whole, adversely change the treatment of any creditor's claim. Id. at 306. The court concluded that a plan modification is not adverse where "[n]one of the changes negatively affects the repayment of creditors, the length of the [p]lan, or the protected property interests of parties in interest." See also In re Celotex Corp., 204 B.R. 586, 608-09 (Bankr. M.D. Fla. 1996) (holding that creditors and equity holders who had accepted debtor's plan of reorganization were deemed to have accepted modifications that did not adversely change treatment under plan of any claims or interests); In re Placid Oil Co., 92 B.R. 183, 190 (Bankr. N.D. Tex. 1988).

41.     Under these authorities, the Plan Proponents should be authorized to make the Modifications to the Plan as set forth in the Draft Second Amended Plan attached as Exhibit A hereto, and such Modifications should be deemed accepted by Creditors that vote to accept the Plan. As set forth above, none of the Modifications adversely change the treatment of any of the Debtors' Creditors, other than possibly the effect of the Access Lending Modifications on Goldman, which consents to such Modifications subject to their inclusion in the Debtors' confirmed chapter 11 plan. Indeed, for the reasons detailed herein, the Access Lending Modifications benefit all other Creditors of Access Lending. The Liquidating Trust Modifications and the Indenture Trustee Modifications are primarily administrative revisions that will assist the

Plan Proponents and the Liquidating Trustee in implementing the Plan and managing the

Liquidating Trust.  These Modifications have no discernable effect on Creditors of the Estates.

Finally, the Technical Modifications merely correct typographical, grammatical, and other

ministerial errors contained in the Plan as solicited.  In light of the foregoing, the Plan Proponents

believe that no accepting Creditor would reconsider its vote based on the Modifications.

**NOTICE**

42.     No trustee has been appointed in the Chapter 11 Cases. Notice of this

Motion has been provided to: (1) the Office of the United States Trustee for the District of

Delaware; (2) counsel to the Committee; (3) all persons listed on the Access Lending schedules as

having a claim or potential claim against Access Lending; (4) each person who filed a claim

against Access Lending; (5) all parties who have filed timely objections to the Plan; and (6) all

parties who have timely filed requests for notice under Bankruptcy Rule 2002.  In light of the

nature of the relief requested herein, the Plan Proponents submit that no other or further notice is

required.

**NO PRIOR REQUEST**

43.     No previous motion for the relief sought herein has been made to this or any

other Court.

**CONCLUSION**

WHEREFORE, the Plan Proponents respectfully request that the Court enter an

order, substantially in the form attached hereto as Exhibit B: (i) determining that the Modifications

do not adversely change the treatment of Creditors and do not require resolicitation of any Class of

Creditors; (ii) authorizing the Plan Proponents to make the Modifications included in the Draft

Second Amended Plan and deeming the Modifications to be accepted by all Creditors that vote to

accept the Plan; and (iii) granting such other relief as the Court deems just and proper.

Dated: April 18, 2008
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzanne S. Uhland
Ben H. Logan
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION