# **<u>EXHIBIT A</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Proposed Hearing Date: 4/24/08 at 10:00 a.m. |
| | : | Proposed Objection Deadline: At the hearing |

## NOTICE OF MOTIONS AND HEARING

PLEASE TAKE NOTICE that on April 18, 2008 the above-captioned debtors and

debtors in possession (the "Debtors") filed the **Motion of the Debtors and the Official**

**Committee of Unsecured Creditors for an Order Determining that Proposed Plan**

**Modifications Do Not Adversely Change the Treatment of Creditors and Do Not Require**

**Resolicitation of Any Class of Creditors** (the "Motion") with the United States Bankruptcy

Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801

(the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that the Debtors contemporaneously filed a

**Motion to Shorten Notice and Objection Periods** for the Motion (the "Notice Motion") with

the Bankruptcy Court. The hearing date and objection deadline set forth herein are consistent

with the dates proposed in the Notice Motion. In the event that the Court does not approve the

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership and New Century Warehouse Corporation, a California corporation.

Date filed: 4/16/08
Docket #: 6339

dates proposed in the Notice Motion, the Debtors will file and serve a separate notice notifying all parties-in-interest of the revised hearing date and objection deadline.

PLEASE TAKE FURTHER NOTICE that a hearing with respect to the Motion be held on **April 24, 2008 at 10:00 a.m.** before the Honorable Kevin J. Carey at the United States Bankruptcy Court, 824 Market Street, 5th Floor, Courtroom #5, Wilmington, Delaware 19801 (the "Hearing").

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion may be made **at the Hearing**.

IF NO OBJECTIONS TO THE MOTION ARE TIMELY RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: April 18, 2008
     Wilmington, Delaware

Mark D. Collins (Bar No. 2981)
Michael J. Merchant (Bar No. 3854)
Christopher M. Samis (Bar No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

- and -

Ben H. Logan
Suzzanne S. Uhland
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
Telephone:  (415) 984-8700
Facsimile:  (415) 984-8701

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416(KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Hearing Date: April 24, 2008 at 10:00 a.m.** |
| | : | **Objection Deadline: At the hearing** |

**MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER DETERMINING THAT PROPOSED PLAN MODIFICATIONS DO NOT ADVERSELY CHANGE TREATMENT OF CREDITORS AND DO NOT REQUIRE RESOLICITATION OF ANY CLASS OF CREDITORS**

The above captioned debtors and debtors in possession (the "Debtors") and the

Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the

"Plan Proponents") hereby move this Court (the "Motion") for entry of an order pursuant to

sections 105 and 1127(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule

3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) determining that

the proposed modifications (the "Modifications") to the *First Amended Joint Chapter 11 Plan of*

*Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March*

*18, 2008* (the "Plan") set forth in the draft of the *Second Amended Joint Chapter 11 Plan of*

*Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April*

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company, NCoral, L.P., a Delaware limited partnership and New Century Warehouse Corporation, a California corporation.

*[ ], 2008* (the "Draft Second Amended Plan"), which is attached hereto in blacklined form as Exhibit A,[2] do not adversely change the treatment of Creditors[3] and do not require resolicitation of any Class of Creditors and (ii) authorizing the Plan Proponents to make the Modifications to the Plan and deeming the Modifications to be accepted by all Creditors that vote to accept the Plan. In support of their Motion, the Plan Proponents respectfully represent as follows:

## INTRODUCTION

In the month-long period since the Plan Proponents filed the Plan, they have worked to address comments, questions, and concerns raised by Creditors and other parties in interest about the Plan. These discussions have yielded the proposed Modifications that are incorporated into the Draft Second Amended Plan. Many of the Modifications are ministerial or editorial in nature, while others are substantive. Most of these changes, and essentially all the substantive provisions, pertain solely to the Plan's treatment of New Century Warehouse Corporation ("Access Lending"), a small, stand-alone Debtor with two main Creditors and a third small Creditor. The Modifications to the Access Lending provisions of the Plan reflect a settlement of disputes between Access Lending's two principal creditors - Goldman Sachs Mortgage Company ("GSMC" and, together with its affiliate Goldman, Sachs & Co., "Goldman") and the Debtor New Century Mortgage Corporation ("NCMC") - in a manner beneficial to all creditors of the Access Lending Estate other than Goldman, which has consented to these modifications. These Modifications are also beneficial to NCMC (and , therefore, beneficial to the Creditors of NCMC and the other Operating Debtors), although the improved recoveries to NCMC from the Access Lending Estate are not material when considered in the context of the Estate of NCMC or the anticipated recoveries for Creditors of NCMC or the other Operating Company Debtors. The Modifications have essentially no perceptible impact on the Estates of the Holding Company Debtors.

Because the significant Modifications set forth in the Draft Second Amended Plan relate to

---

[2] The Plan Proponents intend to file an amended chapter 11 plan prior to the Confirmation Hearing substantially in the form of the Draft Second Amended Plan (the "Second Amended Plan") The Second Amended Plan may contain further non-material modifications, which modifications will be disclosed to the Court and parties in interest

[3] Capitalized terms not otherwise defined herein have the meaning given to them in the Amended Plan.

Access Lending, this Motion focuses primarily on the Access Lending-related Modifications (the "Access Lending Modifications"), the reasons for them, and their effects before then setting forth the few other inconsequential substantive modifications. In no case do any of the Modifications adversely affect any Creditor in a material matter (other than possibly the effect of the Access Lending Modifications on Goldman, whose Claims against Access Lending are being settled in connection with the Access Lending Modifications and which has consented to the Access Lending Modifications subject to their inclusion in the Debtors' confirmed chapter 11 plan). Rather, the Modifications either benefit or have no discernable effect on Creditors and, therefore, the Plan Proponents do not believe that resolicitation of any Class of Creditors is necessary or appropriate.[4]

## FACTUAL BACKGROUND

I.    THE CHAPTER FILINGS

1.    On April 2, 2007 (the "Petition Date"), the Debtors, other than New Century Warehouse Corporation d/b/a Access Lending ("Access Lending") filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code. No trustee has been appointed in these cases (the "Chapter 11 Cases"), and the Debtors continue to manage their affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.    On April 4, 2007, the Court entered an order authorizing the joint administration of the Debtors' cases for procedural purposes only (the "Joint Administration Order").

3.    On April 9, 2007, the United States Trustee for the District of Delaware appointed the Committee.

---

[4] Goldman's vote on the Plan with respect to its Claim against Access Lending is conditioned on confirmation of the Plan as modified in Exhibit A hereto. In the event that the Bankruptcy Court does not approve the Access Lending Modifications or the Draft Second Amended Plan is materially modified without Goldman's consent, Goldman has the right to withdraw or change its vote or to object to confirmation on any and all grounds (not limited to the Access Lending Modifications).

4.      On August 3, 2007, Access Lending, a wholly owned subsidiary of Debtor New Century TRS Holdings, Inc. ("TRS Holdings"), filed a voluntary chapter 11 petition, and, subsequently, the Joint Administration Order was amended to include Access Lending.

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

II.    ACCESS LENDING[5]

6.      Access Lending financed residential mortgage loans originated by a network of mortgage originators and other smaller financial institutions. Access Lending provided financing to these loan originators that was, in turn, used to fund the loans provided to individual borrowers who were customers of the loan originators. Access Lending obtained its financing from three entities through various receivable purchase agreements, credit agreements, and repurchase agreements.

7.      Access Lending operated largely independently of the other Debtors and, as noted, did not file a chapter 11 petition along with those entities. Those Debtors' financial difficulties, however, triggered cross-defaults under certain of Access Lending's financing facilities. Goldman had a repurchase agreement with Access Lending that Goldman contends qualified for the "safe harbor" protections of the Bankruptcy Code. In March 2007, Goldman declared an event of default under the Master Repurchase Agreement dated February 15, 2006 (as amended by Amendment No. 1 dated as of October 25, 2006, Amendment No. 2. dated November 30, 2006, and Amendment No. 3 dated as of February 7, 2007) entered into by Access Lending and GSMC, with New Century Financial Corporation ("NCFC") as guarantor (the "Goldman MRA"). Goldman proceeded to exercise remedies against Access Lending. Access Lending

---

[5] All factual description herein relating to Access Lending or claims against Access Lending is for settlement purposes only, and is not an acknowledgment of admission of the Debtors, the Committee, or Goldman as to the validity of such factual description.

entered into forbearance agreements with the other two entities that had provided it financing, which allowed Access Lending to operate while it liquidated substantially all of its assets.

8.      Pursuant to the *Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 Authorizing the Access Sale and Granting Related Relief*, Access Lending sold substantially all of its assets as a going concern to Access Holdings Corporation ("Access Holdings") pursuant to that certain Amended and Restated Asset Purchase Agreement by and between Access Holdings Corporation and New Century Warehouse Corporation dated as of April 26, 2007 (the "APA"). The sale closed on April 27, 2007. Under the APA, Access Holdings agreed to pay Access Lending 60% of the net proceeds realized on the sale of loans that were subject to Access Lending's financing facilities, with a minimum guaranteed amount of $4.5 million, plus approximately $76,000. As of the filing of this Motion, Access Lending has received $2.4 million from Access Holdings, holds approximately $3.28 million in its bank account, and is owed the remaining $2.1 million of the amount guaranteed to it under the APA. Access Lending, in consultation with the Committee, extended the due date for the payment of the minimum guaranteed amount, but that extended date passed without Access Holding satisfying its obligations under the Access Purchase Agreement. Thus, on February 28, 2008, Access Lending notified Access Holdings of this default and made demand on Access Holdings to pay immediately the remaining balance due -- approximately $2.1 million. Access Lending, the other Debtors, and the Committee are making active efforts to recover the remaining balance, either through a revised agreement that will result in Access Holdings paying $1 million to Access Lending in the next few weeks and Access Holdings agreeing to a revised methodology for paying additional sums to Access Lending or, if necessary, pursuing other legal remedies. Thus, if the Plan, as amended to include the Modifications, is confirmed, as of the Effective Date, the Debtors expect that there will be approximately $4.28 million in the Access Lending Estate, with the prospect of receiving additional recoveries from Access Holdings, probably in the range

of an additional $1.1 million, or perhaps slightly more.[6]  As a result, the Debtors estimate that the

amounts available to satisfy Allowed A/P/S Claims against Access Lending and Allowed

Unsecured Claims against Access Lending will equal approximately $5.38 million, or perhaps

slightly more.  While Access Lending intends to proceed aggressively in attempting to collect the

amounts due from Access Holdings, whether Access Lending will recover any amount in excess of

the $3.28 million held presently by Access Lending is presently uncertain.  In sum, Access

Lending presently has $3.28 million of cash, expects to have approximately $4.28 million on the

Effective Date, and expects ultimately to have around $5.4 million to distribute to its Creditors,

subject to the uncertainties noted above.

III.     CLAIMS AGAINST ACCESS LENDING

9.     As of the filing of this Motion, the Debtors estimate that, based on an

assumed Effective Date of April 30, 2008, Secured Claims, Priority Claims, and Administrative

Claims (defined in the Plan as "A/P/S Claims") against Access Lending will total approximately

$950,000.00.  Professional fees and the estimated costs of administering Access Lending's Estate

from April 2, 2007 through April 27, 2007 (the date of the closing of the sale of Access Lending's

assets) comprise nearly all A/P/S Claims against Access Lending.  No Priority Claims or Secured

Claims were filed against Access Lending as of its claims bar date.  Thus, the Debtors estimate

that as of the Effective Date they will have approximately $3.5 million available to distribute to

Holders of Allowed Unsecured Claims against Access Lending and ultimately the total available

for distribution to Holders of Allowed Unsecured Claims against Access Lending will equal

around $4.5 million (subject to the uncertainties mentioned above).

10.     There are five Unsecured Claims against Access Lending entitled to vote to

accept or reject the Plan.  Those Claims are held by Goldman, NCMC, Sheppard, Mullin, Richter

& Hampton LLP ("Sheppard"), Street Resources Group ("SRG"), and Deutsche Bank National

Trust Company ("DBNTC").  The five Claims held by these entities have been balloted in an

---

[6] No Priority Claims or Secured Claims were filed against Access Lending prior to its claims bar date.

aggregate amount of $19,150,459.70 -- $15.1 million (or 78.9%) of which is on account of

Goldman's Claim and $3.974 million (or 20.7%) of which is on account of NCMC's Claim, with

the remaining 0.4% on account of the Claims of Sheppard, SRG, and DBNTC.

                  a.     <u>Goldman Claim</u>

        11.     Goldman filed Proof of Claim number 3847 (the "Goldman Claim") against

Access Lending on October 17, 2007. The Goldman Claim asserts a Claim against Access

Lending based on conversion, constructive trust, losses under the Goldman MRA, and other

tortious acts, as well as related contract claims including attorneys' fees (as more fully described in

the Goldman Claim), allowed for voting purposes in the amount of $15,109,754, which Claim

Goldman asserts is guaranteed by NCFC. The Goldman Claim arises out of the Goldman MRA.

On March 8, 2007, Goldman notified Access Lending that it was terminating the Goldman MRA

based on some asserted events of default and on March 12, 2007 notified Access Lending that it

was purporting to exercise a remedy under the Goldman MRA by crediting what Goldman asserted

was the market value of the mortgage loans subject to the Goldman MRA against Access

Lending's repurchase obligations.

        12.     Goldman asserts that its Claim against Access Lending results from

deficiencies and other contractual rights under its MRA, as well as the fact that, according to

Goldman, former management of Access Lending allegedly collected proceeds from the sale of

some mortgage loans subject to the Goldman MRA or otherwise owned by Goldman. The Debtors

believe that they have various defenses to Goldman's Claim, but obviously Goldman disagrees.

        13.     Shortly prior to April 2, 2007 (the Petition Date for all Debtors other than

Access Lending), NCMC directed Access Lending to transfer approximately $10.1 million to

NCMC's general corporate operating account. This transfer was the subject of the Adequate

Protection Dispute discussed in section III.D.3 of the Disclosure Statement. The Court has

approved the motion to approve the settlement of the Adequate Protection Dispute, and pursuant

thereto, Goldman Sachs has received a payment of $5,603,511.34. As part of the settlement

contained in the Access Lending Modifications, the Debtors and Goldman agree that Goldman's

remaining Claim against Access Lending is fixed at $9,506,242.66 to account for its payment

under the settlement of the Adequate Protection Dispute, and Goldman's guaranty Claim against

NCFC is allowed at $5,000,000.

> b.    NCMC Claim

14.    Access Lending is a direct subsidiary of TRS Holdings. Prior to the Petition

Date, NCMC, which like Access Lending is a direct subsidiary of TRS Holdings, advanced Access

Lending substantial sums. As a result, NCMC asserts a claim against Access Lending (the

"NCMC Claim"), in the amount of $3,973,199.86. Most of these advances by NCMC were made

in the months immediately prior to NCMC's Petition Date and were used to fund margin calls

made by Access Lending's three MRA counterparties, including Goldman. These advances were

made by NCMC as loans to its sister company and are documented on the books of both Access

Lending and NCMC as intercompany loans. The $10.1 million transfer from Access Lending

shortly prior to NCMC's Petition Date were accounted for as partial payments on such

intercompany debt and the $3,973,199.86 million balance is the amount outstanding after

application of these payments. Goldman contests whether this intercompany debt is debt or should

be recharacterized as an equity contribution.

> c.    Sheppard Claim

15.    Sheppard filed Proof of Claim number 2328 (the "Sheppard Claim") against

Access Lending on August 28, 2007. Pursuant to the Sheppard Claim, Sheppard asserts a general

unsecured claim against Access Lending in the amount of $68,801.70 for legal services rendered

prior to April, 2 2007. Sheppard filed identical Proofs of Claim against Debtors NCFC, NCMC,

and Home123 Corporation ("Home123"). The Debtors reserve their rights with respect to the

Sheppard Claim.

> d.    SRG Claim

16.    Access Lending scheduled SRG as holding a general unsecured claim for

$1,657.00 on account of prepetition services rendered by SRG to Access Lending.

e.    DBNTC Claim

17.    DBNTC filed Proof of Claim number 3756 (the "DBNTC Claim") against Access Lending on December 14, 2007. Pursuant to the DBNTC Claim, DBNTC asserts an unliquidated general unsecured claim against Access Lending relating to certain custody agreements under which DBNTC serves as custodian.

f.    Natixis Claim

18.    Natixis Real Estate Capital Inc. ("Natixis") filed a $7.6 million contingent Claim against Access Lending seeking indemnification in case it is held liable to Goldman in a litigation Goldman commenced against Natixis relating to certain loans owned by Goldman pursuant to its MRA, which loans Natixis asserts it purchased by paying Access Lending. Natixis' Claim against Access Lending is contingent on Natixis being held liable to Goldman and actually paying Goldman, but Natixis denies liability to Goldman in this litigation, and the Debtors understand that Natixis has not paid Goldman anything related to this litigation. Thus, the Debtors show no liability to Natixis on their books and records and believe that Natixis' Claim against Access Lending should be disallowed under Bankruptcy Code Section 502(e)(1)(B). The Debtors therefore objected to Natixis' Claim against Access Lending. Natixis responded, and the dispute with respect to Natixis' Claim against Access Lending will ultimately be determined by the Bankruptcy Court (or by agreement of the parties). While the Debtors believe that Natixis' Claim against Access Lending should be disallowed, nothing in the Plan modifications prejudice Natixis' rights on this issue. To the contrary, if Natixis has a valid claim against Access Lending, the Plan modifications will benefit Natixis -- to the extent that Goldman receives distributions in the Access Lending portion of the Draft Second Amended Plan, this may arguably reduce the damages Goldman seeks against Natixis, and to the extent that NCMC agrees to partially subordinate its recoveries from the first $3.5 million of Access Lending Net Distributable Assets, that will benefit all other Creditors of Access Lending, including Natixis (if it has a valid Claim against Access Lending) and Goldman (thereby arguably reducing Goldman's damages sought against Natixis).

IV.    THE PLAN

19.    On March 18, 2008, the Plan Proponents filed the Plan, and the Debtors filed the related Disclosure Statement with the Court under certification of counsel. The Court then entered an order dated March 18, 2008 [Docket No. 5396] approving the Disclosure Statement and establishing solicitation procedures, among other things. "Solicitation Packages" were mailed to Creditors on March 21, 2008. The deadline to vote to accept or reject the Plan is April 21, 2008 and the confirmation hearing is scheduled for April 24, 2008.

A.    Access Lending Modifications

20.    As detailed in the Disclosure Statement, the Plan contains a series of complex interrelated compromises that together form a global settlement of the Estates' primary intercreditor and intercompany disputes. Among the compromises, the Debtors other than Access Lending are divided into two "Debtor Groups" (the Holding Company Debtors and the Operating Debtors), while Access Lending is in its own "Debtor Group." In almost every respect, the Plan provides for a plan within a plan for Access Lending. Unlike the other Debtors, Access Lending's assets are not transferred to the Liquidating Trust on the Effective Date and are not then subject to the terms of the Liquidating Trust Agreement; rather, Access Lending's stock is transferred from TRS Holdings to the Liquidating Trust and Access Lending remains an independent corporate entity ("Reorganized Access Lending").

21.    Because settlement discussions between Goldman and NCMC, Access Lending's two largest general unsecured creditors, were ongoing as of the filing of the Plan, the Plan Proponents kept the Plan's treatment of Access Lending as simple as possible. The Plan provides for three Access Lending Classes: Class AL1 (Priority Claims Against Access Lending), Class AL2 (Secured Claims Against Access Lending), and Class AL3 (Other Unsecured Claims Against Access Lending). Upon the Effective Date, the Plan Administrator for Reorganized Access Lending is responsible for paying all A/P/S Claims against Access Lending, resolving all Disputed Claims against Access Lending, prosecuting Access Lending Causes of Action (if any), and paying taxes as appropriate. Upon completion of these tasks, the Plan presently provides that

the Plan Administrator is to calculate and distribute the Access Lending Net Distributable Assets to Holders of Allowed Unsecured Claims against Access Lending and then dissolve Reorganized Access Lending.  The only way in which the Plan's settlements presently involve Access Lending is with respect to the "Joint Administrative Expense Share" compromise by which the Plan proposes to allocate administrative expenses for which (a) liability cannot be allocated to a particular Debtor or Debtors and (b) Debtors in more than one Debtor Group are liable. Specifically, the Plan provides that 0.7% of such expenses for the period from April 2, 2007 through April 27, 2007 shall be allocated to Access Lending.  Notably, if the Access Lending portion of the Plan is not confirmed along with the portions of the Plan relating to the other Debtors, Access Lending's Joint Administrative Expense Share would be reduced to zero under the Plan.  (See Exhibit C to the Plan).

22.     Goldman and the Plan Proponents now have reached a settlement of their disputes, consisting of a series of interrelated compromises, regarding the Goldman Claim and the NCMC Claim that is embodied in the Draft Second Amended Plan.  The elements of the settlement, which are incorporated into the Draft Second Amended Plan (and, as noted above, are referred t herein as the "Access Lending Modifications") are as follows:[7]

> a.     Distributions to Holders of Allowed Access Lending Unsecured Claims

23.     Under the Plan, Access Lending Net Distributable Assets (i.e., the Assets of Access Lending net of A/P/S Claims and post-Effective Date expenses of Reorganized Access Lending) are distributed Pro Rata to Holders of Allowed Class AL3 Claims (i.e., all general unsecured creditors of Access Lending).  In the Draft Second Amended Plan (see Draft Second Amended Plan, Article 4.L), this treatment has been modified so as to provide that (i) until Holders of Class AL3 Claims other than NCMC receive distributions equal to 30% of the allowed amounts of their Class AL3 Claims, the NCMC Claim will be allowed at 60% of its scheduled amount (or

---

[7] The description of the proposed Plan modifications is a general summary of the proposed modifications and is provided for explanatory purposes only.

$2,383,919.92), and (ii) after Holders of Class AL3 Claims other than NCMC receive distributions

equal to 30% of the allowed amounts of their Class AL3 Claims, the NCMC Claim will be allowed

in the amount of $3,973,199.86 and no further distribution will be made on account of the

Goldman Claim. Thus, the most that Goldman can recover from the Estate of Access Lending on

account of the Goldman Claim is $2,851,872.80 and, after Goldman recovers such amount from

Access Lending, all further recoveries will be distributed Pro Rata to the remaining Holders of

Allowed Class AL3 Claims, including NCMC. If the 30% threshold is reached, NCMC will have

recovered $715,175.98, subject to possible adjustments discussed in paragraph (b) below. All

other Creditors of Access Lending (other than NCMC) benefit from this compromise because,

until they receive cash equal to 30% of the amount of their Allowed Class AL3 Claims, the NCMC

Claim will be allowed at only 60% of its scheduled amount (a difference of $1,121,327.06), and,

thereafter, the Goldman Claim will not share in any recoveries (a net reduction of $8,384,915.60).

For example, Sheppard, SRG, DBNTC and Natixis (if Natixis has a valid Claim against Access

Lending) will benefit since their Pro Rata distributions will be increased -- when Access Lending

Net Distributable Assets are in the range of the expected cash on hand on the Effective Date, they

will share with NCMC based on NCMC discounting the NCMC Claim by 40%. And to the extent

that Access Lending recovers additional amounts from Access Holding after the Effective Date,

other Creditors against Access Lending will benefit since the dominate Access Lending Creditor --

Goldman -- will not participate.[8]

      24.    The compromises embodied in these modifications are also beneficial to

NCMC, although minor when assessed in the context of the Draft Second Amended Plan as a

whole -- the modifications will have a positive, but de minimis, impact on the recoveries available

for Creditors of NCMC. Goldman asserted that the intercompany Claim of NCMC against Access

Lending should be disallowed, arguing that it should be recharacterized as an equity contribution.

---

[8] Goldman will share in distributions until it receives a 30% recovery on the Goldman Claim. The Debtors expect that this threshold will be met on the Effective Date or shortly thereafter. The examples in the text are based on the simplifying assumptions that Goldman's maximum distribution will be reached on the Effective Date.

Obviously, NCMC disagrees. The compromises embodied in the modifications resolve this issue by Allowing NCMC 's Claim against Access Lending at approximately $2.4 million until other Unsecured Creditors receive a 30% recovery, and thereafter Allowing NCMC's Claim against Access Lending at the full asserted amount of approximately $3.9 million and providing that Goldman will not participate in any such distributions. As a result, NCMC is estimated to share in approximately 20% of the distributions expected to be available on the Effective Date and close to 100% of any future distributions available thereafter. This compromise reflects that collections received from Access Holdings after the Effective Date are likely to be the product of NCMC's efforts to pursue Access Holdings. Thus, Goldman was willing to give up its share of any such future recoveries in return for a discounted sharing by NCMC in the cash expected on the Effective Date. From NCMC's perspective, it will do far better under the modifications than if Goldman prevailed in recharacterizing the NCMC Claim as equity even with respect to the cash expected to be available on the Effective Date, and thereafter will get the benefit of almost all recoveries realized against Access Holdings.

> b.    Interim Distributions.

25.    To accommodate the modified treatment of Class AL3 Claims, the Plan Proponents and Goldman agree that it is necessary for the Plan, as amended, to provide for the Plan Administrator to have the ability to make interim distributions. Accordingly, the Draft Second Amended Plan duplicates, nearly identically, the interim distribution provisions employed for the Holding Company Debtors and Operating Debtors. (See Draft Second Amended Plan, Article 10.E.2). If and when the Plan Administrator determines that interim distributions are warranted and economical, the Plan Administrator may make interim distributions to Holders of Allowed Class A3 Claims provided that the Access Lending Administrative Fund, the Access Lending A/P/S Reserve, and the Access Lending Claims Reserve are fully funded. While they have no impact on any other Creditors of the Estates, these modifications benefit Creditors of Access Lending because they will not be forced to wait until all Claims against and Causes of Action of Access Lending are resolved before receiving distributions.

c.    NCFC Guarantee Claim

26.    As noted above, NCFC guaranteed Access Lending's obligations under the Goldman MRA. Goldman asserts that it has a Claim against NCFC in the same amount of its Claim against Access Lending. The Debtors assert the same defenses to Goldman's Claim against NCFC as they do to Goldman's Claim against Access Lending. In recognition of the counterarguments to their positions and in order to avoid potentially costly claim litigation, the parties have agreed that Goldman shall have a Class HC3b Claim (Other Unsecured Claim Against NCFC) in the amount of $5,000,000.00. (See Draft Second Amended Plan, definition of "Goldman HC3b Claim"). This is substantially less than the amount that Goldman asserts -- $15.1 million based on Goldman's Claim against Access Lending, as allowed for voting purposes, before receipt of its Adequate Protection payment or approximately $9 million after netting these payments. Other NCFC Creditors will benefit from this aspect of the settlement with Goldman.

d.    Cap on Administrative and Post-Effective Date Expenses

The Access Lending Net Distributable Assets are the assets that will be distributed to Holders of Allowed Unsecured Claims against Access Lending. The Plan provides that Access Lending Net Distributable Assets are calculated by deducting Access Lending's administrative expenses, A/P/S Claims against or allocated to Access Lending, the expenses of Reorganized Access Lending, and the costs of prosecuting the Access Lending Causes of Action from the gross proceeds of the liquidation of Access Lending's Assets and the gross recoveries from the Access Lending Causes of Action. Pursuant to the settlement between the Debtors and Goldman, the Draft Second Amended Plan slightly modifies this calculation: if the amount to be deducted from the gross proceeds of the liquidation of Assets and prosecution of Access Lending Causes of Action exceeds $1,000,000, the excess amount will be paid out of amounts that would otherwise be distributed to NCMC on account of the NCMC Claim. (See Draft Second Amended Plan, Article 10.F.4). This element of the settlement avoids litigation with Goldman about the appropriate allocation of administrative expenses, such as professional fees and corporate payroll expenses, while still ensuring that a significant and, in the Debtors' view, accurate amount of such

expenses are borne by Access Lending's Creditors. Further, to the extent that the $1,000,000.00 threshold is exceeded, deducting the excess amount from the distribution to NCMC (and, thus, the Operating Debtors) is an equitable result, as the Operating Debtors are prime beneficiaries of the Access Lending Estate. As with all but one aspect of the settlement, this element has no impact on Creditors of the Holding Company Debtors.

              e.      Objections to Claims Against Access Lending

      27.      Under the Draft Second Amended Plan, all Creditors of Access Lending, as opposed to just the Plan Administrator, will have standing to object to Claims against Access Lending (See Draft Second Amended Plan, Article 10.C). This modification expands the rights of Access Lending Creditors, while not affecting any other Creditor of the Estates.

              f.      Release of Goldman

      28.      The Draft Second Amended Plan contains a provision releasing any claims of the Debtors against Goldman related to Access Lending. (See Draft Second Amended Plan, Article 13.D). The Debtors are not aware of any claims that they hold against Goldman related to Access Lending. Indeed, Goldman asserts that since its obligations arise under a repurchase agreement (as defined in Bankruptcy Code section 101(47), no transfer to it may be avoided under the Bankruptcy Code avoiding powers, including preferences, strong-arm avoidance or constructive fraudulent conveyances, as set forth in Bankruptcy Code section 546(f).

