IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416(KJC)** |
| **INC., a Delaware corporation, <u>et al.</u>,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Hearing Date: April 24, 2008 at 10:00 a.m.** |
| | : | |

**REPLY BRIEF OF PLAN PROPONENTS IN SUPPORT OF CONFIRMATION OF
SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE
DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED
<u>AS OF APRIL 23, 2008</u>**

---

[1]  The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited partnership.

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     THE PLAN SETTLEMENTS ......................................................................... 4

        A.      Debtor Groups and Determined Distribution Amounts ........................... 5

        B.      Multi-Debtor Claim Protocol ................................................................ 15

        C.      The Intercompany Claims Protocol ....................................................... 16

        D.      Joint Administrative Share ..................................................................... 19

        E.      Litigation Proceeds ................................................................................ 20

        F.      The EPD/Breach Claim Protocol ........................................................... 23

III.    RESPONSES TO OBJECTIONS ................................................................. 29

        A.      The Plan Doest Not Provide for the Substantive Consolidation of the
                Debtors, but Rather, Contains a Series of Interrelated Compromises that
                Together Comprise a Global Settlement of Key Intercompany and
                Intercreditor Disputes............................................................................. 29

        B.      The Objections Raised by the Ad Hoc Committee of Deferred
                Compensation Plan Beneficiaries with Respect to the Disposition of the
                Rabbi Trust Proceeds are Unfounded ..................................................... 40

        C.      Reply to NYSTRS.................................................................................. 55

IV.     THE PLAN MAY BE CONFIRMED PURSUANT TO SECTION 1129(B) OF
        THE BANKRUPTCY CODE NOTWITHSTANDING CLASS HC3B'S
        REJECTION OF THE PLAN ........................................................................ 59

        A.      Cram Down Generally ............................................................................ 59

        B.      The Plan Does Not Discriminate Unfairly Against Holders of Claims in
                Class HC3b ............................................................................................. 60

        C.      The Plan Is Fair And Equitable to Holders of Claims in Class HC3b.... 61

V.      CONCLUSION.............................................................................................. 61

The above-captioned debtors and debtors in possession (the "Debtors") and the Official

Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan

Proponents") respectfully submit this reply brief in support of confirmation of the *Second*

*Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of*

*Unsecured Creditors Dated as of April 23,, 2008* (the "Plan").[1]

## I.
## INTRODUCTION

As a result of a truly collaborative effort with the Official Committee of Unsecured

Creditors (the "Committee") and other core Creditor constituencies, the Debtors stand on the brink

of having completed an orderly liquidation under chapter 11 of the Bankruptcy Code and

confirming a chapter 11 plan that has received widespread Creditor support. This has been

accomplished in slightly more than one year following the Debtors' unexpected and rapid descent

from being one of the nation's largest subprime mortgage lenders to being debtors in chapter 11

bankruptcy and in the face of rapidly deteriorating market conditions, their announced need to

restate their financial statements for 2005 and 2006, government investigations, and the turmoil

associated with the sudden cessation of their massive operations.

From the beginning of these Chapter 11 Cases,[2] the Debtors and the Committee have had a

single overriding goal—a goal that is at the core of the Bankruptcy Code:  to maximize return for

Creditors while fairly and equitably apportioning the Estates' assets among them.  The path to

maximizing return to Creditors was straightforward: sell the Estates' alienable assets for the

highest attainable price, make use of institutional knowledge, memory, and skill to wind-down

operations while also reconciling Claims and dealing with litigation and investigations, and then

exit chapter 11 as soon as possible.  The path to ensuring the fair and equitable treatment of the

Estates' large and diverse Creditor body was much less clear.  The Debtors ran large-scale, highly

---

[1] On April 18, 2008, the Plan Proponents filed a draft of the Plan as an exhibit to the *Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Determining that Proposed Plan Modifications Do Not Adversely Change Treatment of Creditors and Do Not Require Resolicitation of Any Class of Creditors.* The Plan Proponents anticipate that a final version of the Plan will be filed on April 23, 2008.

[2] Any capitalized term not otherwise defined herein has the meaning ascribed to such term in the Plan.

complex businesses that when thrust unexpectedly into chapter 11, required extensive factual analysis and presented myriad novel legal issues.

Most of the sixteen Debtors count a number of sophisticated financial institutions, both as whole loan purchasers and counterparties to Master Repurchase Agreements, among their Creditors, while employees, service providers, trade vendors, landlords, equipment lessors, and noteholders, among others, filled out the Creditor ranks. From this diverse Creditor body with divergent interests, the United States Trustee appointed a creditors' committee composed of a counterparty to a substantial Master Repurchase Agreement with joint and several Claims against most of the Debtors, the Debtors' largest landlord with Claims against NCFC only, an information service provider with Claims against two of the operating company Debtors (Home 123 Corporation ("Home123") and New Century Mortgage Corporation ("NCMC")), two whole loan purchasers with early payment default and breach Claims (respectively, "EPD Claims" and "Breach Claims") against NC Capital Corporation ("NC Capital"), a trustee for 104 securitization trusts with EPD and Breach Claims against NC Capital and NCMC, and an indenture trustee for subordinated debt issued by Debtors' public parent company (New Century Financial Corporation ("NCFC")). In combination, the seven Committee members hold Claims against, among other Debtors, NCFC and each of the three main operating Debtors (NCMC, NC Capital, and Home123), with five Committee members holding Claims against just one Debtor and two holding Claims against multiple Debtors. The Committee, which has not changed in composition during these cases, represents a cross-section of the Debtors' Creditors and capital structure. It was particularly well-positioned to work with the Debtors in crafting the compromises that would be necessary to formulate, draft, and obtain confirmation of a chapter 11 plan that would maximize returns to Creditors while ensuring fair and equitable treatment of the Debtors' varied Creditor constituencies. The Debtors and the Committee have not squandered the opportunity to collaborate, not only with each other but other key Creditor groups as well. The Debtors, the Committee, and other Creditors that have been a part of the Plan process have challenged each

other and, at times, have disagreed adamantly with each other, but collaboration and compromise have carried the day.

The Plan is the fruit of these efforts. Fittingly, the touchstone of the Plan is compromise. The Plan contains numerous interrelated protocols and other mechanisms that together comprise a global settlement of nearly all of the key intercreditor and inter-Estate disputes. The Plan, if confirmed, will resolve, among other things, disputes related to prepetition and administrative Intercompany Claims, a potentially staggering amount of litigation related to EPD and Breach Claims of loan purchasers, the allocation of the net proceeds of the Estates' causes of action, and intercompany disputes regarding ownership of assets and liability for Claims.

The Plan looks complex, and it is. All of its key provisions and most of its minor provisions were painstakingly negotiated over the last eight months. The Plan Proponents and their professionals rigorously tested data while tapping their collective creativity in their quest to formulate a fair and equitable chapter 11 plan that would resolve as many of the Estates' intercreditor issues as possible. The key Plan settlements were developed not in isolation, but together over time. Each compromise informed the others and, therefore, a revision to one, almost always resulted in a revision to all. And this should come as no surprise, for while the Debtors are separate entities that, with certain exceptions, each have their own identifiable assets and liabilities, pre-bankruptcy the Debtors were highly interdependent companies engaged in voluminous complex and often interrelated financial transactions resulting in many Creditors, from employees to large financial institutions, having multi-faceted relationships with the New Century family of companies. The Plan Proponents were dedicated to respecting the integrity of each individual Debtor, but they also realized the interconnection among the various Debtors and their Creditors.

This reality yielded the concept of the "Debtor Group"—whereby the Debtors, other than New Century Warehouse Corporation ("Access Lending") were placed into one of two Debtor Groups (the Holding Company Debtors or the Operating Debtors)—along with the concepts of "Determined Distribution Amounts" and the "Multi-Debtor Claim Protocol," through which the

Plan Proponents devised mechanisms to recognize the varying relative asset-to-liability ratios of the Debtors and that some Creditors had Claims for which more than one Debtor was jointly and severally liable, which if these multiple Debtors had appreciable assets would logically enhance the recoveries to which such Creditors were entitled. These protocols provided the platform upon which the various Plan compromises were built.

The Plan Proponents believe that the Plan provides a fair and equitable means of treating the Estates' Creditors, and this belief is ratified by the overwhelming support of the Plan by Creditors other than a subset of Creditors—certain former members of management who opted to defer a portion of their compensation—who are seeking to use their votes against the Plan as leverage in their ongoing litigation with the Debtors. But just as working within the confines of the Bankruptcy Code forced most of the Debtors' disparate Creditor constituencies to the negotiating table and yielded a chapter 11 plan that has broad Creditor support, so does the Code, through its cramdown provisions, prevent this group of Creditors from commandeering the Chapter 11 Cases and destroying value that all have worked so diligently to preserve. As set forth herein, notwithstanding their mischaracterization of the Plan as substantively consolidating the Debtors and their votes against the Plan, the Plan treats the beneficiaries of the Debtors' deferred compensation plan (the "Deferred Compensation Plan Beneficiaries") in the same manner as it does the Debtors' other Creditors: fairly and equitably. Indeed, confirmation of the Plan will not prejudice these former members of management from pursuing their litigation. As they acknowledge, if they prevail in their litigation, confirmation of the Plan will not affect them at all. In contrast, if the Estates prevail in that litigation, participants in the deferred compensation plan will receive treatment that comports in all respects with the requirements of the Bankruptcy Code.

## II.
## THE PLAN SETTLEMENTS

The Plan contains a series of compromises each of which constitutes a reasonable compromise of issues and which together create a series of interrelated settlements that allocate value among the Debtors' Creditors. No individual settlement may be severed—each of these

settlements was reached as part of an integrated Plan. For example, the resolution reached with regard to the EPD/Breach Claim Protocol was related to the allocation of Litigation Proceeds, to the settlement of Intercompany Claims, to the settlement of the allocation of Joint Administrative Expenses, to the Multi-Debtor Claim Protocol and on and on. These settlements deal with issues that are factually and legally complex and uncertain. They are the sort of matters that cry out for compromise.

A.    **Debtor Groups and Determined Distribution Amounts**

    1.    The Debtor Groups and Determined Distribution Amounts are a Fair Resolution of Intercompany Litigation Issues and are Fair to Creditors of Each Debtor.

As an initial step in developing the Plan, the Plan Proponents analyzed ownership of assets and identified the Claims against the various Debtors as well as the Claims between and among the Debtors including both Intercompany Claims on the Debtors books and potential litigation Claims. In general, the Debtors functioned in three groups, which reflect the allocation of their assets and Claims. These three operational sets of Debtors also are utilized to group the Debtors in the Plan.

The Holding Company Debtors.  NCFC and New Century TRS Holdings (as context requires, referred to herein as "TRS Holdings" or "Old NCFC"), the current and former ultimate parents, as well as their two subsidiaries New Century Credit Corporation ("NC Credit") and NC Residual IV Corporation ("NC Residual IV"), are designated the Holding Company Debtors in the Plan. They hold the stock of the Operating Debtors and Access Lending and generally operated as real estate investment trusts, frequently holding residual interests in securitization trusts realized by the Debtors from the securitization of pools of mortgage loans. The most substantial of the Holding Company Debtors are NCFC and TRS Holdings. The history of the formation of these two entities has engendered considerable confusion about the title to particular assets, particularly as a result of the 2004 REIT Conversion (discussed herein at Section II.A.2).

The Operating Debtors.  The Operating Debtors generally were the entities that conducted the Debtors' business operations, including originating, purchasing, and selling loans and servicing loans for third parties. The primary Operating Debtors, NCMC, NC Capital, and to some extent

Home 123, were the entities that owned loans originated by the Debtors as part of the sequence of transactions involved in each loan sale to a third party (and repurchase in the event of a Breach or EPD Claim), resulting in huge and uncertain Claims among those entities.

Access Lending. Access Lending is a subsidiary that the Holding Company Debtors acquired in early 2006. It was a comparatively small operation that provided warehouse financing to other loan originators. It operated largely autonomously from the other Debtors and, accordingly, is grouped separately in the Plan from the other Debtors.

The Plan provides for the separate pooling of the assets of the Debtors in Holding Company and Operating Debtor Groups. But the Plan then uses what are termed Determined Distribution Amounts, in conjunction with the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol, to weight the distributions made to Creditors with Claims against specific Debtors in each Debtor Group. The Determined Distribution Amounts range from 25% to 130% and take into account such factors as the relative asset-to-liability ratios of each Debtor, uncertainties as to which of the Debtors in the Holding Company Debtor Group owns certain assets, and the Intercompany Claims among Debtors in a single Debtor Group.

As set forth below, the creation of the Debtor Groups and Determined Distribution Amounts together with the Multi-Debtor Protocol and the Intercompany Claim Protocol result in distributions to the Creditors of those entities that is fair in light of these considerations.

    2.    Issues Affecting the Holding Company Debtors.

        a.    Which of NCFC and TRS Holdings Owns Certain Assets is Unclear.

            (i)    The 2004 REIT Conversion

On October 1, 2004, the Debtors accomplished a corporate reorganization pursuant to which a newly formed Maryland entity became the ultimate parent of this family of companies and qualified as a real estate investment trust ("REIT") for federal income tax purposes (the "REIT Conversion"). Prior to this date, a Delaware the company now known as TRS Holdings was the ultimate parent of the Debtors, but at the time it was known as New Century Financial Corporation, a Delaware corporation (and, thus, also is referred to herein as "Old NCFC"). In 2004, the Debtors

established New Century REIT, a Maryland corporation with REIT status ("NC REIT") and its wholly-owned subsidiary NC Merger Sub, a Delaware corporation. NC Merger Sub was merged into TRS Holdings, with TRS Holdings surviving as a wholly-owned subsidiary of NC REIT. NC REIT's name was then changed to "New Century Financial Corporation" (the Debtor entity referred to herein and in the Plan as NCFC), and the name of Old NCFC was changed to "New Century TRS Holdings, Inc." To be clear (although clarity is not the hallmark of this matter), both NCFC and TRS Holdings at various times have been known as New Century Financial Corporation; the first is a Maryland corporation and the second is a Delaware corporation.

Yet, after the name changes, all of the general ledger accounts relating to TRS Holdings continued to be identified under the name "NCFC" because the general ledger software would not allow for the name to be changed. Additionally, all of the general ledger accounts relating to NCFC were identified under the name "REIT." As a result, after the REIT Conversion, the general ledger account names were inconsistent with the legal entity names.

These name changes and the inconsistency between the terminology used in the general ledger account system and the legal names of the entities have contributed to substantial confusion and uncertainty concerning the differences between NCFC and TRS Holdings, including as to which of these entities owns certain assets. Further, while there was an express assumption of certain obligations pursuant to the transaction documents, there were no wholesale asset transfer documents. In the course of negotiating the Plan, the Debtors and the Committee did their best to sort out these issues, but there inherently is uncertainty as to which entity owns certain major assets or Causes of Action.

(ii)    Carrington Interest and the Rabbi Trust

In early 2004, TRS Holdings acquired an interest in a limited partnership fund (the "Carrington Fund") and an interest in its general partner, Carrington Capital Management, LLC (the "GP" and together with the Carrington Fund, the "Carrington Interest"). The REIT Conversion, which occurred later that year, muddled which Debtor entity, TRS Holdings or NCFC, owned the Carrington Interest. Certain agreements related to the Carrington Fund executed in

7

December 2004, soon after the REIT Conversion, refer to "New Century TRS Holdings, Inc., a Delaware corporation formerly known as 'New Century Financial Corporation" as the investor in the Carrington Fund. However, a 2006 amendment to the Limited Liability Company Agreement governing the GP identified "New Century Financial Corporation" (without indicating any state of incorporation) as the owner of the membership interest in the GP. Internal communications during 2005 and 2006 refer to "NCFC's" ownership of interests in both the Carrington Fund and the GP; the assets were maintained on the Debtors' books, however, as an asset of TRS Holdings.

