IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416(KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Hearing Date: April 24, 2008 at 10:00 a.m.** |
| | : | **Eastern Time** |

### DECLARATION OF TODD BRENTS IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED AS OF APRIL 23, 2008

INTRODUCTION

I, Todd Brents, declare as follows:

1.     I submit this Declaration in support of confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors dated as of April 23, 2008 (as amended or modified, the "Plan") filed by the above captioned debtors and debtors in possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan Proponents"). Capitalized terms not defined herein have the meanings ascribed to them in the Plan or related disclosure statement (as amended or modified, the "Disclosure Statement"), as applicable.

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; and NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited partnership and New Century Warehouse Corporation, a California corporation.

2.      I am over eighteen years of age.  All facts in this Declaration are based on my personal knowledge, upon information supplied to me by persons who reported to me at the Debtors' operations, upon information supplied to me by the Debtors' professionals and consultants, upon my review of relevant documents, or upon my opinion based on my experience and knowledge of the Debtors' business operations, financial affairs and related issues.  If called upon, I could and would competently testify to the facts set forth herein.

WITNESS BACKGROUND

3.      I am the corporate secretary for each of the Debtors.  My day to day responsibilities for the Debtors include leading the claims resolution process as well as assisting in accounting and reporting matters.  I led the efforts of compiling and analyzing data for the Schedules of Assets and Liabilities and the recovery analysis.  I have been employed by AlixPartners, LLP, a global restructuring, consulting and financial advisory firm, for seven years, and currently serve as a Managing Director in its Case Management Services business unit. Before joining AlixPartners, I worked for 5 years at Frito-Lay, Inc. in its treasury, operations analysis and credit departments.  Prior to my employment at Frito-Lay, Inc., I worked for 2 years as the assistant controller at Color Tile, Inc. after working for 4 years at Arthur Andersen, LLC as an audit associate.

4.      I hold a Bachelor of Business Administration Degree in Accounting from the University of Texas at Arlington.  I earned my Master of Business Administration from Southern Methodist University.  I am a Certified Public Accountant (CPA) and a Certified Insolvency and Restructuring Advisor (CIRA).

5.      While at AlixPartners, I have worked on the chapter 11 cases of Refco, Inc., Mirant Corporation, Avado Brands, Exide Technologies, Genuity, Inc., and Sunterra Corporation.  In all of these matters, I worked in the areas of claims administration and bankruptcy accounting and reporting, among others.

## BACKGROUND FACTS

6.     New Century Financial Corporation was formed as a Delaware corporation in 1995. On October 1, 2004, New Century Financial Corporation reorganized into a Maryland real estate investment trust ("REIT") for federal income tax purposes. Prior to this date, New Century TRS Holdings, Inc., a Delaware corporation ("TRS Holdings")[2] was the ultimate parent of the Debtor entities and was named "New Century Financial Corporation, a Delaware Corporation". On April 12, 2004, the Debtors established New Century REIT, Inc., a Maryland corporation with REIT status ("NCFC") and its wholly-owned subsidiary NC Merger Sub, Inc., a Delaware corporation, in anticipation of the REIT conversion. In order to effect the conversion, on October 1, 2004, NC Merger Sub was merged into TRS Holdings, with TRS Holdings surviving as a wholly-owned subsidiary of NCFC. At the time of the merger, NCFC's name was changed to "New Century Financial Corporation", and TRS Holdings became "New Century TRS Holdings, Inc."

7.     After the 2004 conversion, NCFC was the sole parent of TRS Holdings, NC Residual IV Corporation, a Delaware Corporation ("NC Res IV") and New Century Credit Corporation, a California corporation ("NC Credit"). TRS Holdings was the sole parent of New Century Mortgage Corporation, a California corporation ("NCMC") and New Century Warehouse Corporation, a California corporation ("Access Lending"). TRS Holdings also ultimately owned 99% of Home 123 Corporation, a California corporation ("Home 123"). NCMC was the ultimate, sole parent of NC Capital Corporation, a California corporation ("NC Capital"), New Century Mortgage Ventures, LLC ("NC Mortgage") and NC Residual III Corporation, a Delaware corporation. NCMC also ultimately owned the other 1% of Home 123.[3]

