# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NEW CENTURY TRS HOLDINGS, INC., *et al*.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 07-10416 (KJC)<br>(Jointly Administered)<br><br>Hearing Date: April 24, 2008 at 10:00 a.m. |

## SUPPLEMENTAL REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN FURTHER SUPPORT OF CONFIRMATION OF JOINT CHAPTER 11 PLAN OF LIQUIDATION

TO THE HONORABLE KEVIN J. CAREY,
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of New Century TRS Holdings, Inc., *et al*., the above-captioned debtors and debtors-in-possession (the "Debtors"), by its co-counsel, Blank Rome LLP and Hahn & Hessen LLP, hereby files this Supplemental Reply of the Official Committee of Unsecured Creditors (the "Committee Reply") in Further Support

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation ("NCFC"); New Century TRS Holdings, Inc. (f/k/a new Century Financial Corporation), a Delaware corporation ("TRS Holdings"); New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation ("NCMC"); NC Capital Corporation, a California corporation ("NC Capital"); Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation ("Home 123"); New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation.

of Confirmation of Joint Chapter 11 Plan of Liquidation, and in support thereof respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1. This Supplemental Reply is being submitted as a supplement to the Reply Brief in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April 23, 2008 (the "Plan").  Before being able to propose a consensual plan in these cases, a number of disputes and controversies between the various creditor constituencies had to be investigated and settled. Starting with the premise that, if possible, these cases should be confirmed on a deconsolidated basis (*i.e.*, the separate assets and liabilities of each Debtor entity should be respected), the Plan Proponents examined numerous issues involving the assets and liabilities of the separate Debtors' estates, including, for example, whether (i) assets listed on a particular Debtor's books and records were properly recorded as assets of that Debtor, (ii) it was proper that assets were acquired utilizing the funds of one Debtor, but recorded on the books of a different Debtor for administrative or other reasons, and (iii) certain intercompany claims should be recharacterized as capital contributions, not debt obligations, as there appeared to be little or no evidence that the Debtors ever paid these "obligations" in the past or intended to repay them in the future.  The Plan Proponents also looked into other material issues not reflected on the Debtors' books and records, such as (i) what is the proper method for allocating among the various Debtors' estates chapter 11 administrative expenses incurred and to be incurred, and (ii) how to allocate among the various Debtors' estates potential recoveries from assets not recorded on the various Debtor's books, such as tax refunds and anticipated litigation recoveries.

---

[2]  Undefined terms contained herein shall have the meanings ascribed to such terms in the Plan.

2. After conducting this investigation, the various creditor constituencies represented on the Committee, with the assistance of the Committee's professionals, engaged in extensive, arms-length negotiations to try and settle these controversies as part of a consensual plan without having to resort to costly, time-consuming and protracted litigation. The Plan embodies a number of intricate and complex settlements among the various creditor constituencies that have claims against different Debtor entities. Like each leg in a three-legged stool, these settlements are interrelated and cannot be modified without impacting the other compromises embodied in the Plan. This Supplemental Reply seeks to explain to the Court the material controversies that were raised among the various creditor constituencies and how those controversies were settled as part of the Plan.

## The Composition of the Committee

3. On April 9, 2007, the Office of the United States Trustee for the District of Delaware appointed the following seven (7) of the Debtors' largest unsecured creditors to the Committee: Credit Suisse First Boston Mortgage Capital LLC, Credit-Based Asset Servicing and Securitization LLC, Residential Funding Company, LLC, Deutsche Bank National Trust Co., Wells Fargo Bank, N.A. as Indenture Trustee, Fidelity National Information Services, Inc., and Maguire Properties – Park Place, LLC. Since its formation, the Committee has appointed Kodiak Funding LP, one of the largest creditors of NCFC, as an ex officio member of the Committee.

4. The Committee is comprised of a balanced cross-section of the different creditor constituencies in these cases. Two (2) members, including a co-chairperson of the Committee, assert significant claims against the Holding Company Debtors; one (1) member, who is the other co-chairperson, asserts a significant claim against the Operating Debtors; three

- 3 -

127340.01600/40174410v.1

(3) members assert significant EPD/Breach Claims against NC Capital; and one (1) member holds a Claim that is subject to the Multi-Debtor Claim Protocol because more than one Debtor is jointly and severally liable for such Claim. Such member also holds a separate EPD/Breach Claim against NC Capital.

