## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEW CENTURY TRS HOLDINGS, INC., a Delaware corporation, et al.,[1] | Case No. 07-10416(KJC) |
| Debtors. | Jointly Administered |
| | Hearing Date: April 24, 2008 at 10:00 a.m. Eastern Time |

### DECLARATION OF HOLLY FELDER ETLIN IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED AS OF APRIL 23, 2008

### INTRODUCTION

I, Holly Felder Etlin, declare as follows:

1. I submit this Declaration in support of confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors dated as of April 23, 2008 (as amended or modified, the "Plan") filed by the above captioned debtors and debtors in possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan Proponents"). Capitalized terms not defined herein have the meanings ascribed to them in the

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; and NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited partnership and New Century Warehouse Corporation, a California corporation.

Plan or related disclosure statement (as amended or modified, the "Disclosure Statement"), as applicable.

2. I am over eighteen years of age. All facts in this Declaration are based on my personal knowledge, upon information supplied to me by persons who report to me at the Debtors, upon information supplied to me by the Debtors' professionals and consultants, upon my review of relevant business records and documents, or upon my opinion based on my experience and knowledge of the Debtors' business operations, financial affairs and related issues. If called as a witness, I could and would competently testify to the facts set forth herein.

## WITNESS BACKGROUND

3. I am the President, Chief Executive Officer and Chief Restructuring Officer of New Century Financial Corporation, a Maryland corporation ("NCFC"). I was appointed as the President and Chief Executive Officer of NCFC on June 8, 2007. Since June 8, 2007, I have also been the President or Chief Executive Officer, as the case may be, of each of the other Debtors other than NC Asset Holding, L.P. ("NC Asset Holding") and NCoral, L.P. ("NCoral"), both of which are limited partnerships.

4. I am a Managing Director of AlixPartners, LLP. I first became affiliated with the Debtors on March 22, 2007, when the Debtors retained AlixPartners as their financial advisor.

5. My duties include overseeing the business operations and financial affairs of the Debtors, and since the sales of substantially all of the Debtors' operating assets, my duties have included overseeing the wind-down of these Estates. I have access to the Debtors' business and financial records, including related agreements and contracts. I have also been personally involved in the Debtors' bankruptcy cases. Among other things, I have been extensively

involved in the Debtors' efforts to develop, draft, negotiate and seek approval of the Plan, as well as negotiations with many significant creditors to settle litigated and disputed claims.

## BACKGROUND FACTS

6. I have nearly 30 years of experience providing restructuring and reorganization services to companies in a variety of industries. Immediately prior to joining AlixPartners, I was a Principal with XRoads Solutions Group in New York.

7. I hold a bachelor's degree from the University of California at Los Angeles. I am a Certified Insolvency and Restructuring Advisor (CIRA) and Certified Turnaround Professional (CTP). I am also Immediate Past Chairman of the Turnaround Management Association, and a member of American Bankruptcy Institute, Association of Insolvency & Restructuring Advisors, and International Women's Insolvency & Restructuring Confederation.

8. My prior experience includes serving as Chief Restructuring Officer and acting-CEO of Tanner & Haley, one of the largest luxury destination clubs in the United States, Turnaround Advisor to Winn Dixie, and Chief Restructuring Officer of Impath, the preeminent cancer pathology company in the United States.

## UNCONTESTED CONFIRMATION ISSUES

A. 1129(a)(1) and 1129(a)(2) - THE PLAN COMPLIES WITH APPLICABLE BANKRUPTCY CODE PROVISIONS AS HAVE THE PLAN PROPONENTS.

9. The Plan establishes separate classes for each of NCFC, TRS Holdings, NC Credit, NC Residual IV, NCMC, NC Capital, Home123, and Access Lending. The Plan also establishes a set of omnibus classes for NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, and NCoral. Classes HC1 through HC4 are for Claims against and Interests of NCFC. Classes HC5 through HC7 are for Claims against TRS Holdings. Classes HC8 through HC10 are for Claims against NC Credit. Classes HC11 through HC13 are for

Claims against NC Residual IV. Classes OP1 through OP3 are for Claims against NCMC. Classes OP4 through OP6 are for Claims against NC Capital. Classes OP7 through OP9 are for Claims against Home123. Classes OP10 through OP12 are for Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, and NCoral. Classes AL1 through AL3 are for Claims against Access Lending. Each Claim or Interest placed in a class is substantially similar to the other Claims or Interests in that class. I believe that the Plan's classification scheme is reasonable and necessary to implement the Plan.

