UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------------x

In re:

NEW CENTURY TRS HOLDINGS, INC.,
a Delaware Corporation, et al.,

                 Debtors.

------------------------------------------------------------x

Chapter 11

Case No. 07-10416 (KJC)

Jointly Administered

## RESPONSE OF KIRKPATRICK & LOCKHART PRESTON GATES ELLIS, LLP TO FEE AUDITOR'S FINAL REPORT REGARDING AMENDED INTERIM FEE APPLICATION OF KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP FOR THE FIRST INTERIM PERIOD

Kirkpatrick & Lockhart Preston Gates Ellis LLP ("K&L Gates"), counsel to the

Examiner, submits its response to the Fee Auditor's Final Report Regarding Amended Interim

Fee Application of Kirkpatrick & Lockhart Preston Gates Ellis LLP for the First Interim Period

(the "Fee Auditor Report" or "FAR")[1] and states as follows:

### BACKGROUND

1.      On April 2, 2007 (the "Petition Date"), New Century Financial Corp. and

its subsidiaries (collectively, the "Debtors" or "New Century") filed voluntary petitions for relief

under Chapter 11 of the United States Bankruptcy Code.

2.      Since the Petition Date, the Debtors have continued to operate their

businesses and manage their affairs as debtors-in-possession pursuant to Sections 1107 and 1108

of the Bankruptcy Code.

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Fee Auditor Report.

3.    New Century filed its bankruptcy petitions approximately two months
after it had publicly disclosed that it would restate consolidated financial results for the quarters
ended March 31, June 30 and September 30, 2006 to correct errors New Century discovered in
its application of generally accepted accounting principles regarding New Century's allowance
for loan purchase reserves. At that time, New Century had also indicated that it expected to
record a loss with respect to its residual interests.

4.    On May 23, 2007, New Century indicated that it had determined that
errors had also been made in New Century's annual financial statements for its fiscal year ended
December 31, 2005 (the "2005 Financial Statements") with respect to both the accounting and
reporting of loan repurchase losses and New Century's valuation of certain residual interests in
securitizations. New Century claimed that it was more likely than not that these errors resulted
in a material overstatement of pretax earnings in the 2005 Financial Statements. As such, New
Century's board of directors concluded that the 2005 Financial Statements should not be relied
upon.

5.    On June 1, 2007, the Court Entered an Order Denying in Part and
Granting in Part Motion of the United States Trustee (the "UST") for an Order Directing
Appointment of a Chapter 11 Trustee, or in the Alternative, an Examiner (the "Examiner
Order").

6.    Pursuant to the Examiner Order, the Court authorized and directed the
Examiner to, inter alia,

> investigate any and all accounting and financial statement
> irregularities, errors or misstatements, including but not limited to
> such irregularities, errors or misstatements that (i) gave rise to the
> announced need to restate the Debtors' financial statements for the
> first three quarters of 2006 and/or (ii) led the Debtors' management
> and Audit Committee to conclude it was more likely than not that

2

> pre-tax earnings in the 2005 financial statements were materially
> overstated (collectively, the "Accounting Issues"), and identify and
> evaluate any claims or rights of action that the estates might have
> arising from or relating to such irregularities, errors or
> misstatements.

Examiner Order at ¶ 3. The Court also authorized and directed the Examiner to investigate any

possible unauthorized post-petition use of cash collateral by the Debtors (the "Cash Collateral

Issue") and to otherwise perform the duties of an examiner pursuant to Section 1106(a)(3) and

(a)(4) of the Bankruptcy Code, subject to the provisions of the Examiner Order. Id.

      7.     The Court ordered the Examiner to file with the Court a report of his

examination within ninety (90) days of his appointment. Id. at ¶ 5. By Orders dated October 10,

2007 and January 23, 2008, the Court extended the Examiner's time to file his report until

February 29, 2008.

      8.     The Examiner Order authorized the Examiner to "retain counsel and other

professionals if he . . . determines that such retention is necessary to discharge his . . . duties,

with such retention to be subject to Court approval under standards equivalent to those set forth

in 11 U.S.C. § 327[.]" Id. at ¶ 7.

      9.     On June 8, 2007, the Examiner filed an Application for an Order

Authorizing the Retention of K&L Gates as Counsel to the Examiner *Nunc Pro Tunc* to June 1,

2007. On July 25, 2007, the Court entered an Order approving the Examiner's retention of K&L

Gates *nunc pro tunc* to June 1, 2007. K&L Gates has agreed to a voluntary 10% discount on its

fees.

      10.    On June 8, the Examiner additionally filed an Application for an Order

Authorizing the Retention of BDO Seidman, LLP ("BDO") As Accountants and Financial

Advisor to the Examiner *Nunc Pro Tunc* to June 29, 2007. On September 7, 2007, the Court

entered an Order approving the Examiner's retention of BDO *nunc pro tunc* to June 29, 2007.

BDO has agreed to a voluntary 10% discount on its fees.

11.     On August 24, 2007, K&L Gates filed the First Monthly Application of

Kirkpatrick & Lockhart Preston Gates Ellis, LLP, Counsel to the Examiner, For Allowance of

Compensation for Professional Services Rendered and for Reimbursement of Expenses Incurred

from June 1, 2007 To July 31, 2007 (the "First Monthly Application").

12.     On September 14, 2007, K&L Gates filed its Notice of First Interim Fee

Application Request.

13.     On January 25, 2008, K&L Gates received the Initial Fee Auditor Report

(the "Initial Fee Auditor Report") with respect to fees and expenses incurred during June 1, 2007

to July 31, 2007 (the "First Interim Period") wherein the Fee Auditor requested that K&L Gates

explain several of its fees and expenses incurred during the First Interim Period within ten (10)

days of receipt of the Fee Auditor Report.

14.     K&L Gates submitted a 44 page response to the Initial Fee Auditor Report

to the Fee Auditor on February 6, 2008 pursuant to a mutually agreed upon extension.

15.     The Examiner's 550 page final report (the "Final Report") was filed with

the Court on February 29, 2008.

16.     On April 10, 2008, the Fee Auditor filed the Fee Auditor Report with the

Court.

## THE EXAMINER'S INVESTIGATION

17.     As more fully detailed below, the Examiner was directed by the Court to

undertake a massive investigation of a multibillion enterprise in a very short time frame.

By way of example, throughout the course of the Examiner's investigation, the Examiner and his

team of professionals received and reviewed a huge volume of documents from numerous

4

sources, including, but not limited to: (i) approximately 2.5 million megabytes of documents

(approximately 250 million pages) from raw e-mail and shared drive data produced to the

Examiner by the Debtors; (ii) approximately 15,000 pages of documents from the New Century

Special Investigation Committee ("SIC"); (iii) approximately 11,000 pages of documents from

independent directors; and (iv) more than 1.9 million pages of documents from New Century's

outside auditor[2].

        18.      The Examiner and his professionals conducted approximately 110

interviews of 85 different fact witnesses throughout the course of his investigation. These

interviews included a large number of present or former employees of New Century who

performed accounting or finance functions at various offices or facilities maintained by New

Century, members of New Century's Board of Directors, several of New Century's internal audit

personnel, present or former members of New Century's in-house legal team, certain personnel

in New Century's investor relations department and several accountants from New Century's

outside auditor.

        19.      In light of the Examiner's extensive mandate, the Examiner and his

professionals had to expend significant time at the outset of the investigation familiarizing

themselves with (a) the background of the Debtors' cases, (b) the investigations already in

process by other parties, and (c) the results of an internal investigation by the SIC formed by

New Century's Audit Committee of New Century's accounting that had taken place prior to the

---

[2] The Examiner did not receive approximately 750,000 documents from the Debtors until the end of
January 2008 and similarly did not receive 25 percent of the documents requested from the outside
auditor until January 2008. Given the deadline in which the Examiner was required to file his report, the
Examiner's review of these withheld documents were expectedly limited.

Petition Date. The SIC's investigation was discontinued due to the Debtor's constraints from the pending Chapter 11 proceedings.

