```
                  UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF DELAWARE

IN RE:                    . Case No.  07-10416(KJC)
                          .
                          .
NEW CENTURY TRS           .
HOLDINGS, INC., et al.,   . 824 Market Street
                          . Wilmington, DE  19801
                          .
              Debtors.    .
                          . April 25, 2008
. . . . . . . . . . . . . .. 9:03 a.m.

                      TRANSCRIPT OF TRIAL
               BEFORE HONORABLE KEVIN J. CAREY
               UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Richards, Layton & Finger, P.A.<br>By:  MICHAEL J. MERCHANT, ESQ.<br>    CHRISTOPHER M. SAMIS, ESQ.<br>One Rodney Square<br>920 N. King Street<br>P.O. Box 551<br>Wilmington, DE 19899 |
| For the Debtors: | O'Melveny & Myers, LLP<br>By:  BEN LOGAN, ESQ.<br>    ANDREW PARLEN, ESQ.<br>400 South Hope Street<br>Suite 1060<br>Los Angeles, CA 90071 |
| For the Debtors: | O'Melveny & Myers, LLP<br>By:  SUZANNE UHLAND, ESQ.<br>610 Newport Center Drive<br>17th Floor<br>Newport Beach, CA 92660 |
| Audio Operator: | Leslie Murin |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd.):

For Morgan Stanley:          Milbank, Tweed, Hadley &
                              McCloy LLP
                             By:  JEFFREY K. MILTON, ESQ.
                             1 Chase Manhattan Plaza
                             New York, NY  10005

For the Ad Hoc               Stevens & Lee
Committee of Deferred        By:  JOSEPH H. HUSTON, JR., ESQ.
Comp Claimants:              1105 North Market Street
                             Wilmington, DE  19801

For the Ad Hoc               Bernstein, Shur, Sawyer & Nelson, P.A.
Committee of Deferred        By:  ROBERT J. KEACH, ESQ.
Comp Claimants:                   PAUL McDONALD, ESQ.
                             100 Middle Street
                             Portland, ME  04104

For the Official             Blank Rome, LLP
Committee of Unsecured       By:  REGINA STANGO KELBON, ESQ.
Creditors:                        One Logan Square
                             18th and Cherry Streets
                             Philadelphia, PA  19103

For the Official             Blank Rome, LLP
Committee of Unsecured       By:  BONNIE GLANTZ FATELL, ESQ.
Creditors:                   Chase Manhattan Centre
                             1201 Market Street
                             Suite 800
                             Wilmington, DE 19801

For the Official             Hahn & Hessen LLP
Committee of Unsecured       By:  MARK T. POWER, ESQ.
Creditors:                        MARK S. INDELICATO, ESQ.
                             488 Madison Avenue
                             14th and 15th Floor
                             New York, NY  10022

For UBS Real Estate          Paul, Hastings, Janofsky &
Securities, Inc.:             Walker, LLP
                             By:  KIM D. NEWMARCH, ESQ.
                             191 North Wacker Drive
                             30th Floor
                             Chicago, IL  60606
                             (Telephonic Appearance)

For Deutsche Bank:           Nixon Peabody, LLP
                             By:  DENNIS J. DREBSKY, ESQ.
                             437 Madison Avenue
                             New York, NY   10022
                             (Telephonic Appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Bank of America,          Kaye Scholer LLP
N.A.:                         By:  NICHOLAS J. CREMONA, ESQ.
                              425 Park Avenue
                              New York, NY  10022
                              (Telephonic Appearance)

For Wells Fargo Bank:         Kelley Drye & Warren LLP
                              By:  HOWARD STEEL, ESQ.
                              101 Park Avenue
                              New York, NY  10178
                              (Telephonic Appearance)

4

**I N D E X**

                                                        **PAGE**

**WITNESSES FOR CREDITORS' COMMITTEE**

  **SAMUEL STAR**

  Cross Examination by Mr. Keach                         9

  Cross Examination by Mr. Logan                        32

  Redirect Examination by Mr. Power                     34

  Recross Examination by Mr. Keach                      43

  Recross Examination by Mr. Logan                      45

**WITNESSES FOR THE DEBTORS**

  **TODD BRENTS**

  Direct Examination by Ms. Uhland                      49

  Cross Examination by Mr. McDonald                     75

  Redirect Examination by Ms. Uhland                    77

1          THE CLERK:  All rise.

2          THE COURT:  Good morning.

3          UNIDENTIFIED ATTORNEYS:  Good morning.

4          THE COURT:  All right.  I would like to begin -- Mr.

5  Power, is there something you wanted to start with?

6          MR. POWER:  Well, Your Honor, I didn't.  I was just

7  going to ask Mr. Star to come up.  That's where we're starting.

8          THE COURT:  All right.  Well, let me -- before we do

9  that, let me make a ruling on the deferred comp Ad Hoc

10 Committee's motion to strike the declaration of Ms. Etlin,

11 which is Docket Number 6407.  The declaration is Docket Number

12 6407.

13         Yesterday, the debtor made a proffer of her

14 testimony, of her direct testimony, and while Mr. Logan didn't

15 specifically read verbatim from the declaration, I take it that

16 as he referred to different paragraphs in the proffer that he

17 made he intended that it be admitted in toto.  Objections were

18 raised on among other grounds that Ms. Etlin didn't have

19 personal knowledge that some of it constituted a violation of

20 the Best Evidence Rule, which I don't think is applicable here,

21 and the reason is that it's not a matter of what would be

22 better in the way of quality of evidence, and that's how I

23 think it's been asserted here.

24         I'll start preliminarily by saying that Ms. Etlin, as

25 CEO and CRO, is probably the most authoritative, knowledgeable

**J&J COURT TRANSCRIBERS, INC.**

1  company representative that could be offered as a witness,

2  based upon her involvement at the company, there's maybe a

3  little hint of CFO mixed in there too.  While she is, as I

4  think Mr. Keach has conceded, an expert in her business, she

5  was not offered as an expert witness and will not be considered

6  one.  So my rulings are based on what the record shows was her

7  personal involvement at the company and with the processes that

8  were described.

9         I'll begin by saying the motion will be granted in

10  part and denied in part, and I will refer specifically to the

11  declaration itself at this point.  I will give no evidentiary

12  consideration to any of the headings or subheadings, since some

13  of them are made in statement form.

14         With respect to Paragraphs 1 through 8, they merely

15  give background, and Paragraphs 9 through 15 are

16  straightforward factual descriptions of what the plan contains.

17  Beginning with Paragraph 16, the declaration begins to get into

18  some of the economics of the plan and the assumptions that were

19  made, including interrelationship of the resolutions between

20  and among adverse constituencies.  If find that these are

21  factual in nature and not based upon Ms. Etlin's expertise.

22         Now, when we arrive at Paragraph 23, there are parts

23  of the declaration in that paragraph and which follow and which

24  I will identify specifically that I think fairly can be

25  considered either arising out of expertise unrelated to her

1  position exclusively as an officer of the company or

2  speculation, and I will exclude them.  Beginning in Paragraph

3  23, for those reasons I will exclude from admission into

4  evidence the third, fourth sentences, the sixth and seventh

5  sentences, and on the following page the tenth and last

6  sentence in that paragraph.  I will exclude the first sentence

7  of Paragraph 24, the second sentence of Paragraph 25 and the

8  first sentence of Paragraph 26, and in the final sentence of

9  Paragraph 28, the language that follows the words, "assumptions

10  for the creditors of NCFC," meaning everything after NCFC will

11  be excluded.

12         When we get to Section G, that's paragraphs --

13  beginning at Section G with Paragraphs 31 through 41 that

14  consist largely of a straightforward account of some voting

15  results which I think it's expected will be corroborated by

16  other evidence, including the declaration of the -- the

17  tabulation I guess I'll call it.  Paragraphs -- well, beginning

18  at Section H and Paragraph 33, the declaration returns to the

19  confirmation standards.  I'll strike the word "appropriately"

20  from Paragraph 33, and with that omission it simply factually

21  describes what is in the plan.  I don't think there's any

22  dispute about that or with what's contained in Paragraph 34.

23         Paragraph 35, I think fairly stated, simply reflects

24  the business judgment of the debtor and is factual in nature or

25  related to something in which the CEO and CRO would be expected

**J&J COURT TRANSCRIBERS, INC.**

1  to participate and be permitted to give a view on.  With

2  respect to Paragraph 42, again, that simply reflects the

3  business judgment of the debtor.

4        So, except for those provisions which I've explicitly

5  said are to be excluded, the declaration will be admitted into

6  evidence as Ms. Etlin's direct testimony.  I'll also add that

7  through cross examination much of the foundation that the

8  deferred comp Ad Hoc Committee was seeking actually was

9  demonstrated.  And with that, let's continue the testimony of

10  Mr. Star.

11        UNIDENTIFIED ATTORNEY:  Your Honor, Paragraph 23, we

12  had a hard time following.  Could we indulge you to go through

13  that again, please?

14        THE COURT:  Be seated.  Certainly.  I will exclude

15  the third sentence, the fourth sentence, the sixth sentence,

16  the seventh sentence and the tenth and final sentence in the

17  paragraph.

18        UNIDENTIFIED ATTORNEY:  One, four, six, seven, ten

19  and final, is that correct?

20        THE COURT:  Three, four --

21        UNIDENTIFIED ATTORNEY:  Three, four --

22        THE COURT:  Six, seven, ten.

23        UNIDENTIFIED ATTORNEY:  Okay.  Thank you, Your Honor.

24        THE COURT:  Any other questions?  All right.  Good

25  morning, Mr. Star.  I remind you that you are still under oath,

**J&J COURT TRANSCRIBERS, INC.**

1  sir.

2          THE WITNESS:  Yes, I understand.

3          THE COURT:  All right.

4    SAMUEL STAR, CREDITORS' COMMITTEE WITNESS, PREVIOUSLY SWORN

5                    CROSS EXAMINATION

6  BY MR. KEACH:

7  Q    Mr. Star, good morning.

8  A    Good morning.

9  Q    I have to ask, did you discuss your testimony from

10  yesterday with anyone this past evening or this morning?

11  A    No, I did not.

12  Q    Did you discuss your prospective testimony with anyone?

13  A    No, I did not.

14  Q    Did you refer to any documents, either after your -- after

15  your testimony yesterday or this morning, in preparation for

16  today?

17  A    No, I did not.

18  Q    Mr. Star, in connection with your -- in your participation

19  with the committee's deliberations and the discussions that you

20  referred to yesterday, have you ever heard the phrase, "Hold

21  Co./Op Co. Model?"

22  A    Yes.

23  Q    And what does that phrase refer to, if you can recall from

24  those discussions?

25  A    It referred to a scenario that combines certain entities

**J&J COURT TRANSCRIBERS, INC.**

1  of the debtor.

2  Q    Being more specific, can you tell me which entities were

3  combined?

4  A    The Hold Co. entities consisted of New Century Financial

5  Corporation, New Century Credit Corporation, New Century

6  Residual IV Corporation and New Century TRS Holdings.

7  Q    That was the Hold Co. side?

8  A    Yes.

9  Q    And the Opt Co. side of the Hold Co./Op Co. Model combined

10  which companies?

11  A    New Century Mortgage Corporation, Home123, New Century

12  Capital Corporation, New Century Mortgage Ventures, New Century

13  Asset Holding -- pretty much all the green shaded --

14  Q    Yes, I was just going to actually save you some time.  So

15  if we look at the demonstrative, which has been exhibit --

16  which I think is Debtor's 2, if I'm not mistaken, the Hold Co.

17  side of the Hold Co./Op Co. Model would be the yellow?

18  A    Yes.

19  Q    And the Opt Co. side of the Hold Co./Op Co. Model would be

20  the green?

21  A    Yes.

22          MR. KEACH:  May I approach, Your Honor?

23          THE COURT:  You may.

24          MR. KEACH:  Your Honor, I'm going to be referring to

25  Mr. Star's deposition transcript --

1            THE COURT:  Thank you.

2  Q    Mr. Star, do you recall earlier this week, it seems like

3  so long ago, that we -- your deposition was taken, correct?

4  A    Yes, on Monday.

5  Q    And you were represented by counsel at your deposition?

6  A    Yes.

7  Q    And you recall that you were under oath?

8  A    Yes, I do.

9  Q    And I think I asked you that day whether there was any

10 reason -- medical, physical or otherwise -- why you could not

11 participate, and you answered that you could participated,

12 correct?

13 A    Yes.

14 Q    If you could turn in your deposition to -- let me get the

15 exact page, excuse me for one second -- to Page 146, and I'm

16 actually starting at Line 1 on Page 146.  Do you have it?

17 A    Yes.

18 Q    Okay.  And I'll just read this, and then we'll -- and

19 we'll talk about.

20            MR. POWER:  Your Honor, objection.  This is hearsay.

21 If he wants to ask the witness a question that's fine, but he

22 is not permitted to refer to a prior transcript when the

23 witness is here.

24            THE COURT:  Well, I think it's easier for the record,

25 Mr. Power, if Mr. Keach is permitted to proceed in that

**J&J COURT TRANSCRIBERS, INC.**

1  fashion.  Overrule.  If it gets too cumbersome, we'll --

2          MR. KEACH:  Really, it's going to be one question and

3  one answer I believe, Your Honor, and he's an adverse party

4  witness.

5  Q    And I'll just -- again, starting at Line 1:

6  "Q    All right.  So when you ended up with what I'll call the

7  'Hold Co./Op Co. Model,' consolidating, substantively

8  consolidating the holding companies and substantively

9  consolidating the operating companies, the adjustments you were

10 just referring to were to actually mitigate the harms of that

11 model as opposed to a total substantive consolidation," and the

12 word I think there is "loan."  It should be "model."  Would you

13 agree with me that the last word is probably mistyped?

14 A    Yes.

15 Q    Okay.  And your answer was, "That's fair."  Did I read

16 that accurately?

17 A    Yes, you did.

18 Q    Okay.  And in the prior pages, and we won't need to refer

19 to them, I'll just ask you, in that -- in your answer in which

20 you described as fair -- as that being a fair description of

21 the plan --

22          MR. POWER:  Objection, Your Honor.  I don't see any

23 reference to the plan --

24          MR. KEACH:  I'll withdraw that.

25 Q    Is the Hold Co./Op Co. Model incorporated into the plan

1  with certain adjustments, to the best of your knowledge?

2  A    Yes.

3  Q    What specific adjustments were you referring to that

4  mitigated the harms of the Hold Co./Op Co. Model?

5  A    The multi-debtor protocol, the inter-company protocol.

6  Q    Were there others?

7  A    The expense sharing, or the joint administrative expense

8  sharing allocation.  Those are the ones I can recall right now.

9  Q    And again this will just be for the purposes of refreshing

10  your recollection.  If you would like to refer to Pages 140 and

11  141 since you are having trouble remembering --

12          MR. POWER:  Your Honor, I'd like -- if the witness

13  needs -- let's let the witness testify and then if he needs his

14  memory refreshed we can do that, but to ask him to refresh

15  before he's answered the question --

16          MR. KEACH:  He just said he didn't remember others.

17          THE COURT:  Overrule.

18  Q    And I'll just -- just to make this go a little quicker,

19  Mr. Star, on Page 139 at Page 19, excuse me, at Line 19 I think

20  you started to refer to adjustments, and I don't mean to ask

21  you to read through this other than to refresh your

22  recollection, but if you want to read Pages 139 to 142 or

23  three, that might help you.

24                              (Pause)

25  A    Okay.

1  Q    And so were there other adjustments to the Hold Co./Op Co.

2  Model that were -- that you had referred to in your earlier

3  answer?

4  A    The other settlements included reductions of certain types

5  of claims.

6  Q    And what claims were reduced?

7  A    The claims of Home123 and the claims of the NC Capital EPD

8  and breach claimants.

9  Q    Was anything done with respect to the master repurchase

10  agreement claims?

11  A    Yes.

12  Q    And what was done to those claims?

13  A    They were subject to the multi-debtor protocol.

14  Q    And was there also an enhancement of the -- of their

15  allowed claims?

16  A    Yes.

17  Q    And specifically what was that?

18  A    It was to increase it by a factor of 30 percent.

19  Q    So their claims were allowed at 130 percent?

20  A    Correct.

21  Q    In the course of your discussions with the committee with

22  respect to these adjustments and again in your earlier answer

23  you talked about the fact that you had discussed mitigating

24  harms and these were the adjustments that were done to mitigate

25  harms, which creditor groups were harmed by the Hold Co./Op Co.

1  Model without the adjustments?

2  A    You had creditors at New Century Mortgage Corporation.

3  You had creditors at TRS Holdings.  You had creditors at New

4  Century Financial Corporation.  Those are the main ones.

5  Q    Were MRA creditors also hurt, master repurchase agreement

6  creditors?  Excuse me.

7  A    Hurt as a result of?

8  Q    Of the Hold Co./Op Co. Model.

9  A    Well, when you say, "as a result of the model," the model

10 incorporated adjustments to -- to address that issue.

11 Q    Excuse me.  Let me -- without consideration of the

12 adjustments, were there creditors hurt by the Hold Co./Op Co.

13 Model?

14 A    Yes, the MRA --

15 Q    Were the MRA creditors hurt by the model?

16 A    They were impacted, yes.

17 Q    So, if I look at the list of creditors who were impacted

18 by the Hold Co./Op Co. Model, negatively impacted, you've

19 listed, and just correct me if I'm wrong, creditors at New

20 Century Mortgage Company, creditors at New Century Financial

21 Corporation, creditors at TRS and the MRA creditors as a group?

22 A    That's fair.

23 Q    Were -- when you said, and I think you used the phrase,

24 "creditors at New Century Mortgage Company," did you mean that

25 all of the creditors of that company were hurt by the Hold

**J&J COURT TRANSCRIBERS, INC.**

1  Co./Op Co. Model without the adjustments or just some?

2  A    The creditors who just had claims solely against Mortgage

3  Corporation would have been impacted.

4  Q    And again, with respect to New Century Financial

5  Corporation, you said creditors of New Century Financial

6  Corporation.  Was it all of the creditors at New Century

7  Financial Corporation or just some?

8  A    All of them were impacted.

9  Q    And same question with respect to TRS, some creditors or

10 all?

11 A    All of them.

12 Q    Okay.  And the master repurchase agreement claimants, same

13 question.

14 A    Yeah, they were impacted.

15 Q    And were all of them impacted or just some of them?

16 A    All of them were impacted.

17 Q    Now, with respect to the multi-debtor protocol, what harm

18 to what group of creditors was that intended to fix?

19 A    It was intended to address the issue of having claims at

20 separate entities that ended up being merged in Hold Co. or Op

21 Co.

22 Q    Okay.  In other -- was the problem that you had to fix

23 because substantive consolidation eliminated the claims against

24 the other debtor entities, like guarantors or co-borrower

25 claims, and, therefore you needed to enhance the recovery?  Was

1 that the problem?

2 A    Well --

3         MR. POWER:  Objection, Your Honor.  I think

4 substantive consolidation is legal term.  If he wanted to say

5 merging the entities that's fine or putting -- grouping them,

6 but --

7         MR. KEACH:  Your Honor, he's already used the term a

8 million times.  He's already adopted it.

9         MR. POWER:  I don't think so, Your Honor.

10         THE COURT:  Well --

11         MR. POWER:  The questioner used the term, not the

12 witness.

13         THE COURT:  The term is being tossed about.  I don't

14 take the discussion to mean that the witness has concluded,

15 despite the fact the examiner has, that there's been

16 substantive consolidation here.  It's ultimately a legal

17 determination for the Court, and I understand the context in

18 which the questions are being asked.  So, why don't we proceed

19 with that understanding.

20         MR. KEACH:  Thank you, Your Honor.

21 Q    Again, just to put this back on track a little bit and to

22 save some time, Mr. Star, if you'll look at Page 140 of your

23 deposition?

24 A    Yes.

25 Q    And look at Line 2, and I'll just read the questions and

**J&J COURT TRANSCRIBERS, INC.**

1  answers and maybe we can just get through this by having you

2  confirm whether these are your answers today.

3  "Q   Were there any other adjustments to account for the fact

4  that there was damage to creditors by substantive

5  consolidation?

6  "A   We adopted the multi-debtor protocol.

7  "Q   And specifically what aspects of the multi-debtor protocol

8  were put in place in order to mitigate against the damage

9  caused by substantive consolidation?

10 "A   Because substantive consolidation would eliminate the

11 claims of the other debtor entities, the guarantors or the

12 co-borrower claims, we applied a factor to increase their

13 claim."  Did I read that correctly?

14 A    Yes.

15 Q    And does that accurately reflect your understanding of why

16 the -- what harm the multi-debtor protocol fixed and how?

17 A    Yes.

18 Q    With respect to the inter-creditor protocol, what harm to

19 what group of creditors was fixed by that and how?

20 A    I'm sorry.  You said, inter-creditor protocol?

21 Q    Inter-company protocol.  Excuse me.  I misspoke.  In fact,

22 let me withdraw the question just so we're entirely clear.  You

23 referred to the inter-company protocol as one of the

24 adjustments that was used to mitigate the harms of the Hold

25 Co./Op Co. Model.

                    **J&J COURT TRANSCRIBERS, INC.**

1  A    Right.

2  Q    Right.  And let me just take -- I'll take the question in

3  one part each rather than combine it.  How did the

4  inter-company protocol address the harms caused by the

5  substantive consolidation?

6  A    It determined which inter-company claims would be allowed

7  and which wouldn't and at what -- at what amount.

8  Q    And correct me if I'm wrong, but essentially what it said

9  is that the claims of the operating company group would be

10 allowed against the holding company group at a hundred percent,

11 correct?

12 A    Yes.

13 Q    All right.  And the claims of the holding company group

14 backed against the operating company group, however, would be

15 reduced?  They'd be allowed at 50 percent?

16 A    That's correct.

17 Q    Okay.  What specific group of creditors who were harmed by

18 the Hold Co./Op Co. Model were benefitted by the fix created by

19 the inter-company protocol?

20 A    Well, the creditors at New Century Mortgage Corporation

21 received a benefit because the claim against them was reduced.

22 Q    Now, with respect to the master repurchase agreement

23 claimants, the -- what, again, was the adjustment that was done

24 for their benefit to address the harm to them from the Hold

25 Co./Op Co. Model?

**J&J COURT TRANSCRIBERS, INC.**

1  A     The multi-debtor protocol.

2  Q     And that's because they had claims against multiple

3  debtors, correct?

4  A     Yes.

5  Q     Okay.  From your work in participating in the committee

6  deliberations that you referred to yesterday, do you know which

7  types of creditors are in the same class as the deferred comp

8  beneficiaries?

9  A     Yes, the junior subordinate debenture holders, the

10 landlord, McGuire, as well as the MRA creditors.

11 Q     And is Kodiak among that group?

12 A     Well, they're the largest holder -- I think the sole

13 holder of the junior subordinated debentures.

14 Q     Okay.  And McGuire, the landlord, is on the Creditors'

15 Committee, correct?

16 A     Yes.

17 Q     And Kodiak is on the Creditors' Committee?

18 A     As ex officio, yes.

19 Q     Okay.  Are there any holder -- are there any MRA

20 counter-parties on the Creditors' Committee?

21 A     Yes, Credit Suisse.

22 Q     And if I look at -- and, again, let me just summarize who

23 I think you said was in that same group.  You said MRAs,

24 Kodiak, the landlord and the deferred comp claimants?

25 A     At NCFC?

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Yes.

2  A    Yes.

3  Q    Okay.  McGuire -- does McGuire have claims against more

4  than one debtor?

5  A    I don't believe so.

6  Q    Do you know if there are any guaranties on their lease or

7  not that have come up?

8  A    I don't believe so.

9  Q    But with respect to that group, if I look at that group,

10 the MRAs had the harm of the Old Co. -- the Hold Co./Op Co.

11 Model addressed by the multi-debtor protocol, correct?

12 A    Yes.

13 Q    Was there any -- were any of these adjustments for the

14 benefit of the subordinated debt holders?

15 A    Yes.

16 Q    In what sense did that work?

17 A    By allowing the inter-company claim.

18 Q    They benefitted by that?

19 A    Yes.

20 Q    Whose claim -- was the McGuire claim only against NCFC?  I

21 just asked you that, but just for clarity, it was only against

22 NCFC or was it against some other holding company debtor?

23 A    I believe I said I believed it was only against NCFC.

24 Q    I just wanted to get -- not have the TRS/NCFC confusion

25 come into the mix.  Looking at that class of claims, is it fair

 1  to say that the MRAs and Kodiak have the majority, vast

 2  majority, in dollar amount of the claims in that class?

 3  A    I'm sorry.  You said the MRAs and Kodiak?

 4  Q    Yes, combined.  The MRAs --

 5  A    Yes --

 6  Q    -- and Kodiak combined.

 7  A    Yes.

 8  Q    Do you know what percentage in dollar amount in the class

 9  they hold?

10  A    Well, the MRAs had a claim, I believe 124 million.  Kodiak

11  was about 90 million.  So that's -- so that's 214 million out

12  of the total, I think we estimated at 364.

13  Q    Okay.  So more than half?

14  A    Yeah.

15  Q    Okay.  And as we said, they both benefitted from the

16  negotiated adjustments to the Hold Co./Op Co. Model, correct?

17  A    Yes.

18  Q    I think, correct me if I'm wrong, when Mr. Power was

19  asking you questions yesterday, you referred to some

20  ambiguities about asset ownership as being of concern to the

21  committee, do I recall that correctly?

22  A    Yes, you do.

23  Q    Okay.  And specifically what ambiguities regarding asset

24  ownership do you recall being of concern?

25  A    Where the Rabbi Trust assets belonged, where the tax

1  refund belonged, where the Carrington investments belonged, as

2  well as the inter-companies where -- which are assets of

3  different estates, how those would be dealt with.

4  Q    Okay.  Again, just so that I make sure I have this, you

5  have the Carrington interest, the Rabbi Trust assets, the tax

6  refund and certain inter-company claims?

7  A    Yes.

8  Q    Was there an issue over -- and I think actually in your

9  deposition you refer to it as "loan residuals," and then you

10 corrected it in your errata to be "servicing rights," correct?

11 A    That's correct.

12 Q    Was there any issue over servicing rights?

13 A    Well, the issue was whether that would be properly

14 allocated to New Century Residual IV.

15 Q    And do you recall how the -- how the committee eventually

16 resolved any ambiguity relating to the servicing rights?

17 A    Yes.

18 Q    And how was that done?

19 A    Those proceeds were allocated to the Op Co. group.

20 Q    And why?

21 A    Because the only creditor at New Century Residual IV was

22 an inter-company claim from New Century Mortgage Corporation,

23 as well as the rationale we received as why the proceeds were

24 allocated there in the first place, which would be due to some

25 tax -- tax reasons, tax planning.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    But since it only had one related creditor, where it

2 resided didn't really matter economically, correct?

3 A    Well, not to that creditor.

4 Q    Well, but that creditor and the other entity were both in

5 the same group, correct?

6 A    No.  That creditor was in the other group.

7 Q    It didn't affect any creditor other than an affiliate

8 creditor, is how you resolved it?

9 A    Well, we -- they felt it would -- it was appropriate to

10 give the creditor with the economic benefit -- the economic

11 interest the rights to those assets.

12 Q    Okay.  With respect to the Carrington interest issues,

13 were you present during Ms. Etlin's testimony?

14 A    Yes.

15 Q    And you heard her describe that issue as being around the

16 issue of which New Century Financial Corporation was the hold

17 of those interests based on contracts that both predate and

18 postdate REIT conversion, correct?

19 A    I recall.

20 Q    And would you agree that that was the ambiguity that you

21 referred to when you said the committee was concerned about an

22 ambiguity here?

23 A    Yes.

24 Q    And with respect to the Rabbi Trust, again, you heard Ms.

25 Etlin testify about the same issue, in other words the

1  ambiguity over New Century Financial Corp. pre-REIT conversion

2  and post with respect to those assets as well?

3  A    That was part of it.  There was also the issue of given

4  the economic realities of how the trust was funded and who paid

5  the beneficiaries, there was a discussion by the committee of

6  whether that could possibly be considered an asset of New

7  Century Mortgage Corporation.

8  Q    And you hear Ms. Etlin testify about those very same

9  ambiguities, correct?

10 A    About the ownership issues between TRS and FC, but I don't

11 recall about the MC.

