UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                    .    Case No. 07-10416 (KJC)
                          .
NEW CENTURY TRS           .
HOLDINGS, INC., et al.,   .
                          .    824 North Market Street
                          .    Wilmington, DE 19801
                          .
        Debtors.          .    April 24, 2008
. . . . . . . . . . . . . .    11:06 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Richards, Layton & Finger, P.A.
                           By:  MICHAEL J. MERCHANT, ESQ.
                                CHRISTOPHER M. SAMIS, ESQ.
                           One Rodney Square
                           920 N. King Street
                           P.O. Box 551
                           Wilmington, DE  19899

                           O'Melveny & Myers, LLP
                           By:  SUZZANNE UHLAND, ESQ.
                           610 Newport Center Drive
                           17th Floor
                           Newport Beach, CA 92660

                           O'Melveny & Myers, LLP
                           By:  BEN H. LOGAN, ESQ.
                                ANDREW PAVLEN, ESQ.
                                ANGELA WANG, ESQ.
                           400 South Hope Street
                           Suite 1060
                           Los Angeles, CA 90071

Audio Operator:            Nickita Barksdale

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

```
For Deutsche Bank          Nixon Peabody, LLP
National Trust Co.:        By:  DENNIS J. DREBSKY, ESQ.
                           437 Madison Avenue
                           New York, NY   10022


For Natixis Real           Bayard
Estate Capital Inc.:       By:  ERIC M. SUTTY, ESQ.
                           222 Delaware Avenue
                           Suite 900
                           P.O. Box 25130
                           Wilmington, DE  19899


For Morgan Stanley:        Milbank, Tweed, Hadley &
                            McCloy LLP
                           By:  JEFFREY MILTON, ESQ.
                           1 Chase Manhattan Plaza
                           New York, NY  10005


For the United States:     U.S. Department of Justice
                           By:  JAN M. GEHT, ESQ.
                           Washington, DC


For the Ad Hoc             Bernstein, Shur, Sawyer & Nelson, P.A.
Committee of Deferred      By:  ROBERT J. KEACH, ESQ.
Compensation Plan                PAUL McDONALD, ESQ.
Beneficiaries:             100 Middle Street
                           Portland, OR  04104

                           Stevens & Lee
                           By:  JOSEPH H. HUSTON, JR., ESQ.
                           1105 North Market Street
                           Wilmington, DE  19801


For Wells Fargo Bank       Eckert Seamans Cherin & Mellott, LLC
& Zurich American          By:  RONALD S. GELLERT, ESQ.
Insurance Co.:             4 East 8th Street, Suite 200
                           Wilmington, DE  19801


For Countrywide:           Edwards & Angell, Palmer
                            & Dodge, LLP
                           By:  WILLIAM E. CHIPMAN, JR., ESQ.
                           919 North Market Street
                           Wilmington, DE  19801
```

APPEARANCES (Cont'd.):

For Countrywide:            Draper & Goldberg, PLLC
                           By:  ADAM HILLER, ESQ.
                           903 Sycolin Rd., Suite 301
                           Leesburg, VA  20175

For Bank of America:       Potter, Anderson & Corroon, LLP
                           By:  GABRIEL R. MacCONAILL, ESQ.
                           Hercules Plaza
                           1313 North Market Street
                           Wilmington, DE 19801

For the Official           Hahn & Hessen LLP
Committee of Unsecured     By:  MARK T. POWER, ESQ.
Creditors:                      MARK S. INDELICATO, ESQ.
                           488 Madison Avenue
                           14th and 15th Floor
                           New York, NY  10022

                           Blank Rome, LLP
                           By:  BONNIE GLANTZ FATELL, ESQ.
                           Chase Manhattan Centre
                           1201 Market Street
                           Suite 800
                           Wilmington, DE 19801

                           Blank Rome, LLP
                           By:  REGINA STANGO KELBON, ESQ.
                           One Logan Square
                           130 North 18th Street
                           Philadelphia, PA  19103

For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  JOSEPH McMAHON, ESQ.
                           844 King Street
                           Suite 2313
                           Lockbox 35
                           Wilmington, DE 19801

For Credit Suisse/DLJ:     Chadbourne & Parke LLP
                           By:  DOUGLAS DEITSCH, ESQ.
                           30 Rockefeller Plaza
                           New York, NY  10112

APPEARANCES (Cont'd.):

For RFC:                       Dorsey & Whitney, LLP
                              By:  ERIC L. SCHNABEL, ESQ.
                              95 Route 17 South
                              Paramus, NJ  07652

For FIS:                       Baker & Hostetler, LLP
                              By:  DONALD A. WORKMAN, ESQ.
                              Washington Square
                              1850 Connecticut Ave., NW
                              Washington, DC  20036-5304

Certain D's & O's:             Morris, James, Hitchens &
                               Williams, LLP
                              By:  CARL N. KUNZ, III, ESQ.
                              PNC Bank Center
                              222 Delaware Avenue
                              10th Floor
                              P.O. Box 2306
                              Wilmington, DE  19899

For New York State             Lowenstein Sandler, PC
Teachers' Retirement          By:  MICHAEL S. ETKIN, ESQ.
System:                       65 Livingston Avenue
                              Roseland, NJ 07068

For Carrington Capital         Mayer, Brown, Rowe & Maw
Management, Inc.:             By:  SEAN SCOTT, ESQ.
                              190 South La Salle Street
                              Chicago, IL  60603
                              (telephonic appearance)

For UBS Real Estate            Paul, Hastings, Janofsky & Walker
Securities, Inc.:            By:  KIMBERLY D. NEWMARCH, ESQ.
                              191 North Wacker Dr., 30th Floor
                              Chicago, IL  60606
                              (telephonic appearance)

For Bank of America:           Kaye Scholer LLP
                              By:  NICHOLAS CREMONA, ESQ.
                              425 Park Avenue
                              New York, NY  10022
                              (telephonic appearance)

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Wells Fargo Bank,       Kelley Drye & Warren LLP
N.A.                        By:  HOWARD STEEL, ESQ.
                            101 Park Avenue
                            New York, NY  10178
                            (telephonic appearance)

For Pima County:            GERMAN YUSUFOV, ESQ.
                            (telephonic appearance)

**INDEX**

**WITNESSES:**                                                    **PAGE**
HOLLY ETLIN
   Proffer by Mr. Logan                                            63
   Cross Examination by Mr. Keach                                  81
   Direct Examination by Mr. Power                               128
   Redirect Examination by Mr. Logan                             154
   Recross Examination by Mr. Keach                              163
   Redirect Examination by Mr. Power                             166
   Further Redirect Examination by Mr. Logan                     168

SAMUEL STAR
   Direct Examination by Mr. Power                               177

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| Declaration of Jamie Edmonson | -- | 56 |
| Demonstrative Exhibit - Chart | -- | 68 |
| Ad Hoc 11 REIT conversion agreement | 85 | 86 |
| 1 Carrington Capital Management LLC agreement | 86 | 87 |
| 2 Document dated 12/1/04 | 88 | 88 |
| 3 Document dated 3/21/06 | 89 | 92 |
| 4 Document dated 7/11/06 | 93 | 93 |
| 5 Pleading filed by CCM | 95 | 98 |
| 6 NCFC Deferred Compensation Plan | -- | 107 |
| 8 Document dated February 2008 | 99 | 101 |
| 9A thru 9F - Various amendments to schedules | 102 | 102 |
| 7 Document | 104 | 105 |
| D-1 Adversary Complaint | 155 | 162 |
| D-2 Demonstrative Chart | 155 | --- |

1          THE CLERK:  Okay.  If everyone could please take your

2 seats?  The Judge is going to be coming in.

3                      (Pause)

4          THE CLERK:  All rise.  Be seated, please.

5          THE COURT:  Good morning, all.

6          ALL:  Good morning.

7          MS. UHLAND:  Good morning, Your Honor.  We are here

8 today with respect to at least two matters, our motion to amend

9 -- to modify our plan, which we would like to take up first,

10 and then the confirmation hearing with respect to our plan.

11          We have been able to resolve many of the objections

12 to the confirmation of the plan.  There are -- at least there

13 are two that we are aware of.  Two -- actually, three

14 objections that we understand are still pending.  Those are

15 those of the Ad Hoc Committee of participants in our deferred

16 compensation plan, the New York State Teachers Retirement, the

17 securities class action plaintiffs, and the -- I might get the

18 initials scrambled -- the Deutsche Bank affiliate that filed a

19 claim -- the Deutsche Bank entity that filed an objection most

20 recently.

21          THE COURT:  Deutsche Bank National Trust Company.

22          MS. UHLAND:  Yes.  The way we propose to proceed

23 today is to take first our motion to modify the plan.  We think

24 that lays the framework to proceed with the plan.  And we've

25 received this morning an objection, which if the objector's

1   here pressing that objection, we'll address it in connection

2   with that motion.

3           Thereafter, what I'd like to do is walk the Court

4   through some additional changes beyond the modified plan filed

5   with the Court, some additional changes to the plan that are

6   the result of some of these agreements that we've reached to

7   resolve both formal and informal objections.  And so we can --

8   the Court has an understanding of what's been resolved, what

9   remains open, and we all have a precise picture of what our

10  plan looks like that we're seeking to confirm today, and I'll

11  walk the Court through those changes.

12          After that we will be proceeding to put on -- what we

13  propose to do is put on our case in chief with respect to

14  confirmation of the plan, and at the conclusion of that address

15  the remaining objections that are still pending.

16          THE COURT:  Okay, and what will the form of the

17  presentation of your case in chief involve?

18          MS. UHLAND:  What we propose, Your Honor, is with

19  respect to the plan proponents, because we're co-proponents

20  here, is that we will be presenting the ballot -- the ballot

21  report to the Court and reviewing its results.  We'll

22  thereafter be reviewing through proffer the testimony that is

23  common in this district.  We'll be reviewing by proffer the

24  compliance with the 1129(a) standards as well as submitting by

25  proffer some additional factual testimony, and those would be

1  proffers of Ms. Etlin and Mr. Brents.  We'll be submitting

2  those proffers.

3          Thereafter, the Committee, as a co-proponent of the

4  plan, will be -- I'm actually unclear whether they're taking by

5  direct testimony or proffered testimony of Sam Star as a

6  witness, and thereafter, the debtors will be proceeding to

7  argument on certain key issues with respect to -- legal issues

8  with respect to the plan.

9          THE COURT:  Do any objectors have any live witnesses

10  to present today?

11          MR. KEACH:  Your Honor, the Ad Hoc Committee will be

12  presenting its case through Ms. Etlin, Mr. Brents, and Mr.

13  Star, so my thought was if they are going to put in the direct

14  testimony through the declarations that have been filed, it

15  would be appropriate to cross those witnesses seriatim.  We

16  would proceed by cross examination in response to the proffer.

17          THE COURT:  All right.  Anyone else?

18          MS. UHLAND:  And, Your Honor --

19          MR. KEACH:  The only other issue I think, Your Honor,

20  when we get to that point, as Your Honor knows, we filed

21  motions to strike the declarations and a motion in limine, and

22  it would be appropriate to take that up, it seems to me, before

23  we get the consideration of the proffers and of the cross

24  examinations.

25          THE COURT:  Very well.

1          MS. UHLAND:   And, Your Honor, to be clear, we have

2     declarations that are submitted.   Our intent to -- is to submit

3     by proffer.   There may be some additions -- supplemental

4     testimony to which they will -- we will be proffering them in

5     addition to the declarations, but we will submit all of that by

6     proffer, and it will all be subject to cross examination by Mr.

7     Keach or other objectors.

8          So at the conclusion of -- as I said, our final step

9     would be the presentation of our case and argument.   I think at

10    that time it may make sense to take arguments in -- well, we'll

11    see, because we'll see what objections remain with the -- we'll

12    not have discreet legal issues, and it's unclear to me as we go

13    through some of the argument, particularly with respect to the

14    New York State Teachers, which are more discreet objections to

15    the plan, we may want to group our sets of arguments by topic.

16    We can conclude that, I think, when we get to it.

17         And then finally, Your Honor, we submitted a draft of

18    the confirmation order this morning.   I don't propose to review

19    that when I'm initially reviewing the plan.   I think we can

20    wait until the end of the process to determine the right way to

21    go through the confirmation order and proceed to get that

22    finalized.

23         THE COURT:   All right.   And just in terms of general

24    time frame, what do you anticipate?   I know you can't

25    anticipate the length of cross examination, but I'll ask Mr.

1   Keach about that.  But from the debtor's standpoint, because

2   basically I'm interested in are we -- do you think we'll finish

3   today?  We do have tomorrow set aside.  Any thoughts?

4           MS. UHLAND:  Your Honor, we believe, based on our

5   time, that we will be able to finish today given the number of

6   objections that we've resolved, and the fact that our proffered

7   testimony is -- the declarations are not voluminous and the

8   proffer, while slightly longer than the declarations, we don't

9   expect to be an extended period of time.  So the real argument

10  will be what it is.  My colleague, Mr. Logan, will be involved,

11  so I will not give the Court too aggressive a view of the

12  timing constraint given my experience with him.  But as --

13                      (Laughter)

14          MS. UHLAND:  I'm sorry.  We've been operating on low

15  amounts of sleep lately.  So it really would depend on the

16  length of the cross examination, Your Honor.

17          THE COURT:  All right.  Mr. Keach, any notion of how

18  extensive in terms of time?  And I'm not asking for a

19  commitment, just the --

20          MR. KEACH:  Sure.  No, I mean, actually, I think

21  we'll be reasonably efficient and reasonably brief, Your Honor.

22  I do not expect any of the individual crosses to exceed 20 or

23  30 minutes, and they'll probably be less.

24          THE COURT:  All right.  Then in terms of scheduling,

25  we'll probably go a couple hours or so.  We will take a lunch

1  break and resume thereafter, and how late we go today will

2  depend on how far things have developed.

3            In terms of the Court's decision, frankly, I'm not

4  sure what to tell you, except that all of my options are open.

5  My goal was always to try to make decisions from the bench, but

6  as I think you recognize, some of the features of the plan

7  involve a framework which is unique, certainly new to me, and

8  some issues which impact not only confirmation but arguably the

9  adversary matter in which one of the major objectors is

10 involved.  So I'll decide at the end whether and what

11 objections I can resolve on  the record from the bench, and I

12 will do that as and when I can.

13            With respect to others, I may need to take them under

14 advisement and either write on them or spend some time

15 preparing remarks which I can read into the record at some

16 point hopefully in the very near future.

17            MS. UHLAND:  We appreciate that, Your Honor, and

18 there's many -- many aspects of this case have been new and

19 complex, and it's been a learning experience for all of us.

20            THE COURT:  And the darn Judge is always a little bit

21 behind that curve, I know.

22            MS. UHLAND:  What I'd like to do so we can get things

23 going is with respect to the motion to modify, the primary

24 aspect of that motion has to do with a settlement with Goldman

25 Sachs.

1                THE COURT:  Goldman.

2                MS. UHLAND:  I'm going to turn that over to my

3    partner, Mr. Logan, and have him address those aspects of the

4    motion to modify.

5                THE COURT:  Very well.

6                MR. LOGAN:  Thanks.  Your Honor, actually, let me

7    pass on one other good piece of news that Ms. Uhland was not

8    even aware of, and that's on the outstanding objections.  One

9    has been resolved.  That's the Deutsche Bank National Trust

10   Company objection, and I'll go ahead and make the statement on

11   the record that Mr. Drebsky, Mr. Power, and I agreed to a

12   minute ago.

13               They filed an objection largely related to the

14   gathering of information related to complying with the

15   EPD/Breach Protocol.  We've engaged in discussions with them

16   really at a businessperson level as to how to facilitate that,

17   make it as least painful as possible, and those discussions

18   have gone well.

19               And, accordingly, Deutsche Bank will be withdrawing

20   its objection with full reservation of their rights to come

21   back before the Court if things break down to seek a

22   modification of the process, and that's quite acceptable to the

23   plan proponents.

24               THE COURT:  Very well.

25               MR. DREBSKY:  I can just, on behalf of Deutsche

 1 Bank --

 2          THE COURT:  You need to come to a microphone, sir.

 3          MR. DREBSKY:  Dennis Drebsky representing Deutsche

 4 Bank, and I would agree with the representations made by

 5 counsel.  Hopefully -- we have 103 trusts to administer, and

 6 that's caused some problems in terms of gathering information

 7 and what's needed.  Hopefully, it could all be worked out.

 8 There has been productive discussions at I'll call it the

 9 technical level but wanted to make sure that if those broke

10 down, we'd have access to this Court to modify the

11 questionnaire and the protocol.

12          THE COURT:  All right.  Thank you.

13          MR. DREBSKY:  Thank you.

14          MR. LOGAN:  Your Honor, turning to the motion to

15 modify the plan, and specifically with respect to New Century

16 Warehouse Corporation, what we call Access Lending as a defined

17 term, when we filed the plan a month or so ago, there were a

18 number of issues that we were hoping to resolve before we got

19 to this point, and I'm very pleased to report that one of the

20 key issues was the Access Lending issue with Goldman Sachs.  We

21 are very clear in the plan that each plan for each debtor needs

22 to be confirmed on its own standalone basis, and, accordingly,

23 whether or not we could meet the standards with respect to

24 Access Lending was critically important to the co-plan

25 proponents.

1          Access Lending is a standalone subsidiary in the

2  sense that it really operated autonomously from the other

3  debtors, had its own capital structure, had its own accounting

4  systems that were, of course, consolidated, but it was quite

5  autonomous.  It itself is what we call a warehouse lender, and

6  I'll use that, because that's the terminology they used.  They

7  provided financing to other loan originators who were not

8  affiliated with any of the debtors.  They in turn had financing

9  provided to them by repurchase counter parties, three of which

10  were major repurchase counter parties, State Street Guaranty

11  Bank and Goldman Sachs.

12          At the time of the filing of the cases by the main

13  debtors, April 2nd, 2007, Goldman Sachs and Access Lending were

14  at war.  The other two they've made peace with.  And I'm sure

15  Your Honor will remember in late April we brought a motion

16  before the Court to sell substantially all of the assets of

17  Access Lending, and that sale was consummated.  The long and

18  short of it is that Access Lending is now a shell corporation.

19  It has some cash.

20          I'm pleased to report that the situation's improved a

21  bit since when we filed the motion.  The motion said there was

22  $3.28 million of cash on hand, we expect that by the effective

23  date that to increase to 4.28.  It is now 4.28.

24          THE COURT:  Now, Mr. Logan, not to interrupt you, and

25  to assure that Ms. Uhland did not put me up to this, but I have

1 read the debtor's motion --

2          MR. LOGAN:  Fine.

3          THE COURT:  -- and I have read the objection.  And

4 without oversimplifying -- well, maybe oversimplifying the --

5 what seems to be the dispute, Natixis said -- is that how you

6 pronounce it?  Says it's not that we don't like the settlement,

7 it's just that we don't know how it may hurt us, my words, not

8 theirs, in our action that's not taking place in this forum.

9 The debtor's position is it's not going to affect them at all.

10 It seems to me that's the essence of the objection here.

11          MR. LOGAN:  That's right, Your Honor, and so let me

12 deal specifically with that.  Natixis has filed a contention

13 claim.  It's an unliquidated claim.  It's a claim for

14 indemnification.  They've been sued by Goldman in New York

15 State Court for $6.7 million.  So they filed a claim against

16 Access Lending for $6.7 million, and, as they state in their

17 objection, that's essentially duplicative of the Goldman claim.

18          Accordingly, the debtors filed an objection.  We

19 think it's objectionable under 502(e)(1)(b).  It's a claim --

20 it' a duplicate claim.  It's basically a double count, and

21 until and unless they are obligated to Goldman Sachs, they

22 don't have standing to bring the claim.  None of that's

23 affected though by this plan.

24          Whatever their rights are to oppose the debtors,

25 Access Lending, in that objection, we're not trying to

1  prejudice whatsoever, but that is the context.  They assert

2  they are part of an unsecured creditor pool that includes

3  Goldman Sachs, and, quite frankly, some trivial other

4  creditors.  There's about $1,000 to a trade creditor, and

5  Shepherd Mullin is owed about $60,000 for some pre-petition

6  work.

7          The settlement we think is beneficial to the estates

8  and, quite frankly, neutral or perhaps helpful for Natixis in a

9  couple respects.  Goldman Sachs as part of the settlement

10  agreed to reduce its claim from the $15.1 million filed to

11  slightly less than $10 million but, most importantly to agree

12  that once they got a 30-cent recovery on that, they won't take

13  any additional consideration whatsoever.  That means -- and the

14  30-cent recovery can be satisfied in essence by the cash on

15  hand.  So the million one that's yet to be recovered, we hope,

16  will be shared without Goldman participating.

17          If Natixis has a valid claim against Access Lending,

18  there will be the beneficiary of Goldman waiving the balance of

19  its claim.  The estates will also be the beneficiary of Goldman

20  waiving the balance of the claim, because the estates have

21  about a $3.9 million inter-company claim.  NCMC has a $3.9

22  million inter-company claim against Access Lending, and the

23  real bid and ask of the compromise was that NCMC effectively

24  agreed to partially subordinate its claim.  It would be reduced

25  by 40 percent, so that all creditors other than NCMC, including

1  Natixis, which share out of the cash on hand, and then after

2  the cash on hand is distributed, and unsecured creditors get a

3  30-cent recovery, Goldman goes away, so that benefits Nataix,

4  and it benefits NCMC.

5         From the estate's perspective, that's beneficial,

6  because we trade, quite frankly, some -- we get some upside and

7  trade for some downside and resolve issues about whether or not

8  the inter-company is a valid claim or capital contribution, and

9  the dollar impact on NCMC is trivial.  It gets lost in the

10 routing.  I don't have a calculator that goes out that far.

11 But, as far as Natixis is concerned, purely focused on Natixis,

12 Natixis benefits in several respects.

13        First off, with respect to the point in time until

14 unsecured creditors against Access Lending realized 30 cents on

15 the dollar, it benefits, because (1) Goldman reduces its claim,

16 the estates, NCMC, reduce its claim by 40 percent, and then

17 Natixis, if it has a valid claim after the 30-cent recovery is

18 realized, again will benefit as will all other unsecured

19 creditors, because Goldman weighs in the additional recovery.

20        So it was a settlement, a settlement that I wish had

21 happened earlier, but shock upon shock, settlements in the plan

22 process break out, and this one actually broke out fairly far

23 in advance of the confirmation hearing, at least a week in

24 advance.  So it's a settlement that we think is actually

25 beneficial to Natixis.

1          It certainly doesn't have a material adverse impact

2   on Natixis.  Natixis has a claim that's disputed, but if we're

3   wrong on that, there's nothing in the settlement that

4   prejudices Natixis, and Natixis gets the benefit of having both

5   the Goldman claim capped and then -- and reduced and capped,

6   and Goldman waiving any additional distribution and having the

7   NCMC claim partially subordinated for the first 30-cent

8   recovery.

9          So, frankly, it's beneficial to Natixis.  We don't

10  think Natixis has a valid claim until and unless they pay

11  Goldman, but that's for another day.

12          THE COURT:  Thank you.

13          MR. SUTTY:  Good morning, Your Honor.  Eric Sutty of

14  Bayard on behalf of Natixis Real Estate Capital.  We did submit

15  an objection this morning.  First I'd like to address a couple

16  of the issues raised by debtor's counsel.

17          They say they object to our claim under 502(e)(1)(b).

18  That objection has not been brought before this Court, and we

19  reserve all rights to defend that objection.  They have

20  objected to our claim under 502(b).  We filed a response, and

21  the parties have agreed to continue that to the May 7th

22  hearing.  We think we will have a valid claim in this court,

23  and it's premature to object under 502(e)(1)(b).  Our claim is

24  not co-liability with the debtors that our interpretation of

25  502(e) addresses.

1        Natixis paid these funds to --

2        THE COURT:  Before you continue.  Let me ask while

3   what you just said might be relevant in connection with the

4   claim objection hearing, does it have any relevance to what the

5   Court should consider in connection with approving the proposed

6   settlement?

7        MR. SUTTY:  No, we just wanted to make it clear on

8   the record that we reserve all rights --

9        THE COURT:  All right.

10       MR. SUTTY:  -- with respect to that.  Mr. Logan

11  indicated that the settlement will be beneficial to Natixis.

12  We don't know.  We don't know how this settlement will impact

13  our claim against the estate.  We don't know how it will impact

14  the New York litigation that Goldman has brought against us.

15  That is the basis of our objection.

16       On three days' -- three business days' notice the

17  debtors are trying to approve a settlement with very little

18  detail.  It's our belief that the way the claim amount was

19  derived at was they looked at Goldman's claim.  There was an

20  amount asserted in there for certain mortgage loans of $15.1

21  million.  That number encompasses the same 38 mortgages that

22  are subject to the New York litigation.

23       THE COURT:  So far, I don't think you've said

24  anything with which the debtor would disagree.

25       MR. SUTTY:  Well, I think --

1            THE COURT:  In terms of the facts.

2            MR. SUTTY:  Correct.  The impact on us is unknown,

3   and I think this Court is the proper Court to determine whether

4   the settlement amount is being allocated against those 38 loans

5   which will affect our claim in these estates.  We should be a

6   party to this settlement.  We've contacted debtor's counsel.

7   We've tried to get involved in the settlement, and they

8   precluded us from all those discussions.  If we're left with a

9   claim -- I mean the allocation of the Goldman settlement

10  proceeds in the New York litigation will impact the claim that

11  Natixis has in these cases.  We are trying to get information

12  on what that allocation is and how it will affect our claim.

13  That is not provided in this plan modification motion.

14            THE COURT:  Thank you.

15            MR. SUTTY:  Thank you.

16            THE COURT:  Any response?

17            MR. LOGAN:  I will be really brief this time, Your

18  Honor.  I -- what Natixis is basically is saying is they want

19  resolution of how this affects their New York state litigation.

20  We don't try to deal with that one way or another.  That's

21  between them and Goldman.  Goldman and Natixis can sort it out.

22  If I wanted to speculate, I'd speculate it has a positive

23  impact.  Every dollar Goldman gets reduces claims Goldman could

24  assert against Natixis, but we're just not trying to deal with

25  that.

1           THE COURT:  Well, let me ask this.  While the parties

2   may have either together or separately reached the settlement

3   figures as a result of some allocation, does the settlement

4   agreement itself provide an allocation?

5           MR. LOGAN:  Your Honor, in fact, we didn't get into

6   an allocation whatsoever.  The settlement agreement does not

7   touch that issue, and we did not discuss that with Goldman.  We

8   really don't think it's our business.

9           THE COURT:  All right.  Thank you.  I'm going to

10  overrule the objection.  The papers I think clearly explain the

11  benefit of the settlement to the estate, but more to the

12  objection itself, I cannot perceive how -- based upon how the

13  settlement is structured, that it will prejudice or could

14  prejudice Natixis in its New York litigation or in the claim

15  objection.

16          Whether it specifically benefits, as the debtor

17  suggests, Natixis individually, there's certainly an overall

18  benefit to the estate.  This is just one piece of many pieces

19  of litigation involving disputes about loan sales.  I guess

20  most or all of which are going to be resolved if the plan is

21  ultimately confirmed, and I can't fathom from the objection how

22  approval of the settlement would harm Natixis.

23          Now, I will say yes, they came to the Court on short

24  notice.  It's not unusual, however, as Mr. Logan alluded to,

25  that in the lead up to confirmation that there would be a

1  flurry of last-minute compromises either formally proposed or

2  suggested right at confirmation hearing.  But I don't see what

3  the benefit of additional time would yield to anyone in

4  connection with consideration of this proposed settlement and

5  modification to the plan.  Consequently, I will overrule the

6  objection.

7           MS. UHLAND:  Thank you, Your Honor.

8           THE COURT:  Now, is there a separate order to be

9  entered on that motion, or will you simply rest with

10  incorporation into the plan of the revisions?

11           MS. UHLAND:  We actually have a separate, Your Honor

12  -- order, Your Honor --

13           THE COURT:  All right.  Bring it up.

14           MS. UHLAND:  -- if I may I bring it up?

15           THE COURT:  Yes.  Thank you.

16                     (Pause)

17           THE COURT:  That order has been signed.

18           MS. UHLAND:  Thank you, Your Honor.  Next I'd like to

19  walk through some additional revisions that we've made to the

20  plan.  The red-lined plan should've been brought over to the

21  court this morning.  It now on the front has instead of

22  brackets, if you looked at the red lined, it now says dated as

23  of April 23rd.  We have several copies of this red-lined plan.

24  We'll want to make sure that certain objectors whose -- we'll

25  be handing those out momentarily, so people could follow along

1  as I walk through.

2            THE COURT:  I have it.

3            MS. UHLAND:  You have yours?  Thank you.

4            THE COURT:  Yes, I do.  Do you have an extra copy for

5  my law clerk?  Thank you.

6                     (Pause)

7            MS. UHLAND:  Before launching into these additional

8  changes to the plan, I just wanted to point the Court to a

9  couple of changes -- and the parties to a couple of changes

10 that were made -- that were made a little bit earlier, so,

11 therefore, they went in the filed modified plan to address the

12 SEC's concerns.  And one of the reasons, I'd like to point it,

13 is because it clarifies some portions of the plan that then

14 flow through some of the objections.

15            In the initial-filed version of the plan the debtors

16 had provided for both the continuation of the stay, which would

17 protect the debtors, as well as an injunction designed to --

18 really to protect the liquidating trust, and we used the define

19 term protected parties to describe those who were included in

20 these injunctive provisions.  And in the filed version of the

21 plan with the disclosure statement protected parties focused on

22 the liquidator or included the liquidating trustee and the

23 liquidating trust and the debtors.

24            In accordance with our agreements with the SEC, they

25 wanted -- they were concerned, given their ongoing

1  investigations, to have anything other than the clarity of the

2  automatic stay governing whatever they would be doing with

3  respect to the debtors, qua of debtors.  Accordingly, we

4  removed -- and this is in our motion to modify -- the debtors

5  from the definition of protected parties, but we made more

6  clear the language with respect to the automatic stay just

7  expanding the language to incorporate more of the statutory

8  provisions to be clear that both the automatic stay of a 362(a)

9  plus the exceptions in 362(b) would be what would be

10 applicable, therefore, giving the SEC the comfort they need

11 with respect to their provisions.

12         THE COURT:  It's the same comfort that New York

13 Teachers have asked for.

14         MS. UHLAND:  Yes, although they may not be entitled

15 -- well, so they're -- the SEC has the comfort that they're

16 excluded under the police power.  The New York Teachers should

17 be comforted that they can still bring motions under the same

18 legal standards under 362 to obtain relief from such a stay,

19 and -- but that -- so that was just a modification that we made

20 that -- as I said, just to clarify that on the record, that was

21 part of the prior motion.

22         With respect to the additional modifications this

23 morning, there are some that I'll just skip over very quickly

24 where we decided for clarification we needed to say something

25 or another thing was in accordance with the Bankruptcy Code.

1 And there were some instances where we talked about, in

2 particular, Access Lending and didn't indicate that it was

3 access lending or its estate.  So there were some cleanup

4 modifications of that nature.

5         The other modifications were designed to resolve

6 informal objections from the United States Trustee, and I'm

7 going to walk through those, as well as a refinement on --

8 actually, it was a resolution of an informal objection to the

9 disclosure statement with respect to providing documents, and

10 this was an issue raised by Wells Fargo.

11         So again on just -- this is not red lined, but Page

12 17 of the document that I distributed, you'll see the

13 definition of protected party does not include the debtors in

14 such a -- in that definition.

15         Page 53 is one of the typo -- one of the

16 clarification changes referring to the Bankruptcy Code.

17         Page 54 includes a provision at the request of the

18 U.S. Trustee with respect to the bond amount to be obtained by

19 the liquidating trust, and it provides that either the Plan

20 Advisory Committee and the U.S. Trustee can agree on the bottom

21 amount.  Alternatively, the parties can go to the Court, but it

22 gives the U.S. Trustee an opportunity to be part of the non-

23 court process.

