UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEW CENTURY HOLDINGS, INC., a Delaware corporation, et al. | Case No. 07-10416 (KJC) Jointly Administered |
| Debtor. | |

**POST-HEARING SUBMISSION IN SUPPORT OF THE OBJECTION OF AD HOC COMMITTEE OF BENEFICIARIES OF THE NEW CENTURY FINANCIAL CORPORATION DEFERRED COMPENSATION PLAN AND/OR SUPPLEMENTAL EXECUTIVE RETIREMENT/SAVINGS PLAN TO CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF MARCH 18, 2008**

Gregory J. Schroeder, Michelle Parker, Martin Warren, Steve Holland, and Nabil Bawa and the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan (the "Plans"), for themselves and all other similarly situated, as beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or The New Century Financial Corporation Supplemental Executive Retirement/Savings Plan (collectively, the "Beneficiaries"), objected to confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March 18, 2008, and as subsequently amended (the "Chapter 11 Plan"). As detailed in that objection (the "Objection"), should the Beneficiaries prevail in any aspect of the pending adversary proceeding, the Chapter 11 Plan, by admission of the proponents of the Chapter 11 Plan, will not affect that litigation result. That result could not have been known at the time of the confirmation hearing. Therefore, the Beneficiaries were to be treated as unsecured

creditors of New Century Financial Corporation given the possibility (however remote) that they objected to confirmation of the Chapter 11 Plan. The Objection asserted on the ground that the Chapter 11 Plan does not, and cannot, meet the requirements of 11 U.S.C. §1129(a) and (b). The hearing with respect to confirmation of the Chapter 11 Plan took place over two days, April 24 and 25, 2008. At the hearing, the proponents of the Chapter 11 Plan disclosed that the Chapter 11 Plan had been rejected by the class consisting of unsecured creditors of New Century Financial Corporation ("NCFC"). Thus, the Debtors moved forward seeking confirmation under sections 1129(a) and (b) of the Bankruptcy Code. During the hearing the court heard the testimony of three witnesses and admitted into evidence numerous documents. Critical factual and legal issues have been fully briefed and argued, and those arguments (all of which are preserved) will not be repeated here.

Rather, consistent with the Court's request, the Beneficiaries offer this Post-Hearing Submission to amplify and expand upon certain arguments made at the confirmation hearing and to offer specific references to the record of that hearing in support of the arguments made here and in prior memoranda filed with the Court.

2

### DISCUSSION OF AUTHORITIES AND CITATIONS TO THE RECORD

A.    **THE PLAN CANNOT BE CONFIRMED UNDER SECTION 1129(a)(1) BECAUSE IT VIOLATES SECTION 1123 (a)(4) BY PROVIDING A GREATER DISTRIBUTION TO THE MASTER REPURCHASE AGREEMENT CREDITORS**

As noted at the confirmation hearing, the co-proponents bear the burden of establishing by a preponderance of the evidence that each and every requirement of sections 1129(a) and (b) has been satisfied in connection with the attempt to confirm the Chapter 11 Plan. *See. e.g.*, In re Armstrong World Industries, Inc., 348 B.R. 111, 120 (D. Del. 2006); Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R. 491, 500 (D.N.J. 2005); In the Matter of Genesis Health Ventures, Inc., 266 B.R. 591, 598-599 (Bankr. D. Del. 2001), *appeal dismissed by* 280 B.R. 339 (D. Del. 2002); In re Union Meeting Partners, 165 B.R. 553, 574 (Bankr. E.D. Pa. 1994).    Since the plan proponent bears the burden, an objecting party may successfully rebut a plan proponent's evidence without introducing any new evidence of its own. *See* In re Global Ocean Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000).    Indeed, even in the absence of opposition, the court has an independent duty to find that each and every element of section 1129 is met. In re Congoleum Corp., 362 B.R. 167, 175 (Bankr. D.N.J. 2007); In the Matter of Lernout & Hauspie Speech Products, N.V., 301 B.R. 651, 656 (Bankr. D.N.J. 2003); In the Matter of Great Bay Hotel & Casino, Inc., 251 B.R. 213, 221 (Bankr. D.N.J. 2000); Genesis Health Ventures, 266 B.R. at 599.

One such requirement is section 1129(a)(1), which mandates that a plan must comply with all applicable provisions of title 11 of the United States Code, *i.e.* the Bankruptcy Code. One such applicable provision is section 1123(a)(4). A plan may not

3

be confirmed unless, *inter alia*, it "provide[s] the *same treatment for each claim or interest in a particular class,* unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4)(emphasis supplied). Courts with the Third Circuit have consistently construed this requirement strictly, and have refused to confirm plans that place form over substance in an attempt to circumvent section 1123(a)(4)'s requirements.

