IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416(KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | Re: Docket No. 6412 |
| | : | |

**POST-HEARING BRIEF OF PLAN PROPONENTS**
**IN SUPPORT OF CONFIRMATION OF PLAN LIQUIDATION**

The above captioned debtors and debtors in possession (the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan Proponents") hereby submit this post-hearing brief in support of confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Committee dated as of April 23, 2008 (the "Plan").[2] At the end of the confirmation hearing, the Court indicated that it would accept short rebuttal briefs concerning the issues argued at the confirmation hearing. TR. 4/25/08 at 186:1-3. Accordingly, this brief addresses a few issues raised by the objectors in their closing argument to which the Plan Proponents did not have an opportunity to respond orally.

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership and New Century Warehouse Corporation, a California corporation.

[2] Capitalized terms used herein without definition have the meanings set forth in the Plan.

I.   THE PLAN PROVIDES FOR THE SAME TREATMENT FOR EACH CLAIM IN CLASS HC3b.

In his closing argument, counsel for the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan (the "Deferred Compensation Claimants") contended that the Plan violates Bankruptcy Code Section 1123(a)(4), and thereby Bankruptcy Code Section 1129(a)(1), because the Plan supposedly provides disparate treatment for creditors in Class HC3b -- the Class of general unsecured creditors with claims against New Century Financial Corporation ("NCFC"). The Deferred Compensation Claimants only have claims in Class HC3b. They argued that the Plan supposedly inflates the claims of MRA creditors with claims in Class HC3B by 130% whereas all other creditors in this Class (including the Deferred Compensation Claimants) receive distributions based on 100% of their claims. TR. 4/25/08 at 136:9-137:17. Thus, counsel for the Deferred Compensation Claimants contended that his clients will receive inferior and different treatment compared to that of the MRA claimants in Class HC3b, in violation of Bankruptcy Code Section 1123(a)(4).

This argument badly misstates the Plan. Bankruptcy Code section 1123(a)(4) provides that a plan shall provide for the same treatment of each claim or interest in a class, unless a holder of a particular claim or interest agrees to a less favorable treatment. Accordingly, the applicable provisions of the Plan concerning distributions to creditors in Class HC3b provide that every creditor in that Class with an allowed claim will receive equal treatment -- its pro rata share of the Holding Company Debtor Portion of the Litigation Proceeds and its pro rata share of the Holding Company Debtor Net Distributable Assets. Plan Article 4.C.2. No claim in Class HC3b is inflated.

Instead of focusing simply on the distributions to creditors in Class HC3b (the only Class where the Deferred Compensation Claimants have claims) their counsel obscured the issue by basing his argument on the Multi-Debtor Claim Protocol set forth in Article 6 of the Plan as it

affects certain creditors in another class -- Class HC10b. This protocol is applicable only if a creditor has valid claims against multiple Debtors and therefore has claims in multiple classes. With respect to the Holding Company Debtors, the creditor must have a valid joint and several claim against both NCFC and New Century Credit Corporation ("NC Credit") -- i.e., a claim in Class HC3b (general unsecured claims against NCFC) and a claim in Class HC10b (general unsecured claims against NC Credit). If a creditor has joint and several claims in each of these Classes, then for purposes of distributions from the assets available to distribute to the creditors with claims against the Holding Company Debtors, the creditor gets a Determined Distribution Amount on account of both these claims equal to 130% of its allowed claim against NCFC. Since this 130% factor applies only if the creditor has a claim against both NCFC and NC Credit, creditors with joint and several claims are in effect agreeing to take a reduced recovery compared to their rights if they could assert a full claim against each.

