IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | :   **Chapter 11** |
| | : |
| **NEW CENTURY TRS HOLDINGS,** | :   **Case No. 07-10416(KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : |
| | :   **Jointly Administered** |
| **Debtors.** | : |
| | :   Re: Docket No. 6412 |
| | : |

### SUMMARY OF THE EVIDENTIARY RECORD THAT SUPPORTS CONFIRMATION OF THE PLAN OF LIQUIDATION

The above captioned debtors and debtors in possession (the "Debtors") and the Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan Proponents") hereby submit a summary of key portions of the evidentiary record that support confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Committee dated as of April 23, 2008 (the "Plan").[2]

At the conclusion of the confirmation hearing, the Court invited the parties to submit post-hearing pleadings in which they highlight, from the Plan Proponents' standpoint, those parts of the record that support confirmation of the Plan or, from the objectors' standpoint, those

---

[1]  The Debtors are the following entities:  New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited partnership, and New Century Warehouse Corporation, a California corporation.

[2]  Capitalized terms used herein without definition have the meanings set forth in the Plan.

parts of the record that militate against confirming the Plan. TR. 4/25/08 at 182:3-15.[3] The Court

indicated that it did not want proposed findings of fact and conclusions of law in narrative form.

TR. 4/25/08 at 185:20-24.

The Plan Proponents hereby submit the following specific references to the

evidentiary record, a record which they believe strongly supports confirmation of the Plan. To

enhance its usefulness, this pleading is organized by general topics.

## I.    EVIDENCE CONCERNING UNCERTAINTIES AS TO WHICH DEBTOR OWNS CERTAIN ASSETS.

### A.    The Carrington Investments.

New Century Financial Corporation was formed as a Delaware Corporation in 1995. On

October 1, 2004, New Century Financial Corporation reorganized into a Maryland Real Estate

Investment Trust ("REIT") for federal income tax purposes. Prior to this date, New Century TRS

Holdings, Inc., a Delaware Corporation ("TRS Holdings") was the ultimate parent of the Debtor

entities and was named "New Century Financial Corporation, a Delaware Corporation". New

Century REIT, Inc., a Maryland Corporation with REIT status ("NCFC") and its wholly-owned

subsidiary NC Merger Sub, Inc., were established in anticipation of the REIT conversion. In order

to effect the conversion, on October 1, 2004, NC Merger Sub was merged into TRS Holdings, with

TRS Holdings surviving as a wholly-owned subsidiary of NCFC. At the time of the merger,

NCFC's name was changed to "New Century Financial Corporation", and TRS Holdings became

"New Century TRS Holdings, Inc." Stipulated facts, TR. 4/25/08 at 55:14-57:3, modifying

declaration of Todd Brents [Docket No. 6396].

The Debtors' general ledger system identifies the legal entity now known as New Century

---

[3]  This pleading uses the convention of referring to the transcript from the confirmation hearing as "TR.", followed by the date and then the page and line numbers.

Financial Corporation, a Maryland REIT as "REIT." The general ledger identifies the entity now known as New Century TRS Holdings, Inc. as "NCFC", which is its former name. TR. 4/25/08 at 57:22-58:18.

In the course of developing the Plan, members of the Committee raised questions about which Debtor owned various types of assets, including the Rabbi Trust, the Carrington Interests, the tax refunds and certain servicing rights that had been sold to Carrington. TR. 4/24/08 at 195:24-196:8.

There is ambiguity as to which of NCFC and TRS Holdings owns the Carrington Interests. Prior to October 2004, the ultimate parent corporation was known as New Century Financial Corporation, but is now known as TRS Holdings. The legal documentation was unclear after the REIT conversion as to what entity owned certain assets. The accounting documentation was also sometimes clear and sometimes not. TR. 4/24/08 at 83:22-84:15.

Contracts involving New Century Financial Corporation created ambiguities concerning ownership of the Carrington Interests. TR. 4/25/08 at 24:12-23.

The Carrington Interest is actually two different interests – a general partner interest and a limited partner interest. The accounting for both interests always remained with TRS Holdings. The legal documentation "was all over the place as to who the ultimate owner of these interests and controller of these interests was." Some of the documentation indicated that TRS Holdings was the owner, while other documentation indicated that NCFC was the owner, while other documentation indicated that NCMC was the owner. TR. 4/24/08 at 84:16-85:2.

Between the Carrington general partnership interest and the limited partnership interest, the

limited partnership interest in the fund is by far the more valuable. Of the $45-50 million of value reported in the Debtors' books and records for the Carrington interest, the bulk of that value relates to the limited partnership interest. TR. 4/24/08 at 130:13-132:8.

The Debtors' books value the Carrington Interest at approximately $49.5 million. That is split between the LP and the GP interest as follows: (i) $42 million for the LP interest and (ii) approximately $8 million for the GP investment. TR. 4/25/08 at 60:3-19.

The entity now known as TRS Holdings signed the limited liability company agreement of Carrington Capital Management, LLC, which is the GP interest, in February 2004. TR. 4/24/08 at 86:21-87:13; Ad Hoc Exhibit 1.

Ad Hoc Exhibit 2 is a December 1, 2004 agreement between Carrington Investment Partners (US), LP and New Century TRS Holdings, Inc. It identifies the Debtor entity as "New Century TRS Holdings, Inc., a Delaware Corporation formerly known as 'New Century Financial Corporation.'" Ad Hoc Exhibit 2 at DIP 003500. It covers the limited partnership investment in the Carrington fund, which was an initial investment of $29.5 million. TR. 4/24/08 at 88:1-22, 132:9-133:14. This document post-dates the REIT conversion. Stipulated Facts, TR. 4/25/08 at 55:14-57:3.

Ad Hoc Exhibit 2 is an unsigned copy of an agreement dated December 1, 2004 between Carrington Investment Partners (US), LP and New Century TRS Holdings, Inc. TR. 4/24/08 at 88:1-22. This post-dates the REIT conversion. Stipulated Facts, TR. 4/25/08 at 55:14-57:3.

Ad Hoc Exhibit 3 is dated March 31, 2006. It includes both an amendment and restatement of the general partnership agreement and the limited partnership agreement. The amended and

restated general partnership agreement included in Ad Hoc Exhibit 3 is executed by NCFC, which probably is NCFC, the Maryland REIT, although it does not indicate NCFC's state of incorporation and the officer executing on behalf of NCFC was the executive vice president of both NCFC and TRS Holdings at the time. TR. 4/24/08 at 89:3-90:21.

Ad Hoc Exhibit 3 includes an amended and restated version of the Carrington limited partnership interest dated as of March 31, 2006. The exhibit produced at trial does not indicate what New Century entity executed it. The signature pages are offsite on file with Carrington. TR. 4/24/08 at 90:22-91:22.

There is no way of telling what New Century entity executed the amended and restated Carrington limited partnership agreement in March 2006. TR. 4/24/08 at 91:23-92:14.

Some of the legal documents suggest a transfer of the Carrington general partner interest from TRS Holdings to NCFC, the Maryland REIT. However, the Debtors have been unable to locate any legal documents that reflect a transfer of the limited partnership interest in the Carrington fund from TRS Holdings to New Century Financial Corporation, the Maryland REIT. The Debtors have looked "high and low" for any such documents and have been unable to locate any. TR. 4/24/08 at 133:19-134:11. Thus, all documentary evidence points to the conclusion that TRS Holdings still owns the limited partnership interest.

Ad Hoc Exhibit 1 is the Limited Liability Company Agreement of Carrington Capital Management. It was executed on February 12, 2004. New Century Financial Corporation is a party to this agreement. New Century Financial Corporation's state of incorporation is not indicated on the agreement. TR. 4/25/08 at 60:20-61:9.

Ad Hoc Exhibit 3 includes the First Amended and Restated Limited Liability Company Agreement of Carrington Capital Management, LLC. The Debtor party to that agreement is identified as New Century Financial Corporation. The state of incorporation of this entity is not shown. The date of this document is July 11, 2006. TR. 4/25/08 at 61:10-25.

Ad Hoc Exhibit 2 is a contribution and transfer agreement between Carrington Investment Partners (US), LP and New Century TRS Holdings, Inc. New Century TRS Holdings, Inc. is identified as a Delaware Corporation. The exhibit is not signed. Mr. Brents attempted to locate a signed copy in the Company's books and records but was unable to locate one. TR. 4/25/08 at 62:1-23.

The pleading Carrington filed in these cases concerning the Plan is confusing as to which Debtor entity Carrington believes owns the Carrington Investments. It refers to NCFC holding these interests, but also inconsistently refers to NCFC acquiring the interests in 2004, whereas, in fact, the interests acquired in 2004 were acquired by what is now known as TRS Holdings. TR. 4/24/08 at 95:20-97:1; Ad Hoc Exhibit 5.

