IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| NEW CENTURY TRS HOLDINGS, INC., | ) |
| a Delaware corporation, *et al.*, | ) Bank. No. 07-10416 (KJC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| GREGORY J. SCHROEDER, *et al.*, | ) |
| | ) |
| Appellants, | ) |
| | ) Civ. No. 08-546-SLR |
| v. | ) |
| | ) |
| NEW CENTURY LIQUIDATING TRUST, | ) |
| *et al.*, | ) |
| | ) |
| Appellees. | ) |

Joseph H. Huston, Jr., Esquire, and Maria Aprile Sawczuk, Esquire, of Stevens & Lee, P.C., Wilmington, Delaware, and Robert J. Keach, Esquire, and D. Sam Anderson, Esquire, of Bernstein, Shur, Sawyer & Nelson, P.A., of Portland, Maine.  Counsel for Appellants.

Bonnie Glantz Fatell, Esquire, and David W. Carickhoff, Esquire, of Blank Rome LLP, Wilmington, Delaware, and Mark T. Power, Esquire, Mark S. Indelicato, Esquire, Don D. Grubman, Esquire, and Joseph Orbach, Esquire, of Hahn & Hessen LLP, New York, New York.  Counsel for Appellees.

## MEMORANDUM OPINION

Dated:  June 16, 2009
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

In April 2007, New Century TRS Holdings, Inc. ("TRS Holdings") and its affiliates (collectively, "debtors"[1]) filed chapter 11 bankruptcy petitions. In March 2008, debtors filed a liquidation plan. In July 2008, over objections raised by the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan (collectively, along with Gregory J. Schroeder, Michelle Park, Martin Warren, Steve Holland, and Nabil Bawa, "appellants"), the bankruptcy court confirmed the liquidation plan.

Pending before the court are appellants' appeal[2] (D.I. 1) of the plan confirmation and the motion to dismiss filed by New Century Liquidating Trust and Alan M. Jacobs

---

[1]"Debtors" are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited liability partnership. (Bk. D.I. 8254 at 1 n.1) "Debtors" also include New Century Warehouse Corporation (a/k/a Access Lending), a California corporation, which filed its voluntary chapter 11 petition on August 3, 2007. (*Id.*) In total, there are sixteen debtors-in-possession. (*Id.* at 10)

[2]Appellants at one time had two appeals pending, but the earlier-filed appeal has been consolidated with the instant appeal by order of the court. (D.I. 9)

as Liquidating Trustee and Plan Administrator for New Century Warehouse

Corporation's (collectively, "appellees") (D.I. 13).  For the reasons that follow, appellees'

motion to dismiss is denied and the bankruptcy court issuances that are the subject of

the appeal (Bk. D.I. 8254, 8255, 8596, 8626) are reversed.

## II. BACKGROUND

### A. Debtors' Business and the Events Leading to Bankruptcy

Debtors were in the business of originating, servicing, and purchasing mortgage

loans (as well as selling mortgage loans) through whole loan sales and securitizations.

(Bk. D.I. 8254 at 3)  Founded in 1995,[3] TRS Holdings grew rapidly from its inception.

(Id. at 8)  In 1996, its first year of operation, TRS Holdings originated $357 million in

mortgage loans.  (Id.)  Ten years later, in 2006, TRS Holdings originated approximately

$60 billion in mortgage loans; between April 2005 and December 2006, TRS Holdings

funded more than $200 million in loans almost every business day.  (Id.)  Prior to the

bankruptcy filings, TRS Holdings had grown to employ over 7,200 people, had a market

capitalization of over $1 billion (as of February 2007), had its equity securities traded on

---

[3]Formed as a Delaware corporation in 1995, the entity formerly known as New Century Financial Corporation ("NCFC") was the parent corporation of the other debtor entities. (Bk. D.I. 8254 at 21)  In 2004, in anticipation of NCFC being reorganized into a Maryland real estate investment trust ("REIT") for federal income tax purposes, New Century REIT, Inc. (a Maryland corporation with REIT status) and its wholly-owned subsidiary, NC Merger Sub, Inc. (a Delaware corporation), were established.  (Id.)  On October 1, 2004, to effect the reorganization, NC Merger Sub was merged into NCFC, and NCFC's name was changed to New Century TRS Holdings, Inc. ("TRS Holdings").  (Id.)  TRS Holdings, the surviving corporation, was now a wholly-owned subsidiary of New Century REIT, Inc., with New Century REIT, Inc., taking the name of "New Century Financial Corporation."  (Id.)  After the merger and reorganization, debtors' general ledger system identified the entity now known as New Century Financial Corporation as "REIT," but continued to identify TRS Holdings as NCFC, its former name.  (Id.)  The court herein refers to the entity formerly known as NCFC and now known as TRS Holdings as TRS Holdings.

