September 24, 2009

Re: Longo vs. New Century TRS Holdings, Inc.

Dear Judge Carey,

My husband and I are aware that whatever documents we plan to provide in support of our action against New Century TRS Holdings, Inc. must also be sent to you. Attached is the additional information that Janine Cerbone requested in a phone conversation we had yesterday. Please note that this in addition to what we sent you last week will be what we are relying on at our proof hearing October 6th 2009. Thank you .

Regards,

*Janet Longo*
Janet Longo

Via Regular Mail, Facsimile and Email                               September 24, 2009

Janine Cerbone

       Re:  Longo vs. New Century TRS Holdings, Inc.

Dear Ms.Cerbone :

      I enclose the document we spoke about yesterday afternoon which shows that in fact, New Century approved the Broker, First National Mortgage Sources in connection with our refinance. Also enclosed is a letter from Charles E. Houston, Jr., Vice President, Senior Counsel and Director of Consumer Litigation for New Century Mortgage Corporation dated November 1, 2006. I am also enclosing an article written by David Cho of the Washington Post. This shall serve to confirm that we will be relying on these documents and this Article together with all of the documents we recently provided you with in support of our action against New Century TRS Holdings, Inc. It is also my intention to rely upon the regulations in RESPA, the Truth-in-Lending Disclosure Act, Underwriter standards, Borrowers Bill of Rights and all other Statutes which I believe pertain to this matter. I will also be making a few Exhibits.

      Please provide me with all of the documentation that you will be relying upon to dispute our claim at this time.

      This shall also confirm that your offer of $10,000.00 to settle our claim is an insult and is flatly rejected. I must state for the record that I am quite intrigued by some of our discussion yesterday. First you advise that your client did NOTHING wrong and yet the overly inflated income came directly from New Century Mortgage employee, underwriter, David Lawrence despite this being a fully documented loan! This was a well orchestrated scam and you are fully aware of it. It is also alarming that you have such blatant disregard for the HUD Settlement Statement and the requirements of RESPA when you mentioned that having more than one Settlement Statement is "standard practice". I will be certain to mention this to the Judge at our proof hearing. This reckless attitude, in addition to the arrogant statements that you made to me as the victim in this matter, makes it crystal clear as to why there was a mortgage meltdown. We were caught in the height of the fraud through no fault of our own and we are now paying dearly for it.

Thank you,

Janet Longo

NEW CENTURY MORTGAGE #3735 WSL
Compliance Department
3351 Michelson Drive
Suite 400
Irvine, CA 92612

09/06/06

Reference Number: 4348109

ALFONSO LONGO
4 FRIAR CT
JACKSON, NJ 08527

Dear ALFONSO LONGO

We recently received a request for credit services on your behalf from our approved mortgage broker. We appreciate the opportunity to serve your financial needs.

We are writing to provide you with the important information you see below.

New Century has ordered your credit report at the request of your mortgage broker:

FIRST NATIONAL MORTGAGE SOURCES LLC
1207 FRONT STREET
SACRAMENTO, CA 95814
(916) 290-4991

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit score.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

If you have questions concerning the terms of the loan, contact the lender.

The name, address and telephone number of the credit reporting agencies providing data are:

| Experian- Fair, Issac (FICO) | Equifax Credit Information Services- Beacon | Trans Union- Empirica |
|---|---|---|
| P.O. Box 9600 | P.O. Box 740241 | P.O. Box 1000 |
| Allen, TX 75013 | Atlanta, GA 90974 | Chester, PA 19022 |
| 1-800-311-4769 | 1-800-685-1111 | 1-800-888-4213 |

Please see the attached for your individual credit scores.

