# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Honorable Kevin J. Carey |
| | Chapter 11 |

| | |
|---|---|
| New Century Mortgage Corporation | 07-10419 |
| New Century Mortgage Ventures, LLC | 07-10429 |
| NC Capital Corporation | 07-10420 |
| NC Residual III Corporation | 07-10424 |
| New Century R.E.O. Corp. | 07-10426 |
| New Century R.E.O. II Corp. | 07-10427 |
| New Century R.E.O. III Corp. | 07-10428 |
| NC Deltex, LLC | 07-10430 |
| NCoral, L.P. | 07-10431 |
| NC Asset Holding, L.P. | 07-10423 |
| Home123 Corporation | 07-10421 |
| New Century TRS Holdings, Inc. | 07-10416 |
| NC Residual IV Corporation | 07-10425 |
| New Century Credit Corporation | 07-10422 |
| New Century Financial Corporation | 07-10417 |
| New Century Warehouse Corporation | 07-11043 |

Debtors.

# DISCLOSURE STATEMENT FOR THE MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION DATED AS OF SEPTEMBER 30, 2009

| | |
|---|---|
| Mark S. Indelicato | Bonnie Glantz Fatell |
| Mark T. Power | David W. Carickhoff |
| Janine M. Cerbone | BLANK ROME LLP |
| HAHN & HESSEN LLP | 1201 Market Street |
| 488 Madison Avenue | Suite 1800 |
| New York, New York 10022 | Wilmington, DE 19891 |
| (212) 478-7200 | (302) 425-6400 |

Counsel for Alan M. Jacobs
as Plan Administrator of Reorganized Access Lending
and as Liquidating Trustee of the New Century Liquidating Trust
(including in the Liquidating Trustee's capacity as sole officer and director of each Debtor).

**TABLE OF CONTENTS**

I.     PURPOSE OF THE MODIFIED DISCLOSURE STATEMENT ......................................2

II.    BACKGROUND ...............................................................................................................4

       A.    BANKRUPTCY FILING BY THE DEBTORS.....................................................4

       B.    THE ORIGINAL PLAN ........................................................................................5

             (i)    Confirmation of the Original Plan .............................................................5

             (ii)   Occurrence of the Original Effective Date ................................................6

             (iii)  The Appeal of the Original Confirmation Order .......................................6

             (iv)   Preservation of the Status Quo Pending Appeal to the Third Circuit .........8

       C.    ACTIONS TAKEN SINCE THE ORIGINAL EFFECTIVE DATE .....................9

             (i)    Causes of Action .......................................................................................9

             (ii)   Discharge of Examiner; Attorney Client Privilege Issues ........................10

             (iii)  Sale of Trust Assets .................................................................................11

             (iv)   DCP Litigation .........................................................................................11

III.   THE MODIFIED PLAN...................................................................................................12

       A.    SUMMARY OF THE MODIFIED PLAN ............................................................12

       B.    RECOMMENDATION .......................................................................................13

       C.    CLASSIFICATION AND TREATMENT OF CLAIMS .....................................14

       D.    Solicitation procedures.........................................................................................20

             (i)    Eligibility to Vote ....................................................................................20

             (ii)   Ballots ......................................................................................................25

             (iii)  Voting Procedure .....................................................................................25

             (iv)   Deadline for Voting ..................................................................................25

             (v)    Importance of your Vote...........................................................................25

       E.    MEANS OF IMPLEMENTING THE MODIFIED PLAN ..................................26

(i)     Implementation of Modified Plan ................................................................26

F.     CLAIMS AND DISTRIBUTIONS ..........................................................................26

G.     PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS ...............................................................................................................32

(i)     Reservation of Rights to Object to Claims ...............................................32

(ii)     Objections to Claims. ...............................................................................33

(iii)     Service of Objections. ...............................................................................33

(iv)     Determination of Claims. ..........................................................................33

(v)     No Distributions Pending Allowance. .......................................................34

(vi)     Claim Estimation. .....................................................................................34

(vii)     Allowance of Claims Subject to Section 502 of the Bankruptcy Code. .........................................................................................................34

H.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............................34

I.     EFFECT OF CONFIRMATION AND INJUNCTION .......................................35

(i)     Injunction ..................................................................................................35

(ii)     Term of Injunctions ..................................................................................36

(iii)     Exculpation ...............................................................................................36

(iv)     Binding Effect of the Modified Plan and the Actions Taken Under the Original Plan Prior to the Entry of the Reversal Order .......................37

J.     CONDITIONS PRECEDENT ...............................................................................37

(i)     Conditions Precedent to Modified Effective Date ....................................37

a.     Approval of Modified Disclosure Statement. ................................37

b.     Approval of Plan Compromises. ....................................................38

c.     Form of Modified Confirmation Order. .........................................38

d.     Entry of Modified Confirmation Order. .........................................38

(ii)     Revocation, Withdrawal, or Non-Consummation of Modified Plan .........38

K.     RETENTION OF JURISDICTION ........................................................................38

L.     NON-SEVERABILITY. ......................................................................................39

M.    BANKRUPTCY RULE 9019 REQUEST ............................................................39

IV.    FINANCIAL INFORMATION ......................................................................................39

A.     IN THE BANKRUPTCY PROCEEDING ...........................................................39

B.     FINANCIAL ACTIVITY SINCE THE ORIGINAL EFFECTIVE DATE...........39

(i)     Transfer on the Effective Date ................................................................39

(ii)    Cash Position as of August 31, 2009 .......................................................39

C.     PROJECTED NET DISTRIBUTABLE ASSETS .................................................41

D.     RISKS AND ASSUMPTIONS ASSOCIATED WITH RECOVERY PROJECTIONS .................................................................................................41

V.     CERTAIN FACTORS TO BE CONSIDERED REGARDING THE MODIFIED PLAN ........................................................................................................................42

VI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................42

VII.   ALTERNATIVES TO CONFIRMATION OF THE PLAN ............................................43

VIII.  ACCEPTANCE AND CONFIRMATION OF THE PLAN...............................................43

A.     GENERAL CONFIRMATION REQUIREMENTS .............................................43

B.     BEST INTERESTS TEST ..................................................................................44

(i)     Generally ................................................................................................44

C.     FINANCIAL FEASIBILITY TEST. ...................................................................45

D.     ACCEPTANCE BY IMPAIRED CLASSES. ......................................................45

E.     APPROVAL OF PLAN SETTLEMENTS ..........................................................48

IX.    CONCLUSION...........................................................................................................48

# I. PURPOSE OF THE MODIFIED DISCLOSURE STATEMENT

**APPROVAL OF THIS MODIFIED DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT MEAN THAT THE BANKRUPTCY COURT RECOMMENDS ACCEPTANCE OR REJECTION OF THE MODIFIED PLAN.**

The information used in preparing this Modified Disclosure Statement was obtained by the Liquidating Trustee from information in the Debtors' books and records that were turned over to the Liquidating Trustee on the Original Effective Date. This Modified Disclosure Statement does not constitute financial or legal advice. Creditors and Holders of Interests of the Debtors should consult their own advisors if they have questions about the Modified Plan or this Modified Disclosure Statement. Capitalized terms used in this Modified Disclosure Statement and not expressly defined herein will have the meaning ascribed to such terms in the Modified Plan. The Modified Plan is annexed hereto as **Exhibit A**. A reference in this Modified Disclosure Statement to a "Section" refers to a section of this Modified Disclosure Statement.

The Original Disclosure Statement, prepared by the Debtors in support of the Original Plan, was approved by the Bankruptcy Court on March 18, 2008. The Original Disclosure Statement contains significant information regarding the Debtors' chapter 11 proceedings including the events leading up to the bankruptcy filing, the terms of the Original Plan and the complex settlements set forth therein including the Multi-Debtor Claims Protocol, the Intercompany Claims Protocol and the EPD/Breach Claims Protocol. The purpose of this Modified Disclosure Statement is not to repeat the information contained in the Original Disclosure Statement but to describe the proposed changes to the Original Plan that are necessary to proceed in accordance with the Memorandum Opinion and Reversal Order whereby the District Court reversed confirmation of the Original Plan and to implement the settlement of the Adversary Proceeding commenced by the Beneficiaries. This Modified Disclosure Statement will also address actions that have transpired since the Original Effective Date and the effects, if any, such actions have on Creditors. The Original Disclosure Statement is annexed hereto as **Exhibit B** and is incorporated herein and made a part hereof to the extent not inconsistent with the Modified Disclosure Statement for any and all information regarding the provisions of the Original Plan that are being adopted and implemented in the Modified Plan.

**WHILE THIS MODIFIED DISCLOSURE STATEMENT DESCRIBES CERTAIN BACKGROUND MATTERS AND THE MATERIAL TERMS OF THE MODIFIED PLAN, IT IS INTENDED AS A SUMMARY DOCUMENT ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MODIFIED PLAN AND THE EXHIBITS ATTACHED TO THE MODIFIED PLAN AND THIS MODIFIED DISCLOSURE STATEMENT. YOU SHOULD READ THE MODIFIED PLAN AND ITS EXHIBITS TO OBTAIN A FULL UNDERSTANDING OF THEIR PROVISIONS. ADDITIONAL COPIES OF THE MODIFIED DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS MODIFIED DISCLOSURE STATEMENT, AS WELL AS COPIES OF THE ORIGINAL DISCLOSURE STATEMENT, CAN BE OBTAINED FROM NEW CENTURY LIQUIDATING TRUST, 3777 MICHELSON, SUITE CN-350, IRVINE, CA 92612 (ATTENTION: MONIKA LEMHOEFER MCCARTHY), AND BLANK ROME LLP, 1201 MARKET STREET, SUITE 800, WILMINGTON, DE 19891 (ATTENTION: BONNIE GLANTZ FATELL, ESQ. AND DAVID CARICKHOFF, ESQ.),**

OR BY ELECTRONIC MAIL TO LiquidatingTrust@ncen.com. COPIES OF PAPERS FILED IN THIS CASE ALSO MAY BE INSPECTED DURING REGULAR COURT HOURS IN THE CLERK'S OFFICE, UNITED STATES BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 MARKET STREET, 3RD FLOOR, WILMINGTON, DELAWARE 19801.

THE STATEMENTS AND INFORMATION CONCERNING THE DEBTORS AND THE MODIFIED PLAN SET FORTH IN THIS MODIFIED DISCLOSURE STATEMENT AND THE ORIGINAL DISCLOSURE STATEMENT, TO THE EXTENT NOT INCONSISTENT WITH THIS MODIFIED DISCLOSURE STATEMENT, CONSTITUTE THE ONLY STATEMENTS OR INFORMATION CONCERNING SUCH MATTERS THAT HAVE BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE MODIFIED PLAN.

THE STATEMENTS CONTAINED IN THIS MODIFIED DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. NEITHER DELIVERY OF THIS MODIFIED DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE MODIFIED PLAN WILL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE THIS MODIFIED DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THIS MODIFIED DISCLOSURE STATEMENT WERE COMPILED. THE LIQUIDATING TRUSTEE ASSUMES NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DOES NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES.

THIS MODIFIED DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE MODIFIED PLAN. CERTAIN OF THE INFORMATION CONTAINED IN THIS MODIFIED DISCLOSURE STATEMENT IS BASED ON ASSUMPTIONS THAT WERE INCLUDED IN THE ORIGINAL DISCLOSURE STATEMENT TO ENABLE CREDITORS TO COMPARE THE DISTRIBUTION TO BE PROVIDED UNDER THIS MODIFIED PLAN WITH THOSE PROJECTED UNDER THE ORIGINAL PLAN. THE ESTIMATES, ASSUMPTIONS AND PROJECTIONS UTILIZED IN THIS MODIFIED DISCLOSURE STATEMENT MAY BE MATERIALLY DIFFERENT FROM ACTUAL RESULTS, INCLUDING ESTIMATES OF THE CASH THAT WILL BE AVAILABLE FOR DISTRIBUTION TO THE HOLDERS OF CLAIMS, ESTIMATES OF THE PERCENTAGE RECOVERY OF THE VARIOUS TYPES OF CLAIMS AND INTERESTS, ESTIMATES OF THE AGGREGATE FINAL AMOUNTS OF THE VARIOUS TYPES OF CLAIMS, ESTIMATES OF THE PROCEEDS FROM THE SALES OF THE DEBTORS' REMAINING ASSETS AND ESTIMATES OF THE EXPENSES THAT WILL BE INCURRED BY THE LIQUIDATING TRUST DURING THE WIND DOWN PERIOD. THERE CAN BE NO ASSURANCE THAT ANY FORECASTED OR PROJECTED RESULTS CONTAINED HEREIN WILL BE REALIZED, AND ACTUAL RESULTS

MAY VARY FROM THOSE SHOWN, POSSIBLY BY MATERIAL AMOUNTS. IN FACT, SOME OF THE ACTUAL RESULTS ACHIEVED SINCE THE ORIGINAL DISCLOSURE STATEMENT WAS APPROVED DO VARY SUBSTANTIALLY FROM THE ESTIMATES UTILIZED IN THE ORIGINAL DISCLOSURE STATEMENT.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THIS MODIFIED DISCLOSURE STATEMENT. PURSUANT TO THE MODIFIED PLAN, ANY SECURITIES OF THE DEBTORS ISSUED TO ANY PARTY UNDER, PURSUANT TO OR IN EFFECTUATING THE MODIFIED PLAN, AND THE OFFERING AND ISSUANCE THEREOF BY ANY PARTY, INCLUDING WITHOUT LIMITATION THE DEBTORS, ARE EXEMPT FROM SECTION 5 OF THE SECURITIES ACT OF 1933, IF APPLICABLE, AND FROM ANY STATE OR FEDERAL SECURITIES LAWS REQUIRING REGISTRATION FOR THE OFFER OR SALE OF A SECURITY OR REGISTRATION OR LICENSING OF AN ISSUER OF, UNDERWRITER OF, OR BROKER OR DEALER IN, A SECURITY, AND OTHERWISE ENJOY ALL EXEMPTIONS AVAILABLE FOR DISTRIBUTIONS OF SECURITIES UNDER A PLAN IN ACCORDANCE WITH ALL APPLICABLE LAW, INCLUDING WITHOUT LIMITATION SECTION 1145 OF THE BANKRUPTCY CODE.

