As of September 30, 2009, the Liquidating Trust had a cash balance of $58,204,422. Reorganized Access Lending had a cash balance of $5,091,252. The major unliquidated asset of the Holding Company Debtors' Estates is the Carrington Interests. The Rabbi trust, which had a balance of $35,903,057 on August 31, 2009 is also a Holding Company Debtor Asset and will be distributed in accordance with the terms of the Settlement Agreement. It is anticipated that approximately $15 million of the Rabbi trust will be returned to the Holding Company Debtors' Estates. The major unliquidated asset of the Operating Debtors' Estates is the Debtors' tax refund. The Causes of Action, which constitute a major asset of all Creditors herein, will be distributed under the terms of the Modified Plan.

Since the Original Effective Date, the Liquidating Trust has received receipts in excess of $33,957,025, which were comprised of tax refunds, insurance refunds, the proceeds from the sale of certain Trust Assets, including certain Carrington Assets, a partial release of funds held in the Rabbi trust, the release of funds from the escrow account in connection with the DBNTC cure claim litigation and recoveries on certain litigations, including the Liberty Mutual action and certain preference actions. The Liquidating Trust has also incurred expenses during this period totaling $25,215,796, including the payment of $20,284,008 in professional fees which include professional fees incurred in investigating and commencing the Causes of Action and $4,931,789 million in payroll and other Trust Operating Expenses. The Liquidating Trustee also paid approximately $22 million since the Original Effective Date related to obligations of the Liquidating Trust under the Original Plan, including but not limited to, professional fees of the Debtors and the Committee, the WARN settlement, and other Allowed Administrative Expenses.

The Trust Expenses since the Original Effective Date have been higher than originally projected in the Original Disclosure Statement because of intense litigation regarding the turnover of documents to the Liquidating Trustee by the Examiner, the Reversal Order, the DCP Litigation, the continuing investigation of the Causes of Action and the magnitude of claims reconciliation that has been required since the Original Effective Date. As a result of general economic conditions, and its effect on the subprime market in general, certain assets have not achieved the level of return assumed in the Original Disclosure Statement. See Original Disclosure Statement at 145. This, combined with the increased expenses, has lowered the expected returns to Creditors under the Modified Plan as set forth in the Modified Disclosure Statement.

The net proceeds, if any, realized from the prosecution of the Causes of Action are not included in the recovery estimates contained in this Modified Disclosure Statement but projected expenses for the Causes of Action are included in these estimates as expenses. As set forth in Section III.A a hereof and in Article 9.C.1 of the Modified Plan, the net proceeds of all Causes of Action (other than Access Lending Causes of Action) will be allocated 24.75% to the Holders of Allowed Unsecured Claims against Holding Company Debtors, 2.75% to the Holders of Allowed Unsecured Claims against NC Credit, 27.5% to the Holders of Allowed Unsecured Claims against Operating Debtors other than Holders of Allowed EPD/Breach Claims against NC Capital, and 45% to Holders of Allowed EPD/Breach Claims against NC Capital and distributed in accordance with the terms of the Modified Plan. The net proceeds of all Causes of Action against Access Lending will be distributed Pro Rata to Holders of Allowed Class AL3 Claims (Other Unsecured Claims against Access Lending).

40

C.   PROJECTED NET DISTRIBUTABLE ASSETS

The Liquidating Trustee projects that (i) the Access Lending Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Access Lending Unsecured Claims, including NCMC) will be approximately $3.8 million; (ii) the Holding Company Debtor Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Holding Company Debtor Claims excluding Litigation Proceeds) will be in the range of approximately $0 million to $27 million; (iii) the NC Credit Net Distributable Assets (the cash available to be distributed to NC Credit claims excluding Litigation Proceeds) will be in the range of approximately $0.5 million to $2 million, and (iv) the Operating Debtor Net Distributable Assets (the Cash available to be distributed to Holders of Allowed Operating Debtor Claims excluding Litigation Proceeds) will be in the range of approximately $54 million to $99 million. This projection assumes that Allowed A/P/S Claims to be paid on or after the Original Effective Date will be in the range of approximately $7 million to $14 million and that the expenses of the Liquidating Trust will be approximately $33 million. These ranges are subject to final Claims reconciliation. (See Section IV.D hereof regarding risks associated with these projections).

