**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NEW CENTURY TRS HOLDINGS, INC., | ) |  |
| a Delaware corporation, *et al.*,[1] | ) | Case No. 07-10416 (KJC) |
|  | ) |  |
| Debtors | ) | Jointly Administered |
|  | ) |  |

## MEMORANDUM[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

### I.    INTRODUCTION

Before the Court is the objection by the Trustee for the New Century Liquidating Trust to

Janet and Alfonso Longo's (the "Longos") unsecured claim number 3801 in the amount of

$2,816,854.62 (the "Claim" or the "Longos' Claim"). The Court held an evidentiary hearing on

---

[1] The pre-confirmation Debtors were the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited liability partnership. On August 3, 2007, New Century Warehouse Corporation, a California corporation, which is also known as "Access Lending," filed a voluntary chapter 11 bankruptcy petition. These entities are referred to herein as the "Debtors," collectively, or any individual entity may be referred to herein as the "Debtor."

[2] The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(B).

the merits of the Longos' Claim. Subsequently, the Trustee and the Longos filed post-hearing

briefs. For the reasons set forth below, the Trustee's objection will be sustained, in part, and

denied, in part. The Longos' Claim will be allowed in the amount of $1,850.00.

## II.    **BACKGROUND**

### A. The Pre-petition Loan Transaction[3]

On or about September 6, 2006, the Longos received a solicitation by mail offering home

mortgage refinancing services.[4] Compl. ¶ 14; Ex. T-5 (Longos' Response to Interrogatory

No.1); Evidentiary Hearing Transcript, dated November 24, 2009 ("Tr.") 108:4. They were

interested in refinancing their home in order to consolidate their debt, so they called the number

on the solicitation. Compl. ¶ 14; Ex. T-5 (Longos' Response to Interrogatory No.1). They

reached Nick Street, a broker employed by First National Mortgage Sources, LLC, who told

them that he could help them refinance and that the closing fees would be around $2,000.00. Tr.

81:18-83:0; Compl. ¶ 15. This was a wholesale transaction, meaning that Mr. Street, an

independent broker, rather than an employee of New Century Mortgage Corporation ("New

Century"), worked with the Longos to gather information, prepared a loan application, and sent

---

[3] On September 12, 2007, the Longos filed a complaint (the "Complaint") in the United States District Court for the District of New Jersey (Civil Action No. 07-4372 (MLC)), naming various defendants, including "New Century Mortgage," which is described as "a mortgage company whose principal place of business is at 2880 Gateway Oaks Drive #200, Sacramento, California 95083. The claims in the Complaint arise out of the Longos' September 2006 refinance loan transaction and allege violations of the Truth in Lending Act ("TILA"), the Real Estate Settlement Procedures Act ("RESPA"), the Home Ownership and Equity Protection Act ("HOEPA"), the New Jersey Consumer Fraud Act, the New Jersey Home Ownership Security Act, and assert other common law theories of fraud and conspiracy. A copy of the Complaint and its Exhibits were attached in support of the proof of claim. Citations herein to the Complaint are for purposes of exposition and ease of reference.

[4] The Longos allege that this solicitation was from New Century, but the Trust disputes this claim. The solicitation was not produced.

the information to New Century (and possibly other lenders).[5] Tr. 44:10-45:1; Ex. T-20. The

Longos sent their financial information to Mr. Street, and Mr. Street faxed to the Longos a

Borrower's Certification and Authorization form, which allowed him to verify their financial

records and to check their credit. Tr. 107:12-16; Compl. ¶¶ 16-17.

On September 7, 2006, the Longos received from New Century a loan application packet

of documents to execute (the "Packet"). Compl. ¶ 18. The Packet included an itemization of

Prepaid Finance Charges, which showed additional charges that surprised the Longos. Compl.

¶19. The Longos contacted Mr. Street to inquire about these unexpected charges, and Mr. Street

told them that the charges "did not apply to this loan" and that the Longos should disregard them.

Compl. ¶20, Tr. 83:15-20.

On September 13, 2006, a notary employed by U.S. Certified Signers came to the

Longos' home to conduct the closing. Compl. ¶ 23; Ex. T-5 (Longos' Response to Interrogatory

No.1). The Longos stated that the notary was in a hurry and that she rushed them through the

closing documents. Compl. ¶ 24-25; Ex. T-5 (Longos' Response to Interrogatory No.1). She

presented the Longos with several documents, including the following, that the Longos did not

have time to review:  (i) Federal Truth-In-Lending Disclosure Statement (Ex. T-1); (ii) Notice of

Right to Cancel (Ex. T-3); (iii) Good Faith Estimate (Ex. T-9); (iv) Adjustable Rate Note

(Compl. Ex. H); (v) Mortgage (Ex. T-17); and (vi) Addendum to Escrow Instructions Debts and

Disbursements (Ex. T-19).  Tr. 111:15-17. The Longos also acknowledge that, at closing, they

"did notice that the HUD-1 Settlement Statement listed the fees that mirrored the Good Faith

Estimate that Defendant New Century Mortgage had sent them in the loan application packet of

---

[5] The Longos claim that Mr. Street was an agent of New Century, but they failed to present any evidence showing such a relationship ever existed or that New Century ever held Mr. Street out as an agent. *See* Discussion, Part F, below.

3

documents, and that Mr. Street had advised Plaintiffs to disregard." Compl. ¶ 25; Tr. 83:19-20.

After the Longos signed the closing documents, the notary informed them that she did not have

copies of the documents to give them and that she had to leave to go to her next closing. [6] Compl.

¶ 30; Ex. T-5 (Longos' Response to Interrogatory No.1). The notary promised that she would

make copies and either drop them off at the Longos' house or mail them via overnight delivery.[7]

Compl. ¶ 30; Ex. T- 5 (Longos' Response to Interrogatory No.1).

The Longos' loan (the "Loan") consisted of an Adjustable Rate Note in the original

principal amount of $365,000 with an original interest rate of 7.25%. Longo Proof of Claim,

Attachment H, Ex. T-18. The Loan's Prepaid Finance Charges totaled $15,905.20. Ex. T-7. The

Loan proceeds were used to pay the first and second mortgages against the Longos' residence

and $25,235 in consumer credit card debts. Tr. 42:2-4; Ex. T-19 (listing the particular debts

paid). New Century also paid property taxes that were due November 1, 2006, and the Longos

received $3,015.68 in cash. Tr. 42:4-6. The Loan allowed the Longos to save $664.00 in

payments each month.[8] Tr. 42:6-11.

---

[6] The Longos claim that Mrs. Longo did not sign the mortgage and did not initial the riders to the mortgage. Tr. 88:4-7; Ex. T-17. The Longos also claim that Mr. Longo's initials are forged on some of the pages of the mortgage, although he did sign the mortgage and the adjustable rate rider. Tr. 117:20-23; Tr. 120:4-12. There is no allegation that New Century forged the initials. Neither Mr. nor Mrs. Longo contends that they did not understand they were granting a mortgage lien against their property. The Longos further claim that they did not sign the HUD-1 Settlement Statement (Ex. T-10) at closing because it reflected charges they believed were erroneous. Compl. ¶28.

