2006 and (ii) that certain Junior Subordinated Indenture between NCFC and Wells Fargo Bank, N.A., as trustee, dated as of November 16, 2006.

"**Cash**" means cash or cash equivalents in certified or immediately available funds, including but not limited to bank deposits, checks, and similar items.

"**Causes of Action**" means all claims, causes of action, third-party claims, counterclaims and crossclaims (including but not limited to any Causes of Action described in the Disclosure Statement) of the Debtors and/or their Estates that may be pending on the Original Effective Date or instituted after the Original Effective Date against any Person based in law, equity, or otherwise, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise, and whether asserted or unasserted as of the date of entry of the Original Confirmation Order, including Avoidance Actions; provided, however, that any affirmative defense or crossclaim asserted with respect to a Claim shall not be deemed a Cause of Action to the extent that it seeks to disallow or reduce or is offset against such Claim.

"**Chapter 11 Cases**" means the 16 above-captioned chapter 11 cases of the Debtors pending in the Bankruptcy Court and jointly administered with one another under Case No. 07-10416 (KJC).

"**Claim**" means "claim," as such term is defined in Section 101(5) of the Bankruptcy Code and, except as otherwise provided in the context, means a Claim against the Debtors or the Estates.

"**Class**" means a group of Claims or Interests as established under Article 2 of this Modified Plan pursuant to Bankruptcy Code section 1122.

"**Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

8

"**Common Stock 510(b) Claim**" means any Claim (i) arising from rescission of a purchase or sale of Common Stock Interests, Option Interests, or Warrant Interests, for damages arising from the purchase or sale of such securities, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of the same respective priority as Common Stock Interests, Option Interests, or Warrant Interests pursuant to section 510(b) of the Bankruptcy Code.

"**Common Stock Interests**" means the common stock of NCFC issued and outstanding immediately before the Original Effective Date.

"**Cramdown Plan**" means this Modified Plan if confirmed by the Bankruptcy Court pursuant to section 1129(b) of the Bankruptcy Code.

"**Creditor**" means "creditor," as such term is defined in section 101(10) of the Bankruptcy Code.

"**De Minimis Distribution**" means a distribution to be made in accordance with the terms of this Modified Plan that is $50.00 or less.

"**Debtor Group**" means, individually or collectively, the Holding Company Debtors, the Operating Debtors, NC Credit or Access Lending.

"**Debtors**" means, collectively, the following entities in existence on the Petition Date: Access Lending; Home123; NC Asset Holding; NC Capital; NC Credit; NC Deltex; NC Residual III; NC Residual IV; NCFC; NCMC; NCoral; NCM Ventures, LLC; NC R.E.O.; NC R.E.O. II; NC R.E.O. III; and TRS Holdings.

"**Determined Distribution Amount**" means the amount assigned to each Allowed Unsecured Claim, as set forth in Article 4 of this Modified Plan and subject to the Multi-Debtor

Protocol and Intercompany Claim Protocol, for purposes of determining distributions to be made to Holders of Allowed Unsecured Claims in accordance with the terms of this Modified Plan.

"**Disallowed Claim**" means a Claim or any portion thereof that (i) has been disallowed by Final Order, (ii) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or Administrative Claim Request has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Modified Plan, (iii) is not Scheduled and as to which no Proof of Claim or Administrative Claim Request has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Modified Plan, (iv) has been withdrawn by agreement of the Debtors , or the Liquidating Trustee and the Holder thereof, or (v) has been withdrawn by the Holder thereof.

"**Disputed Claim**" means a Claim or any portion thereof that is neither an Allowed Claim nor a Disallowed Claim, including without limitation all Claims that (i) have not been Scheduled by the Debtors or have been Scheduled as unknown, contingent, unliquidated, disputed, or at zero, (ii) are the subject of a Proof of Claim that differs in nature, amount, or priority from the Schedules, or (iii) are the subject of an objection filed with the Bankruptcy Court, which has not been withdrawn or overruled by a Final Order of the Bankruptcy Court; provided however, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or a Disallowed Claim.

"**Disputed [Class Designation, A/P/S, Administrative, Priority Tax, Priority, Secured, Unsecured, Other Unsecured, or 510(b)] Claim**" means a Disputed Claim of the

specified Class or a Disputed Claim that is an A/P/S Claim, Administrative Claim, Priority Tax Claim, Priority Claim, Secured Claim, Unsecured Claim, Other Unsecured Claim, or 510(b) Claim.

"**EPD/Breach Claim**" means a Claim arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of a representation or warranty under such agreement made by one or more of the Debtors or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan.

"**EPD/Breach Claim Protocol**" means the protocol (attached as Exhibit B to the Original Plan) by which the amount of damages for EPD/Breach Claims are calculated.

"**Estates**" means the estates created by the commencement of the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

"**Executory Contract**" means any executory contract or unexpired lease subject to section 365 of the Bankruptcy Code, between any Debtor and any other Person.

"**Examiner**" means Michael J. Missal, acting in his capacity as the examiner appointed in the Chapter 11 Cases by the Bankruptcy Court pursuant to section 1104(c) of the Bankruptcy Code, or such other Person, acting in such capacity, as the Bankruptcy Court may hereafter appoint.

"**Exculpated Party**" means any of the Debtors, the Liquidating Trustee (including in his capacity as Plan Administrator and sole officer and director of the Debtors), the Estates, the Liquidating Trust, Reorganized Access Lending, the Committee, each of the Members of the Committee, the Indenture Trustee, the Plan Advisory Committee, and their respective officers,

11

directors, employees, members, attorneys, crisis managers, financial advisors, and professionals, each in their respective capacities.

"**Fee Application**" means an application filed with the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules for compensation of a Professional Fee Claim.

"**Fee Auditor**" means Warren H. Smith & Associates, P.C., acting in its capacity as the fee auditor appointed in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court dated October 10, 2007 [Docket No. 3260], or such other Person, acting in such capacity, as the Bankruptcy Court may hereafter appoint.

"**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, entered on the docket of the Chapter 11 Cases, that has not been reversed, rescinded, stayed, modified or amended, that is in full force and effect, and with respect to which: (a) the time to appeal, seek review or hearing, or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; (b) any right to appeal, seek review or rehearing, or petition for certiorari has been waived in writing; or (c) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which review, rehearing or certiorari was sought. Notwithstanding, and in lieu of the foregoing, insofar as the Modified Confirmation Order confirming this Modified Plan is concerned, Final Order means only such order or judgment which has been entered on the docket and as to which no stay is in effect.

"**Goldman**" means, together, GSMC and its affiliate Goldman, Sachs & Co.

12

"**Goldman AL3 Claim**" means any and all Claims of Goldman against Access Lending arising out of or relating to the Goldman MRA, which Claim is allowed under this Modified Plan in Class AL3 in the amount of $9,506,754.00.

"**Goldman HC3b Claim**" means any and all Claims of Goldman against NCFC arising out of or relating to the Goldman MRA which Claim is allowed under this Modified Plan in Class HC3b in the amount of $5,000,000.00.

"**Goldman MRA**" means the Master Repurchase Agreement dated February 15, 2006 (as amended by Amendment No. 1 dated as of October 25, 2006, Amendment No.2. dated November 30, 2006, and Amendment No. 3 dated as of February 7, 2007) entered into by Access Lending, GSMC, and NCFC (as guarantor), the Guaranty dated February 15, 2006 between GSMC and NCFC, as well as any other documents executed or delivered in connection therewith.

"**GSMC**" means Goldman Sachs Mortgage Company.

"**Holder**" means the owner or holder of any Claim or Interest.

"**Holding Company Debtor Claims Reserve**" means the reserve established, in accordance with Article 9.B.3 of the Original Plan, to pay any Disputed Unsecured Claim against a Holding Company Debtor to the extent such Claim becomes an Allowed Unsecured Claim against a Holding Company Debtor to be reviewed by the Liquidating Trustee subsequent to the Modified Effective Date to insure it complies with the Modified Plan.

"**Holding Company Debtor Net Distributable Assets**" means the amount as calculated pursuant to Article 9.C.2 of this Modified Plan.

"**Holding Company Debtor Portion of Litigation Proceeds**" means 24.75% of the Litigation Proceeds.

"**Holding Company Debtor Portion of the Restatement Litigation Proceeds**" means 24.75% of the Restatement Litigation Proceeds.

"**Holding Company Debtors**" means, collectively, NCFC, NC Residual IV, and TRS Holdings.

"**Home 123**" means Home 123 Corporation, a California corporation and a Debtor.

"**Indenture Trustee**" means Wells Fargo Bank, N.A., in its capacity as trustee of the Capital Trust Indentures.

"**Indenture Trustee Expenses**" means the reasonable compensation and expenses of the Indenture Trustee including the fees and expenses of its counsel, agents and advisers, incurred at any time prior to or subsequent to the Petition Date, and prior to or subsequent to the Original Effective Date; provided, however, any such fees, compensation, or expense arising subsequent to the Original Effective Date shall only be paid from distributions to be made on account of Capital Trust Claims and Senior Class HC3b Claims.

"**Intercompany Claim**" means a Claim held by a Debtor against another Debtor.

"**Intercompany Claim Protocol**" means the protocol, set forth in Article 7 of this Modified Plan, pursuant to which each Intercompany Claim is assigned a Determined Distribution Amount, notwithstanding the treatment of the Class in which a particular Intercompany Claim is classified.

"**Interest**" means, with respect to any Debtor, any "equity interest," as such term is defined in Bankruptcy Code § 101(16). Interests shall also include, without limitation, all stock, partnership, membership interest, warrants, options, or other rights to purchase or acquire any shares of stock in the Debtors.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

14

"**IRS**" means the Internal Revenue Service.

"**Joint Administrative Expense**" means (i) an Allowed Administrative Claim (including, without limitation, Professional Fee Claims) or portion thereof or (ii) an expense of administering the Debtors' Estates, or portion thereof, incurred in the ordinary course prior to the Original Effective Date and paid by the Debtors on or before the Original Effective Date in the ordinary course in either case for which, as determined by the Liquidating Trustee and approved by the Plan Advisory Committee, (a) liability cannot be allocated to a particular Debtor or Debtors and (b) Debtors in more than one Debtor Group are liable; provided, however, any claim that would be an Allowed Administrative Claim arising after the Original Effective Date shall be deemed a Trust Operating Expense to the extent it would otherwise be a Trust Operating Expense if the Original Plan had not been reversed and shall be allocated as a Trust Operating Expense in accordance with the terms of this Modified Plan.

"**Joint Administrative Expense Share**" means the share (expressed in terms of percentage) of a Joint Administrative Expense allocated to each of Access Lending, the Holding Company Debtors, and the Operating Debtors (attached as Exhibit C to the Original Plan).

"**Lien**" means any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt, or litigation.

"**Liquidating Trust**" means the liquidating trust into which all of the Assets of the Debtors, other than the Assets of Access Lending, were transferred upon the Original Effective Date.

"**Liquidating Trust Agreement**" means the formative trust agreement for the Liquidating Trust, filed by the Original Plan Proponents with the Bankruptcy Court and executed on the Original Effective Date.

15

"**Liquidating Trust Assets**" means the Assets of the Debtors, including Access Lending Interests but excluding the Assets of Access Lending, contributed to the Liquidating Trust.

"**Liquidating Trustee**" means Alan M. Jacobs, appointed to act as trustee of the Liquidating Trust in accordance with the terms of the Original Plan, the Original Confirmation Order, the Liquidating Trust Agreement, the Status Quo Order, and this Modified Plan, or any successor appointed in accordance with the terms of this Modified Plan and the Liquidating Trust Agreement.

"**Litigation Proceeds**" means the net proceeds of all Causes of Action (other than Access Lending Causes of Action) whether from judgment, settlement, or claim on insurance, as calculated pursuant to Article 9.C.1 of this Modified Plan and includes the Restatement Litigation Proceeds.

"**Members of the Committee**" means, individually and collectively, the Persons appointed as members of the Committee by the U.S. Trustee on April 9, 2007, each acting in its capacity as a member of the Committee.

"**Modified Confirmation Date**" means the date on which the Modified Confirmation Order is entered on the docket in the Chapter 11 Cases by the Bankruptcy Court.

"**Modified Confirmation Hearing**" means the hearing pursuant to Bankruptcy Rule 3020(b) at which the Bankruptcy Court considers confirmation of the Modified Plan, as such hearing may be continued from time to time.

"**Modified Confirmation Order**" means the Order of the Bankruptcy Court confirming this Modified Plan pursuant to Section 1129 of the Bankruptcy Code.

"**Modified Disclosure Statement**" means the disclosure statement that relates to this Modified Plan, as approved by the Bankruptcy Court pursuant to sections 1125 and 1127 of the

Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time.

"**Modified Effective Date**" means the Business Day on which this Modified Plan becomes effective pursuant to Article 14.A of this Modified Plan; provided, however, that if any stay or injunction against enforcement or execution of the Modified Confirmation Order is issued prior to the date that would otherwise be the Modified Effective Date, the Modified Effective Date shall be the first Business Day after all such stays or injunctions are no longer in effect.

"**Modified Plan**" means this Modified Second Amended Joint Chapter 11 Plan of Liquidation dated September 30, 2009 (either in its present form or as it may be amended or modified from time to time), any exhibits hereto and any documents incorporated herein by reference.

"**Multi-Debtor Claim Protocol**" means the protocol, set forth in Article 6 of this Modified Plan, pursuant to which a Creditor's Determined Distribution Amount is assigned where such Creditor holds Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable.

"**NC Asset Holding**" means NC Asset Holding, L.P., a Delaware limited partnership and a Debtor.

"**NC Capital**" means NC Capital Corporation, a California corporation and a Debtor.

"**NC Capital EDP/Breach Claimant Portion of Litigation Proceeds**" means 45% of the Litigation Proceeds.

"**NC Credit**" means New Century Credit Corporation, a California corporation and a Debtor.

"**NC Credit Claims Reserve**" means the reserve established, in accordance with Article 9.B.4 of this Modified Plan from funds that would otherwise be deposited in the Holding Company Debtor Claims Reserve, to pay any Disputed Unsecured Claim against NC Credit to the extent such Claim becomes an Allowed Claim against NC Credit.

"**NC Credit Portion of Litigation Proceeds**" means 2.75% of the Litigation Proceeds.

"**NC Credit Portion of the Restatement Litigation Proceeds**" means 2.75% of the Restatement Litigation Proceeds.

"**NC Deltex**" means NC Deltex, LLC, a Delaware limited liability company and a Debtor.

"**NC REO**" means New Century R.E.O. Corp., a California corporation and a Debtor.

"**NC REO II**" means New Century R.E.O. II Corp., a California corporation and a Debtor.

"**NC REO III**" means New Century R.E.O. III Corp., a California corporation and a Debtor.

"**NC Residual III**" means NC Residual III Corporation, a Delaware corporation and a Debtor.

"**NC Residual IV**" means NC Residual IV Corporation, a Delaware corporation and a Debtor.

"**NCFC**" means New Century Financial Corporation, a Maryland corporation and a Debtor.

"**NCFC Interest**" means an Interest in NCFC, including Stock Interests, Option Interests, and Warrant Interests.

"**NCFC Interest Holder**" means a Holder of an NCFC Interest.

"**NCM Ventures**" means New Century Mortgage Ventures, LLC, a Delaware limited liability company and a Debtor.

"**NCMC**" means New Century Mortgage Corporation, a California corporation and a Debtor.

"**NCMC AL3 Claim**" means any and all Claims of NCMC against Access Lending, which Claim is allowed under this Modified Plan in Class AL3 in the amount of $3,973,199.86.

"**NCoral**" means NCoral, L.P., a Delaware limited partnership and a Debtor.

"**New Century Benefit Plan**" means the New Century Financial Corporation Deferred Compensation Plan and Supplemental Employee Retirement Plan ("SERP").

"**Operating Debtor Claims Reserve**" means the reserve established, in accordance with Article 9.B.4 of the Original Plan, to pay any Disputed Unsecured Claim against an Operating Debtor to the extent such Claim becomes an Allowed Unsecured Claim against an Operating Debtor to be reviewed by the Liquidating Trustee subsequent to the Modified Effective Date to insure it complies with this Modified Plan.

"**Operating Debtor Net Distributable Assets**" means the amount as calculated pursuant to Article 9.C.4 of this Modified Plan.

"**Operating Debtor Portion of the Litigation Proceeds**" means 27.5% of the Litigation Proceeds.

"**Operating Debtor Portion of the Restatement Litigation Proceeds**" means 27.5% of the Restatement Litigation Proceeds.

"**Operating Debtor Unsecured Claim**" means all Unsecured Claims against Operating Debtors.

