Plan, the Plan Administrator retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the assets of Reorganized Access Lending during liquidation, and to satisfy other liabilities or expenses incurred by Reorganized Access Lending in accordance with this Modified Plan.

        3.    *Final Distributions on Allowed Access Lending Unsecured Claims.*  Upon resolution of all Disputed Unsecured Claims against Access Lending and all Access Lending Causes of Action, the Plan Administrator shall pay all of the Allowed Unsecured Claims against Access Lending from all remaining Access Lending Net Distributable Assets in accordance with Article 10.F.4 of this Modified Plan.

**F.**    **Access Lending Reserves.**

        1.    *Access Lending Administrative Fund.*  On the Original Effective Date, the Plan Administrator established the Access Lending Administrative Fund.  The initial amount of the Access Lending Administrative Fund was based on the Plan Administrator's good faith estimate of the Reorganized Access Lending Operating Expenses and the cost necessary to complete Reorganized Access Lending's obligations under the Original Plan and the Plan Administrator Agreement and was funded from Access Lending's Assets.  The Liquidating Trustee shall maintain the Access Lending Administrative Fund and review the Access Lending Administrative Fund as of the Modified Effective Date to determine if any changes are required to the Access Lending Administrative Fund to comply with this Modified Plan.  Reorganized Access Lending shall pay all Reorganized Access Lending Operating Expenses and costs and expenses related to carrying out its obligations under this Modified Plan and the Plan Administrator Agreement only from the Access Lending Administrative Fund.  The Plan

Administrator may add additional amounts to the Access Lending Administrative Fund to prosecute the Access Lending Causes of Action or for administration and other miscellaneous needs of Reorganized Access Lending without further notice or motion and such additional amounts shall be funded from Access Lending's Assets subject to Article 10.F.4 of this Modified Plan.

    2.    *Access Lending A/P/S Claims Reserve.*  On the Original Effective Date, the Plan Administrator established the Access Lending A/P/S Claims Reserve for all Access Lending A/P/S Claims that are Disputed Access Lending A/P/S Claims or Allowed Access Lending A/P/S Claims that were not paid on the Original Effective Date. The Liquidating Trustee shall continue to maintain the Access Lending A/P/S Claims Reserve and shall review the Access Lending A/P/S Claims Reserve as of the Modified Effective Date to determine if any changes are required to the Access Lending A/P/S Claims Reserve to comply with this Modified Plan.  The amount reserved for each Disputed Administrative Claim against Access Lending and each Allowed Administrative Claim against Access Lending that was not paid on the Original Effective Date was based upon the Administrative Claim being the lower of (i) the amount set forth in the Administrative Claim Request filed by the Holder of such Claim, or if no Administrative Claim Request has been Filed, the amount set forth for such Claim in the Debtors' books and records and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of this Modified Plan.  The amount reserved for a Disputed Priority Tax Claim, Disputed Priority Claim, or Disputed Secured Claim against Access Lending or for an Allowed Priority Tax Claim, Allowed Priority Claim, or Allowed Secured Claim against Access

Lending that was not paid on the Original Effective Date shall be based upon such Claim being the lower of (i) the amount set forth in the Proof of Claim filed by the Holder of such Claim, or if no Proof of Claim has been filed, the Scheduled amount set forth for such Claim if it is shown on the Schedules as being noncontingent, liquidated, and undisputed and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of this Modified Plan. As soon as practicable after (and to the extent) a Disputed Access Lending A/P/S Claim becomes an Allowed Access Lending A/P/S Claim, the Plan Administrator shall make a payment from the Access Lending A/P/S Claims Reserve to the Holder of such Claim based on the Allowed amount of such Claim. After (and to the extent) a Disputed Access Lending A/P/S Claim or a Disallowed Claim is determined not to be an Access Lending A/P/S Claim, the portion of the Access Lending A/P/S Claims Reserve reserved for such Claim shall be released from the Access Lending A/P/S Claims Reserve to Reorganized Access Lending and shall be distributed pursuant to the terms of this Modified Plan. Any amount remaining in the Access Lending A/P/S Claims Reserve following the final disposition of all Access Lending A/P/S Claims shall be released from the Access Lending A/P/S Claims Reserve to Reorganized Access Lending and shall be distributed pursuant to the terms of this Modified Plan.

3.    *Access Lending Claims Reserve.* On the Original Effective Date, the Plan Administrator established the Access Lending Claims Reserve. The Liquidating Trustee shall maintain the Access Lending Claims Reserve and shall review the Access Lending Claims Reserve as of the Modified Effective Date to determine if any changes are required to the Access Lending Claims Reserve to comply with the Modified Plan. With

respect to any interim distribution made to Holders of Allowed Access Lending Unsecured Claims, the amount reserved for each Disputed Unsecured Claim against Access Lending shall be the amount that would be distributed on account of such Claim if it was an Allowed Access Lending Unsecured Claim based upon the Claim being in the lower of (i) the amount set forth in Proof of Claim filed by the Holder of such Claim and (ii) the estimated amount of such Claim for distribution purposes, as determined by the Bankruptcy Court as set forth in Article 11.F of this Modified Plan.  As soon as practicable after (and to the extent) a Disputed Unsecured Claim against Access Lending becomes an Allowed Unsecured Claim against Access Lending, the Plan Administrator shall make a payment from the Access Lending Claims Reserve to the Holder of such Claim based on the proportionate amount, if any, that the Plan Administrator has paid on account of Allowed Access Lending Unsecured Claims; and any remaining amount reserved on account of such Claim shall be released from the Access Lending Claims Reserve.  After (and to the extent) a Disputed Unsecured Claim against Access Lending becomes a Disallowed Claim, the portion of the Access Lending Claims Reserve reserved for such Claim shall be released from the Access Lending Claims Reserve to Reorganized Access Lending and shall be distributed pursuant to the terms of this Modified Plan.  Any amount remaining in the Access Lending Claims Reserve following the final disposition of all Disputed Unsecured Claims against Access Lending shall be released from the Access Lending Claims Reserve to Reorganized Access Lending and shall be distributed pursuant to the terms of this Modified Plan.

4.    *Calculation of Access Lending Net Distributable Assets.*  The Access Lending Net Distributable Assets shall be calculated by deducting from the gross amount

available from the liquidation of Reorganized Access Lending's Assets and the prosecution of the Access Lending Causes of Action (i) the amount paid by Access Lending to the Liquidating Trust pursuant to Article 10.C of this Modified Plan; (ii) the amount of all Allowed A/P/S Claims allowed against Access Lending and paid by Access Lending on or before the Original Effective Date or paid by the Plan Administrator from the Assets of Reorganized Access Lending after the Original Effective Date or Modified Effective Date; (iii) the amount of administering the Estate of Access Lending incurred in the ordinary course prior to the Original Effective Date and paid by Access Lending on or before the Original Effective Date in the ordinary course; (iv) the Joint Administrative Expense Share of Access Lending paid by Access Lending on or before the Original Effective Date; (v) any taxes paid by the Plan Administrator from Reorganized Access Lending's Assets pursuant to Article 10.G of this Modified Plan, (vi) any costs incurred in connection with the prosecution of the Access Lending Causes of Action, and (vii) any Reorganized Access Lending Operating Expenses and expenses incurred by the Plan Administrator in connection with performing its duties under the Original Plan or this Modified Plan; provided, however, that to the extent the amount of the sum of (i) through (vii) of this Article 10.F.4 exceeds $1,000,000, such excess amount shall be paid out of and deducted from the amounts that otherwise would be distributed to NCMC on account of the NCMC AL3 Claim.

**G.    Dissolution of Reorganized Access Lending.**  After all distributions have been made to Holders of Allowed Claims against Access Lending, the Plan Administrator shall file a certificate of dissolution in the applicable state of incorporation for Reorganized Access Lending, and Reorganized Access Lending shall dissolve and cease to exist.  Any remaining

Assets of Reorganized Access Lending shall be distributed to the Liquidating Trust as sole shareholder in a liquidating distribution, and shall become Liquidating Trust Assets that may be distributed pursuant to the terms of this Modified Plan.

**H.    Access Lending Income; Returns.**  Any income earned by the Assets of Reorganized Access Lending is attributable to Reorganized Access Lending and not to the Liquidating Trust or its beneficiaries.  The Plan Administrator shall make and file, if necessary, any and all tax returns for Reorganized Access Lending with respect to such taxable income, and shall pay taxes, if any, properly payable by Reorganized Access Lending from Reorganized Access Lending's Assets. The Plan Administrator shall also file (or cause to be filed) any other statements, returns or disclosures relating to Reorganized Access Lending that are required by any governmental unit or the Plan Advisory Committee.

**I.    Removal of Access Lending.**  If this Modified Plan cannot be confirmed with respect to Access Lending, the Plan Proponents of the Modified Plan may remove Access Lending from this Modified Plan.  In such event, the Classes pertaining to Access Lending shall be removed from this Modified Plan, and the Modified Plan shall omit any treatment of the assets and liabilities of Access Lending.  The removal of Access Lending from this Modified Plan shall not affect this Modified Plan with respect to any other Debtor, except with respect to allocation of Joint Administrative Expense Shares as set forth on Exhibit C to this Modified Plan.

### ARTICLE 11.

### PROVISIONS FOR CLAIMS ADMINISTRATION AND DISPUTED CLAIMS

**A.    Reservation of Rights to Object to Claims.**  Unless a Claim is expressly described as an Allowed Claim pursuant to or under this Modified Plan, upon the Modified Effective Date and for the period from the Original Effective Date until all such Claims are resolved, the Liquidating Trustee shall be authorized to assert any and all objections of the

Estates to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, priority, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Claims, Priority Tax Claims, Priority Claims, Secured Claims, Unsecured Claims, 510(b) Claims, Interests, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtors' or the Liquidating Trustee's failure to object to any Claim in the Chapter 11 Cases shall be without prejudice to the Liquidating Trustee's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

B.    **Objections to Claims.** Prior to the Original Effective Date, the Debtors were responsible for pursuing any objection to the allowance of any Claim. From and after the Original Effective Date, the Liquidating Trustee retained responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making distributions, if any, with respect to all Claims (including those Claims that were subject to objection by the Debtors as of the Original Effective Date), subject to any approvals of the Plan Advisory Committee as set forth in the Liquidating Trust Agreement; provided, however, that Creditors of Access Lending had standing to object to Claims against Access Lending. The Bankruptcy Court has entered orders extending the Liquidating Trustee's time to object to Claims to the later of (i) January 31, 2010, or (ii) 180 days after the date such Claim is filed, provided that the Liquidating Trustee may request (and the Bankruptcy Court may grant) additional extensions of such deadline by filing a motion with the Bankruptcy Court, based upon a reasonable exercise of the Liquidating Trustee's business judgment. A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to this Modified Plan.

114

C.    **Service of Objections.**  An objection to a Claim shall be deemed properly served on the Holder of such Claim if the Liquidating Trustee effects service by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases .

D.    **Determination of Claims.**  Except as otherwise agreed by the Debtors or the Liquidating Trustee (including in his capacity as Plan Administrator), any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and ( c) an application to otherwise limit recovery with respect to such Claim, filed by the Debtors or the Liquidating Trustee on or prior to any applicable deadline for filing such objection or application with respect to such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with this Modified Plan. Nothing contained in this Article 11 shall constitute or be deemed a waiver of any claim, right, or Causes of Action that the

Debtors, the Liquidating Trust, or Reorganized Access Lending may have against any Person in connection with or arising out of any Claim or Claims, including without limitation any rights under 28 U.S.C. § 157.

      **E.**     **No Distributions Pending Allowance.** No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that in the event that only a portion of such Claim is an Allowed Claim, the Liquidating Trustee may make, in his or her discretion, a distribution pursuant to the Modified Plan on account of the portion of such Claim that becomes an Allowed Claim.

      **F.**     **Claim Estimation.** In order to effectuate distributions pursuant to this Modified Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Liquidating Trust, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right , on and after the Original Effective Date, to seek an order of the Bankruptcy Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of property that must be withheld from distribution on account of Disputed Claims; provided, however, that the Bankruptcy Court shall determine (i) whether such Claims are subject to estimation pursuant to section 502(e) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any.

      **G.**     **Allowance of Claims Subject to Section 502 of the Bankruptcy Code.** Allowance of Claims shall be in all respects subject to the provisions of section 502 of the Bankruptcy Code, including without limitation subsections (b), (d), (e), (g), (h), and (i) thereof.

116

H.    **Goldman HC3b Claim.**  The Goldman HC3b Claim shall be an Allowed Class HC3b Claim in the amount of $5,000,000.

I.    **Goldman AL3 Claim.**  The Goldman AL3 Claim shall be an Allowed Class AL3 Claim in the amount of $9,506,754.00.

J.    **NCMC AL3 Claim.**  Subject to Article 4.M of this Modified Plan, the NCMC AL3 Claim shall be an Allowed Class AL3 Claim in the amount of $3,973,199.86.

### ARTICLE 12.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    **Assumption of Certain Contracts and Leases and Cure Payments.**  Twenty (20) days prior to the Original Confirmation Hearing, the Original Plan Proponents filed the Assumption Schedule, a copy of which is attached hereto as <u>Exhibit A</u>.  Objections to any proposed cure payment were required to be filed and served no later than the Assumption Objection Deadline and were adjudicated, if necessary, at the Original Confirmation Hearing. Any non-debtor party or Person to an Executory Contract that did not file an appropriate pleading with the Bankruptcy Court on or before the applicable Assumption Objection Deadline waived its right to dispute the cure amount.  All unpaid cure payments, if any, under any Executory Contracts that were assumed or assumed and assigned under the Original Plan, which assumption or assumption and assignment are hereby adopted by this Modified Plan effective as of the Original Effective Date, shall be made by the Liquidating Trustee as soon as practicable after the Modified Effective Date but not later than thirty (30) days after the Modified Effective Date, provided that, in the event that there is a dispute regarding the amount of any cure payments, the Liquidating Trustee shall make such cure payments as may be required by section 365(b)(l) of the Bankruptcy Code within ten (10) days following the entry of a Final Order resolving such dispute.

B.        **Rejection of Remaining Executory Contracts and Unexpired Leases.**  On the Original Confirmation Date, except for (i) any Executory Contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code and (ii) any Executory Contract identified on the Assumption Schedule, each Executory Contract entered into by the Debtors prior to the Petition Date that had not previously expired or terminated pursuant to its own terms, was rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective on (i) the Original Confirmation Date or (ii) if the Executory Contract had been removed from the Assumption Schedule after the Original Confirmation Date, the date of such removal.  The Modified Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of the Original Confirmation Date.

C.        **Rejection Damages Bar Date.**  Except to the extent another Bar Date applies pursuant to an order of the Bankruptcy Court, any Proofs of Claim with respect to a Claim arising from the rejection of Executory Contracts under the Original Plan (including Claims under section 365(d)(3) of the Bankruptcy Code) were required to be filed with XRoads Case Management Services, P.O. Box 8901, Marina Del Rey, California 90295 (Telephone (888) 784-9571), and a copy served on counsel for the Original Plan Proponents and the Liquidating Trustee, within thirty (30) days after the Original Effective Date or September 1, 2008, or such Claim would be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Liquidating Trust, the Liquidating Trustee, their successors, their assigns, or their Assets.  Any Claim arising from the rejection of an Executory Contract shall be treated as a Claim in Class HC3b (Other Unsecured Claims against NCFC), Class HC7 (Other Unsecured Claims against TRS Holdings), Class HC10b (Other Unsecured Claims against NC

118

Credit), Class HCl3 (Other Unsecured Claims against NC Residual IV), Class OP3c (Other Unsecured Claims against NCMC), Class OP6c (Other Unsecured Claims against NC Capital), Class OP9b (Other Unsecured Claims against Home123), Class OP12 (Other Unsecured Claims against NC Asset Holding, NC Deltex, NC REO, NC REO II, NC REO III, NC Residual III, NCM Ventures, and NCoral), or Class AL3 (Other Unsecured Claims against Access Lending), depending on which Debtor the Claim is asserted against. Nothing in this Modified Plan or the Original Plan extends or modifies any previously applicable Bar Date.

