4. I have personal knowledge of the exhibits referenced herein including the "Expert Report of Daniel Castro, Jr, In Support of Nancy Alanis – List of Documents Relied On" attached to my August 20, 2015 *Affidavit of Daniel I. Castro, Jr Expert Witness for Plaintiff Nancy Alanis* ("8.20.15 Expert Affidavit/8.14.15 Expert Report") and filed in the state district court litigation in Bexar County, Texas *Cause No. 2011-CI-02829* (the "First Lawsuit"). **[Ex-M]**.

5. I incorporate my August 20, 2015 *Affidavit of Daniel I. Castro, Jr Expert Witness for Plaintiff Nancy Alanis* and the attached exhibits thereto which are true and correct copies of the originals ("8.20.15 Expert Affidavit/8.14.15 Expert Report") herein by reference for all purposes as if repeated in full verbatim and I can testify to the same;

6. I received "new exhibits" from Nancy Alanis ("Alanis") in May 2019. In April 2016, Alanis obtained her mortgage records bates stamped and authenticated from the New Century Liquidating Trust ("NCLT"). In October 2018, Alanis also obtained a certified 5.23.12 Reporter's Record pertaining to the NCLT. These **[Exhibits A-D]** are attached to this affidavit and incorporated herein by reference for all purposes as though repeated in full verbatim as:

   - **Ex-A:** New Century Liquidating Trust ("NCLT") authenticated and bates stamped Alanis Note held by the NCLT with no Steve Nagy or any other blank indorsement thereon
   - **Ex-B:** New Century Liquidating Trust ("NCLT") authenticated and bates stamped May 17, 2006 letter agreement executed between New Century and Barclays Bank where New Century sold an "interest" in the Alanis mortgage loan to Barclays, *not Wells Fargo*
   - **Ex-C:** New Century Liquidating Trust ("NCLT") authenticated and bates stamped Alanis *New Century Header File* - Alanis mortgage loan was in Pool No. "2006-173 Jul06 Barclays", *not* Wells Fargo "NC3" pool of loans
   - **Ex-D:** Certified 5.23.12 Reporters Record highlighting a court hearing involving Alanis liquidated original lender New Century Mortgage Corporation held in the U.S. Bankruptcy Court Delaware District *(Case No. 07-10416(KJC)*

7. These new exhibits **[Exhibit-A – D]** were filed in the first lawsuit and were uncontroverted. Exhibit A-D support my 8.20.15 *Affidavit* / 8.14.15 *Expert Report* conclusions where I concluded that Wells Fargo Bank, N.A., As Trustee For The Pooling And Servicing Agreement Dated As Of October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates, Series 2006-NC3 ("Wells Fargo" "Wells Fargo, As Trustee", "Wells Fargo Trust" "Wells Fargo NC3 Trust") never acquired an "owner or holder" interest in the Alanis Note and Deed of Trust ("Alanis Mortgage Loan"). Without Pooling and Servicing Agreement ("PSA") authority, Wells Fargo could never and did not securitize the Alanis mortgage loan into the Wells Fargo Trust;

8. I am also attaching additional **[Exhibits E-M]** which I have previously reviewed in preparation for my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report* and/or received in 2019

from Alanis. I am also attaching current documents pertaining to my expert qualifications and a copy of my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report*. Exhibits E-M are attached to this affidavit and incorporated herein by reference for all purposes as though repeated in full verbatim as follows:

- **Ex-E:** Certified March 3, 2005 Limited Power of Attorney
  *(Executed between Ocwen and New Century)*
- **Ex-F:** Certified August 8, 2008 Affidavit of Alan Jacobs
- **Ex-G:** Certified February 2, 2011 Transfer of Lien
- **Ex-H:** November 5, 2015 Affidavit of Mark Cronenwett filed in first lawsuit
  *(Authenticating Wells Fargo Alanis Note with Steve Nagy Endorsement)*
- **Ex-I:** Daniel I. Castro, Jr. Resume
- **Ex-J:** Daniel I. Castro, Jr. Publications in The Past Ten Years
- **Ex-K:** Daniel I. Castro, Jr. Expert Reports and Depositions
- **Ex-L:** Daniel I. Castro, Jr. Expert Qualifications / Fees
- **Ex-M:** 8.20.15 Expert Affidavit/8.14.15 Expert Report

9. To help the trier of fact to understand the evidence or to determine a fact in issue, my opinion and testimony relies on technical and other specialized knowledge and training in Residential Mortgage Backed Securities and securitizations relying on reliable principles and methods and I have applied those principles and methods to the facts and evidence reviewed in this *Affidavit Of Daniel I. Castro, Jr Expert Witness For Plaintiff Nancy Alanis (Supplement Expert Report To 8.20.15 Expert Affidavit / Expert Report Filed In Cause No. 2011-CI-02839)* ("Supplement Affidavit") and as outlined in my August 20, 2015 *Affidavit of Daniel I. Castro, Jr Expert Witness for Plaintiff Nancy Alanis* ("8.20.15 Expert Affidavit/8.14.15 Expert Report"). **[Ex-M]**;

10. A complete statement of all my opinions and the basis and reasons for them, the facts or data considered and exhibits used to support my expert opinion can be found in my August 20, 2015 *Affidavit of Daniel I. Castro, Jr Expert Witness for Plaintiff Nancy Alanis* ("8.20.15 Expert Affidavit/8.14.15 Expert Report") and this Supplement Affidavit. My opinion testimony is based on the facts, data and exhibits filed by both Wells Fargo and Nancy Alanis in the first lawsuit and also filed by Alanis in 2019, in the United States District Court For The Western District Of Texas San Antonio Division, Civil Action No. 5:19-cv-311 and provided to me by Nancy Alanis;

11. In the first lawsuit, my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report* remained uncontroverted and because Wells Fargo filed no expert report to controvert my expert conclusions, there was no necessity to file any rebuttal expert affidavit;

12. In my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report*, I stated the facts and relevant documents I reviewed to determine whether Wells Fargo obtained "owner and holder" status through a "valid assignment" of the Alanis Note and Deed of Trust for 13210 Hunters View, San Antonio, Texas 78230 (aka "Property") executed on June 15, 2006 with her original

lender New Century Mortgage Corporation ("New Century") ("Alanis Mortgage Loan) to securitize the Alanis Mortgage Loan into the Wells Fargo Trust;

13. To prepare my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report,* I spent 30 hours reviewing the documents filed by both Wells Fargo and Nancy Alanis, including the voluminous Wells Fargo *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* ("Pooling and Servicing Agreement", "PSA") (*See* Doc. No. 8) and corresponding *Prospectus Supplement dated October 30, 2006* (File No. 333-130543) ("Prospectus Supplement"). (*See* Doc. No. 9). **[Ex-M]**;

14. To summarize, I have reviewed the evidence and facts in my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report* and the new evidence and facts provided to me by Alanis in 2019. After a review of the same, I concluded that the Alanis Mortgage Loan was never validly assigned by Alanis' original lender New Century Mortgage Corporation to Wells Fargo for securitization in the Wells Fargo Trust. Without assigning valid "owner or holder" status in the Alanis mortgage deed of trust, there was no securitization of the Alanis mortgage loan into the Wells Fargo Trust. Therefore, Wells Fargo, As Trustee acquired no PSA authority and lacked standing to accelerate the Alanis Note and/or attempt to foreclose on the Alanis mortgage deed of trust for the following reasons:

   (a)  The February 2, 2011 *Transfer of Lien* was signed by Christina Carter before a notary acting as Account Manager for Ocwen Loan Servicing, LLC ("Ocwen") and Attorney-in-Fact for New Century Mortgage Corporation. ("New Century"). **[Ex-G]**.

   (b)  Christina Carter falsely swore the agreements between Wells Fargo and Alanis' original lender New Century were made in "September 2010" and executed in "February 2011". **[Ex-G]**.

   (c)  Christina Carter falsely swore she executed the February 2, 2011 *Transfer of Lien* relying on a March 3, 2005 Limited Power of Attorney executed between Ocwen and New Century Mortgagee Corporation. **[Ex-E]**.

   (d)  According to the August 8, 2008 Affidavit of Alan M. Jacobs, Liquidating Trustee for the New Century Liquidating Trust ("NCLT") in connection with the United States Bankruptcy Court District Of Delaware – *In re New Century TRS Holdings, Inc. (No. 07-10416 KJC)*, New Century Mortgagee Corporation was liquidated in bankruptcy on "August 1, 2008" and all of their assets were transferred to the New Century Liquidating Trust on said date. **[Ex-F]**.

   (e)  Alan Jacobs also swore that all agreements and interests in notes were extinguished. Therefore, New Century Mortgage Corporation did not exist in "2011" to provide any authority to Ocwen to act in its behalf when executing a transfer of lien after the date of liquidation of "August 1, 2008". **[Ex-F]**.

(f)   As a result of Ocwen forging an attorney-in-fact for the liquidated "August 2008" New Century Mortgage Corporation in "2011", the Ocwen February 2, 2011 *Transfer of Lien* assignment of the Alanis mortgage to Wells Fargo conveyed nothing to Wells Fargo and was a nullity and void because New Century did not exist in "2011" to assign the Alanis Mortgage Loan to Wells Fargo for securitization into the Wells Fargo Trust. Wells Fargo therefore, could not assert any "owner or holder" interest in the Alanis Mortgage Loan. **[Ex-F], [Ex-G]**.

(g)   On pg. 19 of my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report*, I referenced Sec. 2.01 *Conveyance of Mortgage Loans* which states in relevant part: "...**In connection with the transfer and assignment of each Mortgage Loan**, the Depositor has delivered or caused to be delivered ...the following documents...

  **(i) The original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee...**

  **\*\*\*\*\***

  **(v) the original Assignment of Mortgage for each Mortgage endorsed in blank...".** **[Ex-M]**.

(h)   While there was no assignment of the Alanis Mortgage Loan to any entity in the New Century Liquidating Trust records provided to Alanis in April 2016 and/or evidenced by the February 2, 2011 *Transfer of Lien,* the February 2, 2011 *Transfer of Lien* purportedly executed between Wells Fargo and Ocwen Manager Christina Carter acting through a forged attorney-in-fact for New Century Mortgage Corporation also lacked the required New Century Mortgage Corporation PSA "endorsement in blank" thereon and was a nullity, void and assigned no Alanis Mortgage Loan to Wells Fargo for securitization in the Wells Fargo Trust. Thus, Wells Fargo lacked PSA authority and standing to enforce a foreclosure action on the Alanis mortgage deed of trust.

15. To summarize further, I have reviewed the evidence and facts in my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report* and the new evidence and facts provided to me by Alanis in 2019. After a review of the same, I concluded that the Alanis Mortgage Loan was never validly assigned by Alanis' original lender New Century Mortgage Corporation to Wells Fargo for securitization in the Wells Fargo Trust. Without assigning valid "owner or holder" status in the Alanis Note, there was no securitization of the Alanis mortgage loan into the Wells Fargo Trust. Therefore, Wells Fargo, As Trustee acquired no PSA authority and lacked standing to accelerate the Alanis Note and/or attempt to foreclose on the Alanis mortgage deed of trust for the following reasons:

(a)   On pg. 12 of my *8.20.15 Expert Affidavit/8.14.15 Expert Report,* I provided expert opinion testimony that the Wells Fargo *Prospectus Supplement dated October 30, 2006* (File No. 333-130543) at page S-65, "chain of title" endorsement provisions for Non-MERS mortgage loans required: "...(a) **the original mortgage note, endorsed without recourse in blank** by the last endorsee, **including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;...**" **[Ex-M]**.

(b)   On pg. 10 of my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report*, I provided expert opinion testimony outlining the Pooling and Servicing Agreement "Parties" which

DID NOT INCLUDE Alanis' original lender New Century Mortgage Corporation. **The "originator and responsible party" is identified as NC CAPITAL CORPORATION** and Sutton Funding is identified as the Sponsor. **[Ex-M]**.

(c) On pg. 11 of my *8.20.15 Expert Affidavit*/8.14.15 *Expert Report*, I provided expert opinion testimony that on page S-65 and S-66, Assignment Of The Mortgage Loans states as follows: "...*NC CAPITAL sold the mortgage loans, without recourse, to Sutton, and Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans including all principal outstanding ...to the depositor on the closing date....*" **[Ex-M]**.

(d) On pg. 19 of my *8.20.15 Expert Affidavit*/8.14.15 *Expert Report*, I referenced Sec. 2.01 *Conveyance of Mortgage Loans* which states in relevant part: "...**In connection with the transfer and assignment of each Mortgage Loan, the** Depositor has delivered or caused to be delivered ...the following documents...

    **(i) The original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee...**

*****

    **(v) the original Assignment of Mortgage for each Mortgage endorsed in blank...**". **[Ex-M]**.

(e) On the Wells Fargo, As Trustee Alanis Note, there are no PSA endorsements from the originator and responsible party "NC Capital Corporation", the seller "Sutton Funding" and/or any other PSA contracting party as stated herein. **[Ex-H], [Ex-M]**.

(f) The Wells Fargo, As Trustee version of the Alanis Note was not compliant with the Wells Fargo PSA chain of title endorsement requirements for Mortgage Notes which as a result, conferred no PSA authority on Wells Fargo to securitize the Alanis Mortgage Loan. **[Ex-H], [Ex-M]**.

(g) When Mark D. Cronenwett filed his November 5, 2015 *Affidavit of Mark D. Cronenwett* and authenticated the Wells Fargo Alanis Note with a Steve Nagy endorsement thereon, his sworn statements were materially false and egregiously misleading when stating "...*this copy has been made from the actual original Note...*" because **there was no actual original Note with a Steve Nagy endorsement thereon. [Ex-H]**. The Mark D. Cronenwett sworn statements were materially false because the Wells Fargo endorsed "Steve Nagy" Note stood in stark conflict to the *actual original* Alanis Note held by the New Century Liquidating Trust with "no endorsement" thereon. **[Ex-A]**.

(h) The May 23, 2012 certified Reporters Record also contains sworn testimony from Alan Jacobs, Liquidating Trustee for the New Century Liquidating Trust prohibiting "Steve Nagy" stamps on Notes after "August 2008" and Christina Carter swore in the February 2, 2011 *Transfer of Lien* that the Wells Fargo agreements with New Century Mortgage Corporation were entered into in "September 2010", which is two years *after* the "August 2008" date for prohibited "Steve Nagy" endorsements on Notes. **[Ex-D], [Ex-G]**.

(i)   On the NCLT Alanis Note, there are no PSA endorsements and more specifically, there is no endorsement from "NC Capital Corporation", "Sutton Funding" and/or any other PSA contracting party. **[Ex-A]**.

(j)   On pg. 16 of my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report*, I concluded there was no evidence of the required PSA "Chain of Title Endorsements" on any version of the Alanis Notes provided to me for review. **[Ex-A]**, **[Ex-H]**.

(k)   There were no endorsements by any of the Wells Fargo, As Trustee PSA Parties as required by the Wells Fargo Pooling and Servicing Agreement and corresponding *Prospectus Supplement*. An endorsement on the Alanis Note from NC CAPITAL CORPORATION, Sutton and other contracting trust parties was mandatory to evidence a chain of title and securitization into the Wells Fargo Trust. **[Ex-M]**, **[Ex-A]**, **[Ex-H]**.

(l)   The Wells Fargo "Steve Nagy" endorsed Alanis Note conflicts with the NCLT Alanis Note where there are no endorsements thereon. **[Ex-H]**, **[Ex-A]**.

(m)   Therefore, the Alanis Note held by the New Century Liquidating Trust with no endorsement thereon is the valid Alanis Note and Wells Fargo was never assigned the Alanis Mortgage Deed of Trust or Note for securitization in the Wells Fargo Trust. **[Ex-A]**.

16. The Alanis new evidence provided to me in May 2019 is materially significant and supports the expert conclusions I reached in my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report*:

- **Ex-A:   Alanis Note held by the NCLT with no "Steve Nagy" blank indorsement**

     The bates stamped and authenticated Alanis Note which Alanis obtained from the New Century Liquidating Trust (NCLT) in April 2016 and filed in the first lawsuit was uncontroverted and supports my conclusion that Wells Fargo never held an "Owner or Holder" interest in the Alanis mortgage loan (Note and Deed of Trust).

     New Century Mortgage Corporation never sold to Wells Fargo, As Trustee the Alanis mortgage loan because the Alanis Note held by the NCLT lacked an endorsement from the New Century Mortgage Corporation and/or the New Century Liquidating Trust.

     Further, there is no NC CAPITAL CORPORATION originator endorsement and or Sutton Funding endorsement as "seller of the mortgage loans" on the Alanis Note that was a prerequisite to securitization into the Wells Fargo trust.

- **Ex-B:   May 17, 2006 letter agreement executed between New Century and Barclays Bank where New Century sold an "interest" in the Alanis mortgage loan to Barclays, *not Wells Fargo*.**

     The New Century letter agreement which Alanis obtained from the New Century Liquidating Trust (NCLT) in April 2016 and filed in the first lawsuit was uncontroverted and supports my conclusion that New Century Mortgage Corporation never assigned any "owner and holder" interest in the Alanis mortgage deed of trust and note to Wells Fargo when entering into negotiations

with Barclays Bank, *not* Wells Fargo to sell "an interest" in the Alanis Mortgage Loan.

In par. No. 11, the *Intention of the Parties* makes clear that for tax purposes, only an "interest" in loans were being sold by New Century Mortgage Corporation and therefore, no assignment of the mortgage could have been executed.

- **Ex-C:  A *New Century Header File* also revealed the Alanis mortgage loan was in Pool No. "2006-173 Jul06 Barclays", not Wells Fargo "NC3" pool of loans**

    This New Century Header File which Alanis obtained from the New Century Liquidating Trust (NCLT) in April 2016 and filed in the first lawsuit was uncontroverted and supports my conclusion that New Century Mortgage Corporation never assigned any "owner and holder" interest in the Alanis mortgage deed of trust and note to Wells Fargo when entering into negotiations with Barclays Bank, *not* Wells Fargo to sell "an interest" in the Alanis Mortgage Loan.

- **Ex-D:  A certified 5.23.12 Reporters Record highlighting a court hearing involving her liquidated original lender New Century Mortgage Corporation held in the U.S. Bankruptcy Court Delaware District *(Case No. 07-10416(KJC)*)**

    The 5.23.12 Reporters Record containing the Alan Jacobs, Liquidating Trustee for the New Century Liquidating Trust sworn testimony provides competent evidence that when only authorizing "New Century" employees to handle NCLT Trust matters and prohibiting "Steve Nagy" endorsements on Notes, the Ocwen Manager Christina Carter attorney-in-fact for New Century Mortgage Corporation sworn assertion was a notable forgery.

