**loan, or (b) repurchase the defective mortgage loan.** The substitution or repurchase is required to be effected in the same manner as a substitution or repurchase for a material breach of a mortgage loan representation and warranty, as described below under "—Representations and Warranties Relating to the Mortgage Loans." The obligation of the responsible party to cure the defect or to substitute or repurchase the defective mortgage loan and to indemnify for such breach will constitute the sole remedies available to the holders of the certificates and the trustee relating to the defect." *(emphasis added)*

(7) ***Trust Closing Date***

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-8, the "closing date" (the start-up date for the Trust) is identified as follows:

Relevant Dates:
Cut-off Date................ October 1, 2006.
Closing Date................ On or about October 31, 2006.

(8) **Only "Thirty Year" Mortgage Loans Placed In The Trust**

Pursuant to the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-36), "forty year (40)" mortgage loans were not included as part of the Trust as follows:

**General**
"The trust will primarily consist of approximately 2,350 conventional, subprime, adjustable- and fixed-rate, first-lien and second-lien residential **mortgage loans with original terms to maturity from the first scheduled payment due date of not more than 30 years**, having an aggregate scheduled principal balance of approximately $430,021,521 as of the cut-off date. All the mortgage loans in the trust were acquired by the sponsor from NC Capital Corporation." (emphasis added)

**(H)** ***I PERSONALLY REVIEWED [Ex-D], [Ex-E] and [Ex-F], THREE RELEVANT VERSIONS OF THE ALANIS NOTE(S) PROVIDED DURING THE LITIGATION BY DEFENDANTS' WELLS FARGO, AS TRUSTEE, OCWEN LOAN SERVICING, LLC AND MACKIE WOLF ZIENTZ & MANN, PC LACKING "PSA" "CHAIN OF TITLE ENDORSEMENTS" AS FOLLOWS:***

**(i)** **1st Version Of ALANIS Note Produced By Defendants in Discovery In 2012**– **[Ex-D]**

(1) On April 23, 2012, the Defendants WELLS FARGO, *As Trustee* and OCWEN produced the ALANIS Adjustable Rate Balloon NOTE (***With No Indorsement In Blank***) in response to ALANIS written discovery requests

(2) The ALANIS Adjustable Rate Balloon NOTE (***With No Indorsement in Blank***) was executed between Plaintiff NANCY ALANIS and her original lender NEW CENTURY MORTGAGE CORPORATION on June 15, 2006 *(40-year Amortization Period).*

(3) [All Pages] ALANIS Note: BATES Stamped WELLS FARGO 00409-00412

(4) [Pg 1] Alanis Note: BAR CODED

(5) [Pg 1] ALANIS Note: STAMPED NOTICE BY MISSION TITLE

> ***"...We hereby certify this copy is a true and correct copy of the original instrument...MISSION TITLE..."***

(6) [Pg 4] ALANIS Note: ***No Indorsement In Blank***

**(ii) 2nd Version Of ALANIS Note Filed By Defendants In A Judicial Proceeding 2014– [Ex-E]**

(1) During a November 2014 summary judgment proceeding, the Defendants WELLS FARGO, *As Trustee*, OCWEN and MACKIE WOLF ZIENTZ & MANN, PC filed the 10.21.14 *Affidavit of Gina Feezer*, Custodian of Records for Ocwen Loan Servicing. Attached to the 10.21.14 *Affidavit of Gina Feezer* was Exhibit "A-1 NOTE" (***With No Indorsement in Blank***).

(2) The ALANIS Adjustable Rate Balloon NOTE (***With No Indorsement in Blank***) was executed between Plaintiff NANCY ALANIS and her original lender NEW CENTURY MORTGAGE CORPORATION on June 15, 2006 *(40-year Amortization Period).*

(3) [All pages ALANIS Note]: NO BATES STAMP

(4) [Pg 1] ALANIS Note: BAR CODED

(5) [Pg 1] ALANIS Note: STAMPED NOTICE BY MISSION TITLE

> ***"...We hereby certify this copy is a true and correct copy of the original instrument...MISSION TITLE..."***

(6) [Pg 4] ALANIS Note: ***No Indorsement In Blank***

(7) [Pg. 4 / ¶ 14] - *Affiant* Gina Feezer Summary Judgment Affidavit
***"...I am a Custodian Of Records For OCWEN..."***

(8) [Pg. 5 / ¶ 14] - *Affiant* Gina Feezer Summary Affidavit
***"...The Records attached hereto are the original or exact duplicates of the originals..."***

(9) [Pg. 5 / ¶ 14] - *Affiant* Gina Feezer
***"...These records are also identified as exhibits to this Affidavit as indicated below..."***

**(iii) 3rd Version Of ALANIS Note Produced By Defendants in Discovery In 2015– [Ex-F]**

(1) On March 26, 2015, the Defendants WELLS FARGO, *As Trustee*, OCWEN and MACKIE WOLF ZIENTZ & MANN, PC produced during discovery a materially different version of the ALANIS Note than the ALANIS Note produced during discovery in 2012. The March 26, 2015 Alanis Note was produced (***With Indorsement In Blank/Steve Nagy Stamped Signature Pay To The Order Of Without Recourse New Century Mortgage Corporation***)

(2) The March 26, 2015 ALANIS Adjustable Rate Balloon NOTE (***With Indorsement in Blank***) was executed between Plaintiff NANCY ALANIS and her original lender NEW CENTURY MORTGAGE CORPORATION on June 15, 2006 (40-year Amortization Period)

(3) The March 26, 2015 ALANIS Note was identified as "ORIGINAL NOTE"

(4) The March 26, 2015 Alanis Balloon Note (***With Indorsement In Blank***) contradicts the 10.21.14 *Affidavit of Gina Feezer* who swore the Exhibit "A-1 NOTE" ALANIS Adjustable Rate Balloon NOTE (***With No Indorsement In Blank***) was "... ***the original or exact duplicates of the originals***..."

(5) [All Pages] ALANIS Note: DIFFERENT BATES Stamp WELLS FARGO 001126-001130

(6) [Page 1] ALANIS Note: *NO* BAR CODE

(7) [Pg 1] ALANIS Note: *NO* STAMPED NOTICE BY MISSION TITLE

(8) [Pg 4] ALANIS Note: ***Indorsement In Blank /Steve Nagy Stamped Signature Pay To The Order Of Without Recourse New Century Mortgage Corporation***)

**(I)** ***I Concluded There Was No Evidence of "Chain Of Title Endorsements" On Any Version Of The ALANIS NOTE With Any PSA Parties As Required By The Pooling And Servicing Agreement And The <u>Corresponding Prospectus Supplement</u>***

(1) After reviewing the "three" different versions of the ALANIS Notes produced during discovery and/or filed by WELLS FARGO, *As Trustee*, OCWEN and/or MACKIE WOLF ZIENTZ & MANN in judicial proceedings [Ex-D], [Ex-E] and [Ex-F], it is my professional opinion that WELLS FARGO (*As Trustee*) and OCWEN (*as successor loan servicer to HOMEQ Servicing Corp.*) failed to comply with key provisions in the pooling and servicing agreement, which required among other things, providing evidence of a complete "chain of title endorsements" and all intervening endorsements, from the originator to the last endorsee on the mortgage note. There is no evidence ion the ALANIS Note of an endorsement from the Originator/Responsible Party NC CAPITAL or Sponsor SUTTON FUNDING, LLC.

(2) In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-65), "chain of title" endorsement requirements are outlined as follows:

**DELIVERY OF MORTGAGE LOAN DOCUMENTS**

"...In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(b) the **original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;**..."

(3) In connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* at ***Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,*** additional "chain of title" endorsement provisions for Non-MERS mortgage loans are outlined as follows:

**"ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES**

**SECTION 2.01 CONVEYANCE OF MORTGAGE LOANS**

(a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund. On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement;

(b) **In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian** for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) **the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of _____________, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee.** To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party;

(ii) the original of any guarantee executed in connection with Mortgage Note;

(iii) the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording;

(iv) the originals of all assumptions, modification, consolidation and extension agreement, if any, **with evidence of recording thereon**;

(v) the original Assignment of Mortgage for each Mortgage endorsed in blank (except with respect to MERS Designated Loans);

(vi) **the originals of all intervening assignments of Mortgage** (if any) **evidencing a complete chain of assignment from the applicable originator to the last endorsee** (or, in the case of a MERS Designated Loan, MERS) **with evidence of recording thereon...."**

**(J)** ***I Concluded That As It Pertains To The Defendants February 2, 2011 Transfer Of Lien [Ex-G], Purportedly Executed Between ALANIS' Original Lender NEW CENTURY MORTGAGE CORPORATION ("NEW CENTURY") And Wells Fargo, As Trustee, There Was A Material Break In The "Chain Of Title" and "Non-Compliance" and/or "Breach" Of The Pooling & Servicing Agreement***

(1) I have reviewed the certified copy of the *Transfer Of Lien (Vol. 14872 Pg. 933)* filed in public records with the office of Gerard Rickhoff, County Clerk Of Bexar County. The *Transfer of Lien* purportedly executed on February 2, 2011 between NEW CENTURY MORTGAGE CORPORATION ("NEW CENTURY") and WELLS FARGO, *As Trustee* conflicts with the "date" in the first sentence, which states in the present tense *"...The TRANSFER OF LIEN is made and entered into as of this 1st day of SEPTEMBER 2010..."*; **[Ex-G]**

(2) Based on the parties identified in the mandatory "endorsement chain of title" provisions contained in the pooling and servicing agreement dated October 1, 2006 and the *Prospectus Supplement dated October 30, 2006* referenced herein, the February 2, 2011 *Transfer of Lien* appears on its face, to be a fabricated and/or a forged instrument, and provides evidence of a material "break in the chain" of title and Wells Fargo, *As Trustee* does not have a legal or equitable interest in the ALANIS mortgage loan;

(3) NEW CENTURY MORTGAGE CORPORATION ("NEW CENTURY") purportedly executed the February 2, 2011 *Transfer of Lien* with **WELLS FARGO BANK NATIONAL ASSOCIATION, *AS TRUSTEE*** FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2006-NC3 **[Ex-G]**;

(4) Public records from the UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE – *In re New Century TRS Holdings, Inc Case No. 07-10416 (KJC) (Liquidation Bankruptcy Proceedings* show NEW CENTURY was dissolved in a Delaware liquidation bankruptcy proceeding in "August 2008";

(5) ALANIS' original lender NEW CENTURY MORTGAGE CORPORATION is not identified as a party to the pooling and servicing agreements and had no authority from the ***PSA*** or the ***ProSupp*** to execute a *Transfer of Lien* in "2006" and /or "2011". *Prospectus Supplement dated October 30, 2006 (File No. 333 130543),* pages (S-7) – (S-8) **[Ex-C]**;

(6) The parties to the ***Assignment of the Mortgage Loans*** are outlined in the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543) and* NEW CENTURY is not a party identified in the pooling and servicing agreement *Assignment of The Mortgage Loans* "Chain of Title" at page S-65 **[Ex-C]** as follows:

> **NC CAPITAL** (*not NEW CENTURY*) "...**sold the mortgage loans, without recourse, to Sutton, and Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans** including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, **without recourse, to the depositor on the closing date**....";

(7) Pursuant to the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-36 **[Ex-C]**, the SPONSOR (i.e., SUTTON FUNDING, LLC) acquired the loans from NC CAPITAL, *not* NEW CENTURY as follows:

> "General
> "..... **All the mortgage loans in the trust were acquired by the sponsor from NC Capital Corporation**...." *(emphasis added)*

(8) The February 2, 2011 *Transfer of Lien* is not compliant with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* at ***Article II Conveyance of Mortgage Loans****; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,* requiring evidence of a "chain of title" at (b)- (b)(vi) **[Ex-B]** as follows:

> "(b) **In connection with the transfer and assignment of each Mortgage Loan**, the Depositor has delivered or caused to be delivered to the Custodian for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:
>
> (vi) **the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee** (or, in the case of a MERS Designated Loan, MERS) **with evidence of recording thereon....**"

(9) I also have reviewed the April 23, 2012 *Defendants' Response to Plaintiff's First Set Of Written (Interrogatory Answer No. 2)* and the sworn verification statements of HOWARD HANDVILLE, WELLS FARGO Authorized Agent and OCWEN Loan Servicing, LLC "Loan Analyst". In pertinent part, *Interrogatory Answer No. 2* states as follows: "...***Wells Fargo is the owner of the Note and Mortgage pursuant to assignment dated June 27, 2006***..." I understand the Defendants have not produced this assignment to date and it has not been located in public records evidencing a "recording". The failure to produce this June 27, 2006 assignment would be non-compliant with the PSA at ARTICLE II CONVEYANCE OF MORTGAGE LOANS (b)(vi) which requires "...*the originals of all intervening assignments of Mortgage (if any) evidencing* ***a complete chain of assignment from the applicable originator to the last endorsee*** *(or, in the case of a MERS Designated Loan, MERS)* ***with evidence of recording thereon***...." [Ex-B];

(10)In connection with *Interrogatory Answer No. 2*, I have also read the May 4, 2015 Hearing *Transcript* before Hon. Judge Arteaga and reviewed the statements made in court by Defendants attorney Mark Cronenwett who stated in pertinent part: "...***The answers to this interrogatory are not incorrect, Your Honor. It is true, that the Note was assigned from the loan originator New Century to Wells Fargo on this date....***". For the reasons stated herein, attorney Mark Cronenwett made statements before the Court that are false because NEW CENTURY was never a party to the pooling and servicing agreement and had no PSA authority to assign the ALANIS Note to Wells Fargo, *As Trustee* between 2006 and 2011. *Prospectus Supplement dated October 30, 2006 (File No. 333 130543)*, pages (S-7) – (S-8). [Ex-C]. At all times relevant to the pooling and servicing agreement, "Sponsor SUTTON FUNDING, LLC" and the "Depositor SECURITIZED ASSET BACKED RECEIVABLES, LLC" were the relevant parties identified with authority to "Assign and/or Transfer" mortgage loans as described in ***Assignment of the Mortgage Loans*** outlined in the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-65. Id. [Ex-C]

**(K)** ***I Concluded That As It Pertains To The Defendants Multiple Versions Of The ALANIS Note Executed Between NANCY ALANIS and her Original Lender NEW CENTURY MORTGAGE CORPORATION ("NEW CENTURY"), There Was A Material Break In The "Chain Of Title" and "Non-Compliance" and/or "Breach" Of The <u>Pooling & Servicing Agreement</u>***

(1) NEW CENTURY executed an *Adjustable Rate Balloon Note* with ALANIS on June 15, 2006 (ALANIS Note/No Indorsement In Blank) [Ex-D]

(2) On page (1) of the (ALANIS Note/No Indorsement In Blank), it states "...***My monthly payments will be based on an assumed 40–year amortization period (The Amortization period)***...." [Ex-D]

(3) Pursuant to the *Prospectus Supplement dated October 30, 2006 (File No. 333- 130543)* at page S-36 [Ex-C], "forty year (40)" loans were not included as part of the Trust as follows:

"General
The trust will primarily consist of approximately 2,350 conventional, subprime, adjustable- and fixed-rate, first-lien and second-lien **residential mortgage loans with original terms to maturity from the first scheduled payment due date of not more than 30 years**, having an aggregate scheduled principal balance of approximately $430,021,521 as of the cut-off date. **All the mortgage loans in the trust were acquired by the sponsor from NC Capital Corporation**." (emphasis added)

(4) Pursuant to the *Prospectus Supplement dated October 30, 2006 (File No. 333- 130543)* at page S-36 **[Ex-C]**, the ALANIS "40-year" mortgage loan was non-conforming with the PSA and was never securitized into the Trust and WELLS FARGO, *As Trustee* has no legal or equitable interest in the ALANIS Note.

(5) ALANIS' original lender NEW CENTURY MORTGAGE CORPORATION is not identified as a party to the pooling and servicing agreements and had no authority from the ***PSA*** or the ***ProSupp*** to execute a *Transfer of Lien* in "2006" and /or "2011". *Prospectus Supplement dated October 30, 2006 (File No. 333 130543)*, pages (S-7) – (S-8) **[Ex-C]**;

(6) ALANIS' original lender NEW CENTURY is not a party identified in the pooling and servicing agreement *Assignment of Mortgage Loans* "Chain of Title". The ***Assignment of the Mortgage Loans*** identifies assigning parties Originator/Responsible Party NC CAPITAL and Sponsor SUTTON. *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-65) **[Ex-C]** as follows:

> **NC CAPITAL** (*not NEW CENTURY*) "...**sold the mortgage loans, without recourse, to Sutton,** and **Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans** including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, without recourse, **to the depositor on the closing date**...."

(7) In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-65) **[Ex-C]**, "chain of title" endorsement requirements are outlined as follows:

**DELIVERY OF MORTGAGE LOAN DOCUMENTS**

"...In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(b) the **original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;...**"

(8) In connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006 at* ***Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans*** **[Ex-B]**, additional "chain of title" endorsement provisions for Non-MERS mortgage loans are outlined as follows:

**"ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES SECTION 2.01 CONVEYANCE OF MORTGAGE LOANS**

(a) **The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee** for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund. On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) **In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian** for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) **the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee**, endorsed "Pay to the order of ____________, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party";

(9) None of the ALANIS Notes produced and/or filed by the Defendants WELLS FARGO, *As Trustee*, OCWEN Loan Servicing, LLC and MACKIE WOLF ZIENTZ & MANN contain any evidence of the required "Chain of Title" endorsements from the "originator to the last endorsee" and this is compelling evidence the ALANIS mortgage loan was non-conforming with the terms of the

pooling and servicing agreement and was never securitized into the Trust and WELLS FARGO, *As Trustee* does not have a legal or equitable interest in the ALANIS Note.

(10) Further, there appears there was never any attempt made within "thirty days" to cure the non-conforming "Chain Of Title" endorsement defects in connection with the ALANIS mortgage loan. See *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-66 – S-67) [Ex-C]. The parties and custodian (i.e. Deutsche Bank National Trust Company) entered into agreements to ensure compliance with the pooling and servicing agreements as follows:

> "...**If the custodian, during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file that is not executed**, has not been received or is unrelated to the mortgage loans, or that any **mortgage loan does not conform to the requirements above as set forth in the review criteria set forth in the pooling and servicing agreement, the custodian is required to promptly so notify the responsible party, the servicer, the trustee and the depositor in writing. The responsible party will be required to use reasonable efforts to cause to be remedied a material defect** in a document constituting part of a mortgage file of which it is so notified by the custodian.
>
> **If, however, within thirty days after the depositor's notice of the defect, the responsible party has not caused the defect to be remedied, the responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan.** The substitution or repurchase is required to be effected in the same manner as a substitution or repurchase for a material breach of a mortgage loan representation and warranty, as described below under "—Representations and Warranties Relating to the Mortgage Loans...."

(11) Without a timely cure within "thirty days" of the non-conforming "Chain Of Title" endorsement defects in connection with the ALANIS mortgage loan, the pooling and servicing parties agreed "...**the responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan...**". The Originator/Responsible Party is identified as NC CAPITAL. *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at pages S-8, S-46, and S-66-67 [Ex-C]. Under both of these scenarios, the non-conforming (with the PSA) ALANIS Note was required to be removed by the Responsible party (NC CAPITAL) from the Trust pool and (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan. Because the non-conforming (with the PSA) ALANIS mortgage loan was required to be removed from the Trust pool after thirty days, WELLS FARGO, *As Trustee* does not own a legal

or equitable interest in the ALANIS Note.

(12) The ALANIS Note [Ex-D] was, on its face, noticeably non-conforming with the pooling and servicing agreements "chain of title" endorsement provisions and lacked key endorsements from the PSA parties NC CAPITAL, SUTTON and SECURITIZED ASSET BACKED RECEIVABLES. Id.

(13) The ALANIS Note [Ex-D] was, on its face, noticeably non-conforming with the pooling and servicing agreements because the agreements contained therein were made in part, on ***a 40–year amortization period (The Amortization period)*** which conflicted with the "thirty year" mortgage requirement of the pooling and servicing agreement. Id.

(14) After failing to cure the forty year ("40-year") amortization period defect with the ALANIS loan which conflicted with the thirty year ("30-year") PSA loan period requirement for securitization into the Trust, and failing to cure within "thirty days", the lack of "chain of title" endorsement defects appearing on the face of the ALANIS mortgage note, which shows a complete lack of "chain of title" from the "originator to the last endorsee", the ALANIS mortgage loan could not remain in the Trust, and the Originator/Responsible Party (NC CAPITAL) was required to "...(a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan. *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-66 – S-67) [Ex-B]

8. As provided herein, the Trust agreements are contained in the pooling and servicing agreement and set forth how the trust acquires its assets. The Trust agreement sets forth both powers and limits of the Trust. The PSA requires each party to the sale of the mortgage loans endorse each mortgage note to the next party in the chain of title until the mortgage note is endorsed to the Trustee for the benefit of the Trust. Following a series of endorsement on the mortgage note reflective of each party who had an ownership in the mortgage note, there is a culminating blank endorsement from the depositor. To comply with the PSA, this chain of title of endorsements would have to have been completed by the closing date of October 31, 2006. This requirement stems from an industry business standard in securitization, namely to evidence that there was in fact a "true sale" of the securitized assets and they are no longer property of the originator, sponsor, or depositor, and thus not subject to the claims of creditors of the originator, sponsor, or depositor.

9. Further, any assignments necessary to transfer the mortgage loan to the Trust would have to have been required to be dated prior to the Trust closing date. The February 2, 2011 *Transfer of Lien* is fabricated because NEW CENTURY was not a party to the PSA and had no PSA "assigning/transfer" authority. The *Transfer of Lien* was also not executed on or before the Trust closing date of October 31, 2006.

10. In reviewing the Defendants multiple versions of the ALANIS Note produced in discovery or filed in the litigation, there is no evidence of transfer of the ALANIS mortgage loan to the parties defined in the PSA. The evidence also shows the complete failure of the parties to the securitization to convey the ALANIS Note to the Trust. The "three" versions of the ALANIS Note are non compliant with the PSA "chain of title endorsement" requirements which provide compelling evidence the ALANIS mortgage loan was not securitized nor was it transferred into the Trust. The ALANIS mortgage note was not endorsed to the trust by the depositor and is devoid of the required chain of endorsements required in the PSA. A note "endorsed in blank" does not comply with the mandatory terms of the PSA and is an extreme deviation from the industry standards, customs and practices which were material to this PSA transaction.