    B.     SEC Modifications

      29.      In consultation with the Securities and Exchange Commission (the "SEC"), the Plan Proponents have modified (i) the definition of "Protected Party" and (ii) the Plan's provisions relating to the extension of the automatic stay and exculpation (the "SEC Modifications"). (See Draft Second Amended Plan, Articles 13.B and 13.C). The SEC had expressed concerns to the Plan Proponents about including the Debtors within the definition of Protected Party, which term is used in Article 13.A, the Draft Second Amended Plan's injunction section. The Plan Proponents' primary concern in including the Debtors within the Protected Party definition was to ensure that any stays or injunctions imposed during the Chapter 11 Cases

(including the automatic stay of section 362 of the Bankruptcy Code) are recognized by parties and courts after the Effective Date. Accordingly, the definition of "Protected Party" has been modified to remove the Debtors, while the Plan Proponents have added explanatory detail to Article 13.B (formerly Article 12.B), the provision of the Draft Second Amended Plan that provides for the extension of injunctions or stays (including the automatic stay) until the later of the entry of the Final Decree or the dissolution of the Liquidating Trust. The additional language of Article 13.B is not a substantive modification. Rather, the additional language simply excerpts certain language from section 362 of the Bankruptcy Code so as to clarify the preceding sentence's reference to section 362.

30.    The third SEC Modification is found in Article 13.C. of the Draft Second Amended Plan, where the Plan Proponents have acknowledged that no provision of the Draft Second Amended Plan releases prepetition claims held by the SEC other than for claims pertaining to the filing of the Chapter 11 Cases.

C.    Liquidating Trust Modifications

31.    The Draft Second Amended Plan contains three modifications to provisions regarding the Liquidating Trust (the "Liquidating Trust Modifications"), each of which is administrative or mechanical in nature. First, Article 8.E.4 has been amended to more accurately describe the application of Treasury Regulation section 301.7701-4(d) and applicable guidance published by the Internal Revenue Service to the transfer of Assets from the Debtors to the Liquidating Trust for federal income tax purposes. The Plan Proponents believe that this modification benefits beneficiaries of the Liquidating Trust because, by providing a more complete and precise description of the transfer of the Assets to the Liquidating Trust, it enables each beneficiary to determine the specific Asset or Assets, and the portion of each such Asset, that the beneficiary is deemed to receive from the Debtors in satisfaction of its Claims and contribute to the Liquidating Trust as grantor for federal income tax purposes.

32.    Article 8.F.5.c.xii of the Plan has been deleted. This provision required that upon determining that the beneficiaries or the Liquidating Trust could become subject to adverse

16

tax consequences, the Liquidating Trustee would be obligated take such actions that would alleviate such adverse tax consequences. Upon further consideration of this provision, the Plan Proponents became concerned that the provision could create conflicts of interest for the Liquidating Trustee, as beneficiaries of the Liquidating Trust will likely have varying tax situations. In addition, this provision placed an obligation on the Liquidating Trustee that the Plan Proponents believe is not properly within the scope of his employment. The omission of this provision in the Draft Second Amended Plan has no material consequence to Creditors.

33.     Finally, Article 8.F.6, which provides that the Liquidating Trustee must make a good faith determination of the value of the Liquidating Trust Assets as soon as practicable after the Effective Date, has been modified to exclude ambiguous language and lessen the administrative burden on the Liquidating Trustee. This modification will assist the Liquidating Trustee in properly carrying out his duties and will reduce the Liquidating Trust's administrative costs, thereby benefiting beneficiaries of the Liquidating Trust.

D.      Indenture Trustee Modifications

34.     The Modifications in Article 4.C to the Senior Claims Procedure were included to establish a reserve (the "Future Expense Reserve") in the amount of $100,000 to be held by the Indenture Trustee for payment of future Indenture Trustee Expenses, all of which Indenture Trustee Expenses are subject to the Indenture Trustee's charging lien. The Future Expense Reserve shall only be funded from any distributions that would otherwise be made on account of Allowed Capital Trust Claims and not from any other Assets. Therefore, these revisions only impact Holders of Senior Class HC3b Claims, if any, and Holders of Capital Trust Claims. Because the Indenture Trustee has a charging lien against the assets in the Capital Trust and would be entitled to payment of its Indenture Trustee Fees prior to any distribution of such assets to the Holders of Senior Class HC3b Claims and the Holders of Capital Trust Claims, such Holders are not prejudiced by the establishment of the Future Expense Reserve and the proposed revisions are not materially adverse to any Creditors. Moreover, the only known Holder of a Capital Trust Claim has reviewed and approved these revisions.

E.     Technical Modifications

35.     The Draft Second Amended Plan also contains certain technical

clarifications and grammatical corrections (the "Technical Modifications") that must be rectified

before confirmation. These modifications are ministerial in nature, and the Plan Proponents

believe that they do not amount to the type of modification requiring resolicitation of acceptances

of the Plan. The Technical Modifications are perfunctory and do not violate sections 1122 or 1123

of the Bankruptcy Code and do not adversely affect the treatment of any Creditor's Claim.

## RELIEF REQUESTED AND AUTHORITY THEREFOR

36.     By this Motion, the Plan Proponents are seeking the entry of an order,

pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, authorizing them

to make modifications to the Plan as set forth in the Draft Second Amended Plan.

37.     Section 1127(a) of the Bankruptcy Code provides as follows:

> The proponent of a plan may modify such plan at any time before
> confirmation, but may not modify such plan so that such plan as
> modified fails to meet the requirements of sections 1122 and 1123 of
> this title. After the proponent of a plan files a modification of such
> plan with the court, the plan as modified becomes the plan.

38.     Under this provision, a plan proponent may modify its plan prior to

confirmation so long as the modified plan meets the requirements of sections 1122 and 1123 of the

Bankruptcy Code. Bankruptcy Rule 3019 provides as follows:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and
> before its confirmation, the proponent may file a modification of the
> plan. If the court finds after hearing on notice to the trustee, any
> committee appointed under the Code, and any other entity
> designated by the court that the proposed modification does not
> adversely change the treatment of the claim of any creditor or the
> interest of any equity security holder who has not accepted in writing
> the modification, it shall be deemed accepted by all creditors and
> equity security holders who have previously accepted the plan.

The Modifications comply with these requirements.

39.     Courts addressing this issue have concluded uniformly that resolicitation is

unnecessary unless a modification has an adverse impact on the treatment of the claims of a

creditor accepting the prior version of the plan. In In re American Solar King Corp., 90 B.R. 808 (Bankr. W.D. Tex. 1988), the modification at issue added an allowed claim to a class the distribution for which was in the form of stock. The additional shares necessary to pay the "new" claimant raised the possibility that the value of the distribution (i.e., stock) received by the other class members would be diluted. The bankruptcy court nevertheless concluded that the proposed modification did not cause a sufficiently "material" negative change in the treatment of this class's claims to warrant a resolicitation to such claimants. Id. at 823-25.

40.    Likewise, in In re Mt. Vernon Plaza Community Urban Redevelopment Corp. I, 79 B.R. 305 (Bankr. S.D. Ohio 1987), the court found that modifications that added a co-proponent, included another party to the plan, increased administrative expenses, set a time limit for filing proofs of claim, and added various technical modifications did not, taken as a whole, adversely change the treatment of any creditor's claim Id. at 306. The court concluded that a plan modification is not adverse where "[n]one of the changes negatively affects the repayment of creditors, the length of the [p]lan, or the protected property interests of parties in interest." See also In re Celotex Corp., 204 B.R. 586, 608-09 (Bankr. M.D. Fla. 1996) (holding that creditors and equity holders who had accepted debtor's plan of reorganization were deemed to have accepted modifications that did not adversely change treatment under plan of any claims or interests); In re Placid Oil Co., 92 B.R. 183, 190 (Bankr. N.D. Tex. 1988).

41.    Under these authorities, the Plan Proponents should be authorized to make the Modifications to the Plan as set forth in the Draft Second Amended Plan attached as Exhibit A hereto, and such Modifications should be deemed accepted by Creditors that vote to accept the Plan. As set forth above, none of the Modifications adversely change the treatment of any of the Debtors' Creditors, other than possibly the effect of the Access Lending Modifications on Goldman, which consents to such Modifications subject to their inclusion in the Debtors' confirmed chapter 11 plan. Indeed, for the reasons detailed herein, the Access Lending Modifications benefit all other Creditors of Access Lending. The Liquidating Trust Modifications and the Indenture Trustee Modifications are primarily administrative revisions that will assist the

Plan Proponents and the Liquidating Trustee in implementing the Plan and managing the Liquidating Trust. These Modifications have no discernable effect on Creditors of the Estates. Finally, the Technical Modifications merely correct typographical, grammatical, and other ministerial errors contained in the Plan as solicited. In light of the foregoing, the Plan Proponents believe that no accepting Creditor would reconsider its vote based on the Modifications.

## NOTICE

42.     No trustee has been appointed in the Chapter 11 Cases. Notice of this Motion has been provided to: (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Committee; (3) all persons listed on the Access Lending schedules as having a claim or potential claim against Access Lending; (4) each person who filed a claim against Access Lending; (5) all parties who have filed timely objections to the Plan; and (6) all parties who have timely filed requests for notice under Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Plan Proponents submit that no other or further notice is required.

## NO PRIOR REQUEST

43.     No previous motion for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Plan Proponents respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B: (i) determining that the Modifications do not adversely change the treatment of Creditors and do not require resolicitation of any Class of Creditors; (ii) authorizing the Plan Proponents to make the Modifications included in the Draft Second Amended Plan and deeming the Modifications to be accepted by all Creditors that vote to accept the Plan; and (iii) granting such other relief as the Court deems just and proper.

Dated: April 18, 2008
      Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

-and-

Suzzanne S. Uhland
Ben H. Logan
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

**EXHIBIT A**

## UNITED STATES BANKRUPTCY COURT
### For the District of Delaware

| | |
|---|---|
| In re | Honorable Kevin J. Carey |
| | Chapter 11 |
| New Century Mortgage Corporation | 07-10419 |
| New Century Mortgage Ventures, LLC | 07-10429 |
| NC Capital Corporation | 07-10420 |
| NC Residual III Corporation | 07-10424 |
| New Century R.E.O. Corp. | 07-10426 |
| New Century R.E.O. II Corp. | 07-10427 |
| New Century R.E.O. III Corp. | 07-10428 |
| NC Deltex, LLC | 07-10430 |
| NCoral, L.P. | 07-10431 |
| NC Asset Holding, L.P. | 07-10423 |
| Home123 Corporation | 07-10421 |
| New Century TRS Holdings, Inc. | 07-10416 |
| NC Residual IV Corporation | 07-10425 |
| New Century Credit Corporation | 07-10422 |
| New Century Financial Corporation | 07-10417 |
| New Century Warehouse Corporation | 07-11043 |
| Debtors. | |

**~~FIRST~~[DRAFT] SECOND AMENDED JOINT CHAPTER 11 PLAN OF
LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS DATED AS OF ~~MARCH 18,~~APRIL [  ], 2008**

Suzzanne S. Uhland
Ben H. Logan
Andrew M. Parlen
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

and

Mark Collins
Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

Counsel for the Debtors

Mark S. Indelicato
Mark T. Power
Janine M. Cerbone
HAHN & HESSEN LLP
488 Madison Avenue
New York, NY 10022
(212) 478-7200

and

Bonnie Glantz Fatell
BLANK ROME LLP
1201 Market Street
Suite 800
Wilmington, DE 19891
(302) 425-6400

Regina Stango Kelbon
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
(215) 569-5500

Counsel for Official Committee of Unsecured
Creditors

**DRAFT**
**04/18/2008**

# TABLE OF CONTENTS

**Page**

ARTICLE 1.    DEFINITIONS..................................................................................1

    A.    Defined Terms ...........................................................................1

    B.    Other Terms ..........................................................................~~19~~20

    C.    Time Periods .........................................................................~~19~~20

    D.    Exhibits ..................................................................................~~19~~20

ARTICLE 2.    CLASSIFICATION OF CLAIMS AND INTERESTS...................~~19~~20

    A.    Summary ...............................................................................~~19~~20

    B.    Classification .......................................................................~~22~~23

ARTICLE 3.    TREATMENT OF ADMINISTRATIVE CLAIMS AND
PRIORITY TAX CLAIMS........................................................~~25~~26

    A.    Administrative Claims..........................................................~~25~~26

    B.    Priority Tax Claims .............................................................~~27~~28

ARTICLE 4.    TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ....~~27~~28

    A.    Priority Claims Against All Debtors (Classes HC1, HC5, HC8,
HC11, OP1, OP4, OP7, OP10, and AL1) ..............................~~27~~28

    B.    Secured Claims Against All Debtors (Classes HC2, HC6, HC9,
HC12, OP2, OP5, OP8, OP11, and AL2) ..............................~~28~~29

    C.    Class HC3:  Unsecured Claims Against NCFC ....................~~28~~29

    D.    Class 4:  NCFC Interests .....................................................~~33~~34

    E.    Class HC7:  Other Unsecured Claims against TRS Holdings...............~~34~~35

    F.    Class HC10:  Unsecured Claims Against NC Credit. ...........~~34~~36

    G.    Class HC13:  Other Unsecured Claims against NC Residual IV..........~~35~~37

    H.    Class OP3:  Unsecured Claims Against NCMC. ...................~~36~~38

    I.    Class OP6:  Unsecured Claims Against NC Capital.............~~38~~39

    J.    Class OP9:  Unsecured Claims Against Home123 ...............~~39~~41

    K.    Class OP12:  Other Unsecured Claims Against NC Asset Holding,
NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III,
NCM Ventures, and NCoral..................................................~~41~~42

    L.    Class AL3:  Other Unsecured Claims Against Access Lending ...........~~41~~43

ARTICLE 5.    ACCEPTANCE OR REJECTION OF THIS PLAN.......................~~42~~44

    A.    Impaired Classes of Claims Entitled to Vote ........................~~42~~44

    B.    Classes Deemed to Accept this Plan .....................................~~43~~45

    C.    Classes Deemed to Reject this Plan ......................................~~44~~46

    D.    Nonconsensual Confirmation ...............................................~~44~~46

    E.    Removal of Debtors...............................................................~~44~~46

**DRAFT**
**04/18/2008**

## TABLE OF CONTENTS
### (continued)

**Page**

ARTICLE 6.    THE MULTI-DEBTOR CLAIM PROTOCOL FOR
TREATMENT OF CLAIMS AGAINST MULTIPLE DEBTORS . 4547

A.    Allowed Unsecured Claims for Which More than One Holding
Company Debtor Is Jointly and/or Severally Liable ............................. 4547

B.    Allowed Unsecured Claims for Which More than One Operating
Debtor Is Jointly and/or Severally Liable ............................................ 4547

C.    Separate Application to Debtor Groups ................................................ 4648

D.    Inapplicable to Claims Against Access Lending .................................. 4648

E.    Inapplicable to Intercompany Claims ................................................... 4648

ARTICLE 7.    THE INTERCOMPANY PROTOCOL FOR  TREATMENT OF
INTERCOMPANY CLAIMS ......................................................... 4648

A.    Claims of Holding Company Debtors Against Other Holding
Company Debtors ................................................................................... 4648

B.    Claims of Operating Debtors Against Other Operating Debtors ........... 4648

C.    Claims of Holding Company Debtors Against Operating Debtors ........ 4749

D.    Claims of Operating Debtors Against Holding Company Debtors ........ 4749

ARTICLE 8.    MEANS OF IMPLEMENTING THIS PLAN ................................ 4749

A.    Implementation of Joint Plan .............................................................. 4749

B.    Corporate Action .................................................................................. 4749

C.    Dissolution of Debtors Other than Access Lending ............................ 4749

D.    Dissolution of the Committee .............................................................. 4850

E.    Vesting of Assets in Liquidating Trust; Assumption of Plan
Obligations ............................................................................................ 4951

F.    Liquidating Trust .................................................................................. 5052

G.    Plan Advisory Committee ..................................................................... 5861

H.    Liability, Indemnification ..................................................................... 6163

I.    Retention of Professionals ................................................................... 6265

J.    Access Lending ..................................................................................... 64K. Preservation o

LK.    Successors ............................................................................................. 6766

ARTICLE 9.    DISTRIBUTIONS UNDER THIS PLAN ........................................ 67

A.    Timing of Distributions ........................................................................ 67

B.    Reserves ................................................................................................. 6968

C.    Distribution Calculations ...................................................................... 72

D.    Payment in Full of Unsecured Claims .................................................. 74

E.    Manner of Distribution ......................................................................... 78

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| F. | De Minimis Distributions | 78 |
| G. | Delivery of Distributions | ~~79~~78 |
| H. | Undeliverable Distributions | 79 |
| I. | Setoffs and Recoupments | 79 |
| J. | Distributions in Satisfaction; Allocation | 80 |
| K. | Cancellation of Notes and Instruments | 80 |
| L. | No Interest on Claims | 81 |
| M. | Withholding Taxes | 81 |
| N. | Reports | ~~82~~81 |

ARTICLE 10.    82

| | | |
|---|---|---|
| A. | Transfer of Access Lending Stock | 82 |
| B. | The Plan Administrator | 82 |
| C. | Reimbursement of Debtors and Liquidating Trust | 82 |
| D. | Resolution of Claims and Prosecution of Access Lending Causes of Action | 83 |
| E. | Timing of Distributions on Account of Claims Against Access Lending | 83 |
| F. | Access Lending Reserves | 84 |
| G. | Dissolution of Reorganized Access Lending | 87 |
| H. | Access Lending Income; Returns | 87 |
| I. | Removal of Access Lending | 88 |

ARTICLE 11.    PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS    ~~82~~88

| | | |
|---|---|---|
| A. | Reservation of Rights to Object to Claims | ~~82~~88 |
| B. | Objections to Claims | ~~82~~89 |
| C. | Service of Objections | ~~83~~89 |
| D. | Determination of Claims | ~~83~~89 |
| ~~E.~~ E. | No Distributions Pending Allowance | ~~84~~90 |
| ~~F.~~ F. | Claim Estimation | ~~84~~90 |
| ~~G.~~ G. | Allowance of Claims Subject to Section 502 of the Bankruptcy Code | ~~85~~91 |
| H. | Goldman HC3b Claim | 91 |
| I. | Goldman AL3 Claim | 91 |
| J. | NCMC AL3 Claim | 91 |

# TABLE OF CONTENTS
### (continued)

**Page**

ARTICLE 1~~1~~2.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ ~~85~~91

    A.      Assumption of Certain Contracts and Leases and Cure Payments ........ ~~85~~91

    B.      Rejection of Remaining Executory Contracts and Unexpired Leases ... ~~85~~92

    C.      Rejection Damages Bar Date ................................................................ ~~86~~92

    D.      Insurance Policies ................................................................................ ~~86~~93

ARTICLE 1~~2~~3.   EFFECT OF CONFIRMATION AND INJUNCTION .................... ~~87~~94

    A.      Injunction ............................................................................................ ~~87~~94

    B.      Term of Injunctions ............................................................................ ~~89~~95

    ~~C.~~ C. Exculpation ............................................................................... ~~89~~96

    D.      Release of Goldman ............................................................................. 97

    ~~D.~~ E. Binding Effect of Plan .................................................................... ~~90~~97

    ~~E~~F.    No Effect on Objections to Fee Applications .................................... ~~90~~97

~~ARTICLE 13.~~ ARTICLE 14. CONDITIONS PRECEDENT ..................................... ~~90~~98

    ~~A.~~ A. Conditions Precedent to Effective Date .................................................... ~~90~~98

    ~~B.~~ B. Revocation, Withdrawal, or Non-Consummation of Plan ...................... ~~91~~99

ARTICLE ~~14.~~ 15. ...................................................... ADMINISTRATIVE PROVISIONS ~~92~~99

    A.      Retention of Jurisdiction ..................................................................... ~~92~~99

    B.      Payment of Statutory Fees .................................................................. ~~95~~102

    C.      General Authority ................................................................................ ~~95~~103

    D.      Headings .............................................................................................. ~~96~~103

    E.      Final Order .......................................................................................... ~~96~~103

    F.      Amendments and Modifications ......................................................... ~~96~~103

    G.      Payment Date ...................................................................................... ~~97~~104

    H.      Withholding and Reporting Requirements ......................................... ~~97~~104

    I.      No Waiver ........................................................................................... ~~97~~104

    J.      Tax Exemption .................................................................................... ~~97~~104

    K.      Securities Exemption ........................................................................... ~~98~~105

    L.      Non-Severability ................................................................................. ~~98~~105

    M.      Revocation .......................................................................................... ~~98~~105

    N.      Plan Controls Disclosure Statement ................................................... ~~98~~106

    O.      Governing Law .................................................................................... ~~98~~106

    P.      Notices ................................................................................................. ~~99~~106

    Q.      Filing of Additional Documents ......................................................... ~~99~~107

**TABLE OF CONTENTS**
(continued)

**Page**

R.     Direction to a Party.................................................................~~99~~107

S.     Successors and Assigns..............................................................~~100~~107

T.     Final Decree ..............................................................................~~100~~107

~~ARTICLE 15.~~ ARTICLE 16. CONFIRMATION REQUEST................................~~100~~107

~~ARTICLE 16.~~ ARTICLE 17. BANKRUPTCY RULE 9019 REQUEST AND, TO
EXTENT REQUIRED, REQUEST PURSUANT TO
BANKRUPTCY CODE SECTIONS 105(A) AND 1123(A)(5)..~~101~~108

## INTRODUCTION

New Century Financial Corporation, New Century TRS Holdings, Inc., New Century Mortgage Corporation, NC Capital Corporation, Home123 Corporation, New Century Credit Corporation, NC Asset Holding, L.P., NC Residual III Corporation, NC Residual IV Corporation, New Century R.E.O. Corporation, New Century R.E.O. II Corporation,  New Century R.E.O. III Corporation, New Century Mortgage Ventures, LLC, NC Deltex, LLC, NCoral, L.P., and New Century Warehouse Corporation, debtors and debtors in possession in the above-captioned chapter 11 cases and the Official Committee of Unsecured Creditors appointed in the above-captioned chapter 11 cases as co-proponents propose this First Amended Joint Chapter 11 Plan of Liquidation pursuant to the provisions of the Bankruptcy Code.

## ARTICLE 1.

## DEFINITIONS

A.    **Defined Terms.**

Unless otherwise provided in this Plan, all terms used herein shall have the meanings assigned to such terms in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure. For the purposes of this Plan, the following terms (which appear in this Plan in capitalized forms) shall have the meanings set forth below, and such meanings shall be equally applicable to the singular and to the plural form of the terms defined, unless the context requires otherwise.

**"510(b) Claims"** means, collectively, Series A 510(b) Claims, Series B 510(b) Claims, and Common Stock 510(b) Claims.

**"Access Lending"** means New Century Warehouse Corporation, a California corporation and a Debtor.

**"Access Lending Administrative Fund"** means the reserve established for the Reorganized Access Lending Operating Expenses and the expenses incurred in connection with the pursuit of the Access Lending Causes of Action in accordance with Article 10.F.1 herein, which reserve may be augmented by the Plan Administrator in his or her discretion.

**"Access Lending A/P/S Reserve"** means the reserve established, in accordance with Article 10.F.2 of this Plan, to pay (i) all Allowed A/P/S Claims against Access Lending to the extent such Claims are not paid on the Effective Date and (ii) any Disputed A/P/S Claim against Access Lending to the extent such Claim becomes an Allowed A/P/S Claim.

**"Access Lending Bar Date"** means, with respect to Access Lending, (i) December 14, 2007 and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Persons, including governmental units, asserting a Claim against Access Lending must have filed a Proof of Claim against Access Lending or be forever barred from asserting such Claim.

**"Access Lending Causes of Action"** means all Causes of Action, including Avoidance Actions, of Access Lending, which Causes of Action are not included within the Liquidating Trust Assets.

**"Access Lending Claims Reserve"** means the reserve established, in accordance with 10.F.3 of this Plan, to pay any Disputed Unsecured Claim against Access Lending to the extent such Claim becomes an Allowed Unsecured Claim against Access Lending.

**"Access Lending Interest"** means an Interest in Access Lending, all of which Interests are owned by TRS Holdings.

**"Access Lending Net Distributable Assets"** means the amount as calculated pursuant to Article 8.J10.F.64 of this Plan.

**"ACH"** means an automated clearing house transfer from a domestic bank.

**"Adequate Protection Proceeds"** means any funds allocated by a Final Order to be distributed to the estate of NCMC from either of two escrow accounts established pursuant to the Order Granting Adequate Protection Pursuant to Bankruptcy Code Sections 105(a), 361, 362 and 363(b)(1) and Establishing Preliminary Procedures for Resolving Certain Claims dated June 29, 2007 [Docket No. 1729] and held by Hahn & Hessen LLP, as escrow agent.

**"Administrative Claim"** means any Claim for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation:   (a) Professional Fee Claims, (b) any post-petition taxes subject to

administrative treatment, and (c) fees and charges assessed against the Debtors or the Estates pursuant to Section 1930 of title 28 of the United States Code.

**"Administrative Claim Request"** means a request for payment of an Administrative Claim (excluding Professional Fee Claims) that is to be filed with the Bankruptcy Court and served on counsel for the Plan Proponents, if on or before the Effective Date, or on the Liquidating Trustee, if after the Effective Date, and in any event by no later than the Administrative Claim Request Deadline.

**"Administrative Claim Request Deadline"** means the date set as the deadline for filing Administrative Claim Requests for Administrative Claims (excluding Professional Fee Claims) that are not subject to the Bar Date Orders, which shall be thirty (30) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

**"Administrative Fund"** means the reserve established for the Trust Operating Expenses and expenses incurred in connection with the pursuit of the Causes of Action in accordance with Article 9.B.1 herein, which reserve may be augmented by the Liquidating Trustee in consultation with the Plan Advisory Committee.

**"Allowed Claim"** or **"Allowed Interest"** means, respectively, a Claim or Interest:  (i) that has been Scheduled and (a) is not Scheduled as disputed, contingent, or unliquidated and (b) as to which no Proof of Claim has been filed;  (ii) as to which a timely Proof of Claim has been filed as of the relevant Bar Date and no objection thereto, or application to equitably subordinate or otherwise limit recovery, has been made; (iii) as to which a timely Administrative Claim Request has been filed as of the Administrative Claim Request Deadline and no objection thereto, or application to equitably subordinate or otherwise limit recovery, has been made; or (iv) that has been allowed by a Final Order; or which is allowed in the Plan; provided, however, that prior to the deadline imposed by this Plan to file objections to a given Claim, no Claim shall be treated as Allowed to the extent that it is filed by the holder of such Claim (x) in an amount greater than the amount listed for such Claim by the Debtors in their Schedules or (y) asserting a priority higher than the priority listed for such Claim by the Debtors in their Schedules.

**"Allowed [Class Designation, A/P/S, Administrative, Priority Tax, Priority, Secured, Unsecured, Other Unsecured, 510(b), or Capital Trust] Claim"** means an Allowed Claim of the specified Class or an Allowed Claim that is an A/P/S Claim, Administrative Claim, Priority Tax Claim, Priority Claim, Secured Claim, Unsecured Claim, Other Unsecured Claim, 510(b) Claim, or Capital Trust Claim.

**"Allowed [Debtor Group] Unsecured Claims"** means Unsecured Claims that are allowed against Debtors in the specified Debtor Group.

**"April Debtors Bar Date"** means with respect to all Debtors other than Access Lending (i) August 31, 2007 and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Persons, including governmental units, asserting a Claim against any Debtor(s) other than Access Lending must have filed a Proof of Claim against such Debtor(s) or be forever barred from asserting such Claim.