There is similar confusion about the ownership of the rabbi trust (the "Rabbi Trust") established by the New Century Financial Corporation Supplemental Benefit and Rabbi Trust Agreement (the "Rabbi Trust Agreement"). Prior to the REIT Conversion, Old NCFC established the New Century Financial Corporation Deferred Compensation Plan, Amended and Restated July 1, 2004 (the "Deferred Compensation Plan") and the Rabbi Trust. While there was an explicit assignment of the Deferred Compensation Plan to NCFC in the Merger Agreement executed in connection with the REIT Conversion, there was no corresponding amendment to the Rabbi Trust Agreement at the time of the REIT Conversion and no agreement expressly assigning the assets of the Rabbi Trust from TRS Holdings to NCFC. In addition, the assets and liabilities directly associated with the Rabbi Trust were recorded on the books of TRS Holdings - this accounting treatment continued even after the consummation of the REIT Conversion. Nonetheless, all solicitation materials distributed to employees indicated that the Deferred Compensation Plan was offered by NCFC and that the Deferred Compensation Plan was supported by the Rabbi Trust, an asset of NCFC.

It is well established that the scope of an interest in property is determined in a bankruptcy proceeding by looking to state law. See, e.g. Butner v. United States, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."); 5-541 Colliers on Bankruptcy - 15th Edition Rev. P. 541.05 ("Determination of [whether the debtor has an interest in property] requires resort to non bankruptcy law"); 9 Norton Bankr. L. & Prac. 3d § 175:26 (same).

With respect to the Debtors' interest in the Carrington Fund and the GP, the agreements are governed by the laws of the state of Delaware.  In construing a contract, courts applying Delaware law will look first to the language of the contract to determine the intent of the parties.  Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992).  The intent of the parties as ascertained by the language of the governing documents is important in determining who is a partner in a general partnership or a member of a limited liability company.  As noted by the court in Chaiken v. Employment Security Commission, Del. Super., 274 A.2d 707, 709 (1971), "[T]he intention of the parties, as explained by the working of the agreement is paramount."  A court will look outside of the contract when a contract leaves ambiguity as to the intent of the parties or when it is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992) (internal citations omitted).  In order to show the existence of a partnership in Delaware, "one must show the existence of the partnership by a preponderance of the evidence, and to do so one may demonstrate an intention to share profits and losses, and may use acts, the dealings and conduct of the parties, and admissions of the parties to do so."  Callahan v. Fenimore, 1999 Del. Ch. Lexis 200 (Del. Ch. Oct. 8, 1999).

As demonstrated above, there is evidence that the Carrington Fund and the GP are still owned by TRS Holdings, and there is also evidence that these interests may be have been intended to be transferred to NCFC after the REIT Conversion.  There is an ambiguity among the documents as to whether NCFC or TRS Holdings owns the interests in the GP and Carrington Fund that would need to be litigated to be resolved.  It is not clear whether a court would be able to determine the holder of the interests to be TRS Holdings or NCFC.

The Rabbi Trust Agreement is governed by the laws of the state of California.  In California, the interpretation of trust agreements follows the general rules of construction for contracts.  See Estate of Gump, 16 Cal.2d 535, 548. (1940) ("In construing trust instruments, as in the construction and interpretation of all documents, the duty of the courts is to first ascertain and then, if possible, give effect to the intent of the maker.")  It is clear that the intent of the parties was

to establish the Rabbi Trust between TRS Holdings and Wells Fargo, as Trustee. However, doubt remains as to whether the Rabbi Trust was assigned to NCFC from TRS Holdings at the time of the REIT Conversion.

In Ike v. Doolittle, 61 Cal.App.4th 51 (1998), a California court of appeal noted that "the interpretation of a written instrument, including a declaration... of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein." Id. at 73 (citing Scharlin v. Superior Court, 9 Cal. App. 4th 162, 168 (1992)). Here, the documents on their face appear not to have transferred the Rabbi Trust, but the Debtors' communications with the participants indicate that it was transferred. Thus, there is extrinsic evidence that would support litigation as to which Debtors' Creditors have an interest in the assets held in the Rabbi Trust.

This confusion of ownership of assets as a result of the REIT Conversion is the primary basis for placing NCFC and TRS Holdings in the Holding Company Debtor Group. By grouping these two Debtors, the parties effected a compromise of the disputes regarding the ownership of these two key assets of the Debtors.

        b.      Intra-Holding Company Debtor Claims.

NC Residual IV was an owner of some residual interests in securitization trusts, and NC Credit was a "conduit" entity that had a non-Debtor subsidiary contribute mortgage loans to some New Century-sponsored securitization trusts. The only known Claims against NC Residual IV other than that of NCMC are Claims of Morgan Stanley under its master repurchase agreement (an "MRA") (to which, among other Debtors, NCFC, NC Credit, and NC Residual IV were parties). The only known asset of NC Residual IV is a receivable owed by NCFC in the amount of $419 million. This receivable results primarily from income generated on residuals owned by NC Residual IV but paid to NCFC. Because under the Plan, Morgan Stanley's Claims against NC Residual IV will be treated as having a Determined Distribution Amount of 0% of their allowed amounts, any recovery realized by NC Residual IV on its Intercompany Claim against NCFC in turn would be paid to its parent, NCFC. The circularity of this exercise is why the Plan Proponents

concluded that this Intercompany Claim could properly be accounted for by pooling the few assets of NC Residual IV with the other Holding Company Debtors.

The Claims against NC Credit consist entirely of MRA Claims under MRAs where the counterparties to the MRAs (each a "Repurchase Counterparty") have joint and several Claims against other Debtors, including NCFC. NC Credit has certain assets—an intercompany receivable in the amount of $62.7 million owed by NCFC and approximately $1 million of cash. This intercompany receivable primarily results from income generated from loans held by NC Credit prior to their sale, where the cash received on these loans was paid to NCFC, rather than NC Credit. The Plan takes these facts into account. Because all but a negligible fraction of third party Creditors with Claims against NC Credit also have joint and several Claims against NCFC, the Plan Proponents concluded that the net effect of this structure could be reflected in the Plan by combining the assets of NC Credit with the other Holding Company Debtors, but by providing that the Repurchase Counterparties (or any other Creditors) who have Claims for which NCFC and NC Credit are jointly and severally liable will receive a Determined Distribution Amount of 130% of one of these Claims and a Determined Distribution Amount of 0% of the other such Claim for purposes of receiving distributions from the pooled assets of the Holding Company Debtors.

       3.      Issues Affecting the Operating Debtors.

           a.      Operating Debtors.

The Operating Debtors are grouped together in the Plan for different reasons than are the Holding Company Debtors. For the most part the ownership of assets among Operating Debtors can be discerned (although, as discussed below, the ownership of the Litigation Proceeds is less clear), but the resolution of the actual and potential Intercompany Claims among the Operating Debtors is most efficiently achieved by grouping the assets and assigning Determined Distribution Amounts to the Creditors based on the different Operating Debtors against which Creditors hold Claims. The intra-Operating Debtor Intercompany Claims are also addressed through the Plan compromises.

NCMC owned the primary operating businesses and most of the mortgage loans sold in the Chapter 11 Cases. For example, NCMC operated the servicing business that yielded the largest pool of cash from asset dispositions. In contrast, Home123's assets as of the Petition Date primarily consisted of a small amount of furniture, fixtures, and equipment. NC Capital owned a less substantial amount of mortgage loans. The remaining Operating Debtors have minimal, if any, assets and served as single purpose holding company entities. The Plan Proponents believe that upon completion of the Claims reconciliation process, all but a small fraction of the Claims against the Operating Debtors other than NCMC, Home123, and NC Capital will be Claims of Repurchase Counterparties.

Reflecting the relative value of the assets contributed to the joint pool of Operating Company assets and the relative amount of Claims against each of these Debtors, the Plan assigns Determined Distribution Amount percentages of (i) 100% to Unsecured Claims against NCMC (except as noted in footnote 4 hereof), (ii) 25% to Unsecured Claims against Home123 (except as noted in footnote 4 hereof), and (iii) 25% to Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral.[3]

b.    Potential Intercompany Claims for Loan Sale Transactions.

As noted above, the primary rational for grouping these Debtors is to resolve intercompany issues. NC Capital has relatively few assets other than sizeable Intercompany Claims that it <u>might</u>

---

[3] The Plan Provides for a Class of Special Deficiency Claims against each of NCFC, NC Credit, NCMC, Home123, and NC Capital. As of the filing of this Reply, DB Structured Products, Inc ("DBSP") is the only creditor in each of these Classes, holding a $20 million claim for which NCFC, NC Credit, NCMC, Home123, and NC Capital are jointly and severally liable. These claims are allowed based on a Bankruptcy Court-approved settlement agreement early in the Chapter 11 Cases between the Debtors and DBSP pursuant to which DBSP's recovery on account of its claims is limited to its pro rata share of the proceeds distributed from the net recoveries arising out of events or circumstances that led to the restatement of the Debtors' financial statements. In a modification of this settlement so as to comport with the structure of the Plan, the Plan Proponents and DBSP have agreed that, under the Plan, Special Deficiency Claims will receive, a Holder's election, either (i) a pro rata share of proceeds distributed from 55% of the net recoveries of all Causes of Action using a Determined Distribution Amount of 115% with respect to one of DBSP's two Special Deficiency Claims against Holding Company Debtors and one of DBSP's three Special Deficiency Claims against Operating Debtors or (ii) a pro rata share of 55% of the Restatement Litigation Proceeds using a Determined Distribution Amount of 130% with respect to one of DBSP's two Special Deficiency Claims against Holding Company Debtors and one of DBSP's three Special Deficiency Claims against Operating Debtors, as opposed receiving a pro rata share of proceeds distributed from 100% of the net recoveries of Restatement-related Causes of Action.

have against NCMC. Most mortgage loans sold by the Debtors were originated by NCMC and Home123 and were sold to NC Capital in order to complete whole loan sales and securitizations in the secondary market. NC Capital generally entered into loan sale agreements (the "Loan Sale Agreements") with third party purchasers in which NC Capital made typical representations and warranties and agreed to repurchase the mortgage loans if the borrower committed a payment default soon after the sale closed. Claims of those loan purchasers related to these sales (i.e. EPD/Breach Claims) comprise a substantial portion of the total Claims filed against the Debtors and the majority of EPD/Breach Claims are against NC Capital, as opposed to other Operating Debtors, since NC Capital was generally the Debtor that entered into Loan Sale Agreements.

These mortgage loans were generally sold by NCMC to NC Capital (or often in the case of Home123, sold by Home123 to NCMC, then by NCMC to NC Capital) shortly before NC Capital sold them in the secondary market. In 1998, NCMC and NC Capital entered into a Master Mortgage Loan Purchase and Servicing Agreement (the "NC Capital Purchase Agreement"). The NC Capital Purchase Agreement envisioned that sales of mortgage loans from NCMC to NC Capital would take place pursuant to written confirmation and loan sale schedules. The NC Capital Purchase Agreement also contemplated that NCMC would make standard representations and warranties to NC Capital in connection with such sales. If, in fact, loans were sold by NCMC to NC Capital pursuant to this agreement, NC Capital would have an Intercompany Claim against NCMC that would largely mirror the EPD/Breach Claims that secondary loan buyers assert against NC Capital. However, the sales of mortgage loans from NCMC to NC Capital were not documented under the terms of the NC Capital Purchase Agreement nor were they reflected in the Debtors' books and records in the manner described in the NC Capital Purchase Agreement. Accordingly, the application of the NC Capital Purchase Agreement to the mortgage loans sold by NCMC to NC Capital is unclear. Nonetheless, it was the Debtors' practice for NCMC to repurchase mortgage loans from third party purchasers that had purchased mortgage loans from NC Capital to the extent such repurchase was required under the Loan Sale Agreements. With

respect to loans originated by Home 123, similar Claims would arise, except that NCMC may have Claims back against Home 123 for the loans it purchased from Home 123 and sold to NC Capital.

To resolve potential Intercompany Claims of NC Capital against NCMC with respect to mortgage loans purchased by NC Capital from NCMC, the Plan provides Creditors of NC Capital a recovery greater than they would recover if only the assets of NC Capital were available to them and NC Capital did not have a mirror Intercompany Claim against NCMC. Thus, the Plan assigns a Determined Distribution Amount percentage of 50% to EPD/Breach Claims against NC Capital, in effect discounting the recoveries of these Creditors to the pooled assets of the Operating Debtors to reflect the strengths and weaknesses of the uncertain Intercompany Claim of NC Capital against NCMC for EPD/Breach Claims. But at the same time, this compromise was married with a Plan provision that allocates 45% of any Litigation Proceeds to Holders of EPD/Breach Claims against NC Capital, reflecting both the comparative strength of the rights of these Creditors to Litigation Proceeds and a settlement of the Intercompany Claim of NC Capital against NCMC related to EPD/Breach Claims. Similarly the Determined Distribution Amount percentage (25%) for Home123 reflects a resolution of potential NCMC Claims against that entity.

   c.  Other Intra-Operating Company Claims.

In addition to a Claim of $180.2 million recorded between NCMC and NC Capital, there is an intra-Operating Company Claim between NC Residual III Corporation ("NC Residual III") and NCMC. NC Residual III, a direct subsidiary of NC Capital, has a receivable from NCMC in the amount of $174.8 million, which primarily reflects interest income generated on NC Residual III's residuals and distributed to NCMC instead of NC Residual III. NC Residual III has only one known third party Creditor (Morgan Stanley, based on Morgan Stanley's MRA) and its only asset is a small amount of the proceeds from the sale of residual interests securitization trusts. There are a number of open issues related Morgan Stanley's MRA and, notably, Morgan Stanley did not vote against or object to the Plan. The receivable from NCMC was taken into account in the overall settlement between NCMC and NC Capital described above.

### B.    Multi-Debtor Claim Protocol

The Plan Proponents developed the Multi-Debtor Claim Protocol as a means to take into account the legal rights of Creditors holding guarantees or other valid joint and several contractual arrangements with Debtors. Accordingly, the Plan Proponents analyzed a range of scenarios to determine what the recoveries might be if the Debtors were grouped differently. Where Debtors within a Debtor Group had assets that might provide incremental recoveries, Creditors with joint and several Claims against multiple Debtors were given an enhanced recovery.

As discussed, within the Holding Company Debtors, it is difficult to distinguish whether NCFC or TRS Holdings own certain assets. Accordingly, under the Plan, a Creditor with a joint and several Claim against both NCFC and TRS Holdings receives distributions as if only NCFC or TRS Holdings was liable for such Claim. NC Credit did have certain separate assets, namely cash attributable to it as of the Petition Date as well as Intercompany Claims against NCFC. Accordingly, a Holder of an Allowed Unsecured Claim for which NCFC and NC Credit are jointly and severally liable should receive a greater distribution than would a Creditor holding an Allowed Unsecured Claim for which either NCFC or NC Credit is liable. To address this issue, the Multi-Debtor Claim Protocol provides that a Holder of Allowed Holding Company Debtor Unsecured Claims for which both NCFC and NC Credit are jointly and/or severally liable will be assigned a Determined Distribution Amount of 130% (subject to footnote 4 hereof with respect to Special Deficiency Claims) of the amount of its Allowed Unsecured Claim against NCFC and will be assigned a Determined Distribution Amount of 0% with respect to its Claim against NC Credit.

A similar methodology is applied under the Plan to Creditors holding Allowed Unsecured Claims for which certain Operating Debtors are jointly and/or severally liable. As discussed, most of the Operating Debtors have minimal assets other than NCMC, NC Capital, and Home 123. Unsecured Claims against these other Operating Debtors are also likely to be de minimis. However, if the Claims against these entities were not dealt with in a joint plan that pooled assets, a Holder of an Allowed Operating Debtor Unsecured Claim for which NCMC, NC Capital, and Home 123 are jointly and severally liable, would recover additional value compared to holder of

an Allowed Unsecured Claim against a single Operating Debtor. Accordingly, the Plan provides

that if a Creditor holds Allowed Unsecured Claims (subject to footnote 4 hereof with respect to

Special Deficiency Claims) against NCMC, NC Capital, and Home123, and those Debtors are

jointly and/or severally liable for such Claims, the Creditor will receive an enhanced recovery (up

to the allowed amount of such Claims) by virtue of being assigned a Determined Distribution

Amount on account of its Allowed Unsecured Claim against NCMC of 130% and will be assigned

a Determined Distribution Amount of 0% with respect to its Claims against other Operating

Debtors.