8.     From 1995 to October 1, 2004, TRS Holdings was referred to as "New Century Financial Corporation." During this time, for accounting purposes, all of the general

---

[2] "TRS" stands for "taxable REIT subsidiary."
[3] Note that only those Debtors discussed in this Declaration have been identified in this paragraph.

ledger accounts relating to TRS Holdings were identified under the name "NCFC." After the October 1, 2004 REIT conversion and the accompanying name change whereby TRS Holdings ceased to be named "New Century Financial Corporation," all of the general ledger accounts relating to TRS Holdings continued to be identified under the name "NCFC" because the general ledger software would not allow for the name to be changed. Additionally, subsequent to the conversion, all of the general ledger accounts relating to NCFC were identified under the name "REIT." As a result, after the REIT conversion, the general ledger account names were inconsistent with the legal entity names.

9.      The name changes and the inconsistency between the terminology used in the general ledger account system and the legal names of the entities have contributed to substantial confusion and uncertainty concerning the differences between NCFC and TRS Holdings, including as to which of these entities owns certain assets. In the course of negotiating the Plan, the Debtors and the professionals employed by the Committee did their best to sort out these issues, but it is simply not possible to determine with certainty what entity owns certain major assets or potential causes of action. Over the balance of my declaration I describe certain of the major areas of uncertainty that need to be addressed in any chapter 11 plan (or chapter 7 liquidation) for the Debtors. In light of the objection filed by the "Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan" (the "Ad Hoc Committee of NCFC Deferred Comp Beneficiaries"), I will focus on issues affecting NCFC.

## ASSET CLASSES

### CARRINGTON INTERESTS

10.      Pursuant to the Limited Liability Company Agreement of Carrington Capital Management, LLC, dated February 12, 2004, Bruce Rose, "New Century Financial Corporation" and Scott Nussbaum became members of Carrington Capital Management, LLC. Bruce Rose was designated the "Managing Member" and was allocated a 60% interest. "New Century Financial Corporation" was designated as a "Special Member" and was allocated a 35%

interest. Scott Nussbaum was allocated a 5% interest. While no signature pages to the agreement have been located, the agreement appears to be in execution version. The agreement did not identify "New Century Financial Corporation's" place of incorporation anywhere throughout the agreement, but given the date, the only NCFC in existence was the Delaware corporation, or TRS Holdings.

11.     The parties entered into a Contribution and Transfer Agreement on December 1, 2004 that was between Carrington Investment Partners (US), LP and "New Century TRS Holdings, Inc., a Delaware corporation formerly known as 'New Century Financial Corporation.'" Pursuant to this agreement, TRS Holdings contributed its limited partnership interest in Carrington Mortgage Credit Fund I, LP to Carrington Investment Partners (US), LP in return for a limited partnership interest in Carrington Investment Partners (US), LP. While no signature pages to the agreement have been located, the agreement appears to be in execution version. Notwithstanding the language of this agreement, internal communication in 2005 and 2006 refer to both investments as being assets of NCFC, not TRS Holdings.

12.     Pursuant to the First Amended and Restated Limited Liability Company Agreement of Carrington Capital Management, LLC, dated July 7, 2006, Bruce Rose and "New Century Financial Corporation" became members of Carrington Capital Management, LLC. Bruce Rose was designated the "Managing Member" and was allocated a 63.25% interest. "New Century Financial Corporation" was designated as a "Special Member" and was allocated a 36.75% interest. While no signature pages to the agreement have been located, the agreement appears to be in execution version. The agreement did not identify "New Century Financial Corporation's" place of incorporation anywhere throughout the agreement.

13.     The original investments in both Carrington Capital Management, LLC and Carrington Mortgage Credit Fund I, LP were funded by NCMC and recorded as an intercompany receivable from TRS Holdings. The investment in and investment income from both Carrington Capital Management, LLC and Carrington Mortgage Credit Fund I, LP were recorded on the books of TRS Holdings. Notwithstanding this fact, some internal

communication in 2005 and 2006 refer to both investments as being assets of NCFC, not TRS Holdings.

14.     If the Carrington Interest is, in fact, owned by TRS Holdings, making the Carrington Interest available to the Creditors of NCFC, as provided in the Plan, will benefit these Creditors.