5. After several months of analysis and negotiations, the Committee voted unanimously to approve the terms of the Plan and have recommended that all creditors vote in favor of the Plan.

6. The Plan has been overwhelmingly approved by creditors holding the vast majority of the claims in these cases including the claims at the NCFC level. Only a small group of former employees seek to prevent confirmation of the Plan in a effort to obtain undue leverage against the Debtors and Committee in their separate adversary proceeding over the assets in the Rabbi Trust. The Committee submits that the objection filed by these former employees should be overruled.

## The Major Compromises Contained in the Plan

### A. The Allocation of Administrative Expenses Among the Various Debtors

7. One of the principal issues that had to be resolved prior to the formation of a consensual plan in these cases was determining the proper method for allocating among the various Debtors' estates the chapter 11 administrative expenses incurred and to be incurred. The administrative expenses incurred in these cases, including both operating expenses and professional fees, have been substantial. In considering alternative methods for allocating such expenses, the Plan Proponents first considered whether the expenses could be allocated based on which Debtor's behalf such services had been or were being provided. While certain of the expenses could have been allocated in this manner, such as fees and expenses incurred in

connection with certain asset sales, there was a significant portion of the expenses which could not readily be allocated to a specific Debtor. For example, professional fees incurred performing services on behalf of all of the Debtors or the Committee in the chapter 11 proceedings, including plan confirmation issues, could not easily be allocated to a specific Debtor. Similarly, the significant costs incurred in connection with the Examiner's investigation of the Debtors' restatement of their consolidated financial statements and the Debtors' responses to the investigations being conducted by the Securities and Exchange Commission were not easy to allocate. Such expenses could arguably have been allocated entirely to NCFC, the Parent company that made the public filings and had public shareholders, or among the various Debtor entities based on their consolidated financial statements.

8. After considering various alternatives, the Debtors and the Committee ultimately decided that an appropriate method for allocating administrative expenses would be to base the allocation on the estimated asset values of the various Debtor groups. This compromise results in the allocation of such expenses to the Holding Company Debtors, Operating Company Debtors and Access Lending at 22.4%, 76.8% and 0.7%, respectively.

### B. Issues Concerning the Proper Ownership of Certain Assets by a Debtor

9. As part of its investigation, the Committee raised numerous issues regarding why the Debtors' books and records reflected a certain asset belonging to a particular Debtor in light of evidence to the contrary indicating that such asset may belong to a different Debtor. For example, the Debtors' books and records reflected that the Carrington Interest was owned by TRS Holdings, even though certain of the amendments to the partnership documents reflected that NCFC may own the Carrington Interest. Compounding this problem was the fact that TRS Holdings was formerly known as New Century Financial Corporation, a Delaware

127340.01600/40174410v.1

corporation, and it is unclear in many instances whether the party listed in a document as "New Century Financial Corporation" referred to the entity now known as TRS Holdings or NCFC. Putting aside the issue of colorable title based on the Debtors' records, in terms of economic substance, the Debtors' records showed that NCMC provided most of the funds used to acquire the Carrington Interests. As a result, the Committee and its professionals also investigated whether the Carrington Interest should more properly be reflected as an asset of NCMC, and if not, whether the intercompany accounts between TRS Holdings and NCMC properly accounted for the funding provided by NCMC to TRS Holdings for its acquisition of the Carrington Interests.

10. A similar issue was identified regarding the ownership of the assets in the Rabbi Trust. Depending on the relevant date of inquiry, either NCFC or TRS Holdings (then known as New Century Financial Corporation, a Delaware corporation) is listed as the party to the trust agreement. In addition, in terms of economic substance, the Debtors records showed that most of the beneficiaries of the Rabbi Trust were employees of NCMC, not NCFC. The funding for the Rabbi Trust came for the most part from NCMC. When an employee redeemed his or her interest in the Trust, NCMC would typically satisfy the redemption request out of its operating funds and the employee's share of the Rabbi Trust assets would remain in the Rabbi Trust. This blurring of the lines between competing ownership interests in the Rabbi Trust assets, like the Carrington Interests, caused the Committee and its professionals to investigate whether the assets in the Rabbi Trust should more properly be reflected as an asset of NCMC, and if not, whether the intercompany accounts between NCFC, TRS Holdings and NCMC properly accounted for the funding provided by NCMC.