10. The Plan designates classes of Claims and Interests. It identifies unimpaired classes -- Class HC1 (Priority Claims Against NCFC), Class HC2 (Secured Claims Against NCFC), Class HC5 (Priority Claims Against TRS Holdings), Class HC6 (Secured Claims Against TRS Holdings), Class HC8 (Priority Claims Against NC Credit), Class HC9 (Secured Claims Against NC Credit), Class HC11 (Priority Claims Against NC Residual IV), Class HC12 (Secured Claims Against NC Residual IV), Class OP1 (Priority Claims Against NCMC), Class OP2 (Secured Claims Against NCMC), Class OP4 (Priority Claims Against NC Capital), Class OP5 (Secured Claims Against NC Capital), Class OP7 (Priority Claims Against Home123), Class OP8 (Secured Claims Against Home123), Class OP10 (Priority Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, and NCoral), Class OP11 (Secured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, and NCoral), Class AL1 (Priority Claims Against Access Lending), and Class AL2 (Secured Claims Against Access Lending). The Plan provides for the treatment of impaired classes -- Class HC3a (Special Deficiency Claims Against NCFC), Class HC3b (Other Unsecured Claims Against NCFC), Class HC4a (Series A Preferred Stock Interests), Class HC4b (Series A 510(b) Claims), Class HC4c (Series B Preferred Stock Interests), Class HC4d (Series B

510(b) Claims), Class HC4e (Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims), Class HC7 (Other Unsecured Claims Against TRS Holdings), Class HC10a (Special Deficiency Claims Against NC Credit), Class HC10b (Other Unsecured Claims Against NC Credit), Class HC13 (Other Unsecured Claims Against NC Residual IV), Class OP3a (Special Deficiency Claims Against NCMC), Class OP6a (Special Deficiency Claims Against NC Capital), Class OP3b (EPD/Breach Claims Against NCMC), Class OP3c (Other Unsecured Claims Against NCMC), Class OP6a (Special Deficiency Claims Against NC Capital), Class OP6b (EPD/Breach Claims Against NC Capital), Class OP6c (Other Unsecured Claims Against NC Capital), Class OP9a (Special Deficiency Claims Against Home123), Class OP9b (Other Unsecured Claims Against Home123), Class OP12 (Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, and NCoral), and Class AL3 (Other Unsecured Claims Against Access Lending). Additionally, Articles 3.A of the Plan designates (but does not classify) Claims of the type specified in section 507(a)(2) of the Bankruptcy Code (Administrative Claims), and Article 3.B of the Plan designates (but does not classify) Claims of the type specified in section 507(a)(8) of the Bankruptcy Code (Priority Tax Claims). I do not believe that there are any claims associated with these Chapter 11 Cases of the type specified in section 507(a)(3) of the Bankruptcy Code.

11. The Plan provides for the same treatment of all Claims or Interests placed in the same class, and I believe that the Plan provides adequate means for its implementation. Among other things, the Plan provides (i) for the transfer of all Assets of the Debtors (other than Access Lending) to the Liquidating Trust, (ii) for the transfer of the stock in Access Lending to the Liquidating Trust, and (iii) that the Plan Administrator will be the chief executive officer and sole director of Access Lending after the Effective Date. The Plan also provides for the

appointment of a post-confirmation Liquidating Trustee, Plan Administrator, and the Plan Advisory Committee.

B.  1129(a)(3) -- GOOD FAITH

12. Throughout this process, the board of directors of NCFC (the "Board") was involved in the plan process and had the benefit of advice from management, turnaround advisors (AlixPartners), investment bankers (Lazard Freres & Co. LLC), and counsel (including O'Melveny & Myers LLP and Richards Layton and Finger, P.A.). The Debtors and their advisors worked closely with the Official Committee of Unsecured Creditors (the "Committee") and its financial advisors (FTI Consulting, Inc.) and counsel (both Hahn & Hessen LLP and Blank Rome, LLP) in the formulation of the Plan. The Debtors were aware that the members of the Committee include Creditors holding Claims against a cross-section of the Debtors and of various types. Thus, the composition of the Committee reflected a broad cross-section of the Debtors' capital structure and the Debtors took this into consideration when negotiating with the Committee. I am not aware of any special benefit or personal gain that is expected by any member of the Board, management, the Committee or the Debtors' or Committee's professionals concerning the Plan. Given my involvement with the plan process, I am confident that I would have become aware of any improper purpose for the Plan if one existed.