20.    Due to the enormity and complexity of the investigation, as well as the massive number of documents that needed to be processed and reviewed, K&L Gates' professionals were divided into a number of teams, each assigned to investigate certain subjects within the scope of the investigation. The more significant issue teams were : (1) general organization and case management (the "Case Management Team"); (2) bankruptcy issues (the "Bankruptcy Team"); (3) matters regarding the potential post-petition unauthorized use of cash collateral (the "Cash Collateral Team"); (4) issues pertaining to New Century's Board of Directors and its Audit Committee (the "Audit Committee and BOD Team"); (5) matters with respect to New Century's internal controls (the "Internal Controls Team") and New Century's Internal Audit Department (the "Internal Audit Team"); (6) loan quality and underwriting matters (the "Loan Quality and Underwriting Team"); (7) issues related to New Century's public disclosures and financial reporting (the "Disclosures and Financial Reporting Team"); (8) matters concerning New Century's outside auditor (the "Outside Auditor Team"); and (9) issues related to repurchase reserves, residual interest valuations and other accounting issues (the "Accounting Team").

21.    Each investigative team had one or more team leaders that were responsible for ensuring the progress of that team's portion of the Examiner's investigation and to ensure that any efforts were not duplicative of those undertaken by members of other investigative teams.

22.    To ensure that the investigation was coordinated adequately, the Examiner required periodic reports from the various investigative teams. In an effort to reduce duplicative

6

efforts, update the various teams regarding the status of the differing components of the

investigation and make sure that information relevant to various parts of the investigation was

properly disseminated, weekly team meetings were held with the Examiner and the various team

leaders (the "Weekly Team Leaders Meetings") to review the progress of the investigation,

understand work planned for the future, and to share information gathered thus far in the

investigation. The Weekly Team Leaders Meetings were usually comprised entirely of key team

leaders, as well as Matthew Bowman, a Legal Project Professional who was a member of the

Case Management Team and was involved with major administrative aspects of the

investigation.

23.    In addition to the Weekly Team Leaders Meeting, meetings were held by

certain team leaders and the associates within each team (the "Weekly Team Meeting") to share

updates discussed at the Weekly Team Leaders Meeting and to clarify tasks going forward in an

effort to conduct the investigation in the most efficient and effective manner possible. Due to the

size and scope of the Examiner's investigation, as well as the massive amount of documents

being processed and reviewed daily, such Weekly Teem Meetings were imperative to keep the

numerous professionals updated on their goals and deadlines and to avoid unnecessary

duplication of effort across teams.

24.    The period from the Examiner's appointment to the filing of the

Examiner's Report spanned less than nine months and was an extremely short period of time

within which to complete a report of this breadth and complexity. Nevertheless, the Examiner,

his counsel, and his financial advisors engaged in an extensive review of millions of pages of

documents, completed extensive legal research, performed high levels of analyses of various

accounting issues and conducted dozens of witness interviews, all of which culminated in the

preparation and submission of the Examiner's Final Report with the Court. Given the massive and complex nature and scope of the Examiner's investigation, coupled with the limited time the Examiner was given to complete his investigation, K&L Gates respectfully submits that the fees and expenses incurred by the Examiner's counsel during the First Interim Period were reasonable, justified and compensable and that every effort was taken to minimize unnecessary expenses and duplicative efforts.

## SPECIFIC RESPONSES TO THE FEE AUDITOR'S INQUIRIES

### A.    Meetings Attended By Multiple K&L Gates Professionals (FAR ¶ 5)

25.    As described above, the Examiner had been directed by the Court to undertake and complete a large multifaceted investigation in a limited period of time. As such, an Examiner is not a typical professional in a bankruptcy case. In light of the many different components of the Examiner's investigation, which required bankruptcy and insolvency, accounting, internal investigations and litigation expertise, the number of personnel required to undertake the various components of the Examiner's investigation and the time frame within which the Examiner was required to complete his investigation and file his Final Report, team leader and other meetings were necessary and appropriate in order to properly coordinate the investigation and ensure that it was undertaken in the most efficient and cost-effective way possible.

26.    Moreover, the necessity of certain team leaders' or members' participation in meetings that occurred at the outset of the investigation may not be sufficiently appreciated without also considering the total contribution of those team leaders or members to both the investigation and the drafting of the Examiner's Final Report as is reflected in later applications.

8

(a)     June 19, 2007 Meeting

27.     The June 19, 2007 meeting was one in which counsel to the Special

Investigative Committee ("SIC"), Heller Ehrman, which had conducted a previous internal

investigation of New Century's accounting, provided a comprehensive overview on the

background and results of the SIC's investigation to provide the Examiner with the benefit of its

prior work and avoid the need for duplicative effort by the Examiner going forward. As such, it

was necessary to send the critical team leaders of the various investigative teams, as well as a

core group of team members, to hear the details of the previous investigation so that each

attorney understood the findings of the previous investigation and avoided any duplicative efforts

in carrying out the various portions of the Examiner's investigation.

28.     Six K&L Gates partners and two associates prepared for and attended this

meeting. These attorneys included: (1) Edward M. Fox, a K&L Gates partner with special

expertise in bankruptcy and insolvency matters; (2) Rebecca L. Kline Dubill, a K&L Gates

partner with special expertise in internal investigations and securities enforcement; (3) Stavroula

E. Lambrakopoulos, a K&L Gates partner with special expertise in securities enforcement; (4)

Lawrence C. Lanpher, a K&L Gates partner specializing in internal investigations; (5) Stephen

G. Topetzes, a K&L Gates partner with special expertise in internal investigations and securities

enforcement; (6) Phillip J. Kardis III, a K&L Gates partner with special expertise in corporate

and transactional matters, particularly with respect to the mortgage banking and consumer credit

industries; (7) Erin A. Koeppel, a K&L Gates associate specializing in internal investigations and

securities enforcement; and (8) Lisa M. Richman, a K&L Gates associate specializing in internal

investigations and securities enforcement.

29.     Each of the attendees serves either as a team leader or a core team member

in the following capacities: (1) Edward M. Fox leads the Bankruptcy Team; (2) Rebecca L. Kline

9

Dubill is a team leader for the Case Management and Outside Auditor Teams; (3) Stavroula E.
Lambrakopoulos is a team leader of the Outside Auditor and the Internal Controls Teams; (4)
Lawrence C. Lanpher is a team leader of the Cash Collateral and Loan Quality Teams; (5)
Stephen G. Topetzes serves as a group leader in charge of coordinating the efforts of various
team leaders and is also a team leader of the Audit Committee and BOD, Disclosures and
Financial Reporting and Accounting Teams; (6) Philip J. Kardis III is a core member of the
Accounting Team and was attending as the team representative; (7) Erin A. Koeppel is a team
leader of the Case Management Team; and (8) Lisa M. Richman is a core member of the
Accounting Team.

        30.    The attendance of these attorneys at the meeting was not only beneficial,
but essential to the Examiner's investigation. Each of these attorneys was responsible for
significant and varying components of the Examiner's investigation and returned to relay the
information garnered at the meeting with their various investigative teams.

        31.    Specifically, the attendance of Erin A. Koeppel and Lisa M. Richman at
this meeting was both necessary and appropriate to the Examiner's investigation. Throughout
the course of the Examiner's investigation, Ms. Koeppel coordinated all document management,
review and production issues and handled all case management issues for the entire investigative
team. As such, it was critical for Ms. Koeppel to understand the details of the previous
investigation to avoid any duplicative efforts going forward. Ms. Koeppel would later play a
significant role in assisting the Examiner to determine any potential causes of actions against
current or former officers and directors of New Century and assisted the Examiner in drafting
and revising a significant portion of his Final Report. The Court should take into consideration
Ms. Koeppel's total contribution to the Examiner's investigation when evaluating the necessity

of her attendance at this meeting. Accordingly, K&L Gates submits that the Fee Auditor's
recommendation to reduce the fees incurred on account of Ms. Koeppel's participation at this
meeting is unwarranted.