12 Q    Okay.  But the issues that she testified, as amplified by

13 what you just said, those were the only issues relating to the

14 Rabbi Trust ownership that you can recall?

15 A    Yes.

16 Q    I think you mentioned the issue of the tax refund.  You

17 did hear Ms. Etlin say, I believe, that from her standpoint

18 there was never an issue over the tax refund.  It was always

19 going to be at NCMC, correct?

20 A    I heard her say that, but I don't agree.

21 Q    But that -- you understood that to consistently be the

22 debtor's position, correct?

23 A    I would not -- I would say it was not a consistent

24 position, but that's where it ultimately got decided.

25 Q    All right.  And that's where in the plan the tax refund is

1  going, correct?

2  A    That was the decision in the plan, yes.

3  Q    Now, with respect to the inter-company claims issues,

4  again, you were present for Ms. Etlin's testimony, and I think

5  you must have heard her testify about the report done by

6  AlixPartners?

7  A    Yes.

8  Q    And then that report was translated into amendments to

9  schedules, correct?

10  A    Yes.

11  Q    Did the committee, to your knowledge, ever object to any

12  of those amendments to the schedules?

13         MR. POWER:  Objection, Your Honor.  I -- first of

14  all, I'm not even sure the committee can object to amendment

15  schedules, but -- it's certainly a legal question.  I don't --

16  he can ask him if the witness has any knowledge.  I --

17         THE COURT:  Rephrase your question.

18         MR. KEACH:  I'll lay a foundation, Your Honor.

19  Q    Did -- to your knowledge, did the committee or any of its

20  professionals review the amendments to schedules before they

21  were filed?

22  A    Not before they were filed.

23  Q    Were they reviewed after they were filed?

24  A    Yes.

25  Q    Okay.  Did -- to your knowledge, did the committee attempt

**J&J COURT TRANSCRIBERS, INC.**

1  to do anything to change or alter the amendments after they

2  were filed?

3  A    No.

4  Q    Okay.

5                        (Pause)

6  Q    Do you recall, Mr. Star, any discussions at the committee

7  level regarding full substantive consolidation of the debtors?

8  A    Yes.

9  Q    And do you recall whether or not the committee actually

10 considered whether there were factors that tilted towards full

11 substantive consolidation?

12 A    Yes, it was discussed.

13 Q    Okay.  And do you recall, were there specific factors

14 particular to the New Century companies that were discussed as

15 tilting in that direction?

16 A    Yes.

17 Q    And were those factors the asset ambiguities that you just

18 talked about?

19 A    It was a part of them, yes.

20 Q    All right.  And were there any others?

21 A    Yes.

22 Q    And what were they?

23 A    They included the cash management system, the corporate

24 governance.  It included the financial reporting.  Those are

25 the main areas.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  When you say, "corporate governance," do you just

2  mean that they had the same boards of directors?

3  A    Yeah, overlapping boards, overlapping management.

4  Q    Okay.  So, we have the asset ambiguities and the things

5  you just mentioned.  Were there any others that you can think

6  of?

7  A    Not at this time.

8  Q    Okay.  And when -- were there, in fact, factors that the

9  committee discussed that argued against substantive

10  consolidation?

11  A    Did you ask me when or the -- what --

12  Q    No.  Are there -- you know -- my question was, did --

13  well, let me just take it one piece at a time so that the

14  record's clear.  Did the committee, to your knowledge, discuss

15  or consider factors present in the facts and circumstances of

16  the New Century entities and cases that argued against

17  substantive consolidation?

18  A    Yes.

19  Q    And do you recall what those factors were?

20  A    Yes.

21  Q    And what were they?

22  A    The maintenance of separate books and records, the

23  separate company financial statements issued in connection some

24  of the whole loan purchase transactions, maintenance of

25  inter-company accounts, and those are the main ones I recall.

1  Q    Do you recall during your deposition that I showed you the

2  10-Ks for the New Century groups of companies for 2004 and

3  2005?

4  A    Yes.

5  Q    And do you recall that both of those documents had

6  consolidating information in them?

7  A    Yes.

8  Q    Do you understand what consolidating information is?

9  A    Yes.

10  Q    What is it?

11  A    It's a roll-up -- or shows a roll-up of individual

12  entities into a consolidated enterprise.

13  Q    And does it show each individual entity's balance sheet?

14  A    Are you asking about the disclosure specifically or just

15  in general?

16  Q    In general.

17  A    In general, yes.

18  Q    Okay.  And do you recall that that disclosure did exactly

19  that?

20  A    It did, but not for all the entities.

21  Q    Okay.  For all the entities for which there was common

22  recording in the 10-K?

23  A    For all the entities we're talking about in this case, all

24  the debtor entities.

25  Q    Right.  So, all -- there was consolidating information for

**J&J COURT TRANSCRIBERS, INC.**

1  all of the debtor entities in the 10-K?

2  A     No.

3  Q     Which ones are excluded?

4  A     The individual entities I believe under TRS Holdings.

5  Q     Were any others excluded?

6  A     I don't recall specifically, but that was the -- but

7  that's the one I specifically remember.

8  Q     And do you recall telling me at the deposition that was

9  the first time you had ever looked at the consolidating

10  information in both of the 10-Ks?

11  A     In the 10-Ks, yes.

12  Q     And 10-Ks are public documents, correct?

13  A     Yes.

14  Q     Anybody who can get on the Internet can get them?

15  A     Yes.

16  Q     Mr. Star, you -- we talked about the Hold Co./Op Co. Model

17  and I think you said in the model the Hold Co. entities are

18  combined and the Op Co. entities are combined.  With specific

19  reference to the Hold Co./Op Co. Model prior to the adjustments

20  that you've referred to, what do you mean when you say that the

21  Hold Co. entities are combined?

22  A     We added up the assets at the Hold Co. entities and added

23  up the expenses and the claims at the Hold Co. entities.

24  Q     So the assets are combined for distribution?

25  A     Well, they're combined for the model.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Right.  And then the claims are combined?

2  A    Yes.

3  Q    And what happens to the inter-company claims?

4  A    The inter-companies within those entities were allowed at

5  zero.

6  Q    Okay.  And when you referred to the combination of the

7  operating companies in the Hold Co./Op Co. Model, what did you

8  mean by "combined?"

9  A    That the assets were added up, the expenses were added up

10  and the claims were added up.

11  Q    Okay.  And the inter-companies were allowed at zero?

12  A    Yes, the same.

13  Q    Okay.  You said that the committee at times considered

14  substantive consolidation, full substantive consolidation,

15  correct?

16  A    The committee reviewed a scenario that reflected the

17  impact of substantive consolidation, yes.

18  Q    Do you have a working definition of substantive

19  consolidation that you use?

20  A    Working definition would be the -- the combination of all

21  assets, expenses, claims amongst the whole -- all the -- all

22  the entities.

23  Q    And the zeroing out of the inter-company claims?

24  A    Yes.

25           MR. KEACH:  May I have a moment, Your Honor?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  You may.

2                          (Pause)

3          MR. KEACH:  Nothing further, Your Honor.

4          THE COURT:  All right.  I did neglect to ask whether

5  the debtor had an -- and I should have let you go before Mr.

6  Keach.  I --

7          MR. KEACH:  My apologies.

8          THE COURT:  I hate it when I repeat mistakes.

9          MR. KEACH:  I may have stood and preempted it.  I

10 apologize.

11         THE COURT:  Well --

12                    CROSS EXAMINATION

13 BY MR. LOGAN:

14 Q    Good morning, Mr. Star.

15 A    Good morning.

16 Q    I want to turn to the questions that Mr. Keach asked you

17 about two of the creditors you identified as having claims only

18 against NCFC, and I want to be very clear on that.  Which

19 creditors on the Creditors' Committee had claims only against

20 NCFC?

21 A    McGuire, the landlord, and Kodiak, the holder of the

22 junior subordinated note.

23 Q    He asked you some questions about various adjustments

24 built into the models and some into the plan of liquidation

25 itself that benefitted creditors of NCFC.  I want to make sure

                **J&J COURT TRANSCRIBERS, INC.**

1  I at least understand what some of those are.  I think you

2  referred to the inter-company claim issue.  Explain -- explain

3  that, please.

4  Q    Well, allowing the -- some of the inter-company claim.  As

5  we discussed before, the committee looked at the scenarios

6  where the inter-company claim from the holding companies

7  against the operating companies wouldn't be allowed at all.  So

8  that benefitted the NCFC or the holding company creditors.  The

9  -- the Rabbi Trust, keeping the Rabbi Trust at the holding

10  company debtors, again, we talked about at the committee level

11  whether some of that or all of that belongs at NC Mortgage

12  Corporation, which is in the operating company, and also with

13  the expense allocation on the basis of -- the number we came up

14  with I think was about 22 percent of the expenses were

15  allocated to the holding company, and the vast majority, or

16  almost 80 percent of it, was at the operating company level.

17  Q    And resolution of those issues would have, looked at in

18  isolation, a beneficial impact on creditors with claims only

19  against NCFC, is that correct?

20  A    Well -- creditors of NCFC and others at that holding

21  company level.

22  Q    Is there any difference in how those adjustments affected

23  Kodiak and McGuire and how they affected deferred compensation

24  claimants?

25  A    No.  Since they were in the pool, they'd be -- they'd have

1  the same benefit.

2           MR. LOGAN:  I have no further questions, Your Honor.

3           THE COURT:  Redirect?

4           MR. POWER:  Your Honor, could I just have a moment,

5  please?

6           THE COURT:  You may.

7                    (Pause)

8                REDIRECT EXAMINATION

9  BY MR. POWER:

10 Q    Mr. Star, to your knowledge does any members of the

11 committee have claims against TRS Holdings?

12 A    No.

13 Q    When you were responding to Mr. Keach's questions about

14 the harms that were affecting creditors, go through the process

15 of how the committee demonstrated -- identified the harms.  Did

16 it work from a Decon/Sub-Con Model and then look at the harms,

17 is that how you started it?

18 A    Yeah, the benchmark in all the discussions was the

19 deconsolidation model.  In other words, every scenario we ran

20 we did merge certain entities, and there were other variations

21 of Hold Co./Op Co.  There were other combinations that were

22 looked at.  Each creditor looked at the decon model the best we

23 could construct one.

24 Q    So, when you say the benchmark was the decon, just explain

25 what do you mean?  What was -- what was intended in that?  What

**J&J COURT TRANSCRIBERS, INC.**

1  do you mean by decon model?  Let's just break 00

2  A    Well, we came up -- we had a model and that showed the

3  recoveries, the assets, the expenses, the claims at each debtor

4  entity and came up with a recovery calculation under a certain

5  set of assumptions, and, again, the assumptions varied

6  depending on where we'd decide an asset sat or we'd show the

7  impact of where a different asset sat, and so an individual

8  creditor at New Century Mortgage, for example, based on a

9  separate company analysis, a deconsolidate analysis, said my

10  recovery percentage is X under this scenario.  If you are going

11  to merge certain entities or do a whole Hold Co./Op Co., for

12  example, it's a Y recovery percentage.  Explain to me why

13  that's better for me or worse for me or why should I -- why

14  should I entertain that type of adjustment.

15  Q    And so then -- I guess just so I understand, they took the

16  deconsolidation model and then based on these various

17  adjustments basically -- well, let me strike that.  Let me just

18  go through it another way.  To your knowledge, did the

19  committee ever run a full substantive consolidation model?

20  A    Yes, we had a model that -- for laymen's terms,

21  substantively consolidated the entities, yes.

22  Q    And that means basically all the debtor entities combined

23  -- all the debts, all the assets -- eliminates inter-company

24  claims?

25  A    Yes, eliminated the guaranties.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Eliminated the guaranty claims, that was my other

2  question.

3  A    Yes.

4  Q    It didn't mention guaranties before.  It would eliminate

5  guaranty claims?

6  A    Yes, it did.

7  Q    Was that model adopted by the committee, to your

8  knowledge?

9  A    The substantive consolidation scenario?  No.

10 Q    If the -- if it was ultimately determined that the limited

11 partnership interest in Carrington belonged and was owned by

12 TRS Holdings, which -- to your knowledge, which creditors would

13 share in the benefits of that?  Do you know?

14         MR. KEACH:  Objection, Your Honor; outside of the

15 scope of my cross.

16         MR. POWER:  Your Honor, I actually don't think so.  I

17 think he asked specifically about what assets were an issue and

18 which creditors benefitted from the things in the plan --

19         THE COURT:  Overrule.

20 A    The creditors at TRS Holdings, which I think approximated

21 about 15 million, and also the inter-company claims to the

22 extent they'd be allowed from NC Mortgage Corporation.

23 Q    And by doing the Hold Co. group, which creditors who

24 wouldn't own the Carrington interest would benefit by -- by

25 basically grouping together TRS and NCFC?

                    **J&J COURT TRANSCRIBERS, INC.**

1  A    If you assume the Carrington investments were TRS, then

2  the New Century Financial Corporation had a benefit from

3  combining.  They were getting the benefit of those assets.

4  Q    Now, when you were talking about harms that were being

5  mitigated throughout the entire discussion, were you referring

6  to harms to certain creditors or harms to certain groups of

7  creditors that had claims against certain debtor entities?

8  A    Well, it was generic.  It's groups of creditors.

9  Q    So, when Mr. Keach asked you if any specific creditor

10 benefitted from something, did -- were you -- meant to testify

11 that only that creditor and nobody else in that group or was it

12 generally the group?

13 A    No, it was generally the group.

14 Q    If the Rabbi Trust assets were determined to be owned by

15 TRS, which creditors would benefit from that scenario?

16 A    Well, again, those specific TRS creditors and New Century

17 Mortgage Corporation, by virtue of their inter-company account.

18 Q    And by virtue of the Hold Co. structure and grouping the

19 different entities, do other creditors benefit if that was --

20 if you assume the Carrington asset belongs in the TRS estate?

21 A    Well, if you do the Hold Co. structure, it's -- all the

22 creditors of those four entities get the benefit of it.

23 Q    Let's talk briefly about litigation because I don't think

24 that was discussed.  Now, litigation is also an asset that the

25 committee considers, is that right?

1  A    Yes.

2  Q    If all the litigation recoveries were determined to belong

3  in the operating entities, particular New Century Mortgage

4  Corp., which creditors would benefit from that alignment?

5  A    Which creditors on the committee or just in general?

6  Q    General.

7  A    The New Century Mortgage Corporation creditors and any

8  entities that had inter-company claims against New Century

9  Mortgage.

10  Q    Now, under the plan, are you familiar with how the

11  litigation proceeds are allocated?

12  A    Yes.

13  Q    And which creditors benefit generally from the allocation

14  of litigation proceeds?

15  A    Well, they all benefit, but to a different degree.

16  Q    But every -- every creditor benefits, is that right?

17  A    Yes.  That was part of the discussion in the settlement.

18  Q    When you were talking in response to Mr. Keach's question

19  about the inter-company protocol, do you recall that?

20  A    Yes.

21  Q    And you were talking about a harm.  What was specifically

22  the harm that the committee was trying to address there?  Was

23  it --

24  A    The harm -- the harm was -- well, the harm was initially

25  raised from the perspective of the New Century Mortgage

**J&J COURT TRANSCRIBERS, INC.**

1  Corporation creditors when they looked at the -- I think it was

2  a $360 million inter-company claim against -- from New Century

3  Financial Corporation against New Century Mortgage Corporation

4  and whether that is a valid claim or not.

5  Q    And so that -- when you say, "harm," you meant that issue,

6  is that --

7  A    Yes.

8  Q    And --

9  A    Because that -- because the harm would be the dissolution

10 of the New Century Mortgage Corporation pool with the claim of

11 the New Century Financial Corporation.

12 Q    What specifically is the harm, though, that was raised in

13 terms of what was identified as a harm that needed to be fixed?

14 A    Well, the claims pool would be increased by $360 million

15 --

16 Q    But if it's --

17 A    -- at the New Century Mortgage level.

18 Q    And what were the issues raised, whether that was

19 appropriate or not?  Were there any issues --

20 A    The issue was whether that inter-company claim was a true

21 debt obligation or some type of equity contribution.

22 Q    And did the committee look into factors as to whether that

23 was a true debt obligation or not?

24 A    Yes, they did.

25 Q    And based on that it decided how to resolve that harm, is

**J&J COURT TRANSCRIBERS, INC.**

1  that right?

2  A    Yes.

3  Q    You were asked questions about what you observed from Ms.

4  Etlin's testimony yesterday, and Mr. Keach asked about books

5  and records and the legal agreements of the Carrington

6  interest, is -- do you recall that?

7  A    Yes.

8  Q    You also have knowledge about where the Carrington assets

9  sit on the books and records of the debtor?

10 A    Yes.

11 Q    Which debtor?

12 A    According to the schedules, they are a TRS Holdings

13 Corporation.

14 Q    Was that also an issue in terms of ownership that the

15 committee considered -- where the books and -- what the books

16 and records reflected?

17 A    Yes.

18 Q    When you were mentioning the factors that the committee

19 looked at whether to do substantive consolidation or I guess

20 non-substantive consolidation, you mentioned a couple things.

21 One of them you mentioned was financial records and whatnot?

22 A    Yes.

23 Q    What did you mean by that?  What records did you think

24 supported the notion of substantive consolidation?  In your

25 layman term, what --

**J&J COURT TRANSCRIBERS, INC.**

1  A    That supported substantive consolidation?

2  Q    Yes.

3  A    The -- the ambiguities of notwithstanding where an asset

4  was recorded or a liability was recorded whether -- where they

5  belonged in that entity.

6  Q    You had discussions about the tax refund, and there were

7  issues about that and you didn't agree with Ms. Etlin in terms

8  of her testimony.  Could you briefly explain what you were

9  referring to there?

10  A    Yes.  I believe Ms. Etlin testified that there -- there

11  was never an issue that the tax refund belonged at New Century

12  Mortgage Corporation.  We were gathering facts with respect to

13  the reason for the refund, tax sharing agreements, again how --

14  tax activities for both the inter-company accounts and -- so we

15  weren't so convinced from the beginning that it necessarily

16  belonged there.

17  Q    But ultimately the committee decided it does belong in the

18  Mortgage Corp., is that --

19  A    Yeah, the committee was comfortable it belonged there at

20  the end of the day.

21  Q    You mentioned the -- I think originally in your deposition

22  you thought it was loan residuals and then you realized it was

23  actually mortgage servicing rights?

24  A    Yes.

25  Q    Were those part of the mortgage servicing rights in

**J&J COURT TRANSCRIBERS, INC.**

1  connection with the Carrington sale that the Judge approved

2  last year?

3  A    Yes.

4  Q    Which entity sold those mortgage servicing rights, do you

5  know?  Actually, strike that, Your Honor.  I'll ask another

6  question.  Which of the debtor entities actually ran the

7  servicing business for the debtors, do you know?

8  A    I believe it was New Century Mortgage Corporation.

9  Q    And by servicing business, is that -- what's your

10 understanding of what that means?

11 A    Well, the administrative aspects of managing a loan

12 portfolio.

13 Q    And as part of that sale were servicing rights, to your

14 knowledge, sold to Carrington?

15 A    Yeah, the rights to those -- to the -- the revenue stream

16 for performing those administrative services were sold.

17 Q    And when you mentioned mortgage servicing rights, that

18 there was an issue as to where they belonged, were those the

19 rights that were sold as part of that package to Carrington --

20 A    Yes.

21 Q    -- that were part of the mortgage -- New Century Mortgage

22 Corp. servicing business?

23 A    Yes.

24 Q    Mr. Star, in -- you mentioned creditors in New Century

25 Financial Corporation.  Are there also -- are you aware of any

1  other types of creditors, like landlords, that are in that

2  group?

3  A    At New Century Financial Corporation?

4  Q    Besides McGuire.  I know you mentioned McGuire.

5  A    I don't recall specifically.

6          MR. POWER:  Your Honor, could I just have one second?

7                         (Pause)

8          MR. POWER:  Your Honor, I have no more questions.

9          THE COURT:  Thank you.  Mr. Keach, let me just take a

10  five-minute break at this point.  Then you'll have the

11  opportunity to recross.  Just five minutes.

12                         (Recess)

13          THE CLERK:  All rise.

14          THE COURT:  Mr. Keach?

15          MR. KEACH:  Thank you, Your Honor.  Very briefly.

16                    RECROSS EXAMINATION

17  BY MR. KEACH:

18  Q    Mr. Star, in response to counsel's questions, you were

19  talking about the adjustments, and I had asked you earlier

20  about the adjustment with respect to the master repurchase

21  agreement creditors, and I believe you said that their claims

22  were enhanced or increased in some way to mitigate the

23  potential harm to them of the Hold Co./Op Co. Model, is that

24  correct?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And specifically were their claims allowed at a percentage

2  greater than a hundred percent?

3  A    I don't understand.

4  Q    Well, let me just ask you directly.  How were the claims

5  of the master repurchase agreement creditors enhanced as an

6  adjustment?

7  A    We increased it by a 30 percent factor.

8  Q    All right.  So, the -- if their allowed claim otherwise

9  would have been $100, it was now allowed at $130 so that they

10 could collect on that amount, correct?

11 A    Correct.

12 Q    All right.  And from an economic standpoint, that's the

13 same as increasing their percentage share of the distribution,

14 isn't it?

15 A    Yes.

16 Q    Okay.  And the MRA creditors are in the same class as the

17 other unsecured creditors of NCFC, the general unsecured

18 creditors?

19 A    Yes.

20 Q    All right.  And again, if, you know, we use simple

21 numbers, if a hundred dollars gets distributed, they get 13

22 cents and everybody else gets ten cents, right, the MRAs?

23 A    Yes.

24           MR. KEACH:  Nothing further, Your Honor.

25                     RECROSS EXAMINATION

**J&J COURT TRANSCRIBERS, INC.**

1  BY MR. LOGAN:

2  Q    Mr. Star, Mr. Keach just asked you about the adjustment

3  for the MRA creditors.  Focusing purely on claims they have

4  against holding company debtors, in order to get the 130

5  percent distribution adjustment, did they need to have claims

6  against multiple of the holding company debtors?

7  A    Yes, I believe it was specified in the plan which other

8  debtors they needed to have claims against.

9  Q    And is it NCFC and NC Credit?

10 A    I believe so.

11 Q    Does NC Credit have assets?

12 A    It had some assets, yes.

13 Q    Why did the committee support a plan that gave a

14 distribution enhancement if an MRA creditor had a claim against

15 NC Credit and NCFC?

16 A    Well, I think the committee looked at it in its totality.

17 I mean, it wasn't just that adjustment.  It was the benefits,

18 or perceived benefits, of all the other adjustments.

19 Q    Is the enhancement limited to MRA creditors, and by that I

20 mean if other creditors have claims against multiple debtors,

21 do they get the same treatment?

22 A    Oh, sure.

23         MR. LOGAN:  I have no further questions, Your Honor.

24         THE COURT:  Thank you.  Thank you, sir.  You may step

25 down.

**J&J COURT TRANSCRIBERS, INC.**

1            THE WITNESS:  Thank you.

2            MS. UHLAND:  Your Honor, we're prepared to call Mr.

3   Brents to the stand.

4            MR. McDONALD:  Your Honor, Paul McDonald on behalf of

5   the Ad Hoc Committee of Deferred Compensation Claim

6   Beneficiaries.  Before Mr. Brents takes the stand, we move to

7   convert our pending motion to strike Mr. Brent's declaration to

8   a motion in limine to preclude his testimony essentially on the

9   grounds that the infirmities that are revealed in the

10  declaration cannot and will not be cured by simply having Mr.

11  Brents testify here live at trial.

12           First and foremost, Mr. Brents, like Ms. Etlin and

13  Mr. Star, we contend is simply an expert witness masquerading

14  as a fact witness.  Like Ms. Etlin and Mr. Star, Mr. Brents was

15  not identified as an expert witness, nor were the subjects of

16  his testimony outlined by the March 28 deadline.

17           To the extent that Mr. Brents were deemed not to be

18  an expert witness, we believe that his testimony should be

19  precluded under Federal Rule of Evidence 701 in the sense that

20  they cannot satisfy the third prong of that rule, which would

21  require that his testimony not be based upon specialized

22  knowledge.

23           Lastly, to the extent that the Court were to conclude

24  that Mr. Brents is not an expert and does satisfy the

25  requirements of Rule 701, we would say that his testimony

**J&J COURT TRANSCRIBERS, INC.**

1  should be barred under Rule 602 of the Federal Rules of

2  Evidence on the grounds that he does not have personal

3  knowledge of the facts on which the declaration contends he is

4  to testify.  He was the leader of a team of people from

5  AlixPartners.  He lacks personal knowledge of the events to

6  which he's going to testify.  The basis of his knowledge is

7  almost entirely facts that were related to him by the hearsay

8  reports of people within the AlixPartners team, as well as

9  representatives of the debtor.

10         So, on those grounds, we would suggest that he is not

11  competent to testify at this hearing today.

12         MS. UHLAND:  Your Honor, we intend as part of this

13  direct -- well, first let me say that with respect to the

14  topics of Mr. Brents' testimony, it will be within the topics

15  covered by his declaration, which was filed prior to the

16  conclusion of the deposition, and in informal conversations I

17  did relay to counsel that the areas of Mr. Brents' testimony

18  well prior -- as we were scheduling the deposition to explain

19  that he would be testifying on some of the sort of factual

20  basis -- bases for the settlements in the -- in the plan, and I

21  don't believe that there was a surprise about the scope or the

22  areas covered by his testimony.

23         In any event, during the deposition I outlined the

24  areas of testimony, and prior to the conclusion of the

25  deposition, the declaration was provided.  So I don't think we

1  have a -- we have a narrower focus and a -- and while things

2  are quick in bankruptcy, as is inevitable in this process, I

3  think we do have a clear -- a clearer sort of understanding by

4  the other side on what the areas are going to be.

5       We intend today through the direct testimony to lay

6  the additional foundation for this information and the

7  processes on which Mr. Brents obtained the information about

8  which he is going to testimony, and we're not seeking to have

9  any of this be expert testimony, and with respect to the

10  testimony today, as opposed to the declaration, we're not

11  seeking to get any -- into any conclusory or opinion type, even

12  lay opinion type, testimony with Mr. Brents today.  We just

13  want to clarify some of the record with respect to what is and

14  isn't in the general ledger based on his review of data

15  extracted from the general ledger and how that was done.  I

16  think it's a -- we ought to have the opportunity to present the

17  testimony, lay the foundation and have the Court consider it,

18  subject to the, you know, appropriate evidentiary objections.

19       THE COURT:  Well, let me say this.  To the extent the

20  Ad Hoc Committee is indicating that the nature of the testimony

21  is similar to that which was given by Ms. Etlin and Mr. Star,

22  what evidence came in, in the Court's view, was factual in

23  nature, and despite the fact that they may be outside advisors

24  employed by the company, or by the committee in Mr. Star's

25  case, doesn't make them not appropriate as fact witnesses.

**J&J COURT TRANSCRIBERS, INC.**

1           Now, again, comparing the proposed witness here to

2    the prior testimony, frankly, I think the Ad Hoc Committee was

3    very successful in keeping out of the record the things to

4    which it legitimately objected, and I think the committee also

5    accomplished its purpose in filing the motion with respect to

6    Mr. Star, because, while I do not know this, I suspect that the

7    examination was narrowed considerably in scope, specifically as

8    a result of that, and my guess is, and frankly Ms. Uhland is

9    intimating this, the same is going to occur with this witness.

10   So, the motion as converted is denied with leave to make the

11   appropriate objections as the testimony proceeds.

12           MS. UHLAND:  Thank you, Your Honor.  We'd now like to

13   call Mr. Brents.

14           THE COURT:  All right.

15           THE CLERK:  Please raise your right hand.  Place your

16   left hand on the Bible.

17           TODD BRENTS, WITNESS FOR THE DEBTORS, SWORN

18           THE CLERK:  Please state and spell your name.

19           THE WITNESS:  Todd B. Brents, B-r-e-n-t-s.

20           THE CLERK:  Thank you --

21                       DIRECT EXAMINATION

22   BY MS. UHLAND:

23   Q    Mr. Brents, can you tell us what your role is with the

24   debtors?

25   A    I currently serve as the corporate secretary.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And, Mr. Brents, by whom are you employed?