24         On Page 61 there was a statement that appears to be a

25 determination of the tax treatment of liquidating trusts and

1 whether or not it is a, quote, disputed ownership fund.  We

2 have stricken it from the plan document, and this will be

3 attached to a Court order, and this would incorporate a binding

4 that may not be appropriate here, so we've stricken it from

5 that.  We have provided in the liquidating trust document

6 itself that it's the parties' intent that it not be such a

7 fund.

8         Page 66 is another of the clarifications referring to

9 the Bankruptcy Code, and Page 67 is a clarification with

10 respect to the debtor's estates or Access estate.

11        Page 84 there's a typographical error corrected.

12        On Page 92 -- give people a chance to catch up.  We

13 -- the U.S. Trustee observed that there was a lack of clarity.

14 To the extent we can remove executory contracts from our

15 scheduled executory contracts after confirmation, which is a

16 reservation in the document in the -- I guess it would be

17 Article 12A.  No, not 12.  Yes, 12A.  We didn't -- he did not

18 want or he observed that we could technically enter a documents

19 that have a retroactive date of rejection which didn't make

20 sense, so we clarified in the insert that to the extent we do

21 that, that the date we do that will be the date of rejection of

22 such contract.

23        On Page 96 with respect to our exculpation provision,

24 we clarified the -- sort of the meaning of reliance on counsel.

25 Again, the United States Trustee thought it inappropriate in

1  this document that there be a finding about something or felt

2  that this could be construed as the Court making a finding on

3  an absolute defense on facts not before it, and so we clarified

4  that.  That people could -- that individuals or exculpated

5  parties can rely on counsel with the effect that it would have

6  under applicable law.

7           Page 97 is a clarification also requested by the

8  United States Trustee, as is frequent in Chapter 11 plans,

9  particularly liquidating plans.  After the effective date the

10 liquidating trustee is the sole party with the right to object

11 to claims.  Prior to that there's no such limitation in the

12 Bankruptcy Code.  The United States Trustee wanted to be clear

13 that that limitation would not apply to fee applications or

14 other fee-related claims, and that's -- so (f) clarifies

15 nothing, alters the right of parties to object to fee claims or

16 503(b)(3) claims under the Code.

17          THE COURT:  While we're on a provision that discusses

18 fee applications, what is the parties' intention -- and I

19 assume there's some collective intention concerning when they

20 would be brought to the Court for consideration.

21          MS. UHLAND:  Well, it's interesting.  The United --

22 the Court is aware we -- our fee auditor is very behind in this

23 case, so we -- that's why we haven't had --

24          THE COURT:  I'm not aware of that.

25          MS. UHLAND:  Yes, the fee auditor is months -- well,

1  I mean they don't have deadlines for reviewing out documents,

2  so this Court has not had an initial -- I may be relying on

3  some of the people following this closely, but we have not had

4  an initial fee -- interim fee hearing in this case, because the

5  -- notwithstanding the dates of the submissions, the fee

6  auditor hasn't finished.  I think they may have just last week

7  finished reviewing the professional fees of the -- for the

8  first interim of the parties, and then there's the response

9  period, and then just as you've seen, Your Honor, just started

10  trickling in, whereas, the parties have actually -- most of the

11  parties have submitted both their first and second fee --

12  interim fee application.

13          So the parties will be prepared to file -- I believe

14  we have a --  it's 45 days, 60 days -- 45 days after the

15  effective date -- after the effective date is our date for

16  filing our final fee applications.  We would be aided if we had

17  more input from -- if we had all the responses from the fee

18  auditor, so that we could in effect address those in our final

19  fee applications.  And the parties are prepared to meet the 45

20  days, but it's been -- I mean it's been quite a source of

21  frustration, because people haven't been able to recover their

22  interim fees.

23          THE COURT:  Well, I was unaware of this.  I intend to

24  place a call to the fee auditor and find out what's happening,

25  but we've come this far.  I suppose it might be best simply to

1  just have one round at this point, if we can do that, and then

2  be done with it.

3          MS. UHLAND:  Well, I think he's -- we're almost there

4  with the first interim which takes us through July, which given

5  the levels of activity at the beginning of the case, I think --

6  and maybe we want to -- maybe at the conclusion of this hearing

7  I can go back and confer with the other professionals and see.

8  But my inclination would be to go ahead and have our first

9  interim, if we can, because my -- we should be almost -- almost

10 there.

11         But no, it's -- there's -- it's been oddly slow, and

12 then it's been a little bit if a jam for us, because, for

13 example, my firm, we got our response to the fee application --

14 or the auditor's response was due April 15, right in the middle

15 of this, so we kind of waited and waited and then got it and

16 had to respond.  But -- so it's been a bit of a timing

17 challenge for us.

18         THE COURT:  When I engage a fee auditor, I ask a

19 question that in my experience partners ask associates and

20 clients ask lawyers, and that is do you have time to handle it,

21 and the answer in this case was yes.  Okay.  Well, I will do my

22 followup.  You do your followup, and then I guess our next

23 hearing is early May.

24         MS. UHLAND:  May 7th.

25         THE COURT:  Why don't you give me a report on where

1  you think we stand and what we should do at that point?

2          MS. UHLAND:  We will do so, Your Honor.

3          THE COURT:  All right.  And if anyone else has a view

4  about that, they're welcome to express it at that time.  I also

5  have a view, which I will pass along at that time as well, but

6  I will hold it till then.  Okay.  I interrupted you.  Please

7  continue.

8          MS. UHLAND:  On Page 99 there are -- this has to do

9  with the ability to -- what happens if the plan does not go

10  effective.  What happens to the confirmation order?  In some

11  orders I have seen or some plans I have seen provide for an

12  automatic vacation of the order.  Sometimes it's vacated on

13  notice.  What we provided in our plan, thinking it was -- you

14  know, believing it was more appropriate than the automatic, was

15  to have it be a motion by the proponents that the order may be

16  vacated.  And the United States Trustee -- we were concerned

17  about whether this was a Rule 60 motion or some other kind of

18  motion, and so we just wanted to -- we ended up -- we and the

19  United States Trustee didn't get -- reach complete agreement on

20  whether Rule 60 applied, so the inserted language there is

21  effectively to reserve the parties' rights with respect to any

22  motion and the legal standards applying to it.

23          THE COURT:  Yes, and the proposed form of order

24  provides a 90-day period?

25          MS. UHLAND:  If we --

1            THE COURT:  Which would -- the expiration which would

2    trigger the right to do that?

3            MS. UHLAND:  If it -- if we haven't satisfied this,

4    yes, then after 90 days --

5            THE COURT:  Okay.

6            MS. UHLAND:  -- we can revoke it if we haven't gone

7    effective.

8            On Pages 103 and 104 we were trying to balance or

9    actually re-balance after further consultation with the

10   proposed liquidating trustee some of the obligations on the

11   liquidating trust with respect to execution of documents

12   necessary to effect sales and assignments of documents.  There

13   were many, many transactions for loans entered into, and there

14   are sort of trailing assignment documents that need to be

15   signed, and during the course of this case the debtors have

16   been, you know, signing on behalf of New Century to -- you

17   know, to allow these people to complete their transactions.

18           It is quite burdensome, and there are -- there is a

19   substantial volume of these.  The liquidating trustee going

20   forward wanted to be clear and, as I said, just re-balanced

21   this obligation on the estate that any of these requests sort

22   of on a go forward basis will be at the expense of the

23   requesting party.  And that they effectively on the -- we also

24   want to be clear that the requesting party -- you know, if we

25   -- if this still becomes burdensome, that the parties can

1 modify this requirement on a notice of motion.

2           THE COURT:  What about -- it triggers in my mind a

3 question about whether you would expect that I'll continue to

4 see these batches of lift stay motions that have been filed now

5 pretty routinely through the course of the case.  Does the plan

6 address that subject at all?

7           MS. UHLAND:  The plan does not, and what we're -- and

8 we tried to come up with some language with actually

9 Countrywide that filed an objection on that, and just because

10 of the nature of trying to describe that litigation as distinct

11 from other sets of litigation that we don't want to have relief

12 from stay with, what we've determined is that we are going to

13 try to do global stipulations with the parties who have been

14 filing them, and we're going to -- and we'll read about

15 Countrywide's objection.  We're going to enter into such a

16 stipulation with them in connection with confirmation, so that

17 they're free to proceed, but we were concerned about a global

18 statement on that.

19           THE COURT:  Okay, but my selfish concern is I think

20 that would obviate the need for the filing and disposition of

21 such motions with the Court.

22           MS. UHLAND:  Yes.

23           THE COURT:  Thank you.  And I mean thank you.

24           MS. UHLAND:  Also on Page 104 -- and this is also at

25 the request of the United States Trust -- this one is back to

1   the United States Trustee's request.  We wanted to clarify who

2   would get a notice of a non-material plan modification motion,

3   and that would go to the 2002 list.

4           On Page 105 the United States Trustee -- no doubt all

5   of us are watching our Supreme Court on this 1146 issue.  We

6   went back and wanted us to clarify and be more careful that we

7   were tracking the language of the statute there both with

8   respect to the making more and eliminating recording and then

9   to go to the language we're all waiting to be defined, stamp or

10  similar text.

11          And those are the proposed plan changes, and, as I

12  said, those were to resolve objections or potential and formal

13  objections by Wells Fargo as an indentured trustee for numerous

14  securitization trusts as well as the United States Trustee.

15  And we would have Mr. McMahon confirm that we've resolved his

16  issues with those revisions.

17          THE COURT:  All right.  Thank you.  Mr. McMahon.

18          MR. McMAHON:  Good morning.  Joseph McMahon for the

19  United States Trustee.  Your Honor, debtor's counsel did work

20  through with us on our concerns.  With respect to the 1146(a)

21  language, we saw for the first time today it still may not be

22  tight enough for our office's liking.  Without delaying

23  proceedings, what I'll try to do is work with debtor's counsel

24  between now and the close of it to come up with the language

25  which acceptably addresses our concern.  Thank you.

1          THE COURT:  Before you leave the podium, Mr. McMahon,

2 I take it -- and I confess I am indulging myself in asking this

3 question -- that the U.S. Trustee has not otherwise filed an

4 objection to confirmation.

5          MR. McMAHON:  Your Honor, that is correct.

6          THE COURT:  Okay, and I was curious about why not in

7 light of the barter with which its objection to the disclosure

8 statement was pressed, particularly concerning the substantive

9 consolidation issue.  Has the U.S. Trustee reached a different

10 position with respect to that?

11          MR. McMAHON:  Your Honor, at the time we addressed

12 the disclosure statement issue our concern was at that stage

13 with respect to what the impact would be if the debtors did not

14 properly notice and seek relief and make an evidentiary showing

15 with respect to whether or not they had met the substantive

16 consolidation test.  While they ardently fought our objection,

17 there was a -- what I would consider to be a concession made,

18 which was they amended the language in the disclosure statement

19 and plan to provide that they were primarily moving under Rule

20 9019 seeking approval of a settlement.  But in the event that

21 that was not the applicable standard, they were going to seek

22 substantive consolidation in the alternative.

23          So that was the issue at the disclosure statement,

24 whether or not we were going to be getting here today, Your

25 Honor, potentially faced with a decision where the Court would

1 not approve the plan and then have to do this all over again

2 for the sake of I guess who's right for lack of a better

3 description.  We have I guess considered the subject of whether

4 or not we were going to weigh in on that substantive test, and

5 we have elected not to take a position with respect to it at

6 the outset of a hearing subject to seeing whatever evidence

7 he's putting on.

8             THE COURT:  Thank you.

9             MR. McMAHON:  Thank you.

10            MR. GELLERT:  Good morning, Your Honor.  Ronald

11 Gellert from Eckert Seamans on behalf of Wells Fargo Bank in

12 this instance.  Your Honor, I just want to confirm that

13 counsel's statements with respect to the changes made to the

14 plan are satisfactory to Wells Fargo and do satisfy their

15 informal objection.

16            MR. McMAHON:  Thank you.

17            MR. GELLERT:  Thank you.

18                     (Pause)

19            MR. POWER:  Your Honor, sorry for the delay.  Mark

20 Power from Hahn and Hessen on behalf of the Committee.  We're a

21 joint proponent of the plan.  With respect to the general

22 authority provision that's been modified that Ms. Uhland was

23 talking about, there is a line regarding if --

24            THE COURT:  Can you get me to the page?

25            MR. POWER:  There's no page number.

1            MS. UHLAND:  Page 103, Your Honor.

2            MR. POWER:  One 0 three, Your Honor.  Sorry.

3            THE COURT:  Thank you.

4            MR. POWER:  In Paragraph C this is actually similar

5  to Your Honor's concern about lift stay motions continuing on

6  forever.  The liquidating trustee in this case has concerns

7  about being asked forever to execute power of attorneys and

8  other collateral documents in connection with the transfers of

9  these loans throughout the Unites States and the world.

10           This provision relates to the Trustee's ability and

11 agreement to basically try to facilitate those transfers and

12 facilitate the assignments or powers of attorneys to make sure

13 those parties reserve their rights.  At the same time the

14 Trustee's concern about the expense and the burden of having to

15 basically comply with the multiple requests on these documents

16 -- and this provision is trying to deal with that mechanism --

17 the line -- and basically I think it's the seventh line down --

18 relates to the expenses and what has to be done and who incurs

19 them.

20           The general concept here, Your Honor, is a trustee,

21 which most of the time it's the trustee or servicer -- loan

22 servicer -- will basically make a request of the liquidating

23 trustee to execute a power of attorney or document, and the

24 Trustee has the ability to do that provided it doesn't cause

25 material expense.  If the requesting party wants something

1  specifically executed -- and we're primarily talking about

2  power of attorney -- they need to prepare those documents, and

3  if they want the Trustee or his counsel to prepare them, then

4  the expense has to be reimbursed.

5          Countrywide is concerned that that expense

6  reimbursement -- they want to clarify on the record that

7  basically relates to that.  What we're talking about is the

8  expenses that have to be incurred by the requesting party

9  relate to the expenses associated with preparing those

10 documents.  So I can confirm on the record that what we're

11 referring to there is if a party wants to the liquidating

12 trustee to execute some form of agreement, the party requesting

13 it has basically the obligation to prepare that agreement and

14 submit it for review by the liquidating trustee.

15          MR. CHIPMAN:  Good morning, Your Honor.  William

16 Chipman on behalf of Countrywide.  Yes, that's fine.  What we

17 were concerned about -- what Countrywide was concerned about --

18 and this is a change from the version we -- I guess that was

19 submitted this morning, Your Honor.  Expense is kind of vague.

20 We don't know what kind of expenses Countrywide was going to be

21 charged, so Countrywide is fine with basically preparing the

22 documents, getting them to the Trustee, paying for filing fees,

23 and that nature.  All we need is a signature.

24          We just wanted to make sure we weren't going to be

25 charged overhead, secretarial time, administrative expenses for

1    doing that, and we would -- and we understand that if we

2    requested the Trustee prepare those documents, we'd have to pay

3    for heat.  We're not intending to do that.  We just wanted some

4    clarification on the record.  So I think that's fine, Your

5    Honor.

6            THE COURT:  All right.  Thank you.

7            MR. CHIPMAN:  Thank you.

8            THE COURT:  I'm assuming one of the things that will

9    happen, Mr. Power, that somebody will provide a form to send

10   out to say this is what I'm willing to sign and make it easier

11   in the process.

12           MR. POWER:  Yes, Your Honor.  My understanding -- I'm

13   certainly not a securitization lawyer, but the Trustee -- there

14   is a certain amount of work behind the scenes to verify that

15   the party making the request is the party that owns the loan,

16   and there's a software that's done.  We've confirmed that that

17   process is not laborious for the estate, we think.  So we're

18   hoping to get it to a ministerial state, so Your Honor can

19   avoid motions to compel and those things down the road.  That's

20   what we'd like to do.

21           THE COURT:  All right.  Thank you.

22           MS. UHLAND:  Thank you, Your Honor.  Next what I'd

23   like to do is move -- and we can take them as the order in the

24   agenda -- is walk through the objections and put together our

25   score card of where we are --

40

1          THE COURT:  All right.

2          MS. UHLAND:  -- and indicate some other filed

3 objections and resolutions and proposed resolutions.

4          The first objection -- and it is the objection we

5 received by Pima County to our plan concerning interest.  We

6 have indicated -- we contacted Pima County.  Their claim is in

7 the approximate amount of just over $1,000.  We intend to pay

8 that claim.  We'll pay that claim as soon as practicable after

9 the effective date.  We left them that information.  I don't

10 know if they're appearing here today to press their objection.

11          MR. YUSUFOV:  Your Honor, this is German Yusufov

12 appearing for Pima County.

13          THE COURT:  All right.  Speak up, please.

14          MR. YUSOFOV:  Sure.  Your Honor, I did speak to a

15 colleague of the counsel in the courtroom yesterday, and I do

16 want to confirm that we had an agreement that our claim will

17 get paid with any post-petition interest, as counsel said,

18 shortly after the effective date.  And with that agreement on

19 the record, our objection is resolved.

20          THE COURT:  All right.  Thank you.

21          MR. YUSOFOV:  May I be excused?

22          THE COURT:  Yes, you may.

23          MR. YUSOFOV:  Thank you.

24          MS. UHLAND:  Next, Your Honor, is the --

25          THE COURT:  And I guess so that we're clear, Pima --

1          MS. UHLAND:   That would resolve the first and the

2    last, I believe.

3          THE COURT:   Yes, thank you.

4          MS. UHLAND:   Or the second to last penultimate

5    objection.   In order, Your Honor, the next objection we

6    received was an objection from the IRS with respect to the

7    setoff provisions in the plan, and what we are proposing with

8    the IRS -- and it's in the -- I don't know if you have a copy

9    of the proposed confirmation order up --

10          THE COURT:   I do.

11          MS. UHLAND:   -- there close.   And we've been working

12    with the IRS.   What we're doing and we'd like to put in the

13    confirmation just to give the Court the highlight is, you know,

14    agree with them that they're excepted from the setoff provision

15    and also establish a reserve mechanism for their claim as we

16    continue to resolve our issues.

17          THE COURT:   That's Paragraph 12 of the proposed

18    order.

19          MS. UHLAND:   That's Paragraph 12, and we've been

20    discussing -- we are still working with the IRS to finalize the

21    language, but in concept, and as set forth in this, what we're

22    proposing, and that the language in this would supersede the

23    plan injunction language and the setoff language contained

24    therein, is that we will set up a reserve of 1.5 million

25    initially for the what I'm going to call the net IRS -- the net

1  liability the debtors may have to the IRS.

2         We understand as of today the IRS' best estimate is

3  their best estimate, not a definitive determination.  Their

4  best estimate is we're in a slight refund position as they've

5  been calculating matters as of today.  But we propose to

6  establish a reserve of 1.5 million provided that prior to May

7  30th the IRS may file a notice to request that we increase that

8  reserve or -- either the liquidating trust or the debtors

9  depending on the timing of the effective date.

10        The changes from the language indicated in the

11 confirmation order, Your Honor, that we're working through with

12 the IRS right now are the following.

13        First with respect to the burden when they file that

14 notice, it will be -- they will file the notice of

15 determination, and it will be the debtor's and the liquidating

16 trustee's burden -- or it'll be their obligation to disprove

17 the -- effectively, the IRS.  So it will be our obligation to

18 disprove the IRS' claim that the debtors have additional tax

19 liability, and that determination will be based on applicable

20 non-bankruptcy law.  There is I think a process not unlike our

21 proof of claim process where there's a certain shifting of

22 burdens based on the amount of evidence provided by each party.

23 And whatever those burdens are is what we intend to govern

24 this.

25        Second, the IRS is -- wants to make sure that if they

1  file a notice to increase the reserve, that we don't make --

2  start making distributions based on the lower reserve amount

3  pending the final determination.  So we're going to be adding

4  -- again, this is subject to refinement, but additional

5  language to what's in the confirmation order to provide that

6  upon receipt of any notice and until Court determination of the

7  amount of the reserve, the liquidating trustee will make --

8  will not make any distributions on account of priority --

9  priority tax or unsecured claims, unless the liquidating trust

10  has sufficient assets to make such payment reserving for the

11  full amount set forth in the notice.  So the IRS wants to make

12  sure that they're protected in that interim period.

13        There are some other refinements to this language,

14  but in principal we have a, you know, agreement with the IRS

15  with respect to this, and this process with respect to the

16  notice and the determination will supersede the claims process

17  that's currently pending with the IRS, and we'll be dealing

18  with their liability in the context of the reserve issue.

19        THE COURT:  Okay.

20        MS. UHLAND:  I think Mr. Geht is here in the

21  courtroom if he wants to confirm this.  I'd also note for the

22  record, Your Honor, notwithstanding our rather interesting and

23  heated -- at least legally heated hearing on -- in January that

24  the debtors and IRS have been working very cooperatively to try

25  to move this along and -- and I would say we have almost

1 biweekly calls right now with the IRS' counsel to further this

2 along, but why don't we --

3          THE COURT:  I'm pleased to hear that.  Thank you.

4          MR. GEHT:  Good morning, Your Honor.  Jan Geht for

5 the Internal Revenue Service.  I agree in substance with what

6 the counsel has said.  We're still working out the final

7 language details primarily relating to the protection for the

8 IRS in terms of it's reserve and the changes to the reserve and

9 when the payments can be made to creditors at or below our

10 security -- security status.

11          THE COURT:  Thank you.

12          MS. UHLAND:  Next, Your Honor, is in effect a cure

13 objection from Zurich American Insurance Company.  The parties

14 are in the process of reconciling these amounts.  We believe

15 we're down into the 10,000/11 -- 10 to 20 thousand dollar range

16 as of today.   The parties have agreed that whichever way the

17 balance goes, that the -- once the agree on a number, that if

18 the debtors owe the money, the debtors will pay it and vice

19 versa.  If Zurich owes the money, they will refund it.

20          The -- and if the parties cannot reach an agreement

21 on that dispute, that they'll return to Bankruptcy Court for a

22 determination on this.  We are hopeful that that won't be the

23 case.  It seems that this is just an accounting reconciliation

24 matter.  I don't know if the counsel for Zurich --

25                              (Pause)


                    **J&J COURT TRANSCRIBERS, INC.**

1           MR. GELLERT:  Your Honor, Ronald Gellert from Eckert

2    Seamans in this instance on behalf of Zurich American Insurance

3    Company.  Your Honor, that's -- the representation is

4    substantially accurate.  One caveat to that is to the extent

5    there's other obligations which exist on the insurance policies

6    which may include deductibles or other non-monetary obligations

7    that should the debtor assume these policies, they will be

8    obligated to comply with the terms of those policies.  And I

9    think that's -- I think that's agreed.

10          MS. UHLAND:  Yes, Your Honor, they -- these are being

11   assumed by the debtors, and so they're being assumed with

12   whatever obligations they have under the agreements.

13          THE COURT:  All right, so based upon that agreement,

14   the objection is resolved.

15          MR. GELLERT:  That is correct, Your Honor.  Thank

16   you.

17          THE COURT:  All right.  Thank you.

18          MS. UHLAND:  Your Honor, the next item we understand

19   to be a simple statement by Carrington Capital with respect to

20   their -- the debtor's investments and in their fund and their

21   general partnership interest and their LLC interest in their

22   general partner.

23          THE COURT:  It's in the nature of a reservation of

24   rights not an objection, as I read it, simply saying if the

25   liquidation trustee should try to transfer the interest, which

1 is I guess to become part of the trust, then it's free to

2 exercise whatever rights it might otherwise have under

3 applicable non-bankruptcy law.

4 　　　　MS. UHLAND:  And that was my understanding as well.

5 　　　　THE COURT:  All right.

6 　　　　MS. UHLAND:  The next objection is by Union Bank that

7 was -- where it was unclear if we were assuming some but not

8 all of its contracts.  We have confirmed that we are assuming

9 all the group of contracts that relate to the subject matter,

10 and with that, my understanding is that Union Bank -- that

11 their objection is resolved.  I don't know that they're

12 appearing.

13 　　　　THE COURT:  Let's see.  I do not see them either on

14 the in-person sign-up sheet or on the telephone sign-in sheet.

15 　　　　MS. UHLAND:  But they did indicate that we could

16 represent that their objections were resolved.

17 　　　　THE COURT:  All right.

18 　　　　MS. UHLAND:  With respect to the New York State

19 Teachers' Retirement System objection, that one is a legal

20 objection.  We have not had a chance since filing their reply

21 to see whether the language on the preservation of documents is

22 acceptable to them.  On one of our breaks I'll try to contact

23 their counsel to review that, but this is one that we believe

24 we should just trail to the following argument, and we'll

25 address that one on its merits at that time.

1          Similarly, Your Honor, we have the objection of the

2  Ad Hoc Committee Beneificiaries of the New Century Financial

3  Corporation Deferred Compensation Plan, and that one is --

4          THE COURT:  Alive and well.

5          MS. UHLAND:  -- alive and well.

6          With respect to H,  the objection of Deutsche Bank

7  National Trust Company, Mr. Logan represented that that is now

8  resolved.

9          Pima County we've discussed.

10          With respect to Countrywide, we propose the

11  following.  We propose to enter into a stipulation for relief

12  from stay with Countrywide that will allow them, provided, you

13  know, they have a good faith belief that the -- they're seeking

14  relief from stay only with respect to, you know, loans that

15  they own and that in which the estate has no -- the estate has

16  no interest.  That they can proceed to -- and we'll give them a

17  global stipulation to proceed with those foreclosure sales on

18  their second lien loans, and that we will provide in the

19  confirmation order that that stipulation will govern over the

20  stay extension and injunction provisions that are contained in

21  the play.

22          So we're going to do a separate stipulation, but

23  we're going to refer to that stipulation to be clear in the

24  confirmation order, so that there's no question.  In light of

25  the Court's prior statement, I think we might also want to put

1  in a global -- a more generalized statement to the extent the -

2  - such global stipulations are entered into, that they will

3  supersede in an effort to deal with the foreclosing lenders and

4  clear up the docket in this case, which is getting to some very

5  high numbers.

6          THE COURT:  I see that Mr. Hiller is standing to be

7  heard.

8          MR. HILLER:  Thank you, Your Honor.  Good morning --

9  good afternoon, Your Honor.  Adam Hiller on behalf of

10  Countrywide Servicing Operations.  Your Honor, Ms. Uhland has

11  spoken correctly, and on the basis of the debtor's -- I should

12  say the plan proponents' representation, that the stipulation

13  will follow the confirmation order and will be carved out of

14  the confirmation order by its terms.  We do withdraw the

15  objection.

16          Your Honor, I just wanted to point out one other

17  thing, and I wanted just to ask if we can get the consent of

18  the parties to this.  We didn't find anything in the

19  confirmation order and the plan that expressly continues relief

20  that has been granted to the parties during the case primarily

21  really from stays.  Obviously, what our office is mostly

22  worried about to make sure that if the Court did enter a relief

23  from stay before confirmation, that that would continue in

24  effect notwithstanding the plan injunctions and the imposition

25  of the automatic stay and the plan and the confirmation order.

1  So if no parties have a problem with that, we probably would

2  put that into the stipulation as well.

3         MS. UHLAND:  Your Honor, what may make sense in that

4  regard is when we do the confirmation order, I don't know that

5  we need to amend the plan, but we will probably -- our plan is

6  on these injunctive and stay motions is to repeat them in the

7  confirmation order, and maybe we can clarify that while we're

8  continuing all stays, we're also giving effect to all orders

9  giving relief from the stay, and we can just add that

10 clarification to the confirmation order.

11        THE COURT:  All right.  Thank you.

12        MR. HILLER:  Your Honor, that's fine with us.  Your

13 Honor, I have some motions for relief from stay I need to file

14 in other cases.  May I be excused?

15        THE COURT:  You may.

16        MR. HILLER:  Thank you.

17                     (Pause)

18        MS. UHLAND:  Your Honor, what I would -- if people

19 have the stamina, what I would propose next is to go ahead and

20 review with the Court the voting on the plan and make sure that

21 we have the declaration of the tabulation agent submitted, and

22 then I will leave it to the Court whether he wants, after we go

23 through that process, because there's a little bit -- there's

24 some complication to it -- whether we want to proceed with the

25 proffers of Ms. Etlin and Mr. Brents.

1          THE COURT:  All right.  Let's deal with tabulation

2    anyway.

3          MS. UHLAND:  Your Honor, the debtors have submitted

4    -- and it may assist the Court if the Court has it in front of

5    him -- the declaration of Jamie Edmonson regarding tabulation

6    of votes in connection with the first amended joint plan of

7    liquidation of the debtors.

8          THE COURT:  All right.  Let me get to it.

9                    (Pause)

10         THE COURT:  All right.  I have it.  Understand that

11   I've also reviewed the proposed confirmation order which sets

12   forth in detail the results of the balloting.

13         MS. UHLAND:  Thank you, Your Honor.  I was going to

14   simply point out some highlights to frame our discussion as we

15   proceed and also mention briefly Paragraphs 16 -- 15 and 16 of

16   the motion with respect to the voting process.

17         THE COURT:  All right.

18         MS. UHLAND:  In summary, Your Honor, the plan was

19   accepted by all voting classes both with respect to amount and

20   numerosity except for Class HC3B, which are the unsecured

21   creditors of New Century Financial Corporation.  With respect

22   to the creditors of New Century Financial Corporation, the --

23   with respect to amount, 395,060,366, or 95.4 percent of those

24   voting, accepted, and 18,955,681, or 4.5 percent rejected.  And

25   with respect to numerosity, we have 75, or 26.8 percent,

1  accepting, and 203, or 73.02 percent, rejecting.  So with

2  respect to that class we'll be seeking confirmation of the plan

3  in accordance with Section 1129(b).

4           THE COURT:  Who are these creditors?

5           MS. UHLAND:  These -- the creditors in HC3B are in --

6  in broad strokes, Your Honor, there are MRA claimants, the

7  parties under the master repurchase agreements of guaranties

8  from New Century Financial Corporation.  If the Court remembers

9  back to our trustee motion, there's some debt that was issued

10 at New Century Financial Corporation that we sometimes referred

11 to as Kodiak -- the Kodiak debt.  It's approximately $90

12 million of face amount of debt.

13          There are secured financing deficiency claims in that

14 class.  There are the deferred compensation plan participants.

15 There are several litigation claimants including Positive

16 Software with which the Court is familiar.

17          In addition, there's a substantial claim of a

18 landlord, McGuire, which sits on the Creditors' Committee,

19 which contracted only with NCFC, no other debtors, for a --

20 what was going to be a substantial build out and move into a

21 very large office -- new and larger consolidated office of

22 facilities in Orange County, and it's a substantial -- they

23 have a substantial rejection claim.

24          Of those members, just so the Court's aware, Kodiak,

25 which also has only claims at NCFC, and McGuire, which only has

1  claims at NCFC, sit on the Creditors' Committee.

2          THE COURT:  And among those that you've mentioned,

3  who voted for and who voted against?

4          MS. UHLAND:  I am not clear on the equipment lessors,

5  but we under -- you know, the Kodiak and McGuire and MRA claims

6  voted for, some deferred comp plan beneficiaries for, and many

7  deferred comp plan beneficiaries voted against.  As far as the

8  makeup of those, we'll be proffering some testimony in

9  connection with Ms. Etlin on who are the deferred comp plan

10 beneficiaries as far as their role in management and receipt of

11 bonuses, so the Court can get a clearer picture of that.

12         THE COURT:  All right.

13         MS. UHLAND:  The -- just to -- for the other large

14 classes here are the unsecured claims of NC -- I'm sorry.  It

15 would be the EPD/Breach claims of Capital -- New Century

16 Capital Corporation.  And I believe that's OP6B, which voted

17 100 percent in favor of the plan.

18         And then the unsecured claims at New Century Mortgage

19 Corp., that is also MRA claims, many, many vendor claims,

20 equipment finance claims.  Sort of what one would think of as

21 the broader group of creditors, as well as many employee claims

22 and litigation claims.  That class, which is rather a very

23 large class, voted quite heavily, 99 percent in amount and 94

24 percent in number to accept the plan.