The United States District Court for the District of Delaware upheld a bankruptcy court ruling that a plan violated Section 1123(a)(4) by providing for the payment of certain fees to creditors bound by a particular type of contract but not to other creditors in the same class performing the same services under a similar – but not identical – contract. The FINOVA Group, Inc. v. BNP Paribas (In re The FINOVA Group, Inc.), 304 B.R. 630 (D. Del. 2004). Specifically, the court supported the bankruptcy court's finding that:

> [All] of these transactions were essentially of the same structure in terms of cost, *i.e.* the interest cost to the borrower. And they just approached the calculation and the payments in a slightly different fashion.

Id. at 636. Accordingly, the court held that "To treat [two of the creditors] differently would be to ignore the economic realities of their Credit Agreements, elevate form over substance and violate the equal treatment mandate of Section 1123(a)(4)." Id. at 637. If creditors are classified together, they must be treated equally under the plan, regardless of whether or not some class members have stronger claims or defenses than others. *See* In re Resorts Int'l, Inc., 145 B.R. 412, 448 (Bankr. D.N.J. 1990).

Moreover, a plan proponent may not attempt to justify disparate treatment within a class by pointing to distinctions among the various claims included in that class. *See* Union Meeting Partners, *supra*. In Union Meeting Partners, the Debtor proposed a plan which provided for an additional 15% distribution to all unsecured creditors except for

4

one in exchange for each creditors vote in favor of the plan. The lone unsecured creditor

needed to perform several additional steps beyond voting for the plan in order to receive

the same 15% distribution. In denying confirmation of the plan, the court stated:

> Because [the objecting creditor] is nonrecourse and because the General
> Partners have not guaranteed this debt, the Debtor might have been
> allowed to treat [that creditor's] deficiency claim in the manner described
> if it had placed [that creditor's] unsecured claim in its own class, apart
> from the claims of the general unsecured creditors and [the objecting
> creditor's] secured claim. [Internal citations omitted.] However, the
> Debtor, for better or worse, has chosen to incorporate both types of
> claims in the same class in its current Plan before us, and to treat them
> differently. The clear dictates of § 1123(a)(4) require us to deny
> confirmation of the Debtor's Plan for that reason.

Union Meeting Partners, 165 B.R. at 567 (citing In re AOV Industries, Inc., 792 F.2d

1140, 1151-52 (D.C. Cir. 1986)).

The disparate treatment need not be overt or strictly monetary in order to violate

Section 1123(a)(4). On a motion seeking stay pending appeal of a confirmation order,

the United States District Court for the Southern District of New York considered

whether there was a substantial possibility that the appellants could successfully

challenge the plan's compliance with section 1123(a)(4). Specifically, the appellants

argued that the plan discriminated against certain creditors where it proposed *pro rata*

distributions to all creditors in the class but promised broad releases only to those

creditors voting in support of the plan. See ACC Bondholder Group v. Adelphia Comm.

Corp. (In re Adelphia Comm. Corp.), 361 B.R. 337 (S.D.N.Y. 2007). The plan's

proponents argued that "it is only the claimant's 'claim or interest' that must be treated

equally, rather than the claimant itself." Adelphia, 361 B.R. at 362 (citing In re Heron,

Burchette, Ruckert, & Rohwell, 148 B.R 660, 672 (Bankr. D.D.C. 1992). The court,

however, noted that "Courts have not made a clear distinction between treatment of

5

'claimants' and treatment of 'claims,'" and held that in this context, "the semantic distinction . . . goes against the sprit of section 1123(a)(4) and what it seeks to protect." Id. at 363-364.    Accordingly, the Adelphia court held that there was a substantial possibility that the appellants could prevail on appeal.

The record at the hearings in this case makes it clear that the Debtors and Committee's Chapter 11 Plan violates section 1123(a)(4) and fails the confirmation test imposed by the first subsection of section 1129. Samuel Star, one of the Committee's financial advisors from FTI and its only fact witness,  testified unequivocally to this effect. *See* **Transcript of the April 25, 2008  Confirmation Hearing ("4/25 Tr.") at 43:18-44:23.**  In explaining one of the adjustments built into the Chapter 11 Plan to mitigate the harm created by its use of *sub rosa* substantive consolidation, Mr. Star explained as follows about the treatment of the MRA creditors:

Q.    ...How were the claims of the master repurchase agreement creditors enhanced as an adjustment?

A.    We increased it by a 30 percent factor.

Q.    All right.  So, the—if their allowed claim otherwise would have been $100, it was now allowed at $130 so that they could collect at that amount, correct?

A.    Correct.

Q.    All right.  And from an economic standpoint, that's the same as increasing their percentage share of the distribution, isn't it?

A.    Yes.

Q.    Okay.    And the MRA creditors are in the same class as the other unsecured creditors of NCFC, the general unsecured creditors?