The purpose and result of the Multi-Debtor Claim Protocol are not to give disparate treatment to claims of equal rank against NCFC. All such claims in Class HC3b receive exactly the same treatment -- a pro rata share of the assets available to creditors against the Holding Company Debtors based upon 100% of the creditor's allowed unsecured claim against NCFC. The factor only is applicable to that creditor if it also has a separate and distinct claim against NC Credit in Class HC10b, such that NC Credit and NCFC are jointly and severally liable to that creditor. The Plan effectively provides that such creditors will receive a Determined Distribution Amount equal to 30% on their Class HC10b claims against NC Credit.[3]

---

[3] Since the Multi-Debtor Claim Protocol is applicable to claims against the Holding Company Debtors only if NCFC and NC Credit are jointly and severally liable for the amount owed to the creditor, the dollar amount of these claims in Classes HC3b and HC10b will be identical. For example, if a creditor had a $1 million joint and several claim against NCFC and NC Credit, it could have asserted that it was entitled to a $1 million claim against each, or a $2 million combined Determined Distribution Amount for purposes of determining its pro rata share of the assets available for creditors of the Holding Company Debtors. The Multi-Debtor Claim Protocol reduces this and provides such creditors with joint and several claims a discounted combined Determined Distribution Amount -- in the example $1.3 million. Depending on one's perspective, this could be viewed as a 100% Determined Distribution Amount on account of the creditor's Class HC3b claim against NCFC and a 30% Determined Distribution Amount on account of the creditor's Class HC10b claim against NC Credit, or vice versa. The result is the same. And in any event, creditors with joint and several claims receive a 100% Determined Distribution Amount against either NCFC or NC Credit and a 30% Determined Distribution Amount against the other. In no case, does a creditor with a joint and several claim against

With minor exceptions, the only creditors with claims against NC Credit are the MRA and similar creditors who also hold joint and several claims against NCFC. Ad Hoc Exhibit 10 at 4 n. 13. These creditors are legally entitled to recover on their separate claims against NCFC and NC Credit, for NC Credit has its own assets. Specifically, NC Credit has a net intercompany account receivable against NCMC in the amount of $16.9 million and a net receivable owed by NCFC in the amount of $67.3 million. TR. 4/25/08 at 22-4; Brents Declaration at ¶33, accepted as a stipulated fact, TR. 4/25/08 at 74:16-20; Ad Hoc Exhibit 8 at DIP000004. NC Credit also had approximately $1 million in cash on the petition date. Ad Hoc Exhibit 10 at 2. As Mr. Star explained, since NC Credit has its own assets such joint and several claims must be recognized in some way. TR. 4/25/08 at 19:22- 20::4; 45:1-12.[4]

During cross-examination, counsel for the Deferred Compensation Claimants attempted to trap Ms. Etlin into testifying that the Multi-Debtor Claim Protocol improperly inflates the claims of certain creditors with respect to NCFC so that creditors in Class HC3b will receive unequal treatment. Ms. Etlin did not agree with this mischaracterization and correctly described the Plan.

> Q. [Mr. Keach]   And in the plan of liquidation there's also something called the multi-debtor protocol, correct?
>
> A. [Ms. Etlin]   Yes, there is.
>
> Q.   All right. Explain what the multi-debtor protocol is?

---

NCFC and NC Credit receive a greater distribution on <u>account of its claim against NCFC</u> than do the Deferred Compensation Claimants.

[4] This issue also highlights that intercompany claims were taken into account in the Plan in a variety of ways -- partly through the Intercompany Claim Protocol that dealt with intercompany claims between the major groups of Debtors, but also through Determined Distribution Amounts, such as the 130% Determined Distribution Amount for creditors with joint and several claims against NCFC and NC Credit in recognition of the fact that NC Credit has substantial intercompany claims against NCFC and NCMC, which together with the $1 million in cash held on the petition date, provide an appropriate basis to adjust the distributions to creditors who had a joint and several claims against both NC Credit and NCFC. This is just one illustration. For example, the Determined Distribution Amount for creditors with EPD/Breach claims against NC Capital is set at 50% to reflect the fact that the only real asset held by NC Capital is an uncertain intercompany claim against NCMC. Plan Article 4.1.2. TR. 4/24/08 at 121:14-122:15.