The income stream being realized by the Debtors on account of the limited partnership interest in Carrington is presently being realized by NCFC, the Maryland REIT. 4/24/08 TR. at 97:22-98:8.

The Debtors' books and records indicate that the Carrington Interests are owned by TRS Holdings. TR. 4/25/08 at 40:8-13.

The Debtors' books and records reflect that the Carrington Interest, including the limited partnership interest, is held by TRS Holdings. 4/24/08 TR. at 135:2-11.

An extract of the Debtors' general ledger review by Mr. Brents indicated that the Carrington Investments, both the GP and LP investments, are owned by TRS Holdings. TR. 4/25/08 at 65:2-19.

In March 2008, the Debtors, assisted by AlixPartners, amended their Schedules of Assets and Liabilities. In the course of doing so, they adjusted the intercompany accounts to reflect uncertainties with respect to the ownership of the Carrington Interests and the Rabbi Trust. These adjustments were made to the intercompany accounts receivable and payable. However, Schedule B still lists the Rabbi Trust as being owned by NCFC and the Carrington Interests as being owned by TRS Holdings. TR. 4/25/08 at 76:1-79:3.

NCMC advanced the money that TRS Holdings used to buy the original limited partnership interest in the Carrington fund. TR. 4/24/08 at 135:23-136:4.

In negotiating the Plan, the Committee raised the issue about what entity funded the investment in Carrington. TR. 4/24/08 at 136:9-17.

In the Plan negotiations, there was an argument that since NCMC is the entity that funded the Carrington investment, NCMC should be entitled to that asset. TR. 4/24/08 at 137:3-12.

When the Committee analyzed which Debtor held various assets, it saw that the Carrington Investment, both the GP and the LP interests, was booked as an asset of TRS Holdings. Since TRS Holdings was not an operating company that generated cash flows, the Committee investigated the source of the funds that were used to purchase this investment and learned that the funds came from NCMC. TR. 4/28/08 at 182:16-183:7.

Litigating over whether NCFC or TRS Holdings owns the Carrington limited partnership or

general partnership interest would have been expensive. Negotiations with Carrington were always complex and subject to strenuous confidentiality requirements. Litigating this issue would have caused quite a dispute with Carrington. Moreover, everything in these Chapter 11 cases draws at least half a dozen lawyers and would have been expensive to litigate. TR. 4/24/08 at 94:15-95:17.

If it were determined that the Carrington Interests properly belonged to TRS Holdings, that would benefit creditors at TRS Holdings, which totaled $15 million in claims, plus creditors of NCMC, given that it has a substantial intercompany claim against TRS Holdings. TR. 4/25/08 at 36:10-22.

If one assumes that the Carrington Interests was properly owned by TRS Holdings, the Plan benefits the creditors of NCFC. TR. 4/25/08 at 36:23-37:3.

No member of the Committee has a claim against TRS Holdings. 4/25/08 TR. at 34:10-12.

The controversy over whether old NCFC or new NCFC owned the Rabbi Trust assets and Carrington Interests, at least in part, contributed to the decision to pool assets of these entities for purposes of distributions under the Plan. TR. 4/24/08 at 109:18-110:3.

### B.    The Rabbi Trust

New Century Financial Corporation was formed as a Delaware Corporation in 1995. On October 1, 2004, New Century Financial Corporation reorganized into a Maryland Real Estate Investment Trust ("REIT") for federal income tax purposes. Prior to this date, New Century TRS Holdings, Inc., a Delaware Corporation ("TRS Holdings") was the ultimate parent of the Debtor entities and was named "New Century Financial Corporation, a Delaware Corporation". New

Century REIT, Inc., a Maryland Corporation with REIT status ("NCFC") and its wholly-owned subsidiary NC Merger Sub, Inc., were established in anticipation of the REIT conversion. In order to effect the conversion, on October 1, 2004, NC Merger Sub was merged into TRS Holdings, with TRS Holdings surviving as a wholly-owned subsidiary of NCFC. At the time of the merger, NCFC's name was changed to "New Century Financial Corporation", and TRS Holdings became "New Century TRS Holdings, Inc." Stipulated facts, TR. 4/25/08 at 55:14-57:3, modifying declaration of Todd Brents [Docket No. 6396].

The Debtors' general ledger system identifies the legal entity now known as New Century Financial Corporation, a Maryland REIT as "REIT." The general ledger identifies the entity now known as New Century TRS Holdings, Inc. as "NCFC", which is its former name. TR. 4/25/08 at 57:22-58:18.

In the course of developing the Plan, members of the Committee raised questions about which Debtor owned various types of assets, including the Rabbi Trust, the Carrington Interests, the tax refunds and certain servicing rights that had been sold to Carrington. TR. 4/24/08 at 195:24-196:8.

The New Century Financial Corporation Supplemental Benefit and Deferred Compensation Trust Agreement entered into as of January 1999 was executed by New Century Financial Corporation, the Delaware entity, which is today known as TRS Holdings. TR. 4/24/08 at 104:9-105:2; Ad Hoc Exhibit 7.

Ad Hoc Exhibit 7 is the trust agreement associated with the Rabbi Trust. The parties to it are New Century Financial Corporation and Wells Fargo Bank, N.A. It is dated January 1999. The state of incorporation of New Century Financial Corporation is Delaware. TR. 4/25/08 at

65:20-66:12.    It indicates that the Rabbi Trust was owned by the entity now known as TRS Holdings. TR. 4/25/08 at 66:13-18.

Ad Hoc Exhibit 11, the Agreement of Plan and Merger dated as of April 21, 2004, was shown to Ms. Etlin. She had never seen it before and is not a lawyer. There are passages in this document that refer to amending the deferred compensation plan but no specific references to amending the trust. Ms. Etlin does not know if the plan and the trust were amended through this document. TR. 4/24/08 at 154:18-155:11.

The money held in the Rabbi Trust was funded by NCMC. TR. 4/24/08 at 137:13-22.

When a beneficiary of the deferred compensation plan left the employ of the Debtors, NCMC paid the deferred compensation to which that former employee was entitled. Thus, the original funding of contributions to the Rabbi Trust originated from NCMC and NCMC funded deferred compensation payments to employees when they left the employ of the Debtors. This gave rights to NCMC to be reimbursed out of the Rabbi Trust and this happened periodically prior to the filing of the bankruptcy petitions. TR. 4/24/08 at 137:23-138:23.

When NCMC paid the deferred compensation owed to withdrawing employees, the chain of inter-company accounts consisted of an account payable owed by NCFC to NCMC and a payable owed by the Rabbi Trust to NCFC. 4/24/08 TR. at 165:2-166:4.

The Committee was concerned about how to allocate ownership of the Rabbi Trust given ambiguities in the documents and the fact that this trust was funded by NCMC. This funding gave rise to an argument that NCMC (an Operating Debtor) should be allocated the Rabbi Trust assets. TR. 4/25/08 at 24:24-25:11.

LA3:1147417 3
RLF1-3281155-1

Exhibit D–1 is the complaint filed by the putative class of deferred compensation beneficiaries in their Adversary Proceeding. It asserts that the action was brought against New Century Holdings, Inc., among others. New Century Holdings, Inc. does not exist. TR. 4/24/08 at 156:3-157:4, Exhibit D-1.

The adversary complaint filed by the deferred compensation beneficiaries sought a remedy whereby the Court would declare that the assets in the Rabbi Trust were available only for creditors of New Century Financial Corporation, defined in such a fashion that it referred to New Century Financial Corporation as it existed on January 1, 1999 – i.e., TRS Holdings. 4/28/08 TR. at 168:16-169:7; Exhibit D–1.

The extraction from the general ledger reviewed by Mr. Brents indicated that the Rabbi Trust is owned by TRS Holdings. 4/25/08 TR. at 66:13-18.

In March 2008, the Debtors, assisted by AlixPartners, amended their Schedules of Assets and Liabilities. In the course of doing so, they adjusted the intercompany accounts to reflect uncertainties with respect to the ownership of the Carrington Interests and the Rabbi Trust. These adjustments were made to the intercompany accounts receivable and payable. However, Schedule B still lists the Rabbi Trust as being owned by NCFC and the Carrington Interests as being owned by TRS Holdings. TR. 4/25/08 at 76:1-79:3.

If the Rabbi Trust were determined to be owned by TRS Holdings, that would benefit the creditors (approximately $15 million in amount) with claims against TRS Holdings and NCMC by virtue of its intercompany claim against TRS Holdings. TR. 4/25/08 at 37:14-17.