2

the New York Stock Exchange, had credit facilities of $17.4 billion to finance its activities, and was the second largest originator of subprime residential mortgage loans. (*Id.*)

In February and March 2007, debtors experienced a swift reversal of fortune. On February 7, 2007, TRS Holdings announced that it must restate its loan repurchase losses in its previously-filed financial statements for quarters ended March 31, June 30, and September 30, 2006, and that it expected to post both a fourth quarter loss and a loss for all of 2006; this announcement precipitated multiple securities class action lawsuits against the company. (*Id.* at 6) On March 2, 2007, TRS Holdings announced that it could not file its 2006 Form 10-K without unreasonable effort and expense, which caused the New York Stock Exchange to announce the de-listing of the company's stock on March 13, 2007. (*Id.* at 7) These announcements led warehouse lenders to cut off funding for loans originated by debtors and to replace debtors as the mortgage loan servicer. (*Id.*) Under those circumstances, debtors were able to fund only a portion of their loan originations. (*Id.*) Ultimately, by the end of March 2007, debtors found themselves with obligations in excess of $7 billion and insufficient liquidity to satisfy those obligations. (*Id.* at 7, 9)

## B. Bankruptcy Proceedings and the Plan

On April 2, 2007, debtors filed voluntary chapter 11 bankruptcy petitions.[4] (*Id.* at 1) On April 9, 2007, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"), which consisted of seven creditors

_____

[4]Measured by the value of pre-petition assets, debtors' bankruptcy filing was the largest chapter 11 filing in 2007 and, as of February 29, 2008, the ninth-largest ever. (Bk. D.I. 8254 at 9 n.11)

3

holding claims of various types against different individual debtors. (*Id.* at 10 n.12) Debtors, the Creditors' Committee, and other creditor groups began negotiating a chapter 11 plan. (*See id.* at 9-10)

On June 20, 2007, appellants filed an adversary proceeding against debtors, Wells Fargo Bank, N.A. as Trustee ("Wells Fargo"), the Compensation Committee of the Board of Directors of New Century Financial Corporation as Plan Administrator (the "Compensation Committee"), and the Creditors' Committee concerning amounts that appellants had contributed under deferred compensation plans while in debtors' employ. (*Id.* at 27) In January 1999, TRS Holdings had created a trust (the "Deferred Compensation Trust"), with Wells Fargo as Trustee, to be used in conjunction with The New Century Financial Corporation Deferred Compensation Plan and/or The New Century Financial Corporation Supplemental Executive Retirement/Savings Plan (the "Deferred Compensation Plans").[5] (*Id.* at 23, 27) Appellants and other eligible employees had contributed funds under the Deferred Compensation Plans. (*Id.*) In the adversary proceeding, appellants have sought a declaration that the Deferred Compensation Plans are not "top hat" plans as defined by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"),[6] and that the Deferred Compensation Trust, therefore, is not an asset of the bankruptcy estates that can be

---

[5]As of December 31, 2006, the Deferred Compensation Trust contained more than $43 million. (Bk. D.I. 8254 at 27)

[6]ERISA defines a "top hat" plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated individuals." 29 U.S.C. § 1051(2)

4

used to satisfy other creditors' claims.[7]   (*Id.* at 27-28)

On February 2, 2008, after extensive negotiations (Bk. D.I. 8254 at 9), debtors

and the Creditors' Committee filed a joint chapter 11 liquidation plan and corresponding

disclosure statement. (Bk. D.I. 4804 and 4805)  On March 18, 2008, debtors filed an

amended joint liquidation plan ("the first amended plan").  (*See* Bk. D.I. 5405)  That

same day, the bankruptcy court approved the disclosure statement, established

procedures for voting on the first amended plan, and scheduled a hearing on plan

confirmation. (*See* Bk. D.I. 5396)  On April 18, 2008, appellants filed an objection to

plan confirmation. (Bk. D.I. 6338)

On April 23, 2008, debtors filed a second amended joint liquidation plan (the

"second amended plan" or "plan").  (*See* Bk. D.I. 6412)  The plan separates the sixteen

debtors into three groups (each, a "Debtor Group") to facilitate the distributions to the

unsecured creditors. (*Id.* at 10)  The first Debtor Group, the Holding Company Debtors,

consists of real estate investment entities that typically held residual interests in

securitization trusts, owned stock in the Operating Company Debtors, and provided

overall direction and management to the Operating Company Debtors.[8]  (*Id.* at 11)  The

---

[7]Appellants argue in the adversary proceeding that, if the Deferred
Compensation Plans are not top hat plans subject to ERISA, then any employee
contributions "never inure[d] to the benefit of any employer and [have been] held for the
exclusive purpose of providing benefits to participants in the [compensation] plan and
their beneficiaries and defraying reasonable expenses of administering the
[compensation] plan." (Bk. D.I. 8254 at 28 n.23 (quoting 29 U.S.C. § 1103(c)(1)))  In
the alternative, appellants argue that the terms of the Deferred Compensation Plans
and the Deferred Compensation Trust provide that the Deferred Compensation Trust is
available only to general creditors of NCFC. (*Id.* at 28)

[8]The Holding Company Debtors consist of NCFC, TRS Holdings, New Century
Credit Corporation ("NC Credit"), and NC Residual IV Corporation ("NC Residual IV").
(Bk. D.I. 8254 at 11)