Subj: **New Century**
Date: 11/1/2006 3:41:37 PM Central Standard Time
From: CHouston@ncen.com
To: jlynn22l@aol.com

Charles E. Houston, Jr.
Vice President, Senior Counsel and Director of Consumer Litigation
New Century Mortgage Corporation
3121 Michelson Drive, 6th Floor
Irvine, CA 92612
(949) 517-1685 (phone)
(949) 471-8143 (direct fax)

NOTE: This communication, and any attachment to it, may contain privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient (or authorized to receive for addressee), you may not read, use, copy, disclose or disseminate to anyone the message or any information contained therein. **If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachment(s) without reading, printing or saving in any manner. Thank you.**

202 334-6000 5613

5 of 10

# washingtonpost

# Pressure at Mortgage Firm Led To Mass Approval of Bad Loans

By David Cho
Washington Post Staff Writer
Monday, May 7, 2007; A01

Maggie Hardiman cringed as she heard the salesmen knocking the sides of desks with a baseball bat as they walked through her office. *Bang! Bang!*

" 'You cut my [expletive] deal!' " she recalls one man yelling at her. " 'You can't do that.' " *Bang!* The bat whacked the top of her desk. As an appraiser for a company called New Century Financial, Hardiman was supposed to weed out bad mortgage applications. Most of the mortgage applications Hardiman reviewed had problems, she said.

But "you didn't want to turn away a loan because all hell would break loose," she recounted in interviews. When she did, her bosses often overruled her and found another appraiser to sign off on it.

Hardiman's account is one of several from former employees of New Century that shed fresh light on an unfolding disaster in the mortgage industry, one that could cost as many as 2 million American families their homes and threatens to spill over into the broader economy.

New Century has become the premier example of a group of companies that grew rapidly during the housing boom, selling working-class Americans with questionable credit huge numbers of "subprime" loans with "teaser" rates that typically rose after the first two years. This business transformed the once-tiny New Century into a lending powerhouse that was held up as a model of the mortgage industry's success.

But now, with home values falling and adjustable loan rates rising, record numbers of homeowners are failing to make their payments. And a detailed inquiry into the situation at New Century and other subprime lenders suggests that in the feeding frenzy for housing loans, basic quality controls were ignored in the mortgage business, while the big Wall Street investment banks that backed these firms looked the other way.

New Century, which filed for bankruptcy protection last month, has admitted that it underreported the number of bad loans it made in its financial reports for the first three quarters of 2006. Hardiman and other former employees of New Century interviewed said there was intense pressure from bosses to approve loans, even those with obviously inflated housing appraisals or exaggerated homeowner incomes.

"The stress in that place was ungodly. It was like selling your soul," said Hardiman, who worked for New Century in 2004 and 2005. "There was instant notification to everyone as soon as you rejected a loan. And you dreaded doing it because you paid for it. Two guys would come with a bat, and they were

all [ticked] off because you cut their deals."

New Century officials would not publicly respond to the ex-employees' allegations. A senior executive, who spoke on condition of anonymity because of state and federal investigations into the company, acknowledged that the atmosphere in some branches might have been intense at times. But he said the firm had safeguards to make sure workers did not feel pressure to approve questionable loans.

Hearing what Hardiman went through, he said, was "upsetting" and "not representative of our offices."

"In an organization with this size . . . I'm not naive to think that [such behavior] didn't happen," the executive said. "But I find it highly implausible over the last 10 years that something systemic was going on and somehow it was disguised. . . . There were pressures, especially in a declining market, and those pressures became more robust. But we turned up our controls and our vigilance at the very same time."

**As Industry Grew, Standards Loosened**

Once a little-used lending tool, subprime loans made up 20 percent, or about $600 billion, of all mortgages issued in the country last year. These loans carry a high risk of default because they generally are made to home buyers with questionable credit. But because they require borrowers to pay high interest rates, they have been a gold mine for lenders in recent years, accounting for 30 percent of all profits made in the mortgage business, according to Mercer Oliver Wyman, a consulting firm.

Lenders also made a fortune selling subprime loans to Wall Street. Investment banks charged huge fees for packaging them into massive bonds called mortgage-backed securities. Investors received high returns for buying and selling these bonds.

But there is growing evidence that along this chain, the filters that were supposed to catch bad loans did not work.

Salespeople were supposed to be the "first line of defense" against fraud and bad loans, said Steve Krystofiak, president of the Mortgage Broker Association for Responsible Lending, a group that is trying to retool practices in the industry.