## II. BACKGROUND

### A. BANKRUPTCY FILING BY THE DEBTORS

The following debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on April 2, 2007 (the "Petition Date"), thereby commencing case numbers 07-10416, 07-10417, 07-10419, 07-10420, 07-10421, 07-10422, 07-10423, 07-10424, 07-10425, 07-10426, 07-10427, 07-10428, 07-10429, 07-10430, and 07-10431 (collectively, and with the chapter 11 case of New Century Warehouse Corporation, the "Chapter 11 Cases") currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"):

| | |
|---|---|
| New Century Financial Corporation, a Maryland corporation; Case No. 07-10417 | New Century R.E.O. Corp., a California corporation; Case No. 07-10426 |
| New Century TRS Holdings, Inc., a Delaware corporation; Case No. 07-10416 | New Century R.E.O. II Corp., a California corporation; Case No. 07-10427 |
| New Century Mortgage Corporation, a California corporation; Case No. 07-10419 | New Century R.E.O. III Corp., a California corporation; Case No. 07-10428 |

| | |
|---|---|
| NC Capital Corporation, a California corporation;<br>Case No. 07-10420 | New Century Mortgage Ventures, LLC, a Delaware limited liability company;<br>Case No. 07-10429 |
| Home123 Corporation, a California corporation;<br>Case No. 07-10421 | NC Deltex, LLC, a Delaware limited liability company;<br>Case No. 07-10430 |
| New Century Credit Corporation, a California corporation;<br>Case No. 07-10422 | NCoral, L.P., a Delaware limited partnership;<br>Case No. 07-10431 |
| NC Asset Holding, L.P., a Delaware limited partnership;<br>Case No. 07-10423 | NC Residual IV Corporation, a Delaware corporation;<br>Case No. 07-10425 |
| NC Residual III Corporation, a Delaware corporation;<br>Case No. 07-10424 | |

Subsequently, on August 3, 2007, New Century Warehouse Corporation, a California corporation which is also known as and is referred to herein as "Access Lending" (collectively with the above-listed entities, the "Debtors"), filed a voluntary chapter 11 petition (Case No. 07-11043).

## B. THE ORIGINAL PLAN

### (i) Confirmation of the Original Plan

On February 2, 2008, the Debtors and the Official Committee of Unsecured Creditors of the Debtors (the "Creditors Committee") as co-proponents (the "Original Plan Proponents") filed the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008 [Docket No. 4805] and the Debtors filed the Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008 [Docket No. 4804].

On February 15, 2008, the Debtors filed the Motion of Debtors and Debtors-in-Possession for an Order (A) Approving Proposed Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008; (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Proposed Joint Chapter 11 Plan of Liquidation; and (C) Scheduling a Hearing

on Confirmation of Proposed Join Chapter 11 Plan of Liquidation and Approving Related Notice Procedures [Docket No. 4897] (the "Original Procedures Motion"). On February 27, 2008, the Debtors filed the Amended Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008 [Docket No. 5103], which was approved by the Bankruptcy Court on March 18, 2008 (the "Original Disclosure Statement"). On March 18, 2008, the Original Plan Proponents filed their First Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March 18, 2008 [Docket No. 5405] and this Court entered its order approving the Original Procedures Motion [Docket No. 5396] (the "Original Procedures Order"), which also approved the Original Disclosure Statement and found it to contain adequate information in accordance with the provisions of Section 1125 of the Bankruptcy Code.

On April 23, 2008, the Debtors filed the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April 23, 2008 [Docket No. 6412] (as modified by the Confirmation Order, the "Original Plan"). On July 2, 2008, the Bankruptcy Court rendered its Opinion on Confirmation, In re New Century Trs Holdings, Inc., 390 B.R. 140 (Bankr. D. Del 2008), ("Opinion on Confirmation") and on July 15, 2008, the Bankruptcy Court entered the Order Confirming the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April 23, 2008 (the "Original Confirmation Order"). On July 22, 2008, the Court entered the Order Amending the Confirmation Order (the "Order Amending Confirmation Order").

### (ii) Occurrence of the Original Effective Date

On August 1, 2008 (the "Original Effective Date"), the Original Plan became effective. Pursuant to the terms of the Original Plan, on the Original Effective Date, Alan M. Jacobs ("Jacobs") was appointed as Plan Administrator of Reorganized Access Lending and the New Century Liquidating Trust Agreement (the "Trust Agreement") was executed, thereby creating the Liquidating Trust and appointing Jacobs as Liquidating Trustee of the Liquidating Trust.

On the Original Effective Date, all of the Assets of the Debtors were transferred to the Liquidating Trust, including approximately $71.5 million in cash. An additional $5.1 million was transferred to the Access Lending bank accounts. In addition, on the Original Effective Date, the Creditors Committee was dissolved and the Plan Advisory Committee was created. All of the Debtors' remaining officers and directors resigned while Alan M. Jacobs was appointed sole officer and director of each of the remaining Debtors to assist in the winding up of the Debtors' estates.

On August 4, 2008, a Notice of (I) Entry of Order Confirming Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors dated as of April 23, 2008, (II) Effective Date and (III) Bar Dates for Administrative Claims, Professional Fee Claims, Subordination Statements and Rejection Damages Claims (the "Notice of Original Effective Date") was filed with the Court and served on all known creditors and parties-in-interest.

### (iii) The Appeal of the Original Confirmation Order

On July 14, 2008, Gregory J. Schroeder, Michelle Park, Martin Warren, Steve Holland and Nabil Bawa and the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan, for themselves and all other similarly situated beneficiaries of the New Century Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan (collectively, the "Beneficiaries") filed a Notice of Appeal of the Opinion on Confirmation and the Order Regarding the Opinion on Confirmation (the "First Appeal"). On July 24, 2008, the Beneficiaries filed a Notice of Appeal of the Confirmation Order and the Order Amending the Confirmation Order (the "Second Appeal" and together with the First Appeal, the "Appeal").

On July 29, 2008, the Beneficiaries filed a motion to stay the Original Confirmation Order pending their Appeal (the "Beneficiaries' Stay Motion"). After a hearing on August 22, 2008, the Bankruptcy Court denied the Beneficiaries' Stay Motion, but imposed, with the consent of the Liquidating Trustee, a notice mechanism that required that the Liquidating Trustee, as hereinafter defined, to provide the Beneficiaries with notice before certain Classes of Creditors would be permitted to receive distributions under the Original Plan.

On January 22, 2009, the Debtors filed a motion to dismiss the Appeal on the grounds of equitable mootness (the "Motion to Dismiss"). On June 16, 2009, the United States District Court for the District of Delaware (the "District Court") issued a Memorandum Opinion, In re New Century Trs Holdings, Inc., 407 B.R. 576 (Bankr. D. Del 2009), (the "Memorandum Opinion") and signed an Order denying the Trust's Motion to Dismiss and reversing the Confirmation Order (the "Reversal Order") which were entered on the Docket on June 17, 2009. See Memorandum Opinion at 20. Despite finding that the Original Plan had been substantially consummated and reversal of the Original Plan would require unraveling of the Original Plan, the District Court nonetheless held that the Beneficiaries' Appeal of the Confirmation Order was not equitably moot. See Memorandum Opinion at 16.

Next, the District Court determined that aspects of the Original Plan resulted in improper substantive consolidation. However, the District Court acknowledged that "the plan here does not call for a typical case of substantive consolidation," and that "the aggregation in this case was not accompanied by erasure of inter-entity liabilities and was achieved by compromise settlement." See Memorandum Opinion at 22–23. Nevertheless, the District Court found that the structure of the Original Plan led to increased competition for creditors for a consolidated pool of assets resulting in a "less precise" valuation of certain creditor's claim than if the creditors were dealing with Debtors as individual groups. See Memorandum Opinion at 22.

Finally, the District Court also held that the treatment of certain Holders of Claims in Class HC3b in the Original Plan was in violation of section 1123(a)(4) of the Bankruptcy Code. See Memorandum Opinion at 23. The District Court found that the enhanced Determined Distribution Amounts received by certain Holders of Claims in Class HC3b based on the Multi-Debtor Claim Protocol was a detriment to other Holders of Claims in Class HC3b not receiving enhanced Determined Distribution Amounts and thus was a violation of the Bankruptcy Code.

The District Court did not find any other violation of the Bankruptcy Code by the Original Confirmation Order. Rather, the District Court found that many of the actions taken by the Liquidating Trustee since the Original Effective Date were the "natural and inevitable

consequences of a liquidation" and, therefore, need not be undone in order to properly address the issues raised by the Reversal Order.

On June 24, 2009 the Liquidating Trustee filed with the District Court: (i) a Motion for Rehearing or in the alternative Clarification of the District Court Order on Appeal (the "Motion for Rehearing"), (ii) a Motion for Stay of the District Court Order (the "Motion for Stay"), (iii) an Affidavit of Alan M. Jacobs in support of Motion for Rehearing and Motion for Stay, and (iv) an Emergency Motion for Expedited Consideration of Motion for Rehearing and Motion for Stay.

On June 26, 2009 the District Court entered an order (the "Stay Order") denying the Motion for Rehearing but granting the Motion for Stay, granting a stay of the Memorandum Opinion and Reversal Order pending appeal to the Third Circuit Court of Appeals (the "Stay"). On July 17, 2009, the Liquidating Trustee filed his Notice of Appeal of the Memorandum Opinion and Reversal Order.

### (iv)     Preservation of the Status Quo Pending Appeal to the Third Circuit

The District Court in its Memorandum Opinion found that reversing the Original Confirmation Order would not result in great difficulty or inequity because "[c]ertain events are the natural and inevitable consequences of a liquidation, e.g., the discharge of employees … transfer of assets to the Liquidating Trustee, and asset sales . . . Indeed, the only aspects of plan implementation that arguably need to be reversed are the relatively few distributions that have occurred." Memorandum Opinion at 17. In its Stay Order, the District Court reaffirmed its position regarding the intended affects of its Reversal Order by stating that "[t]he court's June 17, 2009 memorandum opinion and order reversed the plan's debtor grouping and disparate intra-class distribution provisions. The Liquidating Trustee's authority, the settlement of claims, privilege – none of these, so far as the court is aware, need be affected by the relief granted." Stay Order at 3.

On July 17, 2009, the Liquidating Trustee and the Plan Advisory Committee filed the Motion for order preserving the status quo, including (i) maintaining the Liquidating Trust and Reorganized Access Lending and (ii) maintaining Alan M. Jacobs as the Liquidating Trustee of the Liquidating Trust, Plan Administrator of Reorganized Access Lending and sole officer and director of the Debtors, pending entry of a final order consistent with the District Court's Memorandum Opinion (the "Status Quo Motion").

The Bankruptcy Court entered an order granting the Status Quo Motion on July 27, 2009 (the "Status Quo Order"). Pursuant to the terms of the Status Quo Order, the Liquidating Trustee has withdrawn his appeal of the Memorandum Opinion and the Reversal Order. The Liquidating Trustee proposes the Modified Plan to address the concerns raised by the District Court in the Memorandum Opinion while also preserving the integrity of the Original Plan and the complex and interrelated compromises that were negotiated by all of the major creditor constituencies that formed the basis of the Original Plan.

**C. ACTIONS TAKEN SINCE THE ORIGINAL EFFECTIVE DATE**

    **(i) Causes of Action**

Once the Original Plan became effective, the Liquidating Trustee's primary responsibility on behalf of all creditors was to maximize the value of the Trust Assets, which included the various Causes of Action that the Debtors transferred to the Trust on the Original Effective Date. In order to properly fulfill such responsibilities, the Liquidating Trustee, with the assistance of his professionals, began an immediate investigation and analysis of potential Causes of Actions against third parties (or in some cases continued the investigations conducted by the Creditors' Committee). This was particularly important given the implications of section 546(a) of the Bankruptcy Code, which provides for a two-year statute of limitations from the Petition Date on certain causes of action. As a result of this investigation, the Liquidating Trustee, in consultation with the Plan Advisory Committee and professionals of the Liquidating Trust, commenced various litigations in the Bankruptcy Court and in certain state and federal courts. The Liquidating Trustee was the only party empowered to commence these actions and because the effectiveness of the Original Plan was not stayed, the Liquidating Trustee was obligated to bring these actions in accordance with his fiduciary duty to all creditors.