**THE LIQUIDATING TRUSTEE MAKES NO REPRESENTATION CONCERNING THE ACCURACY OF THE PROJECTED FINANCIAL INFORMATION OR THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. MANY OF THE ASSUMPTIONS ON WHICH THESE PROJECTIONS ARE BASED ARE SUBJECT TO SIGNIFICANT ECONOMIC UNCERTAINTIES, AS DISCUSSED IN SECTION IV.D HEREOF. IT IS LIKELY THAT SOME ASSUMPTIONS WILL NOT MATERIALIZE BECAUSE OF UNANTICIPATED EVENTS AND CIRCUMSTANCES. ACCORDINGLY, THE ACTUAL RESULTS ACHIEVED THROUGHOUT THE PROJECTION PERIOD ARE LIKELY TO VARY FROM THE PROJECTED RESULTS. THE VARIATIONS MAY BE MATERIAL AND ADVERSE OR POSITIVE.**

**THE LIQUIDATING TRUSTEE DOES NOT ANTICIPATE AT THIS TIME THAT HE WILL UPDATE THESE PROJECTIONS AT THE HEARING ON CONFIRMATION OF THE MODIFIED PLAN, FURNISH UPDATED PROJECTIONS IN DOCUMENTS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR OTHERWISE MAKE SUCH PROJECTIONS PUBLIC.**

D.   RISKS AND ASSUMPTIONS ASSOCIATED WITH RECOVERY PROJECTIONS

In Section III.F hereof, this Modified Disclosure Statement presents the Liquidating Trustee's estimated ranges of recoveries for Holders of Unsecured Claims. In formulating these estimates, the Liquidating Trustee has a "high-case" set of assumptions and a "low-case" set of assumptions. In the "high case" set of assumptions, the Liquidating Trustee has assumed optimal outcomes with respect to remaining asset disposition, litigation, and claims resolution. In the "low case" set of assumptions, the Liquidating Trustee has assumed outcomes that are less favorable with respect to remaining asset disposition, litigation, and claims resolution. The Debtors disclosed certain key assumptions in the Original Disclosure Statement that were part of the distribution model utilized in formulating the recovery estimates set forth in the Original Disclosure Statement. See Original Disclosure Statement at 153–156. Such key assumptions, to

the extent not materialized since the Original Effective Date, have been utilized by the Liquidating Trustee in formulating recovery estimates herein.

## V. CERTAIN FACTORS TO BE CONSIDERED REGARDING THE MODIFIED PLAN

Holders of Claims against the Debtors should read and consider carefully the factors set forth below, as well as the other information set forth in this Modified Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Modified Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Modified Plan and its implementation.

An objection to confirmation of the Modified Plan could prevent confirmation or delay confirmation for a significant period of time. In such case, the Modified Effective Date may not occur and payments to creditors may not commence for several months. In addition, if the Modified Plan is not confirmed, the case may be converted to a case under Chapter 7, in which event the Liquidating Trustee believes that creditor recoveries will be substantially diminished.

The Liquidating Trustee believes that the Modified Effective Date should occur within forty-five (45) days following the entry of the Modified Confirmation Order, although there can be no assurance that each of the conditions to the Modified Effective Date will be satisfied by then.