[7] The Longos also claim that they did not receive the New Jersey Application Disclosure Statement, the Settlement Cost Book, or the Consumer Handbook on Adjustable Rate Mortgages. Ex. T-5, at 6. New Century utilized a third-party vendor responsible for mailing disclosures to all borrowers, and these disclosures were generated automatically. Tr. 55:2-18. The Longos received a cover letter, dated September 7, 2006, which lists several enclosed documents, including the New Jersey Application Disclosure Statement, the Settlement Cost Book, and the Consumer Handbook on Adjustable Rate Mortgages. Ex. T-29. The Court infers from this letter that the Longos did receive these disclosures.

[8] Monthly savings are the difference between the sum of the Longos' mortgage and credit card payments before and after the refinance transaction. The Longos' pre-Loan monthly mortgage and credit card payments (those that New Century paid off) totaled $3,154.00; their consolidated, post-Loan monthly payment was $2,489.95, reflecting a savings of $664.00 a month. Tr. 42:2-15.

On September 14, 2006, the Longos called Mr. Street and told him that the notary did not provide them with copies of any of the documents they had signed at closing.[9] Compl. ¶ 31; Ex. T-4. On September 19, 2006, the Longos received checks from Lender's First Choice Agency, Inc., made payable to the Longos' creditors who were listed on the Escrow Instructions.[10] Ex. T-19; Ex. T-21 (Longos' payoff records).

The Longos state that on September 28, 2006, after numerous phone calls, they received copies from New Century of some of the closing documents. Compl. ¶ 33. After contacting various agencies (including the New Jersey Department of Banking) for assistance in obtaining copies of documents, the Longos later received other documents, including their TILA disclosure form and their Loan Application. Compl. ¶ 39. The Longos contend that Mr. Longo's signature on the Loan Application is forged and that the Loan Application inflates their income by more than $2,000 per month. Compl. ¶39, Ex. T-20.

On December 28, 2006, the Longos sent a letter to the New Jersey Department of Banking and Insurance complaining of the problems with the Loan and the closing. Ex. T-12. The New Jersey Department of Banking and Insurance, upon investigating the Longos' allegations, found that they were charged twice for the application fee in violation of New Jersey law. N.J. ADMIN. CODE § 3:1-16.2 (2013).[11] New Century was directed to refund the $850

---

[9] The Trustee accepts, for purposes of this proceeding, that the Longos did not receive their documents at the closing.

[10] Lender's First Choice Agency, Inc. is described in the Longo's Complaint as "a title company/escrow agent/settlement company." Compl. ¶8.

[11] The New Jersey Administrative Code provides in pertinent part as follows:

> (a) No lender shall charge a borrower any fees incident to the origination, processing or closing of a mortgage loan other than the following, except as otherwise authorized by State or Federal law, either explicitly or as interpreted by the appropriate regulator in official staff commentary, regulatory bulletins, or memoranda.

(cont. on next page)

application fee to the Longos. Ex. T-16. New Century prepared a check to the Longos in the amount of $850 immediately prior to its bankruptcy filing, but due to the bankruptcy filing, the check was not sent to the Longos. Tr. 37:9-17. At the Evidentiary Hearing, the Trustee agreed that the Longos have an unsecured claim of $850.00. Tr. 37:16-17.

**B. The Debtors' Bankruptcy / Procedural Background**

On April 2, 2007, New Century TRS Holdings, Inc. and related entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. By order dated June 28, 2007 (the "Bar Date Order"), this Court established August 31, 2007 at 5:00 p.m. (prevailing Pacific Time) as the deadline for filing proofs of claim in the chapter 11 case (the "Bar Date") (D.I. 1721). On July 9, 2007, the Debtors' claims and noticing agent, Xroads Case Management Service LLC (the "Claims Agent"), filed a Declaration of Service, stating that it mailed a copy of the Notice of Bar Date (the "Bar Date Notice") and a proof of claim form substantially similar to Official Form No. 10 to "parties listed on the Master Mailing Matrix as set forth on a list maintained by Debtors' counsel." (D.I. 1861). On August 3, 2007, the Claims Agent filed affidavits of publication stating that it had published the Bar Date Notice in The Wall Street Journal (National Edition) and the Orange County Register on July 23, 2007. (D.I. 2148 and D.I. 2149).

The Longos filed their Claim in the Debtors' bankruptcy case on January 28, 2008. On May 14, 2008, the Debtors filed their Twenty-First Omnibus Objection, seeking to disallow and expunge the Claim. (D.I. 7017). The Longos did not respond to the Claim objection. On July 11, 2008, the Court entered an Order Disallowing and Expunging Certain (A) Amended and

---

1. Application fee: Defined as a fee imposed by a lender or broker for accepting or processing a mortgage loan application. The application fee shall not be based upon a percentage of the principal amount of the loan or the amount financed.
N.J. ADMIN. CODE § 3:1-16.2 (2013).

Superseded Claims; (B) Late Filed Claims; and (C) No Supporting Documentation Claims (D.I. 8553). The Claim was disallowed and expunged in its entirety.

On December 9, 2008, the Longos filed a letter with the Court requesting that the Court reconsider its order disallowing and expunging the Longo Claim (the "Motion to Reconsider") (D.I. 9229). The New Century Liquidating Trust filed an objection to the Motion to Reconsider on January 13, 2009 (D.I. 9287). The Court granted the Longos' Motion to Reconsider on July 28, 2009 (D.I. 9753).

On November 20, 2009, the Court entered an Order confirming the Modified Second Amended Joint Chapter 11 Plan of Liquidation (the "Modified Plan") (D.I. 9905).[12]  The Modified Plan adopted, ratified and confirmed the New Century Liquidating Trust Agreement, dated as of August 1, 2008, which created the New Century Liquidating Trust (the "Trust") and appointed Alan M. Jacobs as Liquidating Trustee of New Century Liquidating Trust and Plan Administrator of New Century Warehouse Corporation (the "Trustee").

An Evidentiary Hearing concerning the merits of the Claim was held and, thereafter, the Trustee and the Longos each submitted Proposed Findings of Fact and Conclusions of Law (D.I. 10023 and 10049, respectively).

---

[12] This Court entered an Order Confirming the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April 23, 2008 (the "Confirmation Order") on July 15, 2008 (D.I. 8596), which became effective on August 1, 2008. An appeal was taken and, on July 16, 2009, the United States District Court for the District of Delaware issued a Memorandum Opinion reversing the Confirmation Order.  On July 27, 2009, the Bankruptcy Court entered the Order Granting Motion of the Trustee for an Order Preserving the Status Quo Including Maintenance of Alan M. Jacobs as Liquidating Trustee, Plan Administrator and Sole Officer and Director of the Debtors, Pending Entry of a Final Order Consistent with the District Court's Memorandum Opinion (the "Status Quo Order") (D.I. 9750).

### III.    **DISCUSSION**

#### A.  **Legal Standard for an Objection to a Proof of Claim**

When a claim objection is filed in a bankruptcy case, the burden of proof as to the validity of the claim "rests on different parties at different times." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).

Bankruptcy Rule 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure, *i.e.*, includes the facts and documents necessary to support the claim, constitutes *prima facie* evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f).  A proof of claim that lacks the supporting documentation required by Rule 3001 does not receive the presumption of *prima facie* validity. Rather, the claimant maintains the burden of proving its claim by a preponderance of the evidence. *See, e.g., In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008).