19

"**Operating Debtors**" means, collectively, Home 123, NC Asset Holding, NC Capital, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, NCMC, and NCoral.

"**Option Interest**" means unexercised options to purchase Common Stock Interests.

"**Original Confirmation Date**" means the date on which the Original Confirmation Order was entered on the docket in the Chapter 11 Cases by the Bankruptcy Court or July 15, 2008.

"**Original Confirmation Hearing**" means the hearing pursuant to Bankruptcy Rule 3020(b) at which the Bankruptcy Court considered confirmation of the Original Plan, which occurred on April 24 and 25, 2008.

"**Original Confirmation Order**" means the Order Confirming the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April 23, 2008 entered by the Bankruptcy Court on July 15, 2008 as amended by the Order Amending the Confirmation Order entered by the Bankruptcy Court on July 22, 2008.

"**Original Disclosure Statement**" means the disclosure statement that related to the Original Plan, as approved by the Bankruptcy Court pursuant to Order dated March 18, 2008.

"**Original Effective Date**" means the effective date of the Original Plan, which occurred on August 1, 2008.

"**Original Plan**" means the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors dated as of April 23, 2008, any exhibits thereto, and any documents incorporated therein by reference.

"**Original Plan Proponents**" means collectively the Debtors and the Committee.

"**Other AL3 Claims**" means all Class AL3 Claims other than the Goldman AL3 Claim and the NCMC AL3 Claim.

"**Other Unsecured Claim**" means any Unsecured Claim other than Special Deficiency Claims and EPD/Breach Claims.

"**Person**" means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, or any political subdivision thereof or other entity.

"**Petition Date**" means, (i) with respect to all Debtors other than Access Lending, April 2, 2007, the date on which all of the Debtors other than Access Lending commenced the Chapter 11 Cases, and (ii) with respect to Access Lending, August 3, 2007, the date on which Access Lending commenced its Chapter 11 Case.

"**Plan Administrator**" means the Liquidating Trustee acting in his capacity as the chief executive officer and sole director of Reorganized Access Lending and as the Person responsible for liquidating and winding down the Estate of Access Lending as set forth in Article 10.B of the Original Plan and Article 10.B of this Modified Plan.

"**Plan Administrator Agreement**" means the agreement setting forth the rights and duties of the Plan Administrator dated as of August 1, 2008.

"**Plan Advisory Committee**" means the post-confirmation committee formed on the Original Effective Date and selected by the Committee in accordance with Article 8.G of the Original Plan.

"**Plan Proponents of the Modified Plan**" means the Debtors, by and through their sole officer and director, and the Liquidating Trust and Reorganized Access Lending, by and through

21

their Bankruptcy Court appointed Liquidating Trustee and/or Plan Administrator, respectively, pursuant to the terms of the Original Plan and the Status Quo Order.

"**Priority Claim**" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

"**Priority Tax Claim**" means a Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

"**Professional**" means the Examiner, the Fee Auditor, or any Person employed by the Debtors, the Committee, and/or the Examiner pursuant to a Final Order in accordance with sections 327 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Original Effective Date pursuant to sections 327, 328, 329, 330, and/or 331 of the Bankruptcy Code. This definition excludes professionals that may be selected and employed by the Liquidating Trust, the Liquidating Trustee, or the Plan Advisory Committee on and after the Original Effective Date with respect to services rendered by such professionals on and after the Original Effective Date, which fees and expenses shall be treated as Trust Operating Expenses.

"**Professional Fee Claim**" means all fees and expenses claimed by Professionals retained by the Debtors, the Committee, and/or the Examiner that were approved on a final basis by a Final Order as of the Original Effective Date. This definition excludes professional fees and expenses incurred by any professionals that may be selected and employed by the Liquidating Trust, the Liquidating Trustee, or the Plan Advisory Committee on and after the Original Effective Date, which fees and expenses shall be treated as Trust Operating Expenses.

"**Proof of Claim**" means a proof of claim filed in the Chapter 11 Cases pursuant to section 501 of the Bankruptcy Code and/or pursuant to any order of the Bankruptcy Court, together with supporting documents.

22

"**Pro Rata**" means proportionate, so that, for example, the ratio of the consideration distributed on account of the Determined Distribution Amount of an Allowed Claim to the amount of the Determined Distribution Amount of the Allowed Claim is the same as the ratio of the consideration distributed on account of all Determined Distribution Amounts of Allowed Claims in such Class of Claims to the amount of all Determined Distribution Amounts of Allowed Claims in that Class.

"**Protected Party**" means any of the Liquidating Trustee (including in his capacity as Plan Administrator and sole officer and director of the Debtors), the Estates, the Liquidating Trust, Reorganized Access Lending, and the Plan Advisory Committee, each in their respective capacities.

"**Reorganized Access Lending**" means Access Lending on and after the Original Effective Date subject to the occurrence of the Modified Effective Date.

"**Reorganized Access Lending Operating Expenses**" means the expenses incurred by Reorganized Access Lending in connection with carrying out the obligations of the Plan Administrator pursuant to the terms of this Modified Plan or the Plan Administrator Agreement as of the Original Effective Date, in each case with the exception of any expenses incurred in connection with the Causes of Action.

"**Restatement Litigation Proceeds**" means the portion of Litigation Proceeds that constitutes net proceeds of any recoveries realized by the Liquidating Trust on claims arising out of events or circumstances that led to the restatement of the financial statements of the Debtors or such restatement itself, as may be agreed to by the Holder of a Special Deficiency Claim and the Liquidating Trustee or determined by final order of the Bankruptcy Court.

23

"**Reversal Order**" means the order entered by the United States District Court for the District of Delaware on June 16, 2009 reversing the Original Confirmation Order.

"**Scheduled**" means, with respect to any Claim, such Claim is listed on the Schedules.

"**Schedules**" means the Schedules of Assets and Liabilities and the Statement of Financial Affairs filed by the Debtors with the Bankruptcy Court, pursuant to section 521(a) of the Bankruptcy Code, Bankruptcy Rule 1007(b), and the Official Bankruptcy Forms, as may be amended from time to time.

"**Schroeder Litigation**" means the adversary proceeding entitled *Schroeder v. New Century Holdings, Inc.*, Adversary Proceeding No. 07-51598 (KJC) pending in the Bankruptcy Court.

"**SEC**" means the Securities and Exchange Commission.

"**Secured Claim**" means a Claim that is secured by a valid and unavoidable lien on property in which the Estates have an interest, or that is subject to recoupment or setoff under section 553 of the Bankruptcy Code to the extent of the value of the Holder's interest in the Estates' interest in such property, or to the extent of the amount subject to recoupment or setoff as applicable, as determined by the Bankruptcy Court pursuant to sections 506(a), 553, and/or 1129(b)(2)(A)(i)(II), as applicable.

"**Senior Class HC3b Claim**" means a Class HC3b Claim that arises from an obligation of NCFC that comes within the definition of "Senior Debt" in either of the Capital Trust Indentures.

"**Series A 510(b) Claim**" means any Claim (i) arising from rescission of a purchase or sale of series A Preferred Stock Interests, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code

24

on account of such Claims and (ii) which, if asserted against NCFC, would be of junior priority to Series A Preferred Stock Interests and of senior priority to Series B Preferred Stock Interests pursuant to section 510(b) of the Bankruptcy Code.

"**Series A Preferred Stock Interests**" means the 9.125% Series A Cumulative Redeemable Preferred Stock of NCFC issued and outstanding immediately before the Original Effective Date.

"**Series B 510(b) Claim**" means any Claim (i) arising from rescission of a purchase or sale of Series B Preferred Stock Interests, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims and (ii) which, if asserted against NCFC, would be of junior priority to Series B Preferred Stock Interests and of senior priority to Common Stock Interests pursuant to section 510(b) of the Bankruptcy Code.

"**Series B Preferred Stock Interests**" means the 9.75% Series B Cumulative Redeemable Preferred Stock of NCFC issued and outstanding immediately before the Original Effective Date.

"**Settlement Agreement**" means that Settlement Agreement dated July 2009 by and among Alan M. Jacobs, as Liquidating Trustee of the New Century Liquidating Trust, the Liquidating Trustee in his capacity as sole officer and director of New Century Financial Corporation and the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and SERP Plan.

"**Settling Parties**" means each member of the New Century Benefit Plan that are beneficiaries under the Settlement Agreement.

"**Special Deficiency Claim**" means any Claim arising under a master repurchase agreement governing the sale and repurchase of mortgage loans by the Debtors to and from DB Structured Products, Inc., provided for in that certain settlement agreement with DB Structured Products, Inc. dated as of August 8, 2007 and approved in the "Order Approving Settlement Agreement with DB Structured Products, Inc. Pursuant to Bankruptcy Rule 9019 and Sections 105(a), 361, 363, 502 and 542 of the Bankruptcy Code" entered on August 21, 2007 [Docket No. 2369], and any other settlement agreement entered into by the Liquidating Trust and approved by Final Order that provides that it gives rise to a claim that is to be treated as a Special Deficiency Claim under this Modified Plan.

"**Status Quo Order**" means the order entered on July 27, 2009 by the Bankruptcy Court preserving the status quo, including maintaining the Liquidating Trust and the Liquidating Trustee pending the entry of a Final Order of the Bankruptcy Court consistent with the Reversal Order.

"**Stock Interests**" means Common Stock Interests, Series A Preferred Stock Interests, and Series B Preferred Stock Interests.

"**Subordination Settlement**" means that Stipulation among Credit Suisse-First Boston Mortgage Capital LLC, General Electric Capital Corporation, Kodiak Funding LP and Kodiak CDO Management LLC Settling the Subordination Statement Claims as approved by order of the Bankruptcy Court dated June 12, 2009.

"**Subordination Statement**" means the pleading that a Holder of a Class HC3b Claim must file with the Bankruptcy Court no later than thirty (30) days after the Original Effective Date in order to assert that such Holder holds a Senior Class HC3b Claim, which pleading must describe with specificity the legal and factual basis for establishing that such Holder holds a

26

senior Class HC3b Claim and, therefore, is entitled to the benefits of subordination as set forth in the Capital Trust Indentures.

"**TRS Holdings**" means New Century TRS Holdings, Inc, a Delaware corporation and a Debtor.

"**Trust Operating Expenses**" means the expenses incurred by the Liquidating Trust in connection with carrying out the obligations of the Liquidating Trust pursuant to the terms of this Modified Plan or the Liquidating Trust Agreement from and after the Original Effective Date, in each case with the exception of any expenses incurred in connection with the Causes of Action.

"**Unsecured Claim**" means any Claim against any Debtor that is not an Administrative Claim, a Priority Claim, a Priority Tax Claim, a Secured Claim or a 510(b) Claim, provided that Unsecured Claims shall include, without limitation, any Claim secured by an interest in property of the Estate to the extent the amount of such Claim exceeds the value, as determined by the Bankruptcy Court pursuant to sections 506(a), 553, and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, of the Holder's interest in the Estate's interest in property of the Estate securing such Claim.

"**U.S. Trustee**" means the Office of the United States Trustee.

"**Warrant Interests**" means unexercised warrants to purchase Common Stock Interests.

B.    **Other Terms.**  The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to this Modified Plan as a whole and not to any particular article, section or clause contained in this Modified Plan.  A reference to an "Article" refers to an Article of this Modified Plan or the Original Plan, as appropriate.  A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in or by the Bankruptcy Code.  The rules of

construction set forth in section 102 of the Bankruptcy Code shall apply in construing this Modified Plan.

C.    **Time Periods.**  In computing any period of time prescribed or allowed by this Modified Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If any act under this Modified Plan is required to be made or performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

D.    **Exhibits.**  All Exhibits to this Modified Plan are incorporated by reference into and are made a part of this Modified Plan as if set forth in full herein.  Exhibits to the Original Plan which may be referred to in this Modified Plan are incorporated by reference into and are made a part of this Modified Plan as if set forth in full herein.

## ARTICLE 2.

## CLASSIFICATION OF CLAIMS AND INTERESTS

A.    **Summary.**  The categories of Claims and Interests listed below classify Claims (except for Administrative Claims and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to this Modified Plan.

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| [unclassified] | Administrative and Priority Tax Claims against all Debtors. | Unimpaired – not entitled to vote |
| **Claims Against Holding Company Debtors** | | |
| Class HC1 | Class HC1 consists of Priority Claims against NCFC. | Unimpaired - not entitled to vote |
| Class HC2 | Class HC2 consists of Secured Claims against NCFC. | Unimpaired - not entitled to vote |

28

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Class HC3a | Class HC3a consists of Special Deficiency Claims against NCFC. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class HC3b | Class HC3b consists of Other Unsecured Claims against NCFC. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class HC4a | Class HC4a consists of Series A Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4b | Class HC4b consists of Series A 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4c | Class HC4c consists of Series B Preferred Stock Interests. | Deemed to reject - not entitled to vote |
| Class HC4d | Class HC4d consists of Series B 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC4e | Class HC4e consists of Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims. | Deemed to reject - not entitled to vote |
| Class HC5 | Class HC5 consists of Priority Claims against TRS Holdings. | Unimpaired - not entitled to vote |
| Class HC6 | Class HC6 consists of Secured Claims against TRS Holdings. | Unimpaired - not entitled to vote |

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Class HC7 | Class HC7 consists of Other Unsecured Claims against TRS Holdings. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class HC8 | Class HC8 consists of Priority Claims against NC Credit. | Unimpaired - not entitled to vote |
| Class HC9 | Class HC9 consists of Secured Claims against NC Credit. | Unimpaired - not entitled to vote |
| Class HC10a | Class HC10a consists of Special Deficiency Claims against NC Credit. | Impaired - entitled to vote |
| Class HC10b | Class HC10b consists of Other Unsecured Claims against NC Credit. | Impaired - entitled to vote |
| Class HC11 | Class HC11 consists of Priority Claims against NC Residual IV | Unimpaired - not entitled to vote |
| Class HC12 | Class HC12 consists of Secured Claims against NC Residual IV | Unimpaired - not entitled to vote |
| Class HC13 | Class HC13 consists of Other Unsecured Claims against NC Residual IV | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class HC14 | Class HC14 consists of Settling Parties Claims in Settlement of the Schroeder Litigation | Impaired – entitled to vote |
| **Claims Against Operating Debtors** | | |
| Class OP1 | Class OP1 consists of Priority Claims against NCMC. | Unimpaired - not entitled to vote |
| Class OP2 | Class OP2 consists of Secured Claims against NCMC. | Unimpaired - not entitled to vote |

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Class OP3a | Class OP3a consists of Special Deficiency Claims against NCMC. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP3b | Class OP3b consists of EPD/Breach Claims against NCMC. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP3c | Class OP3c consists of Other Unsecured Claims against NCMC. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP4 | Class OP4 consists of Priority Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP5 | Class OP5 consists of Secured Claims against NC Capital. | Unimpaired - not entitled to vote |
| Class OP6a | Class OP6a consists of Special Deficiency Claims against NC Capital. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |

31

| CLASS | DESCRIPTION | STATUS |
|---|---|---|
| Class OP6b | Class OP6b consists of EPD/Breach Claims against NC Capital. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP6c | Class OP6c consists of Other Unsecured Claims against NC Capital. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP7 | Class OP7 consists of Priority Claims against Home123. | Unimpaired - not entitled to vote |
| Class OP8 | Class OP8 consists of Secured Claims against Home123. | Unimpaired - not entitled to vote |
| Class OP9a | Class OP9a consists of Special Deficiency Claims against Home123. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP9b | Class OP9b consists of Other Unsecured Claims against Home123. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| Class OP10 | Class OP10 consists of Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Unimpaired – not entitled to vote |
| Class OP11 | Class OP11 consists of Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, | Unimpaired – not |

| CLASS | DESCRIPTION | STATUS |
|-------|-------------|--------|
|  | NC REO III, NC Residual III, NCM Ventures, and NCoral. | entitled to vote |
| Class OP12 | Class OP12 consists of Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |
| **Claims Against Access Lending** | | |
| Class AL1 | Class AL1 consists of Priority Claims against Access Lending. | Unimpaired – not entitled to vote |
| Class AL2 | Class AL2 consists of Secured Claims against Access Lending. | Unimpaired – not entitled to vote |
| Class AL3 | Class AL3 consists of Other Unsecured Claims against Access Lending. | Impaired – voted to accept the Original Plan. No material adverse impact on potential recovery under Modified Plan so no additional voting will be solicited. |

B.    **Classification.**  The Claims against the Debtors shall be classified as specified below (other than Administrative Claims and Priority Tax Claims, which shall be treated in accordance with Article 3 below).  Consistent with section 1122 of the Bankruptcy Code, a Claim or Interest is classified by this Modified Plan in a particular Class only to the extent the Claim or Interest is within the description of the Class, and a Claim or Interest is classified in a different Class to the extent it is within the description of that different Class.  Other than the addition of a Class of Creditors to effectuate the implementation of the Settlement Agreement in conjunction with the Schroeder Litigation, the classification of Claims and Interests in the

Modified Plan is the same as the classification of Claims and Interests in the Original Plan. The classification of Claims pursuant to this Modified Plan is as follows:

1. *Class HC1.* Class HC1 consists of Priority Claims against NCFC.