      **D.**    **Insurance Policies.**  To the extent that any or all of the insurance policies set forth on Exhibit A herewith are considered to be Executory Contracts, then notwithstanding anything contained in the Original Plan to the contrary, the Original Plan and this Modified Plan shall constitute a motion to assume the insurance policies set forth on Exhibit A herewith and to assign them to the Liquidating Trust.  Subject to the occurrence of the Modified Effective Date, the entry of the Modified Confirmation Order shall constitute approval of such assumption and assignment pursuant to section 365(a) of the Bankruptcy Code effective as of the Original Effective Date and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, the Estates, and all parties in interest in the Chapter 11 Cases.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Original Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Original Confirmation Date with respect to each such insurance policy set forth on Exhibit A herewith.  To the extent that the Bankruptcy Court determines otherwise with respect to any insurance policy, the Plan Proponents of the Modified Plan reserve the right to seek rejection of such insurance policy or other available relief.  The Original Plan or the Modified Plan shall not affect contracts that have been assumed and assigned by order of the

119

Bankruptcy Court prior to the Original Confirmation Date or Modified Confirmation Date. For the avoidance of doubt, the certain insurance policies (including any insurance policies that are not Executory Contracts, insurance policies that may have expired prior to the Petition Date, insurance policies in existence on the Petition Date, and insurance policies entered into by the Debtors after the Petition Date) of the Debtors set forth on Exhibit A and all rights thereunder and rights under any other insurance policies under which the Debtors may be beneficiaries (including the rights to make, amend, prosecute, and benefit from claims) are retained and were transferred to the Liquidating Trust pursuant to the Original Plan and such transfer shall be confirmed and adopted pursuant to this Modified Plan.

## ARTICLE 13.

### EFFECT OF CONFIRMATION AND INJUNCTION

A.    **Injunction.  Except as otherwise expressly provided in this Modified Plan, the documents executed pursuant to the Original Plan and this Modified Plan, or the Original Confirmation Order or this Modified Confirmation Order, on and after the Original Effective Date, all Persons and entities who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose prior to the Original Effective Date (including but not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) are permanently enjoined from:  (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or**

encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff or right of subrogation of any kind against obligation due to any Protected Party or any property of any Protected Party; and (v) any act, in any manner, in any place whatsoever, that does not conform to, comply with, or is inconsistent with any provisions of this Modified Plan. Any Person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. Nothing contained in this Article 13 shall prohibit the Holder of a Disputed Claim from litigating its right to seek to have such Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of this Modified Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of such Disputed Claim of any of the obligations of the Debtors, the Liquidating Trustee, or the Liquidating Trust under this Modified Plan. The Modified Confirmation Order also shall constitute an injunction enjoining any Person from enforcing or attempting to enforce any claim or cause of action against any Protected Party or any property of any Protected Party based on, arising from or related to any failure to pay, or make provision for payment of, any amount payable with respect to any Priority Tax Claim on which the payments due under Article 3.B of this Modified Plan have been made or are not yet due under Article 3.B of this Modified Plan; provided, however, that the foregoing injunction will not enjoin actions by the SEC to the extent that pursuant to section 362(b)(4) of the Bankruptcy Code such actions are not subject to section 362(a) of the Bankruptcy Code. Except as provided in Article 13.C of this Modified Plan, nothing in this Modified Plan or the Original Plan shall (i) release or discharge any claims held by the

121

SEC against any non-debtors or (ii) enjoin or restrain the SEC from enforcing any such claims against any non-debtors.

      **B.**    **Term of Injunctions.**  Unless otherwise provided herein or in the Modified Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases by orders of the Bankruptcy Court, under sections 105 or 362 of the Bankruptcy Code, this Modified Plan, or otherwise and extant on the Original Confirmation Date or the Modified Confirmation Date, have remained in full force and effect since the Original Effective Date and shall remain in full force and effect until the later of (i) entry of the Final Decree or (ii) the dissolution of the Liquidating Trust. In accordance therewith, and without limiting the foregoing, until the later of (i) entry of the Final Decree or (ii) the dissolution of the Liquidating Trust, all Persons or entities (except as provided in section 362(b) of the Bankruptcy Code) are stayed from (i) the commencement or continuation of a judicial, administrative, or other action or proceeding, including the employment of service of process, against the Debtors that was or could have been commenced prior to the Petition Date, or to recover a claim against the Debtors that arose prior to the Petition Date, (ii) the enforcement, against the Debtors or against property of the Estates, of a judgment obtained before the Petition Date, (iii) any act to obtain possession of property of the Estates or of property from the Estates or to exercise control over property of the Estates, (iv) any act to create, perfect, or enforce any lien against property of the Estates, and (v) any act to collect, assess, or recover a claim against the Debtors that arose before the Petition Date.

      **C.**    **Exculpation.**  On and after the Original Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is

hereby released from, any claim, cause of action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, (a) pertaining to the timing of the commencement of the Chapter 11 Cases, (b) for any act or omission that occurred during the Chapter 11 Cases or in connection with the formulation, negotiation, and/or pursuit of confirmation of the Original Plan, the consummation of the Original Plan, and/or the administration of the Original Plan and/or the property distributed under the Original Plan, or (c) for any act or omission that occurred in connection with the formulation, negotiation, and/or pursuit of confirmation of this Modified Plan, the consummation of the Modified Plan and/or administration of the Modified Plan or the Status Quo Order and/or the property to be distributed under this Modified Plan, except, in each case, for claims, causes of action or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to determination of such by final order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Original Plan, this Modified Plan and the Status Quo Order to the extent permitted by applicable law.  Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  No provision of this Modified Plan, the Original Plan, the Original Disclosure Statement or the Modified Disclosure Statement shall be deemed to act or release any Claims, Causes of Action or liabilities that the Liquidating Trust, Reorganized Access Lending, the Estates, or the SEC may have against any Person or entity for any act, omission, or failure to act that occurred (i) with respect to the Debtors other than Access Lending, prior to April 2, 2007 and (ii)

123

with respect to Access Lending, prior to August 3, 2007, in either case, other than for claims, Causes of Action, or liability pertaining to the timing of the commencement of the Chapter 11 Cases, nor shall any provision of this Modified Plan be deemed to act to release any Avoidance Actions.

        D.       **Release of Goldman.**  On the Modified Effective Date, effective as of the Original Effective Date, any and all claims, Causes of Action, rights or remedies of any kind or nature that the Debtors or the Estates have, may have or could have asserted against Goldman, its affiliates or its former or present officers, directors, employees, attorneys, financial advisors or other professionals, which claims, causes of action, rights or remedies arise out of or relate to Access Lending shall be waived, set aside, discharged, settled, compromised, and released.

        E.       **Binding Effect of the Original Plan and the Modified Plan.**  (a)  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, subject to the occurrence of the Modified Effective Date and to the extent not inconsistent with the Reversal Order, on and after the Original Confirmation Date, the provisions of the Original Plan, to the extent implemented by the Liquidating Trustee, shall bind any Holder of a Claim against, or Interest in, the Debtors, Estates and their respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under the Original Plan, whether or not such Holder has accepted the Original Plan and whether or not such Holder has filed a Claim.  On and after the Original Confirmation Date, the EPD/Breach Claim Protocol shall be binding on all Holders of Claims in Classes OP3b and/or OP6b irrespective of how such Holders vote on the Original Plan and irrespective of whether such Holders submit the information requested by the Debtors pursuant to the questionnaire referenced in the

EPD/Breach Protocol. Any vote in favor of the Original Plan by a Holder of Claims in Classes OP3b and/or OP6b will constitute an express consent to the EPD/Breach Protocol in the Original Plan as adopted by this Modified Plan.

(b)    Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Modified Confirmation Date, the provisions of this Modified Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective successors or assigns, whether or not the Claim or Interest of such Holder is impaired under the Modified Plan, whether or not such Holder has accepted this Modified Plan and whether or not the Holder has filed a Claim.

(c)    The rights, benefits and obligations of any Person named or referred to in the Original Plan or this Modified Plan, whose actions may be required to effectuate the terms of the Original Plan or this Modified Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person (including, without limitation, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

## ARTICLE 14.

### CONDITIONS PRECEDENT

A.    Conditions Precedent to Modified Effective Date. This Modified Plan shall not become effective unless and until each of the following conditions shall have been satisfied in full in accordance with the provisions specified below:

1.    *Approval of Modified Disclosure Statement.* The Bankruptcy Court shall have approved a disclosure statement to this Modified Plan in form and substance acceptable to the Plan Proponents of the Modified Plan in their sole and absolute discretion.

125

2.    *Approval of Plan Compromises.*    The compromises and settlements contained in Articles 4, 6, and 7 of this Modified Plan and the Original Plan shall be approved as of the Original Effective Date without material modification by Final Order in accordance with Bankruptcy Rule 9019 and shall be binding and enforceable against all Holders of Claims and Interests under the terms of this Modified Plan.

3.    *Form of Modified Confirmation Order.*  The Modified Confirmation Order shall be in form and substance acceptable to the Plan Proponents of the Modified Plan in their sole and absolute discretion.

4.    *Entry of Modified Confirmation Order.*  The Modified Confirmation Order (i) shall have been entered by the Bankruptcy Court, (ii) shall not be subject to any stay of effectiveness, and (iii) shall have become a Final Order, the Modified Confirmation Date shall have occurred, and no request for revocation of the Modified Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

5.    *Liquidating Trust.*  The Modified Confirmation Order shall reconfirm the establishment of the Liquidating Trust.

6.    *Liquidating Trustee.*  The Modified Confirmation Order shall reconfirm the appointment of Alan M. Jacobs as Liquidating Trustee.

7.    *Plan Administrator.*  The Modified Confirmation Order shall reconfirm the appointment of Alan M. Jacobs as Plan Administrator.

B.    **Revocation, Withdrawal, or Non-Consummation of this Modified Plan.**  If after the Modified Confirmation Order is entered, each of the conditions to effectiveness has not been satisfied or duly waived on or by ninety (90) days after the Modified Confirmation Date,

126

then upon motion by the Plan Proponents of the Modified Plan, the Modified Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Modified Confirmation Order shall not be vacated if each of the conditions to effectiveness is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  As used in the preceding sentence, a condition to effectiveness may only be waived by a writing executed by the Plan Proponents of the Modified Plan.  If the Modified Confirmation Order is vacated pursuant to this Section, this Modified Plan shall be null and void in all respects and the Status Quo Order will remain effective pending further order of the Bankruptcy Court, and nothing contained in this Modified Plan, the Modified Disclosure Statement, nor any pleadings filed in connection with the approval thereof shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtors, (iii) prejudice in any manner the rights of the Original Plan Proponents or the Plan Proponents of the Modified Plan in the Chapter 11 Cases, or (iv) constitute an admission of any fact or legal position or a waiver of any legal rights held by any party prior to the Confirmation Date.  This Article 14.B is not intended to establish the applicable legal standard with respect to vacating the Modified Confirmation Order, and the rights of all parties in interest to object to any motion filed pursuant to this Article 14.B., including on the basis that the applicable legal standard has not been satisfied, are fully reserved.

## ARTICLE 15.

### ADMINISTRATIVE PROVISIONS

A.    **Retention of Jurisdiction.**  This Modified Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain

and have exclusive jurisdiction (to the extent granted by applicable law, including any Provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter (i) arising under the Bankruptcy Code, (ii) arising in or related to the Chapter 11 Cases, the Original Plan or this Modified Plan, or (iii) that relates to the following:

       1.    to hear and determine motions for (i) the assumption or rejection or (ii) the assumption and assignment of Executory Contracts or unexpired leases and the allowance of Claims resulting therefrom;

       2.    to adjudicate any and all disputes over the ownership of a Claim or Interest;

       3.    to adjudicate any and all disputes arising from or relating to the distribution or retention of consideration under the Original Plan or this Modified Plan;

       4.    to hear and determine timely objections to Claims, whether filed before or after the Original Confirmation Date, including objections to the classification, estimation or establishment of priority or status of any Claim, and to allow or disallow any Claim, in whole or in part;

       5.    to determine the extent, validity, and/or priority of any Lien asserted against property of the Debtors or the Estates or property abandoned or transferred by the Debtors or the Estates;

       6.    to determine the amount, if any, of interest to be paid to Holders of Allowed Unsecured Claims if any Allowed Unsecured Claims are paid in full pursuant to the terms of this Modified Plan;

       7.    to hear and determine matters related to the assets of the Estates, including liquidation of the Debtors' assets; provided that notwithstanding the foregoing, the

Liquidating Trustee (including in his capacity as Plan Administrator) shall have no obligation to obtain the approval or authorization of the Bankruptcy Court or file a report to the Bankruptcy Court concerning the sale, transfer, assignment or disposition of assets; provided further, that the Liquidating Trustee may seek "comfort orders" or similar orders of the Bankruptcy Court approving the Liquidating Trustee's sale or disposition of such assets to facilitate such transactions;

8. to adjudicate disputes relating to any alleged subordination of the Capital Trust Claims;

9. to enter and implement such orders as may be appropriate in the event the Modified Confirmation Order is for any reason stayed, revoked, modified or vacated;

10. to consider modifications of or amendments to this Modified Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including without limitation, the Modified Confirmation Order;

11. to issue orders in aid of execution, implementation, or consummation of this Modified Plan;

12. to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Original Plan, this Modified Plan, the Original Confirmation Order or the Modified Confirmation Order including disputes arising under agreements, documents, or instruments executed in connection with this Modified Plan or the Original Plan;

13. to hear and determine all motions requesting allowance of an Administrative Claim;

14. to hear and determine all Fee Applications;

129

15.    to determine requests for the payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses and parties entitled thereto;

16.    to hear and determine all controversies arising in connection with the implementation of this Modified Plan;

17.    to hear and determine all Causes of Action, Avoidance Actions, and other suits and adversary proceedings to recover assets of (i) the Liquidating Trust, as successor-in-interest to any of the Debtors (other than Access Lending) and property of the Estates (other than the Estate of Access Lending), wherever located, and (ii) Reorganized Access Lending, as successor-in-interest to Access Lending and property of the Estate of Access Lending, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or this Modified Plan or the Original Plan, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

18.    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19.    to resolve all conflicts and disputes between the Liquidating Trustee, the Liquidating Trust, Reorganized Access Lending, the Plan Advisory Committee, and Holders of Claims or Interests;

20.    to hear any matter not inconsistent with the Bankruptcy Code;

130

21.    to hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Original Effective Date;

22.    to consider matters regarding the Debtors' insurance policies, if any, including jurisdiction to reimpose the automatic stay or its applicable equivalent provided in the Original Plan or this Modified Plan;

23.    to issue injunctions, provide declaratory relief, take such other legal or equitable actions, or issue such other orders as may be necessary or appropriate to restrain interference with this Modified Plan, the Debtors, the Estates or their property, the Committee, the Liquidating Trust, Reorganized Access Lending, the Liquidating Trustee, the Plan Advisory Committee, Professionals, or the Modified Confirmation Order;

24.    to enter a Final Decree closing the Chapter 11 Cases; and

25.    to enforce all orders previously entered by the Bankruptcy Court.

**B.    Payment of Statutory Fees.**  All fees payable through the Original Effective Date pursuant to section 1930 of Title 28 of the United States Code shall be paid on or before the Original Effective Date.  All fees payable after the Original Effective Date pursuant to section 1930 of Title 28 of the United States Code shall be paid by the Liquidating Trust or Reorganized Access Lending, as applicable.

**C.    General Authority.**  The Liquidating Trust or Reorganized Access Lending, subject to the Status Quo Order, shall execute such documents, and take such other actions, as

131

are necessary to effectuate the transactions provided for in this Modified Plan as well as the provisions of the Original Plan as adopted by this Modified Plan. Additionally, with respect to mortgage loans purchased from one or more of the Debtors prior to or subsequent to the Petition Date, the Liquidating Trust shall execute, upon written request, and at the expense of the requesting party, any powers of attorney as shall be prepared by the requesting party and reasonably satisfactory to the Liquidating Trustee, necessary to fully effectuate the transfer of such loan or otherwise to effect the appropriate transfer of record title or interest in such loan, including, without limitation, any powers of attorney as may be necessary to allow the purchaser of such mortgage loan from such Debtor (including any trustee or servicer on behalf of the purchaser) to complete, execute and deliver, in the name of and on behalf of the applicable Debtor or the Liquidating Trust, any required assignments of mortgage or instruments of satisfaction, discharge or cancellation of mortgages, mortgage notes or other instruments related to such mortgage loan; provided, however, that the party making the requests presents evidence reasonably satisfactory to the Liquidating Trustee, of the validity of the transfer being effectuated and that the loan being transferred was purchased from the applicable Debtor; provided, further, that the Liquidating Trust shall not be liable for the actions of the requesting party under any such powers of attorney; and provided, further, that the Liquidating Trustee may seek modification of this requirement on noticed motion and other parties may oppose such motion. Powers of attorney executed by the Debtors prior to their dissolution shall be binding on the Liquidating Trustee, the Liquidating Trust, and the Estates and may be recorded by the holder of such power of attorney with full force and effect notwithstanding the dissolution of the Debtors.