    And the "Steve Nagy" stamp signature endorsement on the Wells Fargo Alanis Note affixed on the same page as the Alanis signature was an altered Note when compared with the Alanis Note held by the NCLT with no endorsements thereon. The Wells Fargo Alanis Note contained a forged Alanis signature and "Steve Nagy" signature which rendered it a nullity and assigned no "owner and holder" interest in the Alanis Note. **[Ex-H]**.

17. Through my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report* and this supplement Affidavit, I have provided:

    (i)   a complete statement of all opinions I will express and the basis and reasons for them. **[Ex-M]** and my supplement affidavit with attached exhibits;

    (ii)  the facts or data considered in forming my opinions. **[Ex-M]** and my supplement affidavit with attached exhibits;

    (iii) any exhibits that will be used to summarize or support my opinions. **[Ex-M]** and my supplement affidavit with attached exhibits;

    (iv)  my qualifications, including a list of all publications authored in the previous 10 years. **[Ex-M]**, **[Ex-J]**.

    (v)   a list of all other cases in which, during the previous 4 years, I testified as an expert at trial or by deposition. **[Ex-K]**.

    (vi)  The compensation to be paid for the study and testimony in the case. **[Ex-L]**

18. As a securitization expert reviewing the Alanis 2016 evidence and 2019 new evidence, I re-assert my previous expert conclusion that Wells Fargo, As Trustee is not the "owner or holder" and has never been the "owner or holder" of the Alanis Mortgage Loan (Note and Deed of Trust for 13210 Hunters View, San Antonio, Texas, 78230).

19. PSA authority and standing to sue is a critical component to the proper functioning of the RMBS securitization process. It is a threshold issue to ensure compliance with mandatory federal regulations. If there is no valid PSA assignment of "owner and holder" interest in a mortgage loan, there is no PSA standing and or authority to proceed in any legal action and the pathway to the courthouse should be prohibited. Only the party demonstrating a valid "owner and holder" assignment in a securitized mortgage loan acquires PSA authority and standing to seek judicial redress for securitized mortgage loan deficiencies.

20. As the evidence demonstrated in 2015 and again in 2019, when Wells Fargo, As Trustee executed a February 2, 2011 *Transfer of Lien* using a forged attorney in fact for New Century Mortgage Corporation and a revoked 3.2.05 limited power of attorney to assert an "owner and holder" interest in the Alanis mortgage loan in "2011" when New Century liquidated in bankruptcy in "August 2008", that assignment was null and void. Because Wells Fargo, As Trustee never obtained a valid PSA assignment in the Alanis Mortgage Loan, they could not securitize the Alanis Mortgage Loan in the Wells Fargo Trust.

21. When reviewing the NCLT Alanis Note with no endorsements thereon, the New Century May 2006 letter agreement with Barclays Bank, *not* Wells Fargo and the 5.23.12 sworn testimony of Alan Jacobs, Liquidating Trustee for the New Century Liquidating Trust, Wells Fargo, As Trustee notably did not obtain the required valid PSA endorsements (i.e. NC Capital, Sutton and all PSA contracting parties) on the Alanis Note to assert an "owner and holder" interest in the Alanis mortgage deed of trust and Note and were prohibited from securitizing the same.

22. Because Wells Fargo, As Trustee lacked PSA authority and were prohibited by law from securitizing the Alanis Mortgage Loan into the Wells Fargo Trust using forged and revoked mortgage instruments, Wells Fargo, As Trustee lacked PSA standing and could not accelerate the Alanis Note and/or enforce an action for foreclosure on the Alanis mortgage deed of trust and suit on the Alanis Note in connection with the Alanis property commonly known as 13210 Hunters View, San Antonio, Texas 78230.

*Affiant Further Sayeth Not..."*

**DANIEL I. CASTRO, JR.**

**SWORN TO AND SUBSCRIBED TO BEFORE ME**, on this the 23 day of May, 2019 to certify which witness my hand and official seal.

**NOTARY PUBLIC
IN AND FOR THE STATE OF NEW JERSEY**

**My Commission Expires:** 08/11/2019    [Stamp]

SEAN P. HIGGINS
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 8/11/2019

**Ex-A**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re

NEW CENTURY TRS HOLDINGS, INC., a
Delaware Corporation, et al.,[1]

Debtors.

Chapter 11

Case No. 07-10416 (BLS)

(Jointly Administered)

-------------------------------------------------------------x

## DECLARATION OF DONNA E. WALKER CONCERNING RECORDS PRODUCED BY THE NEW CENTURY LIQUIDATING TRUST

I, the undersigned, Donna E. Walker, pursuant to 28 U.S.C. § 1746, declare that:

1.    I was an employee of New Century Mortgage Corporation ("NCMC") before it filed for bankruptcy, and am presently a consultant for the liquidating trustee of the New Century Liquidating Trust (the "Trust"), established pursuant to a confirmed chapter 11 plan of liquidation (the "Plan") of New Century TRS Holdings, Inc. and its affiliated debtors (the "Debtors"), including NCMC. The Trust is the custodian of documents and electronic data for the Debtors and has maintained such documents and electronic data turned over to the Trust by the Debtors since the effective date of the Plan. I am authorized by the Trust to make this declaration.

2.    In response to a request for documents made to the Trust by Nancy Alanis ("Alanis"), the Trust searched its files and produced to Alanis the files identified as bates range NC_Alanis_00000001 - NC_Alanis_0000885 (the "Produced Files"). The Produced Files were produced to Alanis on or about April 21, 2016.

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.) ("NCFC"); New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation); New Century Mortgage Corporation (f/k/a JBE Mortgage) ("NCMC"); NC Capital Corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com); New Century Credit Corporation (f/k/a Worth Funding Incorporated); NC Asset Holding, L.P. (f/k/a NC Residual II Corporation); NC Residual III Corporation; NC Residual IV Corporation; New Century R.E.O. Corp.; New Century R.E.O. II Corp.; New Century R.E.O. III Corp.; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage); NC Deltex, LLC; NCoral, L.P.; and New Century Warehouse Corporation.

3.   I submit this declaration to authenticate the Produced Files that the Trust located and produced in response to Alanis' request, but I do not make any representations or warranties, express or implied, regarding the completeness, condition, or quality of such Produced Files.

4.   The Produced Files are copies of files maintained in electronic form by the Trust as of the date on which Alanis made her request for the production of the Produced Files.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of May, 2016

Donna E. Walker
Consultant
New Century Liquidating Trust

Sworn to before me this
11th day of May, 2016

Notary Public

SUSAN FARRELL
Notary Public, State of New York
No. 01FA4890039
Qualified in Nassau County
Commission Expires April 27, 2019

# ADJUSTABLE RATE BALLOON NOTE
### 2 Year Rate Lock
(LIBOR Six-Month Index {As Published In *The Wall Street Journal*} - Rate Caps)

*I certify this copy is a true and correct copy of the original instrument.*
Mission Title
By

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY, IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

June 15, 2006         San Antonio                    Texas
[Date]                [City]                        [State]

13210 Hunters view, San Antonio, TX 78230
[Property Address]


NOTE

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 193,500.00           (this amount is called "Principal"), plus interest, to the order of Lender. Lender is  New Century Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.925 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the first day of each month beginning on          August 1, 2006
My monthly payments will be based on an assumed 40                    -year amortization period (the "Amortization Period"). I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  07/01/2036               , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 18400 Von Karman, Suite 1000, Irvine, CA 92612

or at a different place if required by Note Holder.
### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 1,631.71   . This amount may change.

### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

1008511117

Page 1 of 4                                              Initials AIKA

NCMC
Adjustable Rate Balloon Note (TX)
RE-522 (011806)

NC_Alanis_00000208

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of July, 2008, and on that day every 6th month thereafter. The date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six And Five Hundredth (s) percentage points (6.050         %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe on the Change Date in full over the remaining Amortization Period at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Notwithstanding the Amortization Period applicable to this Note, the entire unpaid principal amount will be fully due and payable on the Maturity Date.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.925% or less than 9.925%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One And One-half percentage point(s) (1.500 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 16.925%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

1008511112

Initials NKA

NCMC
Adjustable Rate Balloon Note (TX)
RE-522 (011806)

NC_Alanis_00000209

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** ndar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

1008511112

Initials: _NSA_

CMC
adjustable-rate Balloon Note (TX)
E-522  (011806)

NC_Alanis_00000210

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
NANCY ALANIS                -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

[Sign Original Only]

1008511112

Page 4 of 4

NC_Alanis_00000211

# Ex-B

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------x

In re

NEW CENTURY TRS HOLDINGS, INC., a
Delaware Corporation, *et al.*,[1]

                    Debtors.

--------------------------------------------x

Chapter 11

Case No. 07-10416 (BLS)

(Jointly Administered)

## DECLARATION OF DONNA E. WALKER CONCERNING RECORDS PRODUCED BY THE NEW CENTURY LIQUIDATING TRUST

I, the undersigned, Donna E. Walker, pursuant to 28 U.S.C. § 1746, declare that:

1.    I was an employee of New Century Mortgage Corporation ("NCMC") before it filed for bankruptcy, and am presently a consultant for the liquidating trustee of the New Century Liquidating Trust (the "Trust"), established pursuant to a confirmed chapter 11 plan of liquidation (the "Plan") of New Century TRS Holdings, Inc. and its affiliated debtors (the "Debtors"), including NCMC. The Trust is the custodian of documents and electronic data for the Debtors and has maintained such documents and electronic data turned over to the Trust by the Debtors since the effective date of the Plan. I am authorized by the Trust to make this declaration.

2.    In response to a request for documents made to the Trust by Nancy Alanis ("Alanis"), the Trust searched its files and produced to Alanis the files identified as bates range NC_Alanis_00000001 - NC_Alanis_0000885 (the "Produced Files"). The Produced Files were produced to Alanis on or about April 21, 2016.

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.) ("NCFC"); New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation); New Century Mortgage Corporation (f/k/a JBE Mortgage) ("NCMC"); NC Capital Corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com); New Century Credit Corporation (f/k/a Worth Funding Incorporated); NC Asset Holding, L.P. (f/k/a NC Residual II Corporation); NC Residual III Corporation (f/k/a Worth Funding Incorporated); NC Asset Holding, L.P. (f/k/a NC Residual II Corporation); NC Residual III Corporation; New Century R.E.O. Corp.; New Century R.E.O. II Corp.; New Century R.E.O. III Corp.; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage); NC Deltex, LLC; NCoral, L.P.; and New Century Warehouse Corporation.

3.    I submit this declaration to authenticate the Produced Files that the Trust located and produced in response to Alanis' request, but I do not make any representations or warranties, express or implied, regarding the completeness, condition, or quality of such Produced Files.

4.    The Produced Files are copies of files maintained in electronic form by the Trust as of the date on which Alanis made her request for the production of the Produced Files. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of May, 2016

Donna E. Walker
Consultant
New Century Liquidating Trust


Sworn to before me this
10th day of May, 2016

Notary Public

SUSAN FARRELL
Notary Public, State of New York
No. 01FA4890036
Qualified in Nassau County
Commission Expires April 27, 2019

**EXECUTION COPY**

As of May 17, 2006

NC Capital Corporation
New Century Mortgage Corporation
210 Commerce Street
Irvine, California 92612

Attention: Kevin Cloyd

Re:   Purchase Price and Terms Agreement

Dear Mr. Cloyd:

Barclays Bank PLC or its assignee (the "Purchaser") hereby confirms its agreement to purchase and NC Capital Corporation (the "Seller") hereby confirms its agreement to sell, on a mandatory delivery basis, two pools of fixed and adjustable rate, first and second lien, residential mortgage loans described herein (the "Mortgage Loans") on a servicing released basis, on the terms and conditions set forth below.

In addition to this Purchase Price and Terms Agreement (which incorporates the terms set forth in the bid letter attached as Exhibit A hereto (the "Bid Letter")), the Amended and Restated Mortgage Loan Purchase Agreement, to be dated as of June 1, 2006 (the "Purchase Agreement"), between the Seller and the Purchaser, and the Interim Servicing Agreement, dated as of January 1, 2006 (the "Servicing Agreement"), between the Purchaser and New Century Mortgage Corporation ("NCMC"), shall set forth the terms and provisions with respect to the Mortgage Loans and the sale and servicing thereof. The Mortgage Loans will be conveyed by the Seller to the Purchaser pursuant to two Assignment and Conveyances, each to be dated as of the respective Closing Date (as defined below) (the "Assignment and Conveyance").

Ownership of the Mortgage Loans shall be evidenced by delivery of the Mortgage Loans as whole loans pursuant to this Purchase Price and Terms Agreement, the Purchase Agreement and the Servicing Agreement.

1.  Term of this Commitment

The first pool of Mortgage Loans (the "First Closing Mortgage Loans") shall be purchased by the Purchaser and sold by the Seller, subject to the terms hereof and the Bid Letter, on June 29, 2006, or such other date as shall be mutually agreed upon by the parties hereto (the "First Closing Date"). The first pool of Mortgage Loans (the "Second Closing Mortgage Loans") shall be purchased by the Purchaser and sold by the Seller, subject to the terms hereof and the Bid Letter, on July 28, 2006, or such other date as shall be mutually agreed upon by the parties hereto (the "Second Closing Date" and, together with the First Closing Date, the "Closing Dates").

NYLIB5 903608.4

CONFIDENTIAL

NC_Alanis_00000512

Notwithstanding the foregoing and prior to each Closing Date, in the event that there is a material adverse change to (a) the Property, business, operations, financial condition or prospects of the Seller or any of its affiliates, (b) the ability of the Seller or any of its affiliates to perform its obligations under any of this Purchase Price and Terms Agreement, the Purchase Agreement or the Servicing Agreement or (c) the Mortgage Loans as a whole, in each case as determined in good faith by the Purchaser in its sole reasonable discretion, or any other condition exists which, in the Purchaser's sole discretion, constitutes a material impairment of the Seller's ability to perform its obligation as Seller hereunder or under the Purchase Agreement or the Servicing Agreement, the Purchaser shall be relieved of any obligation to purchase any Mortgage Loans.

When used in this Section 1, the term "Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

In addition, the obligation of the Purchaser to purchase any Mortgage Loan from the Seller on a Closing Date is expressly contingent upon the satisfactory due diligence review by the Purchaser to confirm that such Mortgage Loan conforms to the terms of this Purchase Price and Terms Agreement and conforms to the underwriting guidelines of the Seller, as further described in the Bid Letter.

2.  Aggregate Amount of Mortgage Loans

The aggregate outstanding principal balance as of (i) June 1, 2006 (the "First Cut-off Date") of the First Closing Mortgage Loans and (ii) as of July 1, 2006 (the "Second Cut-off Date", and together with the First Cut-off Date, the "Cut-off Dates") of the Second Closing Mortgage Loans shall be approximately $500,000,000 for each pool.

Notwithstanding the foregoing, the Purchaser, in its sole discretion, may accept delivery of less than 90% of the $500,000,000 pool amount on each Closing Date. In the event that the Seller delivers First Closing Mortgage Loans or Second Closing Mortgage Loans with an aggregate outstanding principal balance that is less than $450,000,000 the Seller shall pay the Purchaser a pair-off fee (as described in the Bid Letter) for the difference between the actual amount delivered (in the aggregate) and $450,000,000.

3.  Purchase Price

The purchase price for each pool of Mortgage Loans sold to the Purchaser on the Closing Dates (which includes the related servicing rights) (the "Purchase Price") shall be equal to the product of (i) the related Purchase Price Percentage (as defined below) and (ii) the aggregate outstanding principal balance of the related pool of Mortgage Loans as of the related Cut-off Date, after application of payments due on such Mortgage Loans on or before such Cut-off Date, to the extent such payments were actually received (the "Cut-off Date Aggregate Pool Balance"), plus accrued and unpaid interest on the pool of Mortgage Loans at the weighted average mortgage interest rate (net of the Servicing Fee Rate) from the interest paid to date through the day prior to the related Closing Date, inclusive. In the event the characteristics and parameters of the related pool of Mortgage Loans as described in Section 4 changes prior to any

NYLIB5 903608.4

CONFIDENTIAL

NC_Alanis_00000513

Closing Date, the Seller and Purchaser shall negotiate in good faith to recalculate the related Purchase Price Percentage.

The "Purchase Price Percentage" with respect to the First Closing Mortgage Loans shall be equal to 102.25% and the Purchase Price Percentage with respect to the Second Closing Mortgage Loans shall be equal to 102.20%, each subject to adjustment as described below. Notwithstanding the foregoing sentence, the related Purchase Price Percentage shall be adjusted up or down per the following table for every basis point (0.01%) by which the weighted average interest rate of the Mortgage Loans in such pool (the "Weighted Average Gross Coupon") as of the related Cut-off Date exceeds or falls below a rate equal to 8.45%.

| Weighted Average Gross Coupon ("GWAC") Range | Adjustment to Mortgage Loan Price Percentage per 0.01% (1 bp) change in GWAC |
| --- | --- |
| > 8.45% | 1.50 bps up |
| = 8.45% | none |
| < 8.45% | 1.50 bps down |

The Purchase Price for the First Closing Mortgage Loans and Second Closing Mortgage Loans shall be paid to the Seller on the related Closing Date in immediately available funds by wire transfer to an account designated by the Seller in writing.

4. <u>The Mortgage Loans</u>

Each pool of Mortgage Loans will have the applicable characteristics set forth in the Bid Letter. The Seller shall make the representations and warranties to be set forth in the Purchase Agreement as of each Closing Date. In addition, Seller agrees that (i) the Mortgage Loans shall be selected from among the outstanding one- to four-family mortgage loans in the Seller's portfolio on the related Cut-off Date as to which the representations and warranties set forth in the Purchase Agreement can be made, (ii) such selection will not be made in a manner so as to affect adversely the interests of the Purchaser, (iii) no Mortgage Loan will be a "High Cost Loan" where High Cost Loan means a Mortgage Loan classified as (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994 or (b) a "high cost home," "threshold," "covered", "high risk home", "predatory" or similar loan under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees), (iv) no Mortgage Loan will be secured by mortgaged property located in the State of Georgia if originated on or after October 1, 2002 and on or prior to March 7, 2003, (v) no Mortgage Loan has a debt-to-income ratio greater than 60% and (vi) no Mortgage Loan originated on or after August 1, 2004 requires the related mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the Mortgage Loan transaction.