11. Any attempt in "2011" or "2015" to accept a transfer of the ALANIS Note would violate the REMIC provisions of the IRS tax code. If the Defendants allege the ALANIS loan is in default, the loan cannot be a "qualified mortgage loan" under the IRS tax code because a qualified mortgage loan is a performing mortgage loan.

12. Based on a review of the evidence produced and/or filed by the Defendants as identified herein and my personal and specialized knowledge of the industry standards, customs and practices applicable to Residential Mortgage Backed Securities and securitization through the terms and agreements contained in the PSA, it is my opinion WELLS FARGO, *As Trustee*, never owned a legal or equitable interest in the ALANIS mortgage loan.

13. Due to non-compliance with the pooling and servicing agreement and prospectus supplement and failure to timely cure defects including among other things, the "lack of chain of title endorsements" required to be placed on the ALANIS Note as well as the non compliant "forty year" ALANIS mortgage loan, the ALANIS mortgage loan was never securitized in the "PSA" Trust and is unenforceable as to WELLS FARGO, *As Trustee*.

14. Without the ALANIS mortgage loan being securitized into the PSA Trust, WELLS FARGO, *As Trustee* never had PSA authority to accelerate and/or attempt to foreclose on the ALANIS property identified in the June 15, 2006 ALANIS Adjustable Rate Balloon NOTE as "13210 Hunters View, San Antonio, Texas 78230".

*Affiant Further Sayeth Not...*"

**DANIEL I. CASTRO, Jr.**

**SWORN TO AND SUBCRIBED BEFORE ME.** on this the 20th day of August, 2015 to certify which witness my hand and official seal.

**[STAMP]**

**NOTARY PUBLIC (Sign)**
**IN AND FOR THE STATE OF NEW JERSEY**

My commission expires: March 31, 2020

MONIQUE D HALL
Notary Public
State of New Jersey
My Commission Expires Mar. 31, 2020
I.D.# 2462027

# Expert Report

NANCY ALANIS
*Plaintiff*

*v.*

WELLS FARGO BANK NATIONAL ASSOCIATION,
AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT
DATED AS OF OCTOBER 1, 2006
SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3
MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2006 NC3;

And

MACKIE WOLF ZIENTZ & MANN, P.C.
(As Debt Collectors);

And

HOMEQ SERVICING CORPORATION;

And

OCWEN LOAN SERVICING, LLC;
*Defendants.*

IN THE DISTRICT COURT, 45TH JUDICIAL DISTRICT, BEXAR COUNTY, TEXAS
CASE NO. 2011-CI-02839

Prepared By:

Daniel I. Castro, Jr.
Robust Advisors, Inc.
7 DeGraaf Court
Mahwah, NJ 07430

August 14, 2015

**Ex-A**

## Table of Contents

I. SCOPE OF ENGAGEMENT AND QUALIFICATIONS ..... 4

II. Expert Qualifications ..... 5

A. Daniel I. Castro, Jr. Qualifications. ..... 5

III. Prior Testimony ..... 10

A. Daniel I. Castro, Jr. Prior Testimony. ..... 10

IV. Facts, Analysis, and Opinions ..... 10

A. Case Summary ..... 10

B. Relevant Wells Fargo Litigations In Connection With Fabricated Instruments ..... 11

C. Relevant Publications Regarding Wells Fargo In Connection With Fabricated Instruments ..... 11

D. Relevant Pooling & Servicing Agreements Allegedly Securitizing the Nancy Alanis Mortgage Loan ..... 12

E. Relevant Pooling & Servicing Agreements Requiring Compliance For Mortgage Loan Securitization Into The Trust ..... 13

21. (1) Governing Laws. ..... 13

22. (2) The Pooling and Servicing Agreement Parties Do Not Include ALANIS" Original Lender New Century Mortgage Corporation ("NEW CENTURY") ..... 14

23. (3) Loan Servicer Benefits To ALANIS (Compliance with Industry Standards) ..... 16

24. (4) Pooling and Servicing Agreement Identifies an "Assignor" of Mortgage Loans as SPONSOR (i.e. Sutton Funding, LLC), Not NEW CENTURY ..... 17

25. (5) Pooling and Servicing Agreement Identifies an "Assignor" of Mortgage Loans as The DEPOSITOR " i.e., Securitized Asset Backed Receivables, LLC", Not NEW CENTURY ..... 18

26. (6) "Chain Of Title Endorsements" Required by the Pooling and Servicing Agreement For All Non-MERS Mortgage Loans ..... 18

27. (7) "Substitution" and/or "Repurchase" of Mortgage Loans for Non-Compliance With Pooling And Servicing Agreements ..... 20

28. (8) Trust Closing Date ..... 21

29. (9) Only "Thirty Year" Mortgage Loans Placed In The Trust ..... 22

F. Relevant Multiple Versions Of The ALANIS Note(s) Provided During The Litigation By Defendants' Wells Fargo, *As Trustee*, OCWEN Loan Servicing, LLC and Mackie Wolf Zientz & Mann, PC Lacking "Chain Of Title Endorsements" ..... 22

31. (1) 1st Version Of ALANIS Note produced by Defendants in 2012 ..... 22

32. (2) 2nd Version Of ALANIS Note filed by Defendants in 2014 ..... 23

33. (3) 3rd Version Of ALANIS Note produced by Defendants in 2015 ..... 24

34. (4) No Evidence of "Chain Of Title Endorsements" On Any Version Of The ALANIS NOTE As Required By The Pooling And Servicing Agreement And The Corresponding Prospectus Supplement ..... 25

G. Material Break In "Chain Of Title", "Non-Compliance" and/or "Breach" Of The Pooling & Servicing Agreement ..... 28

36. (a) February 2, 2011 Transfer of Lien (Non Compliant With Pooling And Servicing Agreements) ..... 28

41. (b) All Versions Of The ALANIS Note (Non-Compliant With The Pooling and Servicing Agreements) ..... 31

H. General Mortgage Banking ..... 36

I. ATTACHMENTS ..... 36

# I. SCOPE OF ENGAGEMENT AND QUALIFICATIONS

## A. Scope of Engagement

1. I have been retained in this matter by Philip M. Ross, SBN 17304200 on behalf of Nancy Alanis as a testifying expert to express my opinions regarding certain issues in the litigation between Nancy Alanis and Wells Fargo Bank National Association, as Trustee for the Pooling and Servicing Agreement dated as of October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3 ("WELLS FARGO"), and Mackie Wolf Zientz & Mann, P.C. (As Debt Collectors), and HOMEQ Servicing Corporation ("HOMEQ"), and Ocwen Loan Servicing, LLC (OCWEN), pending as Case Number 2011-CI-02839 in the District Court, 45th Judicial District, Bexar County, Texas.

2. All of the expert opinions expressed in this report are based on my professional experience and research, and on materials I have personally reviewed regarding the parties and the events at issue in this case, which include documents produced by the parties, certain pleadings, my own publications and writings, regulatory documents, and pertinent standards and guidance, including without limitation:

i. Selected pleadings filed in this case and the exhibits thereto,

ii. Selected Securities & Exchange Commission ("SEC") filings for *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* ("PSA") and *Prospectus Supplement dated October 30, 2006* ("ProSupp") *(File No. 333-130543)*,

iii. Selected discovery materials produced during the litigation by the Defendants and the Plaintiff,

iv. UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE – *In re New Century TRS Holdings, Inc Case No. 07-10416 (KJC) (Liquidation Bankruptcy Proceedings)*,

v. UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK - *In re:* Cynthia Carrsow-Franklin, Debtor, Case No. 10-20010 (RDD),

vi. Press Reports Cited In Connection With Wells Fargo Fabrication Of Mortgage

Instruments,

vii. Selected memorandums, statutes, regulations and government filings, and

viii. My publications and working papers.

3.　　　My opinions are based solely on my professional experience and research and on materials I have reviewed. Although some of my opinions are related to legal concepts, none of my opinions are legal opinions. My opinions are primarily related to market customs and practice, coupled with years of experience, training, acquired specialized knowledge and broad exposure to the complex issues, purpose and meaning of provisions contained in the Pooling and Servicing Agreements, Mortgage Loan documents, and related agreements. I reserve the right to supplement and/or modify my opinions based on future discovery in this case and other new information not now known to me. My expert compensation in this case is $900.00 per hour. The payment of my fee is not contingent upon the nature, content or substance of my opinions, nor the outcome of this matter.

## II.　Expert Qualifications

### A.　Daniel I. Castro, Jr. Qualifications.

4.　　　I have been involved in the Fixed Income and Structured Finance Markets for over 30 years.　My experience includes mortgage servicing, mortgage banking, and broad knowledge of Asset Backed Securities (ABS), Residential Mortgage Backed Securities (RMBS), Commercial Mortgage Backed Securities (CMBS), Collateralized Debt Obligations (CDOs), Asset Backed Commercial Paper (ABCP), Structured Investment Vehicles (SIVs), Pooling and Servicing Agreements (PSAs) and other Structured Finance products. I have a particularly broad perspective on the market and have worked as a Strategist, Quantitative Analyst, Banker, Rating Agency Analyst, Research Analyst, Collateral Manager, Fund Manager, Chief Credit Officer, Salesman, and Investor. I have been on both the sell-side and buy-side of the market (buying and selling billions of dollars of RMBS/Structured Finance securities) and have a thorough understanding of

both the big picture and nuances of the Fixed Income and Structured Finance markets. During the time I ran Merrill Lynch's Structured Finance Research Group, I was voted to the Institutional Investor All-America Fixed Income Research Team for 13 consecutive years, and recognized for my expertise in ABS, RMBS, CDOs, and Prepayments. I was the top-ranked analyst for ABS.

5. I have worked on numerous RMBS over the years, both on the sell-side, as a researcher and as an Issuer, and on the buy-side as a Chief Investment Officer, collateral manager, fund manager, and as an investor. I was also responsible for RMBS at Moody's, where I ran RMBS rating committees. I purchased whole loan mortgages and subsequently securitized them in two public RMBS transactions. I fully understand the structures, governing documents, the underlying mortgages, how they are originated, how they are underwritten, and how they are priced and traded. I have wide-ranging experience building and using sophisticated analytic models to value and trade RMBS investments.

6. I am the founder of Robust Advisors, Inc., an independent consulting company focusing on structured finance markets, including asset-backed securities ("ABS"), mortgage-backed securities ("MBS") (both residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS")), collateralized debt obligations ("CDOs"), asset-backed commercial paper ("ABCP"), and structured investment vehicles ("SIVs"). I provide due diligence, valuation, expert witness, litigation support, and general consulting services. I have frequently addressed structured finance-industry conferences and have provided commentary on the structured finance markets in various publications.[1] A list of the publications I authored in the previous ten years is attached as Appendix 2 to this Report. In 2011 and 2012, I was a full-time independent consultant engaged in the same activities that I am today, but I had not yet set up a company. From 2008 through 2010, I worked part-time as an independent consultant. During my

[1] A copy of my complete *curriculum vitae* is attached as Appendix 1 to this Report.

time as an independent consultant, my clients included Bank of America, MBIA Insurance, and Greywolf Capital Management (regarding CDOs), BMW North America (regarding automobile lease ABS), Merrill Lynch (regarding CMBS), and Redwood Trust and Ironshore Insurance (regarding RMBS).

8. Prior to becoming a full-time independent consultant, I spent one year as Managing Director and Head of Strategy and Analytics for Structured Finance for BTIG LLC, a FINRA registered broker-dealer. My primary focus at BTIG was CDOs, largely writing reports, communicating with investors, and selling CDO tranches. From May 2008 until April 2010, I spent approximately two years at Huxley Capital Management as Managing Director, Chief Risk Officer, and portfolio manager of a fund that invested in ABS financed by the Term Asset-Backed Securities Loan Facility ("TALF"). Through the TALF program, the Federal Reserve Bank of New York provided leverage in the form of non-recourse loans to investors under the Master Loan and Security Agreement ("MLSA"). TALF loans were fully collateralized by the securities they funded. The amount of funding provided by TALF loans was determined by a "haircut" in a similar manner to the market practice in the repo market.

9. From 2007 to 2010, I served on the Board of Directors of the American Securitization Forum ("ASF"). ASF is an industry trade organization that represents the structured finance and securitization industries. I also served on ASF's Investor Committee (which addresses the issues and concerns of investors in structured finance markets), on the Editorial Advisory Board of *American Securitization* (ASF's official journal), and as a CDO Program Advisory Committee member for the ASF 2008 conference. As an ASF representative, I provided expert advice and analysis on issues related to securitization to Congressional committees, the Federal Reserve, and the Department of the Treasury. I also lectured to ASF program participants on "CDOs—Concepts and Topics" and "Securitization 101—Introduction to Securitization."

10.     From 2005 through April 2008, I was Managing Director, Chief Credit Officer, and a Portfolio Manager for the Structured Finance Group at GSC Group. During that time, GSC Group (formerly GSC Partners and Greenwich Street Capital Partners) was an investment management firm and asset manager that also served as a CDO Fund Collateral Manager and invested in, among other things, leveraged loans, RMBS, CMBS, ABS and other real estate structured products. While at GSC Group, I participated in the collateral management of thirteen ABS CDOs and seven CLOs. Many of the CDOs were backed by CDS of the underlying collateral—otherwise known as synthetic CDOs. As part of my responsibilities related to GSC's collateral management services, I participated in CDO asset selection, the purchase and warehousing of those assets for particular transactions, and the structuring, documentation, and closing of CDOs. As part of my role in documenting these CDOs, I reviewed and helped negotiate all of the primary transaction documents relating to such transactions, including the indentures and collateral management agreements. During my time at GSC, I was also the Chief Investment Officer of a Real Estate Investment Trust ("REIT") named GSC Capital Corp. ("GSCCC"), which invested primarily in agency and non-agency RMBS, purchased whole loan mortgages, and issued RMBS backed by those mortgage loans. GSCCC, similar to other REITs, used significant leverage in building its investment portfolio. When I purchased securities (agency and non-agency RMBS, Treasuries, etc.) for the REIT, I generally did so using repurchase ("repo") financing. GSCCC had repo agreements with several broker-dealers from 2005-2008. I also provided credit analysis and trading advice to GSC Group's Structured Finance, Commercial Real Estate, and Leveraged Loan investment committees to inform their decisions involving ABS, MBS, CDOs, commercial real estate, other structured products, and leveraged loans. Furthermore, I helped to manage a GSC hedge fund that invested primarily in CDO equity, and a GSC hedge fund that invested in illiquid/distressed ABS/MBS.

11.     For thirteen years before I joined GSC Group, from 1991 to 2004, I was the head of the Structured Finance Research Department at Merrill Lynch, where I was responsible for extensive research into structured finance markets, and for publishing periodic research reports regarding, among other structured products, ABS, RMBS, CMBS, and CDOs. I interacted extensively with Merrill Lynch's institutional-investor clients regarding sales, trading, and origination of non-agency RMBS, ABS, CMBS, ABS/RMBS/CMBS-backed CDOs, CLOs, ABCP, SIVs, and other structured finance products. The largest portion of my time was spent working directly with institutional investors, advising them about the potential risks and returns of their investments. I also spent considerable time with leveraged investors such as hedge funds and REITs, showing them how repo financing could affect their returns in an enhanced way, depending on the price performance of their investments. During each year between 1992 and 2004, Institutional Investor magazine named me as a member of its All-American Fixed Income Research Team for different combinations of ABS strategy, non-agency RMBS strategy, non-agency RMBS prepayment strategy, and CDO strategy—including multiple instances as a "First Team" member for ABS strategy.

12.     Before joining Merrill Lynch, I was a Senior Analyst at Moody's Investor Service, from 1987 to 1991, where I was responsible for the analysis and rating of ABS and RMBS. I chaired Moody's ABS and RMBS rating committees from 1989 to 1991.

13.     I earned a Masters degree in Business Administration ("M.B.A.") in Finance and International Business from Washington University in 1982, preceded by a Bachelor of Arts degree ("B.A.") in Government and International Relations from the University of Notre Dame in 1980.

# III. Prior Testimony

## A. Daniel I. Castro, Jr. Prior Testimony.

14. In the past four years, I provided expert testimony by deposition in six cases:

i. Bank of America, N.A., et al. v. Bear Stearns Asset Management, Inc., et al., No. 08-CIV-9265 (S.D.N.Y), Deposition Testimony, March 2012 and November 2012.

ii. U.S. Bank National Association v. Barclays Bank PLC, The Bank of New York Mellon, MBIA Insurance Corporation, and Angelo Gordon & Co. LP, Interpleader Case No. 11-CIV-9199 (WHP), (S.D.N.Y.), Deposition Testimony, August 2012.

iii. Ironshore Insurance Ltd. v. Western Asset Management Company, No. 11-CIV-05954 (LTS) (JCF) Defendant, (S.D.N.Y.), Deposition Testimony, May 2013.

iv. Joel I. Sher, Chapter 11 Trustee for TMST, Inc., f/k/a Thornburg Mortgage, Inc., v. Barclays Capital, Inc. (D. Md., Northern Division), Case No. ELH-110192, Deposition Testimony, November 2013.

v. Highland CDO Opportunity Master Fund, L.P., v. Citibank, N.A. et al., and Citibank N.A. et al., v. Highland CDO Opportunity Master Fund, L.P. (U.S. District Court, S.D.N.Y.), Case No. 12-CIV-02827, Deposition Testimony, June 2015.

vi. U.S. Securities and Exchange Commission v. Commonwealth Advisors, Inc. and Walter A. Morales, Civil Action No. 3:12-cv-00700-JWD-SCR, Deposition Testimony, July 2015.

I have not testified as an expert at trial.

# IV. Facts, Analysis, and Opinions

## A. Case Summary

15. Plaintiff NANCY ALANIS ("ALANIS") asserts that Defendant Wells Fargo Bank National Association, As Trustee For The Pooling And Servicing Agreement Dated As Of October 1, 2006, Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3 ("WELLS FARGO", "WELLS FARGO", *As Trustee*) is not the

owner and holder of her Note and Deed Of Trust. ALANIS alleges that to obtain an unlawful legal and equitable interest in her mortgage loan, WELLS FARGO, *As Trustee*, loan servicer OCWEN Loan Servicing, LLC ("OCWEN") and the debt collector law firm of MACKIE WOLF ZIENTZ & MANN (collectively "DEFENDANTS") among other things, fabricated mortgage instruments in connection with her loan, including her "Note" AND "Transfer of Lien". Further, ALANIS maintains the Pooling and Servicing Agreement alleged by WELLS FARGO, *As Trustee* to securitize her Note was materially breached and/or non-compliant with Pooling and Servicing Agreement, which provides "chain of title" evidence her mortgage loan was never securitized into the Trust. My research of the Pooling and Servicing Agreement in connection with the October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3 ("PSA") supports the ALANIS allegations as follows:

## B. Relevant Wells Fargo Litigations In Connection With Fabricated Instruments

16. Courts have reviewed and weighed in on the deposition testimony of former WELLS FARGO employee John Kennerty, where he maintained WELLS FARGO "*...manufactured mortgage assignments. He also testified that his "assignment team's" duties were not limited to processing assignments, including, when determined necessary, creating them; in addition, the "assignment team" included people tasked with endorsing notes...*"[2]

## C. Relevant Publications Regarding Wells Fargo In Connection With Fabricated Instruments

17. On March 12, 2014, the New York Post exposed an internal *WELLS FARGO Home Mortgage Foreclosure Attorney Procedures Manual*, which appears to provide systematic, step-by-step instructions for Wells Fargo Home Mortgage "Default Docs Team" and foreclosure

[2] UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK, *In re:* Cynthia Carrsow-Franklin, Debtor, Case No. 10-20010 (RDD). http://www.nysb.uscourts.gov/sites/default/files/opinions/198939_109_opinion.pdf

attorneys to fabricate evidence in foreclosure cases—down to the computer codes they use to order production of falsified documents.[3] The 150-plus-page document was published on March 17, 2014 by the Washington Post.[4] The manual describes how Wells Fargo expects its attorneys to prepare and handle files in foreclosure cases. When WELLS FARGO begins a foreclosure case, page 14 explains what is supposed to happen:

> "...*Documents include the original note, recorded mortgage, title policy, and recorded and unrecorded assignments. Documents are sent to imaging so that at the time of referral they can be uploaded via VendorScape or Desktop to the Foreclosure Attorney*...."

18. While the attorney should have a complete copy of the original note, as it exists at the time the foreclosure begins and before filing the foreclosure lawsuit, sometimes the original note is missing and/or the original note lacks an endorsement—the signature or stamp that transfers the note from one party to another.

19. The WELLS FARGO manual outlines steps for attorneys and the WELLS FARGO Default Docs Team to create allonges, endorsements to a note on a separate sheet of paper when there is no room left at the bottom of the note. Step 3 under the header "Allonge" on page 17 reads:

> "...*WFHM Default Docs Team: If file was ordered and received, review ... to determine what entities the attorney needs the note endorsement to reflect*...."

## D. Relevant Pooling & Servicing Agreements Allegedly Securitizing the Nancy Alanis Mortgage Loan

20. During the *ALANIS v Wells Fargo, As Trustee et al* litigation, Defendants provided during discovery and/or filed in the litigation, links and/or documents to the October 1, 2006 Pooling and Servicing Agreement and October 30, 2006 Prospectus Supplement ("ProSupp")

---

[3] http://nypost.com/2014/03/12/wells-fargo-made-up-on-demand-foreclosure-papers-plan-court-filing-charges/

[4] http://www.washingtonpost.com/business/economy/wells-fargo-foreclosure-manual-under-fire/2014/03/17/25cd383c-ae00-11e3-96dc-d6ea14c099f9_story.html

alleged to include the ALANIS mortgage loan. I have personally reviewed these documents, applied my experience, training, and acquired specialized knowledge to render opinions on the relevant PSA provisions and the ALANIS non-conforming (with the PSA) mortgage loan. WELLS FARGO, *As Trustee* maintains that the ALANIS Mortgage Loan is securitized in the Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass-Through Certificates Series 2006 NC3 ("PSA") as reflected in the following PSA and/or ProSupp[5]:

i. *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006*
ii. *Prospectus Supplement dated October 30, 2006 (File No. 333-130543) (Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3)*

Throughout the remainder of this report, all references to PSA are related to (i) above, and all references to ProSupp are related to (ii) above.