**"A/P/S Claim"** means any Claim that is an Administrative Claim, Priority Claim, Priority Tax Claim, or Secured Claim.

**"A/P/S Claims Reserve"** means the reserve established, in accordance with Article 9.B.2 of this Plan, to pay (i) all Allowed A/P/S Claims (other than against Access Lending) to the extent such Claims are not paid on the Effective Date and (ii) any Disputed A/P/S Claim (other than against Access Lending) to the extent such Claim becomes an Allowed A/P/S Claim.

**"Assets"** means the assets of each of the Debtors, of any nature whatsoever, including, without limitation, all property of the Estates under and pursuant to section 541 of the Bankruptcy Code, Cash, Causes of Action, rights, interests and property, real and personal, tangible and intangible, including all files, book and records of the Estates.

**"Assumption Objection Deadline"** means the date seven (7) days prior to the Confirmation Hearing.

**"Assumption Schedule"** means the schedule of Executory Contracts (not previously assumed in the Chapter 11 Cases) to be assumed by the Debtors as of the Effective Date pursuant

to this Plan, together with the amount of cure payments, if any, to be paid by the Liquidating Trustee in accordance with section 365(b)(1) of the Bankruptcy Code.

**"Avoidance Actions"** means all Claims and Causes of Action arising under sections 522, 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code.

**"Ballot"** means the form or forms distributed to each Holder of an Allowed Claim in an impaired Class entitled to vote on this Plan on which the Holder indicates acceptance or rejection of this Plan or any election for treatment of such Claim under this Plan.

**"Ballot Date"** means the date set by the Bankruptcy Court by which all Ballots must be received.

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code, as in effect on the date hereof.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware and any other court that exercises jurisdiction over the Chapter 11 Cases.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure applicable to the Chapter 11 Cases and the Local Rules of the Bankruptcy Court, each as in effect from time to time.

**"Bar Dates"** means, collectively, the Access Lending Bar Date and the April Debtors Bar Date.

**"Bar Date Orders"** means (i) the "Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form, Manner and Sufficiency Thereof" [Docket No. 1721] and (ii) the "Order Establishing Bar Dates for Filing Proofs of Claim in the Chapter 11 Case of New Century Warehouse Corporation and Approving Form, Manner and Sufficiency Thereof" dated October 23, 2007 [Docket No. 3404].

**"Business Day"** means any day except a Saturday, Sunday or a "legal holiday," as such term is defined in Bankruptcy Rule 9006(a).

**"Capital Trust Claim"** means a Claim against NCFC arising from NCFC's obligations under the Capital Trust Indentures.

"**Capital Trust Indenture**" means, collectively, (i) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of September 13, 2006 and (ii) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of November 16, 2006.

"**Cash**" means cash or cash equivalents in certified or immediately available funds, including but not limited to bank deposits, checks, and similar items.

"**Causes of Action**" means all claims, causes of action, third-party claims, counterclaims and crossclaims (including but not limited to any Causes of Action described in the Disclosure Statement) of the Debtors and/or their Estates that may be pending on the Effective Date or instituted after the Effective Date against any Person based in law, equity, or otherwise, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Confirmation Order, including Avoidance Actions; provided, however, that any affirmative defense or crossclaim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce or is offset against such Claim.

"**Chapter 11 Cases**" means the 16 above-captioned chapter 11 cases of the Debtors pending in the Bankruptcy Court and jointly administered with one another under Case No. 07-10416 (KJC).

"**Claim**" means "claim," as such term is defined in Section 101(5) of the Bankruptcy Code and, except as otherwise provided in the context, means a Claim against the Debtors or the Estates.

"**Class**" means a group of Claims or Interests as established under Article 2 of this Plan pursuant to Bankruptcy Code section 1122.

"**Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

"**Common Stock 510(b) Claim**" means any Claim (i) arising from rescission of a purchase or sale of Common Stock Interests, Option Interests, or Warrant Interests, for damages

arising from the purchase or sale of such securities, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of the same respective priority as Common Stock Interests, Option Interests, or Warrant Interests pursuant to section 510(b) of the Bankruptcy Code.

"**Common Stock Interests**" means the common stock of NCFC issued and outstanding immediately before the Effective Date.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the docket in the Chapter 11 Cases by the Bankruptcy Court.

"**Confirmation Hearing**" means the hearing pursuant to Bankruptcy Rule 3020(b) at which the Bankruptcy Court considers confirmation of this Plan, as such hearing may be continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

"**Cramdown Plan**" means this Plan if confirmed by the Bankruptcy Court pursuant to section 1129(b) of the Bankruptcy Code.

"**Creditor**" means "creditor," as such term is defined in section 101(10) of the Bankruptcy Code.

"**De Minimis Distribution**" means a distribution to be made in accordance with the terms of this Plan that is $50.00 or less.

"**Debtor Group**" means, individually or collectively, the Holding Company Debtors, the Operating Debtors, or Access Lending.

"**Debtors**" means, collectively, the following entities in existence on the Petition Date: Access Lending; Home123; NC Asset Holding; NC Capital; NC Credit; NC Deltex; NC Residual III; NC Residual IV; NCFC; NCMC; NCoral; NCM Ventures, LLC; NC R.E.O.; NC R.E.O. II; NC R.E.O. III; and TRS Holdings.

"**Determined Distribution Amount**" means the amount assigned to each Allowed Unsecured Claim, as set forth in Article 4 of this Plan and subject to the Multi-Debtor Protocol

**DRAFT**
**04/18/2008**

and Intercompany Claim Protocol, for purposes of determining distributions to be made to Holders of Allowed Unsecured Claims in accordance with the terms of this Plan.

"**Disallowed Claim**" means a Claim or any portion thereof that (i) has been disallowed by Final Order, (ii) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or Administrative Claim Request has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (iii) is not Scheduled and as to which no Proof of Claim or Administrative Claim Request has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (iv) has been withdrawn by agreement of the Debtors and the Holder thereof, or (v) has been withdrawn by the Holder thereof.

"**Disclosure Statement**" means the disclosure statement that relates to this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified, or supplemented from time to time.

"**Disputed Claim**" means a Claim or any portion thereof that is neither an Allowed Claim nor a Disallowed Claim, including without limitation all Claims that (i) have not been Scheduled by the Debtors or have been Scheduled as unknown, contingent, unliquidated, disputed, or at zero, (ii) are the subject of a Proof of Claim that differs in nature, amount, or priority from the Schedules, or (iii) are the subject of an objection filed with the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order of the Bankruptcy Court; provided however, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or a Disallowed Claim.

"**Disputed [Class Designation, A/P/S, Administrative, Priority Tax, Priority, Secured, Unsecured, Other Unsecured, or 510(b)] Claim**" means a Disputed Claim of the specified Class or a Disputed Claim that is an A/P/S Claim, Administrative Claim, Priority Tax

Claim, Priority Claim, Secured Claim, Unsecured Claim, Other Unsecured Claim, or 510(b) Claim.

**"Effective Date"** means the Business Day on which this Plan becomes effective pursuant to Article ~~13.~~14.A of this Plan; provided however, that if any stay or injunction against enforcement or execution of the Confirmation Order is issued prior to the date that would otherwise be the Effective Date, the Effective Date shall be the first Business Day after all such stays or injunctions are no longer in effect.

**"EPD/Breach Claim"** means a Claim arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of a representation or warranty under such agreement made by one or more of the Debtors or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan.

**"EPD/Breach Claim Protocol"** means the protocol, attached as Exhibit B hereto, by which the amount of damages for EPD/Breach Claims are calculated.

**"Estates"** means the estates created by the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

**"Executory Contract"** means any executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, between any Debtor and any other Person.

**"Examiner"** means Michael J. Missal, acting in his capacity as the examiner appointed in the Chapter 11 Cases by the Bankruptcy Court pursuant to section 1104(c) of the Bankruptcy Code, or such other Person, acting in such capacity, as the Bankruptcy Court may hereafter appoint.

**"Exculpated Party"** means any of the Debtors, the Liquidating Trustee (including in its capacity as Plan Administrator), the Estates, the Liquidating Trust, Reorganized Access Lending, the Committee, each of the Members of the Committee, the Indenture Trustee, the Plan Advisory Committee, and their respective officers, directors, employees, members, attorneys, crisis managers, financial advisors, and professionals, each in their respective capacities.

**"Fee Application"** means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for compensation of a Professional Fee Claim.

**"Fee Auditor"** means Warren H. Smith & Associates, P.C., acting in its capacity as the fee auditor appointed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court dated October 10, 2007 [Docket No. 3260], or such other Person, acting in such capacity, as the Bankruptcy Court may hereafter appoint.

**"Final Decree"** means the decree contemplated under Bankruptcy Rule 3022.

**"Final Order"** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, entered on the docket of the Chapter 11 Cases, that has not been reversed, rescinded, stayed, modified or amended, that is in full force and effect, and with respect to which:  (a) the time to appeal, seek review or rehearing, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; (b) any right to appeal, seek review or rehearing, or petition for certiorari has been waived in writing; or (c) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which review, rehearing or certiorari was sought.  Notwithstanding, and in lieu of the foregoing, insofar as the Confirmation Order confirming this Plan is concerned, Final Order means only such order or judgment which has been entered on the docket and as to which no stay is in effect.

**"Goldman"** means, together, GSMC and its affiliate Goldman, Sachs & Co.

**"Goldman AL3 Claim"** means any and all Claims of Goldman against Access Lending arising out of or relating to the Goldman MRA, which Claim is allowed under the Plan in Class AL3 in the amount of $9,506,754.00.

**"Goldman HC3b Claim"** means any and all Claims of Goldman against NCFC arising out of or relating to the Goldman MRA which Claim is allowed under the Plan in Class HC3b in the amount of $5,000,000.00.

**"Goldman MRA"** means the Master Repurchase Agreement dated February 15, 2006 (as amended by Amendment No. 1 dated as of October 25, 2006, Amendment No. 2. dated

November 30, 2006, and Amendment No. 3 dated as of February 7, 2007) entered into by Access Lending, GSMC, and NCFC (as guarantor), the Guaranty dated February 15, 2006 between GSMC and NCFC, as well as any other documents executed or delivered in connection therewith.

　　　**"GSMC"** means Goldman Sachs Mortgage Company.

　　　**"Holder"** means the owner or holder of any Claim or Interest.

　　　**"Holding Company Debtor Claims Reserve"** means the reserve established, in accordance with Article 9.B.3 of this Plan, to pay any Disputed Unsecured Claim against a Holding Company Debtor to the extent such Claim becomes an Allowed Unsecured Claim against a Holding Company Debtor.

　　　**"Holding Company Debtor Net Distributable Assets"** means the amount as calculated pursuant to Article 9.C.2 of this Plan.

　　　**"Holding Company Debtor Portion of Litigation Proceeds"** means 27.5% of the Litigation Proceeds.

　　　**"Holding Company Debtor Portion of the Restatement Litigation Proceeds"** means 27.5% of the Restatement Litigation Proceeds.

　　　**"Holding Company Debtors"** means, collectively, NCFC, NC Credit, NC Residual IV, and TRS Holdings.

　　　**"Home 123"** means Home123 Corporation, a California corporation and a Debtor.

　　　**"Indenture Trustee"** means Wells Fargo Bank, N.A., in its capacity as trustee of the Capital Trust Indentures.

　　　**"Indenture Trustee Expenses"** means the reasonable compensation and expenses of the Indenture Trustee, including the fees and expenses of its counsel, agents and advisers, incurred at any time prior to or subsequent to the Petition Date, and prior to or subsequent to the Effective Date; provided, however, any such fees, compensation, or expense arising subsequent to the Effective Date shall only be paid from distributions to be made on account of Capital Trust Claims and Senior Class HC3b Claims.

11　　Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

"**Intercompany Claim**" means a Claim held by a Debtor against another Debtor.

"**Intercompany Claim Protocol**" means the protocol, set forth in Article 7 of this Plan, pursuant to which each Intercompany Claim is assigned a Determined Distribution Amount, notwithstanding the treatment of the Class in which a particular Intercompany Claim is classified.

"**Interest**" means, with respect to any Debtor, any "equity interest," as such term is defined in Bankruptcy Code § 101(16).  Interests shall also include, without limitation, all stock, partnership, membership interest, warrants, options, or other rights to purchase or acquire any shares of stock in the Debtors.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**Joint Administrative Expense**" means (i) an Allowed Administrative Claim (including, without limitation, Professional Fee Claims) or portion thereof or (ii) an expense of administering the Debtors' Estates, or portion thereof, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date in the ordinary course in either case for which, as determined by the Liquidating Trustee and approved by the Plan Advisory Committee, (a) liability cannot be allocated to a particular Debtor or Debtors and (b) Debtors in more than one Debtor Group are liable.

"**Joint Administrative Expense Share**" means the share (expressed in terms of percentage) of a Joint Administrative Expense allocated to each of Access Lending, the Holding Company Debtors, and the Operating Debtors as set forth in Exhibit C to this Plan.

"**Lien**" means any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt, or litigation.

"**Liquidating Trust**" means the liquidating trust into which all of the Assets of the Debtors, other than the Assets of Access Lending, will be transferred upon the Effective Date.

**"Liquidating Trust Agreement"** means the formative trust agreement for the Liquidating Trust, to be filed by the Plan Proponents with the Bankruptcy Court at least fifteen (15) days prior to the deadline to vote to accept or reject this Plan.

**"Liquidating Trust Assets"** means the Assets of the Debtors, including Access Lending Interests but excluding the Assets of Access Lending, contributed to the Liquidating Trust.

**"Liquidating Trustee"** means the Person appointed to act as trustee of the Liquidating Trust in accordance with the terms of this Plan, the Confirmation Order, and the Liquidating Trust Agreement, or any successor appointed in accordance with the terms of this Plan and the Liquidating Trust Agreement

**"Litigation Proceeds"** means the net proceeds of all Causes of Action (other than Access Lending Causes of Action) whether from judgment, settlement, or claim on insurance, as calculated pursuant to Article 9.C.1 of this Plan and includes the Restatement Litigation Proceeds.

**"Members of the Committee"** means, individually and collectively, the Persons appointed as members of the Committee by the U.S. Trustee on April 9, 2007, each acting in its capacity as a member of the Committee.

**"Multi-Debtor Claim Protocol"** means the protocol, set forth in Article 6 of this Plan, pursuant to which a Creditor's Determined Distribution Amount is assigned where such Creditor holds Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable.

**"NC Asset Holding"** means NC Asset Holding, L.P., a Delaware limited partnership and a Debtor.

**"NC Capital"** means ~~New Century~~NC Capital ~~Services, Inc.~~Corporation, a California corporation and a Debtor.

**"NC Capital EDP/Breach Claimant Portion of Litigation Proceeds"** means 45% of the Litigation Proceeds.

**"NC Credit"** means New Century Credit Corporation, a California corporation and a Debtor.

**"NC Deltex"** means NC Deltex, LLC, a Delaware limited liability company and a Debtor.

**"NC REO"** means New Century R.E.O. Corp., a California corporation and a Debtor.

**"NC REO II"** means New Century R.E.O. II Corp., a California corporation and a Debtor.

**"NC REO III"** means New Century R.E.O. III Corp., a California corporation and a Debtor.

**"NC Residual III"** means NC Residual III Corporation, a Delaware corporation and a Debtor.

**"NC Residual IV"** means NC Residual IV Corporation, a Delaware corporation and a Debtor.

**"NCFC"** means New Century Financial Corporation, a Maryland corporation and a Debtor.

**"NCFC Interest"** means an Interest in NCFC, including Stock Interests, Option Interests, and Warrant Interests.

**"NCFC Interest Holder"** means a Holder of an NCFC Interest.

**"NCM Ventures"** means New Century Mortgage Ventures, LLC, a Delaware limited liability company and a Debtor.

**"NCMC"** means New Century Mortgage Corporation, a California corporation and a Debtor.

**"NCMC AL3 Claim"** means any and all Claims of NCMC against Access Lending, which Claim is allowed under the Plan in Class AL3 in the amount of $3,973,199.86.

**"NCoral"** means NCoral, L.P., a Delaware limited partnership and a Debtor.

**"Operating Debtor Claims Reserve"** means the reserve established, in accordance with Article 9.B.4 of this Plan, to pay any Disputed Unsecured Claim against an Operating Debtor to the extent such Claim becomes an Allowed Unsecured Claim against an Operating Debtor.

**"Operating Debtor Net Distributable Assets"** means the amount as calculated pursuant to Article 9.C.3 of this Plan.

**"Operating Debtor Portion of the Litigation Proceeds"** means 27.5% of the Litigation Proceeds.

**"Operating Debtor Portion of the Restatement Litigation Proceeds"** means 27.5% of the Restatement Litigation Proceeds.

**"Operating Debtor Unsecured Claims"** means all Unsecured Claims against Operating Debtors.

**"Operating Debtors"** means, collectively, Home 123, NC Asset Holding, NC Capital, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, NCMC, and NCoral.

**"Option Interest"** means unexercised options to purchase Common Stock Interests.

**"Other AL3 Claims"** means all Class AL3 Claims other than the Goldman AL3 Claim and the NCMC AL3 Claim.

**"Other Unsecured Claim"** means any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims.

**"Person"** means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

**"Petition Date"** means, (i) with respect to all Debtors other than Access Lending, April 2, 2007, the date on which all of the Debtors other than Access Lending commenced the Chapter 11 Cases, and (ii) with respect to Access Lending, August 3, 2007, the date on which Access Lending commenced its Chapter 11 Case.

"**Plan**" means this Joint Chapter 11 Plan of Liquidation (either in its present form or as it may be amended or modified from time to time), any exhibits hereto, and any documents incorporated herein by reference.

"**Plan Administrator**" means the Liquidating Trustee, acting in its capacity as the chief executive officer and sole director of Reorganized Access Lending and as the Person responsible for liquidating and winding down the Estate of Access Lending as set forth in Article 8.J10.B of this Plan.

"**Plan Administrator Agreement**" means the agreement setting forth the rights and duties of the Plan Administrator, to be filed by the Plan Proponents with the Bankruptcy Court no later than two (2) days prior to the Confirmation Hearing.

"**Plan Advisory Committee**" means the post-confirmation committee formed on the Effective Date and selected by the Committee in accordance with Article 8.G of this Plan.

"**Plan Proponents**" means, collectively, the Debtors and the Committee.

"**Priority Claim**" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

"**Priority Tax Claim**" means a Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

"**Professional**" means the Examiner, the Fee Auditor, or any Person employed by the Debtors, the Committee, and/or the Examiner pursuant to a Final Order in accordance with sections 327 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330, and/or 331 of the Bankruptcy Code.  This definition excludes professionals that may be selected and employed by the Liquidating Trust, the Liquidating Trustee, or the Plan Advisory Committee on and after the Effective Date with respect to services rendered by such professionals on and after the Effective Date.

"**Professional Fee Claim**" means all fees and expenses claimed by Professionals retained by the Debtors, the Committee, and/or the Examiner that have not been approved on a

final basis by a Final Order as of the Effective Date.  This definition excludes professional fees and expenses incurred by any professionals that may be selected and employed by the Liquidating Trust, the Liquidating Trustee, or the Plan Advisory Committee on and after the Effective Date.

**"Proof of Claim"** means a proof of claim filed in the Chapter 11 Cases pursuant to section 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

**"Pro Rata"** means proportionate, so that, for example, the ratio of the consideration distributed on account of the Determined Distribution Amount of an Allowed Claim to the amount of the Determined Distribution Amount of the Allowed Claim is the same as the ratio of the consideration distributed on account of all Determined Distribution Amounts of Allowed Claims in such Class of Claims to the amount of all Determined Distribution Amounts of Allowed Claims in that Class.

**"Protected Party"** means any of the ~~Debtors, the~~ Liquidating Trustee (including in its capacity as Plan Administrator), the Estates, the Liquidating Trust, Reorganized Access Lending, and the Plan Advisory Committee, each in their respective capacities.

**"Reorganized Access Lending"** means Access Lending on and after the Effective Date.

**"Reorganized Access Lending Operating Expenses"** means the expenses incurred by Reorganized Access Lending in connection with carrying out the obligations of the Plan Administrator pursuant to the terms of this Plan or the Plan Administrator Agreement, in each case with the exception of any expenses incurred in connection with the Causes of Action.

**"Restatement Litigation Proceeds"** means the portion of Litigation Proceeds that constitutes net proceeds of any recoveries realized by the Liquidating Trust on claims arising out of events or circumstances that led to the restatement of the financial statements of the Debtors or such restatement itself, as may be agreed to by the Holder of a Special Deficiency Claim and the Liquidating Trustee or determined by final order of the Bankruptcy Court.

**"Scheduled"** means, with respect to any Claim, such Claim is listed on the Schedules.

17    Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

**DRAFT**
**04/18/2008**

**"Schedules"** means the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by the Debtors with the Bankruptcy Court, pursuant to section 521(a) of the Bankruptcy Code, Bankruptcy Rule 1007(b), and the Official Bankruptcy Forms, as may be amended from time to time.

**"SEC"** means the Securities and Exchange Commission.

**"Secured Claim"** means a Claim that is secured by a valid and unavoidable lien on property in which the Estates have an interest, or that is subject to recoupment or setoff under section 553 of the Bankruptcy Code to the extent of the value of the Holder's interest in the Estates' interest in such property, or to the extent of the amount subject to recoupment or setoff, as applicable, as determined by the Bankruptcy Court pursuant to sections 506(a), 553, and/or 1129(b)(2)(A)(i)(II), as applicable.

**"Senior Class HC3b Claim"** means a Class HC3b Claim that arises from an obligation of NCFC that comes within the definition of "Senior Debt" in either of the Capital Trust Indentures.

**"Series A 510(b) Claim"** means any Claim (i) arising from rescission of a purchase or sale of Series A Preferred Stock Interests, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of junior priority to Series A Preferred Stock Interests and of senior priority to Series B Preferred Stock Interests pursuant to section 510(b) of the Bankruptcy Code.

**"Series A Preferred Stock Interests"** means the 9.125% Series A Cumulative Redeemable Preferred Stock of NCFC issued and outstanding immediately before the Effective Date.

**"Series B 510(b) Claim"** means any Claim (i) arising from rescission of a purchase or sale of Series B Preferred Stock Interests, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of junior priority

to Series B Preferred Stock Interests and of senior priority to Common Stock Interests pursuant to section 510(b) of the Bankruptcy Code.

**"Series B Preferred Stock Interests"** means the 9.75% Series B Cumulative Redeemable Preferred Stock of NCFC issued and outstanding immediately before the Effective Date.

**"Special Deficiency Claim"** means any Claim arising under a master repurchase agreement governing the sale and repurchase of mortgage loans by the Debtors to and from DB Structured Products, Inc., provided for in that certain Settlement Agreement with DB Structured Products, Inc. dated as of August 8, 2007 and approved in the "Order Approving Settlement Agreement with DB Structured Products, Inc. Pursuant to Bankruptcy Rule 9019 and Sections 105(a), 361, 363, 502 and 542 of the Bankruptcy Code" entered on August 21, 2007 [Docket No. 2369], and any other settlement agreement entered into by any of the Debtors and approved by Final Order that provides that it gives rise to a Claim that is to be treated as a Special Deficiency Claim under this Plan.

**"Stock Interests"** means Common Stock Interests, Series A Preferred Stock Interests, and Series B Preferred Stock Interests.

**"Subordination Statement"** means the pleading that a Holder of a Class HC3b Claim must file with the Bankruptcy Court no later than thirty (30) days after the Effective Date in order to assert that such Holder holds a Senior Class HC3b Claim, which pleading must describe with specificity the legal and factual basis for establishing that such Holder holds a Senior Class HC3b Claim and, therefore, is entitled to the benefits of subordination as set forth in the Capital Trust Indentures.

**"TRS Holdings"** means New Century TRS Holdings, Inc, a Delaware corporation and a Debtor.

**"Trust Operating Expenses"** means the expenses incurred by the Liquidating Trust in connection with carrying out the obligations of the Liquidating Trust pursuant to the terms of this

Plan or the Liquidating Trust Agreement, in each case with the exception of any expenses incurred in connection with the Causes of Action.

**"Unsecured Claim"** means any Claim against any Debtor that is not an Administrative Claim, a Priority Claim, a Priority Tax Claim, a Secured Claim or a 510(b) Claim, provided that Unsecured Claims shall include, without limitation, any Claim secured by an interest in property of the Estate to the extent the amount of such Claim exceeds the value, as determined by the Bankruptcy Court pursuant to sections 506(a), 553, and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, of the Holder's interest in the Estate's interest in property of the Estate securing such Claim.

**"U.S. Trustee"** means the Office of the United States Trustee.

**"Warrant Interests"** means unexercised warrants to purchase Common Stock Interests.

B.    **Other Terms.**  The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to this Plan as a whole and not to any particular article, section or clause contained in this Plan.  A reference to an "Article" refers to an Article of this Plan.  A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in or by the Bankruptcy Code.  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply in construing this Plan.

C.    **Time Periods.**  In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If any act under this Plan is required to be made or performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

D.    **Exhibits.**  All Exhibits to this Plan are incorporated by reference into and are made a part of this Plan as if set forth in full herein.

## ARTICLE 2.

## CLASSIFICATION OF CLAIMS AND INTERESTS

A.    **Summary.**   The categories of Claims and Interests listed below classify Claims (except for Administrative Claims and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to this Plan.

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| [unclassified] | Administrative and Priority Tax Claims against all Debtors. | Unimpaired - not entitled to vote |
| **Claims Against Holding Company Debtors** | | |
| Class HC1 | Class HC1 consists of Priority Claims against NCFC. | Unimpaired - not entitled to vote |
| Class HC2 | Class HC2 consists of Secured Claims against NCFC. | Unimpaired - not entitled to vote |
| Class HC3a | Class HC3a consists of Special Deficiency Claims against NCFC. | Impaired - entitled to vote |
| Class HC3b | Class HC3b consists of Other Unsecured Claims against NCFC. | Impaired - entitled to vote |
| Class HC4a | Class HC4a consists of Series A Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4b | Class HC4b consists of Series A 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4c | Class HC4c consists of Series B Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4d | Class HC4d consists of Series B 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4e | Class HC4e consists of Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC5 | Class HC5 consists of Priority Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC6 | Class HC6 consists of Secured Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC7 | Class HC7 consists of Other Unsecured Claims against TRS Holdings. | Impaired - entitled to vote |
| Class HC8 | Class HC8 consists of Priority Claims against | Unimpaired - not entitled |

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| | NC Credit. | to vote |
| Class HC9 | Class HC9 consists of Secured Claims against NC Credit. | Unimpaired - not entitled to vote |
| Class HC10a | Class HC10a consists of Special Deficiency Claims against NC Credit. | Impaired - entitled to vote |
| Class HC10b | Class HC10b consists of Other Unsecured Claims against NC Credit. | Impaired - entitled to vote |
| Class HC11 | Class HC11 consists of Priority Claims against NC Residual IV. | Unimpaired - not entitled to vote |
| Class HC12 | Class HC12 consists of Secured Claims against NC Residual IV. | Unimpaired - not entitled to vote |
| Class HC13 | Class HC13 consists of Other Unsecured Claims against NC Residual IV. | Impaired - entitled to vote |
| **Claims Against Operating Debtors** | | |
| Class OP1 | Class OP1 consists of Priority Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP2 | Class OP2 consists of Secured Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP3a | Class OP3a consists of Special Deficiency Claims against NCMC. | Impaired - entitled to vote |
| Class OP3b | Class OP3b consists of EPD/Breach Claims against NCMC. | Impaired - entitled to vote |
| Class OP3c | Class OP3c consists of Other Unsecured Claims against NCMC. | Impaired - entitled to vote |
| Class OP4 | Class OP4 consists of Priority Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP5 | Class OP5 consists of Secured Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP6a | Class OP6a consists of Special Deficiency Claims against NC Capital. | Impaired - entitled to vote |
| Class OP6b | Class OP6b consists of EPD/Breach Claims against NC Capital. | Impaired - entitled to vote |
| Class OP6c | Class OP6c consists of Other Unsecured Claims against NC Capital. | Impaired - entitled to vote |
| Class OP7 | Class OP7 consists of Priority Claims against Home123. | Unimpaired - not entitled to vote |

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Class OP8 | Class OP8 consists of Secured Claims against Home123. | Unimpaired - not entitled to vote |
| Class OP9a | Class OP9a consists of Special Deficiency Claims against Home123. | Impaired - entitled to vote |
| Class OP9b | Class OP9b consists of Other Unsecured Claims against Home123 | Impaired - entitled to vote |
| Class OP10 | Class OP10 consists of Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired - not entitled to vote |
| Class OP11 | Class OP11 consists of Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired - not entitled to vote |
| Class OP12 | Class OP12 consists of Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Impaired - entitled to vote |
| **Claims Against Access Lending** | | |
| Class AL1 | Class AL1 consists of Priority Claims against Access Lending. | Unimpaired - not entitled to vote |
| Class AL2 | Class AL2 consists of Secured Claims against Access Lending. | Unimpaired - not entitled to vote |
| Class AL3 | Class AL3 consists of Other Unsecured Claims against Access Lending. | Impaired - entitled to vote |

B.       **Classification.**   The Claims against the Debtors shall be classified as specified below (other than Administrative Claims and Priority Tax Claims, which shall be treated in accordance with Article 3 below).   Consistent with section 1122 of the Bankruptcy Code, a Claim or Interest is classified by the Plan in a particular Class only to the extent the Claim or Interest is within the description of the Class, and a Claim or Interest is classified in a different Class to the extent it is within the description of that different Class.   This Plan does not effect a substantive consolidation of the Debtors.   The classification of Claims pursuant to this Plan is as follows:

**DRAFT**
**04/18/2008**

1.      *Class HC1.*  Class HC1 consists of Priority Claims against NCFC.