Thus, the Plan stands in contrast to the "deemed" consolidation rejected in In re Owens

Corning, 419 F.3d 195 (3d Cir. 2005), in which plan proponents proposed to ignore the fact that

the objecting banks had claims against multiple debtors with substantial assets. Here, the Plan

Proponents devised a mechanism to recognize that where Creditors hold Claims for which more

than one Debtor that owns assets in a Debtor Group is jointly and severally liable, those Creditors

are entitled to enhanced recoveries as compared to Creditors holding Claims against a single

Debtor or Debtors that do not own any assets in that Debtor Group.

C.    **The Intercompany Claims Protocol**

The Holding Company Debtors have aggregate Claims against the Operating Company

Debtors that total approximately $362.2 million.[4] The Operating Company Debtors have

aggregate Claims against the Holding Company Debtors that total approximately $321.9 million.

Under the Plan, the Holding Company Debtor Intercompany Claims against the Operating

Company Debtors are assigned a Determined Distribution Amount percentage of 50%, whereas the

Operating Company Debtor Claims against the Holding Company Debtors are assigned a

Determined Distribution Amount percentage of 100%.

The Holding Company Debtors' Claims against the Operating Company Debtors are

comprised of a net intercompany receivable on the books of NCFC owed by NCMC in the amount

---

[4] Note that the disclosure statement amount says $362.2 million, but subsequent adjustments revealed a $23.6 million adjustment that will be made which will reduce the amount to $338.6 million.

of $345.3 million[5] and a net intercompany receivable on the books of NC Credit owed by NCMC in the amount of $16.9 million. The $345.3 million net receivable balance consists mainly of approximately $786 million in cash provided to NCMC, offset by approximately $415 million in cash sent to NCFC. The $16.9 million net intercompany receivable reflects the ongoing intercompany business transactions that occurred between the NC Credit and NCMC, including the payments of proceeds for the sale of loans, interest income on the loans and guaranty fees.

The Holding Company Debtors' Claims are assigned a Determined Distribution amount of 50% as a result of a settlement arising from the contention by several of the Creditor groups that the cash provided to NCMC by the Holding Company Debtors should be considered capital contributions rather than intercompany debt. The law in the Third Circuit provides that debt will be recharacterized as equity when the court determines that the parties intended the transaction to constitute an equity contribution, as opposed to a loan. See In re SubMicron Sys. Corp., 432 F.3d 448, 456 (3d Cir. 2006). The Third Circuit has held that "no mechanistic scorecard suffices"[6] and that "intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." Id.

In In re Dornier Aviation, 453 F.3d 225 (2006), the Fourth Circuit Court of Appeals addressed whether a parent's intercompany loans to its subsidiary should be characterized as debt or equity. The Fourth Circuit adopted an 11 factor test, but also cited In re SubMicron Sys. Corp. in its contention that "no mechanistic scorecard suffices." Ultimately, the Fourth Circuit ruled that,

---

[5] Note that this amount is subject to a $23 million adjustment involving the Carrington interest. The adjusted amount will be $320.1 million.

[6] The Third Circuit indicated that the multi-factor tests employed by the other Circuits and by the District Court in the case "undoubtedly include pertinent factors." These tests include, among other factors, 1) the names given to the certificates evidencing indebtedness; 2) the presence or absence of a fixed maturity date; 3) the source of payments; 4) the right to enforce payment of principal and interest; 5) participation in management flowing as a result; 6) the status of contribution in relation to regular corporate creditors; 7) the intent of the parties; 8) thin or adequate capitalization; 9) identity of interest between creditor and stockholder; 10) source of interest payments; 11) the ability of the corporation to obtain loans from outside lending institutions; 12) the extent to which the advance was used to acquire capital assets; 13) the failure of the debtor to repay on the due date or to seek a postponement; 14 the presence or absence of voting rights; 15) the presence or absence of a fixed rate of interest or interest payments; 16) the security, if any, for the advances; 17) the presence or absence of a sinking fund to provide payments. See, In re SubMicron Sys. Corp. at 456.

although some aspects of the transaction were consistent with a loan, the transaction on the whole was more consistent with a capital contribution. The court noted several important factors: 1) the parent's insider status; 2) the lack of a fixed maturity date for the purported loan; 3) the fact that the subsidiary would not be required to pay until it became profitable; 4) the subsidiary's long history of unprofitability and the fact that its liabilities exceeded its assets; and 5) the parent's assumption of the subsidiary's losses. Id. at 234.

In response to the legitimacy of the position of Creditors of the Operating Debtors that the Claims of the Holding Company Debtors should be disallowed, the Plan Proponents oversaw the development of a compromise that involves two components. First, the intercompany transactions between NCMC and NCFC and between NCMC and NC Credit are netted, resulting in the combined net intercompany balance of $362.2 million.[7] Second, the Plan assigns the net balance a Determined Distribution Amount percentage of 50%.

The Operating Debtors' Claims against the Holding Company Debtors are comprised of a net intercompany receivable on the books of NCMC from TRS Holdings in the amount of $240.6 million and a net intercompany receivable on the books of NCMC from NC Residual IV in the amount of $81.3 million. The net receivable amount from NC Residual IV reflects the ongoing intercompany business transactions that occurred between the NC Residual IV and NCMC, including the payments of proceeds for the sale of loans, interest income on the loans and mortgage servicing fees, as well as the book value of residual interests. The net receivable amount from TRS Holdings is the result of approximately 29,000 transactions from 1997 to April, 2, 2007. The amount primarily results from cash payments to TRS Holdings to (i) pay off convertible debt of a net amount of $163 million,[8] (ii) fund stock purchases and options in the amount of $182 million, (iii) fund the Carrington interest investment of $22 million, (iv) fund stock dividends of $8

---

[7] See footnote 4 hereof.

[8] The net amount of $163 million related to the convertible debt is comprised of $200 million of convertible debt proceeds sent to NCMC by TRS Holdings, $400 million sent to TRS Holdings by NCMC to pay for the conversion of the debt to equity and a $36 million account adjustment related to non-cash expense recorded as part of the conversion that was charged to NCMC.

million and (v) pay operating expenses of TRS Holdings of $57 million. These amounts are offset by cash sent to NCMC of $144 million and an allocation of tax expense to NCMC of $38 million.

NCMC's Claims against the Holding Company Debtors are assigned a Determined Distribution Amount percentage of 100% because the majority of the net balances are a result of ongoing intercompany transactions that would be difficult to recharacterizie as equity under the law of the Third Circuit. With respect to the balance due from NC Residual IV, the entire intercompany balance relates to the sale of loans by NCMC to NC Residual IV, which would ultimately securitize the loans. With respect to TRS Holdings, the balance primarily is the result of NCMC, as the primary operating company, lending money to TRS Holdings to fund TRS Holdings' operational functions, which included capital management, investments, payment of employees and other general operating expenses as well as substantial amounts upstreamed to the TRS Holdings to satisfy TRS Holdings' obligations in connection with the REIT Conversion.

**D.    Joint Administrative Share**

In order to allocate (i) Allowed Administrative Claims (including Professional Fee Claims) and (ii) expenses of administering the Debtors' Estates incurred in the ordinary course prior to the Effective Date and paid by the Debtors in the ordinary course prior to the Effective Date for which liability (a) cannot be allocated to a particular Debtor or Debtors and (b) Debtors in more than one Debtor Group are liable, the Plan assigns a "Joint Administrative Expense Share" to each Debtor Group. In particular, as set forth on Exhibit C to the Plan, the Joint Administrative Shares for the period from April 2, 2007 through April 27, 2007 are 0.7% for Access Lending[9], 22.4% for the Holding Company Debtors, and 76.8% for the Operating Debtors. For the period from April 28, 2007 through the Effective Date, the Joint Administrative Shares are 0% for Access Lending, 77.4% for the Holding Company Debtors, and 22.6% for the Operating Debtors. Access Lending's Joint Administrative Expense Share is reduced to 0% after April 27, 2007 because the sale of Access Lending's assets to Access Holdings closed on April 27, 2008.

---

[9] The allocation of Joint Administrative Expenses is subject to a $1 million cap imposed on administrative and post-Effective Date expenses of the Access Lending Estate.

The percentages representing the Joint Administrative Expense Share are based on the

relative asset values of the Debtors in the high case recovery scenario used for purposes of

determining the estimate recoveries in the Debtors' Disclosure Statement. While this metric does

not directly reflect the expense associated with the Debtors Groups, it was determined by the Plan

Proponents to be a reasonable compromise under the circumstances of the Chapter 11 Cases. The

Holding Company Debtors may have incurred a disproportionate percentage of the professional

fees in the case in light of the fact that NCFC, the public parent company, was the named party to

the financial restatement (and related shareholder litigation) and, therefore, the Examiner

investigation. On the other hand, a large percentage of the overall shared administrative expense

includes employee payroll, almost all of which could be allocated to the Operating Debtors.

Further, the relative asset values do affect, in some respects, the portion of the professional fees

incurred by the Estates; a considerable amount of professional effort was expended in connection

with the asset sales that benefited the Operating Debtors, including investment banker fees

incurred in connection with those sales. Access Lending's proportionate share was determined

based on an estimate of time spent on Access Lending-related matters, which is more easily

identified.

In consideration of the foregoing, the Plan Proponents, including the Committee (with

members holding Claims against both Holding Company Debtors and the Operating Debtors),

agreed that the allocation was a fair compromise in the context of the Plan.

**E.     Litigation Proceeds**

The Plan allocates Litigation Proceeds (i.e. the net proceeds of all Causes of Action other

than Access Lending Causes of Action) 27.5% to the Holders of Allowed Holding Company

Debtor Claims, 45% to the holders of Allowed EPD/Breach Claims against NC Capital, and 27.5%

to the remaining of Holders of Allowed Operating Debtors Claims other than Holders of Allowed

EPD/Breach Claims against NC Capital. The Plan Proponents believe that this represents a fair

compromise of the allocation of the Litigation Proceeds and that combining the Litigation

Proceeds and then dividing the Litigation Proceeds on a percentage basis will provide for more

efficient prosecution of the Estates' Causes of Action. This will also avoid disputes among the Estates with respect to claims brought on alternative legal theories that might be asserted by different Debtor Estates.

The allocation recognizes that a substantial percentage of the avoidance claims, in particular preference claims, are likely to be held by the Operating Debtors, which collectively paid most of the operating expenses of the Estates. In addition, many of the commercial litigation claims also reside with the Operating Debtors. The primary litigation asset, however, is the litigation likely to arise based on the restatement of the Debtors' audited financial statements and as outlined in the Examiner's Final Report.

Different Debtors have arguments of varying strengths that they should be the beneficiaries of any litigation related to the financial restatement. For example, NCFC is the public company that filed consolidated financial statements and it was the entity that announced that it needed to restated these consolidated financials. It is also a party to the KPMG agreement. On the other hand, the issues that led to the restatement—e.g., the reserves for loan repurchases and the carrying value of the loans that were repurchased—were most directly applicable to the financial statements of NC Capital (which was obligated on most loan repurchase claims and had this reserve on its books) and NCMC (which is the parent of NC Capital, as well as the entity obligated on some loan sale contracts for EPDs and Breaches and the entity that tended to repurchase and hold loans put back to it and to NC Capital). Indeed, KPMG prepared separate audited financial statements for numerous debtors including NCMC and NC Capital, with the last such financial statements being those for the fiscal year ended December 31, 2005. The Debtors filed NCFC's consolidated financial statements publicly and distributed audited financial statements for NCMC and NC Capital and unaudited interim financials for these two entities covering 2005 and 2006 to numerous parties. NCMC provided copies of its financial statements to numerous state regulators, Repurchase Counterparties, and loan purchasers. Similarly, NC Capital provided its financial statements to numerous loan purchasers. Not surprisingly, NCFC's announcement that it needed to restate its consolidated financial statements had a crushing effect on the Operating Debtors.

21

Any client of an independent auditor has standing to sue the auditor for professional negligence. Bily v. Arthur Young & Co., 3 Cal. 4th 370, 406 (1992); Arthur Andersen v. Superior Court, 67 Cal. App. 4th 1481, 1502 (1998). Standing to pursue a negligent misrepresentation claim against an independent auditor is easier to establish; one need only establish that it is a party that the auditor either intended to influence with the audit report or knew would rely on the report. Bily, 3 Cal. 4th at 406 (1992); Arthur Andersen, 67 Cal. App. 4th at 1502. Thus, NCFC, NCMC, and NC Capital all have standing to bring claims against KPMG for professional negligence and negligent misrepresentation because all three were clients of KPMG whose financial statements KPMG was hired to review. KPMG's engagement letter, pursuant to which KPMG audited the New Century companies' financial statements and issued a clean opinion letter in 2004, 2005, and 2006, explicitly states that KPMG was retained "to provide professional services to New Century Financial Corporation and its subsidiaries."[10]

In this case, though all three entities, NCFC, NCMC, and NC Capital, have standing to bring claims against KPMG, it is difficult to ascertain which Debtor may have claims of the greatest monetary value. NC Capital's and NCMC's separately audited financial statements indicated that those entities were the parties that maintained the loan purchase loss reserves identified as the primary factor driving the need for the restatement of financial statements and, therefore, they undoubtedly suffered substantial damage from any accounting errors related thereto. NCFC, against which numerous lawsuits were commenced after the announcement of the restatement, also has substantial potential claims. Based on the impact of the restatement caused by the accounting errors and the damage done to the assets of the Debtors on account of such announcement (particularly the Debtors' loan origination and servicing businesses) and in the

---

[10] In addition, KPMG acknowledged in NCFC's 10-Ks for 2004 and 2005 (no 10-K was filed for 2006) that KPMG was engaged for the purpose of auditing the financial statements of NCFC and its subsidiaries. In NCFC's 2004 and 2005 10-Ks, KPMG stated "[w]e also have audited . . . the consolidated balance sheets of New Century Financial Corporation and subsidiaries" and "[i]n our opinion, management's assessment that New Century Financial Corporation and subsidiaries maintained effective internal control over financial reporting . . . . Also, in our opinion, New Century Financial Corporation and subsidiaries maintained, in all material respects, effective internal control over financial reporting . . . ." NCFC 2005 10-K at F-3, F-4; NCFC 2004 10-K at F-3.

context of other Plan settlements (such as the 50% Determined Distribution Amount percentage assigned to Holders of Allowed EDP/Breach Claims against NC Capital), the Plan Proponents developed a compromise that allocated 27.5% of the Litigation Proceeds to the Holding Company Debtors, 45% to the EPD/Breach Creditors with Claims against NC Capital and 27.5% to the other Operating Company Creditors. This allocation of Litigation Proceeds takes into account the relative rights of the Debtors to assert these litigation claims and is fair particularly given that it is integrated with a number of other settlements.

F.    **The EPD/Breach Claim Protocol**

The EPD/Breach Claim Protocol is an innovative and proper means of dealing with Claims arising under whole loan purchase agreements and loan securitizations and satisfies the requirements of the Bankruptcy Code.

The Plan establishes two Classes (Class OP3B and Class OP6B) for EPD/Breach Claims against NCMC and NC Capital, respectively. The Plan provides that distribution to Creditors holding Allowed Claims in these two Classes will be made based on Determined Distribution Amounts calculated pursuant to the EPD/Breach Claim Protocol attached as Exhibit B to the Plan. This protocol is designed to avoid protracted litigation over the amount of Claims in these two Classes that otherwise would threaten to consume a substantial period of time – potentially years – and substantial resources of the Estates and Creditors. The Debtors developed this protocol working closely with the Committee and the major holders of Claims in these two Classes. This effort is designed to streamline the Claims adjudication process and thereby substantially improve distributions to Creditors (by avoiding the incurrence of administrative costs that otherwise would be incurred) and by speeding distributions to Creditors. The EPD/Breach Claim Protocol has been strongly embraced by the Creditors in these two Classes.