RABBI TRUST

15.     Prior to the REIT conversion, old NCFC (now known as TRS Holdings), incorporated under the laws of Delaware, offered key employees the opportunity to participate in the "New Century Financial Corporation Deferred Compensation Plan" (the "Employee Deferred Compensation Plan"). Old NCFC's obligations under the Employee Deferred Compensation Plan were supported by a "Rabbi Trust" (the "Trust Agreement") formed pursuant to the "New Century Financial Corporation Supplemental Benefit and Deferred Compensation Trust Agreement", effective January 1, 1999. The Trust Agreement designated Wells Fargo Bank, N.A. ("Wells Fargo"), as the "Trustee." Both the Employee Deferred Compensation Plan and the Trust Agreement are governed by California law.

16.     The "Agreement of Plan and Merger," dated April 21, 2004 (the "Merger Agreement"), entered into in connection with the REIT conversion explicitly provided for the assumption of the "Deferred Compensation Plan" and the "Directors Deferred Compensation Plan" by the new NCFC from old NCFC. It did not refer to the Trust Agreement, but provided that "any and all other agreements in effect immediately prior to the [effective time of the merger] will be assumed by" NCFC.

17.     In July 2004, old NCFC took steps to modify the Employee Deferred Compensation Plan in accordance with changes made to the Internal Revenue Code. The "Amended and Restated" plan (the "Amended Plan") was adopted by the Board of Directors for old NCFC and became effective on July 1, 2004. The Amended Plan defined "Corporation" as old NCFC, or its "successors." The Employee Deferred Compensation Plan and the Trustee Agreement indicate that they are binding on old NCFC's "successors."

18.     After the REIT Conversion, NCFC regularly distributed materials bearing

its name to eligible and participating employees.  Solicitation materials generated in just prior to

2005, 2006, 2007 generally referred to "NCFC."  Internally distributed memoranda and letters

appeared on the new NCFC's letterhead and affirmed that this benefit was only available to "key

employee[s] of New Century Financial Corporation."  And, enrollment confirmations stating that

"New Century Financial Corporation [was] pleased to provide this valuable benefit" were given

to participating employees before the beginning of each calendar year.  Given their nature, none

of these documents, designed for internal consumption, mentioned the place of incorporation of

the sponsoring entity.

19.     NCFC entered into an "Administrative Service Agreement" with The

Newport Group, Inc. (the "Newport Group") for the administration of the Plan in 2006.  This

document clarified that NCFC was a Maryland corporation.  Also, on March 29, 2006, new

NCFC created the "New Century Financial Corporation 2006 Supplemental Executive

Retirement Plan" for a select group of executives designated by the Board of Directors.  Stergios

Theologides, Executive Vice President - Corporate Affairs and General Counsel, executed this

document on behalf of "New Century Financial Corporation, a Maryland corporation."

20.     While the contributions to and redemptions from the Rabbi Trust were

funded mostly by NCMC, the assets and liabilities directly associated with the Rabbi Trust were

recorded on the books of old NCFC -- i.e., TRS Holdings.  NCMC paid employee payroll

expenses on behalf of substantially all Debtor entities and allocated the expenses to the

appropriate entity by recording an intercompany receivable from such entity.  For an employee

participating in the Plan, NCMC would send Wells Fargo the cash contribution portion of the

employee's payroll amount.  TRS Holdings would record an increase in the Rabbi Trust asset on

its books and record an offsetting liability, which represented the Plan liability amount owed to

the employee.  When the employee redeemed assets from the Rabbi Trust, NCMC would also

fund the redemption and record an intercompany receivable from TRS Holdings.  TRS Holdings

would then reduce the amount of the Plan liability by the redemption amount and record an

offsetting intercompany payable to NCMC.   Essentially, NCMC would pay both for the

employee's contributions to the Rabbi Trust and for the employee's redemptions from the Rabbi

Trust, and be left with two receivables on its books relating to each of the payments.   One of the

receivables would be from the entity responsible for the employee's payroll expense amount (if

other than NCMC) and the other receivable would be from TRS Holdings and would represent

the employee's redemption amount.