11. While there were arguments advanced to the contrary, the Committee

ultimately decided when attempting to ensure that creditors were not adversely impacted by the Holding Company Debtors/Operating Company Debtors structure (the "Holdco/Optco Structure") adopted in the Plan, that ownership of the Carrington Interest should be divided 50% to NCFC and 50% to TRS Holdings, and that the assets held in the Rabbi Trust should be allocated 100% to NCFC. Different results could have been reached but these asset allocations were part of the Plan compromises.

12. The ownership of the Tax Refund that the Debtors have claimed from the IRS in the approximate amount of $66 million was another asset allocation issue that had to be resolved in the Plan. On January 30, 2008, the Debtors filed a claim for refund on Form 1120x with the IRS claiming a net operating loss carryback pursuant to section 172(b) of the Internal Revenue Code from the Debtors' 2006 taxable year to the 2004 taxable year. The Debtors' had claimed that the net operating loss carryback from the 2006 taxable year reduces their 2004 taxable income and results in an allowable tax refund for the 2004 taxable year. Pursuant to section 505(a) of the Bankruptcy Code, the Bankruptcy Court will have jurisdiction over the Debtor' claim to the Tax Refund no later than May 28, 2008.

13. Although NCFC filed consolidated tax returns for the Debtors in the 2004-2006 taxable years, the Plan provides that any funds received with respect to the Tax Refund will be included in the amounts used to determine the Operating Debtor Net Distributable Assets, because the Debtors' records indicate that NCMC funded the tax payments for the 2004-2005 taxable years and incurred the carryback losses in the 2006 taxable year. Furthermore, the Debtors' records do not reflect that an intercompany claim was created to account for these tax payments nor has a tax sharing or allocation agreement among the Debtors been produced.

14. In similar corporate structures where there is an absence of a tax sharing

or allocation agreement, courts generally hold that the resulting tax refund should be allocated to each entity in proportion to the operating losses that generated the refund. See In re TMCI Electronics, 279 B.R. 552, 556 (Bankr. N.D. Ca. 2000) (citing In the Matter of Bob Richards Chrysler-Plymouth Corp., 473 F. 2d 262, 263 (9th Cir. 1973)). The Plan Proponents elected to follow this line of cases and believe that the allocation of the Tax Refund as an asset of the Operating Debtors is appropriate under the Plan. See id. at 557 (a tax refund made possible through operating losses of a subsidiary in bankruptcy should be used to benefit the creditors of that entity rather than the creditors of the bankrupt parent). This allocation of the Tax Refund was also part of the compromises adopted under the Plan.

15.     The allocation of the Estates' Litigation Proceeds is another critical compromise established in the Plan. The Plan combines all estate Causes of Action (other than those belonging to Access Lending) and divides the net proceeds, if any, which are generated from those Causes of Action among the Holders of Unsecured Claims against the Holding Company Debtors and the Operating Debtors on a percentage basis. Specifically, the Litigation Proceeds are allocated 27.5% to the Holders of Allowed Holding Company Debtor Claims, 45% to the Holders of Allowed EPD/Breach Claims against NC Capital and 27.5 % to Holders of Allowed Operating Debtor Claims (other than Holders of Allowed EPD/Breach Claims against NC Capital). These sharing percentages roughly mirror the estimated claims in each class as a percentage of the total claims in the case.

16.     This allocation recognizes that a substantial percentage of the avoidance claims, in particular the chapter 5 claims, are likely to be held by the Operating Company Debtors as NCMC and Home 123 incurred and paid most of the Debtors' on-going operating expenses. In addition, many of the commercial litigation claims also reside with the Operating

Company Debtors. The primary litigation asset identified, however, is the potential claims arising out of the Debtors' need to restate its financial statements, as identified in the report of Examiner Michael Missal. While NCFC was party to the primary engagement letter with the Debtors' auditors, KPMG, the financial statements were consolidated financial statements of all Debtors. Additionally, KPMG also prepared separate audited financial statements for NCMC and NC Capital which were provided to and relied upon by major creditors of these entities including repurchase counterparties, loan purchasers and investors in securitization trusts.