C.  1129(a)(4) - THE PLAN PROVIDES FOR COURT APPROVAL OF PAYMENTS.

13. The Plan provides that Professional Fee Claims submitted by estate professionals will be entitled to payment only if and to the extent they are approved by the Court, and that all other Administrative Claims will be entitled to payment only to the extent they are Allowed Claims.

D.  1129(a)(5) - SERVICES OF CERTAIN INDIVIDUALS.

14. The Plan provides that, at least fifteen (15) days prior to the deadline to vote to accept or reject the Plan, the Plan Proponents shall have filed a Liquidating Trust Agreement, which agreement shall identify the Liquidating Trustee. In accordance with these provisions, the Plan Proponents have appointed Allen M. Jacobs as the Liquidating Trustee and the Plan Administrator and have filed the Liquidating Trust Agreement.

E.  1129(a)(6) - PROVISIONS REGARDING PUBLICLY REGULATED RATES.

15. The Plan is a liquidating plan, and does not implicate any rates subject to government regulation.

F.  1129(a)(7) - THE PLAN SATISFIES THE "BEST INTERESTS" TEST.

16. The Debtors' assets have been largely liquidated so that the Estates now consist of cash resulting from the sale of various assets, the Debtors' claims for tax refunds (the "Tax Refunds"), some additional assets and various causes of action.

17. I believe that the Plan provides a much more efficient vehicle to accomplish the goal of liquidating the remainder of the Estates and distributing proceeds to Creditors than would conversion to chapter 7. I also believe that the recoveries for Creditors under the Plan will exceed the recoveries they likely would receive if these cases were converted to chapter 7.

18. The Debtors prepared under my direction an analysis that is attached as Exhibit E to the Disclosure Statement illustrating some of the projected effects of the conversion of the Chapter 11 Cases to chapter 7 (the "Liquidation Scenarios"). The Liquidation Scenarios include a "High Recovery Case" and a "Low Recovery Case." We set forth two liquidation cases because the Debtors' estimates of recoveries under the Plan (set forth in Section I.A.4 of the Disclosure Statement, found on pages 12 -14 of the printed version of the Disclosure Statement mailed to Creditors), similarly contain both a high and low case. The High Recovery Case and

the Low Recovery Case included in the Liquidation Scenarios mirror, with certain modifications that I describe below, the assumptions underlying the high and low projected recoveries under the Plan.

19.  The Liquidation Scenarios assume that the Estates would start with the Cash presently held by the Debtors; with respect to that starting point the Liquidation Scenarios are not different than the estimates of recoveries under the Plan. With respect to assets that have not yet been converted to Cash, the Liquidation Scenarios assume the same results as under the Plan, with two exceptions. First, the Debtors believe that a conversion to chapter 7 would likely adversely affect the recovery of the Tax Refunds, given that negotiations with the Internal Revenue Service ("IRS") and the recovery of over two dozen state and local tax refunds would be set back -- the Debtors and their personnel have been engaged in extensive and delicate negotiations with the IRS and state and local authorities related to these refunds. Thus, the Debtors estimate that the amount of the Tax Refunds would be reduced by 25% in both the High Recovery Case and Low Recovery Case Liquidation Scenarios because of the lack of continuity of personnel involved in this effort. Second, the Debtors believe that conversion to chapter 7 would adversely affect the prospects for a recovery on the Carrington Interest given a chapter 7 trustee's constraints in resolving issues with a private investment fund. In their efforts to realize value on the Carrington Interest, the Debtors have engaged in extensive negotiations with Carrington Capital Management, LLC ("Carrington"). A chapter 7 trustee would need to start over. This would be daunting. For example, it took the Debtors and the Committee a protracted time to get as far as they have with Carrington since Carrington has been guarded in delivering information to the Debtors and the Committee regarding the Carrington Fund, which Carrington asserts is highly confidential. Carrington also has asserted that the Carrington Interest is subject

to transfer restrictions. Notwithstanding these positions, Carrington has agreed to cooperate with the transfer of the Carrington Interest to the Liquidating Trust and on April 18, 2008 filed its "Statement" concerning the Plan in which Carrington consented to the transfer of this interest in the Carrington fund to the Liquidating Trust but expressly reserved its right to object to any other transfers. Based on my extensive personal involvement in this matter, I believe that a chapter 7 trustee would have far greater difficulty in realizing value with respect to the Carrington Interest than will be the case under the Plan. Accordingly, the Liquidation Scenarios attached as Exhibit E to the Disclosure Statement estimate that the recoveries to be realized on the Carrington Interest would be reduced by 35% in the High Case Scenario. This only affects the High Case Analysis, since the Low Case Scenario (both for purposes of analyzing likely recoveries under the Plan and a chapter 7) assumes that nothing will be realized on the Carrington Interest.