32. Moreover, because the meeting involved the Accounting Issues, Ms.
Richman's participation in this meeting was similarly critical. Ms. Richman later participated in
numerous interviews of several current or former New Century employees, which particularly
focused on the Accounting Issues, was responsible for taking detailed notes of these interviews
and later drafted memoranda highlighting the interviews in which the Accounting Issues were
addressed. Additionally, Ms. Richman assisted the Examiner in drafting and revising significant
portions of the Examiner's Final Report dealing with the Accounting Issues. Ms. Richman's
background in internal investigations and securities enforcement made her particularly suitable
for these functions. The Court should take into consideration Ms. Richman's total contribution
to the Examiner's investigation when evaluating the necessity of her attendance at this meeting.

33. K&L Gates submits that it was more efficient to send eight key attorneys,
the majority of whom serve as team leaders, or were attending in representative capacities for
their various teams, for such a critical explanation at the outset of the Examiner's investigation,
than to send fewer attorneys who would then have to hold multiple meetings with multiple
parties in an effort to relay this information to the respective investigative teams. Moreover, the
quality of the information imparted from attorney to attorney degrades as the communication
chain lengthens. As such, the attendance of each of these eight attorneys was not only necessary,
but critical to the Examiner's investigation.

(b) June 29, 2007 Meeting

34. On June 29, 2007, certain team leaders participated in a videoconference
with K&L Gates' E-Discovery group in our Seattle, Washington office to discuss the most

11

efficient and effective way to load, process and review the millions of pages of documents that would be produced to the Examiner in the coming months. K&L Gates attorneys would need to review and digest this information to ascertain and understand the facts underlying the investigation, as well as to prepare for the numerous upcoming witness interviews.

35.    The team leaders who participated were Rebecca L. Kline Dubill, Stavroula Lambrakopoulos and Lawrence C. Lanpher, all of whose roles have been explained above. Also participating were Walter P. Loughlin, a K&L Gates partner specializing in internal investigations and securities enforcement and a team leader of the Accounting Team, Brian A. Ochs, a K&L Gates Partner specializing in internal investigations and securities enforcement and a team leader for the team performing background research on New Century, Glenn R. Reichardt, a K&L Gates partner specializing in internal investigations and securities enforcement and a team leader of the Accounting Team and Matthew Bowman, a Legal Project Professional who was a member of the Case Management Team and was involved in the major administrative aspects of the investigation.

36.    As a member of the Case Management Team, Matthew Bowman was charged with handling all document-related issues, including managing the document database and all document review and production issues. As such, Mr. Bowman's attendance at the June 29, 2007 meeting with our E-Discovery group was critical to properly coordinate the loading, processing and reviewing of the millions of pages of documents that were expected to be produced to the Examiner in upcoming months. Accordingly, K&L Gates submits that a reduction in fees for Mr. Bowman's attendance at this meeting is unwarranted.

37.    As previously stated, Rebecca L. Kline Dubill served as the team leader of the Case Management Team, the team which played the primary organizational role in managing

12

the overall progress of the Examiner's investigation. Ms. Kline Dubill, along with Ms. Koeppel, essentially served as the Examiner's eyes and ears to ensure that the investigation progressed smoothly from an organizational standpoint and addressed any problems that arose during the investigation. The Case Management Team also managed all document review and production efforts for the entire investigative team. As such, Ms. Kline Dubill's participation in this meeting was critical in light of the millions of pages of documents that were expected to be produced in upcoming months. Accordingly, K&L Gates submits that a reduction in fees for Ms. Kline Dubill's attendance at this meeting is unwarranted.

38.     The attendance of each of the various team leaders was necessary to determine the document review needs of each respective team and to share this information with the E-Discovery group in Seattle, Washington. Moreover, the team leaders, collectively, had to agree on a workable solution to review and digest the millions of pages of documents that would be produced to the Examiner in the coming months of the Examiner's investigation. Accordingly, the attendance of each participant was necessary to the Examiner's investigation.

(c)     July 11, 2007 Meeting

39.     On July 11, 2007, Rebecca L. Kline Dubill, Glenn Reichardt, Stephen G. Topetzes, Stavroula E. Lambrakopoulos and Erin A. Koeppel, all team leaders whose roles have been explained more fully above, attended a meeting with BDO, the Examiner's accountant and financial advisor. David T. Case, a K&L Gates partner specializing in internal investigations and commercial litigation, who is a team leader of the Internal Audit, the Audit Committee and BOD Teams, also attended.

40.     This core group of team leaders met with the Examiner's financial advisors to discuss case strategy, the approach of the investigation and to learn the status of BDO's review on the various Accounting Issues.

13

41.     Although the Fee Auditor requests a reduction of fees incurred for Erin A.
Koeppel's attendance at this meeting, K&L Gates believes that a reduction of fees incurred on
account of Ms. Koeppel's attendance at this meeting is unwarranted.  As previously discussed
above, Ms. Koeppel later played a significant role in assisting the Examiner to identify any
causes of action against current or former officers or directors of New Century related to the
Accounting Issues and assisted the Examiner in drafting and revising his Final Report.  As such,
K&L Gates submits that Ms. Koeppel's attendance at this meeting was both necessary and
appropriate.

42.     Each team leader involved in this meeting was in charge of a significant
portion of the investigation dealing with the varied Accounting Issues.  Thus, their presence was
critical for this meeting.

(d)     July 17, 2007 Meeting

43.     On July 17, 2007, team leaders Rebecca L. Kline Dubill, Glenn R.
Reichardt, Stephen G. Topetzes, Erin A. Koeppel, Stavroula Lambrakopoulos, Walter P.
Loughlin, Phillip J. Kardis III and David T. Case, all of whose roles have been explained more
fully above, and two core team members, Andrew R. McFall and Phillip J. Kardis III, attending
in their representative capacity for their various teams, attended a full day meeting with the
financial professionals hired by the SIC of the board of directors of New Century, as well as
Heller Ehrman, counsel to the SIC.  This meeting was arranged so that the financial and legal
professionals hired by the SIC could set forth and explain to the financial and legal professionals
hired by the Examiner their findings, as well as answer any questions the Examiner's
professionals might have concerning the SIC Investigation.

44.     The best and most efficient way for K&L Gates to perform its financial
investigation was to begin by obtaining and understanding the information already gathered by

14

New Century's internal investigation. Only K&L Gates attorneys who were essential to the investigations pertaining to the Accounting Issues prepared for and attended this meeting.

45.     At the outset of the investigation, the Examiner focused his initial efforts on two accounting issues (loan repurchase reserves and valuation of residual interests) disclosed by New Century in its Form 8-K filings on February 7 and May 26, 2007. It was therefore critical for members of the Accounting Team to participate in this meeting to understand the accounting issues covered in the previous SIC investigation. Andrew R. McFall is an associate specializing in securities enforcement and was a core member of the Accounting Team. Mr. McFall would later play a significant role in assisting the Examiner in drafting and revising a significant portion of the Final Report dealing with repurchase reserve issues and other Accounting Issues. As such, K&L Gates submits that Mr. McFall's attendance at this meeting was critical.

46.     The roles of Rebecca Kline Dubill and Erin A. Koeppel have previously been explained above. Given their key organizational role in the Examiner's investigation, their attendance at a meeting, at the outset of the investigation, explaining the efforts and outcome of the previous SIC investigation, was critical to avoid any duplicative efforts going forward.

47.     In an effort to be cost-effective, the various team leaders then shared the information learned at this meeting with their respective teams upon their return. Due to the broad subject matter being discussed and the limited availability to meet with the SIC professionals in the future, it was necessary and appropriate for K&L Gates to send a core group of team leaders and team members to address any items that might affect the Examiner's investigation.

(e)      July 16, 2007 Meeting

48.      The July 16, 2007 meeting was a Weekly Team Leaders Meeting as defined more fully above. Each of the nine participants were team leaders of varying investigative teams with the exception of Jennifer Shuttleworth, who attended the meeting to assist the Examiner with overall case management, and Bruce H. Nielson who is a core team member providing critical background research on New Century.