2  A    AlixPartners.

3  Q    And what is your position there?

4  A    I'm a managing director.

5  Q    And how long have you been with AlixPartners?

6  A    Approximately seven years.

7  Q    And before that, what did you do?

8  A    I worked at Frito-Lay Corporation in various capacities in

9  treasury, operations analysis and credit.

10 Q    And before that?

11 A    Before that I was employed at Color Tile as one of the

12 assistant controllers, and before that at Arthur Andersen &

13 Company as an auditor.

14 Q    And can you briefly describe your educational background?

15 A    I have a degree in accounting from the University of Texas

16 at Arlington and an MBA from Southern Methodist University.

17 Q    Can you outline for us, as it relates to the matters that

18 we're here to discuss today, what your primary responsibilities

19 are with respect to the debtors, either as an officer or in

20 connection with your employment with AlixPartners?

21 A    In my role as corporate secretary, I serve to authenticate

22 corporate actions, to affirm them as appropriate -- appropriate

23 in documentation or otherwise, that corporate actions

24 authorized by the board or that an action taken by a corporate

25 officer is also -- that they are authorized to take that

1  action.  As it relates to my work as an advisor to the company

2  through AlixPartners, primarily it's focused on two areas --

3  one, around claims, the claims area -- claims analysis, claims

4  objections and claims resolution -- and that would include the

5  development and the implementation of the breach in EPD

6  protocol.  The other area is assisting the company with its

7  reporting and some of the special reporting requirements that

8  it has while it navigates a bankruptcy proceeding.

9  Q    Mr. Brent (sic), did you have any role in the preparation

10 of the schedules and statements and financial affairs filed by

11 the debtors?

12 A    Yes.  Shortly after the filing, as the company was

13 preparing the information to go into the statements and

14 schedules, I assisted them in developing the information -- or

15 obtaining the information from their systems that they needed,

16 understanding that information and putting it in a form to go

17 into the statements and schedules.

18 Q    And did you also have a role in connection with collecting

19 information for the plan negotiation process?

20 A    Yes.  After the statements and schedules were completed, I

21 began working on obtaining the information that would be used

22 as the inputs, if you will, to the information that ultimately

23 went into the recovery model and the plan.

24 Q    You discussed that you were obtaining the information from

25 the debtors for these two items.  Can you describe generally

**J&J COURT TRANSCRIBERS, INC.**

1  the process that you undertook to obtain that information from

2  the books and records?

3  A    Well, the primary place for the numbers, the accounting

4  information, resided in the general ledger system of the

5  company, and so that information was culled from the general

6  ledger, either through extracts from the general ledger and the

7  spreadsheets and through analysis performed by company

8  personnel from that data that came from the general ledger.

9  Q    What exactly is the general ledger of the debtors?

10 A    A good way to think about it would be a large database

11 that contains all of the company's accounting transactions, and

12 in this case it's a database that has millions of records and

13 it goes back to 1997.  That's how far back some of the

14 company's records go.  And you could think of that database as

15 a listing of all the transactions organized by legal entity on

16 one hand and organized by the type of transaction or the type

17 of asset or liability, or the account if you will, that it

18 affects.  So, some transactions affect a cash account or a

19 fixed asset account or a liability account, and so that

20 database is organized along those lines.

21 Q    And how would you find out, using the general ledger -- or

22 how would you obtain information from the general ledger about

23 which asset belonged to which debtor?

24 A    You would write a report that would extract data from the

25 general ledger that would identify those relationships, the

**J&J COURT TRANSCRIBERS, INC.**

1 legal entity and the specific account number and coding

2 information that would identify that asset or those transaction

3 types that support that asset.

4 Q    And in connection with the preparation of the schedules or

5 the collection of the data for the plan, did you pull such

6 reports from the general ledger?

7 A    They were pulled -- I -- they were pulled at my direction,

8 and I saw them -- you know, I saw -- it was done by people

9 under my direction.

10 Q    In addition to reviewing the general ledger, was there any

11 other information from the company's books and records that you

12 reviewed as part of this overall collection process?

13         MR. McDONALD:  Objection; mischaracterizes his prior

14 testimony.

15         THE COURT:  Any response?

16         THE WITNESS:  Yes, there were other --

17         THE COURT:  Sir, response from Ms. Uhland.

18         MR. McDONALD:  Your Honor, if I may amplify, I do not

19 believe there was testimony that he has ever reviewed the

20 general ledger.

21         MS. UHLAND:  Your Honor, let me lay more foundation

22 for that.

23         THE COURT:  Very well.

24 Q    Let's go back to the -- you talked about -- you described

25 for us what the general ledger was.  What -- how would -- how

1 would one, if one wanted to, or how did you, when you were

2 obtaining information, how would you obtain information from

3 the general ledger, you personally obtain information from the

4 general ledger that you just described?

5 A    Well, because it's a database, you can't just go look at

6 the database.  One has to extract the information from the

7 database.  So, I would have somebody run a report that would

8 extract the information, the transaction detail that contained

9 the information that was -- we were looking for to address a

10 particular question, and would extract that information into a

11 spreadsheet, and then we would look at that spreadsheet that

12 was an extract of the data that came out of the general ledger.

13 Q    Did you review any spreadsheets in connection with the

14 process you described as information gathering?

15 A    Yes.

16 Q    And did you review -- with respect to the matters we're

17 discussing today which relate to questions about assets and

18 inter-company claims, did you review any of the spreadsheets

19 from the general ledger on those matters?

20 A    Yes.

21 Q    Are there any other -- are there any -- other than the

22 general ledger, are there any books and records of the

23 companies that you -- other than the matters we just described,

24 are there any other books and records of the companies that you

25 reviewed in connection with this information gathering?

1        A    Yes.   There were a number of other documents.

2    Occasionally there would be journal entry support, the actual

3    written documentation that the company sometimes created when

4    they recorded the transactions, and -- as well as legal

5    documents, documents around particular assets or liabilities or

6    transactions that we were -- we were looking at.

7    Q    Did you review any publicly filed documents?

8    A    Yes, we also referred to the company's SEC filings.

9    Q    Turning now to --

10           MS. UHLAND:   -- actually, may I confer with my

11   opposing counsel a moment to see if we can speed this up?

12           THE COURT:   You may.

13                         (Pause)

14           MS. UHLAND:   Your Honor, to speed matters along,

15   we've agreed to stipulate to the facts in paragraphs -- as I'm

16   going to modify the facts in Paragraph 6 of the declaration,

17   which is a brief -- and I'm going to read the modification for

18   you which is a brief summary of the transactions that gave rise

19   to the reconversion.

20           THE COURT:   All right.   Hold on.   Let me get to the

21   declaration.   I have -- all right, I have it.

22           MS. UHLAND:   All right.   Your Honor, just to clarify

23   -- not to clarify, but to just, pursuant to our agreement,

24   we're going to change the second -- I'm sorry, the third

25   sentence that has a date reference.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I'm sorry, paragraph number again?

2          MS. UHLAND:   Paragraph Number 6.

3          THE COURT:  Okay.

4          MS. UHLAND:  We're going to rephrase the third

5    sentence to read as follows.  We're going to strike this

6    phrase, "On April 12th, 2004, the debtors established," strike

7    all those words and replace them and then go on to say, "New

8    Century Re Inc." -- I guess -- "a Maryland corporation with

9    REIT status, NCFC and its" -- and to continue on -- "and its

10   wholly owned subsidiary merger sub, a Delaware Corp., were

11   established in anticipation of the reconversion."

12         THE COURT:  And what's the evidentiary status of the

13   declaration apart from that?

14         MS. UHLAND:  Simply, Your Honor, I think all we would

15   like to do is just independent of this declaration that where

16   the parties are willing to stipulate onto the record to these

17   particular facts regarding the debtors.

18         THE COURT:  In Paragraph 6?

19         MS. UHLAND:  Yes.

20         THE COURT:  And is any other part of the declaration

21   to be admitted or offered?

22         MS. UHLAND:  No.  This is just to move this testimony

23   along so I don't have to try to get these basic facts in

24   through the witness.

25         THE COURT:  All right.  So Paragraph 6 is to be

**J&J COURT TRANSCRIBERS, INC.**

1  admitted as stipulated facts.

2          MR. McDONALD:  As modified.

3          MS. UHLAND:  As modified.

4          THE COURT:  All right, thank you.

5  BY MS. UHLAND:

6  Q    Mr. Brents, back to the general ledger.  Can you describe

7  how the -- in general, how the companies are identified in the

8  general ledger?

9          MR. McDONALD:  Objection, no foundation.

10          THE COURT:  Sustained.

11  BY MS. UHLAND:

12  Q    Mr. Brents, are you familiar with the -- are you familiar

13  -- excuse me -- do you have a knowledge of the classification

14  schemes used in the debtor's general ledger?

15          MR. McDONALD:  Objection to foundation again, Your

16  Honor.

17          THE COURT:  Overruled.  She's asking him if he knows.

18  BY MS. UHLAND:

19  A    Yes.  Based upon the spread sheets and the data from the

20  general ledger that I've reviewed, I'm familiar with these

21  designations.

22  Q    Do you know how the identified companies on the top of the

23  chart over here, do you know how the nomenclature used in the

24  general ledger to identify the companies at the top of the

25  chart?

**J&J COURT TRANSCRIBERS, INC.**

1  A    The company -- excuse me -- at the top of the chart is New

2  Century --

3           MR. McDONALD:  Objection, Your Honor.  The basis of

4  his knowledge is hearsay.

5           THE COURT:  Overruled.  You may answer.

6  BY MS. UHLAND:

7  A    The entity at the top of the chart, New Century Financial

8  Corporation, is identified in the general ledger -- is

9  described in the general ledger as REIT, R-E-I-T.

10 Q    And do you know how the company identified in the chart as

11 New Century TRS Holdings is identified?

12 A    Yes.  That entity is identified in the records as NCFC, a

13 reference to its former name.

14 Q    Do you know the name of the -- do you have an

15 understanding of how long the general ledger has been in

16 existence, the general ledger program has been in existence at

17 the debtors?

18 A    Since 1997.

19           MS. UHLAND:  Are the documents that were admitted

20 into evidence remaining at the stand?

21           THE COURT:  Which ones?  And the answer is, I don't

22 know.

23                     (Laughter)

24           MS. UHLAND:  The Ad Hoc Committee exhibits.

25           THE WITNESS:  Ad Hoc 1 is here.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Is that the only one that's there?

2            THE WITNESS:  Oh, I stand corrected.  There are some

3  others.

4            THE COURT:  All right.  Thank you.

5            THE WITNESS:  Ad Hoc 7, 11, 6; looks like a number of

6  them.

7  BY MS. UHLAND:

8  Q    Based on your work preparing the debtor's schedules, are

9  you familiar with assets referred to as the -- the parties have

10 been referring to as the Carrington Investments?

11 A    Yes.

12 Q    Can you briefly describe what those investments are?

13 A    Represents --

14           MR. McDONALD:  Objection, foundation.

15           THE COURT:  Tell us specifically how you are familiar

16 with those investments.

17           THE WITNESS:  First I see a reference to them in the

18 company's general ledger.  Second, I see legal documents that

19 govern the investment.

20           MR. McDONALD:  Your Honor, I believe this witness

21 testified he has not seen the general ledger, and what I've

22 seen from his declaration is that he has looked at three

23 documents that deal with Carrington, all three of which were

24 unsigned.

25           THE COURT:  Overruled, you may answer.  I'll weigh it

                    **J&J COURT TRANSCRIBERS, INC.**

1  accordingly.

2  A    Could you restate the question, please?

3  Q    Can you describe generally what we've been referring to as

4  the Carrington Investments in the courtroom?  First I asked you

5  if you were familiar with them, you said yes.  Now I'm going to

6  ask you to describe them very generally.

7  A    Yes.  It represents an interest on behalf of the company

8  and an LP, an investment fund, as well as a GP, the general

9  partner that manages that investment fund of a fund sponsored

10  by a Carrington entity.

11  Q    And are you aware, based on the debtors' schedules, what

12  the values are assigned in the debtors' schedules, or the

13  debtors' -- in the debtors' schedules to each of those assets?

14  A    Yes.  They are valued at approximately 49 and a half

15  million dollars.  That's the book value that's presented in the

16  schedules.

17  Q    And how is that allocated between the assets?

18  A    Approximately 42 million to the LP investment and

19  approximately eight million to the GP investment.

20  Q    If you would refer to Ad Hoc Exhibit 1.

21  A    Okay.

22  Q    Do you have that in front of you?

23  A    Yes.

24  Q    What is the title of that document?

25  A    Limited Liability Company Agreement of Carrington Capital

**J&J COURT TRANSCRIBERS, INC.**

Brents - Direct/Uhland                           61

1  Management, LLC.

2  Q    And who are the stated parties to that agreement?

3  A    Carrington Capital Management, LLC, Bruce M. Rose, New

4  Century Financial Corporation and Scott Nusbaum.

5  Q    Does it indicate the state of incorporation of New Century

6  Financial Corporation?

7  A    No.

8  Q    And what is the date of that document?

9  A    February 12th, 2004.

10  Q    And if you could locate Ad Hoc Exhibit 3.

11  A    Okay.

12  Q    If you could go to Bates Page 799 of that document.

13  A    Okay.

14  Q    What's the title of that document?

15  A    First Amended and Restated Limited Liability Company

16  Agreement of Carrington Capital Management, LLC.

17  Q    And who are the parties indicated in the first paragraph

18  of that document?

19  A    Carrington Capital Management, LLC, Bruce M. Rose and New

20  Century Financial Corporation.

21  Q    Does it indicate the state of incorporation of New Century

22  Financial Corporation?

23  A    No.

24  Q    What is the date of that document?

25  A    July 11th, 2006.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And if you could turn to Ad Hoc Exhibit 2.

2  A    Okay.

3  Q    And what is the title of that document?

4  A    Contribution and Transfer Agreement Between Carrington

5  Investment Partners US, LP and New Century TRS Holdings, Inc.

6  Q    And does it indicate the state of incorporation for New

7  Century TRS Holdings, Inc.?

8  A    Yes.  It indicates that being as --

9  Q    I'm sorry, I didn't ask you who the parties were.  Who are

10 the parties to that agreement?

11 A    The parties are Carrington Investment Partners US, LP and

12 New Century TRS Holdings, Inc.

13 Q    And does it indicate the state of incorporation of TS

14 Holdings, Inc.?

15 A    Yes, it is Delaware.

16 Q    And this document, is it a signed copy?

17 A    No.

18 Q    Have you seen this document before?

19 A    Yes, I believe I have.

20 Q    And did you attempt to obtain -- do you know if there

21 exists a signed copy of this document in the company's books

22 and records?

23 A    No, I was not able to locate one.

24 Q    You described earlier a process by which information was

25 obtained from the general ledger.

1  A     Yes.

2  Q     In the information you reviewed with respect to ownership

3  of assets that you described, what did the information that you

4  reviewed from the general ledger -- what did the information

5  you reviewed pursuant to the process you described earlier --

6  pursuant to that process, where did, what did it indicate, what

7  did that information indicate about the ownership of the

8  Carrington interest?

9          MR. McDONALD:  Objection, Your Honor, on multiple

10  grounds.  First on foundational grounds in the sense that what

11  Mr. Brents reviewed were AlixPartners' spreadsheets derived

12  from the general ledger, and secondly on the grounds that this

13  is clearly expert testimony based on his analysis of the books

14  and records of the company.

15          THE COURT:  All right.  Well, you might be more

16  specific about --

17          MS. UHLAND:  All right.

18          THE COURT:  -- where he gleaned the information from

19  precisely, but the question did arguably call for a conclusion

20  about what they meant, but the testimony with respect to what

21  it showed factually will be allowed.

22          MS. UHLAND:  Thank you, Your Honor.

23  BY MS. UHLAND:

24  Q     Let's review again more precisely the process from getting

25  from the general ledger to -- I'm forgetting the word you used

**J&J COURT TRANSCRIBERS, INC.**

1  before -- the Excel spreadsheet that was created or that you

2  did review, can you explain who created those spreadsheets and

3  your understanding of how they were created?

4  A     Correct.  Okay.  The sheet that I have in mind is what's

5  referred to as a lead sheet.  It's a bit of an accounting term,

6  but it represents an extraction of all the general ledger data

7  and it is summed or added by each entity and it's also added by

8  each general ledger account number representing the particular

9  asset or liability or income statement account from the general

10 ledger.  And so that lead sheet essentially adds up those

11 transactions in one place.  It's used to see the totals of each

12 of those accounts and those debtor entities.  And that

13 spreadsheet was essentially a report run by somebody with

14 access to the system to run the reports.  You run the report

15 and you copy it into an Excel spreadsheet.  And then that's the

16 spreadsheet that I reviewed.

17 Q     So -- and who was the person who ran this report for you?

18 A     The one I'm referring to would have been Donna Walker that

19 ran the report.  She works for the company.

20 Q     And did you obtain such a report that indicated -- going

21 back to the question I raised about investigating ownership --

22 you talked about a report that summarized, again, debtors and

23 their assets or what exactly was this summary that you're

24 talking about of the information that was extracted?

25 A     Yes.  It summarized all of the accounts representing their

1  assets and their liabilities.

2  Q    And from that, I'll refer to it as the extraction, did

3  that extraction indicate which debtor did -- under that

4  extraction, where were the Carrington investments located?

5           MR. McDONALD:  Objection, foundation.

6           THE COURT:  Any response?

7           MS. UHLAND:  I'll rephrase.

8  BY MS. UHLAND:

9  Q    Did the extraction you reviewed have any information

10  regarding the debtor under which the Carrington investments

11  were classified?

12  A    Yes.

13  Q    And which debtor was that?

14           MR. McDONALD:  Objection, lack of foundation.

15           THE COURT:  Overruled.

16  BY MS. UHLAND:

17  A    TRS Holdings.

18  Q    Both of the interests you referred to?

19  A    Yes.

20  Q    Referring now to Ad Hoc Exhibit 7.  If you can put that in

21  front of you.

22  A    Okay.

23  Q    Have you seen this document before?

24  A    Yes.

25  Q    And what is your understanding of this document?

**J&J COURT TRANSCRIBERS, INC.**

1  A    This is the trust agreement associated with the Rabbi

2  Trust.

3  Q    And can you read from the first paragraph who the parties

4  are to this document?

5  A    The parties are New Century Financial Corporation and

6  Wells Fargo Bank N.A.

7  Q    And what is the date of this document?

8  A    It's January 1999.  The specific date is hard to read on

9  this copy.

10  Q    And does it indicate the state of incorporation of New

11  Century Financial Corporation?

12  A    Delaware.

13  Q    In the extraction that you referred to, did it indicate a

14  location of the Rabbi Trust asset, the Rabbi Trust that this

15  document refers to?

16  A    Yes.

17  Q    And in which debtor was the Rabbi Trust document located?

18  A    TRS Holdings.

19  Q    Turning to another topic, you indicated that you, in

20  addition to -- did you prepare -- did you assist in the

21  preparation of the statement of financial affairs as well as

22  the debtors' schedules?

23  A    Yes.

24  Q    And in that connection, did you assist in the preparation

25  of statement of Schedule 19 -- let me repeat that.  In that

**J&J COURT TRANSCRIBERS, INC.**

1  connection, did you seek to determine which debtors' financial

2  statements or to whom, to which third parties debtors

3  distributed their financial statements?

4  A     Yes.

5  Q     Can you describe the process you undertook at the company

6  to determine the answers to those questions?

7  A     Once the requirement was described to the company, we

8  inquired as to who would have the information.  We found out

9  that there was a gentleman that tracked the financial

10  statements that were provided to third parties, particularly

11  the stand-alone financial statements, and we obtained the

12  records from him as the records he kept as far as who the

13  financial statements were given to.

14  Q     And with respect to New Century Mortgage Corporation and

15  NC Capital, did those debtor entities distribute their

16  financial statements?

17           MR. McDONALD:  Objection, Your Honor.  Can we have a

18  foundation as to whether this witness has personal knowledge on

19  this issue?

20           THE COURT:  Sustained.

21  BY MS. UHLAND:

22  Q     With respect to the statements of financial affairs that

23  were filed with the Bankruptcy Court that you assisted in

24  preparing, do those indicate that -- and we may -- do those

25  indicate that the financial statements for New Century Mortgage

1  Corporation and NC Capital were distributed to third parties?

2  A    Yes.

3  Q    And can you describe generally the types of third parties

4  that received those based on the statements of financial

5  affairs?

6          MR. McDONALD:  Objection, Your Honor.  It's the same

7  objection.  What is the basis of the knowledge?

8          THE COURT:  Didn't he testify he had involvement in

9  preparing the schedules or amendments?  No, he didn't, just

10 that he had seen them.

11         MS. UHLAND:  He assisted in the preparation of the

12 statement of financial affairs and can testify as to what they

13 contain.

14         THE COURT:  Overruled.

15         MR. McDONALD:  Your Honor, may I be heard further?  I

16 guess, the question would be, do those schedules indicate to

17 which third parties they were distributed, because if that's

18 the basis of his knowledge and they don't indicate that, then I

19 would suggest he does not have personal knowledge as to whom

20 they were distributed.

21         THE COURT:  I thought he had, in essence, had

22 answered that question, but Ms. Uhland --

23         MS. UHLAND:  I can ask it again.

24 BY MS. UHLAND:

25 Q    Did the statement of financial affairs indicate to which

**J&J COURT TRANSCRIBERS, INC.**

1 third parties financial statements for NCFC and New Century

2 Capital were issued?

3 A    Yes.

4 Q    And you are familiar with -- are you familiar with those

5 statements of financial affairs?

6 A    Yes.

7 Q    And based on that, what types of entities are indicated in

8 the statement of financial affairs as being the types of third

9 parties that received New Century Mortgage Corporation's and

10 New Century Capital's financials?

11 A    They are state regulatory authorities, MRA counter parties

12 and whole-owned purchasers.

13 Q    I'd like to turn now to a slightly different area and that

14 is that we've discussed, or other witnesses have testified

15 which are intercompany claims and balances.  First question is,

16 in connection with the preparation of the schedules or the

17 collection of data, did you collect any information with

18 respect to intercompany balances?

19 A    Yes.  There was information that was extracted from the

20 general ledger and provided to the organization that compiled

21 the statement of financial affairs.

22 Q    Can you describe that process?  How were the intercompany

23 balances, what was the process through which you obtained the

24 information of the intercompany balances to put in the debtors'

25 schedules?

1 A    They were extracted from the general ledger and they were

2 organized in a way that they aligned the receivables and

3 payables by debtor entities in the spreadsheet and they were

4 provided to Crossroads.

5 Q    In connection with that process, did the debtors at any

6 point amend their schedules to alter the intercompany balances?

7 A    Yes.  It was later determined that there were some errors

8 in the compilation of those schedules on the original

9 statements and schedules and they were amended in approximately

10 February or early May -- or excuse me, early March of 2008.

11 Q    And what was your role in that process?

12 A    I was involved in reviewing the changes, understanding the

13 changes and preparing a summary of those changes.

14 Q    As the current -- and you are familiar with the current

15 schedules?

16 A    Yes.

17 Q    What is the current intercompany receivable, what is

18 NCFC's current receivable from NCMC -- I'm sorry, receivable as

19 of the petition date?

20         MR. McDONALD:  Objection.

21         THE COURT:  Basis?

22         MR. McDONALD:  Calls for expert testimony.

23 BY MS. UHLAND:

24 Q    As reflected in the debtors' schedules with which you're

25 familiar.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  You may answer.

2  BY MS. UHLAND:

3  A     The receivable is listed at 345 million, approximately

4  345 million.

5  Q     Is that the amount that is in the current schedules?

6  A     Yes.

7  Q     Did you, as part of the process of amending the schedules

8  or collecting data for the plan negotiations, did you

9  investigate, did you do any -- please describe any research --

10 did you do any research in connection with that process?

11 A     Yes, we made inquiries of what types of transactions were

12 included in those accounts, so the types of transactions in the

13 general ledger in those accounts.  I also reviewed an

14 extraction of data from the general ledger summarizing the --

15 with detail of the transactions in those accounts and then also

16 a summary of those transactions.

17 Q     What did those extractions indicate with what I will call

18 -- did those extractions indicate the gross amounts of the

19 number of transactions under gross amounts owing?

20 A     Yes.

21 Q     And what were those gross amounts?

22         MR. McDONALD:  Objection.  Calls for expert

23 testimony.

24         THE COURT:  Overruled.

25 BY MS. UHLAND:

**J&J COURT TRANSCRIBERS, INC.**

1  A    What is showed was transactions represented by, or

2  representing cash transfers from NCFC to NCMC of approximately

3  $786 million, cash transfers from back the other direction from

4  NCMC back to NCFC of approximately $415 million.  Also had some

5  other transactions related to charges for operating expenses

6  paid by NCMC on behalf of NCFC as well as interest on certain

7  of those balances.  And it also -- and the net of all that was

8  345, and then there's a corresponding adjustment, the other

9  relating to an adjustment made to the Carrington interest that

10 goes there as well.  So the 345, you have to factor in the

11 Carrington adjustment too, which gets the net balance down to

12 320 million.

13 Q    So can you maybe restate again what was in the general

14 ledger extract versus perhaps what was in the debtors' filed

15 amended schedules?

16 A    The general ledger extract shows 345 million and the

17 schedule as I recall, I recall that it has the 345, but it also

18 shows the adjustment of the 23 million on -- excuse me, the 20

19 million that gets it to the net of 320.  I believe they're

20 broken out separately is the point I'm making on the schedules.

21 I seem to recall they are.

22 Q    Let's hold that Carrington, that last adjustment you

23 mentioned aside for a minute and just review the other, some of

24 the other major receivables.  Is there a -- does NC Credit have

25 a receivable, a net receivable from NCMC?

1 A    Yes.

2 Q    And what is the, on the debtors' schedules, what is the

3 total amount of that receivable, the net amount?

4 A    Approximately 16.9 million.

5        THE COURT:  For purposes of the record, are we

6 referring to Ad Hoc Exhibit 9 at this point?  Ms. Uhland?

7        MS. UHLAND:  I wasn't referring to Ad Hoc Exhibit 9.

8        THE COURT:  The witness appears to be referring to a

9 document and I wasn't quite sure what he was looking at.

10       MS. UHLAND:  Oh.  He's referring to his declaration

11 which you're happy to have a copy of.

12       MR. McDONALD:  Your Honor, is it appropriate for the

13 witness to be testifying off of the declaration?

14       THE COURT:  Well, usually in the absence of

15 objection, I permit witnesses to have papers.  If there is an

16 objection, then I'll address it.

17       MR. McDONALD:  At this point I would object and

18 request that the witness testify from his memory rather than

19 from a document that's not been admitted into evidence.

20       THE COURT:  Any response?

21       MS. UHLAND:  Your Honor, I'm trying to, we have --

22 the information that we're discussing here is information that

23 if we were -- should be non-controversial information, sort of

24 a summary from the debtors' schedules, and I believe that the

25 declaration if made available, it has been made available,

1  they've had the copies of this declaration for, since Tuesday,

2  on these factual issues I don't believe they objected in their

3  motions to the factual balances contained in here, and to

4  facilitate this process and have the witness testify from this

5  declaration when they hadn't previously even objected to the

6  submission of those facts I find it a little troubling, I'm

7  just --

8            THE COURT:  All right.  Here's what we're going to

9  do.  I'm going to take a short break.  I'd like counsel to

10 confer.  If this concerns information that truly is not

11 disputed, let's take the shortcut, unless for some reason it's

12 really not necessary or appropriate to do that.  Take a short

13 recess.

14            MS. UHLAND:  Thank, Your Honor.

15                    (Recess)

16            MS. UHLAND:  Your Honor, Mr. Keach has really helped

17 us out here in this process and he has agreed that the

18 paragraphs that we were belaboring over, 29 through 35 of the

19 Brents' declaration may come in as direct testimony.

20            THE COURT:  Very well.  Twenty-nine through 35.

21 BY MS. UHLAND:

22 Q    Just a few more questions, Mr. Brents.  Back to the

23 general ledger that you described, approximately how many

24 entries are in the general ledger?