25         Before moving, I don't know that I need to -- I'm not

1 -- I don't quite recall whether I need to move this into

2 evidence.  It's a filed declaration, and the Court can make

3 findings on it, but --

4          THE COURT:  Why don't you?

5          MS. UHLAND:  Why don't I -- before doing that, I

6 wanted to point the Court to some provisions with respect to

7 the balloting that raised some questions but do not alter any

8 of the voting results.  I just wanted to review that with the

9 Court.

10          THE COURT:  All right.

11          MS. UHLAND:  In our voting procedures order we

12 provided that -- and this is just for voting.  This isn't for

13 managing the claims register.  That if a debtor -- if an entity

14 filed a claim but then filed -- sorry.  If an entity had a

15 scheduled claim and then filed a claim, that they would vote

16 their filed claim not their scheduled claim.  And we realized

17 somewhat -- that there was some ambiguity on that order that

18 some creditors moved their -- some creditors changed the amount

19 of their claims, and other creditors seemed to have replaced

20 their claims with claims at other debtors, in effect moving

21 their claims.

22          We -- after further analysis, we determined that

23 there could be an argument that they were filing a second

24 claim.  In other words, if they had filed a claim against NCMC,

25 and then they filed one against NCFC, maybe they meant to have

1  two claims, but that isn't the way that we distributed the

2  ballots.  We assumed that the creditor had intended to move

3  their claim, and we treated it as a superseded claim, and then

4  only the second claim would be what we would base the voting

5  status on.

6          We went through, after a re-review and questioning

7  whether there may be some argument on ambiguity in that

8  language, and determined out of our over 4,000 voting packages

9  and entries in the voting database that we actually had 305

10  scheduled claims for which the -- where it was determined that

11  the creditor filed a -- what we call a superseding claim

12  against a different debtor.  And so we went back through to try

13  to determine, well, what if they had really intended to have

14  two claims that they could vote in our plan, because our plan,

15  you know, allows for a few claims against different debtors to

16  vote them separately?

17          And the -- we back through and did an analysis to

18  determine whether it would alter the voting, and we determined

19  that it would not alter the voting, and this is how we came up

20  with our -- we came up with -- what we basically did was we did

21  a worst-case analysis if these 305 votes had come in.  If

22  someone had received a ballot in a different class and voted to

23  assume -- and voted to accept the plan, we did assume that they

24  accepted the plan.  And we did have -- of the people that

25  received these superseding ballots, 44 of them got ballots and

1  voted them, and of that amount 39 voted to accept the plan, and

2  5 voted to reject.

3          There were another 261 that did not vote of these

4  parties, and what we did was we determined, well, what if they

5  had all voted to reject?  And of those amounts, there were 63

6  of them in Class NCFC, the class that's already by numerosity

7  voting to reject.  And if we undertook that exercise, we

8  determined that the numerosity would be somewhat worse or

9  somewhat lower rejecting the plan, but that the dollar amount

10 acceptance in this worst-case scenario would still be

11 overwhelming.  It would still be 95 percent acceptance.

12         We also made this determination at the other four

13 classes.  One was -- it looks like we have a -- one was in the

14 New Century OP3C, which is the general unsecured creditors of

15 mortgage.  One is OP6C, which are the general unsecured

16 creditors of NC Capital, and, finally, OP3 -- OP9B, which are

17 the unsecured creditors of Home123.   In each case -- of those

18 cases, if we moved all of these possible claims to reject,

19 those classes still accept both in numerosity and in amount.

20 So we did a worst-case sensitivity analysis on those 305, and

21 it did not alter the voting results.

22         If the Court would like, I can proffer testimony to

23 establish that to make the further record, but that was a

24 disclosure we wanted to make to the Court as the -- as I said,

25 as the plan proponents went back and looked at the language of

1  the order and determined that it might be ambiguous.

2          THE COURT:  I require nothing further.  Does anyone

3  else case to be heard in connection with the Edmonson

4  declaration?

5                    (No verbal response)

6          THE COURT:  All right.  Is the debtor moving it into

7  evidence?

8          MS. UHLAND:  Yes, Your Honor, the debtor would move

9  the declaration into evidence.

10          THE COURT:  Is there any objection?

11                    (No verbal response)

12          THE COURT:  I hear none.  It's admitted without

13  objection.  Shall we take up the two motions that the Ad Hoc

14  Committee has filed at this point?

15          MS. UHLAND:  Yes, Your Honor, I believe that would be

16  appropriate.

17          THE COURT:  All right.

18          MR. KEACH:  Thank you, Your Honor.  Robert Keach for

19  the Ad Hoc Committee of Deferred Compensation Beneficiaries.

20          We did file -- following the depositions that we were

21  able to take of the witnesses we understand that will be

22  testifying for the co-proponents today, Mr. Star, Ms. Etlin,

23  and Mr. Brents, we did file -- and upon review, including most

24  recently last night -- a review of Ms. Etlin's declaration and

25  the earlier filed declaration of Mr. Brents, we filed a motion

1 to strike those declarations and a motion in limine with

2 respect to Mr. Star.  There are common themes in the motions

3 and if, with Your Honor's permission I'll argue them

4 collectively where appropriate.

5          THE COURT:  Let me ask this.

6          MR. KEACH:  Sure.

7          THE COURT:  Since apparently both Ms. Etlin and Mr.

8 Brents are available for testimony why don't we -- well, it's a

9 suggestion and -- why don't we just take the declarations?

10 You'll have your opportunity to cross examine and then to the

11 extent you think there are portions of the declarations that

12 ought to be stricken, why don't we handle it that way?

13          MR. KEACH:  Well, Your Honor, procedurally we're

14 happy to handle it that way.  As long as our rights that are

15 encompassed within the motion to strike are preserved I have no

16 objection to proceeding in that fashion.  We do think there are

17 serious issues with respect to permitting any of these

18 witnesses to testify as experts when we were assured that they

19 would not do so, because we would have approached that process

20 very differently had they been designated as experts.  But

21 frankly provided that those issues are preserved and we have

22 other evidentiary issues with respect to the declarations as

23 well, best evidence, hearsay, other things, so long as our full

24 range of evidentiary exceptions are preserved, Your Honor, I

25 have no problem proceeding that way if that assists the Court.

1          THE COURT:  Okay.  Now, does the Star testimony

2    present a different issue?

3          MR. KEACH:  The Star testimony, Your Honor, presents

4    both that same issue, and primarily that same issue.  In

5    addition there are serious issues, and again, I think we can

6    proceed in the fashion the Court just outlined.  There are also

7    serious issues relating to whether or not Mr. Star has any

8    personal knowledge and with respect to the issues about which

9    he testifies which came up in the deposition.  Again, if Your

10   Honor would like those declarations can go in with a full

11   reservation of our evidentiary objections.  We can raise them

12   both before and after cross as appropriate and deal with them

13   in that fashion so if the Court has the benefit of that before

14   it rules.

15         THE COURT:  All right.  Thank you.  Ms. Uhland, in

16   terms of process is that something --  or Mr. Logan, I don't

17   know who's going to be handling the examination.

18         MS. UHLAND:  That's fine, Your Honor.

19         THE COURT:  I guess the other thing you might

20   consider is whether you simply want to put them on and do the

21   direct yourself.  But I leave that to you.  I'm content to stay

22   with the process that I suggested.  So maybe the thing to do is

23   to break now for lunch, give you a chance to think about that,

24   and then when we come back tell me how you would like to

25   proceed.  But is there anything else preliminarily before we

1 break?

2          MS. UHLAND:  Your Honor, one other issue, and that is

3 with respect to a motion to file certain documents under seal

4 which we realized this morning.  These documents are the

5 documents that relate to our interest in the Carrington Fund,

6 and I think that Mr. Keach and I understand that the -- what

7 we're -- the issue before the Court today and the plan has to

8 do with the parties to the documents.  And so what I'd like to

9 do is when I submit them as -- I'll have to submit them as

10 evidence under seal.  I'd like to not have to seal the

11 testimony, but just have Mr. Keach and I and the witnesses try

12 to not refer to the contents, but the parties, to the documents

13 and the dates so that we won't be treading on any confidential

14 information.

15          THE COURT:  Has a written motion been filed?

16          MS. UHLAND:  Yes, it has.  And maybe the Court can

17 review -- just this morning we --

18          THE COURT:  Has a copy been sent to chambers?

19          MS. UHLAND:  I will.

20          MR. SAMIS:  It was supposed to follow us, Your Honor,

21 but you probably wouldn't have seen it.  And, for the record,

22 this is Chris Samis from Richards, Layton & Finger.  We do have

23 a copy here.

24          THE COURT:  All right.

25          MS. UHLAND:  But maybe we can present it to the Court

1  and I can work things out with Mr. Keach over the break.  That

2  may be something that we can try to resolve before we come

3  back.

4          THE COURT:  Okay.

5          MR. KEACH:  I think in principle we don't have a

6  difference of opinion here.  I just haven't seen the --

7          THE COURT:  All right.  May I have a copy?

8          MR. SAMIS:  Absolutely, Your Honor.

9          THE COURT:  All right.  Thank you.  Anything else

10 preliminarily?

11         MS. UHLAND:  No, Your Honor.

12         THE COURT:  Okay.  Let's recess and reconvene at

13 quarter to two.  All right.  Court will stand in recess.

14                      (Break)

15         MS. UHLAND:  Thank you, Your Honor.  What we would

16 like to do now is go ahead and proceed.  First, we've reviewed

17 with Mr. Keach our -- the seal motion and the documents sought

18 to be filed under seal.  And in fact this would apply to some

19 of the potential exhibits that relate to the Carrington

20 interest that Mr. Keach will be using as well, entering in

21 evidence.  What we've proposed to do, Your Honor, and this may

22 be a little tricky, we certainly have an understanding that the

23 things we're testifying about aren't touching upon confidential

24 information and they didn't touch upon confidential information

25 in connection with the deposition.  So we're comfortable we'll

1  be able to proceed that way.

2          What we'd like to do when we present the documents

3  into evidence is provide a copy to the witness, a copy to

4  opposing counsel, a copy to the Court and a copy in an envelope

5  with the court reporter.  Now, I don't know if the Court has a

6  sealed document whether the Court needs another envelope or you

7  just can write on it under seal.  Not quite sure on the

8  mechanics on sealed exhibits.

9          THE COURT:  Just note that it's under seal.

10          MS. UHLAND:  Okay.  And we don't expect that there's

11  going to need to be, and we will work strenuously to avoid any

12  sealed testimony related with these matters.

13          THE COURT:  All right.  Well, let me ask if anyone

14  else cares to be heard in connection with the emergency motion

15  to file these documents under seal?

16          MR. McMAHON:  Your Honor, Joseph McMahon for the

17  United States Trustee.  We don't have an objection to the

18  relief requested.  We just ask that we be provided with a good

19  copy of the document.

20          MS. UHLAND:  That's fine, Your Honor.  I believe our

21  prior motions related to the Carrington interest we provided

22  copies to the United States Trustee in full and we don't have a

23  problem with that.

24          THE COURT:  All right.  Does anyone else care to be

25  heard in connection with this motion?  All right.  Then is it

1 appropriate for me to sign the order that's been submitted with

2 the motion?

3          MR. KEACH:  Your Honor, just a point of

4 clarification, and I think we agree on this, it's not the

5 intention of the parties that the evidence to go in would be

6 limited, only that the evidence when it comes in will be under

7 seal.  We don't think the oral testimony is going to encroach

8 on the confidentiality provision anyway.  But just to be clear

9 this isn't limiting introduction it's just limiting it's

10 treatment after introduction as we understand it.

11          THE COURT:  Understood.

12          MS. UHLAND:  Yes, that's our understanding as well.

13          THE COURT:  All right.  I've signed the order.

14          MS. UHLAND:  Thank you, Your Honor.  Our first

15 proffer will be of Ms. Etlin and my partner Mr. Logan will be

16 handling that.

17          THE COURT:  All right.

18          MR. LOGAN:  Your Honor, we propose to proceed by a

19 manner which is sort of a mixture between proffer and reference

20 to the declaration.  And I think what would probably make the

21 most sense, since Mr. Keach has indicated he does want to cross

22 examine, is that Ms. Etlin take the stand and we will reference

23 her declaration, but it will be more than just a reference to

24 the declaration.  We're going to try to keep this as short as

25 possible, notwithstanding what Ms. Uhland said about me

1  earlier.  And we think that we can expedite matters by

2  incorporating some matters by reference to the declaration and

3  on other mattes we think warrant emphasis or that go beyond the

4  declaration written words we will do that by proffer.  So I'd

5  like to call to the stand Holly Etlin.

6          THE COURT:  All right.

7  H O L L Y   E T L I N, SWORN

8          COURT DEPUTY:  Please state your name and spell your

9  last name.

10          THE WITNESS:  Holly Felder Etlin.  The last name is

11  E-t-l-i-n.

12                  DIRECT EXAMINATION

13  BY MR. LOGAN:

14  Q   Ms. Etlin, do you have a copy of the declaration -- your

15  declaration that was filed in this case?

16  A   Yes, Mr. Logan, I do.

17          MR. LOGAN:  Your Honor, do you have a copy as well

18  because we will be referring to it?  Your Honor, the proffer

19  will start basically with the background facts on Paragraph

20  Number 6.  I would ask Ms. Etlin to describe her background.

21  She would explain she has nearly 30 years of experience in the

22  restructuring and reorganization business.  That is with

23  AlixPartners.  And prior to that she was with XRoads and has

24  other extensive background in this particular line of work.

25          She would describe her restructuring background --

1  excuse me --  her educational background and degrees that are

2  in Paragraph 7 including some of the honors and awards she's

3  received.  I won't belabor those.  In Paragraph 8 she would

4  describe her involvement with acting as a CRO or the CEO or

5  other responsible positions with some of the largest

6  reorganizations in recent years including the Win Dixie case

7  where she was the turnaround advisor.

8         We would then turn to some of the elements of 1129.

9  And I would explain why I was asking these questions.  They

10 were to go through -- I would explain that I was going to ask

11 questions designed to elicit basic facts, not law, but facts

12 concerning some of the elements of 1129.  I would start off by

13 asking her to describe the classification of claims set forth

14 in the plan, and she would explain as set forth in her

15 declaration Paragraphs 9 and 10 that separate classes were

16 established for each one of the debtors on an individual basis.

17 And she would explain that classes were established based upon

18 the debtors' analysis of creditors with like kind interest, and

19 based upon negotiations with the creditors committee and other

20 parties involved in negotiating the plan that has been filed.

21 She would say that in greater detail as set forth in Paragraphs

22 9 and 10.

23         She would explain as set forth in Paragraph 11 the

24 plan provides for the same treatment of all claims or interest

25 in a class.  She would then turn to some questions that I would

1  pose that I would explain would go to the good faith element as

2  set forth in 1129(a)(3) and beyond that, I guess, in context to

3  the case and to the Court for how the plan was negotiated.  She

4  would explain that the debtors -- from the debtors' perspective

5  the plan was carefully and diligently reviewed with the board

6  of directors of the debtors, the debtors relied upon

7  professionals who are experienced in this industry, and she

8  would explain that the initial and primary point for a

9  negotiation from the creditors' perspective was the unsecured

10 creditors' committee and she would explain that from the

11 debtors' perspective the composition of the creditors'

12 committee was very material.

13          And she would compliment Mr. McMahon for appointing a

14 creditors committee which includes members that broadly cross-

15 sect the debtors' capital structure and the debtor entities.

16 And she would explain that that was a topic that the board of

17 directors of the company inquired about alike.  And they

18 inquired about the fairness of the plan in the sense of was it

19 negotiated with the relevant constituents.  And she would

20 explain that the composition of the committee was a material

21 fact considered by the board and considered by her.  She would

22 further testify that beyond the creditors on the creditors

23 committee the debtors reached out to their other major

24 creditors and tried to negotiate and quite successfully did

25 negotiate settlements of such matters as the EPD and Breach

1  Claims.

2         She would explain that many of those creditors were

3  not on the creditors committee, but the debtors pro-actively

4  reached out to representatives of the major indenture trustees

5  and whole loan buyers who are not on the creditors committee to

6  negotiate critical elements of the plan including claims that

7  the debtors anticipated would be the largest filed in the case

8  and the ones that could be most troubling and costly and

9  difficult to resolve.

10        She would very briefly touch on Paragraph Number 13

11  where she would explain that the plan does contain the

12  provisions for approval of payments.  And she would be very

13  interested to hear what Your Honor has to say at the next

14  hearing on that topic.  She would also touch on Paragraph 14 on

15  the element of 1129(a)(5) regarding the service for certain

16  individuals and explain that pursuant to the plan Alan M.

17  Jacobs has been selected as the liquidating trustee.  And she

18  would further testify that she has met with Mr. Jacobs and she

19  would testify that Mr. Jacobs has expressed to her his thanks

20  for how far along this case is and how well developed this plan

21  is as far as being able to hand off to the liquidating trustee

22  a workable undertaking and one where most of the compromises,

23  most of the hard work has been accomplished.

24        She would explain very briefly that 1129(a)(6) is

25  irrelevant because this is not a case where the debtor has

1  regulated rates.  She'd next identify this chart that we have

2  sitting in the well.  She would explain that she is the CEO and

3  the CRO of each one of the entities identified in that chart.

4  Doing her best Vanna White she would go through the chart and

5  explain that this is a corporate organization chart that

6  identifies the debtors and the ownership relationship of stock

7  and the debtors among themselves.  She would further explain

8  that the color coding system was added for purposes of clarity

9  to identify the groups of debtors that identified in the plan

10  as the Hold Co. companies, the holding company debtors is the

11  terminology.  And those are the entities marked in yellow.  She

12  would identify the green boxes as the operating debtors.  She

13  would identify the blue box as New Century Warehouse

14  Corporation that we often refer to as Access Lending which is

15  yet a third group in the way the plan is structured.

16       And finally she would identify any loan financial

17  corporation which is a non-debtor, but is the parent of at

18  least one of the debtors Home 1, 2, 3 Corporation.  And she

19  would explain that this chart has been prepared to help all of

20  us keep track of where various companies, various debtors fit

21  into the corporate organization.  And after she did that I

22  would move -- I'd move this chart to admission.

23            THE COURT:  As the demonstrative exhibit I take it.

24            MR. LOGAN:  Yes, sir.

25            THE COURT:  Any objection?

1        MR. KEACH:  Other than the general objection that we

2   have to the entire proffer and the entire declaration we have

3   no specific objection to the demonstrative, Your Honor.

4            THE COURT:  It's admitted.

5        MR. KEACH:  I would next explain that I wanted to

6   explore with her some of the factual elements of the best

7   interest test, 1129(a)(7).  And Ms. Etlin would turn to Exhibit

8   E attached to the disclosure statement, which I apparently

9   failed to bring with me, and I will quickly run off to my desk

10  and get it.  And she would explain that Exhibit E was prepared

11  under her direction to analyze certain consequences that she

12  believes would flow if the case were converted to Chapter 7 or

13  the cases converted to Chapter 7.

14        She would explain the first set of charts are labeled

15  low case liquidation scenario.  And Ms. Etlin would explain

16  that this is designed to model a low case, a worse case,

17  conservative case that corresponds by and large with the low

18  case range for the plan of liquidation set forth earlier in the

19  disclosure statement.  And then following that is a high case

20  liquidation scenario which she would explain largely models

21  with exceptions that she would later explain the high case

22  estimates for the plan.  And she would explain that the columns

23  in these two charts identify debtor-by-debtor individual

24  entity-by-individual entity the calculations for those entities

25  on a standalone basis.

1          She would explain that as far as the assets available

2    to be distributed are concerned the starting point is the cash

3    presently held by the companies segregated debtor-by-debtor.

4    She would then explain that the other recoveries match the

5    recoveries that are set forth in the disclosure statement for

6    the estimates to be realized under the plan with two major

7    exceptions.  The first of those exceptions she would explain

8    has to do with the tax refunds.

9          Ms. Etlin would probably go on in substantial length

10   about the difficult efforts that have been underway with both

11   the IRS that Your Honor heard about today and with the

12   multitude of state and local taxing authorities.  And she would

13   explain that those negotiations have progressed well and far,

14   but it has been a difficult and time consuming process.  And

15   she would testify based upon her personal experience involved

16   in those negotiations that it is her view that if the cases

17   were converted to a Chapter 7 and new personnel trustees,

18   Chapter 7 Trustees were interjected into the process that would

19   severely setback the efforts to realize tax funds.  And she'd

20   estimate that based upon her personal view that would reduce

21   the tax refunds available for the estates by approximately 25

22   percent.

23         She would explain the second material change between

24   the assets to be distributed in a Chapter 7 and under the plan

25   as it relates to the Carrington interest, the so-called

1  interest in the Carrington fund, the general partnership

2  interest and limited partnership interest.  Ms. Etlin would

3  testify that she had been personally involved in negotiations

4  with Carrington over possible efforts to realize value from

5  that fund, and she would explain that Carrington is very

6  concerned about confidentiality of the information concerning

7  Carrington and its funds.

8        She would explain that that has been a laborious and

9  time consuming process to get where the debtors are in

10  realizing value on the Carrington fund, and she would explain

11  that if that process had to be dealt with in a Chapter 7

12  context or new people involved that that would severely

13  restrict or retard, is what she would say, the efforts to

14  realize value from the Carrington interest.  And she would

15  explain that that has no impact on the low case scenario

16  because the low case scenario conservatively estimates that

17  nothing is realized on the Carrington fund.  But the high case

18  scenario which assumes that substantial value is realized under

19  Carrington fund she believes would be appropriate to discount

20  the value by 35 percent.

21        She would further explain that the liquidation

22  scenarios assume that there would be some costs for Chapter 7

23  Trustees.  Just the Trustee fees themselves and she would

24  explain the derivation as set forth in the charts.  She then

25  would go on and at some substantial length would explain that

1 in a Chapter 7 she believes the most material adverse impact

2 and recoveries for creditors would likely be the unraveling of

3 the integrated settlements that are part and parcel of the plan

4 of liquidation.  She would mention the EPD and Breach Protocol.

5      Ms. Etlin would explain some of the efforts that went

6 into deriving that protocol and she would testify that until it

7 was developed it was one of her greatest concerns as to how we

8 would collectively deal with the plan for this company, because

9 it inherently involved dealings with hundreds of thousands of

10 loans with principle balances in excess of $200 billion with

11 the risk of a multitude of litigations over EPD and Breach

12 Claims.  And she would explain that the EPD Breach Protocol

13 that was negotiated with the indenture trustees and the whole

14 loan purchasers was creative and innovative and she believes

15 would save the estate substantial expense.

16      And she would further testify that in a Chapter 7 her

17 belief is that that process would unravel in part because it is

18 integrated with other settlements in the plan.  And she'd give

19 an example of that.  She would explain that if the EPD Breach

20 Protocol was tried to be pursued in isolation by someone just

21 looking out solely for the interest of say NC Capital or many

22 of the EPD Breach Claims that are asserted that would run into

23 the great problem that resolution of that particular protocol

24 had to be negotiated with representatives of creditors at other

25 entities.  For example, the litigation proceeds she would

1  testify were the topic of great debate with the committee.

2  People expressed alternative views as to where the litigation

3  proceeds should be allocated as far as an asset.

4          She would testify that some of the factors that were

5  considered were that the public statements issued by the

6  debtors were issued by the parent company, NCFC, but that NCMC

7  and NC Capital which are two of the operating company

8  subsidiaries have their own financial statements.  And she

9  would testify that the major accounting issues that relate to

10 the statement arise in their financials, reserves for loans to

11 be repurchased and the value of the loans that had been

12 repurchased would be on the books by and large of NC Capital

13 and as the chart indicates its parent NCMC, New Century

14 Mortgage Corporation.

15         And she would explain that part of the EPD Breach

16 Protocol compromise was integrated with the compromise on the

17 litigation proceeds where creditors who asserted EPD Breach

18 Claims were willing to agree to a compromise that many thought

19 understated the value of the EPD and Breach Claims in part as a

20 settlement where they were allocated 45 percent of any

21 litigation proceeds.  And she would further explain that that

22 was integrated yet more -- yet still with the other settlements

23 in the plan.  And she would use by way of illustration the

24 allocation of administrative expenses.

25         Ms. Etlin would testify that by and large during the

1  pendency of these Chapter 11 cases the employees of the company

2  are retained by the parent company NCFC.  And she would testify

3  that some argued that their expenses should be allocated to

4  their employer.  She would explain that creditors of NCFC

5  thought that was unfair.  She would explain that people

6  involved in the plan process looked at many alternative

7  allocation methodologies.  And she would testify that there is

8  no perfect allocation methodology, but that she personally

9  believes that the allocation methodology developed in the plan

10  is the fairest, the appropriate methodology, and certainly the

11  least expensive in that it allocates administrative costs based

12  upon the value of the assets realized.

13          She would testify that there could be alternative

14  approaches such as looking to allocate dollar-by-dollar on

15  similarly find basis administrative cost, but she would explain

16  that if people went down that path that would entail

17  administrative costs just related to that allocation effort.

18  But more importantly that it was integrated with all the other

19  compromises.  And she would explain that the debtors were

20  constantly aware that as they attempted or people considered

21  revising one compromise it had an impact on other compromises.

22          And I would ask her how that relates to a Chapter 7

23  liquidation.  And she would explain that in a Chapter 7

24  liquidation she believes that parochial individual interest

25  represented by Chapter 7 Trustees for the different debtors

1  would need to restart that whole process.  And that it is her

2  belief that as a result the substantive results could be far

3  worse.  And she believes that the total administrative cost

4  would increase by approximately $19.5 million.  And she would

5  explain that about 8.5 million of that is solely related to the

6  EPD and Breach Protocol, the other $11 million is just related

7  to the additional cost of trying to resolve all the innumerable

8  compromises and settlements, and she would underscore that they

9  are intertwined, that they cannot be severed.  One cannot look

10  to any of the particular settlements incorporated in the plan

11  and decide that it should be revised in a fashion that would

12  benefit one particular estate without recognizing that there

13  are other compromises to cut the other direction would be

14  greatly and directly affected.

15          She would further testify then at Chapter 7 there are

16  costs and impacts that are not reflected in these tables.  She

17  would explain that none of the liquidation analyses attached as

18  Exhibit E to the disclosure statement show any value for

19  litigation proceeds.  And she would further testify that that

20  is true also for the recovery analyses in the plan.  And she

21  would explain that that is because it's uncertain.  One would

22  be speculating as to the value of those recoveries.  However,

23  if in fact the case were converted to a Chapter 7 and different

24  Chapter 7 Trustees were appointed she would testify that

25  whatever recoveries were realized in that litigation she

1  believes it's her opinion, it's her view would be directly

2  adversely affected.  And she would explain she bases that on

3  her position as a client who often tries to manage litigation

4  recoveries.

5       And her concern would be that warring estates would

6  battle over who has standing, who has the better against KPMG,

7  for example.  And that threshold battle would divert the

8  Chapter 7 Trustees from pursuing a unified action to benefit

9  the collective whole.  And she would further testify that the

10  compromises in the plan including the allocation of the

11  litigation proceeds she believes will enhance recoveries for

12  creditors under the plan in a fashion that cannot be captured

13  in any numeric analysis such as set forth in Exhibit E.

14  However, it is very, very real.

15       She would further explain that the percentage

16  recoveries to creditors, she believes, in a Chapter 7 would be

17  reduced because there would be a new bar date established.  And

18  she would explain that one of the things she personally managed

19  in this case was establishing a reasonable, but fairly early

20  bar date of August 31st and then working assiduously and with a

21  lot of pressure on her professionals to get the claims resolved

22  as soon as humanly possible.  EPD Breach Protocol being one

23  paramount example.  And she would explain that that process

24  would be severely setback in a Chapter 7.

25       She would then turn to the topic of voting, and she

1  would not repeat Ms. Edmonson's declaration, but she would go

2  into a topic which Your Honor started to ask questions about.

3  And that is focusing on the one class that did not vote to

4  accept the plan.  That is the Class HC3B.  That's the class of

5  unsecured creditors with claims against the parent company

6  NCFC.  And she would explain that she has looked at the voting

7  results and she has looked at how those votes all among the

8  various constituents in the case, and she would explain that

9  out of that class of creditors $395 million and change in

10 dollar amount or 95 percent voted in favor, and 4.5 percent in

11 dollar amount or $18.9 million voted no.

12        She would explain that notwithstanding the various

13 substantial acceptance in terms of dollars the class was

14 rejected in numerosity.  She would testify that she looked to

15 the ballot results for the creditors in this class who voted

16 yes and those who voted no and she would explain that the 75

17 creditors with $395 million of claims who voted yes include a

18 broad cross section of creditors in this class including such

19 diverse groups as the MRA counter party such as Bank of

20 America, Credit Suisse First Boston, such diverse parties as

21 Wells Fargo as the indenture trustee for the Kodiak

22 subordinated debt, a number of trade creditors, McGuire the

23 major landlord with claims only against NCFC.  She would

24 explain that Kodiak also has claims only against NCFC.

25        Then she would explain that out of the 203 negative

1  votes 200 were cast members who are participants in the

2  deferred compensation plan.  So 200 out of the 203 negative

3  votes were deferred compensation claimants holding claims that

4  aggregate 4.5 percent in dollar amount of the class.  And she

5  would further explain that those claimants include former

6  senior members of management who deferred bonuses that they

7  were -- that they earned -- I've got to make sure I use the

8  right tax terminology -- based upon the corporation's earning

9  results, the EBITDA, for 2005 and 2006 which results the

10  company has announced were incorrect.

11          MR. KEACH:  I'm happy to say the multitude of

12  objections we have to just proffer to the end, but just so that

13  he doesn't get away from us I fail to see the relevance of any

14  of this.  There are no 1126 motions that designate votes.  And

15  last time I checked motivation in casting a vote didn't make

16  your vote worth more or less.  So it would seem to me that

17  other than to cast aspersions on less than ten of the 200

18  people who cast negative votes there's no relevance to this

19  whatsoever.

20          THE COURT:  Overruled.  You may continue.

21          MR. LOGAN:  She would explain that the group of

22  creditors voting no in this class who receive bonuses they were

23  based upon financial statements that needed to be restated,

24  include creditors who voted no with $2.6 million of asserted

25  claims.  And she would testify that those parties have been

1    identified in the examiner's report.  She would then go on to

2    Paragraph 33 of her declaration and speak very briefly that the

3    plan does provide for the payment of priority claims.  She

4    probably wouldn't even talk about Paragraph Number 34 because

5    that's more legal argument.

6        She would talk about the matters discussed in

7    Paragraph 35.  And she would explain that one of her functions

8    is to ensure that the corporation does have the liquidity, the

9    debtors have the liquidity to consummate the plan.  She would

10   testify that she monitors that very carefully, and she would

11   testify that the corporation does have the cash sufficient to

12   make effective date payments.

13       She would explain that the elements of 1129(a)(12)

14   have been satisfied, that the requirement of 1129(a)(13) is

15   irrelevant because there are no retiree benefits.  And she

16   would explain that we put in Paragraphs 38 and 39 because we

17   thought that we needed to cover every element of 1129, but she

18   would explain that she would defer to counsel would argue that

19   at the final argument.  She would further testify that the

20   first principle purpose of the plan is not to avoid taxes, but

21   rather the purpose of the plan is to affect a fair resolution

22   of these Chapter 11 cases taking into consideration the legal

23   interest and rights and claims of a multitude of creditors with

24   claims against a disparate capital structure with different

25   legal rights.  She would testify that the purpose was to do

1  that as fairly and as expeditiously as possible.  And quite

2  frankly she would testify that she's proud of the results.

3        She would finally testify that not only are the

4  settlements relevant for purposes of the liquidation analysis,

5  but as far as settlements in the plan is concerned that they

6  truly, truly were negotiated at arms length over an extended

7  period of time.  The parties who have divergent interest

8  representing essentially every constituent in this case in

9  terms of where they fit in a corporate organization, where they

10  fit in various places in the capital structure, and she would

11  testify that that was done in an effort taking into

12  consideration factors that courts often articulate as legal

13  standards, but as a business person are just commonsense.  That

14  whether or not the settlement is fair is something she looks at

15  very carefully and looked at here.