A.    Yes.

> Q. All right. And again, if…we use simple numbers, if a hundred dollars gets distributed, they get 13 cents and everybody else gets ten cents, right, the MRA's?
>
> A. Yes.

**Id.** at 444-23. The only explanation offered by the co-proponents of the Plan for this disparate treatment of the of these class members was that the MRA's had multiple claims against multiple debtors, as did some other groups of creditors. **Id.** at 45:2-22. The co-proponents contended only that the discrimination was justified because it was necessary to offset other adjustments or harms, not that there was no discrimination or that it was immaterial. **Id.** As provided by the precedent cited above, not to mention the plain meaning of the Bankruptcy Code, these alleged justifications cannot support the intra-class discrimination present in the Chapter 11 Plan. Simply put, the Chapter 11 Plan cannot be confirmed under section 1129(a)(1) because section 1123(a)(4)'s clear dictate is violated. *See also* **4/25 Tr. at 20:5-21:2** (Composition of class of Other Unsecured Creditors of NCFC includes MRA creditors); **Id.** at **14:1-20** (Enhancement of MRA claims by factor of 30%).

**B.    THE PROPONENTS FAILED TO SATISFY SECTION 1129(a)(7) BECAUSE THEY FAILED TO PROVE THAT EACH MEMBER OF THE DISSENTING CLASS OF NCFC UNSECURED CREDITORS WILL RECEIVE AS MUCH UNDER THE PLAN AS EACH WOULD RECEIVE IN A CHAPTER 7 CASE.**

A plan may not be confirmed unless it meets all of the requirements of 11 U.S.C. § 1129(a), including the "best interest" requirement set forth in 11 U.S.C. § 1129(a)(7). The proponent of the plan bears the burden of establishing that "creditors will receive at least as much under the Plan as they would receive in a liquidation of the Debtors' assets under Chapter 7." Lisanti Foods, 329 B.R. at 500. "The focus under this section is upon each holder of a claim, as distinguished from the class in which the claim is placed." Genesis Health Ventures, 266 B.R. at 610. Thus, under the Chapter 11 Plan, the co-proponents are charged with establishing that every member of the dissenting class— Other General Unsecured Creditors of NCFC—will do as well under the Chapter 11 Plan as each such member would do under a Chapter 7 case for NCFC on a stand-alone basis.

As noted above, since the plan proponents bear the burden, an objecting party may successfully rebut a plan proponent's evidence without introducing any new evidence of its own. In Global Ocean Carriers, an objecting creditor did not introduce expert testimony, but managed through cross examination of the plan proponents' experts to call certain valuation testimony into serious doubt. Noting that the plan proponent bears the burden of establishing compliance with section 1129(a)(7), the court held that the evidentiary issues raised by the objecting creditor precluded the court from holding that the plan proponent met that burden. Global Ocean Carriers, 251 B.R. at 46.

The only evidence regarding the possible results of a Chapter 7 liquidation was introduced by the co-proponents through the declaration and live testimony of Holly

8

Etlin, the Debtor's CRO and CEO. Most of Ms. Etlin's testimony predicting the outcome of Chapter 7 cases for the Debtors in general was excluded, however. **4/25 Tr. at 5:8-8:10** (Court's ruling excluding portions of Etlin Declaration); *see also* **Declaration of Holly Felder Etlin** in support of confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors ("Etlin Declaration"). For example, the proffered testimony that the settlements achieved in the case would unravel if the cases were each in Chapter 7 was excluded. The testimony that conversion to Chapter 7 would negatively affect litigation recoveries was excluded. The testimony that the benefits of the Intercompany Protocol would be lost in a Chapter 7 was excluded. The testimony that a Chapter 7 would necessarily result in litigation over allocation of administrative expenses was excluded. The fact that a Chapter 7 case would require the expenditure of over $19 million of additional professional fees was excluded. Indeed the very statement that "...it is quite possible that the Creditors of NCFC would do far worse in an actual Chapter 7 than shown on Exhibit E" was excluded. **4/25 tr. at 7:8-11;** *see also* **Etlin Declaration at ¶28.**

No other witness offered testimony on these points, including as to any possible factual foundation for Exhibit E to the Disclosure Statement, the so-called High Case and Low Case Liquidation Scenarios. The efficacy of Exhibit E depends on these excluded statements by Ms. Etlin. However, focusing on the "Low Case Liquidation Scenario," footnote 3 states that one assumption of the exhibit is that there is no recovery on account of causes of action. This assumption depends on Ms. Etlin's excluded conclusion that a Chapter 7 would negatively affect litigation recoveries. Footnote 4 assumes additional legal and professional fees of $19.5 million, and assumes litigation over allocation of

9

administrative expenses, litigation over intercompany claims and the loss of the various "protocols." However, the only support for these assumptions was found in the excluded proffered testimony of Ms. Etlin.   Exhibit E cannot stand and is useless to support confirmation of the Plan without the excluded testimony since it is admissible only as a summary of testimony or other evidence and must rest on an evidentiary foundation elsewhere provided, but not provided in any sense by the co-proponents given the exclusion of Ms. Etlin's proffered testimony.