| | |
|---|---|
| A. | It's another one of the complex form of ways of dealing with inter-party claims and inter-entity claims that exist in these cases. And, again, the multi-debtor protocol is designed to reduce expense in connection with claims resolution, and to take into account the legal rights of creditors holding guaranties, or other valid joint and several contractual arrangements with the debtors. There are parties who are claimants in these cases who have multiple claims, claims against multiple entities for the same amounts as the result of their joint and several contractual agreements. These parties originally in our claims negotiations took the position that they were entitled to—let's say they had a $10 claim, just for simplification purposes—they were entitled to receive their deemed distribution on the $10 claim across every entity in exactly the same amount until they received 100 cents on the dollar. That doesn't necessarily appear fair to anybody who looks at these things, and so, there was a protracted negotiation with these parties wherein we agreed that those claims would be for distribution purposes collapsed. However, they would be given in effect, in effect, an inflator associated with their distribution amount of 130%, which took into account the fact that they had these claims against multiple entities. Again, a way of dealing with an incredibly complex set of legal issues and claims, and factoring that into, as we did in the Winn-Dixie case, the ultimate distribution amount, which, frankly, is what everybody is interested in anyway at the end of the day. |
| Q. | Sure. And so, if we actually just get to the actual question, the way the multi-debtor protocol operates is that for creditors who have claims against multiple debtors, those creditors have to file a claim against one debtor, but with an inflated claim distributed amount or percentage, correct? |
| A. | No, that's not correct. They have to have valid claims against multiple debtors in order to get that determined distribution amount. |
| Q. | And they get the determined distribution amount because given the consolidation within groups and not being able to file claims against individual debtors, correct? |
| A. | No. They have filed claims against individual debtors. That is the evidence upon which they are allowed a larger deemed distribution amount. |

| | |
|---|---|
| Q. | Well, if the groups were not consolidated as you just described, those creditors would file claims against every individual debtor and collect from every individual debtor until they were paid, right? That's what their legal rights required them to do? And the consolidation of the debtors into a group is what prevents them from doing that, correct? Since you've got one asset pool, they can't very well file their claims against individual debtors because the individual debtors have disappeared into one asset pool. Isn't that right? |
| Mr. Logan: | Your Honor, objection. This is legal argument. Argumentative. |
| The Court: | She's doing pretty well, so— |
| Mr. Logan: | I know she is. |
| The Court: | I would have let her go on myself, but— |
| Mr. Logan: | Objection withdrawn. |
| | (LAUGHTER) |
| Q. | And there's one asset pool, correct? |
| A. | Mr. Keach, again, you're mixing up the terms— |
| Q. | I'm not mixing up anything, and please, motion to strike as non-responsive, Your Honor. First— |
| The Court: | Denied. |
| Q. | It would be better if we could focus on the actual question, because the speeches are nice, but the questions are more important. |
| A. | I would agree with that, Mr. Keach. |
| The Court: | Mr. Keach—Ms. Etlin, one moment. Mr. Keach, you must refrain from gratuitous remarks. Ask questions. The witness will answer— |
| Q. | Within the operating company group are the assets pooled for distribution? |
| A. | Yes, they are pooled for distribution— |
| Q. | Okay. |

| | |
|---|---|
| A. | —purposes only. |
| Q. | Right. And somebody who has a claim against every one of the debtors therefore can't file their claim against individual debtors because the claims are pooled for distribution, correct? |
| A. | No. |
| Q. | So, they still can file against individual silos of assets, even though the assets are combined? |
| A. | They have filed against individual silos of assets. That is the basis for the determination of their distribution amounts are their individual valid claims against multiple debtors. |
| Q. | Right. And how is the distribution being made to them? Are they getting to collect from every individual asset pool? |
| A. | No. The compromise, as I've stated, basically takes valid claims against multiple debtors and assigns, as a result of those valid claims, a deemed distribution amount which inflates the value of the basic single claim amount, which is filed against multiple debtors. Because typically when these claimants filed, they filed the same claim against multiple debtors because it's the same claim under joint and several. And what we've done is we've said rather than having a situation in which assets are flowing into entities, and then you have to take into account the inter-company values, and the cash circles around, and maybe comes to rest at one point, or maybe it comes to rest at another point, and it results in potentially very unfair levels of distribution to various groups of creditors, let's take into account everyone's potential legal rights against all those various parties, plus the inter-company amounts that might shift the values between the various entities, and let's come up with a single deemed distribution amount which takes into account all those various parties based on the actual legal nature of their multiple claims what they ultimately receive a distribution in these cases. |
| Q. | Alright. And the inflator is done to compensate for the fact that they can't file individual claims against individual silos of assets and collect from those individual silos of assets, correct? In other words, the inflator is a consequence of the consolidation, not the consolidation being a product of some controversy about that claim? |