No member of the Committee has claims against TRS Holdings. 4/25/08 TR. at 34:10-12.

11

The controversy over whether old NCFC or new NCFC owned the Rabbi Trust assets and Carrington Interests, at least in part, contributed to the decision to pool the assets of these entities for purposes of distributions under the Plan. TR. 4/24/08 at 109:18-110:3.

### C.    Intercompany Claims of NCMC Against TRS Holdings that would Provide a Basis for Creditors of NCMC to Seek to Avoid any Transfer of the Carrington Investments or the Rabbi Trust if TRS Holdings Transferred these Assets to NCFC.

As of April 2, 2007, NCMC had a net receivable on its books owed by TRS Holdings in the amount of $240.6 million. This net account receivable includes $22 million transferred by NCMC to TRS Holdings to fund TRS Holding's acquisition of the Carrington Interests. Stipulated Facts, TR. 4/25/08 at 74:16-20, incorporating by reference ¶ 31 of Declaration of Todd Brents [Docket No. 6396].

### D.    Litigation Proceeds.

Which Debtor entities, and therefore which creditors, should receive the benefit of Litigation Proceeds was the topic of great debate within the Committee. People expressed alternative views as to where the Litigation Proceeds should be allocated. Some of the factors that were considered were (i) the public financial statements issued by the Debtors were issued by the parent company, NCFC, and (ii) NCMC and NC Capital issued their own financial statements and the major accounting issues that related to the financial restatement arise in the financials of these two Operating Debtors, including reserves for loans to be repurchased and the value of the loans that the Debtors had repurchased. The restatement largely affected the financial statements of NC Capital and its immediate parent, NCMC. TR. 4/24/08 at 71:25-72:14.

The Debtors' Statement of Financial Affairs indicate that the separate financial statements for NCMC and NC Capital were distributed to the state regulatory authorities, MRA counterparties

and whole loan purchasers.  TR. 4/25/08 at 68:25-69:12.

Separate financial statements were generated for each of the Debtors and were delivered to their major creditors, including both audited annual financial statements and unaudited quarterly statements.  Disputes over which estates could assert the right to various cause of action related to the financial restatement could undermine the value of those causes of action.  Etlin Declaration ¶ 23 (Docket No. 6407], as admitted into evidence, TR. 4/25/2008 at 5-8.

In developing the Plan, the Committee considered which Debtor entity should appropriately be allocated the Litigation Proceeds.  Different Committee members had very different views on this issue and it was among the last issues compromised in developing the Plan. The final resolution was to allocate 45% of the net proceeds of litigation claims to the EPD and Breach creditors with claims against NC Capital, 27.5% to the Holding Company Debtors and 27.5% to the Operating Company Debtors, excluding NC Capital's EPD and Breach claimants. TR. 4/24/08 at 202:14-204:10.

If Litigation Proceeds were deemed to be assets of NCMC, that would benefit creditors of NCMC and any entities that had intercompany claims against NCMC.  In the Plan, Litigation Proceeds are shared among the various entities so that all creditors benefit to a varying degree. TR. 4/25/08 at 37:23-38:17.

### E.    Tax Refunds.

The Committee analyzed which Debtor owned the Debtors' tax refunds.  Ultimately, the Committee decided to support a Plan that attributed these tax refunds to NCMC based on the Debtors' accounting, which Debtor paid the taxes, which Debtor generated the losses that were carried back and other facts and circumstances that drove the tax refunds.  TR. 4/24/08 at 200:16-

202:13.

The Committee disagreed with the Debtors that the Tax Refunds should clearly be allocated to NCMC. The Committee ultimately supported that position, but initially had doubts. TR. 4/25/08 at 25:16-26:2.

## II. EVIDENCE CONCERNING INTERCOMPANY CLAIMS AND HOW THEY ARE DEALT WITH IN THE PLAN.

Various members of the Committee asked FTI to investigate whether the intercompany claims of the Debtors against each other should be allowed as capital or debt. They also asked FTI to analyze the impact on a plan if these claims were allowed or disallowed. FTI ran various scenarios with different assumptions with respect to the intercompany balances and whether they should be allowed in full, disallowed or allowed at various amounts, such as 50% of what was shown on the books. TR. 4/24/08 TR. at 190:19-192:3.

FTI prepared analyses of various scenarios concerning intercompany claims and provided them to members of the Committee. This helped form the basis for the compromises set forth in the Plan concerning the treatment of intercompany accounts. TR. 4/24/08 at 192:4-18.

Intercompany claims are dealt with in the Plan partly through Determined Distribution Amounts. For example, in light of the potential for intercompany claims between NC Capital and NCMC, EPD/Breach Claims against NC Capital get a Determined Distribution Amount equal to 50% of the allowed claim. The intercompany claims within a group of Debtors themselves are zeroed, but the Plan adjusts distributions to creditors with claims against a particular Debtor to reflect such factors as the strength of intercompany claims. The example given above reflects intercompany claims between two Operating Debtors. This is the type of approach that was used

in the Winn-Dixie bankruptcy and is an effective way of settling very complex inter-creditor and intercompany claims. If the analysis were done on an unconsolidated Debtor-by-Debtor basis, the intercompany claims will lead to very circular transfers among Debtors. The alternative is to zero out the intercompany claims and then to attempt to deal with the potential merits of intercompany claims by inflating or deflating the claims of creditors of those entities for distribution purposes. Tr. 4/24/08 at 119:14-120:23.

The Determined Distribution Amount percentages used in the Plan are closely integrated with the analysis of intercompany claims. For example, as between NC Capital and NCMC, the intercompany claims are zeroed out for distribution purposes, but creditors with claims against NC Capital receive a 50% Determined Distribution Amount in order to take into account the potential intercompany claims. This approach is an efficient and effective means of dealing with such issues and lowers the costs of administration. TR. 4/24/08 at 121:14-122:15.

The Determined Distribution Amounts set forth in the Plan take into account such factors as joint and several claims against multiple Debtors and intercompany claims that might shift values between various Debtor entities. TR. 4/24/08 at 125:25-127:3.

NCMC was the Debtor entity that originated most loans. NC Capital Corporation, however, sold most of the loans in the secondary market. Several Committee members, including Deutsche Bank National Trust, C-Bass and RFC, raised the issue as to whether they should have claims against NCMC with respect to their purchases of loans from NC Capital. They asserted that the loans that they purchased from NC Capital had certain backing representations and warranties issued by NCMC to NC Capital. TR. 4/24/08 at 206:18-208:14.

The Plan utilizes Determined Distribution Amounts to settle very complex inter-company

and intercreditor issues. For example, the EPD/Breach claimants with claims against NC Capital are afforded a 50% Determined Distribution Amount with respect to the pooled assets of the Operating Debtors in recognition of the potential intercompany claims of NC Capital against NCMC. This is the technique used in the Winn-Dixie plan and is incorporated in the Plan here. This approach zeroes out the intercompany claims but deals with the potential merits of intercompany claims by inflating or deflating the distributions for the affected creditors. TR. 4/24/08 at 119:14-120:23.

The Determined Distribution Amounts and the merits of intercompany claims are integrated. The intercompany claims between Debtors, for example, are assigned a Determined Distribution Amount of zero, but the creditors of different Debtors received distributions based upon differing Determined Distribution Amounts. For example, the intercompany claim issue between NC Capital and NCMC is dealt with for purposes of distribution by giving a Determined Distribution Amount of 50% to the parties with claims against NC Capital in recognition of the fact that zeroing out the intercompany claim otherwise would not deal with this issue. This is an effective and low cost form of administration of dealing with intercompany issues. TR. 4/24/08 at 118:24-122:15.

The Determined Distribution Amounts used in the Plan take into account such matters as the fact that some creditors have joint and several claims against multiple Debtors and the fact that intercompany claims among Debtors shift values between the various Debtor entities. TR. 4/24/08 at 125:25-127:3.

The Plan provides that Holding Company Debtors will receive a distribution based on 50% of the amount of the intercompany claims the Holding Company Debtors have against the

Operating Debtors, notwithstanding the assertions by NCMC's creditors that these claims should be recharacterized as equity. Etlin Declaration ¶ 24 [Docket No. 6407], as admitted into evidence, TR. 4/25/2008 at 5-8.

There are substantial issues as to whether the intercompany debt owed by NCMC to NCFC was debt or a contribution of capital. This issue was raised by the Committee and by other creditors. TR. 4/24/08 at 102:22-103:11.

Ms. Etlin asked counsel to analyze whether the intercompany debt owed by NCMC to NCFC was debt or equity under the applicable legal standards. Counsel concluded that there was no definitive legal answer. TR. 4/24/08 at 103:19-104:4.