5

second Debtor Group, the Operating Company Debtors, were generally entities that conducted debtors' business operations, including originating, purchasing, and selling loans and servicing loans for third parties.[9]  (*Id.*)  The final Debtor Group consists only of New Century Warehouse Corporation ("Access Lending"), which was acquired by TRS Holdings in early 2006 and was a subsidiary that provided warehouse financing to independent mortgage companies.  (*Id.*)

The plan classifies claims based upon the three Debtor Groups.  (*Id.*)  Claims against the Holding Company Debtors are placed in classes HC1 through HC13, with appellants assigned to class HC3b along with holders of other unsecured claims against NCFC.  (*Id.* at 11-13)  Claims against the Operating Company Debtors are placed in classes OP1 through OP12.  (*Id.* at 13-14)  Claims against Access Lending are placed in classes AL1 through AL3.  (*Id.* at 14)

The plan provides for the distribution of the net cash available from the assets of debtors in each Debtor Group to the holders of unsecured claims against debtors in that Debtor Group.  (*Id.* at 14-15)  Cash available for distribution to unsecured creditors in each Debtor Group is calculated based on the gross proceeds obtained from disposing of that Debtor Group's assets minus amounts for allowed administrative, priority, and secured claims, expenses of administering the Debtors' estates during the chapter 11 proceedings, and expenses of the liquidating trust established by the plan.  (*Id.*)

---

[9]The Operating Company Debtors consist of New Century Mortgage Corporation ("NCMC"), NC Capital Corporation ("NC Capital"), Home123 Corporation ("Home123"), NC Asset Holding, L.P. ("NC Asset Holding"), NC Deltex, LLC ("NC Deltex), New Century REO Corporation ("NC REO"), New Century REO II Corporation ("NC REO II"), New Century REO III Corporation ("NC REO III"), NC Residual III Corporation ("NC Residual III"), New Century Mortgage Ventures, LLC ("NCM Ventures"), and NCoral, L.P. ("NCoral").  (Bk. D.I. 8254 at 11)

The plan provides for certain protocols that affect the amount of each claimant's distribution, including the Multi-Debtor Claim Protocol, the Intercompany Claim Protocol, and the EPD/Breach Claim Protocol.[10] (*Id.* at 15-19) The Multi-Debtor Claim Protocol adjusts the distribution amount for creditors holding allowed unsecured claims for which more than one debtor is jointly and/or severally liable. (*Id.* at 15) For instance, under the Multi-Debtor Claim Protocol, unsecured creditors with claims for which Holding Company Debtors NCFC and NC Credit are jointly and/or severally liable will receive 130% of the amount of their claims against NCFC and 0% of the amount of their claims against NC Credit. (*Id.* at 15-16) Similarly, unsecured creditors with claims for which NCMC and other Operating Company Debtors are jointly and/or severally liable will receive 130% of the amount of their claim against NCMC and 0% of the amount of their claim against the other Operating Company Debtors. (*Id.* at 16)

The Intercompany Claim Protocol addresses claims held by one debtor against another debtor by adjusting the distribution amount based on the merits of each debtor's intercompany claims.[11] (*Id.*) First, claims against other debtors within the same Debtor Group receive 0% of the claim amount. (*Id.*) Second, in recognition of NC Capital's potential intercompany claims against NCMC, EPD/Breach claimants with claims against NC Capital will receive 50% of the amount of their claims against the Operating Company Debtors. (*Id.* at 17) Finally, NCFC will receive 50% of the amount

[10]The plan provides that certain provisions may not "be stricken, altered, or invalidated," including provisions related to the Multi-Debtor Claim and Intercompany Protocols and the treatment and classification of claims. (*See* Bk. D.I. 6412 at 105)

[11]These claims appear on debtors' books and records, but there are no promissory notes or instruments evidencing the debt. (Bk. D.I. 8254 at 16)

7

of its claims against NCMC in recognition that the NCMC's debt owed to NCFC could be recharacterized as equity in NCFC. (Id. at 17-18)

The EPD/Breach Claim Protocol is used to calculate the amount of damages for EPD/Breach Claims and is interrelated with other compromises in the plan.[12] (Id. at 18-19) For example, where the EPD/Breach Protocol generates a claim amount that is disputed as too high or too low, the dispute is resolved consistent with the compromise on the allocation of Litigation Proceeds (as defined in the plan) among the EPD/Breach claimants and other classes of creditors.[13] (Id. at 19) Pursuant to that compromise, the EPD/Breach claimants with claims against NC Capital receive 45% of the net Litigation Proceeds, the Holding Company Debtors receive 27.5% of the net Litigation Proceeds, and the Operating Company Debtors (excluding those with EPD/Breach Claims against NC Capital) receive 27.5%. (Id. at 24-25)

On the date debtors filed their petitions, debtors had approximately $62 million of cash in their operating accounts. (Id. at 19) After filing, debtors generated an additional $230.4 million through asset sales; under the plan, those proceeds are assets of the Operating Company Debtors. (Id. at 19-20) The plan provides for the transfer of debtors' remaining assets (including capital stock in Access Lending but not