But salespeople worked on commission -- meaning the more loans they sold, the more bonus money they received. "That's a bad business model. It's absolutely contradictory," Krystofiak said, adding that he has witnessed salespeople tweak numbers in mortgage applications to ensure that the loans would be approved.

Automated underwriting software that searches for irregularities and possible fraud was also supposed to stop bad loans. But industry professionals say such programs were easily manipulated. Meanwhile, some appraisers and underwriters, who examine housing values and other claims made on loan applications, say they felt pressure from bosses to let questionable loans through.

New Century and other lenders sold their mortgages through auctions to investment banks. Once a bid was accepted, the investment banks performed their own detailed review and could return any loans deemed questionable without paying for them.

Several investment banks, including               , Morgan Stanley and                 said they rigorously examined the subprime mortgages they had bid on. Morgan Stanley, for instance, said it

reviewed every loan appraisal and the credit histories of about 25 percent of borrowers.

Traders familiar with the bidding process said competition for mortgages from New Century began to heat up in 2005. Mortgage-backed securities based on New Century loans had been performing better for investors than those from other subprime lenders, in some cases producing two or three times the return of a U.S. Treasury bond. Many banks felt they had to loosen their standards and agree to return fewer bad loans in order to win the auctions, the traders said.

The head of a large Wall Street bank's mortgage group contended that his firm regularly lost out on New Century's business because its due diligence process was stringent and it had been returning a high number of loans. New Century wanted the bank to ease its standards, and the issue became a source of friction between the companies.

"The entire industry, over time, became more lax," he said, speaking on condition of anonymity because he was not authorized to talk about his company's inner workings. "The more [loans] you accepted, the better relationship and the better price you would have. The name of the game was definitely volume."

A New Century spokeswoman said negotiating with banks to reduce both their due diligence and the number of loans they returned was a "generally accepted practice" that was "always a matter of discussion."

There was little downside for banks to push paper through the pipeline, said Kevin Beyers, a forensic accountant at Parkside Associates in Atlanta who specializes in the mortgage industry. Besides returning loans, these firms could require a lender to buy back loans that had cleared the banks' reviews but later turned out to be bad.

"Loose underwriting was not a secret," Beyers said. "[Investment] banks had to have known what was going on. They just have too much information and sophistication at their fingertips. And they knew the lenders pretty well."

**Firm Unravels With Market's Slump**

To address the problem of bad loans, New Century said since 2000 it has been reducing the compensation of branch managers if they approved loans that were later determined to bad. Underwriters have always been paid on the quality of their work rather than the volume of loans approved. New Century said it always had monitored the performance of employees and last year implemented a statistical program that tracked whether they were approving a high number of bad loans.

A spokeswoman said these moves helped the firm reject or reduce the appraisal value of 20 percent of the loan applications it received in the Northeast last year.

The firm's comments are difficult to square with accounts from rank-and-file workers. These employees worked at five different branches that handled subprime loans all over the country. All except Hardiman spoke on condition of anonymity, citing recent e-mails from the firm telling them not to comment publicly, although the company said that is standard corporate media policy. Hardiman said she was fired for refusing to approve weak loans. Others said they left because they were pressured to pump loans through the system. A few were interviewed while they were worked at New Century but then lost their jobs after the firm filed for bankruptcy.

Although there were variations in their descriptions of the atmosphere in their offices, most said they

were pushed to approve questionable loans. Several of the interviewed employees said they faced "unofficial quotas" of loans that had to be approved each day. The pressure to meet these expectations was so unrelenting that a worker in Foxboro, Mass., collapsed from stress and was taken to the hospital, two employees said. In the firm's Long Island branch, the atmosphere resembled a fraternity, largely because the average age was 23, an appraiser there said.

A veteran appraiser who worked in Pearl River, N.Y., said he joined New Century because he had heard the pay was good. That turned out to be true, but he quickly discovered that the place was a pressure cooker. He said he often was encouraged "to make loans work." His boss generally supported him when he wanted to reject a questionable loan, he said. But other office managers "were all about the numbers just so they got their bonuses."

Still, the veteran appraiser didn't blame them.

"They were pressured to make loans, that's how you do business," said the man. "They were trying to do more and more business. That's essentially what Wall Street wanted."