More particularly, on or prior to April 2, 2009, the Liquidating Trustee commenced the following actions:

    a.    Three actions against KPMG LLP and/or KPMG International seeking in excess of $1 billion in damages, including (i) an action against KPMG International in the United States District Court for the Southern District of New York, (ii) an action against KPMG LLC in the state court in California, and (iii) a mediation/arbitration against KPMG LLC;

    b.    An action against various former officers and directors seeking in excess of $150 million in damages and avoidance claims, and alleging breaches of fiduciary duties that led to the Debtors' collapse;

    c.    An action against certain former officers seeking the return of payments for bonuses that should not have been paid based on the Debtors' restatement of its earnings for the 2005 and 2006 fiscal years;

    d.    Approximately one hundred and sixty (160) preference actions seeking the return of over $30 million. Since April 1, 2009, approximately ninety-three (93) preference actions have been settled by the Liquidating Trustee (thirty-four of which followed the filing of suit and fifty-nine of which settled prior to the filing of the suit) resulting in a total recovery to the Debtors' Estates to date of approximately $1,750,000 plus the waiver of claims by certain potential defendants; and

e.  Additionally, approximately thirty-two (32) potential preference matters have been tolled for a short period of time pursuant to written agreements between the Liquidating Trustee and the potential preference defendants, involving the avoidance of over $31 million in pre-petition transfers.

As of the Original Effective Date, there were two litigations pending against certain of the Debtors' former insurance companies related to the denial of coverage by the insurance carriers for acts that occurred prior to the Petition Date – one was pending before the Delaware District Court and one was pending before the state court in California. The litigation in the state court in California (the "Liberty Mutual Litigation") resulted in a pre-trial settlement against two of the Debtors' former insurance brokers for approximately $1.2 million, and proceeded to trial against Liberty Mutual. The jury trial began in May 2009 in state court in California and on June 1, 2009, the Liquidating Trustee settled the lawsuit against Liberty Mutual for $5 million. The insurance litigation pending in Delaware as of the Original Effective Date is still pending as of the date hereof.

### (ii)  Discharge of Examiner; Attorney Client Privilege Issues

An additional component of the investigation by the Liquidating Trustee was to gain access to the work product produced by the Examiner, who was appointed by the Bankruptcy Court to investigate, *inter alia*, the Debtors' restatement of their financial statements. In his extensive investigation of the issues surrounding the Debtors' need for such restatement, the Examiner reviewed thousands of pages of documents from various third parties. The Examiner's turnover of these documents to the Liquidating Trustee was vigorously contested by certain of the Debtors' former directors, KPMG LLP and parties to the securities litigation commenced against the Debtors' former officers and directors regarding issues of attorney-client privilege, the effect of prior orders of the Bankruptcy Court on subsequent discovery and the implications of the dissolution of the Creditors' Committee as of the Original Effective Date. The Bankruptcy Court, after several months of intense litigation, issued a decision and order that discharged the Examiner and authorized the Examiner to turn over documents to the Liquidating Trust. In May 2009, counsel for the Examiner began turning over the documents to the Liquidating Trustee.

In addition, Heller Ehrman, former counsel to the Special Investigative Committee to the Debtors' Board of Directors, received a subpoena for the production of documents from the plaintiffs in the securities litigation commenced by certain former Holders of Interests of the Debtors. As a result of Heller Ehrman's own dissolution, it agreed with the Liquidating Trustee and the plaintiffs in the securities litigation to turn over to the Liquidating Trustee all documents that may be responsive to the subpoenas, since the Liquidating Trustee succeeded to the Debtors' privilege as the successor to the Debtors under the Original Plan. The Liquidating Trustee's counsel has received these documents and has been attempting to comply with the subpoenas while, to the extent appropriate, preserving the Debtors' right to certain privileges with its former counsel.

### (iii)    Sale of Trust Assets

On the Original Effective Date, title to the Debtors' 36.75% ownership interest (the "NCLT Membership Interest") in Carrington Capital Management, LLC, an independent, non-debtor operating entity ("CCM"), vested in the Liquidating Trust.  Pursuant to a series of transactions that occurred in early 2009, the Liquidating Trustee sold the NCLT Membership Interest to CCM.  These transactions with CCM were done without Bankruptcy Court approval, as otherwise would have been required under the Bankruptcy Code, pursuant to the authorizations granted to the Liquidating Trustee and the Plan Advisory Committee in the Original Plan.

### (iv)    DCP Litigation

On June 29, 2007, the Debtors (other than Access Lending) were served with a complaint for declaratory judgment and other equitable relief that was filed on June 20, 2007 in the Bankruptcy Court against the Debtors (other than Access Lending) and certain of NCFC's directors, captioned as *Gregory J. Schroeder, et al v. New Century Holdings, Inc., et al.*, Adv. Pro. No. 07-51598 (the "Adversary Proceeding") [Docket No. 1447].

In July 2009, the Beneficiaries and the Liquidating Trustee agreed to resolve the Adversary Proceeding in accordance with the terms of the Settlement Agreement (the "DCP Settlement").  The Settlement Agreement provides in relevant part that the Liquidating Trustee will liquidate the New Century Benefit Plan trust assets and pay legal fees of $2.3 million to counsel for the Beneficiaries, $18.9 million to the Beneficiaries and return the balance of approximately $15 million to the Liquidating Trust.  Additionally, pursuant to the Settlement Agreement, the Liquidating Trustee will assign to the Beneficiaries certain causes of action against third-party administrators and consultants arising out of the administration of the New Century Benefit Plan (collectively, all payments and assignments to be made to the Beneficiaries pursuant to the Settlement Agreement shall be referred to as the "DCP Settlement Amount").  The DCP Settlement Amount shall be paid pro rata to the Beneficiaries, based upon vested balances in the New Century Benefit Plan as of December 31, 2007.  Distributions to be made to certain of the New Century Benefit Plan participants, who are currently defendants in a litigation brought by the Liquidating Trustee for breach of fiduciary duty, shall be held by the Liquidating Trustee pending the conclusion of such litigation. The remainder of the New Century Benefit Plan asset balance will be turned over to the Liquidating Trust and shall become Trust Assets for use in accordance with the Modified Plan.

The Settlement Agreement will not become effective until the Bankruptcy Court enters an order confirming the Modified Plan.  The distributions contemplated by the Settlement Agreement are to be made as soon as is practicable after the occurrence of the Modified Effective Date, with the parties using their best efforts to achieve satisfaction of all conditions by no later than October 30, 2009.  Additionally, the parties have agreed, pursuant to the Settlement Agreement, to enter into full and final mutual releases, with the exception of any claims and Causes of Action that the Liquidating Trust may have under Chapter 5 of the Bankruptcy Code against the Beneficiaries that are not based on distributions made on account of the New Century Benefit Plan. The Settlement Agreement also provides that the Beneficiaries will consent to the Modified Plan that includes the preservation of all aspects of the Settlement Agreement.

On September 8, 2009, the Liquidating Trustee filed a motion with the Bankruptcy Court seeking approval of the Settlement Agreement pursuant to Bankruptcy Rule 9019 (the "Approval Motion"). The Approval Motion is set to be heard by the Bankruptcy Court on October 14, 2009.

## III.   THE MODIFIED PLAN

### A.    SUMMARY OF THE MODIFIED PLAN

The following is a brief summary of the Modified Plan, which is qualified in its entirety by reference to the Modified Plan, a copy of which is attached as <u>Exhibit A</u> to this Modified Disclosure Statement. The Original Disclosure Statement sets forth in greater detail the structure and purpose of the Original Plan, including an analysis of the rationale for the creation of the Debtor Groups, and the establishment of the Multi-Debtor Claim Protocol, the Intercompany Claim Protocol and the EPD/Breach Claim Protocol. Each of these protocols was developed to effectuate distributions to Creditors in accordance with the heavily negotiated settlements which form the foundation of the Original Plan and are adopted and incorporated into the Modified Plan with certain discreet modifications necessary to comply with the Memorandum Opinion and Reversal Order. In addition to adopting and incorporating the provisions of the Original Plan consistent with the Memorandum Opinion and Reversal Order, the Modified Plan also provides for the implementation of the Settlement Agreement with the Beneficiaries and preserves the integrity of the actions taken by the Liquidating Trustee and Plan Administrator since the Original Effective Date. This Modified Disclosure Statement shall not repeat the analysis of the various protocols contained in the Original Disclosure Statement, but shall adopt those portions of the Original Disclosure Statement which shall be incorporated by reference herein.

In order to address the specific concerns raised by the District Court in its Memorandum Opinion, the Proposed Modifications to the Original Plan as embodied in the Modified Plan center around three discreet modifications with respect to (a) the treatment of NC Credit Creditors and NC Credit Assets as the treatment of such under the Original Plan was a basis for the District Court's reversal of the Confirmation Order, (b) the implementation of the Settlement Agreement, and (c) preservation of actions taken by the Liquidating Trustee in reliance on the Original Plan having gone effective without any stay pending appeal (the "Proposed Modifications"). First, the Trustee and the Plan Advisory Committee have modified the Original Plan to remove NC Credit from the Holding Company Debtor Group and, thus, from each of the provisions that treat the Holding Company Debtors as a unified debtor group sharing assets and liabilities. Accordingly, NC Credit's Assets, consisting solely of an intercompany claim against NCFC in the amount of $67.6 million and an intercompany claim against NCMC in the amount of $16.9 million, will not be included among the Holding Company Debtor Assets and, thus, will not be available for distribution to Holders of Allowed Claims against the Holding Company Debtors. Rather, the NC Credit Assets will be available only for distribution to Holders of Allowed Claims against NC Credit. As a result of the removal of the NC Credit Assets from the Holding Company Debtor Assets, it is no longer necessary to give certain NCFC Creditors enhanced distributions in exchange for their agreement to forgo recoveries on their NC Credit Claims pursuant to the terms of the Multi Debtor Claim Protocol contained in the Original Plan. This mechanism was found by the District Court to have violated Section 1124(a)(3) of the Bankruptcy Code by creating disparate treatment among similarly situated NCFC Creditors.

Likewise, Holders of Allowed Claims against NC Credit will not be entitled to share in a distribution from any of the Holding Company Debtor Assets except to the extent that they have an allowed claim against multiple Debtors and as a result of the intercompany claim against Holding Company Debtors. Additionally, in order to maintain the same proportionality in potential litigation recoveries that were originally assigned to Holders of Allowed Claims against NC Credit in the Original Plan by virtue of Holders of Allowed Claims against NC Credit sharing in the Holding Company Debtor Portion of Litigation Proceeds, the Holding Company Debtor Portion of Litigation Proceeds will be reduced from 27.5% to 24.75% of the Litigation Proceeds. As a result, the remaining 2.75% of the Litigation Proceeds will become the NC Credit Portion of the Litigation Proceeds to be distributed to Holders of Allowed Claims against NC Credit in accordance with the Modified Plan.

Next, the Modified Plan includes provisions to effectuate the terms of the DCP Settlement. In July 2009, the Beneficiaries and the Liquidating Trustee agreed to resolve the Adversary Proceeding in accordance with the terms of the Settlement Agreement. The Settlement Agreement provides, in relevant part, that the Trustee will liquidate the assets currently being held by the Trustee related to the Rabbi Trust established by the Debtors prior to the Petition Date (the "Plan Trust Assets") to make certain payments to the Beneficiaries, their counsel and returning the balance of the Plan Trust Assets to the Liquidating Trust. The settlement amount shall be paid pro rata to the Beneficiaries, based upon vested balances in the New Century Benefit Plan as of December 31, 2007; with distributions to certain of the Beneficiaries, who are currently defendants in a litigation brought by the Trustee for breach of fiduciary duty, to be held by the Trustee pending the conclusion of such litigation. To the extent that the Trustee prevails in such litigation, these distributions may be used to satisfy any judgments that may be obtained in such litigation.

The Settlement Agreement will not become effective until the Bankruptcy Court enters an order approving the Modified Plan. The distributions contemplated by the Settlement Agreement are to be made as soon as is practicable after the occurrence of the Modified Effective Date. Additionally, the parties have agreed, pursuant to the Settlement Agreement, to enter into full and final mutual releases, with the exception of any claims that the Liquidating Trust may have under Chapter 5 of the Bankruptcy Code against the Beneficiaries that are not based on distributions made on account of the New Century Benefit Plan. The Beneficiaries shall not be entitled to any further distribution under the terms of the Modified Plan or from the Liquidating Trust. The Settlement Agreement also provides that the Beneficiaries will consent to the Modified Plan provided it preserves the Settlement Agreement.

Lastly, the Modified Plan preserves the integrity of the actions taken by the Liquidating Trustee (including in his capacity as Plan Administrator and sole Director and Officer) since the Original Effective Date given that the Bankruptcy Court denied the Beneficiaries' Stay Motion such that the Original Plan became effective on August 1, 2008 and the Liquidating Trustee was required to operate the Liquidating Trust and Reorganized Access Lending in his capacity as Liquidating Trustee, Plan Administrator and sole Director and Officer in accordance with the terms of the Original Plan.

**B. RECOMMENDATION**

**THE LIQUIDATING TRUSTEE AND THE PLAN ADVISORY COMMITTEE ("PAC") RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE ON THE MODIFIED PLAN CAST THEIR BALLOTS TO ACCEPT THE MODIFIED PLAN. THE LIQUIDATING TRUSTEE AND THE PAC BELIEVE THAT CONFIRMATION OF THE MODIFIED PLAN WILL PROVIDE THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS.**

## C.    CLASSIFICATION AND TREATMENT OF CLAIMS

Section 1122 of the Bankruptcy Code provides that a Chapter 11 plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Section 1122 of the Bankruptcy Code, the Modified Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims, which pursuant to section 1123(a)(1) of the Bankruptcy Code, do not need to be classified).  The Liquidating Trustee also is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to other Claims and Interests in such Class.

The classification of Claims (except for Administrative Claims and Priority Tax Claims) and Interests listed below is for all purposes, including without limitation, voting, confirmation, and distributions under the Modified Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim will be deemed classified in a particular Class only to the extent such Claim satisfies the definition of such Class and will be deemed classified in a different Class to the extent any remainder or other portion of such Claim satisfies the definition of such different Class.  A Claim is in a particular Class only to the extent such Claim is an Allowed Claim in such Class and has not been paid or otherwise settled before the Modified Effective Date.