## VI. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences of the Modified Plan to the Debtors, and to Holders of Unsecured Claims, Interests, and 510(b) Claims. This summary does not address the federal income tax consequences to Holders whose Claims are paid in full in Cash or are otherwise unimpaired under the Modified Plan (i.e., Holders of Allowed A/P/S Claims). In addition, the summary does not address the potential tax consequences of the entry of the Reversal Order if the Modified Plan is not confirmed. It is the expectation of the Liquidating Trustee that once the Modified Plan is confirmed and becomes effective, the establishment of the Liquidating Trust as of the Original Effective Date will be confirmed. If, however, the Modified Plan is not confirmed, it is not clear what position the IRS will take regarding the 2008 tax year.

This summary of the tax consequences of the Modified Plan is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions, and published administrative rulings and pronouncements of the IRS currently in effect. These authorities are all subject to change, possibly with retroactive effect, and any such change could alter or modify the federal income tax consequences described below.

This summary does not address foreign, state or local income tax consequences, or any estate or gift tax consequences of the Modified Plan, nor does it purport to address the federal income tax consequences of the Modified Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment

companies, investors in pass-through entities, broker-dealers and tax-exempt organizations). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Modified Plan with respect to a particular Holder of a Claim or Interest.

Due to the complexity of the transactions to be consummated pursuant to the Modified Plan, the lack of applicable legal precedent, the possibility of changes in law, differences in the nature of various Claims, differences in individual Claim or Interest Holders' methods of accounting, and the potential for disputes as to legal and factual matters, the federal income tax consequences described herein are subject to significant uncertainties. No ruling has been applied for or obtained from the IRS, and no opinion of counsel has been requested or obtained by the Debtors with respect to any of the tax aspects of the Modified Plan.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH SUCH HOLDER. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE MODIFIED PLAN.

For a discussion of the potential tax consequences under the Modified Plan to Holders of Claims, Interest Holders and the Debtors, see the discussions contained in the Original Disclosure Statement. See Original Disclosure Statement at 157–163. The transfer of the Assets of the Debtors to the Liquidating Trust under the Modified Plan shall be deemed to have occurred as of the Original Effective Date as such Assets were in fact transferred on that date since the Original Plan was not stayed pending the appeal by the Beneficiaries of the Original Confirmation Order to the District Court.

### VII. ALTERNATIVES TO CONFIRMATION OF THE PLAN

The Plan Proponents of the Modified Plan believe that the Modified Plan provides a recovery to creditors that is greater than or equal to the probable recoveries by creditors if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. **If the Modified Plan is not confirmed because the requisite classes did not vote to accept the Modified Plan, then the Liquidating Trustee will likely file a motion to convert the case to a case under Chapter 7.**

### VIII. ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Plan Proponents believe that the Modified Plan satisfies all the requirements for confirmation.

#### A. GENERAL CONFIRMATION REQUIREMENTS

Bankruptcy Code § 1129(a) contains several requirements for confirmation of a plan. Among those requirements are that a plan be proposed in good faith, that certain information be

disclosed regarding payments made or promised to be made to insiders and that the plan comply with the applicable provisions of chapter 11. The Plan Proponents of the Modified Plan believe that they have complied with these requirements, including those requirements discussed below.

### B. BEST INTERESTS TEST

#### (i) Generally

Each holder of a Claim or Interest in an impaired class must either (i) accept the Modified Plan or (ii) receive or retain under the Modified Plan Cash or property of a value, as of the Modified Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Bankruptcy Court will determine whether the Cash and property issued under the Modified Plan to each Class equals or exceeds the value that would be allocated to the Holders in a liquidation under Chapter 7 of the Bankruptcy Code (the "Best Interest Test"). The Plan Proponents of the Modified Plan believe that the Holders of Claims against and Interests in the Debtors will have an equal or greater recovery as a result of the sale of the Debtors' assets as discussed herein and under the Modified Plan than could be realized in a chapter 7 liquidation for the following reasons.

The Estates are liquidating and therefore the Plan Proponents are not seeking to require Creditors to accept non-Cash consideration so that the Estates could pursue going concern value. Accordingly, the only question is whether the Creditors will have recovered more (or at least as much) under the Modified Plan than they would recover through an asset liquidation by a chapter 7 trustee.