Pursuant to Bankruptcy Code Section 502(a), a claim that is properly filed under Rule 3001 and Code section 501 is deemed allowed unless a party in interest objects. 11 U.S.C.A. § 502(a). "The objecting party carries the burden of going forward with evidence in support of its objection which must be of probative force equal to that of the allegations of the creditor's proof of claim." *Kincaid*, 388 B.R. at 613 citing *Allegheny*, 954 F.2d at 173-74.  If the objecting party succeeds in overcoming the *prima facie* effect of the proof of claim, the ultimate burden of persuasion then rests on the claimant to prove the validity of the claim by a preponderance of the evidence. *Id.*

#### B.  **Truth in Lending Act ("TILA")**

The Longos allege that the Debtors should be liable for the following TILA violations: (1) failure to provide them with proper pre-settlement disclosure of the terms of the mortgage,

(2) failure to provide them with copies of any of the documents they signed at closing, and (3) failure to provide them with right of rescission notices at closing.

The Truth in Lending Act ("TILA") was enacted in 1968 and requires clear disclosure of all costs as well as the key terms of lending arrangements to inform consumers of the true cost of credit. 15 U.S.C.A. § 1601 *et seq.* (2013). TILA is implemented by "Regulation Z." 12 C.F.R. § 226 et seq. (2013). Section 1638(a) of TILA requires creditors to disclose specific items in certain consumer credit transactions, and section 1638(b) sets forth the form and timing requirements of those disclosures.[13] 15 U.S.C. §1638.

TILA prescribes different types of damages for violations: section 1640(a)(1) permits recovery of actual damages for TILA violations, while section 1640(a)(2)(A) provides statutory damages for certain specific TILA violations. 15 U.S.C.A. § 1640 (civil liability for TILA violations). Section 1640(a) provides, in relevant part:

> Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part ... with respect to any person is liable to such person in an amount equal to the sum of—
>
> (1) any actual damage sustained by such person as a result of the failure;
>
> (2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, ... or (iv) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $400 or greater than $4,000; . . .

---

[13] Section 1638(a) requires disclosure of at least fifteen items, including, among other requirements: (1) identity of the creditor required to make the disclosure; (2) the "amount financed" (calculated pursuant to the instructions in the statute); (3) the "finance charge;" (4) the finance charge expressed as an "annual percentage rate;" (5) the "total of payments" (*i.e.*, the amount financed and the finance charge); and (6) the number, amount and due dates for payments.

Regulation Z also provides, in relevant part, that "[t]he creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. §226.17(a)(1). It also requires the disclosures to be made "before consummation of the transaction." 12 C.F.R. §226.17(b).

. . . .

(4) . . . . In connection with the disclosures referred to in section 1638 of this title, a creditor shall have a liability determined under paragraph (2) *only* for failing to comply with the requirements of section 1635 of this title, of paragraph (2) (insofar as it requires a disclosure of the "amount financed"), (3), (4), (5), (6), or (9) of section 1638(a) of this title ....

15 U.S.C.A. § 1640(a) (emphasis added). Accordingly, statutory damages (*i.e.*, those provided under section 1640(a)(2)) are available for certain violations of section 1638(a), but not for violations of section 1638(b). The only remedy for a violation of the form and timing requirements of section 1638(b) is actual damages. *See, e.g., Baker v. Sunny Chevrolet, Inc.,* 349 F.3d 862, 871 (6th Cir. 2003) (holding that statutory damages are not available for §1638(b) violations); *Warburton v. Foxtons, Inc.,* No. 04-2474, 2005 WL 1398512, *9 (June 13, 2005 Bankr.D.N.J) (same).

Actual damages are defined as "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." *Vallies v. Sky Bank,* 591 F.3d 152, 158 (3d Cir. 2009) quoting *Black's Law Dictionary* 445 (9th ed. 2009). To prove actual damages under TILA, a plaintiff must show that "the TILA violation was the proximate cause of any actual damages." *Peters v. Jim Lupient Oldsmobile Co.,* 220 F.3d 915, 917 (8th Cir. 2000); *see also Vallies v. Sky Bank*, 591 F.3d 152, 157 (3d Cir. 2009) ("The plain meaning of § 1640(a) requires causation to recover actual damages.")

The Third Circuit Court of Appeals has stated explicitly that a plaintiff must prove detrimental reliance to recover actual damages for a violation of TILA's disclosure requirements. *Vallies*, 591 F.3d at 157. The *Vallies* Court held that "[i]n the context of TILA disclosure violations, a creditor's failure to properly disclose must cause actual damages; that is, without detrimental reliance on faulty disclosures (or no disclosure), there is no loss (or actual damage)."

In other words, "[t]o recover actual damages, consumers must show that they suffered a loss *Id.* because they relied on an inaccurate or incomplete disclosure." *Id.* at 158.

Other courts have described different tests to show causation and detrimental reliance.  In *Peters,* for example, the Eighth Circuit adopted a four-part test to show causation:  a plaintiff must show that (1) he read the TILA disclosure statement, (2) he understood the charges being disclosed; (3) had the disclosure statement been accurate, he would have sought a lower price; and (4) he would have obtained a lower price." *Peters,* 220 F.3d at 917. The Third Circuit agreed that a plaintiff who can satisfy the *Peters* causation test would establish detrimental reliance. *Vallies,* 591 F.3d at 164, n. 19.  The Sixth Circuit has decided that a plaintiff may establish detrimental reliance by demonstrating that he or she would have elected not to take the loan had the required information been available.  *U.S. v. Petroff-Kline,* 557 F.3d 285, 297 (6th Cir. 2009).

The record before me demonstrates that New Century provided the Longos with a pre-settlement "Federal Truth-in-Lending Disclosure Statement" dated September 7, 2006 disclosing the items required by section 1638(a) including, among other things, the Amount Financed, Finance Charge, Annual Percentage Rate and Total of Payments. Ex. T-6.  When the Longos questioned the broker about the "extremely high" fees, the broker told them to disregard the pre-settlement disclosures from New Century, claiming they were sent in error. Tr. 83:15-20, Ex. T-5 (Longos' Response to Interrogatory No.1).  As Mr. Street was not an agent of New Century, New Century is not responsible for his alleged actions. [14]

Even if I assume - - without deciding - - that New Century did not provide all pre-settlement disclosures required by TILA, the Longos failed to prove any actual damages caused

---

[14] See Discussion, Part F, below.

by New Century's alleged pre-settlement disclosure violations.[15] Similarly, the Longos have failed to prove any actual damages caused by the notary's failure to provide them with copies of the disclosure documents they signed at closing. In the Complaint, the Longos acknowledge that TILA disclosures were made again at the closing.[16] Compl. ¶¶25, 26; Ex. T-1, and Ex. T-9. Despite their objection to the disclosed fees, the Longos went forward with the loan transaction, borrowing the entire amount, but choosing not to sign the HUD-1 Settlement Statement which they claim included the erroneous charges. Compl. ¶28; Ex. T-10. *See also* Compl. Ex. H and Ex. T-17 (signed Adjustable Rate Note and Mortgage). The Longos argue that they suffered actual damages because they have a Loan that they cannot afford. Tr. 110:9-13. However, any actual damages suffered by the Longos resulted from detrimental reliance on the broker's statements or conduct, not on New Century's TILA disclosures.