2. *Class HC2.* Class HC2 consists of Secured Claims against NCFC.

3. *Classes HC3a-b.* Class HC3 consists of Unsecured Claims against NCFC, and shall be further classified in separate Classes as follows:

   (a) Class HC3a consists of Special Deficiency Claims against NCFC.

   (b) Class HC3b consists of Other Unsecured Claims against NCFC.

4. *Class HC4.* Class HC4 consists of NCFC Interests and 510(b) Claims against NCFC, and shall be further classified in separate Classes as follows:

   (a) Class HC4a consists of Series A Preferred Stock Interests.

   (b) Class HC4b consists of Series A 510(b) Claims.

   (c) Class HC4c consists of Series B Preferred Stock Interests.

   (d) Class HC4d consists of Series B 510(b) Claims.

   (e) Class HC4e consists of Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims.

5. *Class HC5.* Class HC5 consists of Priority Claims against TRS Holdings.

6. *Class HC6.* Class HC6 consists of Secured Claims against TRS Holdings.

7. *Class HC7.* Class HC7 consists of Other Unsecured Claims against TRS Holdings.

8. *Class HC8.* Class HC8 consists of Priority Claims against NC Credit.

9. *Class HC9.* Class HC9 consists of Secured Claims against NC Credit.

34

10.    *Classes HC10a-b.* Class HC10 consists of Unsecured Claims against NC Credit, and shall be further classified in separate Classes as follows:

    (a)    Class HC10a consists of Special Deficiency Claims against NC Credit.

    (b)    Class HC10b consists of Other Unsecured Claims against NC Credit.

11.    *Class HC11.* Class HC 1 consists of Priority Claims against NC Residual IV.

12.    *Class HC12.* Class HC12 consists of Secured Claims against NC Residual IV.

13.    *Class HC13.* Class HC13 consists of Other Unsecured Claims against NC Residual IV.

14.    *Class HC14.* Class HC14 consists of Settling Parties Claims in settlement of the Schroeder Litigation.

15.    *Class OP1.* Class OP1 consists of Priority Claims against NCMC.

16.    *Class OP2.* Class OP2 consists of Secured Claims against NCMC.

17.    *Classes OP3a-c.* Class OP3 consists of Unsecured Claims against NCMC, and shall be further classified in separate Classes as follows:

    (a)    Class OP3a consists of Special Deficiency Claims against NCMC.

    (b)    Class OP3b consists of EPD/Breach Claims against NCMC.

    (c)    Class OP3c consists of Other Unsecured Claims against NCMC.

18.    *Class OP4.* Class OP4 consists of Priority Claims against NC Capital.

19.    *Class OP5.* Class OPS consists of Secured Claims against NC Capital.

20.    *Classes OP6a-c.*  Class OP6 consists of Unsecured Claims against NC Capital, and shall be further classified in separate Classes as follows:

       (a)    Class OP6a consists of Special Deficiency Claims against NC Capital.

       (b)    Class OP6b consists of EPD/Breach Claims against NC Capital.

       (c)    Class OP6c consists of Other Unsecured Claims against NC Capital.

21.    *Class OP7.*  Class OP7 consists of Priority Claims against Home123.

22.    *Class OP8.*  Class OP8 consists of Secured Claims against Home123.

23.    *Classes OP9a-b.*  Class OP9 consists of Unsecured Claims against Home123, and shall be further classified in separate Classes as follows:

       (a)    Class OP9a consists of Special Deficiency Claims against Home123.

       (b)    Class OP9b consists of Other Unsecured Claims against Home123.

24.    *Class OP10.*  Class OP10 consists of Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NC Coral.

25.    *Class OP11.*  Class OP11 consists of Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NC Coral.

26.    *Class OP12.*  Class OP12 consists of Other Unsecured Claims NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NC Coral.

27. *Class AL1.*  Class AL1 consists of Priority Claims against Access Lending.

28. *Class AL2.*  Class AL2 consists of Secured Claims against Access Lending.

29. *Class AL3.*  Class AL3 consists of Other General Claims against Access Lending.

### ARTICLE 3.

### TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

As provided in Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims shall not be classified for the purposes of voting or receiving distributions under this Modified Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article 3.

A.   **Administrative Claims.**

1.   **Non-Professional Fee Administrative Claims.**  Each Holder of an Administrative Claim (other than Professional Fee Claims) was required under the Original Plan to file an Administrative Claim Request requesting payment of such Administrative Claim with the Bankruptcy Court by no later than August 31, 2008.  This Administrative Claim Request Deadline shall govern all Administrative Claims pursuant to this Modified Plan.  Nothing herein extends a Bar Date established in the Bar Date Orders or the Administrative Claim Request Deadline established under the Original Plan.  The Liquidating Trustee shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in cash, as soon as practicable after the Modified Effective Date, if not previously paid by the Liquidating Trustee or within thirty (30)

37

days after such Administrative Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, (i) a Holder of an Allowed Administrative Claim (excluding Holders of Professional Fee Claims) may be paid on such other date or dates and upon such other terms as may be agreed upon by such Holder and the Liquidating Trustee and (ii) the Liquidating Trustee was authorized to pay in the ordinary course of business any expenses of administering the Debtors' estates incurred in the ordinary course of business after the Original Effective Date and any such payments made by the Liquidating Trustee subsequent to the Original Effective Date are authorized by the Modified Plan. Without limiting the foregoing, all outstanding fees payable to the U.S. Trustee under 28 U.S.C. § 1930 that have not been paid as of the Original Effective Date shall be paid by the Liquidating Trustee no later than thirty (30) days after the Modified Effective Date or when due in the ordinary course. Any fees payable to the U.S. Trustee under 28 U.S.C. § 1930 arising after the Original Effective Date shall be treated as Trust Operating Expenses and paid by the Liquidating Trustee in the ordinary course of business.

        2.    **Professional Fee Claims.** The Liquidating Trustee was authorized to pay Professionals who were entitled to reimbursement or allowance of fees and expenses from the Estates pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code, in Cash, in the amount awarded to such Professionals by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Original Effective Date and the date upon which any order awarding fees and expenses became a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases and after application of any

retainer received by such Professionals. All final applications for allowance of a Professional Fee Claim were required to be filed by September 15, 2008. The Bankruptcy Court entered an order allowing Professional Fee Claims in accordance with the terms of the Original Plan on December 22, 2008.

B.    **Priority Tax Claims.** The Liquidating Trustee shall pay, at the Liquidating Trustee's discretion, each Holder of an Allowed Priority Tax Claim either (i) in full in Cash as soon as practicable after the Modified Effective Date or within thirty (30) days after such Priority Tax Claim becomes an Allowed Claim or (ii) over a period ending not later than five (5) years after the Petition Date, with deferred Cash payments in equal amounts on a quarterly basis in an aggregate amount equal to any such Allowed Priority Tax Claim, together with interest thereon (if and so required) at the legal rate required for such Claim in chapter 11 cases. All Allowed Priority Tax Claims which are not due and payable on or before the Original Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. The Liquidating Trustee may prepay any Allowed Priority Tax Claim at any time after the Original Effective Date without any penalty or charge. Holders of Allowed Priority Tax Claims will not be entitled to receive any payment on account of any penalty arising with respect to, or in connection with such Claims. Any Claim for any such penalty, or demand for any such penalty, will be deemed disallowed as of the Petition Date by confirmation of this Modified Plan.

### ARTICLE 4.

### TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

As required by the Bankruptcy Code, this Modified Plan places Claims and Interests into various Classes according to their right to priority and other relative rights. This Modified Plan specifies whether each Class of Claims or Interests is impaired or unimpaired, and this Modified Plan sets forth the treatment each Class will receive.

39

A.   Priority Claims Against All Debtors (Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1). Each of Classes HC1, HC5, HC8, HC11, OP1, OP4, OP7, OP10, and AL1, which are unimpaired, consists of all Allowed Priority Claims against a particular Debtor. Unless the Holder of an Allowed Priority Claim and the Liquidating Trustee, including in his capacity as Plan Administrator, agree to a different treatment, the Liquidating Trustee was authorized to pay each such Holder of an Allowed Priority Claim, in full, in Cash, without interest as soon as practicable after the Original Effective Date and, if not paid by the Modified Effective Date, as soon as practicable after the Modified Effective Date.

B.   Secured Claims Against All Debtors (Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2). Each of Classes HC2, HC6, HC9, HC12, OP2, OP5, OP8, OP11, and AL2, which are unimpaired, consists of all Allowed Secured Claims against a particular Debtor. At the sole option of the Liquidating Trustee, (i) Allowed Secured Claims will be unaltered and, subject to the requirements of section 1124(2) of the Bankruptcy Code, as of the Original Effective Date, the legal, equitable, and contractual rights of the Holders of Allowed Secured Claims shall be reinstated in full, or (ii) each Holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, the Holder's Allowed Secured Claim (a) Cash in the amount of the Allowed Secured Claim on the later of the initial distribution date under this Modified Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, (b) the property of the estate which constitutes collateral for such Allowed Secured Claim on the later of the initial distribution date under this Modified Plan and the date such Claim becomes an Allowed Claim, or as soon thereafter as practicable, or (c) such other treatment as may be agreed to by the Liquidating Trustee, including in his capacity as Plan Administrator and such Holder.

C.    **Class HC3:  Unsecured Claims Against NCFC.**

      1.    **Class HC3a: Special Deficiency Claims against NCFC.**  Class HC3a, which is impaired, consists of all Allowed Special Deficiency Claims against NCFC. Each Holder of an Allowed Class HC3a Claim shall receive its Pro Rata share, at the election of the Holder, of (i) the Holding Company Debtor Portion of the Litigation Proceeds or (ii) the Holding Company Debtor Portion of the Restatement Litigation Proceeds, in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article 4.C.1) divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, and HC13 Claims.   The Determined Distribution Amount for each Allowed Class HC3a Claim shall be, based on the election made by the Holder of such Claim, (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Holding Company Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Holding Company Debtor Portion of the Restatement Litigation Proceeds.  The election to be made by the Holder to share in either the (i) Holding Company Debtor Portion of the Litigation Proceeds or (ii) Holding Company Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and submitted to the Liquidating Trustee on or before the Original Effective Date if such Claim was an Allowed Claim prior to the Original Effective Date, on or before the Modified Effective Date if such Claim became an Allowed Claim after the Original Effective Date, or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee.  In the event any Holder fails to make a timely

election as required above, such Holder shall be deemed to have elected to share in the Holding Company Debtor Portion of the Litigation Proceeds.

2. **Class HC3b: Other Unsecured Claims against NCFC.** Class HC3b, which is impaired, consists of all Allowed Other Unsecured Claims against NCFC. Subject to Article 4.C.3 and Article 9.G of this Modified Plan, each Holder of an Allowed Class HC3b Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, and HC13 Claims. The Determined Distribution Amount for each Allowed Class HC3b Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol, (ii) the Intercompany Claim Protocol and (iii) with respect to Holders of Capital Trust Claims' to Article 4.C.3 of this Modified Plan.

3. Senior Claim Procedure.

(a) Certain Holders of Class HC3b Claims have asserted a Senior Class HC3b Claim, which dispute has been settled pursuant to the terms of the Subordination Settlement.

(b) Any distribution that would otherwise be made on account of Allowed Capital Trust Claims in accordance with Article 9 of this Modified Plan shall be distributed in accordance with the terms of the Subordination Settlement;

42

provided, however, that prior to turning over any such distributions, pursuant to the terms of the Subordination Settlement, the Liquidating Trustee shall first pay to the Indenture Trustee out of such distributions (i) the balance of any Indenture Trustee Expenses previously incurred, plus (ii) the amount of $100,000 to be held by the Indenture Trustee in reserve (the "Future Expense Reserve") for payment of future Indenture Trustee Expenses, all of which Indenture Trustee Expenses are subject to the Indenture Trustee's charging lien. The Future Expense Reserve shall only be funded from any distributions that would otherwise be made on account of Allowed Capital Trust Claims and not from any other Assets. In no event shall the Indenture Trustee Expenses be paid from any Assets except from the Future Expense Reserve and from any distributions that would otherwise be made on account of Allowed Capital Trust Claims. All amounts owing to the Indenture Trustee for its Indenture Trustee Expenses or payable to the Future Expense Reserve shall be paid prior to any distribution to any Holder of a Senior Class HC3b Claim and prior to any distribution to any Holder of a Capital Trust Claim, due to its Indenture Trustee charging lien. Upon the earlier of the (i) termination of the Indenture Trustee's role in these (or related) proceedings and (ii) final distribution to Holders of Capital Trust Claims, any amounts remaining in the Future Expense Reserve shall be distributed in accordance with the terms of the Subordination Settlement

(c)    If a Debtor(s) other than NCFC is jointly and/or severally liable with NCFC for the amount of a Senior Class HC3b Claim and the Holder of a Senior Class HC3b Claim holds an Allowed Unsecured Claim(s) against such

43

Debtor(s) in respect of such liability, any distribution that the Holder receives on account of such Claims shall be included in determining whether the Holder's Senior Class HC3b Claim has been paid in full. If a Senior Class HC3b Claim has been paid in full, any distributions that would have been paid on account of such Claim pursuant to the terms of the Subordination Settlement, shall be paid first in accordance with the terms of the Subordination Settlement and then Pro Rata to Holders of Senior Class HC3b Claims, if any, that remain unpaid. If all Holders of Senior Class HC3b Claims (if any) have been paid in full on account of their Senior Class HC3b Claims, (i) any additional amounts distributed to Holders of Allowed Class HC3b Claims shall be distributed to the Indenture Trustee for the account of Holders of Allowed Capital Trust Claims on account of their Capital Trust Claims in accordance with the terms of the Subordination Settlement and this Modified Plan's treatment of Allowed Class HC3b Claims, but subject to the Indenture Trustee's charging lien for payment of its Indenture Trustee Expenses, and (ii) Holders of Allowed Capital Trust Claims shall be subrogated to the distributions that the Holders of Senior Class HC3b Claims would have received on account of their Allowed Unsecured Claims against the Debtors if such Holder's Senior Class HC3b Claims had not been paid in full.

**D.    Class 4: NCFC Interests.**

1.    **Class HC4a: Series A Preferred Stock Interests.** Class HC4a, which is impaired, consists of all Series A Preferred Stock Interests. Holders of Interests in Class HC4a shall receive no distribution or dividend on account of such Interests. Subject to the provisions of Article 9.K herein, the entry of the Modified Confirmation Order shall

44

act as an order approving and effecting the cancellation as of the Original Effective Date of all shares of Series A Preferred Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Series A Preferred Stock Interests) outstanding immediately prior to the Original Effective Date without any conversion thereof or distribution with respect thereto.

2.    **Class HC4b:  Series A 510(b) Claims.**  Class HC4b, which is impaired, consists of all Series A 510(b) Claims.  Holders of Claims in Class HC4b shall receive no distribution on account of such Claims under this Modified Plan.

3.    **Class HC4c: Series B Preferred Stock Interests.**  Class HC4c which is impaired, consists of all Series B Preferred Stock Interests.  Holders of Interests in Class HC4c shall receive no distribution or dividend on account of such Interests.  Subject to the provisions of Article 9.K herein, the entry of the Modified Confirmation Order shall act as an order approving and effecting the cancellation as of the Original Effective Date of all shares of Series B Preferred Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Series B Preferred Stock Interests) outstanding immediately prior to the Original Effective Date without any conversion thereof or distribution with respect thereto.

4.    **Class HC4d:  Series B 510(b) Claims.**  Class HC4d, which is impaired, consists of all Series B 510(b) Claims.  Holders of Claims in Class HC4d shall receive no distribution on account of such Claims under this Modified Plan.

5.    **Class HC4e: Common Stock Interests, Option Interests, Warrant Interests, and Common Stock 510(b) Claims.**  Class HC4e, which is impaired, consists of all Common Stock Interests, all Option Interests, all Warrant Interests, and all

45

Common Stock 510(b) Claims.  Holders of Interests or Claims in Class HC4e shall receive no distribution or dividend on account of such Interests or Claims. Subject to the provisions of Article 9.K herein, the entry of the Modified Confirmation Order shall act as an order approving and effecting the cancellation as of the Original Effective Date of all shares of Common Stock Interests (and all securities convertible or exercisable for or evidencing any other right in or with respect to Common Stock Interests) outstanding immediately prior to the Original Effective Date without any conversion thereof or distribution with respect thereto.