    **D.**    **Headings.**    The headings of the Articles, paragraphs, and sections of this Modified Plan are inserted for convenience only and shall not affect the interpretation hereof.

E.    **Final Order.**  Except as otherwise expressly provided in this Modified Plan, any requirement in this Modified Plan for a Final Order may be waived by the Liquidating Trustee upon written notice to the Bankruptcy Court.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

F.    **Amendments and Modifications.**  The Plan Proponents of the Modified Plan may alter, amend, or modify this Modified Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Modified Confirmation Hearing.  After the Modified Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of this Modified Plan with respect to any Debtor, the Plan Proponents of the Modified Plan may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in this Modified Plan, the Modified Disclosure Statement, or the Modified Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Modified Plan, by the filing of a motion and, so long as the proposed modifications to the Modified Plan are non-material, (i) notice need only be provided to the Persons listed the Bankruptcy Rule 2002 service list, and (ii) the solicitation of all Creditors and other parties in interest shall not be required.

G.    **Payment Date.**  Whenever any payment or distribution to be made under this Modified Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

H.    **Withholding and Reporting Requirements.**  In connection with this Modified Plan and all instruments issued in connection therewith and distributions thereon, the Liquidating Trustee, including in his capacity as Plan Administrator, shall comply with all withholding and

133

reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

      I.     **No Waiver.** The failure of the Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Debtors', the Liquidating Trust's, or Reorganized Access Lending's right to object to or examine such Claim, in whole or in part.

      J.     **Tax Exemption.** Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of a security under the Original Plan or this Modified Plan, or the making or delivery of an instrument of transfer pursuant to, in implementation of or as contemplated by the Original Plan or this Modified Plan, including, without limitation, any transfers to or by the Debtors, if on the Original Effective Date, and the Liquidating Trustee, if after the Original Effective Date, of the Debtors' property in implementation of or as contemplated by this Modified Plan (including, without limitation, any subsequent transfers of property by the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax or similar tax. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Modified Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, transfer tax, intangible tax, or similar tax.

      K.     **Securities Exemption.** Any rights issued under, pursuant to or in effecting this Modified Plan or the Original Plan prior to the entry of the Reversal Order, including the stock of Reorganized Access Lending, and the offering and issuance thereof by any party, including without limitation the Debtors or the Liquidating Trust, shall be exempt from section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring

registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation section 1145 of the Bankruptcy Code.

L.    **Non-Severability.**  Except as specifically provided herein, the terms of this Modified Plan constitute interrelated compromises and are not severable.  Additionally, no provision of Articles 4, 6, or 7 of this Modified Plan may be stricken, altered, or invalidated.

M.    **Revocation.**  The Plan Proponents of the Modified Plan reserve the right to revoke and withdraw this Modified Plan prior to the Modified Confirmation Date.  If the Plan Proponents of the Modified Plan revoke or withdraw this Modified Plan, then this Modified Plan shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors, the Committee, the Liquidating Trust, the Liquidating Trustee or any other Person or to prejudice in any manner the rights of the Debtors, the Committee, the Liquidating Trust, the Liquidating Trustee or any Person in any further proceedings involving the Debtors, or be deemed an admission by the Debtors, the Committee, the Liquidating Trust and/or the Liquidating Trustee including with respect to the amount or allowability of any Claim or the value of any property of the Estates.

N.    **Modified Plan Controls Modified Disclosure Statement.**  In the event and to the extent that any provision of this Modified Plan is inconsistent with any provision of the Modified Disclosure Statement, the provisions of this Modified Plan shall control and take precedence.

O.    **Governing Law.**  Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless specifically

135

stated, the rights, duties, and obligations arising under this Modified Plan, any agreements, documents, and instruments executed in connection with this Modified Plan or the Original Plan to the extent adopted by this Modified Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control) and, with respect to the Debtors incorporated in Delaware, corporate governance matters shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to conflicts of law principles. Corporate governance matters relating to any Debtor not incorporated in Delaware shall be governed by the law of the state of incorporation of the applicable Debtor.

     **P.**    **Notices.** Any notices or requests of the Debtors or the Liquidating Trust by parties in interest under or in connection with the Modified Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

    If to the Debtors, the Liquidating Trust or the Liquidating Trustee:

    c/o Alan M. Jacobs
    Liquidating Trustee of New Century Liquidating Trust
    999 Central Avenue, Suite 208
    Woodmere, NY 11598

    With a copy to:

    Hahn & Hessen LLP
    Attn:  Mark S. Indelicato, Esq.
    488 Madison Avenue
    New York, NY 10022

    and

    Blank Rome LLP
    Attn:  Bonnie Fatell, Esq.
    1201 Market Street
    Wilmington, DE 19801

136

Q.      **Filing of Additional Documents.**  On or before "substantial consummation" (as such term is defined in section 1102(2) of the Bankruptcy Code) of this Modified Plan, the Plan Proponents of the Modified Plan may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate and further evidence the terms and conditions of this Modified Plan.

R.      **Direction to a Party.**  From and after the Modified Effective Date, the Plan Proponents of the Modified Plan may apply to the Bankruptcy Court for entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by this Modified Plan and the Original Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of this Modified Plan incorporating action taken pursuant to the Original Plan.

S.      **Successors and Assigns.**  The rights, benefits, duties, and obligations of any Person named or referred to in this Modified Plan, including all Creditors, shall be binding on, and shall inure to the benefit of, the successors and assigns of such Person.

T.      **Final Decree.**  Once any of the Estates has been fully administered, as referred to in Bankruptcy Rule 3022, the Liquidating Trust or another party, as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a Final Decree to close the Chapter 11 Case of the applicable Estate(s).

## ARTICLE 16.

### CONFIRMATION REQUEST

The Plan Proponents of the Modified Plan hereby request confirmation of this Modified
Plan as a Cramdown Plan with respect to any impaired Class that does not accept this Modified
Plan or is deemed to have rejected this Modified Plan.

### ARTICLE 17.

### BANKRUPTCY RULE 9019 REQUEST AND, TO EXTENT REQUIRED, REQUEST
### PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A) AND 1123(A)(5)

Pursuant to Bankruptcy Rule 9019, the Plan Proponents of the Modified Plan hereby
request approval of all compromises and settlements included in this Modified Plan, including,
without limitation, the compromises and settlements included in Articles 4, 6, and 7 of this
Modified Plan. To the extent required, the Plan Proponents of the Modified Plan hereby request
confirmation of this Modified Plan based on the partial substantive consolidation of the Debtors
pursuant to sections 105(a) and 1123(a)(5) of the Bankruptcy Code.

Dated: Wilmington, Delaware
           September 30, 2009

Respectfully submitted,

NEW CENTURY FINANCIAL CORPORATION,
on behalf of the Debtors and Debtors-in-Possession

_____/s/ Alan M. Jacobs_____
By:      Alan M. Jacobs,

Liquidating Trustee of the New Century Liquidating
Trust (including in his capacity as sole officer and
director of each of the Debtors) and as Plan
Administrator of Reorganized Access Lending

138

Authorized and Approved by:

THE PLAN ADVISORY COMMITTEE

_____/s/ Donald A. Workman_____
By:     Donald A. Workman, Esq. (Chair)

Counsel for Lender Processing Services, Inc.

**EXHIBIT A**

### Exhibit 1 - Assumption Schedule

Out of any abundance of caution the Debtors have listed critical documents and agreements on this schedule. The listing of a document or agreement on this schedule shall not constitute an admission by the Debtors that such document or agreement is (a) an executory contract or unexpired lease or that the Debtors have any liability thereunder; or (b) that the document or agreement was entered into prepetition and therefore subject to section 365(a) of the Bankruptcy Code. The Debtors intend to assume all agreements not previously rejected the primary purpose of which is the perpetual licensing of intellectual property rights from third parties and for which no cure amount is owed by the Debtors. Examples include, but are not limited to, those agreements with Microsoft, Lawbase and Legato.

### Part A. Contracts

| Contract | Cure Amount |
|---|---|
| Services Agreement dated as of December 20, 2007 by and among New Century Mortgage Corporation and ACS Commercial Solutions. | $0 |
| Epicor Software Corporation Maintenance / Support Renewal Program dated as of July 1, 2007 by and between Epicor Software Corporation and New Century Mortgage Corp. | $0 |
| Records Management and Data Protection Service Agreements and Customer Agreements dated as of various dates by and between Iron Mountain Information Management Inc. ("Iron Mountain"), its predecessor companies and New Century Mortgage Corporation, Home 123 Corporation, New Century Financial Corporation, etc. for hardcopy storage and tape storage accounts numbered: 01222.0FX031, 01222.0CF310, 01222.0FX578, 01222.00I.322, 01222.0L3429, 04311.0H0929, 04311.0H5450, 01422.0OP084, 44114.044075, 44113.041293, 44114.057273 | $0 |
| Park Place Short Term Lease dated as of January 22, 2008 by and among Maguire Properties - Park Place, LLC and New Century Financial Corporation. | $0 |
| Agreement between Data-Link Systems, LLC and New Century Mortgage Corporation dated as of July 5, 2007 (the "Agreement"), Amendment No. 1 dated as of April __ 2008, and Feature Addendum dated as of January 3, 2008 | $0 |
| Onbase Online Hosted Solution Agreement dated as of January 7, 2008 by and between Hyland Software, Inc. and New Century Financial Corporation. | $0 |
| Authorization and Agreement for Cash Management Services dated as of 7/23/2003 by and between New Century Mortgage Corporation and Union Bank of California, N.A. and the Security Agreement dated as of 3/10/2005 by and between New Century Mortgage Corporation and Union Bank of California, N.A. | $0 |
| Letter Agreement and price list dated as of March 31, 2008 by and between Bekins Moving Solutions and New Century Mortgage Corporation. | $0 |

## Part B. Insurance Policies

| TYPE OF POLICY | Carrier | POLICY # |
|---|---|---|
| **COMMERCIAL LIABILITY** | | |
| General Liability | Fidelity & Deposit Co. of Maryland | CP0913762802 |
| Umbrella AL, GL & REO | Fidelity & Deposit Co. of Maryland | UMB913752 |
| Auto Liability | Fidelity & Deposit Co. of Maryland | CAP0016872 |
| Property / Flood | Fidelity & Deposit Co. of Maryland | FIA1003282 |
| General Liability | Fidelity & Deposit Co. of Maryland | FIA 100256503 |
| Umbrella AL, GL & REO | Fidelity & Deposit Co. of Maryland | UMB 5344245 |
| General Liability | Fidelity & Deposit Co. of Maryland | FIA 1002565 |
| Umbrella AL, GL & REO | Fidelity & Deposit Co. of Maryland | UMB 5344245 |
| General Liability | Great Northern Ins (Chubb) | 35397736 LAO |
| Umbrella AL, GL & REO | Federal Insurance Co. (Chubb) | 7977-03-85 |
| General Liability | Great Northern Ins (Chubb) | 35397736 LAO |
| Umbrella AL, GL & REO | Federal Insurance Co. (Chubb) | 7977-03-85 |
| General Liability | Great Northern Ins (Chubb) | 35397736 LAO |
| Umbrella AL, GL & REO | Federal Insurance Co. (Chubb) | 7977-03-85 |
| General Liability | Centennial Insurance Company | 497-40-20-82 |
| **DIRECTORS & OFFICERS** | | |
| Run Off Program | American International Specialty Lines Insurance Company (AISLIC) | 672-43-85 |
| Run Off Program | Ace American Insurance Company | DOX G2166120A-002 |
| Run Off Program | Lloyds of London | FD0604467 |
| Run Off Program | Axis Reinsurance Company | RNN727183 |
| Run Off Program | Starr Excess Liability Insurance Co. | 4121907 |
| Run Off Program | American International Group, Inc. (AIG) | 713-23-15 |
| Run Off Program | Lloyds of London | FD0604994 |
| Run Off Program | Ace American Insurance Company | DOXG21661338001 |
| Run Off Program | Axis Reinsurance Company | RNN727184 |
| Run Off Program | Liberty Mutual Insurance Company | 073551-018 |
| Run Off Program | Navigators Insurance Company | NY06DOL149577NV |
| Run Off Program | Arch Insurance Company | AID00016068-00 |
| Run Off Program | CNA Insurance Company | 287039031 |
| Run Off Program | Navigators Insurance Company | NY06DOL149583NV |
| Go Forward (Execs & Organization) | AIG | 713-35-92 |
| Go Forward (Execs & Organization) | U.S. Specialty Ins. Co. (HCC Global) | 14-MGU-07-A14286 |
| Primary Layer | AISLIC | 672-43-85 |
| 2nd Excess Layer | Ace American Insurance Company | DOX G2166120A-002 |
| 3rd Excess Layer | Lloyds of London | FD0604467 |
| 4th Excess Layer | Axis Reinsurance Company | RNN727183 |

| TYPE OF POLICY | Carrier | POLICY # |
|---|---|---|
| 5th Excess Layer | Starr Excess Liability Insurance Co. | 4121907 |
| 6th Excess Layer | XL Specialty Insurance Company | ELU0929060 |
| 7th Excess Layer | Lloyds of London | FD0504994 |
| 8th Excess Layer | Ace American Insurance Company | DOXG21681338001 |
| 9th Excess Layer | Axis Reinsurance Company | RNN727184 |
| 10th Excess Layer | Liberty Mutual Insurance Company | 73551016 |
| 11th Excess Layer | Navigators Insurance Company | NY08DOL149577HV |
| IDL/Ed Gotschall Only | Hartford Insurance Company | 000A0238401506 |
| Independendant Directors Liability | Arch, CNA & Navigators | Various |
| Primary Layer | Liberty Mutual Insurance Company | LNE-B71-073551-012 |
| 2nd Excess Layer | Houston Casualty Company (Global) | 24-MG-03-A2237 |
| 3rd Excess Layer | Lexington Insurance Company | 1620592 |
| 4th Excess Layer | Greenwich Insurance Company | ELU 82569-02 |
| 5th Excess Layer | Kemper Insurance Company(Lumbermans) | 3DY 016540 01 |
| 6th Excess Layer | XL Insurance (Bermuda) | XLD+O-05782-01 |
| 7th Excess Layer | Allied World Assurance Company | C001156 |
| 8th Excess Layer | Lloyds of London | L2CX069 |
| 9th Excess Layer | Philadelphia Insurance Companies | PHSD037932 |
| 10th Excess Layer | Royal & Sunalliance | HS 611797 |
| Primary Layer | Liberty Mutual Insurance Company | LNE-B71-073551-013 |
| 2nd Excess Layer | Houston Casualty Company (Global) | 24-MG-03-A2257 |
| 3rd Excess Layer | Lexington Insurance Company | 1620615 |
| 4th Excess Layer | XL Insurance Company | EX71010999 |
| 5th Excess Layer | Sheffield Insurance Company | EAN598659 |
| 6th Excess Layer | Illinois Union Insurance Company | DOXG21689686001 |
| 7th Excess Layer | XL Insurance Company | XLD+O-05782D2 |
| 8th Excess Layer | AWA Company | C001152002 |
| 9th Excess Layer | Lloyds of London | FD042660S |
| 10th Excess Layer | Philadelphia Insurance Companies | PHSD068425 |
| Primary Layer | American International Group, Inc. (AIG) | 408-81-35 |
| Excess Layer | Houston Casualty Company | 14-MGU-08-A16485 |
| EMPLOYMENT PRACTICES LIABILITY | | |
| Employment Practices | Max Re | 12575-1930-EPLI-2006 |
| Employment Practices | Max Re | 7747-752-EPLI-2005 |
| Employment Practices | Max Re | 4256-359-EPLI-2004 |
| Employee Commercial Crime | Travelers Casualty & Surety Company | 104011836 |
| FIDUCIARY LIABILITY | | |
| Run Off Program | Philadelphia Indemnity Insurance Co. | PHSD219056 |
| Fidiciary Liability | Philadelphia Indemnity Insurance Co. | PHSD219056 |
| Fidiciary Liability | Philadelphia Indemnity Insurance Co. | PHSD114807 |

| TYPE OF POLICY | Carrier | POLICY # |
|---|---|---|
| MORTGAGE BANKERS BOND | | |
| Primary Coverage | Bankers Insurance Services | MBB-05-00071 |
| Primary Coverage | Bankers Insurance Services | MBB-03-00002 |
| SERVICING INSURANCE | | |
| Flood | Lloyds of London | 1916-3263 |
| Wind | Lloyds of London | 1770-3263 |
| Fire & Liability | Safeco | MIP7553881A |
| Fire & Liability | Safeco | MSH7710681B |
| Fire & Liability | Safeco | MSH7710548B MIP78553565A |
| Fire & Liability | Safeco | MIH7710548B |
| Fire & Liability | Safeco | MIH7710681B |
| WORKERS COMP | | |
| Workers Comp | Valley Forge Insurance Co (CNA) | WC24921601 WC249216177 WC249216373 |
| Workers Comp | Valley Forge Insurance Co (CNA) | WC249221914 WC249221928 WC249221800 |
| Workers Comp | ACE American Insurance Company - claims administered by ESIS | WLRC43981547 |
| Workers Comp | ACE American Insurance Company - claims administered by ESIS | WLRC44436124 |
| Workers Comp | Travelers Paid Loss Occurrence | TRJUB1761B86107 TC2JUB1761B46507 for AZ, MA, OR and WI |

**EXHIBIT B**

**EPD/ BREACH PROTOCOL**[1]

I.    EPD/FPD Claims.

    A.    Methodology.

        EPD and FPD Claims are Claims based on a provision in a loan purchase agreement that obligated a Debtor to repurchase a loan if the borrower defaulted on his or her first loan payment after the loan was sold (a First Payment Default or "FPD") or defaulted on a payment due within a period of time (usually 30 or 60 days) after the loan was sold (an Early Payment Default or "EPD"). Loan purchase agreements varied as to whether the EPD/FPD provision was set forth as a standalone provision of the loan sale agreement or was styled as a representation or warranty. A Claim based on either is treated as an EPD/FPD Claim for purposes of the protocol.