5. <u>Servicing</u>

The Servicing Rights related to each pool of Mortgage Loans shall be assigned and transferred to the Purchaser on each Closing Date. The Mortgage Loans shall be serviced by NCMC or its assignee on behalf of the Purchaser and its assignees pursuant to the Servicing

NYLIB5 903608.4

NC_Alanis_00000514

CONFIDENTIAL

Agreement from and after each Closing Date and until August 29, 2006 for the First Closing Mortgage Loans and September 30, 2006 for the Second Closing Mortgage Loans, or such other dates as mutually agreed upon by the Seller, the Purchaser and NCMC (the "Servicing Transfer Date"). At such time the Seller shall cooperate to effect a Complete Servicing Transfer with respect to the Mortgage Loans. A "Complete Servicing Transfer" shall include the following: (i) the Seller shall have fully complied with the servicing transfer provisions contained in the Purchase Agreement and the Servicing Agreement; (ii) the Seller shall have provided the Purchaser or its designee with a complete servicing file with respect to each of the related Mortgage Loans; and (iii) the Seller shall have provided the Purchaser or its designee with a complete and accurate servicing tape with respect to each of the related Mortgage Loans.

Pursuant to the Servicing Agreement, NCMC shall be entitled to receive, from interest actually collected on each Mortgage Loan, a servicing fee (the "Servicing Fee") with respect to each Mortgage Loan in an amount equal to one-twelfth of the product of (a) the Servicing Fee Rate (50 basis points (0.50%) per annum) and (b) the scheduled principal balance of such Mortgage Loan payable monthly during any month NCMC acts as servicer with respect to such Mortgage Loan. The Servicing Fee shall be pro-rated (based upon the number of days of the related month NCMC so acted as servicer, expressed as a percentage of such month) for each part thereof. NCMC acknowledges and agrees that the Servicing Fee represents normal compensation for performing such services and that the entire Servicing Fee shall be treated by NCMC, for accounting and tax purposes, as compensation for the servicing and administration of the Mortgage Loans pursuant to the Servicing Agreement.

6. **Tax Service Contracts; Flood Certification Contracts**

The Seller shall ensure that each of the Mortgage Loans shall be covered by (i) a paid-in-full, life-of-loan tax service contract (each, a "Tax Service Contract"), and (ii) a paid-in-full, life-of-loan, flood certification contract (each, a "Flood Certification Contract"), each with a provider acceptable to the Purchaser and each of which shall be assigned to the Purchaser or the Purchaser's designee at the Seller's expense. The obligations set forth in this Section 6 shall survive the closing of the transaction contemplated hereby, shall not merge with the closing documents and shall be independently enforceable.

7. **Purchase Agreement; Servicing Agreement**

The Purchase Agreement and the Servicing Agreement each sets forth additional representations and warranties to be made as of the related Closing Date (the "Representations and Warranties") and requires the Seller, at the Purchaser's option, to repurchase any Mortgage Loan with respect to which a material breach of a Representation and Warranty is discovered and cannot be cured (a "Loan in Breach") at the Repurchase Price (defined below).

Notwithstanding anything to the contrary set forth in the Purchase Agreement or in the Servicing Agreement, the price for such repurchase (the "Repurchase Price") with respect to any Loan in Breach shall be with respect to any Mortgage Loan that becomes a Loan in Breach (a) during the first year immediately following the related Closing Date, an amount equal to the Purchase Price Percentage multiplied by the then outstanding principal balance of such Loan in Breach as of the date of such repurchase (including, without duplication, the amount of

NYLIB5 903608.4

NC_Alanis_00000515

CONFIDENTIAL

any outstanding advances owed to any servicer), plus accrued interest on such Loan in Breach at the mortgage interest rate from the date on which interest had last been paid through the date of such repurchase, plus all costs and expenses incurred by the Purchaser arising out of or based upon such breach, including without limitation costs and expenses incurred in the enforcement of the Seller's repurchase obligation thereunder, (b) during the second year following the related Closing Date, an amount equal to the product of (i) 100% plus an amount equal to (A) a fraction, whose numerator is equal to 12 less the number of months since the first anniversary of such Closing Date and whose denominator is equal to 12, multiplied by (B) the Purchase Price Percentage less 100%, multiplied by (ii) the then outstanding principal balance of such Loan in Breach as of the date of such repurchase, plus accrued interest on such Loan in Breach at the mortgage interest rate from the date to which interest had last been paid through the date of such repurchase, plus the amount of any outstanding advances owed to any servicer, plus all costs and expenses incurred by the Purchaser arising out of or based upon such breach, including without limitation costs and expenses incurred in the enforcement of the Seller's repurchase obligation thereunder, and (c) thereafter, an amount equal to the then outstanding principal balance of such Loan in Breach as of the date of such repurchase plus accrued interest thereon at the mortgage interest rate from the date to which interest had last been paid through the date of such repurchase, plus the amount of any outstanding advances owed to any servicer, plus all costs and expenses incurred by the Purchaser arising out of or based upon such breach, including without limitation costs and expenses incurred in the enforcement of the Seller's repurchase obligation thereunder. In the event of a securitization of any of the Mortgage Loans by the Purchaser or any of its affiliates, the Repurchase Price for such a Loan in Breach shall be as set forth in clause (c) above.

With respect to each Mortgage Loan, in the event that the first payment to be made by the mortgagor on the first due date after any Closing Date with respect to any Mortgage Loan is not paid before the first day of the month following such due date, the Seller, at the Purchaser's option, shall repurchase such Mortgage Loan at the Purchase Price. Notwithstanding the foregoing, the Seller shall have a period of forty-five (45) days following such first due date to cure any such delinquency. The Purchaser shall notify the Seller and request a repurchase within sixty (60) days after the mortgagor's failure to make such payment (including such additional cure period) and the Seller shall repurchase such Mortgage Loan within five (5) business days of the receipt of such notice.

With respect to Mortgage Loans without prepayment penalties, in the event that any such Mortgage Loan prepays in full within the three (3) months immediately following the related Closing Date, the Seller shall pay the Purchaser, within three (3) business days of such prepayment in full, the Purchase Price for such Mortgage Loan, as set forth herein, less the outstanding principal balance of such Mortgage Loans as of the related Cut-off Date.

The repurchase price provisions set forth in this Section 7 shall survive each Closing Date and shall not merge with the closing documents, but instead shall be independently enforceable by the Purchaser.

8. <u>Custody of Mortgage Loan Documents</u>

NYLIB5 903608.4

CONFIDENTIAL

NC_Alanis_00000516

Pursuant to the Custodial Agreement, dated as of January, 1, 2006 (the "Custodial Agreement"), among the Purchaser, Deutsche Bank National Trust Company (the "Custodian"), NCMC and the Seller, the Seller shall deliver to the Custodian all original documents with respect to each Mortgage Loan, as set forth in the Custodial Agreement. Such documents will be held by the Custodian in trust for the benefit of the Purchaser, and the Seller shall pay all costs associated with the shipment of the files to the Custodian prior to each Closing Date. The Purchaser shall pay the costs and expenses of the Custodian. The Seller shall pay any fees or costs incurred in connection with a one-time preparation of each assignment in blank.

9.  Review of Loan Files

With respect to each pool of Mortgage Loans, the Seller shall make the Mortgage Loan file, together with all credit and servicing files (including, without limitation, the related mortgagor's payment history), available at its offices for review during normal business hours prior to the related Closing Date. The Purchaser, or its designee, may review the Mortgage Loan files prior to such Closing Date for the purpose of ensuring conformity with the terms of this Purchase Price and Terms Agreement and the Purchase Agreement. If the Purchaser makes such examination prior to any Closing Date and identifies any Mortgage Loan which does not conform to the Purchaser's requirements, in its sole discretion, such Mortgage Loan shall be deleted from the Mortgage Loan schedule to be delivered to the Purchaser on such Closing Date.

The Purchaser may, at its option and without notice to the Seller, purchase all or part of the Mortgage Loans without conducting any partial or complete examination. The fact that the Purchaser or any prospective purchaser of the Mortgage Loans has conducted or has failed to conduct any partial or complete examination of the Mortgage Loan files shall not affect the Purchaser's (or any of its successors') rights to demand repurchase, substitution or other relief as provided under the Purchase Agreement.

10. Securitization

In the event of a securitization of the Mortgage Loans by the Purchaser or any of its affiliates, the Seller, NCMC and the Purchaser shall comply with the provisions relating to securitizations set forth in the Bid Letter.

11. Intention of the Parties

It is the intention of the parties that the Purchaser is purchasing, and the Seller is selling, interests in the Mortgage Loans and not a debt instrument of the Seller or other security. Accordingly, each party intends to treat the transaction for federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of an ownership interest (the "Ownership Interest") in the Mortgage Loans. Moreover, the arrangement under which the Mortgage Loans are held will be consistent with the classification of such arrangement as a grantor trust in the event it is not found to represent direct ownership of the related Ownership Interest in the Mortgage Loans. The Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Loan files to determine the characteristics of the Mortgage Loans which will affect the federal income tax consequences of owning the Ownership Interest in the Mortgage

NYLIB5 903608.4

NC_Alanis_00000517

CONFIDENTIAL

Loans and the Seller shall cooperate with all reasonable requests made by the Purchaser in the course of such review.

12. Costs

The Purchaser shall pay any commissions due its salesmen, the legal fees and expenses of its attorneys and the costs and expenses of the Custodian (including shipping fees incurred following each Closing Date). Except as otherwise specified herein, all other costs and expenses incurred in connection with the transaction contemplated hereby, fees for title policy endorsements and continuations and the Seller's attorney's fees shall be paid by the Seller.

13. Confidential Information

The Purchaser and the Seller shall keep confidential and shall not divulge to any non-affiliated person, without the other's prior written consent, the price paid by the Purchaser for the Mortgage Loans, except to the extent that it is appropriate for the Purchaser or the Seller, as the case may be, to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies. The rights and obligations set forth in this Section shall survive each Closing Date and shall not merge with or into any of the closing documents described herein, but instead shall be independently enforceable.

14. Brokerage Fees

Neither the Seller nor the Purchaser has employed or used a broker in connection with the transactions contemplated herein, and to the extent that a demand is made upon either the Seller or the Purchaser for brokerage fees associated herewith, neither the Seller nor the Purchaser shall be responsible for paying any brokerage fees of the other party. Each party hereto shall indemnify and hold the other party harmless against all claims of any brokers or other persons employed or used by the first party for brokers' commissions relating thereto, which indemnification shall include all losses, damages and expenses, including attorney's fees for settlement, litigation or appearance and other costs for same, suffered by such other party in connection with such claims. The rights and obligations set forth in the preceding sentence shall survive each Closing Date and shall not merge with or into any of the closing documents described herein, but instead shall be independently enforceable.

15. Notices

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, return receipt requested, or if by other means, when received by the other party at the address shown on the first page hereof, or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

-7-

NYLIB5 903608.4

NC_Alanis_00000518

CONFIDENTIAL

## 16. Governing Law

This Purchase Price and Terms Agreement shall be deemed in effect when a fully executed counterpart thereof is received by the Purchaser in the State of New York and shall be deemed to have been made in the State of New York. This Purchase Price and Terms Agreement shall be construed in accordance with the substantive laws of the State of New York without regard to conflicts of law principles.

## 17. Further Agreements

The Purchaser and the Seller each agree to execute and deliver to the other such additional documents, instruments or agreements that may be necessary or appropriate to effectuate the purposes and intent of this Purchase Price and Terms Agreement.

## 18. Entire Agreement and Amendments

This Purchase Price and Terms Agreement contains the entire agreement relating to the subject matter hereof between the Seller and the Purchaser and supersedes any prior oral or written agreement between the Seller and the Purchaser. This Purchase Price and Terms Agreement may only be amended by a written document signed by both the Seller and the Purchaser.

**[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]**

NYLIB5 903608.4

CONFIDENTIAL

NC_Alanis_00000519

Kindly acknowledge receipt of this confirmation by signing and promptly returning the enclosed duplicate of this letter on or before June 23, 2006. Your failure to return a countersigned duplicate of this letter to us within the time indicated shall give us the right, at our sole option, to declare the oral agreement confirmed hereby null and void.

Very truly yours,

BARCLAYS BANK PLC

By: _____

    Name:   Paul Menefee
    Title:     Director

Receipt of this confirmation is
hereby acknowledged:

NC CAPITAL CORPORATION

By: _____
    Name:
    Title:

NEW CENTURY MORTGAGE
    CORPORATION

By: _____
    Name:
    Title:

Sutton—New Century (06.29.06)—PPTA

CONFIDENTIAL

NC_Alanis_00000520

Kindly acknowledge receipt of this confirmation by signing and promptly returning the enclosed duplicate of this letter on or before June 23, 2006. Your failure to return a countersigned duplicate of this letter to us within the time indicated shall give us the right, at our sole option, to declare the oral agreement confirmed hereby null and void.

Very truly yours,

BARCLAYS BANK PLC

By: _____
    Name:
    Title:

Receipt of this confirmation is
hereby acknowledged:

NC CAPITAL CORPORATION

By: _____
    Name:    Kevin Cloyd
    Title:    President

NEW CENTURY MORTGAGE
  CORPORATION

By: _____
    Name:    KEVIN CLOYD
    Title:    EXECUTIVE VICE PRESIDENT

CONFIDENTIAL

NC_Alanis_00000521

# Ex-C

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------x

In re

NEW CENTURY TRS HOLDINGS, INC., a
Delaware Corporation, et al.,[1]

Debtors.

Chapter 11

Case No. 07-10416 (BLS)

(Jointly Administered)

-------------------------------------------------x

## DECLARATION OF DONNA E. WALKER CONCERNING RECORDS PRODUCED BY THE NEW CENTURY LIQUIDATING TRUST

I, the undersigned, Donna E. Walker, pursuant to 28 U.S.C. § 1746, declare that:

1.    I was an employee of New Century Mortgage Corporation ("NCMC") before it filed for bankruptcy, and am presently a consultant for the liquidating trustee of the New Century Liquidating Trust (the "Trust"), established pursuant to a confirmed chapter 11 plan of liquidation (the "Plan") of New Century TRS Holdings, Inc. and its affiliated debtors (the "Debtors"), including NCMC. The Trust is the custodian of documents and electronic data for the Debtors and has maintained such documents and electronic data turned over to the Trust by the Debtors since the effective date of the Plan. I am authorized by the Trust to make this declaration.

2.    In response to a request for documents made to the Trust by Nancy Alanis ("Alanis"), the Trust searched its files and produced to Alanis the files identified as bates range NC_Alanis_00000001 - NC_Alanis_0000885 (the "Produced Files"). The Produced Files were produced to Alanis on or about April 21, 2016.

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.) ("NCFC"); New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation); New Century Mortgage Corporation (f/k/a JBE Mortgage) ("NCMC"); NC Capital Corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com); New Century Credit Corporation (f/k/a Worth Funding Incorporated); NC Asset Holding, L.P. (f/k/a NC Residual II Corporation); NC Residual III Corporation; NC Residual IV Corporation; New Century R.E.O. Corp.; New Century R.E.O. II Corp.; New Century R.E.O. III Corp.; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage); NC Deltex, LLC; NCoral, L.P.; and New Century Warehouse Corporation.

DOCUMENT SCANNED AS FILED

3.    I submit this declaration to authenticate the Produced Files that the Trust located and produced in response to Alanis' request, but I do not make any representations or warranties, express or implied, regarding the completeness, condition, or quality of such . Produced Files.

4.    The Produced Files are copies of files maintained in electronic form by the Trust as of the date on which Alanis made her request for the production of the Produced Files.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10ᵗʰ day of May, 2016

Donna E. Walker
Consultant
New Century Liquidating Trust

Sworn to before me this
10ᵗʰ day of May, 2016

Notary Public

SUSAN FARRELL
Notary Public, State of New York
No. 01FA4980030
Qualified in Nassau County
Commission Expires April 27, 20 19

648

DOCUMENT SCANNED AS FILED



*DC1+FTPOL+1008511112*

Loan Number: 1008511112

Borrower Name: ALANIS, NANCY

Document Type: FTPOL

Page Count:

MIN #:

sold_date: investor_name:

7/28/2006 BARCLAYS

pool_no: ps_pool_name:

2006-173 jul06 barclays

loan no: 1008511112

CONFIDENTIAL

NC_Alanis_00000090

DOCUMENT SCANNED AS FILED

# Ex-D

# VERITEXT
## LEGAL SOLUTIONS

**Veritext, LLC**
**New York Region**

30 Old Country Rd., Suite 300
Mineola NY 11501
Tel. (516) 608-2400 Fax. (516) 608-2450
Fed. Tax ID: 20-3132569

| | |
|---|---|
| **Invoice #:** | NY3511137 |
| **Invoice Date:** | 10/15/2018 |
| **Balance Due:** | $0.00 |

**Bill To:** Nancy Alanis
Nancy Alanis
13210 Hunters View
San Antonio, TX, 78230

| | |
|---|---|
| **Case:** | New Century v. |
| **Job #:** | 761918 | Job Date: 5/23/2012 | Delivery: Daily |
| **Billing Atty:** | Nancy Alanis |
| **Location:** | US Bankruptcy Court Delaware Division |
| | 824 Market Street | Wilmington, DE 19801 |
| **Sched Atty:** | Judge Kevin J Carey | US Bankruptcy Delaware District |

| Witness | Description | Units | Quantity | Price | Amount |
|---|---|---|---|---|---|
| 07-10416 | Certified Transcript | Page | 321.00 | $0.90 | $288.90 |

| | |
|---|---|
| **Invoice Total:** | $288.90 |
| **Payment:** | ($288.90) |
| **Credit:** | $0.00 |
| **Interest:** | $0.00 |
| **Balance Due:** | $0.00 |

Notes:

TERMS: Payable upon receipt. Accounts 30 days past due will bear a finance charge of 1.5% per month. Accounts unpaid after 90 days agree to pay all collection costs, including reasonable attorney's fees. Contact us to correct payment errors. No adjustments will be made after 90 days. For more information on charges related to our services please consult http://www.veritext.com/services/all-services/services-information

**To pay online, go to**
**www.veritext.com**

Veritext accepts all major credit cards
(American Express, Mastercard, Visa, Discover)

Please remit payment to:
**Veritext**
P.O. Box 71303
Chicago IL 60694-1303

| | |
|---|---|
| **Invoice #:** | NY3511137 |
| **Job #:** | 761918 |
| **Invoice Date:** | 10/15/2018 |
| **Balance:** | $0.00 |

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3    Case No. 07-10416(KJC); Adv. 10-56215; Adv. 11-53893; Adv.