## E. Relevant Pooling & Servicing Agreements Requiring Compliance For Mortgage Loan Securitization Into The Trust

21. **(1) Governing Laws.**

In connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006,* Section 10.03 Governing Law states as follows:

> THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

5 https://www.sec.gov/Archives/edgar/data/1378964/000091412106003360/0000914121-06-003360.txt

22. **(2) The Pooling and Servicing Agreement Parties Do Not Include ALANIS" Original Lender New Century Mortgage Corporation ("NEW CENTURY")**

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543),* the parties to the pooling and servicing agreement are identified on pages (S-7 - S-8) as follows: ***"...The following diagram illustrates the various parties involved in the transaction and their functions..."***

In their opinion letter dated October 31, 2006, *Cadwalader, Wickersham & Taft LLP*, special counsel for Securitized Asset Backed Receivables LLC also identified the parties to the pooling and servicing agreement as follows: (1) Securitized Asset Backed Receivables LLC; (2) NC Capital Corporation; (3) HomEq Servicing Corporation; (4) Deutsche Bank National Trust Company; (5) Wells Fargo Bank, National Association. ALANIS' original lender New Century Mortgage Corporation ("NEW CENTURY") was never identified as a party to the pooling and servicing agreement. (emphasis added)

*Cadwalader, Wickersham & Taft LLP* made assumptions that all the documents and agreements had been duly executed as follows:

> "...*We have also assumed that all documents, agreements and instruments have been duly authorized, executed and delivered by all parties thereto, that all such parties are validly existing and in good standing under the laws of their respective jurisdictions of organization, that all such parties had the power and legal right to execute and deliver all such documents, agreements and instruments, and that such documents, agreements and instruments are legal, valid and binding obligations of such parties, enforceable against such parties in accordance with their respective terms.* As used herein, "to our knowledge", "known to us" or words of similar import mean the actual knowledge, without independent investigation, of any lawyer in our firm actively involved in the transactions contemplated by the Agreement.
>
> We express no opinion concerning the laws of any jurisdiction other than the laws of the State of New York and, to the extent expressly referred to in this letter, the federal laws of the United States of America.
>
> Based upon and subject to the foregoing, *we are of the opinion that:*
>
> *1. The Securities have been duly authorized by the Company and, **when the***

***Securities have been duly executed, authenticated and delivered by the Trustee in the manner contemplated in the Pooling and Servicing Agreement and paid for by and sold to the Underwriter pursuant to the Agreement, the Securities will be validly issued and outstanding***, fully paid and non-assessable and entitled to the benefits provided by the Pooling and Servicing Agreement…."[6]

23. **(3) Loan Servicer Benefits To ALANIS (Compliance with Industry Standards)**

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543),* ALANIS is alleged to be a third party beneficiary to the trust through loan servicer industry compliance requirements which directly affect the servicing of debtors mortgage loans on pg (S-52) and pg (S-56) as follows:

*General*

*HomEq Servicing Corporation ("HomEq") will act as servicer for the mortgage loans.* ***The servicer will service the mortgage loans in accordance with the pooling and servicing agreement.***(emphasis added)

*HomEq's Policies and Procedures*

*Upon the acquisition of servicing rights, HomEq coordinates with the prior servicer of the mortgage loans to achieve a transfer of servicing activities with minimal impact to mortgagors. The transfer and boarding process involves notifying the mortgagors of the servicing transfer, transferring electronic files containing loan set up information and a payment history, if applicable. In addition, loan documents either are stored in hard copy or electronically imaged form for future review and reference. All boarding activities are regularly reviewed to assure best practices are employed throughout the boarding process.*

*Once a mortgage loan has been boarded, HomEq begins to collect mortgage payments in adherence to the applicable servicing agreement and customary industry standards.*

NOTE: OCWEN Financial Corporation (OCWEN or the Company) (NYSE OCN) completed the

---

[6] Legal Opinion of Cadwalader, Wickersham & Taft LLP, dated October 31, 2006. http://www.sec.gov/Archives/edgar/containers/fix270/1378964/0000914121-06-003366.txt

acquisition of the $22.4 billion HomEq servicing portfolio and platform on September 1, 2010.[7] Also see FORM 10-K ANNUAL REPORT at page 6.[8]

24. **(4) Pooling and Servicing Agreement Identifies an "Assignor" of Mortgage Loans as SPONSOR (i.e. Sutton Funding, LLC), Not NEW CENTURY**

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-44, the SPONSOR is identified as Sutton Funding, LLC ("SUTTON"). The Sponsor SUTTON is identified among other things, as an "Assignor" of the mortgage loans (*Not* NEW CENTURY) pursuant to provisions outlined in *Assignment Of The Mortgage Loans* on page S-65 and S-66 as follows:

**ASSIGNMENT OF THE MORTGAGE LOANS**

"Pursuant to a mortgage loan purchase and warranties agreement, **NC Capital Corporation sold the mortgage loans, without recourse, to Sutton, and Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, without recourse, to the depositor on the closing date.** Pursuant to the pooling and servicing agreement, the depositor will sell, without recourse, to the trust, all right, title and interest in and to each mortgage loan, including all principal outstanding as of, and interest due after, the close of business on the cut-off date. Each such transfer will convey all right, title and interest in and to (a) principal outstanding as of the close of business on the cut-off date (after giving effect to payments of principal due on that date, whether or not received) and (b) interest due and accrued on each such mortgage loan after the cut-off date. However, Sutton will not convey to the depositor, and will retain all of its right, title and interest in and to (x) principal due on each mortgage loan on or prior to the cut-off date and principal prepayments in full and curtailments (i.e., partial prepayments) received on each such mortgage loan prior to the cut-off date and (y) interest due and accrued on each mortgage loan on or prior to the cut-off date."

7 OCWEN FINANCIAL CORPORATION. *Ocwen Financial Corporation Announces Third Quarter 2010 Financial Results* http://shareholders.ocwen.com/releasedetail.cfm?ReleaseID=585548

8 OCWEN FINANCIAL CORPORATION 2013 FORM 10-K ANNUAL REPORT http://shareholders.ocwen.com/secfiling.cfm?filingID=1445305-14-799&CIK=873860

25. **(5) Pooling and Servicing Agreement Identifies an "Assignor" of Mortgage Loans as The DEPOSITOR " i.e., Securitized Asset Backed Receivables, LLC", Not NEW CENTURY**

In connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement, Dated as of October 1, 2006 at Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,* the Depositor *(i.e. Securitized Asset Backed Receivables, LLC, Not NEW CENTURY)* is identified as an "Assignor" of mortgage loans as follows:

**ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES**
**SECTION 2.01 CONVEYANCE OF MORTGAGE LOANS**

"(a) **The Depositor**, concurrently with the execution and delivery hereof, hereby **sells, transfers, assigns, sets over and otherwise conveys to the Trustee** for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund."

26. **(6) "Chain Of Title Endorsements" Required by the Pooling and Servicing Agreement For All Non-MERS Mortgage Loans**

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-65, "chain of title" endorsement provisions for Non-MERS mortgage loans are outlined as follows:

**DELIVERY OF MORTGAGE LOAN DOCUMENTS**

"...In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(a) the original mortgage note, endorsed without recourse in blank by the last endorsee, **including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;**"

In connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* at ***Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,*** additional "chain of title" endorsement provisions for Non-MERS mortgage loans are outlined as follows:

**"ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES**
**SECTION 2.01 CONVEYANCE OF MORTGAGE LOANS**

(a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund. On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) The **original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee,** endorsed "Pay to the order of ______________, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party;

(ii) The original of any guarantee executed in connection with Mortgage Note;

(iii) the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording.

(iv) the originals of all assumptions, modification, consolidation and extension

agreement, if any, **with evidence of recording thereon**; (emphasis added)

(v) the original Assignment of Mortgage for each Mortgage endorsed in blank (except with respect to MERS Designated Loans)

(vi) the **originals of all intervening assignments of Mortgage** (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee (or, in the case of a MERS Designated Loan, MERS) **with evidence of recording thereon….**"

27. **(7) "Substitution" and/or "Repurchase" of Mortgage Loans for Non-Compliance With Pooling And Servicing Agreements**

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-66, the PSA parties and Custodian (i.e. Deutsche Bank National Trust Company) entered *Delivery Of Mortgage Loans* compliance agreements, which included as follows:

"…Pursuant to the pooling and servicing agreement, the custodian will agree to execute and deliver on or prior to the closing date an acknowledgment of receipt of the original mortgage note, item (a) above, with respect to each of the mortgage loans delivered to the custodian, with any exceptions noted. The custodian will agree, for the benefit of the holders of the certificates, to review, or cause to be reviewed, each mortgage file within ninety days after the closing date--or, with respect to any Substitute Mortgage Loan delivered to the custodian, within 30 days after the receipt of the mortgage file by the custodian--and to deliver a certification generally to the effect that, as to each mortgage loan listed in the schedule of mortgage loans,

- all documents required to be reviewed by it pursuant to the pooling and servicing agreement are in its possession;
- each such document has been reviewed by it and appears regular on its face and relates to such mortgage loan;
- based on its examination and only as to the foregoing documents, certain information set forth on the schedule of mortgage loans accurately reflects the information set forth in the mortgage file delivered on such date; and

- **each mortgage note has been endorsed as provided in the pooling and servicing agreement.**

If the custodian, during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file that is not executed, has not been received or is unrelated to the mortgage loans, or that any mortgage loan does not conform to the requirements above as set forth in the review criteria set forth in the pooling and servicing agreement, the custodian is required to promptly so notify the responsible party, the servicer, the trustee and the depositor in writing. The responsible party will be required to use reasonable efforts to cause to be remedied a material defect in a document constituting part of a mortgage file of which it is so notified by the custodian.

**If, however, within thirty days after the depositor's notice of the defect, the responsible party has not caused the defect to be remedied, the responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan.** The substitution or repurchase is required to be effected in the same manner as a substitution or repurchase for a material breach of a mortgage loan representation and warranty, as described below under "—Representations and Warranties Relating to the Mortgage Loans." The obligation of the responsible party to cure the defect or to substitute or repurchase the defective mortgage loan and to indemnify for such breach will constitute the sole remedies available to the holders of the certificates and the trustee relating to the defect." (emphasis added)

28. (8) **Trust Closing Date**

In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-8, the "closing date" (the start-up date for the Trust) is identified as follows:

Relevant Dates:
Cut-off Date................ October 1, 2006.
Closing Date................ On or about October 31, 2006.

29. **(9) Only "Thirty Year" Mortgage Loans Placed In The Trust**

Pursuant to the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-36, "forty year (40)" mortgage loans were not included as part of the Trust as follows:

**General**
"The trust will primarily consist of approximately 2,350 conventional, subprime, adjustable- and fixed-rate, first-lien and second-lien residential mortgage loans **with original terms to maturity from the first scheduled payment due date of not more than 30 years**, having an aggregate scheduled principal balance of approximately $430,021,521 as of the cut-off date. All the mortgage loans in the trust were acquired by the sponsor from NC Capital Corporation." (emphasis added)

**F. Relevant Multiple Versions Of The ALANIS Note(s) Provided During The Litigation By Defendants' Wells Fargo, *As Trustee*, OCWEN Loan Servicing, LLC and Mackie Wolf Zientz & Mann, PC Lacking "Chain Of Title Endorsements"**

30. I have reviewed "three" versions of the ALANIS Note produced during discovery and/or filed by the Defendants WELLS FARGO, *As Trustee*, OCWEN Loan Servicing, LLC ("OCWEN") and/or MACKIE WOLF ZIENTZ & MANN, PC in judicial proceedings.[9]

31. **(1) 1st Version Of ALANIS Note produced by Defendants in 2012**

On April 23, 2012, the Defendants WELLS FARGO, *As Trustee* and OCWEN produced the ALANIS Adjustable Rate Balloon NOTE (***With No Indorsement In Blank***)[10] in response to ALANIS written discovery requests. In connection with the ALANIS written discovery requests, the Document(s) to be produced were defined on page 13 (e) under the heading *Definitions*

---

[9] Different Versions of ALANIS Note provided by Defendants: Discovery (April 23, 2012); November 2014 summary judgment proceeding; and Discovery Supplement (March 26, 2015).

[10] ADJUSTABLE RATE BALLOON NOTE ***(with no endorsement)*** (BATES STAMPED WELLS FARGO 00409-00412). Produced by Defendants During Discovery in April 23, 2012.

*(Applicable To Written Discovery Requests).* In pertinent part, "Document(s)" was defined as "*...all writings...photostating, photographing, magnetic or electronic impulse, mechanical or electronic recording or other form of data compilation, tape or disc recordings, and all other data compilations from which information can be obtained or translated, which are in your possession, custody or control or which are known to you...*". The April 2012 ALANIS Note (***With No Indorsement In Blank***) provided by the Defendants during discovery can be summarized as follows:

(a) ALANIS Adjustable Rate Balloon NOTE (***With No Indorsement in Blank***):

(b) Provided by the Defendants during discovery on April 23, 2012

(c) Executed between Plaintiff NANCY ALANIS and her original lender NEW CENTURY MORTGAGE CORPORATION on June 15, 2006 (40-year Amortization Period)

(d) BATES Stamped WELLS FARGO 00409-00412

(e) BAR CODED Note on page 1

(f) STAMPED in upper right hand corner on page one: "***...We hereby certify this copy is a true and correct copy of the original instrument...MISSION TITLE...***"

(g) On page 4 of 4: ***No Indorsement In Blank***

32. **(2) 2nd Version Of ALANIS Note filed by Defendants in 2014**

During a November 2014 summary judgment proceeding, the Defendants WELLS FARGO, *As Trustee*, OCWEN and MACKIE WOLF ZIENTZ & MANN, PC filed the 10.21.14 *Affidavit of Gina Feezer*, Custodian of records for Ocwen Loan Servicing[11] and a court order was entered after considering the same. Attached to the 10.21.14 *Affidavit of Gina Feezer* was Exhibit "A-1 NOTE" (*without indorsement in blank*) which can be summarized as follows:

---

[11] *ADJUSTABLE RATE BALLOON NOTE* ***(with no endorsement)*** (Attached as Exhibit "A-1 NOTE" to the 10.21.14 *Affidavit of Gina Feezer*, Custodian Of Records for OCWEN Loan Servicing and filed in a judicial proceeding where a court order was entered).

(a) ALANIS Adjustable Rate Balloon NOTE (***With No Indorsement in Blank***) executed between Plaintiff NANCY ALANIS and her original lender NEW CENTURY MORTGAGE CORPORATION on June 15, 2006 (40-year Amortization Period).

(b) ALANIS Adjustable Rate Balloon NOTE (***With No Indorsement in Blank***) was attached as Exhibit "A-1 NOTE" to the 10.21.14 *Affidavit of Gina Feezer*, Custodian Of Records for OCWEN Loan Servicing and filed in a judicial proceeding where a court order was entered.

(c) No BATES STAMP

(d) [Pg. 4 / ¶ 14] - *Affiant* Gina Feezer
"...*I am a Custodian Of Records For OCWEN...*"

(e) [Pg. 5 / ¶ 14] - *Affiant* Gina Feezer
"...***The Records attached hereto are the original or exact duplicates of the originals***..."

(f) [Pg. 5 / ¶ 14] - *Affiant* Gina Feezer
"...*These records are also identified as exhibits to this Affidavit as indicated below...*"

(g) BAR CODED Note on page 1

(h) STAMPED in upper right hand corner on page one:
"...***We hereby certify this copy is a true and correct copy of the original instrument...MISSION TITLE...***"

(i) On page 4 of 4: ***No Indorsement In Blank***

33. **(3) 3rd Version Of ALANIS Note produced by Defendants in 2015**

Almost three years after producing the ALANIS NOTE ***(without indorsement)*** during discovery, on March 26, 2015, and less than two months before their previous May 18, 2015 trial setting, the Defendants WELLS FARGO, *As Trustee*, OCWEN and MACKIE WOLF ZIENTZ & MANN, PC produced during discovery a materially different version of the ALANIS Note (***With Indorsement In Blank/Steve Nagy Stamped Signature Pay To The Order Of Without Recourse***

***New Century Mortgage Corporation***)[12] and also identified this ALANIS Note as the "original".

This March 26, 2015 version of the ALANIS Note can be summarized as follows:

- ALANIS Adjustable Rate Balloon NOTE (*With Indorsement In Blank/Steve Nagy Stamped Signature Pay To The Order Of Without Recourse New Century Mortgage Corporation*):
- Executed between Plaintiff NANCY ALANIS and her original lender NEW CENTURY MORTGAGE CORPORATION on June 15, 2006 (40-year Amortization Period).
- Produced on March 26, 2015 during discovery by Defendants WELLS FARGO, As Trustee, OCWEN LOAN SERVICING and MACKIE WOLF ZIENTZ & MANN, PC
  - (a) Identified as "ORIGINAL NOTE"
  - (b) DIFFERENT BATES Stamp: WELLS FARGO 001126-001130
  - (c) **NO BAR CODE** / BAR CODE COMPLETELY REDACTED
  - (d) NO STAMP in upper right hand corner on page one: "*...We hereby certify this copy is a true and correct copy of the original instrument...MISSION TITLE...*"
  - (e) On page 4 of 4: *(With Indorsement In Blank/Steve Nagy Stamped Signature Pay To The Order Of Without Recourse New Century Mortgage Corporation)*

NOTE: The March 26, 2015 Alanis Balloon Note (*With Indorsement In Blank*) contradicts the 10.21.14 *Affidavit of Gina Feezer* who swore the Exhibit "A-1 NOTE" ALANIS Adjustable Rate Balloon NOTE (*Without Indorsement In Blank*) was "*... the original or exact duplicates of the originals...*"

34. **(4) No Evidence of "Chain Of Title Endorsements" On Any Version Of The ALANIS NOTE As Required By The Pooling And Servicing Agreement And The Corresponding Prospectus Supplement**

After reviewing the "three" different versions of the ALANIS Notes produced during discovery

---

[12] *ADJUSTABLE RATE BALLOON NOTE* ***(with one endorsement in blank/Steve Nagy New Century)*** (BATES STAMPED WELLS FARGO 001126-001130). Produced by Defendants During Discovery on March 26, 2015.

and/or filed by WELLS FARGO, *As Trustee*, OCWEN and/or MACKIE WOLF ZIENTZ & MANN in judicial proceedings, it is my professional opinion that WELLS FARGO (*As Trustee*) and OCWEN (*as successor loan servicer to HOMEQ Servicing Corp.*) failed to comply with key provisions in the pooling and servicing agreement, which required among other things, providing evidence of a complete "chain of title endorsements" on mortgage instruments as follows:

(1) In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-65, "chain of title" endorsement requirements are outlined as follows:

**DELIVERY OF MORTGAGE LOAN DOCUMENTS**

"...In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(b) the **original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;...**"

(2) In connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* at ***Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,*** additional "chain of title" endorsement provisions for Non-MERS mortgage loans are outlined as follows:

**"ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES**
**SECTION 2.01 CONVEYANCE OF MORTGAGE LOANS**

(a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right title and interest

of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund. On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) **In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian** for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) **the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee**, endorsed "Pay to the order of ____________, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party;

(ii) the original of any guarantee executed in connection with Mortgage Note;

(iii) the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording;

(iv) the originals of all assumptions, modification, consolidation and extension agreement, if any, **with evidence of recording thereon**;

(v) the original Assignment of Mortgage for each Mortgage endorsed in blank (except with respect to MERS Designated Loans);

(vi) **the originals of all intervening assignments of Mortgage** (if any) **evidencing a complete chain of assignment from the applicable originator to the last endorsee** (or, in the case of a MERS Designated Loan, MERS) **with evidence of recording thereon**...."

## G. Material Break In "Chain Of Title", "Non-Compliance" and/or "Breach" Of The Pooling & Servicing Agreement

35. I have reviewed the relevant "Pooling & Servicing Agreement" allegedly securitizing the NANCY ALANIS Mortgage Loan as follows:

1. *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006*
2. *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)*

36. **(a) February 2, 2011 Transfer of Lien (Non Compliant With Pooling And Servicing Agreements)**

I have reviewed the certified copy of the *Transfer Of Lien (Vol. 14872 Pg. 933)* filed in public records with the office of Gerard Rickhoff, County Clerk Of Bexar County. The *Transfer of Lien* purportedly **executed on February 2, 2011** between NEW CENTURY MORTGAGE CORPORATION ("NEW CENTURY") and WELLS FARGO, *As Trustee* conflicts with the "date" in the first sentence, which states in the present tense "*...**The TRANSFER OF LIEN is made and entered into as of this 1st day of SEPTEMBER 2010...***"

37. Based on the parties identified in the mandatory "endorsement chain of title" provisions contained in the pooling and servicing agreement dated October 1, 2006 and the *Prospectus Supplement dated October 30, 2006* referenced herein, the February 2, 2011 *Transfer of Lien* appears on its face, to be a fabricated and/or forged instrument, and provides evidence of a material "break in the chain" of title and Wells Fargo, *As Trustee* does not appear to have a legal or equitable interest in the ALANIS mortgage loan for the following reasons:

(1) NEW CENTURY purportedly executed the February 2, 2011 *Transfer of Lien* with WELLS FARGO BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006

SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2006-NC3;

(2) NEW CENTURY was never a party to the pooling and servicing agreements;

(3) NEW CENTURY was dissolved in a Delaware liquidation bankruptcy proceeding in "August 2008" and had no authority from the PSA to execute a *Transfer of Lien* in "2011"[13];

(4) The parties to the ***Assignment of the Mortgage Loans*** are outlined in the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-65 as follows:

**NC CAPITAL** (*not NEW CENTURY*) "...**sold the mortgage loans, without recourse, to Sutton, and Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans** including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, **without recourse, to the depositor on the closing date**....";

(5) NEW CENTURY is not a party identified in the pooling and servicing agreement *Assignment of The Mortgage Loans* "Chain of Title" and could not have executed or authorized a *Transfer of Lien* in connection with the ALANIS mortgage loan in "2011";

(6) The February 2, 2011 *Transfer of Lien* is not compliant with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006* at *Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,* requiring evidence of a "chain of title" at (b)-(b)(vi) as follows:

"(b) **In connection with the transfer and assignment of each Mortgage Loan,** the Depositor has delivered or caused to be delivered to the Custodian for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(vi) **the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable**

[13] UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE - *In re New Century TRS Holdings, Inc Case No. 07-10416 (KJC) (Liquidation Bankruptcy Proceedings)*

**originator to the last endorsee** (or, in the case of a MERS Designated Loan, MERS) with evidence of recording thereon**....**"

38. I also have reviewed the April 23, 2012 *Defendants' Response to Plaintiff's First Set Of Written (Interrogatory Answer No. 2)* and the sworn verification statements of HOWARD HANDVILLE, WELLS FARGO Authorized Agent and OCWEN Loan Servicing, LLC "Loan Analyst"[14]. In pertinent part, *Interrogatory Answer No. 2* states as follows: "...***Wells Fargo is the owner of the Note and Mortgage pursuant to assignment dated June 27, 2006***..." I understand the Defendants have not produced this assignment to date. The failure to produce this June 27, 2006 assignment would be non-compliant with the PSA at ARTICLE II CONVEYANCE OF MORTGAGE LOANS (b)(vi) which requires "...*the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee (or, in the case of a MERS Designated Loan, MERS) with evidence of recording thereon....*"

39. In connection with *Interrogatory Answer No. 2*, I have also read the May 4, 2015 Hearing *Transcript*[15] before Hon. Judge Arteaga and reviewed the statements made in court by Defendants attorney Mark Cronenwett who stated in pertinent part: "...***The answers to this interrogatory are not incorrect, Your Honor. It is true, that the Note was assigned from the loan originator New Century to Wells Fargo on this date....***".