2.      *Class HC2.*  Class HC2 consists of Secured Claims against NCFC.

3.      *Classes HC3a-b.*  Class HC3 consists of Unsecured Claims against NCFC, and shall be further classified in separate Classes as follows:

(a)      Class HC3a consists of Special Deficiency Claims against NCFC.

(b)      Class HC3b consists of Other Unsecured Claims against NCFC.

4.      Class HC4.  *Class HC4 consists of NCFC Interests and 510(b) Claims against NCFC, and shall be further classified in separate Classes as follows:*

(a)      Class HC4a consists of Series A Preferred Stock Interests.

(b)      Class HC4b consists of Series A 510(b) Claims.

(c)      Class HC4c consists of Series B Preferred Stock Interests.

(d)      Class HC4d consists of Series B 510(b) Claims.

(e)      Class HC4e consists of Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims.

5.      *Class HC5.*  Class HC5 consists of Priority Claims against TRS Holdings.

6.      *Class HC6.*  Class HC6 consists of Secured Claims against TRS Holdings.

7.      *Class HC7.*  Class HC7 consists of Other Unsecured Claims against TRS Holdings.

8.      *Class HC8.*  Class HC8 consists of Priority Claims against NC Credit.

9.      *Class HC9.*  Class HC9 consists of Secured Claims against NC Credit.

10.     *Classes HC10a-b.*  Class HC10 consists of Unsecured Claims against NC Credit, and shall be further classified in separate Classes as follows:

(a)      Class HC10a consists of Special Deficiency Claims against NC Credit.

(b)      Class HC10b consists of Other Unsecured Claims against NC Credit.

**DRAFT**
**04/18/2008**

11.    *Class HC11.*  Class HC11 consists of Priority Claims against NC Residual IV.

12.    *Class HC12.*  Class HC12 consists of Secured Claims against NC Residual IV.

13.    *Class HC13.*  Class HC13 consists of Other Unsecured Claims against NC Residual IV.

14.    *Class OP1.*  Class OP1 consists of Priority Claims against NCMC.

15.    *Class OP2.*  Class OP2 consists of Secured Claims against NCMC.

16.    *Classes OP3a-c.*  Class OP3 consists of Unsecured Claims against NCMC, and shall be further classified in separate Classes as follows:

(a)    Class OP3a consists of Special Deficiency Claims against NCMC.

(b)    Class OP3b consists of EPD/Breach Claims against NCMC.

(c)    Class OP3c consists of Other Unsecured Claims against NCMC.

17.    *Class OP4.*  Class OP4 consists of Priority Claims against NC Capital.

18.    *Class OP5.*  Class OP5 consists of Secured Claims against NC Capital.

19.    *Classes OP6a-c.*  Class OP6 consists of Unsecured Claims against NC Capital, and shall be further classified in separate Classes as follows:

(a)    Class OP6a consists of Special Deficiency Claims against NC Capital.

(b)    Class OP6b consists of EPD/Breach Claims against NC Capital.

(c)    Class OP6c consists of Other Unsecured Claims against NC Capital.

20.    *Class OP7.*  Class OP7 consists of Priority Claims against Home123.

21.    *Class OP8.*  Class OP8 consists of Secured Claims against Home123.

22.    *Classes OP9a-b.*  Class OP9 consists of Unsecured Claims against Home123, and shall be further classified in separate Classes as follows:

(a)    Class OP9a consists of Special Deficiency Claims against Home123.

(b)    Class OP9b consists of Other Unsecured Claims against Home123.

23.    *Class OP10.*  Class OP10 consists of Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NC Coral.

24.    *Class OP11.*  Class OP11 consists of Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NC Coral.

25.    *Class OP12.*  Class OP12 consists of Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral.

26.    *Class AL1.*    Class AL1 consists of Priority Claims against Access Lending.

27.    *Class AL2.*    Class AL2 consists of Secured Claims against Access Lending.

28.    *Class AL3.*  Class AL3 consists of Other General Claims against Access Lending.

## ARTICLE 3.

## TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under this Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article 3.

A.    **Administrative Claims.**

1.    **Non-Professional Fee Administrative Claims**.  Each Holder of an Administrative Claim (other than Professional Fee Claims) must file an Administrative

**DRAFT**
**04/18/2008**

Claim Request requesting payment of such Administrative Claim with the Bankruptcy Court by no later than thirty (30) days after the Effective Date; provided, however, that any such Administrative Claim Request need not be filed with a hearing date.  Nothing herein extends a Bar Date established in the Bar Date Orders.  The Liquidating Trustee shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the Effective Date or within thirty (30) days after such Administrative Claim becomes an Allowed Claim.  Notwithstanding anything herein to the contrary, (i) a Holder of an Allowed Administrative Claim (excluding Holders of Professional Fee Claims) may be paid on such other date or dates and upon such other terms as may be agreed upon by such Holder and the Liquidating Trustee and (ii) the Debtors (if prior to or on the Effective Date) and the Liquidating Trustee (if after the Effective Date) may pay in the ordinary course of business any expenses of administering the Debtors' estates incurred in the ordinary course of business.  Without limiting the foregoing, all outstanding fees payable to the U.S. Trustee under 28 U.S.C. § 1930 that have not been paid as of the Effective Date shall be paid by the Liquidating Trustee no later than thirty (30) days after the Effective Date or when due in the ordinary course.

2.        **Professional Fee Claims**.    The Liquidating Trustee shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from the Estates pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code, in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases, and after application of any retainer received by such Professionals.

Any final application for allowance of a Professional Fee Claim for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors and the Liquidating Trust at the addresses listed in Article ~~14~~15 of this Plan and on the Fee Auditor and the U.S. Trustee so that it is received no later than forty-five (45) days after the Effective Date, or such Professional Fee Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Liquidating Trust, Reorganized Access Lending, and their successors, their assigns, or their Assets.  Allowed Professional Fee Claims must be paid in full or reserved for in Cash to pay Professional Fee Claims pending allowance by the Bankruptcy Court prior to any payment to Holders of Allowed Unsecured Claims.

B.    **Priority Tax Claims.**  The Liquidating Trustee shall pay, at the Liquidating Trustee's discretion, each Holder of an Allowed Priority Tax Claim either (i) in full in Cash as soon as practicable after the Effective Date or within thirty (30) days after such Priority Tax Claim becomes an Allowed Claim or (ii) over a period ending not later than five (5) years after the Petition Date, with deferred Cash payments in equal amounts on a quarterly basis in an aggregate amount equal to any such Allowed Priority Tax Claim, together with interest thereon (if and so required) at the legal rate required for such Claim in chapter 11 cases.  All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.  The Liquidating Trustee may prepay any Allowed Priority Tax Claim at any time after the Effective Date without any penalty or charge.  Holders of Allowed Priority Tax Claims will not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with such Claims. Any Claim for any such penalty, or demand for any such penalty, will be deemed disallowed by confirmation of this Plan.

## ARTICLE 4.

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

As required by the Bankruptcy Code, this Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. This Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and this Plan sets forth the treatment each Class will receive.

A.      **Priority Claims Against All Debtors (Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1).**  Each of Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1, which are unimpaired, consists of all Allowed Priority Claims against a particular Debtor.  Unless the Holder of an Allowed Priority Claim and the Debtor such Claim is against (if prior to or on the Effective Date) or the Liquidating Trustee, including in its capacity as Plan Administrator, (if after the Effective Date) agree to a different treatment, the Liquidating Trustee shall pay each such Holder of an Allowed Priority Claim, in full, in Cash, without interest, as soon as practicable after the Effective Date.

B.      **Secured Claims Against All Debtors (Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2).**  Each of Classes HC2, HC6, HC9, HC10, OP2, OP5, OP8, OP11, and AL2, which are unimpaired, consists of all Allowed Secured Claims against a particular Debtor.  At the sole option of the Liquidating Trustee, (i) Allowed Secured Claims will be unaltered and, subject to the requirements of Section 1124(2) of the Bankruptcy Code, on the Effective Date, the legal, equitable, and contractual rights of the Holders of Allowed Secured Claims shall be reinstated in full, or (ii) each Holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Secured Claim (a) Cash in the amount of the Allowed Secured Claim on the later of the initial distribution date under this Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, (b) the property of the estate which constitutes collateral for such Allowed Secured Claim on the later of the initial distribution date under this Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, or (c) such other treatment as may be

agreed by the Debtor such Claim is against (if prior to or on the Effective Date) or the Liquidating Trustee, including in its capacity as Plan Administrator, (if after the Effective Date) and such Holder.

C.     **Class HC3:  Unsecured Claims Against NCFC.**

1.     **Class HC3a:  Special Deficiency Claims against NCFC**.  Class HC3a, which is impaired, consists of all Allowed Special Deficiency Claims against NCFC. Each Holder of an Allowed Class HC3a Claim shall receive its Pro Rata share, at the election of the Holder, of (i) the Holding Company Debtor Portion of the Litigation Proceeds or (ii) the Holding Company Debtor Portion of the Restatement Litigation Proceeds, in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article 4.C.1) divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC3a Claim shall be, based on the election made by the Holder of such Claim, (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Holding Company Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Holding Company Debtor Portion of the Restatement Litigation Proceeds.  The election to be made by the Holder to share in either the (i) Holding Company Debtor Portion of the Litigation Proceeds or (ii) Holding Company Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and submitted to the Liquidating Trustee on or before the Effective Date or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee.  In the event any Holder fails to make a timely election, such Holder shall be deemed to have elected to share in the Holding Company Debtor Portion of the Litigation Proceeds.

2.    **Class HC3b:  Other Unsecured Claims against NCFC.**  Class HC3b, which is impaired, consists of all Allowed Other Unsecured Claims against NCFC. Subject to Article 4.C.3 and Article 9.G of this Plan, each Holder of an Allowed Class HC3b Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, HC10b, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC3b Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol, (ii) the Intercompany Claim Protocol, and (iii) with respect to Holders of Capital Trust Claims, to Article 4.C.3 of this Plan.

3.    **Senior Claim Procedure.**

(a)    In order for any Holder of a Class HC3b Claim to assert that it holds a Senior Class HC3b Claim and, therefore, is entitled to the benefits of subordination as set forth in the Capital Trust Indentures, such Holder must file with the Bankruptcy Court and serve on the Debtors, the Holders of the Capital Trust Claims, the Liquidating Trustee, and the Indenture Trustee a Subordination Statement no later than thirty (30) days after the Effective Date.

(b)    If any Holder of a Class HC3b Claim files a Subordination Statement, any distributions that would otherwise be made on account of Allowed Capital Trust Claims in accordance with Article 9 of this Plan shall be turned over to a reserve to be held by the Liquidating Trustee (the "Senior/Sub Reserve") in a separate interest bearing account and to be distributed in accordance with this Article 4.C.3; provided, however, that prior to turning over any such distributions to a reserve the Senior/Sub Reserve, the Liquidating Trustee shall first pay to the Indenture Trustee out of such distributions the

**DRAFT
04/18/2008**

~~balance of any reasonable fees and expenses of the Indenture Trustee which fees and expenses~~ (i) the balance of any Indenture Trustee Expenses previously incurred, plus (ii) the amount of $100,000 to be held by the Indenture Trustee in reserve (the "Future Expense Reserve") for payment of future Indenture Trustee Expenses, all of which Indenture Trustee Expenses are subject to the Indenture Trustee's charging lien. The Future Expense Reserve shall only be funded from any distributions that would otherwise be made on account of Allowed Capital Trust Claims and not from any other Assets. In the event the amount of future Indenture Trustee Expenses exceeds $100,000 and the Future Expense Reserve is depleted, the Liquidating Trustee shall pay out of the Senior/Sub Reserve to the Indenture Trustee any such additional Indenture Trustee Expenses that may be incurred from time to time, upon receipt of one or more invoices from the Indenture Trustee.  Except as previously agreed to by the Committee, in no event shall the Indenture Trustee Expenses be paid from any Assets except from the Senior/Sub Reserve, the Future Expense Reserve and from any distributions that would otherwise be made on account of Allowed Capital Trust Claims. All amounts owing to the Indenture Trustee for its Indenture Trustee Expenses or payable to the Future Expense Reserve shall be paid prior to any distribution to any Holder of a Senior Class HC3b Claim and prior to any distribution to any Holder of a Capital Trust Claim, due to its Indenture Trustee charging lien.  Upon the earlier of the (i) termination of the Indenture Trustee's role in these (or related) proceedings and (ii) final distribution to Holders of Capital Trust Claims, any amounts remaining in the Future Expense Reserve shall be paid into the Senior/Sub Reserve for distribution in accordance with this Article. No distributions shall be made ~~from this reserve~~to any Holder of a Senior Class HC3b Claim or Holder of a Capital Trust Claim from the Senior/Sub Reserve until, with respect to each Subordination Statement, (i) the Bankruptcy Court has made a determination as to whether and to what extent the Holder of a Class HC3b Claim that filed the Subordination Statement holds a Senior Class HC3b Claim or (ii) the Holders

of Allowed Capital Trust Claims and the Holder of a Class HC3b Claim that filed the Subordination Statement reach and obtain approval of a settlement as set forth in Article 4.C.3.d hereof. If no Holder of a Class HC3b Claim timely files and serves a Subordination Statement or, with respect to each timely filed Subordination Statement either (i) the Bankruptcy Court determines that the Holder of a Class HC3b Claim that filed a Subordination Statement does not hold a Senior Class HC3b Claim or (ii) such Holder withdraws its Subordination Statement pursuant to settlement (or otherwise), distributions shall be made to the Indenture Trustee for the account of Holders of Allowed Capital Trust Claims along with other Holders of Allowed Class HC3b Claims in accordance with this Plan's treatment of Allowed Class HC3b Claims, but subject to the Indenture Trustee's charging lien for payment of its Indenture Trustee Expenses.

(c)    If the Bankruptcy Court finds that any Holder of a Class HC3b Claim holds a Senior Class HC3b Claim, and such finding becomes a final non-appealable order, then (i) Holders of Allowed Capital Trust Claims shall receive no distribution from the reserveSenior/Sub Reserve on account of their Allowed Capital Trust Claims unless and until all Holders of Senior Class HC3b Claims are paid in full on account of their Senior Class HC3b Claims and (ii) Holders of Senior Class HC3b Claims shall receive Pro Rata distributions from the amounts held in reservethe Senior/Sub Reserve until they are paid in full. If a Debtor(s) other than NCFC is jointly and/or severally liable with NCFC for the amount of a Senior Class HC3b Claim and the Holder of a Senior Class HC3b Claim holds an Allowed Unsecured Claim(s) against such Debtor(s) in respect of such liability, any distribution that the Holder receives on account of such Claims shall be included in determining whether the Holder's Senior Class HC3b Claim has been paid in full. If a Senior Class HC3b Claim has been paid in full, any distributions from the reserveSenior/Sub Reserve that would have been paid on account of such Claim shall be paid Pro Rata to Holders of Senior Class HC3b Claims, if any, that remain unpaid. If all Holders of Senior Class HC3b Claims (if any) have been paid

in full on account of their Senior Class HC3b Claims, (i) any additional amounts distributed to Holders of Allowed Class HC3b Claims shall be distributed to the Indenture Trustee for the account of Holders of Allowed Capital Trust Claims on account of their Capital Trust Claims in accordance with this Plan's treatment of Allowed Class HC3b Claims, but subject to the Indenture Trustee's charging lien for payment of its Indenture Trustee Expenses, and (ii) Holders of Allowed Capital Trust Claims shall be subrogated to the distributions that the Holders of Senior Class HC3b Claims would have received on account of their Allowed Unsecured Claims against the Debtors if such Holder's Senior Class HC3b Claims had not been paid in full.

(d)     Alternatively, if the Holders of Allowed Capital Trust Claims and the Holder(s) of Class HC3b Claims (if any) that file Subordination Statements reach a settlement of the disputes raised in the Subordination Statements, the Holders of Allowed Capital Trust Claims (or the Indenture Trustee) shall file with the Bankruptcy Court and serve on the Debtors and the Liquidating Trustee a notice of settlement that is executed by the Holders of Allowed Capital Trust Claims and the settling Holder(s) of Class HC3b Claims that filed Subordination Statements.  Such settlement notice shall list the proposed Class HC3b Claim amounts (if any) for each of the signatories.  If no written objection to the notice is filed within 10 calendar days after the notice is served, the Bankruptcy Court shall approve and allow the Class HC3b Claims in the amounts proposed in the notice, provided that such settlement shall not operate to increase the amount of any Senior Class HC3b Claim unless it correspondingly reduces the amount of the Allowed Capital Trust Claim.  If any Holder of a Class HC3b Claim asserts that it holds a Senior Class HC3b Claim, the Indenture Trustee shall be authorized, but not required, to litigatione and/or settle such asserted Claim, on behalf of the Holders of Capital Trust Claims.  The foregoing, however, shall not in any way limit or impair the right of the Holders of Capital Trust Claims to litigate and/or settle such Claims on their own, with or without the participation of the Indenture Trustee.

**DRAFT**
**04/18/2008**

D.      **Class 4:  NCFC Interests.**

1.      **Class HC4a:  Series A Preferred Stock Interests**.  Class HC4a, which is impaired, consists of all Series A Preferred Stock Interests.  Holders of Interests in Class HC4a shall receive no distribution or dividend on account of such Interests.  Subject to the provisions of Article 9.K herein, the entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all shares of Series A Preferred Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Series A Preferred Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

2.      **Class HC4b:  Series A 510(b) Claims.**  Class HC4b, which is impaired, consists of all Series A 510(b) Claims.  Holders of Claims in Class HC4b shall receive no distribution on account of such Claims under this Plan.

3.      **Class HC4c:  Series B Preferred Stock Interests.**  Class HC4c, which is impaired, consists of all Series B Preferred Stock Interests.  Holders of Interests in Class HC4c shall receive no distribution or dividend on account of such Interests.  Subject to the provisions of Article 9.K herein, the entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all shares of Series B Preferred Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Series B Preferred Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

4.      **Class HC4d:  Series B 510(b) Claims.**  Class HC4d, which is impaired, consists of all Series B 510(b) Claims.  Holders of Claims in Class HC4d shall receive no distribution on account of such Claims under this Plan.

5.      **Class HC4e:  Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims.**  Class HC4e, which is impaired, consists of all Common Stock Interests, all Option Interests, all Warrant Interests, and all Common Stock 510(b) Claims.  Holders of Interests or Claims in Class HC4e shall

receive no distribution or dividend on account of such Interests or Claims.  Subject to the provisions of Article 9.K herein, the entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all shares of Common Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Common Stock Interests) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

E.     **Class HC7:  Other Unsecured Claims against TRS Holdings.**  Class HC7, which is impaired, consists of all Allowed Other Unsecured Claims against TRS Holdings.  Each Holder of an Allowed Class HC7 Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, HC10b, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC7 Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

F.     **Class HC10:  Unsecured Claims Against NC Credit.**

1.     **Class HC10a:  Special Deficiency Claims against NC Credit.**  Class HC10a, which is impaired, consists of all Allowed Special Deficiency Claims against NC Credit.  Each Holder of an Allowed Class HC10a Claim shall receive its Pro Rata share, at the election of the Holder, of (i) the Holding Company Debtor Portion of the Litigation Proceeds or (ii) the Holding Company Debtor Portion of the Restatement Litigation Proceeds, in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article 4.F.1) divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC10a Claim shall be, based

on the election made by the Holder of such Claim, (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Holding Company Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Holding Company Debtor Portion of the Restatement Litigation Proceeds.  The election to be made by the Holder to share in either the (i) Holding Company Debtor Portion of the Litigation Proceeds or (ii) Holding Company Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and submitted to the Liquidating Trustee on or before the Effective Date or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee.  In the event any Holder fails to make a timely election, such Holder shall be deemed to have elected to share in the Holding Company Debtor Portion of the Litigation Proceeds.

2.    **Class HC10b:  Other Unsecured Claims against NC Credit.**  Class HC10b, which is impaired, consists of all Allowed Other Unsecured Claims against NC Credit.  Each Holder of an Allowed Class HC10b Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, HC10b, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC10b Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

G.    **Class HC13:  Other Unsecured Claims against NC Residual IV.**  Class HC13, which is impaired, consists of all Allowed Other Unsecured Claims against NC Residual IV.

**DRAFT**
**04/18/2008**

Each Holder of an Allowed Class HC13 Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, HC10, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, HC10b, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC13 Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

> H.     **Class OP3:  Unsecured Claims Against NCMC.**

> 1.     **Class OP3a:  Special Deficiency Claims against NCMC.**  Class OP3a, which is impaired, consists of all Allowed Special Deficiency Claims against NCMC. Each Holder of an Allowed Class OP3a Claim shall receive its Pro Rata share, at the election of the Holder, of (i) the Operating Debtor Portion of the Litigation Proceeds or (ii) the Operating Debtor Portion of the Restatement Litigation Proceeds, in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article IV.4.H.1) divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims.  The Determined Distribution Amount for each Allowed Class OP3a Claim shall be, based on the election made by the Holder of such Claim, (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Restatement Litigation Proceeds.  The election to be made by the Holder to share in either the (i) Operating Debtor Portion of the Litigation Proceeds or (ii) Operating Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and

submitted to the Liquidating Trustee on or before the Effective Date or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee. In the event any Holder fails to make a timely election, such Holder shall be deemed to have elected to share in the Operating Debtor Portion of the Litigation Proceeds.

2.      **Class OP3b:  EPD/Breach Claims against NCMC.**  Class OP3b, which is impaired, consists of all Allowed EPD Breach Claims against NCMC.  Each Holder of an Allowed Class OP3b Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims.  The Determined Distribution Amount of each Allowed Class OP3b Claim shall be 100% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol.

3.      **Class OP3c: Other Unsecured Claims against NCMC.**  Class OP3c, which is impaired, consists of all Allowed Other Unsecured Claims against NCMC. Each Holder of an Allowed Class OP3c Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims.  The Determined Distribution Amount

for each Allowed Class OP3c Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

I.        **Class OP6:  Unsecured Claims Against NC Capital.**

1.        **Class OP6a:  Special Deficiency Claims against NC Capital.**  Class OP6a, which is impaired, consists of all Allowed Special Deficiency Claims against NC Capital.  Each Holder of an Allowed Class OP6a Claim shall receive its Pro Rata share, at the election of the Holder, of (i) the Operating Debtor Portion of the Litigation Proceeds or (ii) the Operating Debtor Portion of the Restatement Litigation Proceeds, in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article ~~IV.~~4.I.1) divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims.   The Determined Distribution Amount for each Allowed Class OP6a Claim shall be, based on the election made by the Holder of such Claim, (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Restatement Litigation Proceeds.  The election to be made by the Holder to share in either the (i) Operating Debtor Portion of the Litigation Proceeds or (ii) Operating Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and submitted to the Liquidating Trustee on or before the Effective Date or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee.  In the event any Holder fails to make a timely election, such Holder shall be deemed to have elected to share in the Operating Debtor Portion of the Litigation Proceeds.

2.        **Class OP6b:  EPD/Breach Claims against NC Capital.**  Class OP6b, which is impaired, consists of all Allowed EPD Breach Claims against NC Capital.  Each Holder of an Allowed Class OP6b Claim shall receive (i) its Pro Rata share of the NC

Capital EPD/Breach Claimant Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount of each Allowed Class OP6b Claim shall be 100% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol for purposes of receiving a Pro Rata share of the NC Capital EPD/Breach Claimant Portion of the Litigation Proceeds and shall be 50% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol for purposes of receiving a distribution of its Pro Rata share of the Operating Debtor Net Distributable Assets.

3.     **Class OP6c: Other Unsecured Claims against NC Capital.**  Class OP6c, which is impaired, consists of all Allowed Other Unsecured Claims against NC Capital.  Each Holder of an Allowed Class OP6c Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims.  The Determined Distribution Amount for each Allowed Class OP6c Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

J.     **Class OP9:  Unsecured Claims Against Home123.**

1.      **Class OP9a:  Special Deficiency Claims against Home123.**  Class OP9a, which is impaired, consists of all Allowed Special Deficiency Claims against Home123. Each Holder of an Allowed Class OP9a Claim shall receive its Pro Rata share, at the election of the Holder, of (i) the Operating Debtor Portion of the Litigation Proceeds or (ii) the Operating Debtor Portion of the Restatement Litigation Proceeds, in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article IV.4.J.1) divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims.   The Determined Distribution Amount for each Allowed Class OP9a Claim shall be, based on the election made by the Holder of such Claim, (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Restatement Litigation Proceeds.  The election to be made by the Holder to share in either the (i) Operating Debtor Portion of the Litigation Proceeds or (ii) Operating Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and submitted to the Liquidating Trustee on or before the Effective Date or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee.  In the event any Holder fails to make a timely election, such Holder shall be deemed to have elected to share in the Operating Debtor Portion of the Litigation Proceeds.

2.      **Class OP9b: Other Unsecured Claims against Home123.**  Class OP9b, which is impaired, consists of all Allowed Other Unsecured Claims against Home123. Each Holder of an Allowed Class OP9b Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b

Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount for each Allowed Class OP9b Claim shall be 25% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

K.      **Class OP12: Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral.** Class OP12, which is impaired, consists of all Allowed Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. Each Holder of an Allowed Class OP12 Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount for each Allowed Class OP12 Claim shall be 25% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

L.      **Class AL3: Other Unsecured Claims Against Access Lending.** Class AL3, which is impaired, consists of all Allowed Other Unsecured Claims against Access Lending. Each Holder of an Allowed Class AL3 Claim shall receive its Pro Rata share of the Access Lending Net Distributable Assets, based on Allowed Class AL3 Claims subject to the following adjustments: (i) until Holders of Allowed Other AL3 Claims and the Holder of the Goldman AL3 Claim receive Cash equal to 30% of the allowed amounts of their Class AL3 Claims on account of such Claims, the Holder of the NCMC AL3 Claim shall receive Pro Rata distributions

**DRAFT**
**04/18/2008**

as though the NCMC AL3 Claim was an Allowed Class AL3 Claim in the amount of $2,383,919.92, and (ii) after Holders of Allowed Other AL3 Claims and the Holder of the Goldman AL3 Claim have received Cash equal to 30% of the allowed amount of their Class AL3 Claims on account of such Claims, the NCMC AL3 Claim shall receive Pro Rata distributions based on the NCMC AL3 Claim being an Allowed Class AL3 Claim in the amount of $3,973,199.86, and no further distributions shall be made to the Holder of the Goldman AL3 Claim on account of such Claim.   The Multi-Debtor Protocol and the Intercompany Claim Protocol do not apply to Class AL3 Claims.