Many of the contracts governing the Debtors' sales of mortgage loans in the secondary market provided that the buyer could put the loans back to the selling Debtor if the Debtor breached certain representations and warranties (a "Breach Claim") or if the borrower under the loan committed a payment default during a specified period of time, generally around 30-60 days

after a loan sale closed (an "EPD Claim").  The Debtors realized that EPD/Breach Claims would likely be among the largest of the Claims asserted in these cases, for the Debtors sold hundreds of thousands of mortgage loans involving approximately $200 billion in principal amount.  Prior to the Petition Date, the Debtors employed a substantial team of personnel dedicated specifically to trying to resolve asserted Breach Claims.  This was a major undertaking during the time of the Debtors' operations.  It held the prospect of being an even more substantial undertaking in connection with the Plan unless a streamlined protocol was developed.  The prospect of trying to resolve these Claims in the context of the Plan was particularly daunting for several reasons.

First, prior to filing for bankruptcy protection, the Debtors typically dealt with valid EPD and Breach Claims by repurchasing the mortgage loans in question.  It was not necessary to determine damages that would flow from a Breach or EPD prepetition since the Debtors would repurchase the loan.  After filing bankruptcy, the Debtors could not repurchase the loans and the key issue for purposes of determining the amount of a Claim was the damages that the Creditor suffered—e.g., the value of the loan that the loan purchaser still held compared to the unpaid principal balance (the "UPB") of the loan at the time of the Breach or EPD.  Determining damages could be a very time-consuming and expensive proposition for the hundreds of thousands of loans in question and could involve factual investigations at a loan-level detail.

Second, many of the secondary loan buyers asserted that the amount of Breach Claims was presently unliquidated and could not be liquidated for years to come.  This is true because many loan buyers have no reason to try to determine whether the selling Debtor breached a representation or warranty until and unless the borrower on that loan defaults.  Thus, at a minimum, any plan would need to develop a mechanism for estimated substantial unliquidated Breach Claims.

In addition, determining the validity of Breach Claims, whether liquidated or unliquidated, inherently involved many subjective and difficult determinations, for many of the representations and warranties contained in loan sales contracts are not objective.

When the Debtors began analyzing the Claims asserted in these cases, they realized that, if anything, they may have underestimated the difficulty of addressing these issues.  The Debtors

expected that EPD/Breach Claims would constitute the largest single group of Claims filed in these cases. That proved to be an understatement. One-hundred and fifty-five Claims asserting EPD/Breach Claims were filed in the amount of $3.929 billion.[11] In many respects, that total both overstates and understates the amounts at issue. It overstates the amounts at issue since 90 of these Claims, totaling $3.864 billion, asserted Claims based purely upon the UPB of the mortgage loans specific to an EPD or Breach Claim, rather than the damages that the Creditors suffered by virtue of the Debtors' failure to repurchase these loans. The filed Claims understate, however, the amount at issue, for 62 of these Claims asserted additional damages in an unliquidated amount, and many of these unliquidated Claims were filed by indenture trustees for large securitization pools, which would likely be among the largest of the EPD and Breach Claims.

The Plan Proponents decided to invite the major indenture trustees for securitization trusts, sponsors of securitizations and major whole loan purchasers who dealt with the Debtors to work with the Plan Proponents to see if a protocol could be developed to deal with these issues. The Plan Proponents also consulted with Fannie Mae; Fannie Mae was not a major buyer of loans from the Debtors, but its proof of claim indicated a creative approach to estimating damages for EPD and Breach Claims, and Fannie Mae has access to substantial industry data. Over the course of approximately three months, these parties analyzed (i) data collected by the Debtors and the participants in the secondary markets and (ii) industry data. The Plan Proponents and secondary market participants who worked to develop this methodology recognized that as long as a protocol treated like Creditors in a consistent manner, altering the numeric factors were not likely to have a material impact on the pro rata distributions to members of the EPD/Breach Claim Classes. The parties strived to develop a protocol consistent with substantial data, but also sufficiently simple that its administration would not delay the calculations or distributions to Creditors in the EPD/Breach Claim Classes. In addition, the parties working to develop this protocol were cognizant of the fact that the aggregate damage calculations that result from the application of the

---

[11] This total excludes claims filed against multiple Debtors and duplicate claims. If multi-Debtor claims and duplicate claims were included, the total would equal $5.672 billion.

protocol should yield a result that was consistent with other interrelated compromises that are the hallmark of the Plan—the Holders of EPD and Breach Claims that were parties to this process would not support a protocol that yielded an aggregate result that was disproportionately low compared to the Claims of other Classes of Creditors, while the other Classes of Creditors would not support the protocol if it generated a result that was disproportionately large.

The EPD/Breach Claim Protocol attached as Exhibit B to the Plan is the product of this work. The protocol differentiates between EPD Claims and Breach Claims and for each type of Claim applies a statistical measure, derived from analysis of data supplied by Creditors, the industry, and the Debtors, to arrive at a damage calculation.

Application of the EPD/Breach Claim Protocol requires information from the Creditors in these Classes. The Plan Proponents could have required Creditors to provide this information by objecting to filed Claims, for most proofs of claim did not include all the documentation that would be required in order establish the validity of the Claim. The Plan Proponents and the major secondary loan purchasers decided, instead, to develop a questionnaire that would streamline this process. This questionnaire was developed based upon input received from the Committee and the major secondary loan buyers and on January 23, 2008, the Debtors mailed this questionnaire to Creditors who had asserted a Claim based upon an EPD or breach. This process was reviewed by the Court at the hearing held on March 5, 2008 to establish solicitation procedures and to approve the Disclosure Statement. The Court's *Order (A) Approving Disclosure Statement Regarding First Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors, Dated as of March 18, 2008 (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Joint Plan of Liquidation and (C) Scheduling a Hearing on Confirmation of Joint Plan of Liquidation and Approving Related Notice Procedures, entered on March 18, 2008* (the "Solicitation and Disclosure Statement Order"), provided that the Debtors would mail to each Holder of a Class OP3b Claim or Class OP6b Claims a copy of the EPD/Breach Claim Protocol, the results of application of the data supplied by the Creditor in the questionnaire, and a ballot with this amount listed. The Solicitation and Disclosure Statement

Order further provided that if a Creditor failed to complete the information sought in the questionnaire prior to the Debtors' mailing the above-listed materials, the amount of the Holder's Class OP3B or OP6B Claim would be temporarily allowed for voting purposes at $1.00. If any Creditor in these Classes objected to the Debtors' calculations, it had until April 11, 2008 to object, in which case a hearing would be held on April 16, 2008. Alternatively, the parties could stipulate to the amount of the Claim for voting purposes.

Since the March 5, 2008 Disclosure Statement hearing, the Debtors have worked assiduously with Creditors to avoid any such disputes. That effort has been wholly successful. The Debtors have filed numerous stipulations with Holders of EPD/Breach Claims over the last couple of weeks. Only one EPD/Breach Claim Holder filed an objection to the amount listed on its EPD/Breach Claim ballot; that Creditor, CitiMortgage, Inc., and the Debtors reached a stipulation for voting purposes prior to April 16, 2008.

The Plan Proponents are gratified by the essentially universal support that the EPD/Breach Claims Protocol has received. The Plan Proponents believe that this aspect of the Plan should save the Estates millions of dollars in administrative costs and is likely to speed distributions to Creditors in these Classes by a substantial period, perhaps years.

The EPD/Breach Claim Protocol is innovative. It also fully satisfies the requirements of the Bankruptcy Code. Bankruptcy Code § 1123(a)(4) provides that a plan is to provide "the same treatment for each claim or interest in a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." This requirement mandates fairness and equality of treatment and that is exactly what the EPD/Breach Claim Protocol provides – each Creditor in the EPD/Breach Claim Classes will receive a distribution based upon a uniform protocol that is fairly and equally applied. The test of § 1123(a)(4) is whether the process for the resolution of distributions to class members is fair and evenhanded. As the court observed in In re Central Medical Center, Inc., 122 B.R. 568 (Bankr. E.D. Mo. 1990):

> [U]nless otherwise consented to, a plan of reorganization must treat
> all members of the same class equally. The parties have presented
> the issue of whether § 1123(a)(4) requires a plan to subject class
> members to the same process for claim satisfaction, or whether that
> that process must yield the same pecuniary result for each class
> member. This Court chooses the former interpretation. . .. The Plan
> subjects each member of the class to the same process for claim
> payment. In other words, the Plan subjects all members of the same
> class to the same means of claim determination. This court holds
> that this is sufficient to satisfy the requirements of § 1123(a)(4).

Id. at 574-575.

In addition, settlements of the type set forth in the EPD/Breach Claim Protocol are

particularly appropriate when the claims involved are numerous and are disputed and unliquidated

and the cost of a more cumbersome claims resolution process would undermine the very purpose

of chapter 11 bankruptcies. As the court observed in In re Dow Corning Corp., 244 B.R. 634

(Bankr. E.D. Mich. 1999):

> [T]he situation changes considerably, however, when a class is
> composed of disputed and unliquidated claims. Under this scenario,
> the precise value of the claims will not be known. And short of
> actually liquidating the claims, there is no way to determine whether
> a proposed settlement is offering to pay claimants the same
> percentage recovery on their respective claims. Any attempt to
> practically apply [a rule of absolute precision as adopted by some
> courts], then, would be unduly burdensome and would severely
> inhibit, if not eliminate the estate's ability to settle disputed and
> unliquidated claims. Settlements, which serve the salutary purpose
> of avoiding the time, expense and uncertainty involved in liquidating
> the claim, are strongly favored and encouraged by the law. In fact, a
> prime objective of the reorganization process is to foster a negotiated
> resolution to the many disputes underlying the bankruptcy.

Id. at 668.

Or as the court in Winn-Dixie observed, where, as here, an issue is likely to lead to

"protracted litigation [that] could wipe out the estate," a compromise "is a better alternative than

forcing the impending litigation." In re Winn-Dixie Stores, Inc., 356 B.R. 239, 250 (Bankr. N.D.

Fla. 2006). Particularly when a settlement of this sort has been developed through negotiations

with representatives of the major creditors whose interests are at issue and the plan is supported by

a majority of the creditors in the class, compromises of this sort found in a plan are particularly

appropriate. Id. at 249-250; In re Exide Technologies, 303 B.R. 48, 70-71 (Bankr. D. Del. 2003).

## III.
## RESPONSES TO OBJECTIONS

A.    **The Plan Doest Not Provide for the Substantive Consolidation of the Debtors, but Rather, a Series of Interrelated Compromises that Together Comprise a Global Settlement of Key Intercompany and Intercreditor Disputes**

    1.    The Plan Settlements, Both Individually and Collectively, Satisfy the Requirements of Bankruptcy Rule 9019(a) Under Applicable Case Law.

        a.    Standard for Settlements in Chapter 11 Plan

Bankruptcy Rule 9019(a) provides that a bankruptcy court may approve a compromise or

settlement on motion by the trustee and after notice and a hearing. When deciding whether or not

to approve a settlement, the court must assess the value of the claim that is being settled and

balance it against the value to the estate of the approval of the settlement. Myers v. Martin (In re

Martin), 91 F.3d 389, 393 (3d Cir. 1996). The Third Circuit looks to the following four when

deciding whether to approve a settlement: (1) the probability of success in litigation, (2) the likely

difficulties in collection, (3) the complexity of the litigation involved, and the expense,

inconvenience, and delay necessarily attending it, and (4) the paramount interest of creditors. In re

RFE Industries, Inc., 283 F.3d 159 (3d Cir. 2002). Courts have also held that settlements should

only be rejected if they fall "below the lowest point in the range of reasonableness." Cosoff v.

Rodman (In re W. T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citing Newman v. Stein, 464

F.2d 689, 693 (2d Cir. 1972). Indeed, as acknowledged by the Ad Hoc Committee of Beneficiaries

of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental

Executive Retirement/Savings Plan (the "Ad Hoc Committee"), "this standard is not high." See

Objection and Memorandum of Law of Ad Hoc Committee of Beneficiaries of the New Century

Financial Corporation Deferred Compensation Plan and/or Supplemental Executive

Retirement/Savings Plan to Confirmation of First Amended Joint Chapter 11 Plan of Liquidation

("Ad Hoc Committee Objection") at 23.

Chapter 11 plans may provide for settlements. See, e.g., In re Allegheny Intern., Inc., 118
B.R. 282, 309 (Bankr. W.D. Pa. 1990) ("A plan may provide for compromise of litigation.").
Indeed, section 1123(b)(3) of the Bankruptcy Code permits "the settlement or adjustment of any of
claim or interest belonging to the debtor or to the estate." Further, section 1123(b)(6) of the
Bankruptcy Code allows a plan to "include any other appropriate provision not inconsistent with
the applicable provisions of [the Bankruptcy Code]." As such, chapter 11 affords a trustee or
debtor in possession tremendous flexibility in formulating and proposing a chapter 11 plan
provided that the plan does not otherwise conflict with the provisions of the Bankruptcy Code.

Where a chapter 11 plan contains settlements, this Court has stated that it is the "duty of the
Bankruptcy Court to determine that a proposed compromise forming a part of a plan is fair and
equitable. In re Exide, 303 B.R. at 67. In addition to the four RFE Industries factors, this Court
has applied criteria (some of which overlap with the RFE Industries factors) set forth in In re
Texaco, Inc., 84 B.R. 893, 902 (Bankr.S.D.N.Y. 1988), when considering a settlement in the
context of a plan of reorganization, namely: (1) the balance between the likelihood of plaintiff's or
defendant's success should the case go to trial vis a vis the concrete present and future benefits
held forth by the settlement without the expense and delay of a trial and subsequent appellate
procedures, (2) the prospect of complex and protracted litigation if the settlement is not approved,
(3) the proportion of the class members who do not object or who affirmatively support the
proposed settlement, (4) the competency and experience of counsel who support the settlement, (5)
the relative benefits to be received by individuals or groups within the class, (6) the nature and
breadth of releases to be obtained by the directors and officers as a result of the settlement, and (7)
the extent to which the settlement is truly the product of "arms-length" bargaining, and not of fraud
or collusion. See In re Exide, 303 B.R. at 67-68.

b.    The Plan's Global Settlement Meets the Standard Set Forth in Exide.

In Section II above, the Plan Proponents have summarized the terms of and justification for
the key compromises that together form the global settlement advanced by the Plan. While the
Plan Proponents strongly believe that each of the sub-parts of the global Plan settlement meets

Exide's standard for chapter 11 plan settlements, the Plan Proponents also believe that the compromises in the Plan should be evaluated for what they are: an interrelated and interdependent set of agreements, each with a term that requires approval of the others, that comprise a global settlement of the main intercreditor and inter-Estate issues presented in the Chapter 11 Cases. Viewed in this light, there is no doubt that the Plan settlement should be approved.

Probability of Success on the Merits:  In evaluating this aspect of the proposed Plan settlement the Court's task is not to "decide the numerous questions of law and fact raised by [objections] but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness."  In re Exide, 303 B.R. at 68 (quoting In re Nashimi Office Bldg. Assoc., 62 B.R. 798, 803 (E.D. Pa. 1986)).  Each of the Plan settlements individually is, and unquestionably the settlements taken as a whole are, reasonably and well within any "range" of reasonableness.