## POTENTIAL LITIGATION AGAINST KPMG RELATED TO THE FINANCIAL RESTATEMENT

21.     On September 7, 2004, KPMG signed an engagement letter setting forth

the professional services KPMG was to perform for NCFC.   NCFC is the parent of the other

Debtors so its financial statements consolidate the results for all the Debtors.   In addition to

performing the annual audit and quarterly reviews of the consolidated financial statements of

NCFC and its subsidiaries, the engagement letter provided, in Appendix I, that KPMG would

provide "other reports," including the "[a]udit of The Anyloan Company, Worth Funding, Inc.

and NCCC for the year ended December 31, 2004."

22.     A draft amendment to the September 7, 2004 engagement letter, dated

"March ___, 2006," set forth a new Appendix I which provided for an increase in fees for the

annual audit and quarterly reviews of the consolidated financial statements of NCFC and its

subsidiaries.   The new Appendix I also provided for "other reports," including the audit reports

for NCMC, NC Credit, Home 123, NC Capital, NC Mortgage, Access Lending and NC

Insurance Services, Inc.

23.     NCMC and NC Capital each issued their own financial statements. The

last financial statements that were audited for any of the Debtors were for the fiscal year ended

December 31, 2005.  These audited financials included financial statements for NCMC and NC

Capital signed by KPMG.  The Debtors distributed these audited financials for NCMC and NC

Capital and unaudited interim financials for these two entities covering 2006 to numerous

parties.  For example, NCMC distributed its financial statements to numerous state regulators,

counter parties under Master Repurchase Agreements and purchasers of loans. NCMC is the parent of NC Capital, so its financial statements consolidate the results for NC Capital, as well as a number of other subsidiaries of NCMC. NC Capital also distributed its financial statements to loan purchasers that had requested them. Multiple other parties may have been sent the NCMC and NC Capital financial statements.

24.     On February 7, 2007, NCFC announced that its Board of Directors had concluded, based upon the recommendation of management, that NCFC's previously filed consolidated financial statements for the quarters ended March 31, June 30 and September 30, 2006 should be restated to correct potential errors in the application of generally accepted accounting principles regarding the allowance for loan repurchase losses. The allowance for repurchase losses on loans sold is a reserve for expenses and losses that may be incurred from the commitment to repurchase or substitute a loan if a payment default occurs early in the life of the mortgage loan or based on alleged violations of representations and warranties in connection with the sale of those loans by the Debtors. In addition, the need for a financial restatement related to the methodology employed by the Debtors for valuing the loans that they had previously repurchased from whole loan buyers and securitization trusts and which the Debtors held in inventory.

25.     The financial statements for NC Capital and NCMC reflect the reserves established for the repurchase of loans since NC Capital and NCMC were generally the Debtors entities that sold these loans. The financial statements for each of these entities also reflect the value of the loans that were repurchased by the Debtors from whole loan buyers and securitization trusts, to the extent the loans continue to be held by the Debtor.

26.     On March 2, 2007, NCFC announced that was unable to file its Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 Form 10-K") by March 1, 2007 without unreasonable effort and expense. After providing notice that it would be unable to file a timely 2006 Form 10-K on March 2, 2007, margin calls by MRA Counterparties increased

significantly. In fact, as of March 8, 2007, the Debtors had received approximately $150 million of margin calls, approximately $70 million of which it was unable to satisfy.

27.     After the March 2, 2007 announcement, certain of the Debtors, principally NCMC, received cease and desist orders or suspensions from regulators in Massachusetts, New Hampshire, New Jersey, New York, Connecticut, Maryland, Rhode Island, Tennessee, and California. The Debtors also entered into consent agreements and/or orders with regulators from Pennsylvania, Florida, Washington, Iowa, Maine, Michigan, Wyoming, and Idaho.

28.     By mid-March 2007, the MRA Counterparties terminated their facilities. Without this funding, Debtors were forced to stop originating loans, precipitating the bankruptcy filing.

INTERCOMPANY BALANCES

NCFC RECEIVABLE FROM NCMC

29.     The intercompany relationship between NCFC and NCMC began in October 2004. Between that date and April 2, 2007, approximately 2,390 transactions occurred between the two entities that resulted in a net intercompany receivable on the books of NCFC owed by NCMC in the amount of $345.3 million (note that this amount was adjusted to $320.1 million as a result of an adjustment involving the Carrington interest). These transactions consisted primarily of approximately $786 million in cash sent by NCFC to NCMC, offset by approximately $415 million in cash sent to NCFC. Also included in this balance are charges for intercompany interest on certain balances and operating expenses paid for on behalf of NCFC.