17.     The Plan allocation of Litigation Proceeds is the result of extensive settlement negotiations among the creditor constituencies. The allocation reflects not only an effort to apportion the litigation assets among the Debtors, but is also part of the integrated global settlement in the Plan that deals with the Claims of the Holders of EPD/Breach Claims against NC Capital and their agreement to discount the intercompany claims against NCMC and consent as a class to the use of the EPD/Breach Claim Protocol.

### C.     **Issues Concerning the Treatment of Intercompany Claims**

18.     One of the issues the Committee's professionals were instructed to investigate was whether grounds existed for the recharacterization of any intercompany claims as capital contributions, not debt obligations. Based on its investigation, the Committee professionals identified a potential issue that existed concerning whether the intercompany claim of NCFC, the parent of NCMC, against NCMC totaling approximately $354 million should be treated as legitimate debt, parri passu with third party claims, or should be recharacterized as a capital contribution. The Third Circuit, in In re SubMicron System Corporation, 432 F.3d 448 (3rd Cir. 2006), set forth the relevant standard to be considered by courts in recharacterizing claims:

- 9 -

> [w]hich course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity).
>
> [T]he determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction.

SubMicron, 432 F.3d at 456-57.  In analyzing the facts to the inquiry set forth in SubMicron, the Committee professionals concluded that there was a material issue concerning whether NCFC's intercompany claim against NCMC should be recharacterized.  Specifically, a number of facts were identified that would support such a recharacterization including, for example, the lack of any promissory note or similar instrument evidencing the indebtedness between NCFC and NCMC; the facts that the Debtors' never settled up the intercompany balance, but instead rolled the balance forward on the books and records from year-to-year; and the fact that the Debtors frequently failed to accrue interest on the intercompany balances.   Further, no evidence was discovered of any credit decisions being made when one Debtor entity decided to advance funds to or on behalf of another Debtor entity.

19.     After considering the foregoing facts, among others, the Committee members ultimately agreed to compromise this intercompany claim issue by reducing NCFC's claim against NCMC to 50% of the face amount.

**D.     Issues Concerning Representations and Warranties
           with the Sale or Securitization of Mortgage Loans**

20.     One of the major disputes that arose during the Plan negotiations was whether the holders of EPD/Breach Claims, the largest group of creditors in the case, who had typically contracted with NC Capital for the purchase or acquisition of whole loans, had the

- 10 -

ability, either directly or indirectly through NC Capital, to assert claims for breach of representations and warranties and/or early payment defaults against NCMC, notwithstanding the fact that they had contracted only with NC Capital.  While NC Capital has significant liabilities, it only has nominal assets.  With some limited exceptions, the Debtors' standard practice prepetition was for NCMC and Home123, the two operating Debtor entities that originated mortgage loans, to internally transfer the loans to NC Capital just prior to NC Capital's transfer of the loans to third parties either through a purchase and sale transaction or a placement in a securitization trust.  In connection with such third party transfers, NC Capital would become contractually obligated for repurchase claims from the whole loan purchasers or securitization trustees.  In exchange for facilitating these third party transactions, NC Capital would be entitled to a modest percentage fee of the proceeds realized from the sale of the loans.  The balance of the proceeds went to NCMC or Home123.

21.     An investigation into this issue revealed that there was some written evidence between NCMC and NC Capital that showed that NCMC may have in fact agreed to stand behind the repurchase obligations being incurred by NC Capital.  Further, some of the major holders of EPD/Breach Claims against NC Capital strenuously argued that NC Capital had significant fraudulent transfer claims against NCMC based on the grounds that insolvent NC Capital did not receive reasonably equivalent value from NCMC in exchange for its agreement to assume the significant repurchase obligations in connection with the sale or transfer of the whole loans to third party purchaser and securitization trustees.  Holders of claims against NCMC (and NCFC) in response argued that the creditors of NC Capital were sophisticated parties who specifically contracted with NC Capital and they should not now be heard to complain about having to look solely to the assets of NC Capital for their recoveries.  This dispute created a

significant impasse of the Committee's ability to propose a consensual plan.