20. Under the Plan, the Debtors will avoid the costs and expenses of fees payable to one or more chapter 7 trustees and their professionals. Because of the divergent interests of the estates, there would likely be multiple trustees, thereby increasing administrative expenses and creating the likelihood of litigation among these trustees. The Liquidation Scenarios assume that the fees charged directly by the chapter 7 trustees would equal 3% of the assets distributed to Creditors, consistent with the sliding scale of maximum chapter 7 trustee fees set forth in the Bankruptcy Code.

21. Probably more important than these direct fees paid to the chapter trustees, conversion to chapter 7 would jeopardize the settlements that are included in the Plan. These settlements are truly interrelated. By this I mean that the EPD/Breach Claim Protocol, the resolution of intercompany claims, the allocation of Litigation Proceeds and the other compromises built into the Plan affected each other and were negotiated as part of an overall

package. If these cases were converted to chapter 7, it is very likely that these settlements would unravel. This, in turn, would entail the likelihood that substantial additional professional fees would be incurred by the chapter 7 trustees in litigating or negotiating over the matters that are settled in the Plan and would involve significant risks that the substantive results would be worse for the Estates.

22. It is unlikely that a chapter 7 liquidation would be able to realize the substantial benefits of the EPD/Breach Claim Protocol. This protocol offers a streamlined means of resolving the most substantial Claims against the Estates and reflects both substantial work of the Plan Proponents and the major EPD/Breach Claimants. It also is interrelated with other Plan compromises involving other groups of Creditors. For example, the EPD/Breach Claim Protocol is tied to the allocation of Litigation Proceeds -- issues concerning whether the absolute dollars generated by the EPD/Breach Claim Protocol were perceived to be too high or too low could be resolved when tied to a compromise on the allocation of Litigation Proceeds among the EPD/Breach Classes and other Classes of Creditors; revising one aspect of one of these settlements, would have repercussions for other settlements contained in the Plan and in chapter 7 it is likely that the trustees would engage in litigation over many of these issues. In addition, chapter 7 trustees and Creditors would likely need to litigate the validity of asserted Breach Claims and a means to deal with the fact that many of these Creditors asserted unliquidated Breach Claims. In addition, chapter 7 trustees would need to litigate the amount of damages that flowed from any valid Breaches and EPDs. This undertaking would be enormous, given that the Debtors sold hundreds of thousands of loans with principal balances exceeding $200 billion. The potential for expending a substantial part of the recoveries otherwise available for Creditors and consuming years in that effort was one of my greatest concerns prior to the time that we

developed the Plan. If these issues were handled through more traditional Claims litigation by a group of chapter 7 trustees, the costs of administration would be increased greatly and the distributions to Creditors would be badly delayed (even for Creditors asserting other types of Claims, for reserves would have to be established for the EPD/Breach Claims, which reserves would likely vastly exceed all other claims against the Estates).

23.  In addition, conversion to chapter 7 would entail the risk of substantial inter-Debtor litigation. For example, as part of the compromises included in the Plan, the Plan adopts a compromise concern the allocation of the Litigation Proceeds. If these cases were converted to chapter 7, it is likely that these compromises would unravel and the chapter 7 trustees would engage in threshold disputes over which Debtor has standing and the better case against the Debtors' prepetition accountants. For example, chapter 7 trustees for NCMC and NC Capital would likely assert that they should pursue these causes of action since most of the issues affecting the financial restatements concern reserves for loan repurchases established on the books of NC Capital and its parent NCMC and the carrying value of loans repurchased by these two Debtors. Separate financial statements were generated for each of these Debtors and were delivered to their major Creditors, including both audited annual financial statements and unaudited quarterly statements. The chapter 7 trustees of the other Debtors, particularly NCFC, would likely argue that these causes of action should be for their benefit since it is the public company whose financial statements consolidated all of these results. Thus, if these cases were converted to chapter 7, I believe that the trustees would likely engage in battles over which of them was entitled to bring actions related to the financial restatements. Such a threshold battle would be both expensive and could well undermine the value of these actions as multiple Estates warred among themselves instead of pursuing the causes of action in a united and uniform

fashion. The negative impact on the likely recoveries from these causes of action are not reflected in the Liquidation Scenarios since we did not try to forecast these litigation recoveries. Although not estimated in terms of dollars in Exhibit E to the Disclosure Statement, I believe that conversion to chapter 7 would likely have a negative impact on such litigation recoveries that would further expand the differential between recoveries under the Plan and those in chapter 7.