49.      As this was a Weekly Team Leaders Meeting, the participation of Erin A. Koeppel, a team leader of the Case Management Team was essential, as she would also take over Ms. Kline Dubill's responsibilities upon her expected leave of absence. Stavroula Lambrakopoulos was a group leader in charge of coordinating the efforts of all the investigative teams, and as such, her participation in the Weekly Team Leaders Meetings was similarly indispensable. Despite the Fee Auditor's recommended reductions, K&L Gates submits that the attendance of Ms. Shuttleworth, Ms. Koeppel and Ms. Kline Dubill were critical and should be compensated.

50.      Given the nature and purpose of these Weekly Team Leaders Meetings and the varying components of the Examiner's investigation which each team leader has been assigned to investigate, the attendance of each of these participants was essential.

(f)      July 30, 2007 Meeting

51.      The July 30, 2007 meeting was a Weekly Team Leaders Meeting involving all of the team leaders that are involved in the Accounting Issues. This call also included BDO, the Examiner's financial advisor. At this meeting, the various team leaders and core team members discussed many aspects of the investigation of the various Accounting Issues, gave status updates regarding each of their teams' efforts and set upcoming deadlines to

16

meet the goals of the Examiner's investigation. This meeting also involved a specific discussion of issues related to New Century's repurchase reserves.

52.    The only two attendees who were not team leaders were Jennifer Shuttleworth and Justin H. Roeber. Ms. Shuttleworth attended the meeting to assist the Examiner with overall case management. Mr. Roeber is an associate and a critical team member of the Accounting Team. Walter P. Loughlin and Justin Roeber were delegated the task of primarily analyzing issues related to New Century's repurchase reserves. Mr. Loughlin requested that Mr. Roeber attend this Weekly Team Leaders Meeting because Mr. Loughlin had to leave the meeting early due to a conflict. Because repurchase reserve issues were being discussed at the meeting, Mr. Loughlin requested that Mr. Roeber attend the entirety of the meeting. As such, K&L Gates submits that the participation of each attendee was necessary and appropriate.

**B.    Witness Interviews With Multiple K&L Gates Participants (FAR ¶ 6)**

53.    During the First Interim Period, K&L Gates conducted approximately 10 witness interviews spanning the course of approximately six days. To prepare for each witness interview, K&L Gates reviewed documents and correspondence related to possible areas of inquiry and prepared detailed interview outlines. After each interview, K&L Gates prepared detailed interview memoranda summarizing the substance of the interview and highlighting areas for further inquiry and investigation.

54.    As stated more fully above, the Examiner has been directed by the Court to undertake a large multifaceted investigation. In light of the approximately 110 total interviews of 85 different fact witnesses that were taken throughout the course of the Examiner's investigation, the many different components of the Examiner's investigation, requiring both bankruptcy/insolvency expertise as well as internal investigations, accounting, securities

17

disclosure and structured finance expertise, the number of personnel required to undertake the various components of the Examiner's investigation and the time limit in which the Examiner was required to complete his investigation and submit his Report, the number of professionals attending such interviews was kept to the most efficient and cost effective level possible to ensure that the Examiner fulfilled his mandate pursuant to the Examiner Order. Most of the interviews covered subjects relevant to more than one issue team.

55.     Each participant in the interviews was a necessary component to the particular interview in which he or she participated. All of the participants' expertise and roles have been defined above, with the exception of Kathleen O. Peterson and Kristin S. Elliott. Ms. Peterson is a K&L Gates partner and a core member of the Accounting Team and Kristin S. Elliott is an associate specializing in bankruptcy/insolvency matters and a critical member of the Bankruptcy Team.

### (a)     June 13, 14, 18 Interviews of Examiner's Proposed Accountants

56.     On June 13, 14 and 18, five (5) K&L Gates professionals prepared for and participated in multiple interviews of the Examiner's proposed forensic accountants. The roles of Messrs. Fox, Topetzes, and Kardis, along with Ms. Kline Dubill and Ms. Lambrakopoulos have been more fully explained above. In those roles, these professionals would have significant contact with the forensic accountants throughout the investigation.

57.     K&L Gates considered at least fourteen (14) different forensic accounting firms and interviewed eight (8) different firms over the course of several days in between other formational work at the outset of the investigation.

58.     In light of the number of accounting firms considered, the numerous accounting firms interviewed and the significant work that the forensic accountants would

18

undertake on behalf of the Examiner on a variety of matters in such a complex investigation, the participation of four team leaders and Philip J. Kardis III was necessary and appropriate. K&L Gates took appropriate steps to ensure that only the most critical attorneys attended these eight (8) interviews. Accordingly, K&L Gates submits that a reduction in the time spent by Ms. Kline Dubill and Ms. Lambrakopoulos is unwarranted.

(b)    July 26, 2007 Interview

59.    On July 26, 2007, two partners, Stephen G. Topetzes and Kathleen O. Peterson and one associate, Andrew R. McFall, all of whose roles are described above, participated in the interview of a New Century employee with knowledge relevant to the repurchase reserve issues and financial reporting issues, two significant components of the Examiner's investigation.

60.    Although the Fee Auditor has recommended a reduction in Andrew McFall's time, Mr. McFall's participation in this interview was indispensable. Mr. McFall is a core member of the Accounting Team and was present to take detailed notes of the interview for purposes of producing a detailed interview memorandum. This allowed Mr. Topetzes and Ms. Peterson to focus their efforts on conducting the interview and resulted in preparation of the detailed interview memorandum by Mr. McFall at a lower cost than if either of Mr. Topetzes or Ms. Peterson produced it. Accordingly, the participation of each of these attorneys, with different backgrounds and responsibilities, at this interview was necessary and appropriate.

(c)    July 13, 2007 Interview

61.    On July 13, 2007, partners Lawrence C. Lanpher, Edward M. Fox and Jeffrey Bornstein and associate Leah G. Shough interviewed a New Century employee with information relevant to the Cash Collateral Issue. Jeffrey L. Bornstein is a K&L Gates partner

19

specializing in securities enforcement and was a critical member of the Cash Collateral Team. Ms. Shough is an associate and was also a critical member of the Cash Collateral Team.

62.    Although the Fee Auditor has requested a reduction of the time spent by Mr. Bornstein and Ms. Shough at this interview, K&L Gates submits that their participation was indispensable as the interview centered on the Cash Collateral Issue. Moreover, Ms. Shough's participation in this interview was critical because she was charged with the task of taking detailed notes of the interview for purposes of putting together a detailed interview memorandum, which could be accomplished by Ms. Shough at lower cost than if the other attorneys present were required to prepare the intervention memorandum. This also allowed Messrs. Lanpher, Bornstein and Fox to focus their efforts on conducting the interview.

63.    Because of the overlap between the cash collateral and other issues to be investigated, the short time frame within which the investigation had to be completed and the interdisciplinary nature of the issues involved, the participation of all the attorneys involved was necessary and appropriate for this interview. Moreover, the knowledge gained by Mr. Bornstein of the Debtors' accounting systems as a result of his participation in the cash collateral investigation would also be extremely useful to his work in other aspects of the investigation later on.

(d)    June 25, 2007 Interview

64.    On June 25, 2007, partners Lawrence C. Lanpher, Edward M. Fox and Jeffery Bornstein and associates, Kristin S. Elliott and Leah G. Shough, attended the scheduled interviews of not one witness, but three different witnesses, including the Debtors' chief executive officer and chief restructuring officer. This was the first scheduled interview relating to the Cash Collateral investigation, an extremely contentious issue involving, not only the Debtors and the repurchase counterparties to the Debtors' repurchase agreements, but the

20

Debtors' bankruptcy professionals. The specific expertise and roles of Messrs. Lanpher, Fox, and Bornstein, along with those of Ms. Shough and Ms. Elliott have been explained more fully above. Both Ms. Shough and Ms. Elliott were responsible for taking detailed notes of the three interviews for purposes of producing detailed interview memoranda regarding the interviews. These detailed memoranda later proved extremely useful in addressing inconsistencies in recollections of various witnesses and concerns expressed by the Debtors concerning the cash collateral report.

65.     In light of the important and contentious issues involved and the multiple interviews scheduled to occur that day, the participation of all five attorneys, including the two associates who kept detailed notes of the witness interviews, was necessary and appropriate for these interviews. The use of multiple attorneys at the initial interviews also permitted the Examiner to expedite the cash collateral investigation by conducting multiple interviews of less significant witnesses at the same time later in the investigation using subsets of this interview team.