25 A    I would estimate that there are multiple millions of

                    **J&J COURT TRANSCRIBERS, INC.**

1  entries going all the way back to 1997.

2          MS. UHLAND:  I have no further questions, Your Honor.

3          THE COURT:  All right.  Committee have any questions?

4          MR. POWER:  No, Your Honor.

5          THE COURT:  All right.  Cross examination.

6          MR. McDONALD:  Yes, Your Honor.

7                       CROSS EXAMINATION

8  BY MR. McDONALD:

9  Q    Good morning, Mr. Brents.

10  A    Good morning.

11  Q    Just a little bit of followup here.  On your direct

12  testimony, you discussed the work that your team did in

13  analyzing the assets of the various entities involved in this

14  proceeding, correct?

15  A    Yes.

16  Q    And you and your team worked together to attempt to

17  reconcile the inter-company balances, correct?

18  A    I wouldn't characterize it as reconcile, I would

19  characterize it as understand.

20  Q    Okay.  And you and your team did that, correct?

21  A    Yes.

22  Q    Now you also testified that you and your team assisted in

23  the preparation of the statement of affairs of the debtors,

24  correct?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And the preparation of the debtors' schedules, correct?

2  A    Yes.

3  Q    And the work that you and your team did in attempting to

4  understand the assets and liabilities of the companies and the

5  inter-company balances, that work went into the preparation of

6  amended schedules on behalf of the debtors, is that right?

7  A    Yes.

8  Q    Okay.  And those schedules were filed in March of this

9  year, isn't that right?

10 A    Yes.

11 Q    Now you've personally reviewed the amended schedules,

12 correct?

13 A    Yes.  Yes.

14 Q    And you understand those schedules to be accurate,

15 correct?

16 A    Yes.

17 Q    And you understand that those schedules were filed and

18 signed under oath under penalty of perjury by your partner at

19 AlixPartners, Jamie Lisac?

20 A    Yes.

21 Q    And isn't it true that the amended schedules that were

22 filed by the debtors in this case take into account any

23 uncertainties with respect to the ownership of the Carrington

24 interests and the Rabbi Trust?

25 A    Those schedules incorporate an adjustment to the

1  inter-company balances for the ownership of that interest.

2  Q    And in whose name are those interests on the amended

3  schedules?

4  A    The inter-company balances reflect the inter-company

5  impact of that being owned, of those interests being owned by

6  NCFC.

7            MR. McDONALD:  I have no further questions at this

8  time, Your Honor.

9            THE COURT:  Redirect?

10                    REDIRECT EXAMINATION

11 BY MS. UHLAND:

12 Q    Mr. Brents, did the schedules amendment that you just

13 referred to amend any statements of assets or description of

14 assets other than inter-company claims?

15 A    No, they did not.

16 Q    Did they amend -- do you know where the debtors' schedules

17 indicated the title of the Carrington interest?  Which debtor

18 on its Schedule B lists the Carrington interest?

19 A    TRS Holdings.

20 Q    And which debtor on Schedule B lists the Rabbi Trust?

21 A    NCFC.

22 Q    And the amended schedules that were just referred to, what

23 asset or liability of the debtors is amended?

24 A    Could you restate that question please?

25 Q    Actually, why don't you look at Ad Hoc Exhibit 9A.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Okay.  Okay.

2  Q    If those reviewing -- are these the amended schedules that

3  you were just referring to in your cross examination?

4  A    Yes.

5  Q    And with respect to New Century Financial Corporation,

6  what is amended in its schedules?

7  A    Schedule B16 is amended to reflect an adjustment to the

8  inter-company balance and Schedule F is amended to reflect an

9  adjustment in its unsecured claims and specifically to the

10  claims of the inter-company liabilities, inter-company claims.

11  Q    So after giving effect to the schedule amendment, what do

12  the schedules provide with respect to the ownership of the

13  Carrington interest?

14         MR. McDONALD:  Objection.  Calls for expert

15  testimony.

16         THE COURT:  Overruled.  You may answer if you're

17  able.

18  BY MS. UHLAND:

19  A    I would characterize it as the inter-company balances

20  reflect the impact of those interests being held at NCFC.

21  Q    And on which debtor, as the schedules are in effect today,

22  which debtors is Schedule B contains the Carrington

23  investments?

24  A    Well, the inter-company impact is reflected on the

25  Schedule B of NCFC.  The original Carrington interests that was

1  on B, I forget exactly what reference it was on B for the TRS

2  Holdings, this still remains on that entity's schedules, i.e.

3  TRS Holdings.

4           MS. UHLAND:  I have no further questions.

5           THE COURT:  Any recross?

6           MR. McDONALD:  Nothing further, Your Honor.

7           THE COURT:  Thank you, sir.  You may step down.  Did

8  the plan proponents have any more evidence to submit in support

9  of plan confirmation?

10          MR. LOGAN:  No, Your Honor.

11          THE COURT:  Do any of the objectors have any evidence

12  to present in support of their opposition to plan confirmation?

13          MR. KEACH:  No, Your Honor.  The Ad Hoc Committee

14  rests.

15          THE COURT:  Nothing from New York Teachers?

16          MR. ETKIN:  No evidence, Your Honor.

17          THE COURT:  All right.  Thank you.  Is it now

18  appropriate to move to a closing argument?

19          MR. LOGAN:  Thank you, Your Honor.  Before I get into

20  the details of the matters that have been discussed and briefed

21  extensively, I think it's appropriate for us all to step back

22  and reflect on where we are today and where we started one year

23  and 23 days ago.  On April 2nd, 2007, the New Century debtors,

24  other than access lending filed what's been reported to be the

25  ninth largest Chapter 11 case ever filed in the United States.

**J&J COURT TRANSCRIBERS, INC.**

1  It was reported to be the largest case of 2007.

2          It was a very complicated case involving a very

3  complex capital structure with many legal issues that needed to

4  be sorted out involving issues that were new to the bankruptcy

5  code in 2005, involving issues regarding extremely complicated

6  accounting issues, involving a capital structure with creditors

7  that had variable rights across the debtors and based upon

8  various legal entitlements they had under state and federal

9  bankruptcy law.

10          It is, if I may be permitted, phenomenal that in the

11  course of one year and 23 days, this case has resolved

12  essentially every dispute that arose concerning the plan

13  process with one exception.  I wish it had resolved all, but I

14  think it's quite a strong testament to the professional

15  integrity, the instructive attitude that was reflected by the

16  parties in this case.  And I extend that to the professionals

17  for the Committee, for the various creditors we dealt with, my

18  friend and colleague Ms. Uhland, the people of the debtors, Ms.

19  Etlin told me that I should say that the professionals should

20  get a medal, that's why I just said that.

21          But let me just add a personal note.  She should get

22  a gold medal.  Mr. Power chortled at one point during her

23  proffer when I mentioned that she drove the professionals.  He

24  chortled because that's an understatement.  But for her

25  personal drive and personal not soft-spoken effort to make sure

1  that we arrived at this point, cut the running of the

2  administrative costs no matter how they're allocated, they're

3  substantial, and arrived at a fair resolution, fair settlements

4  of the multitude of issues that affected these cases and the

5  creditors with which we are dealing, I don't know where we

6  would be.  And I think it is quite a testament to her as well

7  as the other professionals involved that we are where we are

8  today.

9         The plan is complicated.  It is complex, and I'll

10 turn to whether or not it's substantive consolidation shortly.

11 But, I think we all need to recognize that no matter how one

12 characterizes it, it involves a multitude of settlements, and

13 they're complicated settlements.

14         THE COURT:  I'm sorry to interrupt, Mr. Logan.  This

15 is Judge Carey, I hear noise coming from the telephone

16 connection.  Let me ask that all participants please make

17 certain that their phones are on mute.  Thank you.  Mr. Logan.

18         MR. LOGAN:  Thank you, Your Honor.  The plan involves

19 settlements.  There's no dispute about that.  One might, if one

20 were the Ad Hoc Committee of deferred compensation creditors,

21 claim that these are settlements that affect substantive

22 consolidation, we fervently disagree, and I'll turn to that in

23 a minute.  But nobody questions the fact that there are a

24 multitude of settlements incorporated in the plan.  Therefore

25 we start, as Your Honor pointed out, with probably an overly

**J&J COURT TRANSCRIBERS, INC.**

1  complicated list of factors the Courts look at, and quite

2  frankly, Courts have a -- no offense -- have a tendency to

3  distill common sense as lawyers do into a rigorous set of

4  factors.  But they're common sense.  They are common sense as

5  to whether or not a settlement is fair.  And the standard which

6  Courts have uniformly adopted is not whether it's the best

7  possible settlement from the parochial vantage point of one

8  group or the best possible settlement from another group, but

9  rather whether the settlement falls below the lowest point in

10  the range of reasonableness.  Those are the words expressed by

11  the Court in the W.T. Grant case, 1983, and which have been

12  adopted uniformly by Courts everywhere including Your Honor.

13         The test is not, therefore, whether or not there

14  could be a better EPD and breach protocol.  I personally would

15  disagree with that contention.  There's also the test is not

16  whether there could be a better allocation of administrative

17  expenses.  The test is not whether there could be a better

18  grouping of debtors.  The test isn't whether there could be a

19  better way of handling claims where debtors, multiple debtors

20  are jointly and severally liable.  The test is, do these

21  settlements, particularly as they are integrated into a

22  cohesive whole fall below the range of reasonableness, and

23  that's the test that we need to apply.

24         There's one factor in assessing settlements that Your

25  Honor articulated in the Exide case that I want to emphasize in

1 particular, and that is the support of the creditors, the

2 people whose money is at stake.  And as Your Honor pointed out

3 in the <u>Exide</u> case, that warrants particular, particularly

4 strong weight.  Again, reflecting the common sense wisdom, that

5 the people whose oar is in the water ought to be heard and hear

6 the voting results and the lack of any substantive objections

7 to the plan, save one, speak volumes.  The one objecting group

8 we have are people who have rights that they will litigate in

9 the adversary proceeding.  The plan will not stop the adversary

10 proceeding.  And if they prevail, this is not in the rest of

11 the top hat -- it's not a top hat plan, their rights will

12 follow.

13         And that is a risk that the other constituents in the

14 case have opted to take.

15         THE COURT:  Well, let me ask this.

16         MR. LOGAN:  Sure.

17         THE COURT:  What if any of the issues that are still

18 open in the adversary in the debtors or in the plan proponents'

19 view need to be decided in connection with confirmation?

20         MR. LOGAN:  Your Honor, I think there's only one, and

21 I think that their argument that assuming that they lose on the

22 top hat issue, nonetheless are assets that are in the deferred

23 compensation trust, the Rabbi Trust, restricted to what they've

24 called general, unsecured creditors of NCFC, I think that's the

25 sole issue.  And, Your Honor, I should have mentioned this at

1 the outset, but Ms. Uhland and I will divide the argument on

2 this and she will address that particular issue.

3            THE COURT:  Okay.

4            MR. LOGAN:  But I think that's the only issue that's

5 at issue in the adversary proceeding that would remain -- that

6 needs to be dealt with in the context of the plan.

7            Turning back to the Exide factor and the votes of

8 creditors, this plan received extraordinarily strong support.

9 Most of the classes voted either 99 percent or something -- in

10 many cases 100 percent.  I was particularly gratified because

11 of my personal involvement in the EPD/Breach Protocol that

12 those classes voted 100 percent to support a fairly novel, out

13 of the box solution that I think really ought to save the

14 estate substantial resources.  The only class that voted no

15 nonetheless voted overwhelmingly in dollar amount in favor of

16 the plan, and that included affirmative votes from major

17 creditors as we heard today who have claims only against NCSC,

18 Kodiak which has about a $90 million claim, and the McGuire

19 landlord, I don't remember the amount of the claim, but it's

20 substantial and substantial enough to get them on the

21 Committee.

22            Trade creditors voted in favor of the plan.  MRA

23 claimants voted in favor of the plan in their capacity of NCFC

24 creditors.  We got 203 negative votes out of that class, which

25 is the reason that class did not meet the numerosity test.  As

1  Ms. Etlin testified, 200 out of the 203 were cast by deferred

2  compensation beneficiaries.  They're free to vote that way,

3  that's absolutely in their interest and we understand that they

4  need to look out for their parochial interest.  But as the

5  Court weighs the views of creditors to these settlements, the

6  vast, the overwhelming majority of creditors in dollars and an

7  amount are strongly, strongly behind this plan.

8       Let me turn then to some of the settlements that are

9  built into this plan.  And as I go through the articulation,

10  I'm going to have a hard time doing it, because we've all had a

11  hard time pigeon holing the settlements.  They're interrelated

12  and various labels that the plan proponents, particularly Mr.

13  Parlin who I'd also give kudos for doing a lot of the detail

14  drafting the plan document, had to come up with labels for

15  these protocols, for these settlements.  And the problem is

16  that they cannot be looked at in isolation, and some of them

17  don't even have labels.  Let me see if I can articulate many of

18  them, or the key ones.

19       We talked a lot and heard evidence today and

20  yesterday about where various assets reside.  That was not a

21  simple question with respect to many of the key assets.  The

22  litigation proceeds, for example.  As the testimony indicated,

23  separate stand alone financials were delivered to a multitude

24  of parties for NCMC and NC Capital, and those are the entities

25  that had the accounting issues that were at the heart of the

1  financial restatement.  And ergo, creditors with claims against

2  those two operating company debtors strenuously argued that

3  they should be the principal recipients of any litigation

4  proceeds.  They also pointed out that any preference actions

5  are largely, not exclusively, but most preference actions will

6  be preference transfers by NCMC, and ergo again, they should be

7  the principal recipient of litigation proceeds.

8            Creditors at the holding company levels, the public

9  company creditors, strenuously argued exactly to the contrary.

10 These were financial statements filed by NCFC.  It is the

11 public company, it filed statements with the SEC, and on a

12 consolidated basis, it included the litigation, the issues that

13 give rise to most of the litigation or prospective litigation.

14 That was compromised, but it was compromised in a fashion where

15 the rights or the claims of the creditors of NC Capital

16 Corporation, the green box, middle card down on the left, were

17 given significant weight because that is the entity that had

18 the reserves, the accounting reserves on it as well as many of

19 the valuations of the corporation -- excuse me, of the loans

20 that were repurchased from loan purchasers.

21            But that was tied with the fact that they thought the

22 EPD/Breach Protocol understated the value of their claims.

23 That was tied to the fact that they thought that the issues

24 between NC Capital Corporation and NC Mortgage Corporation as

25 to whether or not NC Capital Corporation has a substantial

1  inter-company claim related to the fact that NC Mortgage

2  Corporation sold loans to MC Capital Corporation.  But by and

3  large, it was NC Capital Corporation, essentially a shell, then

4  sold the loans on the secondary market.  Should nonetheless

5  there be an inter-company claim between those two entities.

6  That was all part of an integrated compromise by the inter-

7  company claim between NC Capital Corporation and NC Mortgage

8  Corporation is allotted in the plan at 50 percent.  Excuse me,

9  I misspoke.  It's not allotted 50 percent.  And as Ms. Etlin

10 testified, one can get to the same result economically by not

11 allowing an inter-company claim, but by adjusting the

12 distribution amount.  The distribution amount available for

13 creditors with claims against NC Capital Corporation are

14 adjusted by 50 percent to reflect that.

15         The Carrington interest.  I'm not going to go through

16 the elaborate detail as to which entity signed various

17 documents at various points in time or where it appeared on the

18 balance sheet other than to note that there's a lot of

19 confusion.  In particular, if one wanted to sort through that

20 in detail, one would need to pay particular attention to the

21 fact that the limited partnership interest is more valuable

22 than the general partnership interest, and many of the

23 documents that the Ad Hoc Committee relies upon most

24 strenuously or focuses on deal with the general partnership

25 interest.  The truth of the matter is that no one in this

1    courtroom knows exactly where the Carrington interests resides,

2    and no one would know without a judicial determination as to

3    where it resides which would, notwithstanding Mr. Keach's

4    efforts to say it would be a very simple process with

5    stipulated facts, I strongly disagree.  If we really wanted to

6    litigate that issue, we would have to have a trial with delving

7    into what the intentions of people were at the time of the

8    creations of the REIT, for tax reasons with certain assets left

9    at one entity, which is not a REIT and moved to others.  Those

10   are the sort of things that if people really wanted to go to

11   the mats about, would need to be fully litigated.  And if that

12   were fully litigated and it were determined a particular way,

13   one would have to keep in mind that that affects a host of

14   other compromises built into this plan.

15          Same thing with the Rabbi Trust.  I had great fun

16   showing the adversary complaint that Mr. Keach filed.  And I'm

17   sure he's going to say that that's a typographical error.

18   Maybe it was, but I think it does illustrate the fact that

19   people use the names of these corporations in a fairly cavalier

20   fashion.  And while he may have prepared a complaint that

21   identified the holder of the Rabbi Trust to be an entity that

22   doesn't even exist, he correctly pointed out that my eyesight's

23   not the best, my hearing's even worse, and that in his prayer

24   for relief, he sought relief against a company that he did

25   carefully define, and that was TRS Holdings.  That's the entity

1  that he claims doesn't hold that interest.

2          Your Honor's decision rendered the other day pointed

3  out that that was undoubtedly was an error in their prayer for

4  relief.  And beyond how we phrase the adversary proceeding,

5  there are issues as to whether TRS Holdings or NCFC owns the

6  Rabbi Trust, and certainly there's a distinction between the

7  trust assets themselves, the Trust, where there's $46 million

8  approximately residing, and the plan.

9          But with respect to both Carrington and the Rabbi

10 Trust, let's also step back and remember that even if we did

11 sort out through litigation where those assets legally reside,

12 that doesn't end the inquiry.  For if they were moved legally

13 from TRS to NCFC, the Committee was crystal clear that that may

14 be an invalid transfer.  What consideration was paid by NCFC to

15 move an asset, if in fact it was moved?  And at the time, as

16 the testimony that fortunately got in through a somewhat

17 expedited process at the end illustrates, there was a very

18 substantial receivable, approximately $240 million, owed by TRS

19 to NCMC, and the creditors of NCMC have a very legitimate

20 argument resolved in the plan, but a very legitimate argument

21 that if any transfer from TRS to NCFC in fact did occur, it was

22 improper, it could be set aside.  They had claims, they're the

23 beneficiaries of a substantial inter-company claim NCMC had

24 against TRS and they should not be disabled from getting the

25 benefits of that claim simply because arguably, not certainly,

**J&J COURT TRANSCRIBERS, INC.**

1  but arguably, some assets were moved from TRS to NCFC.

2         And that's particularly true when as the evidence

3  showed, one focuses on the fact that the investment in

4  Carrington was funded by NCMC as Mr. Brents' declaration and

5  other evidence indicated, that's the source of at least a part

6  of the $240 million payable owed by TRS to NCMC.  And it's

7  particularly appropriate also when NCMC funded the Rabbi Trust

8  and it's also particularly appropriate when NCMC paid to the

9  party and employees their claims to proceeds out of the Rabbi

10 Trust, thereby generating a part of the inter-company account.

11         That's part of the set of compromises.  Other

12 compromises that we never even came up with a name for include

13 the weighting factors, the deemed distribution amounts.  Just

14 by way of illustration, NCMC has a -- excuse me -- NC Capital

15 has an adjustment of 50 percent in the distribution amounts for

16 creditors of NC Capital reflecting the uncertainty regarding

17 the inter-company account between those two debtors.  We paid

18 precious little attention to it because it's not at all in

19 controversy, but Home123 and all of the green boxes that are

20 lower on the chart below Home123, NCS, a holding company, NCR -

21 - New Century REO Corporation, New Century REO III, et cetera,

22 et cetera, the plan provides the creditors of those entities

23 get a deemed distribution amount of 25 percent, and that

24 reflects the fact that they had lesser legal rights to the pool

25 of assets available for creditors.  That is a full and fair way

**J&J COURT TRANSCRIBERS, INC.**

1  of dealing with these sort of very complicated issues, and

2  quite frankly, save the estates substantial money, substantial

3  money over what would be required if we had a true, if we had

4  to litigate every issue of every debtor and every creditor on a

5  purely stand alone basis.

6              What we called the interclaim company protocol is a

7  little bit of a misnomer because it deals only with the inter-

8  company claims between the yellow group of companies and the

9  green group of companies, and as I've indicated before, there

10 are many other inter-company claims that entered into the mix.

11 For example, Mr. Brents testified there's a $419 million that

12 NC RES IV, Residential IV, which is one of these yellow

13 companies in the middle, has against NCFC.  They're creditors

14 of NC RES IV.   Morgan Stanley, for example, has an MRA claim

15 against NC RES IV, it relates to the fact that Morgan Stanley

16 financed the residuals that were sold in the Morgan Stanley

17 option.   And a fair resolution -- Morgan Stanley had some

18 fairly substantial rights if they really wanted to press --

19 don't listen to this, Jeff -- if they really wanted to press

20 their claim against NC RES IV, because it had a substantial

21 claim against NC Financial Corporation on account of that

22 account receivable.   That is factored into the calculus and

23 creditors other than Morgan Stanley of NC Financial Corporation

24 get a substantial benefit.

25              There are a multitude of other inter-company claims

1    that I'm not going to go through the painful process of

2    identifying them, but they entered into the calculus of any

3    number of the settlements in the plan, including the weighting

4    factors I mentioned a few minutes ago.

5         The multi-debtor protocol, or what we call the

6    multi-debtor protocol was designed to deal with the fact that

7    creditors who have joint and several claims against a multitude

8    of debtors have enhanced rights.  They have enhanced rights

9    because they could recover on their claim against the assets of

10   each one of those debtors.  The sin that the Third Circuit

11   found in <u>Owens Corning</u> to be, one of the sins they found to be

12   fatal was the fact that such factors were not taken into

13   account in that plan.  They are here.  And it was a plan that

14   was resolved and negotiated with the creditors who have

15   multiple claims against the debtors, joint and several claims,

16   and the resolution that was agreed to by all the constituents

17   with a stake in the issue was that they should have an enhanced

18   distribution, 130 percent, if they had multiple claims against

19   certain debtors, and they're identified in the plan.  In the

20   case of the holding company debtors, they had to have a claim

21   against both NCFC and NC Credit, and that was because NC Credit

22   does have substantial resources.

23        In the case of the green debtors, they had to have

24   claims against Home123, New Century Mortgage Corporation and NC

25   Capital Corporation, which again are the debtors with the most

1   substantial resources, and that was a compromise that was

2   resolved after painstaking work with the Committee and

3   professionals for the debtors.

4         What we've labeled inter-company claim protocol

5   relates to inter-company claims between the yellow group of

6   companies and the green group of companies.  As Ms. Etlin

7   testified, the substantial inter-company claims were perpetual.

8   And particularly when they are held by a parent entity against

9   a subsidiary entity, one can very credibly argue that those are

10  in fact equity contributions, that's what the Third Circuit

11  identified or discussed in the <u>SubMicron</u> case we discuss in our

12  brief.  And that's an issue that we inherently had to deal

13  with, and it is dealt with in the plan, it's dealt with in the

14  plan by a very circular calculation where inter-company claims

15  that the green companies have against the yellow companies are

16  honored at 100 percent of their values, but the yellow company

17  creditors were successful in arguing that their inter-company

18  claims against the green company companies should be allowed at

19  least at 50 percent.

20        The EPD/Breach Protocol.  I wish somebody actually

21  raised this because it would give me a chance to talk about it

22  in greater detail, but it is a very innovative compromise that

23  Ms. Etlin testified, and this is part of the declaration --

24  bless you -- that stayed in the evidence, she estimates saved

25  the estates $5.8 million.  It's a simplified structure, it

1  resolves hundreds of millions of dollars of claims in a fashion

2  that I quite frankly hope the other subprime debtors pick up.

3  We should have copyrighted it and maybe we could have realized

4  more for this estate.  But it is a very, very valuable means of

5  minimizing the administrative costs for these estates and

6  resolving claims.  But it had an impact.  It was painful.  It

7  had an impact on the parties asserting EPD and breach claims.

8  It was painful.  And I can personally testify to a lot of the

9  pain.  To walk those parties through the protocol, and while

10 they accepted generally the concept that a streamlined process

11 of this sort would save them all money, it would increase the

12 assets to be distributed to the creditors, they all had a

13 parochial interest in getting the number as high as possible.

14 And that's one of the reasons we reached out to them.

15      The concept of developing a protocol was one that a

16 number of professionals can take credit for, but the actual

17 numeric values was not something that any professional could

18 arrive at in the abstract.  We required substantial industry

19 data and we got it.  We required substantial negotiations of

20 parties who are not on the Committee, and we got it.  May of

21 them thought that the numeric result that's generated by the

22 protocol is fair among the EPD and breach claimants because

23 after all, if we come up with a higher number, their pro rata

24 share stays constant, assuming that they don't have a pool of

25 loans that has peculiar characteristics and parenthetically we

1  had to get into a lot of that.  But they were not in agreement

2  and we had a very divergent interest as to how that affected

3  their class vis a vis other classes.  And if it understated the

4  value of their class, for example, we estimate that the EPD

5  Breach claims will roughly hit about $500 million, if they

6  thought that number was too low, they had every economic

7  interest in the world to try to negotiate a higher number or

8  extract something else in the multitude of interrelated

9  compromises that are part of this plan.  And that's exactly

10  what happened.

11          That factored into the allocation of administrative

12  costs, as the evidence showed.  It factored into, as the

13  evidence showed, the allocation of litigation proceeds.  It

14  factored into the multi-debtor claim protocol for the EPD

15  Breach claimants don't qualify at least to my understanding, we

16  haven't identified anybody who has joint and several claims

17  against the qualifying debtors.  And it was all part of a very

18  integrated compromise.  And a compromise, Your Honor, that I

19  think has generated a plan that fairly and fully, maybe not

20  perfectly, but fairly and fully allocates economic interest to

21  correspond with competing claims and legal rights.  And does so

22  in a fashion that is well, well within the range of

23  reasonableness.

24          Which brings me to substantive consolidation.  The Ad

25  Hoc Committee asserts that this complex maze that we call the

1  plan affects substantive consolidation.  I want to step back

2  for a few minutes before I turn to their arguments and reflect

3  on a number of features of the plan.

4       The debtors and the Committee understood that the

5  plan has to meet the confirmation standards of 1129 and achieve

6  the required voting requirements debtor by debtor.  Substantive

7  consolidation does not do that.  It meshes the debtors

8  together, effects a merger.  We would not have gone through the

9  very substantial efforts of creating the multitude of classes

10  that are set forth in this plan.  I don't even have a, I didn't

11  think to count them up before the argument, but there are a

12  multitude of those classes.  And the voting declaration goes

13  down painstakingly, painstakingly debtor by debtor to insure

14  that the plan meets the confirmation standards of 1129 with

15  respect to each debtor.

16       In addition, Plan Section 5E provides that if the

17  plan may not be confirmed with respect to any particular

18  debtor, it may be severed out.  We realized that there was a

19  risk, that we may not get the requisite votes for a particular

20  debtor.  We started the hearing yesterday talking about the

21  access lending debtor.  That one, quite frankly, was fairly

22  high risk unless we had reached a deal with Goldman Sachs.  But

23  it's not, the provision of the plan is not unique to access

24  lending.  This plan provides that confirmation standards must

25  be measured for each one of the colored boxes on that chart.

**J&J COURT TRANSCRIBERS, INC.**

1 We must achieve requisite votes, we must achieve the other
2 standards of 1129.  And I think before we get into any of the
3 details, we have to recognize the fact that that is inherently
4 not substantive consolidation.

5          THE COURT:  Let me ask you this.

6          MR. LOGAN:  Sure.

7          THE COURT:  Just to pick an illustration that is
8 prelude to a question that's occurred to me as I've sat here
9 and listened to the testimony and after having reviewed the
10 submissions of the parties, Mr. Star testified when asked what
11 was his definition of substantive consolidation he said, and I
12 think what typically we all might in a general way agree, he
13 said, well, it involves a pooling of assets, expenses and
14 claims, a zeroing out of inter-company obligations and an
15 elimination of guarantees, in its simplest form.  But the
16 question that occurs to me is, how do you determine whether the
17 plan proposes substantive consolidation?  Do you look at its
18 form, which follows the definition that Mr. Star articulated or
19 do you look at its effect?