16        And she would testify that in some cases parties may

17  think that a different settlement would be appropriate, but in

18  every case the settlements that are embodied in this plan were

19  both integrated with a host of others and were also well within

20  the range of what Ms. Etlin saw as plausible results

21  particularly taking into account the complexity of the issues

22  which she would testify were extremely complex, and that the

23  cost of going down an alternative litigation path.  And she

24  would testify that one of her paramount objectives was to make

25  sure these cased did not evolve into a litigation quagmire and

1 that the settlements avoid, in her opinion, substantial cost

2 and complexities that otherwise would result.  And I would have

3 no further questions.

4          THE COURT:  Cross examination.

5          MR. KEACH:  Well, does Your Honor wish to entertain

6 objections to the proffer first?

7          THE COURT:  No.  I would say let's complete the oral

8 examination and then I'll consider any motion you'd like to

9 make.

10          MR. HUSTON:  Good afternoon, Your Honor, may it

11 please the Court.  Joseph Huston of Stevens, Lee on behalf of

12 the Ad Hoc Committee of Beneficiaries.  Just two housekeeping

13 matters first, sir.  I would like to introduce Paul McDonald of

14 the Bernstein, Shur firm whose admission pro hoc has been made

15 and approved by the Court.  And second, both Mr. Keach and Mr.

16 McDonald will, during the presentation, refer to a series of

17 exhibits copies of which have been pre-marked and have been

18 provided to the other parties.  And if I may approach we have a

19 binder for you.

20          THE COURT:  All right.

21                    (Pause)

22          THE COURT:  All right, now, looks to me that at least

23 some of these documents may fall within the scope of the

24 sealing order that I just signed.  I would just ask that as you

25 get to them or use or refer to them you identify which

1 fall into that category.

2          MR. KEACH:  I can actually pass through that in

3 advance if Your Honor would like.

4          THE COURT:  That's fine.

5          MR. KEACH:  We will be introducing what has been pre-

6 marked as Ad Hoc Exhibits 1 through 4.  And those documents, I

7 think, we concede fall within the confidentiality motion in

8 order.  And so when introduced they would go under seal with

9 our consent.

10          THE COURT:  All right.  Thank you.

11                    CROSS EXAMINATION

12 BY MR. KEACH:

13 Q    Ms. Etlin, with respect to the collection of companies

14 that are on your demonstrative exhibit did you or did anyone

15 under your direction including AlixPartners consider a plan

16 which would have involved substantive consolidation -- complete

17 substantive consolidation of all of the debtors on that chart?

18 A    Yes, we did.

19 Q    And did you conclude that that was inappropriate under the

20 standards of Owens Corning?

21 A    Mr. Keach, as we discussed the other day the standards of

22 Owens Corning are legal standards and I'm certainly not a

23 lawyer.  However, we did consider those business and factual

24 matters which are typically called upon in making those legal

25 conclusions.  And the business and factual matters that we

1 found evident in the companies did not support the facts that

2 would normally go into that form of legal analysis.

3 Q    Ms. Etlin, you've also testified that you were or your

4 proffer indicates that you would testify that you were involved

5 in the setting of the bar date.  Correct?

6 A    I set out for my professionals, you will recall Mr. Logan

7 referred to the aggressive nature with which I drove my

8 professionals and frankly the committees' professionals as well

9 in these cases to get to a solution.  The desire to set an

10 early bar date so that we would have an idea of the claims and

11 be able to negotiate resolution of what appeared to be very

12 vexing and protracted claim negotiations was definitely my

13 goal.

14 Q    And are you familiar with the components of the bar date

15 order?

16 A    Generally.  Yes.

17 Q    And are you aware of the fact that the bar date order

18 required creditors with claims against an individual debtor to

19 file their claims against the correct debtor?

20 A    Yes, I am.

21 Q    And in fact, if a creditor with a claim against an

22 individual debtor filed with the wrong debtor they risked

23 losing their claim.  Correct?  I mean, their claim disallowed.

24 A    Yes.

25 Q    Ms. Etlin, with respect to the issue of compromises that

1  were referred to in the proffer of your testimony, was there a

2  compromise or is one of those compromises a compromise that was

3  reached between the debtors and the committee with respect to

4  the location of the Carrington -- the interest in the so-called

5  Carrington entities within this family of companies?

6  A    If by compromise with the committee you mean treatment for

7  purposes of the ultimate realization of the asset the debtor

8  was the party who proposed it and ultimately the committee

9  concurred.

10  Q    Let me back up and try to be a little clearer, because the

11  proffer actually wasn't as specific on this issue as it might

12  be.  Was there an issue as between two of the holding company

13  debtors which of those entities was the owner, if you will, of

14  the so-called Carrington interest?

15  A    Yes.  There definitely was.

16  Q    All right.  And are the Carrington interest a major asset

17  with respect to potential distributions under the plan?

18  A    We certainly hope they will be.

19  Q    And what is the range of values that have been attributed

20  to the Carrington interest?

21  A    Anywhere from zero to 48 or $49 million.

22  Q    And describe, if you can, for the Court what was the

23  nature of the ambiguity as between those two entities regarding

24  ownership of the Carrington interest?

25  A    Certainly.  If you look at the chart, the yellow boxes,

1  there's a yellow box referred to as New Century TRS Holdings,

2  f/k/a New Century Financial Corporation.  Prior to the

3  conversion of the company to REIT in October of 2004 that was

4  the ultimate parent holding company, the Delaware Corporation.

5  When the REIT was created New Century Financial Corporation,

6  the Maryland Corporation came into existence as the ultimate

7  parent.  And New Century Financial Corporation, the Delaware

8  entity was renamed TRS Holdings.  A number of different assets

9  which were owned by New Century at the holding company level

10  prior to the REIT conversion sat in TRS Holdings.  Sometimes

11  the legal documentation moved them very clearly to New Century

12  Financial Corporation, and it was clear that that was the

13  intent of the parties.  Sometimes the legal documents placement

14  was less clear, but the accounting documentation in the

15  accounting books and records was clear and the asset was moved.

16      In the case of Carrington -- the Carrington interest which

17  are both a GP and an LP head fund interest -- the accounting

18  remained in TRS Holdings, however there were documents executed

19  for New Century Financial Corporation prior to the conversion

20  of the REIT.  However, after the conversion of the REIT it was

21  a little unclear.  And frankly the documents that I executed

22  with Carrington in the course of these cases since I became CEO

23  last June were in the name of New Century Financial

24  Corporation, the REIT, the Maryland Corporation, and NCMF the

25  primary operating debtor.  So legal documentation was all over

1 the place as to who the ultimate owner of those interests and

2 controller of those interests was.

3          MR. KEACH:  May I approach, Your Honor?

4          THE COURT:  You may.

5 Q    Ms. Etlin, I'm going to show you what we've pre-marked as

6 Ad Hoc Exhibit 11 just so that we can put some timing with

7 respect to your remarks.  Can you identify Exhibit 11 for the

8 record?

9 A    It's labeled agreement and plan of merger dated as of

10 April 21st, 2004.

11 Q    And I'll represent to you that in addition to being in our

12 exhibits they're in the exhibits that were presented to us for

13 the debtors as well.  Have you seen this document before?

14 A    I don't specifically recall.

15 Q    Do you understand that this is in fact the agreement and

16 plan of merger describing the REIT conversion that you just

17 described?

18 A    Okay.

19 Q    I don't want to put words in your mouth.  I'm asking if

20 you understand that's what this document is.

21 A    Well, I'm not a lawyer and I just testified that I haven't

22 seen it before, but for purposes of this questioning I'm happy

23 to agree with you that it would appear to be the case.

24 Q    Okay.  And looking at the date of the document do you

25 understand that the REIT conversion you described took place

1 sometime on or about April 21st, 2004?

2 A    You know, it's always been represented to me that it

3 didn't actually become effective until October 2004.  However,

4 frankly I can't, Mr. Keach, explain to you the time lag between

5 this document and the actual effectiveness of the conversion.

6 Q    Okay.  And I think for the purpose of our discussion it's

7 probably not going to be terribly important.  But you

8 understand that it was sometime between April of 2004 and the

9 fall of 2004 that the REIT conversion became effective.

10 Correct?

11 A    That is correct.

12 Q    Okay.

13        MR. KEACH:  Your Honor, especially given that I think

14 this is a common exhibit I would move its admission.

15        THE COURT:  Is there any objection?

16        MS. UHLAND:  No, Your Honor.

17        THE COURT:  All right.  Ad Hoc 11 is admitted without

18 objection.

19        MR. KEACH:  May I approach, Your Honor?

20        THE COURT:  Yes.

21 Q    Ms. Etlin, I'm going to show you what we've marked as Ad

22 Hoc Exhibit 1 and ask if you've ever seen this document before.

23 A    Yes, I have.

24 Q    And could you describe it for the record, please?

25 A    This is the limited liability company agreement of

1  Carrington Capital Management.  And if I recall correctly

2  Carrington Capital Management is the GP entity in whom we own a

3  30 some percent interest.

4  Q    And just to tie into your earlier explanation of the

5  alleged ambiguity the New Century Financial Corporation that

6  has -- well, let me back up.  New Century Financial Corporation

7  is one of the parties to this agreement.  Correct?

8  A    Yes.  This agreement is dated February 2004, and is

9  executed by New Century Financial Corporation -- actually this

10  copy isn't signed, but I've seen a signed copy by New Century

11  Financial Corporation.  And again, that would be the entity

12  that ultimately became New Century TRS Holdings, the Delaware

13  Corporation.  The pre-REIT ultimate parent.

14             MR. KEACH:  Move the admission of Ad Hoc 2, Your

15  Honor.

16             THE COURT:  Any objection?

17             MS. UHLAND:  No, Your Honor, but --

18             MR. KEACH:  Excuse me, Ad Hoc 1.  Excuse me.  Looking

19  at the wrong document.

20             MS. UHLAND:  Your Honor, this document --

21             MR. KEACH:  Goes in under seal.

22             THE COURT:  All right.  Submitted without objection.

23  Under seal.

24             MR. KEACH:  May I approach, Your Honor?

25             THE COURT:  Yes.

1 Q    Ms. Etlin, I'm going to show you what we've marked as Ad

2 Hoc Exhibit 2.  And again I would ask if you've ever seen this

3 document before.

4 A    Yes, I have.

5 Q    And just for the record, this document is unsigned, is it

6 not?  At least the copy I've just handed you.

7 A    Yes.  The document is dated December 1st, 2004 and is an

8 agreement between Carrington Investment Partners U.S., LP, and

9 New Century TRS Holdings, Inc.

10 Q    All right.  Have you ever seen a signed copy of this

11 document?

12 A    No, I have not.

13 Q    Do you know whether this document ever became effective in

14 any way, shape or form?

15 A    I do not.

16         MR. KEACH:  Move the admission of Ad Hoc 2, Your

17 Honor.

18         THE COURT:  Any objection?

19         MS. UHLAND:  No, Your Honor.  It's also under seal.

20         MR. KEACH:  Under seal.

21         THE COURT:  Right.  It's admitted without objection

22 under seal.

23         MR. KEACH:  May I approach, Your Honor?

24         THE COURT:  You may.

25 Q    Ms. Etlin, I'm going to show you what we've marked as Ad

1  Hoc 3 and ask if you have ever seen this document before.

2  A     Yes, I have.

3  Q     In fact, this was deposition Exhibit 3 at your deposition.

4  Correct?

5  A     Yes.  It is so marked.  It is a second amended and

6  restated agreement of Limited Partnership Carrington Investment

7  Partners LP dated March 21st, 2006.

8  Q     And am I correct in stating that this document which we've

9  marked singularly as Ad Hoc 3 consists of multiple documents

10 both as exhibits to the Carrington Investment Partners Limited

11 Partnership agreement.  Correct?

12 A     Yes.

13 Q     And if we turn to the page that's Bate Stamped 799.

14                         (Pause)

15 Q     Just by way of assistance it's the first page of the first

16 amended and restated limited liability company agreement of

17 Carrington Capital Management LLC.

18                         (Pause)

19 A     Yes.  That's the GP.  The general partner.

20 Q     Of the limited partnership agreement in which the debtor

21 entities held interest.  Correct?

22 A     The debtor entities hold interest in both the --

23 Q     At the GP level and the LP.

24 A     The GP and the LP.  And this is the GP agreement which was

25 amended in connection with the amendment to the LP agreement.

1  Q    And if we turn to -- in this document to the page Bate

2  Stamped 821 there's a signature page there.  Correct?

3  A    And this agreement is dated July 11th, 2006.

4  Q    Right.

5  A    And this agreement is executed by New Century Financial

6  Corporation by Kevin Cloyd as its EBP.

7  Q    And did you understand that on July 11, 2206 that Mr.

8  Cloyd was an executive vice-president of New Century Financial

9  Corporation meaning the Maryland REIT?

10 A    Actually Mr. Cloyd was an executive vice-president of both

11 the Maryland REIT and TRS Holdings the Delaware entity.  But I

12 believe he, you know, I can only infer.  I was not present at

13 the time this was executed, nor have I spoken extensively with

14 Mr. Cloyd.  But it would appear that he is executing on behalf

15 of New Century Financial Corporation the Maryland REIT entity

16 at this time.

17 Q    Right.  In fact, there was only one entity known as New

18 Century Financial Corporation at this time and that was the

19 Maryland REIT.  Correct?

20 A    That is correct.  The other one had been renamed TRS

21 Holdings.

22 Q    And this document purports to completely amend and restate

23 the limited liability company agreement of the GP?  As you

24 understand it.

25 A    It amends and restates.  Yes.

1  Q    And if we look at the two documents that proceed that in

2  this group of documents known as Ad Hoc 3 those documents are

3  also, are they no, dated in 2006.  In fact, specifically March

4  31, 2006?

5  A    Yes. I believe I already stated that.

6  Q    And the document beginning at Bates Stamped 770, if you'll

7  turn to that.  I think it's Exhibit A to the first document.

8  A    Yes.  That's the US LP entity.

9  Q    And this is designated as a second amended and restated

10 agreement of limited partnership.  Correct?

11 A    Yes.

12 Q    This is the relevant limited partnership agreement

13 relating to the GP and LP interest held by New Century

14 Financial Corp.

15 A    Yes.  However, there does not appear to be a signature

16 page from New Century or a reference from New Century anywhere

17 in the document.

18 Q    And that's because New Century itself is not a general

19 partner -- I mean, excuse me, is that because the limited

20 partners are stated to be referred to in an offsite schedule?

21 A    That is correct.  And we don't have a copy of that offsite

22 schedule.

23 Q    All right.  And as we discussed in your deposition there's

24 no doubt in your mind that the parties to this set of documents

25 or the party among the debtor entity to this set of documents

1  and the signatory from the debtor group of entities to this set

2  of documents is New Century Financial Corporation the Maryland

3  REIT.  Correct?

4  A    No.  My testimony is that the only signatory to any of

5  these documents is of the third document which is the first

6  amended and restated limited liability company agreement of

7  Carrington Capital Management, LLC, the GP.  And that is

8  executed by New Century Financial Corporation, the Maryland

9  REIT.  I have no way of knowing which entity is referred to or

10 executed the other two documents which are attached.

11 Q    And there's no other -- again at the time there was no

12 other entity known as New Century Financial Corporation other

13 than the Maryland REIT.  Correct?

14 A    That is correct.

15          MR. KEACH:  I move the admission of Ad Hoc 3, Your

16 Honor.

17          THE COURT:  Is there any objection?

18          MS. UHLAND:  No, Your Honor, other than it's under

19 seal.

20          MR. KEACH:  Agreed.

21          THE COURT:  Ad Hoc 3 is admitted without objection

22 under seal.

23          MR. KEACH:  May I approach again, Your Honor?

24          THE COURT:  You may.

25 Q    And just to complete the circle a bit, Ms. Etlin, I'm

1  going to show you what we've pre-marked as Ad Hoc 4 and ask if

2  you can identify that, please.

3  A    This is the same document that is contained and

4  encompassed as the last signed document in Ad Hoc 3 which is

5  the first amended and restated limited liability company

6  agreement of Carrington Capital Management dated July 11th,

7  2006.  It's the exact same document.

8  Q    Right.  And this is just the freestanding version of the

9  exhibit to the previous document.  Correct?

10 A    That's correct.

11         MR. KEACH:  Move the admission of Ad Hoc 4, Your

12 Honor.

13         THE COURT:  Any objection?  Hearing none --

14         MS. UHLAND:  No objection.  It's also under seal.

15         THE COURT:  Admitted without objection under seal.

16 Q    And as I understand it, Ms. Etlin, the entire controversy

17 relating to the ownership of the Carrington interest is a

18 product of your belief that this series of documents and the

19 accounting information at the New Century entities created an

20 ambiguity as to ownership.  Correct?

21 A    That's correct.

22 Q    Did you ever as the CEO and CRO of these entities, did you

23 ever consider submitting this dispute for adjudication with the

24 Court?

25 A    No.

1 Q    Was there ever any consideration given to filing a

2 declaratory judgment action and submitting this on stipulated

3 facts to let the Court decide?

4 A    No.

5 Q    Was there any opposition to that approach that you know

6 of?

7 A    I'm not sure it was frankly ever discussed.

8 Q    In your vast experience in turnarounds and Chapter 11's we

9 can agree, can't we, that that would have been a relatively

10 cheap process?

11 A    Until we came to the point of view of discussing whereas

12 it's needed to sit for plan purposes frankly it was a

13 completely unnecessary process and an expenditure of funds of

14 the estates that I wouldn't have undertaken.

15 Q    But again, just to answer my question instead of some

16 hypothetical question, it would have been a relatively cheap

17 exercise to stipulate that these series of documents consisted

18 of the universal documents and submit this dispute to the

19 Court.  Correct?

20 A    Not necessarily.  I'm not going to draw that judgment.

21 Q    And why do you think this would have been expensive to do?

22 A    As we previously stated Carrington and Carrington's

23 principals are very concerned about confidentiality for all

24 purposes.  We had to enter into very complex and very

25 protracted negotiations with them with regard to

1 confidentiality with regard to the funds and the GP.  And

2 anything that would have come before this Court with regard to

3 potential ownership or our interest in ownership in those

4 entities would have caused quite a degree of dispute with them,

5 in my opinion.

6 Q    Okay.  And other than these issues of confidentiality why

7 do you think this would have been an expensive litigation

8 process to resolve this what's seemingly relatively simple

9 issue?

10 A    Because everything we do in this case generally attracts

11 at least a half a dozen lawyers with things to say about

12 whether or not we've done it correctly.

13 Q    And other than that do you have another explanation as to

14 why it might have been expensive?

15 A    I think that's it.

16 Q    There are no others.

17 A    I think that covers it.

18        MR. KEACH:  May I approach, Your Honor?

19        THE COURT:  You may.

20 Q    Ms. Etlin, I'm going to show you what we've pre-marked as

21 Ad Hoc Exhibit 5.  Do you recognize this document?

22 A    Yes, I do.

23 Q    Does it say pleading filed by Carrington Capital

24 Management, LLC?

25 A    Yes, it is.

1  Q    And it was a pleading filed by them with respect to the

2  joint Chapter 11 plan of liquidation.  Correct?

3  A    Yes.

4  Q    And in this pleading does Carrington Capital Management,

5  LLC recite which of the debtor entities is the owner of the

6  general partner and limited partnership interest?

7          MR. LOGAN:  Objection, Your Honor, the document

8  speaks for itself.

9          THE COURT:  Overruled.  You may answer.

10 A    I'm going to have to take a second to read it, Mr. Keach,

11 if you don't mind.

12 Q    Take as much time as you need.

13                        (Pause)

14 A    Yes.

15 Q    And is that entity the Maryland REIT?

16 A    Well, it would appear to be except the second line in

17 Paragraph 1 refers to in 2004 NCFC acquired a limited liability

18 company interest in CCM, and that of course is a defined term

19 from the previous paragraph referring to the Maryland REIT.

20 However, at the time of this acquisition the Maryland REIT

21 didn't exist.

22 Q    In 2004?

23 A    I will agree with you that it's confusing, and frankly for

24 my own purposes as management of the company I have always

25 assumed it was an NCFC interest it was pointed out to me that

1  it was potentially something else.

2  Q    I personally don't think it's confusing.  Do they refer in

3  Paragraph 1 to the situation being governed by the July 11th,

4  2006 agreement?

5                          (Pause)

6  A    They refer to the July agreement in Paragraph 1.

7  Q    In fact, they refer to a limited liability company

8  membership interest in CCM subject to certain limitation and

9  restrictions which are set forth in the first amended and

10  restated limited liability company agreement dated as of July

11  11th, 2006.  Correct?

12  A    Yes, I believe that's what this says.

13  Q    And if I go further in Paragraph 1 --

14            MR. KEACH:  Your Honor, may I just take a pause for a

15  second and consult with counsel?

16            THE COURT:  You may.

17            MR. KEACH:  I just want to make sure that we're not

18  stepping on our agreement.

19            THE COURT:  All right.

20                          (Pause)

21  BY MR. KEACH:

22  Q    And again, looking at this document at the end of

23  Paragraph 1, Ms. Etlin, the pleading indicates that NCFC's

24  original investment in CCM was returned to it in the beginning

25  of 2006 as a return of capital thus NCFC today enjoys only a

1  wholly discretionary income stream generated from its retained

2  limited liability company membership interest in CCM.  Do you

3  see that?

4  A    Yes, I see this.

5  Q    And since you're knowledgeable about the accounting of

6  these companies you understand, do you know, that that income

7  stream is flowing into NCFC, the Maryland REIT?

8  A    That is correct.

9       MR. KEACH:  I move the admission of Ad Hoc 5, Your

10 Honor.

11      THE COURT:  Is there any objection?  Well, that's a

12 pleading.  It's already in the record.  I'll consider it a

13 pleading even though it's called statement.

14      MR. KEACH:  Do I understand that it's been admitted,

15 Your Honor?

16      THE COURT:  It's in the record.

17      MR. KEACH:  Okay.

18 BY MR. KEACH:

19 Q    Ms. Etlin, do you understand that there was at any point

20 in time an issue regarding which of the New Century family of

21 companies was entitled to the tax refund about which we have

22 heard today?

23 A    I'm not sure there was ever an issue with regard to that.

24 Q    Okay.  And in fact, you were reasonably certain precisely

25 which of these entities was entitled to the tax refund.

1  Correct?

2  A    Yes.

3  Q    And which of the entities was that?

4  A    New Century Mortgage.

5         MR. KEACH:  May I approach, Your Honor?

6         THE COURT:  You may.

7  Q    Ms. Etlin, I'm going to show you what we've marked as Ad

8  Hoc Exhibit 8 and let me ask if you've seen this before.

9  A    Yes, I have.

10  Q    Can you describe this for the Court, please?

11  A    Certainly.  The document is labeled Inter-Company

12  Reconciliation bankruptcy schedules versus POR models.  It was

13  produced by New Century and AlixPartners' personnel and it is

14  dated February 2008.  It came to our attention as part of the

15  plan of reorganization process that there were certain

16  discrepancies between the schedules as originally filed in

17  these cases, and the company's books and records particularly

18  as it pertained to the inter-company balances in the company's

19  books and records.  And so this document is attempting to

20  explain at a summary level a very complex series of

21  reconciliations which occurred which resulted ultimately in

22  both changes being made to the recovery model that we were

23  utilizing in discussing various aspects of the plan with

24  creditors as well as filing amendments to the schedules in

25  these cases.

1  Q    And this report is the product of the work that you

2  instructed AlixPartners to do to reconcile those differences

3  between the schedules and what they were discovering in the

4  books and records.   Correct?

5  A    That's correct.  At the time we filed these cases it was

6  -- the company was in a bit of a disarray and it came to our

7  attention later on as we went through process with regard to

8  reconciling a very large clearing account in the servicing sale

9  that there were certain entries that were normally made by the

10 accounting department and the inter-company records that might

11 be only made quarterly or annually.  And unfortunately given

12 what was going on at the company on March 31st and the

13 bankruptcy filing which occurred two days later the quarterly

14 entries then were not made as well as there were certain

15 entries that needed to be given affect to as of the filing date

16 that the accounting department wouldn't have normally done.  So

17 those entries were made.  In addition, we also discovered some

18 minor errors in the actual preparation of schedules even on

19 that date that disagreed with what existed at that time in the

20 company's books and records.  So this sort of cleans all of

21 that up and attempts to explain what was a very complex

22 process.

23 Q    And were you comfortable upon the completion of this

24 report at least with respect to the inter-company issues

25 covered by the report that your team got these issues correct

Etlin - Cross/Keach                    101

1  in the reconciliation?

2  A    Yes, I am.

3  Q    And just to put a fine point on it, this report, at least

4  with respect to AlixPartners' work was the end product of that

5  effort.

6  A    Well, the end product was actually the amendment to the

7  schedules which followed shortly after this.

8  Q    Right.  Which we'll get to in a second.  But short of the

9  amendments to the schedules this report is final, not interim.

10  Correct?

11  A    Yeah.  There may have been additional adjustments to the

12  inter-company accounts after this, but I don't believe they

13  were significant.

14          MR. KEACH:  Move the admission of Ad Hoc 8, Your

15  Honor.

16          THE COURT:  Is there any objection?

17          MS. UHLAND:  No, Your Honor.

18          THE COURT:  Ad Hoc 8 is admitted without objection.

19                      (Pause)

20          MR. KEACH:  May I approach, Your Honor?

21          THE COURT:  You may.

22  Q    Ms. Etlin, I show you what we have pre-marked as Ad Hoc 9A

23  through 9F.  And you can take a moment.  But my first question

24  is have you seen these documents before?

25  A    Yes, I have.

Etlin - Cross/Keach                    102

1  Q    And are these various amendments to the schedules of the

2  debtors noted on the amendments, the amendments that were made

3  as a product of the work we just identified in the previous

4  exhibit?

5  A    Yes.

6  Q    Okay.

7  A    Wait a minute.  Yes.

8  Q    And you as CEO of the debtor certainly understood that in

9  each and every instance these amendments were being submitted

10 under penalty of perjury.  Correct?

11 A    Yes.  They're executed by Mr. Lisac our CFO.

12 Q    And Mr. Lisac in executing them under your supervision as

13 an employee of Alix and of AP Services I trust was certain that

14 he wasn't violating that oath?

15 A    That is correct.

16 Q    Okay.

17      MR. KEACH:  Move the admission of 9A through F, Your

18 Honor.

19      THE COURT:  Any objection?

20      MS. UHLAND:  No, Your Honor.

21      THE COURT:  It's admitted without objection.

22 Q    Was there an issue -- strike that.  Were there discussions

23 between the debtor and the committee with respect to whether or

24 not a substantial debt shown on the books and records as being

25 owed by New Century Mortgage Corp. to New Century Financial

1 Corp. was debt or a contribution capital?

2 A    Yes.

3 Q    And do you recall whether this was an issue that was

4 raised by the committee or by another creditor group?

5 A    I believe it was raised by both.

6 Q    Other than the committee as an entity do you recall which

7 creditors raised this issue?

8 A    No.  I don't specifically recall.  We had multi-party

9 discussions with many very large financial institutions and

10 their counsel and there was a lot of disclosure and exchange of

11 information.  I do recall it coming up.

12 Q    Was there ever a demand made by any creditor or by the

13 committee that this debt be recharacterized as a capital

14 contribution?

15 A    I don't believe so.

16 Q    Is there any document anywhere that evidences a request by

17 any creditor or any entity that the debt be recharacterized?

18 A    In writing I don't believe so.

19 Q    Did you personally, or did anyone at AlixPartners analyze

20 whether or not this debt should be treated as a contribution to

21 capital under any applicable financial accounting standards?

22 A    It was mainly analyzed from the point of view of the

23 applicable legal standards by my counsel under my direction and

24 we had extensive discussions with regard to this issue.

25 Q    And were they able to give you a definitive legal opinion?

1  This is a yes or no.  I don't want the content.  But were they

2  able to give you a definitive legal opinion regarding whether

3  this was a contribution to capital or not?

4  A    No.

5                        (Pause)

6             MR. KEACH:  May I approach, Your Honor?

7             THE COURT:  You may.

8                        (Pause)

9  Q    Ms. Etlin, I believe I've just handed you what we've

10 marked as Ad Hoc 7.  Correct?

11 A    Yes.

12 Q    And can you identify that for the record?

13 A    Yes.  It's New Century Financial Corporation supplemental

14 benefit and deferred compensation trust agreement entered into

15 as of January '99 by and between New Century Financial

16 Corporation, the Delaware entity, and Wells Fargo Bank, N.A. a

17 national banking association as Trustee.

18 Q    Right.  And the only New Century Financial Corporation

19 that existed as of this point in time was the Delaware entity

20 that eventually became TRS.  Is that correct?

21 A    Yes, I believe so.

22 Q    And so the assumption here is that given the name and

23 given the timing, not to mention the state of incorporation

24 that this is the Delaware entity that existed at that time.

25 Correct?

Etlin - Cross/Keach                           105

1  A     There's no doubt.  It refers to the entity as being a

2  Delaware Company right in the first line.

3          MR. KEACH:  Move the admission of Ad Hoc 7, Your

4  Honor.

5          THE COURT:  Any objection?

6          MS. UHLAND:  No objection.

7          THE COURT:  It's admitted without objection.

8          MR. KEACH:  May I approach, Your Honor?

9          THE COURT:  You may.

10 Q    Ms. Etlin, I'm going to show you what is marked as Ad Hoc

11 Exhibit 6, and ask if you can identify this for the record, as

12 well?

13 A    Yes.  This is the New Century Financial Corporation

14 deferred compensation plan, amended and restated July 1st,

15 2004.

16 Q    And I believe in your previous testimony you testified

17 that you believe that the real -- or, the conversion to the

18 REIT, in other words, the formation of the Maryland REIT was

19 effective after that date, correct?

20 A     I believe so.  Yes.

21 Q     And so, again, at this point in time the only entity known

22 and operating as New Century Financial Corporation was the

23 Delaware corporation, correct?

24 A     I believe so.  Yes.

25 Q     Okay.  And if you would turn to Page 21 of the document?

1  A    Yes.

2  Q    And do you see Article 14?

3  A    Yes.

4  Q    And there's a reference to a trust there, correct?

5  A    Yes.

6  Q    And is your understanding that the trust referred to in

7  this document is the trust that was formed by Ad Hoc 7?

8  A    I believe this is an amendment, as it states, to that

9  original plan and trust document.

10 Q    All right.

11 A    Because it refers, right on Page 2, Article 1, to the

12 original plan as amended, and being effective January 1st, '99,

13 which is what the other document is.

14 Q    Right.  And so, the answer is yes, you understand the

15 trust that's referred to here is the trust that's referred to

16 in Ad Hoc 7?

17 A    I believe that's what I just answered.

18 Q    Right.  And you're not aware of any other trust agreement,

19 or any other trust document, correct?

20 A    Not as I sit here today.

21 Q    Okay.

22      MR. KEACH:  I move the admission of Ad Hoc 6, Your

23 Honor.

24      THE COURT:  Any objection?

25      MS. UHLAND:  No objection.

1          THE COURT:  Admitted without objection.

2  Q    Now, with respect to -- again, referring to the so-called

3  compromises in the plan, was one of the compromises reached to

4  agree that the location of the Rabbi Trust assets, in trust by

5  virtue of Ad Hoc 7, would be located at the Maryland REIT?

6  A    I believe that's where they were classified in the

7  company's books and records at the time we walked in, but I'm

8  not entirely sure.  There was a huge discussion about

9  classification of those assets somewhere else.

10 Q    Okay.  And was the issue, just so that we can get to the

11 point of it, was the issue being raised by the committee, as

12 you understood it, similar to the issue that we went through

13 with Carrington?  And that is, was this the pre-2004 New

14 Century Financial Corporation that was the party to these

15 documents, or the post-2004 Maryland REIT New Century

16 Corporation that was the party to these documents?

17 A    Well, your characterization of the committee raising the

18 issue is a little unfair to the committee, Mr. Keach.