Notably, Ms. Etlin's testimony –even that not stricken—is devoid of any specifics as to what a Chapter 7 for NCFC alone would look like.  No attempt was made through Ms. Etlin or otherwise to provide an actual factual or, better yet, other (*e.g.* expert testimony) basis for Exhibit E.

Other portions of Ms. Etlin's Declaration simply defy common sense and logic, yet no real explanation is provided to support the conclusions stated. Yet the conclusions are built into Exhibit E.  For example, Ms. Etlin's Declaration states that  a Chapter 7 trustee would have to start over in negotiations with the IRS over the refund claims, and thus, in Exhibit E, the amount of the tax refunds to be received in a Chapter 7 are reduced arbitrarily by 25% in both the High and Low cases. **Etlin Declaration at ¶19.** The same claim is made about the Carrington Interests; a Chapter 7 trustee would not realize the same value as the Debtors' professionals (who have also been engaged in a liquidation as officers of the court).  **Id.**  Thus, the High Case scenario reduces the value of the Carrington interests by 35%.  Both statements are pure *ipse dixit* with no independent evidentiary support whatsoever.  There is no reason why the IRS or Carrington would agree to a different settlement just because a different liquidator is sitting across the table.

Before parsing Exhibit E stripped of the Etlin-supported assumptions, it is worth noting that Exhibit E failed to meet the requirements of section 1129(a)(7) even before it was gutted by the exclusion of the critical testimony of Ms. Etlin upon which it was based. The disclosure statement accompanying the Chapter 11 Plan provides for a range of recovery of 1.9% to 14.3% for the NCFC unsecured creditors. *See* **Plan at Section I A. 4.** Exhibit E, untouched, provides for a range of 0% (Low Case) to 13.7% (High Case). These ranges in the Chapter 11 Plan, the Disclosure Statement and Exhibit E laid one on the other overlap. Accordingly, they establish that, on certain assumptions not distinguished or illuminated by evidence, the result in Chapter 7 is better than under the Chapter 11 Plan, to wit: the plan could provide 2% when Chapter 7 provides 13.7% since there is no evidence as to when each set of assumptions would prevail.

When the assumptions based solely on the excluded Etlin testimony are removed from Exhibit E, the result is that Chapter 7 looks much better than the Chapter 11 Plan. Using only the Low Case Liquidation Scenario, if only the assumed (and now unsupported) additional legal expenses are taken out of the NCFC column, the projected recovery immediately goes from 0% to over 3%, a percentage higher than the low range under the Chapter 11 Plan. Adding back value for the other now excluded assumptions would only increase this positive differential.

Of course, as noted above, it is not for the Beneficiaries to establish that Chapter 7 is better; it was for the co-proponents to establish that Chapter 7 is worse for each member of the dissenting class. In this effort, the co-proponents have failed, given the lack of evidence to support Exhibit E, the only evidence of a Chapter 7 scenario. No

evidence in the record, much less a preponderance, supports the satisfaction of the "best interests" test of section 1129(a)(7).

C.    *OWENS CORNING* PRECLUDES CONFIRMATION
BECAUSE THE PROPONENTS ADMIT THAT:
(A) THE PLAN EMBODIES SUBSTANTIVE CONSOLIDATION;
(B) THESE CASES COULD NOT BE SUBSTANTIVELY
CONSOLIDATED UNDER *OWENS CORNING;* AND
(C) THE PLAN REQUIRED ADJUSTING "COMPROMISES" TO
MITIGATE THE HARM CAUSED BY SUBSTANTIVE
CONSOLIDATION.

Much of the testimony at the Confirmation Hearing concerned the use of substantive consolidation in the Chapter 11 Plan. As the testimony of Mr. Star made clear, the parties arrived at the "Holdco/Opco Model" as a means of avoiding certain alleged ambiguities over asset ownership and other issues. By Mr. Star's admission, this model involved the substantive consolidation of all of the holding companies as a group and the separate substantive consolidation of the operating company Debtors as a group. **4/25 Tr. at 12:6-17.** That model was incorporated into the Chapter 11 Plan. **Id. at 12:25-13:2.** The parties—primarily the Debtors and the Committees through their respective professionals—then developed a series of adjustments to mitigate the harm caused to various creditor constituencies by substantive consolidation. *See generally* **id. at 12:6-22:17.**