    A.    No. I disagree.

TR. 4/24/08 at 122:16-127:10.

    Mr. Star similarly explained that the Committee approached its analysis of the Plan from an entity-by-entity deconsolidated "benchmark." TR. 4/25/08 at 34:10-37:12. From that benchmark, the Plan took those entity-by-entity rights, including allocations of assets and liabilities, intercompany accounts, joint and several liability of some Debtors, and a host of legal and factual uncertainties, into account by such adjustments as the Determined Distribution Amounts, the Intercompany Claim Protocol, the EPD/Breach Claim Protocol, allocation of Litigation Proceeds, the allocation of Joint Administrative Expenses, the Multi-Debtor Claim Protocol and the other settlements incorporated on an integrated basis in the Plan. See, e.g., TR. 4/24/08 at 109:18-110:3; TR. 4/24/08 at 71:25-72:14; TR. 4/24/08 at 202:14-204:10; TR. 4/25/08 at 37:23-38:17; TR. 4/24/08 at 119:14-120:23; TR. 4/24/08 at 121:14-122:15; TR. 4/24/08 at 119:14-120:23; TR. 4/24/08 at 122:19-123:21; Etlin Declaration ¶ 21, 22 [Docket No. 6407], as admitted into evidence at TR. 4/25/08 at 5-8. Whether phrased as adjustments designed to take into account these legal rights and factual issues or adjustments that are designed to avoid "harms" that otherwise would result from pooling some assets (the ownership of many of which are unclear), the results are proper. During his cross-examination, Mr. Keach used the term "substantive consolidation" frequently in an obvious attempt to play a semantics game. As the Court observed, "[t]he term [substantive consolidation] is being tossed about. I don't take the discussion to mean that the witness has concluded, despite the fact the examiner has, that there's been substantive consolidation here. It's ultimately a legal determination for the Court, and I understand the context in which the questions are being asked. So, why don't we proceed with that understanding." TR. 4/25/08 at 17:13-19.

    The most important fact is that the Plan does not provide a 130% Determined Distribution Amount to any creditors on account of Class HC3b claims against NCFC. Rather, creditors with joint and several claims against NCFC and NC Credit receive effectively a 100%

Determined Distribution Amount on their Class HC3b claim against NCFC and a 30% Determined Distribution Amount on their Class HC10b claim against NC Credit.

Clearly the Plan was not designed to adversely affect creditors with claims against NCFC, for the Plan provides for a similar application of this principle with respect to creditors who have joint and several claims against the three primary Operating Debtors that have assets—NCMC, NC Capital and Home 123. Plan Article VI.B. None of the creditors at the operating company level objected to the application of this protocol, and the overwhelming majority of them voted to accept the Plan.

Moreover, none of the creditors with the largest claims only against NCFC objected to this aspect of the Plan, despite the fact that they receive exactly the same treatment under the Plan as do the Deferred Compensation Claimants. The creditors with the largest claims against NCFC only are Kodiak and Maguire Properties. Both sit on the Committee, have access to all of the relevant financial analysis under the Plan and are represented by separate counsel. These creditors, who are collectively owed more than $100 million, participated in the development of the Plan, including this feature, which is designed to deal with the enhanced legal rights of other creditors who have joint and several claims against both NCFC and NC Credit. TR. 4/25/08 at 32:16-34:1; TR. 4/24/08 at 129:19-190:14.