The Committee analyzed whether a $360 million claim asserted by NCFC against NCMC was a proper debt obligation or some type of equity contribution. TR. 4/25/08 at 38:18-39:24.

Maguire was a member of the Committee and had claims only against NCFC. The Intercompany Claim Protocol used in the Plan benefited Maguire by allowing the intercompany claims of the Holding Company Debtors against the Operating Debtors at 50%. TR. 4/25/08 at 21:3-19.

It benefited the Holding Company creditors, including the deferred compensation claimants, to allow the intercompany claims of the Holding Company Debtors against the Operating Debtors at 50%, as compared to the argument that all of these claims should be deemed to be capital contributions. TR. 4/25/08 at 33:4:-34:1.

The intercompany claim of NCFC against NCMC was a perpetual account. It was always open. Whenever any money passed from NCFC into any other of the entities, it was recorded.

LA3:1147417 3
RLF1-3281155-1

From time to time there would be transactions in which money would go the other way and that would be independently recorded and netted. There were thousands of such transactions on a monthly basis involving multiple millions of dollars. TR. 4/24/08 at 140:19-141:18.

The intercompany accounts among the Debtors are not evidenced by promissory notes or instruments. TR. 4/24/08 at 141:19-21.

In deciding whether to make intercompany advances, no one within the Debtors looked to see whether the receiving Debtor would have the ability to repay the advance. TR. 4/24/08 at 141:22-142:7.

The Debtor's books and records reflect approximately 2,390 transactions between NCFC and NCMC. On April 2, 2007, the books and records reflect that NCFC had a net intercompany receivable owed by NCMC in the amount of $345.3 million. After adjustment for the Carrington Interest, this intercompany account receivable owed to NCFC by NCMC equals $320.1 million. These transactions consist primarily of approximately $786 million of cash sent by NCFC to NCMC, offset by approximately $415 million in cash sent by NCMC to NCFC. Also included in this balance are charges for intercompany interest on certain balances and expenses paid for on behalf of NCFC. Stipulated fact, TR. 4/25/08 at 74:16-20, incorporating by reference ¶ 29 of Declaration of Todd Brents [Docket No. 6396].

As of April 2, 2007, NC Credit had a net receivable on its books owed by NCMC in the amount of $16.9 million. The net receivable primarily is a result of approximately $34 million in MRA guaranty fees charged to NCMC for the parent guaranty (which guaranty was actually made by NCFC), approximately $25 million in interest income owed to NC Credit for income earned on loans owned by NC Credit but for which the cash was received by NCMC, and approximately

$43 million owed by NC Credit to NCMC for loans purchased by NC Credit. Stipulated fact, TR. 4/25/08 at 74:16-20, incorporating by reference ¶ 30 of Declaration of Todd Brents [Docket No. 6396].

As of April 2, 2007, NCMC had a net receivable on its books owed by TRS Holdings in the amount of $240.6 million. This net account receivable includes $22 million transferred by NCMC to TRS Holdings to fund TRS Holding's acquisition of the Carrington Interests. While the intercompany balance between the two entities consisted of over 29,000 transactions from 1997 to April, 2, 2007, the net receivable balance primarily consists of $163 million sent by NCMC to TRS Holdings to fund  a 2004 convertible debt redemption, $182 million sent by NCMC to TRS Holdings to fund stock purchases and options, $22 million sent by NCMC to TRS Holdings to fund the investment in the Carrington interest, $8 million sent by NCMC to TRS Holdings to fund stock dividends and $57 million in payment by NCMC of operating expenses on behalf of TRS Holdings and NCFC. These amounts are offset by cash provided to NCMC of approximately $144 million and the recording of income tax expense of $38 million by NCMC with a corresponding liability to TRS Holdings. The cash payment of $163 million to TRS Holdings by NCMC related to approximately $200 million raised by TRS Holdings through convertible debt, the proceeds of which were distributed by TRS Holdings to  NCMC. Upon the conversion of this debt, NCMC sent cash of approximately $400 million to TRS Holdings to fund the payoff of these bonds, which had appreciated in value. The payment also included a $36 million account adjustment related to non-cash expense recorded as part of the conversion that was charged to NCMC. Interest was accrued on the intercompany balance between NCMC and TRS Holdings. Stipulated Facts, TR. 4/25/08 at 74:16-20, incorporating by reference ¶ 31 of Declaration of Todd Brents [Docket No. 6396].

The Debtors' books and records reflect that NCMC has a net receivable owed by NC Residual IV in the amount of $81.3 million. Stipulated fact, TR. 4/25/08 at 74:16-20, incorporating by reference ¶ 32 of Declaration of Todd Brents [Docket No. 6396].

As of April 2, 2007, NC Credit had a net receivable on its books owed by NCFC in the amount of $67.3 million. Stipulated fact, TR. 4/25/08 at 74:16-20, incorporating by reference ¶ 33 of Declaration of Todd Brents [Docket No. 6396].

As of April 2, 2007, NC Residual IV had a net receivable on its books owed by NCFC (a sister Holding Company Debtor) in the amount of $419.1 million. Stipulated fact, TR. 4/25/08 at 74:16-20, incorporating by reference Declaration of Todd Brents ¶ 34 [Docket No. 6396].

As of April 2, 2007, NC Residual III had a net receivable owed by NCMC in the amount of $174.8 million. Stipulated fact, TR. 4/25/08 at 74:16-20, incorporating by reference ¶ 35 of Declaration of Todd Brents [Docket No. 6396].

The Debtors' current Schedules of Assets and Liabilities indicate that as of the petition date, NCFC had an account receivable owed by NCMC of approximately $345 million. TR. 4/25/98 at 70:17-71:6.

The Debtors' Schedules show that NC Credit has a net receivable owed by NCMC of $16.9 million. 4/25/08 TR. at 72:22-73:4.

The intercompany claim of NCMC (an Operating Debtor) had against NC Residual IV Corporation (a Holding Company Debtor) was taken into account in the Plan by allocating to the Operating Debtors, NC Residual IV's assertion that it was entitled to a portion of the servicing rights sold to Carrington. The only claim against NC Residual IV was intercompany claim it owed

to NCMC. That, plus the fact that some of the servicing rights were allocated to NC Residual IV for some tax planning reasons, led the Plan Proponents to allocate the servicing rights (and the sale proceeds of such rights) to the Operating Debtors. TR. 4/25/08 at 23:8-24:6.

The Debtors and Alix Partners engaged in an exercise to amend the Schedules to reflect updates to the intercompany accounts. The current Schedules, after these adjustments, show that NCFC has an account receivable owed by NCMC of approximately $245 million. This is comprised of cash transfers from NCFC to NCMC of approximately $786 million reduced by cash transfers back the other direction from NCMC to NCFC of approximately $415 million. In addition, the intercompany accounts reflect some operating expenses paid by NCMC on behalf of NCFC as well as interest on certain of these balances. The overall net was $345 million. After an adjustment is made for the Carrington Investment of approximately $20 million, the net is reduced to approximately $320 million. Ad Hoc Ex. 8 at DIP000006; TR. 4/25/08 at 71:7-72:21.

## III.    EVIDENCE CONCERNING THE MULTI-DEBTOR CLAIM PROTOCOL, INCLUDING WHETHER OR NOT IT PROVIDES FOR DISPARATE TREATMENT FOR CREDITORS WITHIN CLASS HC3b.

The Plan provides for the same treatment of all claims or interests placed in a Class. Etlin Declaration ¶ 11 [Docket No. 6407], as admitted into evidence, TR. 4/25/2008 at 5-8.

Separate Classes are established in the Plan for each of the Debtors, including separate Classes for each of the Holding Company Debtors – NCFC, TRS Holdings, NC Credit, and NC Residual IV. Classes HC1 through HC4 are for claims against and interests in NCFC. Classes HC5 through HC7 are for claims against TRS Holdings. Classes HC8 through HC10 are for claims against NC Credit. Classes HC11 through HC13 are for claims against NC Residual IV. Etlin Declaration ¶ 9 [Docket No. 6407], introduced into evidence TR. 4/25/08 TR. at 5-8.

Separate Classes were established for each one of the Debtors on an individual basis. TR. 4/24/08 at 64:12-16.

The Multi-Debtor Claim Protocol is designed to reduce the expense of administering claims resolution and to take into account the legal rights of creditors holding guarantees, or other valid joint and several contractual arrangements with the Debtors. In order to take into account the argument that they were entitled to receive a distribution based on their claim against each jointly and severally obligated Debtor, such creditors' Determined Distribution Amounts were inflated to 130% to take into account the fact that they had claims against multiple Debtor entities. A similar technique was used in the Winn-Dixie case. TR. 4/24/08 at 122:19-123:21, TR. 4/25/08 at 45:2-12.