---

[12]The plan defines an "EPD/Breach Claim" as a claim "arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of representation or warrant under such agreement made by one or more of the Debtors or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan." (Bk. D.I. 8254 at 18)

[13]Under the plan, "Litigation Proceeds" are the net proceeds generated from any litigation (except those proceeds belonging to Access Lending) and include any net proceeds from avoidance actions and suits arising out of the need to restate 2006 financial statements. (Bk. D.I. 8254 at 24)

8

Access Landing's assets[14]) into a liquidating trust. (*Id.* at 20)  The liquidating trust is for

the benefit of holders of unsecured claims against the Holding Company Debtors and

holders of unsecured claims against the Operating Company Debtors. (*Id.*)

The plan provides that debtors' assets will be divided between the Holding

Company Debtors and the Operating Company Debtors for purposes of distribution.[15]

(*Id.*) The Holding Company assets, as asserted on the respective bankruptcy

schedules, consist mostly of intercompany receivables, the Carrington Interests,[16] and

the Deferred Compensation Trust.[17] (*Id.* at 21-22)  The Operating Company assets

include proceeds from the sales of debtors' servicing business and mortgage loans not

---

[14]Access Lending's assets consist primarily of proceeds from the liquidation of its assets in April 2007 and the cash in its operating account as of the petition date. (Bk. D.I. 8254 at 20 n.18)

[15]During plan negotiations, issues arose over which debtors owned which assets. (Bk. D.I. 8254 at 20-21)  These issues stemmed primarily, with respect to the Holding Company Debtors especially, from the 2004 reorganization involving NCFC and TRS Holdings discussed *supra* in footnote 3. (*See id.* at 21)

[16]The Carrington Interests are two different partnership interests owned by debtors – one is a general partnership interest valued by debtors at approximately $8 million, and the other is a limited partnership interest valued by the debtors at approximately $42.5 million. (Bk. D.I. 8254 at 22)  Debtors' accounting records show that the Carrington Interests are owned by TRS Holdings, but other documents after the 2004 reorganization make ownership unclear. (*Id.*)  Income from the limited partnership interest is presently being realized by NCFC, but NCMC advanced the money that TRS Holdings used to purchase the interest. (*Id.*)  The Creditors' Committee has asserted that NCMC, by virtue of its having funded the purchase, should be entitled to that interest. (*Id.*)

[17]The confusion over whether NCFC or TRS Holdings owned the Carrington Interests and the Deferred Compensation Trust led to the decision to aggregate the assets of the Holding Company Debtors for purposes of distribution. (Bk. D.I. 8254 at 22)

9

subject to repurchase.[18] (*Id.* at 24)

On April 23, 2008, the same day the plan was filed, debtors' claims agent filed a declaration reporting the voting results for the first amended plan. (Bk. D.I. 6406) Every class of creditors entitled to vote accepted the first amended plan except class HC3b, which includes appellants. (Bk. D.I. 8254 at 25) Of the 203 votes cast against the first amended plan, 200 were cast by appellants.[19] (*Id.*)

On April 24 and 25, 2008, the bankruptcy court conducted a two-day hearing on plan confirmation. (*Id.* at 2) At the hearing and in post-hearing briefs, appellants raised several arguments against plan confirmation, including that: (i) the plan provides for substantive consolidation of the debtors in violation of *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005); and (ii) the plan does not comply with 11 U.S.C § 1123(a)(4) (as required by § 1129(a)(1)) because, by operation of the Multi-Debtor Claim Protocol, it provides for disparate treatment of claims within the same class. (*Id.*; Bk. D.I. 6645)

On July 2, 2008, the bankruptcy court issued an opinion overruling appellants' objections (the "confirmation opinion") and ordered the plan proponents to draft an order to be entered confirming the plan. (Bk. D.I. 8254, 8255) On July 15, 2008, the bankruptcy court entered the plan proponents' confirmation order. (Bk. D.I. 8596) On July 23, 2008, to correct a typographical error in that order (*see* Bk. D.I. 8624), the bankruptcy court issued an amended confirmation order. (Bk. D.I. 8626) On July 14

---

[18]It was further agreed during plan negotiations that NCMC would receive any potential tax refunds owed to debtors. (Bk. D.I. 8254 at 24)

[19]For reasons not made clear in the bankruptcy court's confirmation order or in the parties' briefs on appeal, the bankruptcy court and the parties treat the voting results on the first amended plan as applicable to the second amended plan.