For years, the volume strategy worked.

Shares in the Irvine, Calif., company rose from $5 in early 2001 to $66 at the end of 2004, cementing its status as a Wall Street favorite. Last year it issued $51.6 billion in loans, more than any other specialized subprime mortgage lender.



When times were good, the company showered lavish gifts on its salespeople, treating them to vacations in Europe and Caribbean cruises hosted by sports celebrities. As recently as March, a few weeks before it filed for bankruptcy, the company had a trip to Ireland scheduled, employees said.

The boom continued for New Century until 2006, when mortgage payment default rates spiked. That happened because homeowners who bought houses last year generally saw their values drop. And, in a declining housing market, many homeowners, especially those who are poor, choose to let their mortgages fall into delinquency rather than try to keep up with the payments, analysts said.

At first, it appeared the cumulative effect of these defaults would have only a moderate effect on New Century's earnings. Then, in February, the company said it would need to revise its financial results for the first three quarters of 2006. A few weeks later, it acknowledged that federal investigators had launched probes into the timing of the stock sales of some of its executives. The company declined to comment on the investigations.

The announcements rattled the markets because the firm was so well regarded. The stock price plummeted 90 percent, and the firm was delisted from the New York Stock Exchange. (Shares now trade under a dollar on an obscure exchange.) New Century filed for bankruptcy April 2 but said current customers would be unaffected and could continue making their mortgage payments.

The appraiser in the Pearl River branch said he considered himself a loyal employee and planned to stick by the company through its struggles. But he was fired the day after the bankruptcy filing, along with 3,200 employees, or half the firm's workforce. Most of those interviewed said they were offered two weeks of pay at rates lower than their salary. A few said they did not receive any severance.

New Century announced Thursday that it is laying off 2,000 more associates. The firm is left with about 750 employees, a company spokeswoman said.

http://www.washingtonpost.com/wp-dyn/content/article/2007/05/06/AR2007050601402_...   12/17/2008

Hardiman, the former New Century appraiser, said she was not surprised by the company's downfall. Few at the company seemed to be thinking long-term when she was there. The message she heard constantly from headquarters, which was broadcast at work conferences and in e-mails, was to approve more loans.

"We were constantly told, 'If you look the other way and let an additional three to four loans in a day that would mean millions more in revenue for New Century over the course of the week,' " Hardiman said. She added that it seemed "no one, from the top levels down to the lower levels of the office, didn't want those loans to go through."

© 2007 The Washington Post Company

Qualify For Federal Refinance or Loan Modification. Late Pmts OK!

Make your mortgage affordable for a lifetime! Lock in today.

No Minimum Credit Score. Get a Low Fixed Rate with an FHA Loan Today!



Home · A Borrowers's Bill of Rights · The Warning Signs of Abusive Lending · Report Abusive Lending

# stopmortgagefraud.com

## The Borrower's Bill of Rights

- A borrower has the right to clear and forthright explanations of the terms and conditions of a loan.

- A borrower has the right to timely and truthful disclosures regarding the rates and costs of the loan.

- A borrower has the right to accurate disclosure of final annual percentage rate and amount of regular payments at the time of loan closing/settlement.

- A borrower has the right not to be subject to deceptive marketing tactics.

- A borrower has the right to obtain credit counseling prior to closing on the loan.

- A borrower has the right to have a lender consider a borrower's ability to repay the loan before such credit is extended.

- A borrower should receive an identifiable benefit when charged a fee or a higher interest rate to refinance a loan.

- A borrower has the right to not be subject to a requirement that he or she finance any portion of points or fees.

- A borrower has the right to decline credit insurance in connection with a loan.

- A borrower has the right to a fair and equitable resolution to any disputes related to their loan.

- A borrower has the right to have favorable information reported to credit bureaus on a timely basis.

1919 Pennsylvania Ave, NW Washington, DC 20006-3438
(202) 557-2700, All Rights Reserved.

PLEASE NOTE: Nothing in this site should be construed as legal advice. If you believe you have a problem, please consult with one or more of the resources we have identified and linked to, or otherwise, seek local assistance for your particular problem.