The classification of Claims pursuant to the Modified Plan is as follows:

| CLASS | DESCRIPTION | STATUS |
|-------|-------------|--------|
| [unclassified] | Administrative and Priority Tax Claims against all Debtors. | Unimpaired – not entitled to vote |

| Claims Against Holding Company Debtors and NC Credit | | |
|-------|-------------|--------|
| Class HC1 | Class HC1 consists of Priority Claims against NCFC. | Unimpaired - not entitled to vote |
| Class HC2 | Class HC2 consists of Secured Claims against NCFC. | Unimpaired - not entitled to vote |

| Claims Against Holding Company Debtors and NC Credit | | |
|---|---|---|
| Class HC3a | Class HC3a consists of Special Deficiency Claims against NCFC. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class HC3b | Class HC3b consists of Other Unsecured Claims against NCFC. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class HC4a | Class HC4a consists of Series A Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4b | Class HC4b consists of Series A 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4c | Class HC4c consists of Series B Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4d | Class HC4d consists of Series B 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4e | Class HC4e consists of Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC5 | Class HC5 consists of Priority Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC6 | Class HC6 consists of Secured Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC7 | Class HC7 consists of Other Unsecured Claims against TRS Holdings. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |

| Claims Against Holding Company Debtors and NC Credit | | |
|---|---|---|
| Class HC8 | Class HC8 consists of Priority Claims against NC Credit. | Unimpaired - not entitled to vote |
| Class HC9 | Class HC9 consists of Secured Claims against NC Credit. | Unimpaired - not entitled to vote |
| Class HC10a | Class HC10a consists of Special Deficiency Claims against NC Credit. | Impaired - entitled to vote |
| Class HC10b | Class HC10b consists of Other Unsecured Claims against NC Credit. | Impaired - entitled to vote |
| Class HC11 | Class HC11 consists of Priority Claims against NC Residual IV | Unimpaired - not entitled to vote |
| Class HC12 | Class HC12 consists of Secured Claims against NC Residual IV | Unimpaired - not entitled to vote |
| Class HC13 | Class HC13 consists of Other Unsecured Claims against NC Residual IV | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class HC14 | Class HC14 consists of Settling Parties Claims in Settlement of the Schroeder Litigation | Impaired – entitled to vote |
| Claims Against Operating Debtors | | |
| Class OP1 | Class OP1 consists of Priority Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP2 | Class OP2 consists of Secured Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP3a | Class OP3a consists of Special Deficiency Claims against NCMC. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |

| Claims Against Holding Company Debtors and NC Credit | | |
|---|---|---|
| Class OP3b | Class OP3b consists of EPD/Breach Claims against NCMC. | Impaired – voted to accept the Original Plan.  No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP3c | Class OP3c consists of Other Unsecured Claims against NCMC. | Impaired – voted to accept the Original Plan.  No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP4 | Class OP4 consists of Priority Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP5 | Class OP5 consists of Secured Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP6a | Class OP6a consists of Special Deficiency Claims against NC Capital. | Impaired – voted to accept the Original Plan.  No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP6b | Class OP6b consists of EPD/Breach Claims against NC Capital. | Impaired – voted to accept the Original Plan.  No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP6c | Class OP6c consists of Other Unsecured Claims against NC Capital. | Impaired – voted to accept the Original Plan.  No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP7 | Class OP7 consists of Priority Claims against Home123. | Unimpaired - not entitled to vote |

| Claims Against Holding Company Debtors and NC Credit | | |
|---|---|---|
| Class OP8 | Class OP8 consists of Secured Claims against Home123. | Unimpaired - not entitled to vote |
| Class OP9a | Class OP9a consists of Special Deficiency Claims against Home123. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP9b | Class OP9b consists of Other Unsecured Claims against Home123. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP10 | Class OP10 consists of Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired – not entitled to vote |
| Class OP11 | Class OP11 consists of Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired – not entitled to vote |
| Class OP12 | Class OP12 consists of Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |

| Claims Against Access Lending | | |
|---|---|---|
| Class AL1 | Class AL1 consists of Priority Claims against Access Lending. | Unimpaired – not entitled to vote |
| Class AL2 | Class AL2 consists of Secured Claims against Access Lending. | Unimpaired – not entitled to vote |
| Class AL3 | Class AL3 consists of Other Unsecured Claims against Access Lending. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |

The classification of Claims under the Modified Plan is identical to the classification of Claims under the Original Plan with the exception of Class HC14, which was added to the Modified Plan to separately classify the Claims of the Settling Parties in settlement of the Schroeder Litigation. Class HC14 Settling Parties are entitled to receive their pro rata distribution under the terms of the Settlement Agreement in full and complete satisfaction of any and all Claims they have against the Liquidating Trust arising out of their participation in the New Century Benefit Plan. The Original Disclosure Statement contains a complete description of the classification of all other Claims under the Original Plan and this Modified Plan. See Original Disclosure Statement at 81–107.

The treatment of unclassified Claims is the same under the Modified Plan as it was under the Original Plan and the Original Disclosure Statement contains a complete description of such treatment. Likewise, the treatment of all Classes of Claims under the Modified Plan is identical to the treatment of such Classes of Claims under the Original Plan, with the exception of Classes HC3b, HC10a, HC10b and HC14. The Treatment of the Claims in Class HC3b have been modified from the Original Plan to (a) eliminate the enhanced Determined Distribution Amounts assigned to certain HC3b Creditors under the Original Plan in exchange for agreeing to have their Claims in Class HC10b against NC Credit reduced to zero; and (b) remove Creditors from Class HC3b that would be deemed Settling Parties under the Modified Plan. Class HC14 has been added in order to separately classify the Settling Parties that were previously classified in HC3b. Such Settling Parties will no longer be entitled to a pro rata share of the Holding Company Debtor Net Distributable Assets and will only be entitled to a pro rata share of the DCP Settlement Amount pursuant to the terms of the Settlement Agreement. Creditors in Class HC10a will no longer share with all Holding Company Debtor Creditors in the Holding Company Debtor Portion of Litigation Proceeds. Likewise, Holding Company Debtor Creditors will not be entitled to a distribution from the NC Credit Portion of Litigation Proceeds. As the enhanced Determined Distribution Amount has been removed from the Class HC3b Creditors who previously were given such enhanced Determined Distribution Amount in exchange for having their HC10b Claims allowed at $0, such corresponding HC10b Claims will now have a Determined Distribution Amount of 100% of the Allowed Amount of their Claim. HC10b Creditors will no longer be entitled to a distribution from the Holding Company Debtor Net

Distributable Assets and will only share in the NC Creditor Net Distribution Assets. Likewise, Holding Company Debtor Creditors will not be entitled to share in the NC Credit Assets. The Original Disclosure Statement contains a complete description of the treatment of all other classified Claims. See Original Disclosure Statement at 81–107.

### D. SOLICITATION PROCEDURES

The Order (A) Approving Disclosure Statement Regarding Modified Second Amended Joint Chapter 11 Plan of Liquidation, (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Modified Second Amended Joint Chapter 11 Plan of Liquidation and (C) Scheduling a Hearing on Confirmation of the Modified Second Amended Joint Chapter 11 Plan of Liquidation and Approving Related Notice Procedures (the "Modified Procedures Order") was entered by the Bankruptcy Court on October __, 2009. The Modified Procedures Order approved this Modified Disclosure Statement as providing adequate information in accordance with and meeting all other requirements of section 1125 of the Bankruptcy Code. The Modified Procedures Order further approved the solicitation procedures as set forth herein.

#### (i) Eligibility to Vote

As provided in the Original Plan and section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims will not be classified for the purposes of voting or receiving distributions under the Modified Plan. Rather, all such Claims will be treated separately as unclassified Claims and will be paid in full. Certain of these Claims have, in fact, been paid in full since the Original Effective Date. The remaining unclassified Claims are unimpaired and are not entitled to vote on the Modified Plan.

As set forth in the Modified Procedures Order, the only Creditors entitled to vote on the Modified Plan are those Creditors in Classes HC10a, HC10b and HC14. All other Holders of Claims and Interests will (i) be deemed to have rejected the Modified Plan in accordance with Section 1126(g) of the Bankruptcy Code, (ii) be deemed to have accepted the Modified Plan in accordance with Section 1126(f) of the Bankruptcy Code, or (iii) be deemed to have retained the same vote on the Modified Plan as their vote on the Original Plan in accordance with Sections 105 and 1127 of the Bankruptcy Code because the treatment of such Creditors is not adversely effected by the modifications to the Original Plan contained in the Modified Plan.

The Claims in the Classes listed in the following table are unimpaired and were conclusively presumed to have accepted the Original Plan and are conclusively presumed to have accepted this Modified Plan as well:

| Class | Description |
|-------|-------------|
| Class HC1 | Priority Claims against NCFC |
| Class HC2 | Secured Claims against NCFC |

| Class | Description |
| --- | --- |
| Class HC5 | Priority Claims against TRS Holdings |
| Class HC6 | Secured Claims against TRS Holdings |
| Class HC8 | Priority Claims against NC Credit |
| Class HC9 | Secured Claims against NC Credit |
| Class HC11 | Priority Claims against NC Residual IV |
| Class HC12 | Secured Claims against NC Residual IV |
| Class OP1 | Priority Claims against NCMC |
| Class OP2 | Secured Claims against NCMC |
| Class OP4 | Priority Claims against NC Capital |
| Class OP5 | Secured Claims against NC Capital |
| Class OP7 | Priority Claims against Home123 |
| Class OP8 | Secured Claims against Home123 |
| Class OP10 | Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class OP11 | Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |

| Class | Description |
|-------|-------------|
| Class AL1 | Priority Claims against Access Lending |
| Class AL2 | Secured Claims against Access Lending |

Creditors in the Classes listed in the above table are not entitled to vote on the Modified Plan. If and to the extent that any Class identified as unimpaired is determined to be impaired, the Creditors in such Class will be entitled to vote to accept or reject the Modified Plan.

All other Classes of Claims and Interests under the Modified Plan are impaired. However, as provided in the Modified Procedures Order, those Creditors that voted on or had the opportunity to vote on the Original Plan and that are not being materially adversely affected by the Modified Plan will not be resolicited and will not be entitled to modify their vote on the Modified Plan. The vote cast by these Creditors that voted or had the opportunity to vote for or against the Original Plan will be deemed their vote on the Modified Plan. Accordingly, the Creditors listed in the following table will not be resolicited for the Modified Plan and their vote on the Original Plan will be deemed their vote on the Modified Plan:

| Class | Description |
|-------|-------------|
| Class HC3a | Special Deficiency Claims against NCFC |
| Class HC3b | Other Unsecured Claims Against NCFC |
| Class HC7 | Other Unsecured Claims Against TRS Holdings |
| Class HC13 | Other Unsecured Claims against NC Residual IV |
| Class OP3a | Special Deficiency Claims against NCMC |
| Class OP3b | EPD/Breach Claims against NCMC |
| Class OP3c | Other Unsecured Claims against NCMC |

| Class | Description |
|---|---|
| Class OP6a | Special Deficiency Claims against NC Capital |
| Class OP6b | EPD/Breach Claims against NC Capital |
| Class OP6c | Other Unsecured Claims against NC Capital |
| Class OP9a | Special Deficiency Claims against Home123 |
| Class OP9b | Other Unsecured Claims against Home123 |
| Class OP12 | Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL3 | Other Unsecured Claims against Access Lending |

The Creditors listed in the following table are impaired and entitled to vote to accept or reject the Modified Plan:

| Class | Description |
|---|---|
| Class HC10a | Special Deficiency Claims against NC Credit |
| Class HC10b | Other Unsecured Claims against NC Credit |
| Class HC14 | Settling Parties |

Each of Classes HC3a, HC3b, OP3a, OP3b, OP3c, OP6a, OP6b, OP6c, OP9a, and OP9b were considered a separate Class for purposes of voting to accept or reject the Original Plan and will be considered as a separate Class for voting on the Modified Plan.

Holders of Claims and Interests in the Classes listed in the following table will not be entitled to a distribution under the Modified Plan and were conclusively presumed to have

rejected the Original Plan and are conclusively presumed to have rejected the Modified Plan as well:

| Class | Description |
|---|---|
| Class HC4a | Series A Preferred Stock Interests |
| Class HC4b | Series A 510(b) Claims |
| Class HC4c | Series B Preferred Stock Interests |
| Class HC4d | Series B 510(b) Claims |
| Class HC4e | Common Stock Interests and Common Stock 510(b) Claims |

The record date for determining any Creditor's eligibility to vote on the Modified Plan is June 30, 2009. Only those Creditors entitled to vote on the Modified Plan will receive a Ballot with this Modified Disclosure Statement.