To determine the value that a Holder of a Claim or Interest in an impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' Assets if the Debtors' Chapter 11 Cases had been converted to a chapter 7 liquidation case and the Debtors' Assets were liquidated by a chapter 7 trustee (the "Liquidation Distribution"). The Liquidation Distribution would consist of the net proceeds from the disposition of the Debtors' Assets, augmented by Cash held by the Debtors, and reduced by certain increased costs and Claims that arise in chapter 7 liquidation cases that do not arise in chapter 11 cases. Further, a chapter 7 trustee would be unlikely to obtain the benefits of the EPD/Breach Claim settlement contained in the Modified Plan, increasing the Unsecured Claims against some Debtors and decreasing Liquidation Distributions for certain Creditors. Further, the chapter 7 trustee is unlikely to obtain certain of the asset recoveries projected by the Liquidating Trustee in the Modified Disclosure Statement, thereby also reducing the Liquidation Distributions.

The Debtors attached as Exhibit F to the Original Disclosure Statement an analysis illustrating some of the projected effects of the conversion of the Chapter 11 Cases to chapter 7 cases (the "Liquidation Scenarios"). The Liquidation Scenarios were based on certain assumptions for asset realization and expenses which have not materialized. However, the Liquidating Trustee believes that a conversion to chapter 7 today could have a far worse result for Creditors than recoveries projected under the Original Disclosure Statement or Modified Disclosure Statement. Since the reduction in asset values and increased expenses that have occurred since the Original Effective Date and reflected in the Modified Disclosure Statement

would have a similar or worse impact on the results set forth in the Liquidation Scenarios put forth in the Original Disclosure Statement, the Liquidating Trustee adopts such analysis for the purposes of this discussion to demonstrate that a conversion of this case at this juncture to one under chapter 7 of the Bankruptcy Code will reduce the amount available to all Unsecured Creditors.

The Liquidation Scenarios assume (with noted exceptions) that the Liquidating Trustee would recover the same value for the Assets as he is projected to recover in the analysis underlying the recovery estimates set forth in the Original Plan. The Liquidation Scenarios, however, project that chapter 7 trustee expenses and litigation expenses would reduce projected recoveries. In addition, the Liquidation Scenarios assume that the different Estates will not benefit from certain settlements in the low recovery case. The base assumptions utilized by the Debtors in the Original Disclosure Statement related to the Liquidation Scenarios discussed in the Original Disclosure Statement are adopted by the Liquidating Trustee for purposes of this analysis.

The Liquidating Trustee believes after administering the Liquidating Trust for over one (1) year that the expenses incurred by a chapter 7 trustee would exceed the costs incurred to operate the Liquidating Trust primarily because of the loss of the institutional knowledge of the Debtors, the increased litigation costs and the increased costs of claims resolution. The Liquidating Trustee also believes that absent the EPD Breach Claim Protocol and Intercompany Claim Protocol, the costs of litigation related to the resolution of these claims would be significant and would reduce the distribution to all Creditors as set forth by the Debtors in the Liquidation Scenarios.

### C. FINANCIAL FEASIBILITY TEST.

In order to confirm a plan, the Bankruptcy Code requires the Bankruptcy Court to find that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors (the "Feasibility Test"). Thus, for a plan to meet the Feasibility Test, the Bankruptcy Court must find that there is a reasonable likelihood that the reorganized debtor will possess the working capital and other resources necessary to operate profitably and will be able to meet its obligations under the plan. Because a form of liquidation is proposed in the Modified Plan and no further financial reorganization of the Debtors will be possible, the Liquidating Trustee believes that the plan meets the feasibility requirement.