The last TILA violation alleged by the Longos is a failure to provide them at closing with notices advising of their right to rescind the Loan. TILA provides a borrower with a right to rescind the transaction and requires the creditor to provide the borrower with clear and conspicuous notice of this right. 15 U.S.C.A. § 1635(a).[17] The creditor must deliver two copies

---

[15] The Complaint alleges that "At no time prior to closing did Plaintiffs receive a written mortgage commitment reflecting the terms of the loan." Compl. ¶21. However, the record indicates that the Longos did receive written disclosure of the loan terms, but they chose to disregard it at the direction of the broker.

[16] The "total settlement charges" to the Longos were revised between the pre-settlement good faith estimate and the settlement good faith estimate prepared by First National Mortgage Sources, LLC by *decreasing* the amount of charges. Compare Ex. T-8 ($19,597.21) and Ex. T-9 ($19,057.01).

[17] Section 1635(a) provides:

    (a) Disclosure of obligor's right to rescind. Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Bureau, of his intention

                                                    (cont. on next page)

of the notice of right to rescind to each consumer entitled to rescind. 12 C.F.R. §226.23(b)(1). Regulation Z further provides that "[i]f the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first." 12 C.F.R. § 226.23(a)(3); *see also* 15 U.S.C.A. § 1635(f).

"When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge." 12 C.F.R. §226.23(d)(1). After the creditor receives a notice of rescission, the creditor must return to the consumer any money or property (such as earnest money, down payment or otherwise) given by anyone in connection with the transaction and take any action necessary to reflect termination of the security interest; then the consumer must tender to the creditor the money, property, or the property's reasonable value. 15 U.S.C.A. §1635(b), *Mitchell v. EMC Mortg. Corp.*, CV-09-1362-PHX-NVW, 2009 WL 3274407, *6 (D. Ariz. Oct. 13, 2009) (citing 12 C.F.R. § 226.23(d)).

The Longos' signed Notice of Right to Cancel states that they may rescind the Loan within three business days from the *last* to occur of the following events: the date of the transaction, the date they received the TILA disclosures, or the date they received the notice of right to cancel. Ex. T-3. Based on the record before me, the Longos have rebutted the presumption of delivery (15 U.S.C.A. §1635(c )), but it is unclear when the Longos finally received copies of the notice of right to cancel. Pursuant to 12 C.F.R. § 226.23(a)(3), if copies of

---

to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Bureau, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Bureau, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C.A. § 1635(a). *See also* 12 C.F.R. § 226.23(b)(1).

the notice were not delivered, the right to rescind ended three years after the date of consummation of the Loan, on September 13, 2009.[18]  *Id.*

The Longos admit that a representative of First National Mortgage Sources, LLC asked whether they would like to rescind the Loan during a telephone conversation on or about September 22, 2006, but they declined. Ex. T-4. In a letter to the Ocean County Department of Consumer Affairs dated November 1, 2006, Mrs. Longo wrote that Charles Day of First National Mortgage Sources, LLC said that "if we still wanted to cancel the loan he would unfund the loan." *Id.* The Longos rejected the offer because if they cancelled the Loan at that time, the Longos would have been late paying their bills *Id.* At the Hearing, Mrs. Longo also testified that they chose not to rescind the Loan because it "came with a stipulation" that they would "need to be prepared to write a check in the amount of $365,000" (the amount of the Loan). Tr. 108:17-19. On this record, I conclude that the Longos did not intend to rescind the Loan and did not suffer actual damages based on the failure to receive copies of the Notice of Right to Cancel.

However, the Longos are entitled to statutory damages for violation of the TILA provision requiring a borrower to receive clear and conspicuous notice of the right to rescind. *See* 15 U.S.C.A. §1640(a)(2)(A) (allowing statutory remedies for failure to comply with §1635). Pursuant to 15 U.S.C.A. §1640(a)(2)(A)(iv), the Court has discretion to grant statutory damages or not less than $400.00 or greater than $4,000.00. This record reflects that Nick Street (and the

---

[18] Although the Longos' Complaint seeks, among other relief, rescission of the Loan, the Longos have not sought rescission from this Court. Because the Debtors transferred the estate's interest in the Loan, the remedies for claimants of the Debtors seeking relief other than monetary damages do not lie with this Court, but elsewhere - - most likely, in a court with jurisdiction over those parties who currently claim rights pursuant to various loan documents. *See In re New Century TRS Holdings, Inc.,* 450 B.R. 504, 510 (Bankr.D.Del. 2011), in which I determined that this Court "is without subject matter jurisdiction to order rescission or cancellation of the Mortgage Loan, now held by an unrelated third party. Moreover, any modification or adjustment to the Mortgage Loan would have no effect or impact on the Debtors' estate or the Liquidating Trust." *See Scott v. Aegis Mortgage Corp. (In re Aegis Mortgage Corp.),* 2008 WL 2150120, *5 (Bankr.D.Del. May 22, 2008) (A declaration as to the rights of parties under a mortgage that was transferred prior to the bankruptcy filing will not alter the debtors' rights, liabilities, options or freedom of action because the debtors are no longer a party to it.).

notary he hired) failed to provide copies of the Notice of Right to Cancel to the Longos at closing, although the Longos signed the form acknowledging receipt. Ex. T-3.  It was not apparent to New Century on the face of the Loan documents that the Longos did not receive copies of the Notice of Right to Cancel.  Accordingly, I will add statutory damages to the Longos' claim against New Century in the amount of $1,000.00.  *See Merriman v. Beneficial Mortgage Co. of Kansas, Inc. (In re Merriman),* 329 B.R. 710, 716 (D.Kan. 2005), *Bell v. Parkway Mortgage, Inc. (In re Bell),* 309 B.R. 139, 168 (Bankr.E.D.Pa. 2004) *reconsidered in part* 314 B.R. 54 (Bankr.E.D.Pa. 2004).

In sum, the Longos received proper pre-settlement TILA disclosures from New Century. Although they did not receive copies of the disclosures at the Loan closing, in violation of the form and timing requirements of TILA §1638(b), the sole remedy for this violation is actual damages, which the Longos have failed to establish.  Failure to provide copies of the notice of right to cancel is a violation of TILA §1635(a), and the Longos are entitled to statutory damages in the amount of $1,000.00 for the lender's failure to comply.

## C.  Home Ownership Equity Protection Act ("HOEPA").

HOEPA, 15 U.S.C.A. § 1639, is an amendment to TILA that created a special class of regulated loans characterized by higher interest rates, costs, or fees, "that requires lenders to make additional disclosures beyond those that are required by TILA for certain high cost mortgages." *Bell,* 309 B.R. at 149.  Regulation Z provides that a high-cost loan is one with respect to which:

(i)    the annual percentage rate ("APR") at consummation will exceed by more than 8 percentage points for first-lien loans, or by more than 10 percentage point for subordinate-lien loans, the yield on Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

15

(ii)    the total points and fees payable by the consumer at or before loan closing will exceed the greater of 8 percent of the total loan amount, or $400, the $400 figure shall be adjusted annually . . . .