E.    **Class HC7:  Other Unsecured Claims against TRS Holdings.**  Class HC7, which is impaired, consists of all Allowed Other Unsecured Claims against TRS Holdings. Each Holder of an Allowed Class HC7 Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7, and HC13 Claims.  The Determined Distribution Amount for each Allowed Class HC7 Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

F.    **Class HC10:  Unsecured Claims Against NC Credit.**

1.    **Class HC10a:  Special Deficiency Claims against NC Credit.**  Class HC10a, which is impaired, consists of all Allowed Special Deficiency Claims against NC Credit. Each Holder of an Allowed Class HC10a Claim shall receive its Pro Rata share

of the NC Credit Portion of the Litigation Proceeds based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article 4.F.1) divided by the sum of the Determined Distribution Amounts of all Allowed Class HC10 Claims. The Determined Distribution Amount for each Allowed Class HC10a Claim shall be 115% of the allowed amount of such Claim.

        2.     **Class HC10b: Other Unsecured Claims against NC Credit.** Class HC10b, which is impaired, consists of all Allowed Other Unsecured Claims against NC Credit. Each Holder of an Allowed Class HC10b Claim shall receive (i) its Pro Rata share of the NC Credit Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC10 Claims, and (ii) its Pro Rata share of the NC Credit Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC10b Claims. The Determined Distribution Amount for each Allowed Class HC10b Claim shall be 100% of the allowed amount of such Claim subject to the Intercompany Claim Protocol.

        G.    **Class HC13: Other Unsecured Claims against NC Residual IV.** Class HC13, which is impaired, consists of all Allowed Other Unsecured Claims against NC Residual IV. Each Holder of an Allowed Class HC13 Claim shall receive (i) its Pro Rata share of the Holding Company Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3, HC7, and HC13 Claims, and (ii) its Pro Rata share of the Holding Company Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class HC3b, HC7,

and HC13 Claims. The Determined Distribution Amount for each Allowed Class HC13 Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

H.    **Class HC14:  Settling Parties Claims in the Schroeder Litigation.**  Class HC14, which is impaired, shall consist of all Allowed Settling Parties Claims. Each holder of an Allowed HC14 Claim shall receive its Pro Rata share of the Settlement Payment (as defined in the Settlement Agreement).  Allowed HC14 Claims shall receive its pro rata share of the Settlement Payment under the terms of the Settlement Agreement in full and complete settlement of any and all claims it has under the New Century Benefit Plans against the Debtors and the Liquidating Trust and shall not be entitled to any further distributions under the Original Plan, this Modified Plan or from the Liquidating Trust.

I.    Class OP3: Unsecured Claims Against NCMC.

1.    **Class OP3a:  Special Deficiency Claims against NCMC.**  Class OP3a, which is impaired, consists of all Allowed Special Deficiency Claims against NCMC. Each Holder of an Allowed Class OP3a Claim shall receive its Pro Rata share, at the election or the Holder, of (i) the Operating Debtor Portion of the Litigation Proceeds or (ii) the Operating Debtor Portion of the Restatement Litigation Proceeds, in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article 4.I.1) divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims.  The Determined Distribution Amount for each Allowed Class OP3a Claim shall be, based on the election made by the Holder of such Claim, (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share

48

in the Operating Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Restatement Litigation Proceeds.  The election to be made by the Holder to share in either the (i) Operating Debtor Portion of the Litigation Proceeds or (ii) Operating Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and submitted to the Liquidating Trustee on or before the Original Effective Date, if such Claim was an Allowed Claim prior to the Original Effective Date, on or before the Modified Effective Date if such Claim became an Allowed Claim after the Original Effective Date, or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee.  In the event any Holder fails to make a timely election, such Holder shall be deemed to have elected to share in the Operating Debtor Portion of the Litigation Proceeds.

2.     **Class OP3b:  EPD/Breach Claims against NCMC.**  Class OP3b, which is impaired, consists of all Allowed EPD Breach Claims against NCMC.  Each Holder of an Allowed Class OP3b Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims.  The Determined Distribution Amount of each Allowed Class

49

OP3b Claim shall be 100% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol, a copy of which is attached hereto as Exhibit B.

3.    **Class OP3c:  Other Unsecured Claims against NCMC.**  Class OP3c, which is impaired, consists of all Allowed Other Unsecured Claims against NCMC. Each Holder of an Allowed Class OP3c Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of All Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims.  The Determined Distribution Amount for each Allowed Class OP3c Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

**J.    Class OP6:  Unsecured Claims Against NC Capital.**

1.    **Class OP6a:  Special Deficiency Claims against NC Capital.**  Class OP6a, which is impaired, consists of all Allowed Special Deficiency Claims against NC Capital. Each Holder of an Allowed Class OP6a Claim shall receive its Pro Rata share, at the election of the Holder, of (i) the Operating Debtor Portion of the Litigation Proceeds or (ii) the Operating Debtor Portion of the Restatement Litigation Proceeds, in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article 4.J.1) divided by the sum of the Determined Distribution Amounts of all

50

Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims. The Determined Distribution Amount for each Allowed Class OP6a Claim shall be, based on the election made by the Holder of such Claim, (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Restatement Litigation Proceeds. The election to be made by the Holder to share in either the (i) Operating Debtor Portion of the Litigation Proceeds or (ii) Operating Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and submitted to the Liquidating Trustee on or before the Original Effective Date, if such Claim was an Allowed Claim prior to the Original Effective Date, on or before the Modified Effective Date if such Claim became an Allowed Claim after the Original Effective Date, or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee. In the event any Holder fails to make a timely election, such Holder shall be deemed to have elected to share in the Operating Debtor Portion of the Litigation Proceeds.

2.    **Class OP6b:  EPD/Breach Claims against NC Capital.** Class OP6b, which is impaired, consists of all Allowed EPD Breach Claims against NC Capital. Each Holder of an Allowed Class OP6b Claim shall receive (i) its Pro Rata share of the NC Capital EPD/Breach Claimant Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Class OP6b Claims, and (ii) its Pro Rata share of

51

the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount of each Allowed Class OP6b Claim shall be 100% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol for purposes of receiving a Pro Rata share of the NC Capital EPD/Breach Claimant Portion of the Litigation Proceeds and shall be 50% of the damage amount determined for such Claim in accordance with the EPD/Breach Claim Protocol for purposes of receiving a distribution of its Pro Rata share of the Operating Debtor Net Distributable Assets.

3.    **Class OP6c:  Other Unsecured Claims against NC Capital.**  Class OP6c, which is impaired, consists of all Allowed Other Unsecured Claims against NC Capital. Each Holder of an Allowed Class OP6c Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount for each Allowed Class OP6c Claim shall be 100% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

K.    **Class OP9:  Unsecured Claims Against Home123.**

52

1.    **Class OP9a:  Special Deficiency Claims against Home123.**  Class OP9a, which is impaired, consists of all Allowed Special Deficiency Claims against Home123. Each Holder of an Allowed Class OP9a Claim shall receive its Pro Rata share, at the election of the Holder, of (i) the Operating Debtor Portion of the Litigation Proceeds or (ii) the Operating Debtor Portion of the Restatement Litigation Proceeds in either case based on the applicable Determined Distribution Amount of such Claim (as set forth in this Article 4.K.1) divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims.  The Determined Distribution Amount for each Allowed Class OP9a Claim shall be, based on the election made by the Holder of such Claim (a) 115% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Litigation Proceeds or (b) 130% of the allowed amount of such Claim subject to the Multi-Debtor Claim Protocol to the extent the Holder elects to share in the Operating Debtor Portion of the Restatement Litigation Proceeds.  The election to be made by the Holder to share in either the (i) Operating Debtor Portion of the Litigation Proceeds or (ii) Operating Debtor Portion of the Restatement Litigation Proceeds shall be irrevocable and shall be made in writing and submitted to the Liquidating Trustee on or before the Original Effective Date, if such Claim was an Allowed Claim prior to the Original Effective Date, on or before the Modified Effective Date if such Claim became an Allowed Claim after the Original Effective Date, or such other date as may be agreed to in writing by such Holder and the Liquidating Trustee.  In the event any Holder fails to make a timely election, such Holder

53

shall be deemed to have elected to share in the Operating Debtor Portion of the Litigation Proceeds.

2.    **Class OP9b:  Other Unsecured Claims against Home123.**  Class OP9b, which is impaired, consists of all Allowed Other Unsecured Claims against Home123. Each Holder of an Allowed Class OP9b Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims.  The Determined Distribution Amount for each Allowed Class OP9b Claim shall be 25% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

L.    **Class OP12:  Other Unsecured Claims Against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral.**  Class OP12, which is impaired, consists of all Allowed Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral. Each Holder of an Allowed Class OP12 Claim shall receive (i) its Pro Rata share of the Operating Debtor Portion of the Litigation Proceeds, based on the Determined Distribution Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP6b Claims, and (ii) its Pro Rata share of the Operating Debtor Net Distributable Assets, based on the Determined Distribution

54

Amount of such Claim divided by the sum of the Determined Distribution Amounts of all Allowed Operating Debtor Unsecured Claims other than Class OP3a, OP6a, and OP9a Claims. The Determined Distribution Amount for each Allowed Class OP12 Claim shall be 25% of the allowed amount of such Claim subject to (i) the Multi-Debtor Claim Protocol and (ii) the Intercompany Claim Protocol.

   M.    **Class AL3:  Other Unsecured Claims Against Access Lending.**  Class AL3, which is impaired, consists of all Allowed Other Unsecured Claims against Access Lending. Each Holder of an Allowed Class AL3 Claim shall receive its Pro Rata share of the Access Lending Net Distributable Assets, based on Allowed Class AL3 Claims subject to the following adjustments: (i) until Holders of Allowed Other AL3 Claims and the Holder of the Goldman AL3 Claim receive Cash equal to 30% of the allowed amounts of their Class AL3 Claims on account of such Claims, the Holder of the NCMC AL1 Claim shall receive Pro Rata distributions as though the NCMC AL3 Claim was an Allowed Class AL3 Claim in the amount of $2,383,919.92, and (ii) after Holders of Allowed Other AL3 Claims and the Holder of the Goldman AL3 Claim have received Cash equal to 30% of the allowed amount of their Class AL3 Claims on account of such Claims, the NCMC AL3 Claim shall receive Pro Rata distributions based on the NCMC AL3 Claim being an Allowed Class AL3 Claim in the amount of $3,973,199.86, and no further distributions shall be made to the Holder of the Goldman AL3 Claim on account of such Claim.  The Multi-Debtor Protocol and the Intercompany Claim Protocol do not apply to Class AL3 Claims.

## ARTICLE 5.

### ACCEPTANCE OR REJECTION
### OF THIS MODIFIED PLAN

A.    **Impaired Classes of Claims that Voted to Accept the Original Plan.**  Except as

otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on this

Modified Plan, the Classes set forth in the following table were entitled to vote to accept or reject

the Original Plan and in fact voted to accept the Original Plan.  The Bankruptcy Court has

entered an order providing that solicitation of these Classes is not required in accordance with

Section 1127 of the Bankruptcy Code to consider confirmation of the Modified Plan in

accordance with section 1126 of the Bankruptcy Code.  Such Classes will be deemed to have

accepted the Modified Plan as a result of their vote in favor of the Original Plan:

| Class | Description |
|---|---|
| Class HC3a | Special Deficiency Claims against NCFC |
| Class HC3b[1] | Other Unsecured Claims Against NCFC |
| Class HC7 | Other Unsecured Claims Against TRS Holdings |
| Class HC13 | Other Unsecured Claims against NC Residual IV |
| Class OP3a | Special Deficiency Claims against NCMC |
| Class OP3b | EPD/Breach Claims against NCMC |
| Class OP3c | Other Unsecured Claims against NCMC |
| Class OP6a | Special Deficiency Claims against NC Capital |
| Class OP6b | EPD/Breach Claims against NC Capital |
| Class OP6c | Other Unsecured Claims against NC Capital |
| Class OP9a | Special Deficiency Claims against Home123 |
| Class OP9b | Other Unsecured Claims against Home123 |
| Class OP12 | Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class AL3 | Other Unsecured Claims against Access Lending |

---

[1]    Class HC3b voted to reject the Original Plan.  However, the vast majority of Class HC3b Claimants that voted against the Original Plan are Settling Parties under the terms of this Modified Plan.  When all Settling Parties are removed from the vote tabulation for Class HC3b on the Original Plan, Class HC3b would be deemed to have accepted the Original Plan.  The Settling Parties are now classified as Class HC14 in this Modified Plan and are entitled to vote to accept or reject this Modified Plan.

B.  **Impaired Classes of Claims Entitled to Vote on this Modified Plan**.  Except

otherwise provided in the order(s) of the Bankruptcy Court pertaining to solicitation of votes on

this Modified Plan, the Classes set forth in the following table are impaired and shall be entitled

to vote to accept or reject this Modified Plan:

| Class | Description |
|---|---|
| Class HC10a | Special Deficiency Claims against NC Credit |
| Class HC10b | Other Unsecured Claims against NC Credit |
| Class HC14 | Settling Parties Claims |

Each of Classes HC10a, HC10b, and HC14 shall be considered a separate Class for

purposes of voting to accept or reject this Modified Plan.

C.  **Classes Deemed to Accept the Modified Plan**.  The Classes set forth in the

following table are unimpaired and shall be deemed to accept this Modified Plan and were

deemed to have accepted the Original Plan:

| Class | Description |
|---|---|
| Class HC1 | Priority Claims against NCFC |
| Class HC2 | Secured Claims against NCFC |
| Class HC5 | Priority Claims against TRS Holdings |
| Class HC6 | Secured Claims against TRS Holdings |
| Class HC8 | Priority Claims against NC Credit |
| Class HC9 | Secured Claims against NC Credit |
| Class HC11 | Priority Claim against NC Residual IV |
| Class HC12 | Secured Claims against NC Residual IV |
| Class OP1 | Priority Claims against NCMC |
| Class OP2 | Secured Claims against NCMC |
| Class OP4 | Priority Claims against NC Capital |
| Class OP5 | Secured Claims against NC Capital |
| Class OP7 | Priority Claims against Home123 |
| Class OP8 | Secured Claims against Home123 |
| Class OP10 | Priority Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral |
| Class OP11 | Secured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, |

57

| Class | Description |
|---|---|
| | NCM Ventures, and NCoral |
| Class AL1 | Priority Claims against Access Lending |
| Class AL2 | Secured Claims against Access Lending |

Pursuant to section 1126(f) of the Bankruptcy Code, Classes HC1, HC2, HC5, HC6, HC8, HC9, HC11, HC12, OP1, OP2, OP4, OP5, OP7, OP8, OP10, OP11, AL1, and AL2 are conclusively presumed to have accepted this Modified Plan, and the votes of Holders of Claims in such Classes therefore will not be solicited for the Modified Plan and were not solicited for the Original Plan. If and to the extent any Class identified as being unimpaired is impaired (whether as a result of the terms of this Modified Plan or any modification or amendment thereto), such Class shall be entitled to vote to accept or reject this Modified Plan.

D.    **Classes Deemed to Reject this Modified Plan.** Holders of Claims in the Classes set forth in the following table are not entitled to receive or retain any property under this Modified Plan and were not entitled to receive or retain property under the Original Plan on account of such Claims and Interests:

| Class | Description |
|---|---|
| Class HC4a | Series A Preferred Stock Interests |
| Class HC4b | Series A 510(b) Claims |
| Class HC4c | Series B Preferred Stock Interests |
| Class HC4d | Series B 510(b) Claims |
| Class HC4e | Common Stock Interests and Common Stock 510(b) Claims |

Pursuant to section 1126(g) of the Bankruptcy Code, Classes HC4a, HC4b, HC4c, HC4d, and HC4e are impaired and are conclusively presumed to have rejected this Modified Plan, and the votes of Holders of Claims and Interests in such Classes therefore will not be solicited for this Modified Plan and were not solicited for the Original Plan.

E.    **Nonconsensual Confirmation.**  As set forth in Article 16 hereof, if any impaired Class fails to accept this Modified Plan, the Plan Proponents of the Modified Plan intend to request that the Bankruptcy Court confirm this Modified Plan as a Cramdown Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to that Class.