        Each Creditor that establishes a valid EPD or FPD under the applicable loan purchase agreement will receive a distribution in the Plan premised upon damages assessed based upon the borrower payment history and the unpaid principal balance ("UPB") for the loan, in both cases measured as of August 31, 2007, according to the following grid:[2]

- Current: 0% of UPB
- 31 – 60 days delinquent: 15% of UPB
- 61 – 90 days delinquent: 20% of UPB
- 91 or more days delinquent: 30% of UPB
- Borrower in bankruptcy: 35% of UPB

---

[1] Capitalized terms not defined herein shall have the meaning given to them in the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 1, 2008.
[2] The applicable category that would lead to the highest calculation takes precedence. For example, if as of 8/31/07 a loan was 61 days delinquent and the borrower was in bankruptcy, the applicable percentage is 35% of UPB.

LA3:1144420.8

- In foreclosure[3]:  40% of UPB

- Real estate owned (including liquidations of such real estate )("REO"): 45% of UPB

If the Creditor sold the loan prior to August 31, 2007 and does not know the loan status as of August 31, 2007, the damage assessment will be measured as of the date of sale.  If a loan has been foreclosed, the measurement will consider the property to be REO and the measurement will be based on the UPB at the time of foreclosure.

If subsequent to the sale of the loan by a Debtor and prior to August 31, 2007, the borrower and the owner of a loan agreed to modify the payment (principal or interest) terms of the loan, then the loan will be treated under the next most severe category in the grid.  For example, if a Creditor and borrower agreed in April 2007 to relax the borrower's payment obligations under a loan, and on August 31, 2007 the borrower was current on the modified schedule, this loan will be treated as though the borrower was 31 – 60 days delinquent. Similarly, if on August 31, 2007 that same borrower was 40 days delinquent under the modified payment schedule, the loan will be treated as though the borrower was 61 – 90 days delinquent.

In order to establish the validity of the EPD/FPD Claim and to apply the grid, each EPD/FPD claimant must provide to the Debtors information set forth in questionnaire for loans on which it asserts an EPD/FPD claim.  This information includes:

- The payment history for each loan for which an EPD or FPD is asserted in electronic format, including identification of the payment status as of August 31, 2007.

- Identification of the loan purchase agreement pursuant to which the loan was sold by a Debtor, including a copy of the relevant EPD/FPD payment

---

[3] In foreclosure means that the period set in a notice of intent to foreclose during which the borrower has the ability

LA3:1144420.8

provisions (note: the length of time for EPD and FPD claims varied among the master loan purchase agreements).

II.   BREACH CLAIMS.

    A.   Methodology.

The damages resulting from breach Claims will be calculated based upon the simplifying assumptions that: (i) 1.5% of the loans in any pool will at some point be subject to a breach that would have caused the selling Debtor to have repurchased the loan, (ii) the "seasoning" of loans will be taken into account so that this 1.5% incidence is spread over the life of the pool based on the Debtors' historic data concerning the timing of when breach claims are asserted, and (iii) damages resulting from breaches will be set at 30% of the UPB of the loan as of August 31, 2007. The following table sets forth the calculation methodology:

| Year | Quarter | % Incidence | Damages |
|------|---------|-------------|---------|
| 2007 | 1 Qtr | 1.500% | 0.450% |
| 2006 | 4 Qtr | 1.200% | 0.360% |
| 2006 | 3 Qtr | 1.120% | 0.336% |
| 2006 | 2 Qtr | 0.850% | 0.255% |
| 2006 | 1 Qtr | 0.680% | 0.204% |
| 2005 | 4 Qtr | 0.530% | 0.159% |
| 2005 | 3 Qtr | 0.360% | 0.108% |
| 2005 | 2 Qtr | 0.180% | 0.054% |
| 2005 | 1 Qtr | 0.140% | 0.042% |
| 2004 | 4 Qtr | 0.100% | 0.030% |
| 2004 | 3 Qtr | 0.085% | 0.026% |
| 2004 | 2 Qtr | 0.065% | 0.020% |
| 2004 | 1 Qtr | 0.060% | 0.018% |
| 2003 | 4 Qtr | 0.053% | 0.016% |
| 2003 | 3 Qtr | 0.045% | 0.014% |
| 2003 | 2 Qtr | 0.035% | 0.011% |
| 2003 | 1 Qtr | 0.025% | 0.008% |
| 2002 | 4 Qtr | 0.022% | 0.007% |
| 2002 | 3 Qtr | 0.018% | 0.005% |
| 2002 | 2 Qtr | 0.015% | 0.005% |
| 2002 | 1 Qtr | 0.012% | 0.004% |
| 2001 and Earlier | | 0.006% | 0.002% |

to bring the loan current has expired.

- 3 -

LA3:1144420.8

If an applicable loan purchase agreement between a Debtor and a non-affiliate of the Debtors did not contain an EPD provision, but did allow the purchaser to cause a Debtor to repurchase loans based on breaches of other types of representations and warranties, the damage calculations set forth in the foregoing table will be multiplied by 1.5667.

Damages, for purposes of distributions under the Plan, will be measured by applying the percentage factor in the final column of this table against the August 31, 2007 UPB of the loans purchased from a Debtor; provided, however, that in no case will the damage calculation for any pool be less than $5,000.

If the Creditor sold the loan prior to August 31, 2007 and does not know the UPB as of August 31, 2007, the damage assessment will be based on the UPB as of the date of sale. If a loan has been foreclosed, the measurement will be based on the UPB at the time of foreclosure. Loans that were paid-in-full or repurchased or replaced by one of the Debtors shall not be included in measuring the applicable UPB.

B.    Interaction with EPD/FPD Claims.

EPD/FPD claims will take precedence over breach claims. Thus, to the extent that a creditor establishes a valid EPD or FPD claim for a loan, that loan's UPB as of August 31, 2007 will be subtracted from the pool of loans for which breaches are computed.

This methodology is designed to avoid the need to resolve disputes over individual breach claims that are presently being asserted and to establish a methodology for assessing unliquidated claims based upon breaches that come to the fore when borrowers default in the future. Accordingly, this statistical approach will be used both with respect to individual breach claims presently being asserted by creditors and to assess unliquidated breaches to be discovered in the future; both types of breaches are subsumed within the statistical analysis set forth above.

- 4 -

LA3:1144420.8

III.    Information.

        In order to receive a distribution under the Plan, each Holder of an EPD/Breach Claim must supply information to the Debtors that enables the Debtors to calculate the damages that result from this protocol and to ensure that multiple creditors are not asserting overlapping claims. That information will be set forth in a questionnaire that the Debtors will submit to each Creditor that has asserted an EPD/Breach Claim.

Note: Nothing contained herein shall affect or impair in any way any other Claims, causes of actions or rights that the Holders of EPD/Breach Claims, the Debtors' Estates, and/or the Liquidating Trust may have against each other.

## Exhibit C

## Allocation of Joint Administrative Expense Shares

The Joint Administrative Expense Shares of Access Lending, the Holding Company Debtors, and the Operating Debtors are as follows:

| Debtor Group | April 2, 2007 through April 27, 2007[1] | April 28, 2007 through Effective Date |
|---|---|---|
| Access Lending | 0.7%[2] | 0% |
| Holding Company Debtors | 22.4% | 22.6% |
| Operating Debtors | 76.8% | 77.4% |

---

[1] If Access Lending is removed from the Plan pursuant to Article 8.J.7 of the Plan, then the Joint Administrative Share allocations set forth in this Exhibit C to the Plan for the period from April 28, 2007 through the Effective Date shall also apply to the period from April 2, 2007 through April 27, 2007; provided, however, that if Access Lending is removed from the Plan, the Holding Company Debtors and the Operating Debtors shall be permitted to seek reimbursement from Access Lending for expenses or any portions thereof paid by the Holding Company Debtors or the Operating Debtors on behalf of Access Lending during the Chapter 11 Cases.

[2] This allocation is subject to Article 10.F.4 of the Plan.

LA3:1145098.4

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re<br>NEW CENTURY TRS HOLDINGS, INC *et al.,* | §<br>§<br>§ | Case No. 07-10416 (BLS) |
| Debtors. | § | (Chapter 11) |

| | |
|---|---|
| NANCY K ALANIS | §<br>§<br>§ |
| *Movant* | §<br>§ |
| v. | §<br>§ |
| Liquidating Trustee<br>NEW CENTURY TRS HOLDINGS, INC *et al* | §<br>§<br>§ |
| And | § |
| NEW CENTURY TRS HOLDINGS, INC *et al* | §<br>§<br>§ |
| *Respondents* | §<br>§ |

**NANCY ALANIS MOTION TO REOPEN CHAPTER 11 CASE TO**
**(i)    FILE ADVERSARIAL COMPLAINT;**
**(ii)  OBTAIN COURT ORDERS ON CORE PROCEEDING MATTERS; AND**
**(iii)  OBTAIN RELATED RELIEF**

# Ex-6

# BARCLAYS

28 May 2010

**Barclays PLC**

**Barclays announces sale of HomEq Servicing to Ocwen Loan Servicing, LLC**

Barclays Bank PLC ("Barclays") has agreed to sell HomEq Servicing, its US mortgage servicing business ('HomEq') to Ocwen Loan Servicing, LLC ('Ocwen'), a subsidiary of Ocwen Financial Corporation, for a consideration of approximately $1.3bn, payable in cash on completion. The consideration is subject to an adjustment mechanism based on the unpaid principal balance of the servicing portfolio and the value of certain other assets at completion of the transaction. As part of the transaction, Barclays has agreed to provide Ocwen with approximately $1.0bn in secured financing and may assist Ocwen in raising additional third party financing. Completion is subject to customary conditions, including competition clearance, and is expected to occur in Q3 2010.

HomEq is the US mortgage servicing business of Barclays Capital and services mortgages with an unpaid principal balance of approximately $28bn as at 31 March 2010. The principal assets subject to the transaction are the mortgage servicing rights and associated servicer advances, as well as the servicing platform based in Sacramento, California and Raleigh, North Carolina.

Subject to regulatory approval, the transaction is expected to have a small positive impact on Barclays core tier one capital ratio, principally as a result of the release of capital deductions. The transaction is not expected to have a material impact on Barclays earnings per share.

Tom Hamilton, Head of Securitized Products Trading, Barclays Capital, said: "Barclays Capital is committed to providing first-class products and capabilities to our clients worldwide. We look forward to continuing to serve our issuer and investor clients from our position as a leading underwriter and market maker of securitised products."

- Ends -

**For further information, please contact:**

**Barclays**
**Investor Relations**
Stephen Jones
+44 (0) 20 7116 5752

**Media Relations**
Alistair Smith / Leigh Bruce
+44 (0) 20 7116 6132 / +44 (0) 20 7773 7371

**Ocwen**
Paul Koches
+1 202 416 1602

**About Barclays PLC**

Barclays is a major global financial services provider engaged in retail banking, credit cards, corporate and investment banking and wealth management with an extensive international presence in Europe, the Americas, Africa and Asia. With over 300 years of history and expertise in banking, Barclays operates in over 50 countries and employs over 144,000 people. Barclays moves, lends, invests and protects money for over 48 million customers and clients worldwide.

For further information about Barclays, please visit our website www.barclays.com.

**About Ocwen**

Ocwen Financial Corporation (NYSE: OCN) is a leading provider of residential and commercial loan servicing, special servicing and asset management services. Ocwen is headquartered in West Palm Beach, Florida with offices in California, the District of Columbia and Georgia and support operations in India and Uruguay. Utilising proprietary technology and world-class training and processes, Ocwen provides solutions that make clients' loans worth more. Additional information is available at www.ocwen.com.

**Forward-looking statements**

This document contains certain forward-looking statements within the meaning of Section 21E of the US Securities Exchange Act of 1934, as amended, and Section 27A of the US Securities Act of 1933, as amended, with respect to certain of the Group's plans and its current goals and expectations relating to its future financial condition and performance. Barclays cautions readers that no forward-looking statement is a guarantee of future performance and that actual results could differ materially from those contained in the forward-looking statements. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements sometimes use words such as "may", "will", "seek", "continue", "aim", "anticipate", "target", "expect", "estimate", "intend", "plan", "goal", "believe" or other words of similar meaning. Examples of forward-looking statements include, among others, statements regarding the Group's future financial position, income growth, assets, impairment charges, business strategy, capital ratios, leverage, payment of dividends, projected levels of growth in the banking and financial markets, projected costs, estimates of capital expenditures, and plans and objectives for future operations and other statements that are not historical fact. By their nature, forward-looking statements involve risk and uncertainty because they relate to future events and circumstances, including, but not limited to, UK domestic and global economic and business conditions, the effects of continued volatility in credit markets, market related risks such as changes in interest rates and exchange rates, effects of changes in valuation of credit market exposures, changes in valuation of issued notes, the policies and actions of governmental and regulatory authorities, changes in legislation, the further development of standards and interpretations under International Financial Reporting Standards (IFRS) applicable to past, current and future periods, evolving practices with regard to the interpretation and application of standards under IFRS, the outcome of pending and future litigation, the success of future acquisitions and other strategic transactions and the impact of competition – a number of which factors are beyond the Group's control. As a result, the Group's actual future results may differ materially from the plans, goals, and expectations set forth in the Group's forward-looking statements.