4    10-55357; Adv. 11-53199; Adv. 12-50187; Adv. 09-52251

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7    NEW CENTURY TRS HOLDINGS, INC., et al.

8            Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11                            United States Bankruptcy Court

12                            824 North Market Street

13                            Wilmington, Delaware

14                            May 23, 2012

15                            10:00 AM

16

17

18    B E F O R E :

19    HON. KEVIN J. CAREY

20    U.S. BANKRUPTCY JUDGE

21

22

23

24

25    ECR OPERATOR:    AL LUGANO

1   HEARING re Debtors' Non-substantive Objection Pursuant to 11

2   U.S.C. Section 502, Fed. R. Bankr. P. 3007 and 9014 and Del.

3   Bankr. L.R. 3007-1 to Claim of Internal Revenue Service for

4   Which Insufficient Documentation is Attached to the Filed

5   Proof of Claim [D.I. 5025; filed 2/22/08]

6

7   HEARING re The New Century Liquidating Trust's Thirty-Third

8   Omnibus Objection to Claims Pursuant to 11 U.S.C. Section

9   502(b) and Fed. R. Bankr. P. 3001, 3007 and Local Rule 3007-

10  1 [Substantive][D.I. 10184; filed 8/13/10]

11

12  HEARING re Debtors' Eighteenth Omnibus Objection:

13  Substantive Objection Pursuant to 11 U.S.C. Section 502,

14  503, 506 and 507, Bankruptcy Rules 3007 and 9014, and Local

15  Rule 3007-1 to Certain (A) Books and Records Claims; (B)

16  Insufficient Documentation; (C) Multiple-Debtor Duplicate

17  Claims; and (D) Reduced and/or Reclassified Claims (D.I.

18  5537; filed 3/27/08]

19

20  HEARING re Motion to Reconsider Order Disallowing and

21  Expunging Certain (A) Amended And Superseded Claims; (B)

22  Late Filed Claims; and (C) No Supporting Documentation

23  Claims Set Forth in Debtors' Twenty-First Omnibus Objection

24  to Claims (D.I. 9229; filed 12/10/08]

25

1    HEARING re Motion of W. Frazer and Konilynn Frazer, Pro Se

2    to Allow Late Filing of Proof of Claim (D.I. 10107; filed

3    5/17/10]

4

5    Mary Guinto and Thomas Guinto v. New Century TRS Holdings,

6    Inc., et al. (Adv. Pro No. 10-56215):

7    HEARING re Motion of New Century Liquidating Trust To

8    Dismiss Adversary Proceeding Complaint (Adv. Dkt. No. 3;

9    filed 2/2/2011]

10

11   HEARING re Motion of Mary Guinto and Thomas A. Guinto, Pro

12   Se to Consider Proof of Claim Timely Filed [D.I. 10328;

13   filed 12/7/10]

14

15   Mary Guinto and Thomas Guinto v. New Century TRS Holdings,

16   Inc., et al. (Adv. Pro No. 10-56215):

17   HEARING re Motion of Claimants, Mary Guinto and Thomas A.

18   Guinto, Requesting the Entry of a Scheduling Order [Adv.

19   Dkt. No. 30' Main Case D.I. 10717 filed 1/30/2012]

20

21   Helen Galope v. New Century TRS Holdings, Inc., et al. (Adv.

22   Pro No. 11-53893):

23   HEARING re Motion of New Century Liquidating Trust to

24   Dismiss Adversary Proceeding Complaint [Adv. Dkt. 4; filed

25   3/8/2012]

1   Molly S. White & Ralph N. White v. New Century TRS Holdings,

2   Inc., et al. (Adv. Pro No. 10-55357):

3   HEARING re Plaintiff's Motion to Compel Discovery [Adv. Pro

4   Dkt. No. 47; filed 2/16/2011]

5

6   Molly S. White & Ralph N. White v. New Century TRS Holdings,

7   Inc., et al. (Adv. Pro No. 10-55357):

8   HEARING re Motion to Reconsider Dismissal of Counts II and

9   VIII of Complaint [Filed by Molly S. White and Ralph N.

10  White] [Adv. Pro Dkt. No. 61; filed 6/17/2011]

11

12  Alfred A. Silva v. New Century Mortgage Corporation (Adv.

13  Pro No. 11-531990:

14  HEARING re Motion of New Century Liquidating Trust to

15  Dismiss Adversary Proceeding Complaint [Adv. D.I. 5; filed

16  10/26/11]

17

18  Christine Konar v. New Century TRS Holdings, Inc. (Adv. Pro.

19  No. 12-50187):

20  HEARING re Motion of New Century Liquidating Trust to

21  Dismiss Adversary Proceeding Complaint [Adv. Dkt. No. 5;

22  filed 4/12/2012]

23

24

25

1    HEARING re Motion for Removal of Trustee filed by Helen

2    Galope [Dkt. No. 10883; filed 5/9/2012]

3

4    Anita B. Carr v. New Century TRS Holdings, Inc., et al.

5    (Adv. Pro. No. 09-52251):

6    HEARING re Plaintiff's Notice of Motion and Motion for

7    Sanctions [Adv. D.I. 122; filed 2/3/12]

8

9    HEARING re Motion of Christine Konar Pro Se, to Consider

10   Proof of Claim Timely Filed [Dkt. No. 10743; filed

11   2/21/2012]

12

13   HEARING re Motion to File Amended Proof of Claim [Filed by

14   Christine Konar][Dkt. No. 10744; filed 2/21/2012]

15

16   HEARING re The New Century Liquidating Trust's Motion to

17   Preclude Alfred A. Silva From Introducing Evidence at the

18   Evidentiary Hearing Pursuant to Federal Rule of Bankruptcy

19   Procedure 7037 and Local Rule 7026-1 [D.I. 10746; filed

20   2/21/2012]

21

22   HEARING re Ex Parte Application for an Order Shortening the

23   Time to Clarify the Order of this Court Allowing New Century

24   to Appear in California Case to Quiet Title [Filed by Leslie

25   Marks] [Dkt. No. 10752; filed 2/23/2012]

1    MS. CROMWELL:  I'd like to call Mr. Jacobs back to

2    the stand.

3            THE COURT:  All right.  Mr. Jacobs, if you would,

4    sir.

5            ALAN JACOBS, WITNESS, PREV. SWORN

6            THE COURT:  You may be seated.  I -- you should

7    consider yourself as still under oath.

8            THE WITNESS:  Thank you.

9            THE COURT:  All right.

10   DIRECT EXAMINATION

11   BY MS. CROMWELL:

12   Q    Hi, Mr. Jacobs.

13   A    Hello.  How are you?

14            THE WITNESS:  May I at least put these aside until

15   they're relevant?

16            THE COURT:  Yes, you may.

17            THE WITNESS:  Yes, go right ahead.

18   Q    Okay.  How long have you been a trustee?

19   A    In this matter, I've been the trustee since August of

20   2008.  I've been a Chapter 11 and a Chapter 7 trustee in a

21   post liquidation trust trustee since 1999, 2000, serving in

22   various capacities in various cases.

23   Q    Okay.  And could you just explain -- well, you know

24   what, never mind.

25            Are there any remaining New Century employees working

1    for the trust?

2    A    There are less than ten former employees of New Century

3    whom I retain on a consulting basis.  They are actually

4    engaged by a temporary employment agency, and I retain them

5    to assist me in administering the trust.

6    Q    Is Steve Nagy still employed by New Century?

7    A    No.

8    Q    And did he leave employment in December of 2007?

9    A    I do not know.

10   Q    Has he been an employee since you started -- since you

11   took over in August of 2008, was he in your employ?

12   A    He was never in my employ.

13   Q    He was never in your employ.

14   A    That is correct.

15   Q    So just to be clear, that Steve Nagy was not in your

16   employ, which means that he was then not in the (sic) New

17   Century employee as of August 8th, 2008?

18   A    Well, to clarify, he was never employed by the

19   liquidating trust.  Prior to the formation of the

20   liquidating trust, none of the former New Century employees

21   were employees directly of New Century for some period of

22   time, I don't know when, but New Century actually had this

23   temporary employment agency retain their former employees at

24   some time during the pendency of the case.  I don't recall

25   when that occurred.

1    Q    So just to -- I'll just tell you where I'm going with

2    this.  I want to know Steve Nagy when he left employment.

3    You don't know when he left New Century employment.  What

4    you do know is that for those employees that have been

5    working through the temporary agency as of August 8th, 2008,

6    Steve Nagy was not one of those people?

7    A    That is accurate.

8    Q    Thank you.  Have you ever come into a bankruptcy where

9    you've discovered that the debtor failed to recognize

10   potential claimants?

11   A    I don't understand what you mean by that.

12   Q    Have you ever come into a bankruptcy where you -- in

13   going through -- I'm assuming you go back through the

14   debtor's books and records and you validate the plan.

15   A    That's not accurate.

16   Q    Oh, okay.  So do you ever go back and look at the work

17   of the prior -- the work that was done up till the time you

18   became involved in the bankruptcy to --

19   A    That's such a vague question, I really can't answer it.

20   Q    Huh.  At any time that you've been working as a

21   liquidating trustee -- well, I don't know how else to ask

22   that.

23        The question is, is that you've never -- so you've

24   never come into a bankruptcy where you said, oh wow, here's

25   a group of creditors that we didn't notice, but we need to

1    you seen the books and records yourself?

2    A    I've seen lots of books and records.

3    Q    For the New Century books and records?

4    A    Yes.

5    Q    All right.  Could you look at this note for me and tell

6    me where you see the endorsement?

7    A    I don't believe I see an endorsement.  I see a

8    signature.

9    Q    Right.  But you see an endorsement by New Century?

10   A    I do not see New Century's signature, corporate

11   signature or endorsement, no.

12   Q    But the note, again just reconfirming, is made out to

13   New Century even though the note's made out to New Century,

14   correct?

15   A    Promise to pay as to lender is New Century Mortgage

16   Corporation.

17   Q    Thank you.  All right.  So are you aware that Steve

18   Nagy's stamped signature is used for endorsement of notes

19   from New Century?

20   A    I've heard reference to that, but I can't apply

21   specifically to any specific instance.

22   Q    Have you ever seen any corporate minutes in regards to

23   who's authorized to stamp Steve Nagy's signature?

24   A    I don't recall.

25   Q    Do you know how many people are authorized to stamp his

1    signature?

2    A    At what point in time are you referring?

3    Q    Any time.

4    A    Well, he's not authorized to stamp the signature today.

5    Q    As of when was he not authorized to stamp his

6    signature?

7    A    On behalf of New Century Liquidating Trust, he has no

8    authorization to use the New Century -- his signature on

9    behalf of the trust.

10    Q    As of when?

11    A    The formation of the trust.

12    Q    As of August 8th, 2008, Steve Nagy had no authorization

13    to stamp on behalf of the New Century Liquidating Trust?

14    A    That is accurate.

15    Q    Are there -- is there anyone authorized to stamp his

16    name?

17    A    No, there would be no reason to use his name in the

18    period and time we just spoke.

19    Q    After August 8th?

20    A    Correct.

21    Q    Huh.  All right.  I want to go back to -- this is back

22    to the Cromwell claim book.  Is it your understanding that

23    the Cromwell loan, that's the same book where the note is

24    and the letter.

25    A    Thank you.

```
 1                      C E R T I F I C A T I O N

 2

        I, Sheila G. Orms, certify that the foregoing is a correct

 3      transcript from the official electronic sound recording of

 4      the proceedings in the above-entitled matter.

 5                                  Digitally signed by Sheila Orms
                                    DN: cn=Sheila Orms, o, ou,
 6      Sheila Orms                 email=digital1@veritext.com,
                                    c=US
 7                                  Date: 2018.10.15 14:18:57 -04'00'

 8      Signature of Approved Transcriber

 9

10

        Veritext

11

        200 Old Country Road

12

        Suite 580

13

        Mineola, NY   11501

14

15

        Date: May 29, 2012

16

17

18

19

20

21

22

23

24

25
```

# Ex-E



LT1-77-20060178422-1

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
LT2-12283-1912-3

Document Title:

## Limited Power of Attorney

When Recorded Return To:
Financial Dimensions, Inc.
1400 Lebanon Church Road
Pittsburgh, PA 15236

OFB#_478-254_

Grantor: *New Century Mortgage Corporation*

Grantee:   Ocwen Loan Servicing, LLC.



**CERTIFICATE**
The page to which this certificate is affixed may have been altered to redact confidential personal information but
is otherwise a full, true and correct copy of the original on file and of record in my office.

ATTESTED:_____
GERARD C. RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY:_____          2·11·15
     Deputy                        Date

BOOK 1291 PAGE 12

POA# 1801          LIMITED POWER OF ATTORNEY

NEW CENTURY MORTGAGE CORPORATION (hereinafter called "Owner") hereby appoints Ocwen Loan Servicing, LLC (hereinafter called "Ocwen"), as its true and lawful attorney-in-fact to act in the name, place and stead of Prior Servicer for the purposes set forth below.

The said attorneys-in-fact, and each of them, are hereby authorized, and empowered, as follows:

1.    To execute, acknowledge, seal and deliver deed of trust/mortgage note endorsements, lost note affidavits, assignments of deed of trust/mortgage and other recorded documents, satisfactions/releases/reconveyances of deed of trust/mortgage, subordinations and modifications, tax authority notifications and declarations, deeds, bills of sale, and other instruments of sale, conveyance, and transfer, appropriately completed, with all ordinary or necessary endorsements, acknowledgments, affidavits, and supporting documents as may be necessary or appropriate to effect its execution, delivery, conveyance, recordation or filing.

2.    To execute and deliver insurance filings and claims, affidavits of debt, substitutions of trustee, substitutions of counsel, non-military affidavits, notices of reclusion, foreclosure deeds, transfer tax affidavits, affidavits of merit, verifications of complaints, notices to quit, bankruptcy declarations for the purpose of filing motions to lift stays, and other documents or notice filings on behalf of Owner in connection with insurance, foreclosure, bankruptcy and eviction actions.

3.    To endorse any checks or other instruments received by Ocwen and made payable to Owner.

4.    To pursue any deficiency, debt or other obligation, secured or unsecured, including but not limited to those arising from foreclosure or other sale, promissory note or check. This power also authorizes Ocwen to collect, negotiate or otherwise settle any deficiency claim, including interest and attorney's fees.

5.    To do any other act or complete any other document that arises in the normal course of servicing.

Dated: March 2, 2005.                                    NEW CENTURY MORTGAGE CORPORATION

Witness.

Name: Toni Sessions                                       Name: Patrick Flanagan
                                                          Title: President
Name: Kim Ros

‖‖‖‖‖‖‖‖‖ 2006-03585
          Pg : 2/2

State of California      )
County of Orange         )

BEFORE ME, Michelle C. David, a Notary Public in and for the jurisdiction aforesaid, on this 2nd day of March, 2005, personally appeared Patrick Flanagan who is personally known to me to be the President of New Century Mortgage Corporation and the person who executed the foregoing instrument by virtue of the authority vested in him and he did acknowledge the signing of the foregoing instrument to be his free and voluntary act and deed as a President for the uses, purposes and consideration therein set forth.

Witness my hand and official seal this 2nd day of March, 2005.

My Commission Expires:  6/4/05

NOTARY STAMP
MICHELLE C DAVID
Commission #1399729
Notary Public - California
Orange County
My Comm. Expires Jun 21, 2008

When Recorded Mail To:
Financial Dimensions, Inc.
1400 Lebanon Church Road
Pittsburgh, PA 15236

410254



I hereby certify this document to be a true, correct and complete copy of the record filed in my office. Dated this ___ day of _____
Roger Desjarlais, County Administrator
By _____
                    Deputy Clerk

‖‖‖‖‖‖‖‖‖ 3253389
          Page: 2 of 2
          10/14/2005 08:58A
FINANCIAL DIMENSIONS/M  POWR  18.50  Beaver County

CERTIFICATE
The page to which this certificate is affixed may have been altered to redact confidential personal information but is otherwise a full, true and correct copy of the original on file and of record in my office.

ATTESTED:
GERARD C. RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY: _____                         2-11-15
         Deputy                              Date

RECORDER'S MEMORANDUM
AT THE TIME OF RECORDATION, THIS
INSTRUMENT WAS FOUND TO BE INADEQUATE
FOR THE BEST PHOTOGRAPHIC REPRODUCTION
BECAUSE OF ILLEGIBILITY, CARBON OR
PHOTO COPY, DISCOLORED PAPER ETC.

DocH 20080178422 Fees: $24.00
07/27/2008    4:11PM # Pages 3
Filed & Recorded in the Official Public
Records of   BEXAR COUNTY
GERRY RICKHOFF COUNTY CLERK

Any provision herein which restricts the sale, or use of the described real
property because of race is invalid and unenforceable under Federal law
STATE OF TEXAS, COUNTY OF BEXAR
I hereby certify that this instrument was FILED in File Number Sequence on
the date and at the time stamped hereon by me and was duly RECORDED
in the Official Public Record of Real Property of Bexar County, Texas on:

JUL 2 7 2006

COUNTY CLERK BEXAR COUNTY, TEXAS

CERTIFICATE
The page to which this certificate is affixed may have been altered to redact confidential personal information but
is otherwise a full, true and correct copy of the original on file and of record in my office.

ATTESTED:
GERARD C. RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

2-11-15

BY: _____
        Deputy                                      Date

# Gerard Rickhoff

COUNTY CLERK  BEXAR COUNTY

BEXAR COUNTY COURTHOUSE
100 DOLOROSA, SUITE 104
SAN ANTONIO, TEXAS 78205

## CERTIFICATE

STATE OF TEXAS §

COUNTY OF BEXAR §

    I, GERARD RICKHOFF, COUNTY CLERK OF BEXAR COUNTY, TEXAS, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT COPY OF THE OFFICIAL PUBLIC RECORDS OF REAL PROPERTY OF BEXAR COUNTY, TEXAS, NOW IN MY LAWFUL CUSTODY AND POSSESSION AS SAME APPEARS OF RECORD FILED IN:

        VOLUME 12283          PAGE 1912

    THIS COPY MAY HAVE BEEN ALTERED TO REDACT CONFIDENTIAL PERSONAL INFORMATION AS REQUIRED BY TEXAS GOVERNMENT CODE 552.147.