40. For the reasons stated herein, attorney Mark Cronenwett made statements before the Court that are false because NEW CENTURY was never a party to the pooling and servicing agreement and had no authority to assign the ALANIS Note to Wells Fargo, *As Trustee* between 2006 and 2011. At all times relevant to the pooling and servicing agreement, "Sponsor SUTTON

---

[14] Defendant April 23, 2012 Responses To Discovery.

[15] May 4, 2015 Transcript Hearing (Judge Arteaga).

FUNDING, LLC" and the "Depositor SECURITIZED ASSET BACKED RECEIVABLES, LLC" were the relevant parties identified with authority to "Assign and/or Transfer" mortgage loans.[16]

41. **(b) All Versions Of The ALANIS Note (Non-Compliant With The Pooling and Servicing Agreements)**

I have reviewed the multiple versions[17][18][19] of the ALANIS NOTE purportedly executed on June 15, 2006 between NEW CENTURY MORTGAGE CORPORATION ("NEW CENTURY") and NANCY ALANIS. Based on the mandatory "chain of title" endorsement provisions contained in the pooling and servicing agreement dated October 1, 2006 and the *Prospectus Supplement dated October 30, 2006* referenced herein, all versions of the ALANIS NOTE appear on their face, to provide evidence of a material break in the "chain of title" and pursuant to the PSA, Wells Fargo, *As Trustee* does not have a legal or equitable interest in the ALANIS mortgage loan for the following reasons:

(1) NEW CENTURY executed an *Adjustable Rate Balloon Note* with NANCY ALANIS on June 15, 2006 (ALANIS Note/No Indorsement In Blank)[20]

(2) On page (1) of the (ALANIS Note/No Indorsement In Blank), it states "…***My monthly payments will be based on a an assumed 40–year amortization period (The Amortization period)***…."[21]

(3) Pursuant to the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-36, "forty year (40)" loans were not included as part of the Trust as follows:

---

16 Id.

17 ADJUSTABLE RATE BALLOON NOTE ***(with no endorsement)*** (BATES STAMPED WELLS FARGO 00409-00412). Produced by Defendants During Discovery in April 23, 2012.

18 *ADJUSTABLE RATE BALLOON NOTE **(with no endorsement)***(Attached as Exhibit "A-1 NOTE" to the 10.21.14 *Affidavit of Gina Feezer*, Custodian Of Records for OCWEN Loan Servicing and filed in a judicial proceeding where a court order was entered).

19 *ADJUSTABLE RATE BALLOON NOTE **(with "one" endorsement in blank/Steve Nagy New Century)*** (BATES STAMPED WELLS FARGO 001126-001130). Produced by Defendants During Discovery on March 26, 2015.

20 ADJUSTABLE RATE BALLOON NOTE ***(with no endorsement)*** (BATES STAMPED WELLS FARGO 00409-00412). Produced by Defendants During Discovery in April 23, 2012.

21 Ibid.

"General

The trust will primarily consist of approximately 2,350 conventional, subprime, adjustable- and fixed-rate, first-lien and second-lien **residential mortgage loans with original terms to maturity from the first scheduled payment due date of not more than 30 years**, having an aggregate scheduled principal balance of approximately $430,021,521 as of the cut-off date. **All the mortgage loans in the trust were acquired by the sponsor from NC Capital Corporation**." (emphasis added)

(4) Pursuant to the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page S-36, the ALANIS "40-year" mortgage loan was non-conforming with the PSA and never securitized into the Trust and WELLS FARGO, *As Trustee* has no legal or equitable interest in the ALANIS Note.

(5) NEW CENTURY was never a party to the pooling and servicing agreements.

(6) NEW CENTURY was dissolved in a Delaware liquidation bankruptcy proceeding in "August 2008" and had no authority from the PSA to execute a *Transfer of Lien* in "2011"[22];

(7) NEW CENTURY is not a party identified in the pooling and servicing agreement *Assignment of Mortgage Loans* "Chain of Title". The ***Assignment of the Mortgage Loans*** is outlined in the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-65) as follows:

> NC CAPITAL (*not NEW CENTURY*) "…sold the mortgage loans, without recourse, to Sutton, and Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, without recourse, to the depositor on the closing date…."

(8) In connection with the *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-65), "chain of title" endorsement requirements are outlined as follows:

---

22 UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE – *In re New Century TRS Holdings, Inc Case No. 07-10416 (KJC) (Liquidation Bankruptcy Proceedings)*

**"DELIVERY OF MORTGAGE LOAN DOCUMENTS**

...In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(a) the **original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;**"

(9) In connection with the *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006 at* ***Article II Conveyance of Mortgage Loans; Representations and Warranties, Section 2.01 Conveyance of Mortgage Loans,*** additional "chain of title" endorsement provisions for Non-MERS mortgage loans are outlined as follows:

**"ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES**
**SECTION 2.01 CONVEYANCE OF MORTGAGE LOANS**

(a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund. On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) In connection with the transfer and assignment of each Mortgage Loan, the Depositor has delivered or caused to be delivered to the Custodian for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) **the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee**, endorsed "Pay to the order of ____________, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party";

(10) None of the ALANIS Notes produced and/or filed by the Defendants WELLS FARGO, *As Trustee*, OCWEN Loan Servicing, LLC and MACKIE WOLF ZIENTZ & MANN contain any evidence of the required "Chain of Title" endorsements from the "originator to the last endorsee" and this is compelling evidence the ALANIS mortgage loan was non-conforming with the terms of the pooling and servicing agreement, and was never securitized into the Trust and WELLS FARGO, *As Trustee* does not have a legal or equitable interest in the ALANIS Note.

(11) Further, there appears there was never any attempt made within "thirty days" to cure the non-conforming "Chain Of Title" endorsement defects in connection with the ALANIS mortgage loan. See *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at page (S-66 – S-67). The parties and custodian (i.e. Deutsche Bank National Trust Company) entered agreements to ensure compliance with the pooling and servicing agreements as follows:

"...If the custodian, during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file that is not executed, has not been received or is unrelated to the mortgage loans, or that any mortgage loan does not conform to the requirements above as set forth in the review criteria set forth in the pooling and servicing agreement, the custodian is required to promptly so notify the responsible party, the servicer, the trustee and the depositor in writing. The responsible party will be required to use reasonable efforts to cause to be remedied a material defect in a document constituting part of a mortgage file of which it is so notified by the custodian.

If, however, within thirty days after the depositor's notice of the defect, the responsible party has not caused the defect to be remedied, the responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan. The substitution or repurchase is required to be effected in the same manner as a substitution or repurchase for a material breach of a mortgage loan representation and warranty, as described below under "—Representations and Warranties Relating to the Mortgage Loans…."

(12) Without a timely cure within "thirty days" of the non-conforming "Chain Of Title" endorsement defects in connection with the ALANIS mortgage loan, the pooling and servicing parties agreed "…**the responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan**…". The Responsible Party is identified as NC CAPITAL. *Prospectus Supplement dated October 30, 2006 (File No. 333-130543)* at pages S-8, S-46, and S-66-67. Under both of these scenarios, the non-conforming (with the PSA) ALANIS Note was required to be removed by the Responsible party (NC CAPITAL) from the Trust pool and (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan. Because the non-conforming (with the PSA) ALANIS mortgage loan was required to be removed from the Trust pool after thirty days, WELLS FARGO, *As Trustee* does not own a legal or equitable interest in the ALANIS Note.

42. The ALANIS Note was non-conforming with the PSA and never part of the trust because, in part, it was structured pursuant to a "40-year" amortization period, which conflicted with the requirements for the trust mortgage loans "…**with original terms to maturity from the first scheduled payment due date of not more than 30 years**…"[23]

[23] Pro Supp S-36

43. The ALANIS Note was, on its face, noticeably non-conforming with the pooling and servicing agreements "chain of title" endorsement provisions and lacked key endorsements from NC CAPITAL, SUTTON and SECURITIZED ASSET BACKED RECEIVABLES.

44. After failing to cure the "40-year" amortization period defect with the ALANIS loan, which conflicted with the "30-year" loan period requirement for securitization into the Trust, and failing to cure the "chain of title" endorsement defects appearing on the face of the mortgage note, which showed a complete lack of "chain of title" from the "originator to the last endorsee" within thirty days, the ALANIS mortgage loan could not remain in the Trust, and the Responsible Party (NC CAPITAL) was required to "...(a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan..."[24]

45. For the reasons stated herein, WELLS FARGO, *As Trustee*, never owned a legal or equitable interest in the ALANIS Note. The ALANIS mortgage loan is unenforceable as to WELLS FARGO, *As Trustee*, and they do not have the right to foreclose.

## H. General Mortgage Banking

46. Having a general knowledge of mortgage banking, if needed at trial, I will be able to address mortgage banking customs and market practices, and among other things, issues pertaining to the effects of unlawfully placing mortgage loan payments in a "Suspense" account for any extended period, and the corresponding mortgage loan delinquency created.

## I. ATTACHMENTS

(1) Appendix 1: Daniel I. Castro, Jr. Resume'
(2) Appendix 2: Daniel I Castro, Jr. Publications
(3) Appendix 3: List of documents relied upon

---

24 Pro Supp. pp. S-66-67

I, DANIEL I. CASTRO, Jr., submit this Expert Report on behalf of named plaintiff in the above-captioned case.

Respectfully Submitted,

**DANIEL I. CASTRO, Jr.**

# Appendix 1: Daniel I. Castro, Jr. Resume

7 DeGraaf Court
Mahwah, NJ 07430

Home: (201) 236-1491
Cell: (646) 703-1315
E-mails: d-castro@msn.com dan@robustadvisors.com

**Professional Experience**

2013-Present **Robust Advisors, Inc.** Mahwah, NJ
**President**

Dan is Founder and President of Robust Advisors, Inc. The company conducts Fixed Income and Structured Finance consulting focusing on ABS, MBS, CDOs, CMBS, SIVs, hedge funds, other funds and related products. Dan provides Expert Witness services, litigation support, due diligence, valuation, and general consulting support.

2008-2012 **Structured Finance Consultant** New Jersey/New York

Dan was an independent Fixed Income and Structured Finance consultant focusing on ABS, MBS, CDOs, SIVs, CMBS, hedge funds, other funds and related fixed income and structured finance products. Dan's consultant experience was the basis for founding Robust Advisors, Inc.

May 2010- April 2011 **BTIG LLC** New York, NY
**Managing Director, Head of Structured Finance Analytics and Strategy**

Dan was head of the group responsible for providing analysis of Structured Finance products (ABS, MBS, CMBS, and CDOs) within the Fixed Income Division of BTIG, a FINRA registered broker-dealer. Dan set the strategy of the Structured Finance Group and disseminated it to the firm's clients. Dan's responsibilities also included selling bonds to institutional investors.

2008-April 2010 **Huxley Capital Management** New York, NY
**Principal, Chief Risk Officer, Portfolio Manager**

Dan was the Chief Risk Officer of Huxley Capital Management. In this capacity, he was responsible for managing all risk exposures for the company, its investors, and affiliated portfolio managers. Dan also co-managed Huxley's TALF investment fund as well as formulating the firm's macro view of the markets and economy.

2007-2010 **American Securitization Forum** New York, NY
**Member, Board of Directors and Investor Committee**
**Editorial Board, The American Securitization Journal**
Dan was on the Board of Directors of the American Securitization Forum, the Industry Trade Group representing the Structured Finance and Securitization Industries in the United States. Dan also was a member of ASF's Investor Committee and an active participant in ASF Project RESTART, which developed ASF's Model RMBS Representations and Warranties. On behalf of ASF, Dan spent considerable time working with Congressional Committees in the House and Senate, as well as the Federal Reserve and Treasury, on issues related to securitization.

2005 - 2008 **GSC Group (formerly GSC Partners)** New York, NY

**Managing Director, Chief Credit Officer, Portfolio Manager, Structured Finance Group; Chief Investment Officer, GSC Capital Corp. (REIT)**
2006 - 2007 **Board of Directors, LownHome Financial (Mortgage Originator)**

Member of several GSC Investment Committees including Structured Finance CDOs, GSC Capital Corp.(REIT), Eliot Bridge (long/short structured finance hedge fund), High Yield Real Estate (Commercial Mortgage Loans), Corporate Credit Group (leveraged loans), GSC Investment Corp. (Closed End Management Investment Company, ticker: GNV), and Pendulum (distressed structured finance hedge fund).

Made investment decisions and co-managed several structured finance vehicles including 13 ABS CDOs, 7 CLOs, 2 hedge funds, and a REIT. Provided macro investment views to multiple investment units of the firm. Provided leadership for credit risk and analysis in ABS, MBS, and CDOs. Approved buy/sell decisions in ABS, MBS, CMBS, CDOs, commercial real estate, and leveraged loans in both cash and synthetic (CDS) markets. Coordinated research for all structured finance related products.

**Board of Directors, American Securitization Forum (ASF)**
**Editorial Board, The American Securitization Journal**

1991 - 2004 **Merrill Lynch & Co.** New York, NY

**Managing Director, Structured Finance Research**

2002 – 2004 *Managing Director*, CDO Strategist
2000 – 2002 *Managing Director*, ABS Strategist
1993 – 2000 *Director*, ABS Research
1991 – 1992 *Vice President*, ABS Research

Head of Merrill Lynch's Asset Backed Securities Research Department since 1991. Changed name of group to Structured Finance Research when responsibility for CDOs was added in 2002. Responsible for research related to ABS, RE ABS, ABCP, CDOs, and at various times for CMBS and non-agency MBS (all credit-related Structured Finance). Position involved significant interaction with Institutional investors, sales, trading, and origination. Published the monthly *ABStract, Structured Credit Brief, CDO Surveillance,* and various product and relative value publications.

Member of **Institutional Investor All-American Fixed Income Research Team** for 13 consecutive years, every year from its inception in 1992 through 2004. Ranked first or second 10 times for ABS Strategy/Research and also ranked in various years for Real Estate ABS Research, ABS Prepayments, and Collateralized Debt Obligations (CDOs).

Dan was featured on the cover of Bloomberg Magazine in September 1997—cover story: *Outlook for the Asset Backed Securities Market.*

1987 - 1991 **Moody's Investor's Service** New York, NY

**Senior Analyst, Structured Finance**

Dan managed client relationships with investment bankers and issuers for ABS and MBS transactions. He was involved in all aspects of analyzing and rating new deals: structuring, negotiating deal parameters, analyzing legal aspects, and establishing credit enhancement levels. He chaired rating committees for MBS and ABS deals in 1990-1991. Dan managed and trained the analysts in the ABS and MBS groups.

1986 - 1987 **Citicorp Investment Bank** New York, NY

**AVP, Structured Finance**

Evaluated economics of proposed securities product structures. Member of deal teams for automobile and credit card securitizations. Helped structure new transactions, analyzed proposed securitizations, and worked on deal documents.

1985 - 1986 **Citicorp Homeowners** St. Louis, MO

**Pricing Manager/Funding Trader**

Managed pricing function for first-lien mortgage portfolio products. Conceptualized and implemented treasury forecasting models to manage liquidity and interest rate risk. Made, posted, and executed two-way prices to other Citicorp business units.

1984 - 1985 **Citicorp Acceptance Company** St. Louis, MO

**Financial Analyst**

Prepared Treasury reports and analyses for the Division. Special projects included analytical work on the sale/securitization of automobile receivables.

1982 - 1984 **McDonnell Douglas Corp.** St. Louis, MO

**Associate—Fiscal Development Program**

Associate in MBA Management Training Program. Management Development assignments included the Accounting group, Contracts Department, Internal Auditing, and Supplier Auditing Group.

1980 - 1982 **Washington University** St. Louis, MO

**Graduate Teaching Assistant.**

Assistant to Professor of Quantitative Business Analysis in the following courses: Linear Programming, Operations Research, Probability, and Calculus.

Summer 1981 **Buick Motor Division, GM** Flint, MI

**Summer Intern**

Pricing and Analysis Department of Financial Division. Summer project was to price options for the 1982 model year Buick Automobile lineup.

**Education**

1980 - 1982    **Washington University**                    St. Louis, MO
**MBA**—Finance/International Business

1976 - 1980    **University of Notre Dame**                  Notre Dame, IN
**BA**—Government/International Relations

**Additional
Information**

Dan has been recognized as a leader in his field by *Institutional Investor* magazine, which named him as a member of its All-American Fixed Income Research Team each year during 1992-2004 and also as a member of the First Team for ABS Strategy.

Dan speaks frequently at industry conferences, is quoted regularly in the financial press, magazines, the Wall Street Journal, Bloomberg, Reuters, and other newswires.   Dan is interviewed occasionally on television, usually on CNBC or Bloomberg TV, but he also has been interviewed on NBC, CBS, CNN, and Reuters TV.

Dan has written chapters and contributed to numerous books covering fixed income investments collaborating with Frank Fabozzi on several books, as well as Martin Fridson.  Most recently Dan wrote the chapter on Asset Backed Securities and co-authored the chapter on Mortgage Backed Securities in Gary Strumeyer's *Investing in Fixed Income Securities, Understanding the Bond Market*, published by John Wiley & Sons, Inc.

Possess FINRA Series 7, 24 and 63 registrations (inactive).

# Appendix 2: Daniel I Castro, Jr.—Publications*

- *BTIG Structured Finance Trading Strategies: More CLO Upgrades on the Way, Moody's Retooling CLO Models*, March 22, 2011
- *BTIG Structured Finance Trading Strategies: CLOs: Poised for Further Improvement, Leveraged Loans Performing Well*, March 10, 2011
- *BTIG Structured Finance Trading Strategies: CLOs for HY Investors, An Overlooked Opportunity*, March 3, 2011
- *BTIG Structured Finance Commentary: Impact of Treasury Rate Shocks, Pain for the Mortgage Market*, December 9, 2010
- *BTIG Structured Finance Commentary: Consumer Credit Improving, Balances falling, fundamentals better*, December 7, 2010
- *BTIG Structured Finance Commentary: 2011: Thoughts and Themes, Ideas and Views for the Coming Year*, December 2, 2010
- *BTIG Structured Finance Commentary, Observations on Structured Finance: More Questions than Answers*, October 7, 2010
- *BTIG Structured Finance Commentary, Observations in Structured Finance: Spector of Uncertainty*, September 29, 2010
- Chapter on Asset Backed Securities in Gary Strumeyer's *Investing in Fixed Income Securities: Understanding the Bond Market*, published by John Wiley & Sons, Inc. Feb. 2005
- *Merrill Lynch Fixed Income Strategy, Structured Credit, Structured Credit Brief: CDO Equity and the Efficient Frontier*, April 23, 2004
- *Merrill Lynch, 2004—The Year Ahead, The ABStract: 2004 ABS/CDO Outlook*, January 12, 2004
- *Merrill Lynch Fixed Income Strategy, Structured Credit: CDO Rating Methodologies Review*, November 14, 2003

---

* I have listed all of my publications during the past ten years that I have been able to locate with reasonable diligence, including information concerning the periodic reports to which I recall contributing or which I recall publishing during my tenure at Merrill Lynch. If I published anything during the last ten years that is neither named specifically herein or covered by reference to a category of periodic publications (a possibility that I cannot discount to a certainty), then any such publication would almost certainly be one that was published during my tenure at Merrill Lynch that I currently do not recall and to which I do not have access. In the event any such publication or publication comes to my attention, I shall promptly amend this disclosure.