## ARTICLE 5.

## ACCEPTANCE OR REJECTION OF THIS PLAN

A.    **Impaired Classes of Claims Entitled to Vote.**  Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on this Plan, the Classes set forth in the following table are impaired and shall be entitled to vote to accept or reject this Plan:

| Class | Description |
|---|---|
| Class HC3a | Special Deficiency Claims against NCFC |
| Class HC3b | Other Unsecured Claims Against NCFC |
| Class HC7 | Other Unsecured Claims Against TRS Holdings |
| Class HC10a | Special Deficiency Claims against NC Credit |
| Class HC10b | Other Unsecured Claims against NC Credit |
| Class HC13 | Other Unsecured Claims against NC Residual IV |
| Class OP3a | Special Deficiency Claims against NCMC |
| Class OP3b | EPD/Breach Claims against NCMC |
| Class OP3c | Other Unsecured Claims against NCMC |
| Class OP6a | Special Deficiency Claims against NC Capital |
| Class OP6b | EPD/Breach Claims against NC Capital |
| Class OP6c | Other Unsecured Claims against NC Capital |
| Class OP9a | Special Deficiency Claims against Home123 |
| Class OP9b | Other Unsecured Claims against Home123 |

| Class | Description |
|---|---|
| Class OP12 | Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL3 | Other Unsecured Claims against Access Lending |

Each of Classes HC3a, HC3b, HC10a, HC10b, OP3a, OP3b, OP3c, OP6a, OP6b, OP6c, OP9a, and OP9b, shall be considered a separate Class for purposes of voting to accept or reject this Plan. If and to the extent any Class identified as being unimpaired is impaired (whether as a result of the terms of this Plan or any modification or amendment thereto), such Class shall be entitled to vote to accept or reject this Plan.

B.      **Classes Deemed to Accept this Plan.**  The Classes set forth in the following table are unimpaired and shall be deemed to accept this Plan:

| Class | Description |
|---|---|
| Class HC1 | Priority Claims against NCFC |
| Class HC2 | Secured Claims against NCFC |
| Class HC5 | Priority Claims against TRS Holdings |
| Class HC6 | Secured Claims against TRS Holdings |
| Class HC8 | Priority Claims against NC Credit |
| Class HC9 | Secured Claims against NC Credit |
| Class HC11 | Priority Claims against NC Residual IV |
| Class HC12 | Secured Claims against NC Residual IV |
| Class OP1 | Priority Claims against NCMC |
| Class OP2 | Secured Claims against NCMC |
| Class OP4 | Priority Claims against NC Capital |
| Class OP5 | Secured Claims against NC Capital |
| Class OP7 | Priority Claims against Home123 |
| Class OP8 | Secured Claims against Home123 |
| Class OP10 | Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |

45      Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

| Class | Description |
|---|---|
| Class OP11 | Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL1 | Priority Claims against Access Lending |
| Class AL2 | Secured Claims against Access Lending |

Pursuant to sections 1126(f) of the Bankruptcy Code, Classes HC1, HC2, HC5, HC6, HC8, HC9, HC11, HC12, OP1, OP2, OP4, OP5, OP7, OP8, OP10, OP11, AL1, and AL2 are conclusively presumed to have accepted this Plan, and the votes of Holders of Claims in such Classes therefore will not be solicited.

C.    **Classes Deemed to Reject this Plan.**  Holders of Claims in the Classes set forth in the following table are not entitled to receive or retain any property under this Plan on account of such Claims and Interests:

| Class | Description |
|---|---|
| Class HC4a | Series A Preferred Stock Interests |
| Class HC4b | Series A 510(b) Claims |
| Class HC4c | Series B Preferred Stock Interests |
| Class HC4d | Series B 510(b) Claims |
| Class HC4e | Common Stock Interests and Common Stock 510(b) Claims |

Pursuant to section 1126(g) of the Bankruptcy Code, Classes HC4a, HC4b, HC4c, HC4d, and HC4e are impaired and are conclusively presumed to have rejected this Plan, and the votes of Holders of Claims and Interests in such Classes therefore will not be solicited.

D.    **Nonconsensual Confirmation.**    As set forth in Article ~~15~~16 hereof, if any impaired Class fails to accept this Plan, the Plan Proponents intend to request that the Bankruptcy Court confirm this Plan as a Cramdown Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to that Class.

E.    **Removal of Debtors.**  If this Plan cannot be confirmed with respect to one or more Debtors, the Plan Proponents may remove such Debtor(s) from this Plan.  In such event,

the Classes pertaining to such Debtor(s) shall be removed from this Plan, and the Plan shall omit any treatment of the assets and liabilities of such Debtor(s).  The removal of any Debtor from this Plan shall not affect this Plan with respect to any other Debtor except as set forth in Article 8.J.710.I of this Plan.

**ARTICLE 6.**

**THE MULTI-DEBTOR CLAIM PROTOCOL FOR**

**TREATMENT OF CLAIMS AGAINST MULTIPLE DEBTORS**

A.      **Allowed Unsecured Claims for Which More than One Holding Company Debtor Is Jointly and/or Severally Liable.**  Where a Creditor holds Allowed Holding Company Debtor Unsecured Claims for which more than one Holding Company Debtor is jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of one of its Allowed Holding Company Debtor Unsecured Claims in the amount of the highest Determined Distribution Amount provided for in the Classes in which the Creditor's Allowed Holding Company Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims; provided however, that where a Creditor holds Allowed Holding Company Debtor Unsecured Claims, other than Allowed Class HC3a Claims and Allowed Class HC10a Claims, for which both NCFC and NC Credit are jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of its Allowed Unsecured Claim against NCFC of 130% of the amount of such Allowed Unsecured Claim and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims.

B.      **Allowed Unsecured Claims for Which More than One Operating Debtor Is Jointly and/or Severally Liable.**  Where a Creditor holds Allowed Operating Debtor Unsecured Claims for which more than one Operating Debtor is jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of one its Allowed Operating Debtor Unsecured Claims in the amount of the highest Determined Distribution

Amount provided for in the Classes in which the Creditor's Allowed Operating Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Operating Debtor Unsecured Claims; provided however, that where a Creditor holds Allowed Operating Debtor Unsecured Claims, other than Allowed Class OP3a Claims, Allowed OP6a Claims, and Allowed Class OP9a Claims, for which each of NCMC, NC Capital, and Home123 are jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of its Allowed Unsecured Claim against NCMC of 130% of the amount of such Allowed Unsecured Claim and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Operating Debtor Unsecured Claims.

C.    **Separate Application to Debtor Groups.**    The adjustment of Determined Distribution Amounts of a particular Creditor's Allowed Unsecured Claims against Debtors in one Debtor Group pursuant to Articles 6.A and 6.B of this Plan does not affect the Determined Distribution Amounts of such Creditor's Allowed Unsecured Claims, if any, against Debtors in another Debtor Group.

D.    **Inapplicable to Claims Against Access Lending.**    The Multi-Debtor Claim Protocol does not apply to Claims against Access Lending.

E.    **Inapplicable to Intercompany Claims.**    The Multi-Debtor Claim Protocol does not apply to Intercompany Claims.

**ARTICLE 7.**

**THE INTERCOMPANY PROTOCOL FOR**

**TREATMENT OF INTERCOMPANY CLAIMS**

A.    **Claims of Holding Company Debtors Against Other Holding Company Debtors.**    The Determined Distribution Amount for each Allowed Claim held by a Holding Company Debtor against another Holding Company Debtor shall be 0% of the allowed amount of such Claim and, therefore, no distribution will be made under this Plan on account of such Claim.

B.       **Claims of Operating Debtors Against Other Operating Debtors.**   The Determined Distribution Amount for each Allowed Claim held by an Operating Debtor against another Operating Debtor shall be 0% of the allowed amount of such Claim and, therefore, no distribution will be made under this Plan on account of such Claim.

C.       **Claims of Holding Company Debtors Against Operating Debtors.**   The Determined Distribution Amount for each Allowed Claim held by a Holding Company Debtor against an Operating Debtor shall be 50% of the allowed amount of such Claim; provided, however, that any recovery on an Allowed Claim held by a Holding Company Debtor against an Operating Debtor shall be limited to the amount that would be distributed on account of such Claim if the Determined Distribution Amounts for Allowed Claims in Classes OP6b, OP9b, and OP12 were 100% of the allowed amount of Claims in those Classes.

D.       **Claims of Operating Debtors Against Holding Company Debtors.**   The Determined Distribution Amount for each Allowed Claim held by an Operating Debtor against a Holding Company Debtor shall be 100% of the allowed amount of such Claim.

## ARTICLE 8.

## MEANS OF IMPLEMENTING THIS PLAN

A.       **Implementation of Joint Plan.**   The Plan Proponents propose that the Plan be implemented and consummated through the means contemplated by sections 1123(a)(5)(B), (D), (E), (F) and (G) and 1123(b)(2), (b)(3) and (b)(4) of the Bankruptcy Code on and after the Effective Date.

B.       **Corporate Action.**   On the Effective Date, the matters under this Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to this Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors or

their subsidiaries.  The officers and directors of the Debtors shall cease to serve immediately after the Effective Date.

C.       **Dissolution of Debtors Other than Access Lending.**  Immediately after the Effective Date, the Liquidating Trustee shall be authorized to take, in his sole and absolute discretion, all actions reasonably necessary to dissolve the Debtors (other than Access Lending) and their subsidiaries under applicable laws, including without limitation under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation; provided, however, (i) after all distributions have been made to Holders of Allowed Claims against NCFC, the Liquidating Trustee shall file a certificate of dissolution in the applicable state of incorporation for NCFC and NCFC shall dissolve and cease to exist; (ii) that the Liquidating Trustee shall not be compelled to dissolve any of the Debtors (other than NCFC) or their subsidiaries if to do so would unduly burden the Liquidating Trust; and (iii) no assets shall revest in the Debtors (other than Access Lending).  Other than with respect to NCFC, which shall be dissolved as set forth in this Article 8.C, the Liquidating Trustee shall have no liability for using his discretion to dissolve or not dissolve any of the Debtors or their subsidiaries.  Whether or not dissolved, immediately after the Effective Date, the Debtors shall have no authorization to implement the provisions of this Plan, unless specifically provided for in the Plan.

D.       **Dissolution of the Committee.**  On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms and such parties shall continue to have a right to be heard with respect to any and all (i) applications for Professional Fee Claims; (ii) requests for compensation and reimbursement of expenses pursuant

to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iii) any motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order.

E.    **Vesting of Assets in Liquidating Trust; Assumption of Plan Obligations.**

1.    *Distribution to Liquidating Trust.*    On the Effective Date, the Debtors other than Access Lending shall distribute and shall be deemed for all purposes to have distributed all Assets of the Debtors, including Access Lending Interests but excluding the Assets of Access Lending, for the benefit of the Holders of Holding Company Debtor Unsecured Claims and for the benefit of the Holders of Operating Debtor Unsecured Claims, whether or not such Claims are Allowed Claims as of the Effective Date, to the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets, the Debtors shall have no further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

2.    *Transfer of Assets.*    On the Effective Date, the Liquidating Trust Assets, as described in paragraph (E)(1) above, will be conveyed directly by the Debtors other than Access Lending to the Liquidating Trust on behalf of the beneficiaries thereof.

3.    *Assumption of Plan Obligations.*    On the Effective Date, all of the Debtors' rights and obligations with respect to each A/P/S Claim (other than A/P/S Claims against Access Lending) and all other rights and obligations of the Debtors (other than Access Lending) under this Plan shall be assigned to and assumed by the Liquidating Trust.

4.    *Treatment of Transfer of Assets.*    For federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims) shall treat the transfer of the Liquidating Trust Assets, which term, for purposes of this Article 8.E.4 only, shall include the Causes of Action (other than Access Lending Causes of Action), to the Liquidating Trust, in accordance with the terms

of this Plan, as a transfer to the Holders of the Unsecured Claims that have a beneficial interest in the Liquidating Trust, with the Holders of Unsecured Claims against the Holding Company Debtors and Holders of Unsecured Claims against the Operating Debtors in accordance with Article 8.E.1 above, as:

(a)    first, a transfer of such Assets to the Holders of Holding Company Debtor Unsecured Claims and Holders of Operating Debtor Unsecured Claims, whether or not such Claims are Allowed as of the Effective Date, with each such Holder receiving an undivided interest in the Liquidating Trust Assets attributable to their respective Debtor Groups, followed by a transfer of the Liquidating Trust Assets by such Holders to the Liquidating Trust, and the beneficiaries of the Liquidating Trust specific Assets, the liquidation proceeds of which such Holder is entitled to share in pursuant to Article 4 of this Plan, having a value that equals, as nearly as possible, the amount such Holder would receive if, on the Effective Date, all Disputed Claims are treated as Allowed Claims, and all Assets are liquidated, converted to cash and distributed to Holders of Allowed Unsecured Claims in accordance with the Plan; and

(b)    second, a transfer to the Liquidating Trust by each such Holder of the undivided interest in that portion of the Liquidating Trust Assets such Holder was deemed to receive pursuant to subparagraph (a), above, in exchange for a beneficial interest in the Liquidating Trust.  Each such Holder, as a holder of a beneficial interest in the Liquidating Trust, shall be treated as the grantors and owners of such beneficiaries' respective grantor and owner of the undivided interest of that portion of the Liquidating Trust. Assets such Holder was deemed to transfer to the Liquidating Trust pursuant to this subparagraph (b).

F.    **Liquidating Trust.**

1.    *Formation of Liquidating Trust.*  On or prior to the Effective Date, the Liquidating Trust shall be formed.  The Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims shall be the sole

beneficiaries of the Liquidating Trust.  Holders of Unsecured Claims against Access Lending shall not be beneficiaries of the Liquidating Trust.

2.      *Liquidating Trust Agreement.*  The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Liquidating Trustee and to ensure the treatment of the Liquidating Trust as a liquidating trust for federal income tax purposes.  In the event a provision of this Plan or the Confirmation Order conflicts with a provision of the Liquidating Trust Agreement, the provision of the Liquidation Trust Agreement shall control.

3.      *Appointment of the Liquidating Trustee.*

(a)      No later than ten (10) days prior to the deadline to vote to accept or reject this Plan, the Plan Proponents will file the Liquidating Trust Agreement with the Bankruptcy Court, which Liquidating Trust Agreement shall identify the Liquidating Trustee. The Liquidating Trustee shall be appointed by the Bankruptcy Court in the Confirmation Order and shall commence serving as the Liquidating Trustee on the Effective Date; provided, however, that the party appointed as Liquidating Trustee shall be permitted to act in accordance with the terms of the Liquidating Trust Agreement from the Confirmation Date (or such earlier date as authorized by the Committee) through the Effective Date and shall be entitled to seek compensation in accordance with the terms of the Liquidating Trust Agreement and this Plan.

(b)      The Liquidating Trustee shall be deemed the Estates' representative (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in this Plan and the Liquidating Trust Agreement, including, without

limitation, the powers of a trustee under sections 704, 108 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including without limitation, commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

(c)        The Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced against the Liquidating Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Liquidating Trustee in any forum other than the Bankruptcy Court.

(d)        The Liquidating Trustee shall at all times maintain a bond acceptable to the Plan Advisory Committee and approved by the Bankruptcy Court.

4.        *Term and Compensation of the Liquidating Trustee.*

(a)        The Liquidating Trustee shall initially be compensated as set forth in the Liquidating Trust Agreement (which compensation may be revised by the Liquidating Trust with the consent of the Plan Advisory Committee) and shall not be required to file a fee application to receive compensation.  The Liquidating Trustee's compensation shall, however, be subject to the review and, if appropriate, objection of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement.

(b)        The Liquidating Trustee may be removed or replaced at any time by the Plan Advisory Committee in accordance with the procedures in the Liquidating Trust Agreement.  In the event of the death or incompetency (in the case of a Liquidating Trustee that is a natural person), dissolution (in the case of a

Liquidating Trustee that is a corporation or other entity), bankruptcy, insolvency, resignation, or removal of the Liquidating Trustee, the Plan Advisory Committee shall have the authority to appoint a successor trustee as set forth in the Liquidating Trust Agreement.

5.      *Liquidation of Liquidating Trust Assets; Responsibilities of Liquidating Trustee.*

(a)      The Liquidating Trustee shall be vested with the rights, powers and benefits set forth in the Liquidating Trust Agreement.  The Liquidating Trustee shall be subject to the directions of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement.  Notwithstanding anything to the contrary contained in this Plan or the Confirmation Order, any act by the Liquidating Trustee, including discretionary acts, will require the consent of or consultation with the Plan Advisory Committee in accordance with the terms of the Liquidating Trust Agreement.  If there is any inconsistency or ambiguity in the Plan, Confirmation Order or the Liquidating Trust Agreement in respect of the Plan Advisory Committee's role in the Liquidating Trustee's authority to act, the provision of the Liquidating Trust Agreement shall control.

(b)      The Liquidating Trustee, in its reasonable business judgment, and in an expeditious but orderly manner, shall liquidate and convert to cash the Liquidating Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidating Trust.  The liquidation of the Liquidating Trust Assets may be accomplished either through the sale of Liquidating Trust Assets (in whole or in combination), including the sale of Causes of Action, or through prosecution or settlement of any Causes of Action, or otherwise.

(c)      The Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) shall be expressly authorized to do the following:

(i)    prosecute, collect, compromise and settle any Causes of Actions in accordance herewith and without further approval of or application to the Bankruptcy Court, except as otherwise provided herein;

(ii)    file, prosecute, compromise and settle objections to Claims without further approval of or application to the Bankruptcy Court, except as otherwise provided herein;

(iii)    open and maintain bank accounts in the name of the Liquidating Trust, draw checks and drafts thereon by the sole signature of the Liquidating Trustee, and terminate such accounts as the Liquidating Trustee deems appropriate;

(iv)    execute any documents, pleadings, and take any other actions related to, or in connection with, the liquidation of the Assets and the exercise of the Liquidation Trustee's powers granted herein, including, but not limited to the exercise of the Debtors' or the Committee's respective rights to conduct discovery and oral examination of any party under Rule 2004 of the Federal Rules of Bankruptcy Procedure;

(v)    hold legal title to any and all rights of the beneficiaries in or arising from the Assets, including but not limited to, the right to vote any claim or interest in an unrelated case under the Bankruptcy Code and receive any distribution thereon;

(vi)    protect and enforce the rights to the Assets vested in the Liquidating Trustee by this Plan by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(vii)    deliver distributions as may be authorized by this Plan;

(viii)    file, if necessary, any and all tax returns with respect to the Liquidating Trust, pay taxes, if any, properly payable by the Liquidating Trust, and make distributions to the beneficiaries net of such taxes, and comply with the requirements of Article 4 hereof;

(ix)    make all necessary filings in accordance with any applicable law, statute or regulation;

(x)    determine and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

(xi)    invest moneys received by the Liquidating Trust or otherwise held by the Liquidating Trust in accordance with Article 8.F.8 of this Plan;

(xii)    in the event that the Liquidating Trustee determines that the beneficiaries or the Liquidating Trust may, will or have become subject to adverse tax consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences;

(xii)    (xiii) utilize the Liquidating Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs necessary or advisable to insure the acts and omissions of the Liquidating Trustee, the Plan Advisory Committee and the members of the Plan Advisory Committee; and

(xiii)    (xiv) prepare and report telephonically, and if requested by the Plan Advisory Committee, in writing or in person, a monthly report of the status of the process of winding down the Estates including Causes of Action.

(d)    The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for

all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

6.      *Valuation of Assets.*   As soon as ~~possible~~practicable after the Effective Date~~(i)~~, the Liquidating Trustee shall ~~determine~~make a good faith determination of the fair market value~~, as of the Effective Date,~~ of the Liquidating Trust Assets ~~based on a good faith determination, and (ii) the Liquidating Trustee shall apprise the Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims in writing of such valuation (and indicate in such writing each Holder's percentage ownership interest in the Liquidating Trust based on each such Holder's relative beneficial interest in the Liquidating Trust or portion thereof as of the Effective Date). The~~. This valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Holders of Holding Company Debtor Unsecured Claims and the Holders of Operating Debtor Unsecured Claims) for all federal income tax purposes.

7.      *Payments by the Liquidating Trust.*   The Liquidating Trust shall make distributions to Holders of Allowed Claims in accordance with Article 9 of this Plan.

8.      *Investment Powers of the Liquidating Trustee and Permitted Cash Expenditures.*   All funds held by the Liquidating Trustee shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Liquidating Trust Agreement; provided, however, that the right and power of the Liquidating Trustee to invest Liquidating Trust Assets, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power that a liquidating trust is permitted to exercise pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.   The Liquidating Trustee may expend the cash of the Liquidating Trust (x) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Liquidating Trust

**DRAFT**
**04/18/2008**

during liquidation, (y) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidating Trust) and (z) to satisfy other respective liabilities incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement.

        9.      *Reporting Duties.*

        (a)      Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trustee shall also send to each holder of a beneficial interest in the Liquidating Trust an annual statement setting forth the holder's share of items of income, gain, loss, deduction or credit and provide to all such holders information for reporting such items on their federal income tax returns, as appropriate.

        (b)      Allocations of Liquidating Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the beneficial interests in the Liquidating Trust (treating any holder of a Disputed Claim, for this purpose, as a current holder of a beneficial interest in the Liquidating Trust entitled to distributions), taking into account all prior and concurrent distributions from the Liquidating Trust (including all distributions held in reserve pending the resolution of Disputed Claims). Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne

    Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

**DRAFT**
**04/18/2008**

immediately after a liquidating distribution of the remaining Liquidating Trust Assets. For this purpose, the tax book value of the Liquidating Trust Assets shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)      The Liquidating Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

10.      *Registry of Beneficial Interests.*  To evidence each holder's beneficial interests in the Liquidating Trust, the Liquidating Trustee shall maintain a registry of holders.

11.      *Non-Transferable.*  Upon issuance thereof, interests in the Liquidating Trust shall be non-transferable, except with respect to a transfer by will or under the laws of descent and distribution. Any such transfer, however, shall not be effective until and unless the Liquidating Trustee receives written notice of such transfer.

12.      *Termination.*  The Liquidating Trust shall terminate after its liquidation, administration and distribution of the Liquidating Trust Assets in accordance with this Plan and its full performance of all other duties and functions set forth herein or in its Liquidating Trust Agreement. The Liquidating Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that, within a period of six (6) months prior to such termination date, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust if it is necessary to facilitate or complete the liquidation of the Liquidating Trust Assets administered by the Liquidating Trust. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months prior to the expiration of each extended term; provided, however, that the aggregate of all such

extensions shall not exceed three (3) years, unless the Liquidating Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

13. *Purpose of the Liquidating Trust.* The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Subject to definitive guidance from the IRS, all parties shall treat the Liquidating Trust as a liquidating trust for all federal income tax purposes. The Liquidating Trust shall not be deemed to be the same legal entity as any of the Debtors, but only the assignee of the assets and liabilities of the Debtors and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code. Neither the Liquidating Trust nor any portion thereof, nor any reserve, account or fund established by this Plan shall be treated as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9(b)(1).

G.    **Plan Advisory Committee.**

1. *Appointment.* On the Effective Date, the Plan Advisory Committee shall be deemed appointed and shall adopt bylaws to govern the actions of the Plan Advisory Committee.

2. *Membership.* The Plan Advisory Committee shall consist of up to five (5) members of the Committee chosen from those members of the Committee that notify counsel to the Committee in writing no later than fifteen (15) days prior to the deadline to vote to accept or reject this Plan of their intention to serve on the Plan Advisory Committee. In the event that less than five (5) of the members of the Committee notify counsel to the Committee of their intent to serve on the Plan Advisory Committee within fifteen (15) days prior to the deadline to vote to accept or reject this Plan, then the

Committee will choose from among the Holders of Unsecured Claims to fill any vacancy until five (5) members have been designated, and the Committee shall use reasonable efforts to maintain the same composition of membership as existed on the Committee. Unless and until such vacancy is filled, the Plan Advisory Committee shall function with such reduced membership.  In the event of the resignation of a member of the Plan Advisory Committee, the remaining members shall use reasonable efforts to designate a successor from among the Holders of Unsecured Claims and shall use reasonable efforts to maintain such composition of membership as existed prior to resignation.  Unless and until such vacancy is filled, the Plan Advisory Committee shall function in the interim with such reduced membership.

3.      *Fiduciary Duties.*    The fiduciary duties, as well as the privileges, immunities, and protections, that applied to the Committee prior to the Effective Date shall apply to the Plan Advisory Committee.  The duties and powers of the Plan Advisory Committee shall terminate upon the termination of the Liquidating Trust.

4.      *Rights and Duties.*  The Plan Advisory Committee's role shall be to advise and approve the actions of the Liquidating Trustee as more particularly set forth in the Liquidating Trust Agreement.  The Plan Advisory Committee shall have the rights and duties set forth in the Liquidating Trust Agreement, including without limitation:

(a)      to terminate the Liquidating Trustee with or without cause and upon such termination or upon the resignation, death, incapacity or removal of the Liquidating Trustee, to appoint a successor Liquidating Trustee; provided, that the Plan Advisory Committee shall file with the Bankruptcy Court a notice appointing such successor trustee;

(b)      to approve any release or indemnity in favor of any third party granted or agreed to by the Liquidating Trustee other than as set forth in the Plan;

Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

**DRAFT**
**04/18/2008**

(c)    to authorize the Liquidating Trustee to commence or continue to prosecute any Cause of Action including, in the Liquidating Trustee's capacity as Plan Administrator, any Access Lending Cause of Action;

(d)    to approve the settlement of any Cause of Action if the amount sought to be recovered by the Liquidating Trustee in the complaint or other document initiating or evidencing such Cause of Action exceeds $100,000;

(e)    to approve the allowance of any Disputed Claim if the final allowed amount of such Claim exceeds $50,000;

(f)    to approve the sale of any Assets by the Liquidating Trustee;

(g)    with respect to each six month period, to approve any budget for the Administrative Fund prepared by the Liquidating Trustee in respect of the Trust Operating Expenses and in connection with Causes of Action and to approve any additional funding of the Administrative Fund;

(h)    in addition to the mandatory distributions required under the Plan, to approve the making of interim distributions if such distributions are warranted and economical;

(i)    to review and object to fees and expenses of professionals retained by the Liquidating Trust; and

(j)    to approve of any investment of Cash or other Liquidating Trust Assets pending distributions to holders of the beneficial interests.

5.    *No Compensation.*  Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Plan Advisory Committee, including reasonable attorneys fees subject to a cap to be established by the Plan Advisory Committee in its discretion, the members of the Plan Advisory Committee shall serve without compensation.  Reasonable expenses, as set forth in this Article 8.G.5, incurred by members of the Plan Advisory Committee may be paid by the Liquidating Trust without need for approval of the Bankruptcy Court.

**DRAFT**
**04/18/2008**

6.    *Objection to Fees.*  The Plan Advisory Committee shall have thirty (30) days, or such other period as determined by the Plan Advisory Committee and the Liquidating Trustee, from the delivery of a fee statement to object to the fees of any professional retained by either the Liquidating Trust or the Plan Advisory Committee by giving notice of any such objection to the professional seeking compensation or reimbursement.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved fifteen (15) days after it is made shall be submitted to the Bankruptcy Court for resolution.  The uncontested portion of each invoice shall be paid within forty (40) days after its delivery to the Plan Advisory Committee and the Liquidating Trustee.

H.    **Liability, Indemnification.**  Neither the Liquidating Trustee (including in its capacity as Plan Administrator), the Plan Advisory Committee, their respective members, designees or professionals, or any duly designated agent or representative of the Liquidating Trustee or the Plan Advisory Committee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of such Liquidating Trustee or Plan Advisory Committee, nor shall such Liquidating Trustee (including in its capacity as Plan Administrator), or any member of the Plan Advisory Committee, be liable for any act or omission taken or omitted to be taken in its capacity as Liquidating Trustee or Plan Administrator, or as a member of the Plan Advisory Committee, respectively, other than for specific acts or omissions resulting from such Liquidating Trustee's or such member's willful misconduct, gross negligence or fraud.  The Liquidating Trustee (including in its capacity as Plan Administrator), or the Plan Advisory Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Liquidating Trustee (including in its capacity as Plan Administrator) or the Plan Advisory

Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidating Trustee (including in its capacity as Plan Administrator) or Plan Advisory Committee or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud.  The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee and Plan Advisory Committee and its members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence, or fraud.

      I.      **Retention of Professionals.**

          1.      Liquidating Trust Professionals.

             (a)      The Liquidating Trustee may retain professionals, including but not limited to, counsel, accountants, investment advisors, auditors, professionals from the Liquidating Trustee's own firm, and other agents on behalf of the Liquidating Trust as necessary or desirable to carry out the obligations of the Liquidating Trustee hereunder and under the Liquidating Trust Agreement. More specifically, the Liquidating Trustee may retain counsel in any matter related to its administration, including counsel that has acted as counsel for the Debtors, the Committee, or any of the individual members of the Committee in the Chapter 11 Cases.