As set forth in detail in Section II.C above, the Debtors and the Committee undertook a detailed factual analysis of the Debtors' assets and transactions giving rise to the potential Claims among the Debtors.  Also, where applicable, the Plan Proponents undertook to research and analyze the legal theories and principals that they believed each Estate could assert in a given dispute, such as the legal standards applicable to the title of particular assets held by the Holding Company Debtors, the ownership of and standing to bring the Causes of Action, and the appropriateness of allowance of a parent company's claims against its subsidiaries where such claims are based on the infusion of cash.  While each of the Plan compromises are part of an integrated whole, each of the settlements is independently reasonable based on the likelihood of potential outcomes in light of the law and facts presented.

Moreover, given that the modification of any of the Plan's key compromises would lead to the collapse of the other key compromises, the Estates would be faced with protracted litigation if the Plan is not confirmed as is.  In a similar situation, the Bankruptcy Court in Winn-Dixie found that the prospect of protracted litigation that could "wipe out" the estate led to the conclusion that the "probability of success would be next to nil" regardless of which side prevailed in litigation

because of the magnitude of litigation costs and fees that the estate would have to bear.  Winn-Dixie, 356 B.R at 250.  The same holds true here.  Litigating even one of the disputes underlying the Plan compromises would drain the Estates of substantial value and could even wipe out the Estates.  When acknowledging the hard reality that if the Estates are going to have to litigate any of the disputes underlying Plan compromises, they will have to litigate them all, there is little doubt that without the global Plan settlement, the Estates will be decimated.  Thus, because none of the compromises falls below the lowest range of reasonableness and because there will be no "success" no matter who is "right" if the settlements are not collectively approved, this factor is satisfied.

The Likely Difficulties in Collection:  While this factor may not appear applicable as it more fittingly applies to conventional, single dispute plantiff/defendant litigation, this factor weighs heavily in favor of approving the Plan Settlements.  The disputes being settled are largely intercompany litigation among liquidating Debtors.  As noted above, each of the Debtors could expend its remaining assets in the litigation of these complex claims—such that by the time a judgment is reached the prevailing Debtor may find that the defendant Debtor has exhausted its assets.  Just as the fact that "creditors would be faced with the Sisyphean task of attempting to collect any percentage of their claims" led the Winn-Dixie court to find that this factor had been met, so too should it lead this Court to the same finding:  without the comprehensive Plan settlement, there will little, if anything, for creditors to collect.  Id.

The Complexity of the Litigation Involved and the Expense, Inconvenience, and Delay Necessarily Attending It:  This factor unquestionably weighs in favor of settlement and may be the primary basis on which the divergent Creditor interests were able to reach an agreement with respect to the Plan.  As in Exide, and likely to a greater degree, "[t]here is no doubt that the litigation involves and complex issues on a variety of topics that would require costly and time-consuming discovery in addition to lengthy trials, delaying distributions to creditors."  In re Exide, 303 B.R at 70.

Notably, as discussed as length above, issues resolved in EPD/Breach Claims would involve tens of thousands of individual loan-level reconciliations and then calculations of damages. Similarly, the allocation of administrative expenses among the Debtors would involve extensive factual analysis as the fees of the Debtors' professionals and the ordinary course expenditures of the Debtors would be subject to detailed audits and could depend at least in part on the outcome of the inter-Estate dispute regarding the allocation of the Litigation Proceeds, which itself may have to await some degree of finality of the resolution of the Causes of Action (including, of course, the restatement-related litigation). Similarly, complex and lengthy litigation would be needed to resolve the validity of the various Intercompany Claims and the ownership of assets such as the Carrington interest. Accordingly, the Plan undoubtedly fulfills this factor.

Paramount Interest of Creditors: In evaluating whether this factor weighs in favor of approving settlements in a plan, courts look to two primary indicia: (i) whether the creditors committee supports the plan at issue and (ii) the level of creditor support for the plan as expressed through voting. See In re Exide, 303 B.R. at 70 (citing In re Texas Extrusion Corp., 844 F.2d 1142, 1149 (5th Cir. 1988); In re BBL Group, Inc., 205 B.R. 625, 630 (Bankr. N.D. Ala. 1996); In re Cellular Information Systems, Inc., 171 B.R. 926, 947 (Bankr. S.D.N.Y. 1994); In re Allegheny Int'l., 118 B.R. at 309). Here, the Committee, which includes representatives of each Estate with significant assets and some of the lesser Estates, played a pivotal role in the negotiation and formulation of the Plan. Not only do the Committee members have Claims against the main Estates, but they also span the spectrum in terms of the types of Claims they hold. One Committee member is an MRA Counterparty with Claims against multiple Debtors and two Committee members are loan purchasers holding EPD/Breach Claims, while the other members collectively hold individual Claims against NCFC, NCMC, and Home123. While the Debtors led the analytical aspects with respect to Plan formulation, the role of the Committee in brokering a fair compromise among the divergent Creditor interests was critical to the achievement of the ultimate result. Indeed, the depth of the Committee's participation and its rationale for strongly supporting the

Plan merits its own brief and, therefore, the Committee has filed a supplemental reply brief on these matters concurrently herewith.

In addition, preliminary voting results show that the Debtors' Creditors have overwhelmingly voted in favor of the Plan. Every impaired voting Class other than Class HC3b (which appears to have the requisite votes in terms of amount of accepting Claims, but not in terms of number of accepting Claims) and HC13 (a Class in which none of the three Claims eligible to vote were cast), appears to have supported the Plan with more than 90% of amount and number of votes. Indeed, it appears that more than 95% of the amount of the voted Claims in Class HC3b voted to accept the Plan, and, more than 90% of that Class' non-Deferred Compensation Beneficiaries claimants who voted, voted in favor of the Plan. The verdict is clear: other than a subset of Creditors that includes former management personnel named in the Examiner's Final Report as perhaps as having received improper compensation, Creditors, particularly those with the greatest amounts at stake, resoundingly support Plan and its compromises. The Debtors' Creditor body at large should be respected and should not fall victim to a group of hold-out Creditors seeking to leverage their settlement position in an adversary proceeding. Rather, the Plan reflects, and the Creditors by virtue of their votes recognize, the reality that the Estates' Creditors are inexorably linked by the myriad intercompany and intercreditor issues, and that to take any other approach than that for which the Plan provides will be decidedly against the paramount interests of Creditors. Accordingly, this factor weighs in favor of approving the interrelated Plan settlements.

Texaco Factors: To the extent they are not subsumed in the RFE Industry factors detailed above (such as Texaco factors 1 and 2) and are applicable to the Plan, the Texaco factors support approval of the Plan settlements as well. Texaco factor 3 weighs in favor of the Plan for, as discussed above, the vast majority of Creditors overwhelmingly support the plan and its proposed settlements. Moreover, while Class HC3b has voted to reject the Plan, over 90% of the amount of Claims on account of which votes were cast voted in favor of the Plan, and the members of that Class that are not Deferred Compensation Beneficiaries voted in favor of the Plan in terms of

numerosity.  Further, with respect to <u>Texaco</u> factor 4 (<u>i.e.</u>, competent and experience of the counsel support the settlement), it should be noted that counsel for the Debtors and the Committee have spent a year familiarizing themselves with the complex novel legal and factual issue facing the parties in these cases and underlying the settlements.  The counsel for the Debtors and the Committee have been directly involved with the negotiation and documentation of each aspect of the Plan and its settlement and after this extensive process are strongly supportive of the agreement reached in the Plan.  Moreover, experienced and sophisticated counsel for numerous whole loan purchasers and Repurchase Counterparties were intimately involved in the collaborative process that led to the formulation of the EPD/Breach Claim Protocol and the Multi-Debtor Claim Protocol, respectively.

With respect to <u>Texaco</u> factors 5 and 6 (<u>i.e.</u>, benefits to be received by individuals and nature and breadth of releases of officers and directors), the settlements reached in the Plan apply to Classes in the Plan only and none of the settlements apply to individual Creditors or directors and officers of the Debtors individually.  Indeed, there are no third party releases in the Plan beyond the Plan's exculpation provisions that apply to the Plan Proponents for postpetition period and bankruptcy-related matters.

Finally, <u>Texaco</u> factor 7 weighs heavily in favor of the settlement.  Notwithstanding suggestions by the Ad Hoc Committee to the contrary, the Plan is a product of arm's length bargaining, indeed vigorous and extensive negotiation over an eight-month period.  As noted above, all the major Creditor constituencies were well represented by engaged members of the Committee, and where the Plan Proponents believed they needed broader support for a settlement – such as the treatment of the Repurchase Counterparties or the EPD/Breach Claim Protocol, the Plan Proponents worked with informal groups of Creditors beyond the Committee to ensure that all views were represented.

      2.      <u>The Ad Hoc Committee's Argument that Plan Violates Owens Corning is Misplaced.</u>

The Ad Hoc Committee steadfastly argues that the Plan violates the standards articulated in Owens Corning with respect to the Holding Company Debtors. The Ad Hoc Committee primarily argues that the Plan is not a compromise because there is no dispute as to whether the Debtors' Estates should be substantively consolidated. Ad Hoc Committee Objection at 22. The Ad Hoc Committee also argues that the Plan "is nearly identical" to the plan proposed in Owens Corning and that it consolidates the Holding Company Debtors merely for convenience and for the benefit of certain unsecured Creditors holding Claims against Debtors with no material assets. Ad Hoc Committee Objection at 18 & 21. The Ad Hoc Committee is simply wrong in its assertions.

The Plan does not provide for substantive consolidation. It would have been far simpler for the Plan Proponents to have proposed a plan that consolidated the debts and assets of each of the Debtors and ignored the relative rights of differing Creditors, distinctions among Debtors and the like. Rather, this is a joint plan and a complicated joint plan because it deals with the host of issues that affect Debtors and Creditors of different Debtors in variable ways. For example, the Plan pools the assets and liabilities of certain groups of Debtors but provides for Classes specific to Debtors and Determined Distribution Amounts specific to those Classes. These Determined Distribution Amounts set forth Classes of Claims against various Debtors and are weighted to reflect the legal rights of Creditors in those Classes, taking into account such matters as what Debtor entities have the stronger ownership claims to various key assets and Causes of Action where ownership is inherently unclear, Intercompany Claims between various Debtors, and whether Creditors have joint and several Claims against multiple Debtors and if so the nature of the assets held by and Claims against those multiple Debtor obligors. This is not substantive consolidation, whether phrased as direct substantive consolidation or "deemed" consolidation. It is an integrated and interrelated series of compromises, one feature of which is the grouping of Debtors.

The Ad Hoc Committee starts its argument with the premise that without an adversary proceeding commenced by the Plan Proponents such matters cannot be "settled." That premise is false and is inconsistent with the express terms of the Bankruptcy Code and common chapter 11

practice.  Bankruptcy Code section 1123(b)(3)(A) provides that a plan may provide for "the
settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  Indeed,
"[c]ompromises are 'a normal part of the process of reorganization.'"  Protective Comm. For
Independent Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157,
1163, 20 L.Ed.2d 1 (1968).  Indeed, in Exide, this Court considered and rejected a similar
argument that a plan can only compromise disputes brought by the plan proponent.  In Exide, the
debtors filed a plan that proposed to compromise a dispute that the debtors had no standing to raise
since a DIP financing order had ceded standing to the creditors' committee.  In re Exide, 303 B.R.
at 66.  The committee opposed this plan and argued that the debtors could not settle the
committee's adversary proceeding, particularly since the debtors had no standing to prosecute it.
Id.  This Court reviewed the case law on this topic and concluded that, as provided in Bankruptcy
Code section 1123(b)(3)(A), a plan can resolve any number of matters, including controversies that
were not brought by the plan proponent and where the settlement is opposed by one of the parties
to the litigation.  Id. at 67.  As this Court observed, courts have often "approved plan settlements
that had not been negotiated with the opposing party."  In re Exide, 303 B.R. at 70.  The current
case is far easier.  If a plan proponent that does not even have standing to litigate a dispute can
settle it in a plan, surely the Plan Proponents can settle in this Plan disputes that they could have
litigated but opted to negotiate and settle, thereby preserving Estate assets for Creditors rather than
spending them on lawyers.  In Exide, this Court declined to approve the settlement contained in the
plan primarily because the settlement received essentially no creditor support.  Id. at 70-71.  That
is in marked contrast to the instant situation where the Plan is the result of open and extensive
negotiations among the Debtors and their major constituencies and is opposed by a single group of
former managers who are locked in litigation—litigation that the Plan does not prejudice.

The court in Winn-Dixie addressed a situation on point with the instant case.[12]  Winn-Dixie
Stores, Inc. and its subsidiaries filed a plan of reorganization that is very similar to the Plan at issue

---

[12] Ms. Etlin was the Turnaround Advisor to Winn-Dixie.

37

here in that differing rights of creditors against various debtors were dealt with in the plan through weighting factors. Following the petition date, the debtors began to restructure in order to cut costs and streamline business operations. <u>Winn-Dixie</u>, 356 B.R. at 245. As they attempted to formulate a consensual plan of reorganization, the decision of whether or not to substantially consolidate became a pivotal issue, one that materially divided the creditors. <u>Id</u>. The debtors and creditors settled the issues related to the substantive consolidation by coming up with a "Substantive Consolidation Compromise." <u>Id</u>. Certain landlords objected to the compromise because landlords without guarantees were to receive the same pro rata share that the landlords with guarantees were to receive. <u>Id</u>. at 245-246. Of the 421 holders of landlord claims, 324 holders accepted the plan while 97 holders rejected it (thus, approximately 77% of holders holding 82.5% of the claims accepted the plan). <u>Id</u>. at 249-250. Of those that rejected the plan, only 12 landlords with guarantee claims filed formal objections. <u>Id</u>. at 250. The objecting landlords had two primary claims: disparate treatment and "deemed" consolidation. <u>Id</u>. at 245 and 251.

The bankruptcy court rejected both arguments. First, it considered important the fact that the debtors had not sought deemed consolidation or even substantive consolidation, but had presented the court with a settlement that touches on events consistent with consolidation. <u>Id</u>. at 252. For example, like the Plan here, the <u>Winn-Dixie</u> plan pooled assets and weighted distributions to reflect legal rights. Next, the court emphasized the fact that the substantive consolidation compromise was an agreement reached between the parties; it "was a compromise that entailed bargaining for specific benefits while giving away certain rights." <u>Id</u>. Specifically, most of the landlords with guarantees thought it was fair to give up their guarantee claims in exchange for 70.6% of their unsecured claims while most of the landlords without guarantees thought it was fair to forego seeking substantive consolidation in exchange for 70.6% of their unsecured claims. <u>Id</u>. Finally, the court noted that the paramount interest of the creditors, even in the face of opposition from a group of creditors, "<u>is that the Substantive Consolidation Compromise is a better alternative than forcing the impending litigation" where such litigation "could wipe out the estate.</u>" <u>Id</u>. at 250 (emphasis added). The court noted the complexity of the

case, the expense, the inconvenience and the delay to the estate and to the creditors, in the event the court was forced to decide on the issue of substantive consolidation, and held that the "Substantive Consolidation Compromise" was a much better alternative. Id.

Like the plan in Winn-Dixie, the Plan here considers the relative rights of Creditors against different Debtors, and distributions take this into account. For example, the Plan provides for a Determined Distribution Amount of 130 percent where a Creditor has a joint and several Claim against both NCFC and NC Credit, two of the Holding Company Debtors about which the Ad Hoc Committee complains. Similar distinctions are made in the Plan in setting distributions for Creditors who have multiple Claims against Operating Debtors, who have better rights to Litigation Proceeds, who have Claims against Debtors that have substantial Intercompany Claims against other Debtors, and on and on.

In that respect, the Plan is markedly different than the plan the Third Circuit rejected in Owens Corning. There, the plan treated all creditors and all debtors as though they were merged into a single entity. In so doing, the Owens Corning plan ignored that certain banks that had loaned the debtors $2 billion legitimately enhanced the credit of these loans by obtaining subsidiary guarantees. This provided the banks with structural seniority and was a lending bargain that occurs every business day. Id. at 212. It was illegitimate to strip these rights from the banks by treating their joint and several claims against several entities as single claims against a single entity that was "deemed" to have merged for purposes of the plan and then reverted to a group of separate entities upon confirmation. Id.