NC CREDIT RECEIVABLE FROM NCMC

30.     The intercompany balance between NCMC and NC Credit reflected the ongoing intercompany business transactions between these two entities. NCMC periodically sold loans to NC Credit, which would hold the loans for a period of time before selling them to NC Res IV. Even so, as of April 2, 2007, NC Credit had a net receivable on its books owed by NCMC in the amount of $16.9M. The net receivable primarily is the result of approximately $34 million in MRA guarantee fees charged to NCMC for the parent guarantee, which guarantee was

actually made by NCFC, approximately $28 million in interest income owed to NC Credit for income earned on loans owned by NC Credit but for which the cash was received by NCMC, and approximately $40 million owed by NC Credit to NCMC for loans purchased by NC Credit.

NCMC RECEIVABLE FROM TRS HOLDINGS

31.    As of April 2, 2007, NCMC had a net receivable on its books owed by TRS Holdings in the amount of $240.6 million.  While the intercompany balance between the two entities consisted of over 29,000 transactions from 1997 to April, 2, 2007, the net receivable balance primarily consists of $163 million sent by NCMC to TRS Holdings to fund  a 2004 convertible debt redemption, $182 million sent by NCMC to TRS Holdings to fund stock purchases and options, $22 million sent by NCMC to TRS Holdings to fund the investment in the Carrington interest, $8 million sent by NCMC to TRS Holdings to fund stock dividends and $57 million in payment by NCMC of operating expenses on behalf of TRS Holdings and NCFC. These amounts are offset by cash provided to NCMC of approximately $144 million and the recording of income tax expense of $38 million by NCMC with a corresponding liability to TRS Holdings.  The cash payment of $163 million to TRS Holdings by NCMC related to approximately $200 million raised by TRS Holdings through convertible debt, the proceeds of which were distributed by TRS Holdings to  NCMC.  Upon the conversion of this debt, NCMC sent cash of approximately $400 million to TRS Holdings to fund the payoff of these bonds, which had appreciated in value.  The payment also included a $36 million account adjustment related to non-cash expense recorded as part of the conversion that was charged to NCMC. Interest was accrued on the intercompany balance between NCMC and TRS Holdings.

NCMC RECEIVABLE FROM NC RES IV

32.    The intercompany balance between NCMC and NC Res IV reflects the ongoing intercompany business transactions between the two entities.   NCMC would sometimes sell loans to NC Res IV for the purpose effecting a securitization.  As of April 2, 2007, NCMC had a net receivable on its books owed by NC Res IV in the amount of $81.3 million.  While the intercompany balance between the two entities consisted of over 890 transactions from

December 1, 2004 to April, 2, 2007, the net receivable balance primarily consists of $301 million owed by NC Res IV to NCMC for the sale of loans to NC Res IV, $53 million owed by NC Res IV to NCMC for the book value of the residual interests in the securitization held by NC Res IV, and $261 million owed by NCMC to NC Res IV for mortgage servicing fees and interest income generated by the securitization for which the cash was sent to NCMC.

## NC CREDIT RECEIVABLE FROM NCFC

33.     As of April 2, 2007, NC Credit had a net receivable on its books owed by NCFC in the amount of $67.3 million. The net receivable primarily reflects interest income generated while NC Credit held loans prior to securitizations, but where the cash was actually received by NCFC which recorded an intercompany payable to NC Credit.

## NC RES IV RECEIVABLE FROM NCFC

34.     As of April 2, 2007, NC Res IV had a net receivable on its books owed by NCFC in the amount of $419.1 million. The net receivable primarily reflects interest income generated for NC Res IV's interests in securitizations, where the cash was actually received by NCFC which then recorded an intercompany payable to NC Res IV.

## NC RES III RECEIVABLE FROM NCMC

35.     As of April 2, 2007, NC Res III had a net receivable on its books owed by NCMC in the amount of $174.8 million. The net receivable primarily reflects interest income generated for NC Res III's interest in securitizations, where the cash was actually received by NCMC which then recorded an intercompany payable owed to NC Res III.

[Remainder of page intentionally left blank.]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this [__]rd day of April 2008 at Wilmington, Delaware.

_____
TODD BRENTS