22. After considering the foregoing facts, among others, and engaging in extensive negotiations, the Committee members ultimately compromised this intercompany/intercreditor dispute by agreeing to allow the holders of EPD/Breach Claims against NC Capital to assert claims against NCMC at 50% of the allowed amount of such claims as determined by the EPD/Breach Claim Protocol. This inter-estate settlement impacts the recoveries of all creditors in the case.

### E. Multi-Debtor Claim Protocol

23. The Plan Proponents developed the Multi-Debtor Claim Protocol in an effort to reduce expense in connection with claim resolution and to take into account the legal rights of creditors holding guarantees or other joint and/or several contractual arrangements with different Debtor entities. Under the Plan, a creditor with a joint and several Claim against both NCFC and TRS Holdings receive distributions as if only NCFC or TRS Holdings was liable for such Claim. The Multi-Debtor Claim Protocol also provides that a Holder of Allowed Holding Company Debtor Unsecured Claims (other than Special Deficiency Claims) for which both NCFC and NC Credit are jointly and/or severally liable will be assigned a Determined Distribution Amount of 130% of the amount of its Allowed Unsecured Claim against NCFC and a Determined Distribution Amount of 0% with respect to its Claim against NC Credit. A similar methodology is applied under the Plan to creditors holding Allowed Unsecured Claims for which certain Operating Debtors are jointly and/or severally liable. Thus, if a creditor holds Allowed Unsecured Claims (other than Special Deficiency Claims) against NCMC, NC Capital and Home123, and those Debtors are jointly and/or severally liable for such Claims, the creditor will receive a Determined Distribution Amount on account of its Allowed Unsecured Claim against

NCMC of 130% and a Determined Distribution Amount of 0% on account of its other Allowed Operating Debtor Unsecured Claims.

24.     Other than the specific Claims of creditors as set forth above, for distribution purposes, the Multi-Debtor Claim Protocol will treat as a single Claim all Unsecured Claims filed and allowed against multiple Debtors in a Debtor Group where such Debtors are jointly and/or severally liable for such Claims.  Furthermore, the Multi-Debtor Claim Protocol treats as distinct Allowed Unsecured Claims against different Debtor Groups.  The purpose of this Multi-Debtor Claim protocol is to mitigate the potential adverse impact on certain creditors of the Holdco/Optco Structure in the Plan.  Based on preliminary balloting results, it appears that the creditors that hold Multi-Debtor Claims have voted overwhelmingly in favor of the Plan.

### F.     EPD/Breach Claim Protocol

25.     As explained in greater detail in the Disclosure Statement, the EPD/Breach Claim Protocol is a key component of the Plan.  The protocol provides a streamlined method for fixing the allowed amount of claims asserting either breaches by the Debtors for early payment defaults or breaches of representations and warranties under individual creditor's loan purchase or securitization trust agreements.  If the EPD/Breach Claim Protocol is not approved, the Plan Proponents anticipate that the Debtors' estates and individual creditors will incur millions of dollars of expenses and time-consuming delays litigating issues concerning whether the alleged breaches actually qualify as breaches under the operative documents, and, if so, whether the damages asserted are appropriate.  In addition, a number of whole loan purchasers and securitization trustees have asserted large unliquidated claims for breaches that exist but have not yet been discovered since such breaches are typically discovered only after the underlying loan goes into default and the servicer discovers the alleged breach.

The Committee believes that the cost and anticipated delay in trying to litigate before the Bankruptcy Court estimation hearings to determine each Creditor's allowed claim amount for existing, but unknown breaches based on pools of thousands or tens of thousands of loans would be prohibitive. The EPD/Breach Claim Protocol provides a streamlined, efficient method for estimating these claims based on a formula to be applied uniformly to all EPD/Breach creditors.

26. The approval of the EPD/Breach Claim Protocol under the Plan was another key component of certain creditor constituencies' agreement to consent to other compromises contained the Plan.