24. The settlements contained in the Intercompany Claim Protocol also represent a substantial benefit that would likely not be available in chapter 7. Under this protocol, the Holding Company Debtors receive a distribution based on 50% of the amount of their Intercompany Claims against the Operating Debtors notwithstanding the assertions by NCMC's Creditors that those Claims should be recharacterized as equity. This would also likely be a matter of dispute among the trustees for these Estates.

25. Further, the Joint Administrative Expense Share reflects a settlement of the allocation of Joint Administrative Expenses and is part of the set of compromises contained in the Plan. In a chapter 7 liquidation, it is likely that the Chapter 7 trustees of the different Estates would engage in litigation over the allocation of professional fees and operating expenses incurred in the Chapter 11 Cases. For example, Creditors of the Estates other than NCFC have asserted that NCFC should bear a greater portion of the expense of the professional fees in light of the professional fees associated with the Restatement (including fees and expenses of the Examiner), while Creditors of the Holding Company Debtors have asserted that a larger portion of the operating expenses should be allocated to the Operating Debtors.

26. In sum, the Debtors estimate that conversion to chapter 7 would require the expenditure of additional professional fees totaling $19,525,000. This is broken down as

follows: (i) an increase in professional fees due to elimination of EPD/Breach Claim Protocol of $8,525,000 (calculated as $150,000 for each of the 31 EPD/Breach Creditors and $25,000 for each of the 155 EPD/Breach Claims, all of which was allocated to NCMC and NC Capital), and (ii) an increase in Expenses due to multiple Estates and litigation due to disputes of ownership of Litigation Proceeds other assets and intercompany claim issues of $11,000,000.

27. In addition to the expense associated with this litigation, each Debtor would bear the risk of less favorable outcomes. With respect to the Joint Administrative Share litigation, the Low Case Scenario reflects a less favorable distribution of Joint Administrative Expenses to NCFC and NCMC than contemplated by the Plan. With respect to the litigation risks that the intercompany claims of NCFC against NCMC might be disallowed as capital contributions, the nature of these risks depends on the perspective from which one views the issues -- from the perspective of NCFC, the risk is that its intercompany claims against NCMC will be disallowed or allowed at less than the 50% used in the Intercompany Claim Protocol that is part of the Plan, while from the perspective of NCMC, the risk is that the intercompany claims of NCFC will be allowed at higher amounts than the 50% settlement used in the Plan. Thus, from the perspective of NCMC, the Low Case Scenario for NCMC set forth in Exhibit E to the Disclosure Statement assumes that the intercompany claim of NCFC against NCMC is allowed at 100% (as opposed to 50% used in the Plan) and the High Case Scenario for NCMC assumes that the claim of NCFC against NCMC is allowed at 25% (as opposed to 50% used in the Plan). From the perspective of NCFC, the Liquidation Scenarios assume that the intercompany claim of NCFC against NCMC will be allowed at 100% in both the High and Low Cases, as opposed to the 50% provided for in the Plan. Other assumptions regarding intercompany claims are set forth in the footnotes to Exhibit E.

28. The Liquidation Scenarios also need to make assumptions regarding litigated resolutions concerning the ownership of certain assets where this ownership is less than clear and where these issues are compromised in the Plan. For example, the Liquidation Scenarios assume that NCFC and TRS Holdings divide ownership of the Carrington Interest 50-50 and that the assets held in the Rabbi Trust are owned 100% by NCFC. These are "conservative" assumptions from the perspective of NCFC. In other words, the Liquidation Scenarios disregard the possibility that the chapter 7 trustee of TRS Holdings might prevail in arguing that this Estate owns the assets in the Rabbi Trust and substantially discounts by 50% the probability that this trustee might prevail in litigation in which this trustee asserts that TRS Holdings owns the Carrington Interest. As a result, the Liquidation Scenarios are based on some quite favorable assumptions for the Creditors of NCFC and it is quite possible that the Creditors of NCFC would fare far worse in an actual chapter 7 than shown on Exhibit E.

29. Further, conversion to chapter 7 would entail setting new bar dates for the filing of Claims. Not only would that result in months of additional delay, but additional claims that were not asserted in the Chapter 11 Cases, or which were late-filed, could be filed against the Estates, thereby reducing the recoveries for Creditors who were diligent and filed timely Claims.