## C.     Issues With Time Entries Listed Under Exhibit D (FAR ¶ 9)

66.     In response to the Fee Auditor's inquiries with respect to the time entries listed in Exhibit D to the Fee Auditor Report, K&L Gates states as follows:

(a)     June 4, 2007 – Rebecca L. Kline Dubill

67.     There was a typographical error in the subpart description for Ms. Kline Dubill's time. The subpart should state ". . . conferences with S. Lambrakopoulos (.5) and others (.9) regarding same . . ." As such, the total amount of time for Ms. Kline Dubill on June 4, 2007 remains unchanged at 6.20 hours and no reduction in fees is warranted.

21

(b)    June 8, 2007 – Lawrence C. Lanpher

68.    There was a typographical error in the subpart description for Mr. Lanpher's time. The subpart should read "Continued investigatory review of documents pertinent to New Century assignment to identify issues and sub-issues for the Examiner to pursue (2.6) . . ." Therefore, the total amount of time billed for Mr. Lanpher on June 8, 2007 remains unchanged at 5.90 hours and no reduction in fees is warranted.

(c)    June 8, 2007 – Nathanael F. Meyers

69.    There was an inadvertent miscalculation in Mr. Meyers' time. The 3.00 total hours should be adjusted to 2.00 hours, resulting in a $193.50 fee reduction. This fee reduction takes into account the 10% discount already deducted from Mr. Meyers' hourly billing rate of $215.00.

(d)    June 18, 2007 – Walter P. Loughlin

70.    There was a typographical error in the subpart description for Mr. Loughlin's time. The subpart description stating "attend videoconference on issues related to the matter" should indicate 2.5 hours, not 2.4 hours as was mistakenly indicated. Therefore, the total amount for Mr. Loughlin's time on June 18, 2007 remains unchanged at 3.50 hours and no reduction in fees is warranted.

(e)    June 29, 2007 – Lawrence C. Lanpher

71.    There was a typographical error in the subpart description for Mr. Lanpher's time. The subpart should read ". . . work on memorandum to the cash collateral investigative team on work to be done (2.40) . . ." Therefore, the total amount of time billed for Mr. Lanpher remains unchanged at 7.60 hours and no reduction in fees is warranted.

(f)     June 6, 2007- Brian A. Ochs

72.     There was an inadvertent miscalculation of Mr. Ochs' time. The 5.00 total hours should be adjusted to 4.90 hours, resulting in a $56.25 fee reduction. This fee reduction takes into account the 10% discount already deducted from Mr. Ochs' hourly billing rate of $625.00.

(g)     June 9, 2007 – Jeffrey L. Bornstein

73.     There was an inadvertent miscalculation in Mr. Bornstein's time. The 5.40 total hours should be adjusted to 5.20 hours, resulting in a $94.50 fee reduction. This fee reduction takes into account the 10% discount already deducted from Mr. Bornstein's hourly billing rate of $525.00.

(h)     July 11, 2007 – Matthew B. Bowman

74.     Three (3.0) hours of Mr. Bowman's time for July 11, 2007, should have been deducted from the time entry for the "Investigation" matter, thus resulting in a decrease from 10.60 hours to 7.60 hours. The three (3.0) hours should have been moved to the "Non-Working Travel" matter. However, K&L Gates inadvertently did not charge the Debtors for Mr. Bowman's non-working travel time. The 10.60 total hours charged to the "Investigation" matter should thus be reduced to 7.60 hours, resulting in a fee reduction of $648.00 for this matter. This fee reduction takes into account the 10% discount already deducted from Mr. Bowman's hourly billing rate of $240.00.

75.     An additional $324.00, however, should be added to the "Non-Working Travel" matter on account of Mr. Bowman's 3.0 hours of non-working travel time. The $324.00 figure takes into account K&L Gates' voluntary 10% discount and the additional 50% discount for non-working travel time.

23

     (i)    July 17, 2007 – Andrew R. McFall

76.    There was an inadvertent miscalculation of Mr. McFall's time. The 8.30 total hours should be adjusted to 8.20 hours, resulting in a \$29.25 fee reduction. This fee reduction takes into account the 10% discount already deducted from Mr. McFall's hourly billing rate of \$325.00.

     (j)    July 18, 2007 - Stavroula E. Lambrakopoulos

77.    There was an inadvertent typographical error in the subpart description for Ms. Lambrakopoulos' time. The subpart should read "Review Heller Ehrman documents and material related to accounting issues (5.7)." Thus, the total amount billed for Ms. Lambrakopoulos' time for July 18, 2007 remains unchanged at 5.70 hours and no reduction in fees is warranted.

     (k)    July 18, 2007 – Lawrence C. Lanpher

78.    There was a typographical error in the subpart description for Mr. Lanpher's time. The subpart should read "Review of documents (including documents produced today by New Century), updates to team members on investigation issues and additions to draft work plan document (6.80)." Therefore, the total amount of time billed for Mr. Lanpher remains unchanged at 8.10 hours and no reduction in fees is warranted.

     (l)    July 18, 2007 – Andrew R. McFall

79.    There was an inadvertent duplication of Mr. McFall's time from July 17, 2007 in Mr. McFall's July 18, 2007 time entry. The July 18, 2007 time entry should read "draft memorandum regarding meeting with the financial advisors to the SIC (4.8)". Mr. McFall's total hours should be reduced from 8.30 hours to 4.80 hours, resulting in a fee reduction of \$1,023.75. This fee reduction takes into account the 10% discount already deducted from Mr. McFall's hourly billing rate of \$325.00.

24

(m)    July 30, 2007 – Jeffrey L. Bornstein

80.    There was an inadvertent miscalculation of Mr. Bornstein's time.  The 5.50 total hours should be adjusted to 5.40 hours, resulting in a $47.25 fee reduction.  This fee reduction takes into account the 10% discount already deducted from Mr. Bornstein's hourly billing rate of $525.00.

(n)    July 31, 2007 – James V. Catano

81.    There was a typographical error in the description of Mr. Catano's time. The section of Mr. Catano's time entry should read "Review Bates Range numbers related to Board of Directors Minutes and compile corresponding excel database including such information (1.9)."  Therefore, the total amount of time billed for Mr. Catano remains unchanged at 5.90 hours and no reduction in fees is warranted.

82.    In sum, K&L Gates agrees to a $1768.50[3] reduction of its fees for the time entries listed under Exhibit D to the Fee Auditor Report.

## D.    Document Review By K&L Gates Partners Was Necessary And Appropriate (FAR ¶ 11)

83.    The Fee Auditor's objection to compensating K&L Gates for time spent by partners reviewing documents appears to misapprehend the nature of the work being performed.  K&L Gates' partners do not typically engage in ordinary document review services that can be handled by more junior attorneys.  In the New Century matter, however, two significant factors required partner involvement.  First, at the time of the Examiner's appointment, New Century had ceased doing business, had let most of its employees go and had sold or was actively seeking to sell what remained of its business.  Accordingly, the Examiner's

---

[3] This fee reduction takes into account the 10% discount already deducted from K&L Gates' total fee request as well as an additional 50% discount for non-working travel time, where appropriate.

25

counsel had to move quickly to identify the categories of documents that existed and would be needed for the investigation before they were sold, lost or left in complete disarray, and insure that they would be properly maintained for future investigative purposes.

84.     In addition, the team leaders leading the initial on-site review of documents used the information they gathered to create the work plans which guided the various teams in their work.

85.     Finally, documents were reviewed by various partners in preparation for the 110 witness interviews of 85 different witnesses conducted throughout the course of the Examiner's investigation. The K&L Gates partners whose time entries are listed in paragraph 11 of the Fee Auditor Report were responsible for conducting many of these interviews.

86.     As there were in excess of one million pages of documents produced during the First Interim Period and ten (10) witness interviews occurring over six (6) different days, K&L Gates assigned junior level attorneys whenever possible to conduct basic document review to select the most critical documents for partner review. Partners primarily focused on critical documents brought to their attention by more junior attorneys or documents that were essential for their upcoming witness interviews. Time denominated as "document review" performed by partners was generally a second-level review and was of a more critical nature to the various witness interviews taken. Accordingly, K&L Gates submits that a reduction in the partners' hourly billing rates is not warranted.