20          MR. LOGAN:  I think the latter, Your Honor.  And I
21 would actually disagree with whether or not this plan fits the
22 form.  The form, as I had mentioned before, is structured
23 debtor by debtor, has to be confirmed debtor by debtor.  The
24 Court addressed this exact question in <u>Winn-Dixie</u>.  And it's
25 not by accident that we focused on <u>Winn-Dixie</u>.  As Ms. Etlin

1 testified, she was the turnaround advisor to Winn-Dixie.

2        I think it's absolutely appropriate between debtors,

3 take any example you want, Home123, and New Century Mortgage

4 Corporation, for them to pool assets but effect the relative

5 rights of creditors against those two entities by adjusting

6 their deemed distributions amounts.  The court in Winn-Dixie

7 called that the substantive consolidation compromise and the

8 court was clear, it's not substantive consolidation, it's a

9 compromise of issues that might be litigated in the form of

10 substantive consolidation, but quite frankly, I think that's a

11 mis-articulation of the standard.  It's not a question of

12 whether or not we could have tried to effect substantive

13 consolidation, in the typical legal sense the bankruptcy courts

14 deal with, which is really, I think your articulation was fair.

15        The better question is, how did we take into account

16 the legal rights that differ as to whether or not a creditor

17 has claims against a particular debtor, or other debtors, how

18 do you take into account the fact that there are guarantees and

19 how do you take into account the fact that there are

20 inter-company claims?  And, there are an infinite number of

21 ways to deal with it and that's why I talked about the

22 compromises sometimes not having labels.  They're deemed

23 distribution amounts, for example, of creditors of a particular

24 entity that are either adjusted up or down.  And that's to

25 reflect the fact that they have different legal rights and

1 while it may be efficient to resolve a host of legal issues and

2 factual issues to pool assets for purposes of distribution,

3 these entities are not merged, they're not substantively

4 consolidated.  Different rights, inter-company claims, multiple

5 debtor claims, joint and several claims, the fact that some

6 parties have claims against entities that are more insolvent or

7 less insolvent than others, are all taken into account and

8 that's the effect, I think it's the effect.  Otherwise, we

9 engage in an exercise of labels, of labels and with all due

10 respect to Mr. Keach, for whom I have enormous respect, a lot

11 of the cross examination was directed to trying to have Mr.

12 Star or others adopt a particular label.  Frankly, that's not

13 the test.  The test is, have these entities -- does this plan

14 propose a result where the separateness of these companies is

15 ignored, does this plan propose a distribution where the

16 relative rights of the creditors against these different

17 entities are ignored, does this plan propose a distribution

18 where the inter-company claims among the various debtors, the

19 complex maze that exists, are ignored and the answer to every

20 one of those questions is a resounding no.  And, it's a

21 resounding no, in part, because of the good offices of Mr.

22 McMahon.  He appointed a Creditors' Committee that included

23 representatives of entities throughout this capital structure.

24      The committee included two creditors with claims only

25 against NCFC and who had every interest to look out for the

1  interests of creditors of NCFC.  And dealing with the committee

2  was both painful, but extraordinarily beneficial.  We knew that

3  we had to reach out beyond the committee to some of the

4  EPD/Breach claimants but we had to reach out less than is often

5  the case because this committee really did represent a cross

6  section of the interests involved in the case and they weren't

7  going to let anybody override the parochial economic interests

8  of creditors against one of the individual debtors, including

9  the rights reflecting the assets and liabilities and the types

10  of claims.  And that included creditors who had economic

11  interests that are totally aligned with the defined beneficiary

12  -- deferred compensation beneficiaries assuming that they lose

13  in their adversary proceeding litigation which has got to be

14  our assumption because if they win, as Mr. Keach pointed out in

15  his objection to the plan, this is all totally irrelevant.

16           Your Honor, just briefly on Owens-Corning.

17           THE COURT:  Before you move on.

18           MR. LOGAN:  Sure.

19           THE COURT:  So, what the debtor here is saying is

20  that the framework avoids what one of the evils of substantive

21  consolidation is something said to be and that is the imposing

22  a rough justice on the variety of interests that exist in a

23  Chapter 11.

24           MR. LOGAN:  I would phrase is very slightly

25  differently, Your Honor.  I think substantive consolidation

1  imposes a grossly homogenous result.  Substantive consolidation

2  by definition defines that every creditor against every

3  entities rights are absolutely equal and ignores the fact that

4  some creditors bargain for joint and several liability.

5          I think the Third Circuit got it right in

6  Owens-Corning, plus they are the Third Circuit, so we're

7  definitely going to follow them.  But I think they got it

8  right.

9          THE COURT:  I always assume they're right.  But, on

10  one level, and I don't presume to put myself through what

11  thought processes the judges there went through, but on one

12  level, it seems to me it was an easy case.  The plan was

13  designed in part to strip a bank of the benefits of its

14  guarantees.  I don't know what was so difficult about deciding

15  that was a bad thing.

16          MR. LOGAN:  I agree.

17          THE COURT:  And, again, not to over simplify the

18  situation.

19          MR. LOGAN:  Not only that, but I also thought deemed

20  substantive consolidation is a weird fiction that you merge for

21  the purposes of a plan and then you spring back to separate

22  entities.

23          THE COURT:  Well, whatever you call it, it's not an

24  uncommon practice.

25          MR. LOGAN:   I know it's not.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  And, normally, or many times, there's no

2    objection on that basis.  So, we might not see a lot written

3    about it.

4          MR. LOGAN:  You and I are starting to get a little

5    philosophical here but just one further indulgence on that.

6    That's right.  And, a lot of the cases that talk about this

7    being a rare and special remedy ignore the fact that quite

8    often the compromise is to affect substantive consolidation.

9          Here, that would have been inappropriate, it really

10   would have been inappropriate.  We had different legal entities

11   that had different assets and different liabilities and

12   different creditors with different rights and inter-company

13   claims and if we had proposed a substantive consolidation plan,

14   it would have been a lot shorter, the voting results would have

15   been a lot simpler to analyze, it would have been far simpler

16   to negotiate with the Creditors' Committee, but that is not

17   what this plan is.  It is a plan that is very complicated and

18   very complex because we didn't try to do what the Third Circuit

19   found evil in Owens-Corning.

20         We used as a model the Winn-Dixie case, and as the

21   court said in the Winn-Dixie case, this is a settlement, this

22   is a settlement of inter-company, inter-creditor issues, is

23   probably the best way to phrase it, as opposed to a substantive

24   consolidation compromise, it's a settlement.  And it's a

25   settlement that reflects those legal rights in a fashion that

1  I'm proud to have been a part of because I think it falls --

2  it's so far above the lowest point of reasonableness that I

3  can't articulate it fully.  It is a full and fair compromise.

4         Your Honor, we're not going to go through the other

5  elements of 1129, we'd be happy to address them if you've like,

6  but, for example, we do acknowledge that with respect to NCFC

7  we have to satisfy the 1129(b) cram down standard, but that is

8  extremely easy.  There are no distributions going to equity

9  holders of NCFC, which is the only class junior to the class

10 that rejected by Numerosity.  And, there are no other classes

11 in NCFC other than the special deficiency class or MRA

12 claimants of which now there resides a single entity which is

13 Deutsche Bank, excuse me, DB Structured Products.  That special

14 class is the result of a compromise Your Honor approved, well,

15 approximately nine months ago, with Deutsche Bank where they

16 agreed to take a claim of $20 million that would share only in

17 litigation proceeds.  Ergo, their treatment is inferior to the

18 claims, the treatments for the other creditors of NCFC and we

19 satisfied the standards of 1129(b) and, indeed, Mr. Keach has

20 never argued to the contrary.

21        We can go through the other elements of 1129 but I'd

22 really rather not belabor it and I think either -- I would

23 propose at this point, I yield the lectern to my friend and

24 partner Ms. Uhland, to deal with the one remaining issue that I

25 think does reside in the adversary proceeding.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right.

2           MS. UHLAND:  Your Honor, the remaining issue is the

3    argument made by the Ad Hoc Committee that, it's really almost

4    sort of a two part argument, that the plan fails because the

5    Rabbi Trust proceeds must be distributed and are limited to

6    their distribution to the general unsecured creditors of "NCFC"

7    and for that argument, Your Honor, they cite to the Rabbi Trust

8    agreement which the Court may refer to, is their Ad Hoc Exhibit

9    7, I believe.

10          THE COURT:  I know what it says.

11          MS. UHLAND:  Your Honor, as we've developed over the

12   course of the day, there's -- the first issue we have in

13   connection with this argument, is that the NCFC referred to in

14   the Rabbi Trust agreement is, in fact, TRS Holdings and there

15   has been no amendment that was located by the company to the

16   Rabbi Trust plan or any other evidence that the Rabbi Trust

17   assets were transferred from TRS Holdings to New NCFC or

18   current NCFC.

19          As Mr. Logan outlined, we don't know today whether

20   that happened and whether assets may have been left

21   intentionally at New Century TRS Holdings.  TRS, Your Honor,

22   stands for taxable REIT subsidiary.  This was left as a tax --

23   the C corp was left as a C corp and many of the transactions we

24   must assume, may have been intentional.  But in any event, we

25   have no assignment, or notification of assignment or amendment

1  of this trust document.

2          I would point the Court -- I think there may be sort

3  of an assumption based on the fact that the plans were

4  transferred, which we know they are, and the debtors agree, the

5  other documents that the debtors representatives have looked

6  it, indicate that the plans, in fact, are at NCFC.  That's

7  where the debtors scheduled those claims and that's where most

8  of the plan participants filed their claims.

9          And, there may be an argument that it may seem just

10 inequitable to split the Rabbi Trust assets from the plan

11 participants and that they should have always been considered

12 in two parts.  In fact, one of the questions that was then

13 corrected on redirect was an effort to describe the transfer as

14 a transfer of the plan and trust, as opposed to just the plans.

15 And I would point the Court to the Rabbi Trust document itself,

16 which makes it clear that the trust and the plans do not

17 necessarily need to go together, at least the creditor

18 relationship.

19         In Article 1 of the plan and the establishment of the

20 trust, in Section 1.3, the last sentence of that section reads

21 that any rights created under the plans in this trust document

22 shall be mere, an interesting word to find in a contract, mere

23 unsecured contractual rights of participants and their

24 beneficiaries against the company, referring to old NCFC and

25 its affiliates, as applicable.

**J&J COURT TRANSCRIBERS, INC.**

1          Accordingly, the trust document itself creates, in my

2 mind, the possibility that the plans may exist at affiliates,

3 whereas the trust itself which supports the obligations under

4 the plans may remain the asset of TRS Holdings.  There is not a

5 necessarily correlation, or requirement that the trust be

6 moved, as long as the trust remain and be paid out, to pay the

7 obligations to the plan participants.  It doesn't necessarily

8 -- it's not a necessary requirement that the Rabbi Trust move

9 to where the plans are.

10          With this lack of clarity with respect to the

11 ownership of the trust, combined with the fact that it's not

12 required under the plan documents that the trust and plan stay

13 together, the compromises set forth in the plan combining the

14 assets or treating, you know, the assets or settling this asset

15 in this way, really does fully effect an appropriate compromise

16 of those uncertain questions.

17          The other issues raised and, in fact, even this issue

18 which is an attempt to limit these assets to creditors of NCFC,

19 whoever they are, really takes from the trust document some

20 language and tries to turn it on its head.

21          There are a number of provisions of the trust

22 documents that refer to the trust being subject to the claims

23 of either general creditors or the company's creditors and we

24 cite the Court to many of those instances in our reply brief,

25 and I won't go through them here.  And as we explain in our

1  papers and is made clear in the case law, these types of

2  provisions included in a Rabbi Trust are intended to indicate

3  that the participants have no preference in these assets, that

4  while the participants -- while the grantor trust is

5  established to pay out the claims of the participants under the

6  plans, so long as there is no insolvency that specifically --

7  this is a grantor trust, they are assets of the debtors and the

8  participants have no special rights.

9        The history, which is outlined of the Rabbi Trust

10  structure, which is outlined quite well in the -- I pronounce

11  it the _Mulia_ decision, cited by the Ad Hoc Committee as well as

12  by the debtors, or the plan proponents in our brief, explains

13  and goes into the premise of this issue, and the necessity of

14  these clarifications because these trusts are established in

15  connection with the special top hat plans, whether it turns out

16  to be one or not is not something the Court needs to decide

17  today, but these are plans created by management, they're

18  created by the debtors for their most senior management and

19  highly compensated employees, and there was a desire to be

20  clear that those parties, notwithstanding their structure and

21  their ranking in the organization, did not get some special

22  privileges with respect to these assets.  The assets have to

23  remain available to general creditors with no special

24  privileges.

25        With that as the premise, and the basis for these, to

**J&J COURT TRANSCRIBERS, INC.**

1  then go and try to use these general creditor languages to try

2  to parse creditor and create creditor to try to basically throw

3  other parties out of the pool, is the exact opposite of the

4  purpose of those.

5          The Mulia case, which the committee relies on on

6  this, is a case that is on its -- it's very purpose utterly

7  distinguishable.  In that case, an unsecured -- sorry, a

8  secured creditor with a security interest in general

9  intangibles was seeking to impose its security interest --

10         THE COURT:  Let me stop you there.  I agree.

11         MS. UHLAND:  Thank you, Your Honor.  The cases that

12  are more relevant that I'd like to review briefly, that relate

13  more to the, maybe the question of the plan treatment, is the

14  Goodman v Resolution Trust case, which is a Forth Circuit case,

15  cited in our papers.  In that case, one of the arguments, and

16  this was a case where the insolvency, and this case, it was not

17  a bankruptcy case because the insolvency -- it was a company

18  that was subject to the RTC, and the RTC receiver was

19  administering the assets of the debtors and the beneficiaries,

20  contended in that case that the language of the Rabbi Trust and

21  the structure of the Rabbi Trust, should require the receiver

22  to, in effect, marshal the assets.  In other words, to only use

23  the assets of the Rabbi Trust to pay -- they should set side

24  the assets of the Rabbi Trust, to use whatever other assets are

25  available to pay other creditors and depositors and only then

1  resort of the Rabbi Trust document -- the Rabbi Trust assets.

2          The Fourth Circuit resoundly denied their attempt at

3  marshaling and stated, as I believe the parties are in this

4  case, they stated that the appellants were, and I'm quoting

5  from Page 129:  "The appellants are really asking for a

6  preference over other creditors.  Unfortunately, the recipients

7  of a grantor Rabbi Trust are unsecured creditors who took the

8  risks of being subject to the claims of general creditors for

9  the benefit of favorable tax treatment, a gamble which failed

10 to pay off in this case."

11         What we have in the plan, Your Honor, and it is in

12 effect, a use of the Rabbi Trust, there are assets and funds in

13 FC to satisfy other obligations of, if they are in FC or in

14 TRS, what they're paying out is, they're being distributed in

15 accordance with the bankruptcy priorities and not being

16 specially set aside for any particular subset of creditors.

17 What is being sought by the Ad Hoc Committee is, in effect, a

18 marshaling of these assets which is prohibited.  The Goodman

19 case and, similarly, the RTC case, I forgot the name RTC -- the

20 McAllister RTC case cited in our cases, both make clear that

21 when a Rabbi Trust in a case of an insolvency, and a Rabbi

22 Trust process, that those assets are to be distributed in

23 accordance with the insolvency procedures and that the -- at

24 issue in the relevant proceeding, be it a bankruptcy or in an

25 RTC insolvency, and that the Rabbi Trust descriptions denying

1 the preference do not restrict the distribution of those

2 assets.

3          Your Honor, simply in the bankruptcy context, and in

4 other cases, there's plenty of cases cited in our briefs,

5 including the <u>Collins</u> and <u>Aikman</u> case, which is, I think, the

6 most clear because it's a turnover case, that simply in that

7 case, the parties sought a turnover as estate property under

8 541 of the Rabbi Trust assets and the court, this is a

9 bankruptcy court decision, determined yes, the Rabbi Trust

10 assets are 541 property, subject to turnover.

11          Based on the fact that there should not be a

12 marshaling within the debtors and the fact that there's a lack

13 of clarity, which is the debtor that actually owns the asset,

14 you know there is a -- let me just indicate for the Court sort

15 of what I'll call a somewhat, an alternative theory, and maybe

16 one of the ways that the parties were thinking about this in

17 framing the plan settlement that we have.  And that is the

18 following, is that in some ways, the way we looked at this is,

19 let's assume that this was an asset of the NCFC estate, one of

20 the ways we thought of this was, this is a plan settlement

21 compromise as between TRS Holdings and Financial as one of the

22 many, was in some ways a two step compromise, that the Rabbi

23 Trust assets, perhaps, should be treated as coming into the

24 estate of Financial, the Carrington interest, we'll say is

25 mostly an asset of TRS Holdings and then once those estates

1 determine their assets, they then entered into a compromise

2 that allowed the creditors of each to benefit.  The Rabbi Trust

3 assets, assuming the litigation is successful in the

4 litigation, is a more liquid asset and than the Carrington

5 interests, which may have more value, but isn't liquid today,

6 and by entering into a compromise that caused those estates and

7 creditors to, you know, effectively those two estates, to merge

8 those assets, it was a compromise that allowed the creditors of

9 Financial to get a potential upside in the realization from the

10 Carrington interests and allowed the creditors of TRS to have,

11 at least at the outset, a more certain distribution or some

12 liquidity in the distribution at the beginning.

13         So, when this issue was -- you know, another way to

14 look at this, in addition to the compromise of lack of clarity,

15 is that we really have two groups of estates with different

16 types of assets and that settling in the plan this way

17 benefitted the creditors of both.  One, by providing greater

18 potential value, and the other liquidity.  And I know it's sort

19 of, as Mr. Logan stated, hard to pull these apart, but that two

20 step transaction, or that two step settlement, is the way that

21 the plan proponents looked at our structure on this compromise.

22         But in sum, Your Honor, on this issue, we go back to,

23 really, just two points.  One, on this particular question and

24 trying to use <u>Butner</u> to argue that state laws determine and you

25 must stick to the terms of the contract, really falls quite

1 | flat on these particular facts, where the contract indicates
2 | that the party that's entitled to the asset is not the party
3 | that the Ad Hoc Committee is asserting should get the benefit.
4 | And further, Your Honor, that the cases are quite clear, that
5 | the language is trying to discourage a preference, and indicate
6 | that there's no preference for highly compensated employees and
7 | management in these assets and they're subject to creditors
8 | rights, cannot then be used as a mechanism for those very
9 | individuals to act in a way that's detrimental to other
10 | claimants in the bankruptcy proceeding.

11 |        THE COURT:  Thank you.   Would the co-proponent like
12 | to be heard?

13 |        MR. POWER:  Thank you, Your Honor.  A lot of things I
14 | was going to say have already been said, so I'm going to try to
15 | be a little quicker than I probably, normally would be.

16 |        First of all, I'd be remiss if I didn't thank the
17 | Court.  We have been together for slightly more than a year on
18 | behalf of the committee and all the creditors, including the
19 | plan beneficiaries, in this case, we thank Your Honor for your
20 | assistance and we are happy to get to this point.  It has not
21 | been easy as Your Honor knows.  There's been a lot of matters,
22 | this is a very unusual case in that -- normally in these cases,
23 | a case this size, the creditor bodies generally have several
24 | major groups.  You have a bondholder group and a secured
25 | creditor group.  You may have employee group.  This case isn't

**J&J COURT TRANSCRIBERS, INC.**

1  like that.  This case doesn't have those groups, it has very

2  large individual creditors, throughout the capital structure.

3  You have large note holders at one level, you have multiple

4  creditors at other levels, you have employees at different

5  levels, it is literally a hodgepodge of different individual

6  interests throughout the entire case.

7        But on behalf of all those creditors, we thank the

8  Court for assisting us in getting to this point and we're very

9  pleased to be here.

10        I echo Mr. Logan's words about the compliments to the

11  professionals and as well as the company people and at

12  AlixPartners and also FTI for the assistance to get here.  I

13  can personally testify, or attest to the fact that it wasn't

14  easy and it took them a lot of work to get here.

15        Your Honor, turning to the matter before your, I

16  think the first thing to -- it's interesting when a party, who

17  is opposing a series of compromises argues that there really

18  isn't a controversy and the party who is advocating the

19  settlement, who has been through the negotiations to try to

20  come to that compromise, and back and forth among the various

21  groups, and spent months and months trying to develop a

22  compromise, it's kind of hard to believe that someone would

23  advocate that.  However, we have that in this situation.

24        The first point I just want to mention is, Mr. Keach

25  in his pleadings, indicates that there really is no controversy

1  here, there's been no complaint filed, there's been no party

2  who stepped up and said, you subordinate the parents debt to

3  the shareholders, to the subsidiaries, there haven't been a

4  series of lawsuits files that you are compromising.

5       And I submit to Your Honor that certainly is not --

6  that is correct, there haven't been a series of lawsuits, but

7  that's not necessary in order to establish that there are

8  issues and disputes regarding creditors rights in assets and

9  Your Honor to prove under Rule 9019, the compromises of those

10  issues.

11       I refer Your Honor back about a month and a half ago,

12  Your Honor entered an order which was really a very important

13  part of this case, which was an adequate protection stipulation

14  settlement.  And if Your Honor recalls, that involved roughly

15  13 different institutions, all represented by counsel, in some

16  cases two sets of counsel, as well as the debtor and the

17  committee and the issues on that settlement were, there was

18  approximately $42 million set aside, and every party, including

19  the debtors and the committee, claimed an interest in those

20  funds.

21       Now, no party filed a declaratory action saying how

22  those funds were distributed, no party filed a lawsuit saying

23  that they are entitled to this right, so they have priorities

24  over the other rights.  Instead, what we did, because we knew

25  those lawsuits were coming, we asked people to hold off, Your

1    Honor entered an order putting the money in safeguard and we

2    spent the next nine months trying to resolve those issues among

3    those parties.  And with a lot of effort, we were successful in

4    doing that.

5            But, again, that is a compromise and the settlement

6    that embodies that global compromise was in the stipulation

7    that was approved by Your Honor, there weren't lawsuits filed

8    to resolve that and, clearly, Your Honor, wasn't aware of every

9    single issue that was raised in that settlement and every

10   single dispute between the creditors were raised, but when Your

11   Honor looked at the settlement and the creditors signed on and

12   Your Honor approved and nobody objected, everybody recognized

13   that that settlement basically met the standards of Rule 9019

14   and was a reasonable -- within the realm of reasonableness.

15           In many ways this plan is very similar to the

16   compromise.  A lot of the same creditors and same parties who

17   were in that global settlement are also parties to this plan

18   and have major claims in this case.

19           Again, we don't have a series of lawsuits which

20   reflect every single person's rights and every single person's

21   interests, but what we do clearly have is a resolution of

22   numerous parties rights and numerous parties interests as part

23   of the plan compromise.  We think it is very appropriate to

24   approve it here.

25           Your Honor, I think the testimony is quite clear both

**J&J COURT TRANSCRIBERS, INC.**

1  from Ms. Etlin and Mr. Star, they both testified that there, in

2  fact, were numerous issues and disputes regarding the

3  allocation of assets and how they should be resolved.  There

4  are also numerous issues regarding claims, whether estates

5  should be pierced or creditors from one debtor should have

6  claims against the other debtor, there were numerous issues

7  whether the inter-company debt should be recharacterized.

8  There were multiple issues.  And I think Your Honor on most of

9  those issues has probably seen those issues before, in cases

10 that Your Honor has been involved in, where you have

11 recharacterization issues and inter-creditor issues.  And Your

12 Honor has seen litigation in all of those.   And the

13 professionals in this case, and the committee members in this

14 case, all believe that the most appropriate and efficient way,

15 without wasting significant estate assets on administrative

16 expenses, was to try to resolve all those numerous issues.  And

17 that's what we've endeavored to do since the beginning.

18        THE COURT:  Well, an argument could be made is,

19 that's the way Chapter 11's are supposed to work, and sometimes

20 it's the only way to ever get a plan confirmed.  And when I

21 think about the number of disputes that the Court has not been

22 asked to resolve, I think it to myself very quietly, not to

23 jinx the situation.

24        MR. POWER:  We agree, Your Honor.  I think one of the

25 standards on a 9019 review from the case law, from Your Honor's

1  decision in <u>Exide</u>, and I'll just briefly touch on this is, who

2  are the parties involved to the settlement, were they

3  represented by counsel, and were basically the parties

4  interests that were being settled, the different interests were

5  properly represented.  And in this case, the answer to all

6  those three questions is yes.

7         First of all, Your Honor has really uncontested

8  testimony that the committee members, there are seven members,

9  they're all represented by counsel except one, but that's made

10 up because some of them have two counsels, some of them have

11 separate financial advisors, they represent the largest

12 creditors in this case.

13        Just for example, on the NCFC level, Kodiak, which is

14 owed slightly below $90 million and the landlord, McGuire, I

15 think is about 15 million all in, is owed roughly -- so, that's

16 north of 111 million, The number of deferred comp. former

17 employees, who voted against the plan, I think totals roughly

18 18 million.  So, in comparison, they're about 10, between 10

19 and 15 percent of these other creditors obligations.  That

20 doesn't take into account the master repurchase creditors who

21 have claims at FC and also the equipment lessors who have

22 claims at FC who are owed in excess of $200 million, those

23 group and their claims haven't been resolved yet so we haven't

24 figure out the final amount.  But the debts clearly are quite

25 significant and the creditors have voted overwhelmingly for the

1 plan.

2         The committee members in this case, if Your Honor

3 actually thinks about it, it's interesting.  Two of the members

4 only have claims at the parent level FC.  One creditor only has

5 a claim at Mortgage Corp., a single claim, with no claims

6 against another entity and then one creditor has claims against

7 multiple entities and that one creditor would be eligible for

8 the multi-debtor protocol that's in the plan.  The other six

9 members aren't eligible for the multi-debtor protocol.

10         Then there are three creditors who have separate

11 claims against -- they have EPD/Breach claims against Capital

12 and one of those creditors has a claim against Capital for

13 EPD/Breach, but also holds a repurchase agreement.  And the

14 reason I go through that detail is because what you're going to

15 hear, I believe, in the next argument is that, in fact, people

16 were doing things which didn't represent their interests, they

17 were trying to resolve claims at a different level.  But if you

18 look at the committee structure, the argument is going to be

19 that the groups that benefitted the most by this plan are

20 Mortgage Corp.  But, Mortgage Corp., there's only one committee

21 member who has a claim solely against Mortgage Corp.  And then

22 the argument may be that TRS creditors benefit a lot because

23 they get to join in the holding company group and maybe they

24 don't have any assets but there are no creditors on the

25 committee at TRS Group.

**J&J COURT TRANSCRIBERS, INC.**

1          Now, there is one very large creditor of TRS which is

2  Mortgage Corp.  In fact, that has the largest claim, so

3  Mortgage Corp. creditors would advocate that whatever benefits

4  TRS should benefit them.  But that's okay, because the largest

5  creditor against Mortgage Corp., is NCFC.  It has a claim of

6  approximately $170 million.  So, Mr. Keach's group is going to

7  benefit substantially by the efforts by Mortgage Corp. to try

8  to improve its assets because the money flows back up to FC.

9          And, what I'm going to argue a little bit later is,

10  the objectors to this plan have absolutely no idea how they

11  benefit, or are harmed by the compromises that are in this

12  plan.  They just have simply no idea.  And the reason is,

13  because this is such an integrated entity, and there are so

14  many inter-company claims and there are so many different

15  parties claiming to these assets that when you move one asset,

16  you don't know where those assets end up in the corporate

17  structure.  And that's basically what we had to deal with when

18  negotiating the plan.

19          So, Your Honor, what did we do and I think Mr. Star

20  was able to testify that the committee went through a detailed

21  process.  Mr. Star and the advisors started out with a

22  de-consolidated basis, that was the starting point, they worked

23  up as to -- all right, let's look at each entity, who do we

24  think has claims against those entities, and where do we think

25  those assets should go.  Let's try to follow a pure

1  de-consolidated basis, as best we can.  And, you know, that's

2  not an easy process, because it leads to issues.  Where do

3  assets go, where do claims go, how do you treat the

4  inter-company claims, are they debt, are they equity, that

5  comes up in every case, that I'm involved in and are creditors

6  going to argue piercing or alternative issues, such as I really

7  have a claim at this entity and I should be treated A.  Every

8  one of those issues came up in the plan negotiations, and they

9  come up in virtually every one that at least I'm involved in.