19 Actually, my own counsel, both internal and external, as part

20 of the due diligence we were performing on the proper

21 classification of assets and liabilities, also raised it.  But

22 yes, you're referring to a concern on all parties' part that

23 everything we had had these things properly in the right space,

24 and that the company's intent really was for certain things to

25 move them after the creation of the REIT, and for certain

1  things not to move them, or whether the books and records

2  really reflected management's intent, and also what legally had

3  happened.

4  Q    All right.  And, in fact, is it not true -- let me say

5  that in a better way -- it's true, isn't it, that one of the

6  reasons that the plan of reorganization substantively

7  consolidates the Hold Co. group of companies is that there was

8  this perceived ambiguity as to whether or not assets were in

9  Old NCFC, or New NCFC, and specifically, the assets in the

10 Rabbi Trust and the Carrington interests?

11 A    Well, first of all, the plan does not substantively

12 consolidate the Hold Co. entities.  I think the plan is very

13 clear, and your and my discussion the other day on this topic

14 was very clear.  It combines those entities for purposes of

15 looking at distributions.  It does not result in a legal,

16 substantive consolidation of those entities.  And so, if that's

17 what you're implying, my answer to your question is no.

18 Q    Well, let's just explore precisely what's happening with

19 Hold Co. in the plan with the so-called Hold Co. entities.  The

20 yellow entities on your chart, those four entities are the so-

21 called holding company debtor group, correct?

22 A    Yes.

23 Q    And within that group, for the purposes of distribution,

24 the assets of those four companies are merged and combined,

25 correct?

1  A    And the inter-company liabilities as between the group are

2  valued at zero.

3  Q    Right.  So --

4  A    There are substantial inter-company balances by and

5  between the various entities.

6  Q    All right.  We'll just take these steps one at a time.

7  First, the assets in that group are pooled for distribution,

8  correct?

9  A    Yes.

10 Q    And the inter-company claims between those four companies

11 are valued at zero?  In other words, they're wiped out for

12 accounting purposes?

13 A    They're wiped out for plan purposes, yes.

14 Q    And the claims against the holding companies share in that

15 combined pool of assets, correct?

16 A    The claims against all entities share -- all entities in

17 yellow share against that combined pool of assets.

18 Q    Right.  All of the claims of all of the entities share

19 against the combined pool, correct?

20 A    That is correct.

21 Q    All right.  And it's true, is it not, that the primary so-

22 called controversies that drove you to construct that part of

23 the plan in the way you constructed it was this alleged

24 ambiguity that the Rabbi Trust assets and the Carrington assets

25 were maybe in Old NCFC and maybe in New NCFC, and that was, the

1  quote, controversy that drove that issue, at least in part,

2  correct?

3  A    In part, yes.

4          MR. KEACH:  If I haven't moved it already, I move six

5  and seven, Your Honor, just to clean up.

6          THE COURT:  They've been moved and admitted.

7  Q    Ms. Etlin, I'm going to ask you to take a look at Ad Hoc

8  Exhibit 10 -- excuse me -- Ad Hoc Exhibit 11, my apologies,

9  which has already been admitted and I think is before you.

10 A    Yes, I have it.

11 Q    All right.  And I'd ask you to turn to Section 2.3 of the

12 merger agreement, which is on Page 3.  Do you see that?

13 A    I see Section 2.3, yes.

14 Q    And is that section entitled New Century Financial Benefit

15 Plans and Employment Agreements?

16 A    It is.

17 Q    And is New Century Financial a defined term in this

18 document?

19 A    I'm sorry.  I believe I've testified previously I haven't

20 seen this document before today, so --

21 Q    Let's just walk through it carefully.  Why don't we go to

22 Page 2, which is actually the first page of the agreement?  And

23 the first paragraph of the document says, "New Century

24 Financial Corporation, a Delaware corporation ('New Century

25 Financial')" right?

1  A    I'm sorry.  Where are you reading?

2  Q    I'm looking right under, in the second page -- excuse me,

3  which is actually Page 1 of the actual agreement, under the

4  title, Agreement and Plan of Merger, the paragraph beginning

5  with "This agreement and plan of merger."  Do we see that?

6  A    Yes.

7  Q    And is New Century Financial, in quotes, the defined term

8  for New Century Financial Corporation, a Delaware corporation?

9  A    Yes.

10 Q    And the Maryland REIT is defined by the term New Century

11 REIT, correct?

12 A    Yes.

13 Q    All right.  Turning back to Section 2.3, and I'd ask you

14 to take a look at this.  You look at a number of -- I

15 understand you're not a lawyer, but you look at a number of

16 legal documents in your work as a turnaround professional,

17 correct?

18 A    Yes.

19 Q    And you looked at a number of legal documents in this case

20 as stated in the proffer, correct?

21 A    Yes.

22 Q    And, in fact, you analyzed legal documents on a regular

23 basis in trying to make some of these decisions you had to make

24 with respect to the plan or liquidation, correct?

25 A    I generally try to rely on the advice of my counsel with

1  regard to the governance of legal documents, Mr. Keach.

2  Q    But you do review them and you do attempt to understand

3  them, don't you?

4  A    Yes.

5  Q    Okay.  Looking at 2.3, it would appear, and I'll

6  paraphrase, and you tell me if you have a different

7  understanding, it says at the effective time the rights and

8  obligations of New Century Financial, which we have identified,

9  under -- and we'll skip over some plans -- the deferred

10 compensation plan, including all amendments and modifications

11 collectively the plans, the awards made under the plans that

12 are outstanding immediately prior to the effective date and the

13 related award agreements, and any and all other agreements in

14 effect immediately prior to the effective time will be assumed

15 by New Century REIT in accordance with the terms thereof and

16 all rights of the parties thereto and the participants therein,

17 to acquire shares, etcetera, etcetera, under the terms of the

18 plans.  And it goes on to say they're assumed by the New

19 Century REIT, correct?

20 A    That's what it says.  Yes.

21 Q    Do you understand that the effect of this paragraph is

22 that New Century REIT is acquiring all of the rights and

23 obligations of New Century Financial, the Delaware corporation,

24 under the deferred compensation plan and trust?

25 A    That would appear to be the case.

1  Q    And you had this document available to you prior to the

2  time you filed the plan of liquidation, correct?

3  A    Mr. Keach, I think I've stated already that my counsel and

4  committee's counsel looked at most of the governing legal

5  documents and we discussed them among ourselves.  I haven't

6  seen this document before today.

7  Q    And if I told you this document was produced by the

8  debtors you wouldn't have any basis to argue with that, would

9  you?

10 A    No.

11 Q    Okay.  With respect to the issue of administrative expense

12 allocation, I believe you testified, did you not, that for the

13 purposes of the plan of liquidation, administrative expenses

14 had been allocated based on the relative value of the various

15 assets and the various debtors, correct?

16 A    Realized value of those assets, yes.

17 Q    What do you mean by realized value?

18 A    Well, there were obviously a lot of assets sold in this

19 case that were sold at substantial losses over time as part of

20 the wind down process.  So, it was allocated based upon the

21 cash at hand, and then the relative assets of the unliquidated

22 assets at that time.

23 Q    Okay.  And with respect to the holding company debtors,

24 where you've placed the Rabbi Trust assets, and the Carrington

25 assets, how did you determine the realized value of those

1 assets for purposes of allocating administrative expense?

2 A    The value on the company's books and records related to

3 the invested assets and the Carrington assets.

4 Q    All right.  And other than the adversary proceeding, and

5 -- well, let me strike that.  Other than proceedings involving

6 our group, initiated by our group, and, I believe, the motion

7 to move the Rabbi Trust assets to safer investments, has

8 anything been done during this case with respect to the Rabbi

9 Trust assets that required an expenditure of administrative

10 expenses?

11 A    There are the on-going fees and other things being paid to

12 the Newport Group and the others involved in the administration

13 of those assets.

14 Q    And you would agree, wouldn't you, that those are

15 relatively modest?

16 A    Certainly.

17 Q    Okay.  And so, other than that there have been no expenses

18 attributable to the maintenance of the Rabbi Trust assets,

19 correct?

20 A    Other than the attention we have paid with regard to all

21 of the issues in controversy regarding the investment of those

22 assets and protecting the funds on behalf of the beneficiaries.

23 Q    And with respect to the Carrington interests have you had

24 to expend significant legal expenses or other professional fees

25 in order to keep the Carrington interests where they belong?

1  A    There have been huge monies expended in connection with

2  Carrington interests and huge negotiations that have occurred

3  --

4  Q    And what --

5  A    -- the contents of which are confidential.

6  Q    All right.  And generally -- and I don't want to -- and if

7  we're encroaching on confidentiality, you tell me, generally

8  what has been the subject matter of those negotiations that

9  took so much time and money?

10  A    The potential ability of the debtors to realize value

11  associated with those assets.  And unfortunately I can't go any

12  further than that.

13  Q    Okay.  Has there been any litigation over that?

14  A    No.  There have been many, many, many meetings attended by

15  many lawyers, and much legal analysis with regard to governing

16  documents over those investment interests and our ability to

17  potentially realize value in some expedited time frame related

18  to those assets.

19  Q    These are meetings attended by many of the debtor's

20  lawyers?

21  A    And the committee's.

22  Q    Okay.  The --

23  A    And Carrington's.

24  Q    You're not paying for Carrington's lawyers, are you?

25  A    No.

1  Q    Okay.  Was any thought given to allocating the

2  administrative expenses among the debtors based on what the

3  fees were incurred to do?

4  A    We looked at that a bit.  We looked at that a bit.

5  Q    And why did you choose not to do that?

6  A    Was -- at the end of the day it was difficult to make a

7  definitive determination with regard to a lot of the expenses

8  as to which the ultimate entity benefitting might be.  New

9  Century Financial Corporation is potentially an ultimate

10 beneficiary of certain legal causes of action, and a large

11 portion of the professional fees in this case have been

12 incurred in relationship to the examiner's investigation and

13 various other securities investigations, many of which focused

14 around operating activities of New Century Mortgage but which

15 related to financial reports filed by New Century Financial

16 Corporation.  So, if you look at sort of the totality of the

17 expenses, there were a lot of them that were not so easily

18 classified.

19 Q    The -- with respect to -- well, let me skip that for one

20 second.

21         MR. KEACH:  May I approach, Your Honor?

22         THE COURT:  Yes.

23 Q    Ms. Etlin, I'm going to show you what we've marked as Ad

24 Hoc Exhibit 10.  Do you recognize this document?

25 A    It would appear to be Exhibit E as filed in the disclosure

1 statement.

2 Q    Okay.  And turning to the low case liquidation scenario

3 that your counsel described as relating to your testimony in

4 the proffer, in looking under NCFC, there's an allocation there

5 of joint administrative expenses of $69,298,000?  Do you see

6 that?

7 A    Yes, I see it.

8 Q    And that allocation is based, as you said, on relative

9 realized values, correct?

10 A    No, not in the liquidation analysis.  As stated in the

11 disclosure statement there are substantial additional expenses

12 assumed with regard to the joint administrative expenses of

13 these estates in the liquidation scenario, and they are

14 allocated differently than they are for purposes of the plan of

15 liquidation.

16 Q    Okay.  And how did you -- what are the additional expenses

17 that you're hypothesizing about in the low case scenario?

18 A    Well, I think they're described in the disclosure

19 statement.  So, if I can turn to those pages and walk you

20 through it?

21 Q    If you recall.  We don't need to dwell on it, frankly.  Do

22 you recall what the additional categories of expense -- are

23 they Chapter 7 liquidation expenses, trustee and the like?

24 A    There's substantial additional legal expenses associated

25 with litigation that would result from the dissolution of the

1  various multi-debtor protocols and claims protocols that have

2  agreed to in these cases.  In addition, the inter-creditor and

3  inter-legal entity litigation which would result from the

4  conflict which would arise with regard to the rights of the

5  various parties to pursue the ultimate causes of action which

6  may exist against KPMG and others, as well as the legal

7  expenses that would be incurred in the entities which have

8  various MRA deficiency and EPD/Breach claims associated with

9  attempting to re-resolve those claims when those protocols

10  would no longer be in effect.

11  Q    Okay.  And you have arrived at your fairly specific

12  conclusions with respect to those extra expenses based on your

13  experience and technical expertise as a turnaround consultant,

14  correct?

15  A    Yes.

16  Q    And your considerable experience as a Chapter 11

17  consultant?

18  A    Yes, upon consultation with my counsel and with committee

19  professionals, and others, yes.

20  Q    Just one more item.  With respect to the entities shown on

21  -- green on your chart, those are the so-called operating

22  company debtors, correct?

23  A    Yes, they are.

24  Q    And similarly to the holding company debtors, with respect

25  to the plan of liquidation that's under consideration today,

1  the operating company's assets are combined for distribution

2  purposes, correct?

3  A    Yes.

4  Q    And the inter-company claims between the operating company

5  debtors are valued at zero?

6  A    I believe so.  Yes.

7  Q    There --

8  A    There may be an inter-company claim -- I think they are

9  all valued at zero.

10 Q    Right.  So, for --

11 A    Some of these compromises, Mr. Keach, are very

12 complicated, so I may need to refer to the disclosure statement

13 if we're going to engage in this line of questioning.

14 Q    Right.  If you have any doubt as to whether or not the

15 inter-company claims are zeroed out within the operating

16 company debtors we can certainly refer to the plan if you'd

17 like.

18 A    Yeah.  I'm going to refer to the --

19 Q    I want you --

20 A    -- refer to the plan.

21 Q    I want you to be certain about this.  Sure.

22                          (Pause)

23 A    Yes.  When it pertains to the operating company debtors,

24 as noted on Page 55 of the disclosure statement, Section C, the

25 third paragraph, the operating company debtors, against other

1 operating company debtors, are assigned, for purposes of their

2 inter-company claims, a determined distribution amount of zero.

3 However, the determined distribution amount percentages for

4 loan purchaser claimants against NC Capital, those claimants'

5 distribution and recognition of potential inter-company claims

6 between NC Capital and NCMC are actually increased by 50

7 percent.  This is the so-called Winn-Dixie plan scheme that I

8 helped implement at Winn-Dixie, and which we've incorporated

9 here where because we have a single unit of compensation for

10 creditors, i.e., cash, ultimately, in these liquidating

11 estates, the way to settle very complex inter-company -- inter-

12 creditor claims, both as between entities and as between

13 creditors, is in the revaluation of their potential

14 distribution amounts rather than resulting in an unconsolidated

15 plan where you're distributing money, for example, into MC

16 Capital, but let's say NC Capital, then owes it to somebody

17 else, so then the money gets distributed there.  Then it gets

18 distributed, but that entity owes it back to NC Mortgage, which

19 then repays it, and you end up in this very circular process.

20 So, what you do is you zero out these claims and then attempt

21 to deal with the potential merits of the inter-company claims

22 by inflating or deflating the claims of the resultant creditors

23 of those entities for distribution purposes.

24 Q    So, again, to get back to my question.  Within the

25 operating company group, inter-company claims are zeroed out,

1  correct?

2  A     As I've specifically testified, yes, the accompanying

3  adjustment --

4  Q     That's the only question I'm asking right now.

5  A     This --

6  Q     The --

7  A     This is specifically integrated, and it's stated in the

8  disclosure statement --

9  Q     Ma'am, we'll get to that.  I only have one question, and

10 that is within --

11         THE COURT:  Mr. Keach, please let Ms. Etlin finish

12 her response.

13         MR. KEACH:  Sure.

14 A     Specifically stated in the disclosure statement, two

15 sections right together, they are integrated, and it

16 specifically states in the disclosure statement that they're

17 integrated in that, yes, they are assigned a determined

18 distribution amount of zero as between the inter-companies, and

19 the way in which the inter-company issue between NC Capital and

20 NCMC is dealt with for purposes of distribution is then with an

21 additional distribution percentage of 50 percent assigned to

22 parties with claims against NC Capital in recognition of the

23 fact that just zeroing them out doesn't deal with the inter-

24 company claims and the potential inter-company claims that

25 exist.

1  Q    Right.  So, within the inter-company -- within the

2  operating company group you zeroed out the inter-companies, and

3  then to deal with the consequences of having zeroed out the

4  inter-companies and combine the assets and combine the claims,

5  you then tweaked the allowed distribution amounts to

6  compensate, correct?

7  A    I don't agree with your characterization.

8  Q    Well, the -- you basically dealt with the distribution

9  percentages in order to deal with the consequences of having

10  consolidated the assets, the claims, and zeroing out the inter-

11  companies, correct?

12  A    Correct, for purposes of providing in a liquidating plan

13  the most effective form and low cost form of administration,

14  since ultimately what everyone is interested in in these cases

15  is the amount of their distribution.

16  Q    Right.  And in the plan of liquidation there's also

17  something called the multi-debtor protocol, correct?

18  A    Yes, there is.

19  Q    All right.  And explain what the multi-debtor protocol is?

20  A    It's another one of the complex forms of ways of dealing

21  with inter-party claims and inter-entity claims that exist in

22  these cases.  And again, the multi-debtor protocol is designed

23  to reduce expense in connection with claims resolution, and to

24  take into account the legal rights of creditors holding

25  guarantees, or other valid joint and several contractual

1  arrangements with the debtors.  There are parties who are

2  claimants in these cases who have multiple claims, claims

3  against multiple entities for the same amounts as a result of

4  their joint and several contractual agreements.  Those parties

5  originally in our claims negotiations took the position that

6  they were entitled to -- let's say they had a $10 claim, just

7  for simplification purposes, they were entitled to receive

8  their deemed distribution on their $10 claim across every

9  entity in exactly the same amount until they had recovered 100

10 cents on the dollar.  That doesn't necessarily appear fair to

11 anybody who looks at these things, and so, there was a

12 protracted negotiation with those parties wherein we agreed

13 that those claims would be for distribution purposes collapsed.

14 However, they would be given, in effect, an inflator associated

15 with their distribution amount of 130 percent, which took into

16 account the fact that they had these claims against multiple

17 entities.  Again, a way of dealing with an incredibly complex

18 set of legal issues and claims, and factoring it into, as we

19 did in the Winn-Dixie case, the ultimate distribution amount,

20 which, frankly, is what everybody is interested in anyway at

21 the end of the day.

22 Q    Sure.  And so, if we can actually just get to the actual

23 question, the way the multi-debtor protocol operates is that

24 for creditors who have claims against multiple debtors, those

25 creditors have to file a claim against one debtor, but with an

1  inflated claims distribution amount or percentage, correct?

2  A    No, that's not correct.  They have to have valid claims

3  against multiple debtors in order to get that determined

4  distribution amount.

5  Q    And they get the determined distribution amount because

6  given the consolidation within groups they're not being able to

7  file claims against individual debtors, correct?

8  A    No.  They have filed claims against individual debtors.

9  That is the evidence upon which they're allowed to have the

10  larger deemed distribution amount.

11  Q    Well, if the groups were not consolidated as you just

12  described, these creditors would file claims against every

13  individual debtor and collect from every individual debtor

14  until they were paid, right?  That's what their legal rights

15  required them to do?  And the consolidation of the debtors into

16  a group is what prevents them from doing that, correct?  Since

17  you've got one asset pool, they can't very well file their

18  claims against individual debtors because the individual

19  debtors have disappeared into one asset pool.  Isn't that

20  right?

21        MR. LOGAN:  Your Honor, objection.  This is legal

22  argument.  Argumentative.

23        THE COURT:  She's doing pretty well, so --

24        MR. LOGAN:  I know she is.

25        THE COURT:  I would have let her go on myself, but --

1          MR. LOGAN:  Objection withdrawn, Your Honor.

2                    (Laughter)

3  Q     And there's one asset pool, correct?

4  A     Mr. Keach, again, you're mixing up the terms --

5  Q     I'm not mixing up anything, and please -- motion to strike

6  as non-responsive, Your Honor.  First --

7          THE COURT:  Denied.

8  Q     It would be better if we could focus on the actual

9  question, because the speeches are nice, but the questions are

10 more important.

11 A     I would agree with that, Mr. Keach.

12         THE COURT:  Mr. Keach -- Ms. Etlin, one moment.  Mr.

13 Keach, you must refrain from gratuitous remarks.  Ask

14 questions.  The witness will answer --

15 Q     Within the operating company group are the assets pooled

16 for distribution?

17 A     Yes, they are pooled for distribution --

18 Q     Okay.

19 A     -- purposes only.

20 Q     Right.  And somebody who has a claim against every one of

21 the debtors therefore can't file that claim against individual

22 debtors because the claims are pooled for distribution,

23 correct?

24 A     No.

25 Q     So, they still can file against individual silos of

1  assets, even though the assets are combined?

2  A    They have filed against individual silos of assets.  That

3  is the basis for the determination of their distribution

4  amounts are their individual valid claims against multiple

5  debtors.

6  Q    Right.  And how is the distribution being made to them?

7  Are they getting to collect from every individual asset pool?

8  A    No.  The compromise, as I've stated, basically takes valid

9  claims against multiple debtors and assigns, as a result of

10 those valid claims, a deemed distribution amount which inflates

11 the value of the basic single claim amount, which is filed

12 against multiple debtors.  Because typically when these

13 claimants filed, they filed the same claim against multiple

14 debtors because it's the same claim under joint and several.

15 And what we've done is we've said rather than having a

16 situation in which assets are flowing into entities, and then

17 you have to take into account the inter-company values, and the

18 cash circles around, and maybe it comes to rest at one point,

19 or maybe it comes to rest at another point, and it results in

20 potentially very unfair levels of distribution to various

21 groups of creditors, let's take into account everyone's

22 potential legal rights against all those various parties, plus

23 the inter-company amounts that might shift the values between

24 the various entities, and let's come up with a single deemed

25 distribution amount which takes into account for those various

1 parties based upon the actual legal nature of their multiple

2 claims what they ultimately receive as a distribution in these

3 cases.

4 Q    All right.  And the inflator is done to compensate for the

5 fact that they can't file individual claims against individual

6 silos of assets and collect from those individual silos of

7 assets?  In other words, the inflator is a consequence of the

8 consolidation, not the consolidation being a product of some

9 controversy about that claim?

10 A    No.  I disagree.

11 Q    Okay.  What controversy is it that drives the multi-debtor

12 protocol?  What controversy did it resolve that didn't exist

13 prior to your decision to consolidate these companies into

14 groups?

15 A    The multi-debtor protocol resolves the controversy as

16 between -- the various controversies that exist between NCFC,

17 NC Credit, NC Capital, NCMC, and Home123 relating to their

18 inter-company values, as well as the actual claims themselves

19 that exist against those entities.  There is -- there was a

20 difficulty in allocating to every one of the 14, I think,

21 entities on that chart, the actual assets themselves and the

22 actual expenses of administration and expenses associated with

23 those entities in a very definitive way across 14 different

24 entities with a degree of accuracy that we felt would survive

25 the ultimate legal challenges that would come from many parties

1  who, if we did not engage in these various settlements which

2  occurred with regard to a focus on deemed distribution amounts.

3  And so, that's what this attempts to settle is very complex,

4  multi-party potential litigation, not only with regard to their

5  right to recover a claim in an individual entity, but which

6  proceeds flow into that entity to then fund their claim.

7  Q    Would the inflator be needed at all if you weren't

8  consolidating these debtors?

9  A    The consolidation results as part of the overall

10 compromise, which includes the inflator.  In other words, it's

11 a single unit.  We didn't come up with the notion of combining

12 these things into the three primary distribution groups and

13 then seek to negotiate distribution amounts.  It came as a

14 result of the negotiations to settle these very complex inter-

15 company claims and try to do it in a way that minimized the

16 cost of ultimate administration and float as many -- as many

17 dollars ultimately back to the underlying creditors as

18 possible.

19 Q    And again, my question, would you need the inflator if you

20 were not substantively consolidating the operating companies?

21 A    I think it's impossible to answer your question.

22 Q    And again, Ms. Etlin, to go just -- end where we started,

23 you concluded, did you not, based on your consultation with

24 counsel, that a complete substantive consolidation under Owens-

25 Corning was not appropriate under the facts of these cases,

**J&J COURT TRANSCRIBERS, INC.**

1  correct?

2  A    That's absolutely true.

3  Q    Okay.

4         MR. KEACH:  Nothing further for now, Your Honor.  I

5  would, again, as I stated when I started this, we've preserved,

6  I believe, our objections to the entire proffer, and if Your

7  Honor would like our objection to the proffer and the various

8  bases for it, I can offer that now if you'd --

9         THE COURT:  Well, here's what I thought we would do.

10  First I'll ask whether anyone else wishes to examine the

11  witness.  Once we complete that, we'll take a short break,

12  because we've been going a while.  And then, before we do

13  direct -- redirect and recross, I'll take those objections so

14  that to the extent further testimony is appropriate to resolve

15  those -- some or all of those objections, we'll use redirect

16  and recross to address that.

17         MR. KEACH:  All right.

18         THE COURT:  Okay?

19         MR. KEACH:  Thank you, Your Honor.

20         THE COURT:  Does anyone else wish to examine this

21  witness?

22         MR. POWER:  Your Honor, Mark Power from Hahn &

23  Hessen, counsel for the committee.  I do have questions.  I'm

24  just not sure whether I'm a -- we're a plan proponent.  So, I

25  have questions, but I'm not sure if I'm on redirect, or whether

**J&J COURT TRANSCRIBERS, INC.**

1  you want me to go --

2             THE COURT:  I'd like --

3             MR. POWER:  -- before debtor goes?

4             THE COURT:  Let's go now.

5             MR. POWER:  Okay.

6             THE COURT:  Mr. Power, before we do, though, give me

7  a time estimate for --

8             MR. POWER:  Um -- it's tough with Ms. Etlin and I,

9  but I would say ten minutes, no more, Your Honor.

10            THE COURT:  All right.  Let's proceed.

11                      DIRECT EXAMINATION

12 BY MR. POWER:

13 Q   Ms. Etlin, I'm counsel for the committee, I think as you

14 know.  I have a few questions just based on the cross

15 examination and your direct.  Just so everyone is clear, the

16 Carrington interests, could you basically describe to the

17 parties in this courtroom exactly how the economics of that

18 works?  In other words, you mentioned you had a general

19 partnership and a limited partnership interest.  Could you

20 explain -- and you said that it was 45 to $50 million of value,

21 is that correct?  Where does most of the value sit, which

22 interests?  Is it in the general partner or the limited

23 partnership interests?

24 A   Well, according to the books and records of the company,

25 which have been kept on a GAAP basis, the value primarily sits

1  in the LP interest.

2  Q    And the LP interest --

3  A    The investment fund interests.

4  Q    The investment fund.  And that interest is the debtors' --

5  and we'll say debtors generically -- invested, put money into

6  the fund to purchase an interest; is that correct?

7  A    Yes.

8  Q    And the fund owns mortgages and mortgage-backed securities

9  that it's invested in; is that correct?

10 A    Yes.  In various forms of residuals and other kinds of

11 mortgage-related things.

12 Q    Okay.  And that fund is totally -- operated totally

13 independent of the debtors' operations.  Is that --

14 A    That's correct.  It's operated by Carrington Capital

15 Management, a GP entity.

16 Q    Are there multiple other investors in that fund?

17 A    Many.  I think our interests, according to the Carrington

18 statement currently constitutes about four percent of the

19 assets of the fund.

20 Q    So, the bulk of the limited partnership interest that

21 we're -- that comprises roughly 45 to $50 million of value, we

22 hope, you hope --

23 A    We all hope.

24 Q    -- is in the limited partnership interest.  Is that

25 correct?

 1          MR. KEACH:  Objection.  Leading.  He's a co-

 2  proponent.  This is direct.

 3          MR. POWER:  Well, I just want to be clear.  I can say

 4  it differently, Your Honor.  I'll withdraw.

 5  Q    When you mentioned the 45 to $50 million, where does the

 6  bulk of that money sit, in which interests again?

 7  A    Again, according to the accounting records of the company,

 8  it sits in the LP interest.

 9  Q    Okay.  Would you look at Exhibit 2, please, that was

10  previously mentioned back in the beginning of your --

11  A    Ad Hoc Exhibit 2?

12  Q    Yes.  Please.

13  A    Okay.  Just give me a second.  They're not in order.

14  Q    There should be a little exhibit tab on the bottom.

15  A    Yes, I know.  Just -- they're not in order in the pile.

16  Q    Okay.

17                          (Pause)

18  A    Yes.

19  Q    Now, that agreement, which has been admitted into

20  Evidence, that is an agreement related to the Carrington

21  Investment Partners, and New Century TRS Holdings, Inc.  Is

22  that correct?

23  A    Yes.

24  Q    And New Century TRS Holdings, Inc. is the Delaware company

25  that was the former holding company.  Is that correct?

1  A    That is correct.

2  Q    Okay.  And would you turn to the last page of that

3  document?

4  A    Yes.

5  Q    Now, that last page refers to New Century TRS Holdings,

6  correct, and indicates it has a $29.5 million investment in the

7  limited partnership capital account?  Is that correct?  At that

8  time?

9  A    That's correct.

10 Q    Now, when you mentioned before about the limited

11 partnership interest, and the 40-some million dollars of value,

12 that's, in essence, that limited partnership interest that's

13 referenced in this agreement.  Is that right?

14 A    That is correct.

15 Q    In the documents you've reviewed today have you seen any

16 document where the general partnership amendments transfer the

17 debtors' limited partnership interests?

18 A    From what to what?

19 Q    Let me rephrase the question.  In the documents that Mr.

20 Keach showed you where the general partnership agreement

21 between Carrington Management and either -- either TRS Holdings

22 or New Century Financial Corp., the debtor corporation, those

23 relate to the general partnership; is that correct?

24 A    Yes.

25 Q    The limited partnership interest, which is the primary

1  economic asset that you're focused on distributing to creditors

2  is the limited -- is the money that this document indicates TRS

3  owns; is that correct?

4  A    That is correct.

5  Q    And have you seen a document in which it indicates that

6  that limited partnership interest was assigned from TRS to NC

7  Financial Corp., the Maryland REIT?

8  A    No, Mr. Power.  We have not.  We have looked high and low

9  for documents evidencing a transfer of either that -- of this

10 entity from one entity to the other, and we have been unable to

11 find them.

12 Q    So, the fact that the general partnership agreement was

13 amended doesn't mean that the limited partnership investment

14 changed hands.  Is that correct?

15 A    It doesn't necessarily follow.  It's unclear.  Like I said

16 -- as I previously testified, everything I've signed in these

17 cases relating to both of these investments I've signed as FC

18 and MC, the REIT and the operating mortgage company.  But as we

19 started plowing through the documents, we didn't necessarily

20 find that we had evidence that they were the actual ultimate

21 holders.

22 Q    Okay.  Now just to be clear, when you talked about the

23 issues that you discovered regarding which entity owns this

24 asset, you talked about legal documents.  But didn't you also

25 talk about accounting records?

1  A     That's correct.

2  Q     Okay.  Let's expand on that a little bit, because I don't

3  think it really was fully expanded.  As of the petition date on

4  the debtors' books and records, which entity is listed as

5  owning the Carrington interest, particularly the limited

6  partnership interest?

7  A     I believe it's in TRS Holdings.

8  Q     So, the debtors' accounting records are in TRS Holdings,

9  and that's where it indicates that asset sits.  Is that

10  correct?

11  A     Yes.

12  Q     And to your knowledge do you have any familiarity with

13  TRS's accountings in terms of how many entries are involved in

14  those book entries?

15  A     Thousands and thousands.

16  Q     So, accounting entries in connection with TRS and the

17  Carrington investments have basically been accounted for in the

18  TRS books and records.  Is that --

19          MR. KEACH:  Your Honor, objection.  Leading.  This is

20  direct.

21          THE COURT:  Sustained.

22          MR. POWER:  You're right, Your Honor.  I'll rephrase.

23  Q     Let me rephrase it this way.  Do you know which entity

24  actually funded the money to acquire the interest in

25  Carrington?

1  A    MC, up through --

2  Q    More --

3  A    MC advanced -- NCMC advanced the money to TRS Holdings to

4  buy the original interest in Carrington.