The adjustments made to mitigate the harms caused by substantive consolidation included the inter-company protocol, the administrative expense allocation by asset value, reductions of certain claims, and the enhancement of other claims (including allowing the claims of parties with claims against multiple debtors at 130%), also known as the multi-debtor protocol. **Id. at 13:3-14:20.** The multi-debtor protocol was put in place because substantive consolidation necessarily prevents the receipt of dividends

12

from multiple debtors (as the debtors are merged). **Id.** **at 17:21-18:17.** The intercompany protocol—upstream claims allowed at 100% and downstream claims allowed at 50%-partially reversed an effect of full consolidation: the complete elimination of all intercompany claims (although all intercompany claims within Debtor groups were fully eliminated). **Id. at 19:2-16.**

The alleged asset ambiguities that drove substantive consolidation included which debtor (TRS vs. NCFC) owned the Carrington interests and the Rabbi Trust assets (assuming the later were owned by any Debtor). **Id. at 22:18-23:7.** These ambiguities were a product of the fact that NCFC, the Maryland REIT, was formed in 2004 and following a merger was known as New Century Financial Corporation, while the former New Century Financial Corporation became TRS, a Delaware corporation. The issue was which "New Century Financial Corporation" was referred to in certain post-2004 documents and whether the merger documents and other post-2004 agreements clearly settled the question of which of those entities owned the relevant assets. **Id. at 24:12-25:15.** In addition, the Committee perceived issues relating to certain intercompany accounts and a possible tax refund. **Id. at 22:23-23:3, 41:6-20.**

However, the Committee accepted the Debtors' professional's reconciliation of inter-company accounts and subsequent amendment of their schedules without any serious question. **Id. at 26:19-27:3.** Critically, according to Todd Brents, the Debtors' other witness, those same inter-company account reconciliations—accepted by the Committee—"reflect the inter-company impact of the [Rabbi Trust and Carrington assets] being owned by NCFC." **Id. at 76:21-77:6.** In addition, as to the tax refund, Mr. Star testified that "the committee was comfortable [that the tax refund] belonged [at

13

NCMC] at the end of the day." **Id. at 41:17-20.** Moreover, as to the Carrington interests, Mr. Star acknowledged documents created after the REIT conversion and related to the merger where the parties clearly distinguished, by name and description, TRS and NCFC. **Id. at 62:1-19.**

Other factors considered by the Committee were overlapping boards and management. **Id. at 27:6-28:3.** Star admitted, however, that the public filings for the Debtors included consolidating information, although he did not review any of the publicly available consolidating information before his deposition days before the hearing. **Id. at 29:1-30:13.**

Mr. Star emphasized that the Holdco/Opco model incorporated substantive consolidation of each group of companies. The assets of each group were combined, the claims against each group were combined and the inter-company claims within each group were allowed at zero. **4/25 Tr. at 30-31.**

Ms. Etlin testified about many of the same issues, although Ms. Etlin clearly had far less doubt about whether substantive consolidation was supported under applicable law and about the location of the assets over which the Committee asserted ambiguity.

Ms. Etlin's proffer explained that Debtors' Demonstrative Exhibit 1, the Debtors' corporate organization chart, is color-coded to identify the groups of debtors identified in the Plan as (i) "the Hold Co. companies," marked in yellow; (ii) the operating debtors, marked in green, and (iii) New Century Warehouse, often referred to as Access Lending, marked in blue. **Transcript of the April 24 Confirmation Hearing ("4/24 Tr.") at 67:1-15**. Ms. Etlin's proffer explained that NCMC and NC Capital, which are two of the operating company subsidiaries, have their own financial statements. **Id. at 72:4-8.**

14

Ms. Etlin testified on cross examination that she did consider a Plan that would have involved complete substantive consolidation of the debtors identified on Debtors' Demonstrative Exhibit 1. **Id. at 81:13-18.** Ms. Etlin indicated on cross examination that "the business and factual matters that we found evident in the companies did not support" the standards of *Owens Corning*. **Id. at 81:19-82:2.** Ms. Etlin further testified on cross examination that she concluded, based on her consultation with counsel, that complete substantive consolidation under *Owens Corning* was not appropriate under the facts of these cases. **Id. at 128:22-129:2.**

Ms. Etlin testified on cross examination that the bar date order required creditors with claims against an individual debtor to file their claim against the correct debtor, and that if the claim was filed against the wrong debtor, the creditor risked having the claim disallowed. **Id. at 82:17-24.**