In fact, if the Plan did not contain the Multi-Debtor Claim Protocol, or something very similar to it, it would have run afoul of the Third Circuit Court of Appeals' holding in In re Owens Corning, 419 F.3d 195 (3rd Cir. 2005). In Owens Corning, banks that had extended a $2 billion unsecured loan to a main operating company also obtained guarantees from each of its subsidiaries. The Owens Corning plan of reorganization, however, deemed all of the debtors consolidated and provided the banks with a single recovery on a single claim against the consolidated group. The direct holding of the Third Circuit was that the banks had bargained for "'structural seniority'—a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors did not have." It was improper to "undo this bargain." Id. at 212. As this Court observed at the confirmation hearing, "it seems to me that it

[Owens Corning] was an easy case. The plan was designed in part to strip the bank of the benefits of its guarantees. I don't know what was so difficult about deciding that was a bad thing." TR. 4/25/08 at 101:9-15. Unlike in Owens Corning, the Multi-Debtor Claim Protocol recognizes joint and several liability and provides for a mechanism to uphold those bargains that creditors made with the Debtors.

Given that the Plan is comprised of a number of interrelated compromises of various disputes, the Plan Proponents developed the various protocols as their best, good faith attempt to keep the playing field level and preserve creditors' respective rights as they existed with respect to each of the Debtors' separate estates, while recognizing and taking into account the fact that some of those rights or claims may be subject to challenge. The intention and result are the exact opposite of the supposedly unequal treatment that the Deferred Compensation Claimants complain of in their objections. They attempt to peel away one or two layers of the global set of multiple compromises contained in the Plan in the hope of convincing the Court that the Plan is somehow unfair or prejudicial to the NCFC class of creditors. The objectors fail to recognize that such layers cannot be examined in isolation because they depend on other layers of the global set of compromises whereby NCFC creditors are receiving significant benefits. For example, the Plan (a) provides that NCFC creditors share in the assets of the Rabbi Trust and in the Carrington Limited Partnership Interests even though there is substantial evidence that these may be TRS Holding assets; (b) allows at 50% the $345.2 million inter-company claim of parent NCFC[5] against subsidiary NCMC despite the strong case that could be made under the facts and the applicable law that NCFC's entire claim against NCMC should be recharacterized as capital;[6] and

---

[5] NCFC's $345.2 million intercompany claim against NCMC is listed in Ad Hoc Exhibit 8 at DIP000006.

[6] See Ms. Etlin's testimony at TR. 4/24/08 at 102:22-103:11, TR. 4/24/08 at 140:19-142:7 ("[intercompany accounts] were perpetually open" 141:2; no "promissory note" or "instrument evidencing the debt between the companies" 141:19-21; no evidence that "anyone within the entire debtor group of companies looked to see whether, as they managed the business and advanced money between various entities, there would be an ability to repay. 142:4-7"). See In re SubMicron Sys. Corp., 432 F.3d 448, 456-57 (3rd Cir. 2006) "[w]hich course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). [T]he determinative inquiry in classifying advances as debt or

(c) allocates only approximately 22% of the joint administrative expenses of these Chapter 11 cases to the Holding Company Debtors notwithstanding arguments that a substantially higher share should be allocated to NCFC. See, e.g., TR. 4/24/08 at 7:19-72:24; TR. 4/24/08 at 74:9-14; TR. 4/25/08 at 32:16-34:1. Although overlooked entirely by the Deferred Compensation Claimants, just the allowance of NCFC's intercompany claim at 50% is projected to result (under the High Case Liquidation Scenario) in the Holding Company creditors receiving over $15 million from the Operating Debtors. Ad Hoc Exhibit 10 at 4.