It is not correct to assert that the Multi-Debtor Claim Protocol results in an enhanced recovery against any particular Debtor. Rather, in order to get the benefit of the Multi-Debtor Claim Protocol, a creditor had to have valid claims against multiple Debtors. TR. 4/24/08 at 123:22-124:10.

In order to qualify for the benefits of the Multi-Debtor Claim Protocol, a creditor has to have filed individual claims against "individual silos of assets" and must have valid individual claims against multiple Debtors. The Multi-Debtor Claim Protocol basically takes "valid claims against multiple Debtors and assigns, as a result of those valid claims, a deemed distribution amount which inflates the value of the basic single claim, which is filed against the multiple Debtors." Rather than having a situation in which assets flow into specific entities and then taking into account intercompany values and circling the cash around, the Multi-Debtor Claim Protocol takes into account creditors' potential legal rights against all the various Debtors, plus the intercompany claims that might shift the values between the various Debtor entities and then

comes up with a single Determined Distribution Amount which takes all this into account, including the legal nature of multiple claims. TR. 4/24/08 at 125:25-127:3.

The Multi-Debtor Claim Protocol was designed to reflect the fact that certain creditors, including MRA claimants, had claims against multiple Debtors. TR. 4/25/08 at 19:22-20:4.

The Debtors' Schedules indicate that NC Credit has a net receivable owed by NCMC of $16.9 million. TR. 4/25/08 at 72:22-73:4, Stipulated fact, TR. 4/25/08 at 74:16-21, incorporating by reference ¶ 30 of Declaration of Todd Brents [Docket No. 6396].

NC Credit had a net receivable on its books owed by NCFC in the amount of $67.3 million. Stipulated fact, TR. 4/25/08 at 74:16-20, incorporating by reference ¶ 33 of Declaration of Todd Brents [Docket No. 6396]; Ad Hoc Ex. 8 at DIP000006.

NC Credit had cash of $1 million on the petition date. Ad Hoc Exhibit 10 at 2.

## IV.    EVIDENCE CONCERNING THE EPD/BREACH CLAIM PROTOCOL.

The EPD/Breach Claim Protocol offers a streamlined means of resolving the most substantial clams against the estates. Its development is the product of substantial work by the Plan Proponents and the major EPD/Breach claimants. Etlin Declaration ¶ 22 [Docket No. 6407], as admitted into evidence, TR. 4/25/2008 at 5-8.

The EPD/Breach Claim Protocol is interrelated with other Plan compromises. For example, disputes over whether or not the EPD/Breach Claim Protocol generated dollar calculations that were perceived as too high or too low were resolved in connection with the compromise on the allocation of Litigation Proceeds among the EPD/Breach claimants and other Classes of creditors. Etlin Declaration ¶ 22 [Docket No. 6407], as admitted into evidence, TR. 4/25/008 at 5-8.

The EPD/Breach Claim Protocol avoids spending a substantial part of the cash that otherwise would be available to creditors in years of litigating the validity and amount of breach and EPD claims involving hundreds of thousands of loans with principal balances exceeding $200 billion. The risk that Creditor recoveries would be substantially reduced by such litigation and distributions delayed by years was one of Ms. Etlin's greatest concerns prior to the development of the EPD/Breach Claim Protocol. Etlin Declaration ¶ 22 [Docket No. 6407], as admitted into evidence. TR. 4/25/2008 at 5-8.

The Debtors estimate that the EPD/Breach Claim Protocol will save $8,525,000 in professional fees alone. Etlin Declaration ¶ 26 [Docket No. 6407], as admitted into evidence. 4/25/2008, TR. at 5-8.

The EPD/Breach Claim Protocol used in the Plan directly affects four of the seven members of the Committee. This protocol was not embraced initially. Rather, it engendered a lot of discussion and the Committee members did their own calculations of their interpretation of protocol. The Committee members directly affected by the EPD/Breach Claim Protocol ultimately supported the protocol but in return for concessions concerning the allocation of Litigation Proceeds. TR. 4/24/08 at 210:15-211:21.

## V.    **EVIDENCE REGARDING DETERMINED DISTRIBUTION AMOUNTS.**

The Plan utilizes Determined Distribution Amounts to settle very complex inter-company and intercreditor issues. For example, the EPD/Breach claimants with claims against NC Capital are afforded a 50% Determined Distribution Amount with respect to the pooled assets of the Operating Debtors in recognition of the potential intercompany claims of NC Capital against NCMC. This is the technique used in the Winn-Dixie plan and is incorporated in the Plan here.

This approach zeroes out the intercompany claims but deals with the potential merits of the intercompany claims by inflating or deflating the distributions for the affected creditors. TR. 4/24/08 at 119:14-120:23.

The Determined Distribution Amounts and the merits of intercompany claims are integrated. The intercompany claims between Debtors, for example, are assigned a Determined Distribution Amount of zero, but the creditors of different Debtors received distributions based upon differing Determined Distribution Amounts. For example, the intercompany claim issue between NC Capital and NCMC is dealt with for purposes of distribution by giving a Determined Distribution Amount of 50% to the parties with claims against NC Capital in recognition of the fact that zeroing out the intercompany claim otherwise would not deal with this issue. This is an effective and low cost form of administration of dealing with intercompany issues. TR. 4/24/08 at 118:24-122:15.

The Determined Distribution Amounts used in the Plan take into account such matters as the fact that some creditors have joint and several claims against multiple Debtors and intercompany claims among Debtors shift values between the various Debtor entities. TR. 4/24/08 at 125:25-127:3.

In negotiating the terms of the Plan, the analysis used by members of the Committee consistently began with a full deconsolidation model as a "benchmark." TR. 4/25/08 at 34:10-37:12.

The Plan Proponents did not develop the notion of combining the Debtors into three primary distribution groups and then seek to negotiate distribution amounts. Rather, negotiations over such matters as joint and several liability of multiple Debtors for certain claims, intercompany

claims, uncertainty as to the allocation of assets, and uncertainty regarding allocation of administrative costs, led to the combination of the Debtors into three groups and the development of inflators and deflators used in the Determined Distribution Amounts. These negotiations were used to settle very complex intercompany claims in a way that minimizes the administrative costs and thereby results in the maximum possible distributions to creditors. TR. 4/24/08 at 127:15-128:18.

## VI.   EVIDENCE CONCERNING THE JOINT ADMINISTRATIVE EXPENSE SHARE SET FORTH IN THE PLAN.

Creditors of the estates other than NCFC asserted that NCFC should bear a greater proportion of the expense of professional fees in light of the professional fees associated with the financial restatement (including fees and expenses of the Examiner), while creditors of the Holding Company Debtors asserted that a larger portion of the operating administrative expenses should be allocated to the Operating Debtors. Etlin Declaration ¶ 25 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

People involved in the Plan negotiations looked at many alternative allocation methodologies for administrative expenses. There is no perfect methodology, but Ms. Etlin personally believed that the allocation methodology used in the Plan is the fairest, the most appropriate and the least expensive methodology in that it allocates administrative costs based upon the value of the assets realized. 4/24/08 TR. at 73:5-12.

The parties involved in the Plan negotiations looked at alternatives such as allocating administrative costs based upon the tasks performed, but that would have entailed additional administrative costs just to do the allocation. Moreover, the allocation of administrative costs was integrated with other compromises. TR. 4/24/08 at 73:13-21.

The estates have incurred substantial administrative costs, in terms of legal expenses and other professional fees, related to the Carrington Interests. Analyzing the potential ability of the Debtors to realize value associated with these assets has entailed the expenditure of "huge monies" and many, many, many meetings attended by many lawyers and much legal analysis. TR. 4/24/08 at 114:23-115:22.

The estates have incurred substantial administrative expenses in litigating the adversary proceeding regarding the ownership of the funds in the Rabbi Trust. TR. 4/24/08 at 140:6-18.

The Plan Proponents looked at the possibility of allocating shared administrative expenses based upon the tasks that the professionals undertook. However, at the end of the day, the Plan Proponents determined that it was difficult to make a definitive determination as to which Debtor entity benefited from many of the administrative expenses. For example, NCFC is potentially an ultimate beneficiary of certain legal causes of action and a large portion of the professional fees in these cases have been incurred in the Examiner's investigation and various securities investigations, many of which focused on operating activities of NCMC but which related to financial statements filed by NCFC. In sum, many of the administrative expenses are not easily classified. TR. 4/24/08 at 116:1-18.