10

and July 24, 2008, appellants timely appealed the confirmation opinion and the related confirmation orders. (Bk. D.I. 8563, 8628)

On July 29, 2008, appellants filed a motion to stay the confirmation order pending appeal (the "stay motion"). (Bk. D.I. 8673) On August 22, 2008, the bankruptcy court denied the stay motion but imposed on the New Century Liquidating Trust (the "liquidating trust") a duty to provide appellants thirty days written notice of its intent to distribute any funds to classes HC1, HC3a, HC3b, HC5, HC7, HC8, HC10a, HC10b, HC11, and HC13. (Bk. D.I. 8847)

## C. Implementation of the Plan

The plan had become effective on August 1, 2008 (the "effective date").[20]   (D.I. 14 at attch. 1, ¶ 5) On the effective date,[21] the liquidating trust was created with Alan M. Jacobs as trustee. (Id. at attch. 1, ¶ 6) Also on that date, the Creditors' Committee was dissolved; the Plan Advisory Committee (the "PAC") was formed; debtors' officers and directors ceased serving and were replaced by Jacobs;[22] debtors' assets were distributed to the liquidating trust; and NCFC's outstanding common and preferred stock, as well as all notes, securities, and indentures, were cancelled.[23] (Id. at attch. 1,

---

[20]On July 28, 2008, in preparation for the plan taking effect, all of Access Lending's stock was transferred to the liquidating trust, which then became the sole shareholder of Access Lending. (D.I. 14 at attch. 1, ¶ 10)

[21]As of the effective date, the Holding Company Debtors had no cash with which to pay their share of administrative expenses. (D.I. 14 at attch. 1, ¶ 24) As part of plan compromises, between the effective date and December 31, 2008, the Operating Company Debtors paid $5.6 million to cover the Holding Company Debtors' share. (Id.)

[22]Debtors also ceased having employees. (D.I. 14 at attch. 1, ¶ 7)

[23]Jacobs speculates that these cancellations precipitated significant tax events in 2008 for equity holders and creditors. (D.I. 14 at attch. 1, ¶ 13)

¶¶ 6-12) Approximately 127,000 parties received notice concerning the effective date. (*Id.* at attch. 1, ¶ 16)

Since the effective date, the liquidating trust has entered into contracts with a temporary legal staffing agency and an information technology contractor and has extended a short-term lease. (*Id.* at attch. 1, ¶ 15) Funds spent pursuant to these contracts total approximately $1.3 million. (*Id.* at attch. 1, ¶ 17) The liquidating trust further spent funds as follows: $142,720 as a premium on a one-year bond covering the liquidating trust's assets; $10,640 as a premium on a one-year bond covering Access Lending's assets; $311,400 as a three-year premium on an Errors and Omissions insurance policy covering the liquidating trust, Jacobs as plan administrator and trustee, and the PAC and its members; and approximately $5.65 million for professionals, including counsel, financial advisors, and accountants.[24] (*Id.*)

Claims have been settled and distributions made after the plan was confirmed, including the following: (1) on July 31, 2008, Credit Suisse First Boston Mortgage Capital LLC reached a settlement with debtors and the Creditors Committee fixing and allowing certain claims and determining its distribution class while waiving other claims; (2) on August 28, 2008, the liquidating trust paid approximately $1.84 million to SPI Litigation Direct LLC ("SPI") in settlement of claims arising out of SPI's work for the debtors; (3) on October 23, 2008, Natixis Real Estate Capital Inc. reached a settlement with the liquidating trust fixing and allowing certain claims and determining its

---

[24]Jacobs avers that the liquidating trust has distributed approximately $21.12 million in payment of professional fees and other pre-effective date administrative claims (D.I. 14 at attch. 1, ¶ 20), but he fails to clarify the allocation between professional fees and administrative claims or whether the $5.65 million in post-effective date professional fees is included in the $21.12 million figure.

12

distribution class while waiving other claims; (4) on October 29, 2008, the liquidating trust paid approximately $46,000 to Fidelity National Information Services in settlement of administrative claims; (5) on November 25, 2008, the liquidating trust paid $66,000 to AT&T, Inc., and its affiliated entities in settlement of administrative claims; (6) on December 12, 2008, the liquidating trust paid $120,000 to Wells Fargo in settlement of administrative claims; (7) on December 19, 2008, the liquidating trust paid $181,000 to GMAC Commercial Finance LLC in settlement of administrative claims; and (8) on December 29, 2008, the liquidating trust paid $2.6 million to a group of employees in settlement of WARN Act claims and other claims arising out of their termination.[25] (*Id.* at attch. 1, ¶ 21)

## III. DISCUSSION

### A. Analysis of Equitable Mootness

Under the doctrine of equitable mootness, a bankruptcy appeal should be dismissed as equitably moot if affording the appellant the relief he seeks "would be inequitable." *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000) (citing *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir. 1996)). Whether the relief sought would be inequitable depends on context. Thus, in deciding whether the doctrine applies, a court must determine whether the relief sought would be inequitable in the context of the case before it.

In determining whether the relief sought would be inequitable and, hence,

---

[25]The bankruptcy court approved each of these settlements. (*See* D.I. 14 at attch. 1, ¶ 21) The liquidating trust also entered into settlements not requiring the bankruptcy court's approval, including settlements with Bloomington Associates 2005 LLC, the Ohio Attorney General, and various taxing authorities. (*Id.* at attch. 1, ¶ 22)

13

whether the doctrine should apply, courts in the Third Circuit are to consider the

following factors:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Continental*, 91 F.3d at 560.  Courts are to give these factors "varying weight,

depending on the circumstances."[26]  *PWS Holding*, 228 F.3d at 236.