**ANY CREDITOR WHOSE CLAIM IS BEING OBJECTED TO BY THE VOTING DEADLINE AND THE OBJECTION HAS NOT BEEN RESOLVED, SUCH CLAIM SHALL BE TEMPORARILY ALLOWED OR DISALLOWED FOR VOTING PURPOSES IN ACCORDANCE WITH THE RELIEF SOUGHT IN THE OBJECTION UNLESS, AFTER NOTICE AND A HEARING PURSUANT TO BANKRUPTCY RULE 3018(A), THE BANKRUPTCY COURT ALLOWS THE CLAIM TEMPORARILY OR ESTIMATES THE AMOUNT OF THE CLAIM FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN. ANY CREDITOR THAT WANTS ITS CLAIM TO BE ALLOWED TEMPORARILY OR ESTIMATED FOR THE PURPOSE OF VOTING MUST TAKE THE STEPS NECESSARY TO ARRANGE AN APPROPRIATE HEARING WITH THE BANKRUPTCY COURT UNDER BANKRUPTCY RULE 3018(a). PROVIDED, HOWEVER, IF A CLAIM WAS ESTIMATED EITHER BY AGREEMENT OR ORDER OF THE BANKRUPTCY COURT FOR PURPOSES OF VOTING ON THE ORIGINAL PLAN AND SUCH CLAIM HAS NOT BECOME AN ALLOWED CLAIM FOR PURPOSES OF VOTING ON THE MODIFIED PLAN, SUCH CLAIM SHALL BE ALLOWED FOR VOTING PURPOSES IN THE AMOUNT SET FOR VOTING ON THE ORIGINAL PLAN.**

### (ii) Ballots

In voting for or against the Modified Plan, please use only the Ballot or Ballots sent to you with this Modified Disclosure Statement. Votes cast to accept or reject the Modified Plan will be counted by Class. Please read the voting instructions accompanying the Ballot for a thorough explanation of voting procedures.

**IF YOU BELIEVE THAT YOU ARE A HOLDER OF A CLAIM IN A VOTING CLASS FOR WHICH YOU DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT NEW CENTURY LIQUIDATING TRUST, 3777 MICHELSON, SUITE CN-350, IRVINE, CA 92612 (ATTENTION: MONIKA LEMHOEFER MCCARTHY), OR BY ELECTRONIC MAIL TO LiquidatingTrust@ncen.com.**

### (iii) Voting Procedure

Unless otherwise directed in your solicitation package, mail your completed ballots to: New Century Liquidating Trust, 3777 Michelson, Suite CN-350, Irvine, CA 92612 (Attention: Monika Lemhoefer McCarthy). **DO NOT RETURN BALLOTS TO THE BANKRUPTCY COURT.** A Ballot that does not indicate an acceptance or rejection of the Modified Plan will not be counted either as a vote to accept or a vote to reject the Modified Plan. If you cast more than one Ballot voting the same Claim before 5:00 p.m. Pacific Time on the voting deadline (November 10, 2009), the last Ballot received before the voting deadline will be deemed to reflect your intent and thus will supersede any prior Ballots. Additionally, you may not split your votes for your Claims within a particular Class under the Modified Plan either to accept or reject the Modified Plan. Therefore, a Ballot or a group of Ballots within a Plan Class received from a single creditor that partially rejects and partially accepts the Modified Plan will not be counted.

Unless the Bankruptcy Court permits you to do so after notice and a hearing to determine whether sufficient cause exists to permit the change, you may not change your vote after the voting deadline passes. **FACSIMILE, EMAIL OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE ACCEPTED.**

**PLEASE PUT YOUR TAXPAYER IDENTIFICATION NUMBER ON YOUR BALLOT; THE LIQUIDATING TRUSTEE MAY NOT BE ABLE TO MAKE DISTRIBUTIONS TO YOU WITHOUT IT.**

### (iv) Deadline for Voting

**IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY 5:00 P.M., PACIFIC TIME ON NOVEMBER 10, 2009.**

### (v) Importance of your Vote

Your vote is important. The Bankruptcy Code defines acceptance by a Class of Claims as acceptance by Holders of at least two-thirds in amount and a majority in number of Allowed

Claims in that Class that vote.  **ONLY THOSE CREDITORS WHO ACTUALLY VOTE ARE COUNTED FOR PURPOSES OF DETERMINING WHETHER A CLASS HAS VOTED TO ACCEPT THE MODIFIED PLAN.  YOUR FAILURE TO VOTE WILL LEAVE TO OTHERS THE DECISION TO ACCEPT OR REJECT THE MODIFIED PLAN.**

### E.     MEANS OF IMPLEMENTING THE MODIFIED PLAN

#### (i)     Implementation of Modified Plan

The Plan Proponents of the Modified Plan propose that the Modified Plan be implemented and consummated through the means contemplated by sections 1123(a)(5)(B), (D), (E), (F) and (G) and 1123(b)(2), (b)(3) and (b)(4) of the Bankruptcy Code on and after the Modified Effective Date.  The Original Disclosure Statement sets forth in greater detail, the means of implementation of the Original Plan.  See Original Disclosure Statement at 109–123. Since the Original Plan went effective on the Original Effective Date, many of the actions required or authorized in order to implement the Original Plan have, in fact, already occurred and will be adopted and ratified by the confirmation and implementation of the Modified Plan including:

a.     the transfer of the Assets of the Debtors, including Causes of Action, to the Liquidating Trust,

b.     dissolution of the Committee,

c.     formation of the Liquidating Trust and appointment of the Liquidating Trustee and Plan Administrator,

d.     establishment of the Plan Advisory Committee

e.     resignation of the Debtors' remaining officers and directors, and

f.     preservation of all Causes of Action

### F.     CLAIMS AND DISTRIBUTIONS[1]

Since the Original Effective Date, the Liquidating Trustee has worked diligently to resolve all Disputed Claims, including all unliquidated and disputed A/P/S Claims.  Numerous objections to claims have been filed and discussions and negotiations continue with countless Holders of Claims.

At this time, the Liquidating Trustee projects that, through the liquidation of the Liquidating Trust Assets (excluding recoveries from the Causes of Action) and after giving

---

[1]     All estimates contained herein with respect to recoveries on Allowed Unsecured Claims are subject to various risks and assumptions, including those discussed in Section IV.D hereof.  Moreover, these estimates are subject to revision in material ways.  They should not be considered a representation that actual outcomes will necessarily fall within this range.

effect to the Intercompany Claim Protocol, the Cash available for distribution to Holders of Allowed Holding Company Debtor Unsecured Claims on account of such Claims will range from approximately $0 million to $27 million and that the Cash available for distribution to Holders of Allowed Operating Debtor Unsecured Claims on account of such Claims will range from approximately $54 million to $99 million and the Cash available for distribution to Holders of Allowed NC Credit Unsecured Claims on account of such Claims will range from approximately $0.5 million to $2 million.  Additionally, the Plan Administrator projects that the Cash available for distribution to Holders of Allowed Access Lending Unsecured Claims (including NCMC) will be approximately $3.8 million.  The actual amount of such Cash (excluding Litigation Proceeds) available for distribution to Holders of Allowed Unsecured Claims will depend on various factors, including:  (1) the cost of administering the Estates and the Liquidating Trust, (2) amounts received on sales of Assets, (3) the amount of A/P/S Claims, and (4) the risks and assumptions discussed in Section IV.D hereof.

As of the Original Effective Date, because of the delay in the liquidation of Holding Company Debtor Assets, the Holding Company Debtor Group did not have sufficient liquid assets to pay its Allowed A/P/S Claims or its share of the Joint Administrative Expenses as required by the Original Plan.  In accordance with the provisions set forth in the Original Plan for the payment of Joint Administrative Expenses and Allowed A/P/S Claims, these expenses were paid out of the Trust Assets comprised mainly of Operating Debtor Assets.  As a result of this temporary liquidity shortfall, the Operating Debtor Group Assets are being used to pay Holding Company Debtor A/P/S Claims and the Holding Company Debtor Joint Administrative Expense Share.  As assets in the Holding Company Debtor Group are liquidated, this shortfall is being eliminated and repaid to the Operating Debtor Group.  It is not anticipated that this temporary liquidity issue will materially alter the distributions to any Creditors under the Modified Plan.

In light of the amounts of currently filed Claims against the Estates of the Holding Company Debtors, Claims listed on the Holding Company Debtors' Schedules, and the projected (i) outcome of the Claims reconciliation process, (ii) effect of the Intercompany Claim Protocol, (iii) effect of the Multi Debtor Protocol, and (iv) Assets of the Holding Company Debtors, the Liquidating Trustee projects that, for distribution purposes under the Modified Plan, the aggregate amount of Unsecured Claims against the Holding Company Debtors will be approximately $380 million (excluding Intercompany Claims) and that Holders of Allowed Unsecured Claims against the Holding Company Debtors will be entitled to receive between approximately $0 million to $27 million, collectively, yielding a blended average recovery (*prior to any recovery from th*e *Causes of Action*) of between approximately 0% and 7.1%.

Further, given the amounts of currently filed Claims against the Estate of NC Credit, Claims listed on the NC Credit Schedules and the projected (i) outcome of the Claims reconciliation process, (ii) effect of the Intercompany Claim Protocol, and (iii) the Assets of NC Credit, the Liquidating Trustee projects that, for distribution purposes under the Modified Plan, the aggregate amount of Unsecured Claims against NC Credit will be approximately $173 million (excluding Intercompany Claims) and that Holders of Allowed Unsecured Claims against NC Credit will be entitled to receive between $0.5 million and $2 million, collectively yielding a net average recovery (*prior to any recovery from th*e *Causes of Action*) of between approximately 0.3% and 1.3%.

In addition, given the amounts of currently filed Claims against the Estates of the Operating Debtors, Claims listed on the Operating Debtors' Schedules, and the projected (i) outcome of the Claims reconciliation process, (ii) effect of the EPD/Breach Claim Protocol and Intercompany Claim Protocol, (iii) effect of the Multi Debtor Protocol, and (iv) Assets of the Operating Debtors, the Liquidating Trustee projects that, for distribution purposes under the Modified Plan, the aggregate amount of Unsecured Claims against the Operating Debtors will be approximately $737 million (excluding Intercompany Claims) and that Holders of Allowed Unsecured Claims against the Operating Debtors will be entitled to receive between approximately $54 million to $99 million, collectively, yielding a blended average recovery (*prior to any recovery from the* Causes of Action) of between approximately 7.3% and 13.4%.

Finally, given the amounts of currently filed Claims against the Estate of Access Lending, Claims listed on the Access Lending's Schedules, and (i) outcome of the Claims reconciliation process and (ii) Assets of Access Lending, the Plan Administrator projects that, for distribution purposes under the Modified Plan, the aggregate amount of Unsecured Claims against Access Lending will be approximately $12.7 million and that Holders of Allowed Unsecured Claims against Access Lending will be entitled to receive approximately $3.8 million collectively, yielding a net average recovery of approximately 29.9%.

These amounts, which are qualified by the risks and assumptions discussed in Section IV.D hereof, are summarized in the following table:

| Class | Impaired/ Unimpaired | Percentage Recovery Estimate (Excluding Litigation Proceeds) |
|---|---|---|
| **Claims to be Paid in Full Under the Plan** | | |
| **Administrative Claims against all Debtors** | Unimpaired | 100% |
| **Priority Tax Claims against all Debtors** | Unimpaired | 100% |
| **Claims Against and Interests in the Holding Company Debtors** | | |
| **Class HC1:  Priority Claims Against NCFC** | Unimpaired | 100% |
| **Class HC2:  Secured Claims Against NCFC** | Unimpaired | 100% |
| **Class HC3a:  Special Deficiency Claims Against NCFC** | Impaired | N/A[2] |

---

[2] The sole source of recovery for Allowed Class HC3a Claims is from the Holding Company Debtor Portion of Litigation Proceeds based on a prior election or deemed election made by these Holders of Special Deficiency Claims.

| Class | Impaired/ Unimpaired | Percentage Recovery Estimate (Excluding Litigation Proceeds) |
|---|---|---|
| **Class HC3b:  Other Unsecured Claims Against NCFC** | Impaired | 0% - 7.1% |
| **Class 4a:  Series A Preferred Stock Interests** | Impaired | 0% |
| **Class 4b:  Series A 510(b) Claims** | Impaired | 0% |
| **Class 4c:  Series B Preferred Stock Interests** | Impaired | 0% |
| **Class 4d:  Series B 510(b) Claims** | Impaired | 0% |
| **Class 4e:  Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims** | Impaired | 0% |
| **Class HC5:  Priority Claims Against TRS Holdings** | Unimpaired | 100% |
| **Class HC6:  Secured Claims Against TRS Holdings** | Unimpaired | 100% |
| **Class HC7:  Other Unsecured Claims Against TRS Holdings** | Impaired | 0%-7.1% |
| **Class HC11:  Priority Claims Against NC Residual IV** | Unimpaired | 100% |
| **Class HC12:  Secured Claims Against NC Residual IV** | Unimpaired | 100% |
| **Class HC13: Other Claims Against NC Residual IV** | Impaired | 0%-7.1% |
| **Claims Against NC Credit** | | |
| **Class HC8:  Priority Claims Against NC Credit** | Unimpaired | 100% |
| **Class HC9:  Secured Claims Against NC Credit** | Unimpaired | 100% |
| **Class HC10a: Special Deficiency Claims Against NC Credit** | Impaired | N/A[3] |

---

[3] The sole source of recovery for Allowed Class HC10a Claims is from the NC Credit Portion of Litigation Proceeds.

| Class | Impaired/ Unimpaired | Percentage Recovery Estimate (Excluding Litigation Proceeds) |
|---|---|---|
| **Class HC10b: Other Unsecured Claims Against NC Credit** | Impaired | 0.3%-1.3% |
| **Settling Parties** | | |
| **Class HC14: Settling Parties** | Impaired | N/A[4] |

| **Claims Against the Operating Debtors** | | |
|---|---|---|
| **Class OP1: Priority Claims Against NCMC** | Unimpaired | 100% |
| **Class OP2: Secured Claims Against NCMC** | Unimpaired | 100% |
| **Class OP3a: Special Deficiency Claims Against NCMC** | Impaired | N/A[5] |
| **Class OP3b: EPD/Breach Claims Against NCMC** | Impaired | 9.1%-16.8% |
| **Class OP3c: Other Unsecured Claims Against NCMC** | Impaired | 9.1%-16.8% (11.9%-21.9% if Creditor holds a Claim for which NC Capital and Home123 have joint and/or several liability) |
| **Class OP4: Priority Claims Against NC Capital** | Unimpaired | 100% |
| **Class OP5: Secured Claims Against NC Capital** | Unimpaired | 100% |
| **Class OP6a: Special Deficiency Claims Against NC Capital** | Impaired | N/A[6] |

---

[4]   Settling Parties are entitled to the pro rata amount of the DCP Settlement Amount as set forth in the Settlement Agreement.