### D. ACCEPTANCE BY IMPAIRED CLASSES.

Section 1129(a) of the Bankruptcy Code requires that each class of claims or interests that is impaired under a plan accept the plan (subject to the "cramdown" exception contained in section 1129(b) of the Bankruptcy Code). Under section 1129(b) of the Bankruptcy Code, if at least one but not all impaired classes do not accept the plan, the Bankruptcy Court may nonetheless confirm the plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of the plan is commonly referred to as "cramdown." The Bankruptcy Code allows the plan to be "crammed down" on non-accepting classes of claims or interests if (i) the plan meets all confirmation requirements except the requirement of section 1129(a)(8) of the Bankruptcy Code

that the plan be accepted by each class of claims or interests that is impaired and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the plan, as referred to in section 1129(b) of the Bankruptcy Code and applicable case law.

Section 1127 of the Bankruptcy Code provides that the proponent of a plan may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of the Bankruptcy Code. Such plan as modified becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of the Bankruptcy Code. Section 1127 of the Bankruptcy Code further provides that the proponent of a modification shall comply with section 1125 of the Bankruptcy Code with respect to the plan as modified and any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection. Only where a creditor's interest is materially and adversely affected by proposed plan modifications must that party be afforded an opportunity to change its vote in accordance with the disclosure and solicitation requirements of section 1125 of the Bankruptcy Code.

Pursuant to the Modified Procedures Order, the Bankruptcy Court has ordered that resolicitation with respect to the modifications contained in the Modified Plan is unnecessary except with respect to Classes HC10a, HC10b, and HC14. As part of the due diligence conducted by the Trustee and the Plan Advisory Committee in addressing the issues surrounding reversal of the Confirmation Order, an analysis of the potential recoveries under the Modified Plan was prepared. The analysis of potential recoveries was developed using information available to the Trustee as of July 30, 2009 and such information was applied to both the Original Plan and the Modified Plan in order to generate a comparative analysis of potential recoveries. The analysis demonstrated that the Proposed Modifications would have, at most, a minimal impact on Claims of the Holding Company Debtor Unsecured Claims and the NC Credit Unsecured Claims as provided for in the Modified Plan and have no impact on Operating Debtor Unsecured Claims. In many instances in which an impact may occur such impact is expected to be less than a 1% variance when compared to the potential recoveries under the Original Plan's distribution model. The only instance in which the variance exceeds 1% is for Holders of Other Unsecured Claims against NC Credit in Class HC10b. The potential recoveries to Creditors in Class HC10b are reduced from 0% - 6.8% under the Original Plan to 0.3% - 1.3% under the Modified Plan. Accordingly, the Creditors in Class HC10b are entitled to vote on the Modified Plan. As no other Creditors are expected to suffer material adverse changes to their proposed treatment under the Modified Plan, resolicitation of any other Class of Creditors would not be necessary under the relevant caselaw. However, given that the Creditors holding Special Deficiency Claims against NC Credit in Class HC10a and the Settling Parties in Class HC14 are directly affected by the Proposed Modifications (even though such Proposed Modifications do not have a materially adverse impact on their expected recoveries), the Court has agreed with the Liquidating Trustee that resolicitation of these Creditors is appropriate.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the

class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified or (ii) the effect of any default is cured and the original terms of the obligation are reinstated. Under the Modified Plan, Class HC1, Class HC2, Class HC5, Class HC6, Class HC8, Class HC9, Class HC11, Class HC12, Class OP1, Class OP2, Class OP4, Class OP5, Class OP7, Class OP8, Class OP10, Class OP11, Class AL1, and Class AL2 are not impaired and are deemed to accept the Modified Plan, while Class HC4a, Class HC4b, Class HC4c, Class HC4d, and Class HC4e are not entitled to receive or retain any property under the Modified Plan on account of Claims or Interests and are conclusively presumed to have rejected the Modified Plan. All other Classes of Claims under the Modified Plan are impaired under the Modified Plan and Holders of Allowed Claims in such Classes are entitled to vote to accept or reject the Modified Plan; provided, however, that pursuant to the Modified Procedures Order, all parties that voted or had the opportunity to vote on the Original Plan, including Holders of Claims in Class HC3a, Class HC3b, Class HC7, Class HC13, Class OP3a, Class OP3b, Class OP3c, Class OP6a, Class OP6b, Class OP6c, Class OP9a, Class OP9b, Class OP12 and Class AL3, will be deemed to have cast the same vote on the Modified Plan as they did for the Original Plan since the modifications contained in the Modified Plan do not adversely affect the treatment of such Claims. As a result, the only Classes entitled to vote on the Modified Plan are Classes HC10a, HC10b and HC14.