12 C.F.R. § 226.32 (West 2013).

The Longos allege that New Century failed to provide them with additional disclosures required for a loan covered by HOEPA. However, the Section 32 worksheet that New Century completed reflects that the Loan was not subject to the requirements of HOEPA. Ex. T-7. The Section 32 Worksheet shows that the rate of a 30-year Treasury note on August 15, 2006 was 5.05% and that the Longos' APR would have to exceed 13% for their Loan to be considered a high-cost loan under HOEPA. *Id.* As reflected on the Worksheet, the Longos' APR was 10.943%, and the Loan did not meet the threshold to trigger the application of HOEPA. *Id.* Further, the Worksheet shows the prepaid finance charges, less prepaid interest, ($15,321.20) to be 0.0438% of the total amount financed. *Id.* This is below the 8% trigger amount. The Longos offered no evidence to challenge the Section 32 Worksheet calculations. Accordingly, the Loan did not qualify as a "high-cost loan," HOEPA does not apply, and New Century was not required to provide the Longos with the additional HOEPA disclosures.

## D. Real Estate Settlement Procedures Act ("RESPA")

The Longos allege that New Century violated RESPA by (1) receiving unreasonable and excessive compensation for its services; (2) failing to disclose the closing costs; and (3) forging the Longos' signatures on the HUD-1 Settlement Statement, which inaccurately stated the actual costs of the Loan. Compl. ¶ 59. The record contains no evidence to support the Longos' first allegation that New Century received unreasonable and excessive compensation.

RESPA requires disclosures related to closing costs for certain loans. RESPA was enacted to ensure that consumers receive information on the "nature and costs of the settlement

16

process" and to protect consumers from unreasonably costly settlements by eliminating

kickbacks and referral fees. *See* 12 U.S.C.A. § 2601. "RESPA requires that borrowers receive

certain disclosures explaining the costs associated with settlement and describing lender services

and escrow account practices." *Nelson v. JP Morgan Chase Bank, N.A.,* 707 F.Supp.2d 309, 315

(E.D.N.Y. 2009) citing (in part) 12 U.S.C. §§ 2603, 2604; *see also* 24 C.F.R. § 3500.7. "RESPA

further requires that lenders and/or brokers provide a Good Faith Estimate ("GFE") of settlement

costs and fees in connection with mortgage loans and home equity credit lines." *Nelson,* 707

F.Supp.2d at 315-16.  *See* 12 U.S.C.A. §§ 2603, 2604; 24 C.F.R. §§ 3500.7 (Good Faith

Estimate), 3500.8 (HUD-1 Settlement Statements).[19]  The Complaint attached to the Longos'

proof of claim includes as exhibits copies of various GFEs they received:  *See* Compl. Ex. E

(GFE prepared by New Century, dated September 7, 2006 listing total settlement costs of

$19,580.00); Compl. Ex. D (GFE prepared by First National Mortgage Sources, LLC, dated

September 8, 2006 and listing total costs of $19,057.01);[20] and Compl. Ex. K (GFE – Itemization

prepared by New Century, dated September 12, 2006 listing total settlement costs of

$18,125.00).

 The record demonstrates that the Longos received numerous GFE disclosures shortly

after they applied for the Loan and at closing.[21]  The Longos argue that the numerous GFEs are

---

[19] 24 C.F.R. part 3500 (Regulation X) is the implementing regulation for RESPA.

[20] Paragraph 18 of the Complaint states that the GFE in Exhibit D was prepared by New Century, but the document states that it was prepared by First National Mortgage Sources, LLC, the company that employed Nick Street. Another copy of the same document was introduced as Ex. T-9; the only difference between the two documents is that Ex. D attached to the Complaint is not signed, but Ex. T-9 was signed by the Longos at closing on 9/13/2006.

[21] 12 C.F.R. § 226.17(b) provides that "special timing requirements" are set forth in 12 C.F.R. §226.19(a) for certain mortgage transactions subject to RESPA.  This section requires a good faith estimate of the disclosures to be delivered or placed in the mail not later than the third business day after the creditor receives the consumer's written application.  According to the allegations in the Complaint, the Longos received the first GFE on September 7, 2006, one day after they contacted the broker on September 6, 2006, in the "loan application packet" sent by New

(cont. on next page)

confusing and violate RESPA, but the regulations provide that a borrower may receive revised GFEs if the costs change, although the charges may be increased only as set forth in the applicable regulations. 24 C.F.R. § 3500.7(f). *See also* Tr. 65:22 – 66:18. In this case, the costs listed in the GFEs provided to the Longos actually *decreased* in later GFEs.

Moreover, even assuming - - without deciding - - that the numerous disclosures were improper, the decisional law is clear that there is no private right of action for violations of RESPA's disclosure provisions. 12 U.S.C.A. §§ 2603-2604 (governing settlement statements and GFEs), or any related regulations.[22] *See Collins v. FMHA-USDA*, 105 F.3d 1366, 1368 (11th Cir. 1997), *cert. denied,* 521 U.S. 1127, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997), *reh'g denied,* 521 U.S. 1145, 118 S.Ct. 25, 138 L.Ed.2d 1055 (1997) (explaining that "[t]he present § 2604(c) replaced the prior § 2605, which had explicitly provided an action for damages for its violation. Pub.L. No. 93-533 § 6, 88 Stat. 1726 (1974), repealed by Pub.L. No. 94-205 § 5, 89 Stat. 1158 (1976). That Congress eliminated the provision when it amended the statute strongly suggests Congress intended that there no longer be a private damages remedy for violation of § 2604(c)."). *See also Nelson*, 707 F. Supp. 2d at 317 ("RESPA itself provides no private right of action for technical violations of its disclosure mandates.") (citing cases). Therefore, the Longos cannot pursue claims under RESPA.

The Longos also allege that New Century violated RESPA by forging their signatures on the HUD-1 Settlement Statement prepared for the Loan closing. However, the HUD-1

---

Century to the Longos for execution. Compl. ¶¶18, 19. Therefore, the GFE was received within the required time period.

[22] While a violation of 24 C.F.R. § 3500.7 is deemed a violation of 12 U.S.C. § 2604, section 2604 does not, however, provide a private right of action for borrowers when lenders fail to make such disclosures. *See* 24 C.F.R 3500.7(i). Similarly, a violation of 24 C.F.R. § 3500.8 is deemed a violation of 12 U.S.C. § 2603, but section 2603 does not provide a private right of action. *See* 24 C.F.R. § 3500.8(c).

Settlement Statements provided by both the Longos and the Trustee (*see* Compl. Ex. F, Compl. Ex. L and Ex. T-10) do not contain any signatures, forged or otherwise. Based upon this record, I cannot conclude that the Longos can pursue a claim under RESPA against New Century.

**E.  New Jersey Home Ownership Security Act of 2002**

The Longos allege that New Century Mortgage gave them a high-cost home loan and failed to provide them with the mandatory "Notice to Borrower" in violation of the New Jersey Home Ownership Security Act of 2002 ("HOSA"). HOSA is New Jersey's corollary to HOEPA and, like HOEPA, requires additional disclosures for high-cost home loans. *See* N.J. STAT. ANN. § 46:10B-22 et seq.