F.    **Removal of Debtors.**  If this Modified Plan cannot be confirmed with respect to one or more Debtors, the Plan Proponents of the Modified Plan may remove such Debtor(s) from this Modified Plan.  In such event, the Classes pertaining to such Debtor(s) shall be removed from this Modified Plan, and the Modified Plan shall omit any treatment of the assets and liabilities of such Debtor(s).  The removal of any Debtor from this Modified Plan shall not affect this Modified Plan with respect to any other Debtor except as set forth in Article 10.I of this Modified Plan.

### ARTICLE 6.

### THE MULTI-DEBTOR CLAIM PROTOCOL FOR TREATMENT OF CLAIMS AGAINST MULTIPLE DEBTORS

A.    **Allowed Unsecured Claims for Which More than One Holding Company Debtor Is Jointly and/or Severally Liable.**  Where a Creditor holds Allowed Holding Company Debtor Unsecured Claims for which more than one Holding Company Debtor is jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of one of its Allowed Holding Company Debtor Unsecured Claims in the amount of the highest Determined Distribution Amount provided for in the Classes in which the Creditor's Allowed Holding Company Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Holding Company Debtor Unsecured Claims.

59

B.    **Allowed Unsecured Claims for Which More than One Operating Debtor Is Jointly and/or Severally Liable.**  Where a Creditor holds Allowed Operating Debtor Unsecured Claims for which more than one Operating Debtor is jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of one its Allowed Operating Debtor Unsecured Claims in the amount of the highest Determined Distribution Amount provided for in the Classes in which the Creditor's Allowed Operating Debtor Unsecured Claims are classified and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Operating Debtor Unsecured Claims; provided however, that where a Creditor holds Allowed Operating Debtor Unsecured Claims, other than Allowed Class OP3a Claims, Allowed OP6a Claims, and Allowed Class OP9a Claims, for which each of NCMC, NC Capital, and Home123 are jointly and/or severally liable, such Creditor shall be (i) assigned a Determined Distribution Amount on account of its Allowed Unsecured Claim against NCMC of 130% of the amount of such Allowed Unsecured Claim and (ii) assigned a Determined Distribution Amount of 0% of the amount of all of its other Allowed Operating Debtor Unsecured Claims.

C.    **Separate Application to Debtor Groups.**    The adjustment of Determined Distribution Amounts of a particular Creditor's Allowed Unsecured Claims against Debtors in one Debtor Group pursuant to Articles 6.A and 6.B of this Modified Plan does not affect the Determined Distribution Amounts of such Creditor's Allowed Unsecured Claims, if any, against Debtors in another Debtor Group.

D.    **Inapplicable to Claims Against Access Lending or NC Credit.**    The Multi-Debtor Claim Protocol does not apply to Claims against Access Lending or NC Credit.

E.    **Inapplicable to Intercompany Claims.**  The Multi-Debtor Claim Protocol does not apply to Intercompany Claims.

### ARTICLE 7.

### THE INTERCOMPANY PROTOCOL
### FOR TREATMENT OF INTERCOMPANY CLAIMS

A.    **Claims of Holding Company Debtors Against Other Holding Company Debtors.**  The Determined Distribution Amount for each Allowed Claim held by a Holding Company Debtor against another Holding Company Debtor shall be 0% of the allowed amount of such Claim and, therefore, no distribution will be made under this Modified Plan on account of such Claim.

B.    **Claims of Operating Debtors Against Other Operating Debtors.**  The Determined Distribution Amount for each Allowed Claim held by an Operating Debtor against another Operating Debtor shall be 0% of the allowed amount of such Claim and, therefore, no distribution will be made under this Modified Plan on account of such Claim.

C.    **Claims of Holding Company Debtors and NC Credit Against Operating Debtors.**  The Determined Distribution Amount for each Allowed Claim held by a Holding Company Debtor or NC Credit against an Operating Debtor shall be 50% of the allowed amount of such Claim; provided, however, that any recovery on an Allowed Claim held by a Holding Company Debtor or NC Credit against an Operating Debtor shall be limited to the amount that would be distributed on account of such Claim if the Determined Distribution Amounts for Allowed Claims in Classes OP6b, OP9b, and OP12 were 100% of the allowed amount of Claims in those Classes.

D.    **Claims of Operating Debtors and NC Credit Against Holding Company Debtors.**  The Determined Distribution Amount for each Allowed Claim held by an Operating

61

Debtor and NC Credit against a Holding Company Debtor shall be 100% of the allowed amount of such Claim.

**ARTICLE 8.**

**MEANS OF IMPLEMENTING THIS MODIFIED PLAN**

A.    **Implementation of this Modified Plan.**  The Plan Proponents of the Modified Plan propose that the Modified Plan be implemented and consummated through the means contemplated by sections 1123(a)(5)(B), (D), (E), (F) and (G) and 1123(b)(2), (b)(3) and (b)(4) of the Bankruptcy Code on and after the Modified Effective Date, provided, however, as a result of the Confirmation of the Original Plan and the lack of a stay of the implementation of the Original Plan, certain acts have occurred on or after the Original Effective Date pursuant to the terms of the Original Plan that will be incorporated and adopted pursuant to the terms of this Modified Plan.  To the extent not inconsistent with the Reversal Order or this Modified Plan, all actions taken by the Liquidating Trustee and the Plan Administrator pursuant to the Original Plan will be deemed to have occurred on or after the Original Effective Date and be authorized, incorporated and adopted by this Modified Plan.

B.    **Corporate Action.**  (a)  On the Original Effective Date, the matters under the Original Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to the Original Plan, which shall be adopted in this Modified Plan, shall be deemed to have been authorized by the Original Confirmation Order and adopted by the Modified Confirmation Order and to have occurred and remain in effect from and after the Original Effective Date without any further action by the Bankruptcy Court or the officers or directors of the Debtors or their subsidiaries.  The officers

62

and directors of the Debtors as of the Original Effective Date ceased to serve immediately after the Original Effective Date.

(b)    On the Modified Effective Date, the matters under this Modified Plan involving or requiring corporate action of the Debtors or their subsidiaries, including, but not limited to, actions requiring a vote or other approval of the board of directors or shareholders and execution of all documentation incident to this Modified Plan shall be authorized by the Liquidating Trustee as sole officer and director of each of the Debtors, pursuant to the terms of the Status Quo Order or the Modified Confirmation Order and to have occurred and remain in full force and effect from and after the Modified Effective Date without any further actions by the Bankruptcy Court.

C.    **Dissolution of Debtors Other than Access Lending.**  Immediately after the Original Effective Date or the Modified Effective Date, as appropriate, the Liquidating Trustee shall be authorized to take, in his sole and absolute discretion, all actions reasonably necessary to dissolve the Debtors (other than Access Lending) and their subsidiaries under applicable laws, including without limitation under the laws of the jurisdictions in which they may be organized or registered, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation; provided, however, (i) after all distributions have been made to Holders of Allowed Claims against NCFC, the Liquidating Trustee shall file a certificate of dissolution in the applicable state of incorporation for NCFC and NCFC shall dissolve and cease to exist; (ii) that the Liquidating Trustee shall not be compelled to dissolve any of the Debtors (other than NCFC) or their subsidiaries if to do so would unduly burden the Liquidating Trust; and (iii) no assets shall revest in the Debtors (other than Access Lending).  Other than with respect to NCFC, which shall be

63

dissolved as set forth in this Article 8.C, the Liquidating Trustee shall have no liability for using his discretion to dissolve or not dissolve any of the Debtors or their subsidiaries. Pursuant to the terms of the Status Quo Order, the Liquidating Trustee shall continue to act as sole officer and director of each of the Debtors and shall be authorized to prepare, propose and implement this Modified Plan.

     **D.**    **Dissolution of the Committee.** On the Original Effective Date, the Committee dissolved automatically, whereupon its members, Professionals and agents were released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, all of which shall remain in full force and effect according to their terms and such parties shall continue to have a right to be heard with respect to any and all (i) applications for Professional Fee Claims; (ii) requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases; and (iii) any motions or other actions seeking enforcement or implementation of the provisions of the Original Plan or the Original Confirmation Order.

     **E.**    **Vesting of Assets in Liquidating Trust; Assumption of Plan Obligations.**

       1.    *Distribution to Liquidating Trust.* On the Original Effective Date, the Debtors other than Access Lending distributed and were deemed for all purposes to have distributed all Assets of the Debtors, including Access Lending Interests but excluding the Assets of Access Lending, for the benefit of (i) the Holders of Holding Company Debtor Unsecured Claims, (ii) the Holders of NC Credit Unsecured Claims and (iii) the Holders of Operating Debtor Unsecured Claims, whether or not such Claims are Allowed

Claims as of the Original Effective Date, to the Liquidating Trust. Since the transfer of the Liquidating Trust Assets, the Debtors have no further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust. In accordance with the terms of the Status Quo Order, the Bankruptcy Court continued the existence of the Liquidating Trust and preserved the transfer of all the Debtors' Assets to the Liquidating Trust pending further order of the Bankruptcy Court on the Reversal Order. Under the terms of this Modified Plan and the Modified Confirmation Order, the transfer of the Assets of the Debtors to the Liquidating Trust shall be adopted and confirmed as of the Original Effective Date.

    2.    *Transfer of Assets.* On the Original Effective Date and subject to the Status Quo Order and the Modified Confirmation Order, the Liquidating Trust Assets, as described in paragraph (E)(I) above, were conveyed directly by the Debtors other than Access Lending to the Liquidating Trust on behalf of the beneficiaries thereof.

    3.    *Assumption of Original Plan Obligations.* Effective as of the Original Effective Date, all of the Debtors' rights and obligations with respect to each A/P/S Claim (other than A/P/S Claims against Access Lending) and all other rights and obligations of the Debtors (other than Access Lending) set forth in the Original Plan were assigned to and assumed by the Liquidating Trust, which assumption and assignment shall continue to be effective as of the Original Effective Date under this Modified Plan. The Liquidating Trust shall continue to be deemed to have assumed and be responsible for any A/P/S Claims that arose during the period from the Original Effective Date through the Modified Effective Date or thereafter as if such obligations existed on the

65

Original Effective Date but only to the extent such expenses would be valid Trust Operating Expenses under the Original Plan.

4. *Treatment of Transfer of Assets.* For federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Holders of Holding Company Debtor Unsecured Claims, the Holders of NC Credit Unsecured Claims and the Holders of Operating Debtor Unsecured Claims) shall treat the transfer of the Liquidating Trust Assets, which term, for purposes of this Article 8.E.4 only, shall include the Causes of Action (other than Access Lending Causes of Action), to the Liquidating Trust in accordance with Article 8.E.1 above, as:

(a) first, a transfer of such Assets to the Holders of Holding Company Debtor Unsecured Claims, the Holders of NC Credit Unsecured Claims and Holders of Operating Debtor Unsecured Claims, whether or not such Claims are Allowed as of the Original Effective Date, with each such Holder receiving an undivided interest in the specific Assets, the liquidation proceeds of which such Holder is entitled to share in pursuant to Article 4 of this Modified Plan, having a value that equals, as nearly as possible, to the amount such Holder would receive if, on the Original Effective Date, all Disputed Claims were treated as Allowed Claims, and all Assets were liquidated, converted to cash and distributed to Holders of Allowed Unsecured Claims in accordance with the Modified Plan; and

(b) second, a transfer to the Liquidating Trust by each such Holder of the undivided interest in that portion of the Liquidating Trust Assets such Holder was deemed to receive pursuant to subparagraph (a), above, in exchange for a beneficial interest in the Liquidating Trust. Each such Holder, as a holder of a

beneficial interest in the Liquidating Trust, shall be treated as the grantor and owner of the undivided interest of that portion of the Liquidating Trust Assets such Holder was deemed to transfer to the Liquidating Trust pursuant to this subparagraph (b) as of the Original Effective Date.

**F.    Liquidating Trust.**

1.    *Formation of Liquidating Trust.* The Liquidating Trust was formed on the Original Effective Date in accordance with the terms of the Original Plan and is subject to the provisions of the Status Quo Order pending further order of the Bankruptcy Court. The Liquidating Trust shall continue to exist and operate in accordance with this Modified Plan. The Holders of Holding Company Debtor Unsecured Claims, the Holders of the NC Credit Unsecured Claims and the Holders of Operating Debtor Unsecured Claims shall be the sole beneficiaries of the Liquidating Trust. Holders of Unsecured Claims against Access Lending shall not be beneficiaries of the Liquidating Trust.

2.    *Liquidating Trust Agreement.* The Liquidating Trust Agreement was executed on the Original Effective Date and contains provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Liquidating Trustee and to ensure the treatment of the Liquidating Trust as a liquidating trust for federal income tax purposes. The Liquidating Trust Agreement shall continue to govern the Liquidating Trust pursuant to this Modified Plan. In the event a provision of this Modified Plan, the Original Plan, the Modified Confirmation Order or the Original Confirmation Order conflicts with a provision of the Liquidating Trust Agreement, the provision of the Liquidation Trust Agreement shall control.

67

3.    *Appointment of the Liquidating Trustee.*

(a)    Under the terms of the Original Plan and the Original Confirmation Order, Alan M. Jacobs was appointed by the Bankruptcy Court as the Liquidating Trustee, and such appointment shall be confirmed by confirmation of this Modified Plan, and he began to serve as the Liquidating Trustee on the Original Effective Date. The Liquidating Trustee was permitted to act in accordance with the terms of the Liquidating Trust Agreement from the Original Confirmation Date (or such earlier date us authorized by the Committee) through the Original Effective Date and was entitled to seek compensation in accordance with the terms of the Liquidating Trust Agreement and the Original Plan.

(b)    The Original Confirmation Order was reversed and remanded to the Bankruptcy Court by Reversal Order on June 16, 2009 by the District Court. On July 27, 2009, the Bankruptcy Court entered the Status Quo Order which preserved the authority of the Liquidating Trustee over the Liquidating Trust Assets until entry of the Modified Confirmation Order or further order of the Bankruptcy Court.

(c)    The Liquidating Trustee shall be deemed the Estates' representative (including, with respect to Reorganized Access Lending, in his capacity as Plan Administrator) in accordance with the provisions of the Bankruptcy Code, including but not limited to section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in this Modified Plan and the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704, 108 and 1106 of the

Bankruptcy Code and Rule 2004 of the Bankruptcy Rules (including without limitation commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

(d)    The Modified Confirmation Order shall state that without the permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or proceeding shall be commenced against the Liquidating Trustee in his official capacity from and after the Original Effective Date, with respect to his status, duties, powers, acts, or omissions as Liquidating Trustee in any forum other than the Bankruptcy Court.

(e)    The Liquidating Trustee shall at all times maintain a bond acceptable to the Plan Advisory Committee and the U.S. Trustee, or approved by the Bankruptcy Court.

4.    *Term and Compensation of the Liquidating Trustee.*

(a)    The Liquidating Trustee shall initially be compensated as set forth in the Liquidating Trust Agreement (which compensation may be revised by the Liquidating Trust with the consent of the Plan Advisory Committee) and shall not be required to file a fee application to receive compensation. The Liquidating Trustee's compensation shall, however, be subject to the review and, if appropriate, objection of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement.

69

(b)    The Liquidating Trustee may be removed or replaced at any time by the Plan Advisory Committee in accordance with the procedures in the Liquidating Trust Agreement.  In the event of the death or incompetency (in the case of a Liquidating Trustee that is a natural person), dissolution (in the case of a Liquidating Trustee that is a corporation or other entity), bankruptcy, insolvency, resignation, or removal of the Liquidating Trustee, the Plan Advisory Committee shall have the authority to appoint a successor trustee as set forth in the Liquidating Trust Agreement.

5.    *Liquidation of Liquidating Trust Assets; Responsibilities of Liquidating Trustee.*

(a)    The Liquidating Trustee shall be vested with the rights, powers and benefits set forth in the Liquidating Trust Agreement.  The Liquidating Trustee shall be subject to the directions of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement.  Notwithstanding anything to the contrary contained in this Modified Plan, the Original Plan, the Modified Confirmation Order or the Original Confirmation Order, any act by the Liquidating Trustee, including discretionary acts, will require the consent of or consultation with the Plan Advisory Committee in accordance with the terms of the Liquidating Trust Agreement.  If there is any inconsistency or ambiguity in the Modified Plan, Original Plan, Modified Confirmation Order or Original Confirmation Order or the Liquidating Trust Agreement in respect of the Plan Advisory Committee's role in the Liquidating Trustee's authority to act, the provision of the Liquidating Trust Agreement shall control.