Any forward-looking statements made herein speak only as of the date they are made. Except as required by the UK Financial Services Authority, the London Stock Exchange or applicable law, Barclays expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained in this announcement to reflect any change in Barclays expectations with regard thereto or any change in events, conditions or circumstances on which any such statement is based. The reader should, however, consult any additional disclosures that Barclays has made or may make in documents it has filed or may file with the SEC.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | § | |
| NEW CENTURY TRS HOLDINGS, INC *et al.,* | § | Case No. 07-10416 (BLS) |
| | § | |
| Debtors. | § | (Chapter 11) |
| | § | |
| | § | |
| NANCY K ALANIS | § | |
| | § | |
| *Movant* | § | |
| | § | |
| v. | § | |
| | § | |
| Liquidating Trustee | § | |
| NEW CENTURY TRS HOLDINGS, INC *et al* | § | |
| | § | |
| And | § | |
| | § | |
| NEW CENTURY TRS HOLDINGS, INC *et al* | § | |
| | § | |
| *Respondents* | § | |

**NANCY ALANIS MOTION TO REOPEN CHAPTER 11 CASE TO**
**(i)    FILE ADVERSARIAL COMPLAINT;**
**(ii)  OBTAIN COURT ORDERS ON CORE PROCEEDING MATTERS; AND**
**(iii)  OBTAIN RELATED RELIEF**

# Ex-7

HELPING HOMEOWNERS IS WHAT WE DO!℠
WWW.OCWEN.COM

NOTICE OF SERVICE TRANSFER (RESPA)

RE: Ocwen Account Number 12345783
Ocwen Account Number: 70531379

August 11, 2010

Dear ALANIS NANCY:

[text faint and rotated]

ALANIS NANCY

70531379

DOCUMENT SCANNED AS FILED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | § | |
| NEW CENTURY TRS HOLDINGS, INC *et al.,* | § | Case No. 07-10416 (BLS) |
| | § | |
| Debtors. | § | (Chapter 11) |
| | § | |
| NANCY K ALANIS | § | |
| | § | |
| *Movant* | § | |
| | § | |
| v. | § | |
| | § | |
| Liquidating Trustee | § | |
| NEW CENTURY TRS HOLDINGS, INC *et al* | § | |
| | § | |
| And | § | |
| | § | |
| NEW CENTURY TRS HOLDINGS, INC *et al* | § | |
| | § | |
| *Respondents* | § | |

**NANCY ALANIS MOTION TO REOPEN CHAPTER 11 CASE TO**
**(i)    FILE ADVERSARIAL COMPLAINT;**
**(ii)  OBTAIN COURT ORDERS ON CORE PROCEEDING MATTERS; AND**
**(iii)  OBTAIN RELATED RELIEF**

# Ex-8



DOCUMENT SCANNED AS FILED



90

DOCUMENT SCANNED AS FILED



91



DOCUMENT SCANNED AS FILED







126

94

DOCUMENT SCANNED AS FILED



DOCUMENT SCANNED AS FILED



128

96

DOCUMENT SCANNED AS FILED

HELPING HOMEOWNERS IS WHAT WE DO!℠
WWW.OCWEN.COM

NOTICE OF SERVICE TRANSFER (RESPA)

RE: Ocwen Account Number: 70561 3079

august 11, 2010

Dear ALANIS NANCY:

Regular Payment Address:
Ocwen Loan Servicing, LLC
P.O. Box 6440
Carol Stream, IL 60197-6440

Overnight Address:
Ocwen Loan Servicing, LLC
Attn: Cashiering
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409

ALANIS NANCY

70561 3079

DOCUMENT SCANNED AS FILED



DOCUMENT SCANNED AS FILED



Order stamps at USPS.com/shop or
call 1-800-Stamp24. Go to
USPS.com/clickn ship to print
shipping labels with postage. For
other information call

Issue PVI:                        $3.24

Total:                    =      $3.24

Paid by:
Cash                      =      $20.00
Change Due:               =      -$16.76



131

99

DOCUMENT SCANNED AS FILED



DOCUMENT SCANNED AS FILED



P.O. BOX 9476
MINNEAPOLIS, MN 55480
www.moneygram.com

MoneyGram
Money Orders

20263668573
203   NN

60528514535145

DATE/AMOUNT
12/03/2010
$634.00

EMPLOYEE
618 (4/10) 500/5000
M 96581-R

R 20263668573 5

RECIBO

R 20263668573 5

MONEYGRAM PAYMENT SYSTEMS, INC. DRAWER
P.O. BOX 9476
MINNEAPOLIS, MN 55480
www.moneygram.com

RECEIPT
RECIBO

DATE/AMOUNT

EMPLOYEE
618 (4/10) 500/5000
M 96911-R

R 20290682719 0

12/03/2010   -   WM
MONEY ORDER

20263668573

SIX HUNDRED ***
THIRTY-FOUR ***
DOLLARS 00 CENTS

60528514535145
1522700337220353 3

PAY EXACTLY

***$634.00***

SYRACUSE IN 46567
Zone-6 Priority Mail
Medium Flat Rate Box
2 lb. 12.40 oz.
Expected Delivery: Wed 12/08/10
Delivery Confirmation
0310201000021384730
Label #:

Issue PVI:                              $10.70

Customer: Postage                       $1.92
Subtotal:                               -$1.32
                                        $1.92

Label #:                                $11.40
Issue PVI:
                                        =======
Total:                                  $13.32

Paid by:
Cash                                    =======
                                        $14.00

133

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com®

Postage        $0.44
Certified Fee  $2.80                    Postmark
                                        Here
Return Receipt Fee
(Endorsement Required)   $0.00
Restricted Delivery Fee
(Endorsement Required)   $0.00
Total Postage & Fees   $ $3.24          12/04/2010

7010 0780 0000 2045 7070

Sent to
CCRTNEI LVNN S LLKKLLVR
Street, Apt. No.;
or PO Box No.  R. BX LHGI
City, State, ZIP+4
CNRD SPREM TL GHIPT (-LMC

DOCUMENT SCANNED AS FILED







134

102

DOCUMENT SCANNED AS FILED







135

103

DOCUMENT SCANNED AS FILED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re<br>NEW CENTURY TRS HOLDINGS, INC *et al.,* | § <br> § <br> § | Case No. 07-10416 (BLS) |
| Debtors. | § | (Chapter 11) |
| | | |
| NANCY K ALANIS | § <br> § <br> § | |
| *Movant* | § <br> § | |
| v. | § <br> § | |
| Liquidating Trustee<br>NEW CENTURY TRS HOLDINGS, INC *et al* | § <br> § <br> § | |
| And | § <br> § | |
| NEW CENTURY TRS HOLDINGS, INC *et al* | § <br> § <br> § | |
| *Respondents* | § <br> § | |

**NANCY ALANIS MOTION TO REOPEN CHAPTER 11 CASE TO**
**(i)    FILE ADVERSARIAL COMPLAINT;**
**(ii)  OBTAIN COURT ORDERS ON CORE PROCEEDING MATTERS; AND**
**(iii)  OBTAIN RELATED RELIEF**

# Ex-9

## MACKIE WOLF ZIENTZ & MANN, P. C.

ATTORNEYS AT LAW
PHONE (214) 635-2650 FAX (214) 635-2686

PACIFIC CENTER I, SUITE 660
14180 NORTH DALLAS PARKWAY
DALLAS, TEXAS 75254
*PLEASE RESPOND TO DALLAS OFFICE

UNION PLAZA
124 WEST CAPITOL, SUITE 1890
LITTLE ROCK, ARKANSAS 72201

11-000099-670
JANUARY 13, 2011
CERT MAIL
NANCY ALANIS
13210 HUNTERS VIEW
SAN ANTONIO, TX 78230

RE: LOAN No. 705813079
MWZM No. 11-000099-670

### NOTICE OF ACCELERATION OF LOAN MATURITY

Dear NANCY ALANIS:

We have been retained by OCWEN LOAN SERVICING, Mortgage Servicer for WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-NC3 , the current Mortgagee of the Note and Deed of Trust related to the above referenced loan. A servicing agreement between the Mortgagee, whose address is:

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-NC3
C/O OCWEN LOAN SERVICING
1661 WORTHINGTON ROAD
SUITE 100
WEST PALM BEACH, FL 33409

and the Mortgage Servicer authorizes the Mortgage Servicer to collect the debt. We have been employed by our client to represent it in collecting the indebtedness and enforcing the Deed of Trust.

A default occurred under the terms of the Note. Notification was sent that default had occurred in the payment of the Note and that OCWEN LOAN SERVICING would accelerate the maturity of the Note if you did not cure the default. Because of your failure to cure the default, the maturity date of the Note was accelerated effective 01/13/2011.

All unpaid principal and accrued interest on the Note are due and payable at this time. According to the Mortgage Servicer's records, the total balance due as of the date of this notice is $222,256.14. As a result of accrued interest and other charges, the total balance due may be greater on the date of your payment and an adjustment may be required to fully pay off the loan. You may obtain the precise amount due by contacting (866) 357-8978. Payment must be made by cashier's check, certified check or money orders.

On Tuesday, 03/01/2011, the Trustee or Substitute Trustee will sell to the highest cash bidder, the property legally described in the enclosed Notice of Foreclosure Sale. The sale will occur at the Bexar County Courthouse in the area designated by the Bexar County Commissioner's Court, or if no such area has been designated by the Commissioner's Court then in the usual and customary location in that County. We have enclosed a copy of the Notice of Foreclosure Sale, which is being posted at the Bexar County Courthouse in accordance with Texas law and the provisions of the Deed of Trust.

Federal law allows you to dispute the validity of the debt, or any portion thereof, within thirty days (30) after receipt of this notice. If you do not, the debt will be assumed valid by the firm. If you notify the firm in writing within thirty days of receipt of this letter that the debt or any portion of the debt is disputed, the firm will obtain verification of the debt and will mail a copy of the verification to you. On your written request, within the thirty-day period for verification, the firm will provide you with the name and address of the original creditor. Additionally, all obligors and guarantors have the right to bring a court action to assert the non-existence of a default or any other defense to acceleration and foreclosure.

If this debt has been discharged in bankruptcy or you are not obligated on this debt, the Mortgage Servicer is not attempting to collect this debt from you personally.

**THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT THE DEBT AND ANY INFORMATION OBTAINED BY IT WILL BE USED FOR THAT PURPOSE.**

Sincerely yours,

Mackie Wolf Zientz & Mann, P. C.

Insed: Notice of Foreclosure Sale



151

## NOTICE OF FORECLOSURE SALE

1. *Property to Be Sold.* The property to be sold is described as follows:

LOT 2, BLOCK 6, NEW CITY BLOCK 16984, HUNTERS CREEK NORTH, UNIT-3, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 8200, PAGE (S) 215-216, OF THE DEED AND PLAT RECORDS OF BEXAR COUNTY, TEXAS.

2. *Instrument to be Foreclosed.* The instrument to be foreclosed is the Deed of Trust recorded in

Document 20060146541 real property records of Bexar County, Texas.

3. *Date, Time, and Place of Sale.* The sale is scheduled to be held at the following date, time, and place:

Date: 03/01/2011

Time: The sale will begin no earlier than 10:00 AM or no later than three hours thereafter.

Place: Bexar County Courthouse, Texas, at the following location:

THE SOUTH END OF THE BEXAR COUNTY COURTHOUSE OR AS DESIGNATED BY THE COUNTY COMMISSIONER'S OFFICE or as designated by the County Commissioners Court.

4. *Terms of Sale.* The sale will be conducted as a public auction to the highest bidder for cash. Pursuant to the deed of trust, the mortgagee has the right to direct the Trustee to sell the property in one or more parcels and/or to sell all or only part of the property.

Pursuant to section 51.009 of the Texas Property Code the property will be sold in AS IS, WHERE IS condition, without any express or implied warranties, except as to the warranties of title, if any, provided for under the deed of trust. Prospective bidders are advised to conduct an independent investigation of the nature and physical condition of the property.

Prospective bidders are reminded that by law the sale will necessarily be made subject to all prior matters of record affecting the property, if any, to the extent that they remain in force and effect and have not been subordinated to the deed of trust. The sale shall not cover any part of the property that has been released of public record from the lien of the deed of trust. Prospective bidders are strongly urged to examine the applicable property records to determine the nature and extent of such matters, if any.

5. *Obligations Secured.* The deed of trust executed by NANCY ALANIS, provides that it secures the payment of the indebtedness in the original principal amount of $193,500.00, and obligations therein described including but not limited to (a) the promissory note; and (b) all renewals and extensions of the note. WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee for the POOLING AND SERVICING AGREEMENT Dated as of October 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS-THROUGH CERTIFICATES,SERIES 2006-NC3 is the current mortgagee of the note and deed of trust.

6. *Default and Request to Act.* Default has occurred under the deed of trust, and the mortgagee has requested a Substitute Trustee conduct this sale. Notice is given that before the sale the mortgagee may appoint another person substitute trustee to conduct the sale.

ROB VALDESPINO, BRENDA ROLON, MICHAEL W. ZIENTZ, JELENA KOVACEVIC, JOHN LYNCH OR EMILY STROOPE

11-000099-670
13210 HUNTERS VIEW, SAN ANTONIO, TX 78230



152

DOCUMENT SCANNED AS FILED

remecula, CA 92566-5071



7196 9006 9294 9314 9480

U.S. Postage and
Fees Paid
WSO

*Send Correspondence to:*
Mackie, Wolf & Zients, PC
Pacific Center I, Suite 660
14180 N. Dallas Pkwy
Dallas, TX 75254

20110114-89
ACC3

NANCY ALANIS
13210 HUNTERS VIEW ST
SAN ANTONIO, TX 78230-2032

7320-v8



153

DOCUMENT SCANNED AS FILED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---

| | | |
|---|---|---|
| In re | § | |
| NEW CENTURY TRS HOLDINGS, INC *et al.,* | § | Case No. 07-10416 (BLS) |
| | § | |
| Debtors. | § | (Chapter 11) |

---

| | |
|---|---|
| | § |
| NANCY K ALANIS | § |
| | § |
| *Movant* | § |
| | § |
| v. | § |
| | § |
| Liquidating Trustee | § |
| NEW CENTURY TRS HOLDINGS, INC *et al* | § |
| | § |
| And | § |
| | § |
| NEW CENTURY TRS HOLDINGS, INC *et al* | § |
| | § |
| *Respondents* | § |

---

**NANCY ALANIS MOTION TO REOPEN CHAPTER 11 CASE TO**
**(i)    FILE ADVERSARIAL COMPLAINT;**
**(ii)  OBTAIN COURT ORDERS ON CORE PROCEEDING MATTERS; AND**
**(iii)  OBTAIN RELATED RELIEF**

---

# Ex-10

N ALANIS
PO BOX 15524
San Antonio, Texas
210.226.2666

September 19, 2010

OCWEN Loan Servicing
Att: Customer Service Dept
PO Box 785057
Orlando, Florida    32878-5057

Re: Dispute "Unpaid Debt" for Loan Number 705813079, 13210 Hunters
View, San Antonio, Texas  78230 and request prompt correction of
errors on my loan

Dear Ocwen Customer Service Dept:

I understand Ocwen recently become the servicing agent on my loan which
was previously serviced by HomEq Servicing and my correspondence is responsive
to your September 13, 2010 correspondence.

After approximately eight phone calls where I am unable to get any help from
your Customer Service Department in India, I am writing to dispute your "unpaid debt"
assertions and further maintain your records are in gross error as I am current with all
of my Mortgage, Tax and Insurance and do not owe the steep interest, late charges,
collection costs, escrow advances, suspense balance figures identified in your
September 13, 2010 correspondence.

In January 2009, I provided HomEq their requested records to verify my
compliance with Mortgage, Tax, & Insurance. HomEq Servicing Consumer Relations
representative Tammy Fair indicated she reviewed my records and was making the
necessary corrections to my loan so it would no longer have "delinquency issues".
You can verify my statements with Tammy Fair who can be reached at 916.339.6542.
Alternatively, if Tammy Fair is no longer available, I will resend my records to you
upon request.

Additionally, I would like to request to be provided the information on the
original creditor as well as the Creditor identified is SABR 2006-NC3.

Your response within thirty days is requested as I do not want to confront a
wrongful foreclosure action particularly if I can provide records for you to verify my
compliance with Mortgage, Loan and Insurance requirements.

Respectfully,

Nancy Alanis

122

**Loren W. Peters**
**Attorney**

6800 Park Ten Blvd. # 219N
San Antonio, Texas 78213

Telephone (210) 734-9024
Facsimile (210) 734-9025
lorenpeters@logixonline.com

October 13, 2010

Ocwen Loan Servicing, LLC
Attn: Customer Service Department
P.O. Box 785057
Orlando, Florida 32878-5057

Re: Loan No. 705813079; HomeEq Servicing Account No. 0325434793; Borrower –
Nancy Alanis; Property Address - 13210 Hunters View, San Antonio, Texas 78230

Dear Ocwen Loan Servicing:

I represent Nancy Alanis, the borrower under the loan referenced above. A letter authorizing you to communicate with me, signed by Ms. Alaniz, is enclosed.