    IN TESTIMONY WHEREOF, WITNESS MY HAND AND OFFICIAL SEAL OF OFFICE GIVEN IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, ON THIS 11th DAY OF February      A.D., 20 15 .

        GERARD RICKHOFF
        COUNTY CLERK
        BEXAR COUNTY, TEXAS

        BY: Edna Cruz Mosley
            Deputy County Clerk

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS OR NATIONAL ORIGIN IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

# Ex-F

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

NEW CENTURY TRS HOLDINGS, INC., *et al.*,[1]

                                    Debtors.

Chapter 11

Case No. 07-10416 (KJC)
(Jointly Administered)

Re: Docket No. 8673
Hearing Date: August 13, 2008
Objection Deadline: August 8, 2008

**AMENDED OBJECTION OF THE NEW CENTURY LIQUIDATING TRUST AND REORGANIZED NEW CENTURY WAREHOUSE CORPORATION TO MOTION TO STAY ORDER CONFIRMING PLAN OF REORGANIZATION PENDING APPEAL PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8005 AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY ORDER CONFIRMING PLAN OF REORGANIZATION PENDING APPEAL PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8005**

The New Century Liquidating Trust and Reorganized New Century Warehouse Corporation (together, the "Trust"), by and through Alan M. Jacobs, as their Bankruptcy Court-appointed Liquidating Trustee and Plan Administrator, respectively, by and through their co-counsel, Hahn & Hessen LLP and Blank Rome LLP, hereby submit this Objection (the "Objection") of the New Century Liquidating Trust and Reorganized New Century Warehouse

---

[1] The pre-confirmation Debtors were the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a new Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership; and New Century Warehouse Corporation, a California corporation.

877285.011-1490548.5

# 870

Corporation to Motion to Stay Order Confirming Plan of Reorganization Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8005 (the "Stay Motion") and Memorandum of Law in Support of Motion to Stay Order Confirming Plan of Reorganization Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8005 (the "Memorandum of Law"), filed by Gregory J. Schroeder, Michelle Park, Martin Warren, Steve Holland and Nabil Bawa and the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan, for themselves and all other similarly situated beneficiaries of the New Century Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan (collectively, the "Beneficiaries"), and respectfully represent:

## PRELIMINARY STATEMENT[2]

Nearly a month after the Court issued its Opinion[3] and two weeks after entry of the Confirmation Order, the Beneficiaries belatedly filed their Stay Motion. The Stay Motion is moot since the Effective Date under the Plan has already occurred and material, irreversible steps towards substantial consummation of the Plan have already taken place, including among other things the transfer of all of the Debtors' property to the Trust, the disbursement of significant moneys by the Trustee in accordance with the terms of the Plan and the officers and directors of the Debtors having ceased to serve in those capacities.

Moreover, the Beneficiaries have failed to meet their burden of satisfying the standards required for the granting of a motion to stay the effectiveness of an adverse order pending appeal

---

[2]  All capitalized terms not herein defined shall have the same meaning as ascribed to them in the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April 23, 2008 (as supplemented, modified, or amended, the "Plan").

pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8005. Not only are the Beneficiaries unlikely to succeed on the merits of their appeal, but the balance of hardships weighs heavily against them.

Finally, to the extent the Court is nevertheless inclined to grant the Stay Motion notwithstanding the substantial arguments to the contrary, the Trust, on behalf of the vast majority of creditors holding an estimated $1 billion in claims who voted overwhelming in favor of the Plan, including creditors holding substantially larger claims in the same class as the Beneficiaries, respectfully requests that the Beneficiaries be required to post a significant bond as a condition to the granting of any such stay.

## BACKGROUND

On April 2, 2007 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"). Until August 1, 2008 when the Plan became effective, the Debtors continued in the management and operation of their businesses pursuant to Bankruptcy Code §§ 1107 and 1108. No trustee has been appointed.

On April 9, 2007, the Office of the United States Trustee for the District of Delaware appointed seven (7) of the Debtors' largest unsecured creditors to the Official Committee of Unsecured Creditors (the "Committee"). Hahn & Hessen LLP and Blank Rome LLP were selected by the Committee to serve as its co-counsel, and FTI Consulting, Inc. was selected by the Committee to serve as its financial advisor.

---

[3]  *In re New Century TRS Holdings, Inc.*, 2008 Bankr. LEXIS 1957 (Bankr. D. Del. July 2, 2008) (the "Opinion").

- 3 -

On February 2, 2008, the Debtors and the Committee filed the *Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008*, and the Debtors filed the *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of February 2, 2008.*

On March 18, 2008, the Court entered an *Order (A) Approving Disclosure Statement Regarding First Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March 18, 2008 (B) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Joint Plan of Liquidation and (C) Scheduling a Hearing on Confirmation of Joint Plan of Liquidation and Approving Related Notice Procedures.*

On March 18, the Debtors filed the *First Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of March 18, 2008.* On April 23, 2008, the Debtors filed the Plan.

On April 18, 2008, the Beneficiaries filed the *Objection and Memorandum of Law to Confirmation of the Plan* (the "Beneficiaries' Objection").

On April 23, 2008, the Debtors' claims agent filed a declaration regarding the tabulation of votes to accept and to reject the Plan, annexed to which was a summary of voting results. Per that summary, every Class but Class HC3b (the Beneficiaries' Class) overwhelmingly voted to accept the Plan in terms of amount of claims and number of claims voting. Even though Class HC3b voted to reject the Plan, 95.42% of in amount of claims in Class HC3b voted to accept the

- 4 -

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

NEW CENTURY TRS HOLDINGS, INC.,
a Delaware corporation, et al.,[1]

Debtors.

Chapter 11

Case No. 07-10416 (KJC)
(Jointly Administered)

## AFFIDAVIT OF ALAN M. JACOBS IN SUPPORT OF OBJECTION TO MOTION TO STAY CONFIRMATION ORDER PENDING APPEAL

Alan M. Jacobs, being duly sworn, deposes and says:

1.      I am the Liquidating Trustee (the "Trustee") of the New Century Liquidating Trust (the "Trust") and Plan Administrator ("Plan Administrator") of Reorganized New Century Warehouse Corporation ("Reorganized Access Lending"). I am authorized to make and submit this affidavit on behalf of the Trust and Reorganized Access Lending. This affidavit is submitted in support of the Objection of the New Century Liquidating Trust and Reorganized New Century Warehouse Corporation to Motion to Stay Order Confirming Plan of Reorganization Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8005 and Memorandum of Law in Support of Motion to Stay Order Confirming Plan of Reorganization Pending Appeal Pursuant to

---

[1] The pre-confirmation Debtors were the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corporation, a California corporation; New Century R.E.O. II Corporation, a California corporation; New Century R.E.O. III Corporation, a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Federal Rule of Bankruptcy Procedure 8005 (the "Objection"). The statements contained herein are based upon personal knowledge.

2.      On April 23, 2008, the Debtors filed the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April 23, 2008 (as supplemented, modified, or amended, the "Plan").

3.      On July 2, 2008, the Court entered the Opinion on Confirmation and the Order Regarding the Opinion on Confirmation approving confirmation of the Plan subject to the entry of a confirmation order to be proposed by the Debtors and the Committee.

4.      On July 15, 2008, the Court entered the Order Confirming the Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors Dated as of April 23, 2008 (the "Confirmation Order"). An Order Amending the Confirmation Order was entered on July 23, 2008.

5.      On August 1, 2008 at 5:00 p.m. (the "Effective Date"), the Plan became effective. On August 4, 2008, a Notice of (I) Entry of Order Confirming Second Amended Joint Chapter 11 Plan of Liquidation of the Debtors and the Official Committee of Unsecured Creditors dated as of April 23, 2008, (II) Effective Date and (III) Bar Dates for Administrative Claims, Professional Fee Claims, Subordination Statements and Rejection Damages Claims (the "Notice of Effective Date") was filed with the Court. A copy of this Notice of Effective Date is attached hereto as Exhibit A.

6.      Pursuant to the Plan, on the Effective Date the New Century Liquidating Trust Agreement (the "Trust Agreement") was executed, thereby creating the Trust and appointing me as Trustee of the Trust. Also on the Effective Date, the Official Committee of Unsecured Creditors (the "Committee") was dissolved and the Plan Advisory Committee was formed (the "PAC"). The

PAC has already conducted its first in person meeting and, among other things, authorized me to take certain immediate actions under the Plan.

7.    The officers and directors of the Debtors ceased to serve immediately upon the occurrence of the Effective Date. Accordingly, pursuant to the terms of the Confirmation Order, as of the Effective Date, I was appointed as the sole officer and director of each of the Debtors, other than Access Lending, and authorized to wind down any remaining corporate affairs of the Debtors.

8.    Also on the Effective Date, pursuant to Article 8 (E)(1) of the Plan, all Assets of the Debtors (excluding Access Lending Assets but including Access Lending Interests) were distributed to the Trust. Pursuant to Article 8 (F)(5)(c)(iii) of the Plan, I have opened several bank accounts in the name of the Trust to hold the Trust Assets and in the name of Reorganized Access Lending to hold Reorganized Access Lending Assets. Since the Effective Date, $73,484,182.91 in cash was transferred to the Trust's bank accounts and $5,064,778.80 was transferred to Reorganized Access Lending's bank accounts.

9.    On July 28, 2008, in preparation for the occurrence of the Effective Date, pursuant to Articles 8 (E) and 10 (A) of the Plan, TRS Holdings, Inc. executed the Stock Power and Assignment Separate Form Certificate. This effectuated a transfer of all of the stock of New Century Warehouse Corporation (Access Lending) to the Trust, which became the sole shareholder of Reorganized Access Lending. A copy of the Stock Power and Assignment Separate Form Certificate is attached hereto as Exhibit B.

10.    As required by Article 8 (F)(3)(d) of the Plan, I have obtained a one year bond to cover the Trust Assets and paid the respective premium of $142,720 out of the Trust Assets to the bonding company.

11.    As required by Article 8 (F)(3)(d) of the Plan, I have obtained a one year bond to

cover the Reorganized Access Lending Assets and paid the respective premium of $10,640 out of Reorganized Access Lending Assets to the bonding company.

12.    Pursuant to Article 8 (F)(5)(c)(xii) of the Plan, I have obtained an Errors and Omissions insurance policy to cover myself as Liquidating Trustee and Plan Administrator, the Trust, and the PAC and its members and paid a three year premium in the amount of $311,400 out of the Trust Assets.

13.    Pursuant to Article 8 (I) of the Plan, I have commenced the retention of various Trust and Reorganized Access Lending professionals including counsel, financial Advisors and accountants.

14.    As of the Effective Date, pursuant to the terms of the Plan, all notes, agreements and securities evidencing Claims and Interests and the rights thereunder of the holders thereof were cancelled and deemed null and void and of no further force and effect. Additionally, pursuant to the terms of the Plan, the Capital Trust Indentures were deemed automatically cancelled and discharged on the Effective Date.

15.    On August 1, 2008, New Century Financial Corporation completed a final Form 8-K indicating that pursuant to the terms of the Plan, all shares of New Century Financial Corporation's outstanding common and preferred stock outstanding immediately prior to the Effective Date have been cancelled, which form was filed on August 4, 2008. A copy of the filed Form 8-K is attached hereto as Exhibit C.

16.    Article 12 (B) of the Plan provides that, on the Confirmation Date, except for (i) any Executory Contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code and (ii) any Executory Contract identified on the Assumption Schedule, each Executory Contract entered into by the Debtors prior to the

Petition Date that had not previously expired or terminated pursuant to its own terms, was rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, effective as of the Confirmation Date.

17.     Pursuant to the Confirmation Order, the Notice of Effective Date was served on approximately 127,000 parties. Such mailing is costing the Trust in excess of $150,000.

18.     The Notice of Effective Date puts all parties on notice that various claims bar dates have begun to run as of the Effective Date. Any changes in such bar dates would require re-noticing at a substantial cost to the estate.

19.     As Trustee, I, or my counsel under my direction, have started to compromise certain claims and implement certain decisions with respect to the remaining estate assets.

Alan M. Jacobs
Liquidating Trustee and
Plan Administrator

Sworn and subscribed to
before me this 8ᵗʰ day
of August, 2008

Notary Public

MARK S. INDELICATO
NOTARY PUBLIC, State of New York
No. 4867556
Qualified in New York County
Commission Expires September 14, 2012

# Ex-G

Book   15135   Page 1347 3pgs   Doc# 20110164236

RETURN TO:
MACKIE WOLF ZIENTZ & MANN P.C.
Pacific Center I, Suite 660
14180 N. Dallas Parkway
Dallas, Texas 75254

2970581307931
Attorney Code: 24076

TRANSFER OF LIEN
TEXAS

This TRANSFER OF LIEN is made and entered into as of this 1ST day of SEPTEMBER, 2010, from NEW CENTURY MORTGAGE CORPORATION , whose address is c/o Ocwen Loan Servicing, LLC. 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409 ("Assignor") to WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS-THROUGH CERTIFICATES,SERIES 2006-NC3, whose address is c/o Ocwen Loan Servicing, LLC. 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409 ("Assignee").

For the sum of ten dollars ($10.00) cash and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Assignor does by these presents hereby grant, bargain, sell, assign, convey, transfer and set over unto the Assignee, its successors, transferees and assigns forever, all of the right, title and interest owned or held by said Assignor in and to the following instrument describing land therein, duly recorded in the Official Public Records of Real Property/Mortgage/Deed of Trust Records of BEXAR COUNTY, State of TEXAS, described as follows:

Mortgagor/Trustor: NANCY ALANIS
Mortgagee/Beneficiary:  NEW CENTURY MORTGAGE CORPORATION
Trustee: ELDON L. YOUNGBLOOD
Document Date: JUNE 15, 2006
Amount: $ 193,500.00
Date Recorded: JUNE 22, 2006 .
Book/Volume/Docket/Liber: 12204
Page/Folio: 847
Instrument No: 20060146541
Property Address: 13210 HUNTERS VIEW, SAN ANTONIO, TX
LEGAL DESCIPTION: *SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.*

This Assignment is made without recourse, representation or warranty.

DATED: FEBRUARY 02, 2011
NEW CENTURY MORTGAGE CORPORATION
BY ITS ATTORNEY IN FACT
OCWEN LOAN SERVICING, LLC

BY:                                                          POA RECORDED ON: JULY 27, 2006
NAME:  Christina Carter                                      INSTRUMENT NO: 2006-0176422
TITLE:  Account Management, Manager
STATE OF FLORIDA
                                )SS.
COUNTY OF PALM BEACH            )

The foregoing instrument was acknowledged before me on this 02ND day of FEBRUARY, 2011., by Christina Carter, Account Management, Manager  at OCWEN LOAN SERVICING, LLC, ATTORNEY-IN-FACT FOR NEW CENTURY MORTGAGE CORPORATION on behalf of the company.  Christine Carter is personally known to me.

Witness my hand and official seal.

11-0000 58.670                                      Notary Signature    Stephen Lee

Notary Public State of Florida
Stephen Lee
My Commission EE025788
Expires 08/13/2014

1918

2070381307931

## EXHIBIT "A"

Lot 2, Block 6, New City Block 16984, HUNTERS CREEK NORTH, UNIT-3, in the City of San Antonio, Bexar County, Texas, according to the map or plat thereof recorded in Volume 8200, Page(s) 215-216, of the Deed and Plat Records of Bexar County, Texas.

Doc# 20110164236
# Pages 3
09/14/2011    12:07:29 PM
e-Filed & e-Recorded in the
Official Public Records of
BEXAR COUNTY
GERARD RICKHOFF COUNTY CLERK

Fees 20.00

STATE OF TEXAS
COUNTY OF BEXAR
This is to Certify that this document
was e-FILED and e-RECORDED in the Official
Public Records of Bexar County, Texas
on this date and time stamped thereon.
09/14/2011   12:07:29 PM
COUNTY CLERK, BEXAR COUNTY TEXAS

1920

# Ex-H

CAUSE NO. 2011-CI-02839

| | | |
|---|---|---|
| NANCY ALANIS,<br>*Plaintiff* | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§ | |
| WELLS FARGO BANK NATIONAL<br>ASSOCIATION, AS TRUSTEE FOR<br>THE POOLING AND SERVICING<br>AGREEMENT DATED AS OF<br>OCTOBER 1, 2006 SECURITIZED<br>ASSET BACKED RECEIVABLES LLC<br>TRUST 2006-NC3 MORTGAGE PASS<br>THROUGH CERTIFICATES SERIES<br>2006 NC3;<br>and<br>HOMEQ SERVICING<br>CORPORATION;<br>and<br>OCWEN LOAN SERVICING, LLC,<br>*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 45th JUDICIAL DISTRICT<br><br><br><br><br><br>OF BEXAR COUNTY, TEXAS |

## AFFIDAVIT OF MARK D. CRONENWETT

Before me, the undersigned notary, personally appeared Mark D. Cronenwett, a person known to me, who having been sworn stated on oath:

1.    My name is Mark D. Cronenwett. I am over the age of 18 years, have never been convicted of a crime, and am fully competent to make this affidavit. I have personal knowledge of all the facts stated herein, and all statements of fact contained herein are true and correct.

2.    1 am counsel of record for Defendants/Counter-Plaintiffs Wells Fargo Bank National Association, as Trustee for the Pooling and Servicing Agreement Dated as of October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass Through Certificates Series 2006 NC3 ("Wells Fargo"), and Ocwen Loan Servicing, LLC ("Ocwen"), in the above-numbered and styled cause.

3.    Attached hereto as Exhibit B-1 is a true and correct copy of a the original Adjustable Rate Balloon Note ("Note") for $193,500.00 payable to New Century Mortgage Corporation ("New Century") signed by Plaintiff Nancy Alanis on June 15, 2006. This copy has been made from the actual original Note, which is presently located in the offices of Mackie Wolf Zientz & Mann, PC, 14160 North Dallas Parkway, Suite 900, Dallas, Texas 75243.

Further affiant sayeth not.

_____
MARK D. CRONENWETT

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

SWORN TO AND SUBSCRIBED before me on this 5th day of November, 2015, to certify which witness my hand and official seal.