- *Merrill Lynch Fixed Income Strategy: ABS CDO Primer, Essential Knowledge for Investors*, October 7, 2003
- *Merrill Lynch Fixed Income Strategy: Evolution of The ABS CDO, Second Generation ABS CDOs are here!*, October 2, 2003
- *Merrill Lynch Fixed Income Strategy: Introduction to CDO Investments, CDO Basics in Plain English*, October 2, 2003
- *Merrill Lynch Credit: Credit Derivative Handbook 2003, A Guide to Products, Valuation, Strategies and Risks*, April 16, 2003, Chapter 11, Synthetic CDO Valuation
- *Merrill Lynch Fixed Income Strategy: Synthetic CDO Valuation*, March 19, 2003
- *Merrill Lynch Structured Finance Market: FASB Interpretation No. 46 (FIN 46)*, February 21, 2003
- *Merrill Lynch, 2003—The Year Ahead, The ABStract, 2003 ABS Market Outlook*, January 7, 2003
- *Merrill Lynch Fixed Income Strategy: Size & Structure of the World Bond Market: 2002, Governments, Corporates, Eurobonds, Emerging Markets*, April 2002, ABS Market
- *Merrill Lynch, 2002—The Year Ahead, The ABStract, 2002 ABS Market Outlook*, December 7, 2001
- *Merrill Lynch, 2001—The Year Ahead, Non-Real Estate ABS, A Maturing Market—Steady Growth, Stable Performance*, December 21, 2000
- *Merrill Lynch, 2001—The Year Ahead, Real Estate ABS, A Maturing Market Should Offer Greater Stability*, December 21, 2000
- *Merrill Lynch Fixed Income Strategy: ABS Product Analysis, 2001 Outlook for Consumer Credit*, December 19, 2000
- *The Yearbook of Fixed Income Investing 1995: The Fixed Income Analysts Society*, John D. Finnerty (Editor), Martin S. Fridson (Editor), Daniel Castro (Contributor), Chapter 1: *Recent Developments in the Market for Asset-Backed Securities*, Irwin Professional Publishing, The McGraw-Hill Companies

**Periodic Publications During Dan's tenure at Merrill Lynch (1991-2004):**

- Weekly Contributor to *Merrill Lynch Fixed Income Weekly*
- Monthly contributor to *Merrill Lynch: The Mortgage Investor*
- Monthly publisher/author of *Merrill Lynch: The ABStract*
- Monthly publisher/author of *Merrill Lynch: Structured Credit Brief*
- Monthly publisher/author of *Merrill Lynch CDO Surveillance Update*
- Weekly publisher/author of *Merrill Lynch Structured Finance Market Update*

(6)  2006  Tax Reimbursements from Taxing Authority and Mission Title for N ALANIS Tax Overpayment

(7)  2006  HomEq Tax Payment $2,742.31 for N ALANIS

(8)  10.01.06  *Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3 under Pooling and Servicing Agreement Dated as of October 1, 2006*

(9)  10.30.06  *Prospectus Supplement dated October 30, 2006 (File No. 333-130543) (Securitized Asset Backed Receivables LLC Trust Mortgage Pass-Through Certificates, Series 2006-NC3) (https://www.sec.gov/Archives/edgar/data/1378964/000091412106003360/0000914121-06-003360.txt)*

(10)  10.31.06  Legality Opinion of Cadwalader, Wickersham & Taft LLP, dated October 31, 2006 http://www.sec.gov/Archives/edgar/containers/fix270/1378964/0000914121-06-003366.txt

(11)  2007-  UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE – *In re New Century TRS Holdings, Inc Case No. 07-10416 (KJC) (Liquidation Bankruptcy Proceedings)*

(12)  2008-2011  NANCY ALANIS 2008-2011 Mortgage, Tax, Insurance Payments

(13)  10.16.17  HOMEQ Default Notices to Alanis

(14)  05.16.08  HOMEQ Default Notices to Alanis

(15)  05.13.08  TELEWIRE from HomEq Servicing to N ALANIS

(16)  08.12.08  TELEWIRE from HomEq Servicing to N ALANIS

(17)       HomEq Payment History for Nancy Alanis

(18)  07.07.08  HOMEQ Default Notices to Alanis

(19)  2008/2010  Tax Delinquency Notices from HomEq Servicing to N ALANIS

(20)  11.11.08  N ALANIS correspondence to HomEq

(21)  12.12.08  N ALANIS correspondence to HomEq

(22)  12.16.08  HOMEQ Default Notices to Alanis

(23)  03.05.09  HOMEQ Default Notices to Alanis

(24)  04.27.09  Federal Reserve Letter To HOMEQ (Wells Fargo Bates Stamped #00120)

(25)  04.30.09  HOMEQ Letter to WELLS FARGO (Wells Fargo Bates #00127-00128)

(26)  07.20.09  N ALANIS correspondence to HomEq (cease harassing calls)

(27)  08.21.09  HomEq correspondence to N ALANIS (will cease harassing calls)

(28) 09.04.09 E-Mail From HOMEQ Rep. (Wells Fargo Bates #00258)

(29) 10.30.09 HOMEQ letter to Federal Reserve
(Wells Fargo Bates Stamped #00196-00202)

(30) 04.21.10 HomEq correspondence to N ALANIS (Foreclosure Action)

(31) 05.10.10 Notice Of Substitute Trustees Sale
(Foreclosure scheduled for 6.1.10)

(32) 08.11.10 HomEq correspondence to N ALANIS

(33) 09.13.10 OCWEN correspondence to N ALANIS

(34) 09.19.10 N ALANIS correspondence to OCWEN

(35) 10.13.10 Loren Peters, atty correspondence to OCWEN

(36) 11.04.10 OCWEN FINANCIAL CORPORATION
*Ocwen Financial Corporation Announces Third Quarter 2010 Financial Results*
http://shareholders.ocwen.com/releasedetail.cfm?ReleaseID=585548

(37) 12.21.10 Loren Peters, atty correspondence to OCWEN

(38) 12.21.10 Loren Peters, atty correspondence to HomEq

(39) 01.13.11 MACKIE WOLF ZIENTZ & MANN, PC corr to N ALANIS

(40) 02.02.11 Appointment of Substitute Trustee

(41) 02.02.11 Transfer of Lien

(42) 02.03.11 Loren Peters correspondence to MACKIE WOLF ZIENTZ & MANN, PC

(43) 02.07.11 Notice Of Foreclosure Sale

(44) 03.08.11 Rule 11 Agreement between Loren Peters and Jeff Hiller

(45) 04.29.11 Rule 11 Agreement between Jeff Hiller and Brian Trenz

(46) 05.06.11 Order Granting Plaintiff's Default Judgment

(47) 08.25.11 Secretary Of State Certificate Of No Record

(48) 09.07.11 OCWEN Correspondence to NK ALANIS

(49) HOMEQ spreadsheet for Alanis
(Wells Fargo Bates Stamped #00203-00204)

(50) 02.24.12 WELLS FARGO Home Mortgage Foreclosure Attorney Procedure Manual

(51) 03.22.12 ALANIS Discovery Requests

(52) 03.22.12 Defendant April 23, 2012 Responses To Discovery

(53) 03.03.14 OCWEN FINANCIAL CORPORATION
2013 FORM 10-K ANNUAL REPORT
http://shareholders.ocwen.com/secfiling.cfm?filingID=1445305-14-799&CIK=873860

(54) 03.12.14 NEW YORK POST NEWSPAPER PUBLICATION:
*WELLS FARGO Made Up On-Demand Foreclosure Papers Plan: Court Filing Charges*
http://nypost.com/2014/03/12/wells-fargo-made-up-on-demand-foreclosure-papers-plan-court-filing-charges/

(55) 03.17.14 THE WASHINGTON POST NEWSPAPER PUBLICATION:
*WELLS FARGO Foreclosure Manual Under Fire*
http://www.washingtonpost.com/business/economy/wells-fargo-foreclosure-manual-under-fire/2014/03/17/25cd383c-ae00-11e3-96dc-d6ea14c099f9_story.html

(56) 05.28.14 MACKIE WOLF ZIENTZ & MANN Corr.
*Notice Of Rescission*

(57) WELLS FARGO "Bates Stamped" Loan Record Entries
(00960, 01065, 01068, 01072)

(58) 10.01.14 *Declaration Of GINA FEEZER*

(59) 10.21.14 *Affidavit Of GINA FEEZER with attached Exhibits*

(60) 01.10.15 *Affidavit of Katherine Ortwerth with attached Exhibits*

(61) 01.28.15 UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK, *In re:* Cynthia Carrsow-Franklin, Debtor, Case No. 10-20010 (RDD)
http://www.nysb.uscourts.gov/sites/default/files/opinions/198939_109_opinion.pdf

(62) 03.26.15 Defendants *Supplemental* Discovery (ALANIS Note Indorsed In Blank)

(63) 04.16.15 *Plaintiff's Verified Sixth Amended Original Petition And Application For Injunctive Relief*

(64) 05.04.15 May 4, 2015 Transcript Hearing (Judge Arteaga)

<DOCUMENT>
<TYPE>EX-4
<SEQUENCE>3
<FILENAME>se5949803-ex4.txt
<DESCRIPTION>POOLING AND SERVICING AGREEMENT
<TEXT>

EXHIBIT 4

===============================================================================

SECURITIZED ASSET BACKED RECEIVABLES LLC,
Depositor,

HOMEQ SERVICING CORPORATION,
Servicer,

NC CAPITAL CORPORATION,
Responsible Party,

WELLS FARGO BANK, NATIONAL ASSOCIATION,
Trustee

and

DEUTSCHE BANK NATIONAL TRUST COMPANY,
Custodian

---

POOLING AND SERVICING AGREEMENT

Dated as of October 1, 2006

---

SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3

MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-NC3

===============================================================================

Ex-B

<PAGE>

TABLE OF CONTENTS

ARTICLE I

DEFINITIONS

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

Section 2.01 Conveyance of Mortgage Loans....................................
Section 2.02 Acceptance by the Trustee of the Mortgage Loans..............
Section 2.03 Representations, Warranties and Covenants of the Responsible Party and the Servicer; Remedies for Breaches of Representations and Warranties with Respect to the Mortgage Loans.............................................................
Section 2.04 [Reserved].......................................................
Section 2.05 Execution and Delivery of Certificates.......................
Section 2.06 REMIC Matters....................................................
Section 2.07 Representations and Warranties of the Depositor.............

ARTICLE III

ADMINISTRATION AND SERVICING
OF MORTGAGE LOANS

Section 3.01 Servicer to Service Mortgage Loans..........................
Section 3.02 Subservicing Agreements between the Servicer and Subservicers
Section 3.03 Successor Subservicers.........................................
Section 3.04 Liability of the Servicer........................................
Section 3.05 No Contractual Relationship between Subservicers and the Trustee..........................................................
Section 3.06 Assumption or Termination of Subservicing Agreements by Trustee..........................................................
Section 3.07 Collection of Certain Mortgage Loan Payments................
Section 3.08 Subservicing Accounts..........................................
Section 3.09 Collection of Taxes, Assessments and Similar Items; Escrow Accounts.........................................................
Section 3.10 Collection Account...............................................
Section 3.11 Withdrawals from the Collection Account.....................
Section 3.12 Investment of Funds in the Collection Account, Escrow Accounts and the Distribution Account........................
Section 3.13 Maintenance of Hazard Insurance and Errors and Omissions and Fidelity Coverage..............................................
Section 3.14 Enforcement of Due-On-Sale Clauses; Assumption Agreements....
Section 3.15 Realization upon Defaulted Mortgage Loans...................
Section 3.16 Release of Mortgage Files........................................
Section 3.17 Title, Conservation and Disposition of REO Property..........
Section 3.18 Notification of Adjustments......................................
Section 3.19 Access to Certain Documentation and Information Regarding the Mortgage Loans.................................................
Section 3.20 Documents, Records and Funds in Possession of the Servicer to

Be Held for the Trustee....................................
Section 3.21 Servicing Compensation....................................
Section 3.22 Annual Statement as to Compliance....................................
Section 3.23 Annual Reports on Assessment of Compliance with Servicing Criteria; Annual Independent Public Accountants' Attestation Report....................................
Section 3.24 Trustee to Act as Servicer....................................
Section 3.25 Compensating Interest....................................
Section 3.26 Credit Reporting; Gramm-Leach-Bliley Act....................................
Section 3.27 PMI Policy; Claims Under the PMI Policy....................................
Section 3.28 PMI Insurer's Fees. On each Distribution Date, prior to distributions being made on the Certificates in accordance with the priorities set forth in Section 3.11, the Servicer shall withdraw from the Collection Account and remit to the PMI Insurer the PMI Insurer Fee due on such Distribution Date....................................

ARTICLE IV

DISTRIBUTIONS AND
ADVANCES BY THE SERVICER

Section 4.01 Advances....................................
Section 4.02 Priorities of Distribution....................................
Section 4.03 Monthly Statements to Certificateholders....................................
Section 4.04 Certain Matters Relating to the Determination of LIBOR.......
Section 4.05 Allocation of Applied Realized Loss Amounts....................................
Section 4.06 Supplemental Interest Account....................................
Section 4.07 Supplemental Float Account....................................

ARTICLE V

THE CERTIFICATES

Section 5.01 The Certificates....................................
Section 5.02 Certificate Register; Registration of Transfer and Exchange of Certificates....................................
Section 5.03 Mutilated, Destroyed, Lost or Stolen Certificates....................................
Section 5.04 Persons Deemed Owners....................................
Section 5.05 Access to List of Certificateholders' Names and Addresses....
Section 5.06 Maintenance of Office or Agency....................................

ARTICLE VI

THE DEPOSITOR AND THE SERVICER

Section 6.01 Respective Liabilities of the Depositor and the Servicer......
Section 6.02 Merger or Consolidation of the Depositor or the Servicer......
Section 6.03 Limitation on Liability of the Depositor, the Servicer and Others....................................
Section 6.04 Limitation on Resignation of the Servicer....................................
Section 6.05 Additional Indemnification by the Servicer; Third Party Claims....................................

ARTICLE VII

DEFAULT

Section 7.01 Events of Default....................

Section 7.02 Trustee to Act; Appointment of Successor....................

Section 7.03 Notification to Certificateholders....................

ARTICLE VIII

CONCERNING THE TRUSTEE AND THE CUSTODIAN

Section 8.01 Duties of the Trustee....................

Section 8.02 Certain Matters Affecting the Custodian and the Trustee......

Section 8.03 Trustee and Custodian Not Liable for Certificates or Mortgage Loans....................

Section 8.04 Trustee May Own Certificates....................

Section 8.05 Trustee's and Custodian's Fees and Expenses....................

Section 8.06 Eligibility Requirements for the Trustee....................

Section 8.07 Resignation and Removal of the Trustee....................

Section 8.08 Successor Trustee....................

Section 8.09 Merger or Consolidation of the Trustee....................

Section 8.10 Appointment of Co-Trustee or Separate Trustee....................

Section 8.11 Tax Matters....................

Section 8.12 Periodic Filings....................

Section 8.13 Tax Classification of the Excess Reserve Fund Account, the Supplemental Interest Account, the Interest Rate Swap Agreement and the Cap Agreement....................

Section 8.14 Custodial Responsibilities....................

Section 8.15 Limitations on Custodial Responsibilities....................

ARTICLE IX

TERMINATION

Section 9.01 Termination upon Liquidation or Purchase of the Mortgage Loans....................

Section 9.02 Final Distribution on the Certificates....................

Section 9.03 Additional Termination Requirements....................

ARTICLE X

MISCELLANEOUS PROVISIONS

Section 10.01 Amendment....................

Section 10.02 Recordation of Agreement; Counterparts....................

Section 10.03 Governing Law....................

Section 10.04 Intention of Parties....................

Section 10.05 Notices....................

Section 10.06 Severability of Provisions....................

Section 10.07 Limitation on Rights of Certificateholders....................

Section 10.08 Inspection and Audit Rights....................

Section 10.09 Certificates Nonassessable and Fully Paid....................

Section 10.10 Assignment; Sales; Advance Facilities........................
Section 10.11 Rule of Construction.........................................
Section 10.12 Waiver of Jury Trial.........................................
Section 10.13 Third Party Rights...........................................
Section 10.14 Regulation AB Compliance; Intent of the Parties;
Reasonableness.............................................................

<PAGE>

SCHEDULES

Schedule I Mortgage Loan Schedule
Schedule II Representations and Warranties of the Servicer
Schedule III Representations and Warranties of NC Capital as to the NC Capital Mortgage Loans
Schedule IV Representation and Warranties of NC Capital as to NC Capital
Schedule V Representations and Warranties of the Depositor as to the Mortgage Loans
Schedule VI Representations and Warranties of the Custodian

EXHIBITS

Exhibit A Form of Class A, Class M and Class B Certificates
Exhibit B Form of Class P Certificate
Exhibit C-1 Form of Class R-I Certificate
Exhibit C-2 Form of Class R-II Certificate
Exhibit D Form of Class X Certificate
Exhibit E Form of Initial Certification of Custodian
Exhibit F Form of Document Certification and Exception Report of Custodian
Exhibit G Form of Residual Transfer Affidavit
Exhibit H Form of Transferor Certificate
Exhibit I Form of Rule 144A Letter
Exhibit J Form of Request for Release
Exhibit K Form of Contents for Each Mortgage File
Exhibit L Form of Certification to be provided with Form 10-K
Exhibit M Form of Trustee's Certification to be provided to Depositor
Exhibit N Form of Servicer's Certification to be provided to Depositor
Exhibit O Sponsor Representation Letter
Exhibit P Servicing Criteria
Exhibit Q Additional Form 10-D Disclosure
Exhibit R Additional Form 10-K Disclosure
Exhibit S Form 8-K Disclosure Information
Exhibit T Interest Rate Swap Agreement
Exhibit U Cap Agreement
Exhibit V Additional Disclosure Notification
Exhibit W PMI Policy
Exhibit X PMI Commitment Letter

<PAGE>

THIS POOLING AND SERVICING AGREEMENT, dated as of October 1, 2006, among SECURITIZED ASSET BACKED RECEIVABLES LLC, a Delaware limited liability

company, as depositor (the "Depositor"), HOMEQ SERVICING CORPORATION, a New Jersey corporation, as servicer (the "Servicer"), NC CAPITAL CORPORATION, a California corporation, as responsible party (the "Responsible Party"), WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and DEUTSCHE BANK NATIONAL TRUST COMPANY, a national banking association, as custodian (the "Custodian").

W I T N E S S E T H:

In consideration of the mutual agreements herein contained, the parties hereto agree as follows:

PRELIMINARY STATEMENT

The Trustee shall elect that four segregated asset pools within the Trust Fund (exclusive of (i) the Prepayment Charges, (ii) the Interest Rate Swap Agreement and the Cap Agreement, (iii) the Supplemental Interest Account, (iv) the Excess Reserve Fund Account, and (v) the right of the LIBOR Certificates to receive Basis Risk Carry Forward Amounts and, without duplication, Upper Tier Carry Forward Amounts, subject to the obligation to pay Class IO Shortfalls) be treated for federal income tax purposes as comprising four REMICs (each, a "Trust REMIC" or, in the alternative, Pooling Tier REMIC-1, Pooling Tier REMIC-2, the Lower Tier REMIC and the Upper Tier REMIC, respectively). Each Class of Certificates (other than the Class P Certificates and the Residual Certificates), other than the right of each Class of LIBOR Certificates to receive Basis Risk Carry Forward Amounts and, without duplication, Upper Tier Carry Forward Amounts and the obligation to pay Class IO Shortfalls and the right of the Class X Certificates to receive payments from the Interest Rate Swap Agreement, the Cap Agreement and the Class IO Shortfalls, represents ownership of a regular interest in the Upper Tier REMIC for purposes of the REMIC Provisions. The Class R-I Certificates represent ownership of the sole class of residual interest in Pooling Tier REMIC-1 for purposes of the REMIC Provisions. The Class R-II Certificates represent ownership of the sole class of residual interest in each of Pooling Tier REMIC-2, the Lower Tier REMIC and the Upper Tier REMIC for purposes of the REMIC Provisions. The Startup Day for each Trust REMIC is the Closing Date. The latest possible maturity date for each regular interest is the latest date referenced in Section 2.06.

The Upper Tier REMIC shall hold as assets the several classes of uncertificated Lower Tier REMIC Regular Interests, set out below. The Lower Tier REMIC shall hold as assets the several classes of uncertificated Pooling Tier REMIC-2 Regular Interests. Pooling Tier REMIC-2 shall hold as assets the several classes of uncertificated Pooling Tier REMIC-1 Regular Interests. Pooling Tier REMIC-1 shall hold as assets the assets of the Trust Fund (exclusive of (i) the Prepayment Premiums, (ii) the Interest Rate Swap Agreement and the Cap

U.S. Person: (i) A citizen or resident of the United States; (ii) a corporation (or entity treated as a corporation for tax purposes) created or organized in the United States or under the laws of the United States or of any State thereof, including, for this purpose, the District of Columbia; (iii) a partnership (or entity treated as a partnership for tax purposes) organized in the United States or under the laws of the United States or of any State thereof, including, for this purpose, the District of Columbia (unless provided otherwise by future Treasury regulations); (iv) an estate whose income is includible in gross income for United States income tax purposes regardless of its source; or (v) a trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have authority to control substantial decisions of the trust. Notwithstanding the last clause of the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, may elect to continue to be U.S. Persons.

Voting Rights: The portion of the voting rights of all of the Certificates which is allocated to any Certificate. As of any date of determination, (a) 1% of all Voting Rights shall be allocated to the Class X Certificates, if any (such Voting Rights to be allocated among the Holders of Certificates of each such Class in accordance with their respective Percentage Interests), (b) 1% of all Voting Rights shall be allocated to the Class P Certificates, if any, and (c) the remaining Voting Rights shall be allocated among Holders of the remaining Classes of Certificates in proportion to the Certificate Balances of their respective Certificates on such date.

## ARTICLE II

## CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES

Section 2.01 Conveyance of Mortgage Loans. (a) The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund. On the Closing Date, the Depositor shall pay, without any right of reimbursement from the Trust, to the Cap Provider the "Fixed Amount" (as defined in the related Cap Agreement) due and payable to the Cap Provider pursuant to the terms of each Cap Agreement.

(b) In connection with the transfer and assignment of each Mortgage

Loan, the Depositor has delivered or caused to be delivered to the Custodian for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) the original Mortgage Note bearing all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of ______________, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee. To the extent that there is no room on the face of the Mortgage Notes for endorsements, the endorsement may be contained on an allonge unless state law does not so allow and the Custodian is so advised in writing by the Responsible Party;

(ii) the original of any guarantee executed in connection with the Mortgage Note;

(iii) the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording. If, in connection with any Mortgage Loan, the original Mortgage cannot be delivered with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the Responsible Party shall deliver or cause to be delivered to the Custodian a photocopy of such Mortgage, together with (A) in the case of a delay caused by the public recording office, an Officer's Certificate of the Responsible Party (or certified by the title company, escrow agent, or closing attorney) stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Responsible Party; or (B) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

(iv) the originals of all assumption, modification, consolidation and extension agreements, if any, with evidence of recording thereon;

(v) the original Assignment of Mortgage for each Mortgage Loan endorsed in blank (except with respect to MERS Designated Loans);

(vi) the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee (or, in the case of a MERS Designated Loan, MERS) with evidence of recording thereon, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of Mortgage, the Responsible Party shall deliver or cause to be delivered a photocopy of such intervening assignment, together with (A) in the case of a delay caused by the public recording office, an Officer's Certificate of the Responsible Party or a certificate from an escrow company, a title company or a closing attorney stating that such intervening assignment of Mortgage has been dispatched to the appropriate public recording office for recordation and that such original recorded intervening assignment of Mortgage or a copy of such intervening assignment of Mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of Mortgage will be promptly delivered to the Custodian upon receipt thereof by the Responsible Party; or (B) in the case of an intervening assignment where a public recording office retains the original recorded intervening assignment or in the case where an intervening assignment is lost after recordation in a public recording office, a copy of such intervening assignment certified by such public recording office to be a true and complete copy of the original recorded intervening assignment;

(vii) the original or a copy of the mortgagee title insurance policy or, in the event such title policy is unavailable, a certified true copy of the related policy binder or commitment for title certified to be true and complete by the title insurance company;

(viii) the original or, if unavailable, a copy of any security

(www) Simple Interest Mortgage Loans. With respect to each Mortgage Loan that is a simple interest Mortgage Loan, the Mortgage Loan is identified on the related Mortgage Loan Schedule as a simple interest Mortgage Loan, the Mortgage Loan is required to be serviced as a simple interest mortgage loan pursuant to the terms of the related Mortgage Note, and the servicing and collection practices used in connection therewith have been in accordance with legal, proper, prudent and customary practices for servicing simple interest mortgage loans;

(xxx) 100% of Purchase Financed. No Mortgage Loan is a "manufactured housing loan" pursuant to the New Jersey Act, and one hundred percent of the amount financed of any purchase money second lien Mortgage Loan subject to the New Jersey Act was used for the purchase of the related Mortgaged Property;

(yyy) No Points or Fees on Prepayment. No points, fees or similar charges are required to be reimbursed to a Mortgagor upon a prepayment in full of the related Mortgage Loan; and

(zzz) Points and Fees. No Mortgagor was charged Points and Fees (whether or not financed) in excess of the requirements of the state in which the Mortgaged Property is located. This representation and warranty is a Deemed Material Breach Representation.