(b)    Prior to the Effective Date, the Committee shall approve a budget for the six (6) month period beginning on the Effective Date, on a professional-by-professional basis, for professional fees for services to be rendered to the Liquidating Trust, which budget may be altered from time to time by the Plan Advisory Committee in accordance with the Liquidating Trust Agreement provided that any fees and expenses of professionals retained by the Liquidating Trust that have been incurred prior to the date of the modification of the budget shall constitute budgeted amounts.  Except with respect to services rendered and expenses incurred in connection with Fee Applications pending on the Effective Date or filed after the Effective Date, the Professionals retained by the Debtors or the Committee shall only be entitled to compensation for services performed and expenses incurred after the Effective Date to the extent, if any, of the amount budgeted for each respective Professional.  Following the Effective Date, the Liquidating Trustee may pay, without application to the Bankruptcy Court or any other court of competent jurisdiction, such professionals retained by the Liquidating Trust in accordance with agreements that the Liquidating Trustee determines to be reasonable. The Plan Advisory Committee shall approve in advance the Liquidating Trustee's retention of professionals and their compensation arrangements.

2.    *Plan Advisory Committee Professionals.*  The Plan Advisory Committee shall have the right to retain counsel of its choice in the event of a dispute or conflict with the Liquidating Trustee or for other purposes set forth in the Liquidating Trust Agreement and the reasonable fees and expenses of such counsel shall be paid by the Liquidating Trust.

J.    **Access Lending.**

1.    *Transfer of Access Lending Stock.*  On the Effective Date, pursuant to Article 8.E of the Plan, TRS Holdings shall distribute the stock of Access Lending to the

Liquidating Trust, which shall become the sole shareholder of Reorganized Access Lending.

2.    *The Plan Administrator.*    The Liquidating Trustee shall act as Plan Administrator with respect to Reorganized Access Lending and, in such capacity, shall have entered into a Plan Administrator employment agreement to be filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing.  The initial Plan Administrator, and each successor Plan Administrator, shall serve until the earlier of (i) the dissolution of Reorganized Access Lending or (ii) such Plan Administrator's resignation, death, incapacity, removal or termination.  Upon the occurrence of the Effective Date, the articles of incorporation of Access Lending shall be amended to provide that Plan Administrator shall be the chief executive officer and sole director of Reorganized Access Lending.  In such capacity, the Plan Administrator shall have all necessary and appropriate power to act for, on behalf of and in the name of Reorganized Access Lending, with the same power and effect as if each of his or her actions in furtherance of his or her duties as a responsible person and as a board appointed officer and shareholder appointed director of Reorganized Access Lending were explicitly authorized by the appropriate board of directors or shareholders.  In its capacity as Plan Administrator, the Liquidating Trustee shall take such actions as are in the best interests of Reorganized Access Lending.

3.    *Resolution of Claims and Prosecution of Access Lending Causes of Action.*    The Liquidating Trustee, as Plan Administrator, shall resolve all Disputed Claims against Access Lending as soon as practicable following the Effective Date and shall have the right to prosecute all Access Lending Causes of Action.  The Liquidating Trustee, acting as Plan Administrator, shall pay all Allowed A/P/S Claims against Access Lending as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.  Upon resolution of all Disputed Unsecured Claims against Access Lending and all Access Lending Causes of Action, the

Liquidating Trustee, as Plan Administrator, shall pay all the Allowed Unsecured Claims against Access Lending from the Access Lending Net Distributable Assets in accordance with Article 8.J.6 of the Plan.

4. *Dissolution of Reorganized Access Lending.* After all distributions have been made to Holders of Allowed Claims against Access Lending have been paid, the Liquidating Trustee, acting as Plan Administrator, shall file a certificate of dissolution in the applicable state of incorporation for Reorganized Access Lending, and Reorganized Access Lending shall dissolve and cease to exist. Any remaining Assets of Reorganized Access Lending shall be distributed to the Liquidating Trust as sole shareholder in a liquidating distribution, and shall become Liquidating Trust Assets that may be distributed pursuant to the terms of this Plan.

5. *Access Lending Income; Returns.* Any income earned by the Assets of Reorganized Access Lending is attributable to Access Lending and not to the Liquidating Trust or its beneficiaries. The Liquidating Trustee, acting as Plan Administrator, shall make and file, if necessary, any and all tax returns for Reorganized Access Lending with respect to such taxable income, and shall pay taxes, if any, properly payable by Access Lending from Reorganized Access Lending's Assets. The Liquidating Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to Reorganized Access Lending that are required by any governmental unit or the Plan Advisory Committee.

6. *Calculation of Access Lending Net Distributable Assets.* The Access Lending Net Distributable Assets shall be calculated by deducting from the gross amount available from the liquidation of Reorganized Access Lending's Assets and the prosecution of the Access Lending Causes of Action: (i) the amount of all Allowed A/P/S Claims allowed against Access Lending and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estate of Access Lending, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid

by the Debtors on or before the Effective Date in the ordinary course, (iii) the Joint Administrative Expense Share of Access Lending paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, (iv) any taxes paid by the Liquidating Trustee from Reorganized Access Lending's Assets pursuant to Article 8.J.5 of the Plan, (v) any costs incurred in connection with the prosecution of the Access Lending Causes of Action, and (vi) any expenses incurred by the Plan Administrator in connection with performing its duties under this Plan.

7.    *Removal of Access Lending.*  If this Plan cannot be confirmed with respect to Access Lending, the Plan Proponents may remove Access Lending from this Plan.  In such event, the Classes pertaining to Access Lending shall be removed from this Plan, and the Plan shall omit any treatment of the assets and liabilities of Access Lending.  The removal of Access Lending from this Plan shall not affect this Plan with respect to any other Debtor, except with respect to allocation of Joint Administrative Expense Shares as set forth on Exhibit C to this Plan.

J.    K.**Preservation of All Causes of Action.**  Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) shall be vested with, retain, and may exclusively enforce and prosecute any claims or Causes of Action that the Debtors or the Estates may have against any Person or entity.  The Liquidating Trustee may pursue such retained claims (other than those of Access Lending) or Causes of Action (other than Access Lending Causes of Action) in accordance with the best interests of the creditors of Debtors other than Access Lending, the Estates (other than the Estate of Access Lending), or the Liquidating Trust.  The Plan Administrator may pursue such retained claims of Access Lending or Access Lending Causes of Action in accordance with the best interests of the creditors of Access Lending, the Estate of Access Lending, or Reorganized Access Lending.

K.    ~~L.~~ **Successors.**  The Liquidating Trust shall be the successor to the Debtors (other than Access Lending) for the purposes of sections 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Causes of Action and other litigation-related matters.  The Liquidating Trust shall succeed to the attorney-client privilege of the Debtors (other than Access Lending) with respect to all Causes of Action (other than Access Lending Causes of Action) and other litigation-related matters, and the Liquidating Trustee may waive the attorney-client privilege with respect to any Cause of Action or other litigation-related matter, or portion thereof, in the Liquidating Trustee's discretion.  Reorganized Access Lending shall be the successor to Access Lending for the purposes of sections 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Access Lending Causes of Action and other litigation-related matters.  Reorganized Access Lending shall succeed to the attorney-client privilege of Access Lending with respect to all Access Lending Causes of Action and other litigation-related matters, and the Liquidating Trustee, it its capacity as Plan Administrator, may waive the attorney-client privilege with respect to any Access Lending Causes of Action or other litigation-related matter, or portion thereof, in the Liquidating Trustee's discretion.

### ARTICLE 9.

### ~~ARTICLE 9.~~

### DISTRIBUTIONS UNDER THIS PLAN

A.    **Timing of Distributions.**

1.    *Distributions on Account of Allowed A/P/S Claims.*  The Liquidating Trustee shall pay any Allowed A/P/S Claim against Debtors other than Access Lending from the Liquidating Trust Assets, except as otherwise provided in this Plan, as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

2.    *Interim Distributions on Account of Allowed Unsecured Claims.*  Subject to approval of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement and pursuant to the calculations set forth in Article 9.C of this Plan, (a) the

Liquidating Trustee shall make an interim distribution at least annually of its net income and the net proceeds from the sale of Liquidating Trust Assets provided that any such distribution is not unduly burdensome to the Liquidating Trust, and (b) shall have the right to make more frequent interim distributions, to Holders of Allowed Holding Company Debtor Unsecured Claims and Holders of Allowed Operating Debtor Unsecured Claims if the Liquidating Trustee determines that such interim distributions are warranted and economical; provided, however, that any such distribution shall only be made if (i) the Administrative Fund and the A/P/S Claims Reserve are fully funded; (ii) with respect to interim distributions to Holders of Allowed Unsecured Claims against Holding Company Debtors, the Holding Company Debtor Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; (iii) with respect to interim distributions to Holders of Allowed Unsecured Claims against Operating Debtors, the Operating Debtor Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; and (iv) the Liquidating Trustee retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Liquidating Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement.  This provision shall be interpreted to be consistent with Revenue Procedure 94-45 § 3.10.

3.      *Final Distributions on Allowed Unsecured Claims.*  Notwithstanding anything else in this Plan, upon the settlement and satisfaction of all A/P/S Claims, the settlement and satisfaction of all Claims against Access Lending, the dissolution of Reorganized Access Lending and the distribution in liquidation of all remaining Assets of Reorganized Access Lending to the Liquidating Trust, the completion of the prosecution and/or settlement of all objections to all other Claims and the Causes of Action, and the completion of the sale and/or liquidation of all Assets, the Liquidating Trustee shall

distribute, as soon as practicable, all remaining Liquidating Trust Assets pursuant to the terms of this Plan using the calculations set forth in Article 9.C of this Plan.

B.     **Reserves.**

1.     *Administrative Fund.*  On the Effective Date, the Liquidating Trustee shall establish the Administrative Fund.  The initial amount of the Administrative Fund shall be based on the Liquidating Trustee's good faith estimate of the cost necessary to complete the Liquidating Trust's obligations under this Plan and the Liquidating Trust Agreement and will include the amount budgeted for the Liquidating Trust's professionals pursuant to Article 8.I.1 of this Plan.  The Liquidating Trust shall pay all costs and expenses related to carrying out its obligations under this Plan and the Liquidating Trust Agreement from the Administrative Fund and, in the Liquidating Trustee's discretion, and with approval of the Plan Advisory Committee, may add additional amounts to the Administrative Fund to prosecute the Causes of Action (other than Access Lending Causes of Action) or for administration and other miscellaneous needs of the Liquidating Trusts without further notice or motion in accordance with the terms of the Liquidating Trust Agreement.

2.     *A/P/S Claims Reserve.*  On the Effective Date, the Liquidating Trustee shall establish the A/P/S Claims Reserve for all A/P/S Claims that are Disputed A/P/S Claims or Allowed A/P/S Claims that are not paid on the Effective Date, provided, however, that none of the provisions in this Article 9.B.2 apply to A/P/S Claims against Access Lending.  The amount reserved for each Disputed Administrative Claim and each Allowed Administrative Claim that is not paid on the Effective Date shall be based upon the Administrative Claim being in the lower of (i) the amount set forth in the Administrative Claim Request filed by the Holder of such Claim, or if no Administrative Claim Request has been Filed, the amount set forth for such Claim in the Debtors' books and records, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.11.F of this Plan; provided,

however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be jointly and/or severally liable, the Liquidating Trustee shall contribute to the A/P/S Reserve on account of only one such Claim.  The amount reserved for a Disputed Priority Tax Claim, Disputed Priority Claim, or Disputed Secured Claim or for an Allowed Priority Tax Claim, Allowed Priority Claim, or Allowed Secured Claim that is not paid on the Effective Date shall be based upon such Claim being in the lower of (i) the amount set forth in the Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.11.F of this Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be jointly and/or severally liable, the Liquidating Trustee shall contribute to the A/P/S Reserve on account of only one such Claim.  As soon as practicable after (and to the extent) that a Disputed A/P/S Claim becomes an Allowed A/P/S Claim, the Liquidating Trustee shall make a payment from the A/P/S Claims Reserve to the Holder of such Claim based on the Allowed amount of such Claim.  After (and to the extent) a Disputed A/P/S Claim or a Disallowed Claim is determined not to be an A/P/S Claim, the portion of the A/P/S Claims Reserve reserved for such Claim shall be released from the A/P/S Claims Reserve and shall be distributed pursuant to the terms of this Plan.  Any amount remaining in the A/P/S Claims Reserve following the final disposition of all A/P/S Claims shall be released from the A/P/S Claims Reserve and shall be distributed pursuant to the terms of this Plan.

      3.    *Holding Company Debtor Claims Reserve.*  On the Effective Date, the Liquidating Trustee shall establish the Holding Company Debtor Claims Reserve.  With respect to any interim distribution made to Holders of Allowed Holding Company Debtor Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any

**DRAFT**
**04/18/2008**

Holding Company Debtor shall be the amount that would be distributed on account of such Claim if it was an Allowed Holding Company Debtor Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.11.F of this Plan. As soon as practicable after (and to the extent) that a Disputed Unsecured Claim against a Holding Company Debtor becomes an Allowed Unsecured Claim against such Holding Company Debtor, the Liquidating Trustee shall make a payment, subject to the Multi-Debtor Claim Protocol, from the Holding Company Debtor Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the Holding Company Debtor Claims Reserve. After (and to the extent) a Disputed Unsecured Claim against a Holding Company Debtor becomes a Disallowed Claim, the portion of the Holding Company Debtor Claims Reserve reserved for such Claim shall be released from the Holding Company Debtor Claims Reserve and shall be distributed pursuant to the terms of this Plan. Any amount remaining in the Holding Company Debtor Claims Reserve following the final disposition of all Disputed Unsecured Claims against Holding Company Debtors shall be released from the Holding Company Debtor Claims Reserve and shall be distributed pursuant to the terms of this Plan.

4.      *Operating Debtor Claims Reserve.*  On the Effective Date, the Liquidating Trustee shall establish the Operating Debtor Claims Reserve.  With respect to any interim distribution made to Holders of Allowed Operating Debtor Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Operating Debtor shall be the amount that would be distributed on account of such Claim if it was an Allowed Operating Debtor Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim and (ii) the

estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 10.11.F of this Plan. As soon as practicable after (and to the extent) that a Disputed Unsecured Claim against an Operating Debtor becomes an Allowed Unsecured Claim against such Operating Debtor, the Liquidating Trustee shall make a payment, subject to the Multi-Debtor Claim Protocol, from the Operating Debtor Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the Operating Debtor Claims Reserve. After (and to the extent) a Disputed Unsecured Claim against an Operating Debtor becomes a Disallowed Claim, the portion of the Operating Debtor Claims Reserve reserved for such Claim shall be released from the Operating Debtor Claims Reserve and shall be distributed pursuant to the terms of this Plan.  Any amount remaining in the Operating Debtor Claims Reserve following the final disposition of all Disputed Unsecured Claims against Operating Debtors shall be released from the Operating Debtor Claims Reserve and shall be distributed pursuant to the terms of this Plan.

C.      **Distribution Calculations.**

1.      *Calculation of Litigation Proceeds.*  The Litigation Proceeds shall be calculated by deducting all expenses related to any Causes of Action (other than Access Lending Causes of Action) including, but not limited to, fees and costs of attorneys, other professionals, and expert witnesses, and all expenses incurred in the pursuit of such Causes of Action, as determined by the Liquidating Trustee, from the proceeds of all Causes of Action (other than Access Lending Causes of Action) whether from judgment, settlement, or claim on insurance.  The Holding Company Debtor Portion of Litigation Proceeds is 27.5% of the Litigation Proceeds.   The Operating Debtor Portion of Litigation Proceeds is 27.5% of the Litigation Proceeds.  The NC Capital EPD/Breach Claimant Portion of Litigation Proceeds is 45% of the Litigation Proceeds.

2.      *Calculation of Holding Company Debtor Net Distributable Assets.*  The Holding Company Debtor Net Distributable Assets shall be calculated by deducting from the gross amount (other than Litigation Proceeds) available from the liquidation of the Holding Company Debtors' Assets:  (i)  the amount of all Allowed A/P/S Claims allowed against or allocated by the Liquidating Trustee to the Holding Company Debtors and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estates of the Holding Company Debtors, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date in the ordinary course, (iii) the Joint Administrative Expense Share of the Holding Company Debtors paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, and (iv) the Holding Company Debtors' proportionate share of the Trust Operating Expenses as determined by the Liquidating Trustee.

3.      *Calculation of Operating Debtor Net Distributable Assets.*  The Operating Debtor Net Distributable Assets shall be calculated by deducting from the gross amount available from the liquidation of the Operating Debtors' Assets, which gross amount shall include the Adequate Protection Proceeds but exclude the Litigation Proceeds:  (i)  the amount of all Allowed A/P/S Claims allowed against or allocated by the Liquidating Trustee to the Operating Debtors and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estates of the Operating Debtors, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors on or before the Effective Date, (iii) the Joint Administrative Expense Share of the Operating Debtors paid by the Debtors prior to or on the Effective Date or by the Liquidating Trustee after the Effective Date, and (iv) the Operating Debtors' proportionate share of the expenses of the Trust Operating Expenses as determined by the Liquidating Trustee.

4.      *Calculation of Interim Distributions.*   Subject to the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol:

(a)      the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against Holding Company Debtors up to the amount of the Holding Company Debtor Net Distributable Assets (calculated as of the date of the interim distribution in accordance with Article 9.C.2 of this Plan) plus the Holding Company Debtor Portion of the Litigation Proceeds less the amount required (i) to be contributed in respect of such distribution to the Holding Company Debtor Claims Reserve pursuant to Article 9.B.3 of this Plan and (ii) to fully fund the Holding Company Debtors' proportionate share of the Administrative Fund and the A/P/S Claims Reserve; and

(b)      the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against Operating Debtors up to the amount of the Operating Net Distributable Assets (calculated as of the date of the interim distribution in accordance with Article 9.C.3 of this Plan) plus the Operating Debtor Portion of the Litigation Proceeds less the amount required (i) to be contributed in respect of such distribution to the Operating Debtor Claims Reserve pursuant to Article 9.B.4 of this Plan and (ii) to fully fund the Operating Debtors' proportionate share of the Administrative Fund and the A/P/S Claims Reserve.

D.      **Payment in Full of Unsecured Claims.**

1.      *Limitation on Distributions on Account of Allowed Unsecured Claims.* Notwithstanding the Determined Distribution Amounts assigned to Allowed Unsecured Claims pursuant to Articles 4, 6, and/or 7 of this Plan, any Allowed Unsecured Claim is paid in full under this Plan at such time as the Holder of such Allowed Unsecured Claim has been paid the allowed amount of such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy

Court); provided, however, that where a Creditor holds Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable, such Creditor is not entitled to receive distributions under this Plan in excess of the amount of the Debtors' joint and/or several liability in respect of such Claims plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court), and the Creditor's Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable shall be deemed paid in full at such time as the Creditor has been paid the allowed amount of one such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court).

2.      *Payment of Interest on Allowed Unsecured Claims.* Notwithstanding the Determined Distribution Amounts assigned to Allowed Unsecured Claims pursuant to Articles 4, 6, and/or 7 of this Plan, (i) if, and only if, all Holders of Allowed Unsecured Claims against the Holding Company Debtors and all Holders of Allowed Unsecured Claims against Operating Debtors have been paid 100% of the amount of their Allowed Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of the Holding Company Debtors and the Operating Debtors and (ii) if, and only if, all Holders of Allowed Unsecured Claims against Access Lending have been paid 100% of the amount of their Allowed Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of Access Lending;  provided, however; that with respect to Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable, interest is payable on such Claims pursuant to the terms of this Article 9.D.2 based on the allowed amount of the joint and/or several liability fixed by such Claims.

Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

3.      *Payment in Full of Allowed Unsecured Claims for Which Debtors in More than One Debtor Group Are Jointly and/or Severally Liable.*  To the extent a Holder of Allowed Unsecured Claims for which Debtors in more than one Debtor Group are jointly and/or severally liable is paid 100% of the allowed amount of the joint and/or several liability fixed by such Claims through interim distributions, the Liquidating Trustee shall retain any further interim distributions that would be made on account of such Claims (giving effect, if applicable, to the Multi-Debtor Claim Protocol) as if only Debtors within a single Debtor Group were liable for such Claim until the Liquidating Trustee makes a final distribution under this Plan.  Prior to making a final distribution under this Plan, the Liquidating Trustee shall determine, with respect to every Allowed Unsecured Claim for which Debtors in more than one Debtor Group are jointly and/or severally liable that has been paid 100% of the allowed amount of the joint and/or several liability fixed by such Claim, the amount of distributions in respect of such Claim made on account of Debtors within each Debtor Group.  The Liquidating Trustee shall reallocate the excess distributions, if any, that it has retained to be included in the appropriate Debtor Group's Assets based on the relative distributions made to Claims in each Debtor Group on account of such joint and/or several liability.

4.      *Payment in Full of All Allowed Holding Company Debtor Unsecured Claims.*  If, in accordance with the terms of this Plan, all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid 100% of the allowed amount of their Allowed Holding Company Debtor Unsecured Claims, any remaining amount of the Holding Company Debtor Net Distributable Assets or the Holding Company Debtor Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol to Holders of Allowed Operating Debtor Unsecured Claims on account of such Claims. After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in

accordance with Article 9.D.1 and 9.D.2 hereof, any remaining amount of the Holding Company Debtor Net Distributable Assets or the Holding Company Debtor Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

5.      *Payment in Full of All Allowed Operating Debtor Unsecured Claims Other Than EPD/Breach Claims Against NC Capital.*  If, in accordance with the terms of this Plan, all Holders of Allowed Operating Debtor Unsecured Claims other than Holders of Allowed Class OP6b Claims have been paid 100% of the allowed amount of their Allowed Operating Debtor Unsecured Claims, any remaining amount of the Operating Debtor Net Distributable Assets or the Operating Debtor Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol first to Holders of Allowed Class OP6b Claims on account of such Claims until such Claims are paid 100% of their allowed amounts, and second to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims until such Claims are paid 100% of their allowed amounts. After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 hereof, any remaining amount of the Operating Debtor Net Distributable Assets or the Operating Debtor Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

6.      *Payment in Full of All Allowed EPD/Breach Claims Against NC Capital.* If, in accordance with the terms of this Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol, all Holders of Allowed Class OP6b Claims have been paid 100% of the allowed amount of their Allowed Class OP6b Claims, any remaining amount of the NC Capital EPD/Breach Claimant Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Plan, including the Multi-

Debtor Claim Protocol and the Intercompany Claim Protocol, first to Holders of Allowed Operating Debtor Claims other than Allowed Class OP6b Claims on account of such Claims until such Claims are 100% of their allowed amounts, and second to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims until such Claims are paid 100% of their Allowed Amounts.  After all Holders of Allowed Operating Debtor Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 hereof, any remaining amount of NC Capital EPD/Breach Claimant Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

E.    **Manner of Distribution.**    At the option of the Liquidating Trustee, any distributions under this Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer, or by ACH.  Notwithstanding any other provisions of this Plan to the contrary, no payment of fractional cents will be made under this Plan.  Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary).

F.    **De Minimis Distributions.**    All De Minimis Distributions will be held by the Liquidating Trust for the benefit of the Holders of Allowed Claims entitled to De Minimis Distributions.  When the aggregate amount of De Minimis Distributions held by the Liquidating Trust for the benefit of a Creditor exceeds $50.00, the Liquidating Trust will distribute such De Minimis Distributions to such Creditor.  If, at the time that the final distribution under this Plan is to be made, the De Minimis Distributions held by the Liquidating Trust for the benefit of a Creditor total less than $50.00, such funds shall not be distributed to such Creditor, but rather, shall vest in the Liquidating Trust and be distributed to other Holders of Allowed Claims in accordance with the terms of this Plan.

G.    **Delivery of Distributions.**    Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be made by the Debtors, if on the Effective

Date, or the Liquidating Trustee, if after the Effective Date, (i) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is filed or the Debtors or the Liquidating Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Liquidating Trustee has not received a written notice of a change of address. The distributions to Holders of Capital Trust Claims shall be made to the Indenture Trustee, which, subject to the right of the Indenture Trustee to assert its charging lien against the distributions for payment of the Indenture Trustee Expenses, shall transmit the distributions to the Holders of Capital Trust Claims.

H.    **Undeliverable Distributions.**  If payment or distribution to the Holder of an Allowed Claim under this Plan is returned for lack of a current address for the Holder or otherwise, the Liquidating Trustee shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment. If, after the passage of ninety (90) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the holder shall be distributed to the Holders of Allowed Claims in the appropriate Class or Classes, and the Allowed Claim shall be deemed satisfied to the same extent as if payment or distribution had been made to the holder of the Allowed Claim.

I.    **Setoffs and Recoupments.**  The Debtors, if on the Effective Date, or the Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator), if after the Effective Date, may, pursuant to sections 502(h), 553, and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, set off against or recoup from any Claim on which payments are to be made pursuant to this Plan, any claims or Causes of Action of any nature whatsoever that are proven valid that the Debtors may have against the Holder of such Claim; provided, however, (i) that neither the failure to effect

such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, the Estates, the Liquidating Trust, or Reorganized Access Lending of any right of setoff or recoupment that the Debtors or the Estates may have against the Holder of such Claim, nor of any other claim or Cause of Action and (ii) nothing in this Article 9.I shall limit the ability of the Debtors or the Liquidating Trustee (including, with respect to Reorganized Access Lending, in its capacity as Plan Administrator) to withhold distributions on account of any Claim based on any right of setoff or recoupment that the Debtors or the Estates may have with respect to such Claim under the Bankruptcy Code, including but not limited to under section 502(d).

J.    **Distributions in Satisfaction; Allocation.**  Except for the obligations expressly imposed by this Plan and the property and rights expressly retained under this Plan, if any, the distributions and rights that are provided in this Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests in the Debtors and the Estates and the assets and properties of the Debtors and the Estates, whether known or unknown, arising or existing prior to the Effective Date.  Distributions received in respect of Allowed Unsecured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

K.    **Cancellation of Notes and Instruments.**  As of the Effective Date, except as with respect to the stock of Access Lending, all notes, agreements and securities evidencing Claims and Interests and the rights thereunder of the holders thereof shall, with respect to the Debtors, be canceled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights against the Debtors, the Estates, or the Liquidating Trust, and such instruments shall evidence no such rights, except the right to receive the distributions provided for in this Plan.  Additionally, the Capital Trust Indentures, and all related notes and documents, including without limitation, the two series of Junior Subordinated Notes due 2036, the Amended and Restated Trust Agreement, dated as of September 13, 2006, and the Amended and Restated Trust Agreement, dated as of November 16, 2006, and the two series of trust preferred securities and trust common securities, respectively, shall be deemed automatically

canceled and discharged on the Effective Date, <u>provided</u>, <u>however</u>, that the Capital Trust Indentures, and related notes and documents shall continue in effect solely for the purposes of (i) allowing the Holders of Capital Trust Claims to receive their distributions, if any, hereunder, including the right to litigate and/or settle any Claim asserted by a purported Holder of a Senior Class HC3b Claim under Article 4.C.3 of this Plan, (ii) allowing the Indenture Trustee to make distributions on account of the Capital Trust Claims, (iii) permitting the Indenture Trustee to asserts its charging lien against such distributions for payment of the Indenture Trustee Expenses, and (iv) authorizing, but not requiring, the Indenture Trustee to litigate and/or settle any Claim asserted by a purported Holder of a Senior Class HC3b Claim under Article 4.C.3 of this Plan.   The Capital Trust Indentures and related notes and documents shall terminate completely upon completion of all such distributions.   The Liquidating Trust shall not be responsible for any of the fees, expenses or costs incurred in connection with the continuation or termination of the Capital Trust Indentures.

L.    **No Interest on Claims.**   Unless otherwise specifically provided for in this Plan and except as set forth in Article 9 hereof, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a Holder of a Claim and approved by an order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.   In addition, and without limiting the foregoing, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

M.    **Withholding Taxes.**   The Debtors, if on the Effective Date, and the Liquidating Trustee (including in its capacity as Plan Administrator), if after the Effective Date, shall be entitled to deduct any federal, state or local withholding taxes from any payments under this Plan.   As a condition to making any distribution under this Plan, the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information

and certification as may be deemed necessary for the Debtors, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, to comply with applicable tax reporting and withholding laws.