If the Plan Proponents had opted for substantive consolidation, as contended by the Ad Hoc Committee, the Plan would have been far simpler and could have ignored such matters as the enhanced recoveries afforded to Creditors with Claims against multiple Debtors, the weighting of the strength and amount of various Intercompany Claims, the relative rights of Creditors with Claims against Debtors with comparatively more assets and fewer Creditors compared to Claims

of Creditors against more insolvent estates, and the host of other factors built in to the Plan
compromises.[13]

Even if this Court were to consider the Plan's treatment of TRS Holdings and NCFC as
substantive consolidation of these two entities, the Plan Proponents reserve the right to argue that
such treatment is justified under Owens Corning.[14]   Unlike Owens Corning, the Plan enhances
recoveries of Creditors with Claims against multiple Holding Company Debtors.  And unlike
Owens Corning, there is substantial confusion and tangled relations between NCFC and TRS
Holdings that would be impossible to resolve without litigation over such matters as which of these
entities really owns the Carrington Interest and the Rabbi Trust.  The inconsistencies in the
operative legal documents and fundamental differences in how these assets were carried on the
books of NCFC and TRS Holdings are not the sort of minor accounting "imperfections" that the
court found unavailing in Owens Corning.  Id. at 215.

**B.**    **The Objections Raised by the Ad Hoc Committee of Deferred Compensation Plan
Beneficiaries with Respect to the Disposition of the Rabbi Trust Proceeds are
Unfounded**

1.    Assets of the Rabbi Trust are Subject to Disputed Ownership.

As discussed in Section II.A above, TRS Holdings, a Delaware corporation, established the
Deferred Compensation Plan and the Rabbi Trust in 1999, five years prior to the REIT Conversion.
Although the Merger Agreement expressly assigned the Deferred Compensation Plan to NCFC, a
Maryland corporation, there was no corresponding amendment to the Rabbi Trust Agreement
assigning the assets of the Rabbi Trust from TRS Holdings to NCFC.  Moreover, the assets and
liabilities of the Rabbi Trust continued to be recorded on the corporate general ledger of TRS

---

[13] In addition, the court in Owens Corning considered the Owens Corning plan's most fatal flaw to be the fact that the
debtors sought to be "deemed consolidated" for purposes of the plan of reorganization, but would emerge from the
plan with the same, distinct legal structure as it had before the bankruptcy.  In re Owens Corning, 419 F.3d at 216.
That also distinguishes the Plan from the reorganization effort the Third Circuit concluded was flawed in Owens
Corning.

[14] The Third Circuit in Owens Corning left open the issue of whether a court could order partial consolidation,
providing that "this theoretical issue is not before us."  In re Owens Corning, 419 F3d. at 210.

Holdings—and not NCFC—after the conversion. As a practical matter, therefore, the assets of the
Rabbi Trust remained within the control of TRS Holdings. Moreover, the funding source of the
Rabbi Trust appears to have been assets of NCMC and, consequently, that Estate may have an
interest as well. The Ad Hoc Committee's argument that the assets of the Rabbi Trust may be paid
only to the creditors of NCFC, and no other Debtor, ignores these uncontroverted factual
circumstances regarding the changes in corporate form and corresponding control over the assets
of the Rabbi Trust.

      2.    A Rabbi Trust Does Not Hold Funds in Trust for the Exclusive Benefit of Deferred
                Compensation Plan Beneficiaries.

In connection with the motions of the Debtors and Wells Fargo (as Trustee) to dismiss the
Ad Hoc Committee's Adversary Complaint, the Debtors, Wells Fargo and the Committee, have
argued and briefed the issue that the proceeds of the Deferred Compensation Plan, as held in the
Rabbi Trust established to support the by the Deferred Compensation Plan were not held in trust
for the exclusive benefit of the Deferred Compensation Plan Beneficiaries, but rather, became
property of the Estates upon commencement of the Chapter 11 Cases.

The Deferred Compensation Plan was an "unfunded" employee benefit plan "for tax
purposes and for purposes of Title I of ERISA." Deferred Compensation Plan, Article 1. The
Rabbi Trust was established, at the Debtor's discretion, in order to provide a funding source for the
Deferred Compensation Plan. The Deferred Compensation Plan provided that "the provisions of
the Trust shall govern the rights of the Participant and the creditors of the Employers to the assets
transferred to the Trust." Deferred Compensation Plan, 14.2. Further, the Deferred Compensation
Plan provided that "nothing contained herein shall give any such Participant any rights that are
greater than those of a general creditor of the Company." Deferred Compensation Plan, 15.9. The
Rabbi Trust Agreement specifically stated that: "It is intended that the Trust constitute a grantor
trust under [Internal Revenue] Code Sections 671 through 679, with the assets of the Trust Fund
being treated as assets of the Company for purposes of Federal, state and local income tax laws."
Trust Agreement, Section 4.1. Also, "Any rights created under the Plans and this Trust Agreement

shall be mere unsecured contractual rights of Participants and their beneficiaries against the

Company and its affiliates, as applicable. Any assets held by the Trust Fund will be subject to the

claims of the Company's general creditors under federal and state law in the event of insolvency."

Id. at Section 1.3. The parties clearly intended that the Rabbi Trust was to be "irrevocable." Id. at

Section 1.1.

      The Rabbi Trust Agreement sets forth the parties' mutual intention to create a grantor trust

in which the assets were to remain the sole property of the "Company" (as defined in the Rabbi

Trust Agreement) until distributed to Deferred Compensation Plan beneficiaries or, in the event of

the Company's insolvency, to be treated as "assets of the Company," with the Deferred

Compensation Plan Beneficiaries having no special right, title or interest in them. Upon creation

of the Rabbi Trust, the Deferred Compensation Plan participants and beneficiaries merely held

unsecured contractual rights against the Company and its affiliates. Thus, while the identification

of the "Company" may be unclear, the documents are clear that upon the Company's chapter 11

filing, consistent with the Deferred Compensation Plan and Rabbi Trust Agreement, the assets of

the Rabbi Trust became unencumbered property of its estate, and the Deferred Compensation Plan

Beneficiaries merely had general unsecured claims against the Company.

      3.     <u>The Terms "Creditors" and "General Creditors," as Used Interchangeably in the Deferred Compensation Plan and Trust Agreement, and as Similarly Used in the IRS's Model Rabbi Trust Agreement, Were Not Intended to be Exclusive or Limiting, but Rather, to Ensure that the Deferred Compensation Plan Participants did not Receive or Retain any Special Interest, Prepetition or Postpetition, in the Assets of the Rabbi Trust.</u>

      The Ad Hoc Committee argues in its Objection that even if the assets of the Rabbi Trust are

not held for their exclusive benefit, the assets may be paid only to the Deferred Compensation Plan

Beneficiaries and "general unsecured creditors" of NCFC. The Ad Hoc Committee contends that

the Rabbi Trust assets are specifically reserved for "general unsecured creditors" of NCFC and

cannot be made available under a chapter 11 plan to secured Creditors, even to the extent of their

deficiency Claims, or to administrative and priority Creditors, claiming that the language in the

Deferred Compensation Plan and Rabbi Trust Agreement, as well as the holdings in a number of

cases, in particular <u>Bank of America v. Moglia</u>, 330 F.3d 942 (7th Cir. 2003), supports its position. Indeed, none of the claimed support states what the Ad Hoc Committee suggests.

First, the language in the Deferred Compensation Plan and Rabbi Trust Agreement does not support the Ad Hoc Committee's interpretation of "general creditors." The Deferred Compensation Plan specifically provided that the plan participants would not have any rights greater than those of a general creditor of the "Company." Deferred Compensation Plan, 15.9. The Rabbi Trust Agreement further stated that the assets held in the Rabbi Trust would be "subject to the claims of the Company's general creditors under federal and state law in the event of insolvency." Rabbi Trust Agreement, Section 1.3. Further, "The assets of the Trust Fund shall at all times be subject to the claims of the general creditors of the Company under Federal and state law...Under any such circumstance [in which the Company becomes insolvent], the Trustee shall...pay the assets held in the Trust Fund only as a court of competent jurisdiction shall direct to satisfy claims of general creditors of the Company." <u>Id.</u> at Section 4.2.

Neither the Deferred Compensation Plan nor the Rabbi Trust Agreement specifies that the assets of the Rabbi Trust must be reserved for general unsecured creditors, or prohibited from satisfying valid secured, administrative, or priority claims, or even the unsecured deficiency claims of secured creditors. The provision stating that in the event of insolvency, the Trustee has to pay out the assets only as a court directs is not a command or decree that the assets must be used to satisfy the claims of "general creditors" who can and must be identified as a specific group. Rather, the terms "creditors" and "general creditors" are used interchangeably, and more accurately refer to an unspecified group of "creditors, generally." The language of the Deferred Compensation Plan and Rabbi Trust Agreement clearly contemplated that once a bankruptcy case was initiated, federal bankruptcy law, as administered by a federal bankruptcy court, would govern the rights and remedies of any and all of the Company's Creditors to the assets of the Rabbi Trust.

Importantly, the language used in the Rabbi Trust Agreement is consistent with the Model Rabbi Trust language and was not intended to exclude any class of creditors or claimants but rather, to ensure that the assets were treated as company assets and that the Deferred

Compensation Plan Beneficiaries had no special ability to reach the assets or priority in them.

Specifically, the Model Rabbi Trust agreement provides as follows:

> d) WHEREAS, Company wishes to establish a trust (hereinafter called "Trust") and to contribute to the Trust assets that shall be held therein, subject to the claims of Company's creditors in the event of Company's Insolvency, as herein defined, until paid to Plan participants and their beneficiaries in such manner and at such times as specified in the Plan(s);
>
> ***
>
> **Section 1. Establishment of Trust . . .**
>
> (d) The principal of the Trust, and any earnings thereon shall be held separate and apart from other funds of Company and shall be used exclusively for the uses and purposes of Plan participants and **general creditors** as herein set forth. Plan participants and their beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust. Any rights created under the Plan(s) and this Trust Agreement shall be mere unsecured contractual rights of Plan participants and their beneficiaries against Company. Any assets held by the Trust will be subject to the claims of Company's **general creditors** under federal and state law in the event of Insolvency, as defined in Section 3(a) herein;
>
> ***
>
> **Section 3. Trustee Responsibility Regarding Payments to Trust Beneficiary When Company Is Insolvent . . .**
>
> (a) Trustee shall cease payment of benefits to Plan participants and their beneficiaries if the Company is Insolvent. Company shall be considered "Insolvent" for purposes of this Trust Agreement if (i) Company is unable to pay its debts as they become due, or (ii) Company is subject to a pending proceeding as a debtor under the United States Bankruptcy Code...
>
> (b) At all times during the continuance of this Trust, as provided in Section 1(d) hereof, the principal and income of the Trust shall be subject to claims of **general creditors** of Company under federal and state law as set forth below.
>
> (1) The Board of Directors and the Chief Executive Officer [or substitute the title of the highest ranking officer of the Company] of Company shall have the duty to inform Trustee in writing of Company's Insolvency. If a person claiming to be a **creditor** of Company alleges in writing to Trustee that Company has become Insolvent, Trustee shall determine whether Company is Insolvent and, pending such determination, Trustee shall discontinue payment of benefits to Plan participants or their beneficiaries.

(2) Unless Trustee has actual knowledge of Company's Insolvency, or has received notice from Company or a person claiming to be a **creditor** alleging that Company is Insolvent, Trustee shall have no duty to inquire whether Company is Insolvent. Trustee may in all events rely on such evidence concerning Company's solvency as may be furnished to Trustee and that provides Trustee with a reasonable basis for making a determination concerning Company's solvency.

(3) If at any time Trustee has determined that Company is Insolvent, Trustee shall discontinue payments to Plan participants or their beneficiaries and shall hold the assets of the Trust for the benefit of Company's **general creditors**. Nothing in this Trust Agreement shall in any way diminish any rights of Plan participants or their beneficiaries to pursue their rights as **general creditors** of Company with respect to benefits due under the Plan(s) or otherwise.

(4) Trustee shall resume the payment of benefits to Plan participants or their beneficiaries in accordance with Section 2 of this Trust Agreement only after Trustee has determined that Company is not Insolvent (or is no longer Insolvent)…

See Model Rabbi Trust agreement, pp. 1-4 (emphases added).

Nothing in the IRS's Model Rabbi Trust language or applicable sections of the Internal Revenue Code indicates any intention by the IRS to preempt or to override the priority scheme set forth in federal bankruptcy law, or to exclude holders of administrative, priority or deficiency claims from accessing those assets. The Model Rabbi Trust contains the terms of a prototypical rabbi trust in which the assets are treated as assets of the employer under federal, state, and local income tax laws. The Internal Revenue Code requires that unless plan beneficiaries' rights to receive monies from a trust is subject to "substantial limitations or restrictions"—such that they have neither legal or equitable rights to the monies prior to payment or distribution—the contributions to a trust must be treated as taxable income to the beneficiaries. See Internal Revenue Service Private Letter Rulings, 8113107, 1980 WL 137740 (Dec. 31, 1980); see also Moglia, 330 F.3d at 944. Thus, in order to create a valid and enforceable rabbi trust, there must be substantial limitations on the beneficiaries' access to the trust assets. The language in the Rabbi Trust Agreement was put in place in order to accomplish this purpose—not to exclude other classes of claimants from access to those assets.

The Ad Hoc Committee's suggestion that the Deferred Compensation Plan Beneficiaries should simultaneously enjoy both the tax-advantaged benefits of the unfunded Deferred Compensation Plan and priority status to those assets in insolvency would turn the Rabbi Trust Agreement (and governing Internal Revenue Service authority) on its head.  TRS Holdings established the Rabbi Trust as a grantor trust to provide a source of funds that could be used to pay deferred compensation to a select group of management and other highly compensated employees. Accordingly, the Rabbi Trust Agreement makes clear that prior to distribution or payment to the Deferred Compensation Plan Beneficiaries, the corpus of the Rabbi Trust is to be treated as the assets and income of the Company and "subject to the claims of creditors" in the event of insolvency." Rabbi Trust Agreement, Preamble.  These "substantial limitations" on the right of the Deferred Compensation Plan Beneficiaries to "control [the] receipt" of the assets of the Rabbi Trust are precisely the feature that provided the Deferred Compensation Plan Beneficiaries with favorable tax treatment in the first instance.  Now, faced with the prospect of sharing those assets with other creditors of the Company, the Ad Hoc Committee seeks to retroactively modify the terms of the Rabbi Trust in a manner that would render the reservation of creditors' rights wholly illusory.  Granting the Deferred Compensation Plan Beneficiaries priority claim status to the assets of the Rabbi Trust would effectively segregate those assets from the Claims of the Company's creditors and eviscerate the "substantial limitation" on the Deferred Compensation Plan Beneficiaries' legal and equitable claims to such assets.  Neither the Tax Code nor the express terms of the Rabbi Trust Agreement contemplate such an interpretation.

4.    The Cases on Which the Ad Hoc Committee Relies do Not Support the Proposition that the Phrase "General Creditors" is a Controlling and Limiting Term.