### G. Other Intercreditor Dispute Resolutions

27. When determining whether to merge the Debtor entities other than NCFC and TRS Holdings into the Holding Company Debtor Group or the Debtor entities other than NCMC into the Operating Company Debtor Group, the Plan Proponents considered whether there was a potential adverse impact on other creditors by including those entities and their creditors in the group. In most cases, it was determined that the Debtor entities to be included had only nominal assets and marginal liabilities such that the inclusion of those entities had little, if any, adverse impact on other creditors. With respect to Home123, the Plan Proponents determined that a small contribution was warranted in order to be able to include Home123 as part of the consensual Plan.[3] The claims of Home 123 were discounted by 75% in order to mitigate the potential adverse effect to other creditors by including Home123 in the Operating Company Debtor group. The Plan Proponents believed that this was appropriate in order to avoid the potential adverse consequence of having a chapter 7 trustee appointed for any of these

---

[3] Home123 will contribute its potential claims, including chapter 5 claims, to the Litigation Proceeds under the Plan.

other Debtor entities, including Home123, and then having to litigate with a chapter 7 trustee over various issues concerning allocation of assets, intercompany claims and ownership of potential chapter 5 and other litigation claims.

28. Another component of the compromises contained in the Plan is the adjustments made to ensure that intercompany claims do not indirectly receive the benefit of certain of the compromises negotiated among creditor groups.

29. As stated above, after months of negotiations, the Committee voted unanimously to approve the terms of the Plan. The Committee's approval demonstrates broad acceptance of the Plan as the Committee is comprised of a balanced cross-section of the different creditor constituencies in these cases, with different Committee members holding Claims against the Holding Company Debtors; Claims against the Operating Company Debtors; EPD/Breach Claims against NC Capital; and a Claim that is subject to the Multi-Debtor Claim Protocol because more than one Debtor is jointly and severally liable for such Claim. The Committee submits that the Plan and the compromises and settlements contained therein are reasonable and should be approved by this Court in its entirety.

## ARGUMENT

**I.  The Compromises and Settlements Contained in the Plan Satisfy the Requirements of Bankruptcy Rule 9019(a) Under Applicable Case Law.**

30. It is well settled that the Bankruptcy Code provides that a chapter 11 plan may include provisions that settle or adjust claims belonging to the debtors or the estates. See 11 U.S.C. § 1123(b)(3)(A). See also In re Exide Technologies, et al., 303 B.R. 48, 66 (Bankr. D. Del. 2003). The resolution of claims by compromise or settlement is generally favored in bankruptcy. In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004) (citing

- 15 -

Myers v. Martin (In re Martin), 91 F. 3d 389, 393 (3d Cir. 1996)). Accordingly, the Supreme Court considers compromises to be "'a normal part of the process of reorganization,'" and believes that it would "be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." Prospective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., 390 U.S. 414, 424 (1968) (citations omitted).

31.  Under Rule 9019 of the Federal Rules of Bankruptcy Procedures ("Bankruptcy Rules"), the approval of any such settlements or compromises in a chapter 11 plan is within the sound discretion of the bankruptcy court. Coram Healthcare Corp., 315 B.R. at 329.

32.  Several circuits, including the Third Circuit, follow a framework based on the Supreme Court's decision in the TMT Trailer Ferry case and will approve a compromise which forms part of a plan of reorganization when that compromise is both fair and equitable. See 390 U.S. at 424; see also Exide Tech., 303 B.R. 48; In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988). In determining whether a compromise is fair and equitable, the court must reach an informed, independent judgment supported by the factual background underlying the litigation and bankruptcy. Exide Tech., 303 B.R. at 67. Furthermore, a determination of fair and equitable does not require the court to conduct a "mini-trial of the facts." In re Allegheny International, Inc., 118 B.R. 282, 311 (Bankr. W.D. Pa. 1990). "Rather, the court must only conclude that the compromise or settlement falls within the reasonable range of litigation possibilities." Corum Healthcare Corp., 315 B.R. at 330 (citing In re Penn Central Transportation Co., 596 F. 2d 1102, 1114 (3d Cir. 1979).

33.  The Third Circuit considers four specific factors in deciding whether to approve a settlement: "(1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience, and

- 16 -

delay necessarily attending it; and (4) the paramount interest of creditors." In re RFE Industries, Inc., 238 F. 3d 159, 165 (3d Cir. 2002) (citing In re Martin, 91 F.3d 389, 393 (3d Cir. 1996)). In evaluating the first factor, probability of success in litigation, "the Court's task is not to 'decide on the numerous questions of law and fact raised by [objections] but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness.'" Exide Tech., 303 B.R. at 68 (citations omitted). With respect to analyzing the paramount interest of creditors, this Court in Exide Tech. found that "[a]n important element in many of the cases in which courts approved plan settlements that had not been negotiated with the opposing party is that the settlements were negotiated with and/or supported by the Creditors Committee…" Id. at 70.