30. In sum, I believe that Creditors will receive more in the Plan than they would in chapter 7.

G. 1129(a)(8) - THE PLAN HAS BEEN ACCEPTED BY REQUISITE VOTING, IMPAIRED CLASSES.

31. The voting results are set forth in the declaration of Jamie Edmonson. As it indicates, all Classes voted to accept the Plan other than Class HC3b.

32. Class HC3b (Other Unsecured Claims Against NCFC) has not voted to accept the Plan. Specifically, while 95.42% in amount of the Claims in Class HC3b has voted to accept the

Plan, 73.02% of the number of Claims in Class HC3b has voted to reject the Plan. While a substantial majority of the Claims in this Class, in terms of dollars, that voted accepted the Plan, the vote failed the numerosity test. The failure of this Class to satisfy the numerosity test was largely the result of rejection of the Plan by many of the Creditors who assert deferred compensation Claims. For example, of the 203 negative votes in this Class, 200 (or 98.52%) were cast by deferred compensation claimants. These claimants were relatively highly compensated members of former management who opted to defer some of their compensation. In addition, some of these deferred compensation claimants who voted to reject the Plan assert Claims based on bonus compensation that was keyed off of the financial results that the Debtors reported in 2005 and 2006 and which the Debtors later announced needed to be restated. Over $2.6 million of the negative votes in this Class were cast by former members of senior management who deferred their bonuses.

H.  **1129(a)(9) - PRIORITY CLAIMS.**

33. The Plan appropriately provides for the payment of priority claims.

I.  **1129(a)(10) - ACCEPTANCE OF AT LEAST ONE IMPAIRED CLASS.**

34. As described above, at least one class of impaired claims for each of the Debtors has voted in favor of the Plan.

J.  **1129(a)(11) - THE PLAN IS FEASIBLE.**

35. I believe that the Plan is feasible. It provides all of the tools the Liquidating Trustee (including in his capacity as Plan Administrator) will require to complete the liquidation of the Debtors' Estates and make distributions to Creditors according to the relative priorities of the claims. We also project that the Debtors will have sufficient Cash on the Effective Date to make the distributions required to be made then.

K.  1129(a)(12) - PAYMENT OF CERTAIN FEES.

36.  The Plan appropriately provides for the payment of fees under 28 U.S.C. § 1930.

L.  1129(a)(13) - CONTINUATION OF RETIREE BENEFITS.

37.  The Debtors are not obligated, now or in the future, to pay retiree benefits.

M.  1129(b) - CRAMDOWN

38.  The following classes are impaired classes that have not accepted the Plan: Class HC3b, Class HC4a, Class HC4b, Class HC4c, Class HC4d, and Class HC4e.

39.  Classes HC 4a, HC4b, HC4c, HC 4dd and HC4e are conclusively deemed to have rejected the Plan because no distribution will be made to these Classes. They receive no distribution under the Plan because they are either equity interests in NCFC or are claims for damages related to the purchase and sale of equity in NCFC and are classified below Creditor Claims pursuant to section 510(b) of the Bankruptcy Code. No Class junior to any of these Classes will receive a distribution under the Plan, as provided in Bankruptcy Code sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii).

N.  1129(c) - ONLY ONE PLAN

40.  Other than the Plan (including previous versions thereof), no plan has been filed in the Chapter 11 Cases. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

O.  1129(d) - PRINCIPAL PURPOSE OF PLAN

41.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of application of section 5 of the Securities Act of 1933.

P.  BANKRUPTY RULE 9019(a) REQUIREMENTS

42.  In my view, the series of interrelated compromises contained in the Plan form a global settlement of the key issues among the Debtors' Estates and their various creditor

constituencies. I explained the rational for many of the compromises above and described many of the costs and risks that would be involved in litigating these matters. In sum, resolving the issues addressed by these settlements through litigation would be costly and inconvenient and that would cause significant diminution and delay of distributions to the creditors of the Debtors' estates. These settlements were negotiated in good faith with representatives of divergent interests and reflect the uncertainty inherent in resolving a large number of difficult issues. Therefore, it is my belief that the Plan is in the paramount interests of creditors.

[Remainder of page intentionally left blank.]

LA3:1146581.5
RLF1-3275078-3

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 23rd day of April 2008 at Wilmington, Delaware.

*[signature]*

HOLLY FELDER ETLIN