## E.   Fees Charged For Training (FAR ¶ 12)

87.    K&L Gates agrees to a $26,104.05[4] reduction in its fees for time spent by

its professionals in Ringtail training.[5]  The fee reductions for training, compiled from the time

entries listed in Exhibit E to the Fee Auditor Report, are as follows:

| DATE | NAME | HOURS | BILLING RATE | TOTAL |
|------|------|-------|--------------|-------|
| 06/20/07 | L.C. Alvarez | 1.00 | $240.00 | $240.00 |
| 06/20/07 | M.B. Bowman | 1.00 | $240.00 | $240.00 |
| 06/20/07 | R.L. Kline Dubill | 1.10 | $455.00 | $500.50 |
| 06/20/07 | E.A. Koeppel | 1.00 | $425.00 | $425.00 |
| 07/03/07 | J.D. Borrowman | 2.00 | $400.00 | $800.00 |
| 07/03/07 | M.B. Bowman | 2.80 | $240.00 | $672.00 |
| 07/03/07 | J.V. Catano | 2.20 | $185.00 | $407.00 |
| 07/03/07 | A.H. Feller | 2.00 | $410.00 | $820.00 |
| 07/03/07 | E. Kane | 1.80 | $275.00 | $495.00 |
| 07/03/07 | S. Kurian | 2.00 | $275.00 | $550.00 |
| 07/03/07 | S.E. Lambrakopoulos | 1.50 | $525.00 | $787.50 |
| 07/03/07 | L.C. Lanpher | 1.50 | $625.00 | $937.50 |
| 07/03/07 | W.P. Loughlin | 2.00 | $750.00 | $1,500.00 |
| 07/03/07 | A.R. McFall | 2.00 | $325.00 | $650.00 |
| 07/03/07 | E. Moser | 1.90 | $500.00 | $950.00 |
| 07/03/07 | B.H. Nielson | 2.00 | $525.00 | $1,050.00 |
| 07/03/07 | B.M. Nikfar | 2.00 | $300.00 | $600.00 |
| 07/03/07 | A. Porter | 1.90 | $275.00 | $522.50 |
| 07/03/07 | M.J. Quinn | 2.10 | $460.00 | $966.00 |
| 07/03/07 | J.H. Roeber | 2.10 | $325.00 | $682.50 |
| 07/10/07 | E.A. Koeppel | 1.00 | $425.00 | $425.00 |

---

[4] This fee reduction takes into account the 10% discount already deducted from K&L Gates' total fee
request.

[5] K&L Gates notes that the Fee Auditor has withdrawn its initial objection to FTI Consulting's fees
incurred in providing Ringtail training for Hahn & Hessen and Blank Rome, counsel to the Official
Committee of Unsecured Creditors.  Accordingly, contrary to the Fee Auditor's assertion that the
"retention of a professional necessarily predisposes the expertise and experience required to provide the
services needed," that is obviously not necessarily the case, particularly when the expertise at issue,
manipulating a computerized data base to most efficiently locate and review relevant documents from
among millions produced, is far from the most important skill set relevant to the task for which the
professional is hired.

27

| DATE | NAME | HOURS | BILLING RATE | TOTAL |
|------|------|-------|--------------|-------|
| 07/20/07 | L.C. Alvarez | 1.80 | $240.00 | $432.00 |
| 07/20/07 | J.D. Borrowman | 1.80 | $400.00 | $720.00 |
| 07/20/07 | M.B. Bowman | 1.70 | $240.00 | $408.00 |
| 07/20/07 | J.V. Catano[6] | 1.80 | $185.00 | $333.00 |
| 07/20/07 | J.L. Hieb | 1.70 | $395.00 | $671.50 |
| 07/20/07 | J.E. Holmes[6] | 1.80 | $200.00 | $360.00 |
| 07/20/07 | E.A. Koeppel | 1.50 | $425.00 | $637.50 |
| 07/20/07 | B.H. Nielson | 1.80 | $525.00 | $945.00 |
| 07/20/07 | B.M. Nikfar | 1.60 | $300.00 | $480.00 |
| 07/24/07 | K.S. Asfour | 2.30 | $365.00 | $839.50 |
| 07/24/07 | J.D. Borrowman | 3.00 | $400.00 | $1,200.00 |
| 07/24/07 | A.J. Camron | 1.50 | $415.00 | $622.50 |
| 07/24/07 | T.W. Fredricks | 1.50 | $310.00 | $465.00 |
| 07/24/07 | S.M. Henry | 1.50 | $450.00 | $675.00 |
| 07/24/07 | S. Kurian | 1.80 | $275.00 | $495.00 |
| 07/24/07 | M.J. Quinn | 1.50 | $460.00 | $690.00 |
| 07/24/07 | J.L. Wayne[6] | 1.80 | $390.00 | $702.00 |
| 07/30/07 | L.C. Alvarez | 1.20 | $240.00 | $288.00 |
| 07/30/07 | M.B. Bowman | 1.60 | $240.00 | $384.00 |
| 07/30/07 | A.J. Camron | 1.10 | $415.00 | $456.50 |
| 07/30/07 | J.V. Catano[6] | 1.10 | $185.00 | $203.50 |
| 07/30/07 | A. Kostner | 0.80 | $265.00 | $212.00 |
| 07/30/07 | S. Kurian | 1.20 | $275.00 | $330.00 |
| 07/30/07 | A.R. McFall | 1.00 | $325.00 | $325.00 |
| 07/30/07 | A. Porter | 1.20 | $275.00 | $330.00 |
| 07/30/07 | M.J. Quinn | 1.10 | $460.00 | $506.00 |
| 07/30/07 | L.M. Richman | 1.10 | $385.00 | $423.50 |
| 07/30/07 | J.L.Wayne | 1.10 | $390.00 | $429.00 |
| 07/30/07 | L. Woo | 0.90 | $245.00 | $220.50 |
| | | | **Total** | **$29,004.50** |
| | | | **Fee Discount** | ($2,900.45) |
| | | | **DISCOUNTED TOTAL** | **$26,104.05** |

---

[6] For time entries of professionals who did not clearly delineate the amount of time spent in Ringtail training for a particular date, K&L Gates utilized the largest amount of time entered by other professionals on the same training date to attend the training.

## F.    Time Billed By Jennifer Shuttleworth (FAR ¶ 13)

88.     Although Jennifer Shuttleworth's primary role is that of a legal secretary
to the Examiner, Ms. Shuttleworth, unlike most, if not all, other secretaries in the firm, also
serves, from time to time, in the capacity of a legal assistant engaging in, among other things,
reviewing various documents and e-mails produced to the Examiner, coordinating various
aspects of the investigation, meeting with various members of the investigative teams on behalf
of the Examiner and preparing various memoranda related to the investigation. K&L Gates does
not bill the Debtors for any of Ms. Shuttleworth's time when spent in a secretarial capacity.
K&L Gates does bill for Ms. Shuttleworth's time spent in a legal assistant capacity.

89.     Although the Fee Auditor Report states that Ms. Shuttleworth's tasks, as
described in Exhibit F to the Fee Auditor Report, do not appear to be different from those
normally assigned to legal secretaries, K&L Gates respectfully disagrees. A substantial portion
of Ms. Shuttleworth's tasks for which K&L Gates requested compensation involved document
and e-mail review. Legal secretaries ordinarily do not perform document review because it
requires a degree of legal judgment, possessed by attorneys and paralegals, to determine which
documents are relevant for the investigation or a particular witness interview. K&L Gates could
have directed a paralegal to perform these tasks, but doing so would have cost the estate more as
our paralegals typically bill at higher rates than the rate at which Ms. Shuttleworth's time is
billed.

90.     K&L Gates submits that Ms. Shuttleworth's fees were reasonable,
necessary and appropriate to assist the Examiner in carrying out his duties and should be
compensated by the Debtors' estate.