10         The parties, basically, endeavored to do an

11  investigation, the debtor basically gathered a lot of

12  information, the committee pushed back, and got further

13  information, asked questions.  As you heard from the testimony

14  of Ms. Etlin said, I didn't think there was an issue about the

15  tax receivable, Mr. Star was very clear, there was a big issue

16  in the committee about where the tax receivable should go.  It

17  ultimately ended up in Mortgage Corp., and that's where the

18  debtor always thought it should go, so the debtor never thought

19  there was an issue but the committee tested every single

20  assumption, tested every single asset allocation.

21         That is the job of a Creditors' Committee,

22  particularly when the committee is fiduciaries for all

23  creditors and every single entity there, and every single

24  creditor.

25         Your Honor, I want to briefly talk about the asset

**J&J COURT TRANSCRIBERS, INC.**

121

1 allocations because I, quite frankly, don't see the dispute.  I

2 think it's pretty clear.  If Your Honor actually looks at the

3 evidence and not the arguments, the Carrington case --

4          THE COURT:  I usually try to do that.

5          MR. POWER:  Okay.  Let me focus you on specific

6 evidence that I think Your Honor should look at.

7          The Carrington interests.  I think the evidence was

8 very clear from Ms. Etlin, there is two different interests and

9 there is an attempt to blur the notion that these are one

10 thing, they're not.  And, as Ms. Etlin testified, the limited

11 partnership interests which was simply an investment in a hedge

12 fund that sat there and is run by somebody else and sits on the

13 books and records as an asset, and may generate cash flow, it

14 was funded by Mortgage Corp., TRS Holdings, according to

15 Exhibit Number 2, is the owner of that asset, the testimony is

16 uncontroverted that that asset sits on the books and records of

17 TRS Holdings, it has sat on the books and records since 2004,

18 as of the petition date it is sitting on the books and records

19 of TRS Holdings, currently today, based on the schedules today,

20 that asset sits on the books and records of TRS Holdings.  So,

21 the only evidence in the record today is both the legal

22 documents that demonstrate that TRS owns that asset, and the

23 books and records which demonstrate that TRS owns that asset.

24          Now, what are we talking about in terms of an asset?

25 Ms. Etlin testified that it was roughly between $45 and $50

1 million of value.  We all hope.  Of that, only about 2 million

2 is for the general partnership, the rest of it is in the

3 limited partnership interest and that's based on the documents

4 and evidence that has been presented.

5        I know Ms. Uhland mentioned that she thought it was a

6 close call, that maybe TRS owns it.  Your Honor, in this record

7 I don't see a close call at all.  On this record, in fact, I

8 see this evidence is overwhelming that the TRS owns that asset.

9 However, the plan compromises that issue and recognizes that

10 maybe it should be shared because maybe there is an issue

11 between which entity owns it.

12        Now, who got hurt by moving that asset over to the

13 group?  Well, if it belonged to TRS, then Mortgage Corp., would

14 have gotten most of that asset.  And, the creditors down below

15 would and the Op Co. Group under the plan would have really

16 benefitted from that position, but that's not what the plan

17 results in, the plan results in basically the creditors at Hold

18 Co getting distributions from that asset at their level.

19        Now, I should mention just to be fair, Mortgage

20 Corp., does have an inter-company claim and will share in those

21 assets but only, must more diluted on a pro rata basis, based

22 on adding in the $3 to $500 million at FC level.

23        Your Honor, the other issue came up about the Rabbi

24 Trust.  I do concede and admit there is some confusion about

25 where that asset sits and I don't think, quite frankly, there

1   is that much confusion about the trust itself.  The documents

2   are pretty clear and the evidence is pretty clear that the

3   trust itself, which holds the res, the funds, is sitting at TRS

4   on the books and records.

5        The testimony of Mr. Brents that he amended the

6   schedules in March, I guess without showing the committee

7   before he did it, or before his partners did it, was that the

8   inter-company debt associated with that asset was moved over to

9   FC. In other words, TRS Holdings borrowed money from Mortgage

10  Corp., about $23 million if Your Honor looks at the exhibit,

11  that was the original amount, and there was an inter-company

12  account created from TRS that it owes Mortgage Corp., that 23

13  million.  The asset is now accreted in value to 40 some million

14  dollars.  The asset has sat there on TRS's books since day one.

15  I'm sorry, I'm mixing things up I think.  The Rabbi Trust has

16  sat there on the books in connection with the documents

17  relating to the transfer, those relate to the divert comp. plan

18  and whether those were integrated into FC, then New FC, and the

19  Maryland REIT, and those documents seem to indicate that they

20  maybe were, although there is some confusion, but in terms of

21  the books and records there is no confusion, they've always

22  been at TRS and the trust has always sat there.

23        But what happened in this case is that the books and

24  records may not have reflected what the debtors intent was or

25  what they thought they were and the came to the committee and

1  said yeah, the assets sit at TRS, but we don't think that's

2  right because we think it should be at FC, because we think the

3  debtors always said it should be at FC and something we've told

4  the employees, it should be at FC and so, we don't think that's

5  right.  And when the committee looked at it, we said, we looked

6  at all the facts in evidence and we looked at everything we had

7  and we said, you know, you're right, you may be right, it

8  belongs in FC.

9         So, if you look at the compromise that's set up,

10  basically from the committee's point of view and Ms. Uhland

11  referred to this, if the asset of the Rabbi Trust is at FC, the

12  asset of Carrington is primarily, if not all, at TRS and those

13  two entities, in essence, compromised.

14         And, in essence, the parties decide in that

15  compromise, had economic stake and were the largest creditors

16  of both of those entities because you had committee members at

17  FC and you had Mortgage Corp., creditors who were entitled to

18  the largest claim at TRS and they decided to settle that issue

19  and compromise it.

20         And, Your Honor has known nothing about these facts

21  in the last two days, is that there were serious issue about

22  where these assets might sit and which entity might own them.

23         Your Honor, I'm not going to -- I'll briefly touch --

24  there hasn't been much dispute about the litigation.  Clearly,

25  the litigation that belongs in this case could be argued by

1 multiple debtors as to which is entitled to it and which one.

2 I do know from experience, you run into a lot of problems when

3 you file a complaint against a party and you allege 13 causes

4 of action, and some of them relate to Chapter 5 claims and some

5 relate to inter-company balances and issues, and you constantly

6 have issues about who is entitled to those claims and does the

7 secured creditor have a claim against the receivable, but not

8 the Chapter 5 claims and how do you allocate those.  And you

9 basically have to do a compromise, is what you do.  Because

10 rarely even when you settle those do you ever allocate the

11 money, I'm paying claim 11, this amount and claim 12 that

12 amount.  What you do is, you settle and you get a certain

13 amount of funds and you figure out where it goes.  In this

14 case, understanding that you have to fund the money to pursue

15 the litigation and you have to decide how to allocate that

16 litigation otherwise you have competing interests arguing the

17 same claims at the same time.  The plan resolves that issue and

18 it resolves it in a very fair and equitable way.

19          It resolves it by allocating the net proceeds of

20 those assets among the different creditor groups as part of

21 distributions.  And I, you know, we haven't heard much contest

22 about that, but that was a very important element of this plan.

23          Briefly, Your Honor, on the liability side. I think

24 the testimony is clear, Ms. Etlin testified that there were

25 some of number facts which would tend to support the notion

1 that the inter-company debt from the holding company level down

2 to the operating levels, was not really debt, it was really

3 capital.

4        And if you look at the <u>SubMicron</u> case, and what the

5 standard is, and I look at very simply and say it's a matter of

6 intent, what did the parties intend when they made the

7 advances.

8        THE COURT:  What does the Third Circuit say.

9        MR. POWER:  I mean the Third Circuit say.  And the

10 reference is, if -- did they intend to act like a banker and

11 extent credit and get repaid with interest, or did they intend

12 to act like an investor and make an investment and hope it

13 would generate additional benefit for the investor.

14        And, in this case, the evidence was pretty -- kind of

15 overwhelming, there's really no evidence on the other side that

16 it was actually debt.  The only thing that indicates it's debt

17 is that it's on the books and records as such.  There was

18 evidence Ms. Etlin said, there's no promissory note of evidence

19 of actual indebtedness, it was never settled up at the end of

20 the year, it continued to roll over as a continuing account.

21 And there was no evidence, she testified, as to a credit

22 decision being made for any of the entries that were made.

23 And, quite frankly, I think Mr. Brents testified that there

24 were millions of entries, millions of entries over the lifetime

25 in terms of back and forths in the general ledger.

1          So, again, Your Honor, there's an issue where you

2    have committee members who are deciding whether a parents

3    company claims against a subsidiary, which has the primary

4    assets, should be treated as capital or debt.  It's very common

5    in bankruptcies.

6          And, the parties raised those issues and, you know,

7    quite frankly, you could argue that the case was very strong

8    for recharacterizing the entire amount.  And those were

9    discussed.  As Mr. Star testified, those issues were considered

10   back and forth and the parties ultimate compromise added a 50

11   percent claim.

12         The multi-debtor protocol, Your Honor, it's

13   interesting.  All the parties that are the beneficiaries of

14   that protocol have either -- have certainly not objected to

15   plan, they've either voted in favor of the plan or they haven't

16   voted at all.  Nobody has raised any objection, whatsoever,

17   that the multi-debtor protocol is somehow unfair, unreasonable.

18   And if Your Honor looks at the multi-debtor protocol, it deals

19   with deem distributions of parties who have legal rights

20   against different entities, and how to adjust for that, based

21   on this Op Co., Hold Co structure.

22         And that is the exact evil that the court talked

23   about in Owens-Corning, where the bank group, which had

24   multiple joint and several liability from different debtor

25   entities, was being disenfranchised because those claims were

**J&J COURT TRANSCRIBERS, INC.**

1  being wiped out.   The multi-debtor protocol, basically, there

2  is no issue any more, because that multi-debtor protocol solves

3  that issue.

4         Now, does that mean that other creditors are harmed

5  because certain creditors who had joint and several liability

6  claims now have a bigger claim?  The answer is no, as the

7  testimony was clear.  The protocol number was based on the

8  contributions by the other individual debtors to the whole. In

9  other words, New Century Credit Corp., contributed assets and

10  value to the holding company structure which resulted in assets

11  flowing into that group.  And, so, those creditors who maybe

12  think, you know, this plan harms me, basically were satisfied

13  and the other creditors, six of the creditors on the committee,

14  who was in the opposite position and saying that you shouldn't

15  have any inter-company -- any multi-debtor protocol, was

16  satisfied that the allocation and the 30 percent increase was

17  fair and reasonable in this case.

18         Your Honor, one thing that really hasn't been

19  mentioned, and I know Mr. Logan is really proud of the

20  EPD/Breach Protocol and he deserves a tremendous amount of

21  kudos for that, is that compromise is extremely important in

22  this case and I just want to briefly explain how.

23         The EPD/Breach Protocol, roughly 500 million, give or

24  take, of creditors are at the NC Corporation level.  They are

25  the largest group of creditors in this case.  They do not have

1  any multi-debtor protocol advantages, they do not have absent

2  litigation, direct claims against Mortgage Corp., they do not

3  have -- they have claims against Capital.

4          As Your Honor heard testimony, those parties believed

5  and felt and advocated quite successfully, that the entity that

6  they purchased the loans for, purchased them from Mortgage

7  Corp., and when those billions and billions of dollars of loans

8  were sold, there were reps. and warranties given with those

9  loans.  And those creditors at NC Capital said, the debtor that

10 is obligated on my debt either has a significant inter-company

11 claim against Mortgage Corp. or I have a great fraudulent

12 conveyance claim because my debtor basically assumed hundreds

13 of millions of dollars of liability without getting adequate

14 consideration for it.  And as Mr. Logan indicated, and the

15 schedule indicate, that entity doesn't have any significant

16 assets.

17         That issue was resolved as part of this plan and

18 settled and it was between multiple creditor groups, in fact,

19 the majority of the creditors had those claims and we were able

20 to settle that among the creditor groups.

21         The thing that's interesting about that is, the

22 reduction -- first, the adoption of the protocol reduces the

23 claims and cuts down the administrative expenses.  The

24 reduction of the creditors who hold EPD/Breach claims against

25 Capital by 50 percent, benefit substantially, Mortgage Corp.,

**J&J COURT TRANSCRIBERS, INC.**

1 because it reduced the claim against it, but it also benefits

2 holding company.  Because holding company receives money

3 through it's inter-company claim, it is the largest creditor of

4 Mortgage Corp.

5          So, the creditors of Capital, who agreed to

6 compromise their claim by taking 50 percent of what they

7 thought their legal rights were, and also agreed to do the

8 protocol and I will tell you, virtually every creditor said

9 this protocol reduces what I think my true claim is, but I'll

10 agree with this in this plan, it benefits the holding company

11 as well because by reducing the claims against Mortgage Corp.,

12 and reducing the total claims against Capital, you've then

13 benefitted the creditors at Mortgage Corp., and you've

14 benefitted the creditors at NCFC because they are the largest

15 creditor of Mortgage Corp.

16          One of the reasons this plan was so difficult was the

17 nature of the inter-company claims and how they flowed.  You

18 could not simply move assets around and figure out exactly what

19 who benefitted and who didn't.  It was a very difficult process

20 to basically try to figure it out.

21          Now, that leads me to the issue of, I guess

22 Owens-Corning and substantive consolidation and I agree with

23 Mr. Logan, I'll try to be brief.

24          I think the rubber hits the road on a different

25 issue, Your Honor.  I think the rubber hits the road on the

1  issue of where the harm is.  Where is the harm in this plan

2  structure and who is being harmed?  And, I agree with you, Your

3  Honor, in Owens-Corning, it was very easy.  The harm was the

4  banks and the guarantee claims and they were being harmed.  In

5  this case, it is not that easy.

6        There is no evidence, at all, to show how this plan

7  harms the creditors at NCFC.  Not a single scintilla of

8  evidence exists to show what would happen if assets are moved

9  around or what would happen if things changed.

10        Again, also no evidence was put on as to, if assets

11  stated at TRS, what would that mean to FC creditors, because

12  while you would think, conceptually, that if you move assets

13  away from FC to TRS, that would hurt the FC creditors, but

14  remember, the expenses go over with that asset, and MC is the

15  largest creditor, so the money goes down to MC and, of course,

16  FC is the largest creditor of NC, so the money flows back up to

17  FC.  There is no evidence to suggest at all that this plan

18  structure harms in anyway the creditors at NCFC.

19        I submit the only argument that the creditors at NCFC

20  are being harmed, is in relation to the issue that Ms. Uhland

21  talked about, which is, if somehow creditors are permitted to

22  participate in these trust funds that are part of the Rabbi

23  Trust and they shouldn't be allowed to based on the documents.

24        With respect to that issue, Your Honor, I concur with

25  Ms. Uhland, I'll try to streamline it.  We basically -- the

**J&J COURT TRANSCRIBERS, INC.**

1  motion was -- the brief was a joint brief, we concur with the

2  arguments, we think the law is quite clear that those assets

3  are available to all creditors and that this Court and the

4  bankruptcy code determines how the distribution of those assets

5  should be done, not state law.

6        The thing that's interesting, at least to me, is the

7  Rabbi Trust notion, the concept is that the senior executives

8  who are highly paid compensated people, have to basically agree

9  when they enter the deferred agreement put the income there,

10  that they're subject to the claims of creditors.  That, in

11  fact, they are subject to insolvency issues like this.  That's

12  part of the benefit.  And the whole structure is designed to

13  limit their claims in the event of insolvency.

14        This matter is being turned around on its head.  It's

15  now being argued that that structure is designed to benefit and

16  somehow carve out and marshal for the plan beneficiaries those

17  funds and not let other creditors use it.  There is nothing

18  that supports the notion that administrative creditors can't

19  share in those funds, that priority creditors can't share in

20  those funds, that MRA counter parties who have large contract

21  breach claims for repurchase obligations can't share in those

22  funds, that note holders who have large subordinate debt claims

23  can't share in those funds.  There is nothing to support that

24  in the law and, Your Honor, to use the notion that a trust

25  agreement that says money is available for general creditors

**J&J COURT TRANSCRIBERS, INC.**

1  should now somehow be a restriction, when the purpose of it was

2  actually the opposite, to make it a restriction on the

3  beneficiaries ability to use those funds, and to make them

4  available for all creditors, we think turns the issue on its

5  head.

6          The law is pretty clear, at least as far as we could

7  see, Your Honor, and the cases mentioned by Ms. Uhland and

8  cited in the brief, regarding that it's property of the estate

9  and that it is available and that those assets should not be

10  marshaled, specifically in the way the beneficiaries hope to

11  benefit their -- to prefer themselves and increase their

12  distribution over other creditors and other creditors

13  interests.

14          Your Honor, just briefly to sum up, this plan was an

15  extremely complicated process, the testimony was pretty clear,

16  it took many months to get through and resolve.  The

17  alternative is, basically, not to confirm the plan and go back

18  to square one and commence litigation as to all the various

19  issues Your Honor has already hear about.  And we submit that

20  when you look at what's in the best interest of the creditors,

21  under the Martin standards, where the last standard is the

22  paramount interest to creditors, we submit that this plan and

23  the compromises proposed in it and the overwhelming support by

24  virtually every single creditor in this case, except for the

25  former employees who are litigating with the estate, clearly

1  demonstrates to the Court that the paramount interests of

2  creditor has been satisfied.

3         Therefore, Your Honor, we would ask that you confirm

4  this plan.

5         THE COURT:  Thank you.  Does anyone else wish to be

6  heard in favor of confirmation?  All right, I hear no response.

7  Let's take a ten minute break now, and then I'll hear from the

8  objectors.  We'll stand in recess.

9              (Short break in proceedings)

10        COURT CLERK:  Be seated.

11        MR. KEACH:  Thank you, Your Honor, Robert Keach for

12  the Ad Hoc Committee.

13        Like Mr. Logan, who has argued before me, I do think

14  it's extremely important to remember precisely why we are here

15  and where were are in this case.  In short, we are not here to

16  approve a compromise.  We are not even here to approve a group

17  of compromises.  And the compromise standard, accordingly, has

18  nothing to do with why we are here.

19        We are here to confirm or not confirm a plan under

20  1129(a) and under 1129(b).  And, the Ad Hoc Committee has no

21  burden of proof in this case.   The debtors and the Creditors'

22  Committee as co-proponent, must establish by the preponderance

23  of the evidence introduced, each and every element of

24  1129(a)(1) and each essential element of 1129(b), which we do

25  contest.  And they can meet that burden, again, only by the

1 evidence introduced through witnesses and through the

2 documents.

3        We've had much argument about what the facts were and

4 what drove settlement and what the history of the case was,

5 none of which is in evidence, and all of which is argument to

6 be disregarded.

7        When the Court looks at these issues and decides

8 whether or not the burden of proof has been met by the

9 co-proponents, what I'm sure the Court will look at, as the

10 Court has said, are the transcripts of the witnesses' testimony

11 and the documents because those are the only things that are

12 important here.

13        Just as importantly, in terms of the context here,

14 there is no Rule 9019 override with respect to the 1129(a)(1)

15 and 1129(b) standards.  We have no doubt that all the parties

16 in the courtroom and all the professionals worked extremely

17 hard and have worked very hard over the last year and a half.

18 We have no doubt that there were difficult issues and long days

19 and nights and we have no doubt and don't question the

20 creativity of some of the professionals and some of the

21 principles in attempting to reach a resolution of these cases.

22        But this isn't about how hard they've worked or how

23 creative the were or what good jobs they've done, or how much

24 any of us may wish to see this case over with, including the

25 Court.  It is only about whether or not they have met the

1    burden, by a preponderance on each and every element.

2          And there has been a rush to get, I think, to the big

3    issues on substantive consolidation and we will certainly get

4    to those and the big issues which we think are big issues with

5    respect to how one defines the debtors property interest in the

6    trust.  But there are other issues that have come up in the

7    evidence which we think are, frankly, uncontroverted that

8    mandate a denial of confirmation, even before we get there.

9          For example, 1129(a)(1) provides that the plan must

10   comply with all the provisions of the code.  Before we get to

11   some of the larger issues like substantive consolidation

12   through the vehicle of 1129(a)(1), there are some little

13   issues.  For example, Section 1123(a)(4) provides that a plan

14   must provide the same treatment for each claim in a particular

15   class unless the affected claimant has agreed otherwise.

16          It has been -- it is in evidence that with respect to

17   the dissenting class in which the beneficiaries are members,

18   that as for the master repurchase agreement creditors, by

19   virtue of multiplier that they are given, that they get 13

20   cents for every ten cents of everybody else in the class.  And

21   there may be others in the class who enjoy that 30 percent

22   advantage as well.  And it makes no difference whether you give

23   them a multiplier on their claim or simply increase the

24   percentage that they take from the distribution.

25          As the witnesses have testified, the economic benefit

1  and the economic detriment and the discrimination within the

2  class is the same.

3        That testimony that MRA's get 13 cents and everybody

4  else gets ten cents is uncontroverted.  That fact alone, if we

5  had nothing else before the Court, would mandate a denial of

6  confirmation because 1123(a)(4) has not been complied with.

7        If the argument as to that differential in treatment

8  is as seemed to be the premise of the cross examination on that

9  point, is that those parties haves different rights than

10 everyone else, that they're being given the multiplier because

11 they have legal rights that are different from other people in

12 the class, than that defense of the desperate treatment within

13 that class is itself disqualifying because that would mean that

14 they had classified those claimants improperly.  People who

15 have different rights can't be in the same class.  And, we

16 quite properly, Your Honor, objected to the classification

17 scheme in the plan when we filed our objection to confirmation.

18       Again, before we get to the big issues, the little

19 issues that everybody wanted to quickly step over mandate a

20 denial of confirmation.

21       With respect to the other issues, Your Honor, I would

22 submit that with respect to the issue of best interests

23 1129(a)(7) and, again before we get to some of the other issues

24 that people wanted to argue about, I would submit that with the

25 exclusions that Your Honor from the declaration of Ms. Etlin,

**J&J COURT TRANSCRIBERS, INC.**

1  and with respect -- and given the utter absence of any other

2  evidence on point, that the debtors have also simply failed to

3  meet their burden of establishing by a preponderance that this

4  plan is in the best interest of creditors under 1129(a)(7)

5  because there is a complete absence of evidence as to what a

6  Chapter 7 distribution would look like on a debtor by debtor

7  basis.

8          It is not for us to establish that we'd be better

9  off, it is for the debtors to establish that the plan is better

10 as to each and every individual debtor if each and every

11 individual debtor had a Chapter 7 case.  There's no evidence in

12 the record on that, none.

13         Looking to some of the larger issues that have been

14 raised, Your Honor, we do think that this plan cannot be

15 confirmed because they attempt to implement it through means

16 forbidden by law and let me take the trust issue first.

17         And, let me first knock down some of the strawmen

18 that have been so successfully argued.  We are not arguing for

19 a preference in this argument.  We are not arguing marshaling.

20 We are not arguing a secured interest, ala Mulia.  We are not

21 arguing any of the arguments that they say we're arguing and

22 that they then defeated easily because we were not arguing

23 them.

24         The definitive actual case law, the most important

25 case law in the brief, I think, on this point, Your Honor, is

**J&J COURT TRANSCRIBERS, INC.**

1 the carefully reasoned decision with respect to the <u>Roman</u>

2 <u>Catholic Diocese of Portland</u>, which dealt specifically with the

3 very important <u>Butner</u> issue when it comes to a trust.

4      First, as everybody in the courtroom knows, who's

5 practiced bankruptcy law for more than a month or two, <u>Butner v</u>

6 <u>U.S.,</u> is controlling here and the property interests that come

7 into the estate are defined by state law.  In other words, the

8 debtor cannot have greater rights in bankruptcy than it would

9 have enjoyed outside of bankruptcy.  When one is looking at

10 trusts and interests in trusts, even trusts that are settled by

11 the debtor and even trusts in which the debtor is one

12 beneficiary, use restrictions on the property that are in the

13 trust document, pre-bankruptcy, must be observed post

14 bankruptcy and that's the holding of the <u>Roman Catholic Diocese</u>

15 cases we cited and I don't think that idea is remarkable under

16 <u>Butner</u>.

17      What you have here is a trust that says we think,

18 unequivocally, that there are only two purposes to which the

19 money can be put.  And, incidentally, let me go, take a slight

20 side detour, Your Honor, and answer a question I think Your

21 Honor posed to other counsel which is, which of the adversary

22 proceeding issues needs to be decided on this point.

23      I think the only issue we've raised, and we were

24 careful to only raise it because we were trying not to invade

25 issues in the litigation, is the issue of whether or not

**J&J COURT TRANSCRIBERS, INC.**

1  creditors of debtors other than NCFC, other than New Century

2  Financial Corporation in the documents, and I'll get to that

3  ambiguity and how it affects this argument in a second.  The

4  only issue is whether creditors of other debtors can share.  I

5  don't think Your Honor needs to get into, for example, the

6  definition of general creditor and as everybody has conceded,

7  we're certainly not getting into any of the issues of what

8  happens if this is not, as we contend, as top hat plan.

9          As I started to say, this trust, we think says

10  unequivocally that there are only two purposes to which the

11  money can be put.  Again, assuming that the trust provisions

12  are not in violation of ERISA and need to be changed.  The

13  monies may be used to pay beneficiaries, participants, or their

14  beneficiaries, their claims, or their withdrawal amounts, or in

15  the case of insolvency, and if it's an insolvency involving a

16  bankruptcy, upon the order of a court of competent

17  jurisdiction, the trustee can use those dollars to pay general

18  creditors of New Century Financial Corporation, period.

19          That use restriction defines the property interests

20  that came into this bankruptcy estate, just like the use

21  restrictions in the Roman Catholic Diocese cases defined those

22  funds.  And, in those case, you had tort claimants.  I think

23  people we would argue unquestionably have equitable claims to

24  assets.  We're trying to get at assets of a trust, settled by

25  the Diocese which had use restrictions, they could only be used

1  for certain things and I forget all the specifics but they were

2  like buildings maintenance, or particular missions of the

3  church.  And the claimants, despite all their considerable

4  equities, who argued that they should be able to invade those

5  trusts and use those monies to maximize dividends to creditors,

6  including the tort claimants, were rebuffed by the court.

7        And, the court citing <u>Butner</u> said that you have to

8  observe the use restriction because it defines the property

9  interest and the debtors property interest was settled by those

10 use restrictions when the case was filed.

11       Now, we're not trying to turn anything on its head,

12 we're looking entirely at this use restriction and it is not

13 simply plucking one provision out of context, and one could

14 ask, but why is it important?  First, the law with respect to

15 these deferred compensation plans, particularly top hat plans,

16 does not require that the trust assets be available to all

17 creditors of the settler or the trust or the employer in order

18 to qualify for top hat treatment.  It simply requires that

19 there be enough risk of loss with respect to the assets that

20 there will not be constructive receipt upon the earning of the

21 income.

22       And so, what all of these trusts try to do is have

23 just enough risk and just enough exposure to meet the IRS

24 standards on constructive receipt and no more.  Point one.  The

25 second point is, if you were to adopt the view that's

1  apparently taken by my colleagues, that is that once the

2  insolvency happens, these assets are just, you know, free

3  assets to be used for any purpose, to pay any creditor,

4  including creditors of some other company not even mentioned in

5  the trust.  You would defeat some fairly important provisions

6  of the trust, one of which is the provision that provides that

7  if a company is insolvent, but restores itself to solvency,

8  that the trust assets can then only be used to pay benefits to

9  participants.  And if you take a different situation than the

10 one we have in front of us, but let's say that, you know, NCFC,

11 the trust NCFC had become mildly insolvent and it had been

12 reported, in fact, to the trustee that had it happened, but

13 that it was sufficient for the purposes of restoring solvency

14 that you took part of the trust race but not all of it, say

15 half.  Upon payment of that half and payment of the creditors,

16 the company is restored to solvency and the exclusive benefit

17 provision which provides that you can only use those funds to

18 pay participants would come back into play.  If you allow the

19 argument that's being made here, that once there's an

20 insolvency you can just spread the money anywhere you want,

21 then that provision would be completely negated.