5  Q    And the committee raised that issue when you were

6  negotiating the plan, didn't the committee?

7            MR. KEACH:  Objection.  Leading.

8            THE COURT:  Sustained.

9  Q    Did the committee raise the issue about which entity

10 funded the investment in Carrington during the plan

11 negotiations?

12 A    Yes.  Among many issues relating to the origination of

13 those assets, the classification of those assets, and what the

14 legal documents said.  I think it was next to your questions

15 about the classification of the Rabbi Trust, the entity around

16 -- the issue around which you did the most due diligence and

17 asked the most questions.

18 Q    Now, let me just ask you, in terms of the plan, I think

19 you testified that the asset in Carrington is in the Hold

20 Company group assets.  Is that fair to say?

21 A    Yes.

22 Q    So, the issues regarding which entity funded the

23 acquisition of that asset ultimately didn't result in moving

24 that asset to the operating companies.  Is that a fair

25 characterization?

1          MR. KEACH:  Objection.  Leading.

2          THE COURT:  Sustained.

3  Q    Ms. Etlin, let me try it this way.  Why didn't the --

4  Carrington asset get put in the operating companies in terms of

5  an asset in that group?

6  A    Because that's not where it was classified at the time of

7  the filing of these cases, and we ultimately determined the

8  proper place to leave it was where it is.

9  Q    Well, was there an argument that the entity that funded it

10  maybe should be entitled to that asset?  Was that argument

11  considered?

12  A    Yes, among many other arguments.  Yes.

13  Q    I'm not sure -- are you familiar with, as of the petition

14  date, the funds for the Rabbi -- I'm sorry.  Strike that.  The

15  money that was used to fund the Rabbi Trust, which -- and are

16  you familiar with which entity actually funded those monies?

17  A    Yes, I am.

18  Q    And which entity?

19  A    NCMC.

20  Q    So, NC --

21  A    The mortgage company, the left, green -- the primary

22  operating debtor.

23  Q    Would you describe -- are you familiar with what happened

24  when an employee who was a beneficiary of the deferred

25  compensation plan left the employ of the debtors and basically

1 took their money out of that plan, how the funds flowed in

2 connection with that departure?

3 A    Oh, I'm very familiar with that.

4 Q    Could you briefly describe it?

5 A    Yes.  NCMC, the primary operating debtor, is the -- holds

6 all the cash concentration accounts for the debtor, and did so

7 prior to the filing of these petitions.  And so, all of the

8 payroll, all of the common disbursement for all of the entities

9 was funded out of NCMC bank accounts, and then the expenses

10 were charged in the books and accounting records to those

11 entities.  So, the original funding for the contributions to

12 the Rabbi Trust originated in the NCMC payroll accounts.  In

13 addition, because the NCMC entity issued the payroll checks,

14 when someone was, for example, terminated or left the employ of

15 the debtor and requested a distribution from the Rabbi Trust,

16 the payroll check was issued by NCMC and the appropriate tax is

17 deducted because, again, that had been deferred compensation.

18 So now it was real compensation and it needed to be claimed.

19 And then at some time periodically in the future, and it didn't

20 happen often enough because it was an issue right -- just prior

21 to filing these cases, NCMC would seek to cause the plan

22 trustee to release from the assets of the trust a reimbursement

23 to NCMC for the people who had withdrawn from the plan.

24 Q    And are you aware of whether any of the funds that are

25 currently sitting in the Rabbi Trust actually may be funds that

1 a departed employee may have had a claim to but that MC

2 satisfied the claim of that employee?  So, technically MC may

3 be entitled to reimburse those funds?  Do you have any

4 knowledge of that?

5          MR. KEACH:  Objection.  Leading, Your Honor.

6          THE COURT:  Sustained.

7          MR. POWER:  Your Honor, it just has to do with

8 knowledge.  I don't think that was --

9          THE COURT:  It was a leading question.

10 Q    Do you have any knowledge of whether any of the funds --

11 do you have any knowledge regarding whether any of the funds

12 relate to monies that -- that Mortgage Corp. has advanced?

13 A    Yes.  The amount pre-petition, actually, was in excess of

14 $20 million.  I was able to successfully cause the trustee to

15 reimburse us just prior to the filing of these cases,

16 approximately -- I think it was approximately $10 million,

17 maybe $8 million I was -- I managed to get out in the last

18 couple of days before the filing of the petitions.  However, in

19 excess of $10 million was hung up there.  The trustee, Wells

20 Fargo, was not comfortable reimbursing us those funds on an

21 expedited basis under their trust agreements, and so it remains

22 hung up there to this day.

23 Q    If those funds ever get released from the Rabbi Trust,

24 where do they go under the plan?

25 A    They go into the holding company debtors.  Under this plan

Etlin - Direct/Power                    140

1  they do not pass back to NCMC.

2  Q    So, NCMC doesn't get the money back that it advanced?  Is

3  that fair to say?

4  A    That's correct.  The creditors of the holding company

5  debtors benefit from that additional ten or so million dollars.

6  Q    Mr. Keach mentioned the expenses of the Rabbi Trust, and

7  that there wasn't a lot of expenses.  Isn't it true that the

8  legal expenses incurred by the state -- let me re -- strike

9  that, Your Honor.  Are you familiar with the adversary

10 proceeding that's going on in this bankruptcy regarding the

11 ownership of the funds in the Rabbi Trust?

12 A    Yes, I'm painfully aware of that, and many other adversary

13 proceedings.

14 Q    In fact, have you -- are expenses being incurred, to your

15 knowledge, relating to the defense of that lawsuit?

16 A    Yes, there have been substantial expenses incurred,

17 probably not as much as some of the other adversary proceedings

18 that I was fortunately able to settle.

19 Q    Let me just ask you some questions about the inter-company

20 claim from NCFC, the Delaware corporation -- NCMC.  Are you

21 familiar that there was a significant inter-company claim that

22 MC owned to FC?  Are you familiar with that?

23 A    Yes, I am.

24 Q    How, generally, did the debtors' inter-company accounts

25 work in terms of settling up those claims?  Were those claims

1 settled, to your knowledge?

2 A    No.  They were perpetually open.  So, whenever money

3 passed from NCFC into any of the other entities, it was

4 recorded.  From time to time there would be transactions in

5 which money would go the other way, and that money would also

6 be independently recorded.  The resulting balance would, of

7 course, be netted in the books and records.  But each of the

8 individual transactions would be recorded, and there were,

9 particularly given the nature of the debtors' business, which

10 caused certain entities to originate mortgages, transfer them

11 to other entities for consolidation and ultimate securitization

12 or sale, the -- it would not be mischaracterizing the inter-

13 company accounts to say that there were thousands of

14 transactions on a monthly basis involving multiple millions of

15 dollars.

16 Q    At the end of each fiscal year, when the company closed

17 its books, were those accounts satisfied?

18 A    No.  They never were.

19 Q    Are you aware of any promissory notes or instruments

20 evidencing the debt between the companies?

21 A    No.

22 Q    Are you aware of any evidence in the company that relates

23 to whether, in fact, FC -- let me strike that, Your Honor.

24 When you were describing the inter-company accounts a moment

25 ago, have you ever seen any evidence in the company regarding

1 whether decisions about whether to advance those funds and the

2 ability to get repaid were ever made at the time those funds

3 were advanced?

4 A    No.  I haven't seen any evidence that anyone within the

5 entire debtor group of companies looked to see whether, as they

6 managed the business and advanced money between various

7 entities, there would be an ability to repay.

8           MR. POWER:  Your Honor, could I just have one second?

9           THE COURT:  You may.

10                     (Pause)

11           MR. POWER:  That's all, Your Honor.  Thank you.

12           THE COURT:  All right.  Does anyone else wish to

13 examine Ms. Etlin?  I hear no response.  Okay.  We'll take a

14 break until 4:10.  Court will stand in recess.  Ms. Etlin, I

15 ask that you not discuss your testimony with anyone.

16           THE WITNESS:  Yes, Your Honor.

17                     (Recess)

18           THE CLERK:  Could everyone take your seats, please?

19                     (Pause)

20           THE COURT:  All rise.

21           THE COURT:  All right.  Mr. Keach?

22           MR. KEACH:  Very briefly, Your Honor, with respect to

23 recross.  Ms. Etlin, if you could take a look at Ad Hoc 7,

24 which is the deferred trust agreement.

25           THE COURT:  I'm sorry --

1          MR. KEACH:  Oh.  I thought you had preserved recross.

2   I stood up to do that as you were leaving, but I thought you

3   had preserved it before we went --

4          THE COURT:  Here's what I anticipated starting right

5   now, and that is to work through your objections --

6          MR. KEACH:  Okay.

7          THE COURT:  -- to the declaration, assuming, perhaps

8   incorrectly, you'll tell me, but assuming that some of them

9   might be overcome by further foundation testimony, or

10  otherwise.  But let's do that, and then we'll finish the

11  examination.

12         MR. KEACH:  Okay.  My apologies, Your Honor.

13         THE COURT:  That's all right.

14         MR. KEACH:  Well --

15         THE COURT:  If you're comfortable there you're

16  welcome to stay.  If you'd prefer to return to your seat,

17  you're welcome to do that, too.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  All right.

20         MR. KEACH:  Your Honor, we would reiterate with

21  respect to the proffer, which was essentially a -- itself a

22  reiteration of the filed declaration, our motion to strike the

23  declaration and therefore the proffer.  First and foremost,

24  this is an issue of respect for the Court's prior order.  We

25  set up a scheduling order specifically providing that expert

1  witnesses would be designated in advance of all of the

2  witnesses on March 28th, and that there would be summaries, as

3  you always have with expert witnesses, there would be summaries

4  provided, there would be an opportunity for early depositions,

5  and there would be an opportunity for <u>Daubert</u> practice, and

6  more importantly, that there would be an opportunity to retain

7  rebuttal experts if appropriate.

8          The debtors did not, and the committee did not

9  designate an expert, and none of these witnesses has been

10 designated as an expert.  And as we have pointed out in the

11 motion in limine and in the motion to strike, the fact

12 witnesses, lay witnesses, if you will, can only offer opinion

13 testimony to the extent that that opinion testimony is not

14 disguised expert testimony.  In other words, fact testimony

15 cannot be based in any way on scientific, technical, or

16 specialized knowledge.

17         It is very clear, Your Honor, with respect to a

18 number of things about Ms. Etlin's testimony, that it is simply

19 expert testimony trying to be -- trying to be dressed as fact

20 testimony.  First, her entire speculation about what would

21 happen in a Chapter 7 with respect to expense and otherwise,

22 she admitted on cross examination was based on her experience

23 and expertise as a turnaround consultant.  It has nothing to do

24 with the fact that she is an officer of the debtor.

25         More importantly, the gravamen, the base, if you

1  will, of lay or fact testimony, is that the witness actually

2  established, by something other than a conclusory statement,

3  that he or she has personal knowledge of the facts being

4  testified about.   Nowhere in Ms. Etlin's testimony is there any

5  statement that she has any personal knowledge of any of the

6  facts that she's talking about.   In fact, what's evident from

7  both the declaration and the testimony is that a number of

8  other experts at AlixPartners gathered information, did

9  analysis, and presented it to her.   And her testimony is

10  entirely the product of applying her expertise, which is

11  considerable, no doubt, as a turnaround consultant, to facts

12  and analyses presented to her.   But what will happen in a

13  Chapter 7, and a prediction about what will happen in a Chapter

14  7, and what the expenses will be, and what some future

15  liquidation will look like is not fact testimony, it's expert

16  testimony.   What is the case with respect to the product of

17  consolidations, or non-consolidations, or de-consolidations is

18  not fact testimony, it's expert testimony.   And so, Your Honor,

19  we, first and foremost, would move to strike the entire

20  declaration and proffer as nothing more than expert testimony

21  being offered in violation of Your Honor's order on scheduling,

22  and in violation of Rule 701.

23          THE COURT:   I'll deny that as a blanket matter.

24  We'll need to address individually expert versus fact

25  testimony.   But let me ask you this.   At what point was it

1  disclosed to you that Ms. Etlin would be called as a witness at

2  the hearing today?

3          MR. KEACH:  They disclosed Ms. Etlin on a timely

4  basis under the -- as a fact witness under the scheduling

5  order, in fact, on the day, I think, designations were due.

6  Mr. Star, the committee's witness, which we'll get to later,

7  was, in fact, not designated on a timely basis.

8          THE COURT:  Well, when was that?

9          MR. KEACH:  But I'm not raising that as an issue.  I

10 would just point that out.  But Ms. Etlin was designated as a

11 fact witness on April 4th.  We then had a number -- in fact, I

12 think about 40,000 documents turned over to us at various

13 times, many of which were turned over to us well after the

14 deadline for producing documents.  And as a consequence of that

15 we agreed to take the depositions of Ms. Etlin and the others

16 at the start of this week.

17         THE COURT:  When did you take Ms. Etlin's deposition?

18         MR. KEACH:  I took Ms. Etlin's deposition on Tuesday.

19 We saw her declaration when it was filed.  We filed the motion

20 to strike I think within hours of the filing of the

21 declaration, as fast as we could produce it.

22         THE COURT:  And when was the declaration filed?

23         MR. KEACH:  My recollection was that the declaration

24 was filed -- it was certainly filed after the completion of her

25 deposition.  It might have been, in fact, Wednesday night, Your

1 Honor.

2          THE COURT:  Okay.  But it was after the deposition?

3          MR. KEACH:  It was after the deposition.  That's

4 right.  In fact, I asked, prior to the start of the depositions

5 there was an indication by the debtors that they might proceed

6 by declaration with respect to Ms. Etlin and Mr. Brents.  I

7 specifically requested to see a copy of any proposed

8 declaration in advance of the deposition and we did not get a

9 copy of the declaration in advance of the deposition.  We never

10 saw the declaration until the deposition was completed, despite

11 having requested it.

12          And I think, Your Honor, it's apparent, for example,

13 that all of the testimony and the best interest test is

14 entirely speculative and based on expert testimony, nothing to

15 do with the facts.

16          THE COURT:  All right.  Anything further?

17          MR. KEACH:  Well, with respect to the proffer itself,

18 Your Honor, and even though we all understand that proceeding

19 by declaration in lieu of direct has become accepted practice,

20 the methodology by which one puts in Evidence does not save it

21 from evidentiary objections.  And with respect to some specific

22 issues in the proffer, for the record, Your Honor, to the

23 extent that, for example, Mr. Logan in his proffer is

24 summarizing what was supposedly would have been testimony of

25 Ms. Etlin, to the extent that that proffer and the declaration

1  expresses views supposedly expressed by other people, for

2  example, board members of the debtor, or Mr. Jacobs as the

3  trustee, those statements are pure hearsay and have to be

4  stricken.

5        With respect to her testimony and preparation of

6  Exhibit E, which was the liquidation scenario, no foundation

7  was laid in the declaration or in live testimony about the

8  witness's personal knowledge or role in the preparation of that

9  exhibit.  In fact, all of the statements about the statements

10 of third parties, positions, for example, taken in settlement,

11 positions taken by way of demands, any statements of third

12 parties expressed through the declaration or through the

13 proffer are hearsay and are inadmissible.  And in several

14 instances there was reference to what would have been in books

15 and records of the debtor with respect to in other words what

16 Ms. Etlin found there, and what she did with it, and it's clear

17 that any reference to the books and records of the debtor, to

18 the extent it's content based, without actually putting the

19 books and records in violates the Best Evidence Rule, and

20 therefore any reference to the books and records has to go out

21 as violative of the Best Evidence Rule and has to be excluded.

22       Those specific objections, in objection to what we

23 think are violations of Rule 701 and 702 with respect to all of

24 the opinion-based testimony of Ms. Etlin we believe requires

25 that the opinion-based testimony be stricken, and as I said,

1 the specific instances of violations of hearsay and best

2 evidence require exclusion of that particular evidence.

3          THE COURT:  Thank you.

4          MR. KEACH:  Thank you, Your Honor.

5          MR. LOGAN:  Your Honor, just a few brief responses.

6 The scheduling order was negotiated by Ms. Uhland, and I

7 understand that there was a lot of dialogue back and forth as

8 to what would be opinion testimony, what would be expert

9 testimony, and it was very clear in the scheduling order that

10 lay opinion testimony could be offered.

11          We need to remember that Ms. Etlin is the CEO and the

12 CRO of every entity, every debtor.  She has been working for

13 over a year now on this case.  She had been personally involved

14 in the negotiations over the settlements that were part and

15 parcel of the plan of liquidation.  She personally has been

16 monitoring, as she explained, the cash flows of the company,

17 the expenses that are incurred in litigation.  She does have

18 substantial other experience, but Ms. Etlin testified as to her

19 personal experience in this case, and it would be a crazy

20 solution if a CEO and a CRO of a company could not give that

21 CEO and CRO's fact testimony as to how settlements were

22 negotiated.  We would never get evidence.

23          THE COURT:  And as a general proposition I don't

24 disagree with that.  But there were times at which the proffer

25 referred to statements made by people -- third parties outside

1  of the company, for example.

2        MR. LOGAN:  Let me deal with those, Your Honor.  If I

3  remember the statements by people outside the company -- well,

4  start within the company.  She certainly testified about the

5  board of directors' involvement, and she also testified about

6  dealings with various creditor groups as the plan was

7  negotiated.  That's relevant for two purposes.  That's relevant

8  to the good faith.  That's indeed where --

9        THE COURT:  Relevance wasn't an objection.

10        MR. LOGAN:  From her perspective, her conclusion that

11  the debtors negotiated a plan in good faith, the fact that they

12  discussed the issues with the board of directors.  And we

13  didn't get into the substance of the discussions with the board

14  of directors.  It's certainly a proper subject for testimony.

15  It's based on her personal knowledge.  It's not hearsay.  We

16  didn't try to submit for purposes of the truth that board

17  member X took this position, or weighed in on that position,

18  just merely for the fact that the discussions were had.

19        THE COURT:  And because of that it would not be

20  hearsay in your view?

21        MR. LOGAN:  That's correct.

22        THE COURT:  All right.

23        MR. LOGAN:  And that, I think, is true for the

24  discussions with parties outside of the courtroom, or outside

25  of the -- she had discussions.  And had discussions, and

1  therefore it's not hearsay, it's not being admitted for the

2  truth, for example, that a creditor was right that certain

3  contributions can be deemed capital contributions.  But they

4  had negotiations, and that's purely for the purpose of showing

5  that it was an issue that was addressed, and it was an issue

6  she evaluated personally in the course of deciding whether or

7  not the compromises in the plan were appropriate, from her

8  personal perspective as the CEO of the company.

9        I'd just go on to add, if we wanted to get into it,

10  and I don't think we do, there's a substantial body of case law

11  to Rule 7001 which -- including Third Circuit Court of Appeals

12  decisions which were even noted in the special advisory notes,

13  that the statements, the opinions of a senior executive of a

14  company are inherently often morphed into the never, never land

15  between opinion testimony and expert testimony.

16        THE COURT:  And I acknowledge that, an dit is a

17  never, never land, and it's a, you know, case-by-case kind of

18  decision.  It's like in a preference action the president of a

19  company testifying to industry, you know, standards or

20  practice, just as one illustration.

21        MR. LOGAN:  A good illustration.  Or there was a lot

22  of cases that say the president of a company can testify to the

23  value of the company, which would normally be an outside

24  expert's testimony, but because they're the president of the

25  company and they inherently have a very substantial factual

1  basis.  About the only thing I heard during Mr. Keach's cross

2  examination that I would be happy to address on redirect, he

3  asked her if her estimate of the legal costs that would be

4  incurred in a Chapter 7, or if the settlements were not

5  developed were based upon her experience as an outside expert.

6  And if that was the sole basis I think he might have something,

7  and I'd be more than happy to address that on redirect.

8                              (Pause)

9              THE COURT:  Bear with me.

10                             (Pause)

11             THE COURT:  Well, the truth is there's merit to both

12 positions.  I mean, this is a situation in which -- I mean,

13 it's typical that either the debtor's or the committee's

14 professionals, the committee's either joining in or opposing

15 the plan, would testify in support or in opposition to the

16 confirmation of the plan, and say typically, very typically,

17 the kinds of things that are contained in the declaration.  Mr.

18 Keach is right.  The form of how it's presented doesn't obviate

19 the need to comply with the Rules of Evidence.  But I will say

20 for the most part I agree with Mr. Logan that the things that

21 are contained in the declaration had -- Ms. Etlin orally

22 pronounced them on the stand today, would have been perfectly

23 admissible as the company representative.

24             The unfortunate part of it is that had the

25 declaration been in the hands of Mr. Keach prior to her

1  deposition, it would have been better.  Now, I understand how

2  things move at such times in a case, and that the timing, while

3  not intentional, may be unfortunate in terms of when things are

4  delivered to the other side.  And it convinces me that with the

5  next witness I think we'll just proceed with oral testimony.

6          MR. LOGAN:  That's right, Your Honor.

7          THE COURT:  But with respect to this one, there are

8  really two things I can do -- well, maybe there are more, but

9  only two occur to me at the moment.  One is to simply let you

10 conclude direct and -- redirect and recross now, and then based

11 on what I hear tonight go through the declaration line by line

12 and decide based upon what's been presented is admissible or

13 not.  Or -- my inclination is is probably most of it is

14 admissible, or to interrupt the testimony at this point, Mr.

15 Keach, give you overnight to go through the declaration again

16 and decide whether you want to ask more specific questions

17 based upon what you've heard now.  My inclination is in the way

18 of admitting the declaration.  And frankly, since you are the

19 -- allegedly aggrieved party, I'll give you the choice,

20 assuming Ms. Etlin is available tomorrow.

21         THE WITNESS:  Your Honor, I'm available until early

22 afternoon only, tomorrow.

23         THE COURT:  Okay.  Mr. Keach?

24         MR. KEACH:  Your Honor, I'm inclined to the former

25 option.  The first, in other words.  I think we should complete

1 the recross and redirect, and I'm happy to let Mr. Logan go

2 first to the extent he wants to do any rehabilitative redirect.

3 We'll do recross, and I think the record should stand on that

4 basis.  That's the record the debtors built, and I think at

5 this point they should live with it.

6             THE COURT:  Very well.  Mr. Logan?  So, for purposes

7 of this examination I would say let's dispense with objections

8 that anything asked is beyond the scope of cross.  All right.

9 I see Mr. Keach nodding affirmatively.

10            MR. KEACH:  Agreed, Your Honor.

11            THE COURT:  Thank you.

12                     REDIRECT EXAMINATION

13 BY MR. LOGAN:

14 Q    Ms. Etlin, could you find a copy of Ad Hoc Exhibit 11,

15 please?  That's the agreement and plan of merger dated as of

16 April 21, 2004.

17 A    Yes, I have it.

18 Q    You mentioned several times to Mr. Keach that you had

19 never seen this document before, and you're not a lawyer, and

20 questions I'm going to ask I assume probably have about as much

21 weight as his did on this topic, but let's look at Page 2 --

22 excuse me -- Section 2.3, Page 3.  And there's a specific

23 passage he asked you about there concerning the amendment and

24 restatement of the 1995 stock option plan, the form of

25 equalization, non-qualified stock option plan, the employee

Etlin - Redirect/Logan                    155

1  stock purchase plan as amended, the deferred compensation plan,

2  the 1999 incentive compensation plan, the directors' deferred

3  compensation plan, and the 2004 performance incentive plan,

4  defined as the plans.  Then the awards made under these plans

5  and the related award agreements, and any and all other

6  agreements in effect immediately prior to the effective date.

7  He asked you, if I remember correctly, did this affect an

8  amendment of the plan and the trust.  My question is very

9  simple.  Do you know if the plan and the trust were amended

10  through this document?

11  A    No, I don't.

12          MR. LOGAN:  Your Honor, I have two housekeeping

13  things.  I'm habitually bad at marking documents, and so we're

14  going to mark that as Exhibit 2.  That's because I have another

15  document that I would like to distribute, if I could approach

16  the bench, and the witness, and --

17          THE COURT:  I'm sorry.  So, you're saying the

18  demonstrative exhibit should be --

19          MR. LOGAN:  Two.

20          THE COURT:  -- Number 2?  Okay.

21          MR. LOGAN:  And, Your Honor, if I may approach the

22  witness and the bench, and of course I have a copy for Mr.

23  Keach of a document I'd like to have marked.

24          THE COURT:  All right.

25          MR. LOGAN:  Marked D-1.

**J&J COURT TRANSCRIBERS, INC.**

Etlin - Redirect/Logan                              156

1          THE COURT:  Thank you.  I'm going to get a larger

2  podium so you have more room to put stuff in, and on.

3  Q     Ms. Etlin, what is D-1?

4  A     It is a pleading filed in these cases against New Century

5  Holdings, Inc., a Delaware corporation, by various plaintiffs.

6  This is the deferred comp complaint filed in these cases.

7  Q     Look at the first page if you could?  There's a caption

8  that says In Re New Century Holdings, Inc., and the caption

9  says, Edward J. Schroeder versus New Century Holdings, Inc.,

10 and there's a footnote that follows that identifies a number of

11 debtors.  Could you point out for me on the chart that's

12 Exhibit D-2 New Century Holdings, Inc.?

13 A     No, I can't.

14 Q     Why is that?

15 A     Because it doesn't exist on the chart.

16 Q     Does it exist, as far as you know, anywhere?

17 A     No.

18 Q     There's a footnote that goes through the list of the

19 debtors and includes New Century Financial Corporation, New

20 Century TRS Holdings, Inc.  Does that footnote list all of the

21 debtors?

22 A     I believe it is.

23 Q     Does it also list New Century Holdings, Inc.?

24 A     I don't know.  Let me look.

25                              (Pause)

Etlin - Redirect/Logan                    157

1  A    There's the REIT, TRS, Mortgage Corporation, New Century

2  Mortgage Ventures, NC Capital, Home123, Anyloan, Credit, NC

3  Assets, the various Residuals, various REO's, Mortgage

4  Ventures, Deltex.  I don't see Holdings in this list.

5           MR. LOGAN:  Your Honor, I apparently made one too few

6  copies of this document.  I don't have my copy.  May I borrow

7  one from the court reporter?

8                          (Pause)

9  Q    Ms. Uhland -- Ms. Uhland -- Ms. Etlin, please turn to Page

10 15, Paragraph Number 65.  This is in Count Number 6.  and under

11 that it says, under the terms of the trust at the plan --

12 A    Hang on.  Hang on.

13 Q    Sorry.

14 A    I know you're trying to be very timely today, Mr. Logan,

15 but now you're too fast.  Paragraph 15?

16 Q    Paragraph 65, Page 15.

17           MR. KEACH:  Your Honor, I appreciate that we

18 indicated we wouldn't get into scope of cross because my

19 thought was that we were going to allow Mr. Logan to

20 rehabilitate Ms. Etlin with respect to issues on the

21 evidentiary rulings we talked about.  Having said that, this is

22 a wholly new area not touched on cross or -- I mean, not on

23 direct, not on cross.  It has nothing to do with the issues

24 before Your Honor with respect to --

25           THE COURT:  My guess is where Mr. Logan is headed is

**J&J COURT TRANSCRIBERS, INC.**

Etlin - Redirect/Logan                   158

1  that even you're confused about who the parties ought to be in

2  connection with the deferred compensation plan and trust.

3          MR. KEACH:  As I said, Your Honor, we'd be happy to

4  stipulate that the caption has a typo in it.

5          MR. LOGAN:  We don't accept that stipulation, Your

6  Honor.

7          THE COURT:  Was I right, Mr. Logan?

8          MR. LOGAN:  You were 100 degrees -- or, 180 degrees

9  on.  You are totally on, Your Honor.  You're on.

10                         (Laughter)

11          THE COURT:  In whatever direction --

12          MR. LOGAN:  Whatever the phrase is, Your Honor.

13          UNIDENTIFIED ATTORNEY:  You're 180 degrees right?

14          THE COURT:  Overruled.

15  Q    Ms. Etlin, Page 15, Paragraph Number 65.

16  A    Yes.

17  Q    It's part of the peripheral -- it says, under the terms of

18  the trust, if the plan is a top half plan the plan assets are

19  subject to the claims of general creditors only of New Century.

20  For the life of me I couldn't find New Century defined in this

21  complaint.  What is New Century?

22  A    It's not a defined term anywhere?

23  Q    I certainly couldn't find it.

24  A    To the best of my knowledge there is no single entity

25  called New Century.

**J&J COURT TRANSCRIBERS, INC.**

1  For the life of me, I couldn't find New Century defined in this

2  complaint.  What is New Century?

3  A    It's not a defined term anywhere?

4  Q    I certainly couldn't find it.

5  A    To the best of my knowledge, there is no single entity

6  called New Century.

7           MR. LOGAN:  Your Honor, I have no further questions.

8           THE COURT:  All right.

9           MR. LOGAN:  Excuse me.  If I could just interject.

10 This does go to the evidentiary issues.

11           THE COURT:  All right.

12 BY MR. LOGAN:

13 Q    Ms. Etlin, you testified on cross about your assessments

14 of the additional administrative costs that would be incurred

15 in connection with what would happen if the settlements

16 unraveled, and Mr. Keach asked you if that was based upon your

17 experience as a turnaround advisor.  Was it based on anything

18 else?

19 A    I have some 30 years being either the principal officer of

20 a company or the advisor of that company in financial distress

21 and this is based upon -- it's hard to distinguish between my

22 business experience, which has largely come in this industry

23 and serving companies in this industry, to the extent the turn

24 around business is an industry, and my role as either the

25 professional or the principal officer of those businesses.

1 However, I consider it as much in a form of my -- these

2 estimates as being in the form of my business expertise.  In

3 other words, I sat down and I said, given what I know about the

4 lawyers who represent these various parties and how difficult

5 they were to broker a deal with in these cases.  And they were

6 extraordinarily difficult.  We commenced negotiations with them

7 in August of last year and we're only sitting here today to

8 confirm a plan.  My original effective date as all the

9 professionals in this case know, I set out a goal of an

10 effective date of March 1st.  We didn't make it.  And we didn't

11 make it because we couldn't get those negotiations to move at

12 the pace at which I felt was reasonable.  So my personal

13 knowledge of how difficult it was to broker deals with those

14 parties and their continuing, I hate to characterize it as lack

15 of satisfaction with those deals, because they are satisfied

16 with the deals, but the continuing fragility of those deals in

17 light of the deals then we cut, subsequently cut with others

18 causes me to believe and caused me to make the estimates which

19 are encompassed in this liquidation analysis.

20       And while parties under my direction prepared it and

21 put the numbers on the page, I was involved in almost every

22 meeting associated with this and ultimately approved the

23 amounts that went into it and was very much part of the

24 discussion and composition of how much we thought these

25 additional expenses would be if all these settlements fell

1 apart.

2 Q    Specific to the New Century bankruptcy cases, do you

3 monitor the run rate for administrative expenses?

4 A    Yes.

5 Q    Carefully?

6 A    Yes.  When certain bills have arrived in these cases it's

7 been known to get very loud in my office at New Century.

8 Q    Is your testimony concerning the expenses that would be

9 incurred if the settlements unraveled based upon specific

10 experience particular to the New Century case?

11 A    Yes.

12 Q    Based on the run rates and factors, the human beings, the

13 issues that you know of?

14        MR. KEACH:  Objection, leading.

15 BY MR. LOGAN:

16 Q    What else is it based on?

17 A    Again,  Mr. Logan, as I see it, I have been personally

18 involved in the actual negotiations or personally monitoring

19 those parties who I authorized to have those negotiations with

20 these various parties weekly.  Everybody in this case knows

21 that I am a horrible task master on this issue and was very

22 concerned with the run rate of the professional fees

23 specifically in this case and the fact that had we not brokered

24 these deals and gotten them done, we very easily could have had

25 the professional fees consume all of the remaining assets in

Etlin - Redirect/Logan                              162

1  these cases.    Not for lack of peoples' honest efforts, but

2  because the matters are so complex and the numbers of law firms

3  and major financial institution creditors that were arrayed

4  against in these cases could litigate forever on these issues.