Ms. Etlin admitted on cross examination that under the Plan the assets of the Hold Co. entities are merged and combined and pooled for distribution; the inter-company liabilities as between the group are valued at zero; and claims against the holding companies share in that pool of assets. **Id. at 108:18-109:20.** Ms. Etlin further testified on cross examination that, similar to the treatment of holding company debtors under the Plan, the operating companies' assets are combined for distribution purposes and inter-company claims between operating company debtors are valued at zero. **Id. at 118:24-119:6.** The controversy that drove this aspect of the Plan was, in part, the alleged ambiguity that the Rabbi Trust assets and the Carrington assets were maybe in Old NCFC and maybe in New NCFC. **Id. at 109:21-110:3.** Ms. Etlin testified on cross examination that she dealt with the distribution percentages in order to deal with the consequences of

15

having consolidated the assets, the claims, and zeroing out the inter-companies. **Id.** **at**
**122:8-12.**


Ms. Etlin testified on cross examination that there was an issue as to which of two

holding company debtors was the owner of the so-called Carrington interests. **Id.** **at**
**83:12-15.**

Ms. Etlin testified on cross examination that the issue with respect to the

Carrington interest was that the accounting remained at TRS Holdings after NCFC's

conversion to the REIT, but the legal documents were not clear as to which entity was the

owner of those interests. **Id.** **at 84:16-85:2; 93:16-21.**

Ms. Etlin testified on cross examination that as the CEO and CRO of the Debtors,

she never considered submitting the issue of the ownership of the Carrington interests for

adjudication with the Court, and was not sure whether that approach was ever discussed.

**Id.** **at 93:22-94:7.**

Ms. Etlin testified on cross examination she understood that the income stream

from NCFC's original investment in Carrington Capital Management is flowing into

NCFC, the Maryland REIT. **Id.** **at 97:22-98:8.**

Ms. Etlin testified on direct examination that everything that she has signed

relating to the Carrington investments she has signed as FC and MC, the REIT and the

operating mortgage company. **Id.** **at 134:16-18.**

Ms. Etlin testified on direct examination that the Carrington assts was not put in

the operating company group "[b]ecause that's not where it was classified at the time of

16

the filing of these cases, and we ultimately determined the proper place to leave it was where it is." Id. at 137:3-8.

Ms. Etlin admitted on cross examination that the effect of paragraph 2.3 of Ad Hoc Exhibit 11 is that New Century REIT is acquiring all of the rights and obligations of New Century Financial, the Delaware corporation, under the deferred compensation plan and trust. Id. at 112:21-25.

Ms. Etlin testified on cross examination that she was reasonably certain precisely which of the debtor entities was entitled to a tax refund; the entity was New Century Mortgage. Id. at 98:19-99:4.

Ms. Etlin testified on cross examination that Ad Hoc Exhibit 8 is the product of the work that AlixPartners did to reconcile the differences between the Debtors' original schedules and what was discovered in the company books and records, particularly with respect to inter-company balances. Id. at 99:7-100:5.

Ms. Etlin testified on cross examination that she was comfortable upon completion of Ad Hoc Exhibit 8 that, with respect to the inter-company issues covered by the report, her team got the issues correct in the reconciliation. Id. at 100:23-101:2.

Ms. Etlin testified on cross examination that Ad Hoc Exhibit 9A-F are amendments to the Debtors' schedules, which amendments were made as a product of the work done on Ad Hoc Exhibit 8. Id. at 102:1-5.

Ms. Etlin testified on direct examination that "whenever money passed from NCFC into any of the other entities, it was recorded. From time to time there would be transactions the other way, and that money would be independently recorded. The resulting balance would, of course, be noted in the books and records." Id. at 141:2-7.

17

**Based on the evidence, *Owens Corning* Bars confirmation of the plan: Both the structure of the Plan and its possible effect implicate the Third Circuit's Opinion.**

The upshot of the testimony on substantive consolidation establishes the following facts: first, the facts of these cases could not support substantive consolidation under the rigorous tests of <u>Owens Corning</u> and the plan proponents—at least the Debtors—were aware of that factual and legal conclusion; second, the Chapter 11 Plan, by incorporating the "Holdco/Opco Model," nonetheless substantively consolidates each relevant group of Debtors, the holding companies and the operating companies (both Ms. Etlin and Mr. Star described the "combination" of these Debtors using precisely the definition used by the Third Circuit for substantive consolidation); and third, the parties agreed on a series of adjustments to mitigate the actual harm to some creditor groups of the admitted substantive consolidation, but not all like creditors enjoyed the benefit of the adjustments, and within the consolidated groups (as opposed to group to group) the Chapter 11 Plan resulted in a disregard of separateness and a loss of creditor rights given, among other things, the allowance of inter-company claims at zero and the fact that some of the consolidated companies had few or any remaining assets.