## II.  THE PLAN IS FAIR AND EQUITABLE WITH RESPECT TO CLASS HC3b.

During his closing argument, counsel for the Deferred Compensation Claimants did not question that the Plan satisfies the absolute priority rule incorporated in the fair and equitable standard of Bankruptcy Code §1129(b)(2)(B), for no class junior to class HC3b will receive any distribution. However, he argued that the "fair and equitable" standard is broader than the absolute priority rule and that the Plan fails to meet this general "fair and equitable" standard. TR. 4/25/08 at 155:12-25. He did not articulate exactly why the Plan supposedly fails the more generic "fair and equitable" standard. As a result, one must assume that this is simply a different articulation of his arguments concerning the supposed differential treatment given to different creditors within class HC3b, his arguments that the Plan arguably effects substantive consolidation in a fashion that the Third Circuit held was inappropriate in Owens Corning, or his argument that the terms of the Rabbi Trust prevent making those assets available for priority creditors or "deficiency" claims. If this is the case, these arguments have been dealt with in the Plan Proponents' opening briefs and closing argument, or are dealt with in other sections of this brief.

When courts have addressed aspects of "fair and equitable" other than the absolute priority rule, they typically have dealt with such matters as whether a class of creditors receives more than a 100% percent distribution or whether a plan inappropriately shifts risk to a senior class

---

equity is the intent of the parties as it existed at the time of the transaction.")

of creditors to the benefit of a junior class. See, e.g., 7 Collier on Bankruptcy ¶1129.04[4][a][ii] at 129-98 to 129-100, ¶1129.04[4][b][i][B] at 1129-103 to 1129-110 (15th Ed. Rev. 2007). Yet, the Plan has express safeguards to ensure that no creditor receives more than a 100% percent distribution and provides that the timing of distributions is simply keyed off the availability of cash and appropriate reserves established for disputed and unliquidated claims. Plan Article 9.A and 9.D.

If the Deferred Compensation Claimants are simply arguing that the Plan is not fair because they do not like certain aspects of the compromises built into the Plan, it is critical to remember that these compromises are an integrated whole and that many of them benefit class HC3b, as discussed above.

In contrast, it would be unfair and inequitable to allow a group of former senior managers of the Debtors to hold hostage a plan that has been overwhelmingly approved by the creditor body in order to obtain perceived leverage in their adversary proceeding, especially since, as they acknowledge, if they prevail in that litigation, the Plan will have no impact on them. It would be particularly unjust and inequitable to reward this approach given that the largest dollar claims held by the Deferred Compensation Claimants are asserted by former senior executives whose deferred bonus compensation was calculated based upon reported financial results for the Debtors that turned out to be inflated and needed to be restated. TR. 4/24/08 at 76:25-78:1.

III.  CONCLUSION.

The Plan Proponents dealt with the major issues raised by the Deferred Compensation Claimants in the prehearing brief that the Plan Proponents filed on April 22, 2008 [Docket No. 6395] and in closing argument made on April 25, 2008. This brief is simply designed to address a few limited issues that the Plan Proponents did not have an opportunity to address orally at the hearing on April 25, 2008.

The central point, reflected in the prehearing brief, this posthearing brief, in closing argument and in the evidentiary record, is that the Plan is a full and fair resolution of the very complex legal and factual issues that surrounded some of the largest and most difficult chapter 11 cases ever filed. The Plan satisfies the standards of the Bankruptcy Code, is overwhelming supported by the creditor body and should be confirmed.

Dated: May 7, 2008
       Wilmington, Delaware

Respectfully submitted,

/s/ Bonnie Glantz Fattel
BLANK, ROME LLP
Bonnie Glantz Fattell (No. 3809)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
(302) 425-6400 - Telephone
(302) 425-646 - Facsimile

- and -

Mark S. Indelicato
Mark T. Power
Janine M. Cerbone
Huria S. Naviwala
HAHN & HESSEN LLP
488 Madison Avenue, 15th Floor
New York, New York 10022
(212) 478-7200 - Telephone
(212) 478-7400 - Facsimile

Co-Counsel to the Official Committee of Unsecured Creditors of New Century TRS Holdings, Inc., et al.

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
P.O. Box 551
One Rodney Square
920 North King Street
Wilmington, DE 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

Suzzanne Uhland
Ben H. Logan
Andrew M. Parlen
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California 94111
(415) 984-8700

Attorneys for Debtors and Debtors In Possession