The Committee considered alternative methods of allocating administrative costs. The three main scenarios they considered were: (1) allocating costs based on tasks, (2) allocating costs based on assets actually realized, and (3) allocating administrative costs based on assets expected to be realized. TR. 4/24/08 at 212:1-18.

## VII.    EVIDENCE CONCERNING THE PLAN PROCESS AND SUPPORT OF CREDITOR CONSTITUENCIES FOR THE PLAN.

In negotiating the Plan with the Committee, the Debtors were aware that members of the Committee included creditors holding claims against a cross-section of the Debtors and of various types. Etlin Declaration ¶ 12 [Docket No. 6407], as admitted into evidence, TR. 4/25/2008 at 5-8.

The Debtors considered the composition of the Committee to be a material fact as they negotiated the Plan. The members of the Committee broadly cut across the Debtors' capital structure and the Debtor entities. The Board of Directors of the Debtors probed as to the fairness of the Plan, and the composition of the Committee was a material fact considered by the Board and by Ms. Etlin. TR. 4/24/08 at 65:8-21.

The Debtors reached out to other major creditors in negotiating components of the Plan, including settlement of such matters as the EPD/Breach Claim Protocol. The Debtors proactively reached out to major securitization trustees and whole loan buyers who were not on the Committee to negotiate critical elements of the Plan, including the negotiation of treatment of what were expected to be the largest claims to be filed on the cases and those that would be most troubling, costly and difficult to resolve. TR. 4/24/08 at 65:21-66:9.

Only one Class of creditors failed to accept the Plan – Class HC3b, which was the Class of unsecured creditors with claims against NCFC. Of that Class, $395 million in dollar amount, or 95% of the claims that voted, voted in favor of the Plan, while $18.9 million dollars in dollar amount, or 4.25% of the claims that voted, voted against the Plan. The 75 creditors with $395 million of claims in this Class who voted yes include a broad cross-section of creditors, including such diverse groups as the MRA counterparties (such as Bank of America and Credit Suisse First Boston), Wells Fargo as indenture trustee for the subordinated debt held by Kodiak

(which claims are only against NCFC), a number of trade creditors, and Maguire Properties (a major landlord with claims only against NCFC). TR. 4/24/08 at 75:25-76:24.

Of the 203 negative votes cast in Class HC3b, 200 were cast by participants in the deferred compensation plan. The dollar amount of these claims equal 4.5% of the total dollar amount in the class that voted. The creditors in this Class who voted against the Plan include former senior members of management who deferred bonuses that they earned based upon the Debtors' reported earnings for 2005 and 2006, which the Debtors later announced needed to be restated. The claimants in this Class who voted against the Plan and who received bonuses based upon financial statements that needed to be restated included creditors with $2.6 million of asserted claims. These claimants have been identified in the Examiner's Report. TR. 4/24/08 at 76:25-78:1.

The Committee included creditors with claims in the same class as the deferred compensation claimants. These include Kodiak, as the holder of the junior subordinated debentures, Maguire and Credit Suisse First Boston. TR. 4/25/05 at 32:16-32:22.

Two members of the Committee – Maguire and Kodiak – had claims only against NCFC. Some of the adjustments build into the models and the Plan of Liquidation benefited creditors of NCFC. These included allowing the inter-company claims of the Holding Company Debtors against the Operating Debtors at 50% (as opposed to treating these claims as capital contributions), keeping the Rabbi Trust at the Holding Company Debtors (as opposed to NCMC) and allocating approximately 80% of the shared administrative expenses to the Operating Debtors. These adjustments that benefited Kodiak and Maguire benefited the deferred compensation claimants in exactly the same manner. TR. 4/25/08 at 32:16-34:1.

No member of the Committee has claims against TRS Holdings. TR. 4/25/08 at 34:10-12.

The Committee has seven members and one ex-officio member. Three of the members have claims against NCFC – Credit Suisse First Boston (which is an MRA claimant), Wells Fargo (the indenture trustee for the junior subordinated debentures), and Maguire (a landlord). TR. 4/24/08 at 186:11-20.

The members of the Committee were generally represented by separate counsel. Skadden Arps represented Maguire. Baker & Hostetler represented Fidelity. Kelley Drye represented Wells Fargo. Credit Suisse is represented by Chadbourne & Parke. TR. 4/28/08 at 186:8-187:21.

Deutsche Bank National Trust is a member of the Committee in its capacity as a securitization trustee. It is represented by Nixon Peabody. TR. 4/28/08 at 188:19-23.

Residential Funding Corporation is on the Committee in its capacity is a loan purchaser. It has both independent counsel and its own financial advisor (Navigant Consulting). TR. 4/28/08 at 188:24-189:11.

Of the Committee members, Fidelity and Credit Suisse have claims against New Century Mortgage Corporation. TR. 4/28/08 at 189:12-16.

The Committee included the largest creditors of NCFC. Credit Suisse First Boston has a claim against NCFC of approximately $124 million. Kodiak has a claim against NCFC of approximately $90 million. TR. 4/24/08 at 189:19-190:14.

The EPD and breach claimants had the largest claims against NC Capital. Deutsche Bank National Trust, which is a Committee member, has the largest such claim. TR. 4/28/08 at 190:15-18.

The Committee voted unanimously to support the Plan. TR. 4/24/08 at 208:23-209:1.

In order to help members of the Committee develop the Plan, FTI ran a variety of scenarios in terms of how assets and liabilities would be moved among the various Debtors estates. FTI ran approximately 75-100 such scenarios. TR. 4/24/08 at 213:2-12.

## VIII. EVIDENCE CONCERNING THE INTERRELATIONS OF THE PLAN SETTLEMENTS.

The settlements incorporated in the Plan are interrelated. For example, the EPD/Breach Claim Protocol, the resolution of intercompany claims, the allocation of Litigation Proceeds and the other compromises incorporated in the Plan affected each other and were negotiated as part of an overall package. Etlin Declaration ¶ 21 [Docket No. 6407], as admitted into evidence. TR. 4/25/08 at 5-8.

The EPD/Breach Claim Protocol is tied to the allocation of Litigation Proceeds. Issues concerning whether the absolute dollars generated by the EPD/Breach Claim Protocol were perceived to be too high or too low were resolved when tied to a compromise on the allocation of Litigation Proceeds among the EPD/Breach Classes and other Classes of creditors. Etlin Declaration ¶ 22 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The settlements contained in the Plan are interrelated and form a global settlement of the key issues among the Debtors' estates and the various creditor constituencies. Etlin Declaration at ¶ 42 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

Resolving the issues addressed by the Plan settlements through litigation would be costly and inconvenient and would cause a significant diminution in and delay of distributions to creditors of the Debtors' estates. Etlin Declaration ¶ 42 [Docket No. 6407], as admitted into

evidence, TR. 4/25/08 at 5-8.

The settlements involved in the Plan were negotiated in good faith with representatives of divergent interests and reflect the uncertainty inherent in resolving a large number of difficult issues. Etlin Declaration ¶ 42 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The Plan settlements are in the paramount interests of creditors. Etlin Declaration ¶ 42 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The Plan settlements are integrated. For example, the development of the EPD/Breach Claim Protocol was tied to negotiations over the allocation of Litigation Proceeds, whereby 45% of the Litigation Proceeds were allocated to the Class of creditors with EPD/Breach claims against NC Capital. This is further integrated with the allocation of administrative expenses. TR. 4/24/08 at 71:19-72:24.

The Plan treatment of shared administrative expenses was integrated with the other Plan compromises. If it were changed, other elements of the Plan would need to be adjusted. TR. 4/24/08 at 73:15-21.

One can not look to any of the particular settlements incorporated in the Plan and decide that it should be revised in a fashion that would benefit one particular estate without recognizing that there are other components that cut the other direction that would be greatly and directly affected. TR. 4/24/08 at 74:9-14.

The settlements embodied in the Plan are integrated with each other and are well within the range of possible results, taking into account the complexity of the issues and the costs of litigation. Without them, there is substantial risk that the cases would devolve into a litigation quagmire.

TR. 4/24/08 at 79:16-80:2.

The settlements embodied in the Plan were negotiated at arms length over an extended period of time. The parties involved in these negotiations had divergent interests and represented essentially every constituent in the Chapter 11 Cases in terms of where they fit into the corporate organization and where they fit into the capital structure. TR. 4/24/08 at 79:3-10.

Obtaining creditor support for the EPD/Breach Claim Protocol was tied directly to the allocation of Litigation Proceeds. For example, the creditors on the Committee who had EPD and breach claims were willing to accept the EPD/Breach Claim Protocol and the concessions they believed it entailed for their claims, only in return for a substantial allocation of the Litigation Proceeds. This compromise also reflected the fact that they believed that the financial restatement issues were driven by activities of the Debtor entities with which they had transactions. TR. 4/24/08 at 211:3-21.