Here, the circumstances are that of a chapter 11 liquidation, and the court must

apply the above factors with that liquidation context in mind.[27]  This means that the

---

[26]The *PWS Holding* court goes on to state that "the foremost consideration is whether the reorganization plan has been substantially consummated," *PWS Holding*, 228 F.3d at 236, but, as discussed hereafter, that statement does not necessarily hold true in the liquidation context.

[27]It is reasonable to question whether the equitable mootness doctrine, as articulated by the Third Circuit, even applies in the liquidation context.  The court in *In re Zenith Electronics Corp.* stated that "[t]he underlying purpose of the doctrine is to 'prevent[ ] a court from unscrambling complex bankruptcy **reorganizations** when the appealing party should have acted before the plan became extremely difficult to retract.'" 329 F.3d 338, 345 (3d Cir. 2003) (quoting *Nordhoff Investments, Inc. v. Zenith Electronics Corp.*, 258 F.3d 180, 185 (3d Cir. 2001)) (emphasis added).  Similarly, the court in *Continental*, in listing factors for determining whether the doctrine should apply, expressly referred to "reorganization."  *See Continental*, 91 F.3d at 560.  Likewise, the courts in *Nordhoff*, *PWS Holding*, and *Zenith* discussed the doctrine applying in a reorganization context.  *See generally Nordhoff*, 258 F.3d at 185-90; *PWS Holding*, 228 F.3d at 235-37; *Zenith*, 329 F.3d at 343-47.

That said, the express focus on reorganization in these cases can reasonably be attributed to the fact that reorganization plans were at issue in each.  Moreover, the court is not aware of any reason why it should be concerned with inequitable appellate relief in a reorganization context but not in a liquidation context.  Accordingly, the court assumes, as have other courts in the Third Circuit, that the equitable mootness doctrine may apply in a liquidation context. *See In re Nellson Nutraceutical, Inc.*, 2008 WL 4532514 (D. Del. Oct. 9, 2008); *In re Reading Broadcasting, Inc.*, 2008 WL 3540212 (E.D. Pa. Aug. 8, 2008).

court, in determining whether the relief sought in this case would be inequitable, cannot indiscriminately follow *Continental* and its progeny.[28]  This is because the guidance in those decisions concerning how to apply the above factors invokes considerations and employs examples that are relevant to reorganizations but not as much to liquidations. For example, unraveling a substantially consummated reorganization plan can be difficult and inequitable – difficult in that it requires reversing multiple, often complex, future-looking transactions (securing financing, issuing equity, contracting with producers and/or suppliers, etc.) and inequitable in that it shifts the tables on non-adverse third parties (such as investors, financiers, etc.) who have acted in reliance on the debtor emerging from bankruptcy in accordance with the particulars of the reorganization plan. *See, e.g., Zenith*, 329 F.3d at 344-46. Thus, in a reorganization context, it makes sense to treat the unraveling of the plan as a significant fact weighing in favor of finding the appeal equitably moot. *See generally id.*  However, it makes less sense to treat the unraveling of the plan with such significance in a liquidation context, since (in that context) the plan transactions tend to be discrete and relatively simple transactions aimed at disposing of the debtor's assets in the short term (sale or disposal of assets, services contracts to sustain the debtor through liquidation, etc.) and the non-adverse third parties transacting with the debtor are not doing so with any particular interest in debtor's future condition, let alone relying on debtor's future condition as contemplated by the particulars of any chapter 11 plan. Accordingly, in light of the foregoing and in keeping with the equitable nature of this inquiry, the court

---

[28]"*Continental* and its progeny" refers to *Continental* and *PWS Holding*, both cited previously, as well as *Nordhoff Investments, Inc. v. Zenith Electronics Corp.*, 258 F.3d 180 (3d Cir. 2001), and *In re Zenith Electronics Corp.*, 329 F.3d 338 (3d Cir. 2003).

15

exercises its discretion in assigning weight to the facts of this case.

Two countervailing considerations inform the court's exercise of discretion. On the one hand, public policy is served by encouraging non-adverse third parties to rely on the finality of bankruptcy confirmation orders. *Continental*, 91 F.3d at 565. Since applying the doctrine brings finality, this suggests that there should be a low bar for applying the doctrine and that the court should construe facts accordingly. On the other hand, however, even while encouraging reliance on finality, the court must preserve a meaningful right of appeal. If the equitable mootness bar is too low, that is, if equitable mootness factors swing too easily in favor equitable mootness, the right of appeal becomes meaningless and the instruction to apply the doctrine "cautiously" and on a "limited" scope, *PWS Holding*, 228 F.3d at 236, is contravened.

### 1. Substantial consummation

To determine whether the substantial consummation factor weighs in favor of equitable mootness, the court first looks to whether the bankruptcy code's definition of "substantial consummation" has been satisfied. *Zenith*, 329 F.3d at 343-44. The bankruptcy code defines "substantial consummation" as the:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). If this definition has been satisfied, the court may then look to whether a successful appeal would unravel the plan, *see id.* at 344-45, although, in the liquidation context, that fact has diminished significance. Indeed, where the plan that has been substantially consummated can be "reversed without great difficulty and

16

inequity," this factor does not weigh in favor of equitable mootness. *See Nordhoff*, 258 F.3d at 186.