[5]   The sole source of recovery for Allowed Class OP3a Claims is from the Operating Debtor Portion of Litigation Proceeds based on a prior election or deemed election made by these Holders of Special Deficiency Claims pursuant to the Original Plan.

[6]   The sole source of recovery for Allowed Class OP6a Claims is from the Operating Debtor Portion of Litigation Proceeds based on a prior election or deemed election made by these Holders of Special Deficiency Claims pursuant to the Original Plan.

| | | |
|---|---|---|
| **Class OP6b: EPD/Breach Claims Against NC Capital** | Impaired | 4.6%-8.4% |
| **Class OP6c: Other Unsecured Claims Against NC Capital** | Impaired | 9.1%-16.8%<br><br>(11.9%-21.9% if Creditor holds a Claim for which NCMC and Home123 have joint and/or several liability) |
| **Class OP7: Priority Claims Against Home123** | Unimpaired | 100% |
| **Class OP8: Secured Claims Against Home123** | Unimpaired | 100% |
| **Class OP9a: Special Deficiency Claims Against Home123** | Impaired | N/A[7] |
| **Class OP9b: Other Unsecured Claims Against Home123** | Impaired | 2.3%-4.2%<br><br>(11.9%-21.9% if Creditor holds a Claim for which NCMC and NC Capital have joint and/or several liability) |
| **Class OP10: Priority Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral** | Unimpaired | 100% |
| **Class OP11: Secured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral** | Unimpaired | 100% |
| **Class OP12: Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral** | Impaired | 2.3%-4.2% |
| **Claims Against Access Lending** | | |

---

[7] The sole source of recovery for Allowed Class OP9a Claims is from the Operating Debtor Portion of Litigation Proceeds based on a prior election or deemed election made by these Holders of Special Deficiency Claims pursuant to the Original Plan.

| Class AL1: Priority Claims Against Access Lending | Unimpaired | 100% |
|---|---|---|
| Class AL2: Secured Claims Against Access Lending | Unimpaired | 100% |
| Class AL3: Other Unsecured Claims Against Access Lending | Impaired | 29.9% |

Distribution to A/P/S Claims and other Classes of Creditors under the terms of the Modified Plan will be determined on the same basis as they were determined under the terms of the Original Plan as set forth in the Original Disclosure Statement with the exception of distributions to Holders of Allowed Claims in Class HC10a and HC10b. See Original Disclosure Statement at 123–133. In addition, the Modified Plan has added Class HC14 to provide for the implementation of the Settlement Agreement and distribution to the Beneficiaries.

As a result of the occurrences of the Original Effective Date, the Liquidating Trustee began to make payments to Holders of Allowed Administrative Claims on or about August 1, 2008. As previously stated, all actions taken by the Liquidating Trustee pursuant to the Original Plan since the Original Effective Date will be adopted and ratified pursuant to the confirmation and implementation of the Modified Plan in accordance with the Status Quo Order.

The Original Plan provided that all Professional Fee Applications be filed no later than September 15, 2008. These Professional Fee Applications were filed and a hearing to approve such applications was held by the Bankruptcy Court on December 18, 2008. Subject to certain modifications agreed to by the various professionals, the Bankruptcy Court approved the Professional Fee Applications and payment was made by the Liquidating Trustee which including amounts paid subsequently to the Original Effective Date totaled $16 million.

## G. PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS

### (i) Reservation of Rights to Object to Claims

Unless a Claim is expressly described as an Allowed Claim pursuant to or under the Modified Plan, or otherwise became an Allowed Claim prior to the Original Effective Date, upon the Original Effective Date, the Liquidating Trustee was deemed to have a reservation of any and all objections of the Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, 510(b) Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Liquidating Trustee's reservation of such objections as of the Original Effective Date is adopted and ratified by the Modified Plan. The Debtors' or the Liquidating Trustee's failure to object to any Claim in the Chapter 11 Cases will be without prejudice to the Liquidating Trustee's rights to contest or otherwise defend against such Claim in

the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

### (ii) Objections to Claims.

Prior to the Original Effective Date, the Debtors were responsible for pursuing any objection to the allowance of any Claim. From and after the Original Effective Date, the Liquidating Trustee became responsible for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims (including those Claims that are subject to objection by the Debtors as of the Original Effective Date), subject to any approvals of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement. Any objections to Claims by the Liquidating Trustee must be filed and served no later than January 31, 2010, provided that the Liquidating Trustee may request (and the Bankruptcy Court may grant) an extension of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidating Trustee's business judgment. A motion seeking to extend the deadline to object to any Claim will not be deemed an amendment to the Modified Plan.

### (iii) Service of Objections.

An objection to a Claim will be deemed properly served on the Holder of such Claim if the Liquidating Trustee effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases.

### (iv) Determination of Claims.

Except as otherwise agreed by the Liquidating Trustee (including in its capacity as Plan Administrator), any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtors or the Liquidating Trustee on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated will be deemed to be an Allowed Claim for such liquidated amount and will be satisfied in accordance with the Modified Plan. Nothing contained in Article 10 of this Modified Plan or the Original Plan will constitute or be deemed a waiver of any claim, right, or Causes of Action that the Debtors, the Liquidating Trust, or Reorganized Access Lending may have against any Person in connection

with or arising out of any Claim or Claims, including without limitation any rights under 28 U.S.C. § 157.

### (v) No Distributions Pending Allowance.

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Liquidating Trustee (including in his capacity as Plan Administrator) may make, in his or her discretion, a distribution pursuant to the Modified Plan on account of the portion of such Claim that becomes an Allowed Claim.

### (vi) Claim Estimation.

In order to effectuate distributions pursuant to the Modified Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Liquidating Trustee, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), will have the right to seek an order of the Bankruptcy Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of property that must be withheld from distribution on account of Disputed Claims; provided, however, that the Bankruptcy Court will determine (i) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

### (vii) Allowance of Claims Subject to Section 502 of the Bankruptcy Code.

Allowance of Claims will be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including without limitation subsections (b), (d), (e), (g), (h), and (i) thereof.

## H. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Pursuant to the terms of the Original Plan, certain Executory Contracts, as set forth on the Assumption Schedule attached to the Original Plan as Exhibit A, were assumed and assigned to the Liquidating Trust pursuant to section 365 of the Bankruptcy Code (the "Assumed Contracts"). The Modified Plan seeks to reaffirm the assumption and assignment to the Liquidating Trust of the Assumed Contracts effective as of the Original Effective Date. Pursuant to the terms of the Original Plan, each Executory Contract entered into by the Debtors prior to the Petition Date that (i) had not expired by its own terms, (ii) was not previously rejected or assumed by order of the Bankruptcy Court, and (iii) was not identified on the Assumption Schedule, were rejected pursuant to sections 365 and 1123 of the Bankruptcy Code (the "Rejected Contracts"). The Modified Plan seeks to reaffirm the rejection of the Rejected Contracts effective as of the Original Confirmation Date. The Modified Confirmation Order will constitute an order of the Bankruptcy Court reaffirming the assumption of the Assumed Contracts effective as of the Original Effective Date and the rejection of the Rejected Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Original Confirmation Date.

As provided in the Original Disclosure Statement, to the extent any insurance policies listed on Exhibit A to the Original Plan were considered Executory Contracts, the Original Confirmation Order constituted approval of the assumption and assignment of such insurance policies to the Liquidating Trust.  See Original Disclosure Statement at 136.  The Modified Plan seeks to reaffirm the assumption of such insurance policies set forth on Exhibit A to the Original Plan as of the Original Effective Date.  The Modified Confirmation Order will constitute an order of the Bankruptcy Court reaffirming the assumption and assignment of such insurance policies effective as of the Original Effective Date.

For the avoidance of doubt, the insurance policies (including any insurance policies that are not Executory Contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date, and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on Exhibit A to the Original Plan and all rights thereunder and rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute, and benefit from claims) are retained and will be transferred to the Liquidating Trust pursuant to the Modified Plan as of the Original Effective Date.

## I. EFFECT OF CONFIRMATION AND INJUNCTION

### (i) Injunction

**Except as otherwise expressly provided in the Modified Plan, the documents executed pursuant to the Original Plan, the Original Confirmation Order or the Modified Confirmation Order, on and after the Original Effective Date, all Persons and entities who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Original Effective Date (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) are permanently enjoined as of the Original Effective Date from: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against obligation due to any Protected Party or any property of any Protected Party; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with any provisions of the Modified Plan.  Any Person or entity injured by any willful violation of such injunction will recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.  Nothing contained in Article 12 of Modified Plan will prohibit the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Modified Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed Claim of any of the obligations of the Debtors, the Liquidating Trustee, or the**

Liquidating Trust under the Modified Plan. The Modified Confirmation Order also will constitute an injunction, as of the Original Effective Date, enjoining any Person from enforcing or attempting to enforce any claim or cause of action against any Protected Party or any property of any Protected Party based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under Article 4 of the Modified Plan have been made or are not yet due under Article 4 of the Modified Plan; provided, however, that the foregoing injunction will not enjoin actions by the SEC to the extent that pursuant to section 362(b)(4) of the Bankruptcy Code such actions are not subject to section 362(a) of the Bankruptcy Code. Except as provided in Article XII.C of the Modified Plan, nothing in the Modified Plan shall (i) release or discharge any claims held by the SEC against any non-debtors or (ii) enjoin or restrain the SEC from enforcing any such claims against any non-debtors.

(ii)    <strong>Term of Injunctions</strong>

Unless otherwise provided in the Original Plan, the Modified Plan, the Original Confirmation Order or the Modified Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases by orders of the Bankruptcy Court under sections 105 or 362 of the Bankruptcy Code, the Modified Plan, or otherwise, and extant on the Original Confirmation Date or the Modified Confirmation Date, will remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Liquidating Trust.

(iii)    <strong>Exculpation</strong>

On and after the Original Effective Date, none of the Exculpated Parties will have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, (a) pertaining to the timing of the commencement of the Chapter 11 Cases, (b) for any act or omission that occurred during the Chapter 11 Cases or in connection with the formulation, negotiation, and/or pursuit of confirmation of the Original Plan, the consummation of the Original Plan, and/or the administration of the Original Plan and/or the property distributed under the Original Plan, (c) for any act or omission that occurred on or after the Original Effective Date in the implementation of the Original Plan, or (d) for any act or omission that occurred in the formulation, negotiation and/or pursuit of Confirmation of the Modified Plan, the consummation of the Modified Plan and/or the property to be distributed under the Modified Plan, except, in either case, for claims, causes of action or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party will be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Original Plan and the Modified Plan and such reasonable reliance will form an absolute defense to any such claim, cause of action, or liability. Without limiting the generality of the foregoing, each Exculpated Party will be entitled to and be granted the protections and benefits of section 1125(e) of the Bankruptcy Code. No provision of the Original Plan, Modified Plan, Original Disclosure Statement or Modified Disclosure Statement will be deemed to act or release any claims, Causes of Action or

liabilities that the Liquidating Trust, Reorganized Access Lending, or the Estates may have against any Person or entity for any act, omission, or failure to act that occurred (i) with respect to the Debtors other than Access Lending, prior to April 2, 2007 and (ii) with respect to Access Lending, prior to August 3, 2007, in either case, other than for claims, Causes of Action, or liability pertaining to the timing of the commencement of the Chapter 11 Cases, nor will any provision of the Original Plan or the Modified Plan be deemed to act to release any Avoidance Actions.

**(iv)    Binding Effect of the Modified Plan and the Actions Taken Under the Original Plan**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, subject to the occurrence of the Modified Effective Date and to the extent not inconsistent with the Reversal Order, on and after the Original Confirmation Date, the provisions of the Original Plan, to the extent implemented by the Liquidating Trustee, shall bind any Holder of a Claim against, or Interest in, the Debtors, Estates and their respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under the Original Plan, whether or not such Holder has accepted the Original Plan and whether or not such Holder has filed a Claim.  On and after the Original Confirmation Date, the EPD/Breach Claim Protocol shall be binding on all Holders of Claims in Classes OP3b and/or OP6b irrespective of how such Holders vote on the Original Plan and irrespective of whether such Holders submit the information requested by the Debtors pursuant to the questionnaire referenced in the EPD/Breach Protocol.  Any vote in favor of the Original Plan by a Holder of Claims in Classes OP3b and/or OP6b will constitute an express consent to the EPD/Breach Protocol in the Original Plan as adopted by the Modified Plan.

The rights, benefits and obligations of any Person named or referred to in the Original Plan or the Modified Plan, whose actions may be required to effectuate the terms of the Original Plan or the Modified Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person (including, without limitation, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

Pursuant to Section 105 of the Bankruptcy Code and the Status Quo Order, any action taken by the Liquidating Trustee in furtherance of the implementation of the Original Plan shall be binding on third parties as if it occurred under this Modified Plan.