The Modified Plan provides fair and equitable treatment of impaired Claims, as either (a) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed Claim or (b) the Holders of Claims and Interests that are junior to such Class of impaired claims will not receive or retain any property under the Modified Plan, subject to the applicability of the judicial new value doctrine. Pursuant to the Modified Plan, no Holders of any Claim or Interest junior to the Holders of such impaired Classes will receive or retain any property on account of such junior Claims.

Holders of Claims and Interests in Class HC4a, Class HC4b, Class HC4c, Class HC4d, and Class HC4e are conclusively presumed to have rejected the Modified Plan and are not entitled to vote to accept or reject the Modified Plan are receiving no property under the Modified Plan and are therefore deemed to reject the Modified Plan. The Modified Plan provides fair and equitable treatment to these Holders because there are no Classes junior to this class and no Class senior to this Class is being paid more than in full on its Allowed Claims.

If any impaired Class fails to accept the Modified Plan, the Plan Proponents intend to request that the Bankruptcy Court confirm the Modified Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to those Classes.

E.     **APPROVAL OF PLAN SETTLEMENTS**

The Modified Plan incorporates numerous settlements and compromises addressing controversies such as potential claims among the Debtor entities, disputed ownership of certain assets, and the treatment of joint and several claims. The Modified Plan incorporates a request pursuant to Bankruptcy Rule 9019 to approve the compromises contained in the Modified Plan. For a settlement to be approved under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interests of the debtor's estate. See Myers v. Martin (In re Martin), 91 F.3d 389, 394 (3d Cir. 1996); In re Marvel Entertainment Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the compromise is fair, reasonable, and in the interest of the estate.'"). To reach this determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement. See Martin, 91 F.3d at 393. The standard by which courts should evaluate the reasonableness of a proposed compromise and settlement is well established. This standard includes consideration of the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Id. The Plan Proponents of the Modified Plan believe the settlements set forth in the Modified Plan meet these requirements.

## IX. CONCLUSION

**THE LIQUIDATING TRUSTEE AND THE PLAN ADVISORY COMMITTEE URGE YOU TO VOTE TO ACCEPT THE MODIFIED PLAN AND TO RETURN YOUR BALLOTS SO THAT THEY WILL BE RECEIVED AT THE ADDRESS AND PURSUANT TO THE PROCEDURES DESCRIBED IN SECTION III.D OF THIS MODIFIED DISCLOSURE STATEMENT, NO LATER THAN 5:00 P.M. PACIFIC TIME ON NOVEMBER 10, 2009.**

Dated: Wilmington, Delaware
September 30, 2009

                Respectfully submitted,

                NEW CENTURY FINANCIAL CORPORATION, et al,
                as Debtors

                __/s/__ Alan M. Jacobs_____
                By:    Alan M. Jacobs, Liquidating Trustee of the New Century Liquidating Trust
                Its:    Sole Officer and Director

NEW CENTURY LIQUIDATING TRUST

/s/ Alan M. Jacobs
By: Alan M. Jacobs
Its: Liquidating Trustee

REORGANIZED ACCESS LENDING

/s/ Alan M. Jacobs
By: Alan M. Jacobs
Its: Plan Administrator (including in the Plan Administrator's capacity as Sole Officer and Director)

# Exhibits

A – Modified Joint Chapter 11Plan of Liquidation, Dated as of September 30, 2009 (attached)

B – Original Disclosure Statement, Dated as of March 18, 2008 (attached)