The record before me demonstrates that the Longos' Loan is not subject to the provisions of HOSA because their Loan does not qualify as a "high cost home loan," which the statute defines as:

> [A] home loan for which the principal amount of the loan does not exceed $350,000, adjusted annually. . . , in which the terms of the loan meet or exceed one or more of the thresholds as defined in this section.

N.J. STAT. ANN. § 46:10B-24.  Pursuant to this definition, the "threshold" analysis only applies to loans with a principal amount of $350,000.00 (as adjusted) or less.[23]  The statute defines the "threshold" as either a "rate threshold" (*i.e.,* the annual percentage rate of the loan must not exceed by more than 8 percentage points the yield on certain Treasury securities - - similar to the analysis under HOEPA) or the "total points and fees threshold" (*i.e.,* for loans of $40,000.00 or more, the total points and fees do not exceed 4.5% of the total loan amount).  *Id.* Because the

---

[23] The statute provides that the "not to exceed" principal amount should be adjusted annually.  In 2006, the "high cost home loan" analysis applied to loans with a principal amount of less than $383,682.60. Ex. T-11. The Longos' Loan, with a principal amount of $365,000, fell within the adjusted statutory amount, thereby requiring a "threshold" analysis.

principal amount of the Longos' Loan ($365,000.00) is less than the adjusted statutory amount, a

"threshold" analysis is required.  The Longos' HOSA Worksheet shows that both the APR rate

and the total points and fees do not meet the thresholds.  Ex. T-11. Therefore, the Longos' Loan

does not qualify as a high-cost home loan under HOSA, and the Longos were not entitled to

receive HOSA's mandatory "Notice to Borrower."

## F.  New Jersey Consumer Fraud Act ("CFA")

The Longos also allege that New Century violated the New Jersey Consumer Fraud Act

("CFA"), enacted to protect consumers from deception and fraud. N.J. STAT. ANN. § 56:8-1 *et*

*seq.*.[24] The New Jersey Supreme Court has explained that to violate the CFA,

> [A] person must commit an "unlawful practice" as defined in the legislation. Unlawful
> practices fall into three general categories: affirmative acts, knowing omissions, and
> regulation violations. The first two are found in the language of *N.J.S.A.* 56:8-2, and the
> third is based on regulations enacted under *N.J.S.A.* 56:8-4. A practice can be unlawful
> even if no person was in fact misled or deceived thereby. The capacity to mislead is the
> prime ingredient of all types of consumer fraud.
>
> When the alleged consumer-fraud violation consists of an affirmative act, intent is not an
> essential element and the plaintiff need not prove that the defendant intended to commit
> an unlawful act.  However, when the alleged consumer fraud consists of an omission, the
> plaintiff must show that the defendant acted with knowledge, and intent *is* an essential
> element of the fraud.

*Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17, 647 A.2d 454, 462 (1994) (internal citations

omitted, emphasis in original).  To state a claim under the CFA, the Longos must show 1)

unlawful conduct by New Century; 2) an ascertainable loss by the Longos; and 3) a causal

---

[24]The Act provides, in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud,
> false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of
> any material fact with intent that others rely upon such concealment, suppression or omission, in
> connection with the sale or advertisement of any merchandise or real estate, or with the subsequent
> performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or
> damaged thereby, is declared to be an unlawful practice [.]

N.J. STAT. ANN. § 56:8-2.

relationship between New Century's unlawful conduct and the Longos' ascertainable loss. *See, e.g., Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557, 964 A.2d 741, 749 (2009) (explaining the elements of a cause of action under the CFA).

The Longos argue that their ascertainable loss or injury is that they were fraudulently induced to enter into a loan that they could not afford due to the Loan's excessive fees and the lender's failure to pay off all of their other consumer debts. Tr. 110:9-13. The Longos have alleged that New Century "engaged in unconscionable commercial practice and material misrepresentation" of the Loan and "knew through its receipt of the Longos' income documentation that the Longos could not afford a loan in the amount of $365,000.00." Compl. ¶89. They further allege that New Century "employed fraudulent methods to lure the Longos into proceeding forward with the Loan." *Id.* Lastly, the Longos claim that New Century "willfully failed to provide [them] with any disclosure documents prior to closing, and deliberately withheld the Longos' closing documents after the closing, thereby not giving the Longos the right to rescind this loan." *Id.*

    (i)    <u>"Misrepresentation" of the Longos' Income</u>

The Longos argue that New Century improperly considered an inflated income amount for the Longos that enabled the Longos to qualify for the Loan, which they could not afford. *Compare* The Underwriter's Income Analysis (Ex. T-22) with documentation to support the Longos' monthly income. (Ex. T-23). In *Dixon-Ford v. U.S. Bank, N.A. (In re Dixon-Ford)*, No. 10-01772, 2011 WL 6749083 (Bankr.D.N.J. Dec. 21, 2011), the Court decided that:

> [A] mortgage lender whom, despite soliciting and obtaining accurate information, presents to a borrower an application grossly misstating income and employment information may mislead a borrower into accepting a mortgage he could not afford. As mentioned, the CFA attaches liability to any commercial practice with the capacity to mislead. Further, such a practice ostensibly exceeds the bounds of reasonable business practice[s] in that it will victimize the average consumer.

> The CFA is broadly applied to accomplish its remedial purpose of rooting out consumer fraud.

*Dixon-Ford*, 2011 WL 6749083, *7 (internal citations and quotation marks omitted). In *Dixon-Ford,* the borrower provided the lender with documentation that she was employed as a telephone services representative and earned $45,000.00 annually; however, the lender prepared a loan application indicating that the borrower was employed as the "vice president" and earned $11,900.00 monthly ($142,800.00 annually). *Id.* at *2. The lender also had two "verification of employment" forms: one correctly stating the borrower's income and position, and one that had been altered. *Id.* The lender sought summary judgment, arguing that the borrower could not have relied on a misstatement of her own financial information and that, in any event, the borrower signed the mortgage documents and was jointly responsible for any misrepresentations. *Id.* at 1. The *Ford-Dixon* Court denied summary judgment, noting that the lender's act of "materially" and "grossly" misstating the borrower's income, together with an altered employment verification form, could be enough to violate the CFA, especially "in light of the Act's broad application and remedial purpose." *Id.* at *7. The *Ford-Dixon* Court pointed out that, unlike claims of common law fraud, "the CFA excuses the victim of a fraud from the burden of showing reliance thereon, instead requiring only proof of a causal nexus between the act or omission and the loss." *Ford-Dixon*, 2011 WL 6749083 at *6 (internal punctuation and citation omitted).

Presented with a different set of facts, the Court in *Jatras v. Bank of America Corp.,* No. 09-3107, 2010 WL 5418912 (D.N.J. Dec. 23, 2010) dismissed the borrowers' claim under the CFA. In *Jatras,* the borrowers alleged that the lender's omission of the monthly rental payment of $2,000.00 in the debt-to-income ratio calculations allowed the loan to be approved in violation of the lender's guidelines. *Id.* at *2. The *Jatras* Court held that borrowers could not prove that

the alleged omission was the proximate cause of their losses (*i.e.,* obtaining a loan they could not

afford). The *Jatras* Court noted that the borrowers promised independently to pay $1.3 million

to purchase a property before contacting the lender for funding. The borrowers did not allege

that the lender induced them into entering into the purchase contract, or coerced them into

signing a loan, or "hoodwinked" them by not allowing them to review the loan documents. *Id.* at

*6, *7. The *Jatras* Court concluded that the proximate cause of the borrowers' financial troubles

was their own imprudence. *Id.* at *7.