70

(b)    The Liquidating Trustee, in his reasonable business judgment, and in an expeditious but orderly manner, shall liquidate and convert to cash the Liquidating Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidating Trust. The liquidation of the Liquidating Trust Assets may be accomplished either through the sale of Liquidating Trust Assets (in whole or in combination), including the sale of Causes of Action, or through prosecution or settlement of any Causes of Action, or otherwise.

(c)    The Liquidating Trustee (including, with respect to Reorganized Access Lending, in his capacity as Plan Administrator) shall be expressly authorized to do the following:

(i)    Institute, prosecute, collect, compromise and settle any Causes of Actions in accordance herewith and without further approval of or application to the Bankruptcy Court, except as otherwise provided herein;

(ii)    file, prosecute, compromise and settle objections to Claims without further approval of or application to the Bankruptcy Court, except as otherwise provided herein;

(iii)    open and maintain bank accounts in the name of the Liquidating Trust, draw checks and drafts thereon by the sole signature of the Liquidating Trustee, and terminate such accounts as the Liquidating Trustee deems appropriate;

(iv)    execute any documents, pleadings, and take any other actions related to, or in connection with, the liquidation of the Assets and

71

the exercise of the Liquidating Trustee's powers granted herein, including, but not limited to the exercise of the Debtors' or the Committee's respective rights to conduct discovery and oral examination of any party under Rule 2004 of the Federal Rules of Bankruptcy Procedure;

(v)     hold legal title to any and all rights of the beneficiaries in or arising from the Assets, including but not limited to, the right to vote any claim or interest in an unrelated case under the Bankruptcy Code and receive any distribution thereon;

(vi)     protect and enforce the rights to the Assets vested in the Liquidating Trustee by this Modified Plan as of the Original Effective Date by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(vii)     deliver distributions as may be authorized by this Modified Plan;

(viii)     file, if necessary, any and all tax returns with respect to the Liquidating Trust, pay taxes, if any, properly payable by the Liquidating Trust, and make distributions to the beneficiaries net of such taxes, and comply with the requirements of Article 4 hereof;

(ix)     make all necessary filings in accordance with any applicable law, statute or regulation;

(x)     determine and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

72

(xi)    invest moneys received by the Liquidating Trust or otherwise held by the Liquidating Trust in accordance with Article 8.F.8 of this Modified Plan;

(xii)    utilize the Liquidating Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs necessary or advisable to insure the acts and omissions of the Liquidating Trustee, the Plan Advisory Committee and the members of the Plan Advisory Committee; and

(xiii)    prepare and report telephonically, and if requested by the Plan Advisory Committee, in writing or in person, a monthly report of the status of the process of winding down the Estates including Causes of Action.

(d)    The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

6.    *Valuation of Assets.*  As soon as practicable after the Modified Effective Date, the Liquidating Trustee shall make a good faith determination of the fair market value of the Liquidating Trust Assets as of the Original Effective Date.  This valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Holders of Holding Company Debtor Unsecured Claims, the Holders of NC Credit Unsecured Claims and the Holders of Operating Debtor Unsecured Claims) for all federal and state income tax purposes.

7.    *Payments by the Liquidating Trust.*  The Liquidating Trust shall make distributions to Holders of Allowed Claims in accordance with Article 9 of this Modified Plan.

8.    *Investment Powers of the Liquidating Trustee and Permitted Cash Expenditures.*  All funds held by the Liquidating Trustee shall be invested in Cash or short-term highly liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Liquidating Trust Agreement; provided, however, that the right and power of the Liquidating Trustee to invest Liquidating Trust Assets, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power that a liquidating trust is permitted to exercise pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.  The Liquidating Trustee may expend the cash of the Liquidating Trust (x) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Liquidating Trust during liquidation, (y) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidating Trust) and (z) to satisfy other respective liabilities incurred by the Liquidating Trust in accordance with this Modified Plan from and after the Original Effective Date or the Liquidating Trust Agreement.

9.    *Reporting Duties.*

(a)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the

74

Liquidating Trustee), the Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trustee shall also send to each holder of a beneficial interest in the Liquidating Trust an annual statement setting forth the holder's share of items of income, gain, loss, deduction or credit and provide to all such holders information for reporting such items on their federal income tax returns, as appropriate.

(b)    Allocations of Liquidating Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of the beneficial interests in the Liquidating Trust (treating any holder of a Disputed Claim, for this purpose, as a current holder of a beneficial interest in the Liquidating Trust entitled to distributions), taking into account all prior and concurrent distributions from the Liquidating Trust (including all distributions held in reserve pending the resolution of Disputed Claims). Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. For this purpose, the tax book value of the Liquidating Trust Assets shall equal their fair market value on the Original Effective Date or, if later, the date such assets were acquired by the Liquidating Trust, adjusted in either case in

75

accordance with tax accounting principles prescribed by the IRC, the regulations and other applicable administrative and judicial authorities and pronouncements.

(c)     The Liquidating Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

10.     *Registry of Beneficial Interests.*  To evidence each holder's beneficial interests in the Liquidating Trust, the Liquidating Trustee shall maintain a registry of holders.

11.     *Non-Transferable.*  Upon issuance thereof, interests in the Liquidating Trust shall be non-transferable, except with respect to a transfer by will or under the laws of descent and distribution.  Any such transfer, however, shall not be effective until and unless the Liquidating Trustee receives written notice of such transfer.

12.     *Termination.*  The Liquidating Trust shall terminate after its liquidation, administration and distribution of the Liquidating Trust Assets in accordance with this Modified Plan and its full performance of all other duties and functions set forth herein or in its Liquidating Trust Agreement.  The Liquidating Trust shall terminate no later than the fifth (5th) anniversary of the Original Effective Date; provided, however, that, within a period of six (6) months prior to such termination date, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Liquidating Trust if it is necessary to facilitate or complete the liquidation of the Liquidating Trust Assets administered by the Liquidating Trust.  Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within six (6) months prior to the expiration of each extended term; provided, however, that the

76

aggregate of all such extensions shall not exceed three (3) years, unless the Liquidating Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations 301.7701-4(d) for federal income tax purposes.

13.    *Purpose of the Liquidating Trust.*    The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.    Subject to definitive guidance from the IRS, all parties shall treat the Liquidating Trust as a liquidating trust for all federal income tax purposes.    The Liquidating Trust shall not be deemed to be the same legal entity as any of the Debtors, but only the assignee of the assets and liabilities of the Debtors and a representative of the Estates for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code.

G.    **Plan Advisory Committee.**

1.    *Appointment.*    On the Original Effective Date, the Plan Advisory Committee was appointed and adopted bylaws to govern the actions of the Plan Advisory Committee.    Such appointment and actions shall be confirmed by confirmation of this Modified Plan.

2.    *Membership.*    The Plan Advisory Committee consists of five (5) members of the Committee chosen from those members of the Committee that agreed to serve on the Plan Advisory Committee. The Plan Advisory Committee was constituted and began to act as the Plan Advisory Committee on the Original Effective Date and pursuant to the Status Quo Order continues to oversee the actions of the Liquidating Trustee in

77

accordance with the terms of the Liquidating Trust Agreement pending further order of the Bankruptcy Court. In the event of the resignation of a member of the Plan Advisory Committee, the remaining members shall use reasonable efforts to designate a successor from among the Holders of Unsecured Claims and shall use reasonable efforts to maintain such composition of membership as existed prior to resignation. Unless and until such vacancy is filled, the Plan Advisory Committee shall function in the interim with such reduced membership.

3.    *Fiduciary Duties.*    The fiduciary duties, as well as the privileges, immunities, and protections, that applied to the Committee prior to the Original Effective Date shall apply to the Plan Advisory Committee. The duties and powers of the Plan Advisory Committee shall terminate upon the termination of the Liquidating Trust.

4.    *Rights and Duties.*    The Plan Advisory Committee's role shall be to advise and approve the actions of the Liquidating Trustee as more particularly set forth in the Liquidating Trust Agreement. The Plan Advisory Committee shall have the rights and duties set forth in the Liquidating Trust Agreement, including without limitation:

(a)    to terminate the Liquidating Trustee with or without cause and upon such termination or upon the resignation, death, incapacity or removal of the Liquidating Trustee, to appoint a successor Liquidating Trustee; provided, that the Plan Advisory Committee shall file with the Bankruptcy Court a notice appointing such successor trustee;

(b)    to approve any release or indemnity in favor of any third party granted or agreed to by the Liquidating Trustee other than as set forth in this Modified Plan;

(c)    to authorize the Liquidating Trustee to commence or continue to prosecute any Cause of Action including, in the Liquidating Trustee's capacity as Plan Administrator, any Access Lending Cause of Action;

(d)    to approve the settlement of any Cause of Action if the amount sought to be recovered by the Liquidating Trustee in the complaint or other document initiating or evidencing such Cause of Action exceeds $250,000;

(e)    to approve the allowance of any Disputed Claim if the final allowed amount of such Claim exceeds $100,000;

(f)    to approve the sale of any Assets by the Liquidating Trustee;

(g)    with respect to each six month period, to approve any budget for the Administrative Fund prepared by the Liquidating Trustee in respect of the Trust Operating Expenses and in connection with Causes of Action and to approve any additional funding of the Administrative Fund;

(h)    in addition to the mandatory distributions required under this Modified Plan, to approve the making of interim distributions if such distributions are warranted and economical;

(i)    to review and object to fees and expenses of professionals retained by the Liquidating Trust; and

(j)    to approve of any investment of Cash or other Liquidating Trust Assets pending distributions to holders of the beneficial interests.

5.    *No Compensation.* Except for the reimbursement of reasonable actual costs and expenses incurred in connection with their duties as members of the Plan Advisory Committee, including reasonable attorneys fees subject to a cap to be

established by the Plan Advisory Committee in its discretion, the members of the Plan Advisory Committee shall serve without compensation. Reasonable expenses, as set forth in this Article 8.G.5, incurred by members of the Plan Advisory Committee may be paid by the Liquidating Trust without need for approval of the Bankruptcy Court.

   6. *Objection to Fees.* The Plan Advisory Committee shall have ten (10) days, or such other period as determined by the Plan Advisory Committee and the Liquidating Trustee, from the delivery of a fee statement to object to the fees of any professional retained by either the Liquidating Trust or the Plan Advisory Committee by giving notice of any such objection to the professional seeking compensation or reimbursement. For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is made shall be submitted to the Bankruptcy Court for resolution. The uncontested portion of each invoice shall be paid within forty (40) days after its delivery to the Plan Advisory Committee and the Liquidating Trustee.

  **H.** **Liability, Indemnification.** Neither the Liquidating Trustee (including in his capacity as Plan Administrator), the Plan Advisory Committee, their respective members, designees or professionals, or any duly designated agent or representative of the Liquidating Trustee or the Plan Advisory Committee, nor their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of such Liquidating Trustee or Plan Advisory Committee, nor shall such Liquidating Trustee (including in his capacity as Plan Administrator), or any member of the Plan Advisory Committee, be liable for any act or omission taken or omitted to be taken in his capacity as Liquidating Trustee or Plan Administrator, or as a member of the Plan Advisory Committee, respectively, other than for

specific acts or omissions resulting from such Liquidating Trustee's or such member's willful misconduct, gross negligence or fraud. The Liquidating Trustee (including in his capacity as Plan Administrator), or the Plan Advisory Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, neither the Liquidating Trustee (including in his capacity as Plan Administrator) or the Plan Advisory Committee shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Liquidating Trustee (including in his capacity as Plan Administrator) or Plan Advisory Committee or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or fraud. The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee and Plan Advisory Committee and its members, designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, without limitation, reasonable attorneys' fees, disbursements, and related expenses) which such parties may incur or to which such parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against such parties arising out of or due to their acts or omissions, or consequences of such acts or omissions, with respect to the implementation or administration of the Liquidating Trust or the Original Plan or Modified Plan or the discharge of their duties hereunder; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of

willful misconduct, gross negligence, or fraud. The protections provided in this section shall be applicable to the Liquidating Trustee (including in his capacity as Plan Administrator and sole officer and director), the Plan Advisory Committee, their respective members, designees or professionals or any duly designated agent or representative or employee in the negotiation, implementation and confirmation of this Modified Plan from and after the Original Effective Date.

I.    **Retention of Professionals.**

1.    *Liquidating Trust Professionals.*

(a)    The Liquidating Trustee may retain professionals, including but not limited to, counsel, accountants, investment advisors, auditors, professionals from the Liquidating Trustee's own firm, and other agents on behalf of the Liquidating Trust as necessary or desirable to carry out the obligations of the Liquidating Trustee hereunder and under the Liquidating Trust Agreement. More specifically, the Liquidating Trustee may retain counsel in any matter related to its administration, including counsel that has acted as counsel for the Debtors, the Committee, or any of the individual members of the Committee in the Chapter 11 Cases.

(b)    Prior to the Original Effective Date, the Committee approved a budget for the six (6) month period beginning on the Original Effective Date, on a professional-by-professional basis, for professional fees for services to be rendered to the Liquidating Trust, which budget may be altered from time to time by the Plan Advisory Committee in accordance with the Liquidating Trust Agreement provided that any fees and expenses of professionals retained by the

82

Liquidating Trust that have been incurred prior to the date of the modification of the budget shall constitute budgeted amounts. Except with respect to services rendered and expenses incurred in connection with Fee Applications pending on the Original Effective Date or filed after the Original Effective Date, the Professionals retained by the Debtors or the Committee shall only be entitled to compensation for services performed and expenses incurred after the Original Effective Date to the extent, if any, of the amount budgeted for each respective Professional. Following the Original Effective Date, the Liquidating Trustee may pay, without application to the Bankruptcy Court or any other court of competent jurisdiction, such professionals retained by the Liquidating Trust in accordance with agreements that the Liquidating Trustee determines to be reasonable. The Plan Advisory Committee shall approve in advance the Liquidating Trustee's retention of professionals and their compensation arrangements.

2.    *Plan Advisory Committee Professionals.*  The Plan Advisory Committee shall have the right to retain counsel of its choice in the event of a dispute or conflict with the Liquidating Trustee or for other purposes set forth in the Liquidating Trust Agreement and the reasonable fees and expenses of such counsel shall be paid by the Liquidating Trust.

J.    **Preservation of All Causes of Action.**  Except as otherwise provided in the Original Plan or the Modified Plan or in any contract, instrument, release or agreement entered into in connection with the Original Plan or Modified Plan, in accordance with the provisions of the Bankruptcy Code, including but not limited to section 1123(b) of the Bankruptcy Code, as of the Original Effective Date the Liquidating Trustee (including, with respect to Reorganized

83

Access Lending, in his capacity as Plan Administrator) shall be vested with, retain, and may exclusively enforce and prosecute any claims or Causes of Action that the Debtors or the Estates may have against any Person or entity. The Liquidating Trustee may pursue such retained claims (other than those of Access Lending) or Causes of Action (other than Access Lending Causes of Action) in accordance with the best interests of the creditors of Debtors other than Access Lending, the Estates (other than the Estate of Access Lending), or the Liquidating Trust. The Plan Administrator may, as of the Original Effective Date, pursue such retained claims of Access Lending or Access Lending Causes of Action in accordance with the best interests of the creditors of Access Lending, the Estate of Access Lending, or Reorganized Access Lending.

     **K.**    **Successors.** The Liquidating Trust shall, as of the Original Effective Date, be the successor to the Debtors (other than Access Lending) and their Estates for the purposes of sections 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Causes of Action and other litigation-related matters. The Liquidating Trust shall, as of the Original Effective Date, succeed to the attorney-client privilege of the Debtors (other than Access Lending) and their Estates with respect to all Causes of Action (other than Access Lending Causes of Action) and other litigation-related matters, and the Liquidating Trustee may waive the attorney-client privilege with respect to any Cause of Action or other litigation-related matter, or portion thereof, in the Liquidating Trustee's discretion. Reorganized Access Lending shall, as of the Original Effective Date, be the successor to Access Lending and its Estate for the purposes of sections 1123, 1129, and 1145 of the Bankruptcy Code and with respect to all pending Access Lending Causes of Action and other litigation-related matters. Reorganized Access Lending shall as of the Original Effective Date succeed to the attorney-client privilege of Access Lending and its Estate with respect to all Access Lending Causes of Action and other litigation-related

84

matters, and the Liquidating Trustee, in its capacity as Plan Administrator, may waive the attorney-client privilege with respect to any Access Lending Causes of Action or other litigation-related matter, or portion thereof, in the Liquidating Trustee's discretion.