Ms. Alanis has received two communications from you. The first was to notify her that you have succeeded HomeEq Servicing as the servicing representative for her loan, and to state that the balance due on her loan as of September 13, 2010 is $215,197.43. The second was to inform her that she had until October 16, 2010 to bring her loan current by payment of $25,271.53. **You must consider this letter, and the enclosed letter signed by Ms. Alanis, as written objection to the amounts and demands made explicitly or implied in your communications. This letter is intended to place you on notice that the amounts you demand are not correct and are most likely based on HomeEq records which are replete with errors. With this notice, you cannot claim a defense under the Federal and Texas Fair Credit Collection Practices Acts that any further errors in demand for the debt is a bona fide error or unintentional.**

The objections are based in large part, although not completely, on the following:

1. We have been in communication with HomeEq Servicing, through its attorneys, and have previously raised objections to claims of default and amounts said due on the loan from HomeEq. HomeEq's attorney in that matter is Ian Bates of Mann & Stevens, P.C., 550 Westcott Street,  Suite 560, Houston, Texas 77007.

2. Mr. Bates provided us with a copy of HomeEq's Payment History (copy enclosed). In attempting to correlate that history with Ms. Alanis' records, I found it to be full of apparent errors, entries which had no relevance to the loan or the agreed payments, reversals of erroneous entries, and other evidence of negligence or incompetence in

123

DOCUMENT  SCANNED  AS  FILED

reversals of erroneous entries, and other evidence of negligence or incompetence in making the entries. Although the document is thoroughly confusing, I reached the conclusions set forth below concerning what had happened.

3. It appears that a number of entries noting payments made by Ms. Alanis were posted beyond the dates she could have expected them to arrive at HomeEq, resulting in late fee charges which are not valid.

4. During the course of the loan, HomeEq did not post all payments made by Ms. Alanis to interest and principal paid -- but instead posted them in suspense accounts and ultimately to repayment of advances by HomeEq for insurance premiums (more about this later). This is clearly in violation of the provisions of the Deed of Trust which secures the loan. Section 2 of the Deed of Trust provides in pertinent part,

> "Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority; (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3."

There are no exceptions in Section 2 for application of Ms. Alanis regular monthly payments except those set forth in Section 3.

Section 3 deals with escrow items (i.e. taxes and insurance premiums). The lender waived the requirement for Ms. Alanis to escrow taxes and insurance premiums when the loan was closed, and did not provide her at any time with written notice revoking the waiver, as required by Section 3 for a revocation to be effective. Therefore the only pertinent part of Section 3 is,

> "If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to repay to Lender any such amount."

The pertinent part of Section 9 provides,

> "Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment."

Demands for reimbursement of advances were not made, and if made would have alerted Ms. Alanis to errors early and facilitated resolution of the issues.

5. When HomeEq posted a monthly payment check to a suspense account instead of crediting it to principal and interest as the Deed of Trust required, it considered the loan to be in default for non-payment, and assessed late charges. Instead of placing a payment in a suspense account to reimburse advances for insurance, HomeEq was obligated to

124

credit the payment to Principal and Interest, and to bill Ms. Alanis for any advances it made. Only after a bill for reimbursement became delinquent was HomeEq permitted to consider the loan in default. HomeEq never did bill Ms. Alanis for advances it made for insurance (although such advances are of arguable validity – see below), but simply made the reimbursements from monthly principal and interest payments. The result was unjustified late charges and monthly interest on paid but non-posted principal, all to Ms. Alanis damage, together with adverse effect on her credit rating resulting from HomeEq reporting to credit reporting agencies.

6. Ms. Alanis paid all taxes prior to their becoming delinquent. Taxes in Texas are permitted to be paid in two installments – the first installment prior to November 30 of the tax year, and the second installment prior to June 30 of the following year. There is at least one instance in which HomeEq considered tax payments to be delinquent when they were in fact timely.

7. There were some issues with insurance coverage. For example, on August 20, 2007, HomeEq posted an advance by it of $5,184.53 for purchase of insurance for the period from June 16, 2007 to June 16, 2008. However, Ms. Alanis had received a letter from New Century Mortgage Corporation (the originator of the loan) acknowledging receipt of her 2007 insurance coverage for all of 2007. The August 20, 2007 advance was obviously a mistake - not a default under the loan. Yet, HomeEq used monthly principal and interest payments to reimburse itself for the wrongful advance. This is but one example of misapplication of loan payments. Had HomeEq notified Ms. Alanis of the perceived but nonexistent lapse in insurance coverage as required by the Deed of Trust, she could have produced evidence of coverage and the matter would not have gotten out of hand.

8. Beginning with the January 1, 2010 payment, HomeEq began returning the payments because in its view the loan was in default and in foreclosure. That view was wrong and HomeEq should have communicated with Ms. Alanis in a good faith attempt to resolve the issues prior to her having to hire me to get its attention. HomeEq did not in fact respond to Ms. Alanis attempts to communicate and resolve the issues in good faith.

In acquiring the account from HomeEq, you have acquired a law suit if you do not work with us to resolve the issues caused by ineptness on the part of HomeEq. If other accounts are as botched as that of Ms. Alanis, you may have acquired a total quagmire.

Making a false representation of the character, amount or legal status of any debt is a violation of the Texas and Federal Fair Credit Reporting Acts. **This letter is intended to place you on notice that the amounts you demand are not correct and are most likely based on HomeEq records which are replete with errors. With this notice, you cannot claim that any further errors in demand for the debt is a bona fide error or unintentional.** You must work with us to reconcile the differences You have been given sufficient facts in this notice to require you to review in detail the actions of HomeEq, to correct its errors, and to communicate to me and my client a true and correct status of the debt.

125

DOCUMENT SCANNED AS FILED

Any attempt to foreclose on the lien against Ms. Alanis' home without a good faith attempt to correlate the HomeEq records with Ms. Alanis records, and settle with Ms. Alanis for her damages resulting from the HomeEq actions, will be met with a lawsuit which will seek damages from Ocwen as well as HomeEq. I trust that you or your attorneys will respond to this letter so we can get the correlation and negotiation process started.

Yours truly,

Loren W. Peters

Cc: Jan Bates
    Mann & Stevens, P.C.
    550 Westcott Street,  Suite 560
    Houston, Texas 77007

    Office of the Texas Attorney General
    Consumer Protection Division
    P.O. Box 12548
    Austin, Texas 78711-2548

    Ms. Nancy Alanis

DOCUMENT  SCANNED  AS  FILED

Nancy Alanis
13210 Hunters View
San Antonio, Texas 78230
October 11, 2010

Ocwen Loan Servicing, LLC.
Attn: Customer Service Department
P.O. Box 785057
Orlando, Florida 32878-5057

Re: Loan No. 705813079

Be advised that I disagree with and object to the balance stated due on the loan as set forth in your letter of September 13, 2010. I also object to your demand that I pay $25,271.53 by October 16, 2010 to avoid foreclosure. Those numbers reflect serious misapplication of my payments, all of which were sent to HomeEq through December , 2009, after which HomeEq began refusing to accept my payments and continued to refuse to communicate with me concerning the loan.

You are directed and authorized to provide all information concerning the referenced loan to my attorney and to discuss all aspects of the loan and settlement of differences with him. My attorney is Loren W. Peters, 6800 Park Ten Blvd. # 219N, San Antonio, Texas 78213; Telephone 210-734-9024; Facsimile 210-734-9025; e-mail address lorenpeters@logixonlined.com.

Be also advised that negotiations began with HomeEq through its attorney, Ian Bates of Mann & Stevens, P.C., 550 Westcott Street, Suite 560, Houston, Texas 77007. Foreclosure action was suspended pending review of HomeEq payment records and further discussions with Mr. Bates. I expect this suspension to continue while my attorney awaits communication with an authorized Ocwen officer or its attorneys.

Yours truly,

Nancy Alanis

127

DOCUMENT SCANNED AS FILED

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ocwen Loan Servicing, LLC
Attn: Customer Service Dep't.
P.O. Box 785057
Orlando, Florida 32878-5057

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery OCT 18 20

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail.    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)    7009 1410 0001 5515 1183

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M

U.S. Postal Service
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | |
|---|---|
| Postage $ | |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees $ | |

Postmark Here

7009 1410 0001 5515 1183

Sent To Ocwen Loan Servicing LLL
Street, Apt. No.; or PO Box No. P.o.Box 785057
City, State, ZIP+4 Orlando Florida 32878-5057

PS Form 3800, August 2006    See Reverse for Instructions

128

**Loren W. Peters**
Attorney

6800 Park Ten Blvd. # 219N
San Antonio, Texas 78213

Telephone (210) 734-9024
Facsimile (210) 734-9025
lorenpeters@logixonline.com

October 13, 2010

Ocwen Loan Servicing, LLC
Attn: Customer Service Department
P.O. Box 785057
Orlando, Florida 32878-5057

    Re: Loan No. 705813079; HomeEq Servicing Account No. 0325434793; Borrower –
        Nancy Alanis; Property Address – 13210 Hunters View, San Antonio, Texas 78230

Dear Ocwen Loan Servicing:

I represent Nancy Alanis, the borrower under the loan referenced above. A letter authorizing
you to communicate with me, signed by Ms. Alaniz, is enclosed.

Ms. Alanis has received two communications from you. The first was to notify her that you have
succeeded HomeEq Servicing as the servicing representative for her loan, and to state that the
balance due on her loan as of September 13, 2010 is $215,197.43. The second was to inform her
that she had until October 16, 2010 to bring her loan current by payment of $25,271.53. You
must consider this letter, and the enclosed letter signed by Ms. Alanis, as written objection
to the amounts and demands made explicitly or implied in your communications. This
letter is intended to place you on notice that the amounts you demand are not correct and
are most likely based on HomeEq records which are replete with errors. With this notice,
you cannot claim a defense under the Federal and Texas Fair Credit Collection Practices
Acts that any further errors in demand for the debt is a bona fide error or unintentional.

The objections are based in large part, although not completely, on the following:

1. We have been in communication with HomeEq Servicing, through its attorneys, and have
previously raised objections to claims of default and amounts said due on the loan from
HomeEq. HomeEq's attorney in that matter is Ian Bates of Mann & Stevens, P.C., 550
Westcott Street, Suite 560, Houston, Texas 77007.

2. Mr. Bates provided us with a copy of HomeEq's Payment History (copy enclosed). In
attempting to correlate that history with Ms. Alanis' records, I found it to be full of
apparent errors, entries which had no relevance to the loan or the agreed payments,
reversals of erroneous entries, and other evidence of negligence or incompetence in

1

129

DOCUMENT SCANNED AS FILED

reversals of erroneous entries, and other evidence of negligence or incompetence in making the entries. Although the document is thoroughly confusing, I reached the conclusions set forth below concerning what had happened.

3. It appears that a number of entries noting payments made by Ms. Alanis were posted beyond the dates she could have expected them to arrive at HomeEq, resulting in late fee charges which are not valid.

4. During the course of the loan, HomeEq did not post all payments made by Ms. Alanis to interest and principal paid — but instead posted them in suspense accounts and ultimately to repayment of advances by HomeEq for insurance premiums (more about this later). This is clearly in violation of the provisions of the Deed of Trust which secures the loan. Section 2 of the Deed of Trust provides in pertinent part,

> "Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3."

There are no exceptions in Section 2 for application of Ms. Alanis regular monthly payments except those set forth in Section 3.

Section 3 deals with escrow items (i.e. taxes and insurance premiums). The lender waived the requirement for Ms. Alanis to escrow taxes and insurance premiums when the loan was closed, and did not provide her at any time with written notice revoking the waiver, as required by Section 3 for a revocation to be effective. Therefore the only pertinent part of Section 3 is,

> "If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to repay to Lender any such amount."

The pertinent part of Section 9 provides,

> "Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment."

Demands for reimbursement of advances were not made, and if made would have alerted Ms. Alanis to errors early and facilitated resolution of the issues.

5. When HomeEq posted a monthly payment check to a suspense account instead of crediting it to principal and interest as the Deed of Trust required, it considered the loan to be in default for non-payment, and assessed late charges. Instead of placing a payment in a suspense account to reimburse advances for insurance, HomeEq was obligated to

2

DOCUMENT SCANNED AS FILED

credit the payment to Principal and Interest, and to bill Ms. Alanis for any advances it made. Only after a bill for reimbursement became delinquent was HomeEq permitted to consider the loan in default. HomeEq never did bill Ms. Alanis for advances it made for insurance (although such advances are of arguable validity – see below), but simply made the reimbursements from monthly principal and interest payments. The result was unjustified late charges and monthly interest on paid but non-posted principal, all to Ms. Alanis damage, together with adverse effect on her credit rating resulting from HomeEq reporting to credit reporting agencies.

6. Ms. Alanis paid all taxes prior to their becoming delinquent. Taxes in Texas are permitted to be paid in two installments – the first installment prior to November 30 of the tax year, and the second installment prior to June 30 of the following year. There is at least one instance in which HomeEq considered tax payments to be delinquent when they were in fact timely.

7. There were some issues with insurance coverage. For example, on August 20, 2007, HomeEq posted an advance by it of $5,184.53 for purchase of insurance for the period from June 16, 2007 to June 16, 2008. However, Ms. Alanis had received a letter from New Century Mortgage Corporation (the originator of the loan) acknowledging receipt of her 2007 insurance coverage for all of 2007. The August 20, 2007 advance was obviously a mistake – not a default under the loan. Yet, HomeEq used monthly principal and interest payments to reimburse itself for the wrongful advance. This is but one example of misapplication of loan payments. Had HomeEq notified Ms. Alanis of the perceived but nonexistent lapse in insurance coverage as required by the Deed of Trust, she could have produced evidence of coverage and the matter would not have gotten out of hand.

8. Beginning with the January 1, 2010 payment, HomeEq began returning the payments because in its view the loan was in default and in foreclosure. That view was wrong and HomeEq should have communicated with Ms. Alanis in a good faith attempt to resolve the issues prior to her having to hire me to get its attention. HomeEq did not in fact respond to Ms. Alanis attempts to communicate and resolve the issues in good faith.

In acquiring the account from HomeEq, you have acquired a law suit if you do not work with us to resolve the issues caused by ineptness on the part of HomeEq. If other accounts are as botched as that of Ms. Alanis, you may have acquired a total quagmire.

Making a false representation of the character, amount or legal status of any debt is a violation of the Texas and Federal Fair Credit Reporting Acts. This letter is intended to place you on notice that the amounts you demand are not correct and are most likely based on HomeEq records which are replete with errors. With this notice, you cannot claim that any further errors in demand for the debt is a bona fide error or unintentional. You must work with us to reconcile the differences You have been given sufficient facts in this notice to require you to review in detail the actions of HomeEq, to correct its errors, and to communicate to me and my client a true and correct status of the debt.

3

DOCUMENT SCANNED AS FILED

Any attempt to foreclose on the lien against Ms. Alanis' home without a good faith attempt to correlate the HomeEq records with Ms. Alanis records, and settle with Ms. Alanis for her damages resulting from the HomeEq actions, will be met with a lawsuit which will seek damages from Ocwen as well as HomeEq.  I trust that you or your attorneys will respond to this letter so we can get the correlation and negotiation process started.

Yours truly,

Loren W. Peters

Cc: Ian Bates
    Mann & Stevens, P.C.
    550 Westcott Street,  Suite 560
    Houston, Texas 77007

    Office of the Texas Attorney General
    Consumer Protection Division
    P.O. Box 12548
    Austin, Texas 78711-2548

    Ms. Nancy Alanis

4

132

DOCUMENT SCANNED AS FILED

Nancy Alanis
13210 Hunters View
San Antonio, Texas 78230
October 11, 2010

Ocwen Loan Servicing, LLC
Attn: Customer Service Department
P.O. Box 785057
Orlando, Florida 32878-5057

Re: Loan No. 705813079

Be advised that I disagree with and object to the balance stated due on the loan as set forth in your letter of September 13, 2010. I also object to your demand that I pay $25,271.53 by October 16, 2010 to avoid foreclosure. Those numbers reflect serious misapplication of my payments, all of which were sent to HomeEq through December , 2009, after which HomeEq began refusing to accept my payments and continued to refuse to communicate with me concerning the loan.

You are directed and authorized to provide all information concerning the referenced loan to my attorney and to discuss all aspects of the loan and settlement of differences with him. My attorney is Loren W. Peters, 6800 Park Ten Blvd. # 219N, San Antonio, Texas 78213; Telephone 210-734-9024; Facsimile 210-734-9025; e-mail address lorenpeters@logixonlined.com.