_____
Notary Public, State of Texas
Printed name:

_____
Commission Expires

L WEBB
Notary Public, State of Texas
My Commission Expires
March 22, 2018

PAGE 2

AFFIDAVIT
1982

# EXHIBIT B-1

# ADJUSTABLE RATE BALLOON NOTE
## 2 Year Rate Lock
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

June 15, 2006                    San Antonio                              Texas
[Date]                              [City]                                  [State]

13210 Hunters view, San Antonio, TX  78230
[Property Address]

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 193,500.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is  New Century Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.925 %. The interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the first day of each month beginning on          August 1, 2006          .
My monthly payments will be based on an assumed 40          -year amortization period (the "Amortization Period"). I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  07/01/2036          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  18400 Von Karman, Suite 1000, Irvine, CA 92612

or at a different place if required by Note Holder.
### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 1,631.71  . This amount may change.

### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

Page 1 of 4

Initials NKA

NCMC
Adjustable Rate Balloon Note (TX)
RE-522  (011806)

1964

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of July, 2008, and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six And Five Hundredth(s) percentage points (6.050 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe on the Change Date in full over the remaining Amortization Period at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Notwithstanding the Amortization Period applicable to this Note, the entire unpaid principal amount will be fully due and payable on the Maturity Date.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.925% or less than 9.925%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One And One-half percentage point(s) (1.500 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 16.925%.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Page 2 of 4

Initials 

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

NCMC
Adjustable Rate Balloon Note (TX)
RE-522  (011806)

Page 3 of 4

Initials: 

1966

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)        _____ (Seal)
NANCY ALANIS                          -Borrower                                              -Borrower

_____ (Seal)        _____ (Seal)
                                      -Borrower                                              -Borrower

_____ (Seal)        _____ (Seal)
                                      -Borrower                                              -Borrower

_____ (Seal)        _____ (Seal)
                                      -Borrower                                              -Borrower

Pay to the order of without recourse
New Century Mortgage Corporation
By:
   Steve Nagy
   V.P. Records Management

[Sign Original Only]

NCMC
Adjustable Rate Balloon Note (TX)
RE-522  (011806)                                        Page 4 of 4

1967

**Ex-I**

# Daniel I. Castro, Jr. Resume

7 DeGraaf Court
Mahwah, NJ 07430

Home: (201) 236-1491
Cell: (646) 703-1315
E-mails: d-castro@msn.com dan@robustadvisors.com

**Professional
Experience**

**2013-Present   Robust Advisors, Inc.**                    Mahwah, NJ
**President**

Dan is Founder and President of Robust Advisors, Inc.  The company conducts
Fixed Income and Structured Finance consulting focusing on ABS, MBS, CDOs,
CMBS, SIVs, hedge funds, other funds and related products.  Dan provides
Expert Witness services, litigation support, due diligence, valuation, and general
consulting support. Clients include Lehman Brothers Bankruptcy Estate, Merrill
Lynch, JPMorgan, Highland Capital, BMW, MBIA, and Ironshore Insurance.

**2008-2012   Structured Finance Consultant**         New Jersey/New York

Dan was an independent Fixed Income and Structured Finance consultant
focusing on ABS, MBS, CDOs, SIVs, CMBS, hedge funds, other funds and
related fixed income and structured finance products.  Dan's consultant
experience was the basis for founding Robust Advisors, Inc.

**May 2010- April 2011   BTIG LLC**                       New York, NY
**Managing Director, Head of Structured Finance Analytics and Strategy**

Dan was head of the group responsible for providing analysis of Structured
Finance products (ABS, MBS, CMBS, and CDOs) within the Fixed Income
Division of BTIG, a FINRA registered broker-dealer.  Dan set the strategy of the
Structured Finance Group and disseminated it to the firm's clients. Dan's
responsibilities also included selling bonds to institutional investors.

**2008-April 2010   Huxley Capital Management**           New York, NY
**Principal, Chief Risk Officer, Portfolio Manager**

Dan was the Chief Risk Officer of Huxley Capital Management.  He was
responsible for managing all risk exposures for the company, its investors, and
affiliated portfolio managers.  Dan also co-managed Huxley's TALF investment
fund as well as formulating the firm's macro view of the markets and economy.

**2007-2010      American Securitization Forum**         New York, NY
**Member, Board of Directors and Investor Committee
Editorial Board, The American Securitization Journal**
Dan was on the Board of Directors of the American Securitization Forum, the
Industry Trade Group representing the Structured Finance and Securitization
Industries in the United States.  Dan also was a member of ASF's Investor
Committee and an active participant in ASF Project RESTART, which developed
ASF's Model RMBS Representations and Warranties.  On behalf of ASF, Dan
spent considerable time working with Congressional Committees in the House
and Senate, as well as the Federal Reserve and Treasury, on issues related to
securitization.

2005 - 2008    **GSC Group (formerly GSC Partners)**    New York, NY

**Managing Director, Chief Credit Officer, Portfolio Manager, Structured Finance Group; Chief Investment Officer, GSC Capital Corp. (REIT)**
2006 – 2007, **Board of Directors, LownHome Financial (Mortgage Originator)**

Member of several GSC Investment Committees including Structured Finance CDOs, GSC Capital Corp.(REIT), Eliot Bridge (long/short structured finance hedge fund), High Yield Real Estate (Commercial Mortgage Loans), Corporate Credit Group (leveraged loans), GSC Investment Corp. (Closed End Management Investment Company, ticker: GNV), and Pendulum (distressed structured finance hedge fund).

Made investment decisions and co-managed several structured finance vehicles including 13 ABS CDOs, 7 CLOs, 2 hedge funds, and a REIT. Provided macro investment views to multiple investment units of the firm. Provided leadership for credit risk and analysis in ABS, MBS, and CDOs. Approved buy/sell decisions in ABS, MBS, CMBS, CDOs, commercial real estate, and leveraged loans in both cash and synthetic (CDS) markets. Coordinated research for all structured finance related products.

1991 - 2004    **Merrill Lynch & Co.**    New York, NY

**Managing Director, Structured Finance Research**

2002 – 2004    *Managing Director*, CDO Strategist
2000 – 2002    *Managing Director*, ABS Strategist
1993 – 2000    *Director*, ABS Research
1991 – 1992    *Vice President*, ABS Research

Head of Merrill Lynch's Asset Backed Securities Research Department since 1991. Changed name of group to Structured Finance Research when responsibility for CDOs was added in 2002. Responsible for research related to ABS, RE ABS, ABCP, CDOs, and at various times for CMBS and non-agency MBS (all credit-related Structured Finance). Position involved significant interaction with Institutional investors, sales, trading, and origination. Published the monthly *ABStract, Structured Credit Brief, CDO Surveillance,* and various product and relative value publications.

Member of **Institutional Investor All-American Fixed Income Research Team** for 13 consecutive years, every year from its inception in 1992 through 2004. Ranked first or second 10 times for ABS Strategy/Research and also ranked in various years for Real Estate ABS Research, ABS Prepayments, and Collateralized Debt Obligations (CDOs).

Dan was featured on the cover of Bloomberg Magazine in September 1997—cover story: *Outlook for the Asset Backed Securities Market.*

1987 - 1991    **Moody's Investor's Service**    New York, NY

**Senior Analyst, Structured Finance**

Dan managed client relationships with investment bankers and issuers for ABS and MBS transactions. He was involved in all aspects of analyzing and rating new deals: structuring, negotiating deal parameters, analyzing legal aspects, and

establishing credit enhancement levels.  He chaired rating committees for MBS and ABS deals in 1990-1991.  Dan managed and trained the analysts in the ABS and MBS groups.

**1986 - 1987    Citicorp Investment Bank**                    New York, NY

**AVP, Structured Finance**

Evaluated economics of proposed securities product structures.  Member of deal teams for automobile and credit card securitizations.  Helped structure new transactions, analyzed proposed securitizations, and worked on deal documents.

**1985 - 1986    Citicorp Homeowners**                    St. Louis, MO

**Pricing Manager/Funding Trader**

Managed pricing function for first-lien mortgage portfolio products. Conceptualized and implemented treasury forecasting models to manage liquidity and interest rate risk.  Made, posted, and executed two-way prices to other Citicorp business units.

**1984 - 1985    Citicorp Acceptance Company**                    St. Louis, MO

**Financial Analyst**

Prepared Treasury reports and analyses for the Division.  Special projects included analytical work on the sale/securitization of automobile receivables.

**1982 - 1984    McDonnell Douglas Corp.**                    St. Louis, MO

**Associate—Fiscal Development Program**

Associate in MBA Management Training Program.  Management Development assignments included the Accounting group, Contracts Department, Internal Auditing, and Supplier Auditing Group. Granted Security Clearance allowing access to Classified Information.

**1980 - 1982    Washington University**                    St. Louis, MO

**Graduate Teaching Assistant**

Assistant to Professor of Quantitative Business Analysis in the following courses: Linear Programming, Operations Research, Probability, and Calculus.

**Summer 1981    Buick Motor Division, GM**                    Flint, MI

**Summer Intern**

Pricing and Analysis Department of Financial Division.  Summer project was to price options for the 1982 model year Buick Automobile lineup.

**Education**

**Washington University**                    St. Louis, MO

**MBA—Finance/International Business**

**University of Notre Dame**                    Notre Dame, IN

**BA—Government/International Relations**

**Additional Information**

Dan has been recognized as a leader in his field by *Institutional Investor* magazine, which named him as a member of its All-American Fixed Income Research Team each year during 1992-2004 and also as a member of the First Team for ABS Strategy.

Dan has testified to Congressional committees regarding securitization.

Dan speaks frequently at industry conferences, is quoted regularly in the financial press, magazines, the Wall Street Journal, Bloomberg, Reuters, and other newswires.   Dan is interviewed occasionally on television, usually on CNBC or Bloomberg TV, but he also has been interviewed on NBC, CBS, CNN, and Reuters TV.

Dan has written chapters and contributed to numerous books covering fixed income investments collaborating with Frank Fabozzi on several books, as well as Martin Fridson.  Dan wrote the chapter on Asset Backed Securities and co-authored the chapter on Mortgage Backed Securities in Gary Strumeyer's *Investing in Fixed Income Securities, Understanding the Bond Market*, published by John Wiley & Sons, Inc. Most recently, Dan wrote six chapters (Securitization, ABS, CMBS, RMBS, CDOs, and SIVs) for a new book, *The Capital Markets, Evolution of the Financial Ecosystem*, published by John Wiley & Sons in February 2017.

Dan has occasionally lectured at various universities, including Northwestern, Notre Dame, Washington University, and Yale regarding securities markets.

Possessed FINRA Series 7, 24 and 63 registrations (inactive).

# Ex-J

# Daniel I. Castro, Jr.
# Publications in the Past Ten Years

- Chapters 17-22 in Gary Strumeyer's *The Capital Markets: Evolution of the Financial Ecosystem,*
- published by John Wiley & Sons, Inc. Feb. 2017
- *BTIG Structured Finance Trading Strategies: More CLO Upgrades on the Way, Moody's Retooling*
- *CLO Models,* March 22, 2011
- *BTIG Structured Finance Trading Strategies: CLOs: Poised for Further Improvement, Leveraged*
- *Loans Performing Well,* March 10, 2011
- *BTIG Structured Finance Trading Strategies: CLOs for HY Investors, An Overlooked Opportunity,*
- March 3, 2011
- *BTIG Structured Finance Commentary: Impact of Treasury Rate Shocks, Pain for the Mortgage*
- *Market,* December 9, 2010
- *BTIG Structured Finance Commentary: Consumer Credit Improving, Balances falling, fundamentals*
- *better,* December 7, 2010
- *BTIG Structured Finance Commentary: 2011: Thoughts and Themes, Ideas and Views for the Coming*
- *Year,* December 2, 2010
- *BTIG Structured Finance Commentary, Observations on Structured Finance: More Questions than*
- *Answers,* October 7, 2010
- *BTIG Structured Finance Commentary, Observations in Structured Finance: Spector of Uncertainty,*
- September 29, 2010

**Ex-K**

# Expert Reports and Depositions          Daniel I. Castro, Jr.

Over the past eleven years, I have provided Expert Witness services on matters related to the Fixed Income Market, Structured Finance market, banks, broker-dealers, hedge funds, trustees, and patent infringement. I have provided assistance in case strategy, market expertise, research, expert reports and depositions. During my 14 years at Merrill Lynch, I was periodically asked to provide information and research for litigation ML was engaged in. I also participated in depositions as an expert in Structured Finance and as a fact witness for ML (multiple cases over several years).

I have given depositions on the following matters:

- Greywolf Capital Management LP v. Fortis Securities LLC, Case No. C08601171 (N.Y. Supreme Court). I was an Expert for Plaintiff, Greywolf Capital. This matter was related to a CDO Squared fund and the performance obligations of various parties to the transaction. The parties reached a settlement prior to going to trial. Deposition: March 2010.

- Bank of America, N.A., et al. v. Bear Stearns Asset Management, Inc., et al., No. 08-CIV-9265 (U.S. District Court, S.D.N.Y). The matter was related to a CDO fund, 2 hedge funds, mortgage backed securities, and the obligations and disclosures of various parties to the CDO transaction. I was an expert for Plaintiff, Bank of America from November 2011 through October 2012. The lawsuit was filed in October 2008 and dismissed in September 2013. Depositions: March 2012 and November 2012.

- U.S. Bank National Association v. Barclays Bank PLC, The Bank of New York Mellon, MBIA Insurance Corporation, and Angelo Gordon & Co. LP, Interpleader Case No. 11-CIV-9199 (WHP), (U.S. District Court, S.D.N.Y.). I was an expert for MBIA. The matter was related to a CRE CDO where Barclays claims that Events of Default have occurred and they asked the court to accelerate and liquidate the CDO. In March 2013, the court delivered a summary judgment in favor of MBIA. Deposition: August 2012.

- Ironshore Insurance Ltd. -v- Western Asset Management Company, No. 11-CIV-05954 (LTS) (JCF) Defendant, (U.S. District Court, S.D.N.Y.) I was an expert for the plaintiff, Ironshore Insurance Ltd. Plaintiff claimed Western purchased unsuitable securities, which were also inconsistent with the agreed to benchmark in a discretionary portfolio managed by the defendant. The parties reached a settlement prior to going to trial. Deposition: May, 2013

- Joel I. Sher, Chapter 11 Trustee for TMST, Inc., f/k/a Thornburg Mortgage, Inc., v. Barclays Capital, Inc (US District Court for the District of Maryland, Northern Division), Case No. ELH-110192. I was an expert for the Plaintiff, TMST. Plaintiff alleged Barclays improperly liquidated repo collateral following a margin call. The parties reached a settlement prior to going to trial. Deposition: November 2013.

- Highland CDO Opportunity Master Fund, L.P., v. Citibank, N.A. et al., and Citibank N.A. et al., v. Highland CDO Opportunity Master Fund, L.P. (U.S. District Court, S.D.N.Y.), Case No. 12-CIV-02827. I was an expert for the Plaintiff and Counter-Defendant, Highland CDO Opportunity Master Fund, L.P. Plaintiff alleged that Citi improperly marked collateral assets, improperly issued margin calls, improperly seized collateral, and liquidated collateral in a commercially

unreasonable manner. Deposition: June 2015. Court rejected plaintiff's claims in March 2016 and Counter-Plaintiff withdrew claims in December 2017.

- <u>U.S. Securities and Exchange Commission v. Commonwealth Advisors, Inc. and Walter A. Morales (U.S. District Court, Middle District of Louisiana)</u>, Civil Action No. 3:12-cv-00700-JWD-SCR. I am an expert for the Defendants. Plaintiff makes several allegations regarding the creation and issuance of a CDO issued in 2007. This matter is ongoing. Deposition Testimony, July 2015.

- <u>Ambac Assurance Corporation v. EMC Mortgage LLC (formerly known as EMC Mortgage Corporation), J.P. Morgan Securities LLC (formerly known as Bear, Stearns & Co. Inc.), and JPMorgan Chase Bank, N.A.</u>, Index No. 650421/2011, Supreme Court of the State of New York, County of New York. I was an expert for defendants. Plaintiff alleged Representation and Warranty violations requiring repurchase of mortgage loans. Deposition Testimony, November 2015. This matter was settled in 2016.

- <u>National Credit Union Administration Board, as Liquidation Agent of U.S. Central Federal Credit Union v. RBS Securities, Inc., et al.</u> (U.S. District Court for the District of Kansas, Case No.: 11-cv-2340-JWL-JPO). I was an expert for defendant NovaStar Mortgage Funding Corp. I wrote an Expert Report in October, 2015. Plaintiff alleges among other things that NovaStar disregarded its underwriting standards and guidelines when it originated mortgage loans. Deposition Testimony, February 2016. This matter was settled in September 2016.

- <u>The Bank of New York Mellon, solely as Securities Administrator for J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 v. WMC Mortgage, LLC; J.P. Morgan Mortgage Acquisition Corporation; and JPMorgan Chase Bank, N.A.</u> (Supreme Court of the State of New York, County of New York). I am an expert for defendants J.P. Morgan Mortgage Acquisition Corporation and JPMorgan Chase Bank, N.A. I wrote an Expert Report in January, 2016 where I provided an opinion on the common industry usage and meaning of the so-called "Mortgage Loan Schedule" (MLS) representation and warranty in the Pooling and Servicing Agreement. This matter was settled prior to trial. Deposition Testimony, September 2016.

- <u>In Re: Lehman Brothers Holdings Inc., et al.</u>, Debtors, US Bankruptcy Court for Southern District of New York, Case No.: 08-13555-SCC. I was an expert for defendant, Lehman Brothers Holdings Inc. and wrote an Expert Report in June, 2017, a Rebuttal Report in July, 2017, and a Reply Report in August, 2017. The reports provided opinions of industry custom and practice regarding the "material and adverse" standard for representations and warranties. Trustees for 244 RMBS trusts alleged that defendant violated various representations and warranties and that those breaches were material and adverse to Plaintiffs. Deposition Testimony, October 2017. Trial Testimony, January, 2018. Defendant, Lehman Brothers Holdings won court decision in March 2018.

- In Re: ACIS Capital Management L.P., ACIS Capital Management G.P., LLC, Debtors, US District Court for the Northern District of Texas, Dallas Division, Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-11. I was an expert for defendant, Highland CLO Funding (CLO equity investor), and wrote an Expert Report in August 2018. The report provided opinions opposing the Bankruptcy Trustee's proposed plans A, B, and C, assessing the value of the Portfolio Management Agreements, the inappropriateness of the actions taken by the bankruptcy trustee acting as the portfolio manager, the offer made by Oaktree Capital Management under Plan A, and an explanation of the nature and intent of the CLO indentures at issue. Deposition testimony, August 2018. Trial testimony, August 2018. The court rejected all three plans to take over ACIS CLOs from Highland in August 2018. The Bankruptcy Trustee submitted Plan D in September 2018. I wrote an expert report and rebuttal report regarding Plan D in November 2018 and did a deposition followed by trial testimony in December 2018. Decision from the court is still pending.