<PAGE>

SCHEDULE IV

Mortgage Pass-Through Certificates,
Series 2006-NC3

Representation and Warranties of NC Capital as to NC Capital

NC Capital hereby makes the representations and warranties set forth in this Schedule IV to the Depositor and the Trustee, as of the Closing Date. Capitalized terms used in this Schedule but not defined in this Schedule have the meanings given to them in the NC Capital Purchase Agreement.

(a) Due Organization and Authority. NC Capital is a corporation duly organized, validly existing, and in good standing under the laws of the state of California and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in the states where the Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by NC Capital. NC Capital has corporate power and authority to execute and deliver this

Agreement and to perform its obligations hereunder; the execution, delivery and
performance of this Agreement (including all instruments of transfer to be
delivered pursuant to this Agreement) by NC Capital and the consummation of the
transactions contemplated hereby have been duly and validly authorized; this
Agreement has been duly executed and delivered and constitutes the valid, legal,
binding and enforceable obligation of NC Capital, except as enforceability may
be limited by (i) bankruptcy, insolvency, liquidation, receivership, moratorium,
reorganization or other similar laws affecting the enforcement of the rights of
creditors and (ii) general principles of equity, whether enforcement is sought
in a proceeding in equity or at law. All requisite corporate action has been
taken by NC Capital to make this Agreement valid and binding upon NC Capital in
accordance with its terms;

(b) No Consent Required. No consent, approval, authorization or
order is required for the transactions contemplated by this Agreement from any
court, governmental agency or body, or federal or state regulatory authority
having jurisdiction over NC Capital is required or, if required, such consent,
approval, authorization or order has been or will, prior to the related Closing
Date, be obtained;

(c) Ordinary Course of Business. The consummation of the
transactions contemplated by this Agreement are in the ordinary course of
business of NC Capital, and the transfer, assignment and conveyance of the
Mortgage Notes and the Mortgages by NC Capital pursuant to this Agreement are
not subject to the bulk transfer or any similar statutory provisions in effect
in any applicable jurisdiction;

(d) No Conflicts. Neither the execution and delivery of this
Agreement, the acquisition or origination of the Mortgage Loans by NC Capital,
the sale of the Mortgage Loans to the Purchaser, the consummation of the
transactions contemplated hereby, nor the fulfillment of or compliance with the
terms and conditions of this Agreement, will conflict with or result in a breach
of any of the terms, conditions or provisions of NC Capital's charter, by-laws
or other organizational documents or any legal restriction or any agreement or
instrument to which NC Capital is now a party or by which it is bound, or
constitute a default or result in an acceleration under any of the foregoing, or
result in the violation of any law, rule, regulation, order, judgment or decree
to which NC Capital or its property is subject, or result in the creation or

imposition of any lien, charge or encumbrance that would have an adverse effect
upon any of its properties pursuant to the terms of any mortgage, contract, deed
of trust or other instrument, or impair the ability of the Purchaser to realize
on the Mortgage Loans, impair the value of the Mortgage Loans, or impair the
ability of the Purchaser to realize the full amount of any insurance benefits
accruing pursuant to this Agreement;

(e) Ability to Service. Originator has the facilities, procedures,
and experienced personnel necessary for the sound servicing of mortgage loans of
the same type as the Mortgage Loans. The Originator is duly qualified, licensed,
registered and otherwise authorized under all applicable federal, state and
local laws, and regulations, if applicable, meets the minimum capital
requirements set forth by HUD, the OTS, the OCC or the FDIC, if applicable, and
is in good standing to enforce, originate, sell mortgage loans to, and service
mortgage loans in each jurisdiction wherein the Mortgaged Properties are
located;

(f) Reasonable Servicing Fee. The Originator acknowledges and agrees
that the Servicing Fee represents reasonable compensation for performing such
services and that the entire Servicing Fee shall be treated by the Originator,
for accounting and tax purposes, as compensation for the servicing and
administration of the Mortgage Loans pursuant to this Agreement and the Interim
Servicing Agreement;

(g) No Litigation Pending. There is no action, suit, proceeding or
investigation pending or, to NC Capital's knowledge, threatened against NC
Capital, before any court, administrative agency or other tribunal asserting the
invalidity of this Agreement, seeking to prevent the consummation of any of the
transactions contemplated by this Agreement or which, either in any one instance
or in the aggregate, may result in any material adverse change in the business,
operations, financial condition, properties or assets of NC Capital, or in any
material impairment of the right or ability of NC Capital to carry on its
business substantially as now conducted, or in any material liability on the
part of NC Capital, or which would draw into question the validity of this
Agreement or the Mortgage Loans or of any action taken or to be taken in
connection with the obligations of NC Capital contemplated herein, or which
would be likely to impair materially the ability of NC Capital to perform under
the terms of this Agreement;

(h) Ability to Perform; Solvency. NC Capital does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. NC Capital is solvent and the sale of the Mortgage Loans will not cause NC Capital to become insolvent. The sale of the Mortgage Loans is not undertaken with the intent to hinder, delay or defraud any of Seller's creditors;

(i) Origination. The Originator's decision to originate any mortgage loan or to deny any mortgage loan application is an independent decision based upon the Originator's Underwriting Guidelines, and is in no way made as a result of Purchaser's decision to purchase, or not to purchase, or the price Purchaser may offer to pay for, any such mortgage loan, if originated;

(j) Anti-Money Laundering Laws. NC Capital has complied with all applicable anti-money laundering laws, regulations and executive orders, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); NC Capital has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws. Additionally, no Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the "Executive Order") or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of Treasury (the "OFAC Regulations") or in violation of the Executive Order or the OFAC Regulations; and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations;

(k) Financial Statements. NC Capital has delivered to the Purchaser financial statements as to its last three complete fiscal years and any later quarter ended more than 60 days prior to the execution of this Agreement. All such financial statements fairly present the pertinent results of operations and changes in financial position for each of such periods and the financial position at the end of each such period of NC Capital and its subsidiaries and have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved, except as set forth in the

notes thereto. In addition, NC Capital has delivered information as to its loan
gain and loss experience in respect of foreclosures and its loan delinquency
experience for the immediately preceding three-year period, in each case with
respect to mortgage loans owned by it and such mortgage loans serviced for
others during such period, and all such information so delivered shall be true
and correct in all material respects. There has been no change in the business,
operations, financial condition, properties or assets of NC Capital since the
date of NC Capital's financial statements that would have a material adverse
effect on its ability to perform its obligations under this Agreement. NC
Capital has completed any forms requested by the Purchaser in a timely manner
and in accordance with the provided instructions;

       (l) Selection Process. The Mortgage Loans were selected from among
the outstanding one- to four-family mortgage loans in NC Capital's portfolio at
the related Closing Date as to which the representations and warranties set
forth in Schedule III could be made and such selection was not made in a manner
so as to affect adversely the interests of the Purchaser;

       (m) Delivery to the Custodian. The Mortgage Note, the Mortgage, the
Assignment of Mortgage and any other documents required to be delivered with
respect to each Mortgage Loan pursuant to the Pooling and Servicing Agreement,
shall be delivered to the Custodian all in compliance with the specific
requirements of the Pooling and Servicing Agreement. With respect to each
Mortgage Loan, NC Capital will be in possession of a complete Mortgage File in
compliance with Exhibit A to the Purchase Agreement, except for such documents
as will be delivered to the Custodian;

       (n) Mortgage Loan Characteristics. The characteristics of the
related Mortgage Loan Package are as set forth on the description of the pool
characteristics for the applicable Mortgage Loan Package delivered pursuant to
Article XI to the Purchase Agreement on the related Closing Date in the form
attached as Exhibit B to each related Assignment and Conveyance Agreement;

       (o) No Untrue Information. Neither this Agreement nor any
information, statement, tape, diskette, report, form, or other document
furnished or to be furnished pursuant to this Agreement or any Reconstitution
Agreement or in connection with the transactions contemplated hereby (including
any Securitization Transaction or Whole Loan Transfer) contains or will contain
any untrue statement of fact or omits or will omit to state a fact necessary to
make the statements contained herein or therein not misleading;

       (p) No Brokers. NC Capital has not dealt with any broker, investment

banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans;

(q) Sale Treatment. NC Capital intends to reflect the transfer of the Mortgage Loans as a sale on the books and records of NC Capital and NC Capital has determined that the disposition of the Mortgage Loans pursuant to this Agreement will be afforded sale treatment for tax and accounting purposes;

(r) Owner of Record. NC Capital is the owner of record of each Mortgage and the indebtedness evidenced by each Mortgage Note, except for the Assignments of Mortgage which have been sent for recording, and upon recordation
NC Capital will be the owner of record of each Mortgage and the indebtedness evidenced by each Mortgage Note, and upon the sale of the Mortgage Loans to the
Purchaser, NC Capital will retain the Mortgage Files with respect thereto in trust only for the purpose of servicing and supervising the servicing of each Mortgage Loan;

(s) Reasonable Purchase Price. The consideration received by NC Capital upon the sale of the Mortgage Loans under this Agreement constitutes fair consideration and reasonably equivalent value for the Mortgage Loans;

(t) Seasoned Mortgaged Loans. NC Capital currently operates or actively participates in an on-going and active program or business (A) to originate Mortgages, (B) to make periodic purchases of Mortgage Loans from originators or other sellers, or (C) to issue or purchase securities or bonds supported by the Mortgage Loans, with a portion of the proceeds generated by such program or business being used to purchase or originate Mortgage Loans made
to Mortgagors who are: (1) low-income families (families with incomes of 80% or
less of area median income), living in low-income areas (a census tract or block
numbering area in which the median income does not exceed 80% of the area median
income) or (2) very low-income families (families with incomes of 60% or less of
area median income). This representation and warranty is a Deemed Material and
Adverse Representation; and

(u) Nonpetition. NC Capital shall not institute against, or join any
other Person in instituting against, the Purchaser any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law, for one year and a day after the related Closing Date.

<PAGE>

SCHEDULE V

Mortgage Pass-Through Certificates,
Series 2006-NC3

take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Certificateholders concerning surrender of their Certificates, and the cost thereof shall be paid out of the funds and other assets which remain a part of the Trust Fund. If within one year after the second notice all Certificates shall not have been surrendered for cancellation, the Residual Certificateholders shall be entitled to all unclaimed funds and other assets of the Trust Fund which remain subject hereto.

Section 9.03 Additional Termination Requirements. In the event the Servicer exercises its purchase option with respect to the Mortgage Loans as provided in Section 9.01, the Trust Fund shall be terminated in accordance with the following additional requirements, unless the Trustee has been supplied with an Opinion of Counsel, at the expense of the Servicer, to the effect that the failure to comply with the requirements of this Section 9.03 will not (i) result in the imposition of taxes on "prohibited transactions" on any Trust REMIC as defined in Section 860F of the Code or (ii) cause any Trust REMIC to fail to qualify as a REMIC at any time that any Certificates are Outstanding:

(a) The Trustee shall sell all of the assets of the Trust Fund to the Servicer, and, within 90 days of such sale, shall distribute to the Certificateholders the proceeds of such sale in complete liquidation of each of the Trust REMICs; and

(b) The Trustee shall attach a statement to the final federal income tax return for each of the Trust REMICs stating that pursuant to Treasury Regulations Section 1.860F-1, the first day of the 90-day liquidation period for each such REMIC was the date on which the Trustee sold the assets of the Trust Fund to the Servicer.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

Section 10.01 Amendment. This Agreement may be amended from time to time by the Depositor, the Responsible Party, the Servicer, the Custodian and the Trustee, without the consent of any of the Certificateholders (i) to cure any ambiguity or mistake, (ii) to correct any defective provision herein or to supplement any provision herein which may be inconsistent with any other provision herein, (iii) to add to the duties of the Depositor, the Custodian or the Servicer, (iv) to add any other provisions with respect to matters or questions arising hereunder or (v) to modify, alter, amend, add to or rescind any of the terms or provisions contained in this Agreement; provided, that any action pursuant to clause (iv) or (v) above shall not, as evidenced by an Opinion of Counsel (which Opinion of Counsel shall not be an expense of the

Custodian, the Trustee or the Trust Fund), adversely affect in any material respect the interests of any Certificateholder; provided, further, that any such action pursuant to clause (iv) or (v) above shall not be deemed to adversely affect in any material respect the interests of the Certificateholders if the Person requesting the amendment obtains a letter from each Rating Agency stating that the amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates; it being understood and agreed that any such letter in and of itself will not represent a determination as to the materiality of any such amendment and will represent a determination only as to the credit issues affecting any such rating. The Trustee, the Depositor, the Responsible Party, the Custodian and the Servicer also may at any time and from time to time amend this Agreement, but without the consent of the Certificateholders to modify, eliminate or add to any of its provisions to such extent as shall be necessary or helpful to (i) maintain the qualification of each Trust REMIC under the Code, (ii) avoid or minimize the risk of the imposition of any tax on any Trust REMIC pursuant to the Code that would be a claim at any time prior to the final redemption of the Certificates or (iii) comply with any other requirements of the Code; provided, that the Trustee has been provided an Opinion of Counsel, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee or the Trust Fund, to the effect that such action is necessary or helpful to, as applicable, (i) maintain such qualification, (ii) avoid or minimize the risk of the imposition of such a tax or (iii) comply with any such requirements of the Code.

This Agreement may also be amended from time to time by the Depositor, the Servicer, the Responsible Party, the Custodian and the Trustee, but with the consent of the Holders of Certificates evidencing Percentage Interests aggregating not less than 66(2)/3% of each Class of Certificates affected thereby for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders of Certificates; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any Certificate without the consent of the Holder of such Certificate, (ii) adversely affect in any material respect the interests of the Holders of any Class of Certificates in a manner other than as described in clause (i), without the consent of the Holders of Certificates of such Class evidencing, as to such Class, Percentage Interests aggregating not

less than 66(2)/3% or (iii) reduce the aforesaid percentages of Certificates the
Holders of which are required to consent to any such amendment, without the
consent of the Holders of all such Certificates then Outstanding.

Notwithstanding any contrary provision of this Agreement, the
Trustee shall not consent to any amendment to this Agreement unless (i) it shall
have first received an Opinion of Counsel, which opinion shall not be an expense
of the Trustee or the Trust Fund, to the effect that such amendment will not
cause the imposition of any tax on any Trust REMIC or the Certificateholders or
cause any such REMIC to fail to qualify as a REMIC or the grantor trust to fail
to qualify as a grantor trust at any time that any Certificates are Outstanding
and (ii) the party seeking such amendment shall have provided written notice to
the Rating Agencies (with a copy of such notice to the Trustee) of such
amendment, stating the provisions of the Agreement to be amended.

Notwithstanding the foregoing provisions of this Section 10.01,
with respect to any amendment that significantly modifies the permitted activities
of the Trustee or the Servicer, any Certificate beneficially owned by the
Depositor shall be deemed not to be Outstanding (and shall not be considered when
determining the percentage of Certificateholders consenting or when calculating
the total number of Certificates entitled to consent) for purposes of
determining if the requisite consents of Certificateholders under this Section
10.01 have been obtained.

Promptly after the execution of any amendment to this Agreement
requiring the consent of Certificateholders, the Trustee shall furnish written
notification of the substance or a copy of such amendment to each
Certificateholder and each Rating Agency.

It shall not be necessary for the consent of Certificateholders
under this Section 10.01 to approve the particular form of any proposed
amendment, but it shall be sufficient if such consent shall approve the
substance thereof. The manner of obtaining such consents and of evidencing the
authorization of the execution thereof by Certificateholders shall be subject to
such reasonable regulations as the Trustee may prescribe.

Nothing in this Agreement shall require the Custodian or the
Trustee to enter into an amendment without receiving an Opinion of Counsel (which
Opinion shall not be an expense of the Custodian, the Trustee or the Trust
Fund), satisfactory to the Trustee that (i) such amendment is permitted and is

not prohibited by this Agreement and that all requirements for amending this Agreement have been complied with and (ii) either (A) the amendment does not adversely affect in any material respect the interests of any Certificateholder
or (B) the conclusion set forth in the immediately preceding clause (A) is not
required to be reached pursuant to this Section 10.01.

Notwithstanding the foregoing, any amendment to this Agreement shall
require the prior written consent of the Swap Provider if such amendment materially and adversely affects the rights or interests of the Swap Provider.

Section 10.02  Recordation of Agreement; Counterparts. This Agreement is subject to recordation in all appropriate public offices for real
property records in all the counties or other comparable jurisdictions in which
any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer at the direction and expense of the Depositor, but only
upon receipt of an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Certificateholders.

For the purpose of facilitating the recordation of this Agreement as
herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall
be deemed to be an original, and such counterparts shall constitute but one and
the same instrument.

Section 10.03 Governing Law. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND
THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 10.04 Intention of Parties. It is the express intent of the
parties hereto that the conveyance (i) of the Mortgage Loans by the Depositor and (ii) of the Trust Fund by the Depositor to the Trustee each be, and be construed as, an absolute sale thereof. It is, further, not the intention of the
parties that such conveyances be deemed a pledge thereof. However, in the event
that, notwithstanding the intent of the parties, such assets are held to be the
property of the Depositor, as the case may be, or if for any other reason this
Agreement is held or deemed to create a security interest in either such assets,
then (i) this Agreement shall be deemed to be a security agreement within the

>

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
KNlPIgMfKLWGFrjSx7lgYPiiOJGpj+dulUicoabXlzRfjK+3kwURIFjvOLGblLy7
UL2T5exVd58SPSaUQkIdiQ==

<SEC-DOCUMENT>0000914121-06-003360.txt : 20061031
<SEC-HEADER>0000914121-06-003360.hdr.sgml : 20061031
<ACCEPTANCE-DATETIME>20061030200138
ACCESSION NUMBER: 0000914121-06-003360
CONFORMED SUBMISSION TYPE: 424B5
PUBLIC DOCUMENT COUNT: 1
FILED AS OF DATE: 20061031
DATE AS OF CHANGE: 20061030

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: Securitized Asset Backed Receivables LLC Trust 2006-NC3
CENTRAL INDEX KEY: 0001378964
STANDARD INDUSTRIAL CLASSIFICATION: ASSET-BACKED SECURITIES [6189]

FILING VALUES:
FORM TYPE: 424B5
SEC ACT: 1933 Act
SEC FILE NUMBER: 333-130543-09
FILM NUMBER: 061173589

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: SECURITIZED ASSET BACKED RECEIVABLES LLC
CENTRAL INDEX KEY: 0001260840
STANDARD INDUSTRIAL CLASSIFICATION: ASSET-BACKED SECURITIES [6189]
IRS NUMBER: 371472598

FILING VALUES:
FORM TYPE: 424B5
SEC ACT: 1933 Act
SEC FILE NUMBER: 333-130543
FILM NUMBER: 061173588

BUSINESS ADDRESS:
STREET 1: 200 PARK AVE.
CITY: NEW YORK
STATE: NY
ZIP: 10166
</SEC-HEADER>
<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>se5885867-424b5.txt
<DESCRIPTION>FORM 424B5
<TEXT>

Filed Pursuant to Rule 424(b)(5)
File No.: 333-130543-09
File No.: 333-130543

(To Prospectus dated October 4, 2006)

PROSPECTUS SUPPLEMENT DATED OCTOBER 30, 2006

$324,265,000
(Approximate)

Securitized Asset Backed Receivables LLC Trust 2006-NC3
Issuing Entity

Securitized Asset Backed Receivables LLC
Depositor

Sutton Funding LLC
Sponsor

HomEq Servicing Corporation
Servicer

Mortgage Pass-Through Certificates, Series 2006-NC3

Ex-C

o Securitized Asset Backed Receivables LLC Trust 2006-NC3 is issuing certificates in 16 or more classes, but is offering only 11 classes through this prospectus supplement.