      N.    **Reports.**  From the Effective Date, until a Final Decree is entered, the Liquidating Trustee (including in its capacity as Plan Administrator) shall submit quarterly reports to the U.S. Trustee within thirty (30) days of the end of each fiscal quarter setting forth all receipts and disbursements of the Liquidating Trust and Reorganized Access Lending as required by the U.S. Trustee guidelines.

## ARTICLE 10.

## IMPLEMENTATION OF PLAN AND DISTRIBUTIONS WITH RESPECT TO ACCESS LENDING

      A.    **Transfer of Access Lending Stock.**  On the Effective Date, pursuant to Article 8.E of the Plan, TRS Holdings shall distribute the stock of Access Lending to the Liquidating Trust, which shall become the sole shareholder of Reorganized Access Lending.

      B.    **The Plan Administrator.**  The Liquidating Trustee shall act as Plan Administrator with respect to Reorganized Access Lending and, in such capacity, shall have entered into the Plan Administrator Agreement to be filed with the Bankruptcy Court no later than two (2) days prior to the Confirmation Hearing.  The initial Plan Administrator, and each successor Plan Administrator, shall serve until the earlier of (i) the dissolution of Reorganized Access Lending or (ii) such Plan Administrator's resignation, death, incapacity, removal or termination.  Upon the occurrence of the Effective Date, the articles of incorporation of Access Lending shall be amended to provide that the Plan Administrator shall be the chief executive officer and sole director of Reorganized Access Lending.  In such capacity, the Plan Administrator shall have all necessary and appropriate power to act for, on behalf of and in the name of Reorganized Access Lending, with the same power and effect as if each of his or her actions in furtherance of his or her duties as a responsible person and as a board-appointed officer and shareholder-appointed director of Reorganized Access Lending were explicitly

authorized by the appropriate board of directors or shareholders.  In its capacity as Plan Administrator, the Liquidating Trustee shall take such actions as are in the best interests of Reorganized Access Lending.

C.    **Reimbursement of Debtors and Liquidating Trust.**  Subject to Article 10.F.4 of this Plan, on the Effective date or as soon as practicable thereafter and following the establishment of the Access Lending Administrative Fund and the Access Lending A/P/S Reserve, the Plan Administrator shall pay from the Assets of Reorganized Access Lending to the Liquidating Trust the (i) the amount of all Allowed A/P/S Claims allowed against Access Lending and paid by the Debtors other than Access Lending on or before the Effective Date or by the Liquidating Trustee after the Effective Date; (ii) the amount of administering the Estate of Access Lending, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Effective Date and paid by the Debtors other than Access Lending on or before the Effective Date in the ordinary course; and (iii) the Joint Administrative Expense Share of Access Lending paid by the Debtors other than Access Lending on or before the Effective Date or by the Liquidating Trustee after the Effective Date.

D.    **Resolution of Claims and Prosecution of Access Lending Causes of Action.**  The Plan Administrator shall resolve all Disputed Claims against Access Lending as soon as practicable following the Effective Date; provided, however, that all Creditors of Access Lending shall have the right to object to any Claims against Access Lending other than the Goldman AL3 Claim and the NCMC AL3 Claim.  The Plan Administrator shall have the exclusive right to prosecute all Access Lending Causes of Action.

E.    **Timing of Distributions on Account of Claims Against Access Lending.**

1.    *Payment of Allowed A/P/S Claims Against Access Lending.* Subject to Article 10.F.4 of this Plan, the Plan Administrator shall pay all Allowed A/P/S Claims against Access Lending as soon as practicable after the later of (a) the Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim.

2.      *Interim Distributions to Holders of Allowed Access Lending Unsecured Claims.*  The Plan Administrator shall have the right to make interim distributions to Holders of Allowed Access Lending Unsecured Claims if the Plan Administrator determines that such interim distributions are warranted and economical; provided, however, that any such distribution shall only be made if (i) subject to Article 10.F.4 of this Plan, the Access Lending Administrative Fund and the Access Lending A/P/S Claims Reserve are fully funded (subject to Article 10.F.4 of this Plan); (ii) the Access Lending Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; and (iii) subject to Article 10.F.4 of this Plan, the Plan Administrator retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the assets of Reorganized Access Lending during liquidation, and to satisfy other liabilities or expenses incurred by Reorganized Access Lending in accordance with this Plan.

3.      *Final Distributions on Allowed Access Lending Unsecured Claims.*  Upon resolution of all Disputed Unsecured Claims against Access Lending and all Access Lending Causes of Action, the Plan Administrator, shall pay all the Allowed Unsecured Claims against Access Lending from all remaining Access Lending Net Distributable Assets in accordance with Article 10.F.4 of this Plan.

F.      **Access Lending Reserves.**

1.      *Access Lending Administrative Fund.*  On the Effective Date, the Plan Administrator shall establish the Access Lending Administrative Fund.  Subject to Article 10.F.4 of this Plan, the initial amount of the Access Lending Administrative Fund shall be based on the Plan Administrator's good faith estimate of the Reorganized Access Lending Operating Expenses and the cost necessary to complete Reorganized Access Lending's obligations under this Plan and the Plan Administrator Agreement and shall be funded from Access Lending's Assets.  Reorganized Access Lending shall pay all Reorganized Access Lending Operating Expenses and costs and expenses related to

Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

carrying out its obligations under this Plan and the Plan Administrator Employment Agreement only from the Access Lending Administrative Fund.  The Plan Administrator may add additional amounts to the Access Lending Administrative Fund to prosecute the Access Lending Causes of Action or for administration and other miscellaneous needs of Reorganized Access Lending without further notice or motion and such additional amounts shall be funded from Access Lending's Assets subject to Article 10.F.4 of this Plan.

     2.    *Access Lending A/P/S Claims Reserve.*  On the Effective Date, the Plan Administrator shall establish the Access Lending A/P/S Claims Reserve for all Access Lending A/P/S Claims that are Disputed Access Lending A/P/S Claims or Allowed Access Lending A/P/S Claims that are not paid on the Effective Date.  The amount reserved for each Disputed Administrative Claim against Access Lending and each Allowed Administrative Claim against Access Lending that is not paid on the Effective Date shall be based upon the Administrative Claim being in the lower of (i) the amount set forth in the Administrative Claim Request filed by the Holder of such Claim, or if no Administrative Claim Request has been Filed, the amount set forth for such Claim in the Debtors' books and records, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of this Plan. The amount reserved for a Disputed Priority Tax Claim, Disputed Priority Claim, or Disputed Secured Claim against Access Lending or for an Allowed Priority Tax Claim, Allowed Priority Claim, or Allowed Secured Claim against Access Lending that is not paid on the Effective Date shall be based upon such Claim being in the lower of (i) the amount set forth in the Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been Filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of this Plan.  As soon as practicable after (and to the extent) a

Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

Disputed Access Lending A/P/S Claim becomes an Allowed Access Lending A/P/S Claim, the Plan Administrator shall make a payment from the Access Lending A/P/S Claims Reserve to the Holder of such Claim based on the Allowed amount of such Claim. After (and to the extent) a Disputed Access Lending A/P/S Claim or a Disallowed Claim is determined not to be an Access Lending A/P/S Claim, the portion of the Access Lending A/P/S Claims Reserve reserved for such Claim shall be released from the Access Lending A/P/S Claims Reserve to Reorganized Access Lending and shall be distributed pursuant to the terms of this Plan. Any amount remaining in the Access Lending A/P/S Claims Reserve following the final disposition of all Access Lending A/P/S Claims shall be released from the Access Lending A/P/S Claims Reserve to Reorganized Access Lending and shall be distributed pursuant to the terms of this Plan.

3.    *Access Lending Claims Reserve.*  On the Effective Date, the Plan Administrator shall establish the Access Lending Claims Reserve. With respect to any interim distribution made to Holders of Allowed Access Lending Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against Access Lending shall be the amount that would be distributed on account of such Claim if it was an Allowed Access Lending Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of this Plan. As soon as practicable after (and to the extent) a Disputed Unsecured Claim against a Access Lending becomes an Allowed Unsecured Claim against Access Lending, the Plan Administrator shall make a payment from the Access Lending Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Plan Administrator has paid on account of Allowed Access Lending Unsecured Claims, and any remaining amount reserved on account of such Claim shall be released from the Access Lending Claims Reserve. After (and to the extent) a Disputed Unsecured Claim against Access Lending becomes a Disallowed Claim, the portion of

Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

the Access Lending Claims Reserve reserved for such Claim shall be released from the Access Lending Claims Reserve to Reorganized Access Lending and shall be distributed pursuant to the terms of this Plan.  Any amount remaining in the Access Lending Claims Reserve following the final disposition of all Disputed Unsecured Claims against Access Lending shall be released from the Access Lending Claims Reserve to Reorganized Access Lending and shall be distributed pursuant to the terms of this Plan.

    4.    *Calculation of Access Lending Net Distributable Assets.*  The Access Lending Net Distributable Assets shall be calculated by deducting from the gross amount available from the liquidation of Reorganized Access Lending's Assets and the prosecution of the Access Lending Causes of Action (i) the amount paid by Access Lending to the Liquidating Trust pursuant to Article 10.C of this Plan; (ii) the amount of all Allowed A/P/S Claims allowed against Access Lending and paid by Access Lending on or before the Effective Date or paid by the Plan Administrator from the Assets of Reorganized Access Lending after the Effective Date; (iii) the amount of administering the Estate of Access Lending incurred in the ordinary course prior to the Effective Date and paid by Access Lending on or before the Effective Date in the ordinary course; (iv) the Joint Administrative Expense Share of Access Lending paid by Access Lending on or before the Effective Date; (v) any taxes paid by the Plan Administrator from Reorganized Access Lending's Assets pursuant to Article 10.G of this Plan, (vi) any costs incurred in connection with the prosecution of the Access Lending Causes of Action, and (vii) any Reorganized Access Lending Operating Expenses and expenses incurred by the Plan Administrator in connection with performing its duties under this Plan; provided, however, that to the extent the amount of the sum of (i) through (vii) of this Article 10.F.4 exceeds $1,000,000, such excess amount shall be paid out of and deducted from the amounts that otherwise would be distributed to NCMC on account of the NCMC AL3 Claim.

    Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

G.      **Dissolution of Reorganized Access Lending.**  After all distributions have been made to Holders of Allowed Claims against Access Lending, the Plan Administrator shall file a certificate of dissolution in the applicable state of incorporation for Reorganized Access Lending, and Reorganized Access Lending shall dissolve and cease to exist.  Any remaining Assets of Reorganized Access Lending shall be distributed to the Liquidating Trust as sole shareholder in a liquidating distribution, and shall become Liquidating Trust Assets that may be distributed pursuant to the terms of this Plan.

H.      **Access Lending Income; Returns.**  Any income earned by the Assets of Reorganized Access Lending is attributable to Reorganized Access Lending and not to the Liquidating Trust or its beneficiaries.  The Plan Administrator, shall make and file, if necessary, any and all tax returns for Reorganized Access Lending with respect to such taxable income, and shall pay taxes, if any, properly payable by Reorganized Access Lending from Reorganized Access Lending's Assets.  The Plan Administrator shall also file (or cause to be filed) any other statements, returns or disclosures relating to Reorganized Access Lending that are required by any governmental unit or the Plan Advisory Committee.

I.      **Removal of Access Lending.**  If this Plan cannot be confirmed with respect to Access Lending, the Plan Proponents may remove Access Lending from this Plan.  In such event, the Classes pertaining to Access Lending shall be removed from this Plan, and the Plan shall omit any treatment of the assets and liabilities of Access Lending.  The removal of Access Lending from this Plan shall not affect this Plan with respect to any other Debtor, except with respect to allocation of Joint Administrative Expense Shares as set forth on Exhibit C to this Plan.

## ARTICLE 11.~~ARTICLE 10.~~

### PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS

A.      **Reservation of Rights to Object to Claims.**  Unless a Claim is expressly described as an Allowed Claim pursuant to or under this Plan, or otherwise becomes an Allowed Claim prior to the Effective Date, upon the Effective Date, the Liquidating Trustee shall be

deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, 510(b) Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.  The Debtors' or the Liquidating Trustee's failure to object to any Claim in the Chapter 11 Cases shall be without prejudice to the Liquidating Trustee's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

B.    **Objections to Claims.**    Prior to the Effective Date, the Debtors shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, the Liquidating Trustee will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims (including those Claims that are subject to objection by the Debtors as of the Effective Date), subject to any approvals of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement; provided, however, that Creditors of Access Lending will have standing to object to Claims against Access Lending.  Unless otherwise provided in this Plan or by order of the Bankruptcy Court, any objections to Claims by the Liquidating Trustee shall be filed and served not later than 180 days after the later of (i) the Effective Date or (ii) the date such Claim is filed, provided that the Liquidating Trustee may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidating Trustee's business judgment.  A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to this Plan.

C.    **Service of Objections.**    An objection to a Claim shall be deemed properly served on the Holder of such Claim if the Liquidating Trustee effects service by any of the following methods:  (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and

made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases.

D.    **Determination of Claims.**  Except as otherwise agreed by the Debtors or the Liquidating Trustee (including in its capacity as Plan Administrator), any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtors or the Liquidating Trustee on or prior to any applicable deadline for filing such objection or application with respect to such Claim.  Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with this Plan.  Nothing contained in this Article ~~10~~11 shall constitute or be deemed a waiver of any claim, right, or Causes of Action that the Debtors, the Liquidating Trust, or Reorganized Access Lending may have against any Person in connection with or arising out of any Claim or Claims, including without limitation any rights under 28 U.S.C. § 157.

E.    **No Distributions Pending Allowance.**  No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that

only a portion of such Claim is an Allowed Claim, the Liquidating Trustee may make, in his or her discretion, a distribution pursuant to the Plan on account of the portion of such Claim that becomes an Allowed Claim.

F.    **Claim Estimation.**  In order to effectuate distributions pursuant to this Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Debtors (if on or prior to the Effective Date) and the Liquidating Trust (if after the Effective Date), after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of property that must be withheld from distribution on account of Disputed Claims; provided, however, that the Bankruptcy Court shall determine (i) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

G.    **Allowance of Claims Subject to Section 502 of the Bankruptcy Code.** Allowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including without limitation subsections (b), (d), (e), (g), (h), and (i) thereof.

H.    **Goldman HC3b Claim.**  The Goldman HC3b Claim shall be an Allowed Class HC3b Claim in the amount of $5,000,000.

I.    **Goldman AL3 Claim.**  The Goldman AL3 Claim shall be an Allowed Class AL3 Claim in the amount of $9,506,754.00.

J.    **NCMC AL3 Claim.**  Subject to Article 4.L of this Plan, the NCMC AL3 Claim shall be an Allowed Class AL3 Claim in the amount of $3,973,199.86.

**ARTICLE 12.**~~ARTICLE 11.~~

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.    **Assumption of Certain Contracts and Leases and Cure Payments.**  Twenty (20) days prior to the Confirmation Hearing, the Plan Proponents shall file the Assumption Schedule, which shall be attached to this Plan as Exhibit A.  Objections to any proposed cure payment must be filed and served no later than the Assumption Objection Deadline and shall be

adjudicated, if necessary, at the Confirmation Hearing.  Any non-debtor party or Person to an Executory Contract that has not filed an appropriate pleading with the Bankruptcy Court on or before the applicable Assumption Objection Deadline shall be deemed to have waived its right to dispute the cure amount.  All unpaid cure payments under any Executory Contracts that are assumed or assumed and assigned under this Plan shall be made by the Liquidating Trustee as soon as practicable after the Effective Date but not later than thirty (30) days after the Effective Date, provided that, in the event that there is a dispute regarding the amount of any cure payments, the Liquidating Trustee shall make such cure payments as may be required by section 365(b)(1) of the Bankruptcy Code within ten (10) days following the entry of a Final Order resolving such dispute.  The Plan Proponents reserve the right to remove any Executory Contract from the Assumption Schedule prior to the Effective Date.

      B.     **Rejection of Remaining Executory Contracts and Unexpired Leases.**  On the Confirmation Date, except for (i) any Executory Contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code and (ii) any Executory Contract identified on the Assumption Schedule, each Executory Contract entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Confirmation Date.

      C.     **Rejection Damages Bar Date.**  Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, any Proofs of Claim with respect to a Claim arising from the rejection of Executory Contracts under this Plan (including Claims under section 365(d)(3) of the Bankruptcy Code) must be filed with XRoads Case Management Services, P.O. Box 8901, Marina Del Rey, California 90295 (Telephone (888) 784-9571), and a copy served on counsel for the Plan Proponents and the Liquidating Trustee, within thirty (30) days after the Effective Date, or such Claim shall be forever barred and shall not be entitled to a distribution or

be enforceable against the Debtors, their Estates, the Liquidating Trust, the Liquidating Trustee, their successors, their assigns, or their Assets. Any Claim arising from the rejection of an Executory Contract shall be treated as a Claim in Class HC3b (Other Unsecured Claims against NCFC), Class HC7 (Other Unsecured Claims against TRS Holdings), Class HC10b (Other Unsecured Claims against NC Credit), Class HC13 (Other Unsecured Claims against NC Residual IV), Class OP3c (Other Unsecured Claims against NCMC), Class OP6c (Other Unsecured Claims against NC Capital), Class OP9b (Other Unsecured Claims against Home123), Class OP12 (Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral), or Class AL3 (Other Unsecured Claims against Access Lending), depending on which Debtor the Claim is asserted against. Nothing in this Plan extends or modifies any previously applicable Bar Date.

       D.    **Insurance Policies.**  To the extent that any or all of the insurance policies set forth on <u>Exhibit A</u> to this Plan are considered to be Executory Contracts, then notwithstanding anything contained in this Plan to the contrary, this Plan shall constitute a motion to assume the insurance policies set forth on <u>Exhibit A</u> to this Plan and to assign them to the Liquidating Trust. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such insurance policy set forth on <u>Exhibit A</u> to this Plan. To the extent that the Bankruptcy Court determines otherwise with respect to any insurance policy, the Plan Proponents reserve the right to seek rejection of such insurance policy or other available relief. The Plan shall not affect contracts that have been assumed and assigned by order of the Bankruptcy Court prior to the Confirmation Date. For the avoidance of doubt, the certain insurance policies (including any insurance policies that are not

Executory Contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date, and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on <u>Exhibit A</u> and all rights thereunder and rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute, and benefit from claims) are retained and will be transferred to the Liquidating Trust pursuant to this Plan.

## <span style="color:blue">ARTICLE 13.</span><span style="color:red">ARTICLE 12.</span>

## <u>EFFECT OF CONFIRMATION AND INJUNCTION</u>

A.      **Injunction.  Except as otherwise expressly provided in this Plan, the documents executed pursuant to this Plan, or the Confirmation Order, on and after the Effective Date, all Persons and entities who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Effective Date (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) are permanently enjoined from: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligation due to any Protected Party or any property of any Protected Party; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with any provisions of this Plan.  Any Person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover**

punitive damages from the willful violator.  Nothing contained in this Article ~~12~~13 shall prohibit the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed Claim of any of the obligations of the Debtors, the Liquidating Trustee, or the Liquidating Trust under this Plan.  The Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any claim or cause of action against any Protected Party or any property of any Protected Party based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under Article 4 of this Plan have been made or are not yet due under Article 4 of this Plan; _provided_, _however_, that the foregoing injunction will not enjoin actions by the SEC to the extent that pursuant to section 362(b)(4) of the Bankruptcy Code such actions are not subject to section 362(a) of the Bankruptcy Code.  Except as provided in Article ~~XII.~~13.C of this Plan, nothing in this Plan shall (i) release or discharge any claims held by the SEC against any non-debtors or (ii) enjoin or restrain the SEC from enforcing any such claims against any non-debtors.

B.      **Term of Injunctions.**   Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases by orders of the Bankruptcy Court, under sections 105 or 362 of the Bankruptcy Code, this Plan, or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Liquidating Trust.~~.~~  In accordance therewith, and without limiting the foregoing, until the later of (i) entry of the Final Decree or (ii) the dissolution of the Liquidating Trust, all Persons or entities (except as provided in section 362(b) of the Bankruptcy Code) are stayed from (i) the commencement or continuation of a judicial, administrative, or other action or proceeding, including the employment of service of process, against the Debtors that was or

**could have been commenced prior to the Petition Date, or to recover a claim against the Debtors that arose prior to the Petition Date, (ii) the enforcement, against the Debtors or against property of the Estates, of a judgment obtained before the Petition Date, (iii) any act to obtain possession of property of the Estates or of property from the Estates or to exercise control over property of the Estates, (iv) any act to create, perfect, or enforce any lien against property of the Estates, and (v) any act to collect, assess, or recover a claim against the Debtors that arose before the Petition Date.**

C.    **Exculpation.  On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, (a) pertaining to the timing of the commencement of the Chapter 11 Cases or (b) for any act or omission that occurred during the Chapter 11 Cases or in connection with the formulation, negotiation, and/or pursuit of confirmation of this Plan, the consummation of this Plan, and/or the administration of this Plan and/or the property to be distributed under this Plan, except, in either case, for claims, causes of action or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under this Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action, or liability.  Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  No provision of this Plan or the Disclosure Statement shall be deemed to act or release any claims, Causes of Action or liabilities that the Liquidating Trust, Reorganized Access Lending, ~~or~~ the Estates, or the SEC may have against any Person or entity for any act, omission, or failure to act that occurred (i) with respect to the Debtors other than Access Lending, prior to April 2, 2007**

**and (ii) with respect to Access Lending, prior to August 3, 2007, in either case, other than for claims, Causes of Action, or liability pertaining to the timing of the commencement of the Chapter 11 Cases, nor shall any provision of this Plan be deemed to act to release any Avoidance Actions.**

D.    **Release of Goldman.  On the Effective Date, any and all claims, Causes of Action, rights or remedies of any kind or nature that the Debtors or the Estates have, may have or could have asserted against Goldman, its affiliates or its former or present officers, directors, employees, attorneys, financial advisors or other professionals, which claims, causes of action, rights or remedies arise out of or relate to Access Lending shall be waived, set aside, discharged, settled, compromised, and released.**

E.    ~~D.~~ **Binding Effect of Plan.**  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective successors or assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan, whether or not such Holder has accepted this Plan and whether or not the Holder has filed a Claim.  On and after the Confirmation Date, the EPD/Breach Claim Protocol shall be binding on all Holders of Claims in Classes OP3b and/or OP6b irrespective of how such Holders vote on the Plan and irrespective of whether such Holders submit the information requested by the Debtors pursuant to the questionnaire referenced in the EPD/Breach Protocol.  Any vote in favor of the Plan by a Holder of Claims in Classes OP3b and/or OP6b will constitute an express consent to the EPD/Breach Protocol.  The rights, benefits and obligations of any Person named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person (including, without limitation, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

F.    E.  **No Effect on Objections to Fee Applications.**   Nothing contained in this Article 1213 shall affect the rights of parties in interest to object to Fee Applications or obviate the power of the Bankruptcy Court to issue orders with respect to Fee Applications.

### ARTICLE 14.ARTICLE 13.

### CONDITIONS PRECEDENT

A.    **Conditions Precedent to Effective Date.**  This Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

1.    *Approval of Disclosure Statement.*   The Bankruptcy Court shall have approved a disclosure statement to this Plan in form and substance acceptable to the Plan Proponents in their sole and absolute discretion.

2.    *Approval of Plan Compromises.*   The compromises and settlements contained in Articles 4, 6, and 7 of this Plan shall be approved without material modification by Final Order in accordance with Bankruptcy Rule 9019 and shall be binding and enforceable against all Holders of Claims and Interests under the terms of this Plan.

3.    *Form of Confirmation Order.*  The Confirmation Order shall be in form and substance acceptable to the Plan Proponents in their sole and absolute discretion

4.    *Entry of Confirmation Order.*  The Confirmation Order (i) shall have been entered by the Bankruptcy Court, (ii) shall not be subject to any stay of effectiveness, and (iii) shall have become a Final Order, the Confirmation Date shall have occurred, and no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

5.    *Liquidating Trust.*  The Liquidating Trust shall have been formed, and all formation documents for such entities shall have been properly executed and filed as required by this Plan and applicable law.

6.    *Liquidating Trustee.*   The appointment of the Liquidating Trustee shall have been confirmed by order of the Bankruptcy Court.

7.    *Plan Administrator.*   The appointment of the Plan Administrator shall have been confirmed by order of the Bankruptcy Court.

B.    **Revocation, Withdrawal, or Non-Consummation of Plan.**   If after the Confirmation Order is entered, each of the conditions to effectiveness has not been satisfied or duly waived on or by ninety (90) days after the Confirmation Date, then upon motion by the Plan Proponents, the Confirmation Order may be vacated by the Bankruptcy Court; provided however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.   As used in the preceding sentence, a condition to effectiveness may only be waived by a writing executed by the Plan Proponents.   If the Confirmation Order is vacated pursuant to this Section, this Plan shall be null and void in all respects, and nothing contained in this Plan, the Disclosure Statement, nor any pleadings filed in connection with the approval thereof shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors, (iii) prejudice in any manner the rights of the Plan Proponents in the Chapter 11 Cases, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any party prior to the Confirmation Date.

## ARTICLE 15.ARTICLE 14.

## ADMINISTRATIVE PROVISIONS

A.    **Retention of Jurisdiction.**   This Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code.   Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter (i) arising

under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases or the Plan, or (iii) that relates to the following:

       1.       to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of Executory Contracts or unexpired leases and the allowance of Claims resulting therefrom;

       2.       to adjudicate any and all disputes over the ownership of a Claim or Interest;

       3.       to adjudicate any and all disputes arising from or relating to the distribution or retention of consideration under this Plan;

       4.       to hear and determine timely objections to Claims, whether filed before or after the Confirmation Date, including objections to the classification, estimation or establishment of priority or status of any Claim, and to allow or disallow any Claim, in whole or in part;

       5.       to determine the extent, validity, and/or priority of any Lien asserted against property of the Debtors or the Estates or property abandoned or transferred by the Debtors or the Estates;

       6.       to determine the amount, if any, of interest to be paid to Holders of Allowed Unsecured Claims if any Allowed Unsecured Claims are paid in full pursuant to the terms of this Plan;

       7.       to hear and determine matters related to the assets of the Estates, including liquidation of the Debtors' assets; provided that notwithstanding the foregoing, the Liquidating Trustee (including in its capacity as Plan Administrator) shall have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer, assignment or disposition of assets; provided further, that the Liquidating Trustee may seek "comfort orders" or similar orders of the Bankruptcy Court approving the Liquidating Trustee's sale or disposition of such assets to facilitate such transactions;

    Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

8.      to adjudicate disputes relating to any alleged subordination of the Capital Trust Claims;

9.      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

10.     to consider modifications of or amendments to this Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including without limitation, the Confirmation Order;

11.     to issue orders in aid of execution, implementation, or consummation of this Plan;

12.     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

13.     to hear and determine all motions requesting allowance of an Administrative Claim;

14.     to hear and determine all Fee Applications;

15.     to determine requests for the payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses and parties entitled thereto;

16.     to hear and determine all controversies arising in connection with the implementation of this Plan;

17.     to hear and determine all Causes of Action, Avoidance Actions, and other suits and adversary proceedings to recover assets of (i) the Liquidating Trust, as successor-in-interest to any of the Debtors (other than Access Lending) and property of the Estates (other than the Estate of Access Lending), wherever located, and (ii) Reorganized Access Lending, as successor-in-interest to Access Lending and property of the Estate of Access Lending, wherever located, and to adjudicate any and all other

Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or this Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

18.     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19.     to resolve all conflicts and disputes between the Liquidating Trustee, the Liquidating Trust, Reorganized Access Lending, the Plan Advisory Committee, and Holders of Claims or Interests;

20.     to hear any matter not inconsistent with the Bankruptcy Code;

21.     to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     to consider matters regarding the Debtors' insurance policies, if any, including jurisdiction to reimpose the automatic stay or its applicable equivalent provided in this Plan;

23.     to issue injunctions, provide declaratory relief, take such other legal or equitable actions, or issue such other orders as may be necessary or appropriate to restrain interference with this Plan, the Debtors, the Estates or their property, the Committee, the Liquidating Trust, Reorganized Access Lending, the Liquidating Trustee, the Plan Advisory Committee, Professionals, or the Confirmation Order;

24.     to enter a Final Decree closing the Chapter 11 Cases; and

25.     to enforce all orders previously entered by the Bankruptcy Court.