The Ad Hoc Committee cites to the term "general creditors" as defined in Black's Law Dictionary, as support for its contention that "general creditors" is a recognized term or principle of law that describes a group that necessarily includes "only general unsecured creditors."  The Ad Hoc Committee mistakenly attempts to support its position by relying on several cases that are

readily distinguishable.[15] To begin with, the entry in <u>Black's Law Dictionary</u>, which cites two additional cases that are wholly irrelevant, is by no means an absolute limitation on the meaning of the phrase "general creditors." The Court must look beyond a single definition in a dictionary and be guided by case law and relevant statues—in this case, the Federal Bankruptcy Code. As to the cases relied upon by the Ad Hoc Committee, in <u>Howard</u> and <u>Midway</u>, <u>infra</u>, the courts do not even mention the term "general creditors" in their opinions—not even once; as such, these cases are not instructive. In <u>Joint Industry Board</u> and <u>Menner</u>, neither court explicitly limits the term "general creditor" to mean only "general unsecured creditor" in all cases and contexts; rather, the courts refer to "general creditors" in a non-descript fashion in order to facilitate their discussion of the difference between priority and non-priority claimants under the specific facts of these cases. Neither court holds as a matter of law that the term "general creditor" must always refer to a specific group of claimants. In addition, the Ad Hoc Committee misstates the holdings and dicta in <u>Quackenbush</u> and <u>Estate of Black</u>. Close inspection of these cases reveals that not only did the courts fail to definitively define the phrase "general creditor," but their usage of the phrase hinged upon specific state statutes pertinent to, respectively, a state liquidation proceeding of an insurance company and a probate matter. None of these cites, including the cite to <u>Trinity Tractor</u> involving the liquidation of a title insurance company, has any relevance whatsoever to the interpretation of a rabbi trust agreement in a bankruptcy case. Because the cases above do not provide the support for the Ad Hoc Committee's argument that the term "general creditors" is a recognized term or principle of law, they should be ignored.

More importantly, the <u>Moglia</u> case, to which the Ad Hoc Committee directs this Court as controlling precedent, does not stand for the proposition that the Ad Hoc Committee posits. In <u>Moglia</u>, the agent of the debtor's secured creditors brought an adversary proceeding against the

---

[15] See <u>Howard Delivery Service, Inc. v. Zurich American Ins. Co.</u>, 547 U.S. 651, 657 (2006), <u>Joint Industry Board at the Electrical Industry v. U.S.</u>, 391 U.S. 224 (1968), <u>In re Midway Airlines, Inc.</u>, 383 F.3d 663, 669 (7th Cir. 2004), <u>Menner v. Slater</u>, 148 Cal. 284 (1905), <u>Quackenbush v. Armato, Gaims, Weil, West & Epstein (In re Title U.S.A. Ins. Corp.)</u>, 36 Cal. App. 4th 363 (1995), <u>Estate of Black</u>, 64 Cal.App.3d 112, 117 (1976) and <u>Trinity Tractor Co. v. Allis-Chalmers Mtg. Co.</u>, 3 Cal. App. 3d 428 , 442 (1970).

Chapter 7 trustee claiming that it had a security interest in the assets of a rabbi trust established by the debtor because its security agreement covered "general intangibles." Moglia, 330 F.3d at 943. However, the trust instrument, which was created prior to the debtor granting a security interest to the agent, provided that the "Trust Corpus...shall remain at all times subject to the claims of the general creditors of [the debtor]. Accordingly, [the debtor] shall not create a security interest in the Trust Corpus in favor of the Executives, the Participants or any creditor." Further, in the event of insolvency, the "Trust Corpus [would be made] available to satisfy the claims of the Company's general creditors." Id. at 946. While the Moglia court found that, based on the facts of the case, the parties intended the term "general creditors" to specifically exclude secured creditors, the court never addressed the availability of the rabbi trust assets to pay deficiency claims of secured creditors. Nor did the Court hold that the term "general creditors" must necessarily mean "unsecured creditors." Although "general creditors" has often been assumed to refer to a debtor's "unsecured creditors," no case has ever held that the phrase "general creditors" must always refer to unsecured creditors. Moglia, 330 F.3d at 945 (citations omitted). To the contrary, the Moglia court explained that, under different facts, the term general creditors could have included secured creditors with a security interest. Id. The court noted that it was important that the rabbi trust at issue was funded before the security agreement was executed—had the trust been funded after the security agreement was executed, the company's contribution of assets to the trust would have been subject to the security agreement regardless of the trust's terms. Id. at 947.

The court in Moglia noted that the company assumed that in order to create a valid rabbi trust, it had to reserve the trust's assets for its "general creditors." Moglia, 330 F.3d at 946. The court inferred that the company reached this assumption based upon its interpretation of the IRS's Model Rabbi Trust. This model agreement stated that the assets of the trust are subject to the claims of the settlor's "general creditors," a term which the company interpreted to mean "unsecured creditors." For that reason, the court opined, the company added additional language to the IRS's boilerplate agreement, i.e. the provision which explicitly forbade the creation of a security interest in the trust assets. The Moglia court stated that the company's assumption that it

48

had to reserve the trust's assets for its unsecured creditors "may have been incorrect," or "more precisely may have been excessively cautious." Id. The validity of a rabbi trust does not depend on assets being specifically reserved for the employer's general or unsecured creditors—rather, the necessary ingredient of a rabbi trust is that the assets must be sufficiently out of the beneficiaries' reach such that their rights are "subject to substantial limitations or restrictions." See Moglia, 330 F.3d at 945.

    Clearly, the facts in Moglia are not similar to the facts in the Chapter 11 Cases. The Company's and Wells Fargo's interchangeable use of the terms "creditors" and "general creditors" in the Deferred Compensation Plan and Rabbi Trust Agreement originated from the interchangeable use of those exact terms in the Model Rabbi Trust. See Model Rabbi Trust at pp. 1-4, supra. These terms were meant to refer to all creditors of the Company. Unlike the Moglia case, the Company did not insert any additional provisions into the Deferred Compensation Plan or Rabbi Trust Agreement which further limited or restricted the definition of "general creditors"; the Rabbi Trust Agreement did not specifically bar the Company from creating any security interests in the assets of the Rabbi Trust. Based on the foregoing, the terms "creditors" and "general creditors" as used in the Deferred Compensation Plan and Rabbi Trust Agreement apply to all creditors of the Company, and certainly should not be viewed as limiting the rights of administrative, priority or deficiency creditors to the assets of the Rabbi Trust.

    Indeed, administrative claimants are no different than any other unsecured creditor except for the fact that the federal bankruptcy law provides them with a priority right in distribution. While certain administrative claims arise postpetition (such as postpetition employee wages or postpetition vendor claims), others arise prepetition but are given priority under federal law. See 11 U.S.C. §503(b)(9) (vendors who ship within 20 days of the bankruptcy are entitled to priority); 11 U.S.C. §507(a)(4) (pre-petition wage claims have statutory priority). Similarly, priority creditors, such as tax claimants, are also unsecured creditors, but are given a priority under the federal bankruptcy statute. 11 U.S.C. §507(a)(8).

Finally, contrary to the Ad Hoc Committee's creative arguments, as a matter of statutory law, holders of deficiency claims also are unsecured creditors. Bankruptcy Code section 506(b) provides that "an allowed claim of a creditor secured by a lien on property in which the estate has an interest...is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, and is an unsecured claim to the extent that the value of such creditor's interest...is less than the amount of such allowed claim." 11 U.S.C. §506(b). Thus, the assets of the Rabbi Trust would necessarily be available to pay deficiency Claims of secured Creditors, if any existed, because these deficiency Claims would automatically be grouped together with all other Unsecured Claims.[16] Any argument to the contrary is wholly unfounded.

5.    The Proceeds of the Rabbi Trust Are Property of the Company's Estate and, Therefore, the Disposition of Such Proceeds is Dictated by Federal Bankruptcy Law.

Well-settled Third Circuit law supports the Plan Proponents' position that based on the provisions of the Deferred Compensation Plan and Rabbi Trust Agreement, the Rabbi Trust is clearly and validly a "rabbi trust," which is "an irrevocable trust for deferred compensation" in which "funds held by the trust are out of reach of the employer, but are subject to the claims of the employer's creditors in the event of bankruptcy or insolvency," and "the employer is treated as the owner of the funds and taxed on all fund earnings until the date of distribution." Accardi v. IT Litigation Trust (In re IT Group, Inc.), 448 F.2d 661, 665 (3d Cir. 2006). The Ad Hoc Committee hinges its arguments in its Objection on the assumption that the Rabbi Trust is, in fact, a proper and valid rabbi trust. See Objection, par. 22. As discussed above, federal tax law demands that the trust fund of a grantor or "rabbi" trust is treated "as if the assets were the general assets of the employer." Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1127 (4th Cir. 1993) (citing Mertens Law of Federal Income Taxation §25B.212 (1988)); Cortina v. Sovran Bank, N.A., 927 F.Supp. 439, 444-5 (S.D.Fla. 1994). For that reason, the employer is indisputably treated as the

---

[16] Further, substantial Claims in the Chapter 11 Cases characterized as "deficiency claims" are wholly unrelated to Secured Claims but instead are damage Claims under MRAs.

"owner of the trust." Id.; see also Resolution Trust Corp. v. MacKenzie, 60 F.3d 972, 976 (2d. Cir. 1995) ("Assets held in a grantor trust are considered the property of the grantor.").

Thus, on the Petition Date, the Company had both a legal and equitable interest in the proceeds. The commencement of a bankruptcy case creates an estate, which is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case," but does not include certain exceptions. 11 U.S.C. §541(a)(1). None of the exceptions enumerated in §541(b) are applicable here. [17] Rather, the case law is clear that once the grantor/employer files for bankruptcy, the rabbi trust corpus becomes "property of the grantor's bankruptcy estate." Bank of America v. Moglia (In re Outboard Marine Corp.), 278 B.R. 778, 785 (N.D.Ill. 2002); Whittaker v. MCI, LLC (In re Worldcom, Inc.), No. 07 Civ. 3408 DLC, 2007 WL 2682882, at * 6 (S.D.N.Y., Sept. 14, 2007); In re Worldcom, Inc., 364 B.R. 538, 543 (S.D.N.Y. 2007); Collins & Aikman Corp. v. Northern Trust Bank of California (In re Collins & Aikman Corp.), No. 05-55927, 2006 WL 2310798, at *3 (Bankr. E.D.Mich., Aug. 9, 2006).

Once a trustee recovers property for the estate, the property of the estate must be distributed to all creditors based on the priorities set forth in the Bankruptcy Code. See Bland v. Farmworker Creditors, 308 B.R. 109, 112 (S.D.Ga. 2003). To adopt the Ad Hoc Committee's

---

[17] Contrary to the Ad Hoc Committee's assertion in paragraph 25 of its Objection, the exception in section 541(b)(7) is not applicable here. Based upon the plain language of section 541(b)(7), and in light of its cross-reference to section 1325(b)(2) of the Bankruptcy Code, it is unlikely that this provision was intended to exclude from a debtor-employer's estate amounts withheld or received by the debtor-employer through its sponsorship of an employee benefit plan. Rather, the provision applies to exclude from the property of an individual debtor's estate amounts that the individual debtor contributed to an employee benefit plan. Section 541(b)(7) states that such amounts will not constitute "disposable income" as defined in section 1325(b)(2) of the Bankruptcy Code. Chapter 13 governs the adjustment of debts of an individual with regular income, and section 1325(b)(2) defines an individual debtor's "disposable income" as current monthly income, less certain expenditures. Thus, the cross-reference to section 1325(b)(2) would not be logical if Congress intended section 541(b)(7) to encompass situations in which the debtor was also the employer. The Court must construe the Bankruptcy Code "as a symmetrical and coherent regulatory scheme" and, as a general rule of statutory construction, should "strive to avoid a result that would render statutory language superfluous, meaningless, or irrelevant." See Gustafson v. Alloyd Co., 513 U.S. 561, 569 (1995); and In re FESQ, 153 F.3d 113, 115 (3d Cir. 1998), citing, Cushman v. Trans. Union Corp., 115 F.3d 220, 225 (3d Cir. 1997). Also, since the addition of this section pursuant to the 2005 amendments, section 541(b) (7) only has been invoked to protect an individual debtor's contributions to an employee benefit plan. See In re Orr, No. 07-81177, 2008 WL 244268 (Bankr. C.D.Ill., Jan. 28, 2008); In re Leahy, No. 06-10574, 2007 WL 1932948 (Bankr. D. Vt., July 3, 2007); In re Sheeran, No. 07-70239, 2007 WL 1725629 (Bankr. E.D. Va., June 13, 2007); In re Skvorecz, No. 06-12278, 2007 WL 1378348 (Bankr. D. Colo., May 11, 2007); In re Braulick, 360 B.R. 327 (Bankr. D. Mont. 2006).

argument that general unsecured creditors must have priority to certain property of the estate over holders of valid, allowed administrative, or priority claims would be to conclude that the IRS Model Rabbi Trust (upon which the Rabbi Trust was modeled) intended to circumvent the priority provisions of the Bankruptcy Code and to pre-empt the federal bankruptcy laws. Parties cannot, by agreement, modify or create a different priority scheme than that required by the Bankruptcy Code. See generally In re Calhoun, 715 F.2d 1103, 1110 (6th Cir 1983) (regarding exceptions to dischargeability, stating the principal that a party can not contract away bankruptcy rights); Matter of Pease, 195 B.R. 431, 431 (Bankr. D. NE 1996) (holding that a prepetition waiver of the automatic stay was per se unenforceable); In re Sky Group Int'l, Inc., 108 B.R. 86, 88 (W.D. PA 1989) (holding that a prepetition waiver of the automatic stay was unenforceable).

In Goodman, the beneficiaries of a grantor trust, established by a savings and loan association ("S&L") before it was placed in receivership, brought an action against the receiver seeking a determination that they were entitled to certain of the trust fund assets. Goodman, 7 F.3d at 1124. The trust agreement provided that the trust was "intended to be a grantor trust with the result that the Employer shall be treated as the owner of all the corpus and income of said trust under Section 671 through 679 of the Internal Revenue Code of 1954." Id. at 1125. Further, the trust assets were to be "subject to the claims of creditors of Employer during both the operation period of the Employer or in the event of Employer's insolvency or bankruptcy." Id. at 1126. In part, the beneficiaries argued that the receiver did not represent the "general creditors" of the S&L. The court rejected this argument, and called it "preposterous," indicating that the receiver represented not only the S&L but also the S&L's depositors and other creditors. It was the responsibility of the receiver under federal law to marshall the assets of the institution and to use those assets to pay the claims of all creditors in the established order of priority. Id. The receiver, the court noted, owed a statutory duty to all creditors to collect the institution's assets and to pay the claims of creditors out of those assets. Id. at 1129; see also McAllister v. Resolution Trust Corp., 201 F.3d 570, 579 (5th Cir. 2000) (pursuant to the relevant statutes, a receiver who

liquidates an insolvent institution must distribute its proceeds, including the assets of a grantor or rabbi trust, to creditors according to the priority rules set out in regulations).

The Ad Hoc Committee argues that the bankruptcy courts are required to interpret and enforce trust documents in accordance with state law, and that state law defines and limits a debtor's property interests and rights to the assets of such trusts. The Plan Proponents do not dispute this general legal proposition. In the instant case, not only is the purpose and intent of the Rabbi Trust being enforced, but the distribution of those assets is also being made in accordance with bankruptcy law. As pointed out above, the parties intended to create a grantor trust under Internal Revenue Code Sections 671-679, with the assets of the Rabbi Trust being treated as assets of the Company for purposes of Federal, state and local income tax laws. Under federal bankruptcy law, federal tax law, as well as the language of the Deferred Compensation Plan and Rabbi Trust Agreement, the assets of the Rabbi Trust must be treated as assets of the Company. The Ad Hoc Committee further relies on <u>Tort Claimants Comm. v. Roman Catholic Archbishop of Portland in Or. (In re Roman Catholic Archbishop of Portland in Or.)</u>, 345 B.R. 686 (Bankr. D. Or. 2006) and <u>Salisbury v. Ameritrust Texas, N.A. (In re Bishop College)</u>, 151 B.R. 394 (Bankr. N.D. Tex. 1993), two cases that involved charitable trusts which had provisions which were entirely different from the Rabbi Trust Agreement at issue, to argue that use of the assets of the Rabbi Trust to pay Creditors other than general unsecured Creditors of NCFC would violate state law. This argument is without merit. The Deferred Compensation Plan and the Rabbi Trust Agreement merely granted the Deferred Compensation Plan Beneficiaries unsecured contractual rights against the Company; it did not grant them specific rights to the assets of the Rabbi Trust. The Ad Hoc Committee's attempts to limit the Debtors' ownership rights to these assets, which are properly preserved under state and federal law, under the pretext that state law compels this result, while simultaneously seeking to expand the Deferred Compensation Plan Beneficiaries' non-existent rights to such assets should be rejected. <u>See</u> <u>Butner</u> 440 U.S. at 55 ("Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping and to prevent a party from receiving a "windfall merely by reason of

the happenstance of bankruptcy."). The Ad Hoc Committee's cites to the Rabbi Trust Agreement

in paragraph 25 of its Objection are simply mistaken: the Rabbi Trust Agreement did not, in the

event of insolvency, direct the Trustee to pay the assets of the Rabbi Trust to the general unsecured

Creditors of NCFC, nor did it reserve or retain any special right, title or interest in those assets to

the Deferred Compensation Plan Beneficiaries.