        34.     In addition to the Martin factors, courts in the Third Circuit also consider factors established by other jurisdictions to assess the fairness and reasonableness of compromises or settlements in the context of a plan of reorganization. See id. at 67-68, 71. In the Texaco case, the bankruptcy court in the Southern District of New York applied the following criteria in considering a plan settlement:

> (1) The balance between the likelihood of plaintiff's or defendant's success should the case go to trial vis a vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures.
>
> (2) The prospect of complex and protracted litigation if the settlement is not approved.
>
> (3) The proportion of the class members who do not object or who affirmatively support the proposed settlement;
>
> (4) The competency and experience of counsel who support the settlement.
>
> (5) The relative benefits to be received by individuals or groups within the class.

- 17 -

>   (6) The nature and breadth of releases to be obtained by the directors and officers as a result of the settlement.
>
>   (7) The extent to which the settlement is truly the product of "arms-length" bargaining, and not fraud or collusion.

Texaco, 84 B.R. at 902.

35.     In applying the settlements and compromises contained in the Plan to the aforementioned Martin factors, it is clear that the standards for approving the Plan settlements under Bankruptcy Rule 9019 have been satisfied.  These are complicated liquidating bankruptcy cases involving hundred of millions of dollars in assets and potential assets and billions of dollars in claims.  The Plan reflects the Plan Proponents' efforts to comply with the deconsolidation mandates of In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005) as amended by 2005 U.S. App. LEXIS 18043 (3d Cir. Aug. 23, 2005), cert. denied, 126 S.Ct. 1910 (2006), while at the same time recognizing and resolving as part of a global compromise the various intercompany and intercreditor disputes described above.  The Committee submits that the Plan compromises fall well within the probability of success if the various issues concerning the proper allocation of administrative expenses and estate assets, and allowance of intercompany claims and intercreditor disputes had to be litigated to their conclusion in the bankruptcy court.  Such litigations, as the Court is well aware, would involve highly complex factual disputes which would be time-consuming and costly to litigate.

36.     It also cannot be credibly disputed that confirmation of the Plan is in the paramount interest of all creditors, including the creditors of NCFC, which, based on the dollar amount of claims held by such creditors, have voted overwhelmingly in favor of the Plan.  The alternatives to confirmation of the Plan is either to litigate these numerous disputes between the Debtors' estates and their creditors or convert the cases to chapter 7 and let the various chapter 7

trustees litigate these same issues.  Neither alternative is in the best interest of creditors.  In negotiating these compromises, the Committee was very mindful of the significant administrative costs being incurred by these estates.  The Committee believes that confirmation of a consensual Plan will result in a significant and immediate reduction in the on-going administrative expenses being incurred by these estates.  Unsecured creditors will benefit from such reductions in expenses.

37. In sum, the Committee believes that the Plan compromises fall well within the range of reasonableness and should be approved.

*[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]*

WHEREFORE, for the reasons set forth above, the Committee respectfully requests the entry of an order confirming the Plan and granting such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
April 22, 2008

                              BLANK ROME LLP

                By:    /s/ *David W. Carickhoff*
                         Bonnie Glantz Fatell (No. 3809)
                         Regina Stango Kelbon
                         David W. Carickhoff (No. 3715)
                         1201 Market Street, Suite 800
                         Wilmington, Delaware  19801
                         (302) 425-6400 - Telephone
                         (302) 425-6464 - Facsimile

                             - and -

                         HAHN & HESSEN LLP
                         488 Madison Avenue, 15th Floor
                         New York, New York 10022
                         (212) 478-7200 - Telephone
                         (212) 478-7400 – Facsimile
                         Mark T. Power
                         Mark S. Indelicato
                         Janine M. Cerbone
                         Huria S. Naviwala

                         Co-Counsel to the Official Committee of
                         Unsecured Creditors of New Century TRS
                         Holdings, Inc., *et al.*