29

## G.    Business Meals and Travel Meals (FAR ¶ 14)

91.    In response to the Fee Auditor's inquiries with respect to the business and travel related meals listed paragraph 14 to the Fee Auditor Report, K&L Gates states as follows:

92.    K&L Gates will not charge the estate for the business meal of Eunice Rim dated June 2, 2007 in the amount of $33.17.

93.    Edward M. Fox's travel related meal charges in the amount of $61.73 incurred between June 13, 2007 and June 15, 2007 consisted of: (1) a dinner expense for $7.14 on June 13, 2007 while attending interviews of proposed forensic accountants to the Examiner; (2) a dinner expense in the amount of $24.79 while attending a court mandated meet and confer with the Debtors and the Creditors Committee on June 14, 2007; and (3) and a breakfast expense at his hotel in the amount of $29.80 incurred while attending the court mandated meet and confer with the Debtors and the Creditors Committee on June 14, 2007.

94.    Kristin S. Elliott's travel related meal charges in the amount of $46.76 dated between June 24, 2007 and June 26, 2007 consisted of: (1) dinner at the airport in the amount of $6.04 on June 24, 2007; (2) a room service dinner on June 25, 2007 in the amount of $27.35; and (3) lunch in the amount of $13.37 on June 26, 2007.  Ms. Elliott's meal expenses were incurred while attending a witness interview in Los Angeles, California.

95.    K&L Gates will reduce Edward M. Fox's travel related meal charges incurred between June 24, 2007 and June 26, 2007 from $64.44 to $41.83. Mr. Fox's meal charges consisted of: (1) one room service dinner on June 25, 2007 for $ 22.73 incurred while attending a witness interview; and (2) a breakfast meal at his hotel in the amount of $19.10 on June 27, 2007 incurred while attending a court hearing on the motion to retain K&L Gates as counsel to the Examiner.

96.    Kristin S. Elliott's travel related meal charges in the amount of $73.14 incurred between July 23, 2007 and July 26, 2007 consisted of: (1) dinner at her hotel in the amount of $29.55 on July 24, 2007; (2) dinner at her hotel in the amount of $34.46 on July 25, 2007; and (3) breakfast at the airport on July 26, 2007 in the amount of $9.13. Ms. Elliott's meals expenses were incurred while attending witness interviews at the Debtor's offices in Irvine, California.

97.    K&L Gates will not charge the estate for Jeffrey Bornstein's travel related meal incurred on July 12, 2007 in the amount of $75.66.

98.    Jeffrey Bornstein's travel related meal charge in the amount of $20.00 incurred July 13, 2007 was for a breakfast meal at his hotel prior to attending a witness interview held at K&L Gates' Orange County office.

99.    K&L Gates has already agreed to a $131.44 reduction in its expenses incurred on account of business or travel-related meals.  The Fee Auditor, however, has requested an additional $18.90 reduction to align the meals to "our recommended ceiling", a ceiling for which the Fee Auditor has failed to show any basis in law or otherwise.  Because K&L Gates recognizes that this is only a small amount of the total expenses requested, K&L Gates agrees to the additional $18.90 reduction in expenses incurred on account of business and travel-related meals, for a total reduction of $150.34.[7]

**H.    Travel Expenses (FAR ¶ 15)**

100.    In response to the Fee Auditor's inquiries with respect to the travel expenses listed in paragraph 15 to the Fee Auditor Report, K&L Gates notes that, due to the

---

[7] K&L Gates expressly reserves the right to object to any such "recommended ceilings" for meal expenses or otherwise, which may be proposed by the Fee Auditor or otherwise with respect to other monthly, interim or final fee applications submitted by K&L Gates or the Examiner.

Debtors' frequent last minute scheduling of critical witness interviews, K&L Gates often

received only two or three days advance notice within which to make travel plans. As this last

minute travel took place during the height of the summer travel season, airfare, car rental and

lodging expenses were frequently higher than they might otherwise have been due to a lack of

availability and the higher prices charged by hotels and airlines for last minute travel.[8] Although

the Fee Auditor sets forth a "recommended ceiling" on nightly hotel rates of $300 per night in

Washington D.C. and $250 per night in all other cities, K&L Gates knows of no basis in law or

fact for the imposition of such a ceiling. Moreover, any such ceiling is simply unrealistic given

the time frame under which K&L Gates was forced to make many of these reservations and the

peak travel season in which these last minute interviews were scheduled. K&L Gates'

professionals did not seek to stay at luxury hotels but simply booked mid-level hotels which had

room availability on short notice and were convenient to the location of the meetings or

interviews to which the attorneys were traveling. Any increased expenses were unavoidable on

the part of K&L Gates.

101.    Edward M. Fox's travel expenses incurred between June 13, 2007 and

June 15, 2007 in the total amount of $1,096.92 consisted of two nights lodging at the Mayflower

Hotel in Washington, D.C. for $479.00 per night plus applicable taxes.

102.    Edward M. Fox's travel expenses incurred June 25, 2007 in the aggregate

amount of $142.50 consisted of: (1) taxi fare from his home in Rye, New York to the La Guardia

Airport on June 13, 2007 in the amount of $90.00; (2) taxi fare from the Washington National

Airport to K&L Gates' Washington, D.C. Office on June 13, 2007 in the amount of $20.00; (3)

---

[8] In fact, at one point during the investigation, Jeffrey Bornstein's hotel was overbooked so they simply
cancelled his reservation and forced him to search for alternate lodging in the Orange County area after
his arrival and day of interviews.

32

taxi fare from K&L Gates' Washington, D.C. Office to his hotel on June 13, 2007 in the amount of $8.50; (4) taxi fare from his hotel in Washington, D.C. to the Amtrak Union station in Washington, D.C. on June 15, 2007 in the amount of $10.00; (5) taxi fare from the Wilmington, Delaware Amtrak train station to the United States Bankruptcy Court for the District of Delaware on June 15, 2007 in the amount of $8.00; and (6) taxi fare from the Bankruptcy Court to the Wilmington, Delaware Amtrak train station on June 15, 2007 in the amount of $6.00.

103.    Kristin S. Elliott's travel expenses incurred between June 24, 2007 and June 26, 2007 in the aggregate amount of $1,069.52 consisted of two nights lodging at the Los Angeles Marriott at the rate of $469.00 per night plus applicable taxes.

104.    Edward M. Fox's travel expenses incurred between June 24, 2007 and June 27, 2007 in the aggregate amount of $1,574.42 consisted of two nights lodging at the Los Angeles Marriott at the rate of $469.00 per night plus applicable taxes and one night's lodging at Hotel Dupont in Wilmington, Delaware at the rate of $429.00 per night plus applicable taxes, for a total of three nights lodging.

105.    Edward M. Fox's travel expenses incurred June 24, 2007 in the amount of $130.00 was on account of taxi fare from his home in Rye, New York to Newark International Airport.

106.    Erin A. Koeppel's travel expenses incurred between July 5, 2007 and July 6, 2007 in the aggregate amount of $192.98 consisted of: (1) one night's lodging at the Crowne Plaza Hotel in Irvine at the rate of $130.98 per night plus applicable taxes; and (2) taxi fare from Dulles International Airport to her home in Washington D.C. in the amount of $62.00.

107.    Lawrence C. Lanpher's travel expenses incurred between June 25, 2007 and June 26, 2007 in the aggregate amount of $491.76 consisted of: (1) mileage for roundtrip

33

travel in his personal car from his home to Dulles International Airport (66 miles) and back at the rate of $0.485 per mile for a total of $32.01; (2) cab fare from Los Angeles International Airport to his hotel in the amount of $52.00; (3) one night's lodging at the Los Angeles Marriott at the rate of $322.75 per night plus applicable taxes; (4) cab fare from his hotel to Los Angeles International Airport in the amount of $55.00; and (5) parking charges at Dulles International Airport in the amount of $30.00.

108.    Stephen G. Topetzes' travel expenses incurred June 27, 2007 in the aggregate amount of $88.00 consisted of taxi fare from his home to the Washington D.C. Amtrak train station in the amount of $48.00 and taxi fare from the Baltimore Amtrak train station to Baltimore Washington International Airport in the amount of $40.00.

109.    K&L Gates will reduce Stephen G. Topetzes' travel expenses incurred between July 5, 2007 and July 6, 2007 from $290.00 to $72.00. Mr. Topetzes incurred a charge of $72.00 for parking at Dulles International Airport.

110.    Kristin S. Elliott's travel expenses incurred between July 23, 2007 and July 25, 2007 in the aggregate amount of $1,064.33 consisted of three nights of lodging at the Marriott Hotel in Irvine at the rate of $319.00 per night plus applicable taxes and a hotel parking charge of $14.00.

111.    Robert Lawton's travel expenses incurred between July 11, 2007 and July 13, 2007 in the aggregate amount of $522.91 consisted of: (1) two nights lodging at Crowne Plaza Hotel in Irvine at the rate of $179.00 per night plus applicable taxes; (2) parking charges at Baltimore Washington International Airport in the amount of $60.00; and (3) mileage to and from his home in Harrisburg, PA to Baltimore Washington International Airport (71 miles each way) at the rate of $0.485 per mile in the amount of $68.87.

34

112.    K&L Gates will reduce Stavroula E. Lambrakopoulos' travel expenses incurred between July 11, 2007 and July 13, 2007 from $955.93 to $818.48. Ms. Lambrakopoulos' travel expenses consisted of: (1) two nights lodging The Westin Bonaventure Hotel & Suites in Los Angeles at the rate of $209 per night plus applicable taxes; (2) cab fare from her home to the K&L Gates Washington, D.C. office on July 11, 2007 in the amount of $23.20; (3) dinner in the amount of $18.35 on July 11, 2007; (4) cab fare from the Los Angeles International Airport to her hotel for $56.00; (5) lunch for five attorneys while reviewing documents on July 12, 2007 in the amount of $38.59; (6) lunch in the amount of $3.60 on July 12, 2007; (7) lunch in the amount of $21.03 on July 13, 2007; and (8) cab fare from her hotel to the Los Angeles International Airport in the amount of $56.00.

113.    Stephen G. Topetzes' travel expenses incurred between July 11, 2007 and July 14, 2007 in the aggregate amount of $722.90 consisted of: (1) two nights lodging at the Crowne Plaza Hotel in Irvine at the rate of $179.00 per night plus applicable taxes; (2) taxi fare from K&L Gates Washington D.C. office to Reagan National Airport in the amount of $17.00; (3) taxi fare from the Santa Ana Airport to his hotel for $10.00; (4) a breakfast for four attorneys on July 12, 2007 in the amount of $65.41; (5) a breakfast for four attorneys on July 13, 2007 in the amount of $74.17; (6) a dinner for four attorneys for $84.02; (7) a dinner for $9.26 on July 13, 2007; (8) parking expenses in the amount of $11.25 at New Century's headquarters; (9) parking expenses in the amount of $3.75 in Irvine, California; and (10) taxi fare in the amount of $54.00 from Dulles International Airport to K&L Gates Washington, D.C. office.

114.    K&L Gates will reduce Lawrence C. Lanpher's travel expenses incurred between July 11, 2007 and July 13, 2007 from $1,472.06 to $889.40.  Mr. Lanpher's expenses consisted of: (1) breakfast on July 11, 2007 in the amount of $2.60; (2) lunch for seven attorneys

on July 11, 2007 for $53.95; (3) breakfast on July 12, 2007 in the amount of $3.26; (4) breakfast on July 13, 2007 in the amount of $5.51; (5) two nights lodging at the Crowne Plaza Hotel in Irvine at the rate of $209.00 per night plus applicable taxes; (6) business-related long distance phone charges of $6.58 on account of New Century matters; (7) lunch for two attorneys on July 13, 2007 in the amount of $14.10; (8) parking at Dulles International Airport for $45.00; (9) round trip mileage expense from his home in Southern Maryland to Dulles International Airport and back (65 miles) at the rate of $0.485 per mile in the amount of $31.53; and (10) a rental car expense on for three days at the rate of $77.75 per day plus applicable taxes, for a total amount of $252.29.

115.    Seba P. Kurian's travel expenses incurred between July 12, 2007 and July 13, 2007 in the aggregate amount of $599.46 consisted of: (1) breakfast at her hotel on July 12, 2007 for $25.60; (2) breakfast at her hotel on July 13, 2007 for $32.00; (3) taxi fare from Dulles International Airport to her home for $65.00; and (4) two nights lodging at The Westin Bonaventure Hotel & Suites in Los Angeles at the rate of $209.00 per night plus applicable taxes.

116.    Michael J. Missal's travel expenses incurred between July 5, 2007 and July 6, 2007 in the aggregate amount of $367.02 consisted of: (1) car rental fees in the amount of $157.59; (2) parking fees in the amount of $12.50; (3) dinner in the amount of $53.95; and (4) one night's lodging at a hotel in the amount of $142.98.

117.    K&L Gates will reduce Matthew B. Bowman's travel expenses incurred between July 11, 2007 and July 13, 2007 from $568.81 to $517.17. Mr. Bowman's travel expenses consisted of: (1) breakfast on July 11, 2007 in the amount of $3.13; (2) parking fees in the amount of $11.00; (3) two nights lodging at the Crowne Plaza Hotel in Irvine at the rate of

36

$179.00 per night plus applicable taxes; and (4) cab fare from Dulles International Airport to his home in Germantown, MD.

118.    Matthew B. Bowman's travel expenses incurred between July 5, 2007 and July 7, 2007 in the aggregate amount of $420.54 consisted of: (1) breakfast on July 5, 2007 in the amount of $4.36; (2) one night's lodging at the Crowne Plaza Hotel in Irvine in the amount of $119.00; (2) breakfast at the hotel restaurant on July 6, 2007 for five attorneys in the amount of $101.20; (3) cab fare from Dulles International Airport to his home in Germantown, MD in the amount of $85.00; and (4) the purchase of a 60 GB minidrive used to send a massive document production from K&L Gates' Washington, D.C. Office to K&L Gates' Pittsburgh office which needed to be received the next day.  In an effort to build the Ringtail document database as quickly as possible, which would eventually store in excess of 2.5 million megabytes of data, K&L Gates required the use of the minidrive to transfer the material to its Pittsburgh office. Other means of transferring the large amount of electronic data in such a short time frame had been attempted but such efforts proved to be extremely inefficient and more costly.  It was imperative for K&L Gates to get this material to its attorneys for review as quickly as possible because of the large amount of documents being produced on a rolling basis and the short time frame for the investigation.

119.    Linda Woo's travel expenses incurred July 11-13, 2007 in the aggregate amount of $636.20 consisted of two nights lodging at the Marriott Hotel in Irvine at the rate of $289.00 per night plus applicable taxes.

120.    Jeffrey L. Bornstein's travel expenses incurred July 11-13, 2007 in the aggregate amount of $724.20 consisted of two nights lodging at the Marriott Hotel in Irvine at the rate of $329.00 per night plus applicable taxes.

121.    In sum, K&L Gates agrees to a $989.75 reduction in its travel expenses.
Although the Fee Auditor has recommended an additional $1,967.08 reduction for K&L Gates'
lodging expenses referencing a "recommended ceiling", the Fee Auditor has failed to show the
legal or factual basis for this recommended ceiling, particularly in light of the Debtors' last
minute scheduling of interviews and the peak travel season in which K&L Gates' professionals
were required to travel.

WHEREFORE, K&L Gates requests that the Court approve fees totaling
$1,687,460.40 ($1,715,332.95 minus $27,872.55) and expenses totaling $53,704.59 ($54,844.68
minus $1,140.09), for a total of $1,741,164.99 on account of K&L Gates' fees and expenses
incurred from June 1, 2007 through July 31, 2007, and grant such other and further relief as the
Court deems just and proper.

Dated: New York, New York
       April 25, 2008

                            KIRKPATRICK & LOCKHART
                            PRESTON GATES ELLIS LLP

                        By:_____
                            Edward M. Fox
                            A Member of the Firm
                            Attorneys for the Examiner
                            599 Lexington Avenue
                            New York, New York 10022
                            (212) 536-3900