22         And so, Your Honor, we think that this is, in fact,

23 four square with the Roman Catholic Diocese case we cite, that

24 in fact, one of the critical infirmities of this plan, whatever

25 you want to say about the genius of the compromises or their

1  good intentions, is that it permits creditors of companies

2  other than New Century Financial Corporation to share in the

3  assets, in violation of settled property rights that existed

4  pre-bankruptcy.  And we think that violates 1129(a)(1) and

5  (a)(3).

6          Let me move on, Your Honor, to the issue of

7  substantive consolidation.  With respect to this issue I have

8  no doubt that the structure of this plan originated, you know,

9  in Winn-Dixie, and I'm sure it was as ingenious and creative in

10 Winn-Dixie as it is here.  But we're not in Florida, and we're

11 not in the Fifth Circuit or the Eleventh Circuit, we're in the

12 Third Circuit and the controlling precedent here is

13 Owens-Corning.

14         THE COURT:  Let me ask you the same question that I

15 asked debtors counsel and that is, how do you determine when

16 substantive consolidation is present by its form, or by its

17 effect?

18         MR. KEACH:  I think that the test that is established

19 not only in Owens-Corning, but also in the Genesis cases cited

20 in Owens-Corning, requires that you took at both and I think in

21 this case, this case fails in both ways.

22         THE COURT:  Well, let me ask you this question.  What

23 if it failed in one but not the other?

24         MR. KEACH:  I think if you are -- I think the

25 rationale of Owens-Corning, and I think it's important to point

1  out that what the court in Owens-Corning was doing was not

2  simply deciding the case in front of it on the deemed

3  consolidation issue, which I agree with Your Honor, it was an

4  easy case that it was an incredibly overreaching case.  But not

5  a whole lot more overreaching than this case.

6          I think what the court said in that and I think what

7  Genesis says is that any time you're going to disregard

8  separateness, and what they mean by that is, combining the

9  assets, combining claims to claim against those combined assets

10  and eliminating inter-company, whether it's two companies

11  you;'re doing it for or 50, any time you do that as a threshold

12  matter, if that's the form you choose, you must meet the

13  standards of Owens-Corning to do so, because even to do it as a

14  matter of form is to disregard the legal separateness of those

15  entities.

16          THE COURT:  Well, let me ask you this.  What if there

17  had, in fact, been the number of adversaries or contested

18  matters raising the issues that the plan proposed to settle and

19  the arrangements came to me, forgetting whether this is

20  practical for the moment, but let's say to the extent

21  practicable, under separate 9019 motions, different result?

22          MR. KEACH:  To the -- not -- if at the end of the

23  day, Your Honor, those 9019 settlements were incorporated into

24  a plan that incorporated substantive consolidation, and even if

25  the sum of those individual settlements dictated the

1  substantive consolidation, the answer would be no different,

2  under Owens-Corning.

3          But more importantly, on the facts of this case,

4  what's clear from the evidence in this case, is that those

5  compromises didn't drive substantive consolidation.  What

6  happened in this case was that substantive consolidation drove

7  the compromises.  You had a situation and I think it's

8  uncontested, in fact, from the deposition and the live

9  testimony, more importantly of Mr. Star, that they arrived at

10  the Hold Co., Op Co. model, in fact, the debtor started working

11  on it early in this case, and when they began to look at the

12  consequences, the harms created by substantively consolidating

13  the holdings companies and substantively consolidating the

14  operating companies, then they began to tweak it.  But there's

15  no question that this wasn't a situation, such as Your Honor

16  premised.  And to knock down another strawman, Your Honor, we

17  don't contend there has to have been an adversary proceeding

18  commenced for there to be a controversy, we just don't think

19  there are real controversies here and we'll get to that in a

20  second.

21          THE COURT:  You don't think the interests involved

22  here are inherently adverse?  I mean, it seems obvious to me.

23          MR. KEACH:  Oh, whether creditors are adverse to the

24  debtor?  I think that's always true.

25          THE COURT:  And to each other.

**J&J COURT TRANSCRIBERS, INC.**

1              MR. KEACH:  But I don't that's what drives the issue.

2   And it's not even whether there are controversies, I think the

3   test under Owens-Corning is, are those controversies that

4   cannot be solved in any other way, other than substantive

5   consolidation?  I think the unequivocal command of

6   Owens-Corning is, substantive consolidation always has to be

7   the last resort, when it's impossible to use any other remedy

8   to resolve the issue of corporate separateness.

9              THE COURT:  Well, that may state the holding in the

10  extreme, but I understand your point.

11             MR. KEACH:  And I think I can quote from the case on

12  that, Your Honor, and I'm happy to momentarily, because I think

13  they use the last resort language specifically.

14             But what you had here was --

15             THE COURT:  Well, there are also considerations of

16  costs involved, so, you know, in practicality of being able to

17  separate things.  So maybe we're saying the same thing

18  different says.

19             MR. KEACH:  I think that's right, but I think what

20  the Court said is, it has to be a perfect storm of

21  circumstances where you just can't possibly separate them and I

22  think the evidence here is clear, despite what everybody said.

23  This issue about which NCFC owns which assets, frankly, from

24  our standpoint, you can look at the last set of contracts in

25  2006 on Carrington and you can look at the merger agreement on

**J&J COURT TRANSCRIBERS, INC.**

1  the Rabbi Trust and I don't think these are serious issues that

2  serious lawyers get too concerned about.  I think it's summary

3  judgment practice and I don't think you need substantive

4  consolidation to overcome those ambiguities.  That could have

5  been done easily.  In fact, I think Your Honor could look at

6  the documents in front of you and decide that point.

7       THE COURT:  Well, I think that's only half of what

8  the plan proponents are saying here.  I think the other half

9  is, yeah, we could put a peg in every hole, but all that would

10  do is set up all of the disputes which would follow.

11       MR. KEACH:  Well, and I think what Owens-Corning

12  says, Your Honor, and again I think this is the Third Circuit's

13  view and I think it's its command is that yeah, that might be

14  messier than substantive consolidation.  It might be messier to

15  have separate estates that have claims against one another that

16  you have to litigate.  But what it says, unequivocally, is that

17  the fact that it might be messier and harder, is wholly

18  insufficient to justify substantive consolidation.

19  Administrative convenience is simply not a basis for a ground

20  upon which substantive consolidation can be based.

21       And, I think that's the court's command.  It

22  recognizes that it's making life harder in bankruptcy cases.

23  But what it says is, that the number one consideration, the

24  number one thing to be guarded against is disregarding

25  separateness.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Oh, I think more fully stated it makes it

2   harder in bankruptcy to disenfranchise certain creditor groups

3   or discreet creditor groups or a discreet creditor, and I think

4   that's what it's intended to do.

5          MR. KEACH:  Well --

6          THE COURT:  But it says what it says, and I will

7   follow what it says as best I can.

8          MR. KEACH:  Thank you, Your Honor.  And I won't dwell

9   on this, because we've covered it in the briefs, and unless the

10  Court has further questions, let me address a couple of other

11  points that were raised by counsel and first and foremost two.

12  The way you handled voting has nothing to do with substantive

13  consolidation.  When the plan result is substantive

14  consolidation, of course, one has to vote in separate channels

15  in order to confirm the plan.  In other words, you can't

16  presume the outcome of confirmation in order to dictate the

17  voting.  There is no case where you have a substantive

18  consolidation plan where the voting presumes the outcome, and

19  so the idea that they somehow let people vote in their own

20  silos is irrelevant I think to whether or not you can have

21  substantive consolidation or not.

22          The -- and let me move on past that issue, Your

23  Honor, to say, you know, let's assume -- and I think Owens-

24  Corning is clear on this.  I think Owens-Corning provides

25  pretty unequivocally if there's no 9019 override to its

1  dictates.   Whatever those dictates are -- and we've argued what

2  we think they are, and we think they're strict, and we think

3  substantive consolidation is supposed to be an extreme rarity

4  under that holding.   But one of the things that is clear is

5  that there's no 9019 override in the case.   That case was about

6  peoples' attempts to settle around an objecting group.

7           THE COURT:   Well, it's a -- there's a convergence of

8  such concepts regularly under plans, and the Code specifically

9  says that settlements can be provided in plans.   But I don't

10 disagree with you that in order to achieve confirmation of a

11 plan confirmation standards must be met.   Frankly, if I find

12 that the confirmation standards are met, I think 9019 may

13 really become irrelevant.

14          MR. KEACH:   I don't think I disagree, Your Honor,

15 because I think the confirmation -- as we've argued, I think

16 the conformation standard is higher, which is why I don't think

17 this is about what's within the lowest level of reasonableness.

18          THE COURT:   Or I suppose I could say each of the

19 things that have been proposed are, in fact, settlements and

20 should be considered under the standard I applied, for example,

21 in Exide, but then it could still fail to meet the confirmation

22 standards, even if the arrangements I found were good

23 arrangements.   It's still -- you know, it could go -- it's like

24 anything else or many other things.   You can look at it

25 different ways and approach it from different directions, but I

1 think the end result here is going to be the same no matter

2 which of those approaches I take.

3           MR. KEACH:  I don't disagree, Your Honor.  In fact,

4 as I would not even begin to purport to tell Your Honor what

5 you meant in _Exide_, but as I read _Exide_, which I think is well

6 reasoned, is that --

7           THE COURT:  Lots of people had suggestions about what

8 I meant in _Exide_.

9           MR. KEACH:  I'm sure they did, Your Honor.  But as I

10 read -- as I read _Exide_, if you're looking at compromises

11 within a plan, the first stage of any compromise is does it

12 meet what I've come to think of as the _Jeffrey_ standards, but

13 what in this circuit are the _Martin_ standards.  In other words,

14 you apply the four-part test.  If it fails that, obviously, you

15 don't go any farther.  I think _Exide_ then quite properly

16 applies an enhanced standard for incorporating compromises into

17 plans, which I think was articulated in Texaco, which have been

18 repeated in a case called _Whispering Pines_ in the First Circuit

19 where you look at, for example, whether or not -- regardless of

20 whether or not the _Martin_ test is met, whether there is --

21 whether the compromises as parts of plans meet the inherent

22 fairness test.  And then when you're all done, you still have

23 to look at whether the plan should be confirmed under 1129(a)

24 and (b).  And I think that's what we think should be done here,

25 and we just think the evidence here falls far short of getting

1  there.

2        Because again if you look at <u>Owens-Corning</u> -- and the

3  only thing that's been argued here, I would hasten to add, in

4  <u>Owens-Corning</u> is what I'll call the second factor.  Nobody's

5  arguing here that creditors believe there was only one entity.

6  The evidence is pretty clear.  There was consolidating

7  information that was publicly available.  The bar date order

8  required that people file against particular debtors.  I think

9  that first prong has been conceded.

10        What <u>Owens-Corning</u> says in the second prong is that

11  commingling justifies consolidation only when separately

12  accounting for the assets and liabilities of the distinct

13  entities will reduce the recovery of every creditor.  That is

14  when every creditor will benefit from consolidation.  That's

15  the evidentiary test they had to meet here.  And I would

16  submit, Your Honor, that when you're reviewing the transcripts

17  and reviewing the documents to decide this case, that that

18  evidentiary standard has not been met here.

19        For example, in one of the questions everybody always

20  to ask objecting parties is are you hurt by this.  Well, the

21  short answer is we clearly are.  As an NCFC creditor, what we

22  are being asked to do is to share assets that we think are

23  unequivocally NCFC, both the Carrington interests and the trust

24  assets.  But even if you pull the Carrington interests out of

25  that, it's the trust assets, and we've asked to share them with

1 other creditors.  If you just stop there, it's inherent --

2 that's inherently dilutive, and we are damaged, and that's the

3 effect of this.  The compensating mechanism for that, they say,

4 is well, you get to share in the Carrington interest, because

5 there's this ambiguity about that, although we'll tell you in

6 the disclosure statement that the Carrington interests are

7 worth somewhere between zero and $43 million.

8          And also we'll let you share in the litigation

9 proceeds, if there are any -- which we have put no value on for

10 purposes of the plan, because we don't know if we have any

11 causes of action, and we don't know if they have any value even

12 if we do.  So what we're asked to -- what we're being asked to

13 do is trade a certain dilutive effect under the evidence for a

14 possible upside on assets that everybody concedes may or may

15 not have any value.  And people may consider that a minor harm

16 or a major harm depending on where you sit, but for purposes of

17 the Owens-Corning test, it's a harm, and there is no evidence

18 to suggest that we're not harmed by those circumstances, and

19 again one can only look at the evidence here.

20          With respect to -- if I move -- and so that's where I

21 think we are with Owens-Corning, Your Honor.  More importantly,

22 what Owens-Corning says is that the disputes have to be

23 virtually intractable.  It has to be impossible to sort out all

24 of these issues of where the assets go and where the accounting

25 is.  And I'll take the asset groups that were alleged to be

153

1 driving substantive consolidation.

2      Carrington we think is not intractable on the

3 evidence.  Rabbi Trusts we think is not intractable on the

4 evidence.  The inter-companies were resolved.  You have

5 testimony again unchallenged by both Ms. Etlin and Mr. Brents

6 that they undertook to look at the inter-companies.  They

7 resolved them.  They filed schedules.  Nobody questioned the

8 amendments to the schedules.  Resolved and done.

9      With respect to the so-called servicing rights,

10 conceded by the witness to have been a non-issue and resolved.

11 And with respect to the only other issue, which was a minor

12 issue involving 1, 2, 3, also done.  These weren't intractable

13 disputes.  This wasn't a case where it's been proved

14 unequivocally that they could've spent millions and millions

15 and millions of dollars trying to work this out and litigate

16 this out, and they wouldn't have come to a definitive

17 conclusion.  That's the command of Owens-Corning.

18      If we move I think to -- if we move along the

19 traction, so I think if you look again at the Martin factors we

20 start at level one of what I think the Exide three-step

21 analysis is.  I don't think they've established that there's a

22 discreet dispute that's costly.  I don't think they've

23 established that it would have been difficult to sort out, and

24 I don't think there's a basis here.  But, more importantly, in

25 terms of inherent fairness, they haven't established that

1  either.  And then again, if we get to the higher level with

2  Owens-Corning, I think it just fails.  And so for all of those

3  reasons, Your Honor, and I -- and I'm not going to stand here

4  and repeat the brief, because I think we've tried hard to put

5  everything we wanted to say in the brief, and I just wanted to

6  highlight some issues.  For all of those reasons -- and we

7  fully appreciate that we are here reigning on the picnic, and

8  we fully appreciate that there are lots of people here with a

9  lot of work in this case, but for those reasons and because of

10 the command of the 1129(a)(1) and 1129(b), we think this plan

11 can't be confirmed.

12       And let me just speak briefly to 1129(b), and then

13 I'll be done.  I think Mr. Logan said we don't contest under

14 1129(b).  I think our brief clearly says otherwise.  In

15 1129(b), while he has recited the absolute priority rule, and

16 he's recited that test, I think, as we all know, under the case

17 law 1129(b) requires that it's necessary that you meet the

18 statutory test but not sufficient.  For a cram down plan to be

19 confirmed, which is an extremely difficult thing to do on

20 evidence, and there's not enough evidence here to do it, you

21 must establish the inherent fairness of the plan on all levels

22 to the dissenting class.  And for the reasons I just talked

23 about with respect to trading dilution for windfall, it's not

24 inherently fair to the dissenting class, and we think,

25 therefore, must fail under both (a) and (b).  Thank you, Your

1  Honor.

2          THE COURT:  Thank you.  Mr. Etkin, I don't think I've

3  seen you sit quietly for so long.

4          MR. ETKIN:  Well, good things come to those who wait,

5  Your Honor.  And at the risk of being somewhat of an

6  afterthought here, we did file an objection to confirmation

7  setting forth some discreet and straightforward issues that we

8  have with the plan.

9          THE COURT:  Let me begin by asking whether the

10 changes made in respect to what I'll call the record retention

11 part of the objection, have they satisfied your objection --

12         MR. ETKIN:  Well --

13         THE COURT:  -- or is there still an issue?

14         MR. ETKIN:  The important answer is that there is no

15 longer an issue.  I looked at what the proponents had

16 suggested, suggested something different.  Over the course of

17 the last two days, Your Honor, we've exchanged some drafts and

18 made some tweaks, and I think that we're now at a point where

19 we've agreed upon language that can be inserted in the

20 confirmation order as well as the liquidating trust agreement

21 substituting the language that was added in a few days ago that

22 would be acceptable to us and would resolve that aspect of our

23 objection.

24         THE COURT:  Okay.  Anything else been resolved?

25         MR. ETKIN:  No.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  Let me give you just a preliminary

2    reaction to the points of your objection, so you can focus your

3    argument appropriately.  I do think the debtor has the better

4    part of the argument.  That to carve you out parallel to the

5    SEC, just it doesn't -- you're not a governmental investigatory

6    agency and shouldn't be accorded that same level of freedom.

7          But with respect to, putting that aside, the other

8    bars that the debtor has put in your way or proposes to put in

9    your way with respect to continuation of the securities

10   litigation, I do think there's some merit to the debtor's

11   argument that a blanket open -- well, let me see -- opening the

12   door to all such litigation as part of the confirmation order

13   would interfere with the administration of the estate and that

14   it's better and more appropriate -- in fact, it more often than

15   not happens this way -- that the individual plaintiffs come

16   back on a motion to say okay I want to go forward.  Typically

17   what happens at that point is the parties work out the

18   parameters of how that should happen, and if they can't, then

19   the Court decides.  Those are my reactions.

20         With respect to the pre-petition exculpation

21   provision to which you object, I may tend to agree with you,

22   but now that I've given you my views, why don't you give me

23   yours?

24         MR. ETKIN:  Okay, Your Honor, and I think the Court

25   really pointed out where we stand.  You know, in terms of some

**J&J COURT TRANSCRIBERS, INC.**

1  of the arguments that were raised in the debtor's reply, I mean

2  we're certainly not disputing the fact that under the plan,

3  that despite the significant losses, that defrauded

4  shareholders have incurred in this case -- and they are clearly

5  the great unwashed in this case -- that the plan does not

6  provide any distribution based upon the subordination

7  provisions of the Code.  We understand that.  We haven't

8  disputed that, but we are here in order to protect the few

9  pathways to recovery that we do have that we think that the

10  plan unjustifiably sets up some roadblocks.

11          In terms of the extension of the automatic stay, Your

12  Honor -- and I read the typical and anticipated floodgates

13  argument.  By the way, I -- let me take one step back.  There

14  has been a change in the setup of these interconnecting

15  exculpations and plan injunctions and extensions of the stay

16  that were in the original plan.  Ms. Uhland pointed them out,

17  and it does impact to some extent the objection that we filed,

18  so let me just put that out there in the first instance.

19          The debtor was no longer a protected party as defined

20  under the plan, so the plan injunction, which is a bit of a

21  different animal, does not include the debtor under its

22  umbrella of protections.  And as I read the plan now -- and

23  it's always somewhat challenging to navigate these injunctions

24  and exculpations and releases and whatever else.  But as I read

25  the plan now, the debtor is being protected by the extension --

1  so-called extension of the automatic stay beyond confirmation

2  through the closing of the case or the termination of the

3  liquidating trust, which, as we pointed in our papers, could be

4  as long as eight years.  So it's sort of a plan injunction but

5  not really a plan injunction.  So I just wanted to get that

6  out, and it does impact the argument a bit.

7          Here's where we stand, Your Honor, with respect to

8  the extension of the automatic stay.  The debtor pointed out a

9  case, which is, we believe, precisely on point, and that's the

10 Teamsters Pension Trust case, and they did the analysis, and we

11 believe clearly, pursuant to the Code, the automatic stay

12 terminates upon the denial of a discharge, and in that case,

13 because under a liquidating plan there is no discharge, which

14 is tantamount to the denial of a discharge, the automatic stay

15 then terminates.

16         The case that the debtors cite in their reply, the

17 Allied Technology case, I don't really believe it stands for

18 what the debtors hope it would stand for.  It is first and

19 foremost not a liquidating plan where the discharge is denied

20 by statute by the Code.  It's a case involving a merger, and

21 there a discharge remained possible, but pursuant to plan

22 language, the Court deemed that the discharge was postponed to

23 a later date when the claim was resolved, so, as a result, the

24 stay was not terminated in connection with that claim.  So I

25 don't really see that as having any relevance to the

**J&J COURT TRANSCRIBERS, INC.**

1   circumstances here.  So that really turns you back to this

2   floodgates argument, Your Honor, where there really is no

3   evidence to demonstrate that people would be filing in with

4   respect to taking advantage of the statutory provision that

5   provides that the automatic stay terminates upon the denial of

6   a discharge.

7        The real concern -- and you can read it in the papers

8   maybe a little bit between the lines -- is concerns relating to

9   the liquidating trust where all the assets are being

10  transferred and where all the activity is going to take place.

11  Essentially on the effective date the debtors will be a shell.

12  The liquidating trust has the protections of the plan

13  injunction.  I'll get to my concerns about that in a moment,

14  but the debtor really doesn't need those protections and isn't

15  entitled to those protections.  And interestingly enough, the

16  cases that the debtor cites in their reply when they drop down

17  and resort to the always favorite 105-type injunction, and that

18  that could substitute itself in for really reimposing the

19  automatic stay.  All of those cases without question, to the

20  extent they're relevant at all, say that it's a case-by-case

21  analysis.  We'll look at the situation.  It's debtor's burden

22  to come in or -- post-confirmation and seek a re-institution of

23  the stay for whatever reasons may exist in connection with that

24  particular matter.

25        So there's really no presupposing this floodgates-

**J&J COURT TRANSCRIBERS, INC.**

1 type argument -- excuse me.  There's no presupposing this

2 floodgates argument.  There's certainly no evidence that the

3 wrecking ball is sitting poised ready to come down with respect

4 to the kind of burden that one would have in seeking injunction

5 relief under 105.  So I frankly, Your Honor, just don't see it.

6 I don't see why, you know, because of some conclusory statement

7 that we're concerned about some people or some group or whoever

8 coming in and seeking some relief against the debtor, which

9 will no longer have any assets, which will essentially be a

10 shell, and no particular concern to the liquidating trustee who

11 has -- who will have the protections and is entitled to some

12 protections pursuant to the plan injunction.  I certainly

13 understand that.

14          I just don't see why the debtor on this record -- and

15 again I believe it is the debtor's burden -- why the debtor on

16 this record would be entitled to a blanket reimposition of the

17 stay, which by statute disappears at confirmation because of

18 some fear of what might happen.  I understand the

19 practicalities, Your Honor.  I understand that we can come back

20 in and -- come back into this court and seek relief and argue

21 that and spare over that.  I just don't think at that juncture

22 in the case that it should really be our burden.  I don't think

23 the Code anticipates that.  I think the cases that even the

24 debtor cited stand for the proposition that the reimposition of

25 the stay, under whatever circumstances existed in those cases,

**J&J COURT TRANSCRIBERS, INC.**

1 is only appropriate on a case-by-case basis where the debtor

2 appropriately demonstrates -- or the post-confirmation debtor

3 or whatever appropriately demonstrates that they're entitled to

4 what amounts to injunctive relief.

5         And so, Your Honor, that's my take on the -- on the

6 stay provision of the plan.  I think that it's -- it's more

7 than an issue of administrative convenience.  I think you've

8 got to look at the Bankruptcy Code and see what it says about

9 when the stay expires.  And even one of the cases, the <u>Moody</u>

10 case, that the debtors cite in their papers, they cite the

11 <u>Teamsters</u> case for the same proposition and favorably in

12 connection with the proposition that the stay expires by virtue

13 of the terms of the statute under circumstances where there's a

14 liquidating plan because of the denial of the discharge at the

15 time -- because there is no discharge at the time that -- at

16 the time of confirmation.

17         So leaving what may be perceived practicalities

18 aside, Your Honor, in connection with imposing that obligation

19 on others who might want to come in, I think right now I might

20 be the only game in town who's stood up and identified that as

21 a possibility.  It may have some curb appeal at first blush,

22 but I just don't think it holds up under the case law and under

23 the Code.  We just believe it's inappropriate.

24         And to some extent, Your Honor, I'll skip the order

25 that the -- that our points are made in the objection, because

1  to some extent this does tie in to our issue with respect to

2  being able to pursue our claims against the debtor solely to

3  the extent of available insurance coverage, because, number

4  one, there is no injunction under the plan now with the removal

5  of the debtors as a protected party.  There is no injunction to

6  that effect under the plan.  The stay should expire, shouldn't

7  be there.  The liquidating trust and other creditors really

8  have no skin in the game other than the fact that they may be a

9  competing claimant to the insurance proceeds that are

10  available, and that's always been somewhat of an undercurrent

11  here, but that doesn't provide creditors with any greater

12  rights to those insurance proceeds than we do as a competing

13  claimant to those proceeds.

14         So with respect to that issue, and the fact that the

15  debtor is not entitled to a discharge by statute under

16  circumstances -- under the circumstances here, we really don't

17  understand the push back with respect to our ability to be able

18  to proceed against the debtor solely to the extent of available

19  insurance proceeds.  There's no issue that the debtor is a

20  beneficiary under the DNO policies, I believe.  I did take a

21  look before today.  There was a policy that was filed in

22  connection with a prior motion before Your Honor regarding the

23  use of proceeds for the payment of defense costs, but I did

24  have a chance to take a look at the policy that was attached to

25  that motion, and the debtor is clearly a beneficiary.  There's

1  clearly entity coverage to the debtor solely for securities

2  litigation under those policies.  The only way we can access

3  those policies is through proceeding against the debtor.  We

4  have no direct right of action against the carrier.  The debtor

5  makes some argument --

6          Let me just take a look for one second in their

7  papers.  I mean they make the 510(b) argument that we're a

8  subordinated creditor.  That's always the mantra I hear.  It's

9  just not relevant in these circumstances.  We're not looking to

10 change our classification under the plan and the results of

11 that classification.  But it is akin to a personal injury

12 claimant that consistently will get stay relief, so long as

13 they agree to limit their recovery to the available insurance.

14 It's no different than that.  And given the fact that the

15 debtor is not entitled to a discharge, given the fact that we

16 don't believe and the case law and the Code do not support the

17 continued -- the blanket continuation of the automatic stay

18 beyond confirmation or the effective date, we don't see that

19 there's -- there should be any issue as to our ability to

20 simply proceed against the debtor as a beneficiary of that

21 insurance, which, of course, by the way, has been -- to the

22 extent that it's an executory contract, it will be assumed by

23 virtue of confirmation of a plan, assuming that takes place.

24         So given all of those factors, Your Honor, we believe

25 that the plan should not preclude us from proceeding with our

**J&J COURT TRANSCRIBERS, INC.**

1  rights against the debtor solely to the extent of the

2  insurance.  That's all we've asked.

3          Let me get briefly, Your Honor, to the issue with the

4  plan injunction after navigating through it.  And very

5  respectfully, Your Honor, I really don't see why we are any

6  different than the SEC with respect to that carve out.  I don't

7  think the SEC status as a federal agency has anything to do

8  with the debtor paying closer attention to their complaint than

9  ours other than the fact that they're the SEC.  I don't think

10 that the case law or the Code create any distinction under

11 circumstances where there's an issue as to whether non-debtors

12 are receiving the benefit of a plan injunction or a release

13 under a plan.  That's the issue.  That's the issue that we're

14 concerned about.  And, frankly, in all candor if that language

15 never appeared in there, maybe I wouldn't even be here talking

16 about it, maybe I wouldn't, but it does.

17          So, unfortunately, I've done this enough times.  My

18 antenna to up, and I'm saying what am I missing.  What did I

19 not read?  What comma did I not see with respect to these

20 provisions?  And then I invariably come to the conclusion, Your

21 Honor, that if it is surplusage, and if there's no intention to

22 in any way impact our rights to pursue our claims against non-

23 debtor third parties, what's the big deal?  Why the push back?

24 Why the problem?  I don't have an answer to that, at least not

25 a good one that I can come up with, other than the fact that

1 we're not a federal agency and maybe don't win the ear of

2 debtor's counsel as quickly as a call from the SEC would.

3         So that's why we believe that we should be afforded

4 the same carve out, because if it's -- if all it will do is

5 confirm what the plan is intended to do or not to do, I don't

6 see the problem.  The other problem with the plan injunction,

7 Your Honor, is if you read through the language, and it is a

8 permanent injunction -- if you read through the language, it

9 could be interpreted to mean that we're permanently enjoined

10 from issuing a subpoena to the liquidating trust for the

11 documents that hopefully at one point in time we will be able

12 to review in connection with the pursuit of these securities

13 litigation in California.  That time has not come yet.  It will

14 hopefully come at some point in time, and as I read the plan

15 injunction provisions, there is a permanent injunction which

16 would, at least arguably, preclude the service of process or

17 the attempt to enforce service of process on the plan trustee.

18 That's a problem.  I don't think that that's justified.  I

19 don't think that there can be any justification for that.  I

20 certainly --

21         THE COURT:  I guess there's some irony in having

22 agreed to a document and data retention policy, but -- keeping

23 you from getting to those things.

24         MR. ETKIN:  Well, I understand all that, Your Honor,

25 but, you know, I've got to dot all the I's and cross all the

1  T's here, and at least, you know, my client is hoping that I

2  do.  So, you know, I'm anticipating and hoping that none of

3  these things will be issues in the real world, but I'm here

4  today.  There's a plan that says X, Y, and Z that cause us, we

5  think, unnecessarily some heartburn in terms of our ability to

6  move forward in the future.

7          You know, the other issue is -- just to give you an

8  example of the kind of mischief that this can -- that this can

9  and has created over the years, and it's because of that

10  mischief that, you know, I pay a little bit too much attention

11  to this stuff.  Plan proponents include the members of the

12  Review Committee in connection with the liquidating trust.

13  There's a Deutsche Bank entity that's on that committee that

14  benefits from the plan injunction.  There's a Deutsche Bank

15  entity that is currently a defendant in the securities

16  litigation.

17          Now, I know the arguments that can be made that it

18  doesn't apply.  That it's in this capacity or that capacity.

19  Nonetheless, Your Honor, wouldn't it be simpler and more

20  appropriate to just indicate as the debtor and the Committee as

21  plan proponents have done for the SEC that we simply -- that

22  the plan is not intended to preclude us from proceeding against

23  non-debtors in connection with the securities litigation?

24  There may be other defendants that are added.  The securities

25  litigation, as Your Honor knows from the pleadings, still

**J&J COURT TRANSCRIBERS, INC.**

1  pretty much remains in its infancy, and there may be additional

2  defendants added along the way as additional information

3  becomes available.  I just don't think it's appropriate for us

4  to be placed in a position of having to navigate that labyrinth

5  in order to come up with the arguments as to why this one's not

6  covered and why this doesn't mean that under the plan when the

7  simple solution would be to provide us with the same

8  confirmation that the SEC received as to the impact of these

9  provisions on their ability to proceed against non-debtors.

10            MS. UHLAND:  Just briefly, Your Honor, with respect

11  to the exculpation, we are prepared to -- we will clarify that

12  the exculpation is not intended to -- the pre-petition

13  exculpation portion, which we carved NCCC out, is not intended

14  to impact his -- lose any claims in his litigation.  That's not

15  the injunction, which is the liquidating trust and the service

16  of process, but on that part, we are prepared to agree with

17  that.

18            MR. ETKIN:  Thank you.

19            MS. UHLAND:  You're welcome.

20            MR. ETKIN:  I appreciate that.  I don't know exactly

21  what that means, but --

22            THE COURT:  Oh, I would take that as good news.

23            MR. ETKIN:  It's a good -- it's --

24                      (Laughter)

25            MR. ETKIN:  It's clearly good news.  It's clearly

1   good news.  But the plan injunction is a serious problem for
2   us.  It's a serious problem, as I've discussed, as it relates
3   to it really amounting to a permanent injunction against the
4   service of process on the plan trustee.  There are other
5   aspects of the plan injunction that we're not -- we have no
6   objection to and obviously understand the need for it, but as
7   far as its reach beyond what's necessary or giving us an
8   opportunity to appropriately seek production when the time
9   comes from the liquidating trust, who will be the recipient of
10  all of the debtor's records and computer-generated data, it, to
11  me, Your Honor, is inappropriate.
12           I should also, you know, point out that the two cases
13  that are cited in the debtor's reply as they relate to the
14  appropriateness of the scope of the plan injunction, I really
15  don't have to go into them in any length, Your Honor, but they
16  simply don't stand for that proposition.  I think one case
17  really had to decide the issue after the plan was confirmed
18  with similar-type language, I guess because they had no pain in
19  the neck like me standing up at confirmation and objecting to
20  it.  But it really didn't go to the appropriateness of that
21  provision.  That provision was already a given under
22  circumstances that I'm not familiar with.  And the other
23  involved an action against the Creditors' Committee based upon
24  some post-petition conduct.  I don't think that the Creditors'
25  Committee is on our gun sights, Your Honor, in this case, and I

1    think that those facts are just so totally inapposite that it

2    really doesn't support the proposition that the debtors are

3    citing those cases for, but irrespective of that, we just don't

4    believe that the plan injunction as currently crafted is

5    appropriate given the concerns that we've raised in our papers

6    and I'm raising before you today.

7             The last issue, which is what I don't understand

8    totally with respect to what Ms. Uhland just gave me, although

9    I'm not looking a gift horse in the mouth, the thing that

10   concerned us about the exculpation provision was some language

11   that was added kind of last minute before the plan and

12   disclosure statement were finalized for distribution and

13   solicitation, Your Honor, and that talked -- let me get the

14   precise language from the plan, so I can just hone in on it.

15   It talks about all of the exculpated parties.

16            THE COURT:  Tell me where you are.

17            MR. ETKIN:  I'm sorry, Your Honor.  And I don't know

18   that you're going to be able to follow, because I'm looking at

19   the draft -- at a draft before the most recently draft.  It's

20   13C is the section.  That's the exculpation provision, but if I

21   give you the page number, I'm afraid I'm going to cause more

22   trouble than solve.  Yes, the -- it's Page 99 in my copy, Your

23   Honor, but I think the most recent --

24            MS. UHLAND:  This is his current version.

25            MR. ETKIN:  Oh, 99.  Then it is --

**J&J COURT TRANSCRIBERS, INC.**

1          MS. UHLAND:  It's an exhibit to the motion, Your

2     Honor.

3          MR. ETKIN:  Thank you.  And the language is that

4     they're, "released from any claim, cause of action, or

5     liability to any other exculpated party to any holder of a

6     claim or interest or to any other party in interest, (a)

7     pertaining to the timing of the commencement of the Chapter 11

8     cases."  I guess my first problem, Your Honor, is I don't know

9     exactly what that means.  I can tell you what it could mean,

10    which causes us the concern, and that is given the conduct at

11    issue in this case, that clearly relates to pre-petition

12    conduct.  I don't know what upper management that this company

13    was discussing vis-a-vis the potential commencement or the

14    filing of a Chapter 11 case that coincides with issues that are

15    relevant to securities litigation, but I certainly don't want

16    to see any of that thrown up in our face down the pike as a

17    means for any of these defendants to assert that the plan

18    somehow exculpates themselves from some aspect of their pre-

19    petition conduct that ties into bankruptcy planning and the

20    other issues that we're confronting in the securities

21    litigation.  Can I gave you --

22         MS. UHLAND:  (Indiscernible) with the -- with our

23    proposal.  So that what -- with respect to that, Your Honor,

24    there's a -- the last sentence of C is what I'll call the

25    clarification of that language, and in the amendment to the

1  plan the SEC requested clarification on this same point, and so

2  you'll see in the black line on this same page, 91, you have

3  the or SEC.  And we can -- what I've -- what we can do is we

4  can clarify that we are not -- that none of the pre-petition

5  claims that are being litigated in the securities cause of

6  action are in any way released by this language.  That there

7  are no --

8          MR. ETKIN:  Sounds good to me, Your Honor.  We'll

9  work on the language.

10         THE COURT:  All right.

11         MR. ETKIN:  I mean I'm not going to take it any

12 further than that.

13         THE COURT:  Very good.

14         MR. ETKIN:  And, you know, hopefully, we'll be able

15 to at least deal with that one.

16         THE COURT:  All right.

17         MR. ETKIN:  Your Honor, I think that sums up our

18 position.  I heard loud and clear the Court's thoughts before I

19 got started, and hopefully, I've added maybe a little meat to

20 the bone with respect to our argument and the reasons why we

21 have the legitimate concerns that we do.

22         THE COURT:  All right.  Thank you.  Let me -- who

23 wishes to respond to this, the debtor or the Committee, because

24 I don't know who's driving -- I don't know who's driving this

25 issue?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. UHLAND:  It's on the --

2          THE COURT:  All right.  Ms. Uhland, let me ask you

3  this.  Why are we still talking about this?

4          MS. UHLAND:  Which provision?

5          THE COURT:  Why hasn't some agreement been reached?

6  Why can't you decide now what ought to happen with respect to

7  this litigation?

8          MS. UHLAND:  Well, let's -- actually, let's --

9  there's two -- I think there's two issues that are -- really

10 fundamentally that are still open with the claimants, and one

11 is, frankly, my issue, and one I'm going to ask Mr. Indelicato

12 to address.  The two issues are what happens with the subpoena

13 that they're -- that is going to be served when they get to the

14 stay -- when they get the -- the PSLRA stay is lifted and we

15 come -- they come here?  And the question is, is -- does there

16 need to be a process back in this court in order to make a

17 determination on that issue?  And the parties here believe that

18 there should be.

19         We think that there is in this case clearly

20 justification to extend the stay, and given the nature of that

21 action, that is continuation of a debtor's complaint, we'd like

22 to have that we -- it supposed to be the plan proponents, and

23 it's really more the successors to this interest want to be

24 able to come back to this court to make sure that they have an

25 opportunity to be heard on, you know, how that matter is

**J&J COURT TRANSCRIBERS, INC.**

1  ultimately resolved and to work it out under this court's

2  jurisdiction.  So there's really -- there's -- fundamentally

3  from the plan proponents' point of view there's a desire to

4  make sure that this doesn't automatically get a third party

5  subpoena with no ability to come back to this court with

6  respect to its administration.

7          THE COURT:  Well, let me ask, based on one of the

8  arguments Mr. Etkin made, where in this record is there support

9  for that relief?

10         MS. UHLAND:  The support for the relief of the -- you

11  know, it's going to have to be on the matter on file on these

12  cases with respect to the complexity of the debtor's

13  operations, the fact that they were -- in the course of this

14  case we've seen multiple relief from stay motions, and we're

15  continuing to see them from other pending litigation.

16         THE COURT:  Without glorifying him to an unnecessary

17  extent, Mr. Etkin really is the only who's been here, you know,

18  taking positions on various things and asking to be now let go.

19         MS. UHLAND:  Your Honor, I mean the -- we have

20  Positive Software.  We had plenty of litigation in this case

21  where parties were seeking to litigate --

22         THE COURT:  Well --

23         MS. UHLAND:  -- and obtain information from the

24  debtors.

25         THE COURT:  Understood, but it just seems to me the

**J&J COURT TRANSCRIBERS, INC.**

1  time has come -- or let's put it this way.  Not that there's

2  ever only one time to address such issues, but it seems to me

3  this is a good time to address this issue and to make the

4  arrangement, and I -- other than the fact that you don't want

5  to, I don't understand why you don't.

6        MS. UHLAND:  Well, on that issue -- see, the question

7  is simply should we stipulate -- should the estates or the

8  liquidating trust stipulate now to relief to have the subpoena,

9  you know, served on the liquidating trust and the debtors

10 respond to that discovery.

11       THE COURT:  Yes, I mean the same thing that we decide

12 in a hearing, that you'd like to occur later as opposed to now,

13 forgetting who has the burden to show what, but why not now?

14       MS. UHLAND:  On this issue it's primarily a successor

15 issue.

16       MR. INDELICATO:  Your Honor, I have tried very hard

17 for two days to keep quiet, but I guess now I must respond.

18 Your Honor, this is something that we have looked at, and if

19 what the Court is asking, would we agree that Mr. Etkin and his

20 client can serve the subpoena, I think the answer to that is

21 yes.  Our concern really is giving a broad brush release, and

22 this was really a concern of the potential or the proposed

23 liquidating trustee.  He's a liquidating trustee in another

24 mortgage case, and without this relief it is very difficult.

25       THE COURT:  Well -- and I said to Mr. Etkin when he

**J&J COURT TRANSCRIBERS, INC.**

1 stood there --

2          MR. INDELICATO:  Yes.

3          THE COURT:  -- as an overall matter, I can understand

4 why the debtor would want not to be inundated or to have the

5 liquidating trustee inundated with such things.  But I hear one

6 voice right now and --

7          MR. INDELICATO:  Yes, and that -- Your Honor, as I

8 said, we would not have an objection to him serving the

9 subpoenas reserving the liquidating trustee's right to come in

10 and contest the scope of that subpoena or anything related to

11 it.  As this Court is aware and will become aware in the -- you

12 know, in the weeks and months ahead, one of the most

13 significant portions of this -- the legal fees associated with

14 this case related -- relate to the litigations and the

15 production of documents, and we are -- we're working with Mr.

16 Etkin to preserve the documents for him, so they're not going

17 anywhere, and that's the mandate of the proposed liquidating

18 trustee.  We just want to make sure that the issues come before

19 this Court at an appropriate time on an appropriate manner.

20          THE COURT:  Okay.  Thank you.

21          MS. UHLAND:  And, Your Honor, really with respect to

22 the stay issues, one of our concerns is to not -- in light of

23 their concern, we don't want the -- with the relief sought by

24 the -- and I think the Court is already getting to this.  This

25 relief sought by the plaintiffs is to wipe out our protections

1  for -- from every creditor which we, you know, vehemently think

2  is not even in -- you know, is not in the interest of any of

3  the creditors of the estate, and we would like -- and we hope

4  that the Court would focus simply on their requested relief.

5          THE COURT:  I am, and I'm trying to, and I'm trying

6  to get you to focus --

7          MS. UHLAND:  I understand.

8          THE COURT:  -- that way, also.

9          MS. UHLAND:  You meaning the whole courtroom, yes.

10         THE COURT:  The plan proponents.

11         MS. UHLAND:  The plan proponents, yes.  The other

12  issue that -- and I think that with the exculpation, we could

13  understand, yet, frankly, Your Honor, this carve out language

14  -- and I explained it in the reply brief or attempted to.  The

15  odd carve out in the injunction language for the SEC was

16  negotiated with the SEC when we had a much broader group of

17  protected parties.  In fact, we have the debtors and protected

18  parties, and the SEC wanted to be very clear that if had

19  debtors and protected parties, that we weren't doing anything,

20  because the SEC may want to be investigating officers of the

21  debtors that had a -- when we had debtors and protected

22  parties, that they not be, you know, prejudiced in any way.

23         Now, the next step that we entered into with the SEC

24  in our negotiations was to take debtors out of protected

25  parties, and but the SEC wanted to keep the carve out that

**J&J COURT TRANSCRIBERS, INC.**

1  they'd negotiated in there, because they'd negotiated it, and

2  they wanted the absolute clarity.  So on this injunction

3  provision, you know, that's why we have I understand, you know,

4  looking at someone getting an exception and wondering, well,

5  maybe that means that it might affect me.  I really is

6  surplusage, but the SEC was very, you know, concerned, and we

7  were in the process of addressing their informal objection.

8  I'm not sure how we can -- you know, based on that explanation

9  and the record, I would hope that that would be satisfactory.

10         THE COURT:  It is satisfactory to me.  I'm not -- I'm

11  -- to the extent that objection is outstanding, I'll overrule

12  it.  But again -- and I -- I'll suggest something in a minute

13  in terms of how we go about this or how you go about this.

14  Whether you do it outside the plan, which is -- it seems to me

15  you could, or in the plan, I think you need to address the

16  remaining objections to Mr. Etkin's clients now.

17         My thought is -- and this will lead to timing in

18  terms of when I'll issue a decision, but I would really like to

19  try to, from the bench or by agreement, address Mr. Etkin's

20  concerns.  Our next hearing is coming up May 7th.  I can you to

21  then to try to work something out.  I won't have a confirmation

22  decision out by then, in any event.

23         MS. UHLAND:  Your Honor, there's one -- and I think

24  on the discovery issues we will certainly endeavor to do so.

25  There's one other remaining legal objection that we weren't

**J&J COURT TRANSCRIBERS, INC.**

1  able to work out in any way ahead of time, because I think the

2  parties are so -- I don't want to get -- we're so far apart,

3  and let me just frame that, and you can let me know whether we

4  think this is something to be determined now or later.

5            There is a -- the -- Mr. Etkin's arguing that his

6  clients should have the benefit of a relief from stay to go

7  after insurance proceeds that sometimes offered to personal

8  injury claimants, and our plan should provide as such.  And

9  this is one of these arguments -- I have not heard this request

10 before, so as -- and so it struck us as, you know, just very

11 unusual, and it seemed like a pure attempt to improve his

12 position through our plan process in a way was really -- we

13 aren't even capable of doing.

14           DNO policies -- our DNO polices are indemnity

15 policies.  They're not the type of liability policies that

16 under some state laws, you know, a tort claimant might have a

17 direct claim to, and so it isn't a situation that we have our

18 insurance policy is providing New Century some kind of defense

19 to the securities litigation.  In fact, the only claims against

20 New Century are the proofs of claim that are sitting there.

21 They're not being litigated against New Century.  They're

22 stayed.  And the plan -- to the extent the -- Mr. Etkin's

23 clients have any direct claims under the insurance policies --

24           THE COURT:  Well, he said they do not.

25           MS. UHLAND:   Well -- and then it just seems very

1  strange that there would be any reason under our plan, and we

2  have insurance policies, which -- about $50 million of which

3  the debtors are, in fact, beneficiaries, and another layer to

4  which the debtors are not even covered parties.  Why a plan

5  would create a direct right in a third party to insurance

6  policies that are owned by the debtors --

7         THE COURT:  I don't think it needs to, but when it's

8  appropriate, you know -- and I guess this goes to the bigger

9  issue to let him go do what he needs to do.  And at some point,

10 it seems to me, he's going to be, and I know everyone wants it

11 later rather than sooner.  You may discuss that, too.  But no,

12 I -- you know, I don't --

13         MS. UHLAND:  Well, Your Honor, to the --

14         THE COURT:  I don't see why the plan --

15         MS. UHLAND:  Okay.

16         THE COURT:  -- must contain, you know, a lift stay as

17 part of it.

18         MS. UHLAND:  All right.

19         THE COURT:  All right, so what hasn't been resolved

20 either already or by my rulings?  You know, let's have a status

21 on May 7th, and to the extent there is a ruling yet to be made

22 by the Court, I will make it.

23         Now, I guess that's all contingent upon what

24 ultimately happens with the Ad Hoc Committee's objection,

25 because there might be no confirmation.  So it's -- I won't do

1  it in pieces, but I'm inclined to address it in a different

2  form than I will the Ad Hoc Committee's objections.

3          MS. UHLAND:  Thank you, Your Honor.

4          THE COURT:  Okay.

5          MS. UHLAND:  One other note I wanted to make.  The

6  counsel for the IRS has been patiently waiting in the

7  courtroom.  Just to let the Court know that we have over the

8  past two days reached agreement in language that will go into

9  the confirmation order.  I'll be positive and not put a

10 question mark on the existence of the confirmation order.  That

11 will go into our confirmation order, just to note that that's

12 been resolved.

13         THE COURT:  Okay.  Now, while we're speaking of that,

14 here's what my intention would be to resolve the Ad Hoc

15 Committee's objection by written opinion and order, and if I

16 overrule the objections, then the order will just say they're

17 overruled.  If I sustain them, it'll say that.  But if they're

18 overruled, what I will do is say by separate order there will

19 be a detailed confirmation order along the lines of what's been

20 suggested.  Now, I do have -- I've reviewed the form of

21 proposed order, and I do have some of my own comments to make,

22 but I think until I'm satisfied there should be a confirmation,

23 I'll hold my comments until that time.  All right.  Mr. Etkin,

24 I saw you rising.  Did you have any questions?

25         MR. ETKIN:  Yes, I just wanted some clarification,

**J&J COURT TRANSCRIBERS, INC.**

1 Your Honor.  I apologize for staying on this, but I don't want

2 -- I certainly don't want the debtor to think that our

3 objection was requesting some special treatment for us.  That

4 wasn't the point of the objection, and it does tie in to the

5 whole issue of the appropriateness of the extending the stay,

6 but there -- the point is that there is no way to access the

7 proceeds of the policy then by pursuing beneficiaries of that

8 policy.

9        Now, the reason why the debtor hasn't been an active

10 participant in the litigation is obvious.  We're stayed, and we

11 could not during the course of this case, nor would I have had

12 the temerity to come into court and ask it for a lifting of

13 that stay under the circumstances of this case to pursue the

14 debtor in Federal Court in California.  But again the time --

15 this is -- the time has come.  Things have changed.

16 Circumstances have changed, so I would hope that what Your

17 Honor was suggesting was that perhaps that the -- one of the

18 items that we discuss between now and March 7th --

19        THE COURT:  I did suggest that it be one of the

20 discussion items, yes.

21        MR. ETKIN:  Okay.  Thank you, Your Honor.

22        THE COURT:  All right.  That I think means we've

23 addressed all of the outstanding objections.  Is there anything

24 further in connection with confirmation?

25        MS. UHLAND:  Your Honor, I think while we could rebut

1  some of the statements made in Mr. Keach's arguments, we also

2  provided substantial papers that the Court --

3        THE COURT:  You did, and I guess my thought was, too,

4  is the parties wish one an opportunity to make post-hearing

5  submissions, I would permit it.  I would not look for repeats

6  of that which has already filed.  I would not look for lengthy

7  submissions.  What would be helpful to the Court, if the

8  parties wished to submit -- and I won't require it, but I'll

9  give you the opportunity, and we'll talk about scheduling in a

10  moment.  So why don't you get a transcript if you'd like to

11  highlight for the Court those parts of the record that support

12  from the proponents' standpoint confirmation, and from the

13  objectors' standpoint, they can point out the gaping holes in

14  the record which militate against approving confirmation.  That

15  probably is what would be most helpful to the Court.

16        In terms of timing, are there any trigger issues from

17  the debtor's standpoint like failure to obtain confirmation by

18  a certain date jeopardizes financing or makes some other bad

19  thing happen?

20        MS. UHLAND:  Let me -- can you allow me to confer

21  with my --

22        THE COURT:  Yes.

23        MS. UHLAND:  -- client?

24                    (Pause)

25        MS. UHLAND:  Your Honor, no -- given it's a

**J&J COURT TRANSCRIBERS, INC.**

1  liquidating case, no fixed triggers that we heard of.  Just an

2  overwhelming desire to cut the burn rate on behalf of all

3  parties.

4          THE COURT:  And Ms. Uhland's driving of everyone

5  toward that finish line.  All right.  Well, it's -- as I think

6  I may have mentioned, I'm out three days next week at the

7  Circuit's Judicial Conference.  I have a busy time coming up,

8  but this will be at the top of the list, and we will turn out a

9  decision as quickly as we can, but it's going to be -- and I

10  won't commit myself, because every time I do, it's a mistake.

11  But I'm looking to do something between two and four weeks from

12  today, within that window.  It won't be by the next time we

13  meet on the 7th.  So how long for an expedited transcript?

14          THE CLERK:  (Inaudible).

15          THE COURT:  Tuesday.  So I would say within a week --

16  submissions within a week after receipt of the transcript.

17  Does that give the parties enough time?

18          MS. UHLAND:  Does that make sense?

19          MR. KEACH:  Yes, that's fine with us, Your Honor.

20          THE COURT:  And it's not going to stop me from

21  beginning on something.  You know --

22          MR. KEACH:  No, that's fine.  I'm just thinking of

23  timing and thinking of my schedule, but I think that's fine.

24          THE COURT:  Okay.

25          MS. UHLAND:  That's fine, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  A week from receipt of the

2    transcript for submissions and just one round simultaneously.

3          MS. UHLAND:  Okay.  Your Honor, my expectation is on

4    the one issue with Mr. Etkin -- and perhaps we can both agree

5    to briefly brief this -- is that on the insurance issue, that's

6    one where we are -- I don't believe there's a possibility of a

7    middle ground.  Should we -- would you like additional

8    briefing --

9          THE COURT:  No.  No.

10         MS. UHLAND:  -- on that as well?

11         THE COURT:  I don't think -- I don't need any

12   additional briefing on that.  And so that the parties are

13   clear, I'd like you to talk about it, and I don't -- as I said

14   before, I don't think the plan needs to provide a pathway for

15   you, so that you can get to the insurance coverage.  On the

16   other hand, it may be that you can be more definitive about the

17   process to be followed to get to the next step, even if it only

18   applies to this plaintiff.  It doesn't need to be embodied in

19   the plan, but I am inclined to see that that moves along.

20         MS. UHLAND:  All right.  Well, Your Honor, we have

21   granted relief from stay for -- on a sort of stepped basis to

22   get -- for the beneficiaries, and, otherwise, the defendants in

23   this litigation do have access to the insurance policies.  So

24   it isn't as if -- which is a little different than some cases.

25   So as a going -- suing the third parties, the non-debtor

**J&J COURT TRANSCRIBERS, INC.**

1 parties, there's no -- we have relief from stay.

2             THE COURT:  But the claim against the debtor has to

3 be liquidated at some point.  That's --

4             MS. UHLAND:  No, it doesn't.  It's a 510(b) claim.

5             THE COURT:  Well, talk about --

6             MS. UHLAND:  Okay.

7             THE COURT:  -- what the plaintiffs here need.  To the

8 extent you disagree, I will rule, and we'll be done with it.

9             MS. UHLAND:  And that'll be on the May 7th we'll --

10 if we can't reach agreement, we'll proceed to argument on May

11 7th?

12             THE COURT:  Yes.

13             MS. UHLAND:  Okay.  Thank you, Your Honor.

14             UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

15             MR. LOGAN:  Just one clarifying question, Your Honor.

16 The additional submission that would be due a week from

17 whenever the transcripts are prepared, you don't want briefing,

18 just references to the transcript or the record that support

19 various propositions?

20             THE COURT:  In whatever -- well, put it this way.

21 That's what would be most helpful to me in whatever form.  I

22 don't want proposed findings and conclusions in narrative form.

23 Yes.  Does that answer your question.

24             MR. LOGAN:  Yes.

25             THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. UHLAND:  And to the extent there's legal

2    rebuttal, can we briefly include that as well?

3          THE COURT:  Certainly.  Briefly.

4          MS. UHLAND:  Briefly.  I'm -- brief is usually safer

5    with me than some others in the courtroom.

6          THE COURT:  Now.  Now.  Now.  All right.  So let me

7    ask the debtor to make arrangements after the hearing for

8    ordering of the transcript, and we'll go from there.  Is there

9    anything further in connection with today's proceedings?

10          MS. UHLAND:  I don't think so, Your Honor.  I guess

11    one question is on the -- what should our next step be with the

12    draft confirmation order?  Should it -- should we continue to

13    try to incorporate the changes that we've discussed and maybe

14    resubmit it to the Court with the compromises contained?

15          THE COURT:  I would say do everything but submit it.

16          MS. UHLAND:  So -- okay.

17          THE COURT:  Yet, maybe what I'll do is on the 7th

18    I'll give you the thoughts I have.  But again, Mr. Keach, fear

19    not, because it's not because I've made my mind up yet, because

20    I haven't.  If I had, I'd tell you now.

21          MR. KEACH:  I understand.

22          MS. UHLAND:  Okay.

23          THE COURT:  Okay.  Anything further?

24          MS. UHLAND:  No, Your Honor.

25          THE COURT:  All right.  Thank you, all.  That

**J&J COURT TRANSCRIBERS, INC.**

187

1  concludes this hearing.  Court will stand at recess.  We'll

2  reconvene for the 3:00 conference call.

3          ALL:  Thank you, Your Honor.

4                    *  *  *  *  *

## C E R T I F I C A T I O N

          We, DENISE O'DONNELL, RITA BERGEN, ELAINE HOWELL, and

PATRICIA C. REPKO, court approved transcribers, certify that

the foregoing is a correct transcript from the official

electronic sound recording of the proceedings in the above-

entitled matter, and to the best of our abilities.


/s/ Denise O'Donnell
DENISE O'DONNELL


/s/ Rita Bergen
RITA BERGEN


/s/ Elaine Howell
ELAINE HOWELL


/s/ Patricia C. Repko
PATRICIA C. REPKO

J&J COURT TRANSCRIBERS, INC.        DATE:  April 29, 2008

**J&J COURT TRANSCRIBERS, INC.**