5  And so I was very conscious, very involved in these matters.

6  Watched very carefully both the progress of those and what we

7  had to spend to get there.    Both our own fees, the people

8  representing me as the debtor as well as the Committee's

9  counsel.    And what needed to get expended to get us to where we

10  are today.

11          MR. LOGAN:    Points out the wisdom of not asking

12  leading questions.    I have no further questions, Your Honor.

13  Your Honor, again reflecting how terrible my housekeeping is,

14  we marked as Exhibit D-1 the complaint in the adversary

15  proceeding, as Your Honor's mentioned before, it's a pleading

16  in the case.    I marked it for identification --

17          THE COURT:    It's a pleading in an adversary case.

18          MR. LOGAN:    In the adversary case.

19          THE COURT:    So you do need to move its admission in

20  this case.

21          MR. LOGAN:    I move its admission.

22          THE COURT:    Is there any objection?

23          MR. KEACH:    We have none, Your Honor.

24          THE COURT:    Submitted without objection.

25                          RECROSS EXAMINATION

Etlin - Recross/Keach                    163

1  BY MR. KEACH:

2  Q    While we're on the subject, Ms. Etlin, and I don't mean to

3  disparage Mr. Logan because we're all getting older and having

4  trouble with small print, would you turn to Page 6, Paragraph

5  14 of D-1, it's in front of you?  Paragraph 14 says on or about

6  January 1, 1999, New Century Financial Corporation ("New

7  Century"), correct?

8  A    Yes, it does.

9  Q    In your considerable experience, putting the phrase in

10 quotes inside parens after the term usually means that's

11 defining the term, correct?

12 A    Even without considerable experience I would say that

13 that's the way it's done.

14 Q    So the reference in Paragraph 65 to New Century would be a

15 reference to New Century Financial Corporation as defined in

16 Paragraph 14, correct?

17 A    That's correct.  Is there a similar definition of New

18 Century Holdings somewhere?

19 A    We'll go with our stipulation of the typo in there, but

20 thank you for pointing it out.  With respect to your experience

21 at Winn-Dixie, which I think you described in your declaration,

22 you were the turnaround advisor at Winn-Dixie, correct?

23 A    That's correct.

24 Q    You were a professional retained for your turnaround

25 expertise?

Etlin - Recross/Keach                    164

1  A    That is correct.

2  Q    All right.  And so when you testified on direct about the

3  similarity of the plan of liquidation and in fact the partial

4  substantive consolidation of the different groups as being

5  similar to Winn-Dixie, that was based on your considerable

6  experience in that case as a professional turnaround advisor,

7  wasn't it?

8          MR. LOGAN:  Your Honor, objection.  She did not

9  testify on that in direct.  That was during cross.

10          MR. KEACH:  Excuse me.  I stand corrected.

11 BY MR. KEACH:

12 Q    When you testified about your Winn-Dixie experience, that

13 was experience you had in Winn-Dixie as you stated in your

14 declaration as a turnaround advisor, correct?

15 A    Yes.

16 Q    You testified, I think in response to Mr. Powers'

17 questions about this issue with respect to direct payments of

18 participant withdrawals by NCMC, correct?

19 A    Yes.

20 Q    All right.  And you mentioned that NCMC paid some

21 participant withdrawals and then was reimbursed out of the

22 trust assets?

23 A    That's correct.

24 Q    If you can take a look at Ad Hoc 7, if you could get that

25 in front of you please.

1  A    I have it.

2  Q    And if you could turn to Article VII, and the Section is

3  7.5, and the Bates Stamped page is 41140.  And I apologize, I

4  can't read the actual page number.

5  A    Yes, I have the applicable paragraph.

6  Q    And Section 7.5 provides that the company, which I think

7  in this case is defined as New Century Financial Corporation

8  can make direct benefit payments, correct?

9  A    Yes.

10  Q    And the trust, and this trust document in fact provides

11  for the reimbursement to the company when that occurs, correct?

12  A    Yes, it does.

13  Q    All right.  And I think we covered this in your

14  deposition, but just to be clear, when New Century Mortgage

15  Company paid participant withdrawals, did you see on the books

16  and records a do to from NCFC to NCMC and then an appropriate

17  request by NCFC to the trust for reimbursement?

18  A    The two weren't necessarily linked directly.  On the

19  request to the trust reimbursement, as I testified, happened

20  much more periodically than the regular disbursements and

21  booking of the do to and from.  But yes, both did occur, they

22  just didn't occur sort of seriatim.

23  Q    But all of the entities were in the accounting chain in

24  the books and records of the company, correct?

25  A    I believe so.  I believe it was from NCMC to NCFC I

1  believe for the deferred comp. trust.

2  Q    And then NCFC would seek the reimbursement from Wells

3  Fargo as the trustee in accordance with 7.5?

4  A    I believe so, yes.

5  Q    So far from being an accounting irregularity, that was the

6  process actually contemplated by the trust agreement, correct?

7  A    I don't believe I ever characterized it as an accounting

8  irregularity.

9         MR. KEACH:  Nothing further, Your Honor.

10        THE COURT:  Mr. Power.

11        MR. POWER:  Could we have one moment?  Your Honor, I

12 have one question, kind of a re-redirect I guess.

13                     REDIRECT EXAMINATION

14 BY MR. POWER:

15 Q    Ms. Etlin, would you refer to Ad Hoc 7 again?  The page

16 marked in the bottom, DIP 041140 that you were just testifying

17 about with Mr. Keach, back to that page.

18 A    Yes, I have it.

19 Q    The reference in the paragraph regarding the company

20 payment that you were previously asked a question about, do you

21 recall that just a second ago?

22 A    Yes.

23 Q    In 7.5.

24 A    Yes.

25 Q    Would you turn to the first page of this document, please?

1  A     Yes.

2  Q     Do you see in the first paragraph where the company is

3  defined?

4  A     Yes.

5  Q     And your prior testimony, even not being a lot of

6  experience, when you take a definition and put it in

7  parentheses, that means that that's generally what the term

8  refers to?

9  A     Yes.

10         MR. KEACH:  Your Honor, objection.  It's actually

11 redundant of the cross because in fact we had her admit that on

12 cross.  This isn't impeachment, it's what we said.

13         MR. POWER:  Your Honor, I'm sorry.  Counsel just on

14 his cross was trying to get to indicate -- actually I think my

15 next question will resolve that objection, Your Honor.

16         THE COURT:  All right.

17 BY MR. POWER:

18 Q     Your prior testimony was that Mortgage Corp. made the

19 payments directly to the employees, not that New Century

20 Financial Corp., is that correct?

21 A     That's correct, because New Century Mortgage is the entity

22 that satisfies all of the payroll.  So it came out of a New

23 Century Mortgage bank account, but the underlying expense or

24 inter-company then is charged back to the entity to which NCMC

25 is owned a reimbursement.

1  Q    But is the reference to the company in this agreement to

2  your knowledge FC not MC?

3  A    That is correct.  The defined term here refers to NCFC,

4  the Delaware company.

5  Q    Are you aware of any agreement where MC agreed to

6  reimburse, agreed to make advances on behalf of the trust as

7  opposed to FC?

8  A    No.  I believe my prior testimony is there were no formal

9  agreements between the entities as to monies that were advanced

10  on a normal basis as part of the normal cash management

11  practices of the company.

12          MR. POWER:  Thank you.  That's all, Your Honor.

13          MR. LOGAN:  Very brief.

14                  FURTHER REDIRECT EXAMINATION

15  BY MR. LOGAN:

16  Q    Ms. Etlin, could you look back at Debtor 1, D-1, that's

17  the adversary complaint?

18  A    Yes.

19  Q    And Mr. Keach pointed out that I, because of aging

20  eyesight and if you checked my hearing it would be worse still,

21  but Paragraph Number 14 has a defined term for New Century.  It

22  says on or about January 1, 1999, New Century Financial

23  Corporation ("New Century"), on January 1, 1999, which of the

24  entities on Chart D-2 was known as New Century Financial

25  Corporation?

1 A    The entity that today is known as New Century TRS

2 Holdings, the Delaware company.

3 Q    So the defined term New Century refers to New Century TRS

4 Holdings Inc.?

5 A    To the extent it's referring to the entity called New

6 Century Financial Corporation on January 1st, 1999, that's

7 correct.

8          MR. LOGAN:  No further questions.

9          THE COURT:  All right.  Thank you, Ms. Etlin.  You

10 may step down.  Okay, I'm willing to go another hour so that we

11 don't save too much for tomorrow.  I hate to be here at the

12 same hour tomorrow.  But because I've now said that with

13 respect to the next witness you need to proceed with live

14 testimony, tell me what that means in terms of the debtor's

15 view of timing?

16          MS. UHLAND:  What I was going to propose, and I

17 haven't had a chance to speak with the Committee, my

18 understanding is that the Committee's witness was going to

19 proceed based on live testimony today in any event and we would

20 like to take some time to prepare.  If we can reorder the

21 witnesses if that's acceptable to the Committee.  That's one

22 possibility.  Let me go speak with them briefly.

23                    (Pause)

24          MS. UHLAND:  Your Honor, just to keep it on schedule,

25 what we propose to do is go ahead with the direct of, Mr. Power

1  will take the direct of Mr. Star.  Some of Mr. Star's issues

2  may require a foundation provided by Mr. Brents' testimony, so

3  if we could proceed with the direct and the cross with Mr. Star

4  today with an ability if necessary to recall Mr. Star for

5  additional direct, if that's acceptable to Mr. Keach, to just

6  try to move this along.

7           MR. KEACH:  Your Honor, I'm all for moving it along.

8  We did have a motion in limine with respect to Mr. Star.

9           THE COURT:  And I'll hear that first.

10           MR. KEACH:  Because I think the issues there are more

11  acute than with Ms. Etlin.

12           THE COURT:  All right.  Well, subject I guess, does

13  this disposition of his motion, I didn't hear an objection in

14  there.

15           MR. KEACH:  I don't, Your Honor.  I was thinking

16  actually just in terms of putting the motion in limine in

17  context.  Maybe the best way to proceed, just and I suggest

18  this, is for the Committee to summarize what Mr. Star is going

19  to testify about and what the basis of his testimony is.

20  Because based on his deposition, we understand it to be purely

21  technical and expert application of other peoples' work towards

22  other peoples' work product.  And I mean to do that briefly.  I

23  don't mean to do it by way of proffer, but simply a summary of

24  the basis of his testimony, the basis of his knowledge and what

25  he's going to testify about.  And then I think it's appropriate

1  at that point to argue the motion in limine.  But that might

2  provide some context for the Court that's not present.

3         THE COURT:  Well, I guess another way to say it is

4  since the motion was filed, a response would have to be given

5  in any event, and it seems to me that would be the response.

6  So why don't we proceed in that fashion.

7         MS. UHLAND:  Okay, thank you, Your Honor.

8         MR. POWER:  Thank you, Your Honor, Mark Power from

9  Hahn and Hessen, counsel for the Committee, co-proponent of the

10 plan.  Your Honor, Mr. Star's actual testimony is extremely

11 limited, but we think very important to the Court's decision on

12 whether to approve the plan.  As Your Honor knows, the plan

13 proponents' view on this plan is it is a series of compromise,

14 all of which are interrelated and integrated, and in fact, the

15 Committee and the debtor and the committee members have been

16 engaging in settlement discussions over the last six months or

17 so, well, I'll say five months, in connection with those

18 settlements.

19         In Your Honor's decision in Exide, which references

20 the Texaco case, the Texaco case lists a number of standards by

21 which Courts should look at whether to approve a settlement

22 that's embodied in a plan in those contexts.  And Item 4 of the

23 factors the Court should consider is the competency and

24 experience of counsel who support the settlement.  Item 6 of

25 the factors is the nature and breadth -- I'm sorry, Your Honor,

1  it's the wrong reference -- Item 5 is the relative benefits to

2  be received by individuals or groups within a class.  And Item

3  7 is the extent to which the settlement is truly the product of

4  arms' length bargaining and not fraud or collusion.

5        And Mr. Keach, in his objection to confirmation,

6  included a number of statements that in fact the plan is not a

7  settlement, but simply a disguise substantive consolidation,

8  and that it really isn't an arms' length negotiation and is in

9  fact a group of certain creditors, in essence, group --

10  colluding is one word to say it -- and trying to basically

11  disenfranchise his clients.

12        Mr. Star's testimony relates to likely to these

13  factors and the response to those positions.  Mr. Star is

14  simply going to testify about the plan process that the

15  Committee went through in order to reach the compromises that

16  are embodied in the plan and is very specific to that area.

17        There's an old expression, Your Honor, that I recall

18  that people should not see two things in life, one is the

19  making of sausages and the other is the making of laws, and I

20  think Mussolini quoted that statement years ago.  And

21  fortunately, his testimony relates to how committees work in

22  terms of developing a plan and reaching compromises under

23  creditors who have very different interests.  And the purpose

24  of his testimony is to show the Court, to satisfy those factors

25  how those compromises were reached, what the issues were, what

were considered and how ultimately they were resolved.  We

think it's important to show the Court that there were

compromises, there truly were disputes, that it shows whether

the positions and how they were resolved, that they were argued

and settled in arms' length negotiations and they were done in

good faith.

He would also testify about the representatives on

the Committee and where their claims sit and who they were

represented with in terms of counsel and financial advisors and

he would basically testify to that.  The testimony's based

purely on his personal knowledge.  He obviously has a team that

works under him.  He is the head of the engagement at FTI.  FTI

is the financial advisors to the Committee.  Mr. Star is the

head of that engagement and has been involved intimately with

the Committee in negotiating this plan.  He took principal

responsibility together with counsel in terms of negotiating

with the debtor, getting the facts and information to go into

the plan and then taking that information and working with each

creditor to try to develop these compromises in this plan.  So

his personal knowledge based on those discussions and the way

it was developed and the way it basically is before Your Honor

today is what he would testify for.  And we believe that's

important and relevant because those are the factors that we

believe Your Honor's going to look at when it decides whether

or not to approve this plan.

1          THE COURT:  All right.  Well, I'll see initially,

2     I've since come to the view that any test that involves more

3     than five factors is too complicated.

4                         (Laughter)

5          THE COURT:  But I know there's controlling law on

6     various issues which tells me differently and I will follow it.

7     I'll also follow my own opinion since it's apparent that the

8     parties have addressed their arguments and framed their

9     arguments in that fashion.  Mr. Keach, any response?

10         MR. KEACH:  Certainly, Your Honor.  First we think

11    Owens Corning is an override on the whole issue and that is

12    that when you're trying to settle to create substantive

13    consolidation, 9019 goes out the window, because Owens Corning

14    is a settlement case.  But we'll save that for final argument.

15    I don't think that if we get to 9019 or enhanced to 9019 the

16    Exide combination of Martin and Texaco, then we disagree about

17    what the factors are, or even frankly, what applicable

18    testimony might be to get there.

19         Now what we disagree about is who can give it.    Mr.

20    Star is employed by FTI, FTI is employed in these cases as a

21    financial advisor to the Committee.  He is employed solely

22    because of his expertise in turnaround accounting and related

23    financial advice.  What he testified to was that he runs a team

24    of people.  That that team of people gathered information from

25    the debtor's professionals, primarily AlixPartners.  Most of

1 that information was supplied to the person working immediately

2 under Mr. Star and not to Mr. Star directly.  It was analyzed

3 by those persons and presented to him and he applied his

4 expert, technical expertise based upon his particular

5 specialized knowledge and expertise as a turnaround consultant

6 to come up with issues that were then pursued further by his

7 team and brought back to him.

8          None of the members of that team are employees of the

9 debtors.  None of those members even of the team had personal

10 knowledge of any of the facts that they were gathering and

11 presenting to him, and Mr. Star has no personal knowledge of

12 any of it.  And in fact, all of his knowledge is derivative of

13 the people on his team .

14          And so we don't have a situation where somebody is

15 describing the factual process under which the Committee made a

16 decision.  If you wanted to do that, the person to call would

17 be the chair of the Committee.  And the chair of the Committee

18 could say, you know, the Committee considered x, y and z, we

19 compromised this point or that point and those are facts.  Mr.

20 Star has none of those facts.  He's a paid financial advisor in

21 this case with no affiliation with any entity as an employee

22 and no means to have personal knowledge of the facts that he's

23 testifying about.

24          In his testimony throughout his deposition, which

25 purported to be elaboration of what he said he was going to

1  testify about, had primarily to do with prepetition events,

2  like this issue over Carrington or the issue over the trust

3  which could only have been derived in his case from the books

4  and records of the company which in fact were fished out by the

5  debtor's professionals and fed to his immediate underlings back

6  up to him.

7          So this is pure expert testimony in the purest sense.

8  I mean, we're not even playing around the fringes of 701, this

9  is just flat out expert testimony.  He wasn't designated as an

10 expert, they didn't designate him by the first deadline or the

11 second deadline, and we've never had a declaration from him

12 before he took his deposition.  We have no opportunity to do

13 Daubert practice, we have no opportunity to get a rebuttal

14 expert witness.  I would point out that even if they attempted

15 to qualify him as an expert, he wouldn't get by Daubert because

16 he didn't do any of this work on his own.

17          THE COURT:  Let's not argue about something that's

18 not been proposed.

19          MR. KEACH:  Right.

20          THE COURT:  Well, since the two versions of the

21 expected testimony are so completely different, there's only

22 one way that I can make a decision about who's right and who's

23 wrong.  So what I will do is overrule the motion and deny the

24 motion in limine, but allow you at any point in the testimony

25 to raise appropriate objections, including that that which he

1  is being asked is expert in nature.

2              MR. KEACH:  We will do that as we go along, Your

3  Honor.  Thank you.

4              THE COURT:  All right.  Thank you, Your Honor.  I

5  call Sam Star.

6  S A M U E L   E.   S T A R, CREDITORS' COMMITTEE WITNESS, SWORN

7              THE CLERK:  Please state your full name and spell

8  your last name for the court reporter.

9              THE WITNESS:  Samuel E. Star, S-t-a-r.

10             THE CLERK:  Thank you.  You may be seated.

11                        DIRECT EXAMINATION

12 BY MR. POWER:

13 Q    Mr. Star, by whom are you currently employed?

14 A    FTI Consulting.

15 Q    And what is FTI Consulting's role in this case?

16 A    We are the financial advisor for the Official Creditor's

17 Committee.

18 Q    And what is your role in connection with that engagement?

19 A    I lead that team.

20 Q    And can you briefly describe the team that you're talking

21 about?

22 A    The team -- there's really two teams, there's the

23 restructuring team that I'm leading.  I have three to four

24 people that work under me.  I'm also assisted by two other

25 partners that are focused on different aspects of the case.

1 And actually one of the partners is an overall consulting

2 partner.  And then we have a separate litigation team that also

3 ultimately does report back to me that focuses on some of the

4 litigation matters in this case.

5 Q    Does that team interface with the Creditor's Committee in

6 this case?

7 A    Through counsel, yes.

8 Q    And does that team, are you involved in that interface?

9 A    That's our litigation group, Ray Sloane.  But again, he

10 does coordinate with me.

11 Q    I'm sorry.  You basically have the restructuring team, is

12 that right?

13 A    No, I'm responsible for the overall engagement, we have

14 different aspects of our firm involved in the case.

15 Q    And briefly describe your specific role.

16 A    As financial advisor?

17 Q    Yeah.

18 A    Our specific role is to help advise the Committee on the

19 transactions in the case.  I mean in the beginning they were

20 all proposed sales, proposed DIP motion, proposed employee

21 bonuses and other employee issues, so we helped the Committee

22 understand those transactions and gave our opinions on how we

23 felt they should be resolved.  Then we got into the monitoring

24 of the cash flow, the cash burn rate.  We had weekly reports to

25 the Committee of the cash balances in the case, oversaw the

1  wind down of the case, how it was progressing, gave our views

2  on whether it was progressing in the manner that we felt was

3  appropriate in our experience, and ultimately led to where we

4  are today in terms of trying to develop a plan of liquidation

5  with the distribution of assets to creditors and figure out

6  which creditors ultimately had which rights to which assets.

7  Q    Let me just step back before we get into plan process.

8  Could you just briefly describe your educational background?

9  A    I'm a graduate of the State University of New York at

10 Albany where I had a BA in accounting in 1981.

11 Q    How long have you been employed with FTI?

12 A    FTI, three and a half years.

13 Q    And where were you employed previously?

14 A    At Ernst and Winnie and their successor companies for 23

15 years.

16 Q    Have you had experience in working as financial advisors

17 for creditors' committees in other cases besides this one?

18 A    Yes, that's my primary role.

19 Q    And how long have you been doing that?

20 A    For about 20 years now.

21 Q    Practically how many cases as financial advisor to

22 committees have you been involved in?

23 A    I'd say over the course of my career, between 80 to 90.

24 Q    Now when you discuss the team at FTI that's working on

25 this for your organization, just to clarify, you're the head of

1 the entire team, when the financial advisor is discussing

2 things with the Committee, are you involved in those

3 discussions?

4 A    Yes, all the time.

5 Q    Mr. Star, you mentioned before, but there came a time when

6 the Committee start to consider a formulating a plan in this

7 case?

8 A    Yes.

9 Q    Is  that what you first -- briefly describe how that

10 process started and approximately when.

11 A    I'd say the process started in earnest in early October

12 where we had a meeting, I believe it was October 9th, that was

13 that first meeting where we talked about ideas and thoughts

14 around a plan and our suggested approach to the Committee was

15 that we take a, I'll call it bottoms up approach, try to

16 understand the assets, the expenses and claims entity by entity

17 and determine based on projections of the ultimate value to be

18 realized for those assets that hadn't been realized plus the

19 assets that have already been monetized, what potential

20 recoveries could be on an entity by entity basis.

21 Q    Now, how did you go about finding information about what

22 those assets would be that would be part of the plan?

23 A    There was a process that evolved over time.  I mean the

24 schedules, the bankruptcy schedules were filed I guess during

25 sometime during the summer so we started with that information,

1  compared those to the individual trial balances, the company's

2  books and records and from there worked with the company's

3  professionals as well as Jay Alix to understand basically the

4  financial position of each entity.

5  Q    So when you were looking for information about assets in

6  different entities, where did you look?

7  A    Like I said, we started out with the statements and

8  schedules, went to the trial balances, there were some

9  differences, so we -- it was a process that really took I would

10 say, a couple months to get through questions we had raised

11 about, differences between the schedules, there were amendments

12 to the schedules and going through I would say document to say

13 for example, we talked about the Rabbi Trust, you know,

14 understanding the origin of the Rabbi Trust, how the Rabbi

15 Trust was funded, how payments were made, who funded those

16 payments.  So we had to get into the whole issue of the cash

17 management of the debtor, the debtor's and understanding the

18 source of monies for the Rabbi Trust activities, the purchase

19 of the Carrington Interest, we got into the tax refunds, the

20 origins of those types of assets, and then I guess the other

21 big area was the inter-company accounts.  So like I said, it

22 was a process that evolved over time working with Jay Alix and

23 company personnel to the extent they were available.

24 Q    Could you briefly just describe how that process worked?

25 Did Jay Alix and the debtor give information to FTI to analyze?

1  Is that a fair assessment?

2  A    That's fair.

3  Q    And then what would you do?  Would you basically take that

4  information and proceed on that front or did you go back to

5  them, basically describe --

6  A    We take that information, look at it, compare it to other

7  information we've seen from public filings just to sort of get

8  a sense of whether we felt it was, we were understanding it,

9  and we went back with questions.

10  Q    Went back to who?

11  A    To primarily through Jay Alix.

12  Q    And when you say questions, can you give me an example?

13  Take the Carrington Interest, did you have questions about

14  that?

15  A    Yes.

16  Q    So basically describe the process to basically, what

17  questions did you raise and what answers did you get?

18  A    Well, we'd ask the questions of understanding what the

19  Carrington Interests were, understanding whether the GP

20  interest versus the LP interest, understanding the basis for

21  the book values for both the GP and the LP interests, asking

22  for supporting documentation for those values on the books and

23  records and then going into the inter-company accounting since

24  those assets -- I'm trying to figure out which entity we saw it

25  at, I believe at TRS we saw the values of those assets booked,

1  we wanted to understand, since TRS wasn't one of the operating

2  entities generating cash flow, how did TRS in fact get the

3  money to purchase those assets?

4  Q    And on that last question, did you get an answer to that?

5  A    Yes.

6  Q    What was the answer?

7  A    It was funded by New Century Mortgage Corporation.

8  Q    Let's go through -- these are liquidating cases, is that

9  correct?

10 A    Yes.

11 Q    And the terms of the major asset groups that are going to

12 be liquidated and distributed to creditors, did you identify

13 any of those assets in which there were concerns or issues

14 about which debtor entity owned those assets?

15 A    Yes.

16 Q    Okay.  Could you just go through those major asset areas?

17 Let's start with the Carrington Interest if you would.

18          MR. KEACH:  Your Honor, objection.  This is expert

19 testimony.  He's asked him if he had concerns about issues

20 relating to debtor groups, he's testified that his only basis

21 for that is facts collected from others in the application, any

22 of his expertise.

23          THE COURT:  Any response?

24          MR. POWER:  Yes, Your Honor.  I don't believe that's

25 correct.  I'm asking him what issues he identified about the

1  ownership and what issues he considered in the connection.

2              THE COURT:  And what would be the basis upon which he

3  would decide or he would be able to identify issues that were

4  material to that process?

5              MR. POWER:  Because he gathered the information.  The

6  issue, Your Honor, is he's testifying about the process used to

7  determine a settlement.

8              THE COURT:  Let me ask in another way.  What basis

9  would he have to know what an issue was?

10             MR. POWER:  I can ask --

11             THE COURT:  Mr. Keach's point is, it could only be

12  based upon his experience and expertise, that's the objection.

13             MR. POWER:  Well, no, Your Honor.  I think it's based

14  on the information provided by the debtor, and then going back

15  with questions and getting those questions answered and then

16  going back and asking more questions.  In other words, it's

17  based on a factual investigation conducted by FTI of the very

18  books and records and the accounting records.

19             THE COURT:  And what would qualify FTI to make such

20  an investigation?

21             MR. POWER:  Well, as financial advisors, they're

22  permitted to do an investigation.  As a layperson witness,

23  they're permitted to make observations based on that

24  investigation.  And that's -- he is not opining as to whether

25  in fact that asset belongs to any entity.  He has not given any

1  expert testimony as to whether what the ultimate conclusion of

2  that issue is.  He's simply testifying about whether an issue

3  existed and then hopefully to ask about how that issue was

4  resolved.

5        THE COURT:  But again, how does he know that an issue

6  exists?

7        MR. POWER:  Based on the inquires that he made.

8        THE COURT:  And what would be the basis for making an

9  inquiry?   How would he know whether to make an inquiry and if

10 so, what the inquiry should be?

11       MR. POWER:  He would know based on his role as

12 financial advisor in the case, Your Honor.  Not as an expert.

13 It's based on -- when a professional conducts an investigation

14 of facts, he's entitled to make certain observations and

15 perceptions on those facts, and that's basically what he's

16 doing.  He's here as a lay witness in that regard.

17       THE COURT:  Well, I'm going to sustain the objection,

18 because the question asked calls for a decision that's based

19 not on a layperson's understanding, but based upon his role as

20 financial advisor, which by the way, I'm sure when he pitched

21 the Committee, he said we're experts in this.  And you said,

22 okay, we'll hire you.  I mean, I know it was --

23       MR. POWER:  It wasn't me, Your Honor.

24       THE COURT:  I understand.  And I know it was not that

25 simple.

1          MR. POWER:  Not that we were unhappy.

2          THE COURT:  But you get the point.

3          MR. POWER:  I do get your point, Your Honor.

4          THE COURT:  Okay.

5    BY MR. POWER:

6    Q    Mr. Star --

7                         (Pause)

8    Q    Mr. Star, let me talk about a different area.  Are you

9    familiar with who the members of the Committee are?

10   A    Yes.

11   Q    Would you briefly describe who the members of the

12   Committee are please?

13   A    Yes, it's a seven member committee.  I believe there's one

14   ex-officio member.  You have three creditors that I believe

15   have claims against New Century Financial Corporation.  That

16   would be one MRA claimant, Credit Suisse.  You have the

17   indentured trustee for the junior subordinated venture

18   represented by Wells Fargo.  And then you have a landlord,

19   McGuire, who has McGuire who has claims at New Century

20   Financial Corporation.

21   Q    And are you familiar with whether those committee members

22   are represented by counsel individually?

23   A    Yes.  I believe all three have separate counsel.

24   Q    Does Skadden Arps represent McGuire, is that true?

25   A    Yes.

1  Q    Fidelity, is that represented by a firm that you know of?

2  A    Yes, Baker and Hostetler.

3  Q    And Wells Fargo, is that represented by Kelly Drye in the

4  committee?

5  A    That's correct.

6  Q    And then the ex officio member, is that the party that

7  actually holds the debt that Wells Fargo's a trustee for ?

8  A    Yes, that's Kodiak.

9  Q    Are you aware if Kodiak has separate counsel?  Is Winston

10  Strawn familiar at all to you?

11  A    I remember Winston Strawn, yes.

12  Q    In fact, Wilson Strawn represents Kodiak, isn't that

13  correct?

14  A    I don't recall.

15        MR. POWER:  Your Honor, I'll withdraw the question.

16  BY MR. POWER:

17  Q    Credit Suisse you mentioned.  Is Credit Suisse represented

18  by counsel?

19  A    Yes.

20  Q    What firm, do you know?

21  A    Chadbourne and Parker.

22  Q    Okay, now those three creditors have claims against NCFC.

23        MR. KEACH: Your Honor --

24        MR. POWER:  Your Honor, I haven't asked the question.

25  I'm building to the next --

1          MR. KEACH:  If there's a question on the end of that,

2   it's leading, Your Honor.

3          MR. POWER:  No, no.  Well, let me ask the question

4   then he can make the objection.

5   BY MR. POWER:

6   Q    What about the other four committee members?  Where do

7   their claims sit and who are they?

8   A    Fidelity had a claim against -- has a claim against New

9   Century Mortgage Corporation.  Then you have three with loan

10  purchaser claims which would be C-BASS, RFC and Deutsche Bank.

11  Q    And does Fidelity have a claim against any other entity?

12  A    Fidelity, yes I believe the also had a claim against

13  Home123.

14  Q    Now let's go through that.  Is Fidelity represented by

15  counsel to your knowledge?

16  A    Yes.

17  Q    Do you know the firm?

18  A    Baker and Hostetler.

19  Q    Is Deutsche Bank N.T., National Trust, represented by

20  counsel on the Committee to your knowledge?

21  A    Yes.

22  Q    What firm, do you know?

23  A    Nixon Peabody.

24  Q    You mentioned RFC.  That's Residential Funding

25  Corporation?

1  A    Yes.

2  Q    Is that firm represented by counsel on the Committee?

3  A    Yes, I believe --

4  Q    I'm sorry, let me strike that.  Does that firm have

5  individual counsel when he sits on the Committee?

6  A    Yes.

7  Q    To your knowledge, does RFC have financial advisors that

8  also assist and represent on committee representation?

9  A    Yes, they also have a financial advisor.

10 Q    What firm is that?

11 A    Navigant Consulting.

12 Q    You mentioned, let me just briefly go through it, which

13 creditor have claims on the Committee against Mortgage Corp.,

14 to your knowledge?

15 A    Fidelity, Credit Suisse through their master purchase

16 agreement either a guaranty or a co-borrower claim.  And then

17 between Deutsche Bank, C-BASS and RFC, I'm not sure if they had

18 claims solely against Mortgage or Mortgage and NC Capital.

19 Q    Are you aware, do you have knowledge generally as to the

20 size of those parties's claims in this case?

21 A    Generally, yes.

22 Q    So could you briefly go through what the size of those

23 claims are?

24 A    The claim of the indentured trustee on behalf of Kodiak

25 was approximately 90 million.  The claim of Credit Suisse for

1 their master repurchase agreement was approximately 124

2 million.  I believe the McGuire claim was in the $15 million

3 range.  Deutsche Bank, their EPD and Breach claim was I think

4 more than 75 million.  RFC and C-BASS, I don't recall.

5 Q    McGuire, did you mention McGuire?

6 A    Yeah, I think I had mentioned approximately 15 million.

7 Q    Okay.  Are you aware of which creditors are the largest

8 individual creditors at NCFC?

9 A    Yes.

10 Q    Which creditors are those?

11 A    That would be Credit Suisse and ultimately Kodiak.

12 Q    Two of the committee members have the largest claims in

13 that group?

14 A    That's correct.

15 Q    And are you aware of which creditors are the largest --

16 which creditor is the largest creditor in the NC Capital Group?

17 A    Those would be the EPD and Breach claimants and I believe

18 Deutsche Bank had the largest claim.

19 Q    In connection with your engagement for the Committee, did

20 any committee members raise issues to you concerning whether

21 inter-company claims should be allowed as capital or debt?

22 A    Yes.

23 Q    And which creditors raised those issues?

24 A    I think it was creditors at various entities, because you

25 had claims going back and forth.

1 Q    When those issues were raised to you, what did you do in

2 response to those questions?

3 A    Well the questions centered around the origin of the

4 claims, any views we may have had of those inter-company

5 claims, and then ultimately the impact of whether those claims

6 would be allowed or disallowed.

7 Q    And did the creditors ask you to indicate why they thought

8 those claims would be disallowed?

9          MR. KEACH:  Well, he can go yes or no on that, Your

10 Honor.  Objection, hearsay.  It's a substance related question.

11 He's asking for the substance of somebody else's conversation.

12          THE COURT:  Well, overruled, but answer the question

13 yes or no if you can.  It's the next question that the

14 objection I think will relate to.

15 BY MR. POWER:

16 A    Yes.

17 Q    Did you take any steps in response to those questions?

18 A    Yes.

19 Q    What steps did you take?

20 A    Well, we gathered facts and based on those facts we

21 actually summarized those facts for the Committee as a whole

22 and then at various points in time, individual committee

23 members, at counsel's direction, would ask us to run scenarios

24 that would have different assumptions with respect to the

25 inter-company balances, whether they should be allowed in full,

1 whether it should be disallowed, whether they should be

2 partially allowed, 50 percent, you know, various different

3 types of assumptions.

4 Q    Based on the questions raised by the Committee members and

5 the investigation you did to look into the facts, did there

6 coma a point in time when the Committee ever considered how to

7 address those issues that were raised by the committee member?

8 A    Yes.

9 Q    And basically describe how that came about and what

10 happened.

11 A    Well it ultimately came about as we ran these various

12 scenarios.  We did, we did share the results of those scenarios

13 with the Committee as a whole and again, depending which entity

14 you were at, you had to view whether you liked the result or

15 you didn't like the result.  But at the end of the day, it was

16 really, it helped form a basis of a compromise amongst the

17 committee members on what position to take on the inter-company

18 accounts in general .

19 Q    So stay with the inter-company accounts, are you aware of

20 any resolution the Committee supported of an issue raised by

21 one of the committee members?

22 A    Yes.

23 Q    And what was the resolution?

24 A    Well, one of the resolutions was that the claims from the,

25 what's been referred to as the holding company debtors would be

1  reduced by 50 percent in terms of the balance.

2  Q    And what claim of the holding company debtors against what

3  other --

4  A    Against the operating company debtors.

5  Q    And is your understanding of that compromise was in

6  response to the questions and issues raised by those committee

7  members?

8  A    It was in response to that question as well as others,

9  because everything, as we've heard before, everything was

10 interrelated.  So if you made a compromise in the company

11 account, people would wondering what would happen to their

12 recoveries on the other side.

13 Q    And you were part of these discussions with the Committee,

14 is that correct?

15 A    Yes.

16 Q    Were any issues raised by the creditors who had claims at

17 the holding company level about whether those inter-company

18 claims should be allowed?

19          MR. KEACH:  Your Honor, objection.  Calls for

20 hearsay.

21          MR. POWER:  Your Honor, I'm not asking for the truth

22 of what was, I'm just asking of any issues.  It's really a yes

23 or no question.

24          MR. KEACH:  If he's not asking for the truth, it's

25 not relevant.

1           MR. POWER:  No, Your Honor, I meant --

2           THE COURT:  That's not necessarily so.  Overruled.

3  You may answer.

4  BY MR. POWER:

5  A    Can you repeat the question please?

6  Q    During the Committee meetings that you were participating

7  in, were any of the creditors at the -- excuse me -- were any

8  creditors of the holding company -- let me strike that.  I'm

9  sorry, Your Honor, I got tongue tied there.  During the

10  meetings of the Committee that you participated in, were any

11  creditors of the holding company debtors, did they raise any

12  issues regarding whether those inter-company claims should be

13  allowed in full?

14  A    Yes.

15  Q    Are you aware of any other inter-company claims that were

16  raised by committee members in connection with the plan

17  context?

18  A    Well, it would be the inter-company claims from the

19  operating company debtors up to the holding company.

20  Q    And did committee members raise questions about those as

21  well?

22  A    Yes.

23  Q    And what did you do in response to those questions?

24  A    We again ran scenarios at specific requests to see what

25  would happen to their recoveries if we had the claims were not

1  in full or some smaller part.

2  Q    Did those issues and questions raised by those committee

3  members ever get resolved, to your knowledge?

4  A    Yes.

5  Q    And how did they get resolved?

6  A    The resolution was the committee support to allow any

7  claims from the operating company debtors against the holding

8  company debtors in full.

9  Q    Did there ever, to your knowledge, come a time when

10 committee members raised concerns about whether assets that the

11 debtor listed on its books and records as belonging to a

12 certain entity actually belonged to that entity?

13          MR. KEACH:  Your Honor, objection.  Hearsay.  The

14 question itself is a recitation of a statement allegedly made

15 by committee members and he's asking him to confirm whether he

16 heard it or not.

17          MR. POWER:  I think the question was, was there ever

18 a time that those questions were raised, it's a yes or no

19 question.

20          MR. KEACH:  By identifying the question you're

21 identifying the statement and asking for affirmation.

22          MR. POWER:  Your Honor, I'll withdraw and re-ask.

23 BY MR. POWER:

24 Q    As part of your -- when you participated in meetings with

25 the Creditors' Committee members, were issues ever arisen about

1  where assets should belong and which debtor?

2  A    Yes.

3  Q    What were those issues?

4  A    Well there were issues with various types of assets which

5  would include the Rabbit Trust assets, the Carrington

6  Interests, the tax refund and I think also with respect to some

7  of the servicing rights, the proceeds from the sale to

8  Carrington.

9  Q    And what were the issues that were discussed and raised at

10 the committee -- strike that.  What were the issues that were

11 raised on the committee meetings regarding those assets?  You

12 can go through them one by one.

13 A    Well, the questions were, which entity would they

14 appropriately belong at.  So, for example, I'll take the

15 servicing rights.   The sale of the servicing rights, the MSR

16 is to Carrington.  There was an allocation of those servicing

17 rights to a company called NC Residual IV, and since to our

18 knowledge that was not an entity that actually did any of those

19 functions or did any of the providing the mortgage and

20 servicing services, we asked why there would be an allocation

21 of those proceeds to that entity.

22         MR. KEACH:  Your Honor, first, motion to strike as

23 non responsive and second, he just recited his expert opinion

24 as to his analysis of those facts.  That clearly wasn't

25 something some committee members said.

1          MR. POWER:  Your Honor, I think his testimony relates

2  to what the issues were considered by the committee members in

3  connection with their deliberation and approval of the plan.

4          THE COURT:  Sustained and granted.  You need to go at

5  it a different way, Mr. Power.

6  BY MR. POWER:

7  Q    Mr. Star, are you familiar with the litigation that the

8  estates may have against various third parties?

9  A    Yes, generally.

10 Q    Can you briefly describe what your knowledge of those

11 litigations are?

12         MR. KEACH:  Objection, Your Honor.  That knowledge

13 could only have been obtained in his capacity as an expert.

14         MR. POWER:  I don't think that's true, Your Honor.

15 This man has a lot of personal experience in terms of reviewing

16 pleadings and information regarding the --

17         THE COURT:  Well, what's his personal knowledge here?

18 Perhaps you should explore that initially.

19         MR. POWER:  Actually, let me try this way, Your

20 Honor.  I'll withdraw.

21 BY MR. POWER:

22 Q    Mr. Star, are you aware of the, where the Carrington

23 Interests are in terms of the plan structure?  What states

24 would hold those interests?

25         MR. KEACH:  Objection, Your Honor.  Again, he can

1 only have obtained that information as an expert in this case

2 and his conclusions about the response to that is an expert

3 opinion.

4           THE COURT:  Overruled.  You may answer if you can.

5 BY MR. POWER:

6 A    Well in the plan, those interests are at the Hold Co.

7 debtor entities.

8 Q    And are familiar with whether the committee actually

9 considered, whether in terms of approving the plan, whether

10 those interests should be in that Hold Co. entities or in the

11 Op. Co. entities?

12 A    Yes, there was consideration of that.

13 Q    The Committee ultimately decided to support the inclusion

14 of those interests in the Hold Co. entities?

15 A    That's correct.

16 Q    Why was that?

17 A    I think part of it had to do with the documentation that

18 we had reviewed, which although it was ambiguous whether which

19 entity within the Hold Co. group it belonged at, it seemed to

20 suggest it was at least one of those two entities.  So again,

21 that was one of the factors I believe they considered.

22           MR. KEACH:  Your Honor, motion to strike.  He just

23 said --

24           THE COURT:  Granted.  Granted.

25 BY MR. POWER:

1  Q    Mr. Star, just in terms of the committee made -- let's not

2  talk about exactly why.  Certain assets are allocated to

3  certain groups between Op Co. and Hold Co.  Is that correct

4  under the plan?

5  A    Yes.

6  Q    The committee considered -- to your knowledge the

7  committee look at each of those assets and make a determination

8  whether it would support putting those assets in those

9  different buckets?

10  A    Yes, they did.

11  Q    And I'd like to go through each asset and describe what

12  part of that process was on behalf of the committee.

13  A    Okay.

14  Q    You went through Carrington and said that was decided to

15  put in a holding company.

16          MR. KEACH:  Objection.  Leading.

17          MR. POWER:  Leading into the next question, Your

18  Honor.  I'm trying to put in context.  I'll strike and

19  withdraw.

20          THE COURT:  All right.

21  BY MR. POWER:

22  Q    Are you familiar with the Rabbi Trust that's been

23  discussed in this case?

24  A    Yes.

25  Q    To your knowledge, did the committee deliberate and

1  consider where those assets should be put in terms of those

2  plans?

3  A    Yes.

4  Q    And what was the decision the committee made to support?

5  A    The committee made the decision to put it in the Hold Co.

6  group of entities.

7  Q    And are you familiar with what the committee considered

8  and made that determination?

9  A    They considered the documentation and the facts

10 surrounding the transactions with the Rabbi Trust.

11 Q    And the committee's ultimate decision was to put it in a

12 holding company.

13 A    Yes.

14 Q    And that's reflected in a plan?

15 A    Yes.

16 Q    Are you familiar with the potential income tax refunds

17 that the estates may be get in this case?

18 A    Yes.

19 Q    Did the committee ever -- did there come a time the

20 committee ever considered where those assets should be placed

21 in terms of the plan?

22 A    Yes.

23 Q    And what was the decision of the committee -- what

24 decision did the committee support in that connection?

25 A    The decision was to have the tax refund at the operating

1  company debtor entities.

2  Q    And are you familiar with what issues the committee

3  considered to reach that decision on where to put those assets?

4  A    Yes.

5  Q    Briefly describe those issues the committee considered.

6         MR. KEACH:  Your Honor, before we go there and either

7  he can ask or I'd like permission to voir dire the witness as

8  to whether or not the committee's considerations were related

9  by him in his expert opinion.  He's about to go into what the

10  committee did based on what he advised them to do and we were

11  at least inquired to figure that out because otherwise it's

12  just expert testimony coming in through what the committee's

13  repeating back.

14         MR. POWER:  Your Honor, I don't believe that's

15  correct.  Basically Mr. Star has been involved in all the

16  committee meetings, personally involved, and basically

17  participated and witnessed the questions and issues.  He's

18  being asked whether he was aware of what the committee did and

19  aware of the information they considered when making that

20  decision.

21         THE COURT:  Well, framed that way I'll overrule the

22  objection.

23  BY MR. POWER:

24  Q    Do you need me to repeat the question?

25  A    No.  I'm fine.  We were asked about tax year end

1  agreements.

2  Q    And when you say we you meant the committee, not you.

3  A    The committee asked the questions.  Yes.  The committee

4  asked about tax year end agreements.  The committee asked about

5  the accounting.  The committee asked about who paid the tax.

6  They asked about who generated the loss that was carried back.

7  They asked about the -- really the facts and circumstances

8  around what drove the refund.

9  Q    And did there come a time with all those questions they

10 asked, the committee ultimately reached a conclusion about

11 where the assets should go under the plan?

12 A    Yes.  They concluded it should be at New Century Mortgage

13 Corporation which is one of the operating company debtors.

14 Q    Now, did there come a time when the committee started

15 talking about where litigation proceeds should be allocated

16 under the plan?

17 A    Yes.

18 Q    And were you involved in those meetings and discussions

19 when the committee members deliberated on that?

20 A    Yes.

21 Q    What were the issues that you observed the committee were

22 considering at the time in terms of litigation proceed

23 allocations?

24 A    Well, the committee asked questions about the, I guess,

25 the nature of the litigation, potential recoveries on the

1  litigation as well as they wanted to just, I guess, they needed

2  those facts to determine in their mind who should get the

3  benefit of those recoveries, if any.

4  Q    And did the committee have any view or any of the members

5  have any view as to who should get the benefits of those

6  recoveries?

7  A    Yes.  Different members had sometimes very differing

8  views.

9  Q    Now, when you say that are you referring to basically

10 where those recoveries should go in which debtor entity?  You

11 say different creditors had different views.

12 A    Yeah.  It had to do with who would get the benefit of

13 those proceeds, if any.

14 Q    Did there come a time that the committee ultimately

15 decided that it would support an allocation of litigation

16 proceeds?

17 A    Yes.

18 Q    And when did that come about?

19 A    That was sort of the last piece of the plan negotiation.

20 After we negotiated the assets that either were realized or we

21 had a sense of what could potentially be realized then we

22 focused on the litigation which in peoples' minds would hope to

23 be a large sum of money, but you couldn't have a sense of

24 assurance of whether that would be collected.  So that came at

25 the end of the negotiation.  Probably I would say in the late

1   November, early December time frame.

2   Q    And what was the ultimate resolution of that negotiation?

3   A    Well, the resolution would be that litigation proceeds, in

4   general, various types of litigation would be part of a pool of

5   which you would allocate 45 percent of those net proceeds to

6   the EPD and Breach Claimants set NC Capital, and then the

7   balance would be split essentially 27 and a half percent to the

8   Hold Co. group of debtors and 27 and a half percent to the

9   Operating Company debtors excluding the EPD and Breach

10  Claimants.

11  Q    During the committee deliberations did there ever come a

12  time when some issues arose between the creditors of NC Capital

13  and the creditors of NC Mortgage?

14  A    Yes.

15  Q    And what were the issues that arose during that time?

16           MR. KEACH:  Objection.  Hearsay, Your Honor.

17           MR. POWER:  Your Honor, the issue was whether the

18  committee -- an issue arose during the committee meeting.  I

19  haven't asked him yet for the content of that meeting.

20           MR. KEACH:  His question is content based.  He asked

21  him if an issue arose on a particular topic.  That could only

22  elicit hearsay response.

23           THE COURT:  Sustained.

24  Q    Mr. Star, did any committee members ever raise -- strike

25  that, Your Honor.  Are you familiar -- you mentioned that NC

1 Capital -- that a lot of creditors had claims against NC

2 Capital.  Is that correct?

3            MR. KEACH:  Objection.  Leading, Your Honor.

4            MR. POWER:  Your Honor, I was just asking him to

5 confer with --

6            THE COURT:  It is leading.  I'll overrule the

7 objection, however.  You may answer.

8 A     The largest component of the claims pool were these

9 potential EPD and Breach Claims which were primarily at NC

10 Capital.

11 Q     And can you briefly describe the nature of those claims?

12 A     Those would potentially be damages arising from loans sold

13 to various parties that we had some type of early payment

14 default or some other infirmity in the collectability of those

15 loans.

16 Q     Now, when you -- in connection with your knowledge of the

17 company which debtor entities actually operated in terms of

18 originating loans?

19            MR. KEACH;  Your Honor, again, objection.  He could

20 only have acquired that knowledge in his capacity as the

21 committee's expert with information gathered from others.  It's

22 not his personal knowledge, and he can't testify as to hearsay.

23 He's not an expert.

24            MR. POWER:  Your Honor, I don't think that's correct

25 in this question.  This question relates to which of the

1 operating entities.  That's a matter of public record both in

2 terms of the financial statements in terms of the company's

3 information.

4          THE COURT:  Well, let me ask.  Is it a subject that's

5 -- is it the subject of factual dispute by anybody?

6          MR. KEACH:  Well, it's not entirely clear which

7 subject he's going into, Your Honor.

8          THE COURT:  I'll allow the question subject to a

9 motion to strike.

10          MR. KEACH:  Okay.  Thank you, Your Honor.

11 BY MR. POWER:

12 Q    Are you aware of which debtor entities are operating

13 entities?

14 A    Yes.

15 Q    Which of those entities are operating entities?

16 A    The New Century Mortgage Corporation, home 1, 2, 3.  Those

17 are the primary operating entities.

18 Q    Which entities primarily originated mortgage loans?

19 A    That would be New Century Mortgage Corporation.

20 Q    Now, you mentioned that New Century Capital previously was

21 the entity that sold the loans.  Do you have any knowledge

22 whether New Century Capital was actually originating loans?

23 A    If they did it was my understanding the majority was at

24 New Century Mortgage Corporation.

25 Q    Do you have any understanding as to why it is that New

1 Century Capital actually sold loans?

2 A    Other than my understanding that the New Century Mortgage

3 Corporation originated them and New Century Capital is the

4 vehicle to actually sell it to the third parties.

5 Q    So the creditors and the committees and other creditors in

6 the case in essence entered into contracts with Capital for the

7 purchase of loans that were originated by Mortgage?

8 A    Yes.

9 Q    Are you aware of whether any creditors have asserted --

10 strike that.  Are you aware whether any creditors have asserted

11 claims against Mortgage Corp. in connection with the sales by

12 NC Capital?

13 A    Yes.

14 Q    And what are you aware?

15 A    Well, I'm aware that an old committee member in particular

16 has some claims against New Century Mortgage Corporation.

17 Q    And has any committee members against New Century Capital

18 raised claims against New Century Mortgage?

19 A    Yes.

20 Q    What committee members and how?  What committee members?

21 A    Well, Deutsche Bank, C-BASS, RFC.

22 Q    What's the nature of those claims?

23 A    They are claiming that the loans that were purchased from

24 NC Capital had certain backing or representations and

25 warranties issued by New Century Mortgage Corporation.  So to

1  the extent they were damaged I assume they are saying that the

2  damages go against the guarantor in effect.

3  Q    That's be Mortgage Corp?

4  A    That's be New Century Mortgage Corporation.

5  Q    Are you aware of any issues raised by Mortgage Corp.

6  creditors in response to that?

7              MR. KEACH:  Objection, Your Honor.

8              MR. POWER:  Your Honor, I'll withdraw that question.

9                          (Pause)

10 Q    Mr. Star, when did the committee start the process of

11 considering the terms of a plan in this case?  To your

12 knowledge.

13 A    I think as I said before October 9th was really the start

14 of it.

15 Q    And do you have any understanding of approximately when

16 the committee ultimately decided to support the plan?

17 A    There was a meeting on December 4th when they came to

18 support the plan.

19 Q    December 4th?

20 A    December 4th.

21 Q    This plan?

22 A    Yes.

23 Q    Do you have any knowledge as to the terms of the

24 committee's votes in terms of how many creditors voted for

25 supporting the plan and how many voted against?

1  A    It was unanimous.

2  Q    In connection with the committee's deliberation of the

3  plan process, I guess it took several months, do you have any

4  knowledge as to why it took several months?

5  A    It was to resolve all these various issues that we've been

6  talking about.

7  Q    When you say it was to resolve various issues were you

8  involved in those resolutions?

9  A    Yes.

10  Q    When you were involved did you discuss them with the

11  committee as a whole or individual committees?  How did you go

12  about assisting in the resolution of those process?

13  A    It was both.  We made presentations to the full committee

14  about our findings and then we had individual discussions.

15  Actually, there's one meeting I recall where we actually, after

16  the full meeting, we spent sometime with each individual member

17  to get their reactions, their thoughts, their concerns, and

18  sort of understand their expectations.  And then as follow-ups

19  many of them asked us to -- started through counsel to run

20  additional scenarios changing some of the assumptions again to

21  see how they were impacted by the result of some of these

22  suggested settlements.

23  Q    And did there come a time, I guess, each committee member

24  ultimately was satisfied with the resolution process, to your

25  knowledge?

1  A    Yes.

2  Q    Are you familiar with the EPD Breach Protocol that's in

3  the plan?

4  A    Generally.

5  Q    And to your knowledge does that protocol affect any

6  committee members?

7  A    Yes.

8  Q    Briefly describe what affect you're aware of.

9         MR. KEACH:  Your Honor, this has to be based on his

10  expert information.  He's applying the EPD Breach Protocol to

11  particular facts gathered in his expert capacity.

12         MR. POWER:  Your Honor, I don't believe so.  This

13  specifically relates to tying in -- he knows where the claims

14  are, he has knowledge of that.

15  Q    Which committee members are affected by the protocol?  I'm

16  not asking for the results of the protocol.

17         THE COURT:  It's pushing the edge.  I agree, but I'll

18  overrule the objection.  You may answer.

19  A    Okay.  It affects Credit Suisse, C-BASS, RFC.  I believe

20  Credit Suisse had a relatively small claims.  Four of the seven

21  members were affected by the protocol.

22  Q    And are you familiar whether the creditor has embraced the

23  protocol initially when it was proposed?

24  A    Well, I wouldn't say initially.  There was a lot of

25  discussion.  A lot of the committee members wanted to

1  understand what it really meant and then sort of went and did

2  their own calculations of their interpretation of the protocol.

3  Q     But ultimately the committee members supported the

4  protocol?  Is it fair to say?

5  A     Ultimately, but in return for other concessions as well.

6  Q     What other concessions?

7  A     Depending on which creditor it was in a sense tied to the

8  allocation of the litigation proceeds.

9  Q     So how did that work?

10 A     As I said before NC Capital, those creditors, they were

11 the ones with the predominant claims -- the fair amount of

12 claims in the case.  The EPD Breach Protocols.  They felt given

13 the concessions they made on the protocol as well as the

14 determined distribution amount they felt they needed to have

15 some extra compensation with respect to any recoveries from the

16 restatement proceeds litigation, for example, because they

17 argue that the restatements were really driven by activities at

18 the entities that they had transacted business with.  So we

19 embarked on sort of another side negotiation of well, how would

20 you allocate these proceeds, and ended up with the resolution

21 that I described earlier.

22                         (Pause)

23         MR. POWER:  Your Honor, can we just have a moment?

24         THE COURT:  Yes, you may.

25                         (Pause)

1 Q    Mr. Star, are you familiar with how administrative

2 expenses are allocated under the plan that's apparently before

3 the Court?

4 A    Yes.

5 Q    To your knowledge was a committee involved in the

6 discussions with the debtors about how those expenses should be

7 allocated?

8 A    Yes.

9 Q    And did the committee consider alternative methods for

10 resolving how to allocate those expenses, to your knowledge?

11 A    It asked about other methods.

12 Q    And what other methods were considered?  By the committee

13 members.

14 A    The committee members asked about allocation by specific

15 tasks, for example, as opposed to a general pot.  And they

16 asked about an allocation based on assets just simply realized

17 as opposed to assets expected to be realized.  Those are the

18 three main scenarios I remember discussing with them.

19 Q    And did there come a time when the committee ultimately

20 decided to support how those expenses would be allocated in

21 connection with the plan?

22 A    Yes.

23 Q    And what was that resolution by the committee?

24 A    The resolution was that expenses would be allocated based

25 on the asset values both realized and expected to be realized

1  across the -- all the debtor entities.

2  Q    Mr. Star, in connection with the deliberation process by

3  the committee to support the plan that you were involved in,

4  did committee members consider individual scenarios in terms of

5  how assets and liabilities would be moved around between

6  various debtor estates?

7  A    Yes.

8  Q    And did your office assist in preparing those scenarios?

9  A    Yes.

10 Q    And how many scenarios approximately did your office

11 prepare for the committee?

12 A    I would say anywhere from 75 to 100 scenarios were run.

13 Q    Were you personally involved in assisting in preparing

14 those and also present them to the committee members?

15 A    Yes.

16 Q    Were you involved in the discussions with the committee

17 members regarding those scenarios?

18 A    Yes.

19 Q    Is it fair to say that some of the scenarios show that

20 creditors at the FC level did worse than the creditors at other

21 levels?

22         MR. KEACH:  Your Honor, objection.

23         THE COURT:  Sustained.

24         MR. POWER:  Even I would object to that question.

25 BY MR. POWER:

1 When you ran the scenarios at the request of various committee

2 members, did the results vary in terms of what the projected

3 distributions would be for the committee members?

4          MR. KEACH:  Same objection, Your Honor.  Any variance

5 is a product of his expert opinion.

6          MR. POWER:  Your Honor, I don't think so.  It's a

7 fact question.

8          THE COURT:  It's a fact question.  Overruled.

9 A    Yes.  The recoveries could consider dramatically in some

10 cases.

11 Q    And in connection with those scenarios can you just

12 briefly describe when we say scenarios what you're referring

13 to?

14          MR. KEACH:  Your Honor, object.  He's describing

15 expert work product.  The scenarios are run by FDI as an

16 expert.

17          THE COURT:  He's about to.  The objection is

18 sustained.

19 BY MR. POWER:

20 Q    Mr. Star, when the committee members received the

21 scenarios that you ran and had meetings with you and counsel to

22 discuss those scenarios, did there ultimately come a point

23 where each committee member was satisfied and able to support

24 the plan scenarios that it represented on that board --

25 represented in the plan?

1  A    Yes.  I believe it got to a point where they had received

2  all the information they requested of us and based on that

3  became comfortable making a decision.

4  Q    And when you ran the scenarios was that sometimes at the

5  request of the members of the committee as to what things to

6  change in those scenarios?

7  A    Yes.

8  Q    And what would you change as a result of request of

9  committee members?

10            MR. KEACH:  Objection, Your Honor.

11            THE COURT:  Sustained.

12            MR. POWER:  I thought I'd get that one in.

13            THE COURT:  Well, apparently everybody's tired, but

14  not that tired.

15            MR. POWER:  Yes, Your Honor, I know that.  And what

16  I'm going to do is I'm going to -- just give me one moment.

17                         (Pause)

18            MR. POWER:  Your Honor, what I'm going to do is I'm

19  going to reserve the right to go back because we're out of

20  order and some of Mr. Star's testimony was based on some other

21  testimony so I'll just preserve that right.  I think we agreed

22  to that previously.

23            THE COURT:  To recall him as a witness?

24            MR. POWER:  To recall him as a witness.  Yes.

25            THE COURT:  But not to extend direct at this point.

1           MR. POWER:  That's correct, Your Honor.

2           THE COURT:  Okay.  I think just looking ahead I think

3   -- and I should have done it the first time and I normally do

4   it, we'll have the pros questioned first and then the objectors

5   next.  So you'll be next up, Mr. Logan or Ms. Uhland.  Witness

6   is excused for the evening.  Mr. Star, I ask that you not

7   discuss your testimony with anyone.  And I'm guessing one of

8   the first questions Mr. Keach will ask you anyway is whether

9   you did or didn't.  Just to give you a heads-up.

10          THE WITNESS:  Thank you.

11          THE COURT:  All right.  You may step down.

12          THE WITNESS:  Thank you.

13          THE COURT:  Anything further for today?

14          MS. UHLAND:  No, Your Honor.

15          MR. INDELICATO:  Your Honor, I hate to bring this up

16  in the middle of a confirmation hearing, but we have asked your

17  chambers that we have a brief conference with you after this

18  hearing concluded today.  And the reason is we wanted to bring

19  something to the Court's attention regarding the examiner's

20  report that recently came to our attention.  I'm happy to do it

21  now, I'm happy to do it in chambers, whatever the Court would

22  like.

23          THE COURT:  Well, I do have, as you know, chamber

24  conferences from time to time off the record.  I'm very

25  reluctant to do it in the middle of the contested hearing of

1 | this nature anyway.

2 |         MR. INDELICATO:  Your Honor, that's fine.  What we --

3 |         THE COURT:  If you prefer to stand in the courtroom

4 | and do it, but go off the record I'm okay with that.

5 |         MR. INDELICATO:  That's fine, Your Honor.

6 |         THE COURT:  All right.  Let's go off the record.

7 |                 (Off the record discussion)

8 |         THE COURT:  Based on how far we've gotten today,

9 | schedule wise, how do the parties anticipate timing will break

10 | down to conclude evidentiary presentations, and/or argument?

11 |         MR. KEACH:  Your Honor, with respect to the cross I

12 | think the cross of Mr. Star will be relatively brief.  I think

13 | shorter than Ms. Etlin, certainly.  And I can't really

14 | anticipate how long Mr. Brents direct will go.  I think a

15 | number of the issues we had actually expected to cover on cross

16 | with Mr. Brents have been covered and would likely be redundant

17 | of things we did with Ms. Etlin.  But again, I don't know where

18 | the direct's going to go.  But I expect the cross of Mr. Star

19 | to be relatively brief.

20 |         MR. UHLAND:  And Mr. Brents' a more limited witness

21 | and so it should be a shorter direct and cross than the prior

22 | cross.  So my expectation is I am hopeful that if we have

23 | another hour and half of evidence and then have an hour and a

24 | half for argument and clean up in the final resolutions.

25 |         MR. KEACH:  Based on taking to Mr. McDonald who is

1  actually doing the cross of Mr. Brents I would think that's

2  fair.  An hour and a half of testimony would cover it.

3          MS. UHLAND:  So if we could start at nine we have a

4  shot of getting out of here by 12:30.

5          MR. KEACH:  I'm not prepared to agree to that, Your

6  Honor.

7          THE COURT:  Neither am I.  I'm just trying to figure

8  out where to place the conference call so that we don't extend

9  the confirmation time.  I'd rather be through with that before

10 we get to the conference call.  So I'm thinking maybe if we

11 could set it up for like three o'clock that might be safe

12 enough.

13         MR. INDELICATO:  That's fine, Your Honor, and we'll

14 notify Mr. Missile and his counsel.  And then if confirmation

15 is extended we'll see if there's a window at least that we

16 could be flexible.

17         THE COURT:  All right.  And I would tend to have the

18 conference call on the record in the courtroom.  Okay.

19 Anything further for today?

20         MS. UHLAND:  No, Your Honor.

21         THE COURT:  All right.  Then we will start at nine

22 o'clock.

23         MS. UHLAND:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         THE COURT:  Stand in recess.

219

**C E R T I F I C A T I O N**

        We, PAT REPKO, KIMBERLY UPSHUR, TAMMY DeRISI, and

RITA BERGEN, court approved transcribers, certify that the

foregoing is a correct transcript from the official electronic

sound recording of the proceedings in the above-entitled

matter, and to the best of our ability.


/s/ Pat Repko                    DATE:  April 30, 2008
PAT REPKO

/s/ Kimberly Upshur
KIMBERLY UPSHUR

/s/ Tammy DeRisi
TAMMY DeRISI

/s/ Rita Bergen
RITA BERGEN
J&J COURT TRANSCRIBERS, INC.