In addition, the alleged asset ambiguities that, *post facto*, the parties used to justify substantive consolidation were hardly present at all. The issue of ownership of the Rabbi Trust assets is resolved by the merger documents without reasonable question; while a fly-specking attorney could perhaps stretch to find some doubt, simple summary judgment practice—at most—would have quickly resolved the matter. The same is true of the Carrington interests: the post-2004 documents are clear (the parties knew when to

use each corporate name properly) and Carrington, in its pleading, knew precisely who its counterparty was and was not. Again, any doubt was resolvable, worst case, by simple motion practice at little expense. Ms. Etlin saw no issue on the tax refund; Mr. Star admitted that "at the end of the day" the Committee was in agreement with Ms. Etlin. The Debtors' team from Alix Partners definitively reconciled and corrected all of the inter-company accounts and filed amended schedules under penalties of perjury, and the Committee did not object to a single adjustment to the schedules.

The evidence is also clear that the substantive consolidation was not driven by a series of interrelated compromises, the product of which was the hybrid form of "subcon" in the Chapter 11 Plan. The parties arrived early at the "Holdco/Opco Model" (probably borrowed from Ms. Etlin's experience in the Winn-Dixie cases) so that they would not have to bother to resolve the Committee's alleged ambiguities; it was simply easier not to. All of the "compromises" (the various adjustments and protocols) were then necessary to sell substantive consolidation to various vocal creditor groups—represented by certain members of the Committee—on the model.

Thus, any claim that the Chapter 11 Plan is not based on substantive consolidation is wholly unsupported by the record. The record is clear that the <u>Owens Corning</u> factors for substantive consolidation are not meant in this case; the co-proponents admit that fact. Even if there were a "Rule 9019 override"—and <u>Owens Corning</u> clearly does not allow for one as the Beneficiaries detailed in the earlier brief—the substantive consolidation in the Chapter 11 Plan was not necessitated by or a product of compromises; rather, all of the "compromises" were required once "Holdco/Opco" was chosen as the prevailing model.

Thus, the only issue is whether <u>Owens Corning</u> permits the "substantive consolidation with compensating adjustments" to mitigate harm represented by the Chapter 11 Plan, and allows it on a lesser showing than required for "full" substantive consolidation. Stated otherwise, does mitigating the admitted, detrimental effect of substantive consolidation for some, but not all creditors, take this Chapter 11 plan outside of the rubric and requirements of <u>Owens Corning</u>? The clear and unequivocal answer from the language and rationale of the Third Circuit's commanding opinion is that it does not.

As the Third Circuit emphasized, the respect of entity separateness as a nearly irrebuttable legal presumption is a "fundamental ground rule." <u>In re Owens Corning</u>, 419 F.3d 195, 211 (3rd Cir. 2005). "As a result, the general expectation of state law and of the Bankruptcy Code, and thus the commercial markets, is that courts respect entity separateness *absent compelling circumstances calling equity(and even then only possibly substantive consolidation) into play.*" <u>Id</u>. (emphasis supplied). Mere benefit to the administration of a case or cases is never sufficient to allow for substantive consolidation of debtors. <u>Id</u>. Substantive consolidation is "extreme" and "imprecise" and the "rough justice" remedy of substantive consolidation should be the remedy of "last resort after considering and rejecting other remedies...". <u>Id</u>. Thus, the Third Circuit held without equivocation that: "what must be proven (absent consent) *concerning the entities for whom substantive consolidation is sought* is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) post-petition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." <u>Id</u>.

20

(emphasis supplied).    These tests are not met in this case, and admittedly so as demonstrated above.

"Substantive consolidation with compensating adjustments" fares no better under these principles than "full" substantive consolidation.  First, "substantive consolidation with compensating adjustments" does not respect entity separateness absent compelling circumstances; rather, it disregards separateness at the outset.  The model then attempts to "fix" the admitted harms to creditor rights and expectations at state law by creating compensating "tweaks" for some creditors, usually the loudest and most "inside" creditors.    This, however, is simply its own form of rough justice, substituting an alternative legal reality to make substantive consolidation closer to, but not exactly like, the reality at state law and under the prevailing contracts  of certain creditors.  Those creditors who are not at the table shouting for "tweaks" are left to rely (perhaps) on the judgment of the plan proponents that the compensating adjustment is sufficient, if an adjustment is available at all.    One adjustment leads to another creditor demand to another adjustment.  The prospect for imperfection, if not abuse, is high.  Some creditors (the largest and loudest) get compensating tweaks and other creditors simply get the loss of rights and dilution of assets and claims that is an inevitable result of substantive consolidation.

Moreover, "substantive consolidation with compensating adjustments" still starts with substantive consolidation.  The Third Circuit command is clear and unequivocal: whether combining two or twenty entities, the test must be met.  If not, there is no combination (and therefore one never gets to the "compensating adjustments" part of the process). Owens Corning, 419 F.3d at 211.

21

In addition, the Third Circuit was clear that modest ambiguities around assets and liabilities would never be sufficient to justify any form of consolidation: "…commingling justifies consolidation only when separate accounting for the assets and liabilities of the distinct entities will reduce the recovery of *every* creditor—that is, when every creditor will benefit from the consolidation." Id. at 214 (emphasis in original). There is no evidence in this case that separate accounting would have reduced the recovery of every creditor in the New Century cases. To the contrary, the co-proponents admit that several creditor groups were harmed, thus the need for compensating adjustments. There is no evidence that every creditor benefits from the "substantive consolidation with compensating adjustments" or that every creditor harmed received the benefit of the adjustments.

Indeed, there is obvious detriment. For example, the Beneficiaries must share assets with MRA creditors with claims allowed at 130% of their actual value; the upward claim adjustment is necessary because the MRA's cannot collect from multiple debtors due to consolidation. However, absent consolidation, the MRA's would receive a distribution only on their legal claim from the NCFC assets and then collect from some other Debtor against whom the Beneficiaries have no claim. Any compensating "premium" that the MRA creditors receive comes at the expense of the Beneficiaries. The alleged but uncertain and unproven compensation for that is that the NCFC creditor body as a whole will share in assets (*e.g.*, Carrington, causes of action) that they might not have access to. However, there is no evidence that the alleged assets don't all belong to NCFC in any event and, more critically, both assets are valued at $0.00 to some

22

undermined number.  The "compensation" to offset the admitted dilution may never come.

Owens Corning no more allows for "substantive consolidation with compensating adjustments" on this evidence than it allows for "full" substantive consolidation.  The co-proponents have failed in their burden of proof by a large margin.  The Chapter 11 plan cannot be confirmed under sections 1129(a)(1) and (a)(3).

23

## CONCLUSION

Based on the evidence introduced at the confirmation hearing, the Chapter 11 Plan cannot be confirmed. The plan violates section 1123(a)(4). The proponents have failed to produce sufficient evidence—if any—that the plan produces equal or better results for every member of the dissenting class than would occur under a Chapter 7 case for NCFC. The command of Owens Corning does not permit the "substantive consolidation with compensating adjustments" embodied in the Chapter 11 Plan. For these reasons, and the other reasons stated in the principal objection and memorandum filed by the Beneficiaries, the Court should enter an order denying confirmation of the Chapter 11 Plan.

Dated: May 7, 2008

STEVENS & LEE, P/C

/s/ Joseph H. Huston, Jr.
JOSEPH H. HUSTON, JR. (No. 4035)
1105 NORTH MARKET STREET
SUITE 700
WILMINGTON, DE 19801
TELEPHONE: (302) 425-3310
TELECOPIER: (610) 371-7972
EMAIL: JHH@STEVENSLEE.COM

- and -

**BERNSTEIN, SHUR, SAWYER & NELSON**

ROBERT J. KEACH
100 MIDDLE STREET
P.O. BOX 9729
PORTLAND, ME 04104-5029
TELEPHONE: (207) 774-1200
TELECOPIER: (207) 774-1127
EMAIL: RKEACH@BERNSTEINSHUR.COM

24

## CERTIFICATE OF SERVICE

Joseph H. Huston, Jr., hereby certifies that on May 7, 2008, he caused a true and correct copy of the foregoing *POST-HEARING SUBMISSION IN SUPPORT OF THE OBJECTION OF AD HOC COMMITTEE OF BENEFICIARIES OF THE NEW CENTURY FINANCIAL CORPORATION DEFERRED COMPENSATION PLAN AND/OR SUPPLEMENTAL EXECUTIVE RETIREMENT/SAVINGS PLAN TO CONFIRMATION OF FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF MARCH 18, 2008* to be served on all parties in interest electronically through the Court's CM/ECF system, and also by regular mail upon the parties listed below.

Mark D. Collins, Esq.
Michael J. Merchant, Esq.
Richards, Layton & Finger, P.A.
P.O. Box 551
One Rodney Square, 920 King Street
Wilmington, DE 19899

Monika L. McCarthy, Esq.
New Century Mortgage Corporation
3337 Michelson Drive, Suite CN-350
Irvine, California 92612

Mark S. Indelicato, Esq.
Mark T. Power, Esq.
Hahn & Hessen. LLP
488 Madison Avenue
New York, NY 10022

Joseph J. McMahon, Jr.
*Office of the United States Trustee*
J. Caleb Boggs Federal Building
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

Suzzanne S. Uhland, Esq.
Andrew M. Parlen, Esq.
O'Melveny & Myers LLP
275 Battery Street
San Francisco, California 94111

AP Services, LLC
Attn: Holly Felder Etlin
9 West 57th Street, Suite 3420
New York, New York 10019

Bonnie Glantz Fatell, Esq.
Regina Stango Kelbon, Esq.
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington, DE 19801-4226

/s/ Joseph H. Huston, Jr.
Joseph H. Huston, Jr.