## IX.    OTHER    ISSUES    INVOLVED    IN    ALLEGED    SUBSTANTIVE CONSOLIDATION

The purpose of the Plan is to effect a fair resolution of the Chapter 11 Cases taking into consideration the legal interests, rights and claims of a multitude of creditors with claims against a disparate capital structure with differing legal rights. The purpose was to accomplish this as fairly and expeditiously as possible. TR. 4/24/08 at 78:21-79:2.

The claim bar date order required creditors to specify which individual Debtor they filed claims against. TR. 4/24/08 at 82:17-24.

The Plan does not provide for substantive consolidation of the Holding Company Debtors. The Plan combines these entities for purposes of distributions, but does not result in a legal

substantive consolidation.  TR. 4/24/08 at 108:4-17.

The controversy over ownership of the Rabbi Trust and the Carrington Interests, between old NCFC and new NCFC, was part of the reason for combining the assets of these entities into a common pool for purposes of Plan distributions.  TR. 4/24/08 at 109:18-110:3.

The Multi-Debtor Claim Protocol used in the Plan is a means of dealing with interparty claims and issues.  It takes into account the legal rights of creditors holding guarantees or other valid joint and several contractual obligations against multiple Debtors.  The Plan provides that qualifying creditors receive a Determined Distribution Amount of 130%.  A similar process was used in the Winn-Dixie case and is an efficient means of dealing with such inter-debtor issues.  TR. 4/24/08 at 122:16-123:21.

In order to get the benefit of the Multi-Debtor Claim Protocol, creditors had to file claims against each of the individual Debtors and have valid claims against these entities.  TR. 4/24/08 at 123:22-124:10.

The Plan was not developed based upon the notion of combining the Debtors into three primary groups and then negotiating distribution amounts.  Rather, the compromises of such matters as joint and several liability resorting from guarantees, intercompany claims, the allocation of assets among Debtors, and the allocation of expenses of administration, led to Determined Distribution Amounts.  The Determined Distribution Amounts were the result of negotiations to settle these very complex intercompany claims in a way that minimizes the cost of ultimate administration and, thereby, realizes as large a possible distribution to creditors.  TR. 4/24/08 at 127:15-128:18.

Ms. Etlin concluded that complete substantive consolidation, as articulated in Owens Corning, was not appropriate under the facts of these cases. TR. 4/24/08 at 128:22-129:2.

The Committee began the process of negotiating the Plan by analyzing assets, expenses and claims entity by entity. This included analyses of potential recoveries entity by entity. TR. 4/28/08 at 180:11-20.

Various adjustments were utilized in the Plan to avoid harms that otherwise would result in grouping Holding Company Debtors and Operating Debtors. These included the Multi-Debtor Claim Protocol, the Intercompany Claim Protocol, the Joint Administrative Expense Share Allocation, and the reduction in the amount of certain types of claims. TR. 4/25/08 at 12:5-14:20.

The Committee considered the possibility of a full substantive consolidation of the Debtors. There were some factors that would support this, including ambiguities about which Debtor owns certain assets, the cash management system, overlapping corporate management and financial reporting. TR. 4/25/08 at 27:6-28:3.

The Committee also considered factors that would argue against full substantive consolidation. These included maintenance of separate books and records, separate company financial statements issued in connection with some of the loan purchase transactions and the maintenance of inter-company accounts. TR. 4/25/08 TR. at 28:8-25.

The Plan benefits creditors with claims against the Holding Company Debtors, including the deferred compensation claimants, as compared to full substantive consolidation in several respects. These include allowing the intercompany claims of the Holding Company Debtors against the Operating Debtors at 50% (as opposed to recharacterizing them as equity), keeping the

entire amount of the Rabbi Trust at the Holding Company Debtors (as opposed to NCMC) and allocating 80% of the administrative costs to the Operating Debtors. TR. 4/25/08 at 32:23-34:1.

The "benchmark" for every discussion by the Committee concerning the Plan was a deconsolidation model. The deconsolidation model showed the recoveries, expenses, assets and claims for each Debtor entity, with certain assumptions regarding where assets properly resided. Comparisons were then made as to what would happen if certain entities were merged for purposes of Plan distributions. TR. 4/25/08 at 34:13-35:14.

The Committee analyzed a model where all of the Debtors were combined into a single pool and intercompany claims and guarantees were eliminated. The Committee, however, did not adopt this model. TR. 4/25/08 at 35:15-36:9.

## X.    EVIDENCE CONCERNING COMPLIANCE WITH THE BEST INTERESTS TEST OF BANKRUPTCY CODE SECTION 1129(a)(7).

The Plan provides a much more efficient vehicle to accomplish the goal of liquidating the remainder of the estates and distributing proceeds to creditors than would conversion to Chapter 7. Recoveries for creditors under the Plan exceed the recoveries creditors likely would receive if these cases were converted to Chapter 7. Etlin Declaration ¶ 17, [Docket No. 6407] as admitted, TR. 4/25/2008 at 5-8.

The Debtors prepared, under the direction of Ms. Etlin, two liquidation analyses. They are attached as Exhibit E to the Disclosure Statement and were introduced as Ad Hoc Exhibit 10. They illustrate the projected effects of the conversion of the Chapter 11 cases to Chapter 7. The liquidation scenarios include a "high recovery case" and a "low recovery case" which correspond to the ranges of recoveries for the Plan set forth in Section I.A.4 of the Disclosure Statement. Etlin

Declaration ¶ 18, [Docket No. 6407] as admitted into evidence, 4/25/2008 TR. at 5-6.

The expected recoveries for creditors under the Plan set forth in the Disclosure Statement are higher for each Class than the liquidation scenarios set forth in Exhibit E. Ad Hoc Exhibit 10; Docket No. 5395.

Conversion to Chapter 7 would likely adversely affect the recovery of tax refunds. The Debtors estimate the reduction would be 25% in both the high recovery case and low recovery case liquidation scenarios. Etlin Declaration ¶ 19, [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

Conversion to Chapter 7 would likely adversely affect the prospects for recovery on the Carrington Interests. The Debtors estimate the recovery to be realized on the Carrington Interests would be reduced by 35% in the high case scenario. This only affects the high case analysis, since the low case scenario (both for purposes of analyzing likely recoveries under the Plan and in Chapter 7) assumes that nothing will be realized on the Carrington Interests. Etlin Declaration ¶ 19, [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

Creditor recoveries in a Chapter 7 would be adversely affected by the fees paid to one or more Chapter 7 trustees and professionals. Because of the divergent interests of the estates, there would will be likely be multiple trustees. The liquidation scenarios prepared by the Debtors assume the Chapter 7 trustee fees would equal 3% of the assets distributed to creditors, consistent with the sliding scale of maximum Chapter 7 trustee fees set forth in the Bankruptcy Code. Etlin Declaration ¶ 20 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

Conversion to Chapter 7 would jeopardize the settlements included in the Plan. These

settlements are interrelated and integrated. It is likely that in Chapter 7 the settlements would unravel, which would entail the likelihood that substantial additional professional fees would be incurred by the Chapter 7 trustees in litigating and negotiating over the matters settled in the Plan and would involve significant risks that the substantive results would be worse for the estates. Etlin Declaration ¶ 21 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

It is unlikely that a Chapter 7 liquidation would be able to realize the substantial benefits of the EPD/Breach Claim Protocol. This particular aspect of the Plan is interrelated with numerous other Plan settlements. It is likely that in Chapter 7, the Chapter 7 trustees would need to litigate the amount of damages resulting from breaches and EPDs. This undertaking would be enormous and would entail the risk of spending a substantial part of the recoveries otherwise available for creditors and consuming years in that effort. The costs of administration in Chapter 7, accordingly, would be increased greatly. The distributions to creditors would be badly delayed. Etlin Declaration ¶ 22, [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

Conversion to Chapter 7 would entail the risk of substantial inter-Debtor litigation. Separate financial statements were generated for each of the Debtors and were delivered to their major creditors, including both audited and annual financial statements and unaudited quarterly statements. Threshold battles over which estate was entitled to Litigation Proceeds would be expensive and could well undermine the value of these actions as multiple estates warred among themselves instead of pursuing the causes of action in a united and uniform fashion. The negative impact on the likely recoveries for these causes of action are not reflected in the liquidation scenarios attached as Exhibit E to the Disclosure Statement since the Debtors did not try to forecast litigation recoveries. Etlin Declaration ¶ 23 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

The Debtors estimate that conversion to Chapter 7 would increase administrative costs for Chapter 7 professional fees due to the elimination of the EPD/Breach Claim Protocol by $8,525,000 and would increase expenses due to multiple estates and litigation due to disputes of ownership of litigation proceeds, other assets and intercompany claim issues by $11 million. Etlin Declaration ¶ 26 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

Conversion to Chapter 7 would entail for each Debtor the risk of less favorable outcomes. For example, the Debtors estimate that in a Chapter 7 creditors of NCFC would be adversely affected by a less favorable distribution of joint administrative expenses. In addition, creditors of NCFC would face the risk in Chapter 7 that intercompany claims NCFC has against NCMC might be treated in their entirety as capital contributions. Etlin Declaration ¶ 27 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

The liquidation scenarios prepared by the Debtors assume that NCFC and TRS Holdings divide ownership of the Carrington Interests 50/50 and that the assets held in the Rabbi Trust are owned 100% by NCFC. These are conservative assumptions from the perspective of NCFC. In other words, the liquidation scenarios disregard the possibility that a Chapter 7 trustee of TRS Holdings might prevail in arguing that this estate owns the assets in the Rabbi Trust and substantially discounts by 50% the probability that a Chapter 7 trustee for TRS Holdings might prevail in litigation in which this trustee asserts that TRS Holdings owns the Carrington Interests. As a result, the liquidation scenarios are based on some quite favorable assumptions for creditors of NCFC. Etlin Declaration ¶ 28 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

Conversion to Chapter 7 would entail setting new bar dates for the filing of claims. This would result in months of additional delay, and the percentage recovery per creditor could be

reduced (compared to the Plan) by the filing of additional claims. Etlin Declaration ¶ 29 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

Ms. Etlin, the CEO and CRO of each of the Debtors, believes, based upon the analysis prepared by the Debtors under her direction, that creditors will receive more in the Plan than they would in Chapter 7. Etlin Declaration ¶ 27 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.

The Debtors forecast that in the low case liquidation scenario, creditors of NCFC would receive nothing if the case were converted to Chapter 7 and that the estate would be administratively insolvent. Etlin Declaration ¶ 18 [Docket No. 6407]; Ad Hoc Exhibit 10.

The high case liquidation scenario prepared by the Debtors estimates that creditors of NCFC would receive a 13.7% recovery if the case were converted to Chapter 7. This compares to a 14.3% recovery for Class HC3b (other unsecured claims against NCFC) under the comparable high case estimates for the Plan. Etlin Declaration ¶ 18 [Docket No. 6407], admitted into evidence, TR. 4/25/2008 at 5-8.; Docket No. 5395; Ad Hoc Ex. No. 10.

The Debtors' liquidation analysis shows the results for individual Debtor entities. TR. 4/24/08 at 68:22-25; Ad Hoc Ex. No. 10.

Ad Hoc Exhibit 10 is the liquidation analysis attached as Exhibit E to the Disclosure Statement [Docket No. 5395].

The liquidation analyses prepared by the Debtors allocate the additional administrative costs that would be incurred in a Chapter 7 differently than in the Plan. The Plan allocates Joint Administrative Expenses based upon the values realized on various assets, whereas the additional

Chapter 7 expenses are allocated in the liquidation analyses based on such factors as allocating all the additional costs related to litigation of EPD and breach claims to NCMC and NC Capital. 4/24/08 TR. at 117:2-118:10; Etlin Declaration ¶ 26 [Docket No. 6407], admitted into evidence TR. 4/25/08 at 5-8.

Ms. Etlin's estimates of the additional administrative costs that would be incurred if the settlements in the Plan unraveled was based in part on her personal experience in dealing with these issues in connection with developing the Plan, including an understanding of the complexity of the issues and the lawyers who represent the various parties. Getting to the Plan stage took longer than she had hoped given the complexity of these issues. She personally was involved in analyzing every number set forth in Ad Hoc Exhibit 10. TR. 4/24/08 at 159:13-161:11.

Ms. Etlin was personally involved in all the negotiations involving Plan settlements and monitors the incurrence of administrative expenses weekly. She is a tough task master and was very concerned with the rate at which professional fees were being incurred and the burn rate that would have occurred if the Plan Proponents had not brokered the settlements incorporated in the Plan. Absent these settlements, she was concerned that the professional fees could consume all the remaining assets in the estates, given the complexity of matters, number of law firms involved and financial institutions that had various interests and the potential for litigating forever over these issues. TR. 4/24/08 at 161:16-162:10.

## XI.    EVIDENCE CONCERNING OTHER ELEMENTS OF BANKRUPTCY CODE SECTION 1129

The Plan was principally negotiated by the Debtors and the Committee. The Debtors considered the fact that the Committee members include a broad cross-section of creditors. No Plan Proponent will receive any special benefit or personal gain under the Plan. Etlin Declaration

¶ 12 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The Plan provides that Professional Fee Claims submitted by estate professionals will be entitled to payment only if and to the extent they are approved by the Court, and that all other Administrative Claims will be entitled to payment only to the extent they are Allowed Claims. Etlin Declaration ¶ 13 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The Plan Proponents have filed the Liquidating Trust Agreement and have identified Mr. Jacobs as the Liquidating Trustee.  Etlin Declaration ¶ 14 [Docket No. 6407], as admitted into evidence TR. 4/25/08 at 5-8.

The Plan is a liquidating plan and does not implicate any rates subject to government regulation. Etlin Declaration ¶ 15 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The Plan has been overwhelming accepted by all Classes entitled to vote, other than Class HC3b.  Etlin Declaration, ¶ 31 [Docket No. 6407], as admitted into evidence TR. 4/25/08 at 5-8; Declaration of Jamie Edmonson [Docket No. 6406].

The Plan provides for the payment of priority claims.  Etlin Declaration ¶ 33 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

At least one Class of impaired claims for each Debtor has voted in favor of the Plan.  Etlin Declaration ¶ 34 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The Plan is feasible.  It provides all the tools the Liquidating Trustee (including in his capacity as the Plan Administrator for Access Lending) will require to complete the liquidation of

the estates and to make distributions to Creditors. The Debtors project that they will have sufficient Cash on the Effective Date to make the distributions required to be made then. Etlin Declaration ¶ 35 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The Debtors have sufficient liquidity to consummate the Plan. Ms. Etlin carefully monitors liquidity. The Debtors will have sufficient cash to make effective date payments. TR. 4/24/08 at 78:7-12.

The Plan provides for the payment of fees under 28 U.S.C. section 1930. Etlin Declaration ¶ 36 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The Debtors are not obligated, now or in the future, to pay retiree benefits. Etlin Declaration ¶ 37 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

Class HC3b rejected the Plan based on numerosity, although over 95% in dollar amount of the claims in that Class that voted accepted the Plan. Classes HC4a, HC4b, HC4c, HC4d and HC4e are conclusively deemed to have rejected the Plan since the receive no distributions under the Plan; these Classes are equity interests in NCFC or are claims for damages related to the purchase or sale of equity in NCFC and are classified below creditor claims pursuant to section 510(b) of the Bankruptcy Code. No Class junior to any of these Classes will receive a distribution under the Plan. Etlin Declaration ¶ 39 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

No plan other than the Plan has been filed. Etlin Declaration ¶ 40 [Docket No. 6407], as admitted into evidence, TR. 4/25/08 at 5-8.

The principal purpose of the Plan is not the avoidance of taxes or the application of section

LA3:1147417 3
RLF1-3281155-1

5 of the Securities Act of 1933.  Etlin Declaration ¶ 41 [Docket No. 6407], as admitted into

evidence, TR. 4/25/08 at 5-8.

Dated:  May 7, 2008
        Wilmington, Delaware

/s/ Bonnie Glantz Fattel
BLANK, ROME LLP
Bonnie Glantz Fattell (No. 3809)
1201 Market Street, Suite 800
Wilmington, Delaware  19801
(302) 425-6400 - Telephone
(302) 425-646 - Facsimile

- and -

Mark S. Indelicato
Mark T. Power
Janine M. Cerbone
Huria S. Naviwala
HAHN & HESSEN LLP
488 Madison Avenue, 15th Floor
New York, New York  10022
(212) 478-7200 - Telephone
(212) 478-7400 - Facsimile

Co-Counsel to the Official Committee of
Unsecured Creditors of New Century TRS
Holdings, Inc., et al.

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Christopher M. Samis (No. 4909)
RICHARDS, LAYTON & FINGER, P.A.
P.O. Box 551
One Rodney Square
920 North King Street
Wilmington, DE  19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

Suzzanne Uhland
Ben H. Logan
Andrew M. Parlen
O'MELVENY & MYERS LLP
275 Battery Street
San Francisco, California  94111
(415) 984-8700

Attorneys for Debtors and Debtors in
Possession