In this case, the bankruptcy code's definition of substantial consummation has been satisfied:  debtors' assets[29] have been transferred to the liquidating trust for disposition and distributions have commenced.  It is also true that the relief appellants seek would unravel the plan, at least in part, since appellants seek on appeal to undo the plan's debtor groups and protocols.

It does not appear from the record, however, that reversing the plan would result in "great difficulty or inequity."  Certain events are the natural and inevitable consequences of a liquidation, *e.g.*, the discharge of employees, cancellation of equity and debts, transfer of assets to the liquidating trustee, and asset sales, to name a few. Indeed, the only aspects of plan implementation that arguably need to be reversed are the relatively few distributions that have occurred,[30] but these are not sufficient to establish "great difficulty and inequity."  Accordingly, this factor does not weigh in favor of equitable mootness.

### 2. Obtaining a stay

Ordinarily, "[t]he existence or absence of a stay is a critical factor in determining whether to dismiss an appeal under the doctrine of equitable mootness." *In re Grand*

---

[29]Appellants argue that not all or substantially all of debtors' assets have been transferred to the liquidating trust because it has not yet been determined whether debtors had rights to the amounts contributed under the Deferred Compensation Plans, which is a significant asset.  Appellees counter, and the court agrees, that appellants' argument on this point misses the mark.  Whatever rights debtors had with respect to those amounts (even if they had no rights) were transferred as of the effective date, thus satisfying the requirement that all or substantially all assets be transferred.

[30]For example, distributions to administrative and WARN Act claimants.

17

*Union Co.*, 200 B.R. 101, 105 (citing *Continental*, 91 F.3d at 561-63). This is so because where no stay has been obtained, the plan goes forward, and it can be difficult to undo the acts of non-adverse third parties proceeding under the plan without prejudicing those non-adverse third parties. *See generally Continental*, 91 F.3d at 561-63; *In re Highway Truck Drivers & Helpers Local Union #107*, 888 F.2d 293, 297 (3d Cir. 1989).

In this case, however, while no stay has been obtained, the plan has not gone forward freely, at least in part because of the bankruptcy court's imposition of a notice requirement; indeed, it appears from the record that no creditor class has received distributions. Moreover, the plan components that have gone forward are not those on which non-adverse third parties have detrimentally relied.[31] Under the circumstances here, then, appellants' failure to obtain a stay has not resulted in the advanced implementation with which this factor is typically concerned. Thus, this factor does not weigh in favor of equitable mootness.

### 3. Rights of non-adverse third parties

Equitable mootness "protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented." *Continental*, 91 F.3d at 562 (quoting *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (quotation marks omitted)). As has been discussed, the record does not establish that non-adverse parties have relied on the particulars of the current

---

[31]The cancellation of debt and equity may have had tax implications for non-adverse third parties, as Jacobs speculates. However, the record does not establish that a successful appeal would create such difficulty with respect to tax filings as to render the appeal inequitable. Accordingly, the court gives no weight to this speculation.

18

liquidation plan in such a way as to make a reversal of confirmation inequitable.

Accordingly, this factor does not weigh in favor of equitable mootness.

### 4. Affect on the plan's success

As articulated in *Continental* and its progeny, this factor is ultimately concerned

with whether an appellant's requested relief "would affect the re-emergence of the

debtor as a revitalized entity." *Nordhoff*, 258 F.3d at 189 (quotation marks omitted).

The analogous concern in the liquidation context would be whether the appellant's

requested relief would affect the debtor's ability to liquidate.  Because nothing in the

record suggests that undoing the current liquidation plan will affect debtors' ability to

liquidate in the future under a different plan, this factor does not weigh in favor of

equitable mootness.

### 5. Public policy of affording finality to bankruptcy judgments

This factor weighs in favor of equitable mootness where non-adverse third

parties have acted in detrimental reliance on the finality of bankruptcy confirmation

orders to such a degree that reversing those orders would discourage future detrimental

reliance by similarly situated parties. *See Continental*, 91 F.3d at 565.   In the

reorganization context, the finality of bankruptcy judgments is significant because

multiple parties, including non-adverse third parties, have acted in detrimental reliance

on the debtor emerging from bankruptcy as contemplated by the reorganization plan.

*See Continental*, 91 F.3d at 565.  Thus, the public policy favoring finality is allowed to

trump the countervailing consideration of preserving a meaningful right of appeal from

erroneous plan confirmations.  Where parties have not relied to their detriment on

finality, which is often the case in the liquidation context, this factor does not weigh in

19

favor of equitable mootness.

In this case, there is no record that any non-adverse third party changed its position in reliance on finality to the degree that reversing the appeal here would discourage similarly situated parties from transacting business with a liquidating debtor. Accordingly, this factor does not weigh in favor of equitable mootness.

Having found that none of the equitable mootness factors weigh in favor of applying the doctrine in this case, the court denies appellees' motion to dismiss.

### B. Analysis of the Appeal on the Merits

#### 1. Standard of review on appeal

This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact[32] and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities

---

[32] "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

are further informed by the directive of the United States Court of Appeals for the Third

Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *See In*

*re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d

Cir. 2002).

### 2. Questions presented

Appellants present five questions on appeal, two of which the court addresses

here:[33] (1) does the plan provide for substantive consolidation inconsistent with *In re*

*Owens Corning*, 419 F.3d 195 (3d Cir. 2005); and (2) does the plan discriminate among

members of class HC3b in violation of 11 U.S.C. § 1123(a)(4)? The court addresses

these in order.

### 3. Substantive consolidation

Substantive consolidation is an equitable remedy. *In re Owens Corning*, 419

F.3d at 210. It is used, essentially, to address the harms caused by debtors (and their

related entities) disregarding their separateness and/or otherwise entangling their

affairs. *See id.* In function, substantive consolidation "'treats separate legal entities as

if they were merged into a single survivor left with all the cumulative assets and

liabilities (save for inter-entity liabilities, which are erased). The result is that claims

against separate debtors morph into claims against the consolidated survivor.'" *Id.* at

205 (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health*

*Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005)). The pooling of assets in a

---

[33]The court does not address appellants' three additional questions since
resolving the two questions listed here is sufficient to instruct the parties and the
bankruptcy court on remand as to the strictures governing subsequent iterations of the
plan.

21

consolidated survivor, and the resulting increased competition among creditors for a share of those assets, means that certain creditors may recover significantly less in a substantive consolidation scenario. *See id.* Because substantive consolidation is "extreme . . . and imprecise," it works "'rough justice'" and is to be used sparingly. *Id.* at 210. Indeed, in the Third Circuit, substantive consolidation is appropriate only where the parties consent or where the proposed-to-be-consolidated entities "(i) prepetition disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.*

The question raised on appeal is whether the plan, by aggregating multiple debtors into debtor groups to resolve claims, effects a substantive consolidation. As the bankruptcy court points out, the plan here does not call for the typical case of substantive consolidation where multiple separate entities are merged into a single entity and inter-entity liabilities are erased; instead of many-into-one, the plan calls for many-into-three, and the inter-entity liabilities are not erased. Typical or not, however, the many-into-three framework still presents the same potential inequities for creditors as would be presented in the many-into-one framework, namely that creditors face increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually. This is the "rough justice" against which *Owens Corning* warns and, because it is effected by aggregating multiple debtors into one or more debtor groups, it falls within the definition of substantive consolidation.

22

It is true that the aggregation in this case was not accompanied by erasure of inter-entity liabilities and was achieved by compromise settlement. These facts, however, are not meaningful grounds for differentiating the instant case from the typical substantive consolidation scenario because they do not eliminate the aggregation's potentially deleterious effects on creditors, which is the main concern expressed in *Owens Corning* with respect to substantive consolidation and the reason why *Owens Corning* limits the use of substantive consolidation to only a few scenarios. Thus, these differences are not sufficient to place the aggregation in this case outside the definition of substantive consolidation. The bankruptcy court erred, then, in concluding that the plan did not effect a substantive consolidation and, as the record does not show that substantive consolidation is warranted in this case consistent with *Owens Corning*, the plan confirmation must be reversed.

### 4. Disparate treatment of class members in the same class

To be confirmable, a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Courts are to enforce this provision according to its plain language. *See Hartford Underwriters Ins. Co. v. Union Planters*, 530 U.S. 1, 6 (2000). Accordingly, if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable.

The question raised on appeal is whether the plan, by providing 100% of the determined distribution amount on some claims in class HC3b (the "100% claims") and

23

130% on other claims in class HC3b whose holders have relinquished claims in class HC10b (the "130% claims"), treats all claims in class HC3b the same or, in the alternative, discriminates with the holders' consent. The bankruptcy court concluded that the plan discriminates with consent, reasoning that the holders of the 130% claims, instead of insisting on receiving 100% of the determined distribution for their HC3b claims and 100% of the determined distribution for their HC10b claims (a total distribution of 200%), consented to less favorable treatment in the form of receiving 0% on their HC10b claims and 130% on their HC3b claims (a total distribution of 130%). The problem, however, is that consent to less favorable treatment in class HC10b only excuses disparate treatment of claims in that class. It is inapposite to the treatment of claims in class HC3b. The treatment of claims in class HC3b is a separate matter, and it is clear that the plan treats the 100% claims in that class less favorably than the 130% claims without the holders' – or at least appellants' – consent. Thus, the bankruptcy court erred in finding that the plan was in compliance with § 1123(a)(4), and the plan confirmation must be reversed.[34]

## IV. CONCLUSION

For the aforementioned reasons, the court denies debtors' motion to dismiss (D.I. 13), reverses the bankruptcy court's issuances that are the subject of this appeal (Bk. D.I. 8254, 8255, 8596, 8626), and remands the case. An appropriate order shall

---

[34]While the court appreciates the complexity of dealing with the tangle of debtor entities involved at bar, nonetheless, there are limits to what equity alone can accomplish. The Third Circuit has established those limits in *Owens Corning* and, while it is the final arbiter of how those limits apply to any individual fact scenario, this court declines to further expand the scope of equitable powers given a bankruptcy court in these circumstances.

24

issue.