**J.    CONDITIONS PRECEDENT**

**(i)    Conditions Precedent to Modified Effective Date**

The Modified Plan will not become effective unless and until each of the following conditions have been satisfied in full in accordance with the provisions specified below:

**a.    Approval of Modified Disclosure Statement.**

The Bankruptcy Court will have approved a disclosure statement to the Modified Plan in form and substance acceptable to the Plan Proponents of the Modified Plan in their sole and absolute discretion.

### b.     Approval of Plan Compromises.

The compromises and settlements contained in Articles 4, 6, and 7 of the Modified Plan and the Original Plan are approved as of the Original Effective Date and the Settlement Agreement is approved as of the Modified Effective Date without material modification by Final Order in accordance with Bankruptcy Rule 9019 and are binding and enforceable against all Holders of Claims and Interests under the terms of the Modified Plan and/or the Settlement Agreement, as appropriate.

### c.     Form of Modified Confirmation Order.

The Modified Confirmation Order will be in form and substance acceptable to the Plan Proponents of the Modified Plan in their sole and absolute discretion.

### d.     Entry of Modified Confirmation Order.

The Modified Confirmation Order (i) will have been entered by the Bankruptcy Court, (ii) will not be subject to any stay of effectiveness, and (iii) will have become a Final Order, the Modified Confirmation Date will have occurred, and no request for revocation of the Modified Confirmation Order under section 1144 of the Bankruptcy Code will have been made, or, if made, will remain pending.

### (ii)     Revocation, Withdrawal, or Non-Consummation of Modified Plan

If after the Modified Confirmation Order is entered, each of the conditions to effectiveness has not been satisfied or duly waived on or by ninety (90) days after the Modified Confirmation Date, then upon motion by the Plan Proponents of the Modified Plan, the Modified Confirmation Order may be vacated by the Bankruptcy Court; provided however, that notwithstanding the filing of such a motion, the Modified Confirmation Order will not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. As used in the preceding sentence, a condition to effectiveness may only be waived by a writing executed by the Plan Proponents of the Modified Plan. If the Modified Confirmation Order is vacated pursuant to this Section, the Modified Plan will be null and void in all respects and the Status Quo Order will remain in full force and effect pending further order of the Bankruptcy Court, and nothing contained in the Modified Plan, the Modified Disclosure Statement, nor any pleadings filed in connection with the approval thereof will (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors (iii) prejudice in any manner the rights of the Original Plan Proponents and the Plan Proponents of the Modified Plan, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any party prior to the Modified Confirmation Date.

### K.     RETENTION OF JURISDICTION

The Modified Plan will not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will retain and have exclusive jurisdiction (to the extent

granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases, the Modified Plan or the Original Plan, or (iii) that are set out more fully in the Modified Plan.

### L.    NON-SEVERABILITY.

Except as specifically provided in the Modified Plan, the terms of the Modified Plan constitute interrelated compromises and are not severable, and no provision of those Articles may be stricken, altered, or invalidated

### M.    BANKRUPTCY RULE 9019 REQUEST

In Article 17 of the Modified Plan, the Plan Proponents of the Modified Plan, pursuant to Bankruptcy Rule 9019, request approval of all compromises and settlements included in the Modified Plan, including, without limitation, the compromises and settlements included in Articles 4, 6, and 7 of the Modified Plan.

## IV.    FINANCIAL INFORMATION

### A.    IN THE BANKRUPTCY

The Original Disclosure Statement sets out in great detail the major financial transactions that occurred during the Chapter 11 cases, the financial condition of the Debtors as of March 2008 and the projected distributions under the Original Plan. See Original Disclosure Statement at 143-156. That analysis will not be repeated here but parties interested in such analysis should refer to the Original Disclosure Statement.

### B.    FINANCIAL ACTIVITY SINCE THE ORIGINAL EFFECTIVE DATE

#### (i)    Transfer on the Effective Date

As of the Original Effective Date, the Debtors transferred all of the Assets of the Debtors, excluding the assets of Access Lending but including the Interests of Access Lending, to the Liquidating Trust. This transfer included $71.5 million in cash of the Debtors, excluding $5.1 million associated with Access Lending. The Liquidating Trustee, with the assistance of its financial advisors, allocated the approximately $210 million in administration expenses incurred in the chapter 11 cases, including salaries, professional fees and the Debtors' normal business operations, among the various Debtors as required under the Original Plan. As a result of the allocation required under the terms of the Original Plan, the Holding Company Debtors experienced a temporary liquidity shortfall which was satisfied by the Operating Debtors. The shortfall created by the Holding Company Debtors' inability to fully reimburse from available cash its allowed A/P/S Claims and its share of the Joint Administrative Expenses is to be repaid from the first funds liquidated from the remaining Holding Company Debtor Assets.

#### (ii)    Cash Position as of August 31, 2009

As of August 31, 2009, the Liquidating Trust had a cash balance of $59,204,054.00. Reorganized Access Lending had a cash balance of $5,090,209.00. The major unliquidated asset of the Holding Company Debtors' Estates is the Carrington Interests. The Rabbi trust, which had a balance of $35,903,057 on August 31, 2009 is also a Holding Company Debtor Asset and will be distributed in accordance with the terms of the Settlement Agreement. It is anticipated that approximately $15 million of the Rabbi trust will be returned to the Holding Company Debtors' Estates. The major unliquidated asset of the Operating Debtors' Estates is the Debtors' tax refund. The Causes of Action, which constitute a major asset of all Creditors herein, will be distributed under the terms of the Modified Plan.

Since the Original Effective Date, the Liquidating Trust has received receipts in excess of $33,255,000, which were comprised of tax refunds, insurance refunds, the proceeds from the sale of certain Trust Assets, including certain Carrington Assets, a partial release of funds held in the Rabbi trust, the release of funds from the escrow account in connection with the DBNTC cure claim litigation and recoveries on certain litigations, including the Liberty Mutual action and certain preference actions. The Liquidating Trust has also incurred expenses during this period totaling $23,514,586.00, including the payment of $18,795,156.00 in professional fees which include professional fees incurred in investigating and commencing the Causes of Action and $4.7 million in payroll and other Trust Operating Expenses. The Liquidating Trustee also paid approximately $22 million since the Original Effective Date related to obligations of the Liquidating Trust under the Original Plan, including but not limited to, professional fees of the Debtors and the Committee, the WARN settlement, and other Allowed Administrative Expenses.

The Trust Expenses since the Original Effective Date have been higher than originally projected in the Original Disclosure Statement because of intense litigation regarding the turnover of documents to the Liquidating Trustee by the Examiner, the Reversal Order, the DCP Litigation, the continuing investigation of the Causes of Action and the magnitude of claims reconciliation that has been required since the Original Effective Date. As a result of general economic conditions, and its effect on the subprime market in general, certain assets have not achieved the level of return assumed in the Original Disclosure Statement. See Original Disclosure Statement at 145. This, combined with the increased expenses, has lowered the expected returns to Creditors under the Modified Plan as set forth in the Modified Disclosure Statement.

The net proceeds, if any, realized from the prosecution of the Causes of Action are not included in the recovery estimates contained in this Modified Disclosure Statement but projected expenses for the Causes of Action are included in these estimates as expenses. As set forth in Section III.A a hereof and in Article 9.C.1 of the Modified Plan, the net proceeds of all Causes of Action (other than Access Lending Causes of Action) will be allocated 24.75% to the Holders of Allowed Unsecured Claims against Holding Company Debtors, 2.75% to the Holders of Allowed Unsecured Claims against NC Credit, 27.5% to the Holders of Allowed Unsecured Claims against Operating Debtors other than Holders of Allowed EPD/Breach Claims against NC Capital, and 45% to Holders of Allowed EPD/Breach Claims against NC Capital and distributed in accordance with the terms of the Modified Plan. The net proceeds of all Causes of Action against Access Lending will be distributed Pro Rata to Holders of Allowed Class AL3 Claims (Other Unsecured Claims against Access Lending).

### C.  PROJECTED NET DISTRIBUTABLE ASSETS

The Liquidating Trustee projects that (i) the Access Lending Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Access Lending Unsecured Claims, including NCMC) will be approximately $3.8 million; (ii) the Holding Company Debtor Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Holding Company Debtor Claims excluding Litigation Proceeds) will be in the range of approximately $0 million to $27 million; (iii) the NC Credit Net Distributable Assets (the cash available to be distributed to NC Credit claims excluding Litigation Proceeds) will be in the range of approximately $0.5 million to $2 million, and (iv) the Operating Debtor Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Operating Debtor Claims excluding Litigation Proceeds) will be in the range of approximately $54 million to $99 million. This projection assumes that Allowed A/P/S Claims to be paid on or after the Original Effective Date will be in the range of approximately $7 million to $14 million and that the expenses of the Liquidating Trust will be approximately $33 million. These ranges are subject to final Claims reconciliation. (See Section IV.D hereof regarding risks associated with these projections).

**THE LIQUIDATING TRUSTEE MAKES NO REPRESENTATION CONCERNING THE ACCURACY OF THE PROJECTED FINANCIAL INFORMATION OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. MANY OF THE ASSUMPTIONS ON WHICH THESE PROJECTIONS ARE BASED ARE SUBJECT TO SIGNIFICANT ECONOMIC UNCERTAINTIES, AS DISCUSSED IN SECTION IV.D HEREOF. IT IS LIKELY THAT SOME ASSUMPTIONS WILL NOT MATERIALIZE BECAUSE OF UNANTICIPATED EVENTS AND CIRCUMSTANCES. ACCORDINGLY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PROJECTION PERIOD ARE LIKELY TO VARY FROM THE PROJECTED RESULTS. THE VARIATIONS MAY BE MATERIAL AND ADVERSE OR POSITIVE.**

**THE LIQUIDATING TRUSTEE DOES NOT ANTICIPATE AT THIS TIME THAT HE WILL UPDATE THESE PROJECTIONS AT THE HEARING ON CONFIRMATION OF THE MODIFIED PLAN, FURNISH UPDATED PROJECTIONS IN DOCUMENTS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR OTHERWISE MAKE SUCH PROJECTIONS PUBLIC.**

### D.  RISKS AND ASSUMPTIONS ASSOCIATED WITH RECOVERY PROJECTIONS

In Section III.F hereof, this Modified Disclosure Statement presents the Liquidating Trustee's estimated ranges of recoveries for Holders of Unsecured Claims. In formulating these estimates, the Liquidating Trustee has a "high-case" set of assumptions and a "low-case" set of assumptions. In the "high case" set of assumptions, the Liquidating Trustee has assumed optimal outcomes with respect to remaining asset disposition, litigation, and claims resolution. In the "low case" set of assumptions, the Liquidating Trustee has assumed outcomes that are less favorable with respect to remaining asset disposition, litigation, and claims resolution. The Debtors disclosed certain key assumptions in the Original Disclosure Statement that were part of the distribution model utilized in formulating the recovery estimates set forth in the Original Disclosure Statement. See Original Disclosure Statement at 153–156. Such key assumptions, to

the extent not materialized since the Original Effective Date, have been utilized by the Liquidating Trustee in formulating recovery estimates herein.

## V. CERTAIN FACTORS TO BE CONSIDERED REGARDING THE MODIFIED PLAN

Holders of Claims against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Modified Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Modified Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Modified Plan and its implementation.

An objection to confirmation of the Modified Plan could prevent confirmation or delay confirmation for a significant period of time. In such case, the Modified Effective Date may not occur and payments to creditors may not commence for several months. In addition, if the Modified Plan is not confirmed, the case may be converted to a case under Chapter 7, in which event the Liquidating Trustee believes that creditor recoveries will be substantially diminished.

The Liquidating Trustee believes that the Modified Effective Date should occur within forty-five (45) days following the entry of the Modified Confirmation Order, although there can be no assurance that each of the conditions to the Modified Effective Date will be satisfied by then.

## VI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Modified Plan to the Debtors, and to Holders of Unsecured Claims, Interests, and 510(b) Claims. This summary does not address the federal income tax consequences to Holders whose Claims are paid in full in Cash or are otherwise unimpaired under the Modified Plan (i.e., Holders of Allowed A/P/S Claims). In addition, the summary does not address the potential tax consequences of the entry of the Reversal Order if the Modified Plan is not confirmed. It is the expectation of the Liquidating Trustee that once the Modified Plan is confirmed and becomes effective, the establishment of the Liquidating Trust as of the Original Effective Date will be confirmed. If, however, the Modified Plan is not confirmed, it is not clear what position the IRS will take regarding the 2008 tax year.

This summary of the tax consequences of the Modified Plan is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions, and published administrative rulings and pronouncements of the IRS currently in effect. These authorities are all subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below.

This summary does not address foreign, state or local income tax consequences, or any estate or gift tax consequences of the Modified Plan, nor does it purport to address the federal income tax consequences of the Modified Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment

companies, investors in pass-through entities, broker-dealers and tax-exempt organizations). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Modified Plan with respect to a particular Holder of a Claim or Interest.

Due to the complexity of the transactions to be consummated pursuant to the Modified Plan, the lack of applicable legal precedent, the possibility of changes in law, differences in the nature of various Claims, differences in individual Claim or Interest Holders' methods of accounting, and the potential for disputes as to legal and factual matters, the federal income tax consequences described herein are subject to significant uncertainties. No ruling has been applied for or obtained from the IRS, and no opinion of counsel has been requested or obtained by the Debtors with respect to any of the tax aspects of the Modified Plan.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE MODIFIED PLAN.

For a discussion of the potential tax consequences under the Modified Plan to Holders of Claims, Interest Holders and the Debtors, see the discussions contained in the Original Disclosure Statement. See Original Disclosure Statement at 157–163. The transfer of the Assets of the Debtors to the Liquidating Trust under the Modified Plan shall be deemed to have occurred as of the Original Effective Date as such Assets were in fact transferred on that date since the Original Plan was not stayed pending the appeal by the Beneficiaries of the Original Confirmation Order to the District Court.

## VII.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Plan Proponents of the Modified Plan believe that the Modified Plan provides a recovery to creditors that is greater than or equal to the probable recoveries by creditors if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. **If the Modified Plan is not confirmed because the requisite classes did not vote to accept the Modified Plan, then the Liquidating Trustee will likely file a motion to convert the case to a case under Chapter 7.**

## VIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Plan Proponents believe that the Modified Plan satisfies all the requirements for confirmation.

### A.    GENERAL CONFIRMATION REQUIREMENTS

Bankruptcy Code § 1129(a) contains several requirements for confirmation of a plan. Among those requirements are that a plan be proposed in good faith, that certain information be

disclosed regarding payments made or promised to be made to insiders and that the plan comply with the applicable provisions of chapter 11. The Plan Proponents of the Modified Plan believe that they have complied with these requirements, including those requirements discussed below.

## B. BEST INTERESTS TEST

### (i) Generally

Each holder of a Claim or Interest in an impaired class must either (i) accept the Modified Plan or (ii) receive or retain under the Modified Plan Cash or property of a value, as of the Modified Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash and property issued under the Modified Plan to each Class equals or exceeds the value that would be allocated to the Holders in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Plan Proponents of the Modified Plan believe that the Holders of Claims against and Interests in the Debtors will have an equal or greater recovery as a result of the sale of the Debtors' assets as discussed herein and under the Modified Plan than could be realized in a chapter 7 liquidation for the following reasons.

The Estates are liquidating and therefore the Plan Proponents are not seeking to require Creditors to accept non-Cash consideration so that the Estates could pursue going concern value. Accordingly, the only question is whether the Creditors will have recovered more (or at least as much) under the Modified Plan than they would recover through an asset liquidation by a chapter 7 trustee.

To determine the value that a Holder of a Claim or Interest in an impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' Assets if the Debtors' Chapter 11 Cases had been converted to a chapter 7 liquidation case and the Debtors' Assets were liquidated by a chapter 7 trustee (the "Liquidation Distribution"). The Liquidation Distribution would consist of the net proceeds from the disposition of the Debtors' Assets, augmented by Cash held by the Debtors, and reduced by certain increased costs and Claims that arise in chapter 7 liquidation cases that do not arise in chapter 11 cases. Further, a chapter 7 trustee would be unlikely to obtain the benefits of the EPD/Breach Claim settlement contained in the Modified Plan, increasing the Unsecured Claims against some Debtors and decreasing Liquidation Distributions for certain Creditors. Further, the chapter 7 trustee is unlikely to obtain certain of the asset recoveries projected by the Liquidating Trustee in the Modified Disclosure Statement, thereby also reducing the Liquidation Distributions.

The Debtors attached as <u>Exhibit F</u> to the Original Disclosure Statement an analysis illustrating some of the projected effects of the conversion of the Chapter 11 Cases to chapter 7 cases (the "Liquidation Scenarios"). The Liquidation Scenarios were based on certain assumptions for asset realization and expenses which have not materialized. However, the Liquidating Trustee believes that a conversion to chapter 7 today could have a far worse result for Creditors than recoveries projected under the Original Disclosure Statement or Modified Disclosure Statement. Since the reduction in asset values and increased expenses that have occurred since the Original Effective Date and reflected in the Modified Disclosure Statement

would have a similar or worse impact on the results set forth in the Liquidation Scenarios put forth in the Original Disclosure Statement, the Liquidating Trustee adopts such analysis for the purposes of this discussion to demonstrate that a conversion of this case at this juncture to one under chapter 7 of the Bankruptcy Code will reduce the amount available to all Unsecured Creditors.

The Liquidation Scenarios assume (with noted exceptions) that the Liquidating Trustee would recover the same value for the Assets as he is projected to recover in the analysis underlying the recovery estimates set forth in the Original Plan. The Liquidation Scenarios, however, project that chapter 7 trustee expenses and litigation expenses would reduce projected recoveries. In addition, the Liquidation Scenarios assume that the different Estates will not benefit from certain settlements in the low recovery case. The base assumptions utilized by the Debtors in the Original Disclosure Statement related to the Liquidation Scenarios discussed in the Original Disclosure Statement are adopted by the Liquidating Trustee for purposes of this analysis.

The Liquidating Trustee believes after administering the Liquidating Trust for over one (1) year that the expenses incurred by a chapter 7 trustee would exceed the costs incurred to operate the Liquidating Trust primarily because of the loss of the institutional knowledge of the Debtors, the increased litigation costs and the increased costs of claims resolution. The Liquidating Trustee also believes that absent the EPD Breach Claim Protocol and Intercompany Claim Protocol, the costs of litigation related to the resolution of these claims would be significant and would reduce the distribution to all Creditors as set forth by the Debtors in the Liquidation Scenarios.

## C.    FINANCIAL FEASIBILITY TEST.

In order to confirm a plan, the Bankruptcy Code requires the Bankruptcy Court to find that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors (the "Feasibility Test"). Thus, for a plan to meet the Feasibility Test, the Bankruptcy Court must find that there is a reasonable likelihood that the reorganized debtor will possess the working capital and other resources necessary to operate profitably and will be able to meet its obligations under the plan. Because a form of liquidation is proposed in the Modified Plan and no further financial reorganization of the Debtors will be possible, the Liquidating Trustee believes that the plan meets the feasibility requirement.

## D.    ACCEPTANCE BY IMPAIRED CLASSES.

Section 1129(a) of the Bankruptcy Code requires that each class of claims or interests that is impaired under a plan accept the plan (subject to the "cramdown" exception contained in section 1129(b) of the Bankruptcy Code). Under section 1129(b) of the Bankruptcy Code, if at least one but not all impaired classes do not accept the plan, the Bankruptcy Court may nonetheless confirm the plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of the plan is commonly referred to as "cramdown." The Bankruptcy Code allows the plan to be "crammed down" on non-accepting classes of claims or interests if (i) the plan meets all confirmation requirements except the requirement of section 1129(a)(8) of the Bankruptcy Code

that the plan be accepted by each class of claims or interests that is impaired and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the plan, as referred to in section 1129(b) of the Bankruptcy Code and applicable case law.

Section 1127 of the Bankruptcy Code provides that the proponent of a plan may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code. Such plan as modified becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of the Bankruptcy Code. Section 1127 of the Bankruptcy Code further provides that the proponent of a modification shall comply with section 1125 of the Bankruptcy Code with respect to the plan as modified and any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection. Only where a creditor's interest is materially and adversely affected by proposed plan modifications must that party be afforded an opportunity to change its vote in accordance with the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code.

Pursuant to the Modified Procedures Order, the Bankruptcy Court has ordered that resolicitation with respect to the modifications contained in the Modified Plan is unnecessary except with respect to Classes HC10a, HC10b, and HC14. As part of the due diligence conducted by the Trustee and the Plan Advisory Committee in addressing the issues surrounding reversal of the Confirmation Order, an analysis of the potential recoveries under the Modified Plan was prepared. The analysis of potential recoveries was developed using information available to the Trustee as of July 30, 2009 and such information was applied to both the Original Plan and the Modified Plan in order to generate a comparative analysis of potential recoveries. The analysis demonstrated that the Proposed Modifications would have, at most, a minimal impact on Claims of the Holding Company Debtor Unsecured Claims and the NC Credit Unsecured Claims as provided for in the Modified Plan and have no impact on Operating Debtor Unsecured Claims. In many instances in which an impact may occur such impact is expected to be less than a 1% variance when compared to the potential recoveries under the Original Plan's distribution model. The only instance in which the variance exceeds 1% is for Holders of Other Unsecured Claims against NC Credit in Class HC10b. The potential recoveries to Creditors in Class HC10b are reduced from 0% - 6.8% under the Original Plan to 0.3% - 1.3% under the Modified Plan. Accordingly, the Creditors in Class HC10b are entitled to vote on the Modified Plan. As no other Creditors are expected to suffer material adverse changes to their proposed treatment under the Modified Plan, resolicitation of any other Class of Creditors would not be necessary under the relevant caselaw. However, given that the Creditors holding Special Deficiency Claims against NC Credit in Class HC10a and the Settling Parties in Class HC14 are directly affected by the Proposed Modifications (even though such Proposed Modifications do not have a materially adverse impact on their expected recoveries), the Court has agreed with the Liquidating Trustee that resolicitation of these Creditors is appropriate.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the

class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified or (ii) the effect of any default is cured and the original terms of the obligation are reinstated. Under the Modified Plan, Class HC1, Class HC2, Class HC5, Class HC6, Class HC8, Class HC9, Class HC11, Class HC12, Class OP1, Class OP2, Class OP4, Class OP5, Class OP7, Class OP8, Class OP10, Class OP11, Class AL1, and Class AL2 are not impaired and are deemed to accept the Modified Plan, while Class HC4a, Class HC4b, Class HC4c, Class HC4d, and Class HC4e are not entitled to receive or retain any property under the Modified Plan on account of Claims or Interests and are conclusively presumed to have rejected the Modified Plan. All other Classes of Claims under the Modified Plan are impaired under the Modified Plan and Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Modified Plan; provided, however, that pursuant to the Modified Procedures Order, all parties that voted or had the opportunity to vote on the Original Plan, including Holders of Claims in Class HC3a, Class HC3b, Class HC7, Class HC13, Class OP3a, Class OP3b, Class OP3c, Class OP6a, Class OP6b, Class OP6c, Class OP9a, Class OP9b, Class OP12 and Class AL3, will be deemed to have cast the same vote on the Modified Plan as they did for the Original Plan since the modifications contained in the Modified Plan do not adversely affect the treatment of such Claims. As a result, the only Classes entitled to vote on the Modified Plan are Classes HC10a, HC10b and HC14.

The Modified Plan provides fair and equitable treatment of impaired Claims, as either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed Claim or (b) the Holders of Claims and Interests that are junior to such Class of impaired claims will not receive or retain any property under the Modified Plan, subject to the applicability of the judicial new value doctrine. Pursuant to the Modified Plan, no Holders of any Claim or Interest junior to the Holders of such impaired Classes will receive or retain any property on account of such junior Claims.

Holders of Claims and Interests in Class HC4a, Class HC4b, Class HC4c, Class HC4d, and Class HC4e are conclusively presumed to have rejected the Modified Plan and are not entitled to vote to accept or reject the Modified Plan are receiving no property under the Modified Plan and are therefore deemed to reject the Modified Plan. The Modified Plan provides fair and equitable treatment to these Holders because there are no Classes junior to this class and no Class senior to this Class is being paid more than in full on its Allowed Claims.

If any impaired Class fails to accept the Modified Plan, the Plan Proponents intend to request that the Bankruptcy Court confirm the Modified Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to those Classes.

### E. APPROVAL OF PLAN SETTLEMENTS

The Modified Plan incorporates numerous settlements and compromises addressing controversies such as potential claims among the Debtor entities, disputed ownership of certain assets, and the treatment of joint and several claims. The Modified Plan incorporates a request pursuant to Bankruptcy Rule 9019 to approve the compromises contained in the Modified Plan. For a settlement to be approved under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interests of the debtor's estate. See Myers v. Martin (In re Martin), 91 F.3d 389, 394 (3d Cir. 1996); In re Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the compromise is fair, reasonable, and in the interest of the estate.'"). To reach this determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement. See Martin, 91 F.3d at 393. The standard by which courts should evaluate the reasonableness of a proposed compromise and settlement is well established. This standard includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Id. The Plan Proponents of the Modified Plan believe the settlements set forth in the Modified Plan meet these requirements.


## IX. CONCLUSION

**THE LIQUIDATING TRUSTEE AND THE PLAN ADVISORY COMMITTEE URGE YOU TO VOTE TO ACCEPT THE MODIFIED PLAN AND TO RETURN YOUR BALLOTS SO THAT THEY WILL BE RECEIVED AT THE ADDRESS AND PURSUANT TO THE PROCEDURES DESCRIBED IN SECTION III.D OF THIS MODIFIED DISCLOSURE STATEMENT, NO LATER THAN 5:00 P.M. PACIFIC TIME ON NOVEMBER 10, 2009.**

Dated: Wilmington, Delaware
September 30, 2009

Respectfully submitted,

NEW CENTURY FINANCIAL CORPORATION, et al,
as Debtors


\_\_/s/\_\_Alan M. Jacobs_____
By:     Alan M. Jacobs, Liquidating Trustee of the New
        Century Liquidating Trust
Its:     Sole Officer and Director

NEW CENTURY LIQUIDATING TRUST


__/s/  Alan M. Jacobs_____
By:      Alan M. Jacobs
Its:      Liquidating Trustee


REORGANIZED ACCESS LENDING


__/s/  Alan M. Jacobs_____
By:      Alan M. Jacobs
Its:      Plan Administrator (including in the Plan
         Administrator's capacity as Sole Officer and
         Director)

**Exhibits**

A – Modified Joint Chapter 11 Plan of Liquidation, Dated as of September ___, 2009

B – Original Disclosure Statement, Dated as of March 18, 2008

**Exhibit A**

**Modified Joint Chapter 11 Plan of Liquidation, Dated as of September \_\_\_, 2009**

**(Attached)**

**Exhibit B**

**Original Disclosure Statement, Dated as of March 18, 2008**

**(Attached)**