I must determine whether adjustment of the Longos' income in the underwriter's analysis

constitutes an "unconscionable commercial practice, deception, fraud, false pretense, false

promise, misrepresentation" under the definition of the CFA that, regardless of intent, could

mislead and cause injury to a borrower. In other words, is the adjusted income similar to the

gross misstatements of *Dixon-Ford* or more like the miscalculation of *Jatras*? The

documentation provided by the Longos to New Century showed monthly income of $5,155.00,

while the underwriter's analysis listed their monthly income as $6,568.00.[25] However, the

testimony of Ms. Lindsay, a New Century employee, causes me to question whether New

Century acted wrongfully in adjusting upward the Longos' income. She testified: "[I]t's

common practice for us, and most other lenders in the industry, to gross [Social Security income]

up 125 percent because it's nontaxable. Gross income is used across the board to qualify

borrowers. So since this is nontaxed income, we grossed it up." Tr. 50:1 – 51:2

At bottom, New Century's adjustment of the Longos' income is much closer to the facts

of *Jatras.* The increase is not a "gross" or "material" misstatement, but an internal calculation

---

[25] The Longos' income listed on the Loan Application prepared by Mr. Street was even higher ($7,487.00/monthly),
but New Century's documents indicate that it relied on the numbers in the Underwriters' Analysis, not the Loan
Application.

for New Century's own underwriting purposes. The record before me indicates that that the adjustment to the Longos' income contained in New Century's internal analysis was apparently customary; but, in any event, I cannot conclude that the income adjustment caused any damage to the Longos.

       (ii)    <u>Misrepresentations about payment of the Longos' consumer debts</u>

Next, the Longos assert a claim under the CFA based upon alleged misrepresentations about the amount of consumer debts the Loan would pay in full. The Longos claim that Mr. Street reviewed their credit report and said that the Loan would result in consolidating their debts, so they would owe only the Loan, utility bills, and car loan. Ex. T-4; Tr. 46:3-10.[26] The Longos claim that four debts were not paid by the Loan proceeds: a car loan, a Bank of America credit card, and two Target credit cards. Ex. T-5 (Response to Interrogatory No. 7).[27]

However, the record reflects that New Century disbursed funds sufficient to cover all consumer debts it was directed to pay pursuant to the Loan Application. Ex. Ex. T-20. Mr. Street prepared the Loan Application, which included a list of the Longos' debts and "starred" those that were supposed to be paid. Tr. 45:2-13 ("the broker usually gets [the debts] from [the borrowers'] credit report and/or they speak with the borrowers to gather the information. And . . .

---

[26] There is some inconsistency between the Longos' claim that the Loan was supposed to pay the balance of the car loan and the documentary evidence. The car loan is not starred on the Loan Application (Ex. T-20, at 3) and New Century had no way of knowing that the Longos wished to pay off their car loan. Tr. 45:2- 46:2. Mrs. Longo's own communications with various consumer protection agencies do not indicate that the Longos expected the car loan to be paid. *See* Ex. T- 4, at 2 ("[Mr. Street] again stated that he had our credit report in front of him and that he would leave us with owing nothing but our mortgage and utility bills and car payments. We immediately agreed to move ahead with this new mortgage"); Ex. T-12, at 1 ("Based on all this information [Mr. Street] gave me a monthly payment that we would be required to pay and he said that the only things that would be left for us to pay would be our utilities and car payments").]

[27] The debts are: car loan - $21,461.00; Bank of America credit card - $6,438.00; two Target credit cards – one in the amount of $1,523.00 and the other in the amount of $639.00. Tr. 47:2-5.

they put a star by all of the debts that are to be paid off").[28]  The Loan Application was transmitted to New Century, and, using that information, New Century prepared escrow instructions listing all of the Longos' debts (creditors and amounts) to be paid.  Ex. T-19; Tr. 47:13 – 49:13.  Ms. Lindsay admitted that New Century had missed one debt that was marked to be paid in the Addendum to Escrow Instructions - - a Target credit card with a balance of $1523.00.  Tr. 48:16 -20.  However, the Longos received a check from the Loan proceeds that included the amount owed to Target, so the Longos could pay that debt separately.  *Id.*  The Addendum to Escrow Instructions was included in the documents that the Longos signed at closing.

On this record, I cannot conclude that New Century made any misrepresentations to the Longos about the debts to be paid by the Loan.  Moreover, I cannot conclude that New Century's failure to prepare a separate check for one Target credit card in the amount of $1,523.00 is the cause of any injury arising from the Loan.

(iii)    Agency relationship between New Century and the broker

Taken as a whole, the Longos' remaining CFA claims (along with other claims based on TILA and RESPA, discussed above) allege injuries caused by the misleading or fraudulent acts and statements of Mr. Street, the broker.[29]  The Longos seek to hold New Century accountable for these fraudulent acts and misrepresentations.  Since the broker was not an agent for New Century, the Longos' claims must be denied.

---

[28] Mrs. Longo  testified that she reviewed all of the bills she paid each month with Mr. Street and was led to believe that the Loan would pay all of them.  Tr. 107:12-20.  Again, this alleges conduct by Mr. Street, not New Century.

[29] In Part B of this Discussion, *supra.*, I have already addressed the Longo's allegations regarding New Century's failure to disclose fees and costs and the failure to provide the Longos with copies of the Loan documents at closing.

"An agency relationship is created 'when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to so act.'" *New Jersey Lawyers' Fund for Client Protection v. Stewart Title Guar. Co.,* 203 N.J. 208, 220, 1 A.3d 632, 639 (N.J. 2010) citing (RESTATEMENT (THIRD) OF AGENCY, §1.01 (2006).

Generally, an agency relationship requires showing actual or apparent authority. *Id.* Mrs. Longo testified that she believed Mr. Street worked for New Century, as shown by a letter she faxed to "Nick Street, At New Century." Ex. T-13; Tr. 107:24- 108:8. However, Ms. Lindsay testified at the Hearing that New Century had two types of relationships with brokers: (1) directly employed brokers, who obtained loans for New Century only, and (2) independent brokers, who were able to submit loan proposals to different lenders. Tr. 44:10-22. Mr. Street was an independent broker. *Id.* In *Morilus v. Countrywide Home Loans, Inc.,* 651 F. Supp. 2d 292 (E.D. Pa. 2008), the borrowers argued that the lender and broker had an actual agency relationship because the lender (i) established standard procedures for the broker to follow to do business with the lender; (ii) monitored the broker's work, and (iii) decided to terminate the broker for failing to follow procedures. The *Morilus* Court disagreed, explaining that "[w]hile control is a key factor in determining whether an agency was intended, it must be of such a high degree that the purported agent is deemed to have had almost no independence." *Id.* at 300. There is no evidence before me that Mr. Street was required to submit the Longos' Loan to New Century or that New Century controlled any of Mr. Street's actions. The record before me establishes that Mr. Street was not a New Century employee and no actual agency relationship existed between Mr. Street and New Century.

The Longos have asserted repeatedly, however, that they believed Mr. Street was acting on behalf of New Century. Apparent authority exists "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* quoting RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. c. (2006). The doctrine looks to the actions of the principal, not the agent: liability results only when the principal's actions "have misled a third party into believing that a relationship of authority does, in fact, exist." *Blaisdell Lumber Co. v. Horton*, 242 N.J. Super. 98, 103, 575 A.2d 1386, 1388 (App. Div. 1990) (quoting *Wilzig v. Sisselman*, 209 N.J. Super. 25, 506 A.2d 1238 (App. Div. 1986) ("the apparency and appearance of authority must be shown to have been created by the manifestations of the alleged principal, and not alone and solely by proof of those of the supposed agent.").

The party seeking to rely on the apparent authority of a putative agent must establish: (1) that the appearance of authority has been created by the conduct of the alleged principal and it cannot be established alone and solely by proof of [conduct by] the supposed agent; (2) that a third party has relied on the agent's apparent authority to act for a principal; and (3) that the reliance was reasonable under the circumstances. *AMB Property, LP v. Penn America Ins. Co.,* 418 N.J. Super 441, 454 (App. Div. 2011).

The *Morilus* Court considered whether an apparent agency relationship existed between the broker and the lender. The *Morilus* Court noted that the broker had no power to bind the lender since any loan application had to be submitted to the lender's underwriting department for independent approval. *Morilus*, 651 F.Supp.2d at 301. The borrowers in *Morilus* claimed they "subjectively believed" the broker was the lender's agent because he was their sole contact regarding the terms of the loan. However, the Court concluded that the borrower had not

provided evidence of any action by the lender indicating that the broker was its agent and, further, the borrowers had signed several application documents indicating that the broker was not the lender and could work with any number of third parties for financing. *Id.* at 302.

Other courts that have examined the apparent agency issue have also determined that a broker/lender relationship alone, without some act by the lender, does not establish apparent agency. *See Pezza v. Wells Fargo Bank, N.A.*, No. 09-2097, 2011 WL 3847248, *5- *6 (D.N.J. Aug. 30, 2011) (Lender was not liable for broker's alleged oral misrepresentation of loan terms at closing when there was no evidence that the broker was the employee or agent of the lender); *Rivers v. Credit Suisse Boston Financial Corp.*, No. 05-6011, 2007 WL 1038567, *6 (D.N.J. March 30, 2007) (Closing agent hired by the borrowers did not represent or implicate the lender through his actions). *See also Stewart Title,* 1 A.3d at 639-40 (Attorney was not an agent for the title company when the title company made no representation to the borrowers that the attorney had actual or apparent authority to act of its behalf and lacked control over the attorney).

The Longos argue that the original solicitation for the loan, sent by New Century, directed them to contact Nick Street. Tr. at 107:24 – 108:8. The Longos testified that they discarded the original solicitation. *Id.* However, the evidence does not demonstrate that the Longos contacted Mr. Street because they had a particular interest in borrowing from New Century.

Considered with the other evidence before me, I cannot conclude that the original solicitation suggested in any way that Mr. Street had authority to act as New Century's agent. Mr. Street worked for First National Mortgage Source LLC, not New Century. Furthermore, the record shows that New Century sent pre-closing disclosure information that was at odds with the information that Mr. Street was providing to the Longos. This indicates that Mr. Street and New

Century were not acting in concert.  Mr. Street had no authority to approve a loan, but submitted

the Longos' information to New Century and awaited a decision from New Century's

underwriting department.  Based on this record, I cannot conclude that New Century gave the

Longos any indication that Mr. Street could act as its agent, and I cannot conclude that it would

be reasonable for the Longos to believe that Mr. Street had authority to act on New Century's

behalf.

Accordingly, on the facts before me, New Century has no liability under the CFA.  The

fraudulent conduct alleged by the Longos was Mr. Street's.  Because Mr. Street did not act with

express or apparent authority of New Century, there is no agency relationship and New Century

is not liable for the fraudulent acts of Mr. Street.

## G.  New Century's Internal Policies and Procedures

The Longos believe that New Century violated its own internal underwriting policies and

procedures and that the Loan, therefore, should not have been funded.  Although the Longos

have identified several possible irregularities with the procurement of their mortgage, none of the

irregularities have statutory remedies.[30]  Even if I assume - - without deciding - - that these

allegations were true, there is no remedy for a company's violation of its own internal policies.

---

[30] These allegations and misconceptions were addressed by the testimony of Ms. Lindsay, a New Century employee, during the Hearing. First, the Longos allege that the Loan was improperly characterized as "no cash-out." However, Ms. Lindsay testified that New Century considers a loan as "no cash out" when, as was the case here, Loan proceeds paid consumer debt with a *de minimis* amount turned over to the borrower. *See* Tr. 42:19-44:4. Second, the Longos assert that New Century improperly relied on Mrs. Longo's income in addition to Mr. Longo's income in approving the Loan. Ms. Lindsay testified that only Mr. Longo's income was considered. Tr. 49:14-51:2. Third, the Longos allege that New Century improperly approved the Loan with a Loan-to-Value ratio ("LTV") of 94.805%. Ms. Lindsay testified that the Loan fell within New Century's parameters. Tr. 51:3-25, Ex. T-18, and Ex. T-24. Fourth, the Longos allege that the appraisal of their home was improper because it was accepted "as is," according to the Underwriter Appraisal Analysis. Ex. T-25. Ms. Lindsay explained that the appraisal fell within New Century's Uniform Appraisal Analysis criteria and was accepted "as is" rather than sent on for further review. Tr. 52:1-53:6. Fifth, the Longos allege that New Century improperly waived the requirement for an original signed appraisal. Ms. Lindsay testified that this requirement was not waived. Tr. 53:7 – 54:2.

In *Graddy v. Deutsche Bank*, No. 11-3038, 2013 WL 1222655 (D.N.J. March 25, 2013), the Court discussed claims for "improvident lending," (which were described by the lender in *Graddy* as a "claim for a lender's violations of its underwriting guidelines") and held that New Jersey courts have never recognized a claim for improvident lending. *Id.* at *2. The Court wrote: "improvident lending as a count or claim in a civil action cannot be sustained; however this does not preclude Plaintiffs from asserting claims [such as negligence, fraud, or violations of CFA] stemming from 'whatever tortious acts that could otherwise be styled as an improvident lending claim.'" *Id.* A separate claim for a violation of New Century's internal underwriting procedures will be denied.

## IV.    CONCLUSION

The Trustee has agreed that the Longos are entitled to an unsecured claim of $850.00. For the reasons set forth above, I have determined that the Longos are entitled to statutory damages of $1,000.00 for a violation of TILA. I have determined that the Trust's objection to the Longos' remaining claims against New Century under HOPEA, RESPA, HOSA and CFA should be sustained. The Longos' claim will be allowed as an unsecured claim in the amount of $1,850.00.

An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: July 29, 2013

30