### ARTICLE 9.

### DISTRIBUTION UNDER THIS MODIFIED PLAN

**A.    Timing of Distributions.**

1.    *Distributions on Account of Allowed A/P/S Claims.*    The Liquidating Trustee shall pay any Allowed A/P/S Claim against Debtors other than Access Lending from the Liquidating Trust Assets, except as otherwise provided in this Modified Plan, as soon as practicable after the later of (a) the Modified Effective Date and (b) the date upon which any such Claim becomes an Allowed Claim; provided, however, to the extent the Liquidating Trustee has paid any Allowed A/P/S Claim subsequent to the Original Effective Date such payment shall be deemed adopted and authorized pursuant to the terms of this Modified Plan.

2.    *Interim Distributions an Account of Allowed Unsecured Claims.*    Except as provided in the Settlement Agreement with respect to the Class HC14 Claims, subject to approval of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement and pursuant to the calculations set forth in Article 9.C of this Modified Plan, (a) the Liquidating Trustee shall make an interim distribution at least annually of its net income and the net proceeds from the sale of Liquidating Trust Assets provided that any such distribution is not unduly burdensome to the Liquidating Trust, and (b) shall have the right to make more frequent interim distributions, to Holders of Allowed Holding Company Debtor Unsecured Claims, Holders of Allowed NC Credit Claims and Holders of Allowed Operating Debtor Unsecured Claims if the Liquidating Trustee determines

85

that such interim distributions are warranted and economical; provided, however, that any
such distribution shall only be made if (i) the Administrative Fund and the A/P/S Claims
Reserve are fully funded; (ii) with respect to interim distributions to Holders of Allowed
Unsecured Claims against Holding Company Debtors, the Holding Company Debtor
Claims Reserve is fully funded and will remain fully funded after such interim
distributions are made; (iii) with respect to interim distributions to Holders of Allowed
Unsecured Claims against NC Credit, the NC Credit Claims Reserve is fully funded and
will remain fully funded after such interim distributions are made; (iv) with respect to
interim distributions to Holders of Allowed Unsecured Claims against Operating Debtors,
the Operating Debtor Claims Reserve is fully funded and will remain fully funded after
such interim distributions are made; (v) the payments are made in accordance with the
terms of the Settlement Agreement; and (vi) the Liquidating Trustee retains amounts
reasonably necessary to meet contingent liabilities, to maintain the value of the
Liquidating Trust Assets during liquidation, and to satisfy other liabilities or expenses
incurred by the Liquidating Trust in accordance with this Modified Plan or the
Liquidating Trust Agreement.  This provision shall be interpreted to be consistent with
Revenue Procedure 94-45 § 3.10.

    3.    *Final Distributions on Allowed Unsecured Claims.*  Notwithstanding
anything else in this Modified Plan, upon the settlement and satisfaction of all A/P/S
Claims, the settlement and satisfaction of all Claims against Access Lending, the
dissolution of Reorganized Access Lending and the distribution in liquidation of all
remaining Assets of Reorganized Access Lending to the Liquidating Trust, the
completion of the prosecution and/or settlement of all objections to all other Claims and

the Causes of Action, and the completion of the sale and/or liquidation of all Assets, the Liquidating Trustee shall distribute, as soon as practicable, all remaining Liquidating Trust Assets pursuant to the terms of this Modified Plan using the calculations set forth in Article 9.C of this Modified Plan.

**B.** **Reserves.**

1.    *Administrative Fund.*  On the Original Effective Date, the Liquidating Trustee established the Administrative Fund.  The initial amount of the Administrative Fund was based on the Liquidating Trustee's good faith estimate of the cost necessary to complete the Liquidating Trust's obligations under the Original Plan and the Liquidating Trust Agreement and included the amount budgeted for the Liquidating Trust's professionals pursuant to Article 8.I.1 of the Original Plan.  The Liquidating Trustee shall continue to maintain such Administrative Fund and shall review the Administrative Fund as of the Modified Effective Date to determine if any changes are required to the Administrative Fund to comply with Article 8.I.1 of this Modified Plan.  The Liquidating Trust shall pay all costs and expenses related to carrying out his obligations under this Modified Plan and the Liquidating Trust Agreement, from and after the Original Effective Date, from the Administrative Fund and, in the Liquidating Trustee's discretion, and with approval of the Plan Advisory Committee, may add additional amounts to the Administrative Fund to prosecute the Causes of Action (other than Access Lending Causes of Action) or for administration and other miscellaneous needs of the Liquidating Trusts without further notice or motion in accordance with the terms of the Liquidating Trust Agreement.

2.    *A/P/S Claims Reserve.*  On the Original Effective Date, the Liquidating Trustee established the A/P/S Claims Reserve for all A/P/S Claims that are Disputed A/P/S Claims or Allowed A/P/S Claims that were not paid on the Original Effective Date, provided, however, that none of the provisions in this Article 9.B.2 apply to A/P/S Claims against Access Lending.  The amount reserved for each Disputed Administrative Claim and each Allowed Administrative Claim that was not paid on the Original Effective Date was based upon the Administrative Claim being the lower of (i) the amount set forth in the Administrative Claim Request filed by the Holder of such Claim, or if no Administrative Claim Request has been Filed, the amount set forth for such Claim in the Debtors' books and records, and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of the Original Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be jointly and/or severally liable, the Liquidating Trustee contributed to the A/P/S Reserve on account of only one such Claim. The Liquidating Trustee shall maintain the A/P/S Reserve pursuant to the terms of the Original Plan and shall review the A/P/S Claims Reserve as of the Modified Effective Date to determine if any changes are required to the A/P/S Claims Reserve to comply with the terms of the Original Plan as adopted by the Modified Plan.  The amount reserved for a Disputed Priority Tax Claim, Disputed Priority Claim, or Disputed Secured Claim or for an Allowed Priority Tax Claim, Allowed Priority Claim, or Allowed Secured Claim that was not paid on the Original Effective Date shall be based upon such Claim being the lower of (i) the amount set forth in the Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been Filed, the Scheduled amount set

88

forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of this Modified Plan; provided, however, that where a Creditor holds such Claims for which more than one Debtor is alleged to be jointly and/or severally liable, the Liquidating Trustee shall contribute to the A/P/S Reserve on account of only one such Claim.  As soon as practicable after (and to the extent) a Disputed A/P/S Claim becomes an Allowed A/P/S Claim, the Liquidating Trustee shall make a payment from the A/P/S Claims Reserve to the Holder of such Claim based on the Allowed amount of such Claim.  After (and to the extent) a Disputed A/P/S Claim or a Disallowed Claim is determined not to be an A/P/S Claim, the portion of the A/P/S Claims Reserve reserved for such Claim shall be released from the A/P/S Claims Reserve and shall be distributed pursuant to the terms of this Modified Plan.  Any amount remaining in the A/P/S Claims Reserve following the final disposition of all A/P/S Claims shall be released from the A/P/S Claims Reserve and shall be distributed pursuant to the terms of this Modified Plan.

3.  *Holding Company Debtor Claims Reserve.*  On the Original Effective Date, the Liquidating Trustee established the Holding Company Debtor Claims Reserve, which Holding Company Debtor Claims Reserve shall be maintained under this Modified Plan pursuant to the terms of the Original Plan.  With respect to any interim distribution made to Holders of Allowed Holding Company Debtor Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Holding Company Debtor shall be the amount that would be distributed on account of such Claim if it was an Allowed Holding Company Debtor Unsecured Claim based upon the Claim being the lower of (i)

89

the amount set forth in Proof of Claim filed by the Holder of such Claim and (ii) the estimated amount of such Claim for distribution purposes as determined by the Bankruptcy Court as set forth in Article 11.F of this Modified Plan.  As soon as practicable after (and to the extent) a Disputed Unsecured Claim against a Holding Company Debtor becomes an Allowed Unsecured Claim against such Holding Company Debtor, the Liquidating Trustee shall make a payment, subject to the Multi-Debtor Claim Protocol, from the Holding Company Debtor Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the Holding Company Debtor Claims Reserve.  The Liquidating Trustee shall review the Holding Company Debtor Claims Reserve as of the Modified Effective Date to determine if any changes are required to the Holding Company Debtor Claims Reserve to comply with the Modified Plan and the creation of the NC Credit Claims Reserve.  After (and to the extent) a Disputed Unsecured Claim against a Holding Company Debtor becomes a Disallowed Claim, the portion of the Holding Company Debtor Claims Reserve reserved for such Claim shall be released from the Holding Company Debtor Claims Reserve and shall be distributed pursuant to the terms of this Modified Plan.  Any amount remaining in the Holding Company Debtor Claims Reserve following the final disposition of all Disputed Unsecured Claims against Holding Company Debtors shall be released from the Holding Company Debtor Claims Reserve and shall be distributed pursuant to the terms of this Modified Plan.

4.    *NC Credit Claims Reserve*.    On the Modified Effective Date, the Liquidating Trustee shall establish the NC Credit Claims Reserve from amounts taken from the Holding Company Debtor Claims Reserve established on the Original Effective Date.  With respect to any interim distribution made to Holders of Allowed NC Credit Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against NC Credit shall be the amount that would be distributed on account of such Claim if it were an Allowed NC Credit Unsecured Claim based upon the Claim being the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim and (ii) the estimated amount of such Claim for distribution purposes as determined by the Bankruptcy Court as set forth in Article 11.F of this Modified Plan.  As soon as practicable after (and to the extent) a Disputed Unsecured Claim against NC Credit becomes an Allowed Unsecured Claim against NC Credit, the Liquidating Trustee shall make a payment, from the NC Credit Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from NC Credit Claim Reserve. After (and to the extent) a Disputed Unsecured Claim against NC Credit becomes a Disallowed Claim, the portion of the NC Credit Claims Reserve reserved for such Claim shall be released from the NC Credit Claims Reserve and shall be distributed pursuant to the terms of this Modified Plan.  Any amount remaining in the NC Credit Claims Reserve following the final disposition of all Disputed Unsecured Claims against NC Credit shall be released from the NC Credit Claims Reserve and shall be distributed pursuant to the terms of this Modified Plan.

91

5.    *Operating Debtor Claims Reserve.*  On the Original Effective Date, the Liquidating Trustee established the Operating Debtor Claims Reserve, which Operating Debtor Claims Reserve shall be maintained under this Modified Plan pursuant to the terms of the Original Plan.  With respect to any interim distribution made to Holders of Allowed Operating Debtor Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against any Operating Debtor shall be the amount that would be distributed on account of such Claim if it was an Allowed Operating Debtor Unsecured Claim based upon the Claim being the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of this Modified Plan.  As soon as practicable after (and to the extent) a Disputed Unsecured Claim against an Operating Debtor becomes an Allowed Unsecured Claim against such Operating Debtor, the Liquidating Trustee shall make a payment, subject to the Multi-Debtor Claim Protocol, from the Operating Debtor Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Liquidating Trust has paid on account of Allowed Claims belonging to the same Class as such Claim, and any remaining amount reserved on account of such Claim shall be released from the Operating Debtor Claims Reserve.  The Liquidating Trustee shall review the Operating Debtor Claims Reserve as of the Modified Effective Date to determine if any changes are required to the Operating Debtor Claims Reserve to comply with this Modified Plan.  After (and to the extent) a Disputed Unsecured Claim against an Operating Debtor becomes a Disallowed Claim, the portion of the Operating Debtor Claims Reserve reserved for such Claim shall be released from the Operating Debtor Claims Reserve and

92

shall be distributed pursuant to the terms of this Modified Plan. Any amount remaining in the Operating Debtor Claims Reserve following the final disposition of all Disputed Unsecured Claims against Operating Debtors shall be released from the Operating Debtor Claims Reserve and shall be distributed pursuant to the terms of this Modified Plan.

**C.      Distribution Calculations.**

1.      *Calculation of Litigation Proceeds.* The Litigation Proceeds shall be calculated by deducting all expenses related to any Causes of Action (other than Access Lending Causes of Action) including, but not limited to, fees and costs of attorneys, other professionals, and expert witnesses, and all expenses incurred in the pursuit of such Causes of Action, as determined by the Liquidating Trustee, from the proceeds of all Causes of Action (other than Access Lending Causes of Action) whether from judgment, settlement, or claim on insurance. The Holding Company Debtor Portion of Litigation Proceeds is 24.75% of the Litigation Proceeds. The NC Credit Portion of Litigation Proceeds is 2.75% of the Litigation Proceeds. The Operating Debtor Portion of Litigation Proceeds is 27.5% of the Litigation Proceeds. The NC Capital EPD/Breach Claimant Portion of Litigation Proceeds is 45% of the Litigation Proceeds.

2.      *Calculation of Holding Company Debtor Net Distributable Assets.* The Holding Company Debtor Net Distributable Assets shall be calculated by deducting from the gross amount (other than Litigation Proceeds) available from the liquidation of the Holding Company Debtors' Assets: (i) the amount of all Allowed A/P/S Claims allowed against or allocated by the Liquidating Trustee to the Holding Company Debtors and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estates of the Holding Company Debtors, as determined by the Liquidating Trustee, incurred in the

93

ordinary course prior to the Original Effective Date and paid by the Debtors on or before the Original Effective Date in the ordinary course, (iii) the Joint Administrative Expense Share of the Holding Company Debtors paid by the Debtors prior to or on the Original Effective Date or by the Liquidating Trustee after the Original Effective Date, and (iv) the Holding Company Debtors' proportionate share of the Trust Operating Expenses as determined by the Liquidating Trustee from and after the Original Effective Date.

3.     *Calculation of NC Credit Net Distributable Assets.*  The NC Credit Net Distributable Assets shall be the recoveries received by NC Credit from distribution on its Intercompany Claims under the Modified Plan. There will be no deduction from these recoveries in determining the NC Credit Net Distributable Assets.

4.     *Calculation of Operating Debtor Net Distributable Assets.*  The Operating Debtor Net Distributable Assets shall be calculated by deducting from the gross amount available from the liquidation of the Operating Debtors' Assets, which gross amount shall include the Adequate Protection Proceeds but exclude the Litigation Proceeds:  (i) the amount of all Allowed A/P/S Claims allowed against or allocated by the Liquidating Trustee to the Operating Debtors and paid by the Liquidating Trustee, (ii) the amount of all costs of administering the Estates of the Operating Debtors, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Original Effective Date and paid by the Debtors on or before the Original Effective Date, (iii) the Joint Administrative Expense Share of the Operating Debtors paid by the Debtors prior to or on the Original Effective Date or by the Liquidating Trustee after the Original Effective Date, and (iv) the Operating Debtors' proportionate share of the expenses of the Trust

94

Operating Expenses as determined by the Liquidating Trustee from and after the Original Effective Date.

     5.    *Calculation of Interim Distributions.* Subject to the terms of this Modified Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol:

     (a)    the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against Holding Company Debtors up to the amount of the Holding Company Debtor Net Distributable Assets (calculated as of the date of the interim distribution in accordance with Article 9.C.2 of this Modified Plan) plus the Holding Company Debtor Portion of the Litigation Proceeds less the amount required (i) to be contributed in respect of such distribution to the Holding Company Debtor Claims Reserve pursuant to Article 9.B.3 of this Modified Plan and (ii) to fully fund the Holding Company Debtors' proportionate share of the Administrative Fund and the A/P/S Claims Reserve;

     (b)    the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against NC Credit up to the amount of the NC Credit Net Distributable Assets (calculated as of the date of the interim distribution in accordance with Article 9.C.3 of this Modified Plan) plus the NC Credit portion of the Litigation Proceeds less the amount required to be contributed in respect of such distribution to the NC Credit Claims Reserve pursuant to Article 9.B.4 of this Modified Plan; and

     (c)    the Liquidating Trustee may make an interim distribution to Holders of Allowed Unsecured Claims against Operating Debtors up to the amount of the Operating Debtor Net Distributable Assets (calculated as of the

95

date of the interim distribution in accordance with Article 9.C.4 of this Modified Plan) plus the Operating Debtor Portion of the Litigation Proceeds less the amount required (i) to be contributed in respect of such distribution to the Operating Debtor Claims Reserve pursuant to Article 9.B.5 of this Modified Plan and (ii) to fully fund the Operating Debtors' proportionate share of the Administrative Fund and the A/P/S Claims Reserve.

**D.      Payment in Full of Unsecured Claims.**

1.      *Limitation on Distributions on Account of Allowed Unsecured Claims.* Notwithstanding the Determined Distribution Amounts assigned to Allowed Unsecured Claims pursuant to Articles 4, 6, and/or 7 of this Modified Plan, any Allowed Unsecured Claim is paid in full under this Modified Plan at such time as the Holder of such Allowed Unsecured Claim has been paid the allowed amount of such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court); provided, however, that where a Creditor holds Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable, such Creditor is not entitled to receive distributions under this Modified Plan in excess of the amount of the Debtors' joint and/or several liability in respect of such Claims plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court), and the Creditor's Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable shall be deemed paid in full at such time as the Creditor has been paid the allowed amount of one such Allowed Unsecured Claim plus interest thereon (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court).

2.      *Payment of Interest on Allowed Unsecured Claims.*  Notwithstanding the Determined Distribution Amounts assigned to Allowed Unsecured Claims pursuant to Articles 4, 6, and/or 7 of this Modified Plan, (i) if, and only if all Holders of Allowed Unsecured Claims against the Holding Company Debtors, all Holders of Allowed Unsecured Claims against NC Credit and all Holders of Allowed Unsecured Claims against Operating Debtors have been paid 100% of the amount of their Allowed Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of the Holding Company Debtors, NC Credit and the Operating Debtors and (ii) if, and only if, all Holders of Allowed Unsecured Claims against Access Lending have been paid 100% of the amount of their Allowed Claims, such Holders shall be entitled to receive interest (calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court) on account of such Allowed Claims, from any remaining proceeds realized from the liquidation or other disposition of Assets of Access Lending; provided, however, that with respect to Allowed Unsecured Claims for which more than one Debtor is jointly and/or severally liable, interest is payable on such Claims pursuant to the terms of this Article 9.D.2 based on the allowed amount of the joint and/or several liability fixed by such Claims.

3.      *Payment in Full of Allowed Unsecured Claims for Which Debtors in More than One Debtor Group Are Jointly and/or Severally Liable.*  To the extent a Holder of Allowed Unsecured Claims for which Debtors in more than one Debtor Group are jointly and/or severally liable is paid 100% of the allowed amount of the joint and/or several

97

liability fixed by such Claims through interim distributions, the Liquidating Trustee shall retain any further interim distributions that would be made on account of such Claims (giving effect, if applicable, to the Multi-Debtor Claim Protocol) as if only Debtors within a single Debtor Group were liable for such Claim until the Liquidating Trustee makes a final distribution under this Modified Plan. Prior to making a final distribution under this Modified Plan, the Liquidating Trustee shall determine, with respect to every Allowed Unsecured Claim for which Debtors in more than one Debtor Group are jointly and/or severally liable that has been paid 100% of the allowed amount of the joint and/or several liability fixed by such Claim, the amount of distributions in respect of such Claim made on account of Debtors within each Debtor Group. The Liquidating Trustee shall reallocate the excess distributions, if any, that it has retained to be included in the appropriate Debtor Group's Assets based on the relative distributions made to Claims in each Debtor Group on account of such joint and/or several liability.

4.    *Payment in Full of All Allowed Holding Company Debtor Unsecured Claims or Allowed NC Credit Unsecured Claims.* If, in accordance with the terms of this Modified Plan, all Holders of Allowed Holding Company Debtor Unsecured Claims or Holders of Allowed NC Credit Unsecured Claims have been paid 100% of the allowed amount of their Allowed Holding Company Debtor Unsecured Claims or Allowed NC Credit Unsecured Claims, any remaining amount of the Holding Company Debtor Net Distributable Assets, the Holding Company Debtor Portion of Litigation Proceeds, NC Credit Net Distributable Assets or NC Credit Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Modified Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol to Holders of Allowed Operating Debtor

Unsecured Claims on account of such Claims. After all Holders of Allowed Operating Debtor Unsecured Claims, all Holders of Allowed Holding Company Debtor Unsecured Claims and all Holders of Allowed NC Credit Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 hereof, any remaining amount of the Holding Company Debtor Net Distributable Assets, the Holding Company Debtor Portion of Litigation Proceeds, NC Credit Net Distributable Assets or NC Credit Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

5.    *Payment in Full of All Allowed Operating Debtor Unsecured Claims Other Than EPD/Breach Claims Against NC Capital.* If, in accordance with the terms of this Modified Plan, all Holders of Allowed Operating Debtor Unsecured Claims other than Holders of Allowed Class OP6b Claims have been paid 100% of the allowed amount of their Allowed Operating Debtor Unsecured Claims, any remaining amount of the Operating Debtor Net Distributable Assets or the Operating Debtor Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Modified Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol first to Holders of Allowed Class OP6b Claims on account of such Claims until such Claims are paid 100% of their allowed amounts, and second to Holders of Allowed Holding Company Debtor Unsecured Claims and Holders of Allowed NC Credit Unsecured Claims, Pro Rata based on the allowed amount of such Claims until such Claims are paid 100% of their allowed amounts. After all Holders of Allowed Operating Debtor Unsecured Claims, all Holders of Allowed Holding Company Debtor Unsecured Claims and Holders of Allowed NC Credit Unsecured Claims have been paid in full in accordance with Article 9.D.1 and

9.D.2 hereof, any remaining amount of the Operating Debtor Net Distributable Assets or the Operating Debtor Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

6.    *Payment in Full of All Allowed EPD/Breach Claims Against NC Capital.* If, in accordance with the terms of this Modified Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol, all Holders of Allowed Class OP6b Claims have been paid 100% of the allowed amount of their Allowed Class OP6b Claims, any remaining amount of the NC Capital EPD/Breach Claimant Portion of Litigation Proceeds shall be paid, in accordance with the terms of this Modified Plan, including the Multi-Debtor Claim Protocol and the Intercompany Claim Protocol, first to Holders of Allowed Operating Debtor Claims other than Allowed Class OP6b Claims on account of such Claims until such Claims are paid 100% of their Allowed Amounts, and second to Holders of Allowed Holding Company Debtor Unsecured Claims and Holders of Allowed NC Credit Unsecured Claims, Pro Rata based on the allowed amount of such Claims until such Claims are paid 100% of their Allowed Amounts.  After all Holders of Allowed Operating Debtor Unsecured Claims, all Holders of Allowed NC Credit Unsecured Claims and all Holders of Allowed Holding Company Debtor Unsecured Claims have been paid in full in accordance with Article 9.D.1 and 9.D.2 hereof, any remaining amount of NC Capital EPD/Breach Claimant Portion of Litigation Proceeds shall be paid to Holders of NCFC Interests in accordance with applicable liquidation preferences of NCFC Interests.

E.    **Manner of Distribution.**    At the option of the Liquidating Trustee, any distributions under this Modified Plan may be made either in Cash, by check drawn on a

100

domestic bank, by wire transfer, or by ACH. Notwithstanding any other provisions of this Modified Plan to the contrary, no payment of fractional cents will be made under this Modified Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary).

F.     **De Minimis Distributions.**  All De Minimis Distributions will be held by the Liquidating Trust for the benefit of the Holders of Allowed Claims entitled to De Minimis Distributions. When the aggregate amount of De Minimis Distributions held by the Liquidating Trust for the benefit of a Creditor exceeds $50.00, the Liquidating Trust will distribute such De Minimis Distributions to such Creditor. If, at the time that the final distribution under this Modified Plan is to be made, the De Minimis Distributions held by the Liquidating Trust for the benefit of a Creditor total less than $50.00, such funds shall not be distributed to such Creditor, but rather, shall vest in the Liquidating Trust and be distributed to other Holders of Allowed Claims in accordance with the terms of this Modified Plan.

G.     **Delivery of Distributions.**  Except as otherwise provided in this Modified Plan, distributions to Holders of Allowed Claims shall be made by the Liquidating Trustee, (i) at the addresses set forth on the Proofs of Claim filed by such Holders (or at the last known addresses of such Holder if no motion requesting payment or Proof of Claim is filed or the Debtors or the Liquidating Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim, or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Liquidating Trustee has not received a written notice of a change of address. The distributions to Holders of Capital Trust Claims shall be made to the Indenture Trustee, which, subject to the right of the Indenture Trustee to assert its charging lien against the

distributions for payment of the Indenture Trustee Expenses, shall transmit the distributions to the Holders of Capital Trust Claims.

**H.    Undeliverable Distributions.**  If payment or distribution to the Holder of an Allowed Claim under this Modified Plan is returned for lack of a current address for the Holder or if payment or distribution cannot be made for lack of any mailing address for the Holder, the Liquidating Trustee shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment.  If, after the passage of sixty (60) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the holder shall be distributed to the Holders of Allowed Claims in the appropriate Class or Classes, and the Allowed Claim shall be deemed satisfied to the same extent as if payment or distribution had been made to the holder of the Allowed Claim.

**I.    Setoffs and Recoupments.**  The Liquidating Trustee (including, with respect to Reorganized Access Lending, in his capacity as Plan Administrator) may, pursuant to sections 502(h), 553, and 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, set off against or recoup from any Claim on which payments are to be made pursuant to this Modified Plan, any claims or Causes of Action of any nature whatsoever that are proven valid that the Debtors may have against the Holder of such Claim; provided, however, (i) that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, the Estates, the Liquidating Trust, or Reorganized Access Lending of any right of setoff or recoupment that the Debtors or the Estates may have against the Holder of such Claim, nor of any other claim or Cause of Action and (ii) nothing in this Article 9.I shall limit the ability of the Liquidating Trustee (including, with respect to Reorganized Access Lending, in his capacity as Plan Administrator) to withhold distributions on

102

account of any Claim based on any right of setoff or recoupment that the Liquidating Trustee, Debtors or the Estates may have with respect to such Claim under the Bankruptcy Code, including but not limited to under section 502(d).

    **J.**    **Distributions in Satisfaction; Allocation.**  Except for the obligations expressly imposed by this Modified Plan and the property and rights expressly retained under this Modified Plan, if any, the distributions and rights that are provided in this Modified Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and Interests in the Debtors and the Estates and the assets and properties of the Debtors and the Estates, whether known or unknown, arising or existing prior to the Modified Effective Date. Distributions received in respect of Allowed Unsecured Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

    **K.**    **Cancellation of Notes and Instruments.**  As of the Original Effective Date, except as with respect to the stock of Access Lending, all notes, agreements and securities evidencing Claims and Interests and the rights thereunder of the holders thereof shall, with respect to the Debtors, be canceled and deemed null and void and of no further force and effect, and the holders thereof shall have no rights against the Debtors, the Estates, or the Liquidating Trust, and such instruments shall evidence no such rights, except the right to receive the distributions provided for in this Modified Plan.  Additionally, the Capital Trust Indentures, and all related notes and documents, including without limitation, the two series of Junior Subordinated Notes due 2036, the Amended and Restated Trust Agreement, dated as of September 13, 2006, and the Amended and Restated Trust Agreement, dated as of November 16, 2006, and the two series of trust preferred securities and trust common securities, respectively, shall be deemed automatically canceled and discharged as of the Original Effective Date,

103

provided, however, that the Capital Trust Indentures, and related notes and documents shall continue in effect solely for the purposes of (i) allowing the Holders of Capital Trust Claims to receive their distributions, if any, hereunder, including the right to litigate and/or settle any Claim asserted by a purported Holder of a Senior Class HC3b Claim, (ii) allowing the Indenture Trustee to make distributions on account of the Capital Trust Claims, (iii) permitting the Indenture Trustee to asserts its charging lien against such distributions for payment of the Indenture Trustee Expenses, and (iv) authorizing, but not requiring, the Indenture Trustee to litigate and/or settle any Claim asserted by a purported Holder of a Senior Class HC3b Claim under Article 4.C.3 of this Modified Plan. The Capital Trust Indentures and related notes and documents shall terminate completely upon completion of all such distributions. The Liquidating Trust shall not be responsible for any of the fees, expenses or costs incurred in connection with the continuation or termination of the Capital Trust Indentures.

L.    **No Interest on Claims.**  Unless otherwise specifically provided for in this Modified Plan and except as set forth in Article 9 hereof, the Modified Confirmation Order, or a postpetition agreement in writing between the Debtors and a Holder of a Claim and approved by an order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Original Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

M.    **Withholding Taxes.**  The Liquidating Trustee (including in his capacity as Plan Administrator) shall be entitled to deduct any federal, state or local withholding taxes from any payments made under this Modified Plan. As a condition to making any distribution under this

Modified Plan, the Liquidating Trustee may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Liquidating Trustee to comply with applicable tax reporting and withholding laws.

N.      **Reports.**   From and after the Original Effective Date, until a Final Decree is entered, the Liquidating Trustee (including in his capacity as Plan Administrator) shall submit quarterly reports to the U.S. Trustee within thirty (30) days of the end of each fiscal quarter setting forth all receipts and disbursements of the Liquidating Trust and Reorganized Access Lending as required by the U.S. Trustee guidelines.

### ARTICLE 10.

### IMPLEMENTATION OF THE MODIFIED PLAN AND DISTRIBUTIONS WITH RESPECT TO ACCESS LENDING

A.      **Transfer of Access Lending Stock.**  On the Original Effective Date, pursuant to Article 8.E of the Original Plan, TRS Holdings distributed the stock of Access Lending to the Liquidating Trust, which became the sole shareholder of Reorganized Access Lending.  The transfer of the stock of Access Lending to the Liquidating Trust shall be confirmed and adopted by this Modified Plan.

B.      **The Plan Administrator.**   The Liquidating Trustee has acted as Plan Administrator since the Original Effective Date with respect to Reorganized Access Lending and, in such capacity, has entered into the Plan Administrator Agreement.  The initial Plan Administrator, and each successor Plan Administrator, shall serve until the earlier of (i) the dissolution of Reorganized Access Lending or (ii) such Plan Administrator's resignation, death, incapacity, removal or termination.  Upon the occurrence of the Original Effective Date, the articles of incorporation of Access Lending were amended or deemed amended to provide that

105

the Plan Administrator is the chief executive officer and sole director of Reorganized Access Lending. In such capacity, the Plan Administrator has all necessary and appropriate power to act for, on behalf of and in the name of Reorganized Access Lending, with the same power and effect as if each of his actions in furtherance of his duties as a responsible person and as a board-appointed officer and shareholder-appointed director of Reorganized Access Lending were explicitly authorized by the appropriate board of directors or shareholders. In his capacity as Plan Administrator, the Liquidating Trustee shall take such actions as are in the best interests of Reorganized Access Lending. The appointment of the Liquidating Trustee as Plan Administrator is continued pursuant to the Status Quo Order pending further order of the Bankruptcy Court and will be confirmed and adopted by this Modified Plan.

   C. **Reimbursement of Debtors and Liquidating Trust.** Subject to Article 10.F.4 of this Modified Plan, on the Modified Effective Date or as soon as practicable thereafter and following the establishment of the Access Lending Administrative Fund and the Access Lending A/P/S Reserve, the Plan Administrator shall pay from the Assets of Reorganized Access Lending to the Liquidating Trust, if he has not already done so pursuant to the terms of the Original Plan, (i) the amount of all Allowed A/P/S Claims allowed against Access Lending and paid by the Debtors other than Access Lending on or before the Original Effective Date or by the Liquidating Trustee after the Original Effective Date or Modified Effective Date; (ii) the amount of administering the Estate of Access Lending, as determined by the Liquidating Trustee, incurred in the ordinary course prior to the Original Effective Date and paid by the Debtors other than Access Lending on or before the Original Effective Date in the ordinary course; and (iii) the Joint Administrative Expense Share of Access Lending paid by the Debtors other than Access

Lending on or before the Original Effective Date or by the Liquidating Trustee after the Original Effective Date or Modified Effective Date.

    **D.**    **Resolution of Claims and Prosecution of Access Lending Causes of Action.** The Plan Administrator shall resolve all Disputed Claims against Access Lending as soon as practicable following the Original Effective Date; *provided*, *however*, that all Creditors of Access Lending shall have the right to object to any Claims against Access Lending other than the Goldman AL3 Claim and the NCMC AL3 Claim. The Plan Administrator shall have the exclusive right to prosecute all Access Lending Causes of Action.

    **E.**    **Timing of Distributions on Account of Claims Against Access Lending.**

    1.    *Payment of Allowed A/P/S Claims Against Access Lending.* Subject to Article 10.F.4 of this Modified Plan, the Plan Administrator shall pay all Allowed A/P/S Claims against Access Lending as soon as practicable after the later of (a) the Original Effective Date or the Modified Effective Date if not already paid and (b) the date upon which any such Claim becomes an Allowed Claim.

    2.    *Interim Distributions to Holders of Allowed Access Lending Unsecured Claims.* The Plan Administrator shall have the right to make interim distributions to Holders of Allowed Access Lending Unsecured Claims if the Plan Administrator determines that such interim distributions are warranted and economical; *provided*, *however*, that any such distribution shall only be made if (i) subject to Article 10.F.4 of this Modified Plan, the Access Lending Administrative Fund and the Access Lending A/P/S Claims Reserve are fully funded (subject to Article 10.F.4 of this Modified Plan); (ii) the Access Lending Claims Reserve is fully funded and will remain fully funded after such interim distributions are made; and (iii) subject to Article 10.F.4 of this Modified