Be also advised that negotiations began with HomeEq through its attorney, Ian Bates of Mann & Stevens, P.C., 550 Westcott Street, Suite 560, Houston, Texas 77007. Foreclosure action was suspended pending review of HomeEq payment records and further discussions with Mr. Bates. I expect this suspension to continue while my attorney awaits communication with an authorized Ocwen officer or its attorneys.

Yours truly,

Nancy Alanis

133

**Loren W. Peters**
**Attorney**

6800 Park Ten Blvd. # 219N
San Antonio, Texas 78213

Telephone (210) 734-9024
Facsimile (210) 734-9025
lorenpeters@logixonline.com

December 21, 2010

Ocwen Loan Servicing, LLC
Attn: Customer Service Department
P.O. Box 785057
Orlando, FL 32878-057

Re:  Loan No. 705813-79; HomeEq Servicing Account No. 0325434793;  Borrower –
Nancy Alanis; Property Address – 13210 HuntersView, San Antonio, Texas 78230

Dear Ocwen Loan Servicing:

I represent Nancy Alanis, the borrower under the loan referenced above.  I have previously furnished you a letter authorizing you to communicate with me, signed by Ms. Alanis.

## Objections and Demands for Explanation and Documentation of Charges

On October 13, 2010 I sent you a letter (copy enclosed) objecting to the amounts and demands made by Ocwen in a communication dated September 13, 2010. The October 13 letter was received by Ocwen on October 18, 2010 according to the certified mail return receipt. To date, you have not responded to that letter. Instead, you have sent another demand dated December 7, 2010, which again inaccurately states amounts owed by Ms. Alanis necessary to bring the account current.  **What is going on in your organization?  Is the customer service department not communicating with anyone else in Ocwen?  Does Ocwen have a policy of ignoring customer objections?  Either way, you are inviting a law suit and damages under the Texas and Federal Debt Collection Practices Acts and the Texas Deceptive Trade Practices Act, among other possible causes of action.**

_**Please take notice that Ms. Alanis disagrees with and objects to the amount set forth in your December 7, 2010 communication (copy enclosed) that demands payment of $27, 576.49 to bring the account current.** You are specifically requested to provide documentary evidence of Ms. Alanis I ndebtedness and the amounts you consider to be in arrears. Documentary evidence should include a record of payments received and how those payments were allocated on Ocwen's or HomeEq's books, an explanation of all codes included in the payment records, and a narrative explanation of the reason for deviation of any part of any payment to account items such as suspense, escrow, costs, or other charges._

134

My October 13 letter constituted the written notice specified in Section 392.202 of the Texas Finance Code, and Section 161 of the FDIC Consumer Protection Regulations. This notice is a follow-up notice under the same laws. Under both the Texas Finance Code and the FDIC Consumer Protection Regulations, Ocwen is obligated within 30 days after receipt of the notice to acknowledge to Ms. Alanis receipt of the notice, and within other time limits to conduct an investigation, provide Ms. Alanis with an explanation of the disputed charges on her account, and suspend collection activities pending your investigation. You are already delinquent on the acknowledgement, and have violated the Texas Finance Code Provisions and the FDIC regulations by continuing collection efforts with your December 7, 2010 communication.

My October 13 letter stated in large part the basis of Ms. Alanis objections to the amounts specified in your September 13, 2010 communication. Additional objections to the December 7, 2010 communication include:

1. The document shows past due principal and interest totaling $17,962.45. This is exactly 11 payments of $1,632.95 each. This is not possible. HomeEq accepted principal and interest payments from Ms. Alanis through September, 2009, then began returning the checks on the basis that the account was in foreclosure. The checks returned by HomeEq were dated October 5, 2009, November 9, 2009, December 9, 2009, January 13, 2010, February 11, 2010, April 13, 2010, and May 17, 2010. In 2010, Ocwen accepted principal and interest checks for October, November, and December. Only 7 principal and interest payments are missing. They were tendered by Ms. Alanis, but returned.

2. The document includes an amount of $2002.76 for "Prev-Prior Servicer Fees." Ms. Alanis demands an explanation and justification for those fees.

3. Ms. Alanis objects to late charges. She tendered every payment, and should not be charged late charges for refused payments.

4. Property inspection fee ($21.00) and "Prev Property Evaluation Expenses" are not appropriate as they are not "expressly chargeable authorized by the agreement creating the obligation or legally chargeable to the consumer" (Texas Finance Code Section 392.303(2); 15 USC 1692f)

5. "Recent Account Activity" states that on December 7, 2010, Ocwen paid $5,537.00 in real property taxes to Bexar County. This is not reflected in the County Tax Collector's on-line records. Those records instead show that Nancy Alanis paid 2010 taxes in full.

Ocwen's statements have placed it at risk of liability and a judgment for damages for breach of contract, for violation of the Texas Finance Code Provisions on debt collection, for violations of the Texas Deceptive Trade Practices Act (which can lead to a judgment for treble damages) and violation of the Federal Debt Collection Practices Act.

135

DOCUMENT SCANNED AS FILED

## Texas Deceptive Trade Practices Act Notice and Demand

Pursuant to the Texas Deceptive Trade Practices Act, Texas Business & Commerce Code Section 17,505, this letter constitutes notice of Nancy Alanis claim under that act. Persistent repetition of errors in accounting by your predecessor, HomeEq, your reliance upon those errors after receiving my October 13, 2010 objection to the accounts, threats of foreclosure based on erroneous accounts, and failure to communicate with Ms. Alanis and with me as her attorney in a timely manner all constitute unconscionable acts or practices under the Texas Deceptive Trade Practices Act. The acts of Ocwen and the acts of your predecessor, HomeEq, also constitute deceptive trade practices of your principal, the actual owner of the note, inasmuch as you are the agents of the owner of the note, and the owner of the note is liable for the unlawful actions of both Ocwen and HomeEq.

Damages suffered by Ms. Alanis arise in large part from her lost opportunity to refinance the property at today's market rates. Over the period of the note, that damage is the present value of the difference between payments at the 9.925% current note rate and the 5% or smaller note rate she could have obtained had HomeEq not created credit problems with its erroneous accounting and threats of foreclosure. The present value of that lost opportunity to obtain a favorable 30 year loan is approximately $140,000.00. In addition, she has suffered damage to her credit reputation, mental anguish and the expense of attorney fees. For purposes of the Texas Deceptive Trade Practices Act notice, we demand compensation of $140,000 plus $4,000 in attorney fees for a total of $144,000.00. Under the Texas Deceptive Trade Practices Act you have a period of 60 days after receipt of this demand to make a settlement offer, or be subject to a judgment for actual damages plus enhanced damages.

The amount of actual damages can be mitigated by Ocwen and HomeEq and their principal, or any one or more of them offering a refinance of the note at a fixed rate at present market, plus a generous offer for other losses, injury and cost to Ms. Alanis.

A Deceptive Trade Practices Act and demand is being served upon HomeEq Loan Servicing. We are unable to serve the same demand upon your principal, the owner of Ms. Alanis' note, because that owner's name and address is not known to us or revealed in public records. Therefore, you must consider this notice and demand to have been served upon Ocwen in its own capacity as well as in its capacity as agent for the note owner.

Yours truly,

Loren W. Peters

cc: William Erby, CEO
    Ocwen Loan Servicing, LLC

136

**U.S. Postal Service**
**CERTIFIED MAIL  RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7010 1060 0001 1392 9569

ORLANDO FL 32878

| | | |
|---|---|---|
| Postage | $0.61 | 0201 |
| Certified Fee | $2.80 | 03 |
| Return Receipt Fee (Endorsement Required) | $2.30 | |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.71 | 12/22/2010 |

Sent To Ocwen Loan Servicing LLC
Street, Apt No.; or PO Box No. P.O. Box 785057
City, State City State Orlando FL 32878-5057

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ocwen Loan Servicing, LLC
Attn: Customer Service Dep't.
P.O. Box 785057
Orlando, FL 32878-5057

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by ( Printed Name)  MAURICE   C. Date of Delivery  DEC 27 20

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merch
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)    7010 1060 0001 1392 9569

PS Form 3811, February 2004        Domestic Return Receipt        102595-0

137

DOCUMENT SCANNED AS FILED

*E*

/0

## Loren W. Peters
### Attorney

6800 Park Ten Blvd. # 219N
San Antonio, Texas 78213

Telephone (210) 734-9024
Facsimile (210) 734-9025
lorenpeters@logixonline.com

December 21, 2010

Ocwen Loan Servicing, LLC
Attn: Customer Service Department
P.O. Box 785057
Orlando, FL 32878-057

Re:  Loan No. 705813079;  HomeEq Servicing Account No. 0325434793;  Borrower –
Nancy Alanis;  Property Address – 13210 HuntersView, San Antonio, Texas 78230

Dear Ocwen Loan Servicing:

I represent Nancy Alanis, the borrower under the loan referenced above.  I have previously furnished you a letter authorizing you to communicate with me, signed by Ms. Alanis.

### Objections and Demands for Explanation and Documentation of Charges

On October 13, 2010 I sent you a letter (copy enclosed) objecting to the amounts and demands made by Ocwen in a communication dated September 13, 2010. The October 13 letter was received by Ocwen on October 18, 2010 according to the certified mail return receipt. To date, you have not responded to that letter. Instead, you have sent another demand dated December 7, 2010, which again inaccurately states amounts owed by Ms. Alanis necessary to bring the account current.  What is going on in your organization?  Is the customer service department not communicating with anyone else in Ocwen?  Does Ocwen have a policy of ignoring customer objections?  Either way, you are inviting a law suit and damages under the Texas and Federal Debt Collection Practices Acts and the Texas Deceptive Trade Practices Act, among other possible causes of action.

*Please take notice that Ms. Alanis disagrees with and objects to the amount set forth in your December 7, 2010 communication (copy enclosed) that demands payment of $27,576.49 to bring the account current.  You are specifically requested to provide documentary evidence of Ms. Alanis I indebtedness and the amounts you consider to be in arrears. Documentary evidence should include a record of payments received and how those payments were allocated on Ocwen's or HomeEq's books, an explanation of all codes included in the payment records, and a narrative explanation of the reason for deviation of any part of any payment to account items such as suspense, escrow, costs, or other charges.*

138

My October 13 letter constituted the written notice specified in Section 392.202 of the Texas Finance Code, and Section 161 of the FDIC Consumer Protection Regulations. This notice is a follow-up notice under the same laws. Under both the Texas Finance Code and the FDIC Consumer Protection Regulations, Ocwen is obligated within 30 days after receipt of the notice to acknowledge to Ms. Alanis receipt of the notice, and within other time limits to conduct an investigation, provide Ms. Alanis with an explanation of the disputed charges on her account, and suspend collection activities pending your investigation. You are already delinquent on the acknowledgement, and have violated the Texas Finance Code Provisions and the FDIC regulations by continuing collection efforts with your December 7, 2010 communication.

My October 13 letter stated in large part the basis of Ms. Alanis objections to the amounts specified in your September 13, 2010 communication. Additional objections to the December 7, 2010 communication include:

1. The document shows past due principal and interest totaling $17,962.45. This is exactly 11 payments of $1,632.95 each. This is not possible. HomeEq accepted principal and interest payments from Ms. Alanis through September, 2009, then began returning the checks on the basis that the account was in foreclosure. The checks returned by HomeEq were dated October 5, 2009, November 9, 2009, December 9, 2009, January 13, 2010, February 11, 2010, April 13, 2010, and May 17, 2010. In 2010, Ocwen accepted principal and interest checks for October, November, and December. Only 7 principal and interest payments are missing. They were tendered by Ms. Alanis, but returned.

2. The document includes an amount of $2002.76 for "Prev-Prior Servicer Fees." Ms. Alanis demands an explanation and justification for those fees.

3. Ms. Alanis objects to late charges. She tendered every payment, and should not be charged late charges for refused payments.

4. Property inspection fee ($21.00) and "Prev Property Evaluation Expenses" are not appropriate as they are not "expressly chargeable authorized by the agreement creating the obligation or legally chargeable to the consumer" (Texas Finance Code Section 392.303(2); 15 USC 1692f)

5. "Recent Account Activity" states that on December 7, 2010, Ocwen paid $5,537.00 in real property taxes to Bexar County. This is not reflected in the County Tax Collector's on-line records. Those records instead show that Nancy Alanis paid 2010 taxes in full.

Ocwen's statements have placed it at risk of liability and a judgment for damages for breach of contract, for violation of the Texas Finance Code Provisions on debt collection, for violations of the Texas Deceptive Trade Practices Act (which can lead to a judgment for treble damages) and violation of the Federal Debt Collection Practices Act.

DOCUMENT SCANNED AS FILED

**Texas Deceptive Trade Practices Act Notice and Demand**

     Pursuant to the Texas Deceptive Trade Practices Act, Texas Business & Commerce Code Section 17.505, this letter constitutes notice of Nancy Alanis claim under that act. Persistent repetition of errors in accounting by your predecessor, HomeEq, your reliance upon those errors after receiving my October 13, 2010 objection to the accounts, threats of foreclosure based on erroneous accounts, and failure to communicate with Ms. Alanis and with me as her attorney in a timely manner all constitute unconscionable acts or practices under the Texas Deceptive Trade Practices Act. The acts of Ocwen and the acts of your predecessor, HomeEq, also constitute deceptive trade practices of your principal, the actual owner of the note, inasmuch as you are the agents of the owner of the note, and the owner of the note is liable for the unlawful actions of both Ocwen and HomeEq.

     Damages suffered by Ms. Alanis arise in large part from her lost opportunity to refinance the property at today's market rates. Over the period of the note, that damage is the present value of the difference between payments at the 9.925% current note rate and the 5% or smaller note rate she could have obtained had HomeEq not created credit problems with its erroneous accounting and threats of foreclosure. The present value of that lost opportunity to obtain a favorable 30 year loan is approximately $140,000.00. In addition, she has suffered damage to her credit reputation, mental anguish and the expense of attorney fees. For purposes of the Texas Deceptive Trade Practices Act notice, we demand compensation of $140,000 plus $4,000 in attorney fees for a total of $144,000.00. Under the Texas Deceptive Trade Practices Act you have a period of 60 days after receipt of this demand to make a settlement offer, or be subject to a judgment for actual damages plus enhanced damages.

     The amount of actual damages can be mitigated by Ocwen and HomeEq and their principal, or any one or more of them offering a refinance of the note at a fixed rate at present market, plus a generous offer for other losses, injury and cost to Ms. Alanis.

     A Deceptive Trade Practices Act and demand is being served upon HomeEq Loan Servicing. We are unable to serve the same demand upon your principal, the owner of Ms. Alanis' note, because that owner's name and address is not known to us or revealed in public records. Therefore, you must consider this notice and demand to have been served upon Ocwen in its own capacity as well as in its capacity as agent for the note owner.

Yours truly,

Loren W. Peters

cc: William Erby, CEO
    Ocwen Loan Servicing, LLC

140

**Loren W. Peters**
Attorney

6800 Park Ten Blvd. # 219N
San Antonio, Texas 78213

Telephone (210) 734-9024
Facsimile (210) 734-9025
lorenpeters@logixonline.com

December 21, 2010

Mr. William Erby, CEO.
Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409

Dear Mr. Erby:

I represent Nancy Alanis, a mortgagor who has a dispute with Ocwen, its predecessor servicing agent, and its principal over her account statements. Ocwen in September, 2010 succeeded HomeEq Servicing as the servicer of the loan. On October 13, 2010, I sent a letter describing my client's objections and asking that I be placed in communication with Ocwen's attorneys or someone else of authority to discuss and resolve the issues. It is two months after the letter was sent, and I have received no response. A copy of the October 13 communication and a copy of my December 21 communication, both mailed to Ocwen's Customer Service Department, are enclosed. The December 21 letter describes Texas Deceptive Trade Practices Act violations which could result in a treble damages judgment against Ocwen if negotiations do not take place.

The I ask that you assign this matter to an individual with negotiating authority to respond to the two letters so we can resolve the issues and avoid a law suit. Thank you for your consideration.

Yours truly,

Loren W. Peters

cc: Ocwen Customer Service Department
P.O. Box 785057
Orlando, FL 32878-5057

141

# Loren W. Peters
## Attorney

6800 Park Ten Blvd. # 219N
San Antonio, Texas 78213

Telephone (210) 734-9024
Facsimile (210) 734-9025
lorenpeters@logixonline.com

December 21, 2010

HomeEq Servicing Corporation
P.O. Box 13716
Sacramento, CA 95853-3716

HomeEq Servicing Corporation
c/o Wachovia Legal Division
301 South College Street
30th Floor
Charlotte, NC 28288-0630

Re: HomeEq Servicing Account No. 0325434793; Borrower –
Nancy Alanis; Property Address – 13210 HuntersView, San Antonio, Texas 78230

## NOTICE AND DEMAND PURSUANT TO SECTION 17.505, TEXAS BUSINESS & COMMERCE CODE (TEXAS DECEPTIVE TRADE PRACTICES ACT)

Dear HomeEq Servicing Corporation:

I represent Nancy Alanis, the borrower identified above. You have engaged in deceptive trade practices in violation of the Texas Deceptive Trade Practices Act (Texas Business & Commerce Code Chapter 17, Subchapter E) in connection with your servicing of the referenced mortgage and receipt and posting of loan payments. Your deceptive trade practices include the following:

1. You have violated the Texas Fair Debt Collection Practices Act (Texas Finance Code Chapter 392) by "attempting to collect interest or a charge, fee, or expense incidental to the obligation" [the above identified loan] where the incidental charge, fee or expense is not "expressly authorized by the agreement [the note and deed of trust] creating the obligation or legally chargeable to the consumer." (Section 392.303(a)(2), Texas Finance Code) This is a per se violation of the Texas Deceptive Trade Practices Act (Section 392.404(a)).

142

DOCUMENT SCANNED AS FILED

2.  You have violated the Texas Fair Debt Collection Practices Act (Texas Finance Code Chapter 392) by "misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental proceeding." (Section 392.304(a)(8), Texas Finance Code). This is a per se violation of the Texas Deceptive Trade Practices Act (Section 392.404(a)).

3.  You have engaged in unconscionable actions or courses of action, including failing to communicate with Ms. Alanis when she objected to your monetary demands and failing to explain your demands to her, diverting and misapplying payments of principal and interest made by Ms. Alanis, assessing late charges for payments which you had diverted to purposes other than payment of principal and interest, and failing to follow the requirements of the deed of trust and note in properly applying principal and interest payments.

Damages suffered by Ms. Alanis arise in large part from her lost opportunity to refinance the property at today's market rates. Over the period of the note, that damage is the present value of the difference between payments at the 9.925% current note rate and the 5% or smaller note rate she could have obtained had HomeEq not created credit problems with its erroneous accounting and threats of foreclosure. The present value of that lost opportunity to obtain a favorable 30 year loan is approximately $140,000.00. In addition, she has suffered damage to her credit reputation, mental anguish and the expense of attorney fees. For purposes of the Texas Deceptive Trade Practices Act notice, we demand compensation of $140,000 plus $4,000 in attorney fees for a total of $144,000.00. Under the Texas Deceptive Trade Practices Act you have a period of 60 days after receipt of this demand to make a settlement offer, or be subject to a judgment for actual damages plus enhanced damages.

The amount of actual damages can be mitigated by Ocwen and HomeEq and their principal, or any one or more of them offering a refinance of the note at a fixed rate at present market, plus a generous offer for other losses, injury and cost to Ms. Alanis.

Under the Texas Deceptive Trade Practices Act you have a period of 60 days after receipt of this demand to make a settlement offer, or be subject to a judgment for actual damages plus enhanced damages.

The amount of actual damages can be mitigated by Ocwen and HomeEq and their principal, or any one or more of them offering a refinance of the note at a fixed rate at present market, plus a generous offer for other losses, injury and cost to Ms. Alanis.

A Deceptive Trade Practices Act and demand is also being served upon Ocwen Loan Servicing, LLC, who succeeded you as servicer of the loan (however the deceptive trade practices were mostly committed during your tenure as loan servicer). We are unable to serve the same demand upon your principal, the owner of Ms. Alanis' note, because that owner's name and address is not known to us or revealed in public records. Therefore, you must consider this

DOCUMENT SCANNED AS FILED

notice and demand to have been served upon HomeEq in its own capacity and in its capacity as
agent for the note owner.

Yours truly,

Loren W. Peters

cc: Nancy Alanis

144

---

**Return Receipt 1 (top)**

...mplete items 1, 2, and 3. Also complete
...em 4 if Restricted Delivery is desired.
...rint your name and address on the reverse
...o that we can return the card to you.
...ttach this card to the back of the mailpiece,
... the front if space permits.

...rticle Addressed to:

...omeEq Servicing Corporation
...o Wachovia Legal Division
...1 S. College St., 30th Floor
...harlotte, NC 28288-0630

X _Ernest V..._

☐ Agent
☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

...rticle Number
...ransfer from service label)    7009 1410 0001 5515 1169

...orm 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**Certified Mail receipt (top right)**

SACRAMENTO CA 95853

| | |
|---|---|
| Postage | $0.44 |
| Certified Fee | $2.90 |
| Return Receipt Fee (Endorsement Required) | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $5.54 |

Sent To HomeEq Servicing Co
Street, Apt. No.; or PO Box No. P.O. Box 13716
City, State, ZIP+4 Sacramento CA 9

PS Form 3800, August 2006

---

**Return Receipt 2 (bottom)**

...NDER: COMPLETE THIS SECTION

...omplete items 1, 2, and 3. Also complete
...em 4 if Restricted Delivery is desired.
...rint your name and address on the reverse
...o that we can return the card to you.
...ttach this card to the back of the mailpiece,
...r on the front if space permits.

...rticle Addressed to:

...  eEq Servicing Corporation
...P.O. Box 13716
...Sacramento, CA 95853-3716

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X _____    ☑ Agent
☐ Addressee

B. Received By ( Printed Name )    C. Date of Delivery
                                   1 1 2011

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

...rticle Number
...ransfer from service l...    7009 1410 0001 5515 1176

...orm 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**Certified Mail receipt (bottom right)**

U.S. Postal Service
CERTIFIED MAIL RE...
(Domestic Mail...
For delivery information visit our websit...

CHARLOTTE NC 28288

| | |
|---|---|
| Postage | $0.44 |
| Certified Fee | $2.80 |
| Return Receipt Fee (Endorsement Required) | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $5.54 |

Sent To HomeEq Servicing Co
Street, Apt. No.; or PO Box No. c/o Wachovia Legal Di
City, State, ZIP+4 7015 College St., 3
Charlotte NC 28

PS Form 3800, August 2006

145

DOCUMENT SCANNED AS FILED

**Loren W. Peters**
**Attorney**

6800 Park Ten Blvd. # 219N
San Antonio, Texas 78213

Telephone (210) 734-9024
Facsimile (210) 734-9025
lorenpeters@logixonline.com

December 21, 2010

Mr. William  Erby, CEO
Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409

Dear Mr. Erby:

I represent Nancy Alanis, a mortgagor who has a dispute with Ocwen, its predecessor servicing agent, and its principal over her account statements. Ocwen in September, 2010 succeeded HomeEq Servicing as the servicer of the loan. On October 13, 2010, I sent a letter describing my client's objections and asking that I be placed in communication with Ocwen's attorneys or someone else of authority to discuss and resolve the issues. It is two months after the letter was sent, and I have received no response. A copy of the October 13 communication and a copy of my December 21 communication, both mailed to Ocwen's Customer Service Department, are enclosed. The December 21 letter describes Texas Deceptive Trade Practices Act violations which could result in a treble damages judgment against Ocwen if negotiations do not take place.

The I ask that you assign this matter to an individual with negotiating authority to respond to the two letters so we can resolve the issues and avoid a law suit. Thank you for your consideration.

Yours truly,

*[signature]*

Loren W. Peters

cc: Ocwen Customer Service Department
    P.O. Box 785057
    Orlando, FL 32878-5057

146

DOCUMENT  SCANNED  AS  FILED

**U.S. Postal Service**
**CERTIFIED MAIL. RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

WEST PALM BEACH FL 33409

| | | |
|---|---|---|
| Postage | $0.61 | 0201 |
| Certified Fee | $2.80 | 93 |
| Return Receipt Fee (Endorsement Required) | $2.30 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $5.71 | 12/22/2010 |

Sent To William Erby, CEO
Street, Apt. No.; or PO Box No. 1661 Washington Rd Ste 100
City, State, ZIP+4 W Palm Beach FL 33409

7009 1410 0001 5515 1268

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. William Erby, CEO
Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent ☐ Addr.

B. Received by ( Printed Name )  C. Date of De
J. Brooks  12/22

D. Is delivery address different from item 1? ☐ Yes.
If YES, enter delivery address below: ☐ No.

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchan
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7009 1410 0001 5515 1268

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M

147

DOCUMENT SCANNED AS FILED

**Loren W. Peters**
Attorney

6800 Park Ten Blvd, # 219N
San Antonio, Texas 78213

Telephone (210) 734-9024
Facsimile (210) 734-9025
lorenpeters@logixonline.com

December 21, 2010

HomeEq Servicing Corporation
P.O. Box 13716
Sacramento, CA 95853-3716

HomeEq Servicing Corporation
c/o Wachovia Legal Division
301 South College Street
30th Floor
Charlotte, NC 28288-0630

Re: HomeEq Servicing Account No. 0325434793; Borrower –
Nancy Alanis; Property Address – 13210 HuntersView, San Antonio, Texas 78230

### NOTICE AND DEMAND PURSUANT TO SECTION 17.505, TEXAS BUSINESS & COMMERCE CODE (TEXAS DECEPTIVE TRADE PRACTICES ACT)

Dear HomeEq Servicing Corporation:

I represent Nancy Alanis, the borrower identified above. You have engaged in deceptive trade practices in violation of the Texas Deceptive Trade Practices Act (Texas Business & Commerce Code Chapter 17, Subchapter E) in connection with your servicing of the referenced mortgage and receipt and posting of loan payments. Your deceptive trade practices include the following:

1. You have violated the Texas Fair Debt Collection Practices Act (Texas Finance Code Chapter 392) by "attempting to collect interest or a charge, fee, or expense incidental to the obligation" [the above identified loan] where the incidental charge, fee or expense is not "expressly authorized by the agreement [the note and deed of trust] creating the obligation or legally chargeable to the consumer." (Section 392.303(a)(2), Texas Finance Code) This is a per se violation of the Texas Deceptive Trade Practices Act (Section 392.404(a))..

148

DOCUMENT SCANNED AS FILED

2.  You have violated the Texas Fair Debt Collection Practices Act (Texas Finance Code Chapter 392) by "misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer debt's status in a judicial or governmental proceeding." (Section 392.304(a)(8), Texas Finance Code). This is a per se violation of the Texas Deceptive Trade Practices Act (Section 392.404(a)).

3.  You have engaged in unconscionable actions or courses of action, including failing to communicate with Ms. Alanis when she objected to your monetary demands and failing to explain your demands to her, diverting and misapplying payments of principal and interest made by Ms. Alanis, assessing late charges for payments which you had diverted to purposes other than payment of principal and interest, and failing to follow the requirements of the deed of trust and note in properly applying principal and interest payments.

Damages suffered by Ms. Alanis arise in large part from her lost opportunity to refinance the property at today's market rates. Over the period of the note, that damage is the present value of the difference between payments at the 9.925% current note rate and the 5% or smaller note rate she could have obtained had HomeEq not created credit problems with its erroneous accounting and threats of foreclosure. The present value of that lost opportunity to obtain a favorable 30 year loan is approximately $140,000.00. In addition, she has suffered damage to her credit reputation, mental anguish and the expense of attorney fees. For purposes of the Texas Deceptive Trade Practices Act notice, we demand compensation of $140,000 plus $4,000 in attorney fees for a total of $144,000.00. Under the Texas Deceptive Trade Practices Act you have a period of 60 days after receipt of this demand to make a settlement offer, or be subject to a judgment for actual damages plus enhanced damages.

The amount of actual damages can be mitigated by Ocwen and HomeEq and their principal, or any one or more of them offering a refinance of the note at a fixed rate at present market, plus a generous offer for other losses, injury and cost to Ms. Alanis.

Under the Texas Deceptive Trade Practices Act you have a period of 60 days after receipt of this demand to make a settlement offer, or be subject to a judgment for actual damages plus enhanced damages.

The amount of actual damages can be mitigated by Ocwen and HomeEq and their principal, or any one or more of them offering a refinance of the note at a fixed rate at present market, plus a generous offer for other losses, injury and cost to Ms. Alanis.

A Deceptive Trade Practices Act and demand is also being served upon Ocwen Loan Servicing, LLC, who succeeded you as servicer of the loan (however the deceptive trade practices were mostly committed during your tenure as loan servicer). We are unable to serve the same demand upon your principal, the owner of Ms. Alanis' note, because that owner's name and address is not known to us or revealed in public records. Therefore, you must consider this

149

notice and demand to have been served upon HomeEq in its own capacity and in its capacity as agent for the note owner.

Yours truly,

Loren W. Peters

cc: Nancy Alanis

150

DOCUMENT SCANNED AS FILED

# MACKIE WOLF ZIENTZ & MANN, P. C.

ATTORNEYS AT LAW
PHONE (214) 635-2650  FAX (214) 635-2686

PARKER CENTER I, SUITE 660
14180 NORTH DALLAS PARKWAY
DALLAS, TEXAS 75254
*PLEASE RESPOND TO DALLAS OFFICE

UNION PLAZA
124 WEST CAPITOL, SUITE 1890
LITTLE ROCK, ARKANSAS 72201

11-000099-670
JANUARY 13, 2011
CERT MAIL
NANCY ALANIS
13210 HUNTERS VIEW
SAN ANTONIO, TX 78230

RE:   LOAN NO. 705813079
MWZM NO. 11-000099-670

### NOTICE OF ACCELERATION OF LOAN MATURITY

Dear NANCY ALANIS:

We have been retained by OCWEN LOAN SERVICING, Mortgage Servicer for WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES, LLC TRUST 2006-NC3 MORTGAGE PASS-THROUGH CERTIFICATES,SERIES 2006-NC3 , the current Mortgagee of the Note and Deed of Trust related to the above referenced loan. A servicing agreement between the Mortgagee, whose address is:

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS-THROUGH CERTIFICATES,SERIES 2006-NC3
C/O OCWEN LOAN SERVICING
1661 WORTHINGTON ROAD
SUITE 100
WEST PALM BEACH, FL 33409

and the Mortgage Servicer authorizes the Mortgage Servicer to collect the debt. We have been employed by our client to represent it in collecting the indebtedness and enforcing the Deed of Trust.

A default occurred under the terms of the Note. Notification was sent that default had occurred in the payment of the Note and that OCWEN LOAN SERVICING would accelerate the maturity of the Note if you did not cure the default. Because of your failure to cure the default, the maturity date of the Note was accelerated effective 01/13/2011.

All unpaid principal and accrued interest on the Note are due and payable at this time. According to the Mortgage Servicer's records, the total balance due as of the date of this notice is $222,256.14. As a result of accrued interest and other charges, the total balance due may be greater on the date of your payment and an adjustment may be required to fully pay off the loan. You may obtain the precise amount due by contacting (866) 357-8978. Payment must be made by cashier's check, certified check or money orders.

On Tuesday, 03/01/2011, the Trustee or Substitute Trustee will sell to the highest cash bidder, the property legally described in the enclosed Notice of Foreclosure Sale. The sale will occur at the Bexar County Courthouse in the area designated by the Bexar County Commissioner's Court, or if no such area has been designated by the Commissioner's Court then in the usual and customary location in that County. We have enclosed a copy of the Notice of Foreclosure Sale, which is being posted at the Bexar County Courthouse in accordance with Texas law and the provisions of the Deed of Trust.

Federal law allows you to dispute the validity of the debt, or any portion thereof, within thirty days (30) after receipt of this notice. If you do not, the debt will be assumed valid by the firm. If you notify the firm in writing within thirty days of receipt of this letter that the debt or any portion of the debt is disputed, the firm will obtain verification of the debt and will mail a copy of the verification to you. On your written request, within the thirty-day period for verification, the firm will provide you with the name and address of the original creditor. Additionally, all obligors and guarantors have the right to bring a court action to assert the non-existence of a default or any other defense to acceleration and foreclosure.

If this debt has been discharged in bankruptcy or you are not obligated on this debt, the Mortgage Servicer is not attempting to collect this debt from you personally.

**THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT THE DEBT AND ANY INFORMATION OBTAINED BY IT WILL BE USED FOR THAT PURPOSE.**

Sincerely yours,

Mackie Wolf Zientz & Mann, P. C.

Insed: Notice of Foreclosure Sale

151

DOCUMENT SCANNED AS FILED