I have written expert reports on the above matters as well as the following:

- United States of America v. Ronald J. O'Malley (U.S. District Court, District of NJ): Crim. No. 10-578(1) (DMC), Hon. Dennis M. Cavanaugh. I wrote an expert report on behalf of defendant for the judge's review prior to sentencing in criminal case regarding mortgage fraud and improper documentation. Report submitted January 2012.

- Digitech Information Systems, Inc. v. BMW Financial Services NA, LLC (U.S. District Court for the Middle District of Florida, Orlando Division), Case No. 10-cv-1373-JA-KRS. I was an expert for defendant, BMW Financial Services. This matter was related to alleged patent infringement by BMW relative to auto leases and auto lease backed funds. My expert report focused on non-infringement and invalidity of the patent-in suit. I did not do a deposition for this case because the judge ruled the patent invalid just prior to my scheduled deposition. Report submitted February 2012.

- Northern Group Inc. and Altitude Partners, Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc. and Merrill Lynch Government Securities, Inc., (Supreme Court of the State of New York), Amended Complaint, Index No. 603271/08. I was an expert for Defendant, Merrill Lynch. Plaintiff claimed Merrill Lynch sold unsuitable securities to them in 2008. I wrote and expert Affidavit in September 2012 and a Reply Affidavit in December 2012. I was not deposed in this matter. In April 2013, two of plaintiff's three claims (breach of fiduciary duty and reckless and negligent misrepresentation) were dismissed in a summary judgment by the court. In July 2014, plaintiff's third claim, fraud, was dismissed in a summary judgment by the court. Reports submitted in September and December 2012.

- Andrew Cox, et al., individually and on behalf of others similarly situated v. Sherman Capital LLC, et al. In the U.S. District Court, Southern District of Indiana, Indianapolis Division, Civil Action No.: 1:12-cv-1654-TWP-MJD, Class Action. I am an expert for defendants and wrote an expert report in October, 2015. Among other allegations, plaintiff claims defendants did not own charged off credit card receivables removed from credit card ABS securitizations, and thereby engaged in debt collection with no legal standing. The case was settled prior to my deposition in March 2016.

**Ex-L**

# DANIEL I CASTRO, JR
# EXPERT QUALIFICATION AND FEE

## I.    Qualifications

1.    I am the founder and president of Robust Advisors, Inc., an independent consulting company that focuses on structured finance products and markets, including Asset Backed Securities, mortgage-backed securities (both residential mortgage-backed securities and commercial mortgage-backed securities), and collateralized debt obligations, including collateralized loan obligations ("CLOs").  I set forth my qualifications in my 8.20.15 *Expert Affidavit*/8.14.15 *Expert Report*.

2.    A copy of my current curriculum vitae is attached as Exhibit I.  A list of documents, data, and other information that I have considered in forming the opinions set forth in this second May 2019 supplement expert report affidavit includes Exhibit A-L and also includes the  "Expert Report of Daniel Castro, Jr, In Support of Nancy Alanis – List of Documents Relied On" attached to my August 20, 2015 *Affidavit of Daniel I. Castro, Jr Expert Witness for Plaintiff Nancy Alanis* ("8.20.15 Expert Affidavit/8.14.15 Expert Report") and filed in the state district court litigation in Bexar County, Texas *Cause No. 2011-CI-02829* (the "First Lawsuit").  A current list of publications I have authored over the past ten years is attached as Ex-J and my expert qualifications and fees are attached as Ex-L.   My current expert reports and depositions are attached as Ex-K.

## II.    Scope of Opinion and Compensation

3.    I have been retained by Nancy Alanis.  In connection with her state court case in Bexar County, Texas in *Cause No. 2011-CI-02839*, I submitted an August 20, 2015 *Affidavit of Daniel I. Castro, Jr Expert Witness for Plaintiff Nancy Alanis* ("8.20.15 Expert Affidavit/8.14.15 Expert

Report"). I have been retained to review various documents filed in the state court action by Alanis and Wells Fargo including in relevant part, the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* ("Pooling and Servicing Agreement", "PSA") (*See* Doc. No. 8) and corresponding *Prospectus Supplement dated October 30, 2006* (File No. 333-130543) ("Prospectus Supplement") (*See* Doc. No. 9), the uncontroverted Alanis mortgage records which Alanis obtained from the New Century Liquidating Trust in April 2016 and the uncontroverted 5.23.12 Reporters Record Alanis. Obtained in October 2018.

4.      I was retained to provide an expert opinion on whether there was a valid assignment and securitization of the Alanis Mortgage Loan in the Wells Fargo Trust which conferred on Wells Fargo the requisite PSA authority and standing to enforce a foreclosure on the Alanis Mortgage Deed of Trust and suit on the Note.

5.      My 8.20.15 Expert Affidavit/8.14.15 Expert Report and attached exhibits is incorporated by reference for all purposes as though repeated in full verbatim into my expert affidavit report prepared in May 2019 in the pending federal court action.

6.      Wells Fargo filed no controverting expert report in the state court action and I have therefore, not prepared a rebuttal to any Wells Fargo expert report.

7.      This report contains my expert opinions in this matter as of the date hereof. I reserve the right to change, amend, modify or supplement my opinions in the future with the benefit of additional facts or information, as a result of a change in my assignment, or if circumstances otherwise so require. I am being compensated at an hourly rate of $900. My compensation is not in any way contingent or based on the content of my opinion or the outcome of this matter. All opinions expressed herein are my own.

# Ex-M

CAUSE NO. 2011-CI-02839

| | | |
|---|---|---|
| NANCY ALANIS | § | IN THE DISTRICT COURT |
| *Plaintiff* | § | |
| | § | 45TH JUDICIAL DISTRICT |
| v. | § | |
| | § | |
| WELLS FARGO BANK NATIONAL | § | |
| ASSOCIATION, AS TRUSTEE FOR | § | |
| THE POOLING AND SERVICING | § | |
| AGREEMENT DATED AS OF | § | |
| OCTOBER 1, 2006 SECURITIZED | § | |
| ASSET BACKED RECEIVABLES | § | |
| LLC TRUST 2006-NC3 | § | |
| MORTGAGE PASS-THROUGH | § | |
| CERTIFICATES SERIES 2006 NC3; | § | |
| and | § | |
| MACKIE WOLF ZIENTZ & MANN, P.C. | § | |
| (As Debt Collectors); | § | |
| and | § | |
| HOMEQ SERVICING CORPORATION; | § | |
| and | § | |
| OCWEN LOAN SERVICING, LLC; | § | BEXAR COUNTY, TEXAS |
| *Defendants.* | § | |

## AFFIDAVIT OF DANIEL I. CASTRO, Jr.
## EXPERT WITNESS FOR PLAINTIFF NANCY ALANIS

| | |
|---|---|
| STATE OF NEW JERSEY | § |
| | § |
| COUNTY OF BERGEN | § |

BEFORE ME, the undersigned authority, on this day personally appeared DANIEL I. CASTRO, Jr., known to me, who being by me duly sworn upon his oath, deposed and said I declare under the penalty of perjury the foregoing is true and correct:

"...**(1)** My name is DANIEL I. CASTRO, Jr. I am of sound mind and over eighteen years of age and competent to make this sworn statement.

**(2)**        I am the owner and President of Robust Advisors, Inc. and reside in Mahwah, New Jersey, County of Bergen.

**(3)**        I have personal knowledge of the facts stated herein and they are all true and correct and I can testify to the same.

**(4)**        I also have personal knowledge of the exhibits referenced herein (including my 8.14.15 Expert Report) and they are all true and correct copies of originals and they are incorporated herein by reference as if repeated in full verbatim and I can testify to the same. The Exhibits attached to this Affidavit are as follows:

1

**Ex-A:** **8.14.15 Daniel I. Castro, Jr. Expert Report For Plaintiff Nancy Alanis**
*(Cause No 2011-CI-02839, In The District Court, 45th Judicial District, Bexar County)*

**Ex-B:** *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006 ("PSA") – Relevant Sections*

**Ex-C:** *Prospectus Supplement dated October 30, 2006 (File No. 333-130543) (Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 ("ProSupp") – Relevant Sections*

**Ex-D:** <u>1st Version Of ALANIS Note Produced By Defendants in Discovery In 2012</u>

On April 23, 2012, the Defendants WELLS FARGO, *As Trustee* and OCWEN Loan Servicing, LLC ("OCWEN") produced the ALANIS Adjustable Rate Balloon NOTE (**With No Indorsement In Blank**) in response to ALANIS written discovery requests (*BATES Stamped WELLS FARGO 00409-00412*)

**Ex-E:** <u>2nd Version Of ALANIS Note Filed By Defendants In A Judicial Proceeding 2014</u>

During a November 2014 summary judgment proceeding, the Defendants WELLS FARGO, *As Trustee*, OCWEN and MACKIE WOLF ZIENTZ & MANN, PC filed the 10.21.14 *Affidavit of Gina Feezer*, Custodian of Records for Ocwen Loan Servicing. Attached to the 10.21.14 *Affidavit of Gina Feezer* was Exhibit "A-1 NOTE" ALANIS Adjustable Rate Balloon NOTE (**With No Indorsement in Blank**).

**Ex-F:** <u>3rd Version Of ALANIS Note Produced By Defendants in Discovery In 2015</u>

On March 26, 2015, the Defendants WELLS FARGO, *As Trustee*, OCWEN and MACKIE WOLF ZIENTZ & MANN, PC produced during discovery a materially different version of the ALANIS Adjustable Rate Balloon NOTE (**With "one" Indorsement In Blank/Steve Nagy Stamped Signature Pay To The Order Of Without Recourse New Century Mortgage Corporation**) (*DIFFERENT BATES Stamp: WELLS FARGO 001126-001130*)

**Ex-G:** **February 2, 2011** *Transfer Of Lien (Vol. 14872 Pg. 933)*
Purportedly executed between NEW CENTURY Mortgage Corporation and WELLS FARGO, As Trustee and filed in public records with the office of Gerard Rickhoff, County Clerk Of Bexar County.

**Ex-H:** **January 30, 2015 Defendants Discovery Supplement (PSA Link)**
**(5)**    I have been retained in this matter by Philip M. Ross, SBN 17304200 on behalf of Plaintiff Nancy Alanis ("ALANIS") as a testifying expert to express my opinions regarding certain issues in the litigation between ALANIS and Wells Fargo Bank National Association, as Trustee for the Pooling and Servicing Agreement dated as of October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3 ("WELLS FARGO"), and Mackie Wolf Zientz & Mann, P.C. (As Debt Collectors), and HOMEQ Servicing Corporation ("HOMEQ"), and Ocwen Loan Servicing, LLC (OCWEN), pending as Case Number 2011-CI- 02839 in the District Court, 45th Judicial District, Bexar County, Texas.

(6)      I prepared an "Expert Report" for ALANIS in connection with *Cause No. 2011-CI-02839* pending in the District Court 45th Judicial District, Bexar County, Texas. [Ex-A]. I have relied entirely on the documents provided to me, including the February 2, 2011 *Transfer of Lien* and the multiple versions of the NANCY ALANIS Note provided during the litigation by the Defendants WELLS FARGO BANK NATIONAL ASSOCIATION, As Trustee For The Pooling And Servicing Agreement Dated As Of October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3 ("WELLS FARGO"), OCWEN LOAN SERVICING, LLC ("OCWEN") and MACKIE WOLF ZIENTZ & MANN, PC ("MACKIE WOLF ZIENTZ & MANN, PC").

(7)      I make this Affidavit based on market customs and practice, coupled with my years of experience, training, acquired specialized knowledge and broad exposure to the complex issues, purpose and meaning of provisions contained in the Pooling and Servicing Agreements, Mortgage Loan documents, and related agreements as follows:

(A)    <u>PROFESSIONAL BACKGROUND AND EXPERT QUALIFICATIONS</u>

My qualifications as an expert witness in pooling and servicing agreements, mortgage banking, and securitization of loans are as follows:

(a)   I have been involved in the Fixed Income and Structured Finance Markets for over 30 years. My experience includes mortgage servicing, mortgage banking, and broad knowledge of Asset Backed Securities (ABS), Residential Mortgage Backed Securities (RMBS), Commercial Mortgage Backed Securities (CMBS), Collateralized Debt Obligations (CDOs), Asset Backed Commercial Paper (ABCP), Structured Investment Vehicles (SIVs), Pooling and Servicing Agreements (PSAs) and other Structured Finance products. I have a particularly broad perspective on the market and have worked as a Strategist, Quantitative Analyst, Banker, Rating Agency Analyst, Research Analyst, Collateral Manager, Fund Manager, Chief Credit Officer, Salesman, and Investor. I have been on both the sell-side and buy-side of the market (buying and selling billions of dollars of RMBS/Structured Finance securities) and have a thorough understanding of both the big picture and nuances of the Fixed Income and Structured Finance markets. During the time I ran Merrill Lynch's Structured Finance Research Group, I was voted to the Institutional Investor All-America Fixed Income Research Team for 13 consecutive years, and recognized for my expertise in ABS, RMBS, CDOs, and Prepayments. I was the top-ranked analyst for ABS.

(b)   I am the founder of Robust Advisors, Inc., an independent consulting company focusing on structured finance markets, including asset-backed securities ("ABS"), mortgage- backed securities ("MBS") (both residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS")), collateralized debt obligations ("CDOs"), asset-backed commercial paper ("ABCP"), and structured investment vehicles ("SIVs"). I provide due diligence, valuation, expert witness, litigation support, and general consulting services. I have frequently addressed structured finance-industry conferences and have provided commentary on the structured finance markets in various publications. In 2011 and 2012, I was a full-time independent consultant engaged in the same activities that I am today, but I had not yet set up a company. From 2008 through 2010, I worked part-time as an independent

consultant. During my time as an independent consultant, my clients included Bank of America, MBIA Insurance, and Greywolf Capital Management (regarding CDOs), BMW North America (regarding automobile lease ABS), Merrill Lynch (regarding CMBS), and Redwood Trust and Ironshore Insurance (regarding RMBS)

(c) Prior to becoming a full-time independent consultant, I spent one year as Managing Director and Head of Strategy and Analytics for Structured Finance for BTIG LLC, a FINRA registered broker-dealer. My primary focus at BTIG was CDOs, largely writing reports, communicating with investors, and selling CDO tranches. From May 2008 until April 2010, I spent approximately two years at Huxley Capital Management as Managing Director, Chief Risk Officer, and portfolio manager of a fund that invested in ABS financed by the Term Asset-Backed Securities Loan Facility ("TALF"). Through the TALF program, the Federal Reserve Bank of New York provided leverage in the form of non-recourse loans to investors under the Master Loan and Security Agreement ("MLSA"). TALF loans were fully collateralized by the securities they funded. The amount of funding provided by TALF loans was determined by a "haircut" in a similar manner to the market practice in the repo market.

(d) From 2007 to 2010, I served on the Board of Directors of the American Securitization Forum ("ASF"). ASF is an industry trade organization that represents the structured finance and securitization industries. I also served on ASF's Investor Committee (which addresses the issues and concerns of investors in structured finance markets), on the Editorial Advisory Board of *American Securitization* (ASF's official journal), and as a CDO Program Advisory Committee member for the ASF 2008 conference. As an ASF representative, I provided expert advice and analysis on issues related to securitization to Congressional committees, the Federal Reserve, and the Department of the Treasury. I also lectured to ASF program participants on "CDOs—Concepts and Topics" and "Securitization 101—Introduction to Securitization."

(e) From 2005 through April 2008, I was Managing Director, Chief Credit Officer, and a Portfolio Manager for the Structured Finance Group at GSC Group. During that time, GSC Group (formerly GSC Partners and Greenwich Street Capital Partners) was an investment management firm and asset manager that also served as a CDO Fund Collateral Manager and invested in, among other things, leveraged loans, RMBS, CMBS, ABS and other real estate structured products. While at GSC Group, I participated in the collateral management of thirteen ABS CDOs and seven CLOs. Many of the CDOs were backed by CDS of the underlying collateral—otherwise known as synthetic CDOs. As part of my responsibilities related to GSC's collateral management services, I participated in CDO asset selection, the purchase and warehousing of those assets for particular transactions, and the structuring, documentation, and closing of CDOs. As part of my role in documenting these CDOs, I reviewed and helped negotiate all of the primary transaction documents relating to such transactions, including the indentures and collateral management agreements. During my time at GSC, I was also the Chief Investment Officer of a Real Estate Investment Trust ("REIT") named GSC Capital Corp. ("GSCCC"), which invested primarily in agency and non-agency RMBS, purchased whole loan mortgages, and issued RMBS backed by those mortgage loans. GSCCC, similar to other REITs, used significant leverage in building its investment portfolio. When I purchased securities (agency and non-agency RMBS, Treasuries, etc.) for the REIT, I generally did so using

4

repurchase ("repo") financing. GSCCC had repo agreements with several broker-dealers from 2005-2008. I also provided credit analysis and trading advice to GSC Group's Structured Finance, Commercial Real Estate, and Leveraged Loan investment committees to inform their decisions involving ABS, MBS, CDOs, commercial real estate, other structured products, and leveraged loans. Furthermore, I helped to manage a GSC hedge fund that invested primarily in CDO equity, and a GSC hedge fund that invested in illiquid/distressed ABS/MBS.

(f) For thirteen years before I joined GSC Group, from 1991 to 2004, I was the head of the Structured Finance Research Department at Merrill Lynch, where I was responsible for extensive research into structured finance markets, and for publishing periodic research reports regarding, among other structured products, ABS, RMBS, CMBS, and CDOs. I interacted extensively with Merrill Lynch's institutional-investor clients regarding sales, trading, and origination of non-agency RMBS, ABS, CMBS, ABS/RMBS/CMBS-backed CDOs, CLOs, ABCP, SIVs, and other structured finance products. The largest portion of my time was spent working directly with institutional investors, advising them about the potential risks and returns of their investments. I also spent considerable time with leveraged investors such as hedge funds and REITs, showing them how repo financing could affect their returns in an enhanced way, depending on the price performance of their investments. During each year between 1992 and 2004, Institutional Investor magazine named me as a member of its All-American Fixed Income Research Team for different combinations of ABS strategy, non-agency RMBS strategy, non- agency RMBS prepayment strategy, and CDO strategy—including multiple instances as a "First Team" member for ABS strategy

(g) Before joining Merrill Lynch, I was a Senior Analyst at Moody's Investor Service, from 1987 to 1991, where I was responsible for the analysis and rating of ABS and RMBS. I chaired Moody's ABS and RMBS rating committees from 1989 to 1991.

(h) I earned a Masters degree in Business Administration ("M.B.A.") in Finance and International Business from Washington University in 1982, preceded by a Bachelor of Arts degree ("B.A.") in Government and International Relations from the University of Notre Dame in 1980.

(B)   *LITIGATION EXPERT DESIGNATIONS*
      In the past four years, I provided expert testimony by deposition in six cases:

i.    *Bank of America, N.A., et al. v. Bear Stearns Asset Management, Inc., et al.*, No. 08-CIV-9265 (S.D.N.Y), Deposition Testimony, March 2012 and November 2012.

ii.   *U.S. Bank National Association v. Barclays Bank PLC, The Bank of New York Mellon, MBIA Insurance Corporation, and Angelo Gordon & Co. LP*, Interpleader Case No. 11-CIV-9199 (WHP), (S.D.N.Y.), Deposition Testimony, August 2012.

iii.  *Ironshore Insurance Ltd. v. Western Asset Management Company*, No. 11-CIV-05954 (LTS) (JCF) Defendant, (S.D.N.Y.), Deposition Testimony, May 2013.

iv.   *Joel I. Sher, Chapter 11 Trustee for TMST, Inc., f/k/a Thornburg Mortgage, Inc., v. Barclays Capital, Inc.* (D. Md., Northern Division), Case No. ELH-110192, Deposition Testimony, November 2013.

v.    *Highland CDO Opportunity Master Fund, L.P., v. Citibank, N.A. et al., and Citibank N.A. et al., v. Highland CDO Opportunity Master Fund, L.P.* (U.S. District Court, S.D.N.Y.), Case No. 12-CIV-02827, Deposition Testimony, June 2015.

    vi. _U.S. Securities and Exchange Commission v. Commonwealth Advisors, Inc. and Walter A. Morales_, Civil Action No. 3:12-cv-00700-JWD-SCR, Deposition Testimony, July 2015.

**(C)**    **PUBLICATIONS**

        This is a list of all of my publications during the past ten years that I have been able to locate with reasonable diligence, including information concerning the periodic reports to which I recall contributing or which I recall publishing during my tenure at Merrill Lynch. If I published anything during the last ten years that is neither named specifically herein or covered by reference to a category of periodic publications (a possibility that I cannot discount to a certainty), then any such publication would almost certainly be one that was published during my tenure at Merrill Lynch that I currently do not recall and to which I do not have access. In the event any such publication or publication comes to my attention, I shall promptly amend this affidavit.

- _BTIG Structured Finance Trading Strategies: More CLO Upgrades on the Way, Moody's Retooling CLO Models_, March 22, 2011
- _BTIG Structured Finance Trading Strategies: CLOs: Poised for Further Improvement, Leveraged Loans Performing Well_, March 10, 2011
- _BTIG Structured Finance Trading Strategies: CLOs for HY Investors, An Overlooked Opportunity_, March 3, 2011
- _BTIG Structured Finance Commentary: Impact of Treasury Rate Shocks, Pain for the Mortgage Market_, December 9, 2010
- _BTIG Structured Finance Commentary: Consumer Credit Improving, Balances falling, fundamentals better_, December 7, 2010
- _BTIG Structured Finance Commentary: 2011: Thoughts and Themes, Ideas and Views for the Coming Year_, December 2, 2010
- _BTIG Structured Finance Commentary, Observations on Structured Finance: More Questions than Answers_, October 7, 2010
- _BTIG Structured Finance Commentary, Observations in Structured Finance: Spector of Uncertainty_, September 29, 2010
- Chapter on Asset Backed Securities in Gary Strumeyer's _Investing in Fixed Income Securities: Understanding the Bond Market_, published by John Wiley & Sons, Inc. Feb. 2005
- _Merrill Lynch Fixed Income Strategy, Structured Credit, Structured Credit Brief: CDO Equity and the Efficient Frontier_, April 23, 2004
- _Merrill Lynch, 2004—The Year Ahead, The ABStract: 2004 ABS/CDO Outlook_, January 12, 2004
- _Merrill Lynch Fixed Income Strategy, Structured Credit: CDO Rating Methodologies Review_, November 14, 2003
- _Merrill Lynch Fixed Income Strategy: ABS CDO Primer, Essential Knowledge for Investors_, October 7, 2003
- _Merrill Lynch Fixed Income Strategy: Evolution of The ABS CDO, Second Generation ABS CDOs are here!_, October 2, 2003
- _Merrill Lynch Fixed Income Strategy: Introduction to CDO Investments, CDO Basics in Plain English_, October 2, 2003
- _Merrill Lynch Credit: Credit Derivative Handbook 2003, A Guide to Products, Valuation, Strategies and Risks_, April 16, 2003, Chapter 11, Synthetic CDO Valuation

- *Merrill Lynch Fixed Income Strategy: Synthetic CDO Valuation,* March 19, 2003 *Merrill Lynch Structured Finance Market: FASB Interpretation No. 46 (FIN 46),* February 21, 2003
- *Merrill Lynch, 2003—The Year Ahead, The ABStract, 2003 ABS Market Outlook,* January 7, 2003
- *Merrill Lynch Fixed Income Strategy: Size & Structure of the World Bond Market: 2002, Governments, Corporates, Eurobonds, Emerging Markets,* April 2002, ABS Market
- *Merrill Lynch, 2002—The Year Ahead, The ABStract, 2002 ABS Market Outlook,* December 7, 2001
- *Merrill Lynch, 2001—The Year Ahead, Non-Real Estate ABS, A Maturing Market— Steady Growth, Stable Performance,* December 21, 2000
- *Merrill Lynch, 2001—The Year Ahead, Real Estate ABS, A Maturing Market Should Offer Greater Stability,* December 21, 2000
- *Merrill Lynch Fixed Income Strategy: ABS Product Analysis, 2001 Outlook for Consumer Credit,* December 19, 2000
- *The Yearbook of Fixed Income Investing 1995: The Fixed Income Analysts Society,* John D. Finnerty (Editor), Martin S. Fridson (Editor), Daniel Castro (Contributor), Chapter 1: *Recent Developments in the Market for Asset-Backed Securities,* Irwin Professional Publishing, The McGraw-Hill Companies

**Periodic Publications During Dan Castro tenure at Merrill Lynch (1991-2004):**

- Weekly Contributor to *Merrill Lynch Fixed Income Weekly*
- Monthly contributor to *Merrill Lynch: The Mortgage Investor*
- Monthly publisher/author of *Merrill Lynch: The ABStract*
- Monthly publisher/author of *Merrill Lynch: Structured Credit Brief*
- Monthly publisher/author of *Merrill Lynch CDO Surveillance Update*
- Weekly publisher/author of *Merrill Lynch Structured Finance Market Update*

**(D)**      <u>**SUMMARY OF ARGUMENT**</u>

Plaintiff NANCY ALANIS ("ALANIS") asserts that Defendant WELLS FARGO, *As Trustee* is not the owner and holder of her Note and Deed Of Trust. ALANIS alleges that to obtain an unlawful legal and equitable interest in her mortgage loan, WELLS FARGO, *As Trustee*, loan servicer OCWEN Loan Servicing, LLC ("OCWEN") and the debt collector law firm of MACKIE WOLF ZIENTZ & MANN (collectively "DEFENDANTS") among other things, fabricated mortgage instruments in connection with her loan, including her "Note" AND "Transfer of Lien". Further, ALANIS maintains the Pooling and Servicing Agreement alleged by WELLS FARGO, *As Trustee* to securitize her Note was materially breached and/or WELLS FARGO, *As Trustee* was non-compliant with the Pooling and Servicing Agreement, which provides "chain of title" evidence her mortgage loan was never securitized into the Trust.   My research of the Pooling and Servicing Agreement in connection with the October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3 ("PSA") and *Prospectus Supplement dated October 30, 2006 (File No. 333-130543) (Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3* **("ProSupp")** supports the ALANIS allegations.

7

**(E)**    *THE DEFENDANTS PROVIDED THE RELEVANT & RELIABLE POOLING AND SERVICING AGREEMENT ALLEGED TO SECURITIZE THE ALANIS MORTGAGE LOAN*

During the *ALANIS v Wells Fargo, As Trustee et al* litigation, the Defendants WELLS FARGO, As Trustee, OCWEN and MACKIE WOLF ZIENTZ & MANN provided during discovery and/or filed in the litigation, links and/or documents to the October 1, 2006 Pooling and Servicing Agreement and October 30, 2006 Prospectus Supplement alleged to include the ALANIS mortgage loan. I have personally reviewed these documents, applied my experience, training, and acquired specialized knowledge to render opinions on the relevant Pooling and Servicing Agreement provisions and the ALANIS mortgage loan non-conforming (with the PSA). WELLS FARGO, *As Trustee* maintains that the ALANIS Mortgage Loan is securitized in the Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3 ("PSA") as reflected in the documents I personally reviewed as follows:

i.    *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006 ("PSA") – [Ex-B]*

ii.    *Prospectus Supplement dated October 30, 2006 (File No. 333-130543) (Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 ("ProSupp") – [Ex-C]*

**(F)**    *I PERSONALLY REVIEWED [Ex-B] THE RELEVANT MORTGAGE LOAN PROVISIONS CONTAINED IN THE SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-NC3 UNDER POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 (PSA) AS FOLLOWS:*

(1)    Section 10.03 Governing Laws states as follows:
THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

(2)    *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006 at **Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,*** requires "chain of title" endorsement provisions for Non- MERS mortgage loans are outlined as follows:

"ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES SECTION

2.01 CONVEYANCE OF MORTGAGE LOANS

(a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund. On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) The **original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee**, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party;

(ii) The original of any guarantee executed in connection with Mortgage Note;

(iii) the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording;

(iv) the originals of all assumptions, modification, consolidation and extension agreement, if any, **with evidence of recording thereon**; (emphasis added);

(v) the original Assignment of Mortgage for each Mortgage endorsed in blank (except with respect to MERS Designated Loans);

(vi) the **originals of all intervening assignments of Mortgage** (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee (or, in the case of a MERS Designated Loan, MERS) **with evidence of recording** thereon...."

(3) **SCHEDULE IV MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-NC3 REPRESENTATIONS AND WARRANTIES OF NC CAPITAL AS TO NC CAPITAL**

NC CAPITAL hereby makes the representations and warranties set forth

(m) Delivery To the Custodian.  The Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered with respect to each Mortgage Loan pursuant to the Pooling and Servicing Agreement, shall be delivered to the Custodian all in compliance with the specific requirements of the Pooling and Servicing Agreement. With respect to each Mortgage Loan, NC CAPITAL will be in possession of a complete Mortgage File in compliance with Exhibit A to the Purchase Agreement, except for such documents as will be delivered to the Custodian.

9

(r)   Owner of Record. NC CAPITAL is the owner of record of each Mortgage and the indebtedness evidenced by each Mortgage Note, except for the Assignments of Mortgage which have been sent for recording, and upon recordation NC CAPITAL will be the owner of record of each Mortgage and the indebtedness evidenced by each Mortgage Note, and upon the sale of the Mortgage Loans to the Purchaser, NC CAPITAL will retain the Mortgage Files with respect thereto in trust only for the purpose of servicing and supervising the servicing of each Mortgage Loan;

(G)   **I PERSONALLY REVIEWED [EX-C], RELEVANT MORTGAGE LOAN PROVISIONS IN THE 10.30.06 POOLING AND SERVICING AGREEMENT PROSPECTUS SUPPLEMENT ("ProSupp")**

(1)   *The Pooling and Servicing Agreement Parties Do Not Include ALANIS" Original Lender New Century Mortgage Corporation ("NEW CENTURY")*

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333 130543),* the parties to the pooling and servicing agreement are identified on pages (S-7) – (S-8) as follows:

(a)   **NC CAPITAL CORPORATION**
      **(Originator/Responsible Party)**

(b)   **SUTTON FUNDING LLC**
      **(Sponsor)**

(c)   **SECURITIZED ASSET BACKED RECEIVABLES LLC**
      **(Depositor)**

(d)   **SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3**
      **(Issuing Entity)**

(e)   **WELLS FARGO BANK, N.A.**
      **(Trustee)**

(f)   **HOMEQ SERVICING CORPORATION**
      **(Servicer)**

(g)   **DEUTSCHE BANK National Trust Company**
      **(Custodian)**

(h)   **BARCLAYS BANK PLC**
      (Interest Rate Cap and Swap Provider)

(i)   **MORTGAGE GUARANTY INSURANCE CORPORATION**
      (PMI) Insurer)

10

(2)    *Loan Servicer Benefits To ALANIS (Compliance with Industry Standards)*

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333- 130543)*, ALANIS is alleged to be a third party beneficiary to the trust through loan servicer industry compliance requirements which directly affect the servicing of debtors mortgage loans on pg (S-52) and pg (S-56) as follows:

*General*
*HomEq Servicing Corporation ("HomEq") will act as servicer for the mortgage loans.* **The servicer will service the mortgage loans in accordance with the pooling and servicing agreement.** (emphasis added)

*HomEq's Policies and Procedures*
*Upon the acquisition of servicing rights, HomEq coordinates with the prior servicer of the mortgage loans to achieve a transfer of servicing activities with minimal impact to mortgagors. The transfer and boarding process involves notifying the mortgagors of the servicing transfer, transferring electronic files containing loan set up information and a payment history, if applicable. In addition, loan documents either are stored in hard copy or electronically imaged form for future review and reference. All boarding activities are regularly reviewed to assure best practices are employed throughout the boarding process.*

*Once a mortgage loan has been boarded,* **HomEq begins to collect mortgage payments in adherence to the applicable servicing agreement and customary industry standards.**

(OCWEN Financial Corporation (OCWEN or the Company) (NYSE OCN) completed the acquisition of the $22.4 billion HomEq servicing portfolio and platform on September 1, 2010
OCWEN FINANCIAL CORPORATION. *Ocwen Financial Corporation Announces Third Quarter 2010 Financial Results*
http://shareholders.ocwen.com/releasedetail.cfm?ReleaseID=585548)

(3)    **The Pooling and Servicing Agreement Identifies an "Assignor" of Mortgage Loans as SPONSOR (i.e. Sutton Funding, LLC), Not NEW CENTURY**

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333- 130543)* at page S-44, the SPONSOR is identified as Sutton Funding, LLC ("SUTTON"). The Sponsor SUTTON is identified among other things, as an "Assignor" of the mortgage loans (*Not* NEW CENTURY) pursuant to provisions outlined in *Assignment Of The Mortgage Loans* on page S-65 and S-66 as follows:

### ASSIGNMENT OF THE MORTGAGE LOANS
"Pursuant to a mortgage loan purchase and warranties agreement, **NC Capital Corporation sold the mortgage loans, without recourse, to Sutton, and Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans including all principal outstanding as of,**

11

and interest due and accruing after, the close of business on the cut-off date, without recourse, to the depositor on the closing date. Pursuant to the pooling and servicing agreement, the depositor will sell, without recourse, to the trust, all right, title and interest in and to each mortgage loan, including all principal outstanding as of, and interest due after, the close of business on the cut-off date. Each such transfer will convey all right, title and interest in and to (a) principal outstanding as of the close of business on the cut-off date (after giving effect to payments of principal due on that date, whether or not received) and (b) interest due and accrued on each such mortgage loan after the cut-off date....

(4)    *Pooling and Servicing Agreement Identifies an "Assignor" of Mortgage Loans as The DEPOSITOR (i.e., Securitized Asset Backed Receivables, LLC), Not NEW CENTURY*

In connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass- Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement, Dated as of October 1, 2006 at Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,* the Depositor *(i.e. Securitized Asset Backed Receivables, LLC, Not NEW CENTURY)* is identified as an "Assignor" of mortgage loans as follows:

### ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES SECTION 2.01 CONVEYANCE OF MORTGAGE LOANS

"(a)    **The Depositor**, concurrently with the execution and delivery hereof, hereby **sells, transfers, assigns, sets over and otherwise conveys to the Trustee** for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund."

(5)    *"Chain Of Title Endorsements" Required by the Pooling and Servicing Agreement For All Non-MERS Mortgage Loans*

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333- 130543)* at page S-65, "chain of title" endorsement provisions for Non-MERS mortgage loans are outlined as follows:

### DELIVERY OF MORTGAGE LOAN DOCUMENTS

"...In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(a)    **the original mortgage note**, endorsed without recourse in blank by the last endorsee, **including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;"**

12

(6) *"Substitution" and/or "Repurchase" of Mortgage Loans for Non-Compliance With Pooling And Servicing Agreements*

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-66, the PSA parties and Custodian (i.e. Deutsche Bank National Trust Company) entered *Delivery Of Mortgage Loans* compliance agreements, which included as follows:

"...**Pursuant to the pooling and servicing agreement, the custodian will agree to execute and deliver on or prior to the closing date an acknowledgment of receipt of the original mortgage note, item (a) above, with respect to each of the mortgage loans delivered to the custodian, with any exceptions noted. The custodian will agree, for the benefit of the holders of the certificates, to review, or cause to be reviewed, each mortgage file within ninety days after the closing date**--or, with respect to any Substitute Mortgage Loan delivered to the custodian, within 30 days after the receipt of the mortgage file by the custodian--and to deliver a certification generally to the effect that, as to each mortgage loan listed in the schedule of mortgage loans,

- all documents required to be reviewed by it pursuant to the pooling and servicing agreement are in its possession;
- each such document has been reviewed by it and appears regular on its face and relates to such mortgage loan;
- based on its examination and only as to the foregoing documents, certain
- information set forth on the schedule of mortgage loans accurately reflects the information set forth in the mortgage file delivered on such date; and
- **each mortgage note has been endorsed as provided in the pooling and servicing agreement.**

**If the custodian, during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file that is not executed, has not been received or is unrelated to the mortgage loans, or that any mortgage loan does not conform to the requirements above as set forth in the review criteria set forth in the pooling and servicing agreement, the custodian is required to promptly so notify the responsible party, the servicer, the trustee and the depositor in writing.** The responsible party will be required to use reasonable efforts to cause to be remedied a material defect in a document constituting part of a mortgage file of which it is so notified by the custodian.

**If, however, within thirty days after the depositor's notice of the defect, the responsible party has not caused the defect to be remedied, the responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage**

13