<TABLE>
<CAPTION>

| Class | Expected Principal Amount (1) | Expected Ratings (S&P/Moody's/Fitch/DBRS) | Pass-Through Rate(2) | Average Life to Call/ Maturity (years)(3)(4) | Principal Payment Window to Call/Maturity(3)(4) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| A-2A | $138,188,000 | AAA/Aaa/AAA/AAA | 1 mo. LIBOR + 0.050% | 1.00 / 1.00 | 11/06 - 08/08 / 11/06 - 08/08 |

| | | | | | |
|---|---|---|---|---|---|
| A-2B | $ 94,015,000 | AAA/Aaa/AAA/AAA | 1 mo. LIBOR + 0.150% | 3.00 / 3.00 | 08/08 - 01/13 / 08/08 - 05/13 |
| A-2C | $ 15,949,000 | AAA/Aaa/AAA/AAA | 1 mo. LIBOR + 0.240% | 6.24 / 9.10 | 01/13 - 01/13 / 05/13 - 07/21 |
| M-1 | $ 19,348,000 | AA+/Aa1/AA+/AA(high) | 1 mo. LIBOR + 0.240% | 3.71 / 3.71 | 03/10 - 10/10 / 03/10 - 10/10 |
| M-2 | $ 18,492,000 | AA/Aa2/AA+/AA | 1 mo. LIBOR + 0.290% | 4.95 / 5.02 | 10/10 - 01/13 / 10/10 - 01/14 |
| M-3 | $ 6,022,000 | AA-/Aa2/AA/AA(low) | 1 mo. LIBOR + 0.320% | 6.24 / 9.39 | 01/13 - 01/13 / 01/14 - 01/19 |
| M-4 | $ 13,976,000 | A/A1/AA-/A | 1 mo. LIBOR + 0.390% | 4.39 / 4.79 | 02/10 - 01/13 / 02/10 - 03/17 |
| M-5 | $ 4,515,000 | A-/A2/A+/A(low) | 1 mo. LIBOR + 0.460% | 4.34 / 4.70 | 01/10 - 01/13 / 01/10 - 03/16 |
| B-1 | $ 4,515,000 | BBB+/A3/A/BBB(high) | 1 mo. LIBOR + 0.800% | 4.34 / 4.67 | 01/10 - 01/13 / 01/10 - 10/15 |
| B-2 | $ 3,870,000 | BBB/A3/A-/BBB(high) | 1 mo. LIBOR + 1.000% | 4.32 / 4.60 | 12/09 - 01/13 / 12/09 - 04/15 |
| B-3 | $ 5,375,000 | BBB-/Baa1/BBB/BBB | 1 mo. LIBOR + 1.950% | 4.31 / 4.53 | 12/09 - 01/13 / 12/09 - 11/14 |

</TABLE>

\- -----------------------

(1) Subject to a variance of plus or minus 5%.

(2) The pass-through rate for each class of certificates will be equal to the sum of one month LIBOR plus a fixed margin, subject to a cap on those pass-through rates as described in this prospectus supplement under "Description of the Certificates--Distributions of Interest and Principal".

(3) Pricing assumes 10% optional clean-up call is exercised.

(4) Based on 100% of the applicable prepayment assumption.

Each class of certificates will receive monthly distributions of interest, principal or both, beginning on November 25, 2006.

Assets of the Issuing Entity--

o Closed end, adjustable- and fixed-rate subprime loans secured by first- or second-lien mortgages or deeds of trust on residential real properties.

Credit Enhancement--

o Subordination of the subordinated certificates to the senior certificates as described in this prospectus supplement under "Description of the Certificates--Distributions of Interest and Principal"; and

o Excess interest and overcollateralization as described in this prospectus supplement under "Description of the Certificates--Overcollateralization Provisions".

Interest Rate Support--

o An interest rate swap agreement with Barclays Bank PLC, as swap provider, for the benefit of the LIBOR certificates as described in this prospectus supplement under "Description of the Certificates--Interest Rate Swap Agreement"; and

o An interest rate cap agreement with Barclays Bank PLC, as cap provider, for the benefit of the LIBOR certificates as described in this prospectus supplement under "Description of the Certificates--Interest Rate Cap Agreement".

\- --------------------------------------------------------------------------

You should consider carefully the risk factors beginning on page S-21 of this prospectus supplement and page 16 in the prospectus.

The certificates will not represent obligations of Securitized Asset Backed Receivables LLC or any of its affiliates. Neither the depositor, the sponsor, nor any of their respective affiliates, will insure or guarantee distributions on the certificates of any series. No governmental agency or any other person will insure the certificates or the collateral securing the certificates.

You should consult with your own advisors to determine if the offered certificates are appropriate investments for you and to determine the applicable legal, tax, regulatory and accounting treatment of the offered certificates.

\- --------------------------------------------------------------------------

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus supplement or the accompanying prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

We will not list the offered certificates on any national securities exchange or on any automated quotation system.

Barclays Capital Inc., the underwriter, will offer the offered certificates from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale plus accrued interest, if any, from the closing date. The proceeds to the depositor from the sale of the offered certificates will be approximately $323,430,506 before deducting expenses. The underwriter's commission will be the difference between the price it pays to the depositor for the offered certificates and the amount it receives from the sale of the offered certificates to the public. The offered certificates will be available for delivery to investors in book entry form through the facilities of The Depository Trust Company, Clearstream Banking, societe anonyme and Euroclear Bank, as operator of the Euroclear System, on or about October 31, 2006.

Barclays Capital

<PAGE>

Table of Contents

<TABLE>
<CAPTION>

Prospectus Supplement Page

<S> <C>

| | |
|---|---|
| Important Notice About Information Presented in this Prospectus Supplement and the Accompanying Prospectus | S-4 |
| European Economic Area | S-5 |
| United Kingdom | S-5 |
| Notice To United Kingdom Investors | S-5 |
| Summary | S-6 |
| Risk Factors | S-21 |
| The Mortgage Loan Pool | S-36 |
| General | S-36 |
| Prepayment Premiums | S-37 |
| Adjustable-Rate Mortgage Loans | S-37 |
| The Index | S-38 |
| Junior Liens | S-38 |
| The Aggregate Mortgage Loans | S-39 |
| The Group I Mortgage Loans | S-40 |
| The Group II Mortgage Loans | S-41 |
| Credit Scores | S-42 |
| Primary Mortgage Insurance | S-42 |
| The Sponsor | S-44 |
| Static Pool Information | S-45 |
| The Depositor | S-46 |
| The Issuing Entity | S-46 |
| The Responsible Party | S-46 |
| General | S-46 |
| Underwriting Guidelines | S-47 |
| The Servicer | S-52 |
| General | S-52 |
| HomEq Servicing Corporation | S-52 |
| HomEq's Delinquency and Foreclosure Experience | S-54 |
| HomEq's Policies and Procedures | S-56 |
| HomEq Prior Securitizations | S-57 |
| The Trustee | S-57 |
| The Custodian | S-58 |
| The PMI Insurer | S-59 |
| The Interest Rate Cap and Swap Provider | S-59 |
| Description of the Certificates | S-59 |
| General | S-59 |
| Book Entry Registration | S-61 |
| Definitive Certificates | S-65 |
| Assignment of the Mortgage Loans | S-65 |
| Delivery of Mortgage Loan Documents | S-65 |
| Representations and Warranties Relating to the Mortgage Loans | S-67 |
| Payments on the Mortgage Loans | S-71 |
| Distributions | S-73 |
| Administration Fees | S-73 |
| Priority of Distributions Among Certificates | S-74 |
| Distributions of Interest and Principal | S-74 |
| Allocation of Principal Payments to Class A Certificates | S-80 |
| Supplemental Interest Account | S-81 |
| Calculation of One-Month LIBOR | S-82 |
| Excess Reserve Fund Account | S-82 |
| Interest Rate Cap Agreement | S-83 |
| Interest Rate Swap Agreement | S-83 |
| Overcollateralization Provisions | S-86 |
| Reports to Certificateholders | S-87 |
| The Pooling and Servicing Agreement | S-89 |
| Subservicers | S-89 |
| Servicing and Trustee Fees and Other Compensation and Payment of Expenses | S-90 |
| P&I Advances and Servicing Advances | S-90 |
| Prepayment Interest Shortfalls | S-91 |
| Servicer Reports | S-92 |
| Collection and Other Servicing Procedures | S-92 |
| Hazard Insurance | S-93 |
| Primary Mortgage Insurance | S-94 |
| Realization Upon Defaulted Mortgage Loans | S-94 |
| Removal and Resignation of the Servicer | S-95 |
| Eligibility Requirements for Trustee; Resignation and Removal of Trustee | S-96 |
| Termination; Optional Clean-up Call | S-97 |
| Certain Matters Regarding the Depositor, the Servicer, the Trustee and the Custodian | S-98 |
| Amendment | S-99 |
| Prepayment and Yield Considerations | S-100 |

<PAGE>

<CAPTION>
<S> <C>

| | |
|---|---|
| Structuring Assumptions | S-111 |
| General | S-121 |
| Defaults | S-121 |
| Prepayment Considerations and Risks | S-121 |
| Overcollateralization Provisions | S-123 |
| Subordinated Certificates | S-124 |
| Effect on Yields Due to Rapid Prepayments | S-124 |
| Weighted Average Lives of the LIBOR Certificates | S-125 |
| Decrement Tables | S-125 |
| Hypothetical Available Funds and Supplemental Interest Rate Cap Table | S-139 |
| Final Scheduled Distribution Date | S-147 |
| Federal Income Tax Considerations | S-147 |
| General | S-147 |
| Taxation of Regular Interests | S-148 |
| Status of the LIBOR Certificates | S-148 |
| The Basis Risk Contract Component | S-149 |
| Other Matters | S-150 |
| State and Local Taxes | S-150 |
| ERISA Considerations | S-150 |

....S-153
....S-153
Legal Investment....S-154
Underwriting....S-154
Legal Matters....S-155
Reports to Certificateholders....S-156
Ratings....I-1
Glossary....II-1
ANNEX I--CERTAIN U.S. FEDERAL INCOME TAX DOCUMENTATION REQUIREMENTS....III-1
ANNEX II--INTEREST RATE CAP SCHEDULE....A-1
ANNEX III--INTEREST RATE SWAP NOTIONAL AMOUNT AMORTIZATION SCHEDULE
SCHEDULE A--COLLATERAL TERM SHEET
</TABLE>

S-3

<PAGE>

Important Notice About Information Presented in this Prospectus Supplement and the Accompanying Prospectus

We provide information about the offered certificates for the series 2006-NC3 in two separate documents that progressively include more detail:

o the accompanying prospectus dated October 4, 2006, which provides general information, some of which may not apply to the series 2006-NC3 certificates.

o this prospectus supplement, which describes the specific terms of the series 2006-NC3 certificates.

Sales of the offered certificates may not be completed unless you have been given the opportunity to receive both this prospectus supplement and the prospectus. You are urged to read both this prospectus supplement and the prospectus in full.

Cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials are included to assist in locating further related discussions. The following table of contents and the table of contents in the accompanying prospectus provide the pages on which these captions are located.

In this prospectus supplement, the terms "depositor", "we", "us" and "our" refer to Securitized Asset Backed Receivables LLC.

All annexes and schedules to this prospectus supplement are a part of this prospectus supplement.

S-4

<PAGE>

EUROPEAN ECONOMIC AREA

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than (euro)43,000,000 and (3) an annual net turnover of more than (euro)50,000,000, as shown in its last annual or consolidated accounts; or

(c) in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

UNITED KINGDOM

The underwriter has represented and agreed that:

(a) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 (the "FSMA")) received by it in connection with the issue or sale of the certificates in circumstances in which Section 21(1) of the FSMA does not apply to the issuer; and

(b) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the certificates in, from or otherwise involving the United Kingdom.

NOTICE TO UNITED KINGDOM INVESTORS

The distribution of this prospectus supplement if made by a person who is not an authorized person under the FSMA, is being made only to, or directed only at persons who (1) are outside the United Kingdom, or (2) have professional experience in matters relating to investments, or (3) are persons falling within Articles 49(2)(a) through (d) ("high net worth companies, unincorporated associations, etc.") or 19 (Investment Professionals) of the Financial Services and Market Act 2000 (Financial Promotion) Order 2005 (all such persons together being referred to as the "Relevant Persons"). This prospectus supplement must not be acted on or relied on by persons who are not Relevant Persons. Any investment or investment activity to which this prospectus supplement relates, including the offered certificates, is available only to Relevant Persons and will be engaged in only with Relevant Persons.

Potential investors in the United Kingdom are advised that all, or most, of the protections afforded by the United Kingdom regulatory system will not apply to an investment in the trust fund and that compensation will not be available under the United Kingdom Financial Services Compensation Scheme.

<PAGE>

SUMMARY

This summary highlights selected information from this prospectus supplement and does not contain all of the information that you need to consider in making your investment decision. You should read this entire prospectus supplement and the accompanying prospectus carefully to understand all of the terms of the offering of the certificates.

Relevant Parties

Sponsor.......................... Sutton Funding LLC, a Delaware limited liability company. The principal office of the sponsor is located at c/o Global Securitization Services, LLC, 445 Broad Hollow Road, Suite 239, Melville, New York 11747, and its telephone number is (631) 587-4700. Barclays Bank PLC is the administrator of the sponsor. For further information regarding the sponsor, see "The Sponsor" in this prospectus supplement.

Depositor........................ Securitized Asset Backed Receivables LLC, the depositor, is a limited liability company organized under the laws of Delaware. The principal executive office of the depositor is located at 200 Park Avenue, New York, New York 10166, and its telephone number is (212) 412-4000. The depositor is a direct wholly owned subsidiary of Barclays Bank PLC. For further information regarding the depositor, see "The Depositor" in this prospectus supplement.

Issuing Entity................... Securitized Asset Backed Receivables LLC Trust 2006-NC3, a trust that will be formed pursuant to a pooling and servicing agreement, dated as of October 1, 2006, by and among the depositor, the responsible party, the servicer, the trustee and the custodian.

Responsible Party................ NC Capital Corporation, a California corporation. The principal executive office of NC Capital Corporation is located at 18400 Von Karman, Suite 1000, Irvine, California 92612, and its telephone number is (949) 440-7030. See "The Responsible Party" in this prospectus supplement.

Servicer......................... HomEq Servicing Corporation, a New Jersey corporation. The principal executive office of HomEq Servicing Corporation is located at 1620 East Roseville Parkway, Suite 210, Second Floor, Roseville, California 95661, and its telephone number is (916) 339-6267. See "The Servicer" in this prospectus supplement.

HomEq Servicing Corporation will act as servicer of the mortgage loans and, in that capacity, will:

<PAGE>

(1) provide customary servicing functions with respect to the mortgage loans pursuant to a pooling and servicing agreement among the depositor, the servicer, the responsible party and

the trustee;

(2) provide certain reports to the trustee; and

(3) make certain advances.

Trustee.......................... Wells Fargo Bank, National Association, a national banking association. The corporate trust office of the trustee is located (i) for purposes of certificate transfers, at Wells Fargo Center, Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479 and (ii) for all other purposes, at 9062 Old Annapolis Road, Columbia, Maryland 21045, Attention: Client Manager - SABR 2006-NC3, and its telephone number is (410) 884-2000. For further information regarding the trustee, see "The Trustee" in this prospectus supplement.

Custodian........................ Deutsche Bank National Trust Company, a national banking association. The office of the custodian is located at 1761 East St. Andrew Place, Santa Ana, California 92705, Attention: BC062C, and its telephone number is (714) 247-6000. For a description of the custodian, see "The Custodian" in this prospectus supplement.

Swap and Cap Provider............ Barclays Bank PLC, a public limited company registered in England and Wales under number 1026167. The registered head office of Barclays Bank PLC is located at 1 Churchill Place, London, E14 5HP. Barclays Bank PLC maintains a branch office at 200 Park Avenue, New York, New York 10166. The telephone number of the New York branch is (212) 412-4000. See "Description of the Certificates--Interest Rate Cap Agreement" and "--Interest Rate Swap Agreement" in this prospectus supplement.

PMI Insurer...................... Mortgage Guaranty Insurance Corporation, a Wisconsin corporation. The principal office of Mortgage Guaranty Insurance Corporation is located at Milwaukee, Wisconsin, and its telephone number is (800) 558-9900. See "The PMI Insurer" in this prospectus supplement.

Rating Agencies.................. Dominion Bond Rating Service, Fitch, Inc., Moody's Investors Service, Inc. and Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc., will issue ratings with respect to the certificates.

<PAGE>

The following diagram illustrates the various parties involved in the transaction and their functions.

```
 -------------------------------
    NC Capital Corporation
        (Originator)
 -------------------------------
               |
               | Loans
               v
 -------------------------------
      Sutton Funding LLC
          (Sponsor)
 -------------------------------
               |
               | Loans
               v
 -------------------------------
  Securitized Asset Backed
         Receivables                ---------------------------
             LLC                      Wells Fargo Bank, N.A.
         (Depositor)             /          (Trustee)
                                /   ---------------------------
 -------------------------------   /
               |                  /  ---------------------------
               | Loans           /  / HomEq Servicing Corporation
               v                /  /          (Servicer)
 -------------------------------  /  ---------------------------
   Securitized Asset Backed          ---------------------------
          Receivables          ----        Deutsche Bank
     LLC Trust 2006-NC3
```

(Issuing Entity) — National Trust Company (Custodian)

Barclays Bank PLC (Interest Rate Cap and Swap Provider)

Mortgage Guaranty Insurance Corporation (PMI Insurer)

Relevant Dates

Cut-off Date...................... October 1, 2006.

Closing Date...................... On or about October 31, 2006.

Final Scheduled Distribution Date.. The distribution date occurring in September 2036.

Distribution Date.................. Distributions on the certificates will be made on the 25th day of each month, or, if the 25th day is not a business day, on the next business day, beginning in November 2006, to the holders of record on the preceding record date.

The record date for the certificates will be the business day preceding the related distribution date, unless the certificates are issued in definitive form, in which case the record date will be the last business day of the month immediately preceding the related distribution date.

Assets of the Pool

The Mortgage Loans................ The mortgage loans to be included in the trust will be adjustable- and fixed-rate subprime mortgage loans secured by first-lien and second-lien mortgages or deeds of trust on residential real properties. All of the mortgage loans were purchased by the sponsor from NC Capital Corporation (which in turn acquired them from New Century Mortgage Corporation). NC Capital

<PAGE>

Corporation will make certain representations and warranties relating to the mortgage loans.

On the closing date, the sponsor will sell the mortgage loans to the depositor and the depositor will sell the mortgage loans to the trust. The aggregate scheduled principal balance of the mortgage loans as of the cut-off date was approximately $430,021,521, of which approximately 79.12% of the mortgage loans are adjustable-rate mortgage loans and approximately 20.88% are fixed-rate mortgage loans. Approximately 17.98% of the mortgage loans are interest-only.

Approximately 95.21% of the mortgage loans are first-lien mortgage loans, and approximately 4.79% of the mortgage loans are second-lien mortgage loans.

The information regarding the mortgage loans set forth in this prospectus supplement that is based on the principal balance of the mortgage loans as of the cut-off date assumes the timely receipt of principal scheduled to be paid on the mortgage loans on or prior to the cut-off date, with the exception of mortgage loans that are 30 to 59 days delinquent (as defined in this prospectus supplement) comprising approximately 0.39% of the mortgage loans.

The mortgage loans have original terms to maturity of not greater than 360 months, have a weighted average remaining term to scheduled maturity of 355 months as of the cut-off date and have the following approximate characteristics as of the cut-off date:

<PAGE>

structured to meet the investment requirements of limited categories of investors, will experience illiquidity. You should consider that illiquidity may also result from legal or regulatory changes, or from the adoption or change of accounting rules, that affect some or all of the classes of the certificates generally or particular types of investors. Illiquidity can have a severely adverse effect on the prices of securities.

The offered certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended. Accordingly, many institutions that lack the legal authority to invest in securities that do not constitute "mortgage related securities" will not be able to invest in the offered certificates, thereby limiting the market for those certificates. If your investment activities are subject to legal investment laws and regulations, regulatory capital requirements, or review by regulatory authorities, then you may be subject to restrictions on investment in the offered certificates. See "Legal Investment" in this prospectus supplement and in the prospectus.

You should consult your own financial, tax, accounting and legal advisors for assistance in determining the suitability of and consequences to you of the purchase, ownership, and sale of the offered certificates.

The ratings on your certificates could be reduced or withdrawn.

Each rating agency rating the LIBOR certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change. No person is obligated to maintain the ratings at their initial levels. If a rating agency qualifies, reduces or withdraws its rating on one or more classes of the LIBOR certificates, the liquidity and market value of the affected certificates is likely to be reduced.

LIBOR certificates may not be suitable investments.

The LIBOR certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly payments or payment on any specific date. The LIBOR certificates are complex investments that should be considered only by investors who, either alone or with their financial, tax, accounting and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

<PAGE>

## THE MORTGAGE LOAN POOL

The statistical information presented in this prospectus supplement concerning the mortgage loans is based on the pool of mortgage loans as of the cut-off date, which is October 1, 2006. Unless otherwise indicated in this prospectus supplement, the information regarding the mortgage loans set forth in this prospectus supplement that is based on the principal balance of the mortgage loans as of the cut-off date assumes the timely receipt of principal scheduled to be paid on the mortgage loans on or prior to the cut-off date, with the exception of the delinquencies referred to under "--General" below. It is possible that principal prepayments in part or in full may occur between the cut-off date and the closing date. Moreover, certain mortgage loans included in the mortgage loan pool as of the cut-off date may not be included in the final mortgage loan pool due to prepayments in full, or as a result of not meeting the eligibility requirements for the final mortgage loan pool, and certain other mortgage loans may be included in the final mortgage loan pool. As a result of the foregoing, the statistical distribution of characteristics as of the cut-off date and as of the closing date for the final mortgage loan pool may vary somewhat from the statistical distribution of such characteristics as of the cut-off date as presented in this prospectus supplement, although such variance should not be material. In addition, the final mortgage loan pool may vary plus or minus 5% from the cut-off pool of mortgage loans described in this prospectus supplement.

### General

The trust will primarily consist of approximately 2,350 conventional, subprime, adjustable- and fixed-rate, first-lien and second-lien residential mortgage loans with original terms to maturity from the first scheduled payment due date of not more than 30 years, having an aggregate scheduled principal balance of approximately $430,021,521 as of the cut-off date. All the mortgage loans in the trust were acquired by the sponsor from NC Capital Corporation.

The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines of the responsible party. See "The Responsible Party--Underwriting Guidelines" in this prospectus supplement for a summary of the underwriting guidelines for NC Capital Corporation. Because, in general, the underwriting guidelines of the responsible party do not conform to Fannie Mae or Freddie Mac guidelines, the mortgage loans are likely to experience higher rates of delinquency, foreclosure and bankruptcy than if they had been underwritten to a higher standard.

Approximately 20.88% of the mortgage loans in the trust are fixed-rate mortgage loans and approximately 79.12% are adjustable-rate mortgage loans, as described in more detail under "--Adjustable-Rate Mortgage Loans" below. Interest on the mortgage loans accrues on the basis of a 360-day year consisting of twelve 30-day months.

All of the mortgage loans are secured by first or second mortgages, deeds of trust or similar security instruments creating first liens or second liens on residential properties consisting of one-to-four family dwelling units,

<PAGE>

Mortgage Loan in accordance with specified plans or (iii) physical damage to a property securing a PMI Mortgage Loan.

The premiums payable to the PMI Insurer for coverage of each insured mortgage loan will be paid by the servicer from interest collections on the mortgage loans as described under "Description of the Certificates--Distributions of Interest and Principal." These premiums are calculated at the per annum rate described under "Description of the Certificates--Administration Fees" in this prospectus supplement (including any state and local taxes on those premiums) (the "PMI Fee Rate") multiplied by the scheduled principal balance of each mortgage loan insured under such PMI Policy.

THE SPONSOR

The sponsor is Sutton Funding LLC, a Delaware limited liability company ("Sutton"). Sutton, a special purpose entity, was formed in December 2005 for the purpose of acquiring, holding, disposing of and making loans secured by mortgage loans and related assets. Sutton's sole equity member is GSS Holdings (Sutton), Inc., a Delaware corporation ("GSS Sutton"). An affiliate of GSS Sutton, Global Securitization Services, LLC, a Delaware limited liability company, provides limited liability company management services to Sutton pursuant to a management agreement with Sutton. Pursuant to an administration agreement between Sutton and Barclays Bank PLC ("Barclays"), Sutton engages Barclays, as administrator, to manage Sutton's mortgage loan acquisition business as further described below. The registered head office of Sutton is located at 2711 Centreville Road, Suite 400, City of Wilmington, County of New Castle, Delaware 19808. Barclays, in its role as administrator for Sutton, maintains a branch office at 200 Park Avenue, New York, New York 10166, and its telephone number is (212) 412-4000.

As a result of Barclays' administration of Sutton, Sutton may be deemed to be an affiliate of Barclays, the counterparty under the interest rate swap agreement and the interest rate cap agreement, and of the depositor and Barclays Capital Inc., the underwriter.

Sutton purchases closed, first- and subordinate-lien residential mortgage loans for securitization or resale. Sutton does not currently service mortgage loans. Instead, Sutton contracts with other entities to service the mortgage loans on its behalf.

Sutton acquires residential mortgage loans through bulk purchases, generally consisting of mortgage loan pools greater than $200 million. Sutton arranges financing to fund its acquisition of mortgage loan pools on a pool by pool basis. Barclays, as administrator, manages Sutton's operations in connection with the purchase and disposition of mortgage loan assets and arranges financing from lenders to fund Sutton's acquisition of mortgage loan assets. Barclays does not provide financing to Sutton to fund Sutton's acquisition of mortgage loan assets.

Prior to acquiring any residential mortgage loans, Barclays, as administrator for Sutton, conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. Barclays' review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks. The scope of the loan due diligence varies based on the credit quality of the mortgage loans.

The underwriting guideline review entails a review of the mortgage loan origination processes and systems. In addition, such review may involve a consideration of corporate policy and procedures relating to state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors.

<PAGE>

As a sponsor, Sutton acquires mortgage loans and initiates their securitization by transferring the mortgage loans to the depositor or another entity that acts in a similar capacity as the depositor, which loans will ultimately be transferred to the issuing entity for the related securitization. Barclays, who acts as Sutton's administrator, was the sponsor of several securitizations backed by residential mortgage loans, including subprime mortgage loans, from 2004 through May 2006. Sutton has been the sponsor of several securitizations of subprime mortgage loans in 2006. The following table describes the approximate initial principal amount of securities issued in subprime mortgage loan securitizations sponsored by Barclays and Sutton since 2004.

| Year | Approximate Principal Amount of Securities Sponsored by Barclays | Approximate Principal Amount of Securities Sponsored by Sutton |
|---|---|---|
| 2004 | $ 8.19 billion | $0 |
| 2005 | $10.07 billion | $0 |
| 2006 | $ 2.97 billion | $5.75 billion |

STATIC POOL INFORMATION

Barclays, who acts as Sutton's administrator, was the sponsor of several securitizations backed by residential mortgage loans, including subprime mortgage loans, from 2004 through May 2006. Sutton has been the sponsor of several securitizations of subprime mortgage loans in 2006. The following information describes the mortgage loans previously acquired by Barclays for the period prior to May 2006, and by Sutton for the period thereafter.

risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category. It is expected that a substantial portion of the mortgage loans will represent these kinds of exceptions.

THE SERVICER

General

HomEq Servicing Corporation ("HomEq") will act as servicer for the mortgage loans. The servicer will service the mortgage loans in accordance with the pooling and servicing agreement.

On June 22, 2006, Barclays entered into an agreement to purchase the U.S. mortgage servicing business of HomEq from Wachovia Corporation. Completion of the transaction is subject to various conditions including regulatory consents and is expected to close no later than the fourth quarter of 2006. Barclays, the swap provider and cap provider, is an affiliate of the depositor and Barclays Capital Inc., the underwriter, and may be deemed to be an affiliate of Sutton, the sponsor. See "The Sponsor" and "The Depositor" in this prospectus supplement.

HomEq Servicing Corporation

The information in this prospectus supplement with regard to HomEq Servicing Corporation, the servicer, has been provided by HomEq.

HomEq is a nationwide consumer loan servicing company, primarily involved in mortgage loan servicing, with facilities in North Highlands, California, Raleigh, North Carolina and Boone, North Carolina. HomEq is a New Jersey corporation that is a subsidiary of Wachovia Corporation, the fourth largest bank holding company in the United States with assets of approximately $554 billion as of June 30, 2006.

S-52

<PAGE>

HomEq's residential sub-prime and alternative servicing operations are currently rated as "Strong" by S&P. Fitch has rated HomEq "RPS1" as a primary servicer of residential Alt-A and sub-prime products, and "RSS1" as a special servicer. In June 2006, Moody's modified its rating of HomEq from "SQ1" to "SQ1-" as a primary servicer of residential subprime mortgage loans. According to Moody's ratings release regarding HomEq, "the SQ1 rating versus an SQ1- rating is in large part due to the above average servicing stability assessment versus prior reviews where Moody's assessed HomEq's servicing stability as strong. Moody's current servicer stability assessments focus on the servicer's stand-alone financial strength, while giving credit for the support that parents and affiliates may provide." HomEq is an approved Freddie Mac and Fannie Mae servicer.

HomEq and its predecessor have been servicing residential mortgage loans since 1967. At the end of 2002, HomEq began acquiring servicing from third parties, and currently a substantial majority of the loans in HomEq's servicing portfolio are serviced for third parties, including loans in over 70 residential mortgage-backed securities transactions. HomEq has serviced prime, and non-prime mortgage loans and has experience acting as a special servicer performing collections, loss mitigation, default reporting, bankruptcy, foreclosure and REO property management.

Currently, substantially all of HomEq's servicing portfolio consists of non-prime mortgage loans, represented by fixed-rate and adjustable-rate, first and second lien conventional mortgage loans. The following table reflects the size and composition of HomEq's servicing portfolio as of the end of each indicated period. Totals in the table that follows may not sum due to rounding.

S-53

<PAGE>

HomEq Mortgage Loan Servicing Portfolio
Composition and Size

<TABLE>
<CAPTION>

| <S> | Aggregate Principal Balance as of June 30, 2006 <C> | Aggregate Principal Balance as of December 31, 2005 <C> | Aggregate Principal Balance as of December 31, 2004 <C> | Aggregate Principal Balance as of December 31, 2003 <C> |
|---|---|---|---|---|
| Product Type | | | | |
| Fixed Rate 1st Lien | $10,806,139,118 | $ 11,234,562,133 | $ 15,826,596,449 | $ 13,548,719,060 |
| Fixed Rate 2nd Lien | 2,098,987,266 | 1,916,187,771 | 2,448,415,562 | 2,294,855,204 |
| ARM 1st Lien | 29,393,219,272 | 31,639,566,303 | 24,343,482,623 | 8,109,636,956 |
| Real Estate Owned (REO) | 694,577,534 | 434,583,520 | 190,081,298 | 160,333,648 |
| Total | $42,992,923,190 | $ 45,224,899,727 | $ 42,808,375,933 | $ 24,113,544,768 |

</TABLE>

HomEq's Delinquency and Foreclosure Experience

The following tables set forth the delinquency and foreclosure experience of the mortgage loans serviced by HomEq at the end of the indicated periods. The indicated periods of delinquency are based on the number of days past due on a contractual basis. No mortgage loan is considered Delinquent for these purposes until it has not been paid by the next scheduled due date. See the definition of "Delinquent" in the "Glossary" in this prospectus supplement. HomEq's portfolio

| | | | |
|---|---|---|---|
| Period of Delinquency | | | |
| 30 to 59 days | 20,831 | 2,378,568 | 5.56% |
| 60 to 89 days | 6,575 | 761,639 | 1.78% |
| 90 days or more | 3,285 | 324,419 | 0.76% |
| Total Delinquencies | 30,691 | 3,464,625 | 8.09% |
| Foreclosures | 7,006 | 703,929 | 1.64% |
| Bankruptcies | 12,181 | 778,816 | 1.82% |
| Total Foreclosures and Bankruptcies | 19,187 | 1,482,745 | 3.46% |
| Real Estate Owned | 2,528 | 190,081 | 0.44% |
| Total Portfolio | 353,614 | $42,808,576 | 100.00% |

| | As of December 31, 2003 | | |
|---|---|---|---|
| | Number of Loans | Principal Balance | Percent by Principal Balance |
| Current Loans | 234,635 | $21,488,618 | 89.11% |
| Period of Delinquency | | | |
| 30 to 59 days | 13,709 | 1,029,985 | 4.27% |
| 60 to 89 days | 3,838 | 276,720 | 1.15% |
| 90 days or more | 2,775 | 185,249 | 0.77% |
| Total Delinquencies | 20,322 | 1,491,954 | 6.19% |
| Foreclosures | 5,101 | 363,205 | 1.51% |
| Bankruptcies | 11,322 | 609,434 | 2.53% |
| Total Foreclosures and Bankruptcies | 16,423 | 972,639 | 4.03% |
| Real Estate Owned | 2,597 | 160,334 | 0.66% |
| Total Portfolio | 273,977 | $24,113,545 | 100.00% |

HomEq's Policies and Procedures

Upon the acquisition of servicing rights, HomEq coordinates with the prior servicer of the mortgage loans to achieve a transfer of servicing activities with minimal impact to mortgagors. The transfer and boarding process involves notifying the mortgagors of the servicing transfer, transferring electronic files containing loan set up information and a payment history, if applicable. In addition, loan documents are stored either in hard copy or electronically imaged form for future review and reference. All boarding activities are regularly reviewed to assure best practices are employed throughout the boarding process.

Once a mortgage loan has been boarded, HomEq begins to collect mortgage payments in adherence to the applicable servicing agreement and customary industry standards. HomEq's collections strategy is based on a predictive behavioral scoring system that enables collection efforts to be focused on mortgage loans that represent the greatest risks within the servicing portfolio and is intended to address potential collection problems as soon as possible before they migrate into more costly delinquency, foreclosure and REO status. The predictive behavioral scoring system is integrated with a predictive dialer and phone switch to facilitate incoming and outgoing calls with mortgagors. Outgoing calls range from an introduction of HomEq as servicer to advanced collection activities. Incoming calls are directed by the phone switch based upon the status of the loan to the appropriate customer service or collections representative.

<PAGE>

In the event collection efforts are not successful, HomEq determines whether foreclosure proceedings are appropriate. HomEq considers a number of factors, including the related mortgagor's payment history, such mortgagor's ability and willingness to pay, the condition and occupancy of the related property, the lien position of the mortgage loan and the amount of equity in the property. HomEq also considers the costs associated with taking possession, interest and expense carry, repairs and marketing. Unless impractical, HomEq seeks to reduce the cycle time and loss severity of foreclosure actions in a manner that meets or exceeds published Fannie Mae timelines.

If a borrower goes into bankruptcy, HomEq will pursue appropriate steps to process the case quickly in an effort to increase monthly cash flows and reduce loss severity, duration and servicing costs. HomEq maintains internal controls to monitor the status of all bankruptcies, whether handled internally or through a multi-state network of attorneys specializing in bankruptcy proceedings in the state of the mortgaged property. HomEq utilizes electronic notifications and case management tools in connection with its bankruptcy account management.

When HomEq acquires title to a mortgaged property through foreclosure proceedings, it utilizes the services of its affiliate, Horizon Management Services, Inc. ("Horizon"), a wholly owned subsidiary of Wachovia Bank, N.A., which specializes in REO management services. Horizon ascertains property occupancy, obtains appraisals and broker price opinions, determines property condition and whether the costs necessary to preserve or enhance property

divergent action.

None of the trust, the depositor, the servicer or the trustee will have any responsibility for any aspect of the records relating to or distributions made on account of beneficial ownership interests of the book-entry certificates held by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

Although DTC, Clearstream and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of certificates among participants of DTC, Clearstream and Euroclear, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. See "Description of the Securities--Book-Entry Registration of Securities" in the prospectus.

See also the attached Annex I for certain information regarding U.S. federal income tax documentation requirements for investors holding certificates through Clearstream or Euroclear (or through DTC if the holder has an address outside the United States).

<PAGE>

Definitive Certificates

The LIBOR Certificates, which will be issued initially as book-entry certificates, will be converted to definitive certificates and reissued to beneficial owners or their nominees, rather than to DTC or its nominee, only if (a) DTC or the depositor advises the trustee in writing that DTC is no longer willing or able to properly discharge its responsibilities as depository with respect to the book-entry certificates and the trustee or the depositor is unable to locate a qualified successor or (b) the depositor, at its option (but with the trustee's consent), notifies DTC of its intent to terminate the book-entry system through DTC and, upon receipt of notice of such intent from DTC, the DTC participants holding beneficial interests in the certificates agree to initiate such termination.

Upon the occurrence of any event described in the immediately preceding paragraph, the trustee will be required to notify all participants of the availability through DTC of definitive certificates. Upon delivery of definitive certificates, the trustee will reissue the book-entry certificates as definitive certificates to beneficial owners. Distributions of principal of, and interest on, the book-entry certificates will thereafter be made by the trustee, or a paying agent on behalf of the trustee, directly to holders of definitive certificates in accordance with the procedures set forth in the pooling and servicing agreement.

Definitive certificates will be transferable and exchangeable at the offices of the trustee, its agent or the certificate registrar designated from time to time for those purposes. As of the closing date, the trustee designates its offices located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479 for those purposes. No service charge will be imposed for any registration of transfer or exchange, but the trustee may require distribution of a sum sufficient to cover any tax or other governmental charge imposed in connection with the transfer or exchange.

Assignment of the Mortgage Loans

Pursuant to a mortgage loan purchase and warranties agreement, NC Capital Corporation sold the mortgage loans, without recourse, to Sutton, and Sutton will sell, transfer, assign, set over and otherwise convey the mortgage loans, including all principal outstanding as of, and interest due and accruing after, the close of business on the cut-off date, without recourse, to the depositor on the closing date. Pursuant to the pooling and servicing agreement, the depositor will sell, without recourse, to the trust, all right, title and interest in and to each mortgage loan, including all principal outstanding as of, and interest due after, the close of business on the cut-off date. Each such transfer will convey all right, title and interest in and to (a) principal outstanding as of the close of business on the cut-off date (after giving effect to payments of principal due on that date, whether or not received) and (b) interest due and accrued on each such mortgage loan after the cut-off date. However, Sutton will not convey to the depositor, and will retain all of its right, title and interest in and to (x) principal due on each mortgage loan on or prior to the cut-off date and principal prepayments in full and curtailments (i.e., partial prepayments) received on each such mortgage loan prior to the cut-off date and (y) interest due and accrued on each mortgage loan on or prior to the cut-off date.

Delivery of Mortgage Loan Documents

In connection with the transfer and assignment of each mortgage loan to the trust, the depositor will cause to be delivered to the custodian, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file:

(a) the original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee;

<PAGE>

(b) the original of any guaranty executed in connection with the mortgage note (if provided);

(c) the related original mortgage and evidence of its recording or, in certain limited circumstances, a copy of the mortgage certified by the

originator, escrow company, title company, or closing attorney;

(d) originals of all assumption, modification, consolidation and extension agreements, with evidence of recording on them (if provided);

(e) the mortgage assignment(s), or copies of them certified by the applicable originator, escrow company, title company, or closing attorney, if any, showing a complete chain of assignment from the originator of the related mortgage loan to the last endorsee--which assignment may, at the originator's option, be combined with the assignment referred to in clause (f) below;

(f) a mortgage assignment in recordable form, which, if acceptable for recording in the relevant jurisdiction, may be included in a blanket assignment or assignments, of each mortgage from the last endorsee in blank;

(g) an original or a copy of a mortgagee title insurance policy or, in the event the policy is unavailable, a copy of the related policy binder or commitment for title insurance; and

(h) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided).

Pursuant to the pooling and servicing agreement, the custodian will agree to execute and deliver on or prior to the closing date an acknowledgment of receipt of the original mortgage note, item (a) above, with respect to each of the mortgage loans delivered to the custodian, with any exceptions noted. The custodian will agree, for the benefit of the holders of the certificates, to review, or cause to be reviewed, each mortgage file within ninety days after the closing date--or, with respect to any Substitute Mortgage Loan delivered to the custodian, within 30 days after the receipt of the mortgage file by the custodian--and to deliver a certification generally to the effect that, as to each mortgage loan listed in the schedule of mortgage loans,

- all documents required to be reviewed by it pursuant to the pooling and servicing agreement are in its possession;
- each such document has been reviewed by it and appears regular on its face and relates to such mortgage loan;
- based on its examination and only as to the foregoing documents, certain information set forth on the schedule of mortgage loans accurately reflects the information set forth in the mortgage file delivered on such date; and
- each mortgage note has been endorsed as provided in the pooling and servicing agreement.

If the custodian, during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file that is not executed, has not been received or is unrelated to the mortgage loans, or that any mortgage loan does not conform to the requirements above as set forth in the review criteria set forth in the pooling and servicing agreement, the custodian is required to promptly so notify the responsible party, the servicer, the trustee and the depositor in writing. The responsible party will be required to use reasonable efforts to cause to be remedied a material defect in a document constituting part of a mortgage file of which it is so notified by the custodian. If, however, within thirty days after the depositor's notice of the defect, the responsible party has not caused the defect to be remedied, the

<PAGE>

responsible party will be required to either (a) substitute a Substitute Mortgage Loan for the defective mortgage loan, or (b) repurchase the defective mortgage loan. The substitution or repurchase is required to be effected in the same manner as a substitution or repurchase for a material breach of a mortgage loan representation and warranty, as described below under "--Representations and Warranties Relating to the Mortgage Loans." The obligation of the responsible party to cure the defect or to substitute or repurchase the defective mortgage loan and to indemnify for such breach will constitute the sole remedies available to the holders of the certificates and the trustee relating to the defect.

Representations and Warranties Relating to the Mortgage Loans

Pursuant to the pooling and servicing agreement, the responsible party will make representations and warranties, with respect to each mortgage loan it sold to the sponsor, as of the closing date, the servicing transfer date (September 30, 2006) or another date as specified, including, but not limited to:

(1) As of the servicing transfer date, except with respect to the Delinquent mortgage loans described under "The Mortgage Loan Pool--General" in this prospectus supplement, no payment required under the mortgage loan is more than 30 days Delinquent nor has any payment under the mortgage loan been more than 30 days Delinquent at any time since the origination of the mortgage loan;

(2) As of the servicing transfer date, except as described in clause (1) above with respect to certain Delinquent mortgage loans, there are no defaults in complying with the terms of the mortgage and all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable;

(3) As of the servicing transfer date (i) the terms of the mortgage note and

Alanis000320

# ADJUSTABLE RATE BALLOON NOTE

2 Year Rate Lock

(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

I certify this copy is a true and correct copy of the original instrument. Mission Title By

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

June 15, 2006 [Date] San Antonio [City] Texas [State]

13230 Hunters view, San Antonio, TX 78230 [Property Address]

NOTE

1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 193,500.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is New Century Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 9.925 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on August 1, 2006. My monthly payments will be based on an assumed 40 -year amortization period (the "Amortization Period"). I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on 07/01/2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 18400 Von Karman, Suite 1000, Irvine, CA 92612

or at a different place if required by Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 1,631.71 . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

1008511112

Initials MKA

Alanis000320

Ex-D

Alanis00321

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the first day of July, 2008, and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six And Five Hundredth(s) percentage points (6.050 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe on the Change Date in full over the remaining Amortization Period at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Notwithstanding the Amortization Period applicable to this Note, the entire unpaid principal amount will be fully due and payable on the Maturity Date.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.925% or less than 9.925%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One And One-half percentage point(s) (1.500 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 16.925%.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

1008511112

Initials MKA

Alanis00321

Alanis000322

7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

1008511112

Initials: [signature]

Alanis000323

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

| | |
|---|---|
| _____ (Seal) -Borrower<br>NANCY ALANIS | _____ (Seal) -Borrower |
| _____ (Seal) -Borrower | _____ (Seal) -Borrower |
| _____ (Seal) -Borrower | _____ (Seal) -Borrower |
| _____ (Seal) -Borrower | _____ (Seal) -Borrower |

*[Sign Original Only]*

1008511112

Wells Fargo 00412

Alanis000323

FILED
10/24/2014 3:41:45 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Roxanne Mujica

Alanis000324

CAUSE NO. 2011-CI-02839

| | | |
|---|---|---|
| NANCY ALANIS, *Plaintiff* | § | IN THE DISTRICT COURT |
| v. | § | |
| WELLS FARGO BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2006 SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-NC3 MORTGAGE PASS THROUGH CERTIFICATES SERIES 2006 NC3; and HOMEQ SERVICING CORPORATION; and OCWEN LOAN SERVICING, LLC, *Defendants* | § | 45th JUDICIAL DISTRICT<br>OF BEXAR COUNTY, TEXAS |

**RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DECLARATORY JUDGMENT, AND COUNTER-MOTION FOR FINAL SUMMARY JUDGMENT BY WELLS FARGO BANK NATIONAL ASSOCIATION, AS TRUSTEE, OCWEN LOAN SERVICING, LLC, AND MACKIE WOLF ZIENTZ & MANN, PC**

Defendant/Counter-Plaintiff Wells Fargo Bank National Association, as Trustee for the Pooling and Servicing Agreement Dated as of October 1, 2006 Securitized Asset Backed Receivables LLC Trust 2006-NC3 Mortgage Pass Through Certificates Series 2006 NC3, Defendant Ocwen Loan Servicing, LLC, and Defendant Mackie Wolf Zientz & Mann, PC (collectively, "Defendants") file this their Response to Plaintiff's Motion for Partial Summary Judgment and Declaratory Judgment, and Counter-Motion for Final Summary Judgment, and respectfully show as follows:

Alanis000324

Ex-E

Alanis000325

# EXHIBIT A

Alanis000325