B.     **Payment of Statutory Fees.**    All fees payable through the Effective Date pursuant to section 1930 of Title 28 of the United States Code shall be paid on or before the

Effective Date.  All fees payable after the Effective Date pursuant to section 1930 of Title 28 of the United States Code shall be paid by the Liquidating Trust or Reorganized Access Lending, as applicable.

C.    **General Authority.**    The Debtors, if on or prior to the Effective Date, and the Liquidating Trust or Reorganized Access Lending, if after the Effective Date, shall execute such documents, and take such other actions, as are necessary to effectuate the transactions provided for in this Plan.  Additionally, with respect to mortgage loans purchased from one or more of the Debtors prior to or subsequent to the Petition Date, the applicable Debtor, if on or prior to the Effective Date, or the Liquidating Trust, if after the Effective Date, shall execute, upon written request, any instruments necessary to fully effectuate the transfer of such loan or otherwise to effect the appropriate transfer of record title or interest in such loan, including, without limitation, any powers of attorney as may be necessary to allow the purchaser of such mortgage loan from such Debtor (including any trustee or servicer on behalf of the purchaser) to complete, execute and deliver, in the name of and on behalf of the applicable Debtor or the Liquidating Trust, any required assignments of mortgage or instruments of satisfaction, discharge or cancellation of mortgages, mortgage notes or other instruments related to such mortgage loan; provided, however, that the party making the request presents evidence to the Debtors or the Liquidating Trust, as the case may be, of the validity of the transfer being effectuated and that the loan being transferred was purchased from the applicable Debtor.

D.    **Headings.**    The headings of the Articles, paragraphs, and sections of this Plan are inserted for convenience only and shall not affect the interpretation hereof.

E.    **Final Order.**    Except as otherwise expressly provided in this Plan, any requirement in this Plan for a Final Order may be waived by the Debtors and the Committee (if prior to the Effective Date) or the Liquidating Trustee (if after the Effective Date) upon written notice to the Bankruptcy Court.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

F.    **Amendments and Modifications.**    The Plan Proponents may alter, amend, or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing.    After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of this Plan with respect to any Debtor, the Plan Proponents, the Plan Advisory Committee, or the proposed Liquidating Trustee, as appropriate, may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan, by the filing of a motion on notice to the Bankruptcy Rule 2002 services list only, and the solicitation of all Creditors and other parties in interest shall not be required.

G.    **Payment Date.**    Whenever any payment or distribution to be made under this Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

H.    **Withholding and Reporting Requirements.**    In connection with this Plan and all instruments issued in connection therewith and distributions thereon, the Debtors (if prior to or on the Effective Date) or the Liquidating Trustee, including in its capacity as Plan Administrator, (if after the Effective Date) shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

I.    **No Waiver.**    The failure of the Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Debtors', the Liquidating Trust's, or Reorganized Access Lending's  right to object to or examine such Claim, in whole or in part.

J.    **Tax Exemption.**    Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of any security under this Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by this Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the

**DRAFT**
**04/18/2008**

Liquidating Trustee, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by this Plan (including, without limitation, any subsequent transfers of property by the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

K.    **Securities Exemption.**  Any rights issued under, pursuant to or in effecting this Plan, including the stock of Reorganized Access Lending, and the offering and issuance thereof by any party, including without limitation the Debtors or the Liquidating Trust, shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation section 1145 of the Bankruptcy Code.

L.    **Non-Severability.**  Except as specifically provided herein, the terms of this Plan constitute interrelated compromises and are not severable.  Additionally, no provision of Articles 4, 6, or 7 of this Plan may be stricken, altered, or invalidated.

M.    **Revocation.**  The Plan Proponents reserve the right to revoke and withdraw this Plan prior to the Confirmation Date.  If the Plan Proponents revoke or withdraw this Plan, then this Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, the Committee, or any other Person or to prejudice in any manner the rights of the Debtors, the Committee, or any Person in any further proceedings involving the Debtors, or be deemed an admission by the Debtors and/or the Committee, including with respect to the amount or allowability of any Claim or the value of any property of the Estates.

N.     **Plan Controls Disclosure Statement.**  In the event and to the extent that any provision of this Plan is inconsistent with any provision of the Disclosure Statement, the provisions of this Plan shall control and take precedence.

O.     **Governing Law.**  Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless specifically stated, the rights, duties, and obligations arising under this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) and, with respect to the Debtors incorporated in Delaware, corporate governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles.  Corporate governance matters relating to any Debtor not incorporated in Delaware shall be governed by the law of the state of incorporation of the applicable Debtor.

P.     **Notices.**  Any notices or requests of the Debtors or the Liquidating Trust by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

If to the Debtors:

O'Melveny & Myers LLP
Attn:  Suzzanne Uhland, Esq.
275 Battery Street
San Francisco, CA  94111

and

Richards, Layton & Finger, P.A.
Attn:  Mark D. Collins, Esq.
One Rodney Square
Box 551
Wilmington, DE 19899

Workshare Professional comparison of pcdocs://la3/1145092/10 and pcdocs://la3/1146802/5. Performed on 4/18/2008.

If to the Liquidating Trust or the Liquidating Trustee:

To the persons indicated in the notice provisions of the Confirmation Order.

Q.    **Filing of Additional Documents.**  On or before "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of this Plan, the Plan Proponents may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate and further evidence the terms and conditions of this Plan.

R.    **Direction to a Party.**  From and after the Effective Date, the Plan Proponents may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by this Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of this Plan.

S.    **Successors and Assigns.**  The rights, benefits, duties, and obligations of any Person named or referred to in this Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

T.    **Final Decree.**  Once any of the Estates has been fully administered, as referred to in Bankruptcy Rule 3022, the Liquidating Trust or another party, as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 Case of the applicable Estate(s).

### ARTICLE 16.ARTICLE 15.

### CONFIRMATION REQUEST

The Plan Proponents hereby request confirmation of this Plan as a Cramdown Plan with respect to any impaired Class that does not accept this Plan or is deemed to have rejected this Plan.

///
///
///

## ARTICLE 17.ARTICLE 16.

### BANKRUPTCY RULE 9019 REQUEST AND, TO EXTENT REQUIRED, REQUEST PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A) AND 1123(A)(5)

Pursuant to Bankruptcy Rule 9019, the Plan Proponents hereby request approval of all compromises and settlements included in this Plan, including, without limitation, the compromises and settlements included in Articles 4, 6, and 7 of this Plan.  To the extent required, the Plan Proponents hereby request confirmation of this Plan based on the partial substantive consolidation of the Debtors pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code.

Dated:  Irvine, California
March 18,April [  ], 2008

Respectfully submitted,

NEW CENTURY FINANCIAL CORPORATION, on behalf of the Debtors and Debtors-in-Possession

/s/ Holly Etlin
By:  Holly Etlin
Its:  Chief Executive Officer, President and Chief Restructuring Officer

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

/s/ Donald A. Workman

**DRAFT
04/18/2008**

By:  Donald A. Workman, Esq.
Counsel for Fidelity National Information
Services, Inc. (Co-chair)

Document comparison done by Workshare Professional on Friday, April 18, 2008
4:43:39 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://la3/1145092/10 |
| Document 2 | pcdocs://la3/1146802/5 |
| Rendering set | ommstandard45 |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 253 |
| Deletions | 208 |
| Moved from | 22 |
| Moved to | 22 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 505 |

**EXHIBIT A**

# Exhibit 1 - Assumption Schedule

Out of any abundance of caution the Debtors have listed critical documents and agreements on this schedule.  The listing of a document or agreement on this schedule shall not constitute an admission by the Debtors that such document or agreement is (a) an executory contract or unexpired lease or that the Debtors have any liability thereunder;  or (b) that the document or agreement was entered into prepetition and therefore subject to section 365(a) of the Bankruptcy Code.  The Debtors intend to assume all agreements not previously rejected the primary purpose of which is the perpetual licensing of intellectual property rights from third parties and for which no cure amount is owed by the Debtors.  Examples include, but are not limited to, those agreements with Microsoft, Lawbase and Legato.

## Part A. Contracts

| Contract | Cure Amount |
|---|---|
| Services Agreement dated as of December 20, 2007 by and among New Century Mortgage Corporation and ACS Commercial Solutions. | $0 |
| Epicor Software Corporation Maintenance / Support Renewal Program dated as of July 1, 2007 by and between Epicor Software Corporation and New Century Mortgage Corp. | $0 |
| Records Management and Data Protection Service Agreements and Customer Agreements dated as of various dates by and between Iron Mountain Information Management Inc. ("Iron Mountain"), its predecessor companies and New Century Mortgage Corporation, Home 123 Corporation, New Century Financial Corporation, etc. for hardcopy storage and tape storage accounts numbered: 01222.0FX031, 01222.0CF310, 01222.0FX578, 01222.00L322, 01222.0L3429, 04311.0H0929, 04311.0H5450, 01422.0OP064, 44114.044075, 44113.041293, 44114.057273 | $0 |
| Park Place Short Term Lease dated as of January 22, 2008 by and among Maguire Properties - Park Place, LLC and New Century Financial Corporation. | $0 |
| Agreement between Data-Link Systems, LLC and New Century Mortgage Corporation dated as of July 5, 2007 (the Agreement"), Amendment No. 1 dated as of April __ 2008, and Feature Addendum dated as of January 3. 2008 | $0 |
| Onbase Online Hosted Solution Agreement dated as of January 7, 2008 by and between Hyland Software, Inc. and New Century Financial Corporation. | $0 |
| Authorization and Agreement for Cash Management Services dated as of 7/23/2003 by and between New Century Mortgage Corporation and Union Bank of California, N.A. and the Security Agreement dated as of 3/10/2005 by and between New Century Mortgage Corporation and Union Bank of California, N.A. | $0 |
| Letter Agreement and price list dated as of March 31, 2008 by and between Bekins Moving Solutions and New Century Mortgage Corporation. | $0 |

## Part B. Insurance Policies

| TYPE OF POLICY | Carrier | POLICY # |
|---|---|---|
| COMMERCIAL LIABILITY | | |
| General Liability | Fidelity & Deposit Co. of Maryland | CP0913762802 |
| Umbrella AL, GL & REO | Fidelity & Deposit Co. of Maryland | UMB913752 |
| Auto Liability | Fidelity & Deposit Co. of Maryland | CAP0016872 |
| Property / Flood | Fidelity & Deposit Co. of Maryland | FIA1003282 |
| General Liability | Fidelity & Deposit Co. of Maryland | FIA 100256503 |
| Umbrella AL, GL & REO | Fidelity & Deposit Co. of Maryland | UMB 5344245 |
| General Liability | Fidelity & Deposit Co. of Maryland | FIA 1002565 |
| Umbrella AL, GL & REO | Fidelity & Deposit Co. of Maryland | UMB 5344245 |
| General Liability | Great Northern Ins (Chubb) | 35397736 LAO |
| Umbrella AL, GL & REO | Federal Insurance Co. (Chubb) | 7977-03-85 |
| General Liability | Great Northern Ins (Chubb) | 35397736 LAO |
| Umbrella AL, GL & REO | Federal Insurance Co. (Chubb) | 7977-03-85 |
| General Liability | Great Northern Ins (Chubb) | 35397736 LAO |
| Umbrella AL, GL & REO | Federal Insurance Co. (Chubb) | 7977-03-85 |
| General Liability | Centennial Insurance Company | 497-40-20-82 |
| DIRECTORS & OFFICERS | | |
| Run Off Program | American International Specialty Lines Insurance Company (AISLIC) | 672-43-85 |
| Run Off Program | Ace American Insurance Company | DOX G2166120A-002 |
| Run Off Program | Lloyds of London | FD0604467 |
| Run Off Program | Axis Reinsurance Company | RNN727183 |
| Run Off Program | Starr Excess Liability Insurance Co. | 4121907 |
| Run Off Program | American International Group, Inc. (AIG) | 713-23-15 |
| Run Off Program | Lloyds of London | FD0604994 |
| Run Off Program | Ace American Insurance Company | DOXG21661338001 |
| Run Off Program | Axis Reinsurance Company | RNN727184 |
| Run Off Program | Liberty Mutual Insurance Company | 073551-016 |
| Run Off Program | Navigators Insurance Company | NY06DOL149577NV |
| Run Off Program | Arch Insurance Company | AID0016068-00 |
| Run Off Program | CNAInsurance Company | 287036031 |
| Run Off Program | Navigators Insurance Company | NY06DOL149583NV |
| Go Forward (Execs & Organization) | AIG | 713-35-92 |
| Go Forward (Execs & Organization) | U.S. Specialty Ins. Co. (HCC Global) | 14-MGU-07-A14285 |
| Primary Layer | AISLIC | 672-43-85 |
| 2nd Excess Layer | Ace American Insurance Company | DOX G2166120A-002 |
| 3rd Excess Layer | Lloyds of London | FD0604467 |
| 4th Excess Layer | Axis Reinsurance Company | RNN727183 |

| TYPE OF POLICY | Carrier | POLICY # |
|---|---|---|
| 5th Excess Layer | Starr Excess Liability Insurance Co. | 4121907 |
| 6th Excess Layer | XL Specialty Insurance Company | ELU09290606 |
| 7th Excess Layer | Lloyds of London | FD0604994 |
| 8th Excess Layer | Ace American Insurance Company | DOXG21661338001 |
| 9th Excess Layer | Axis Reinsurance Company | RNN727184 |
| 10th Excess Layer | Liberty Mutual Insurance Company | 73551016 |
| 11th Excess Layer | Navigators Insurance Company | NY06DOL149577NV |
| IDL/Ed Gotschall Only | Hartford Insurance Company | 00DA023401506 |
| Independdent Directors Liability | Arch, CNA & Navigators | Various |
| Primary Layer | Liberty Mutual Insurance Company | LNE-B71-073551-012 |
| 2nd Excess Layer | Houston Casualty Company (Global) | 24-MG-03-A2237 |
| 3rd Excess Layer | Lexington Insurance Company | 1620532 |
| 4th Excess Layer | Greenwich Insurance Company | ELU 82589-02 |
| 5th Excess Layer | Kemper Insurance Company(Lumbermans) | 3DY 016540 01 |
| 6th Excess Layer | XL Insurance (Bermuda) | XLD +O-06782-01 |
| 7th Excess Layer | Allied World Assurance Company | C001156 |
| 8th Excess Layer | Lloyds of London | L2CX069 |
| 9th Excess Layer | Philadelphia Insurance Companies | PHSD037932 |
| 10th Excess Layer | Royal & Sunalliance | HS 611797 |
| Primary Layer | Liberty Mutual Insurance Company | LNE-B71-073551-013 |
| 2nd Excess Layer | Houston Casualty Company (Global) | 24-MG-03-A2237 |
| 3rd Excess Layer | Lexington Insurance Company | 1620615 |
| 4th Excess Layer | XL Insurance Company | EX71010999 |
| 5th Excess Layer | Sheffield Insurance Company | EAN598559 |
| 6th Excess Layer | Illinois Union Insurance Company | DOXG21659666001 |
| 7th Excess Layer | XL Insurance Company | XLD+O-0678202 |
| 8th Excess Layer | AWA Company | C001152002 |
| 9th Excess Layer | Lloyds of London | FD042860S |
| 10th Excess Layer | Philadelphia Insurance Companies | PHSD056425 |
| Primary Layer | American International Group, Inc. (AIG) | 408-61-35 |
| Excess Layer | Houston Casualty Company | 14-MGU-08-A16485 |
| **EMPLOYMENT PRACTICES LIABILITY** | | |
| Employment Practices | Max Re | 12575-1330-EPLI-2006 |
| Employment Practices | Max Re | 7747-752-EPLI-2005 |
| Employment Practices | Max Re | 4256-359-EPLI-2004 |
| Employee Commercial Crime | Travelers Casualty & Surety Company | 104011836 |
| **FIDUCIARY LIABILITY** | | |
| Run Off Program | Philadelphia Indemnity Insurance Co. | PHSD219056 |
| Fidiciary Liability | Philadelphia Indemnity Insurance Co. | PHSD219056 |
| Fidiciary Liability | Philadelphia Indemnity Insurance Co. | PHSD114807 |

| TYPE OF POLICY | Carrier | POLICY # |
|---|---|---|
| **MORTGAGE BANKERS BOND** | | |
| Primary Coverage | Bankers Insurance Services | MBB-05-00071 |
| Primary Coverage | Bankers Insurance Services | MBB-03-00002 |
| **SERVICING INSURANCE** | | |
| Flood | Lloyds of London | 1916-3253 |
| Wind | Lloyds of London | 1770-3253 |
| Fire & Liability | Safeco | MIP7553681A |
| Fire & Liability | Safeco | MSH7710681B |
| Fire & Liability | Safeco | MSH7710548B<br>MIP78553565A |
| Fire & Liability | Safeco | MIH7710548B |
| Fire & Liability | Safeco | MIH7710681B |
| **WORKERS COMP** | | |
| Workers Comp | Valley Forge Insurance Co (CNA) | WC24921601<br>WC249216177<br>WC249216373 |
| Workers Comp | Valley Forge Insurance Co (CNA) | WC249221914<br>WC249221928<br>WC249221900 |
| Workers Comp | ACE American Insurance Company - claims administered by ESIS | WLRC43981547 |
| Workers Comp | ACE American Insurance Company - claims administered by ESIS | WLRC44438124 |
| Workers Comp | Travelers Paid Loss Occurrence | TRJUB1761B36107<br>TC2JUB1761B46507 for AZ, MA, OR and WI |

**<u>EXHIBIT B</u>**

# EPD/ BREACH PROTOCOL[1]

I.      EPD/FPD Claims.

    A.      Methodology.

        EPD and FPD Claims are Claims based on a provision in a loan purchase agreement that obligated a Debtor to repurchase a loan if the borrower defaulted on his or her first loan payment after the loan was sold (a First Payment Default or "FPD") or defaulted on a payment due within a period of time (usually 30 or 60 days) after the loan was sold (an Early Payment Default or "EPD").  Loan purchase agreements varied as to whether the EPD/FPD provision was set forth as a standalone provision of the loan sale agreement or was styled as a representation or warranty.  A Claim based on either is treated as an EPD/FPD Claim for purposes of the protocol.

        Each Creditor that establishes a valid EPD or FPD under the applicable loan purchase agreement will receive a distribution in the Plan premised upon damages assessed based upon the borrower payment history and the unpaid principal balance ("UPB") for the loan, in both cases measured as of August 31, 2007, according to the following grid:[2]

- Current:  0% of UPB

- 31 – 60 days delinquent:  15% of UPB

- 61 – 90 days delinquent:  20% of UPB

- 91 or more days delinquent:  30% of UPB

- Borrower in bankruptcy:  35% of UPB

---

[1] Capitalized terms not defined herein shall have the meaning given to them in the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 1, 2008.
[2] The applicable category that would lead to the highest calculation takes precedence.  For example, if as of 8/31/07 a loan was 61 days delinquent and the borrower was in bankruptcy, the applicable percentage is 35% of UPB.

- In foreclosure[3]:  40% of UPB

- Real estate owned (including liquidations of such real estate )("REO"): 45% of UPB

If the Creditor sold the loan prior to August 31, 2007 and does not know the loan status as of August 31, 2007, the damage assessment will be measured as of the date of sale.  If a loan has been foreclosed, the measurement will consider the property to be REO and the measurement will be based on the UPB at the time of foreclosure.

If subsequent to the sale of the loan by a Debtor and prior to August 31, 2007, the borrower and the owner of a loan agreed to modify the payment (principal or interest) terms of the loan, then the loan will be treated under the next most severe category in the grid.  For example, if a Creditor and borrower agreed in April 2007 to relax the borrower's payment obligations under a loan, and on August 31, 2007 the borrower was current on the modified schedule, this loan will be treated as though the borrower was 31 – 60 days delinquent. Similarly, if on August 31, 2007 that same borrower was 40 days delinquent under the modified payment schedule, the loan will be treated as though the borrower was 61 – 90 days delinquent.

In order to establish the validity of the EPD/FPD Claim and to apply the grid, each EPD/FPD claimant must provide to the Debtors information set forth in questionnaire for loans on which it asserts an EPD/FPD claim.  This information includes:

- The payment history for each loan for which an EPD or FPD is asserted in electronic format, including identification of the payment status as of August 31, 2007.

- Identification of the loan purchase agreement pursuant to which the loan was sold by a Debtor, including a copy of the relevant EPD/FPD payment

---

[3] In foreclosure means that the period set in a notice of intent to foreclose during which the borrower has the ability

provisions (note: the length of time for EPD and FPD claims varied among the master loan purchase agreements).

II.   BREACH CLAIMS.

   A.   Methodology.

   The damages resulting from breach Claims will be calculated based upon the simplifying assumptions that: (i) 1.5% of the loans in any pool will at some point be subject to a breach that would have caused the selling Debtor to have repurchased the loan, (ii) the "seasoning" of loans will be taken into account so that this 1.5% incidence is spread over the life of the pool based on the Debtors' historic data concerning the timing of when breach claims are asserted, and (iii) damages resulting from breaches will be set at 30% of the UPB of the loan as of August 31, 2007.  The following table sets forth the calculation methodology:

| Year | Quarter | % Incidence | Damages |
|------|---------|-------------|---------|
| 2007 | 1 Qtr | 1.500% | 0.450% |
| 2006 | 4 Qtr | 1.200% | 0.360% |
| 2006 | 3 Qtr | 1.120% | 0.336% |
| 2006 | 2 Qtr | 0.850% | 0.255% |
| 2006 | 1 Qtr | 0.680% | 0.204% |
| 2005 | 4 Qtr | 0.530% | 0.159% |
| 2005 | 3 Qtr | 0.360% | 0.108% |
| 2005 | 2 Qtr | 0.180% | 0.054% |
| 2005 | 1 Qtr | 0.140% | 0.042% |
| 2004 | 4 Qtr | 0.100% | 0.030% |
| 2004 | 3 Qtr | 0.085% | 0.026% |
| 2004 | 2 Qtr | 0.065% | 0.020% |
| 2004 | 1 Qtr | 0.060% | 0.018% |
| 2003 | 4 Qtr | 0.053% | 0.016% |
| 2003 | 3 Qtr | 0.045% | 0.014% |
| 2003 | 2 Qtr | 0.035% | 0.011% |
| 2003 | 1 Qtr | 0.025% | 0.008% |
| 2002 | 4 Qtr | 0.022% | 0.007% |
| 2002 | 3 Qtr | 0.018% | 0.005% |
| 2002 | 2 Qtr | 0.015% | 0.005% |
| 2002 | 1 Qtr | 0.012% | 0.004% |
| 2001 and Earlier | | 0.006% | 0.002% |

to bring the loan current has expired.

LA3:1144420.8

If an applicable loan purchase agreement between a Debtor and a non-affiliate of the Debtors did not contain an EPD provision, but did allow the purchaser to cause a Debtor to repurchase loans based on breaches of other types of representations and warranties, the damage calculations set forth in the foregoing table will be multiplied by 1.5667.

Damages, for purposes of distributions under the Plan, will be measured by applying the percentage factor in the final column of this table against the August 31, 2007 UPB of the loans purchased from a Debtor; provided, however, that in no case will the damage calculation for any pool be less than $5,000.

If the Creditor sold the loan prior to August 31, 2007 and does not know the UPB as of August 31, 2007, the damage assessment will be based on the UPB as of the date of sale. If a loan has been foreclosed, the measurement will be based on the UPB at the time of foreclosure. Loans that were paid-in-full or repurchased or replaced by one of the Debtors shall not be included in measuring the applicable UPB.

B.    Interaction with EPD/FPD Claims.

EPD/FPD claims will take precedence over breach claims. Thus, to the extent that a creditor establishes a valid EPD or FPD claim for a loan, that loan's UPB as of August 31, 2007 will be subtracted from the pool of loans for which breaches are computed.

This methodology is designed to avoid the need to resolve disputes over individual breach claims that are presently being asserted and to establish a methodology for assessing unliquidated claims based upon breaches that come to the fore when borrowers default in the future. Accordingly, this statistical approach will be used both with respect to individual breach claims presently being asserted by creditors and to assess unliquidated breaches to be discovered in the future; both types of breaches are subsumed within the statistical analysis set forth above.

- 4 -

III.    <u>Information</u>.

        In order to receive a distribution under the Plan, each Holder of an EPD/Breach Claim must supply information to the Debtors that enables the Debtors to calculate the damages that result from this protocol and to ensure that multiple creditors are not asserting overlapping claims.  That information will be set forth in a questionnaire that the Debtors will submit to each Creditor that has asserted an EPD/Breach Claim.

<u>Note</u>:  Nothing contained herein shall affect or impair in any way any other Claims, causes of actions or rights that the Holders of EPD/Breach Claims, the Debtors' Estates, and/or the Liquidating Trust may have against each other.

LA3:1144420.8

**<u>EXHIBIT C</u>**

# Exhibit C

## Allocation of Joint Administrative Expense Shares

The Joint Administrative Expense Shares of Access Lending, the Holding Company Debtors, and the Operating Debtors are as follows:

| Debtor Group | April 2, 2007 through April 27, 2007[1] | April 28, 2007 through Effective Date |
|---|---|---|
| Access Lending | 0.7%[2] | 0% |
| Holding Company Debtors | 22.4% | 22.6% |
| Operating Debtors | 76.8% | 77.4% |

---

[1] If Access Lending is removed from the Plan pursuant to Article 8.J.7 of the Plan, then the Joint Administrative Share allocations set forth in this Exhibit C to the Plan for the period from April 28, 2007 through the Effective Date shall also apply to the period from April 2, 2007 through April 27, 2007; provided, however, that if Access Lending is removed from the Plan, the Holding Company Debtors and the Operating Debtors shall be permitted to seek reimbursement from Access Lending for expenses or any portions thereof paid by the Holding Company Debtors or the Operating Debtors on behalf of Access Lending during the Chapter 11 Cases.

[2] This allocation is subject to Article 10.F.4 of the Plan.

1        Workshare Professional comparison of pcdocs://la3/1145098/2 and pcdocs://la3/1145098/4. Performed on 4/18/2008.

Document comparison done by Workshare Professional on Friday, April 18, 2008 4:46:37 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://la3/1145098/2 |
| Document 2 | pcdocs://la3/1145098/4 |
| Rendering set | ommstandard45 |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 3 |
| Deletions | 0 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 3 |

# **EXHIBIT B**

**(to motion)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Re: Docket No. ___ |

**ORDER GRANTING MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR AN ORDER DETERMINING THAT PROPOSED
PLAN MODIFICATIONS DO NOT ADVERSELY CHANGE TREATMENT OF
CREDITORS AND DO NOT REQUIRE RESOLICITATION OF ANY CLASS OF
CREDITORS**

Upon the *Motion Of The Debtors And The Official Committee of Unsecured
Creditors for an Order Determining that Proposed Plan Modifications Do Not Adversely Change
Treatment of Creditors and Do Not Require Resolicitation of any Class ff Creditors* (the
"Motion"); and it appearing that notice of the Motion was good and sufficient upon the particular
circumstances, and that no other further notice need be given; and the Court having considered the
Motion; and after due deliberation thereon; and that the Modifications (as such term is defined in
the Plan) do not adversely change the treatment under the *First Amended Joint Chapter 11 Plan of
Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March*

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a
Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware
corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New
Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a
California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan com, Anyloan com), a
California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation;
NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III
Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O.
Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp.,
a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage
Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage,
TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability
company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and
New Century Warehouse Corporation, a California Corporation.

*18, 2008* (the "Plan") of the claim of any creditor that has not consented to the Modifications; and good and sufficient cause appearing therefor; it is hereby:

ORDERED, ADJUDGED AND DECREED that:

1.    The Motion is GRANTED.

2.    In accordance with sections 105 and 1127 of the Bankruptcy Code and Rule 3019 of the Federal Rules of Bankruptcy Procedure, (a) the above-captioned debtors and debtors in possession and the Official Committee of Unsecured Creditors (together, the "Plan Proponents") are authorized to make the Modifications (as defined in the Motion) included in the Draft Second Amended Plan (as defined in the Motion), attached as <u>Exhibit A</u> to the Motion, and (b) the Modifications are deemed to be accepted by all creditors of the Debtors that vote to accept the *First Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March 18, 2008.*

3.    This Court shall retain jurisdiction to enforce and interpret the terms of this Order.

Dated: April ___, 2008
         Wilmington, Delaware

                                                    _____
                                                    THE HONORABLE KEVIN J. CAREY
                                                    UNITED STATES BANKRUPTCY JUDGE