　　　Once the Company commenced its Chapter 11 Case, the assets of the Rabbi Trust became

unencumbered property of the Company's Estate, and the disposition of those assets are governed

by the Bankruptcy Code. Just as the receiver in Goodman had the responsibility to use the assets

to pay the claims of creditors in the established order of priority, the assets in the Rabbi Trust will

be distributed pursuant to the proposed Plan in accordance with the priority scheme established in

section 507 of the Bankruptcy Code. See Outboard Marine at 792 (noting that the trust agreement

"does not govern the distribution of property of the Estate; the Bankruptcy Code does"). The only

claim to the assets of the Rabbi Trust that the Ad Hoc Committee may make is that of any other

general unsecured creditor of the Company. See Westport Bank & Trust Co. v. Geraghty, 90 F.3d

661, 669 (2d Cir. 1996) ("By virtue of this beneficial tax treatment,...'the recipient receives only

the company's unsecured promise to pay benefits and has no rights against any assets other than

the rights of a general unsecured creditor of the company.'") (citations omitted). Nor does any

"general unsecured creditor" of the Company have any preference over other Creditors of the

Company. See Goodman, 7 F.3d at 1129 (the beneficiaries of a grantor trust were "really asking

for a preference over other creditors; unfortunately, the recipients of grantor or "rabbi" trusts are

unsecured creditors, who took the risk of being subject to the claims of general creditors for the

benefits of favorable tax treatment...").

　　　None of the cases cited in the Ad Hoc Committee's Objection, particularly the Moglia

decision, stand for the proposition that the Rabbi Trust proceeds should not be distributed in

accordance with the priority scheme established in Bankruptcy Code section 507. Using the assets

of the Rabbi Trust to pay Administrative, Priority, and other Claims is entirely consistent with the

language of the Deferred Compensation Plan and Rabbi Trust Agreement, which contemplates that

54

once the Company becomes bankrupt, the assets are subject to the claims of all creditors under applicable federal bankruptcy law.

**C.      Reply to NYSTRS**

      1.      <u>The Confirmation Order will Provide for Appropriate Preservation of Documents and Data.</u>

In preparation of transition to the Liquidating Trust, the Plan Proponents have been reviewing the current status of all documents and data to develop a post-confirmation protocol that is appropriate in these cases.  To that end, the Plan Proponents have determined that four types of information relevant to future litigation are in the Debtors' control:  (1) physical (i.e. paper) documents and files; (2) the "back-up" tapes, i.e. the tapes on which the Debtors' servers were backed up quarterly; (3) certain "restored" back-up tapes of email data, that contain retrievable but not readily searchable email data and (4) emails for certain custodians from the "back-up tapes" and loaded into a computer software system with an outside vendor and located in searchable form.

From and after the Effective Date, the Liquidating Trust will continue to maintain these documents and data, but will store them in a more cost-efficient manner.  Accordingly, the physical documents and back-up tapes will be stored in offsite storage, and the Liquidating Trustee will not destroy or otherwise abandon any such documents or backup tapes without a prior court order.  The restored back-up tapes and the custodian's email in searchable format will be "archived" to lower monthly cost in a such a manner which will preserve the integrity of this data.

The Plan Proponents will include the following in the confirmation order to memorialize these provisions:

> **"From and after the Effective Date, the Liquidating Trustee
> will not destroy or otherwise abandon any documents and will
> maintain the electronic data in the archives subject to further
> order of the Bankruptcy Court."**

2.      The Continuation of the Automatic Stay of Bankruptcy Code Section 362 with
        Respect to the Debtor is Warranted and Necessary to Preserve the Value of the
        Estates for the Benefit of the Debtors' Creditors.

NYSTRS's assertions that the Debtors are "using" the stay as a "sword" instead of a

"shield" are misguided.  The Plan provides only that the automatic stay (including its exceptions)

will continue to protect the Estates after confirmation.  Because of the nature and size of the

Debtors' operations, the Debtors were party to tens if not hundreds of prepetition lawsuits.

Although they sold their servicing business and its loan assets, the Debtors continue to be named in

suits in which the Estates have no economic interest.  Continuing the stay to minimize the effect of

such litigation on the Debtors' (and post-confirmation, the Liquidating Trust's) limited resources

will preserve the value of assets for the Debtors' Creditors.

Further, the Plan Proponents included this express extension of the stay in an abundance of

caution.  While there is authority that the stay remains in effect post-confirmation in a liquidating

Chapter 11 case (see, e.g., Allied Technology, Inc. v. R.B. Brunneman & Sons, Inc., 25 B.R. 484

(Bankr. Ohio 1982)), there is also authority that because a liquidating debtor does not receive

adischarge under § 1141(d)(3) of the Bankruptcy Code, a discharge is denied upon confirmation

and the automatic stay thus terminates under § 362(c)(2)(C) at confirmation.  See Teamsters

Pension Trust Fund of Philadelphia and Vicinity v. Malone Realty Co., 82 B.R. 346, 349 (E.D. Pa.

1988).

However, regardless of whether the automatic stay continues by operation of law, a

bankruptcy court may use its equitable powers under § 105(a) to provide relief to debtors where

the automatic stay is unavailable.  See, e.g., Brock v. Morysville Body Works, Inc., 829 F.2d 383,

387 n.5 (3d Cir. 1987); Moody v. Commissioner, 95 T.C. 655, 661 (1990); In re Wedgewood

Realty Group, Ltd., 878 F.2d 693, 699-702 (3d Cir. 1989).  The equities of the Plan clearly support

the extension of all stays and injunctions extant at confirmation and harm to the administration of

the Plan may result if the stays or injunctions are not continued.  There would appear to be no

harm to any individual Creditor as relief from such stay can be sought post-confirmation for cause

on the same basis as during the Chapter 11 Cases. Any procedural issue faced by an individual Creditor is heavily outweighed by the benefit provided to the orderly administration of the Plan.

The Plan Proponents are not seeking the extension of the stays and injunctions in the case to offensively frustrate the Claims of any individual Creditor, but rather are seeking an extension to ensure the orderly and equitable administration of the Plan and liquidation of the Estates' assets. Each of the cases cited by the NYSTRS is entirely distinguishable and irrelevant to the purposes of the Plan Proponents. See, e.g., Hydramar Inc. v. General Dynamics Corp., 1986 U.S. Dist. Lexis 248248 *12-13 (E.D. Pa. 1986) (the debtor brought a district court action against the defendant creditor and then sought to use the automatic stay to preclude the creditor from asserting a compulsory counterclaim in the action); In re. A.H. Robbins Co., 828 F.2d 1023, 1026 (4th Cir. 1987) (a court staying an action under section 105 of the Bankruptcy Code tolled the statute of limitations for that action); In re Johns-Manville, 31 B.R. 965, 974 (S.D.N.Y. 1983) (the court stated that while it agreed with the "view that a debtor should not be permitted unfairly to convert bankruptcy's protective shield into a sword of aggression", it did not agree that the debtor was "guilty of that practice" in response to a creditor's claim that the debtor was staying its action against it for forum shopping purposes).

None of these cases is factually analogous to the case at bar as the Plan Proponents are merely seeking to protect the Liquidating Trust from the administrative costs of prepetition litigation it has no stake in or is addressing through the Claim process. Thus, the extension of the stay is appropriate in these cases.

      3.      The Plan Injunction Protecting the Liquidating Trust is Similarly Appropriate.

Because the assets of the Debtors are being liquidated through a liquidating trust structure, the stay may not protect the Liquidating Trust. Accordingly, to effectively protect the Liquidating Trust assets from erosion by the costs associated with prepetition litigation against the Debtors, the Plan Injunction is necessary to protect the Liquidating Trust against what would otherwise be actions stayed against the Debtors.

The inclusion of an injunction of this type to protect the value of liquidating estates is a commonly accepted practice in liquidating chapter 11 cases. See, e.g., In re Total Containment, Inc., 2008 WL 250216, *9 (Bankr. E.D. Pa. 2008); see also, Matter of Burnstein-Applebee Co., 63 B.R. 1011, 1020-21 (Bankr. W.D. Mo. 1986).

The Plan Proponents firmly believe that continuing under this Court's protection is necessary to protect the Liquidating Trust assets against creditors seeking to manipulate the orderly distribution of assets in light of the existing and potential future litigation in these matters. As NYSTRS concedes, it may still seek relief from the injunction for cause to the extent any action or process sought to be pursued by NYSTRS would be subject to this injunction. This process requirement, though potentially burdensome to NYSTRS, does not outweigh the benefit to the Creditors as a whole.

4.    The Plan Does Not Impact NYSTRS's Potential Right to file a Direct Claim Against the Debtors D&O Policies.

NYSTRS requests that the Plan explicitly provide that NYSTRS and the Securities Class are not precluded from pursuing their Claims against the Debtors to the extent of available insurance coverage. There is no, and should be no, exception to the treatment of the securities litigation Claims under the Plan with respect to Claims against the Debtors, as this would run afoul to fair and equitable requirements of the Bankruptcy Code. This is particularly true with respect to the Securities Plaintiffs, whose Claims are subordinated by statute. 11 U.S.C. § 510(b). Further, in no way should NYSTRS be given rights under the Debtors' Directors' & Officers' insurance policies (the "D&O Policies"). The Plan should not enhance those claimants' rights under the D&O Policies, particularly where, as here, the plaintiffs would appear not to have any direct claims (unlike personal injury claimants under liability insurance policies).

5.    NYSTRS is Not Entitled to Special "Carve Outs" in the Injunction and Exculpation Provisions.

NYSTRS is the plaintiff in a prepetition securities action against non-debtors. Its primary economic interests are not those of a Creditor but a litigant in third-party litigation. None of the defendants in the lawsuit commenced by NYSTRS are included within the Plan definition of

Protected Party.  The Plan Proponents had earlier agreed to a clarification on this issue with the

SEC (before the definition was narrowed), because the SEC wanted to make abundantly clear that

its ongoing investigation would be unaffected.  The SEC - a government entity serving the public

interest - is entitled to more deference on these issues, and the Plan Proponents retained the SEC

carve-out in Article 13.A of the Plan although it may be surplusage.

    With respect to the Plan's exculpation provision, the exculpation language referred by

NYSTRS was narrowed rather than expanded in the last version of the Plan prior to mailing the

Disclosure Statement.  NYSTRS is asserting prepetition securities Claims, which are not affected

by the limited exculpation language at issue.  The Plan Proponents believe that expressly carving

out the NYSTRS Claims, especially when the NYSTRS itself agrees that its pending Claims are

unaffected by the exculpation, threatens to confuse and/or scuttle this tailored and heavily

negotiated Plan language.

## IV.
## THE PLAN MAY BE CONFIRMED PURSUANT TO SECTION 1129(B) OF THE BANKRUPTCY CODE NOTWITHSTANDING CLASS HC3B'S REJECTION OF THE PLAN

### A.    Cram Down Generally

    Where a debtor is unable to meet the requirements of Bankruptcy Code section 1128(a)(8)

because at lease one impaired non-consenting class of claims or equity interests has voted not to

accept the plan, the "cram down" requirements of Bankruptcy Code section 1129(b) are invoked

with respect to each such impaired, non-consenting class.  Under section 1129(b), the court must

confirm a plan over the dissenting vote of an impaired class or classes of claims or interests as long

as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such

dissenting class or classes.'  The Holders of Class HC3b Claims have voted overwhelmingly in

favor of the Plan based on the amount of their Claim, but have voted to reject the Plan in terms of

numerosity.  The Plan meets the requirements of section 1129(b) with respect to the treatment of

the Holders of Class HC3b Claims.

**B.      The Plan Does Not Discriminate Unfairly Against Holders of Claims in Class HC3b**

The weight of judicial authority holds that a plan unfairly discriminates in violation of

section 1129(b) of the Bankruptcy Code only if similar claims are treated differently without a

reasonable basis for the disparate treatment.  See In re Exide, 303 B.R. at 78; In re Genesis Health

Ventures Inc., 266 B.R. 591, 611-612 (Bankr. D. Del. 2001); In re Great Bay Hotel & Casino, Inc.,

251 B.R. 213, 228 (Bankr. D.N.J. 2000).  The Plan does not unfairly discriminate against Class

HC3b.  Claimants in Class HC3b are not treated differently than holder of similar Claims.  There is

no disparate treatment to members of this Class.  Class HC3a (Special Deficiency Claims Against

NCFC) is the only other Class in which Holders of Unsecured Claims against NCFC are classified,

and the holders of Claims in Class HC3a have voluntarily opted to accept inferior treatment on

their Claims.  Indeed, all Holders of Unsecured Claims against NCFC other than DBSP (the only

Holder of a Special Deficiency Claim against NCFC) are in Class HC3b.  In addition the Plan does

not prejudice the rights of the Class HC3b claimants in any manner - the Plan does not decide any

of the issues in the litigation related to the Deferred Compensation Plan.

**C.      The Plan Is Fair And Equitable to Holders of Claims in Class HC3b**

Bankruptcy Code section 1129(b) sets forth the definition of the phrase "fair and

equitable."  In addition to the requirements enumerated in section 1129, cases have interpreted the

"fair and equitable" standard to include the requirement that it does not allow holders of any junior

claims or interests to receive or retain any property under the plan "on account of" such claims or

interests.  See 124 Cong. Rec. H. 11, 103 (Sept. 28, 1978); S17, 420 (Oct. 6, 1978); Bank of

America Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship, 526 U.S. 434, 441 (1999),

Armstrong World Indus., 432 F.3d 507, 513 (3d Cir. 2005); Genesis, 266 B.R. at 612; In re P.J.

Keating Co., 168 B.R. 464, 469 (Bankr. D. Mass. 1994); In re Mcorp Fin., Inc., 137 B.R. 219, 235

(S.D. Tex. 1992).  The Plan's treatment of Holders of Class HC3b Claims meets the "fair and

equitable" standard because no Class junior to Class HC3b (i.e., Classes HC4a through HC4e) will

receive any distributions under the Plan.

## V.
## CONCLUSION

Based upon the reasons set forth above, the record of the Chapter 11 Cases, and the facts that have been and will be submitted to the Court, the Debtors respectfully request the Court confirm the Plan and grant such other relief as may be justified.

Dated: April 22, 2008
Wilmington, Delaware

/s/ Bonnie Glantz Fattel
BLANK ROME LLP
Bonnie Glantz Fatell (No. 3809)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
(302) 425-6400 - Telephone
(302) 425-6464 - Facsimile

 - and -

Mark S. Indelicato
Mark T. Power
Janine M. Cerbone
Huria S. Naviwala
HAHN & HESSEN LLP
488 Madison Avenue, 15th Floor
New York, New York 10022
(212) 478-7200 - Telephone
(212) 478-7400 - Facsimile

Co-Counsel to the Official Committee of
Unsecured Creditors of New Century TRS
Holdings, Inc., et al

Respectfully submitted,

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
P.O. Box 551
One Rodney Square
920 North King Street
Wilmington, DE 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

 - and -

Suzzanne Uhland
Ben H. Logan
Andrew M. Parlen
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION